# Exhibit 2



U.S. Department of Justice
Antitrust Division



# Antitrust Division Manual

Fifth Edition  |  Last Updated April 2015



# Disclaimer

This Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. No limitations are hereby placed on otherwise lawful investigative and litigative prerogatives of the Department of Justice.

# Introduction

I am pleased to release an updated edition of the Antitrust Division Manual. The incorporated revisions reflect changes in the statutes, rules, and other authority that govern the Division, as well as changes in certain of the Division's practices and procedures.

The Division Manual guides the work of the Division staff and has long been considered a useful resource for antirust practitioners in counseling the business community about the Division's enforcement practices. The Division seeks to provide clarity, transparency, and insight about the Division's processes and procedures and the Division Manual is an important tool for achieving that purpose. This edition of the Manual includes information about the reorganization of our Front Office operations. Since the last edition of the Manual, we have restructured the Office of Operations, which now includes the Director of Civil Enforcement and the Director of Criminal Enforcement, who report to the Deputy Assistant Attorney General for Civil and Criminal Operations. We have also created a new senior level position, Director of Litigation, who is responsible for ensuring that the Division maintains the highest standards in all of its litigation. The Manual also describes the new Office of General Counsel, which, among other responsibilities, oversees the Division's compliance function. These changes are intended to enhance the Division's effectiveness in fulfilling its mission to enforce the antitrust laws and thereby preserve competition and protect American consumers.

While this Manual describes the Division's functions, it is the Division staff who carry out these functions on a daily basis. The Division is fortunate to have an exceptionally dedicated and talented group of attorneys, economists, and support personnel who collectively ensure that our mission is fulfilled in every respect.

Joseph Wayland
Acting Assistant Attorney General
Antitrust Division
November 2012

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 6 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter I. Organization and Functions of the Antitrust Division

# Chapter I.    Organization and Functions of the Antitrust Division

A.   Creation ...........................................................................................................I-2
B.   Purpose ..........................................................................................................I-2
C.   Organization ...................................................................................................I-3
    1.   Office of the Assistant Attorney General .................................................I-4
        a.   Assistant Attorney General ...............................................................I-4
        b.   Deputy Assistant Attorneys General .................................................I-4
        c.   Directors of Enforcement .................................................................I-5
    2.   Office of General Counsel .........................................................................I-5
    3.   Office of Operations .................................................................................I-6
    4.   Washington Civil Sections .........................................................................I-6
        a.   Litigation I Section (Lit I) ..................................................................I-6
        b.   Litigation II Section (Lit II) ................................................................I-7
        c.   Litigation III Section (Lit III) .............................................................I-7
        d.   Networks and Technology Enforcement Section (NTES) ...................I-7
        e.   Telecommunications and Media Enforcement Section (TEL) ............I-7
        f.   Transportation, Energy, and Agriculture Section (TEA) ...................I-7
    5.   Criminal Offices .......................................................................................I-8
    6.   Economic Analysis Group .........................................................................I-8
    7.   Specialized Components ...........................................................................I-9
        a.   Appellate Section .............................................................................I-9
        b.   Foreign Commerce Section ...............................................................I-9
        c.   Legal Policy Section .........................................................................I-10
        d.   Executive Office and Information Systems Support Group ..............I-10
    8.   Antitrust Division Library System ...........................................................I-11

## A.    Creation

The Division's organizational roots can be traced to the creation in March 1903 of an Assistant to the Attorney General to take charge of all lawsuits filed under the antitrust and interstate commerce laws and to assist the Attorney General and the Solicitor General in the conduct of the general executive work of the Department. The post was created under President Theodore Roosevelt and Attorney General Philander Knox.

With the growth of the economy and corporate enterprise during the early part of the 20th century, it became evident that the Department of Justice needed its own corps of specialists in antitrust law to cope with the increasing complexities of antitrust enforcement. Consequently, in 1933, under the administration of President Franklin D. Roosevelt and Attorney General Homer S. Cummings, the Antitrust Division was established. At that time, the Division employed 16 lawyers and had a budget of $142,000.

Harold M. Stephens was appointed the first Assistant Attorney General in charge of the Antitrust Division. Among the individuals who were in charge of the Division were John Lord O'Brian, William Donovan, Robert H. Jackson, Thurmond Arnold, and Tom Clark.

## B.    Purpose

The mission of the Antitrust Division is the promotion and maintenance of competition in the American economy. Private anticompetitive conduct is subject to criminal and civil actions under the Sherman and Clayton Acts, statutes that prohibit conspiracies in restraint of trade, monopolization, and anticompetitive mergers. Through participation in Executive Branch activities and in regulatory and legislative processes, the Division seeks to ensure that Government action is procompetitive or not unnecessarily anticompetitive. Through its own litigation, *amicus* filings, and in a variety of other public forums, the Division also seeks to guide the advancement of antitrust jurisprudence.

The primary functions and goals of the Division include:

- General criminal and civil enforcement of the Federal antitrust laws and other laws relating to the protection of competition and the prohibition of restraints of trade and monopolization, including investigation of possible violations of antitrust laws, conduct of grand jury proceedings, issuance and enforcement of civil investigative demands, and prosecution of all litigation that arises out of such civil and criminal investigations.

- Intervention or participation before administrative agencies functioning wholly, or partly, under the regulatory statutes in proceedings requiring consideration of the antitrust laws or competitive policies, including such agencies as the Commodities

CASE 0:23-cv-03009-JRT-JFD    Doc. 19-2    Filed 10/06/23    Page 8 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter I. Organization and Functions of the Antitrust Division

Futures Trading Commission, Federal Communications Commission, Federal Energy Regulatory Commission, Federal Maritime Commission, Federal Reserve Board, Nuclear Regulatory Commission, Securities and Exchange Commission, and Surface Transportation Board, except proceedings referred to any agency by a Federal court as incident to litigation being conducted under the supervision of another division within the Department.

- Advocacy of procompetitive policies before other branches of government, including:

    o   Developing and presenting legislative proposals of the Department relating to the antitrust laws and competition generally and responding to requests for advice and comments on such matters from Congress and other agencies.

    o   Advising the President, the departments, and other agencies of the Executive Branch on the competitive implications of governmental action.

    o   Assembling information and preparing reports required or requested by the Congress or the Attorney General as to the effect of various Federal laws or programs upon the maintenance and preservation of competition under the free enterprise system.

In addition to these primary functions, additional functions of the Antitrust Division are codified at 28 C.F.R. §§ 0.40, 0.41.

## C.    Organization

The official organizational structure of the Division is established in a formal organization chart approved by the Attorney General and Congress. The Division is supervised by an Assistant Attorney General. The Assistant Attorney General is nominated by the President and confirmed by the Senate. The Assistant Attorney General is assisted by a designated number of Deputy Assistant Attorneys General who may be either career or noncareer employees; at least one (currently the Deputy Assistant Attorney General for Criminal Enforcement) traditionally has been a career employee. The Division's litigating sections and offices report to the Deputy Assistant Attorney General for Civil and Criminal Operations. The Director of Civil Enforcement, Director of Criminal Enforcement, Director of Litigation, and the Director of Economics, who are career employees, have additional supervisory authority for the civil, criminal, and economic programs, respectively.

The Division has eleven litigating components: six civil sections in Washington and five offices and sections that primarily handle criminal matters, located in Chicago, New York, San Francisco, and Washington, D.C.  These eleven components each typically consist of a staff of attorneys and various support personnel including paralegals and

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 9 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter I. Organization and Functions of the Antitrust Division

secretaries. Each section and office is headed by a chief and one or more assistant chiefs, and these components carry out the bulk of the Division's investigatory and litigation activities. The Division has several other components that perform specialized roles, including three economic sections, the Appellate Section, the Legal Policy Section, the Foreign Commerce Section, and the Executive Office that oversees administrative matters for the entire Division.

## 1.      Office of the Assistant Attorney General

### a.      Assistant Attorney General

The Assistant Attorney General in charge of the Antitrust Division is responsible for leadership and oversight of all of the Division's programs and policies and is the Division's chief representative. The Assistant Attorney General is assisted by Deputy Assistant Attorneys General (DAAGs). In addition, the Assistant Attorney General may be assisted by a Chief of Staff, who is responsible for managing the Office of the Assistant Attorney General. The Assistant Attorney General may be assisted by special advisors and other counsel.

### b.      Deputy Assistant Attorneys General

The Division's DAAGs are of equal rank. The Assistant Attorney General may designate one of them to exercise the powers of Assistant Attorney General in his or her absence. In some cases, one of the Deputies may be given the title of "Principal Deputy"; the Principal Deputy is, in effect, "first among equals" among the Deputies and will typically assume the powers of the Assistant Attorney General in the Assistant Attorney General's absence. If a vacancy occurs in the Assistant Attorney General position, one of the deputies will be designated to serve as Acting Assistant Attorney General until a new Assistant Attorney General is nominated by the President and confirmed by the Senate.

The Deputy Assistant Attorneys General (DAAGs) currently include: the DAAG for Criminal and Civil Operations (hereinafter the DAAG for Operations), the DAAG for Civil Enforcement, the DAAG for Litigation, the DAAG for Criminal Enforcement, and the DAAG for Economic Analysis. The DAAG for Operations oversees operational matters including investigative case planning and management, matter prioritization, and resource allocation, in consultation with all other DAAGs and the AAG. Every open investigation is overseen by a DAAG or such other senior counsel as may be designated by the AAG (the "Assigned DAAG" or "Assigned Manager"). The Assigned DAAG or Assigned Manager works with section management to coordinate and supervise matters. The DAAG for Criminal Enforcement is typically a career employee.

**c.**     **Directors of Enforcement**

There are three attorney Directors of Enforcement—the Director of Civil Enforcement, the Director of Criminal Enforcement, and the Director of Litigation, as well as an economist Director of Economics, who are career employees. There may also be Deputy Directors. The Directors of Enforcement have direct supervisory authority over the activities of the various litigating sections and offices; they work closely with the DAAG for Operations, as well as the Assigned DAAG or Assigned Manager, in overseeing Division activities. Each Director is responsible for matters arising out of the various Division components that fall within his or her particular area of responsibility. There are four special assistants to the Directors of Civil and Criminal Enforcement; these assistants generally serve for two years. The four special assistants each are assigned several sections and field offices and play a liaison role between those sections and the Directors, in addition to performing other activities assigned by the Directors.

**2.     Office of General Counsel**

The General Counsel reports to and advises the AAG on the Division's jurisdiction and authority and interprets statutes such as the Hart-Scott-Rodino Act, Tunney Act, and Antitrust Civil Process Act. *See* Chapter II. In this role, the General Counsel also provides guidance to staff on broad recurring issues such as preliminary injunction standards, contacts with represented persons and experts, leniency applications, victims' rights, and privilege and sentencing issues. The General Counsel also creates and maintains tools, such as litigation and remedy databases and the Division Manual.

The General Counsel provides advice regarding drafting Division consent decrees and is tasked with ensuring that all Division judgments are enforced. This responsibility includes oversight of remedy policy documents; review of issues arising out of civil and criminal settlements; and oversight of and coordination with appropriate DAAGs, senior counsel, and sections to enforce parties' compliance, including through ongoing review and evaluation of complaints and related recommendations to the AAG.

The General Counsel also has oversight responsibilities over certain of the Division's ethical and professional obligations, including compliance with the Freedom of Information Act, the Privacy Act, and the Department's *Touhy* Regulations. The General Counsel oversees the Division's responses to requests and inquiries from the Office of the Inspector General, Office of Professional Responsibility, Government Accountability Office (GAO) and any internal investigations, and coordinates responses to suits brought against, or subpoenas issued to, the Division.

The Office of General Counsel includes the Civil and Criminal Deputy General Counsel, the Division's Ethics Officer, and the Freedom of

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 11 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter I. Organization and Functions of the Antitrust Division

Information Act/Privacy Act Unit (FOIA/PA Unit); in addition, the General Counsel may seek assistance from other Division staff as necessary to carry out the General Counsel's responsibilities.

The FOIA/PA Unit receives, evaluates, and processes all Freedom of Information Act and Privacy Act requests made to the Division. It also responds to requests for information by state attorneys general pursuant to Section 4F of the Clayton Act, 15 U.S.C. § 15f(b). *See* Chapter VII, Part C.3.a (describing 4F procedures). The Antitrust Documents Group of the FOIA/PA Unit also maintains and indexes pleadings, business review letters, and other frequently used files. *See* Chapter VI, Part A.3 (describing the FOIA/PA Unit); Chapter VII, Part G (describing FOIA procedures).

### 3.   Office of Operations

The Office of Operations, overseen by the DAAG for Operations, supports the Directors of Civil and Criminal Enforcement and Litigation. The Office of Operations has supervisory authority over matters within litigating sections and offices, oversight of resource allocation, and coordinates the administrative policies and procedures affecting the Division's operations and includes certain administrative and support units including: the Premerger Notification Unit/FTC Liaison Office, the Paralegal Unit, and the Training Unit. These units report to the Directors of Civil and Criminal Enforcement and Litigation.

The functions of the Premerger Notification Unit/FTC Liaison Office are described in Chapter VII, Part A. The Paralegal Unit provides paralegal support on request to investigations and cases handled in the litigating sections and offices. The Training Unit coordinates training opportunities for Division personnel. *See* Chapter VI, Part A.7 (describing Division training programs).

### 4.   Washington Civil Sections

Most of the civil investigative activity and litigation of the Division is carried out by the six Washington, D.C. civil litigating sections. Each of the civil sections is responsible for reviewing proposed mergers and investigating civil nonmerger activity in their assigned portfolio of industries. The sections' duties include all phases of the enforcement process—investigation, litigation, and settlement. The sections cooperate with state and international enforcement authorities and other Federal agencies as necessary. Additionally, as a supplement to the enforcement process, the civil sections engage in competition advocacy when appropriate. A brief description of the activities of each section follows.

#### a.   Litigation I Section (Lit I)

Lit I is responsible for healthcare, insurance, pulp, paper, timber, photography, film, appliances, food products, and cosmetics industries.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 12 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter I. Organization and Functions of the Antitrust Division

Lit I has developed ongoing relationships with the Department of Health and Human Services and the Centers for Medicare and Medicaid Services.

**b.      Litigation II Section (Lit II)**

Lit II is responsible for metals, banking, avionics and aeronautics, defense, road and highway construction, industrial equipment, and waste industries. Lit II has developed ongoing relationships with the Federal Reserve Board and the Department of Defense and also works with the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency as needed.

**c.      Litigation III Section (Lit III)**

Lit III is responsible for the entertainment and media industries. It focuses primarily on motion pictures, music, publishing, radio, television, newspapers, advertising, sports, credit cards, and real estate. Lit III works with the Copyright Office, the Federal Communications Commission, Housing and Urban Development, and the Treasury Department as needed.

**d.      Networks and Technology Enforcement Section (NTES)**

NTES is responsible for computer hardware and software, high technology component manufacturing, Internet-related businesses, financial services, debit cards, professional associations, and the securities industry. NTES has developed ongoing relationships with a variety of Federal agencies and departments including the Securities and Exchange Commission, the Federal Reserve Board, Commerce Department (Internet domain names), and Commodities Futures Trading Commission. NTES also engages in competition advocacy with state authorities issuing regulations relating to the practice of law.

**e.      Telecommunications and Media Enforcement Section (TEL)**

TEL is responsible for telecommunications equipment manufacturers and landline, wireless, and satellite telecommunications service providers. TEL has developed an ongoing relationship with the Federal Communications Commission (FCC) and coordinates merger reviews with FCC staff.

**f.      Transportation, Energy, and Agriculture Section (TEA)**

TEA is responsible for domestic and international aviation; railroad, trucking, and ocean shipping; electricity; hotel, restaurant, and travel services; oil field services; agricultural biotech; and food products, crops, seeds, fish, and livestock. TEA participates in proceedings before such agencies as the Federal Maritime Commission, Federal Energy Regulatory Commission, Environmental Protection Agency, and Department of Agriculture. TEA is active in legislative activities relating to the deregulation of various transportation, energy, and agricultural

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 13 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter I. Organization and Functions of the Antitrust Division

industries, and prepares a variety of reports to Congress and the Executive Branch on policy issues related to those commodities.

### 5.    Criminal Offices

Three offices of the Antitrust Division—located in Chicago, New York, and San Francisco—and two sections in Washington, D.C. are responsible for conducting criminal investigations and litigation. Some of these offices also handle civil merger and nonmerger matters, depending on resource availability and particular expertise. These offices and the two Washington, D.C. criminal sections handle all phases of the enforcement process—investigation, litigation, settlement, and sentencing and also act as the Division's field liaison with U.S. Attorneys, state attorneys general, and other law enforcement agencies within their areas. These offices and sections investigate and prosecute regional, national, and international antitrust conspiracies and related offenses.  The offices and sections are assigned the following territories:

- Chicago Office: North Dakota, South Dakota, Nebraska, Colorado, Kansas, Missouri, Iowa, Minnesota, Wisconsin, Illinois, Indiana, Ohio, and Michigan.

- New York Office: Maine, Vermont, New Hampshire, New York, Massachusetts, Rhode Island, Connecticut, New Jersey, and Pennsylvania.

- San Francisco Office: Washington, Oregon, California, Nevada, Idaho, Montana, Wyoming, Utah, Arizona, New Mexico, Alaska, and Hawaii.

- Washington Criminal I Section: District of Columbia, Maryland, Delaware, West Virginia, Virginia, Kentucky, Tennessee, North Carolina, South Carolina, Puerto Rico, and Florida.

- Washingtion Criminal II Section: District of Columbia, Georgia, Alabama, Mississippi, Louisiana, Arkansas, Oklahoma, Texas, and the Virgin Islands.

### 6.    Economic Analysis Group

The Economic Analysis Group (EAG) is comprised of three sections, the Economic Litigation Section (ELS), the Economic Regulatory Section (ERS), and the Competition Policy Section (CPS) under the oversight of the Director of Economics, who is a career employee. The economic sections do not have investigative responsibilities that correlate directly with those of specific legal sections. Instead, matters are assigned to economist-managers primarily as a result of their industry experience, and those managers draw on EAG staff in any of the sections to undertake the analysis. Thus, it is not unusual for a matter to be under the economic supervision of a manager in one section, but staffed by economists from the other two sections.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 14 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Chapter I. Organization and Functions of the Antitrust Division

The economic issues most often analyzed by all three sections include the competitive effect of mergers and acquisitions, the competitive effects of various alleged trade restraints and proposed regulatory changes, and economic aspects of competition advocacy efforts undertaken by the Division. As part of this competition advocacy effort, economists work extensively with Foreign Commerce Section attorneys on a variety of international matters. Most notable in recent years has been assistance to foreign governments around the world in writing antitrust laws, training antitrust officials, and evaluating specific competitive issues. Economists are assigned to all civil enforcement, regulatory proceeding, and competition advocacy matters and participate fully in them from the initial investigative stage through their final resolution. Economists are also available to serve as expert witnesses in court and agency proceedings.

ELS also includes the Corporate Finance Unit (CFU) which provides financial analyses of failing firm defenses, divestitures, and efficiencies defenses; makes recommendations as to fines; and reviews financial issues involved in damage analyses and other issues requiring financial, accounting, and corporate analysis. Financial analysts are assigned to a matter as soon as it is apparent that issues requiring their assistance are present. A full description of the activities of the CFU is contained in Chapter VI, Part A.6.b.

### 7.    Specialized Components

#### a.    Appellate Section

The Appellate Section reports to the DAAG for Operations, or as otherwise directed by the AAG. The Section represents the Division in all appeals to the United States Courts of Appeals and, in conjunction with the Office of the Solicitor General, all appeals before the United States Supreme Court. This responsibility includes filing *amicus* briefs in selected private antitrust cases and in other cases where the Division's competition advocacy is considered appropriate. In addition to antitrust matters, the Appellate Section represents the United States as statutory respondent in proceedings to review orders of several Federal agencies, such as the Surface Transportation Board and the Federal Communications Commission. Procedures relating to appeals in which the Division is involved, or may have an interest, are described in Chapter IV, Part G.

#### b.    Foreign Commerce Section

The Foreign Commerce Section reports to the DAAG for Operations, or as otherwise directed by the AAG. The Section assists other sections in matters with international aspects and is primarily responsible, at the staff level, for the development of Division policy on international antitrust enforcement and competition issues. The Foreign Commerce Section handles the Division's relations and cooperation with

international organizations and non-U.S. antitrust enforcement agencies, including its compliance with notification and other obligations pursuant to various bilateral and multilateral agreements to which the United States is a party. The Division's activities regarding international organizations and notification procedures are more fully described in Chapter VII, Part D. Foreign Commerce also coordinates the Division's duties under the Export Trading Company Act of 1982, which is described in Chapter III, Part H.3.

### c.   Legal Policy Section

The Legal Policy Section reports to the DAAG for Operations, or as otherwise directed by the AAG. Legal Policy provides analyses of complex antitrust policy matters, including issues involving the intersection of antitrust and intellectual property law and policy, for the Division and Department, as well as for submission to Congress. The Legal Policy Section also coordinates the Division's legislative program and handles long-range planning projects and programs of special interest to the Assistant Attorney General. Legal Policy is involved in a broad spectrum of activities, including conducting studies and making recommendations relating to Division enforcement policies, coordinating with the Federal Trade Commission on potential premerger filing violations, advising on legal and policy considerations in Division investigations and case recommendations, and developing and researching legislative matters that are of interest to the Division. The Legal Policy Section's Legislative Unit is primarily responsible for coordinating the Division's relations with Congress and for responding to congressional requests and inquiries of the Division. Legal Policy coordinates with and assists the General Counsel on issues within the General Counsel's portfolio.

### d.   Executive Office and Information Systems Support Group

The Executive Office formulates and administers the Division's budget and fiscal responsibilities, manages its reporting and records, handles personnel matters, coordinates procurement and contracting, manages facilities and services, oversees its library system, and provides information systems services for all Division activities. The Information Systems Support Group (ISSG) is located within the Executive Office and is responsible for providing automated services and resources to handle information in support of the Division's attorneys, economists, and managers. ISSG oversight includes: automated litigation support and economic analysis, management information systems, and office automation systems. ISSG provides these support services through both Government and contract personnel. ISSG makes extensive use of computer and database management systems. Chapter VI, Part A.6 contains a description of ISSG services.

### 8.      Antitrust Division Library System

The Division maintains libraries in Washington and in the Chicago, New York, and San Francisco offices. Division libraries operate in conjunction with the Department of Justice Main Library. Requests for information should be made to Division Librarians, who coordinate access to automated research databases, as well as printed materials, and arrange interlibrary loans, as appropriate.

# Chapter II.   Statutory Provisions and Guidelines of the Antitrust Division

A.   Statutes Enforced by the Antitrust Division ................................................................. II-3
   1.   Sherman Antitrust Act, 15 U.S.C. §§ 1-7 ............................................................. II-3
   2.   Wilson Tariff Act, 15 U.S.C. §§ 8-11 .................................................................. II-3
   3.   Clayton Act, 15 U.S.C. §§ 12-27 ......................................................................... II-3
   4.   Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14 ............................................... II-5
   5.   International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-12 .......... II-5
   6.   Miscellaneous ................................................................................................. II-6
B.   Statutes Used in Criminal Antitrust Investigations and Prosecutions ......................... II-7
   1.   Offenses that Arise from Conduct Accompanying a Sherman Act Violation ............ II-7
      a.   Conspiracy; Aiding and Abetting ................................................................. II-7
      b.   Fraud ........................................................................................................ II-7
      c.   Money Laundering ..................................................................................... II-7
      d.   Tax Offenses ............................................................................................. II-8
   2.   Offenses Involving the Integrity of the Investigative Process ............................... II-8
      a.   Obstruction ............................................................................................... II-8
      b.   Perjury and False Statements ..................................................................... II-8
      c.   Criminal Contempt .................................................................................... II-9
   3.   Procedural Statutes ......................................................................................... II-9
   4.   Statutes of Limitation ...................................................................................... II-9
   5.   Victim and Witness Rights ............................................................................... II-10
      a.   Attorney General Guidelines ..................................................................... II-10
      b.   Statutes Governing Victims' Rights and Services for Victims ...................... II-10
   6.   Sentencing ..................................................................................................... II-10
      a.   General Provisions .................................................................................... II-10
      b.   Probation ................................................................................................ II-11
      c.   Fines ....................................................................................................... II-11
      d.   Imprisonment .......................................................................................... II-12
      e.   Restitution .............................................................................................. II-12
      f.   Miscellaneous ......................................................................................... II-12
   7.   Debarment ..................................................................................................... II-13
      a.   10 U.S.C. § 2408 ...................................................................................... II-13
      b.   48 C.F.R. § 252.203-7001 .......................................................................... II-13
C.   Statutes Affecting the Competition Advocacy of the Antitrust Division ..................... II-13
   1.   Statutory Antitrust Immunities ........................................................................ II-13
      a.   Agricultural Immunities ............................................................................ II-13
      b.   Export Trade Immunities ........................................................................... II-14
      c.   Insurance Immunities ............................................................................... II-15
      d.   Labor Immunities ..................................................................................... II-15
      e.   Fishing Immunities ................................................................................... II-15
      f.   Defense Preparedness .............................................................................. II-15
      g.   Newspaper Joint Operating Arrangements ................................................ II-16
      h.   Professional Sports .................................................................................. II-16

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 19 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

   i. Small Business Joint Ventures ........................................................................II-16

   j. Local Governments........................................................................................II-16

  2. Statutes Relating to the Regulated Industries Activities of the Antitrust Division .................II-17

   a. Banking ..........................................................................................................II-17

   b. Communications.............................................................................................II-19

   c. Foreign Trade ................................................................................................II-20

   d. Energy............................................................................................................II-21

   e. Transportation...............................................................................................II-22

  3. Statutes Relating to Joint Research and Development, Production, and Standards
   Development ..........................................................................................................II-23

D. Antitrust Division Guidelines................................................................................................II-24

 1. Merger Guidelines..........................................................................................................II-24

 2. Antitrust Guidelines for the Licensing of Intellectual Property ....................................II-24

 3. Antitrust Enforcement Guidelines for International Operations....................................II-25

 4. Statements of Antitrust Enforcement Policy and Analytical Principles Relating to
  Health Care and Antitrust ..............................................................................................II-25

## A.     Statutes Enforced by the Antitrust Division

### 1.     Sherman Antitrust Act, 15 U.S.C. §§ 1-7

**Sherman Act § 1, 15. U.S.C. § 1**
Trusts, etc., in restraint of trade illegal; penalty

**Sherman Act § 2, 15 U.S.C. § 2**
Monopolizing trade a felony; penalty

**Sherman Act § 3, 15 U.S.C. § 3**
Trusts in Territories or District of Columbia illegal; combination a felony

**Sherman Act § 4, 15 U.S.C. § 4**
Jurisdiction of courts; duty of United States attorneys; procedure

**Sherman Act § 5, 15 U.S.C. § 5**
Bringing in additional parties

**Sherman Act § 6, 15 U.S.C. § 6**
Forfeiture of property in transit

**Sherman Act § 7 (Foreign Trade Antitrust Improvements Act of 1982), 15 U.S.C. § 6a**
Conduct involving trade or commerce with foreign nations

**Sherman Act § 8, 15 U.S.C. § 7**
"Person" or "persons" defined

### 2.     Wilson Tariff Act, 15 U.S.C. §§ 8-11

**Wilson Tariff Act § 73, 15 U.S.C. § 8**
Trusts in restraint of import trade illegal; penalty

**Wilson Tariff Act § 74, 15 U.S.C. § 9**
 Jurisdiction of courts; duty of United States attorneys; procedure

**Wilson Tariff Act § 75, 15 U.S.C. § 10**
Bringing in additional parties

**Wilson Tariff Act § 76, 15 U.S.C. § 11**
Forfeiture of property in transit

### 3.     Clayton Act, 15 U.S.C. §§ 12-27

**Clayton Act § 1, 15 U.S.C. § 12**
Definitions; short title

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 21 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

**Clayton Act § 2, 15 U.S.C. § 13**

Discrimination in price, services, or facilities

**Clayton Act § 3, 15 U.S.C. § 14**

Sale, etc., on agreement not to use goods of competitor

**Clayton Act § 4, 15 U.S.C. § 15**

Suits by persons injured

**Clayton Act § 4A, 15 U.S.C. § 15a**

Suits by United States; amount of recovery; prejudgment interest

**Clayton Act § 4B, 15 U.S.C. § 15b**

Limitation of actions

**Clayton Act § 4C, 15 U.S.C. § 15c**

Actions by state attorneys general

**Clayton Act § 4D, 15 U.S.C. § 15d**

Measurement of damages

**Clayton Act § 4E, 15 U.S.C. § 15e**

Distribution of damages

**Clayton Act § 4F, 15 U.S.C. § 15f**

Actions by Attorney General

**Clayton Act § 4G, 15 U.S.C. § 15g**

Definitions

**Clayton Act § 4H, 15 U.S.C. § 15h**

Applicability of *parens patriae* actions

**Clayton Act § 5 (Tunney Act), 15 U.S.C. § 16**

Judgments

**Clayton Act § 6, 15 U.S.C. § 17**

Antitrust laws not applicable to labor organizations

**Clayton Act § 7, 15 U.S.C. § 18**

Acquisition by one corporation of stock of another

**Clayton Act § 7A (Hart-Scott-Rodino Antitrust Improvements Act of 1976), 15 U.S.C. § 18a**

Premerger notification and waiting period

**Clayton Act § 8, 15 U.S.C. § 19**

Interlocking directorates and officers

**Clayton Act § 11,** 15 U.S.C. § 21

Enforcement provisions

**Clayton Act § 12,** 15 U.S.C. § 22

District in which to sue corporation

**Clayton Act § 13,** 15 U.S.C. § 23

Suits by United States; subpoenas for witnesses

**Clayton Act § 14,** 15 U.S.C. § 24

Liability of directors and agents of corporation

**Clayton Act § 15,** 15 U.S.C. § 25

Restraining violations; procedure

**Clayton Act § 16,** 15 U.S.C. § 26

Injunctive relief for private parties; exception; costs

**Clayton Act § 26 (Gasohol Competition Act of 1980),** 15 U.S.C. § 26a

Restrictions on the purchase of gasohol and synthetic motor fuel

**Clayton Act § 27,** 15 U.S.C. § 27

Effect of partial invalidity

### 4.    Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14

**Antitrust Civil Process Act § 2,** 15 U.S.C. § 1311

Definitions

**Antitrust Civil Process Act § 3,** 15 U.S.C. § 1312

Civil investigative demands

**Antitrust Civil Process Act § 4,** 15 U.S.C. § 1313

Custodian of documents, answers and transcripts

**Antitrust Civil Process Act § 5,** 15 U.S.C. § 1314

Judicial proceedings

### 5.    International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-12

**International Antitrust Enforcement Assistance Act § 2,**
15 U.S.C. § 6201

Disclosure to a foreign antitrust authority of antitrust evidence

**International Antitrust Enforcement Assistance Act § 3,**
15 U.S.C. § 6202

Investigations to assist foreign antitrust authority in obtaining antitrust evidence

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 23 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

**International Antitrust Enforcement Assistance Act § 4,**
**15 U.S.C. § 6203**
Jurisdiction of district courts of United States

**International Antitrust Enforcement Assistance Act § 5,**
**15 U.S.C. § 6204**
Limitations on authority

**International Antitrust Enforcement Assistance Act § 6,**
**15 U.S.C. § 6205**
Exception to certain disclosure restrictions

**International Antitrust Enforcement Assistance Act § 7,**
**15 U.S.C. § 6206**
Publication requirements applicable to antitrust mutual assistance agreements

**International Antitrust Enforcement Assistance Act § 8,**
**15 U.S.C. § 6207**
Conditions on use of antitrust mutual assistance agreements

**International Antitrust Enforcement Assistance Act § 9,**
**15 U.S.C. § 6208**
Limitations on judicial review

**International Antitrust Enforcement Assistance Act § 10,**
**15 U.S.C. § 6209**
Preservation of existing authority

**International Antitrust Enforcement Assistance Act § 11,**
**15 U.S.C. § 6210**
Report to Congress

**International Antitrust Enforcement Assistance Act § 12,**
**15 U.S.C. § 6211**
Definitions

**International Antitrust Enforcement Assistance Act § 13,**
**15 U.S.C. § 6212**
Authority to receive reimbursement

## 6.    Miscellaneous

**15 U.S.C. § 29**
Appeals [U.S. is civil complainant, equitable relief sought]

**15 U.S.C. § 1927**
Counsel's Liability for Excessive Costs

## B.    Statutes Used in Criminal Antitrust Investigations and Prosecutions

In addition to the Division's criminal enforcement activities under the Sherman Act, the Division investigates and prosecutes offenses that arise from conduct accompanying antitrust violations or otherwise impact the competitive process, as well as offenses that involve the integrity of the investigative process. The Division also uses statutes governing procedures, victim and witness rights, sentencing, and debarment.

### 1.    Offenses that Arise from Conduct Accompanying a Sherman Act Violation

#### a.    Conspiracy; Aiding and Abetting

**18 U.S.C. § 2**

Principals [aiding and abetting]

**18 U.S.C. § 371**

Conspiracy to commit offense or defraud the United States

**18 U.S.C. § 1349**

Attempt and conspiracy [mail and wire fraud]

#### b.    Fraud

**18 U.S.C. § 201**

Bribery of public officials and witnesses

**18 U.S.C. § 666**

Theft or bribery concerning programs receiving Federal funds

**18 U.S.C. § 1001**

Statements or entries generally [false statements]

**18 U.S.C. § 1341**

Frauds and swindles [mail fraud]

**18 U.S.C. § 1343**

Fraud by wire, radio, or television [wire fraud]

#### c.    Money Laundering

**18 U.S.C. § 1952**

Interstate and foreign travel or transportation in aid of racketeering enterprise

**18 U.S.C. § 1956**

Laundering of monetary instruments

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 25 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

**18 U.S.C. § 1957**

Engaging in monetary transactions in property derived from specified unlawful activity

**d.      Tax Offenses**

**26 U.S.C. § 7201**

Attempt to evade or defeat tax

**26 U.S.C. § 7206**

Fraud and false statements

### 2.      Offenses Involving the Integrity of the Investigative Process

**a.      Obstruction**

**18 U.S.C. § 1503**

Influencing or injuring officer or juror generally

**18 U.S.C. § 1505**

Obstruction of proceedings before departments, agencies, and committees. This statute is used when there is obstruction of proceedings under the Antitrust Civil Process Act.

**18 U.S.C. § 1509**

Obstruction of court orders

**18 U.S.C. § 1510**

Obstruction of criminal investigations

**18 U.S.C. § 1512**

Tampering with a witness, victim, or an informant

**18 U.S.C. § 1519**

Destruction, alteration, or falsification of records in Federal investigations and bankruptcy proceedings

**b.      Perjury and False Statements**

**18 U.S.C. § 1621**

Perjury generally

**18 U.S.C. § 1622**

Subornation of perjury

**18 U.S.C. § 1623**

False declarations before grand jury or court

c.     **Criminal Contempt**

**18 U.S.C. § 402**

Contempts constituting crimes

**18 U.S.C. § 3691**

Jury trial of criminal contempts

**Fed. R. Crim. P. 42**

Criminal contempt

## 3.     Procedural Statutes

**18 U.S.C. § 3143**

Release or detention of a defendant pending sentence or appeal

**Speedy Trial Act of 1974, 18 U.S.C. § 3161-3174**

**Jencks Act, 18 U.S.C. § 3500**

Demands for production of statements and reports of witnesses

**18 U.S.C. § 6001-6005**

Immunity of witnesses

## 4.     Statutes of Limitation

**18 U.S.C. § 3282**

Offenses not capital

**18 U.S.C. § 3285**

Criminal contempt

**18 U.S.C. § 3287**

Wartime suspension of limitations

**18 U.S.C. § 3288**

Indictments and information dismissed after period of limitations

**18 U.S.C. § 3289**

Indictments and information dismissed before period of limitations

**18 U.S.C. § 3292**

Suspension of limitations to permit United States to obtain foreign evidence

## 5.     Victim and Witness Rights

### a.     Attorney General Guidelines

The Attorney General, in accordance with the requirements of the Victim and Witness Protection Act of 1982, the Crime Control Act of 1990, the Violent Crime Control and Law Enforcement Act of 1994, the Antiterrorism and Effective Death Penalty Act of 1996, the Victims Rights Clarification Act of 1997, and the Justice for All Act of 2004, has promulgated Attorney General Guidelines for Victim and Witness Assistance (AG Guidelines) to establish procedures to be followed by the Federal criminal justice system in responding to the needs of crime victims and witnesses. The AG Guidelines serve as a primary resource for Department of Justice agencies, including the Antitrust Division, in the treatment and protection of victims and witnesses of Federal crimes under these acts. In addition, the Division has published a Victim Witness Handbook.

### b.     Statutes Governing Victims' Rights and Services for Victims

**18 U.S.C. § 3771**

Crime victims' rights

**42 U.S.C. § 10607**

Services to victims

## 6.     Sentencing

Attorneys should be familiar with the statutory provisions governing sentencing and the Federal Sentencing Guidelines ("U.S.S.G."), which should be read together with the statutory provisions. Attorneys should be familiar with the Sentencing Guidelines in their entirety, as many provisions are interrelated. Useful sentencing sections include:

### a.     General Provisions

**18 U.S.C. § 3013**

Special assessment on convicted persons

**18 U.S.C. § 3551**

Authorized sentences

**18 U.S.C. § 3552; Fed. R. Crim. P. 32(d)**

Presentence reports

**18 U.S.C. § 3553**

Imposition of a sentence

**18 U.S.C. § 3554**

Order of criminal forfeiture

**18 U.S.C. § 3555**

Order of notice to victims

**18 U.S.C. § 3556**

Order of restitution

**18 U.S.C. § 3557**

Review of a sentence

**18 U.S.C. § 3558**

Implementation of a sentence

**18 U.S.C. § 3559**

Sentencing classification of offenses

b.      **Probation**

**18 U.S.C. § 3561**

Sentence of probation

**18 U.S.C. § 3562**

Imposition of a sentence of probation

**18 U.S.C. § 3563**

Conditions of probation

**18 U.S.C. § 3564**

Running of a term of probation

**18 U.S.C. § 3565**

Revocation of probation

**18 U.S.C. § 3566**, **U.S.S.G. §§ 5B1.1-5B1.3**, **8D1.1-8D1.4**

Implementation of a sentence of probation

c.      **Fines**

**18 U.S.C. § 3571**

Sentence of fine

**18 U.S.C. § 3572**, **U.S.S.G. §§ 2R.1.1**, **5K1.1**, **8C2.4-8C2.8**, **8C3.2**, **8C3.3**, **8C4.1**

Imposition of a sentence of fine and related matters

**18 U.S.C. § 3573**

Petition of the Government for modification or remission

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 29 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

**18 U.S.C. § 3574**

Implementation of a sentence of fine

**18 U.S.C. § 3612**

Collection of fine

d.    **Imprisonment**

**18 U.S.C. § 3581**

Sentence of imprisonment

**18 U.S.C. § 3582**

Imposition of a sentence of imprisonment

**18 U.S.C. § 3583**, **U.S.S.G. §§ 5D1.1-5D1.3**

Inclusion of term of supervised release after imprisonment

**18 U.S.C. § 3584**

Multiple sentences of imprisonment

**18 U.S.C. § 3585**, **U.S.S.G. §§ 2R1.1**, **3B1.1**, **3D1.4**, **3E1.1**, **5C1.1**, **5K1.1**

Calculation of a term of imprisonment

**18 U.S.C. § 3586**

Implementation of a sentence of imprisonment

e.    **Restitution**

**18 U.S.C. § 3556**, **U.S.S.G. §§ 5E1.1**, **8B1.1**

Order of restitution

**18 U.S.C. § 3612**

Collection of unpaid fine or restitution

**18 U.S.C. § 3663**

Discretionary restitution

**18 U.S.C. § 3663A**

Mandatory restitution to victims of certain crimes

**18 U.S.C. § 3664**

Procedure for issuance and enforcement of restitution order

f.    **Miscellaneous**

**18 U.S.C. § 3661**

Use of information for sentencing

**18 U.S.C. § 3673**

Definitions for sentencing provisions

**18 U.S.C. § 3731**

Appeal by United States

**18 U.S.C. § 3742**

Review of a sentence (appeal by the defendant or the United States)

### 7.   Debarment

The Division is required to report to the Defense Procurement Fraud Debarment Clearinghouse within the Department of Justice individual defendants qualifying for debarment under 10 U.S.C. § 2408. The defendants are also listed in the debarment database known as the System for Award Management, www.sam.gov.

#### a.   10 U.S.C. § 2408

Prohibition on persons convicted of defense-contract related felonies and related criminal penalty on defense contractors

#### b.   48 C.F.R. § 252.203-7001

Prohibition on persons convicted of fraud or other defense-contract-related felonies

## C.   Statutes Affecting the Competition Advocacy of the Antitrust Division

### 1.   Statutory Antitrust Immunities

#### a.   Agricultural Immunities

**Clayton Act § 6**, 15 U.S.C. § 17. Section 6 of the Clayton Act permits, among other things, the operation of agricultural or horticultural mutual assistance organizations when such organizations do not have capital stock or are not conducted for profit.

**Capper-Volstead Agricultural Producers' Associations Act**, 7 U.S.C. §§ 291-92. This act allows persons engaged in the production of agricultural products to act together for the purpose of "collectively processing, preparing for market, handling, and marketing" their products and permits cooperatives to have "market agencies in common." The act also authorizes the Secretary of Agriculture to proceed against cooperatives that monopolize or restrain commerce to such an extent that the price of an agricultural commodity is "unduly enhanced."

**Capper-Volstead Cooperative Marketing Act of 1926**, 7 U.S.C. §§ 451-457. This act authorizes agricultural producers and

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 31 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015                    Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

associations to acquire and exchange past, present, and prospective pricing, production, and marketing data.

**Agricultural Marketing Agreement Act of 1937**, 7 U.S.C. §§ 601-627, 671-674. Under 7 U.S.C. § 608b, the Secretary of Agriculture is authorized to enter into marketing agreements with producers and processors of agricultural commodities. These arrangements are specifically exempted from the application of the antitrust laws. The Secretary may also enter into marketing orders, except for milk, that control the amount of an agricultural product reaching the market and thus serve to enhance the price. Milk marketing orders differ from other orders since they provide a mechanism for the establishment of a minimum price for milk rather than establishing levels of maximum output.

**b.    Export Trade Immunities**

**Export Trading Company Act of 1982**, 15 U.S.C. §§ 4001-4003. This act provides limited antitrust immunity for export trade, export trade activities, and methods of operation specified in a certificate of review issued by the Secretary of Commerce with the concurrence of the Attorney General. To obtain the certificate a person must show that the proposed activities:

- Will neither substantially lessen competition or restrain trade in the United States nor substantially restrain the export trade of any competitor of the applicant.

- Will not unreasonably enhance, stabilize, or depress prices in the United States of the class of goods or services exported by the applicant.

- Will not constitute unfair methods of competition against competitors engaged in the export of the class of goods or services exported by the applicant.

- Will not include any act that may reasonably be expected to result in the sale for consumption or resale in the United States of the goods or services exported by the applicant.

- A certificate may be revoked or modified by the Secretary of Commerce if the Secretary or the Attorney General determines that the applicant's activities no longer comply with these standards. While a certificate is in effect, the persons named in it are immune from Federal or state antitrust liability with respect to the conduct specified. However, parties injured by the conduct may sue for actual damages on the ground that the conduct does not comply with the statutory criteria. In addition, the Attorney General may sue under Section 15 of the Clayton Act "to enjoin conduct threatening a clear and irreparable harm to the national interest."

**Webb-Pomerene Act (Export Trade Act)** 15 U.S.C. §§ 61-66. This act provides antitrust immunity for the formation and operation of associations of otherwise competing businesses to engage in collective export sales. The immunity conferred by this statute does not extend to actions that have an anticompetitive effect within the United States or that injure domestic competitors of members of export associations.

c.   **Insurance Immunities**

**McCarran-Ferguson Act**, 15 U.S.C. §§ 1011-15. This act exempts from the antitrust laws the "business of insurance" to the extent "regulated by state law." The Sherman Act continues to be applicable to all agreements or acts by those engaged in the "business of insurance" to boycott, coerce, or intimidate.

d.   **Labor Immunities**

**Clayton Act § 6**, 15 U.S.C. § 17. This statute provides that the labor of a human being is not a commodity or article of commerce, and permits labor organizations to carry out their legitimate objectives.

**Clayton Act § 20**, 29 U.S.C. § 52. Generally, this statute immunizes collective activity by employees relating to a dispute concerning terms or conditions of employment.

**Norris-LaGuardia Act of 1932**, 29 U.S.C. §§ 101-115. This act provides that courts in the United States do not have jurisdiction to issue restraining orders or injunctions against certain union activities on the basis that such activities constitute an unlawful combination or conspiracy under the antitrust laws.

e.   **Fishing Immunities**

**Fishermen's Collective Marketing Act**, 15 U.S.C. §§ 521-522. This act permits persons engaged in the fisheries industry as fishermen to act together for the purpose of catching, producing, preparing for market, processing, handling, and marketing their products. This immunity is patterned after the Capper-Volstead Act. This act also provides for the enforcement by the Department of Justice of cease and desist orders issued by the Secretary of the Interior if interstate or foreign commerce is restrained or monopolized by any association of persons engaged in the fisheries industry as fishermen.

f.   **Defense Preparedness**

**Defense Production Act of 1950**, 50 U.S.C. app. §§ 2061-2171. Under 50 U.S.C. app. § 2158, the President or his delegate, in conjunction with the Attorney General, may approve voluntary agreements among various industry groups for the development of preparedness programs to meet potential national emergencies. Persons participating in such an agreement are immunized from the operation of the antitrust laws with

respect to good faith activities undertaken to fulfill their responsibilities under the agreement.

### g.   Newspaper Joint Operating Arrangements

**Newspaper Preservation Act of 1970**, 15 U.S.C. §§ 1801-04. This act provides a limited exemption for join operating arrangements between newspapers to share production facilities and combine their commercial operations. The newspapers are required to retain separate editorial and reporting staffs and to determine their editorial policies independently.

### h.   Professional Sports

**Sports Broadcasting Act of 1961**, 15 U.S.C. §§ 1291-95. This act exempts, with some limitations, agreements among professional football, baseball, basketball, and hockey teams to negotiate jointly, through their leagues, for the sale of television rights.

### i.   Small Business Joint Ventures

**Small Business Act**, 15 U.S.C. §§ 631-657f. Section 638(d)(2) authorizes the Small Business Administrator, after consultation with the Attorney General and Chairman of the FTC, and with the prior written approval of the Attorney General, to approve an agreement between small business firms providing for a joint program of research and development if the Administrator finds that the program will maintain and strengthen the free enterprise system and the national economy. Under Section 638(d)(3), the Administrator's approval confers antitrust immunity on acts and omissions pursuant to and within the scope of the agreement or program as approved. The Administrator or the Attorney General may prospectively withdraw or modify any such approval.

Section 640(b) confers antitrust immunity on joint actions undertaken by small business firms in response to a request by the President pursuant to a voluntary agreement or program approved by the President to further the objectives of the Small Business Act, if found by the President to be in the public interest as contributing to the national defense. The President is to furnish a copy of any such request to the Attorney General and the Chairman of the FTC. Section 640(c) permits the President to delegate the authority to make such requests to an official appointed with Senate confirmation, in which case the official is required to obtain the Attorney General's approval before making any such request. The request or Attorney General's approval, if required, may be withdrawn.

### j.   Local Governments

**Local Government Antitrust Act of 1984**, 15 U.S.C. §§ 34-36. Under 15 U.S.C. 35, local governments and their officials and employees acting in official capacities have antitrust immunity with respect to actions brought under 15 U.S.C. § 15 for damages, fees, or costs. The act

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 34 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

provides similar immunity for claims directed at a person, as that term is defined in 15 U.S.C. § 12, based on an official action directed by a local government. *See* 15 U.S.C. § 36, 15 U.S.C. § 34.

### 2.   Statutes Relating to the Regulated Industries Activities of the Antitrust Division

The following statutes have a direct impact upon the regulatory activities of the Division. Although this list is not exhaustive, it indicates the major areas of Federal regulation in certain industries with which the Division is especially concerned.

#### a.   Banking

**Bank Merger Act**, 12 U.S.C. § 1828(c). This act creates a special procedure under which bank merger reviews are conducted by the appropriate banking agency—the Comptroller of Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, or the Office of Thrift Supervision. All merger applications involving a bank or savings association (including an application to acquire assets or assume liabilities) are to be forwarded to the Attorney General, who is to report to the banking agency on the proposed merger's competitive effects within 30 calendar days of the date of the agency's request. The banking agency must wait for the 30-day period to expire, or until it receives the Attorney General's report, before it acts on the application. The banking agency can shorten this pre-approval waiting period to 10 days by notifying the Attorney General that an emergency exists requiring expeditious action; and the banking agency may dispense with the report and act immediately if necessary in order to prevent the probable failure of one of the banks or savings associations involved. In any case, the banking agency must notify the Attorney General immediately when it approves a merger.

This act also imposes a post-approval waiting period, requiring that the bank merger not be consummated before the 30th calendar day after the date of approval by the appropriate banking agency. This 30-day waiting period may be shortened to a period of not less than 15 days, with the concurrence of the Attorney General, if the banking agency has not received an adverse competitive effects report from the Attorney General; may be shortened to 5 days if the banking agency has notified the Attorney General that an emergency exists requiring expeditious action; and may be dispensed with entirely if the banking agency has determined that it must act immediately to prevent the probable failure of one of the banks or savings associations involved and therefore dispensed with the pre-approval reports on competitive effects. If a suit under the antitrust laws is not instituted during the 30-day (or shortened) period, the merger may be consummated and thereafter will be exempt from antitrust challenge except under Section 2 of the Sherman Act. (This means that a merger approved immediately to

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 35 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

prevent a probable bank failure may not be subject to antitrust challenge at all.)

If a suit is instituted during the applicable period, it results in an automatic stay of the merger. In any such suit, there is a special defense that allows an anticompetitive merger to go forward if the court finds that its anticompetitive effects will be clearly outweighed by the merged entity's ability to meet the convenience and needs of the community to be served.

Mergers requiring advance competitive review and approval under the Bank Merger Act are exempt under Section 7A(c)(7) from the reporting and waiting period requirements of the HSR statute.

**Bank Holding Company Act of 1956**, 12 U.S.C. §§ 1841-50, 1971-78. Section 3 of this act, 12 U.S.C. § 1842, sets forth the same substantive competition standards for the Federal Reserve Board to apply in reviewing applications by bank holding companies to acquire other bank holding companies, banks, or bank assets as those set forth in the Bank Merger Act. While the pre-approval waiting period does not involve a statutorily required notice to the Attorney General, in practice the Board does notify the Attorney General, and the Attorney General furnishes the Board with a report on competitive effects. Similar standards apply to Section 3 applications as in the Bank Merger Act regarding notice to the Attorney General of any approval, the post-approval waiting period, antitrust immunity once that period has expired, the automatic stay, and the convenience and needs defense. As with the Bank Merger Act, an acquisition, or portion of an acquisition, that is subject to banking agency review under Section 3 is exempt from the HSR reporting and waiting period requirements.

Section 4 of the Bank Holding Company Act, 12 U.S.C. § 1843, governs acquisitions of a nonbank or thrift institution by a bank holding company. There is no required notice to the Attorney General. Generally, a Section 4 acquisition is not subject to Board approval, and is subject to HSR reporting and waiting period requirements; but if it is a type of acquisition subject to Board approval (or disapproval) under Section 4, it is exempt from HSR requirements if copies of all information and documents filed with the Board are also filed with the Division and the FTC at least 30 days prior to consummation of the acquisition, in accordance with Section 7A(c)(8) of the Clayton Act. Section 4 acquisitions are subject to the ordinary operation of the antitrust laws.

The Gramm-Leach-Bliley Act (Financial Services Modernization Act of 1999) amended the Bank Holding Company Act to create a new "financial holding company" under Section 4(k), permitted to engage in certain financial activities, including insurance and securities underwriting and insurance agency activities, that were previously off-limits to bank holding companies. At that time, Sections 7A(c)(7) and (8) were amended to make clear that if a portion of an acquisition falls

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 36 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015         Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

under Section 4(k) and is not subject to Board approval under Section 3 or Section 4, it is not exempt from HSR reporting and waiting period requirements. Like other Section 4 acquisitions, Section 4(k) acquisitions are subject to the ordinary operation of the antitrust laws.

The Bank Holding Company Act also prohibits certain tying arrangements by banks, as well as certain exclusive dealing agreements with customers. 12 U.S.C. §§ 1971-78. These prohibitions are in addition to, and do not supersede, the antitrust laws.

**b.     Communications**

**Communications Act of 1934**, as amended by the Telecommunications Act of 1996, 47 U.S.C. §§ 151-161, 201-231, 251-261, 271-276, 301-339, 351-363, 381-386, 390-399b, 401-416, 501-510, 521-522, 531-537, 541-549, 551-561, 571-573, 601, 604-615b. This act established the Federal Communications Commission (FCC), which is responsible for regulating "interstate and foreign commerce in communication by wire and radio." 47 U.S.C. § 151. The FCC's authority encompasses telecommunications common carriers, radio and television broadcasting, and cable communications. Under Section 402(a) of the act, and 28 U.S.C. §§ 2341-2351, the United States, represented by the Antitrust Division, is automatically a party respondent, separate from the FCC, in proceedings for review of most FCC orders (except licensing and license transfer orders) in the courts of appeals.

The stated purpose of the Telecommunications Act of 1996 was "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." To that end, the 1996 act provided for opening local telephone markets to competition and repealed provisions of the Communications Act that had provided express antitrust exemptions for telephone company mergers approved by the FCC. The 1996 act also included an express antitrust savings clause, Section 601(b)(1), 47 U.S.C. § 152 note, making clear that, in all other respects, the 1996 act does not "modify, impair, or supersede the applicability of any of the antitrust laws."

**Cable Communications Policy Act of 1984**, as amended by the **1996 Telecommunications Act**, 47 U.S.C. §§ 521-573. These acts generally reduced the level of regulation in the cable industry. The FCC was given authority to approve transfers of cable television relay service licenses. Although the parties are not immunized from challenge under the antitrust laws, governmental entities are immune from claims for damages under any Federal law for conduct related to the regulation of cable services after October 2, 1992.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 37 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

### c.     Foreign Trade

**Tariff Act of 1930 § 1337**, 19 U.S.C. § 1337. Under this statute, the International Trade Commission (ITC) evaluates claims of unfair trade practices involving the importation of articles into the United States (primarily with regard to intellectual property rights). The ITC is required to seek the Department's advice before making a final determination. The Department may also participate in the interagency group that advises whether to disapprove the ITC's findings and proposed relief.

**Trade Act of 1974 § 201**, 19 U.S.C. § 2252, allows American businesses claiming serious injury substantially caused by increased imports to petition the ITC for tariff and quota relief under the so-called "escape clause." Once the ITC makes a determination of whether such injury occurred and formulates appropriate relief, the Department may participate in the interagency committee that advises the President whether to institute or modify the import relief urged by the ITC.

**Trade Act of 1974 § 301**, 19 U.S.C. § 2411, provides that the President may take action, including restricting imports, to enforce rights of the United States under any trade agreement or to respond to unfair practices of foreign governments that restrict U.S. commerce. Interested parties may initiate such actions through petitions to the U.S. Trade Representative. The Department participates in the interagency committee that makes recommendations to the President on what actions, if any, should be taken.

**Trade Act of 1974 § 406**, 19 U.S.C. § 2436, provides that businesses claiming injury relating to imports from communist countries may also petition the ITC under the so-called "market disruption statute." The Department may participate in the interagency committee that advises the President whether to institute or modify the import relief urged by the ITC.

**Trade Expansion Act of 1962 § 232**, 19 U.S.C. § 1862, requires the President to take action to control any imports that the President and the Secretary of Commerce determine are threatening to impair national security because of their impact on defense-related domestic producers. Interested parties may initiate these actions through petitions to the Secretary of Commerce. The Department may participate in the interagency committee that makes recommendations to the President on what actions, if any, should be taken.

**Countervailing Duties Imposed.** 19 U.S.C. § 1671 provides that American manufacturers, producers, wholesalers, unions, and trade associations may petition for the imposition of offsetting duties on subsidized foreign imports. Duties will be imposed if the Department of Commerce determines that a foreign country is subsidizing the foreign import and, in almost all cases, if the ITC determines that a domestic industry is materially injured or threatened with injury by the foreign merchandise. Although the statute permits the Division to apply to

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 38 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Chapter II. Statutory Provisions and Guidelines of the Antitrust Division

appear as a party in proceedings before the ITC, the Division has not utilized this option for many years. On occasion, the Division has provided informal advice to the Department of Commerce on request.

**Imposition of Antidumping Duties.** 19 U.S.C. § 1673, provides that antidumping duties shall be imposed on foreign merchandise that is being, or is likely to be, sold in the United States at "less than its fair value," if the Commerce Department determines that such sales have occurred or will occur and the ITC determines that a domestic industry is materially injured or threatened with material injury by imports of the foreign merchandise. Although the statute permits the Division to apply to appear as a party in proceedings before the ITC, the Division has not utilized this option for many years. On occasion, the Division has provided informal advice to the Department of Commerce on request.

**d.   Energy**

**Department of Energy Organization Act**, 42 U.S.C. §§ 7101-7352. This act provides for the organization of the Department of Energy and the transfer of functions from other agencies to that Department. The act determines that it is in the national interest to promote the interest of consumers through the provision of an adequate and reliable supply of energy at the lowest reasonable cost and to foster and assure competition among parties engaged in the supply of energy and fuels.

The Department of Energy Organization Act established the Federal Energy Regulatory Commission (FERC) as an independent regulatory commission within the Department of Energy. FERC establishes rates for the transmission and sale of electric energy and the transportation and sale of natural gas; it also regulates gas and oil pipelines. FERC has authority to regulate mergers and acquisitions, except for acquisitions of voting securities of natural gas companies, under the Federal Power Act and the Natural Gas Act.

The Division often intervenes as a competition advocate in FERC proceedings and in other proceedings involving Department of Energy activities.

**Atomic Energy Act of 1954**, 42 U.S.C. §§ 2011-2297g-4. Under 42 U.S.C. § 2135, the Department is required to advise the Nuclear Regulatory Commission whether granting a license as proposed or certifying a plant would create or maintain a situation consistent with the antitrust laws. If the Department recommends a hearing, the Department may participate as a party.

**Federal Coal Leasing Amendments Act of 1976**, 30 U.S.C. §§ 201-209. Under 30 U.S.C. § 184(l)(1)-(2), the Department reviews the issuance, renewal, or modification of Federal coal leases to ensure they are consistent with the antitrust laws.

**Outer Continental Shelf Lands Act Amendments of 1978**, 43 U.S.C. §§ 1331-1356a. This act requires that the Departments of the

Interior and Energy consult with the Attorney General regarding offshore lease analysis, pipeline rights of entry, review of lease transfers, and review of regulations and plans that the Departments of the Interior and Energy formulate for offshore leasing that may affect competition in the acquisition and transfer of offshore leases.

**Naval Petroleum Reserves Production Act of 1976**, 10 U.S.C. §§ 7420-7439. Under 10 U.S.C. § 7430(g)-(i) and 10 U.S.C. § 7431(b)(2), the Secretary of Energy must consult with and give due consideration to the views of the Attorney General prior to promulgating any rules and regulations or plans of development and amendments thereto, and prior to entering into contracts or agreements for the production or sale of petroleum from the naval petroleum and oil shale reserves. If the Attorney General advises the Secretary within the 15 days allowed for review that any proposed contract or agreement would create or maintain a situation inconsistent with the antitrust laws, then the Secretary may not enter into that arrangement. The Attorney General is also required to report on the competitive effects of any plans or substantial amendments to ongoing plans for the exploration, development, and production of naval petroleum and oil shale reserves.

**National Petroleum Reserves in Alaska.** Under 42 U.S.C. § 6504(d) and 42 U.S.C. § 6506, no contract for the exploration of the National Petroleum Reserve in Alaska may be executed by the Secretary of the Interior if the Attorney General advises the Secretary within the 30 days allowed for review that such contract would unduly restrict competition or be inconsistent with the antitrust laws. The Attorney General is also required to report on the competitive effects of any new plans or substantial amendments to ongoing plans for the exploration of the reserve. Whenever development leading to production of petroleum is authorized, the provisions of 10 U.S.C. § 7430(g)-(i) apply.

**Deepwater Port Act**, 33 U.S.C. §§ 1501-24. The granting of deepwater port licenses, used to load and unload oil for transportation to the United States, is entrusted to the Secretary of Transportation. Before such action is taken, the Secretary must obtain the opinion of the Attorney General and the FTC as to whether the grant of the license would adversely affect competition or be otherwise inconsistent with the antitrust laws. The Secretary only needs to notify the Attorney General and FTC before amending, transferring, or renewing a license.

### e.    Transportation

**Interstate Commerce Commission Termination Act**, Pub. L. No. 104-88, 109 Stat. 803. This act dissolved the Interstate Commerce Commission (ICC) which, until 1976, exercised regulatory control over entry, rates, routings, classifications, intercarrier mergers, and collective ratemaking activities, which the ICC could approve and immunize from antitrust exposure. Its few remaining functions were transferred to the Surface Transportation Board within the Department of Transportation, and the

Secretary of Transportation. Although most of the areas formerly under the ICC's jurisdiction are now deregulated, very limited antitrust immunity is still available in some of these areas. *See, e.g.*, Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), 45 U.S.C. §§ 801-836.

**Airlines.** Under the Federal Aviation Act of 1958, the Civil Aeronautics Board (CAB) exercised extensive regulatory control over entry, fares, mergers, interlocking directorates, and agreements among air carriers until 1978. In 1978, Congress passed the Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705, which phased out CAB and many of its functions. The Division now reviews domestic airline mergers, acquisitions, and interlocking directorates under the antitrust laws as it does in other industries. The Department of Transportation approves and may grant antitrust immunity to agreements between U.S. and foreign carriers.

**Shipping Act of 1984**, 46 U.S.C. app. §§ 1701-19. This act provides that tariffs filed by international ocean shipping conferences and other agreements among carriers engaged in international ocean shipping are immunized from the operation of the antitrust laws if filed with the Federal Maritime Commission.

### 3.   Statutes Relating to Joint Research and Development, Production, and Standards Development

**National Cooperative Research and Production Act**, 15 U.S.C. §§ 4301-06. The National Cooperative Research and Production Act (NCRPA) clarifies the substantive application of the U.S. antitrust laws to joint research and development (R&D) activities, joint production activities and, since it was amended by the Standards Development Organization Advancement Act of 2004, Pub. L. No. 108-237, 118 Stat. 661 (2004), conduct by a qualifying standards development organization (SDO) while engaged in a standards development activity. Originally drafted to encourage research and development by providing a special antitrust regime for joint R&D ventures, the NCRPA requires U.S. courts to judge the competitive effects of a challenged joint R&D or production venture, or standards development activity engaged in by a qualifying SDO, in properly defined relevant markets and under a rule-of-reason standard. The statute specifies that the conduct "shall be judged on the basis of its reasonableness, taking into account all relevant factors affecting competition, including, but not limited to, effects on competition in properly defined, relevant research, development, product, process, and service markets." 15 U.S.C. § 4302.

The NCRPA also establishes a voluntary procedure pursuant to which the Attorney General and the FTC may be notified of a joint R&D or production venture or a standards development activity engaged in by a qualifying SDO. The statute limits the monetary relief that may be

obtained in private civil suits against the participants in a notified joint venture or against a qualifying SDO to actual rather than treble damages, if the challenged conduct is covered by the statute and within the scope of the notification. With respect to joint production ventures, the National Cooperative Production Amendments of 1993, Pub. L. No. 103-42, 107 Stat. 117, 119 (1993), provide that the benefits of the limitation on recoverable damages for claims resulting from conduct within the scope of a notification are not available unless (1) the principal facilities for the production are located within the United States or its territories, and (2) "each person who controls any party to such venture (including such party itself) is a United States person, or a foreign person from a country whose law accords antitrust treatment no less favorable to United States persons than to such country's domestic persons with respect to participation in joint ventures for production." 15 U.S.C. § 4306 (2).

The National Cooperative Production Amendments of 1993 also exclude from the act's coverage, and thus leave subject to the ordinary applicability of the antitrust laws, using existing facilities for the production of a product, process, or service by a joint venture unless such use involves the production of a new product or technology.

## D.   Antitrust Division Guidelines

Several official sets of guidelines have been issued by the Antitrust Division. In addition to the guidelines described below, the Division also issued nonprice vertical restraint guidelines in 1985, but those guidelines no longer reflect Division policy.

### 1.   Merger Guidelines

The Horizontal Merger Guidelines, issued jointly by the Division and the Federal Trade Commission (FTC) on August 19, 2010, replace the guidelines that were issued on April 2, 1992, including the revisions involving the treatment of efficiencies issued on April 8, 1997. The Horizontal Merger Guidelines are designed to outline the Division's standards for determining whether to oppose mergers or acquisitions with a horizontal overlap under Section 7 of the Clayton Act. The Non-Horizontal Merger Guidelines from Section 4 of the 1984 Merger Guidelines remain in effect for nonhorizontal mergers (*i.e.*, vertical mergers; mergers that eliminate potential competitors), although they do not describe the full range of potential anti-competitive effects of nonhorizontal mergers.

### 2.   Antitrust Guidelines for the Licensing of Intellectual Property

The Antitrust Guidelines for the Licensing of Intellectual Property (IP Guidelines) were jointly issued by the Division and FTC on April 6, 1995. The IP Guidelines state the two agencies' enforcement policy with respect to the licensing of intellectual property protected by patent, copyright, and trade secret law.

### 3.      Antitrust Enforcement Guidelines for International Operations

The Antitrust Enforcement Guidelines for International Operations (International Guidelines) were jointly issued by the Division and FTC in April, 1995, and replaced the international guidelines issued by the Department in 1988. The International Guidelines provide antitrust guidance to businesses engaged in international operations on questions that relate to the two agencies' international enforcement policy. The International Guidelines address such topics as subject matter jurisdiction over conduct and entities outside the United States, comity, mutual assistance in international antitrust enforcement, and the effects of foreign governmental involvement on the antitrust liability of private entities.

### 4.      Statements of Antitrust Enforcement Policy and Analytical Principles Relating to Health Care and Antitrust

The Statements of Antitrust Enforcement Policy and Analytical Principles Relating to Health Care and Antitrust (Health Care Policy Statements) were jointly issued by the Division and FTC on August 28, 1996. They revise policy statements jointly issued by the agencies on September 27, 1994, which were themselves a revision and expansion of joint policy statements issued on September 15, 1993. The Health Care Policy Statements consist of nine statements that describe antitrust enforcement policy with respect to various issues in the health care industry. Most of the statements include guidance in the form of antitrust safety zones, which describe conduct that the agencies will not challenge under the antitrust laws, absent extraordinary circumstances.

# Chapter III.   Investigation and Case Development

A.   Finding and Evaluating Antitrust Complaints ........................................................... III-6
B.   Recommending a Preliminary Investigation ............................................................ III-7
   1.   Standards for Approving a Preliminary Investigation ........................................ III-7
   2.   Making a Request for Preliminary Investigation Authority ............................... III-8
   3.   FTC Clearance Procedure and the Short Form Preliminary Investigation Memo .......... III-10
   4.   Referral of a Matter to Another Prosecutorial Agency ..................................... III-11
C.   Conducting the Preliminary Investigation ............................................................. III-11
   1.   Standards for Determining Whether to Proceed by Civil or Criminal Investigation ........ III-12
   2.   Planning the Investigation ................................................................................ III-13
   3.   Obtaining Assistance ........................................................................................ III-15
      a.   Federal Agencies ........................................................................................ III-15
         i.   Federal Bureau of Investigation ......................................................... III-15
         ii.   Other Federal Agencies ...................................................................... III-16
      b.   Non-Federal Agencies and Other Entities ................................................ III-17
   4.   Obtaining Information by Voluntary Requests .................................................. III-17
      a.   Voluntary Requests and the Merger Review Process Initiative ................ III-17
      b.   Considerations in Using Voluntary Information Requests ........................ III-18
      c.   Confidentiality Considerations .................................................................. III-18
   5.   Status Reports on Investigations ...................................................................... III-20
   6.   Evaluating the Results of a Preliminary Investigation ...................................... III-20
   7.   Closing an Investigation ................................................................................... III-20
D.   Conducting a Merger Investigation ....................................................................... III-21
   1.   A Basic Guide to the Premerger Notification Statute and Rules ....................... III-22
      a.   Determining Whether the Act Applies ...................................................... III-23
         i.   Tests .................................................................................................... III-23
         ii.   Definitions ........................................................................................... III-23
         iii.   Calculating Whether the Thresholds Are Met .................................... III-24
         iv.   Special Types of Transactions ............................................................. III-24
      b.   Exemptions to the Reporting Requirements ............................................. III-25
      c.   Filing Mechanics ........................................................................................ III-26
      d.   Waiting Period ........................................................................................... III-26
      e.   Early Termination of the Waiting Period ................................................... III-27
      f.   Request for Additional Information .......................................................... III-28
      g.   Other Provisions of the Act and the Rules ................................................ III-29
         i.   Preliminary Injunction; Hearings ........................................................ III-29
         ii.   Enforcement of the Act ....................................................................... III-29
         iii.   Confidentiality of HSR Materials ........................................................ III-30
         iv.   Relationship of Premerger Notification to Other Statutes ................. III-32
   2.   Reviewing Premerger Filings ............................................................................ III-32
      a.   Procedures for Getting Premerger Filings to Staff for Review ................. III-32
      b.   Substantive Review of the Filing ............................................................... III-33
         i.   Contents of the Form .......................................................................... III-33
         ii.   Other Sources of Information .............................................................. III-35
      c.   Assessing the Completeness of the Filing ................................................. III-35

d.   Recommendation to Open or Not Open an Investigation ...............................................III-35
    i.   The No-Interest Memorandum...............................................................................III-35
    ii.   Opening a Preliminary Investigation......................................................................III-36
e.   Clearance Procedure ....................................................................................................III-36
f.   Preclearance Contacts with the Parties .......................................................................III-37
g.   Maintaining the Filings .................................................................................................III-37
h.   The Preliminary Investigation ......................................................................................III-37
i.   CIDs................................................................................................................................III-38
j.   Second Requests ...........................................................................................................III-38
    i.   Model Second Requests.........................................................................................III-39
    ii.   Procedures for Issuing Second Requests ...............................................................III-39
    iii.   Negotiating Modifications .....................................................................................III-40
    iv.   Compliance with the Second Request ....................................................................III-41
k.   After the Second Request Is Issued ..............................................................................III-42
l.   Timing Agreements .......................................................................................................III-43
m.   After the Parties Are in Substantial Compliance ..........................................................III-43
3.   Procedures for Recommending Suit .....................................................................................III-44
E.   Issuing Civil Investigative Demands ......................................................................................III-45
    1.   Function of Civil Investigative Demands ...........................................................................III-45
        a.   Where CIDs Can Be Used..............................................................................................III-45
        b.   Criminal Investigations.................................................................................................III-46
        c.   Other Matters Wherein CID Use Is Not Authorized ....................................................III-46
        d.   Basic Characteristics of CIDs........................................................................................III-47
    2.   Legislative History of the Antitrust Civil Process Act and Amendments............................III-48
        a.   1962 Act........................................................................................................................III-48
        b.   1976 Amendments .......................................................................................................III-49
        c.   1980 Amendments .......................................................................................................III-49
        d.   1994 Amendments .......................................................................................................III-49
    3.   Types of CIDs.......................................................................................................................III-49
        a.   CIDs for Documentary Material....................................................................................III-50
            i.   Description .............................................................................................................III-50
            ii.   Originals and Copies...............................................................................................III-50
            iii.   Products of Discovery ............................................................................................III-50
            iv.   Time Allowed for Production ..................................................................................III-51
            v.   Manner of Production.............................................................................................III-52
            vi.   Offer to Discuss Problems Raised by CID with Recipients ......................................III-52
        b.   CIDs for Written Interrogatory Responses ...................................................................III-53
        c.   CIDs for Oral Testimony................................................................................................III-54
            i.   Notice.....................................................................................................................III-54
            ii.   Location and Procedure for Taking Testimony.......................................................III-55
            iii.   Right to Counsel, Objections, Privilege, Cross-Examination ..................................III-55
            iv.   Immunity ................................................................................................................III-56
            v.   Witness's Review and Signature of Transcript.......................................................III-56
            vi.   Witness's Right to a Copy of Transcript .................................................................III-57
    4.   Procedures for Issuing CIDs.................................................................................................III-58

5.    Service of CIDs.................................................................................III-59
    a.   Service on Domestic Respondents................................................III-59
    b.   Service on Respondents Situated Abroad ....................................III-60
    c.   Proof of Service ...........................................................................III-61
6.    Confidentiality and Permitted Uses of CID Materials ..........................III-61
    a.   DOJ Use and Outside Disclosure of CID Materials.......................III-61
    b.   Requests for Additional Limitations on Use or Disclosure of CID Material.........III-62
       i.   General Policies....................................................................III-62
       ii.   Disclosure to Congress..........................................................III-63
       iii.   Disclosure to the Federal Trade Commission .........................III-64
       iv.   Disclosure in the Context of a CID Deposition .......................III-64
       v.   Disclosure in Judicial or Administrative Proceedings.............III-66
7.    CID Custodians and Deputy Custodians ...............................................III-69
8.    Grounds for Objection and Judicial Proceedings Concerning CIDs..........III-69
    a.   General Standards—Both Grand Jury and Civil Discovery Standards Apply .......III-69
    b.   Objections Based on Procedural Requirements of the Act ...................III-72
    c.   Objections Based on the Government's Motives............................III-74
    d.   Objections Based on Jurisdictional Grounds................................III-75
    e.   Objections Based on Preexisting Protective Orders......................III-76
    f.   Miscellaneous Objections ..........................................................III-77
    g.   Judicial Proceedings to Enforce or Quash CIDs...........................III-77
    h.   Discovery by CID Recipient Against the Division .........................III-78
       i.   Appellate Review and Remedy Provisions..............................III-80
9.    Return of CID Materials at End of Investigation ..................................III-80
10.  Criminal Penalties...............................................................................III-81
F.   Conducting a Grand Jury Investigation .....................................................III-81
  1.    Requesting a Grand Jury Investigation ...............................................III-82
  2.    Empanelling and Scheduling the Grand Jury ......................................III-84
  3.    Rule 6(e)(3)(B) Notices......................................................................III-84
  4.    Issuing Grand Jury Subpoenas...........................................................III-85
    a.   Subpoenas *Duces Tecum* ............................................................III-85
    b.   Subpoenas *Ad Testificandum* .....................................................III-88
    c.   Subpoenas for Exemplars ............................................................III-89
  5.    Search Warrants.................................................................................III-89
  6.    Procedures for a Grand Jury Session .................................................III-91
  7.    Requests for Statutory Immunity.......................................................III-92
    a.   Division Procedures for Processing Requests for Statutory Immunity .........III-93
    b.   Division Standards for Seeking Immunity Authorization ..............III-94
  8.    Informal Immunity ............................................................................III-95
  9.    Corporate and Individual Leniency .....................................................III-95
    a.   Criteria for Corporate Leniency...................................................III-96
       i.   Leniency Before an Investigation Has Begun ("Type A Leniency") ...........III-97
       ii.   Alternative Requirements for Leniency ("Type B Leniency") .........III-97
       iii.   Leniency for Corporate Directors, Officers, and Employees.........III-98
    b.   Criteria for Individual Leniency ...................................................III-98
    c.   Procedure for Conferring Leniency ..............................................III-99
       i.   Markers ................................................................................III-99
       ii.   Recommendations for Conditional Grant of Leniency.............III-100

iii.    Recommendation for Final Grant of Leniency .................................................III-101
iv.    Confidentiality Policy ..................................................................................III-101
d.    Amnesty Plus .......................................................................................................III-102
10.    Requesting Internal Revenue Service Information During a Grand Jury Investigation ........III-103
11.    Notification or Approval Procedures in Certain Types of Investigations.............................III-103
a.    Notice of Subjects of Sensitive Criminal Investigations .........................................III-104
b.    Approval of Subpoenas to and Criminal Charges Against Members of the
News Media and News Organizations..................................................................III-104
c.    Issuance of Subpoenas to Attorneys for Information Relating to the Representation
of Clients, Searches of Attorney Premises, and Criminal Charges Against Attorneys ......III-105
d.    Notification of Matters Involving Foreign Government Interests...................................III-107
12.    Requesting a Stay of Discovery in Civil Litigation During a Grand Jury Investigation...........III-108
13.    Investigating Related Criminal Activity ...........................................................................III-108
a.    Offenses Related to Sherman Act Violations .......................................................III-109
b.    Offenses that Affect the Integrity of the Investigatory Process........................................III-110
G.    Completing the Investigation and Recommending Civil or Criminal Suit .................................III-110
1.    Preparing to Recommend a Case .......................................................................................III-110
a.    Role of Antitrust Division Economists ................................................................III-110
b.    Notification to Prospective Defendants ................................................................III-111
c.    Dual and Successive Prosecution Policy ("Petite" Policy) .................................................III-112
2.    Case Recommendation Procedures ....................................................................................III-114
a.    Recommending a Nonmerger Civil Action ...........................................................III-114
b.    Recommending a Merger Action .........................................................................III-116
c.    Recommending a Criminal Case ..........................................................................III-118
i.    Recommending an Indictment ......................................................................III-119
ii.    Recommending a Plea Agreement .................................................................III-123
3.    Procedures for Review of Case Recommendations .................................................III-124
H.    Other Investigative Functions ...............................................................................................III-125
1.    Business Review Procedures ..............................................................................................III-125
a.    Origin and Development of Procedure .................................................................III-125
b.    Purpose...............................................................................................................III-126
c.    Manner of Request...............................................................................................III-126
d.    Processing the Request ........................................................................................III-126
e.    Timing of Investigation .......................................................................................III-127
f.    Investigating a Business Review .........................................................................III-127
g.    Review Procedures ..............................................................................................III-128
h.    Judicial Interpretation and Review.......................................................................III-129
2.    National Cooperative Research and Production Act of 1993 .............................................III-130
a.    Purpose and Policy ..............................................................................................III-130
b.    Notification to DOJ and FTC ...............................................................................III-131
c.    Review by Section ...............................................................................................III-132
i.    Original Notifications ...................................................................................III-133
ii.    Supplemental Notifications...........................................................................III-134
d.    Preparation of the Federal Register Notice...........................................................III-134
e.    Notice to Parties ..................................................................................................III-135
f.    Review and Publication of Notice .......................................................................III-135

3.    Export Trade Certificates ..................................................................................III-136
    a.   Overview of the ETC Act ........................................................................III-136
    b.   Initial Processing of an Application .......................................................III-137
    c.   Requests for Supplemental Information ...............................................III-138
        i.    Informal Requests ...........................................................................III-138
        ii.   Formal Requests..............................................................................III-138
    d.   Confidentiality of Information ...............................................................III-140
    e.   Analysis of the Application ....................................................................III-140
    f.   Recommendation and Review ...............................................................III-141
    g.   Decision by the Assistant Attorney General.........................................III-142
    h.   ETC Notebook .........................................................................................III-143
4.    Judgment Monitoring, the JTS System, and Judgment Enforcement...................III-143
    a.   Judgment Monitoring .............................................................................III-143
    b.   JTS and Reporting Requirements ..........................................................III-143
    c.   Judgment Enforcement ..........................................................................III-144
5.    Judgment Modifications and Terminations ........................................................III-146
    a.   Obtaining Approval to Consent to Modification or Termination of Qualifying
         Legacy Decrees.......................................................................................III-147
        i.    Initiation of the Process ..................................................................III-147
        ii.   Recommendation, Review, and Applicable Standards ....................III-148
        iii.  Necessary Papers ...........................................................................III-148
        iv.   Review, Filing, and Other Procedural Aspects ...............................III-149
    b.   Obtaining Approval to Consent to Modification or Termination of Decrees
         Containing Sunset provisions and Nonqualifying Legacy Decrees ...................III-150
        i.    Initiation of the Process ..................................................................III-150
        ii.   Recommendation, Review, and Applicable Standards ....................III-150
        iii.  Necessary Papers ...........................................................................III-151
        iv.   Review, Filing, and Other Procedural Aspects ...............................III-152
        v.    Notice, Publication Costs, and Multiple Defendants .....................III-152

## A.      Finding and Evaluating Antitrust Complaints

The Division's investigations arise from a variety of sources including:

- Complaints received from citizens and businesses when they believe that companies or individuals are engaged in unlawful conduct.

- Analysis and evaluation of filings under the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

- Press reports of various practices that come to the Division's attention through the monitoring of a variety of media, including the Internet, newspapers, journals, and the trade press.

- Information obtained from informants or individuals or companies applying for leniency under the Division's Corporate or Individual Leniency Programs.

- Complaints and information received from other Government departments or agencies.

- Complaints and referrals received from United States Attorneys and state attorneys general.

- Analysis of particular industry conditions by Division attorneys and economists, including systematic industry screenings. (Screening investigations require an "MTS New Matter Form" (ATR 141).)

- Monitoring of private antitrust litigation to determine whether the Division should investigate the matter.

The Division does not begin a formal investigation until the Front Office determines that an investigation should proceed and the Division's resources should be committed. As part of this process, the Division and the FTC clear proposed investigations with each other before they are opened. The purpose of this clearance procedure is to ensure that both agencies are not investigating the same conduct and to avoid burdening the parties under investigation and potential witnesses with duplicative requests. *See* Chapter III, Part B.3, and Chapter VII, Part A. In addition, contact prior to opening a formal investigation may prematurely tip off the subject of the investigation that an investigation has been or may be initiated.

Prior to the opening of an investigation, an attorney, economist, or paralegal who receives a complaint develops information from the complainant, from trade publications and other public sources, and from governmental entities. *See* Chapter VI, Part B. Except under unusual circumstances that require the approval of the appropriate Director of Enforcement, the attorney, economist, or paralegal must not communicate, prior to the approval of an investigation, with other individuals, customers, potential victims or affected parties, or

individuals and corporations that may be implicated in the alleged violation.

## B.    Recommending a Preliminary Investigation

### 1.    Standards for Approving a Preliminary Investigation

Generally, the factors considered in authorizing a preliminary investigation by the Division include (a) whether there is reason to believe that an antitrust violation may have been committed; (b) what amount of commerce is affected; (c) if the investigation will duplicate or interfere with other efforts of the Division, the FTC, a United States Attorney, or a state attorney general; and (d) whether allocating resources fits within the needs and priorities of the Division. Although an investigation does not formally become "civil" or "criminal" until compulsory process is issued in the form of civil investigative demands (CIDs), second requests, or grand jury subpoenas, a preliminary judgment is usually made when the preliminary investigation memo is submitted as to whether the investigation will be pursued as a civil or criminal matter. Generally, the type of conduct will govern the civil/criminal determination (*e.g.,* merger matters are pursued civilly, *per se* price fixing is pursued criminally). *See* Chapter III, Part C.1 (standards for determining whether to proceed by civil or criminal investigation).

In a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy. The greater the potential significance of the matter, the more likely the request to open an investigation will be approved.

In a matter where the suspected conduct appears to meet the Division's standard for proceeding criminally, the decision whether to open an investigation will depend on two questions. The first is whether the allegations or suspicions of a criminal violation are sufficiently credible or plausible to call for a criminal investigation. This is a matter of prosecutorial discretion and is based on the experience of the approving officials; legal authorities may also provide guidance. The second question is whether the matter is significant. Determining which matters are significant is a flexible, matter-by-matter analysis that involves consideration of a number of factors, including the volume of commerce affected; the nature of the conduct; the breadth of the geographic area impacted (including whether the matter is international); the potential for expansion of the investigation or prosecution from a particular geographic area or industry to an investigation or prosecution in other areas or industries; the deterrent impact and visibility of the investigation or prosecution; the degree of culpability of the conspirators (*e.g.,* the duration of the conspiracy, the amount of overcharge, any acts of coercion or disciplining of cheaters);

and whether the suspected conduct directly impacted the Federal Government. Because the Division's mission requires it to seek redress for any criminal antitrust conspiracy that victimizes the Federal Government and, therefore, injures American taxpayers, this last factor is potentially by itself dispositive. The Division is committed to prosecuting all matters of major significance and will ensure resources are assigned accordingly.

Based on these general guidelines, a request for a preliminary investigation is reviewed by the appropriate Director of Enforcement and the DAAG for Operations. If the request is approved and the Division obtains clearance from the FTC, then preliminary investigation authority is granted.

### 2.   Making a Request for Preliminary Investigation Authority

Once an attorney has developed a sufficient factual and legal basis to believe that a matter is appropriate for formal investigation, the attorney should prepare a preliminary investigation memo describing the nature and scope of the activity. For all civil matters, the attorney must consult with an economist in the Economic Analysis Group (EAG) about the proposed investigation during the preparation of the preliminary investigation memo. All preliminary investigation memos should set forth the following information on the first page:

- The commodities or services to be investigated.

- The alleged illegal practices. The specific practices should be outlined if practicable (*e.g.*, price fixing, boycott, illegal acquisition, monopolization, unreasonable agreement among competitors, "restraint of trade").

- All relevant statutes (*e.g.*, 15 U.S.C. § 1; 18 U.S.C. § 371).

- The parties involved (the full name and location of the known companies and their corporate parents, as well as individuals involved).

- The amount of commerce affected on an annual basis (if information is unknown, provide a reasonable estimate).

- The geographic areas involved (*e.g.*, nationwide, worldwide, eastern Virginia).

- Whether the investigation would be an international matter. An international matter is loosely defined as one that involves possible adverse impact on U.S. domestic or foreign commerce and meets any one of the following criteria: (1) a party or witness is not a U.S. citizen or business; (2) a party or witness is located outside the United States; (3) relevant information or evidence is located outside the United States; (4) conduct potentially illegal under U.S. law occurred outside the U.S.; or (5) substantive consultation or coordination is likely to be undertaken with non-U.S. governments.

- For civil matters, the identity of any non-U.S. jurisdictions that have expressed an interest in the investigation.

This detailed information is necessary to help evaluate the request, to obtain FTC clearance, and to determine whether any other Division component is investigating, or has investigated, the same activity. The information also helps the Division in monitoring its investigations and maintaining its relationships with other antitrust enforcers. Staff must develop all of the information for its preliminary investigation memo only from public sources, governmental entities, or the complainant because staff may not initiate contact with the parties or other private entities prior to approval of the request and FTC clearance. For procedures when the parties initiate contact with the Division, *see* Chapter III, Part D.2.f.

After the basic information is set forth, staff should provide a factual summary of the information upon which the request is based. Preliminary investigation memos differ based on the type of investigation proposed.

For proposed merger investigations, staff should discuss the transaction itself (including any complaints received or concern expressed in the press); theory(ies) of competitive harm; possible product markets; possible geographic markets; best estimate of market shares; ease or difficulty of entry and potential barriers; possible efficiencies; the significance of the matter (including any unusual reasons to pursue or not to pursue it); the initial investigative approach; and the outcome of any past investigations in the industry.

For proposed civil nonmerger investigations, the format is more flexible but the criteria for opening are the same. Generally, staff should describe briefly the evidence supporting a potential antitrust violation and any contrary evidence. Staff should also discuss special considerations, such as the existence of private litigation, the possible precedential or deterrent impact of the matter, or other legal or factual circumstances relevant to the decision-making process. Staff should identify potential defenses and outline relevant economic issues. Staff should indicate that consideration has been given to the availability of an effective and administrable remedy. The memo also should describe briefly the proposed course of the investigation, including the estimated duration, anticipated developments, and important (or even dispositive) issues.

For proposed criminal investigations, staff should address the background and source of the information presented, the alleged conduct, the significance of the matter, the proposed investigative approach, and past investigations in potentially related areas or with related entities. Staff also should discuss special considerations such as the applicable statute of limitations, the presence of a governmental agency as a potential victim, any precedential or deterrent impact, or

other legal or factual circumstances relevant to the decision-making process. In some instances, staff already may have developed sufficient information to request authority to conduct a grand jury investigation. In these circumstances, staff may bypass preliminary investigation authority and simply request grand jury authority. For more information on the process for requesting grand jury authority, *see* Chapter III, Part F.

Staff should forward its completed preliminary investigation memo to the section or field office chief for review. If the chief approves, then the section or field office should e-mail the preliminary investigation memo to the ATR-Premerger-PI Requests mailbox and the appropriate special assistant. If the preliminary investigation is likely to be pursued as a criminal matter, the section or field office also should e-mail the preliminary investigation memo to the ATR-CRIM-ENF mailbox. Each preliminary investigation memo should be accompanied by an "MTS New Matter Form" (ATR 141), which should be sent to the Premerger Notification Unit at its ATR-Premerger-MTS Forms mailbox. For instructions on the completion of this form, *see* Division Directive ATR 2810.1 "Matter Tracking System."

After receiving a preliminary investigation memo or grand jury request memo, the Premerger Notification Unit requests clearance from the FTC (for a more detailed discussion, *see* Chapter VII, Part A) and e-mails a copy of the memo to all chiefs and assistant chiefs (the "Clearance Request" e-mail). When clearance is resolved on a civil nonmerger matter, the Premerger Notification Unit e-mails a copy of the preliminary investigation memo—marked with the clearance result and date of resolution—to all chiefs and assistant chiefs (the "Clearance Resolved" e-mail). When final preliminary investigation authority has been granted on any investigation, the Premerger Notification Unit e-mails a copy of the preliminary investigation memo—marked with the clearance result, date of resolution, the name of the individual authorizing the preliminary investigation, the date of authorization, and the file number for the investigation—to all chiefs and assistant chiefs (the "PI Solved" e-mail). Absent special circumstances, such as special expertise held by a certain section or field office or resource allocation issues, the section or field office seeking the preliminary investigation will receive the assignment. For all civil matters, the chief of the appropriate EAG section will assign an economist. The assigned economist will work with the legal staff on all portions of the investigation requiring economic or statistical analysis.

### 3.    FTC Clearance Procedure and the Short Form Preliminary Investigation Memo

All requests for authority to initiate a new investigation are cleared with the FTC. The Premerger Notification Unit requests FTC clearance for each new investigation when the preliminary investigation memo is submitted to the PI Requests mailbox. Depending on the circumstances,

staff may be asked to provide more detailed information to facilitate the clearance process.

Where time is of the essence, it is important to submit a preliminary investigation memo immediately if a section or field office wishes to conduct an investigation. In special circumstances, such as a cash tender offer in a merger matter or upcoming opportunities to conduct consensual monitoring in a potential criminal investigation, the chief or assistant chief should immediately contact the appropriate special assistant so that expedited clearance can be requested from the FTC.

In limited circumstances, a clearance request for a civil investigation may be submitted in short form. Those circumstances include clearance requests contesting an FTC HSR merger clearance request; mergers involving a cash tender offer or bankruptcy; HSR matters in which a significant portion of the waiting period already has expired before clearance is sought; or HSR matters for which it is clear at the outset that clearance will be contested by the FTC. Except when approved by the relevant Director of Enforcement, the short form clearance form should not be used in civil nonmerger investigations. When a short form clearance request has been submitted, staff must submit a full preliminary investigation memo within 48 hours.

Staff should contact the FTC liaison in the Office of Operations with any inquiries regarding FTC clearance. The Division's clearance and liaison procedures with the FTC are described in detail in Chapter VII, Part A.

### 4.    Referral of a Matter to Another Prosecutorial Agency

Sometimes a particular matter more properly should be investigated by another Federal agency or a state or local prosecutorial agency rather than the Division. A matter that involves an issue that is not of direct antitrust significance may be referred to a more appropriate authority (*e.g.*, a state consumer protection agency). If the matter is an antitrust matter that impacts a relatively small geographic region and involves a relatively small amount of commerce, the Division may refer the matter to the antitrust section of the appropriate state attorney general's office. When such a referral is under consideration, the appropriate Director of Enforcement and the Special Counsel for State Relations should be consulted. For more information on referrals to and from state attorney generals, *see* Chapter VII, Part C.4.

## C.    Conducting the Preliminary Investigation

When a section or field office requests preliminary investigation authority, staff and section or field office management should plan the investigation, giving consideration to time limitations. Although each investigation will be different, certain general principles apply to assist staff in (a) allocating resources effectively; (b) obtaining useful documentary and testimonial evidence; and (c) using the services and technical resources of the Division. *See* Chapter VI, Part B.

### 1.  Standards for Determining Whether to Proceed by Civil or Criminal Investigation

Many investigations conducted by the Division are clearly civil investigations (*e.g.*, merger investigations). Nevertheless, there are some situations where the decision to proceed by criminal or civil investigation requires considerable deliberation. In general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging, and customer and territorial allocations. Civil process and, if necessary, civil prosecution is used with respect to other suspected antitrust violations, including those that require analysis under the rule of reason as well as some offenses that historically have been labeled "per se" by the courts. There are a number of situations where, although the conduct may appear to be a per se violation of law, criminal investigation or prosecution may not be appropriate. These situations may include cases in which (1) the case law is unsettled or uncertain; (2) there are truly novel issues of law or fact presented; (3) confusion reasonably may have been caused by past prosecutorial decisions; or (4) there is clear evidence that the subjects of the investigation were not aware of, or did not appreciate, the consequences of their action.

During the preliminary investigation stage of the investigation, staff makes the determination on whether to conduct the remainder of the investigation as a grand jury or CID investigation. In general, however, the nature of the suspected underlying conduct should determine the nature of the investigation. Thus, when the conduct at issue appears to be conduct that the Division generally prosecutes in a criminal case, the investigation should begin as a criminal investigation absent clear evidence that one of the complicating factors that might make the case inappropriate for criminal prosecution is present. Where it is unclear whether the conduct in question would be a civil or criminal violation, the DAAG for Operations and the relevant Director of Enforcement should be consulted before any decision is made concerning the nature of the investigation. Among other things, early Front Office involvement might result in a decision that certain conduct is inappropriate for criminal prosecution. Alternatively, staff might be instructed to continue its preliminary investigation but to focus on facts that might be relevant in determining whether a grand jury should be convened.

The decision to convene a grand jury has several consequences, including restrictions on how the Government can use certain evidence gathered during the course of the grand jury's investigation. In *United States v. Sells Engineering, Inc.,* 463 U.S. 418 (1983) and *United States v. Baggot*, 463 U.S. 476 (1983), the Supreme Court restricted the Government's ability to use evidence gathered during the course of a grand jury investigation in a subsequent civil case. In *Sells*, the Court held that Federal Rule of Criminal Procedure 6(e) prohibits the disclosure of grand jury materials to Department of Justice attorneys

who were not involved in the grand jury proceedings unless the Government obtains a court order based on a showing of particularized need. However, the Court expressly declined to address "any issue concerning continued use of grand jury materials, in the civil phase of a dispute, by an attorney who himself conducted the criminal prosecution." *Sells*, 463 U.S. at 431 n.15. However, the Court resolved that issue in *United States v. John Doe, Inc.*, 481 U.S. 102 (1987). There, it held that an attorney who conducted a criminal prosecution may make continued use of grand jury materials in the civil phase of the dispute without obtaining a court order to do so under Rule 6(e) and "Rule 6(e) does not require the attorney to obtain a court order before refamiliarizing himself or herself with the details of a grand jury investigation." 481 U.S. at 111.

### 2.  Planning the Investigation

At the beginning of any investigation, staff should immediately determine the scope and focus of its investigative effort. Planning sessions should take place at the time the preliminary investigation memo is being drafted, and the preliminary investigation memo should describe the initial investigative approach. At this early stage, the chief and the legal and economic staff should establish a plan describing what is to be done, how and when it will be done, and who will do each task. All investigation plans should address, at least, candidate theories of competitive harm; evidence that would support each theory, and from where the evidence could be obtained; the specific tasks that are necessary to obtain the necessary evidence; when staff plans to accomplish those tasks; and which staff members will be primarily responsible for those tasks. The most effective investigations are very often the result of carefully planned strategies that are well developed at the outset of the investigation. These investigative plans should be submitted to the DAAG for Operations and the appropriate Director of Enforcement. The DAAG for Operations will coordinate a Front Office response to the investigative plan, including providing to staff the name of the Assigned DAAG. Staff should tailor its investigative plan based on the information available to it at the start of the investigation. Often staff will be able to quickly determine, for example, that a proposed merger raises little or no competitive concern. In these circumstances, staff should work to pinpoint any competitive concerns and to resolve the matter as quickly and efficiently as possible. Staff may be presented with a set of facts that leave few issues to be resolved; in these circumstances, staff's investigative plan should be centered around resolving those issues. When staff is presented with competitive concerns that warrant a more in-depth investigation, staff should quickly adapt its investigative plan to obtain the additional information that will be required to resolve the matter.

For example, in a civil investigation, thought should be given as to how best to elicit different types of information—from interviews,

depositions, documents, or interrogatories—as well as what economic evidence, and what support from EAG, is needed. The plan should provide for early development of relevant legal and economic theories and a determination of the relief to be sought. The key premise of investigative planning is that, from the outset of an investigation, staff's theory of the case is well defined, although with some flexibility warranted to account for the possibility that developing additional facts or analysis will disclose a theory that had not previously been considered fruitful.

In most instances, the plan should include drafting an outline of proof. An outline of proof is a living document prepared jointly by the legal and economic staff that should be revised regularly as the factual underpinnings of the case come into focus. For civil nonmerger cases, this outline will normally start with a recommendation outline and end in findings of fact. In merger cases, the outline should provide the evidence for each element of the Merger Guidelines with highlights from the best documents, depositions, or affidavits. It should also include an evaluation of the merging parties' arguments, including their legal and economic theories and the evidence preferred to support them.

For merger investigations, staff must be mindful of time constraints. Staff must balance the usefulness of each proposed task against the opportunity cost of the time the proposed task will consume as a proportion of the time left before the waiting period or timing agreement expires. For example, staff may wish to obtain large amounts of data that will allow for a very thorough evaluation of the proposed transaction, but should be aware of potential consequences of this approach: *e.g.*, producing significant amounts of data often takes a long time, staff could end up with only a short period of time to process the information, and staff could be left with insufficient time to complete even the most basic tasks. On the other hand, if staff obtains too little information, the Division may not have enough facts to sufficiently analyze the proposed transaction and make an enforcement decision.

For civil nonmerger investigations, staff should submit an investigative schedule to the Front Office shortly after the preliminary investigation is opened, typically within one week. The investigative schedule should set target dates for recommending, issuing, and receiving discovery; for status meetings; and for recommending and deciding whether to pursue a civil action. Each plan should be carefully tailored to the investigation and target dates should be established on a case-by-case basis. Each plan must be approved by the DAAG for Operations and the Director of Civil Enforcement. In addition, staff must obtain approval from the DAAG for Operations, and the Assigned DAAG, on all modifications to the investigative schedule. Approvals will be coordinated by the Director of Civil Enforcement or the appropriate special assistant.

Investigating antitrust violations is a multi-stage process, and staff's investigative plan should be a "living" document. Staff should ensure that it updates the focus of its investigative plan at each stage of the investigative process. As the investigation develops, staff should expand its investigative plan to more completely address all of the potentially relevant issues, such as staffing needs, whether to hire technical or economic experts, and possible remedies. In addition, staff should ensure that its investigative plan is informed by ongoing discussions among staff and section management about staff's current substantive analysis. In civil matters, staff should consult with the economist assigned to the investigation and should include EAG's perspective in developing and pursuing the investigation. Moreover, in civil matters, staff should engage the parties in discussion early in the investigation, obtain the parties' substantive evaluation of the matter, and share its own substantive evaluation with the parties. An ongoing critical analysis of a proposed transaction and a transparent discussion of that analysis can lead to a quicker and more effective process of arriving at the ultimate enforcement decision.

Resources available to staff in commencing the investigation are outlined in Chapter VI, Part B. That part of the manual provides detail about the Division's investigatory techniques and procedures, including use of economic resources, data processing and other information retrieval methods, and other source materials that have proven useful in investigation and litigation efforts.

### 3.   Obtaining Assistance

#### a.   Federal Agencies

During the course of the preliminary investigation, staff may require assistance in conducting interviews of industry officials, locating individuals whose whereabouts are unknown, compiling statistical data, or performing various other investigative functions. When such assistance is necessary, staff should consider requesting the services of other Federal agencies.

##### i.   Federal Bureau of Investigation

To obtain FBI assistance, staff, with the concurrence of the chief, should prepare a Request for FBI Assistance. The Request should be sent via e-mail to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate special assistant. Staff must submit a Request for FBI Assistance even when the local office of the FBI has indicated that it will assist staff or when staff plans to use the FBI agent detailed to the field office.

The DAAG for Operations and the Director of Criminal Enforcement review and approve the memo before sending it to FBI Headquarters. Once FBI Headquarters has processed the request and assigned it to the appropriate FBI office (a routine request takes about ten working days), the agent assigned to the matter will contact staff directly and begin the

investigation. After the initial request is made and an agent is assigned, further requests for assistance may be made directly to the assigned agent.

If staff requires FBI assistance to perform a criminal records search in connection with trial preparation and the FBI has not previously participated in the investigation of the matter, then a memorandum from the Division's Director of Criminal Enforcement must be sent to the Federal Bureau of Investigation International Corruption Unit. The memorandum should include the following sections:

- Introduction. A statement requesting assistance in conducting a criminal records check of defendants and potential witnesses in connection with a trial. The statement should include the following information: the name of the case, the criminal number, the judicial district, the date the trial is expected to begin, the date the results of the FBI check are needed, and the name and phone number of the contact person at the Division.

- The Indictment. A brief statement of the charges in the indictment and when the indictment was returned.

- Identifying Information. A list of the defendants first and then the witnesses (each in alphabetical order) with the following identifying information: name, address, country of citizenship, Social Security number, and date of birth. If a defendant is a company, indicate after the company name the name of a high-ranking official (*e.g.*, owner, president, CEO) with the identifying information listed above for that person.

### ii.    Other Federal Agencies

If an investigation involves procurement by a Federal agency such as the Department of Defense, staff should consider seeking the assistance of the Inspector General's Office for the agency. Inspector General agents have proven to be helpful in collecting and analyzing bid or pricing data, interviewing potential witnesses, and helping Division attorneys to understand a particular agency's procurement system and regulations. No special Division procedures are required for obtaining the assistance of Inspector General agents, and each section or field office should make whatever arrangements are appropriate directly with the Inspector General's office for the agency involved. If questions or problems arise, however, staff should discuss the matter with the Assigned DAAG and the appropriate Director of Enforcement.

Before contacting an agency with which the Division has a regular relationship, staff should contact the section within the Division with that regular relationship to coordinate contacts with that agency. For example, contact with the Department of Defense in any civil matters should be coordinated through the Litigation II section. For additional information on dealing with the Department of Defense, *see* Chapter

VII, Part E.2 and E.3, especially with respect to the Division's obligations to report individual defendants qualifying for debarment under 10 U.S.C. § 2408. Before making contact with any foreign entities, staff should coordinate with the Division's Foreign Commerce Section. For example, if staff would like to conduct a third-party interview with foreign national or corporation, staff should first contact the Foreign Commerce Section to obtain clearance.

### b.    Non-Federal Agencies and Other Entities

The Division has developed strong relationships with a number of antitrust enforcement agencies and with relevant entities throughout the United States and the world. For additional information on consultation with non-Federal agencies and other entities, *see* Chapter VII.

## 4.    Obtaining Information by Voluntary Requests

During the preliminary investigation stage, staff often relies upon voluntary requests for information—in the form of both interviews and requests for documents and information—from the potential subjects of the investigation, other companies within the industry, customers, trade associations, and other sources. Voluntary requests may be useful to keep communications less formal, avoid the adversarial tone injected by use of compulsory process, and speed collection of useful information. Voluntary requests to obtain documentary evidence should be considered by staff in developing and implementing its investigative strategy, even though the Antitrust Civil Process Act of 1976 (ACPA) provides the Division with broad authority to issue compulsory process through civil investigative demands (CIDs). For a more comprehensive explanation of CIDs and the ACPA, *see* Chapter III, Part E.

### a.    Voluntary Requests and the Merger Review Process Initiative

The Division's 2006 Merger Review Process Initiative encourages staff actively to tailor investigative plans and strategies to each proposed transaction, with the goals of more quickly identifying critical legal, factual, and economic issues; facilitating more efficient and focused discovery; and providing for a more effective process for evaluating relevant evidence. The Initiative encourages staff to be as aggressive as possible during the initial waiting period. That aggressiveness should allow staff quickly to close those investigations that should be closed and to narrow and refine issues for matters that warrant more significant investigation.

The Initiative specifies that, as soon as possible during the initial waiting period, staff should contact the parties and request that they voluntarily provide relevant documents and information. Such a request might include:

- A list and description of all overlap and potentially relevant products;

- Product/marketing brochures;

- Business plans, market studies, strategic plans, and information on market shares and competitor positioning;

- A list of competitors, suppliers, and customers;

- Readily available data regarding sales and output; and

- Analyses or studies regarding the transaction.

The Initiative also specifies that, as soon as possible during the initial waiting period, staff should request a consultation with the parties to discuss their views of the transaction and other important issues. Staff may want to request that the parties have the appropriate business persons participate in the consultation and that they provide the voluntarily requested documents and information in advance of the consultation. In addition, 2006 amendments to the Merger Review Process Initiative contemplate that The Division may significantly reduce the number of custodians whose files must be searched in return for an agreement that protects The Division's ability to obtain appropriate discovery should it decide to challenge the deal in court.

### b.    Considerations in Using Voluntary Information Requests

While there are no firm rules to guide Division attorneys in deciding whether to use a voluntary request or a CID in seeking documents and other information, some guidelines may be of assistance. Voluntary requests are generally sent to merging parties during the initial 30-day waiting period in an HSR matter, to gather information to help determine whether second requests will be required. The formalities of compulsory process are better designed to ensure full and timely compliance with an extensive request than the less formal procedures of the voluntary request. Additionally, when an investigation may result in an application for a preliminary injunction, use of CID process should normally be employed to avoid the possibility that voluntary cooperation may cease or that production of requested documents may be delayed so long that it interferes with the Division's ability to present a strong case for preliminary relief.

### c.    Confidentiality Considerations

The Freedom of Information Act (FOIA) does not require disclosure of materials obtained through CIDs (such as documents, interrogatory responses, and transcripts of oral testimony) or materials obtained as part of the HSR process. *See* 5 v. 15 U.S.C. § 552(b)(3) (authorizes withholding of information that is specifically exempt from disclosure by a statute other than the FOIA); and 15 U.S.C. § 1314(g) (CIDs); 15 U.S.C. § 18a(h) (HSR process). For an in-depth discussion of CID confidentiality

protections, *see* Chapter III, Part E.6. Information that is not produced in response to a CID or as part of the HSR process (including information revealed in an interview conducted in lieu of a CID deposition) is not protected by the statutory provisions of the CID or HSR statutes. Accordingly, parties will often seek written assurances that the information they submit will be protected from disclosure or that they will be given advance notice if such disclosure is contemplated. It is not uncommon for the Division to provide a confidentiality letter for information produced voluntarily, particularly for interviews, at the request of parties in order to expedite an investigation. Staff should consult the Division's model voluntary production confidentiality letter before issuing such a letter.

Staff may not provide broader assurances than those contained in the Division's model letter without consulting the FOIA/PA Unit and the General Counsel in advance. Assurances of confidentiality and notice normally should not exceed those established by Department regulation. *See* 28 C.F.R. § 16.8. Any assurances of confidentiality or notice should cover only information that the party who submitted the information has in good faith designated sensitive or proprietary and should be limited to a reasonable time period. Further, the assurance should never guarantee absolute confidentiality, but rather should bind the Division only as to what action it will take in its initial response to a FOIA request. *See* 28 C.F.R. § 16.8. FOIA disclosure of non-CID, non-HSR sensitive or proprietary business information is governed by 28 C.F.R. § 16.8 and FOIA Exemption 4, 5 U.S.C. § 552(b)(4). *See Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992). For the exemption and regulation to apply, those submitting documents should request confidentiality and identify sensitive or proprietary business information. For a detailed description of FOIA procedures and exemptions, *see* Chapter VII, Part G.

The administrative burdens involved in complying with nonstatutory assurances of confidentiality or advance notification, sometimes years later, are not easily managed, particularly when documents are involved. For this reason, in the case of documents, staff should carefully consider whether to use a confidentiality letter or CID. (In either case, parties should mark the appropriate documents "sensitive business information" or "proprietary business information" and indicate a period of time for which confidentiality is requested, if greater than ten years, recognizing that such designations are not binding on a court.)

Parties frequently want to provide white papers discussing aspects of an investigation. White papers prepared by merging parties in HSR investigations are subject to the protections of the HSR statute. In other instances, if parties and third parties desire CID protection, the Division can issue a CID either with an interrogatory asking for their views on whatever is contained in the white paper or a CID with a single

document request identifying the white paper by name and date. In the case of an interview, use of a CID is not possible without converting the interview into a deposition, which may not be desirable. Accordingly, a confidentiality letter may be the only option in some situations. Ultimately, if the recipient of a voluntary request declines to furnish information absent the usual assurances of confidentiality, the better practice is usually for staff to prepare a CID compelling the production of the desired documents or information.

### 5. Status Reports on Investigations

There should be consistent periodic updates on the progress of each investigation with the Assigned DAAG, and the appropriate Director of Enforcement. These status meetings are designed to monitor the progress of each investigation and to discuss relevant legal and economic theories. For civil nonmerger investigations, staffs and the Assigned DAAG should confer prior to hiring testifying experts for any matter that has a real potential for litigation. Counsel and DAAGs whose responsibilities include litigation should be fully and consistently briefed on the matter.

### 6. Evaluating the Results of a Preliminary Investigation

In making a determination as to whether to issue compulsory process or open a grand jury investigation, staff should consult with the section or field office chief and the relevant EAG chief to discuss the results of the investigation. In many investigations, the next step in the investigation will be relatively clear; in others, however, the decision whether to continue the investigation will require deliberation and consultation. If there are questions that remain to be resolved, the section or field office chief may wish to consult informally with the relevant Director of Enforcement before making a recommendation.

Staff recommendation to proceed by grand jury investigation, second request, or CID must be processed through the appropriate Director of Enforcement and the Assigned DAAG, and require the approval of the Assistant Attorney General. Case recommendation procedures are discussed in Chapter III, Part G.

### 7. Closing an Investigation

If, after analysis of the conduct or transaction, staff and the chief believe that the matter should not be investigated further, staff should prepare a memorandum recommending that the investigation be closed. For civil matters, staff's memorandum should state whether the relevant EAG manager and EAG staff assigned to the matter concur in the recommendation to close. If the chief concurs, then the section or field office should e-mail the memorandum, along with an MTS "Matter Modify/Close Form" to the appropriate special assistant and the ATR-Premerger-Closing mailbox for the section or field office. Criminal closing recommendations should be e-mailed to the ATR-CRIM-ENF

mailbox. The appropriate Director of Enforcement will review the memorandum and, in consultation with the DAAG for Operations, either close the investigation or request additional information or investigation.

After the decision is made to close the investigation, the section or field office will be notified by the appropriate special assistant that the matter is closed and then receive a confirming e-mail stating that the matter is closed and, in civil matters, that the closing memo is posted on the Division's intranet (ATRnet). When the matter is closed, staff should notify the subjects of the investigation, close its file on the matter, and process all documentary material received during the investigation in accordance with the provisions of Division Directive ATR 2710.1, "Procedures for Handling Division Documents and Information." In the event that staff needs to know quickly when a matter has been closed, staff should call the appropriate special assistant or the Premerger Notification Unit. For additional procedures on early terminations under the Hart-Scott-Rodino Act, *see* Chapter III, Part D.1.e. In a criminal matter, staff should provide written notification of closure to any company in the subject industry that submitted documents to the Division pursuant to a grand jury subpoena or whose documents were seized pursuant to a search warrant, as well as to any company or individual who has been notified by the Division that the company or individual was a "target" of the investigation.

At staff's discretion, other appropriate persons, such as cooperating witnesses or victims, may also be notified.

## D.   Conducting a Merger Investigation

The Antitrust Division investigates proposed mergers and acquisitions to determine whether they may substantially affect competition and violate Sections 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, or Section 7 of the Clayton Act, 15 U.S.C. § 18. Staff should apply stated Division merger enforcement policy in determining whether a merger is anticompetitive. The Division's enforcement policy concerning horizontal mergers is articulated in the joint DOJ/FTC Horizontal Merger Guidelines issued in 2010. Division policy on vertical mergers is found in the DOJ Non-Horizontal Merger Guidelines of 1984. Other sources of Division policy include the public statements of Division officials.

Most mergers and acquisitions do not raise serious competitive issues and staff should endeavor to review these transactions as expeditiously as possible. *See* Chapter III, Part C.4.a (discussing the Merger Review Process Initiative, which encourages staff to actively tailor investigations in an effort to actively employ the Division's resources more efficiently). When investigating a transaction that raises significant competitive issues, staff should always keep in mind its dual role: as analysts seeking to determine objectively whether a proposed transaction likely will substantially lessen competition and as litigators to develop the

evidence necessary to support a challenge if the Division ultimately decides to file a suit.

Most significant mergers and acquisitions must be reported to the Division and the FTC before they occur. The premerger notification provisions of Section 7A to the Clayton Act, 15 U.S.C. § 18a, enacted as part of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, require enterprises to notify the Division and the FTC of a proposed transaction exceeding certain thresholds, to submit documents and other information to the agencies concerning the transaction, and to refrain from closing the transaction until a specific waiting period has expired. Since most of the Division's merger investigations will be conducted under the provisions of the HSR statute, attorneys should be familiar with its provisions and rules.

### 1.    A Basic Guide to the Premerger Notification Statute and Rules

This section describes the premerger notification procedures employed by the Division and FTC. Section 7A of the Clayton Act, 15 U.S.C. § 18a (Title II of the HSR Act, as amended), requires parties to certain acquisitions of voting securities or assets to notify both the Division and the FTC before consummating the proposed transaction and to submit certain information to both agencies. After notification, the parties must wait a specified time, usually 30 days (15 days for cash tender offers or bankruptcy sales, *see* 11 U.S.C. § 363(b)(2)), before the transaction can be consummated. The statute also allows the enforcement agencies to make a request for additional information which extends the waiting period.

The statute grants broad rulemaking authority to the FTC, with Division concurrence, to implement Title II. The HSR Rules are codified at 16 C.F.R. §§ 801-803. Questions regarding specific aspects of the Rules should be directed to the Legal Policy Section, the Premerger Notification Unit, or the appropriate special assistant. The Act, Rules, Formal Interpretations, Informal Interpretations, and additional current information relating to HSR including current thresholds can be found on the [FTC Premerger Notification Office's web page](#). *See also* ABA Section of Antitrust Law, The Merger Review Process (3d ed. 2005).

This section sets forth the basic rules with which attorneys conducting merger investigations should be familiar. The complete text of the Act and Rules should be consulted for specific information. Staff should generally not answer questions from the public about the reportability of particular transactions, filing mechanics, and filing fees. Such questions should be directed to the FTC Premerger Notification Office (telephone number 202-326-3100).

### a.     Determining Whether the Act Applies

#### i.     Tests

The 2000 amendment of the HSR Act requires the size thresholds discussed below to be adjusted annually for changes in the gross national product during the previous year. The FTC provides notice of the changes each year, and the current thresholds are posted on the FTC Premerger Notification Office's web page.

For a transaction to be reportable it must first satisfy the "commerce test." Either the acquiring or the acquired person must be engaged in commerce or in any activity affecting interstate commerce. *See* 15 U.S.C. § 18a(a)(1). If the transaction meets the commerce test and, as a result of such acquisition, the acquiring person would hold voting securities or assets worth in the aggregate more than $200 million (as adjusted), the transaction is reportable, unless an HSR exemption applies. *See* 15 U.S.C. § 18a(a)(2)(A). If, however, the acquiring person would hold voting securities or assets worth in the aggregate less than $200 million (as adjusted), the transaction must satisfy the following two tests in addition to the commerce test described above:

- Size-of-person test: One party to the transaction must have annual sales or assets of at least $100 million (as adjusted) and the other party $10 million (as adjusted). *See* 15 U.S.C. § 18a(a)(2)(B)(ii). When the acquired person is not engaged in manufacturing and does not have at least $100 million (as adjusted) of sales or assets, then it must have assets (not sales or assets) of at least $10 million (as adjusted). *See* 15 U.S.C. § 18a(a)(2)(B)(ii)(II).

- Size-of-transaction test: As a result of such acquisition, the acquiring person must hold voting securities or assets of the acquired person worth in the aggregate more than $50 million (as adjusted). *See* 15 U.S.C. § 18a(a)(2)(B)(i).

Thus, $50 million (as adjusted) is an absolute floor on reporting; if an acquiring person would not hold voting securities or assets of the acquired person valued at greater than $50 million (as adjusted) as a result of an acquisition, the acquisition is not reportable.

#### ii.     Definitions

The Rules define the statutory terms in these tests and the methods for calculating whether the size-of-person and size-of-transaction tests are met. *See* 16 C.F.R. § 801.1. The definition of "person," "entity," and "ultimate parent entity" in subpart (a), the definition of "control" in subpart (b), and the definition of "hold" in subpart (c) will be particularly important in making these determinations.

### iii.     Calculating Whether the Thresholds Are Met

The Rules, at16 C.F.R. § 801.11, explain how calculate the "size-of-transaction" and, when applicable, the "size-of-person."

### iv.     Special Types of Transactions

The Rules also contain a series of rules dealing with special types of transactions. Section 801.4 explains the concept of "secondary acquisitions." Whenever as a result of an acquisition (the primary acquisition), an acquiring person will obtain control of an entity that holds voting securities of another entity which it does not control, then that second aspect of the acquisition (the secondary acquisition) is separately subject to the Act and the Rules under Section 801.4.

Section 801.30 provides that the waiting period begins for certain types of acquisitions when the acquiring person files. The acquired person in such transactions is required to file within 15 days (10 days in the case of cash tender offers). Among the seven types of transactions afforded this special treatment under Section 801.30 are (a) acquisitions of voting securities on a national securities exchange or "over the counter," (b) acquisition of voting securities by means of a tender offer, (c) acquisitions (other than mergers and consolidations) in which voting securities are acquired from someone other than the issuer or related entity, and (d) secondary acquisitions. For all other acquisitions, the waiting period does not begin until all persons required to file have filed.

Section 801.32 makes clear that conversion of convertible voting securities is a potentially reportable acquisition under the Act (the acquisition of convertible voting securities is exempt under Section 802.31). Section 801.40 establishes the reporting scheme for formation of new corporations, particularly new corporate joint ventures. Under Section 801.40(a), each contributor to the corporate joint venture is deemed an acquiring person, and the corporation itself is deemed an acquired person.

The HSR Rules were amended in 2005 in order to reconcile, as far as is practical, what had been disparate treatment of corporations and noncorporate entities (such as partnerships and limited liability companies) under the Rules. In particular, the Rule amendments address the formation of noncorporate entities (Section 801.50) and acquisitions of interests in these entities. The central thrust of the rules is that meaningful antitrust review should occur at the point at which control of an unincorporated entity changes. Control of an unincorporated entity continues to be defined as having the right to 50 percent or more of the profits of the entity or 50 percent or more of its assets upon dissolution. Questions about the HSR treatment of partnerships or LLCs should be directed to the Office of the General Counsel and the Legal Policy Section.

**b.**     **Exemptions to the Reporting Requirements**

Exemptions to the reporting scheme are found in Section 7A(c) of the Clayton Act, 15 U.S.C. § 18a(c). These statutory exemptions include:

- Acquisitions of goods and realty transferred in the ordinary course of business.

- Acquisitions of bonds, mortgages and other obligations that are not voting securities.

- Acquisitions of voting securities, solely for the purpose of investment, if as a result of such acquisition the acquiring person does not hold more than 10 percent of the voting securities of the issuer.

- Transactions which require agency approval under certain statutes, such as the Bank Holding Company Act (in certain cases, material submitted to the agency must be filed with the FTC and the Antitrust Division 30 days before consummation).

- Transfers to or from a Federal agency or a state or a political subdivision thereof.

- Transactions specifically exempted from the antitrust laws.

- Transactions specifically exempted from the antitrust laws if approved by a Federal agency and if copies of all material submitted to such agencies are contemporaneously filed with the FTC and the Antitrust Division.

Part 802 of the Rules interprets these exemptions and contains additional ones. The Act grants the FTC, with the concurrence of the Division, authority to exempt from premerger reporting classes of transactions that are not likely to violate the antitrust laws. *See* 15 U.S.C. § 18a(d)(2)(B). For example, Section 802.2-.3 exempts certain real estate acquisitions, such as shopping centers, hotels and motels, agricultural property, and, unless much higher thresholds are met, acquisitions of oil, gas, and coal reserves. Section 802.4 exempts certain acquisitions of voting securities (or interests in LLCs or partnerships) where the acquisition of the assets of the acquired entity would have been exempt. Section 802.21 exempts acquisitions of voting securities if a notification threshold will not be met or exceeded. (The notification thresholds are defined in Section 801.1(h).) Section 802.23 deals with renewed and amended tender offers. Section 802.30 exempts intraperson transactions. Sections 802.50-.53 exempt many types of transactions dealing with foreign assets and/or foreign persons, often on the basis of limited nexus to U.S. commerce. Specifically, Section 802.50 exempts certain acquisitions of foreign assets, and Section 802.51 exempts certain acquisitions of voting securities of a foreign issuer. Certain acquisitions by creditors, insurers, and institutional investors are also exempted by Sections 802.63-.64.

**c.      Filing Mechanics**

Part 803 provides transmittal rules. The Notification and Report Form (Appendix to Part 803 of the Rules) must be completed in accordance with Section 803.1, and with the instructions in Section 803.2, and on the form itself. Whenever the person filing notification is unable to supply a complete response to any item on the form, a statement of reasons for noncompliance must be supplied, in accordance with Section 803.3. Each Notification and Report Form must be accompanied by one or more affidavits and must be certified, as provided in Sections 803.5-.6 of the Rules.

In some circumstances in which a foreign acquired person refuses to file notification, Section 803.4 may allow the acquiring person to file notification on behalf of the foreign person.

Section 803.7(a) provides that reported transactions must be consummated within one year following the expiration of the waiting period. If the reported transaction is not consummated within one year, an additional filing must be made and waiting period observed before the transaction may be consummated.

Section 803.8(a) requires existing English translations of all or part of any documents required to be submitted with the Notification and Report Form but does not otherwise require translation of documents submitted with the Form. The agencies can require the parties to translate documents provided in response to a second request under Section 803.8(b).

**d.      Waiting Period**

Sections 7A(a) and (b) of the Clayton Act state that, where notification is required with respect to a contemplated acquisition of assets or voting securities, that transaction may not legally be completed until notification has been accomplished and a 30-day waiting period has thereafter expired (only 15 days is required in the case of a cash tender offer or a bankruptcy filing). The waiting period may be extended by issuance of a request for additional information. The request generally extends the waiting period until 30 days (10 days in the case of a cash tender offer or bankruptcy filing) after the parties comply with the request. However a request for additional information to the target of a tender offer (whether or not a cash tender) or to an acquired person in a bankruptcy transaction covered by 11 U.S.C. § 363(b) does not extend the waiting period. *See* 15 U.S.C. § 18a(e)(2); *see also* Chapter III, Part D.f. If the waiting period would otherwise expire on a Saturday, Sunday, or legal holiday as defined in 5 U.S.C. § 6103(a), the waiting period is extended to the following business day. *See* 15 U.S.C. § 18a(k). Note that not all Federal holidays come within this statutory definition. For example, while January 1 comes within this definition, if the New Year's holiday is observed on December 31 or January 2, these dates do not, and waiting periods can expire. The waiting period also is not extended

because some offices of the Federal Government are closed, such as in the event of inclement weather. Similarly, the waiting period is not extended merely because some offices of the Federal Government are closed; for example, the waiting period expires even if the Federal Government is shut down due to inclement weather.

In some instances, parties have wanted to give the agencies additional time to determine whether to issue a request for additional information. This objective may be accomplished in some instances without payment of an additional filing fee by the acquiring person withdrawing its HSR form and refiling by 5:00 p.m. of the second business day following withdrawal. Parties should contact the FTC Premerger Notification Office for details on using this procedure.

Section 803.10(a) of the Rules explains when the waiting period begins, and Section 803.10(b) explains when it expires. It also addresses deficient filings. If the initial filing or second request response does not comply with the Rules, the filing person is to be notified promptly of the deficiencies. The FTC determines whether initial filing rules have been met and issues any notification of noncompliance with the initial filing requirements. *See* Chapter III, Part D.2.c (discussing procedures in cases of deficiencies). When a filing complying with the rules is received, the filing is deemed complete for purposes of triggering the running of the waiting period.

### e.   Early Termination of the Waiting Period

Section 7A(b)(2) of the Clayton Act, 15 U.S.C. § 18a(b)(2), authorizes the FTC and the Division to grant early termination of the Act's waiting period. A Formal Interpretation has been issued that describes the standards for early termination. Under the Formal Interpretation, early termination will normally be granted where (1) it has been requested in writing (the HSR form itself contains a box to be checked if the filing entity requests early termination), (2) all parties have submitted their Notification and Report Forms, and (3) both enforcement agencies have determined not to take enforcement action during the waiting period. In addition, early termination may be granted even absent a request in instances in which a second request has been issued. *See* 16 C.F.R. § 803.11(c).

All early terminations, regardless of when granted, must be cleared through the FTC and the Act requires that notice that early termination has been granted be published in the Federal Register. Grants of early termination are also published on the FTC's website and communicated promptly to the parties by the FTC.

If no preliminary investigation authority has been sought and the section or field office chief and staff agree that early termination is appropriate, they should notify the Division's Premerger Notification Unit promptly so that the response to the request may be relayed to the FTC without delay. *See* Chapter III, Part D.2.d.i.

If the Division has opened a preliminary investigation and the chief and EAG concur in staff's recommendation to grant early termination and to close the investigation, staff should e-mail a closing memorandum to the appropriate special assistant recommending early termination and closing. *See* Chapter III, Part C.7. After the investigation is closed, the Premerger Notification Unit will promptly relay the decision to grant early termination to the FTC. The chief or staff must also submit an MTS closing form via e-mail to the Premerger Notification Unit by sending it to the ATR-Premerger-MTS Forms mailbox. This procedure applies to granting early termination when requests for additional information have been issued, whether or not complied with. Thus, staff should not withdraw the outstanding requests until the Division's Premerger Notification Unit has initiated the early termination procedures.

The FTC is responsible for notifying the parties that early termination has been granted by both agencies, even in situations where the investigation has been cleared to the Division. The FTC is also responsible for handling other procedural requirements, including Federal Register publication. Accordingly, if contacted by the parties, staff should not advise them that the Division is willing to grant early termination, but rather should advise the parties to contact the FTC's Premerger Office for further information.

### f.    Request for Additional Information

Pursuant to Section 7A(e) of the Clayton Act, 15 U.S.C. § 18a(e), the Division or the FTC, but not both, may request additional information or documentary materials from any person required to file a notification (commonly referred to as a "second request") or from any officer, director, agent, or employee of such person. A second request must be made prior to the expiration of the 30-day waiting period (or 15-day waiting period in the case of a cash tender offer or bankruptcy filing). A second request extends the waiting period before which the transaction may be consummated for 30 days (10 days in the case of a cash tender offer or an acquisition from a debtor in bankruptcy) from the time when both parties (or, in the case of any kind of tender offer or a bankruptcy transaction, the acquiring person) have substantially complied with the request.

Where the transaction is any kind of tender offer, the second request to the acquired person does not extend the waiting period, which expires 10 days (cash tenders) or 30 days (other tenders) after the acquiring person has substantially complied with the second request, even if the target has not complied. *See* 15 U.S.C. § 18a(e)(2). The target must still respond to the second request within a reasonable time, *see* 16 C.F.R. § 803.21, or be subject to enforcement proceedings under Section 7A(g), 15 U.S.C. § 18a(g). To ensure that the necessary information is obtained in a timely fashion, the Division will generally issue both a second request and a CID to the acquired person in a tender offer or bankruptcy transaction (11 U.S.C. § 363(b)(2)) provides that the waiting

period can be extended by a second request in the same manner as a cash tender offer). When presented with such an instance, staff should notify the appropriate special assistant.

A second request is effective if received within the original waiting period by the party filing notification or if notice of the issuance of such request is given within the original waiting period to the person to which it is directed, provided the written request is mailed to that person within the initial waiting period (requests to individuals must be sent by certified or registered mail). Notice of issuance of the second request may be given by telephone or in person to the individual named in Item 1(g) of the filing, and the schedule must be read to the recipient, if requested, *see* 16 C.F.R. § 803.20. (In practice, the second request letters and schedules are typically faxed or e-mailed upon request, but it is still necessary to mail them under the statute.) Ideally, staff should provide notice by telephone before 5:00 p.m. on the day the waiting period expires and mail the second requests before midnight. Foreign companies are required to name in Item 1(h) an individual designated to receive service of a second request. Absent a second request, the waiting period expires at 11:59 p.m. Eastern Time on the 30th calendar day (15th calendar day in case of a cash tender offer or acquisition from a debtor in bankruptcy) following the beginning of the waiting period. *See* 16 C.F.R. § 803.10(b). If the waiting period would otherwise expire on a Saturday, Sunday, or legal holiday as defined in 5 U.S.C. § 6103(a), the waiting period is extended to the following business day. *See* 15 U.S.C. § 18a(k).

g.    **Other Provisions of the Act and the Rules**

i.    Preliminary Injunction; Hearings

Section 7A(f) of the Clayton Act, 15 U.S.C. § 18a(f), provides that when the Division or the FTC files a motion for a preliminary injunction and certifies to the district court that the public interest requires relief *pendente lite*, the Chief Judge of such district shall immediately notify the Chief Judge of the Court of Appeals for that circuit who shall designate a district judge to whom the action is to be assigned for all purposes.

ii.    Enforcement of the Act

Sections 7A(g)(1) and (g)(2) of the Clayton Act, 15 U.S.C. § 18a(g)(1)-(2), provide the enforcement mechanism for the Act. Under § 7A(g)(1), any person (or any officer, director, or partner thereof) who fails to comply with any provision of the Act may be liable, in an action brought by the United States, for a civil penalty of up to $16,000 for each day during which such person is in violation of the Act. (The $10,000 daily base year maximum is adjusted periodically for inflation. The Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, § 31001, 110 Stat. 1321, which amended the Federal Civil Monetary Penalties Inflation

Adjustment Act of 1990, requires that civil penalties be adjusted for inflation at least once every four years.) A 1991 Memorandum of Agreement between the Department of Justice and the FTC, for the purpose of promoting efficient and effective handling of civil penalty actions, provides that when the FTC requests that the Department of Justice bring a HSR civil penalty action, FTC attorneys may be appointed as Special Attorneys, under the supervision and control of the Attorney General.

Under 7A(g)(2), 15 U.S.C. § 18a(g)(2), either enforcement agency can seek injunctive relief if there has not been substantial compliance with the notification requirements of the Act and the Rules or with a second request. Under this section, the district court may order compliance and "shall extend the waiting period . . . until there has been substantial compliance." (The Act contains one exception: where a person whose stock is sought to be acquired by means of a tender offer (either cash or noncash) has not substantially complied, the waiting period may not be extended.) Section 7A(g)(2)(C), 15 U.S.C. § 18a(g)(2)(C), also authorizes the court to "grant such other equitable relief as the court in its discretion determines necessary or appropriate."

### iii.    Confidentiality of HSR Materials

Section 7A(h) of the Clayton Act, 15 U.S.C. § 18a(h), provides that HSR material ("[a]ny information or documentary material" filed with the Division or the FTC pursuant to the HSR Act) may not be made public except "as may be relevant to any administrative or judicial action or proceeding." Any questions regarding confidentiality of HSR materials should be directed to the General Counsel. The Division interprets this provision to mean an administrative action or proceeding in which the FTC or Department of Justice is participating (*e.g.,* by filing comments) or a judicial action or proceeding to which the FTC or the Department of Justice is a party. Thus, the Department of Justice may disclose HSR material in a complaint, brief, motion, or other pleading filed in a judicial action to which the Department is a party and in comments filed in regulatory agency proceedings. HSR material may also be disclosed, pursuant to the statute, to Congress.

HSR material is expressly exempted from disclosure under the FOIA. It may not be disclosed to state or foreign enforcement agencies or to third parties during depositions or interviews without the consent of the party producing the material. The Division has taken the position that it will not disclose HSR material to other Federal agencies (outside of the DOJ) except the FTC itself. The confidentiality constraints apply not only to HSR information contained in HSR filings, second request responses and information provided voluntarily by the merger partners during an HSR investigation, but also to the fact that an HSR filing has been made, the fact that a second request has been issued, and the date the waiting period expires.

Section 7A(h) has been interpreted by the two circuits that have addressed the issue as prohibiting the agencies from disclosing HSR information to state attorney general offices. *See Lieberman v. FTC*, 771 F.2d 32 (2d Cir. 1985); *Mattox v. FTC*, 752 F.2d 116 (5th Cir. 1985). Mechanisms have been developed by the National Association of Attorneys General (NAAG), the Division, and the FTC that encourage parties in some instances to provide state enforcement officials with HSR materials and allow greater coordination between Federal and state authorities investigating the same merger. NAAG's Voluntary Premerger Disclosure Compact allows parties voluntarily to file with a designated liaison state a copy of their initial HSR filings, and copies of second request schedules and production, in return for the Compact signatories agreeing not to serve their own compulsory process during the HSR waiting period.

To facilitate coordination of parallel Federal and state merger investigations as much as possible within statutory constraints, the Department announced and implemented a Protocol in March 1992 (revised in March 1998). By its terms, the Protocol applies where all acquiring and acquired persons in a transaction submit a letter to the Division that (1) agrees to provide the designated liaison state (as identified by the NAAG Compact) all information submitted to the Division under the HSR Act or pursuant to CIDs, and (2) waives the HSR and CID confidentiality provisions to the extent necessary to allow discussions of protected materials between the Division and the state attorneys general. Where these requirements are met, the Division will provide the coordinating state copies of the Division's second request and CID schedules and the HSR waiting period expiration date. The Protocol further states: "To the extent lawful, practicable and desirable in the circumstances of a particular case, the Antitrust Division . . . and the State Attorneys General will cooperate in analyzing the merger." *See* Chapter VII, Part C.5 (describing in more detail the relationship between the Division and state attorneys general in merger investigations). Waivers of HSR and CID confidentiality may also be used to allow sharing of parties' sensitive or proprietary information with foreign antitrust authorities and with other Federal agencies. A model waiver letter with respect to non-U.S. agencies can be found at http://www.justice.gov/atr/public/international/206543.htm.

Staff may frequently receive requests for greater protection for HSR material than that provided by the statute. As a policy matter, the Division will not grant greater restrictions on the Division's use of HSR material than that contained in the statute. An exception to this policy can only be made after consultation with the section chief, the General Counsel (including the FOIA/PA Unit), and the Office of Operations.

The Division's policy is to try to give a submitter ten days' notice, whenever possible, before placing HSR material on the public record in any administrative or judicial action or proceeding. Exceptions to this

policy may be authorized by the Assistant Attorney General, especially in cases where ten days' notice is not feasible (for example, where a temporary restraining order is being sought or where documents are attached to initial motion papers). Use of HSR material during litigation should be governed by a court-ordered protective order. *See* 45 Fed. Reg. 21,215-16 (1980).

In contrast to the ACPA, which expressly permits CID material to be used by the Division in connection with the taking of oral testimony pursuant to CID, *see* 15 U.S.C. § 1313(c)(2), Section 7A does not expressly authorize the use of HSR material in CID depositions. Thus, use of HSR material at depositions is governed by Section 7A's requirement that no such information or documentary material "may be made public." Accordingly, HSR material produced by a party should not be shown to another party or third party during a CID deposition or otherwise. Any questions regarding HSR confidentiality should be directed to the General Counsel.

### iv.    Relationship of Premerger Notification to Other Statutes

Section 7A(i), 15 U.S.C. § 18a(i), contains two important explanations of the relationship between the Act and other activities of the Division and the FTC. Under § 7A(i)(1), any action by either agency or any failure of either agency to take any action under the premerger notification legislation has no effect on any proceeding under any other provision of the HSR Act or any other provision of law. This means, for example, that the Division may challenge a transaction even if the waiting period has expired or if the Division has early terminated the waiting period. Moreover, under § 7A(i)(2), the ability of the enforcement agencies to make full use of the ACPA, the Federal Trade Commission Act, and any other provision of law "to secure at any time from any person documentary material, oral testimony, or other information" is not affected by the premerger notification requirements.

## 2.    Reviewing Premerger Filings

### a.    Procedures for Getting Premerger Filings to Staff for Review

The HSR Act requires parties to notify the FTC and the Department of Justice of certain proposed transactions. Three copies of the premerger notification form (and one set of attachments) must be submitted to the Division's Premerger Notification Unit and an additional two copies (and one set of attachments) must be submitted to the FTC. The filings are date stamped and immediately logged in. The FTC's Premerger Office assigns a premerger number to the transaction and computes the original waiting period. This information is immediately available to the Division through a direct link to the FTC's computer database. The Division's Premerger Notification Unit assigns the filing to the appropriate section based on the commodities involved in the transaction and the location of the parties. One copy of the filings with

attachments is sent to the appropriate section for review and a copy of the filings without the attachments is sent to EAG. The Premerger Notification Unit attaches to the filing a cover sheet that identifies the parties and when each filed, the premerger number, the date by which the section or field office needs to complete its initial review (the "section chief's response due" date), and when the waiting period expires.

**b.    Substantive Review of the Filing**

Generally, within five business days of receipt of a HSR filing (three days for a cash tender offer or bankruptcy filing), staff should decide whether the filing raises competitive issues that need to be investigated. The primary basis for this determination is the HSR form and its attachments, although a large number of other sources of information are also available.

### i.    Contents of the Form

The Notification and Report Form, which appears as an appendix to Part 803 of the Rules, is designed to provide the enforcement agencies with the information needed for an initial evaluation of any competitive impact of a proposed acquisition. The most significant changes to the Form to date were made in August 2011, as the FTC and the Division sought to improve the usefulness of the Form to agency staffs while reducing unnecessary burden on filers.

General background about the parties and the transaction is found in the preamble and Items 1-3. This information includes the type of transaction being reported and in what capacity the reporting person is reporting (*e.g.,* as an acquiring person or as an acquired person), as well as the identity of all other parties to the transaction. In particular, Item 3(a) requires a brief description of the transaction, and Item 3(b) requires submission of certain documents constituting the agreement.

Sales are categorized by each appropriate North American Industrial Classification System (NAICS) number. Item 5 requires submission of revenue data for the most recent calendar or fiscal year on a six-digit NAICS basis for nonmanufacturing industries and on a ten-digit NAICS basis for manufacturing industries. As of August 2011, older "base year" data is no longer required.

The Form now requires that revenues from products manufactured abroad but sold into the U.S. be reported under manufacturing codes. Prior to August 2011, such revenues were reported under wholesaling or retailing NAICS codes. This change will help staffs identify overlaps more readily where the parties manufacture the same product, with one manufacturing in the U.S. and the other abroad.

When reviewing NAICS information, staff should be aware that the classifications are not intended to track antitrust product markets.

NAICs information can be used as an initial proxy for overlaps, but the Codes are often either too broad or too narrow.

In addition, NAICS categories are not always clear and some businesses may legitimately be placed in more than one category.

The limitations of NAICS categories require staff always to review Item 4 documents that accompany the HSR form, even when the form does not reveal any NAICS code overlap. Item 4(a) requires filers to provide their Securities and Exchange Commission Central Index Key (CIK) numbers, giving staff easy access via the internet to SEC filings, including proxy statements, 10-K reports, 10-Q reports, 8-K reports, and registration statements. Item 4(b) requires submission of the most recent annual reports and/or annual audit reports. Item 4(c) requires submission of all studies, surveys, analyses, and reports prepared by or for officers or directors for the purpose of evaluating or analyzing the acquisition with respect to various aspects of competition. Documents produced in response to Item 4(c) may include, for example, board of director or management presentations. These 4(c) documents contain the firms' own analyses of the affected markets and the benefits they perceive from the proposed acquisition. Item 4(d), which was added to the Form in 2011, backstops Item 4(c) by requiring certain confidential information memoranda created to find a purchaser for the acquired firm, bankers' books, and efficiencies/synergies documents that may not meet all of the 4(c) requirements. Parties are not required to translate Item 4 documents, but are required to submit English language outlines, summaries, or translations that already exist. *See* 16 C.F.R. § 803.8(a).

Item 6 seeks information on significant (but less than controlling) holders and holdings of the reporting person.

Item 7 requires identification of six-digit industry overlaps, and Item 7(c) requires submission of geographic market data for transactions where such overlaps exist. This is important when reviewing industries characterized by local or regional markets.

The 2011 Form Changes require acquiring persons to provide certain information on "associates" (*see* 16 C.F.R. 801.1(d)(2)), which are essentially entities that are under common investment or operational management with the acquiring person. Information regarding six-digit overlaps between the acquired entity and associates of the acquired person is required in Item 7. In addition, Item 6(c)(ii) elicits information from acquiring persons on such overlaps between their associates' significant minority holdings and the acquired entity.

Item 8 requires, where six-digit NAICS code overlaps exist, the acquiring person to list certain acquisitions it has made.

### ii.    Other Sources of Information

If a review of the HSR form and attachments raises competitive issues, staff should conduct a search of publicly available information to decide whether an investigation should be opened. These sources include, among others, online articles about the relevant industries and companies and press accounts of the proposed transaction, Internet sources such as company web pages, and standard reference books kept in the Antitrust Division Library.

### c.    Assessing the Completeness of the Filing

In addition to substantively reviewing every HSR filing, staff should ensure that HSR filings are complete. When an HSR filing is incomplete or inaccurate, the FTC has the responsibility of notifying the parties. The FTC will require that the parties submit a corrected filing and file a new certification that the filing is complete. In those cases where the deficiency is significant, the waiting period will begin when the corrected filing is resubmitted. The FTC must inform parties of filing deficiencies promptly after the deficiency is discovered, but a filing can be rejected (or "bounced") whenever a deficiency is discovered, even if second requests have been issued and responses have been produced by the parties. After consulting with section management, the attorney reviewing the filing should promptly contact the FTC Premerger Notification Office, the Division's Legal Policy Section, and the Director of Civil Enforcement about any questions regarding the accuracy or completeness of a filing. If, for example, second request or voluntarily produced documents include documents that should have been submitted with the initial filing pursuant to Item 4(c), the Legal Policy Section and the FTC Premerger Notification Office should be promptly informed.

### d.    Recommendation to Open or Not Open an Investigation

Once an HSR filing has been assessed for completeness and substantively reviewed, staff should determine whether the proposed transaction poses no likely competitive harm or whether it raises questions sufficiently serious to warrant a preliminary investigation. All decisions to recommend the opening of a preliminary investigation and all close decisions not to do so should be discussed with the appropriate section chief or assistant chief before the recommendation is made.

### i.    The No-Interest Memorandum

When staff decides that a transaction does not warrant investigation, staff must fill out a "No-Interest" form. The form records information such as the identity of the parties, the HSR transaction number, NAICS codes, product and geographic overlaps, and a summary of the transaction. In the comments section, staff should explain why it recommends that no investigation be initiated. The form should be sent electronically to the reviewing official, usually the chief, assistant chief,

or section HSR coordinator. If the reviewer concurs in the recommendation, he or she will sign off on the recommendation and will electronically inform the Division's Premerger Notification Unit.

### ii.    Opening a Preliminary Investigation

A staff decision to seek preliminary investigation authority should be discussed with the chief of the section or field office before being drafted. Both staff and the chief of the legal section should consult with the economist assigned to the matter before seeking preliminary investigation authority. When a section decides to seek a preliminary investigation, staff should draft a preliminary investigation memo. *See* Chapter III, Part B.2. After the chief reviews the memorandum and approves it, the staff will send it to the Premerger Notification Unit by e-mailing it to the ATR-Premerger-PI Requests mailbox and the appropriate special assistant. The recommendation will be reviewed and clearance will be sought from the FTC to open the investigation.

### e.    Clearance Procedure

Since the FTC and the Division share enforcement responsibility for mergers and acquisitions, the two agencies have developed a clearance process to allocate responsibility between them for reviewing each proposed transaction. Only the agency with clearance may issue a second request. To trigger the clearance process at the Division, the staff reviewing the transaction must submit a request to the Premerger Notification Unit to conduct a preliminary investigation. In limited circumstances, a clearance request for a civil investigation may be submitted in short form. Those circumstances include clearance requests contesting an FTC HSR merger clearance request, mergers involving a cash tender offer or bankruptcy, HSR matters in which a significant portion of the waiting period already has expired before clearance is sought, or HSR matters for which it is clear at the outset that clearance will be contested by the FTC. Except when approved by the relevant Director of Enforcement, the short form clearance form should not be used in civil nonmerger investigations. When a short form clearance request has been submitted, staff must submit a full preliminary investigation memo within 48 hours.

The Division and the FTC have agreed to a clearance process in mergers based primarily on past experience and expertise. The process begins with the transmittal of a clearance request, an electronic form that lists the clearance number, the parties and the conduct being investigated, the geographic area, the premerger number, and the end of the waiting period. If clearance is contested, written claims justifying each agency's right to investigate the matter will be exchanged. The claims form should list each previous investigation or case claimed as expertise with a priority given to those matters handled within the past five years, identify how the matter relates to the transaction at issue, list any party expertise, and indicate whether the investigation was "substantial" (in

this context, substantial means the use of compulsory discovery). In compiling a claim, staff should request the Division's Premerger Notification Unit to conduct a search for all Division matters involving the contested parties and NAICS codes. Clearance is granted to the agency with the stronger claim. For a more detailed description of the clearance process, *see* Chapter VII, Part A.1.

### f.   Preclearance Contacts with the Parties

Parties often request the opportunity to meet with the Division or to provide written information or analysis before clearance is resolved in order to assist the clearance process or to make better use of the initial review period. The Division and the FTC have agreed to a preclearance contacts policy which provides that if the parties do not initiate contact with staff, the Agencies will not initiate contact with the parties without first notifying the other agency and offering the other agency the opportunity to participate. If a party initiates contact, the contacted agency will advise the party that clearance has not been resolved and that any information should be provided simultaneously to both agencies. If a preclearance meeting is deemed appropriate, the contacted agency will coordinate with the other agency to offer the requesting party a joint meeting with both agencies. If a party initiating the contact asks staff if it has any questions, the contacted agency should tell the party that clearance has not been resolved. The contacted agency may ask follow-up questions, but any written information provided in response to these questions should be submitted simultaneously to both agencies.

### g.   Maintaining the Filings

The Division takes the position that it may maintain HSR filings for future investigations. Each section has been directed to establish its own system of retaining HSR filings and periodically destroy filings that are no longer of interest to the section.

### h.   The Preliminary Investigation

The first phase of a merger investigation commences when FTC clearance has been granted and staff has been granted preliminary investigation authority. Staff should use this period to determine whether the proposed transaction raises issues substantial enough to warrant the issuance of a second request. To this end, when preliminary investigation authority is obtained, staff should outline its provisional theory of anticompetitive harm and should begin contacting customers, trade associations, competitors, and other relevant parties to determine whether there are likely competitive concerns in any relevant markets.

Staff should include the economist assigned to the investigation in all relevant aspects of the investigation, such as interviews, team meetings about the direction of the investigation, and the distribution of "hot" documents. In addition, in cases where divestiture is considered a

possible remedy or where efficiencies or "failing company" issues may be present, the Division's Corporate Finance Unit of the Economic Litigation Section should be advised at the earliest possible time.

Early in the investigation, staff should contact the parties to discuss possible competitive concerns and request information. *See* Chapter III, Part C.3.a (detailing information staff should request). The HSR Rules specifically provide for the enforcement agencies to request amplification or clarification of the information in the initial filing. Such requests are informal and voluntary, and they do not extend the waiting period or affect the Division's right to make a second request. The Division deems voluntarily provided information as coming within the confidentiality protections of section 7A(h) of the Clayton Act, 15 U.S.C. § 18a(h). *See* Chapter III, Part D.1.g.iii. Care should be taken, however, to inform the parties that the voluntary request is not a formal second request.

### i.   CIDs

As early as the preliminary investigation phase of a merger investigation, staff may find it advantageous to issue CIDs. While interviews are the primary tool available to staff at the preliminary investigation phase, in limited instances, CIDs—even CIDs for oral testimony—are the proper tool and necessary to help staff make significant progress toward resolving important issues (*e.g.*, market definition, competitive overlaps, entry, efficiencies, and failing firm defenses). Early CIDs are commonly used when staff would like to provide confidentiality protections to a third party hesitant to produce information or to compel a third party to produce information critical to a quick and efficient resolution of the investigation. For additional information on CIDs, *see* Chapter III, Part E.

### j.   Second Requests

If staff concludes that a transaction might raise competitive problems and more information is needed to evaluate it, staff should draft a second request and obtain approval to issue it before the expiration of the applicable waiting period. Second requests must be authorized by the Assistant Attorney General or his or her designee. A recommendation to issue a second request should be e-mailed to the Assigned DAAG and the Director of Civil Enforcement (or the appropriate special assistant) three full business days before the initial waiting period is due to expire. The recommendation should include a memorandum recommending a second request, second request letters to the parties, and the schedules setting forth the documents and information being sought. The memorandum should include sections that address:

- The transaction.

- The investigation.

- The investigative theory. This section should include subsections explaining the theories of competitive harm, possible product and geographic markets, best estimate of market shares and concentration, probable ease or difficulty of entry and any entry barriers, possible efficiencies, weaknesses in a potential case and ways they can be overcome, and other theories investigated and discarded.

- EAG projects underway or planned (along with any special concerns of EAG).

- Defense arguments and the Division's initial response.

- Outcome of past investigations in the industry.

- The ultimate likelihood or attractiveness of a case.

- The basis for any proposed deviations from the model second request.

Since a second request may have substantial consequences for the parties to the transaction, staff should carefully assess both the need for and the scope of the request; if a second request is necessary, staff should tailor it to the transaction and its possible anticompetitive consequences.

### i.      Model Second Requests

The Division and the FTC have agreed to a DOJ/FTC model second request schedule that increases consistency between the agencies and reduces compliance burdens on the parties. In addition, the Division has modified the model second request to update the schedule's instructions on electronic discovery. The Division's model second request is available on ATRnet. Staff should consult with the economist assigned to the matter to craft matter-specific document and information requests.

### ii.      Procedures for Issuing Second Requests

Second requests should be directed to the entity making the filing, unless directed to a specific subsidiary or division of the entity, or to a specific officer, director, agent, or employee of the entity. *See* 16 C.F.R. § 803.20(a)(1). The name and address of the entity making the filing is found in Item 1(a) of the HSR form.

For second requests to be effective and extend the HSR waiting period, staff must either: (1) give the entity written notice of the second request that is received within the initial 30- or 15-day waiting period; or (2) give notice of the second request to the entity via in-person or telephone communication with the person listed in Item 1(g) of the HSR form (Item 1(h) if the 1(g) person is outside of the United States), offering to read the full text of the Second Request to that person and reading the full request if asked. Also, staff must send written

confirmation of the second request via U.S. mail to the entity within the initial waiting period. *See* 16 C.F.R. § 803.20(a)(2). In the case of a second request issued to a natural person (*e.g.*, a board member of a corporation), written notice must be provided to the entity as in (1) or (2) above, and a written copy must also be hand-delivered or sent certified or registered mail to that person's home or business address.

To ensure timely effective notice of the second requests under both of the options described above, staff should e-mail the Item 1(g) contact person several days prior to the expiration of the initial waiting period if a second request is likely to be issued, requesting written confirmation that the 1(g) contact person will accept service of a possible second request on behalf of the entity. Staff should provide notice of the second request to the Item 1(g) contact person by telephone before 5:00 p.m. and mail the second requests before midnight on the day the waiting period expires, keeping in mind the building's mail pick-up schedule to ensure the correct postmark. In addition to mailed written copies, staff should fax or e-mail the second request to the 1(g) contact person before 5:00 p.m., and courtesy copies of the second request to other representatives of the entity as appropriate (*e.g.,* counsel for the entity who are the day-to-day contact with staff).

Cover letters signed by the Assistant Attorney General or his or her designee accompany the second request. These letters follow a standard format and should be sent to the special assistant in Operations when the recommendation is made to issue second requests. Once confirmation is received that the 1(g) contact person will accept service of the second request on behalf of the entity, the letter should be addressed to the entity (or person or entity's subsidiary receiving the second request) c/o the 1(g) contact person.

Since a second request issued to the acquired person in a tender offer (whether or not a cash tender) or bankruptcy transaction covered by 11 U.S.C. § 363(b) does not extend the waiting period, *see* 15 U.S.C. § 18 a(e)(2), the second request letter to the acquired person in a tender offer or bankruptcy transaction should not include the language extending the waiting period. *See* Chapter III.D.1.f. Instead, the letter should state that compliance with the concurrently issued CID will be considered compliance with the second request.

The proposed second request schedules and cover letters should be e-mailed, along with the accompanying recommendation memorandum, to the appropriate special assistant three full business days before the initial waiting period expires.

### iii.   Negotiating Modifications

Every second request modification must be agreed to in writing by the appropriate Division representative; without that written consent, the modification is not valid. Parties receiving second requests are encouraged to contact staff to negotiate limitations or modifications to

the second request. In considering requests for modifications, staff should consider the competitive issues involved, the manner in which information and documents are maintained by the parties, the type of information available to the parties, and the relative burdens to the parties of producing the requested information. Staff should respond to all requested modifications in writing within five business days.

If any issues arise in the course of modification discussions with staff, the parties may contact the chief or assistant chief to discuss the matter. Such discussions with the chief or assistant chief are relatively common during the second request modification process. In the event that any issue cannot be resolved at the section level, the Division has adopted a Second Request Internal Appeal Procedure for requested modifications to a second request. *See also* 15 U.S.C. § 18a(e)(1)(B)(i). This process provides for the party seeking modifications to appeal the chief's decision to a senior official who does not have direct responsibility for the review of any enforcement recommendation in the matter. Typically, this will be a Deputy Assistant Attorney General not involved in the decision-making process of the case. Staff should contact the appropriate special assistant to determine which official will handle the appeal and notify the parties. Staff should also notify the parties that the appeal should be in writing and no more than ten pages long and that it should include a concise explanation of the reasons why further compliance would be unduly burdensome and a summary of compliance discussions with staff and the chief. The reviewer may request additional information within two business days of receipt of the appeal and will render a decision on the appeal within seven business days after receipt of all necessary information.

### iv.    Compliance with the Second Request

Staff attorneys conducting the investigation are responsible for ensuring that the parties have complied with the second request. Clear instructions should be given as to where the response should be sent. Second request responses delivered after 5:00 p.m. eastern time on a regular business day, or at any time on any day other than a regular business day, shall be deemed received on the next regular business day. Delivery is effected on the last day when all the requested material is received and the parties have certified compliance with the second request. The Rules require that a complete response be supplied to any request for additional information. *See* 16 C.F.R. § 803.3. If a party is unable to supply a complete response, it should provide a statement of the reasons for noncompliance.

Staff should determine whether the parties are in substantial compliance with the second request as soon as possible (generally well before the expiration of the second statutory waiting period, even if there is a timing agreement extending the waiting period or otherwise committing the parties to delay the closing). If the submission is not in substantial compliance, staff should prepare a deficiency letter, for the

section chief's signature, specifying the areas in which the submission is deficient and that the parties failed to provide a sufficient explanation for noncompliance. If the section or field office chief concurs, the deficiency letter may be issued, but the parties may appeal to a senior official who does not have direct responsibility for the review of any enforcement recommendation in the matter. Typically, this will be a Deputy Assistant Attorney General not involved in the decision-making process of the case. Staff should contact the appropriate special assistant to determine which official will handle the appeal and notify the parties. As with disputes over modifications, staff should also notify the parties that the appeal should be in writing and no longer than ten pages and that it should include a concise explanation of the reasons why the party believes it is in compliance and a summary of the discussions with staff and the chief. The reviewer may request additional information within two business days and must render a decision on the appeal within three business days after receipt of all necessary information.

While evaluating compliance, staff should be mindful that, pursuant to Clayton Act § 7A(g)(2), it is possible for the Division to seek an injunction preventing the parties from closing their transaction until the parties have substantially complied. *See, e.g., FTC v. Blockbuster, Inc.*, Civ. No. 1:05CV00463 (D.D.C. filed March 11, 2005).

### k.    After the Second Request Is Issued

In the period between the issuance of the second request and substantial compliance by the parties, staff should conduct a thorough investigation that will allow it to decide whether the transaction is anticompetitive and should be challenged in court. From the outset, staff should be focused on building a case to evaluate litigation potential. Shortly after the issuance of a second request, staff must offer to engage in a second request conference with each party to discuss the competitive concerns that exist at that stage in the investigation. Staff should schedule any such conference within five days of the issuance of the second request. If at any time staff believes that a transaction is not likely to adversely affect competition, it may recommend that the investigation be closed. For procedures on closing investigations, *see* Chapter III, Part C.7.

When staff believes that the resolution of discrete issues through the examination of limited additional information could be sufficient to satisfy the Division that the transaction is not anticompetitive, staff may arrange a "quick look" investigation. In a "quick look" investigation, the parties refrain from complying fully with the second request and instead provide limited documents and information, and staff commits to tell the parties, by a particular date, whether full compliance will be necessary. In other investigations, it will be clear from the onset that the transaction raises serious issues that can only likely be resolved after a full investigation and compliance with the second request.

A full second request investigation typically will include issuing CIDs to third parties to obtain information necessary to compute market shares and documents necessary to assess the relevant markets and competitive significance of the transaction; taking depositions and obtaining statements for use in court; retaining and working with experts; conducting legal research; reviewing second request documents; using litigation support systems; and preparing economic and other evidence on the competitive effects of the transaction.

Because much has to be accomplished in a limited time period, staff should carefully develop a comprehensive plan for conducting the investigation. The plan should include who is responsible for implementing each part of the plan and when the task is to be accomplished. The focus should be on bringing the most persuasive evidence to bear on the issues of the investigation and include the appropriate use of discovery tools. One or more meetings are generally held with the Assigned DAAG and/or the Director of Civil Enforcement to discuss the case plan, case theory, and progress of the investigation.

### l.      Timing Agreements

The parties may want more time than the waiting periods in the Act allow to discuss fully the competitive significance of transactions with the Division. Accordingly, section management, in consultation with and following the approval of the Assigned DAAG, may enter into specific procedural agreements in exchange for specific undertakings by the parties regarding their submission of information and compliance with particular investigative requests. Timing agreements allow for the orderly review of information and dialogue on the competitive significance of a transaction, and staff should contact the parties within three days after issuing second requests to determine if a timing agreement is appropriate for its investigation. In these agreements, the parties typically promise not to close the transaction for some period of time after the expiration of the waiting period. The form of these agreements appropriately varies from transaction to transaction. Some potential commitments that may be included in the agreement include commitments for modification of and compliance with second requests and other discovery; early access to the parties' technical personnel and, if necessary, dates for depositions of the parties' executives (staff should consider conditioning these depositions on the receipt of certain documents in advance); the mutual exchange of economic information and dates for discussions between the Division's and the parties' economists; dates by which white papers and staff recommendations will be completed; and dates for meetings between the parties and Division management.

### m.     After the Parties Are in Substantial Compliance

Once the parties are in substantial compliance, *see* Chapter III, Part D.3.c.iv., the waiting period ends after 30 days (10 days in the case of a

cash tender offer or bankruptcy filing). Unless the parties have committed not to close the transaction as part of a timing agreement, the Division must make a decision on whether to challenge the transaction and seek preliminary relief to prevent the transaction from closing.

After the parties have responded to a second request and certified that they are in substantial compliance, staff needs to carefully review the submission substantively, assess the completeness of the submission and whether a deficiency letter should be issued, finish remaining interviews, affidavits, and depositions, and forward a recommendation (with, if applicable, a revised order of proof and any proposed pleadings) to the Assigned DAAG and the Office of Operations. Merger case recommendations generally should be provided to the Front Office one week before any Front Office meeting with the parties.

### 3.    Procedures for Recommending Suit

From the outset of its investigation, staff should be constantly assessing the possibility of challenging the proposed transaction and should conduct the investigation with an eye on proving any violation in court. If it appears likely that staff will recommend challenging the acquisition prior to consummation, staff should prepare the order of proof, evidentiary attachments, and proposed pleadings at the earliest point practicable. Staff should prepare affidavits and exhibits as it completes its investigation. When staff plans to accompany its motion papers, if suit is brought, with a declaration from an economist, the testifying economist assigned to the case should begin to prepare a declaration and accompanying exhibits. The legal basis for challenges to acquisitions prior to consummation is set forth in detail in Chapter IV, Part B, and staff should consult this analysis in preparing the necessary papers. In addition, staff should consult a special assistant in the Office of Operations for specific pleadings filed in other matters.

Because of the time constraints placed on staff by the HSR Act and Premerger Notification Rules, staff should notify the Assigned DAAG, any DAAG whose responsibility includes litigation, the Director of Litigation, and the Office of Operations as soon as it believes a recommendation to file suit is likely. Staff should be mindful of when a litigation hold should be instituted. Staff should also coordinate with the Appellate Section, as their assistance may be useful in the event that it becomes necessary to seek a temporary restraining order or preliminary injunction. For more information on recommending a merger case, *see* Chapter III, Part G.2.b.

## E.    Issuing Civil Investigative Demands

### 1.    Function of Civil Investigative Demands

#### a.    Where CIDs Can Be Used

In most of the civil matters handled in the Antitrust Division, CIDs can be used to compel production of information and documents if voluntary requests, *see* Chapter III, Part C.4, are judged to be inadequate or inappropriate for the Division's needs. Questions relating to the interpretation and scope of the ACPA, 15 U.S.C. §§ 1311-14, should be referred to the General Counsel and the Office of Operations. Under the ACPA, CIDs may be served on any natural or juridical person, including suspected violators, potentially injured persons, witnesses, and record custodians, if there is "reason to believe" that the person may have documentary material or information "relevant to a civil antitrust investigation." 15 U.S.C. § 1312(a). If there is "reason to believe" that any violation within the Division's scope of authority has occurred, there is sufficient authority to issue a CID even in the absence of "probable cause" to believe that any particular violation has occurred. *See, e.g.*, *Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721, at 74,064 (D.D.C. 1981), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986).

The ACPA defines "antitrust investigations" to include "any inquiry" by an "antitrust investigator" to ascertain if "any person is or has been engaged in any antitrust violation or in any activities in preparation for a merger, acquisition, joint venture, or similar transaction, which, if consummated, may result in an antitrust violation." 15 U.S.C. § 1311(c). An "antitrust investigator" is "any attorney or investigator employed by the Department of Justice who is charged with the duty of enforcing or carrying into effect any antitrust law" 15 U.S.C. § 1311(e). "Antitrust violation" means as "any act or omission in violation of any antitrust law, any antitrust order or, with respect to the International Antitrust Enforcement Assistance Act of 1994, any of the foreign antitrust laws." 15 U.S.C. § 1311(d).

CIDs are the compulsory process tool of choice in civil antitrust investigations of potential violations of the Sherman Act, 15 U.S.C. §§ 1-7, or the Wilson Tariff Act, 15 U.S.C. §§ 8-11, and in civil investigations under the International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-6212. CIDs are also available for use in investigations of potential violations of the Clayton Act, 15 U.S.C. §§ 12-27; however, in merger investigations, second requests are usually the preferred form of compulsory process for obtaining information from the parties. Service of CIDs does not extend the initial waiting period. However, in bankruptcy and cash tender transactions, a second request to the acquired person does not extend the waiting period; to ensure that the necessary information is obtained in a timely fashion, the Division will

generally issue both a second request and a CID to the acquired person in such a transaction. *See* Chapter III, Part D.1. In addition, CIDs are usually the only form of compulsory process available to compel production by third parties. Moreover, brief CIDs served on parties in such investigations early in the waiting period may serve to permit more precise drafting of second requests in some instances. CIDs can also be served on parties to supplement the second request, although obtaining timely production of material so requested may prove problematic.

While CIDs can be served only before the Division institutes a civil or criminal action, *see* 15 U.S.C. § 1312(a), they may be issued after the Division has decided to file a civil case and not yet actually filed the case. CIDs cannot be enforced after a complaint is filed. CIDs can also be used to investigate compliance with final judgments and orders in antitrust cases, although in specific situations it may be more efficient to gather compliance evidence by relying upon the "visitation" provisions incorporated in most of the Division's civil judgments. A decision to issue CIDs generally involves a significant expansion in resources committed by the Division and should be made only after serious consideration and a thoughtful reassessment of the matter's potential significance.

### b.      Criminal Investigations

In the event that a civil antitrust investigation uncovers evidence indicating that criminal prosecution is more appropriate than civil enforcement, a grand jury investigation should be opened. Further investigation may not be conducted by CID but rather must proceed by the grand jury process. Thus, for instance, CIDs may not be used to investigate violations of Section 3 of the Robinson-Patman Act, 15 U.S.C. § 13(a), which imposes solely criminal penalties. Evidence already obtained by CIDs may, however, be presented to the grand jury. *See* 15 U.S.C. § 1313(d)(1).

### c.      Other Matters Wherein CID Use Is Not Authorized

CIDs cannot be issued to investigate conduct that is clearly exempt from the antitrust laws, but CIDs can be issued to determine whether specific conduct falls within an exempt category. *See* Chapter III, Part E.8.d. Nor can CIDs be issued for preparing responses to requests for Business Review Letters, *see* 28 § 50.6, or to investigate violations of the Federal Trade Commission Act, *see* 15 U.S.C. § 1311(a). CIDs also cannot be issued to investigate violations of the Newspaper Preservation Act of 1970, 15 U.S.C. § 1803(b); however, if the Attorney General orders a public hearing in such a case, the presiding administrative law judge may permit any party (including the Antitrust Division) to conduct discovery "as provided by the Federal Rules of Civil Procedure." 28 § 48.10(a)(3).

There is also no authority to issue CIDs in connection with the Division's participation in proceedings before Federal regulatory agencies, but information previously gathered by CIDs validly issued for other purposes may be used in such proceedings. *See* 15 U.S.C. § 1313(d)(1). Given the statutory definition of "antitrust investigation," 15 U.S.C. § 1311(c), CIDs cannot be used to investigate possible terminations of judgments or violations of stipulations during the Tunney Act public comment period prior to entry of a consent decree.

### d.   Basic Characteristics of CIDs

CIDs can require a recipient to produce specified documentary material, give sworn answers to written interrogatories, give a sworn oral deposition, or furnish any combination of such responses. A CID can also require production of products of discovery undertaken in other matters, *see* 15 U.S.C. § 1312(a), which includes depositions, documents, interrogatory answers, and other items obtained by discovery in any judicial or administrative litigation "of an adversarial nature." 15 U.S.C. § 1311(i). The requirements for requesting production of products of discovery by CID are more fully discussed in Chapter III, Part E.3.a.iii.

CIDs should be mindful of the theory of the violation being investigated and should request the information needed to develop and establish the violation in accordance with that theory. Additional breadth of scope is generally to be avoided as unnecessary, inasmuch as additional CIDs can subsequently be served on the same person or others if the need for additional material later develops. Unnecessarily broad CIDs can delay an investigation by consuming additional time for respondents' production and staff's review of material that is not likely to contribute to the investigation's outcome. Special care should be taken to keep CIDs served upon third parties as narrow as possible, consistent with the investigation's goals. In some situations, a sharply honed CID with minimal instructions and definitions and only a very limited number of requests can encourage a prompt response.

CIDs issued for purposes that satisfy the requirements of the ACPA must nevertheless conform to all other applicable legal requirements and regulations. Additional considerations exist, for example, when issuing CIDs to:

- An attorney for information relating to the representation of a client. *See* United States Attorneys' Manual § 9-13.410.

- A reporter or news media organization for information gathered in the course of reporting news. *See* 28 C.F.R. § 50.10; *see also* Chapter III, Part F.11.b (discussing analogous procedures which apply in the context of issuing grand jury subpoenas to news organizations).

- A financial institution for customer transaction records. *See* Right to Financial Privacy Act of 1978, 12 U.S.C. §§ 3401-22.

### 2.    Legislative History of the Antitrust Civil Process Act and Amendments

#### a.    1962 Act

The ACPA had its origin in the final report of the 1955 Attorney General's National Committee to Study the Antitrust Laws, which noted that one of the problems faced by the Department of Justice in effectively enforcing the antitrust laws was the lack of compulsory process to obtain evidence during investigations where civil proceedings were contemplated from the outset. Report of Attorney General's National Committee to Study the Antitrust Laws 343-45 (1955). As the Committee pointed out, inadequate investigative tools may lead to incomplete investigations that may in turn mean civil proceedings that a more careful search and study would have shown to be unjustified. The ultimate social cost may be "a futile trial exhausting the resources of the litigants and increasing court congestion." *Id*. at 344. To remedy this deficiency, the Committee recommended legislation to authorize the Department of Justice to issue CIDs requiring the production of documents relevant to a civil antitrust investigation.

The need for such legislation was buttressed by the Supreme Court's opinion in *United States v. Procter & Gamble Co.,* 356 U.S. 677, 683 (1958), which condemned the use of the grand jury for the purpose of eliciting evidence for a civil case. This opinion drew further attention to the fact that the Division was forced to rely in civil investigations on the voluntary cooperation of those under investigation. Congress responded by passing the ACPA in 1962. Soon after its enactment, CIDs issued under ACPA were challenged on constitutional grounds. However, all such challenges were rejected by the courts. *Hyster Co. v. United States*, 338 F.2d 183 (9th Cir. 1964); *In re CBS*, 235 F. Supp. 684 (S.D.N.Y. 1964); *In re Gold Bond Stamp Co.*, 221 F. Supp. 391 (D. Minn. 1963), *aff'd per curiam*, 325 F.2d 1018 (8th Cir. 1964). A later challenge to a CID based in part on constitutional grounds was also rejected in *First Multiple Listing Serv. v. Shenefield, Inc.*, 1980-81 Trade Cas. (CCH) 63,661 (N.D. Ga. 1980).

As originally enacted, the ACPA authorized the issuance of CIDs for service only upon corporations and other nonnatural persons that were the targets of a civil investigation and only to compel the production of documents. In 1965, this narrow reach of the original ACPA was confirmed by the Ninth Circuit's decision in *United States v. Union Oil Co.,* 343 F.2d 29, 31 (9th Cir. 1965), where the court concluded that a CID had to be "confined to material relevant to the ascertainment of whether or not a person 'is or has been engaged in any antitrust violation.'" Moreover, the court held that this did not include investigations of activity that might result in a future violation, such as proposed acquisitions or mergers.

b.      **1976 Amendments**

The Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383, amended the ACPA to provide the Division with additional tools for the conduct of effective civil investigations. As so amended, the ACPA permits the Division to issue CIDs for oral testimony and interrogatory answers in addition to documents and permits CIDs to be served on natural persons as well as on corporate or other legal entities. The amendment also allows CIDs to be used to investigate potential violations such as contemplated mergers and permits CIDs to be served on persons who are not suspected violators.

c.      **1980 Amendments**

Additional amendments to the ACPA were made by the Antitrust Procedural Improvements Act of 1980. Pub. L. No. 96-349, 94 Stat. 1154. These amendments authorize the Division to obtain products of discovery by CID even though the material is subject to a protective order restricting its disclosure. *See* Chapter III, Parts E.3.a.iii. and E.8.e. The 1980 amendments also expressly authorize the Division to disclose CID material to "agents" of the Division, such as independent contractors specializing in automated document retrieval (who may be retained for indexing) or to economic experts or industry specialists. *See* Chapter III, Part E.6.

d.      **1994 Amendments**

The International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §§ 6201-6212, Pub. L. No. 103-438, 108 Stat. 4597, further amends the Act. This statute authorizes the Attorney General and the FTC to enter into "antitrust mutual assistance agreement[s]" with antitrust enforcement authorities of foreign countries or multinational entities to allow reciprocal disclosure of evidence concerning possible violations of the antitrust laws of such a country. *See* 15 U.S.C. § 6201. To that end, this statute broadens the ACPA's definition of "antitrust violation," 15 U.S.C. § 1311(d), to include "with respect to the International Antitrust Enforcement Assistance Act of 1994, any of the foreign antitrust laws." 15 U.S.C. § 6202(b).

## 3.      Types of CIDs

Every CID must identify the conduct being investigated and the statute potentially being violated, *see* 15 U.S.C. § 1312(b)(1), and must name a custodian and deputy custodian, *see* 15 U.S.C. § 1313(a). Care should be taken in drafting the CID form. Some CID challenges have been based in part on allegations that the conduct described is not an antitrust violation or that the requests are not tailored to the conduct. *See* Chapter III, Part E.8. If the investigation is later transferred to other personnel, staff should draft a letter for the Assistant Attorney General's signature to the CID recipient notifying it of the transfer of its CID materials to a different custodian. *See* Chapter III, Part E.7. In

addition, every CID should state the name and telephone number of a Division attorney who can answer inquiries about the CID and should draw attention to the text of 18 U.S.C. § 1505 printed on the back of the CID form.

### a.    CIDs for Documentary Material

#### i.    Description

The ACPA requires that CIDs for documentary material must "describe the class or classes of documentary material to be produced thereunder with such definiteness and certainty as to permit such material to be fairly identified," 15

U.S.C. § 1312(b)(2)(A), a standard comparable to the one applied in civil discovery and to grand jury subpoenas *duces tecum*. For a discussion of judicial interpretation of this standard, *see* Chapter III, Part E.8.

#### ii.    Originals and Copies

The Act's definition of "documentary material" expressly includes the "original or any copy" of requested documents. 15 U.S.C. § 1311(g). In practice, the Division agrees to accept copies rather than original documents. By specifying that "each nonidentical copy" of each requested document be produced, comments written on widely circulated documents can be obtained.

#### iii.    Products of Discovery

CIDs for documentary materials can be used to compel production of any "product of discovery" that was "obtained by any method of discovery in any judicial litigation or in any administrative litigation of an adversarial nature," 15 U.S.C. § 1311(i), that is in the possession, custody, or control of the CID respondent. Moreover, a CID for products of discovery "supersedes any inconsistent order, rule, or provision of law . . . preventing or restraining disclosure of such product of discovery to any person." 15 U.S.C. § 1312(c)(2). Thus, the CID respondent may not resist production on the basis of protective orders previously entered in the litigation wherein the products of discovery were obtained. 15 U.S.C. § 1312(c)(2) also provides that the disclosure to the Division of a product of discovery, pursuant to an express demand for products of discovery, "does not constitute a waiver of any right or privilege" such as the work product privilege.

In order to enable the person from whom the products of discovery were obtained to protect any legitimate interest in preventing or conditioning their production in response to a CID, the ACPA requires that the Division serve a copy of any CID for products of discovery upon the person from whom the discovery originally was obtained, *see* 15 U.S.C. § 1312(a) (last sentence), and requires that the respondent wait at least 20 days after such service before producing the products of discovery in response to the CID, *see* 15 U.S.C. § 1312(b) (last sentence).

Thus, the Division must provide the CID to its intended recipient and copies of it, with any accompanying schedule, to each person whose documents will be produced by the recipient. Service to the person from whom discovery was obtained can be made by mail and should include a [cover letter](). Both the person receiving the CID and the person from whom the discovery products were obtained have the right to object to the CID. *See* 15 U.S.C. §§ 1314(b)(1)(B), 1314(d).

Barring unusual circumstances, requests for the production of products of discovery obtained from a particular source should be made by a separate CID. This step will avoid delay in the response to other requests included in the CID and minimize the dissemination of information concerning the requests being made of the CID recipient. Products of discovery producible in response to a CID include deposition transcripts, interrogatories, documents, admissions, "thing[s]," "results of inspection of land or other property," and "any digest, analysis, selection, compilation, or any derivation thereof; and any index or manner of access thereto." 15 U.S.C. § 1311(i). The ACPA defines the products of discovery obtainable by CID more broadly than it defines "documentary material." Compare 15 U.S.C. § 1311(g) with 15 U.S.C. § 1311(i). Thus, for instance, a CID recipient can be required to produce "things" obtained as products of discovery, a category of materials that a CID respondent could not be compelled to produce if the respondent had not obtained it by discovery.

### iv.   Time Allowed for Production

The CID must specify a return date that "will provide a reasonable time within which the material so demanded may be assembled and made available for inspection and copying or reproduction." 15 U.S.C. § 1312(b)(2)(B). The length of time to be allowed for response in a specific case obviously depends on such circumstances as the number of files and locations required to be searched in preparing the response, other proceedings involving the respondent (*e.g.*, depositions) occurring simultaneously, and the needs of the Division. The return date stated in the CID must often be selected on the basis of incomplete knowledge by the Division as to the factors that determine its reasonableness. Consequently, CIDs are commonly served with a cover letter inviting the respondent or its counsel to telephone staff promptly after receipt of the CID to discuss a reasonable response time. For a more complete discussion of negotiations with CID recipients after service of a CID, *see* Chapter III, Part E.3.a.vi.

As previously mentioned, CIDs containing an "express demand for any product of discovery" cannot be made returnable fewer than 20 days before a copy of the CID has been served on the person from whom the discovery was obtained. 15 U.S.C. § 1312(b).

### v.      Manner of Production

The Act requires the respondent to make the requested documentary material "available for inspection and copying or reproduction" on the return date at its principal place of business, but authorizes alternative means of compliance by agreement with the Division. 15 U.S.C. § 1313(b). In most instances, CIDs are served with a cover letter specifying that the respondent may comply by mailing or shipping hard copy or electronic copies of the requested documentary materials to a specified address at the Division by the return date but reserving the Division's right subsequently to request production of the originals. Since such alternative means of production are usually more convenient both for the respondent and the Division, requests to reimburse respondents for copying costs are usually unjustified. Moreover, the Division is not authorized to reimburse respondents for the cost of searching for responsive documents, and no agreement for such reimbursement should ever be made. A request by several CID recipients that the Division be required to share the cost of compliance was rejected by a district court, albeit without discussing whether the Division could be required to do so. *See Finnell v. U.S. Dep't of Justice*, 535 F. Supp. 410, 415 (D. Kan. 1982).

If document copies are produced that are illegible and the respondent refuses to produce the originals, the Attorney General is authorized to petition the appropriate District Court for an enforcing order. *See* 15 U.S.C. § 1314(a).

A CID response is not complete without proper execution of the certificate of compliance on the back of the CID form. *See* 15 U.S.C. § 1312(g).

### vi.      Offer to Discuss Problems Raised by CID with Recipients

At the time CIDs are drafted, Division staff often lacks information about the manner in which respondent's documents are organized, their geographic distribution, accessibility, and other factors relevant to setting a reasonable response date. Consequently, the Division generally serves CIDs with a cover letter inviting the respondent, or its counsel, to telephone an antitrust investigator identified in the letter in order to attempt to resolve any avoidable problems created by the CID. Responders to this invitation almost always engage staff in a compliance negotiation, seeking to modify the scope of the request and enlarge the time for response.

The first step in compliance negotiations is often to encourage counsel for the respondent to provide an oral summary of the functions of relevant company personnel and the types and locations of company records. Where there is a question whether voluminous files would be helpful to the investigation, staff may specify that, initially, sample files be produced for inspection and evaluation. Early in the negotiation, staff should bring up issues of production related to the company's

electronic data systems and obtain an explanation of the manner in which the company's documents and information are stored and the types of information that is available on electronic sources.

Respondents' proposals to narrow the scope of the request must obviously be assessed in the context of the Division's needs for information and evidence necessary to satisfy the objectives of the investigation. The credibility of respondent's representations in support of such proposals must be carefully scrutinized before they are accepted as grounds for narrowing the scope of a CID. When staff is confident that certain information or documents requested may not be necessary to satisfy the objectives of the investigation, the recipient may be permitted to defer production of such material. Outright cancellation of portions of the CID, as opposed to deferral, should not be agreed to until the investigation has progressed to the point that the lack of need for the deferred material has been convincingly established.

Generally, responses will be made more quickly if staff attorneys can initially narrow the required search to the files of a few key personnel. Again, search of other personnel's files should not be canceled, but only deferred, unless it is clear the additional materials will not be needed, even in litigation. Often, narrowing the requests themselves will not save significant additional time, because once an individual's files have to be searched, the number or breadth of the requests may not significantly affect the amount of time it takes to conduct the search of those files.

Before determining which files should be searched at the outset, staff should ensure that they fully understand what files the CID recipient maintains as well as the range of responsibilities of all relevant personnel. General statements of counsel that "we have no such documents" in response to a CID request should be the beginning of the discussion, not its end. If necessary to reach important information, an additional CID can be issued.

Revisions to the response date are best discussed after agreement is reached on all proposed revisions to scope. An agreed-upon schedule for staggered production often benefits both the respondents and the Division. In working out such a schedule, production of documents and information likely to hold the key to the investigation's further progress should obviously be given a high priority.

**b.**     **CIDs for Written Interrogatory Responses**

CIDs for written interrogatory responses may demand statements of facts and contentions. The Act requires that they be "propound[ed] with definiteness and certainty." 15 U.S.C. § 1312(b)(3)(A). Respondents are required to answer each interrogatory "separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated in lieu of an answer." 15 U.S.C. § 1312(h). As is the case with CIDs for documentary materials, phased responses are

authorized and the CID response is not complete without proper execution of the certificate of compliance on the back of the CID form. *See id.* Usually, interrogatories aimed at obtaining facts and data are more useful than those aimed at contentions, but the latter are useful on occasion.

### c.    CIDs for Oral Testimony

#### i.      Notice

A CID for oral testimony must state the date, time, and place where the testimony will be taken and identify an antitrust investigator who will conduct the examination. *See* 15 U.S.C. § 1312(b)(4). Although the Act defines "antitrust investigator" broadly as to include nonlawyers, 15 U.S.C. § 1311(e), CID depositions should be conducted by lawyers in the absence of exceptional circumstances. More than one Division antitrust investigator may be present at a CID deposition. This point was also made by Senator Hart in the Senate debates on the Hart-Scott-Rodino Antitrust Improvements Act of 1976 when he stated that "the oral examination is to be conducted by the antitrust investigator (accompanied by any assistants he may need)." 123 Cong. Rec. S15,416 (daily ed. Sept. 8, 1976) (statement of Sen. Hart).

The CID form must identify a custodian for the transcript of the deposition. The ACPA neither expressly authorizes nor forbids deposing corporations and other entities by a procedure comparable to that authorized under Rule 30(b)(6), Fed. R. Civ. P. In appropriate circumstances, a CID can be issued to such a nonnatural person to produce, in order to testify on its behalf, the persons most knowledgeable on specified subjects. Such CIDs should be addressed to the corporation or other entity and accompanied by a schedule. The schedule should identify the subject matters to be covered in the deposition and state that persons designated as knowledgeable about those matters are required to provide oral testimony. Examples of 30(b)(6)-style schedules may be found by contacting a special assistant in Operations. Alternatively, albeit with some delay, the Division may serve CID interrogatories requesting identification of the most knowledgeable person concerning specified subject matter and then serve a CID for the oral deposition of that person.

If staff intends to compel a CID recipient to produce documents at the time and place of the deposition, a practice similar to that authorized by Rule 30(b)(5), Fed. R. Civ. P., staff should use the CID form for oral testimony and documentary material. This combined form is not appropriate, however, if the witness is to produce documents in advance of the deposition. If the date for production of documents is different than the date of the deposition, then staff should issue a CID compelling oral testimony and a separate CID compelling the production of documentary material.

### ii.    Location and Procedure for Taking Testimony

The statute provides that testimony may be taken in the Federal judicial district where the witness resides, is found, or transacts business, or in any other place agreed upon by the Division and the deponent. *See* 15 U.S.C. § 1312(i)(3). A CID deponent is entitled to the same fees and mileage as is paid to witnesses in U.S. district courts. 15 U.S.C. § 1312(i)(8). Payment should be arranged through the U.S. Marshal's Office or the U.S. Attorney's Office in the district where the deposition is being taken. Division attorneys should consult with the U.S. Attorney's Office to determine the local practice. The general practice is to conduct the deposition at an office of either the Division or the U.S. Attorney for the district in which the deposition is being taken.

The deposition must be taken before an officer authorized to administer oaths and affirmations, and the testimony must be taken stenographically and transcribed. *See* 15 U.S.C. § 1312(i)(1). In addition, the CID form specifies that the testimony may also be recorded by sound or sound and visual means. The stenographer should be reminded at the outset of any CID deposition, and perhaps again thereafter, that the deposition transcript is to be marked as protected under the ACPA, and that no copies thereof are to be released to the witness or to anyone other than the antitrust investigator or custodian named in the CID. Usually, the stenographer who records the testimony serves as the officer administering the oath or affirmation. Cf. Division Directive ATR 2570.1, "Payment of Litigation-Related Expenses" (concerning arranging for the services of a stenographic reporter).

CID depositions are closed to the public. Only the person testifying, his or her counsel, the antitrust investigators conducting the deposition, the officer before whom the testimony is to be taken, and any stenographer taking the testimony may be present. *See* 15 U.S.C. § 1312(i)(2); *see also* Chapter VII, Part C.5.b.ii. (regarding the presence of state attorneys general staff at CID depositions).

### iii.    Right to Counsel, Objections, Privilege, Cross-Examination

A CID deponent may be accompanied, represented, and advised by counsel at the deposition. *See* 15 U.S.C. § 1312(i)(7)(A). If an issue arises concerning counsel's conflict of interest in representing both the witness and the witness's employer or principal, it may be useful to have the witness's statement on the record as to who his or her lawyer is. If the witness does not so identify the lawyer at the deposition, that lawyer must be excluded from the deposition. Counsel may advise the witness, in confidence, either upon the request of the witness or upon the counsel's own initiative with respect to any question asked of the witness.

The witness or counsel may object on the record to a question and briefly state the reason for the objection. The ACPA provides that an objection may properly be made, received, and entered upon the

record when it is claimed that the witness is entitled to refuse to answer the question on grounds of any constitutional or other legal right or privilege, including the privilege against self-incrimination, which is discussed below. The statute provides that there is no other ground for refusing to answer a question or for interrupting the oral examination. *See* 15 U.S.C. § 1312(i)(7)(A). If the witness refuses to answer a question, the antitrust investigator conducting the examination may petition the district court for an order compelling the witness to answer. *See* 15 U.S.C. § 1314(a); *see also* Chapter III, Part E.8 (discussing judicial enforcement). The CID statute does not provide for questioning by the witness's counsel at the close of the Division's questions, and such questioning is generally not permitted (although in some situations staff may choose to allow a few clarifying questions from counsel). CID depositions differ in this respect from depositions taken pursuant to Fed. R. Civ. P. 30.

### iv.     Immunity

A CID deponent may refuse to respond to a question on the basis of the privilege against self-incrimination (a privilege only available to natural persons, not to corporations). Since a CID deposition is a "proceeding before . . . an agency of the United States" as contemplated in 18 U.S.C. § 6002(2), the Department of Justice may compel the testimony of the deponent under a grant of immunity in accordance with 18 U.S.C. § 6004. Under the latter section, a governmental agency may, with the approval of the Attorney General, issue an order compelling the testimony of an individual in an agency proceeding providing that the agency determines that the prospective testimony is necessary to the public interest and will otherwise be withheld under a Fifth Amendment self-incrimination claim. The authority of the Department of Justice to issue a compulsion order in connection with a CID deposition has been specifically delegated to the Assistant Attorney General and the Deputy Assistant Attorneys General of the Antitrust Division. *See* 28 C.F.R. § 0.175(c).

If a CID deponent has refused or will likely refuse to testify without immunity, staff should notify the Office of Operations. If staff recommends granting immunity to the deponent, staff should follow the procedures set forth in Chapter III, Part F.7 (discussing procedures and standards for seeking statutory immunity). All requests for statutory immunity must be approved by the Deputy Assistant Attorney General for Criminal Enforcement (Criminal DAAG) and cleared by the Criminal Division. Requests for immunity must be received by the Office of Criminal Enforcement at least two weeks before the date that staff will need the immunity authorization letter.

### v.     Witness's Review and Signature of Transcript

After the testimony is transcribed, the witness must be afforded a reasonable opportunity to examine the transcript, unless such

examination is waived by the witness. *See* 15 U.S.C. § 1312(i)(4). If appropriate under the circumstances, the witness may be afforded the requisite opportunity to review and sign the transcript, accompanied by counsel, without letting the transcript out of the Division's possession. Any changes in form or substance that the witness desires to make are to be entered and identified upon the transcript by the officer/stenographer or antitrust investigator, together with a statement of the reasons given by the witness for making these changes.

The transcript is then to be signed by the witness unless the witness waives signature in writing, is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within 30 days of being afforded a reasonable opportunity to examine it, the officer/stenographer or antitrust investigator is authorized to sign it and state on the record the fact of the waiver, illness, absence of the witness, or the refusal to sign, together with the reason, if any, given for the refusal. The transcript must contain a certificate of the officer to the effect that the witness was duly sworn by him or her and that the transcript is a true record of the testimony given by the witness. *See* 15 U.S.C. § 1312(i)(5).

### vi.    Witness's Right to a Copy of Transcript

A witness who has given a CID deposition has the right to receive a copy of the deposition transcript for a reasonable fee unless the Assistant Attorney General determines that the transcript should be withheld for good cause. *See* 15 U.S.C. § 1312(i)(6). Generally, CID deponents are allowed to obtain a copy of their deposition transcripts from the Division as a matter of course. Cf. Chapter III, Part E.6.b.iv. (regarding whether third-party documents used in the deposition should be provided as exhibits to the transcript).

Congress, however, recognized that under certain circumstances it may be an investigative necessity to withhold CID deposition transcripts from the deponent. Thus, at the time the statute was passed, members of Congress stated that the Assistant Attorney General may find good cause to withhold a CID transcript in investigations where there is a possibility of:

- Witness intimidation.

- Economic reprisal.

- The "programmed" formulation of a common defense by possible co-conspirators who "tailor" their testimony to match the evidence held by the Government.

- Perjury.

- The circulation of the copy to co-conspirators seeking to orchestrate testimony.

*See* Antitrust Civil Process Act Amendments of 1976, H.R. Rep. No. 94-1343, at 14-15 (1976) (witness intimidation, economic reprisal, tailored testimony); *see also* 122 Cong. Rec. 30,875-76 (Sept. 16, 1976) (witness intimidation, perjury, orchestrated testimony).

The Assistant Attorney General's authority to determine good cause is not delegable. Accordingly, when staff believes that withholding a CID deposition transcript or series of transcripts is appropriate, staff should forward a short memorandum to the Office of Operations requesting a good cause determination from the Assistant Attorney General. In such an instance, staff should immediately remind the court reporter not to disseminate the transcript to anyone outside the Division. Requests to withhold transcripts should be forwarded as soon as the need to withhold is identified. The requesting memorandum should succinctly explain the circumstances prompting the request, identify the good cause exception on which the attorney's request is based, and explain the reasons for which the general policy of disclosure should be overridden in this instance. Once a deponent requests a copy of the transcript, any conscious decision to delay release of the transcript can be construed as a decision to withhold. *See* 15

U.S.C. § 1312(i)(6); Antitrust Civil Process Act Amendments of 1976, H.R. Rep. No. 94-1343, at App. B (1976) (Letter from Thomas E. Kauper, Assistant Attorney General, Antitrust Division, to Peter W. Rodino, Chairman, the Committee on the Judiciary, U.S. House of Representatives); Testimony of Mark Green, Director, Corporate Accountability Research Group, Antitrust Civil Process Act Amendment, Hearings of the Subcommittee on Monopolies and Commercial Law of the Committee on the Judiciary, H.R. 39, 94th Cong., 1st Sess. 149, 151-52, 156 (1975).

A deponent may appeal a determination by the Assistant Attorney General not to release a CID deposition transcript. Such appeals are to be made in the United States District Court in which the CID document custodian's office is located. *See* 15 U.S.C. § 1314(d). Even when the Division withholds a copy of the transcript, however, CID deponents have an absolute right to inspect the transcript of their CID testimony. *See* 15 U.S.C. § 1312(i)(4).

## 4.   Procedures for Issuing CIDs

As soon as a section or field office has been authorized to conduct a preliminary investigation into a possible civil antitrust violation, it may request the Assistant Attorney General to issue CIDs. The request is made by forwarding a memorandum to the chief, explaining the need for the CIDs, requesting a production date (in practice, it is best to specify a number of days from the date of issuance), and attaching the requested CIDs and schedules. If the CIDs are the first to be issued in the particular investigation, careful consideration should be given to the

potential significance of the matter and the resources they will consume.

Each CID should be prepared on the appropriate form. Separate forms exist for demands for documentary material, oral testimony, written interrogatories, documentary material and written interrogatories, and oral testimony and documentary material. If the CID seeks documents or written interrogatories, a schedule itemizing the requested documentary material or interrogatories must be submitted.

CIDs for corporate documents and interrogatory answers should be addressed to the corporation and not an individual in the corporation. When possible, the CID should include a notation that it is to the "attention of" or "c/o" the General Counsel or another individual known to have authority to bind the corporation.

The chief will review these materials and, if she or he concurs, approve the CID package, which includes the requesting memorandum, cover memorandum from section management (if desired), CIDs, and schedules. Once approved, the section or field office should e-mail the package to the appropriate special assistant.

The Office of Operations will then review the package and forward it with a recommendation to the Front Office. The ACPA requires that all CIDs be signed by the Attorney General or the Assistant Attorney General. *See* 15 U.S.C. § 1312(a). In practice, all CIDs are approved by the Assistant Attorney General. In the Assistant Attorney General's absence, an Acting Assistant Attorney General will be designated to approve and sign CIDs. Once a CID is signed, it is given an identifying number, logged in by the Office of Operations, and returned to the requesting section or field office for service. The Office of Operations may arrange for service of field office CIDs to avoid the delay of returning signed CIDs to the field office for service.

When CIDs are returned for service, they are given to the lead attorney, who prepares a [cover letter](). If the CID is addressed to a person whose counsel has already been in contact with the Division with regard to the investigation, a courtesy copy of the cover letter and CID may also be sent by express mail or fax to counsel to enable preparation of the responses without delay.

### 5.    Service of CIDs

The provisions of the ACPA relating to the manner of service, 15 U.S.C. § 1312 (d), (e), and (f), apply equally to all forms of CIDs (*i.e.*, interrogatory, documentary, and oral deposition) and to petitions by the Division under 15 U.S.C. § 1314(a) for enforcement of a CID.

#### a.    Service on Domestic Respondents

In most instances, CIDs to be served "at any place within the territorial jurisdiction of any court of the United States," 15 U.S.C. § 1312(d)(1),

are served by mail (*i.e.*, by "depositing [a duly executed] copy in the United States mails, by registered or certified mail, return receipt requested." 15 U.S.C. §§ 1312(e)(1)(C), 1312(e)(2)(B). CIDs for an individual are to be mailed to his or her residence or principal office or place of business. *See* 15 U.S.C. § 1312(e)(2)(B). CIDs for a partnership, corporation, association, or other nonnatural entity are to be mailed to its principal office or place of business. *See* 15 U.S.C. § 1312(e)(1)(C). U.S. Postal Service Express Mail, certified and return receipt requested, may be used, but use of private courier or commercial overnight delivery companies does not conform with the statutory service-by-mail requirement and should not be used exclusively. Alternatively, service can be accomplished by personal "delivery" by an "antitrust investigator" (*e.g.*, a Division-employed attorney or paralegal, *see* 15 U.S.C. § 1311(e)) or by a United States marshal or deputy marshal. *See* 15 U.S.C. § 1312(d)(1). CIDs for a partnership, corporation, association, or other entity can be served by delivering a duly executed copy to any partner, executive officer, managing agent or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on its behalf, *see* 15 U.S.C. § 1312(e)(1)(A), or to its principal office or place of business. *See* 15 U.S.C. § 1312(e)(1)(B). CIDs for an individual can be served by delivering a duly executed copy thereof to the individual. *See* 15 U.S.C. § 1312(e)(2)(A). Although, per agreement with counsel, a copy of the CID may be provided by a means not specified in the statute (*e.g.*, fax, commercial overnight delivery company), the CID should always be served via one of the statutorily authorized methods.

**b.    Service on Respondents Situated Abroad**

Under the CID statute, even CID respondents situated abroad may be amenable to domestic service. Thus, a foreign corporation can be served by complying with the provisions for service on its domestic subsidiary, if an adequate measure of the foreign parent's control over the domestic subsidiary can be established. Alternatively, if a partner, executive officer, or managing or general agent of the corporation travels to the United States, personal service upon him or her on United States soil is effective service on the foreign corporation.

The Act also prescribes means of CID service on a person "not to be found within the territorial jurisdiction of any court of the United States," but such service will only be effective if "the courts of the United States can assert jurisdiction over such person consistent with due process." 15 U.S.C. § 1312(d)(2). The Act authorizes service on such persons, *see id.*, in accordance with any of the means for service prescribed by Rule 4(f), Federal Rules of Civil Procedure, for service on individuals in a foreign country. 15 U.S.C. § 1312(d)(2) provides for such service "in such manner as the Federal Rules of Civil Procedure prescribe for service in a foreign country." Rule 45(b)(2) and Rule 4(f), Fed. R. Civ. P., both contain provisions prescribing means for service

abroad, but an analysis of those provisions indicates that Rule 4(f) is the applicable provision. Of the alternatives provided in Rule 4(f), service by registered mail, return receipt requested, pursuant to a court order directing such service pursuant to Rule 4(f)(3), has occasionally been successfully invoked. Service pursuant to Rule 4(f)(3), Fed. R. Civ. P., can be obtained by submitting to the clerk of the United States District Court for the District of Columbia a Request for Service of Civil Investigative Demand, a duly signed copy of the CID to be served, and envelopes displaying the proper postage and return receipts. No hearing or appearance before a judge is required. Rather, the court clerk accomplishes the mailing and returns the signed Certificate of Mailing to the Division.

While, as the above discussion demonstrates, the CID statute explicitly provides for service upon foreign nationals and entities, in conducting investigations that require documents that are located outside the United States, the Department first considers requests for voluntary cooperation when practical and consistent with enforcement objectives. When compulsory measures are needed, the Department seeks whenever possible to work with the foreign government involved. It is essential that the Foreign Commerce Section be notified before service of a CID is attempted, regardless of the means employed, upon a foreign national, corporation, or other entity, or upon a domestic subsidiary thereof.

### c.   Proof of Service

Proof of service requires a verified return setting forth the manner of service by the individual making service. *See* 15 U.S.C. § 1312(f). Where service has been by registered or certified mail, the return must include the signed post office return receipt of delivery. *See id.* Staff should retain all evidence of service.

## 6.   Confidentiality and Permitted Uses of CID Materials

### a.   DOJ Use and Outside Disclosure of CID Materials

While the ACPA permits authorized Department of Justice personnel to use CID material in the performance of their official duties, *see* 15 U.S.C. § 1313(c)(2), it provides for only four circumstances under which CID material may be disclosed to third parties without the consent of the producing party. The ACPA authorizes disclosure of CID material to individuals other than the producing party or authorized Department of Justice personnel without the consent of the producing party as follows:

- To Congress. *See* 15 U.S.C. § 1313(c)(3).

- To the FTC, which is bound by the same rules as DOJ with respect to the use of CID material. *See* 15 U.S.C. § 1313(d)(2).

- To third parties "in connection with the taking of oral testimony" pursuant to the CID statute. *See* 15 U.S.C. § 1313(c)(2).

- For official use in connection with court cases, grand juries, or a Federal administrative or regulatory proceeding in which the DOJ is involved. *See* 15 U.S.C. § 1313(d)(1).

Regulations further governing the use of CID material by Department of Justice personnel are set forth in 28 C.F.R. §§ 49.1-.4.

In general, documents, answers to interrogatories, and transcripts of oral testimony obtained pursuant to a CID cannot be disclosed to state, foreign, or other Federal agencies (except for the FTC), nor can they be disclosed during the course of interviews with other parties, without the consent of the producing party. 15 U.S.C. § 1313(c)(3). CID materials are also explicitly exempt from disclosure under the Freedom of Information Act, but the CID and schedule issued by the Division are generally not exempt. *See* 15 U.S.C. § 1314(g). This FOIA exemption does not apply to non-CID materials, such as white papers, that CID respondents may voluntarily submit to the Division in the course of an investigation. For this reason, parties may ask that a CID be issued for such materials.

Despite these statutory limitations on disclosure of CID materials, the producing parties often seek to restrict further how the Division may use these materials. Parties seeking to limit the Division's use of their CID materials may either seek the consent of the Division or request that a court enter a protective order.

### b.    Requests for Additional Limitations on Use or Disclosure of CID Material

#### i.    General Policies

As noted above, documents, answers to interrogatories, and transcripts of oral testimony obtained pursuant to a CID may be used internally by authorized officials, employees, and agents of the Department of Justice in the performance of their official duties. *See* 15 U.S.C. § 1313(c)-(d). Agents include economic experts, industry specialists, and independent contractors specializing in automated document retrieval. *See* 15 U.S.C. § 1313(c)(2). Each agent should sign a confidentiality agreement with the Division before the disclosure of any CID material is made; disclosure, however, may be made if necessary before the contract containing payment terms has been fully processed. Before any disclosure, the Director of Civil Enforcement and the Office of the General Counsel must be informed.

Copies of CID material may be made for the official use of Department of Justice personnel. *See* 15 U.S.C. § 1313(c). The Division's use of CID material is not restricted to the pending investigation. *See* Chapter III, Part E.9 (discussing the Division's return of CID materials at the end of an investigation). Moreover, as a matter of policy the Division will not agree to restrict its use of CID material to the pending investigation. *See* 28 C.F.R. §§ 49.1-.4 (governing the use of CID material by the

Department of Justice); *see also* Division Directive ATR 2710.l, "Procedures for Handling Division Documents."

Parties producing CID material sometimes seek written commitments from the Division limiting how or when the Division will exercise its statutory authority to disclose CID materials. The Division discourages such additional confidentiality commitments. Such additional commitment should be granted only with the approval of the chief, and all members of the investigative staff should be notified of its existence. The FOIA/PA Unit should also be notified before any such additional commitment is granted to make sure that any additional protection conforms to Division policy. If staff seeks to use anything other than pre-approved language for such commitments, it must seek the prior approval of the Office of the General Counsel (including the FOIA/PA Unit). If the agreement involves potential disclosure of materials to Congress, the Legal Policy Section also should be consulted before any promises are made.

When asked for confidentiality commitments beyond those contained in the statute, staff should consider providing a letter consistent with confidentiality letter issued by the Division in similar circumstances in the past. Although parties are not statutorily entitled to such commitments, courts have issued protective orders in some circumstances limiting how the Division may disclose certain CID material. *See* Chapter III, Part E.6.b. Such additional commitments limit the Division's flexibility and burden staff with additional procedural requirements. In limited circumstances, however, providing additional commitments may be necessary or appropriate. Requests for such commitments should be considered on a case-by-case basis and should only be granted where there is a clearly demonstrated need. If any such commitment is made, the additional commitment should be defined as narrowly as possible, tailored to the specific request of the party, and confirmed in writing.

### ii.    Disclosure to Congress

On several occasions, CID recipients have attempted to obtain a commitment that the Division would refuse to disclose to Congress material produced pursuant to CIDs. The Division does not have the authority to withhold information from Congress and staff shall not make such a promise. *See* 15 U.S.C. § 1313(c).

The Division may agree, however, in very limited circumstances, to give "as much notice as is practicable" to a CID recipient before disclosing CID material to Congress. The Division's preferred practice is to explain to the CID recipient that the Division does not unnecessarily release confidential information to Congress, tries to respond to congressional inquiries in a manner that does not disclose such information, and is rarely asked to give CID material to Congress. As noted above, staff should consult the FOIA/PA Unit to ascertain whether the proposed

commitment conforms to Division policy, and both the Office of the General Counsel and the appropriate Director of Enforcement should be consulted before making a commitment of this nature.

### iii.      Disclosure to the Federal Trade Commission

The custodian of CID material is authorized, in response to a written request from the FTC, to deliver copies of CID material to the FTC for use in connection with an investigation or proceeding under the FTC's jurisdiction. CID material furnished to the FTC may only be used by the FTC in such manner and subject to such conditions as apply to the Department of Justice. The Division has discretionary power to either deliver or withhold CID material requested by the FTC. 15 U.S.C. § 1313(d)(2). Access requests by the FTC are covered in more detail in Chapter VII.A.3.

On occasion, CID recipients have attempted to obtain commitments that the Division will refuse to disclose specified CID material to the FTC. As a policy matter, the Division will not promise to withhold material from the FTC. On limited occasions, the Division will agree to give notice, but only "when practicable," before giving CID material to the FTC. As noted above, staff should consult with the FOIA/PA Unit and the appropriate Director of Enforcement before making any commitment beyond what is contained in the statute.

### iv.      Disclosure in the Context of a CID Deposition

The Division is authorized to use CID material without the consent of the producing party "in connection with the taking of oral testimony" in a CID deposition of either a third party or the producing party. *See* 15 U.S.C. § 1313(c)(2). Note, however, that the Division is not authorized under the antitrust statutes to use material submitted in response to a second request under the HSR filing in connection with the deposition of a person that did not submit the material. Although it is occasionally useful to use CID materials in a deposition of a third party where the third party has already seen the materials, or is at least generally aware of their substance, it is very rarely necessary to use CID materials in connection with a deposition of a third party that is unfamiliar with the contents of those materials. Nevertheless, some CID recipients ask the Division to agree to limit the use of CID documents in third-party depositions. Parties expressing concern as to such use should be told that the Division has an interest in seeing that competitors do not receive access to each other's confidential information, is sensitive to confidentiality concerns, and does not unnecessarily reveal such information.

In some special circumstances, the Division has agreed to provide advance notice, "if practicable," before using the producing party's CID material in a third-party deposition. The notice may be a specific number of days or simply for a period of time that is "reasonable under

the circumstances." Generally, this commitment should only be offered for a very limited number of documents that the producing party reasonably designates as "restricted confidential" or "highly confidential." The purpose for offering such notice is to give the producing party time to object or seek a protective order. The disadvantage to offering such a commitment is that it reduces the Division's flexibility at the deposition and may require the Division to identify to third parties persons whose depositions it is taking.

If CID material not produced by the deponent is used in a deposition, staff should consider carefully whether the deponent should be permitted to retain a copy of the material. Although the deponent has a right to review the material in connection with his or her review of the transcript, the Division has discretion as to whether to allow the deponent to keep a copy of the material. Division policy is to protect the legitimate confidentiality interests of parties and thereby encourage compliance with CIDs; thus, in circumstances where the deponent is not entirely aware of the substance of the document and the third party producer could reasonably object to the document being retained by the deponent, the deponent should not be permitted to retain a copy of the document. Examples of this include notes of a meeting in which the deponent participated produced by another participant and that include observations, reflections, or commentary, or a document that staff initially believes the deponent authored or read but that the deponent denies having seen.

In such a case the preferred practice is either to (a) allow the deponent to receive a copy of the document as an exhibit while reviewing the transcript, but require the exhibit to be returned with a signed affirmation (or letter from counsel) stating that no copies have been made, or (b) allow the deponent to receive a copy of the transcript without the exhibit attached, but permitting review of the document at Division (or other Department of Justice) offices if such a review of the document is necessary to the review of the transcript. Cf. Chapter III, Part E.3.c.vi. (discussing when the Division may withhold the transcript from the deponent). On the other hand, if the deponent is already aware of the substance of the document in question, it is permissible to allow the deponent to receive and retain a copy of the transcript with the third party document attached as an exhibit; providing the third-party document as an exhibit is an appropriate courtesy and may make it more convenient for the deponent to review, correct, and inspect the transcript. Examples falling into this category include depositions where a document authored or received by the deponent was produced by his or her former employer; an agreement signed by the deponent where the copy of the agreement was produced by the other party to the agreement; correspondence involving the deponent or his or her firm; or widely circulated newsletters that the deponent likely read.

### v.      Disclosure in Judicial or Administrative Proceedings

(a) Agreements Concerning Notice

The Division is authorized, pursuant to 15 U.S.C. § 1313(d)(1), to use CID material in connection with any court case or grand jury, Federal administrative proceeding, or regulatory proceeding in which the Division is involved. The Division's policy is to try to avoid using competitively sensitive information in complaints or openly discussing competitively sensitive information, but the Division will not agree to refrain from disclosing CID material in a judicial or administrative proceeding. If competitively sensitive information is to be used in a pleading, the Division's general policy is to make reasonable efforts to allow the party that produced the material the opportunity to seek a protective order. Alternatively, the Division may voluntarily file the document or portion of the pleading under seal.

Notifying parties in writing of the Division's general practice is preferable to making a specific commitment to provide notice. This is because promises regarding how and when the Division may use CID material in judicial and administrative proceedings may impose unnecessary procedural burdens on staff and limit the use of material under circumstances that could not be foreseen at the time the promise was made.

On limited occasions, the Division has agreed to certain limitations on its use of CID material in judicial or administrative proceedings. These agreements have been in the form of promises:

- To notify the producing party in advance, "to the extent that it is reasonably practicable" that the Division plans to use CID information produced by the party in a proceeding or has filed a complaint.

- To make "reasonable efforts" to notify the producing party before turning over material pursuant to a discovery request in litigation in order to provide the party with a reasonable opportunity to see a protective order

- To file under seal any information from a very limited number of documents containing CID information the producing party has reasonably designated "highly confidential" or "restricted confidential."

- Not to impose the party's appearance to seek a protective order or to use the Division's best efforts to secure a reasonable protective order.

Any agreement restricting the use of CID information should be approved by the General Counsel and Director of Civil Enforcement. If an agreement regarding notice is made, it should be as limited as possible and apply only to information or documentary material that the party, for legitimate reasons, designates as "highly confidential" or

"restricted confidential." Giving such notice should be agreed to only with parties that promise not to seek declaratory relief.

(b) Protective Orders During the Investigatory Stage

Producing parties that are not satisfied with the protection offered under the statute or by consent of the Division may seek a protective order issued by a court. Courts usually will issue such protective orders once a case is filed and, on occasion, even during the investigative stage. In *Aluminum Co. of America v. United States Dep't of Justice*, 444 F. Supp. 1342 (D.D.C. 1978), the court held that it was within its power to issue a protective order to limit disclosure to third parties of confidential information obtained by the Division through the production of documents in response to a CID. The *Aluminum* opinion was followed by the Second Circuit in United States v. GAF Corp., 596 F.2d 10 (2d Cir. 1979); accord *Finnell v. U.S. Dep't of Justice*, 535 F. Supp. 410, 413 (D. Kan. 1982).

(c) Discovery/Protective Orders During Proceedings

Once a case is filed, the use of CID material in that case will typically be governed by a protective order issued by the court in which the suit is pending. All protective orders must be approved by the Director of Litigation. Whenever a civil action is commenced based on information obtained by CID, the defendants in that action may invoke their full discovery rights under the Federal Rules of Civil Procedure and obtain CID information gathered in the investigation that is relevant to their defense. The House Report on the 1976 amendments to the ACPA noted that the defendants will thus be able fully to protect their rights at trial by interrogating, cross-examining, and impeaching CID witnesses. The House Report also noted that the scope of civil discovery is not unlimited and that the court has broad discretion under the Federal Rules to set limits and conditions on discovery, typically by issuing a protective order. *See* H.R. Rep. No. 94-1343, at 2610 (1976).

During pretrial discovery, parties will typically request that some, or all, CID materials be provided either voluntary or by compulsory process. In the past, when some producers of CID materials have sought to prevent disclosure of their material in litigation, the Division has taken the position that they are discoverable. Although defendants have the right to discover any CID materials obtained by the Division during the investigation that resulted in the civil litigation to which they are a party (subject to any limitations on discovery provided by the Federal Rules of Civil Procedure and any court-imposed protective order) defendants may also attempt to discover CID materials obtained by the Division during the course of other investigations.

The Division's position with respect to a discovery request for CID materials from another investigation is that CID confidentiality continues to apply to such materials, and they are not subject to discovery, unless (1) the materials being sought have been made public

during the course of prior litigation before a court or Federal administrative or regulatory agency; (2) the litigant seeking discovery has the consent of the person who produced the CID materials to the disclosure; or (3) the Division has used such materials during the course of the instant pretrial investigation or intends to make use of them at trial. Use during the investigation means more than simply perusing the materials to determine whether they are relevant; they must be put to some more direct use during the pretrial stage. The Division essentially adheres to the position adopted by Judge Greene in *United States v. Am. Tel. & Tel. Co*., 86 F.R.D. 603, 647-48 (D.D.C. 1979) (concerning the discoverability of CID materials produced in other investigations).

The Division's position on the reasonableness of protective orders is guided by balancing the public interest in conducting litigation in the open to the greatest extent possible, *see* 28 C.F.R. § 50.9, against the harm to competition from having competitively sensitive information disclosed to competitors. Staffs should also keep in mind that the disclosure of third-party confidential business information obtained through CIDs may cause third-party CID recipients to be less cooperative with the Division in the future.

Typical protective order provisions include:

- Providing both litigating and third parties with the opportunity to designate material as confidential if they have not already done so.

- Requiring parties to restrict their use of any confidential information they have obtained to the preparation and trial of the pending action.

- Restricting access to confidential material and information to the Division, the parties' outside counsel, and certain consultants, denying access by the defendants' business personnel to competitively sensitive documents from competitors.

- Requiring any court submission that contains confidential information or material to be placed under seal, with properly redacted copies available to the public.

- Requiring that the producing party be given an opportunity to request in camera treatment before disclosure of any confidential material or information at trial.

Regardless of whether the Division has filed a case, CID deposition transcripts may be discoverable from the deponent by a third party, and staff should so inform a deponent who is concerned about confidentiality. *See In re NASDAQ Market-Makers Antitrust Litig*., 929 F. Supp. 723, 727 (S.D.N.Y. 1996); *In re Air Passenger Computer Reservation Sys. Antitrust Litig*., 116 F.R.D. 390, 393 (C.D. Cal. 1986). Although the issue is not settled, the Government may be able to assert a qualified privilege over such materials. *See McCray v. Illinois*, 386 U.S. 300, 309-11 (1967) (citing *Vogel v. Gruaz*, 110 U.S. 311 (1884)) and

*Three Crown Ltd. P'ship v. Salomon Bros., Inc.*, 1993-2 Trade Cas. (CCH) ¶ 70,320, at 70,665 (S.D.N.Y. 1993). A Division attorney who has sufficient concern about keeping the information in a deposition from the subject of the investigation may want to consider withholding the copy of the transcript from the witness. *See* Chapter III, Part E.3.c.vi.

### 7.   CID Custodians and Deputy Custodians

The Act requires that the Assistant Attorney General designate an antitrust investigator to serve as custodian, and such additional antitrust investigators as the Assistant Attorney General may from time to time determine to be necessary to act as deputy custodians, of documentary material, answers to interrogatories, and transcripts or oral testimony received under the Act. *See* 15 U.S.C. § 1313(a). When a CID is issued, the general Division practice is to appoint the chief of the requesting section or field office as the custodian and the lead attorney on the matter as the deputy custodian. (Staff may also designate additional attorneys as deputy custodians.) Staff should complete the section of the CID specifying the custodian and deputy custodian by first writing the title then the name of the custodian (typically the relevant section chief) followed by the title then the name of the deputy custodian (typically the lead attorney).

The custodian and deputy custodians are responsible for taking physical possession of the documentary material, interrogatory answers, and transcripts of oral testimony produced pursuant to the CID, for protecting these materials against unauthorized use or disclosure, and for their eventual return. *See* 15 U.S.C. § 1313(c). Persons appointed to these positions should arrange for their removal when transfers, reassignments, resignations, or the like no longer permit them to carry out their custodial obligations.

### 8.   Grounds for Objection and Judicial Proceedings Concerning CIDs

#### a.   General Standards—Both Grand Jury and Civil Discovery Standards Apply

The ACPA provides that no CID shall require the production of any documentary material, the submission of any answers to written interrogatories, or the giving of any oral testimony that would be protected from disclosure under either (1) the standards applicable to grand jury subpoenas or (2) the standards applicable to discovery requests under the Federal Rules of Civil Procedure "to the extent that the application of [civil discovery standards] to any such demand is appropriate and consistent with the provisions and purposes" of the ACPA. 15 U.S.C. § 1312(c)(l).

The civil discovery protections were added to the existing grand jury subpoena standards in 1976. *See* Hart-Scott-Rodino Antitrust Improvements Act of 1976 (1976 amendments), 15 U.S.C. § 18a. Since

that date, CID recipients have litigated the issue of which standard applies when the standard governing the extent of permissible civil discovery is in conflict with the standard that applies in grand jury investigations. The legislative history of the 1976 amendments and the cases recognize that, in general, civil antitrust investigations usually more closely resemble grand jury investigations than typical civil discovery because they are usually broader in scope and less precise in nature than typical civil discovery. Consequently, these authorities generally avoid rigid application of postcomplaint civil discovery standards to CIDs. Successful challenges to CIDs are rare and generally have been limited to burden and relevance issues.

The House Report on the 1976 amendments stressed that their purpose was to increase the effectiveness of antitrust investigations and that application of civil discovery standards must be consistent with this purpose. *See* H.R. Rep. No. 94-1343, at 2606-07 (1976). (Note that the House Report specifically provided that one category of discovery objections permitted under the Federal Rules of Civil Procedure may not be raised against a CID: objections based not on the burdensome or irrelevant nature of the CID but instead on the various procedural requirements of the civil rules, such as rights of notification, intervention, confrontation, and cross-examination.) According to the Second Circuit, this House Report "reveals a preference for [applying] the less stringent grand jury subpoena standard, 'tailored as it is to reflect the broader scope and less precise nature of investigations [as compared to adjudications].'" *Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983). The Second Circuit reasoned that civil discovery standards are tailored to meet the requirements of formal, adversary, adjudicatory proceedings involving detailed pleadings setting forth specific allegations and responses. *See id.* at 58 n.9. Since the issues in adjudications will be more narrowly drawn and well-defined than in an investigation, the grand jury standard is more appropriately applied to antitrust investigations. *See id.*

Senator Philip Hart's explanation of the intent behind the 1976 amendments also supports the theory that civil discovery standards have limited application to CIDs:

> We included the House language . . . because the qualification in that language limited the application of discovery standards in the FRCP to those that are appropriate and consistent with the purposes of the Act. This important qualification provides assurances that unreasonable constraints will not be applied to the Department's investigations. *See* H. Rep. 94-1343. We view the FRCP standard as essentially incorporating the "oppressive" and "burdensome" standards of Rule 26(c). So limited, this standard is consistent with the purposes underlying the Act and would not breed unnecessary litigation by persons seeking to thwart civil antitrust investigations.

Cong. Rec. S15,416 (daily ed. Sept. 8, 1976) (statement of Sen. Hart). Additionally, Senator Hart outlined the "important" factors that should be taken into account in deciding which civil discovery grounds are "appropriate and consistent" for application to CIDs:

- Investigations, unlike pretrial discovery and litigation, are not adversary or adjudicatory.

- Pretrial discovery and litigation have different purposes, a narrower scope, and more clearly definite issues than investigations.

- Parties to pretrial discovery and litigation are clearly identified, while there are no parties in investigations; possible antitrust wrongdoers may not be firmly identified until late in the investigation.

- Parties in pretrial discovery and litigation have certain rights with respect to notification, participation, intervention, confrontation, and cross-examination, whereas there are no such rights (even for targets) investigations.

- Narrow, technical, or merely procedural objections which frustrate expeditious [*sic*] civil antitrust investigations are normally not "appropriate and consistent."

- Relevance in an investigation may be different from relevance in pretrial discovery; once litigation is begun, the interests and scope of the matter tend to be much more specific and refined than in investigations.

- Civil antitrust investigations are nonetheless investigations, and they are in most respects closer to grand jury investigations than they are to pretrial discovery or litigation.

*See also United States v. Witmer*, 835 F. Supp. 201, 207 n.8 (M.D.Pa. 1993), vacated in part on other grounds on reconsideration by 835 F. Supp. 208 (M.D. Pa. 1993), *aff'd by* 30 F.3d 1489 (3rd Cir. 1994) (noting that to the extent the 1976 amendments cite with approval Cleveland Trust and Hyster, "this court believes that Congress intended to approve the use of the discovery rules primarily as a source of protection for privileged information and from vexations or overbroad requests for information").

In addition to the Second Circuit's opinion in *Associated Container*, at least one other post-1976 court decision specifically refers to grand jury subpoena standards as more appropriate to antitrust investigations. *Maccaferri Gabions, Inc. v. United States*, 938 F. Supp 311, 314 (D. Md. 1995) (citing Petition of Gold Bond Stamp Co., 221 F. Supp. 391 (D. Minn. 1963), *aff'd per curiam*, 325 F.2d 1018 (8th Cir. 1964)), holds that CIDs cannot contain any requirement that would be considered unreasonable if contained in a grand jury subpoena *duces tecum*.

There is little other case precedent concerning the application of civil discovery standards to CIDs, but where such objections have been raised, the courts, like Senator Hart, have focused on burden and relevance. *See, e.g., Material Handling Inst., Inc. v. McLaren*, 426 F.2d 90, 92-93 (3d Cir.), *cert. denied*, 400 U.S. 826 (1970) (relevancy and discovery of records maintained in nondocumentary form); *Maccaferri*, 938 F. Supp. at 314 (citing *Finnell* for the proposition that appropriately modified overbroad or unduly burdensome CIDs are enforceable); *Finnell*, 535 F. Supp. 410, 412 (D. Kan. 1982) (objections on grounds, *inter alia*, of burden and relevance denied, with court noting that "[t]he Government has a relatively light burden in proving the relevance of the CIDs to the ongoing investigation"); *Phoenix Bd. of Realtors, Inc. v. U.S. Dep't of Justice*, 521 F. Supp. 828, 832 (D. Ariz. 1981) (CIDs held not to be unduly burdensome where Division attorneys had repeatedly indicated a willingness to negotiate with recipient regarding burden and scope of demands); *Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721, at 74,062 (D.D.C. 1981), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986) (objections may be made if demand is too broad and sweeping, not relevant, not limited to reasonable time period, burdensome, privileged); *First Multiple Listing Serv. v. Shenefield*, 1980-81 Trade Cas. (CCH) ¶ 63,661 (N.D. Ga. 1980) (certain original demands found to be burdensome, but compliance ordered after modification of demands); *Sterling Drug, Inc. v. Clark*, 1968 Trade Cas. (CCH) ¶ 72,629 (S.D.N.Y. 1968) (CID requiring second search of company files not unduly burdensome); *In re CBS, Inc.*, 235 F. Supp. 684, 688 (S.D.N.Y. 1968) (reasonableness of demand); *Gold Bond*, 221 F. Supp. at 394 (CID must be in writing and relevant to antitrust investigation, state nature of conduct constituting alleged violation, state provision of applicable law, and define documents sought with sufficient particularity); *Houston Indus. v. Kaufman*, Civ. No. H-95-5237, 1996 WL 580418 (S.D. Tex. March 7, 1996) (relevance determination of Department of Justice to be given wide latitude).

### b.   Objections Based on Procedural Requirements of the Act

In addition to objections on grounds of the applicable standards, CID recipients have objected on grounds of failure to comply with the Act's procedures and requirements. For example, the Act requires that each CID state the nature of the conduct, activity, or proposed action under investigation and the provision of law applicable to the investigation. *See* 15 U.S.C. § 1312(b)(l). In the first of several cases in which this challenge was made, Gold Bond, the Division alleged that it was investigating "restrictive practices and acquisitions involving the dispensing, supplying, sale or furnishing of trading stamps and the purchase and sale of goods and services in connection therewith." 221 F. Supp. at 397. The court overruled recipient's motion to quash, noting that the sufficiency of the description must be in accordance with the Act's purpose to enable the Attorney General to determine whether

there was a violation of the antitrust laws and, if so, properly to allege the violation in a civil complaint. From this, the court concluded:

> Necessarily, therefore, the nature of the conduct [under investigation] must be stated in general terms. To insist upon too much specificity with regard to the requirement of this section would defeat the purpose of the Act, and an overly strict interpretation of this section would only breed litigation and encourage everyone investigated to challenge the sufficiency of the notice. *Id.*

Since the *Gold Bond* decision, at least seven cases have involved challenges to the adequacy of description of the investigation. In each instance, the *Gold Bond* decision was followed and the descriptions were found to be satisfactory. *See, e.g.*, *Material Handling Inst.*, 426 F.2d at 92. (holding that "possible violation of section l of the Sherman Act by a 'contract or combination in unreasonable restraint of trade'" presents serious concern as to adequacy, but is rendered legally sufficient by subsequent correspondence and conversations between the Government and the recipient prior to issuance of CID); *Lightning Rod Mfrs. Ass'n v. Staal*, 339 F.2d 346, 347 n.1 (7th Cir. 1964) (alleging "[c]onspiracy to restrain trade by fixing the prices of lightning protection systems and components thereof and by conspiring to refuse to deal with a purchaser of components thereof; conspiracy to monopolize by agreeing to exclude a seller of lightning protection systems from the sale thereof"); *Hyster Co. v. United States*, 338 F.2d 183, 184 n.4 (9th Cir. 1964) (alleging "concerted action with manufacturers of tractor equipment, accessories and parts to control production and distribution, and restrictions upon pricing and distribution of those products"); *Maccaferri Gabions v. United States*, 938 F. Supp. 311, 314 (D. Md. 1995) (alleging "violation of §§ 1, 2 of the Sherman Act; § 3 of the Clayton Act by conduct of activities of the following nature: Agreements and conduct restraining trade in the gabion and gabion fastening industries"); *Finnell*, 535 F. Supp. at 412 (alleging "restraints of trade in the sale of used automotive parts" as supplemented by conversations between CID recipient and Division attorney); *First Multiple Listing Serv. v. Shenefield*, 1980-81 Trade Cas. (CCH) ¶ 63,661, at 77,550 (N.D. Ga. 1980) (holding reference to "restrictive membership and other anticompetitive practices in connection with the operation of a real estate multiple listing service" sufficient in light of prior informal communication between Division and CID recipient); *In re Emprise Corp.*, 344 F. Supp. 319, 322 (W.D.N.Y. 1972) (alleging "[t]he use by Emprise Corporation or its subsidiaries or affiliates of lending power or other collateral inducements to obtain concession rights at sports arenas with the effect of foreclosing its competitors from a substantial volume of interstate commerce").

**c.     Objections Based on the Government's Motives**

As with other types of discovery, CIDs may be quashed if they are not issued in good faith. While a presumption of regularity applies to the issuance of CIDs (*see Finnell*, 535 F. Supp. at 411; *accord Hyster Co.*, 338 F.2d at 187; *see also Lightning Rod Mfrs. Ass'n*, 339 F.2d at 347), it has been held that a CID may be quashed if it is issued for the purpose of intimidating or harassing the recipient. In *Chattanooga Pharm. Ass'n v. United States Dep't of Justice*, 358 F.2d 864 (6th Cir. 1966), the Government declined to answer the recipient's allegations that the purpose of the CID was to intimidate and harass the recipient into terminating a pending suit for enforcement of a state fair trade act. Since the Government did not respond, the court held that the allegations were admitted and set aside the CID. Subsequently, in *Am. Pharm. Ass'n v. United States Dep't of Justice*, 344 F. Supp. 9 (E.D. Mich. 1971), *aff'd* 467 F.2d 1290 (6th Cir. 1972), recipients similarly charged that CIDs were issued for the purpose of harassing the recipients. The motions to quash the CIDs were denied, however, when the Assistant Attorney General filed an unrefuted affidavit stating why the CIDs were issued and denying any intent or purpose to harass or bring duress on recipients.

Recipients have challenged CIDs and asked for discovery on the grounds that they were allegedly issued in response to outside political interference and pressure or to pay off a political debt and were not in a bona fide attempt to determine whether a violation occurred. In *In re Cleveland Trust Co.*, 1972 Trade Cas. (CCH) ¶ 73,991, at 92,122 (N.D. Ohio 1969), the court applied grand jury standards applicable to issuance of a subpoena *duces tecum* to hold that the recipient was entitled to certain discovery to establish that the investigation was not a bona fide attempt to ascertain an antitrust violation. *But see* United States v. Cotton Valley Operators Comm., 75 F. Supp. 1, 6 (W.D. La. 1948) (holding evidence antitrust suit was induced by political considerations and to pay a political debt is irrelevant because the court must award judgment, even though the case may have been politically motivated, if evidence supported the Government's allegations); *Finnell*, 535 F. Supp. at 413 ("We would note that the genesis of the investigation does not appear important to the validity of the CIDs as long as the investigation and the CIDs are pursued in good faith"). In *Finnell*, the court denied discovery on the basis of a Division section chief's affidavit rebutting a charge that the allegation that recipients were being harassed for opposing certain legislation. 535 F. Supp. at 413. In *Maccaferri*, the court denied discovery on the basis of a Division statement denying improper purpose in issuing a CID and its own examination of each of petitioner's grounds to see if any rational basis existed to believe that discovery would lead to evidence establishing improper purpose. 938 F. Supp. at 315-319.

Similar issues were raised, but different results reached, in the *Emprise* case, where the court denied discovery to CID recipients who had charged improper motives on the part of the Government, but the Acting Assistant Attorney General denied the charges by affidavit. *Emprise*, 344 F. Supp. at 321-22. Petitioner sought, as an alternative to quashing the CID, to address interrogatories to the Division to determine if an improper purpose existed. The court concluded that the Assistant Attorney General's affidavit answered the question of improper motives and that the interrogatories were, therefore, neither necessary nor appropriate. In so holding, the court distinguished *Cleveland Trust* which permitted limited interrogatories to the Division seeking the identity of the persons who worked on the preparation of the CID and who participated in the decision to issue the demand. *See* Chapter III, Part E.8.h (providing a general discussion of discovery in proceedings to enforce or quash a CID).

### d.    Objections Based on Jurisdictional Grounds

A valid ground for objecting to a CID is that the Division has no jurisdiction to conduct an investigation. *See Phoenix Bd. of Realtors v. U.S. Dep't of Justice*, 521 F. Supp. 828, at 830 (holding that "an activity which is exempt from antitrust laws, cannot form the basis of an antitrust investigation"); *accord Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983). Investigations may, however, be conducted on any matter within the scope of the Division's authority. *Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721, at 74,064 (D.D.C. 1981), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986). Probable cause to believe that any particular violation has occurred is not necessary. *See id.* Moreover, the legislative history to the 1976 amendments stresses that the scope of many antitrust exemptions is not precisely clear, and in many cases the applicability of an asserted exemption may be a central issue in the case. The House Report to the 1976 amendments concluded that the mere assertion of an exemption should not be allowed to halt the investigation. *See* H.R. Rep. No. 94-1343, at 2606 (1976). The few cases that address challenges to CIDs on grounds that the conduct is exempt from, or outside the scope of, the antitrust laws, allow such challenges only when the exemption is clear and where no factual development is required to determine the issue. *Amateur Softball Ass'n of America v. United States*, 467 F.2d 312 (10th Cir. 1972) (holding that CID recipient's mere assertions that baseball exemption covers softball and amateur athletics and that it is not engaged in commerce does not prevent investigation and inquiry into antitrust issues raised); *Australia/ Eastern U.S.A.*, 1982-1 Trade Cas. (CCH) at 74,062 (holding that where the question of antitrust coverage is not absolutely determined by authority, and facts surrounding coverage are unresolved, investigation is authorized). In other words, the Division may issue a CID to determine whether there is a factual basis for a claim of exemption. In *United*

*States v. Time Warner, Inc.*, Misc. No. 94-338 (HHG) (D.D.C. Jan. 22, 1997), the court ordered CIDs enforced despite the recipients' claim that their conduct was exempt from the antitrust laws under the Foreign Trade Antitrust Improvements Act. The court, relying in part on *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 209 (1946), suggested that the Division need not affirmatively establish the basis for its subject matter jurisdiction in order to conduct an investigation, but rather could use CIDs to determine whether the purported antitrust exemption was applicable. In *Associated Container*, 705 F.2d at 58-60, CIDs were enforced over a claim that the activities under investigation were exempt under the Shipping Act, the Noerr-Pennington doctrine, and Act of State doctrine. The court reasoned that the Division's utilization of its investigative authority was necessary to determine whether the companies qualified for the exemptions. In *Houston Industries v. Kaufman*, Civ. No. H-95-5237, 1996 WL 580418 (S.D. Tex. March 7, 1996), the court came to a similar conclusion with regard to the Noerr-Pennington and state action doctrines. In *Phoenix Board of Realtors*, 521 F. Supp. at 830, the court refused to quash CIDs in a case where the CID recipient argued that its conduct was exempt (a) because it had been "sanctioned" by the Department of Justice in consent decrees in other cases, and (b) because the Department was collaterally estopped from challenging it. However, in *Australia/Eastern U.S.A. Shipping Conference v. United States*, 537 F. Supp. 807, 812 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986), the district court quashed parts of CIDs that sought material relating to Noerr-Pennington-protected conduct on the grounds that, in light of First Amendment values, the Government failed to articulate a showing of need other than "official curiosity." The court held, however, that if the Government could show that the material sought was strongly needed to confirm or prove specific suspected violations of the antitrust laws, the balance between First Amendment values and the need for discovery would tip in the Government's favor. *See id.* Cross-appeals were filed and the case was argued before the D.C. Circuit Court of Appeals. The case remained undecided for several years and the Division eventually withdrew the CIDs in question. The D.C. Circuit dismissed the appeal as moot and vacated the district court decision. *See Australia/Eastern U.S.A. Shipping Conference v. United States* Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986) (unpublished order).

**e.    Objections Based on Preexisting Protective Orders**

A CID for the products of discovery supersedes any inconsistent court order, rule, or provision of law preventing or restraining disclosure of such discovery product. *See* 15 U.S.C. § 1312(c)(2). (This section also provides that the disclosure to the Division of a product of discovery, pursuant to an express demand for products of discovery, does not constitute a waiver of any right or privilege, such as the work product privilege.) However, the Division must serve a copy of the CID upon the person from whom the discovery originally was obtained, *see* 15 U.S.C.

§ 1312(a), and such a demand shall not be returned or returnable by the recipient until 20 days after a copy of the demand has been served upon the originator, *see* 15 U.S.C. § 1312(b), to enable the person from whom the products of discovery were obtained to seek additional protection. The confidentiality protection for products of discovery extends to the person from whom discovery was obtained, *see* 15 U.S.C. § 1313(c)(3), and that person has standing to seek a court order requiring the custodian of the CID material to perform the duties imposed by the Act. *See* 15 U.S.C. § 1314(d). Finally, the person from whom the discovery was obtained may file a petition to set aside or modify the demand in the district court where the proceeding in which the discovery was obtained is or was last pending. *See* 15 U.S.C. § 1314(c).

### f.   Miscellaneous Objections

Courts have held that CIDs should not be quashed nor recipients relieved of their duty to respond based on recipient's objections that the information and documents sought were in the possession of another Federal agency. *See Phoenix Bd. of Realtors v. U.S. Dep't of Justice*, 521 F. Supp. 828 (D. Ariz.1981) (court would not quash subpoenas even though information and documents were in the hands of the FTC and could be obtained by the Division); *accord In re CBS, Inc.*, 235 F. Supp. 684 (S.D.N.Y. 1964); *see also Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Trade Cas. (CCH) ¶ 64,721 (D.D.C. 1981) (requests for information already provided to another Federal agency were not found to be unreasonable), *modified*, 537 F. Supp. 807 (D.D.C. 1982), *vacated as moot*, Nos. 82-1516, 82-1683 (D.C. Cir. Aug. 27, 1986). At least one court also has refused to set aside CIDs based on the recipient's objection that another Federal agency had primary jurisdiction over the activity and was conducting an investigation that duplicated the Division's investigation. *See Australia/Eastern U.S.A.*, 1982-1 Trade Cas. (CCH) ¶ 64,721, at 74,066.

### g.   Judicial Proceedings to Enforce or Quash CIDs

A recipient who objects to a CID has two options: to refuse to respond to the CID or to file a petition to quash or modify the CID. If the recipient follows the first option, the Division must petition for enforcement of the CID if the Division wishes to pursue the matter. If the recipient chooses to follow the second option, the recipient must file a petition for an order modifying or setting aside the CID within 20 days after the CID is served or at any time before the specified return date, whichever period is shorter. *See* 15 U.S.C. § 1314(b)(1). The time allowed for compliance does not run during the pendency of a petition, but the petitioner must comply with portions of the CID not sought to be modified or set aside. *See* 15 U.S.C. § 1314(b)(2). A recipient who objects to only part of a CID must comply with the unobjectionable parts. *See* H.R. Rep. No. 94-1343, at 2608 (1976).

Where a CID expressly seeks a product of discovery and where the person from whom the discovery was obtained objects to the CID, the procedures are somewhat different. These procedures are explained above. *See* Chapter III, Part E.8.e. Petition by the Division for enforcement should be drafted in accordance with the advice of the relevant United States Attorney's Office as to local forms and practice. Unless local practice is to the contrary, the Petition should be captioned United States of America, Petitioner v. (Name of CID Recipient), Respondent. The petition should be supported by a memorandum setting forth the factual and legal basis for enforcement of the CID. The recipient must be served with a copy of the petition. Service of such petitions may be accomplished by any of the means provided for service of CIDs. *See* 15 U.S.C. §§ 1312(d), 1312(e). The proper venue for a petition by the Division to enforce, as well as by the respondent to modify or quash, is any judicial district within which the recipient resides, is found, or transacts business. *See* 15 U.S.C. § 1314(b). A petition to enforce a CID is a miscellaneous proceeding that enjoys no special immunity from the delays inherent in Federal court litigation. *See, e.g.*, *United States v. Time Warner, Inc.*, Misc. No. 94-338 (HHG) (D.D.C. filed Nov. 3, 1994) (involving delay of two years before a decision was reached). Division attorneys facing a court proceeding to enforce a CID should seek the advice of the local U.S. Attorney's Office as to the most expeditious procedure to use in that District. For example, in one matter a motion for an order to show cause was filed; in another matter, the petition was accompanied by a motion requesting expedited consideration.

### h.  Discovery by CID Recipient Against the Division

A CID recipient involved in a proceeding to enforce, modify, or quash a CID may, in certain circumstances, be permitted limited discovery under the Federal Rules of Civil Procedure. However, such discovery is not a matter of right. *See United States v. Seitz*, No. MS2-93-063, 1993 WL 501817, at *2 (S.D. Ohio Aug. 26, 1993), *aff'd*, 53 F.3d 332 (6th Cir. 1995). However, the cases generally have held that discovery against the Government in CID court proceedings must be used sparingly to avoid destroying the usefulness of the CID process by delaying compliance. Recipients must make a substantial and supported showing that enforcement of the CID would work an abuse of the court's process. *See United States v. Witmer*, 835 F. Supp. 201 (M.D. Pa. 1993). Both *Seitz* and *Witmer* concerned CIDs issued under the False Claims Act, but the courts interpreted the legislative history of the 1976 amendments to the CID statute to reach their conclusions. The False Claims Act discovery provision closely parallels the antitrust CID provision and the False Claims Act was modeled after the ACPA. *See Witmer*, 835 F. Supp. at 205 (stating that Congress "intended the legislative history and case law interpreting the Antitrust CID provision to 'fully apply' to the False Claims Act CID provision") (citing S. Rep. No. 99-345, at 33 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5298). The

*Witmer* court also relied on *Australia/Eastern U.S.A Shipping Conference* and *Finnell v. U.S. Dep't of Justice*, 535 F. Supp. 410, 415 (D. Kan. 1982), for its holding that a recipient must make a "substantial and supported showing" that the CID would work an abuse of the court's process in order to be permitted limited discovery. *Witmer*, 835 F. Supp. at 207.

Courts ordered discovery against the Division in *In re Cleveland Trust Co.*, 1972 Trade Cas. (CCH) ¶ 73,991 (N.D. Ohio 1969), and in *Associated Container Transportation (Australia) Ltd. v. United States*, 502 F. Supp. 505 (S.D.N.Y. 1980). The court in *Cleveland Trust* held that the right to discovery afforded by the Federal Rules of Civil Procedure was available to a CID recipient under the Act where improper motives in issuing the CID were alleged. The court permitted limited interrogatories to the Division seeking the identity of the persons who worked on the preparation of the CID and who participated in the decision to issue the demand. The Assistant Attorney General had filed an affidavit, but it did not address the improper motives issue.

In *Associated Container*, the court concluded that reasonable discovery was available in CID proceedings but that a court, in passing on the discovery, should bear in mind that the purpose of the CID procedure— to allow the Division to investigate antitrust violations without prematurely becoming involved in full-blown litigation—would be defeated if extended discovery were permitted to delay unduly CID enforcement proceedings. *See id.* at 510. The court permitted the CID recipient to serve limited interrogatories on the Division to substantiate its claim that the conduct under investigation was exempt from the antitrust laws and the Division therefore had no jurisdiction to issue the CID.

Several courts have disagreed with this aspect of the *Associated Container* decision. *See Witmer*, 835 F. Supp. at 207 (noting that the language in *Cleveland Trust* and *Associated Container* was broader than the actual relief afforded). According to the *Witmer* court, the actual discovery allowed is consistent with the view that wholesale discovery in CID enforcement proceedings would, in fact, be inconsistent with the purposes and effectiveness of the CID statutory scheme. *See id.* In *Finnell*, the court quashed a deposition notice to a Division attorney after concluding that discovery was not warranted in the matter; the court cited the concern that extended discovery would destroy the usefulness of CIDs. *See* 535 F. Supp. at 410. In *Australia/Eastern U.S.A Shipping Conference v. United States*, the court noted that the law in the District of Columbia Circuit strictly limits discovery in such proceedings, but recognized that discovery may be available in some investigative subpoena enforcement proceedings. The court, however, quashed the interrogatories to the Division on the basis that they were overly broad. *Australia/Eastern*, 1981-1 Trade Cas. (CCH) ¶ 63,943 (D.D.C. 1981). In *Maccaferri Gabions, Inc. v. United States*, 938 F. Supp. 311 (D. Md. 1995), the court disagreed with the *Associated Container* holding that

discovery was "available as a matter of right" and noted that the holding had not obtained widespread acceptance. *See id.*, 938 F. Supp. at 316 (quoting *Associated Container*, 502 F. Supp. at 509). As noted above, *see* Chapter III, Part E.8.c., the *Maccaferri* court determined that the Antitrust Division's affidavits were not necessarily "conclusive" and examined each of the grounds upon which Maccaferri based its contention that an improper purpose existed. *See id.* at 316-17. After that examination the court found that discovery was not warranted because (1) the affidavit of the Assistant Attorney General put to rest the allegation that she was personally and unusually involved in the investigation; (2) even if the Division had already concluded, prior to issuing the CID, that Maccaferri was "guilty," such a conclusion did not indicate an improper purpose; and (3) the Assistant Attorney General's affidavit conclusively refuted the allegation that political influence was a motivating factor in issuing the CID. *See id.* at 318. The court noted that not one scintilla of evidence raised a reasonable suspicion that political influence caused the authorization of the CID. *See id.*; *see also In re Emprise Corp.*, 344 F. Supp. 319 (W.D.N.Y. 1972) (disallowing service of interrogatories to show improper motive on basis that the interrogatories served no purpose in light of a Division affidavit denying improper motives).

### i.    Appellate Review and Remedy Provisions

Any final order entered by a district court upon a petition for enforcement or quashing of a CID is appealable under 28 U.S.C. § 1291. Contempt of court sanctions are authorized for disobedience to a court enforcing a CID. *See* 15 U.S.C. § 1314(e); *see also Maccaferri Gabions v. United States*, Civ. No. MJG-95-1270 (D. Md. Apr. 16, 1996) (holding firm in civil contempt for failure to comply with order enforcing CID, and imposing fine of $10,000 per day of continued noncompliance).

## 9.    Return of CID Materials at End of Investigation

At the close of an investigation or of any case or proceeding arising out of an investigation, the custodian is required, upon written request of a person who produced documentary material under the CID, to return to that person any original documentary material that has not passed into the control of any court, grand jury, or agency. *See* 15 U.S.C. § 1313(c)(3). The custodian should ensure that the original documents are returned intact and that any stickers and extraneous matter are removed from the materials to be returned. The Division is required to return only original documents.

Where the Division has made copies or is furnished with copies of documentary material pursuant to 15 U.S.C. §§ 1313(b) and (c)(2), the copies do not have to be returned to the person who produced the documents. *See* 15 U.S.C. § 131(c)(3); Division Directive ATR 2710.1, "Procedures for Handling Division Documents." For parties producing copies of documents, staff should suggest that the producing party

agree to have its CID materials destroyed rather than returned. Otherwise, the party requesting the return of nonoriginal material must pay for the return of the material. The Division may retain copies of CID materials for use in other matters or for any official use related to law enforcement purposes.

Although the Division takes the position that materials obtained pursuant to CID are exempt from disclosure under the Freedom of Information Act, if the documents to be returned or destroyed are subject to an open FOIA request, return or destruction must be delayed until the FOIA request is resolved. Staff should consult with the FOIA/PA Unit before returning or destroying CID materials.

When the custodian delivers CID material to a Division attorney for use in connection with a court, grand jury, or Federal administrative proceeding, the attorney assumes responsibility, upon the completion of the proceeding, for returning to the custodian any material that has not passed into the control of the court, grand jury, or agency. *See* 15 U.S.C. § 1313(d)(l).

### 10.   Criminal Penalties

It is a criminal offense intentionally to withhold, misrepresent, conceal, destroy, alter, or falsify any documentary material, answers to written interrogatories, or oral testimony that is the subject of a CID. *See* 18 U.S.C. § 1505. Where there is reason to believe that a CID recipient has intentionally withheld documents or information or has in any other way attempted to evade, avoid, or obstruct compliance with a CID, initiation of a grand jury investigation should be considered.

Authority to conduct an obstruction of justice investigation, including authority to investigate by grand jury, is obtained by following the standard procedures for requesting preliminary investigation and grand jury authority. Under 28 C.F.R. § 0.179a, matters involving obstruction of justice are under the supervisory jurisdiction of the Division having responsibility for the case or matter in which the alleged obstruction occurred. However, the regulations provide that, in order to determine the appropriate supervisory jurisdiction, the Division should consult with the Criminal Division prior to the initiation of an obstruction of justice grand jury investigation or enforcement proceeding.

## F.   Conducting a Grand Jury Investigation

Many of the procedures set forth below vary by judicial district. When unfamiliar with local practice, staff should consult with the appropriate field office or U.S. Attorney's Office. Before a staff initiates a grand jury investigation or consults with a U.S. Attorney's Office about the initiation of a grand jury investigation in a judicial district in the territory of another field office, staff should notify the chief of that office.

### 1.      Requesting a Grand Jury Investigation

Consistent with the standards developed in Part C.1. of this chapter on whether to proceed by criminal or civil investigation, staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution. To request a grand jury investigation, staff should prepare a memorandum on behalf of the section or field office chief to the DAAG for Operations, the Criminal DAAG, and the Director of Criminal Enforcement detailing the information forming the basis of the request. That information may be based on the results of a preliminary investigation or a CID investigation, but often information received from a complaint provides a sufficient basis for the request without conducting a preliminary investigation. The request for grand jury authority should, to the extent possible:

- Identify the companies, individuals, industry, and commodity or service involved.

- Estimate the amount of commerce involved on an annual basis.

- Identify the geographic area affected and the judicial district in which the investigation will be conducted.

- Describe the suspected criminal violations, including nonantitrust violations, and summarize the supporting evidence.

- Evaluate the significance of the possible violation from an antitrust enforcement standpoint (*see* Chapter III, Part B.1.).

- Explain any unusual issues or potential difficulties staff has identified.

- Identify the attorneys who will be assigned to the investigation.

- Explain the background of the investigation, including the source of the information.

- Explain the initial steps in staff's proposed investigative plan.

- State whether there have been any criminal investigations by the Division of the product or service that is the subject of the grand jury request.

Staff should forward the grand jury request memorandum to the field office chief for review. If approved by the chief, the grand jury request memorandum should be e-mailed to the ATR-CRIM-ENF and ATR-Premerger-GJ Request mailboxes with a cc:/ to the appropriate special assistant in Operations. Send the appropriate MTS form (the "New Matter Form" (ATR 141) if a preliminary investigation was not authorized or a preliminary investigation was authorized and will remain open, or the "New Phase Form" (ATR 142) if a preliminary investigation was conducted, the investigation is being upgraded to a grand jury

investigation, and the preliminary investigation will be closed) to the Premerger Notification Unit/FTC Liaison Office by e-mailing the form to the ATR-Premerger MTS Forms mailbox. *See* Division Directive ATR 2810.1, "Matter Tracking System." The DAAG for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation.

Staff should determine whether the district where the grand jury will sit requires the filing of letters of authority. If so, they should be filed under seal. If not, they should be maintained in the field office files. If attorneys are added to the original staff, the chief should notify the office of the Director of Criminal Enforcement and request additional letters of authority.

The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred. In determining the district in which to conduct the grand jury investigation, staff should consider (1) the degree of nexus between the location and the conduct under investigation; (2) the convenience for staff and potential witnesses, including the production and review of documents; (3) the availability of grand jury time (including the availability of antitrust-only versus "shared" grand juries, the frequency of meetings, and the duration of the grand juries' terms); (4) potential difficulties in conducting grand juries in particular jurisdictions; and (5) the judicial districts in which any resulting prosecution likely would be brought.

When seeking grand jury authority, staff should begin planning the grand jury investigation in much the same manner as planning the preliminary investigation. *See* Chapter III, Part C. Staff should establish an investigative plan which should be modified frequently as the investigation progresses. Staff should identify in its plan:

- Subjects of the investigation.

- Factual issues relevant to determining guilt, the validity of potential defenses, or the economic impact of the violation (for both trial and sentencing purposes).

- Potential fact witnesses, whether they should be subpoenaed or interviewed and whether they are candidates for immunity.

- Types of documentary evidence that may be relevant to factual issues.

- Potential sources of documentary evidence and whether to obtain such evidence voluntarily, by subpoena, or by search warrant.

- Opportunities for covert investigation, such as consensual monitoring or the use of search warrants.

- When appropriate, staff should give strong consideration to seeking the assistance of appropriate Government agents and utilizing them as members of staff.

## 2.   Empanelling and Scheduling the Grand Jury

Among the first decisions staff must make after authority is granted is whether to request empanelment of a new grand jury or to use an existing one. Staff should attempt to estimate the number of sessions and the amount of time necessary to complete the investigation. When the investigation will likely take a considerable number of sessions and a substantial amount of grand jury time, it is best to begin a new 18-month grand jury that will be empanelled specifically for antitrust investigations. (Rule 6(g) of the Federal Rules of Criminal Procedure permits the court to extend the term of the grand jury up to an additional six months.) In that way, the Division can maintain better control over the scheduling of grand jury time and operate more efficiently. In some districts, the court is unlikely to empanel a new grand jury for the exclusive use of the Antitrust Division, and staff will share a grand jury with the U.S. Attorney's Office. In such districts, staff usually should attempt to use the most recently empanelled grand jury (*i.e.,* the grand jury with the greatest time left in its term). Staff generally should not seek to empanel a new grand jury when the Antitrust Division will be unable to utilize a significant portion of its available time. Underutilized grand juries may strain relations with the U.S. Attorney and court personnel.

Grand jury procedures can vary significantly in different jurisdictions. Staff should follow the procedures that have been established in the district in which the grand jury will sit. Each field office has a liaison with the U.S. Attorney's Offices in its district. When an investigation will be conducted in an unfamiliar district, staff should consult the designated U.S. Attorney liaison to discuss local practice and, if sharing a grand jury, to discuss potential scheduling conflicts. Staff should develop a good working relationship with the local U.S. Attorney's Office whenever an investigation will be conducted outside of a district in which a field office is located. Staff should inform the U.S. Attorney's Office, typically through its liaison, that the Division will be conducting the investigation. The U.S. Attorney liaison can assist in empanelling or scheduling the grand jury, familiarize staff with local procedures, and provide other advice and assistance. In some jurisdictions, staff will schedule the grand jury through the clerk of the court. In those jurisdictions, staff should develop a working relationship with the clerk's office.

## 3.   Rule 6(e)(3)(B) Notices

Rule 6(e)(3)(B) of the Federal Rules of Criminal Procedure requires the attorneys for the Government to provide the court with the names of

people other than Government attorneys to whom grand jury materials have been disclosed (*e.g.*, economists, agents) and to certify that the attorneys have advised such persons of their obligation of secrecy. Secretaries, paralegals, and clerical staffs need not be listed as they may be considered the alter egos of the attorneys, economists, agents, and others whom they assist. Staff should consult with the local U.S. Attorney's Office and follow local practice in preparing this information for the court.

### 4. Issuing Grand Jury Subpoenas

During the course of its proceedings, the grand jury will issue subpoenas *duces tecum* and subpoenas *ad testificandum*. Subpoenas *duces tecum* require the submission of documentary materials to the grand jury. Subpoenas *ad testificandum* require individuals to appear before the grand jury to testify. The grand jury may also subpoena individuals to provide various types of exemplars, such as handwriting samples. Subpoena recipients typically receive significant lead time to comply with subpoenas, but in exceptional circumstances when there is a risk of flight or destruction or fabrication of evidence, subpoenas may require speedy compliance, usually within one day. Such "forthwith" subpoenas should be used rarely and will likely be subject to close judicial scrutiny. *See* United States Attorneys' Manual § 9-11.140.

#### a. Subpoenas *Duces Tecum*

Subpoenas *duces tecum* often are issued to collective entities, such as corporations and partnerships, for which the Fifth Amendment privilege against self-incrimination is not available. Thus, a custodian of documents for a collective entity cannot refuse to comply with a subpoena for records of that entity because the act of production might incriminate him or her. However, the Government cannot introduce into evidence the fact that a particular person complied with the subpoena for records of the collective entity. *Braswell v. United States*, 487 U.S. 99, 118 (1988).

Subpoenas *duces tecum* for documents may also be issued to individuals or sole proprietors, who are treated as individuals. Although the contents of voluntarily created, preexisting documents are not protected by the Fifth Amendment privilege, *In re Grand Jury Subpoena Duces Tecum* dated Oct. 29, 1992, 1 F.3d 87, 93 (2d Cir. 1993), an individual's act of producing such documents may be self-incriminating by implicitly conceding the existence of the documents, the individual's possession of the documents, or the authenticity of the documents. Before issuing a subpoena *duces tecum* to an individual, staff should consider whether the individual's act of producing the subpoenaed documents may have such testimonial significance, and whether alternative methods of proof are available. Staff may consider requesting authority to compel individuals to produce documents through an immunity order limited to the act of production. In such

cases, staff should examine the individual to the extent necessary to establish compliance with the subpoena, but care should be taken to limit inquiries solely to matters relevant to the act of production. *See* United States Attorneys' Manual § 9-23.250.

Efforts to obtain evidence located outside the United States present special considerations. Staff should consult with the Foreign Commerce Section to discuss possible methods of obtaining such evidence, including alternatives to subpoenas. Special requirements regarding notification of foreign governments are discussed below. *See* Chapter III, Part F.11.d. It is prudent to notify the Foreign Commerce Section any time an investigation involves a foreign witness, subject or target, foreign commerce, activity occurring outside the United States, or evidence located outside the United States. The policies and procedures for notifying foreign governments are constantly evolving. Close contact with the Foreign Commerce Section will help avoid any oversights.

The schedule of documents to be attached to a subpoena *duces tecum* should include those documents necessary to a full investigation of the conduct in question. Before being served, the subpoena schedule must be reviewed to ensure its completeness and to guard against burdensomeness or other grounds for possible motions to quash.

Staff should determine how the subpoena will be served, often by an FBI agent or other government agent. Staff and counsel may also agree to voluntary acceptance of service by counsel on behalf of the recipient. Usually, staff will arrange for service of subpoenas, but in some jurisdictions the U.S. Attorney's Office may control the process.

The subpoena return date should provide a sufficient period of time for service of the subpoena and a document search and production. The subpoena return date must be a day when the grand jury will be sitting within the district. Staff, on behalf of the grand jury, may permit the recipient to return documents directly to the field office rather than producing them before the assembled grand jury. Before permitting this option, staff should consider the benefit of requiring the document custodian to testify before the grand jury. Such testimony can provide important information regarding the scope of the search and production and may result in the identification of documents withheld on a questionable assertion of privilege.

Once the subpoena is issued, counsel for the recipient may claim the subpoena is overly burdensome, especially in connection with data stored on the company's computer systems. As such, counsel may request a deferral of certain categories of documents, sometimes threatening a motion to quash. Because schedules typically are drafted without knowledge of what documents exist and the form in which they are kept, staff should consider, when appropriate, requests for such deferrals. Staff may agree, for example, to accept representative samples or defer production of specific types of documents. If a reasonable accommodation cannot be reached, it is the policy and

practice of the Antitrust Division to defend its subpoenas vigorously against motions to quash.

Prior to engaging in negotiations, staff should ensure that counsel has reviewed the schedule thoroughly with the recipient and understands the recipient's ability to comply with each demand. In most cases, negotiations will result in a satisfactory resolution. Every deferral must be reduced to writing, preferably in a letter from staff to counsel making the request. Failure to do so may seriously compromise staff's ability to preserve the integrity of the subpoena and will make more difficult any subsequent attempt to pursue an obstruction case for withheld or destroyed documents. If litigation is necessary, staff should move to file all papers under seal and conduct the proceedings in chambers to prevent any breach of grand jury secrecy.

It is common to subpoena records from telephone companies and financial institutions. Telephone companies need not notify a subscriber whose records are subpoenaed. To prevent premature disclosure that an investigation exists, staff should include with the subpoena a certification that the subpoena has been issued in connection with a criminal investigation, requesting that the existence of the subpoena not be disclosed to the customer. Under certain circumstances, staff may obtain a court order preventing disclosure. Subpoenas to financial institutions seeking individual account information are governed by the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-22. The Act requires that all such subpoenaed records be returned and actually presented to the grand jury and provides for reimbursement to the institution for the costs incurred in responding to the subpoena. Banks typically will comply with a letter requesting nondisclosure of the subpoena for a set period of time, which may be extended by a subsequent letter. Staff may obtain a court order prohibiting disclosure of the subpoena under certain circumstances.

The Division's standard document subpoena requires companies to produce all electronically stored data in its possession that is responsive to the subpoena. The term "document" is defined in the schedule to the subpoena to include all information stored on a company's computer systems. The subpoena also contains a lengthy instruction describing what steps the company must take to preserve all potentially responsive electronic data in its possession. That instruction describes what types of data must be preserved (*e.g.,* e-mails) and how that data should be preserved in various locations on the company's computer systems (*e.g.,* servers). Finally, the subpoena requires that all electronic data must be produced in an electronic format and that the company must contact staff to determine whether the company's proposed electronic format is compatible with the Division's equipment and resources. Production of electronic data in a paper format should never be accepted.

**b.**     **Subpoenas *Ad Testificandum***

Testimony before the grand jury should be scheduled to utilize the grand jury efficiently. When issuing subpoenas *ad testificandum*, staff should attempt to schedule sufficient witnesses for a full session and should provide adequate lead time to minimize last minute cancellations. Subpoenas usually will be served by a U.S. Marshal or an agent or may be accepted voluntarily by counsel on behalf of the recipient. Service by agent may provide an opportunity to interview the witness prior to the witness's grand jury appearance and often is quicker than service by U.S. Marshal.

The subpoena *ad testificandum* should include the following attached statement of the witness's rights and obligations in appearing before the grand jury, unless circumstances render such advice clearly superfluous (*see* United States Attorneys' Manual § 9-11.151):

Advice of Rights

- The Grand Jury is conducting an investigation of possible violations of Federal criminal laws involving antitrust offenses under the Sherman Act, 15 U.S.C. § 1.

- (State here the general subject matter of the inquiry (*e.g.*, conspiring to fix prices of widgets in violation of 15 U.S.C. § 1).)

- You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

- Anything that you do say may be used against you by the Grand Jury or in a subsequent legal proceeding.

- If you have retained counsel, the Grand Jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you so desire.

The subpoena should also have as an attachment the procedures a witness must follow to receive reimbursement for travel expenses and a witness fee. This is often handled by the Victim-Witness coordinator for the field office.

In addition to the notification given to an individual when subpoenaed, the witness should be made aware of the following at the time of the witness's appearance before the grand jury:

- The identity of the Government attorneys and the presence of the grand jurors and the court reporter.

- The nature of the inquiry (*e.g.,* possible price fixing for the sale of widgets).

- The witness's status as a target, if that is the case. (Staffs should be aware of the Department's position on subpoenaing "subjects" or "targets" of an investigation, *see* United States Attorneys' Manual §§ 9-11.150 to .160, as well as the Department's position on

requests by subjects and targets to testify before the grand jury, *see id.* § 9-11.152.)

- The witness's Fifth Amendment right to refuse to answer any question if a truthful answer would tend to incriminate him or her.

- That anything the witness says may be used against the witness in any criminal proceeding.

- That the witness will be afforded a reasonable opportunity to leave the room to consult with counsel.

- That the grand jury proceedings are secret. While there are exceptions pursuant to statute, such as subsequent trials, no one other than the witness may disclose publicly what has occurred in the grand jury. The witness may disclose what has occurred in the grand jury to anyone if he or she wishes, but is not required to disclose such information to anyone.

- If the witness has been immunized, that the witness understands the effect of the immunity order and that the witness's testimony could still be used in a prosecution for perjury or making a false statement to the grand jury.

The witness should be asked to acknowledge his or her understanding of each of the identified rights and obligations.

### c.   Subpoenas for Exemplars

In addition to issuing subpoenas for documents or testimony, the grand jury may issue subpoenas requiring individuals to provide various types of exemplars. Most typical in antitrust investigations are subpoenas to provide samples of handwriting for use in establishing authorship or authentication of documentary evidence. Prior to issuing the subpoena, staff must arrange with an investigative agent to take the exemplar. When the witness appears before the grand jury, the foreperson will inform the witness that a particular person has been designated the grand jury's agent to take the exemplar and will direct the witness to provide the exemplar at a particular time and place. Usually, upon receipt of the subpoena, the recipient will agree to provide the exemplar at a mutually convenient time and place without appearing before the grand jury.

## 5.   Search Warrants

When appropriate, staff should consider using search warrants prior to or in addition to issuing subpoenas *duces tecum*. If probable cause does not exist at the beginning of an investigation, staff should consider the possibility of developing probable cause before issuing compulsory process, making voluntary requests, conducting interviews, or taking other steps that would make the investigation public.

Search warrants can be an effective means for gathering incriminating evidence. The use of search warrants, as opposed to subpoenas *duces tecum,* minimizes the opportunity for document destruction and concealment, prevents the failure to produce responsive documents either deliberately or through inadvertence, and often spurs a race for leniency. During the course of an investigation, staff may learn that material documents responsive to a subpoena *duces tecum* have been withheld. If staff believes documents have been withheld intentionally rather than being inadvertently overlooked, staff should consider applying for a search warrant instead of providing the recipient a second chance to produce the documents in response to the original or a new subpoena. The requisite probable cause underlying the application may be based on the substantive crime under investigation or, if sufficient evidence exists, on obstruction of justice due to the withholding of subpoenaed materials.

Search warrants may be applied for when there is probable cause to believe that a crime has been committed, that documents or other items evidencing the crime exist, and that such items to be seized are at the premises to be searched. The elements of probable cause are the same for an antitrust crime as for other crimes, both as a matter of law and Division policy. It is not necessary to have probable cause to believe that evidence of the crime may be destroyed or withheld if not seized by search warrant.

The warrant must describe with particularity the property to be seized; state that the property is evidence of a specified criminal offense; provide an exact description of the location to be searched; note the period of time within which the search is to be executed (the period may be no greater than within 14 days pursuant to Fed. R. Crim. P. 41(e)(2)(A)); and note whether the search will be conducted in the daytime (which is defined in Fed. R. Crim. P. 41(a)(2)(B) as 6:00 a.m. to 10:00 p.m.) or whether it may be executed at any time. The Division will rarely seek permission to conduct a nighttime search, which must be based on a showing of good cause pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii). The degree of specificity with which the warrant must describe the documents to be seized and the location to be searched may vary depending on the circumstances. When seeking business records, it is usually sufficient that the warrant describes records of a type usually maintained by the business at the business location.

The factual basis establishing the probable cause for the search will be set forth in the search warrant affidavit. The affidavit must include sufficient facts to establish probable cause both that the crime was committed and that evidence of the crime is at the search location. Supporting evidence of probable cause must not be "stale" (*i.e.,* too old), but there is no set time period after which staleness is presumed. The affidavit may be based entirely on hearsay, as long as the source of the evidence is reliable.

Staff must submit the search warrant affidavit and other documents in the application package to the field office chief responsible for reviewing and authorizing staff's application for the search warrant. When seeking a search warrant, staff must obtain the assistance of an investigative agency, usually the FBI.

The application for the search warrant will be made to a magistrate in the judicial district where the property is located. The affidavit should be filed under seal. Staff should consult with the local U.S. Attorney's Office concerning local practices and procedures, including whether the affidavit is automatically filed under seal, or if a motion to file under seal must be made at the time of application.

Once approved, the search is conducted by a team of agents, who may also seek to interview individuals on site. No staff attorney should be present during the search, but an attorney should be available by telephone for consultation with the agents. Upon the conclusion of the search, the agents should serve a subpoena *duces tecum* on the company requiring the production of documents covered by the search warrant and any additional documents needed by the grand jury. The subpoena should include documents subject to the search warrant in order to obtain documents maintained at other locations or that were not seized at the search location.

If staff believes that privileged documents may have been seized during the search, or if counsel for the subject claims that to be the case, procedures should be followed to ensure that staff and the case agent are not tainted by reading privileged documents. For detailed information and guidance on searching computers, staffs should consult the Criminal Division's *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*.

### 6.    Procedures for a Grand Jury Session

This section provides suggested procedures for the preparation and conduct of a grand jury session. As indicated above, the Division generally follows the procedures used by the U.S. Attorney in a given district. Staff should consult with the local U.S. Attorney liaison when unfamiliar with local practice.

In setting up a grand jury session, staff should:

- Inform the clerk's office or U.S. Attorney's Office of the timing of the session at least one month in advance of the session, so that room arrangements may be made and the jurors may be notified of the schedule. If the Division is sharing a grand jury with the U.S. Attorney's Office or another section or field office, arrangements should be made as early as practicable to ensure availability of grand jury time. Staffs should be aware that in some districts, staff is responsible for notifying the grand jurors of a scheduled session;

in other districts, the U.S. Attorney's Office or the clerk will issue the notices.

- Arrange to obtain a court reporter at the time the session is scheduled and the jurors are notified. *See* Division Directive ATR 2570, "Payment of Litigation-Related Expenses." In some jurisdictions, arrangements will be made by the local U.S. Attorney's Office.

- If subpoena service will be made by the U.S. Marshal, send subpoenas to the U.S. Marshal in the relevant district with a cover letter indicating the date of the testimony, the date by which service is required, and other relevant information. Because marshals in large metropolitan areas have a number of duties and may take as long as two weeks to serve subpoenas (and occasionally longer), staff should provide as much lead time as possible for service. Counsel for a prospective witness will often insist that the witness be immunized. When staff anticipates compelling a witness's testimony, they must allow sufficient time after service to negotiate with counsel and receive a proffer of the witness's testimony, if appropriate.

  Except when few documents are sought, compliance with subpoenas *duces tecum* requires more lead time than testimonial subpoenas. The subpoena return date should be selected to allow sufficient time after service for document search and retrieval. The time needed for compliance, however, is often subject to negotiation and may be extended if necessary.

- Prepare immunity clearance requests for witnesses who may claim their Fifth Amendment privilege at the session. The immunity clearance papers (*see* Chapter III, Part F.7) must be received by the Office of Operations at least two weeks before the date on which staff will need the clearance and possession of the immunity authorization letter. The date that staff needs the letter is the date that the U.S. Attorney will review the motion papers, or the date the judge will be asked to sign the order.

- Immediately before the session begins, determine whether the stenographer has been sworn before the grand jury. If not, check that a copy of the stenographer's oath is available to be administered by the foreperson prior to the stenographer recording any statement or testimony.

## 7.    Requests for Statutory Immunity

The Organized Crime Control Act of 1970 established the present statutory basis for granting use immunity to witnesses before a grand jury, at trial, and in other judicial proceedings. *See* 18 U.S.C. § 6001-6003. All requests for statutory immunity must be approved by the field

office chief and submitted to the Office of Operations, which will request clearance from the Criminal Division.

**a.    Division Procedures for Processing Requests for Statutory Immunity**

For each witness for whom staff seeks immunity, staff should prepare (1) Form OBD-111, and (2) a letter from the Deputy Assistant Attorney General, Antitrust Division, to the U.S. Attorney in the appropriate district requesting that the U.S. Attorney apply to the court for an immunity order. The text of the letter from the Criminal DAAG to the U.S. Attorney is as follows:

Dear _____:

Pursuant to the authority vested in me by 18 U.S.C. § 6003(b) and 28 C.F.R. § 0.175(b), you are authorized to apply to the United States District Court for the [XXX] District of [State] for an order pursuant to 18 U.S.C. §§ 6002-6003 requiring [name of witness] to give testimony or provide other information in the above matter and in any further proceedings resulting therefrom or ancillary thereto.


Sincerely,

Deputy Assistant Attorney General

The forms and letters should be submitted by e-mail to ATR-CRIM-ENF with a cover memorandum from the chief to the Criminal DAAG and the Director of Criminal Enforcement. The memorandum should state that the chief concurs in staff's recommendation to grant use immunity to the prospective witnesses.

Requests for statutory immunity must be received by Office of Operations at least two weeks before the date that staff will need the immunity authorization letter in its possession. In exceptional circumstances, the procedure may be shortened. The Division must clear all immunity requests through the Witness Records Unit of the Criminal Division. *See* United States Attorneys' Manual § 9-23.130. The Criminal Division requires ten working days (exclusive of holidays) to conduct a search of the Department's files, for which it requires each witness's full name, address, Social Security number, and date of birth. In addition to the time required for obtaining immunity clearance, staff must allow sufficient additional time to obtain the U.S. Attorney's signature on the immunity motion. If more than six months have elapsed since the witness was previously immunized or authorized for immunity, staff should contact Office of Operations to determine whether the witness must be recleared by the Criminal Division.

When sending OBD-111 forms forward, staff must also send informational copies to the U.S. Attorney to provide the U.S. Attorney an opportunity to make an independent determination that an

immunity order is in the public interest. *See* United States Attorneys' Manual § 9-23.110. Prior to seeking the order to compel, staff must obtain the U.S. Attorney's signature on the petition. Depending on the jurisdiction and the judge to whom the matter is assigned, the court may require a hearing on the petition at which the witness must appear or may simply sign the petition without a hearing.

**b.    Division Standards for Seeking Immunity Authorization**

The following factors are among those to be considered in determining whether it is in the public interest to compel the testimony of a person under the use immunity statute (*see* United States Attorneys' Manual § 9-23.210):

- The importance of the investigation to effective enforcement of the criminal antitrust laws.

- The quality of the person's testimony or information.

- The likelihood that the person's testimony will enhance the prospect of successful prosecution against more culpable individuals.

- The likelihood of prompt and full compliance by the witness and the effectiveness of available sanctions if there is no such compliance.

- The person's relative culpability in connection with the offense being investigated and the person's history with respect to criminal activity.

- The possibility of successfully prosecuting the person prior to compelling the person to testify or produce information.

- The likelihood of adverse collateral consequences to the person if he or she testifies or provides information under a compulsion order.

Since it is the Division's charging policy to prosecute the highest-ranking culpable individuals from each organization against whom the Division is likely to develop an indictable case, the most significant considerations for staffs should be the individual's degree of culpability and the anticipated value of the individual's expected testimony in advancing the investigation against more culpable individuals.

Staff ordinarily should avoid compelling the testimony of a witness who is a close family relative of a subject of the investigation. Compulsion usually is appropriate, however, when the witness and the relative participated in a common business enterprise and the testimony will relate to that business, or when the testimony will relate to illegal conduct in which there is reason to believe both the witness and the relative participated. *See* United States Attorneys' Manual § 9-23.211.

The Division usually will not seek immunity authorization for an individual who is a potential target of the investigation unless that

individual or counsel provides a full and candid statement of the individual's proposed testimony.

## 8.    Informal Immunity

Judicious use of "letter" or "informal immunity" can enhance the effectiveness and efficiency of the Division's investigations and avoid the unnecessary waste of grand jury time. Informal immunity may be used to conduct interviews with witnesses before or in lieu of grand jury appearances. Also, witnesses appearing before the grand jury may accept informal immunity rather than going through the sometimes lengthy process of obtaining court-ordered immunity, which in some districts requires an appearance before a judge.

Informal immunity, however, is not the legal equivalent of statutory immunity (for example, statutory immunity is binding upon the states whereas informal immunity is not). Thus, no letter conferring immunity should state or suggest that the immunity the letter provides is coextensive with court-ordered immunity under 18 U.S.C. §§ 6001-6003.

Informal immunity is conferred by a letter from the Division setting forth the terms under which a witness's statements may or may not be used against that witness. The model informal immunity letter must be used when conveying informal immunity. The model informal immunity letter is limited to the Division's agreement not to make "direct or indirect use" of any statements, documents, or objects provided by the witness and is binding upon the United States.

When preparing an immunity letter, staff must limit the scope of the "no direct or indirect use" provision by reference to specific statutes, industry, geographic area, and time period. With regard to the statutory limitations, the "no use" provision in the model letter is confined to prosecution of the witness for a violation of Section 1 of the Sherman Act or for a violation of "any other Federal criminal statute" committed in connection with the anticompetitive scheme. Inserting a laundry list of statutes may create a false impression with a jury that the witness has exposure (and faces jail time) under each of the enumerated statutes.

All staff requests for informal immunity must be reviewed and approved by the field office chief. The factors to be considered in determining whether it is in the public interest to grant informal immunity to a prospective witness are the same as those when granting formal, statutory immunity. *See* Chapter III, Part F.7.b.

## 9.    Corporate and Individual Leniency

On August 10, 1993, the Division modified its Corporate Leniency Policy under which a corporation can avoid criminal conviction and fines (*i.e.*, obtain "leniency") by confessing its role in an antitrust violation, fully cooperating with the Division, and meeting other specified conditions.

The conditions differ based on whether the corporation comes forward before or after the Division is aware of the illegal activity. Prior policy precluded the grant of leniency after an investigation had begun. The revised Corporate Leniency Policy also includes conditions under which corporate employees will receive protection from criminal convictions, fines, and prison terms. On August 10, 1994, the Division also established a new Leniency Policy for Individuals for persons who approach the Division on their own behalf, not as part of a corporate proffer or confession.

These leniency policies, sometimes referred to as "amnesty" programs, are intended to induce self-reporting by fully disclosing the factors the Division considers in determining who is eligible for leniency and thus providing greater certainty to parties considering whether to come forward. Under the Division's policy, leniency will be granted if a party that comes forward meets the specified conditions, even if a corporate applicant is one of only two companies that participated in the conspiracy. The leniency program has proven effective in uncovering the existence of previously undetected antitrust violations and in increasing the efficient use of Division resources by quickly advancing investigations.

The Division has issued a comprehensive Frequently Asked Questions paper regarding the operation of the Division's leniency program. This paper is available on the Leniency Program page on the Division's Web site. This page also includes links to the Division's Corporate Leniency Policy, Individual Leniency Policy, model leniency letters, leniency application telephone numbers, and other policy papers discussing the operation of the leniency program. Division attorneys are expected to review the Frequently Asked Questions paper before handling a leniency matter.

### a.      Criteria for Corporate Leniency

Only the first qualifying corporation may be granted leniency as to a particular antitrust violation. If the company that first applies for conditional leniency does not meet the qualifications, conditional leniency remains available for the next company that applies and meets the qualifications. Under the rule that only the first qualifying corporation receives conditional leniency, there have been dramatic differences in the disposition of the criminal liability of corporations whose respective leniency applications to the Division were very close in time. Staffs should be aware that sometimes applicants make leniency applications directly to the Front Office rather than to a Division criminal section chief or staff. Both section personnel and Front Office personnel should immediately report leniency applications to the ATR-LENIENCY mailbox.

### i.      Leniency Before an Investigation Has Begun ("Type A Leniency")

The conditions a company must meet to qualify for corporate leniency vary depending on when it comes forward. Staff should recommend, and leniency will be granted to, a corporation reporting its illegal antitrust activity before an investigation has begun if the following six conditions are met:

- At the time the corporation comes forward, the Division has not received information about the illegal activity being reported from any other source.

- Upon the corporation's discovery of the conduct, the corporation took prompt and effective action to terminate its participation in the illegal activity.

- The corporation reports the wrongdoing with candor and completeness and provides full, continuing, and complete cooperation to the Division throughout the investigation.

- The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.

- Where possible, the corporation makes restitution to injured parties.

- The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or the originator of, the activity.

### ii.      Alternative Requirements for Leniency ("Type B Leniency")

The major change in the 1993 Leniency Policy provides that a company will qualify for leniency even after the Division is aware of the illegal activity, whether this is before or after an investigation has begun, if the following conditions are met:

- The corporation is the first to come forward and qualify for leniency with respect to the illegal activity being reported.

- At the time the corporation comes in, the Division does not have evidence against the company that is likely to result in a sustainable conviction.

- Upon the corporation's discovery of the illegal activity being reported, the corporation took prompt and effective action to terminate its participation in the activity.

- The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation.

- The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.

- Where possible, the corporation makes restitution to injured parties.

- The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.

In applying the last condition, the primary considerations are how early the corporation has come forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity. The burden of satisfying the last condition will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity. That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.

### iii.    Leniency for Corporate Directors, Officers, and Employees

If a corporation qualifies for leniency under the conditions set forth in Part F.9.a.i. ("Leniency Before an Investigation Has Begun" or "Type A" leniency), all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will also receive leniency if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation. If their corporation qualifies for leniency only under Part F.9.a.ii. ("Type B" leniency) or does not qualify for leniency at all, the Corporate Leniency Policy states that individuals who come forward with the corporation will still be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually. In practice, however, the Division ordinarily provides leniency to all qualifying current employees of Type B applicants in the same manner it does for Type A applicants.

### b.    Criteria for Individual Leniency

An individual who approaches the Division on his or her own behalf to report illegal antitrust activity may qualify for leniency under the Leniency Policy for Individuals. The individual must approach the Division before it has become aware of the illegal activity and must not have approached the Division previously as part of a corporate approach seeking leniency for the same illegal conduct. Once a corporation attempts to qualify for leniency under the Corporate Leniency Policy, individuals who come forward and admit their involvement in the illegal activity as part of the corporate confession will be considered for leniency solely under the provisions of the Corporate Leniency Policy. They may not be considered for leniency under the Leniency Policy for Individuals.

As explained above for corporate leniency applications, individual leniency applications should be reported immediately to the ATR-

LENIENCY mailbox noting the date and time counsel called to apply for leniency. Staff should recommend, and leniency will be granted to, an individual reporting illegal antitrust activity before an investigation has begun if the three conditions listed below are met.

- At the time the individual comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source. (Thus, it is not possible to grant conditional leniency to an individual under the Leniency Policy for Individuals after a corporation has applied for leniency, although a cooperating individual could still be considered for immunity outside of the Leniency Policy for Individuals. However, it may be possible to grant a corporation "Type B" conditional leniency after an individual has been granted conditional leniency if the Division does not yet have evidence against the company that is likely to result in a sustainable conviction against it and the company meets the other requirements of Type B leniency.)

- The individual reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation.

- The individual did not coerce another party to participate in the illegal activity and clearly was not the leader in, or the originator of, the activity.

Any individual who does not qualify for leniency under the corporate or individual leniency policies may still be considered for statutory or informal immunity. *See* Chapter III, Parts F.7, F.8.

### c.    Procedure for Conferring Leniency

#### i.    Markers

The Division frequently gives a leniency applicant a "marker" to hold its place in line for leniency in the event that counsel needs to gather additional information before completing its leniency application (*i.e.,* to "perfect" the application). While the marker is in effect, no other subsequent potential applicant can "leapfrog" over the applicant that has the marker. To obtain a marker, counsel must identify the industry, product, or service involved in terms that are narrow enough to allow the Division to determine whether leniency is still available and to preserve the marker for the applicant; state that counsel has uncovered some information or evidence indicating that his client has engaged in a criminal antitrust violation; and disclose the client's identity and the general nature of the conduct discovered. A mere request for a marker, not identifying the information listed above, in order to allow counsel time to investigate to determine whether the client engaged in an antitrust violation will not suffice to obtain a marker. For example, it would not be a sufficient basis for a marker for counsel to state that his

client just received a grand jury subpoena and that he wants a marker for his client while he investigates whether the client has any criminal antitrust exposure in the matter under investigation. In some cases, an identification of the industry will be sufficient for the Division to determine whether leniency is available. For example, there may be no investigations of any products or services in that particular industry. In other cases, an identification of the specific product or service may be necessary in order for the Division to determine whether leniency is available.

When corporate counsel first obtains indications of a possible criminal antitrust violation, authoritative personnel for the company may not have sufficient information to enable them to admit definitively to such a violation. While confirmation of a criminal antitrust violation is not required at the marker stage, in order to receive a marker counsel must report that he or she has uncovered information or evidence suggesting a possible criminal antitrust violation. Confirmation of a criminal antitrust violation will, however, be required before the applicant can receive a conditional leniency letter.

Staffs should be aware that sometimes outside counsel make requests for markers directly to the Front Office rather than to a Division criminal section chief or staff. Section staffs and Front Office personnel should immediately report all requests for markers to the ATR-LENIENCY mailbox noting the date and time that counsel requested the marker. Requests for markers must be approved by the Criminal DAAG.

The marker should be for a relatively short, finite period, with the amount of time given based on factors such as the location and number of company employees counsel needs to interview, the amount and location of documents counsel needs to review, and whether the Division already had an ongoing investigation at the time the marker was requested. A 30-day period for an initial marker is not unusual, particularly in Type "A" leniency applications. If necessary, the marker may be extended solely at the Division's discretion for an additional finite period as long as the applicant demonstrates it is making a good-faith effort to complete its application in a timely manner.

ii.      Recommendations for Conditional Grant of Leniency

Staffs should forward leniency recommendations with the concurrence of the office chief to the ATR-LENIENCY mailbox with a cc:/ to the appropriate special assistant, setting forth the reasons why conditional leniency should be granted. Staff should also include a copy of the proposed conditional leniency letter, and the recommendation memo should identify and explain any proposed deviations in the agreement from the model leniency letter. As indicated earlier, staff should notify the ATR-LENIENCY mailbox as soon as they begin leniency discussions with a corporation or individual so there is a clear record of who first approached the Division. Staff should make its recommendation in a

timely manner. The Front Office will review the request and forward it to the Assistant Attorney General for final decision. If staff recommends against conditional leniency, the applicant's counsel may seek a meeting with the Front Office to discuss the leniency request. Although counsel are not entitled to such a meeting, the opportunity generally will be afforded.

The initial grant of leniency is conditional because many of the leniency requirements must be fulfilled during the course of the criminal investigation and resulting prosecutions of co-conspirators, such as the applicant's establishment of its eligibility for leniency, its full, truthful, and continuing cooperation with the Division, and the payment of restitution to victims. In addition, the final grant of leniency is conditioned on the Division's verification of the applicant's representations regarding its eligibility.

### iii.   Recommendation for Final Grant of Leniency

At the conclusion of the Division's investigation and prosecution of the cartel members, the Division will grant the applicant a final leniency letter if the applicant has met all the conditions of the conditional leniency letter. A staff recommendation for a final grant of leniency should be sent, with the concurrence of the office chief, to the ATR-LENIENCY mailbox with a cc:/ to the appropriate special assistant, setting forth how the applicant has satisfied all of the leniency conditions. Staff should also include a copy of the proposed final leniency agreement.

### iv.   Confidentiality Policy

The Division has a strict confidentiality policy concerning the identity of leniency applicants and the information obtained from them. The Division will not publicly disclose a leniency applicant's identity or the information it provides, unless the applicant has previously made such a disclosure or the Division is authorized to make such a disclosure by the applicant or by court order. Consistent with this policy, the Division will not disclose to foreign authorities the identity of a leniency applicant or the information provided by a leniency applicant unless the applicant agrees to the disclosure. *See* Scott D. Hammond and Belinda A. Barnett, Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008); Gary R. Spratling, Making Companies an Offer they Shouldn't Refuse, The Antitrust Division's Corporate Leniency Policy – An Update, Speech Before the Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (Feb. 16, 1999); Gary R. Spratling, The Corporate Leniency Policy: Answers to Recurring Questions, Speech Before ABA Antitrust Section 1998 Spring Meeting (Apr. 1, 1998). Applicants have consented to a "limited waiver" so staff can share certain information, such as attorney proffers, with international authorities to minimize the time and expense to the leniency applicant

of protracted investigations and to facilitate the successful investigation and prosecution of the applicant's former coconspirators.

### d. Amnesty Plus

A large percentage of the Division's international cartel investigations result from spin-offs from other Division investigations. For example, evidence developed during the investigation of one cartel can lead to the discovery of a second cartel. This rollover pattern led to what is now known as the Division's "Amnesty Plus" program. Under Amnesty Plus, staffs routinely take affirmative steps to discover cartel behavior in additional markets through the use of the "omnibus question" and by encouraging subjects and targets of one investigation to consider whether they qualify for leniency in additional markets. Staffs investigating one cartel routinely ask witnesses at the conclusion of an interview the "omnibus question" (*i.e.,* whether the witness has information about any other cartel). In anticipation of the omnibus question, well-informed defense counsel should explore this question with their clients in preparation for Division interviews and plea negotiations.

In plea negotiations, disclosure of an additional cartel can result in substantial benefits for a company under the Division's Amnesty Plus program. Under the Amnesty Plus program, a company pleads guilty to the antitrust violation currently under investigation; cooperates in the investigation of that violation; and discloses, and cooperates in the subsequent investigation of, a second antitrust conspiracy. The company can receive two benefits for its disclosure of the second offense under the Amnesty Plus program. First, the company can receive leniency for its disclosure of the second offense if it meets the requirements of the leniency program for that offense. Second, the company can also receive a substantial additional reduction in its fine for its participation in the first offense (*i.e.*, the offense to which the company is pleading guilty) pursuant to U.S.S.G. § 8C4.1. *See* Scott D. Hammond and Belinda A. Barnett, Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008); Scott D. Hammond, When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?, Speech Before the 15th Annual National Institute on White Collar Crime (Mar. 8, 2001); Gary R. Spratling, Making Companies an Offer They Shouldn't Refuse: The Antitrust Division's Corporate Leniency Policy – An Update, Speech Before the Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (Feb. 16, 1999).

Companies not taking advantage of the Division's Amnesty Plus program risk harsh consequences. If a company decides not to report its participation in a second antitrust offense and the Division subsequently uncovers the conduct and prosecutes the company for the conduct, the Division may urge the sentencing court to consider the failure of the

company to report the second offense as an aggravating sentencing factor, possibly meriting imposition of a term and conditions of probation, a sentence at the upper end of the Sentencing Guidelines range, or even an upward departure from the Guidelines range. In addition, where multiple convictions occur, the company may receive an increase in its Guidelines calculations under U.S.S.G. § 8C2.5(c) based on its prior criminal history. *See* Scott D. Hammond, When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?, Speech Before the 15th Annual National Institute on White Collar Crime (Mar. 8, 2001).

### 10. Requesting Internal Revenue Service Information During a Grand Jury Investigation

Division attorneys sometimes conduct criminal tax investigations when possible tax violations are inextricably linked to, or will further, an antitrust investigation, *see* Chapter III, Part F.13.a such as in the case of a corrupt purchasing agent who accepts cash kickbacks in exchange for allowing a competitive bidding process to be corrupted and fails to report those kickbacks as income. In such cases, tax returns and taxpayer information may be obtained from the IRS by the tax agent assigned to the investigation, and no court order is necessary.

When Division attorneys require information from the IRS, they must comply with the procedures set forth in 26 U.S.C. § 6103. Tax information retained by a source other than the IRS is not subject to § 6103 and may be obtained by subpoena.

Section 6103 classifies information into three general categories: returns, taxpayer return information, and return information other than taxpayer return information. Returns and taxpayer return information consist generally of the returns themselves and any supporting or related information furnished by the taxpayer or by someone on the taxpayer's behalf. A court order is required before the IRS may disclose such information to Division personnel in connection with nontax matters. Return information other than taxpayer return information is information gathered by the IRS from third parties. The IRS may disclose such information to Division personnel upon written request by the Assistant Attorney General to the Commissioner of the IRS.

The procedures to be followed in obtaining information from the IRS are set out at in United States Attorneys' Manual § 9-13.900 and in the Department's Criminal Tax Manual. All requests for such information must be processed through the Director of Criminal Enforcement and approved by the Assistant Attorney General.

### 11. Notification or Approval Procedures in Certain Types of Investigations

In certain circumstances, investigations or investigative steps may be subject to additional reporting or approval requirements. Additional

requirements exist in the following circumstances: (1) a public figure or entity is the subject of an investigation, (2) staff intends to subpoena or indict a member of the news media or news media organization, (3) staff intends to subpoena an attorney concerning his or her representation of a client, or (4) a foreign government or foreign national is the subject of an investigation or will be issued a subpoena.

**a.    Notice of Subjects of Sensitive Criminal Investigations**

As set forth in Division Directive ATR 3300.1, "Notification of Sensitive Criminal Investigations," it is the policy and practice of the Department of Justice to keep appropriate Department officials, including the Assistant Attorney General of the Criminal Division, the Associate Attorney General, the Deputy Attorney General, and the Attorney General, advised of sensitive criminal investigations, particularly those where public officials or entities are the subjects of the investigation. The notification function is for information purposes only and is not intended to interrupt, delay, or otherwise affect the normal conduct of the investigation. No special authorization for the investigation is required.

Staff should orally notify the Criminal DAAG whenever it determines that the grand jury investigation is a sensitive investigation as described at [United States Attorneys' Manual § 9-2.155](). Staff should then prepare a memorandum from the Assistant Attorney General, Antitrust Division, to the Assistant Attorney General, Criminal Division, naming the subject and briefly describing the investigation, including its current status and the subject's role in the matter.

The memorandum should be sent to the DAAG for Operations and the Criminal DAAG, through the Director of Criminal Enforcement, by e-mailing it to the ATR-CRIM-ENF mailbox. The memo will be reviewed and then forwarded to the Assistant Attorney General, Antitrust Division, for approval. If approved, the memorandum is sent to the Assistant Attorney General, Criminal Division, who is responsible for notifying the appropriate Department officials of the investigation and providing them with copies of the memorandum.

**b.    Approval of Subpoenas to and Criminal Charges Against Members of the News Media and News Organizations**

Staff may not criminally charge nor issue a subpoena regarding news gathering functions to members of the news media or news organizations, including industry or trade publications, without the express approval of the Attorney General. This requirement applies only to subpoenas regarding news gathering functions and does not apply to subpoenas seeking only purely commercial or financial information unrelated to the news gathering function. As to the latter, however, Division policy requires a determination by the Assistant Attorney

General that the information sought relates solely to commercial or financial information before a subpoena may be issued.

Whenever an investigation requires information available from the news media, staff first should attempt to obtain the necessary information from nonmedia sources. If such attempts are unsuccessful and news media sources are the only reasonable sources of the information, staff should attempt to negotiate voluntary provision of the information. If negotiations fail, staff must obtain the approval of the Attorney General to issue subpoenas based on the standards set forth at 28

C.F.R. § 50.10. *See also* United States Attorneys' Manual §§ 9-11.255 and 9-13.400. If uncertain whether these provisions are applicable to particular circumstances, staff should consult with the Director of Criminal Enforcement.

To obtain the Attorney General's approval, staff should provide a memorandum to the DAAG for Operations and the Criminal DAAG, through the Director of Criminal Enforcement, explaining the circumstances justifying the subpoena request or proposed criminal charge. Staff should also provide a memorandum from the Assistant Attorney General, Antitrust Division, to the Attorney General setting forth the factual situation and the reasons for the request, in accordance with the principles in 28 C.F.R. § 50.10.

During the time the Assistant Attorney General and the Attorney General are reviewing the request, staff should take no steps to begin the process of subpoenaing or otherwise interrogating any member of the news media. Staff should allow substantial review time for its request.

This procedure provides the most effective means to maintain a consistent policy of fairness in balancing two important concerns, the importance of a free press and the need for specific information to uncover violations of the law.

c.   **Issuance of Subpoenas to Attorneys for Information Relating to the Representation of Clients, Searches of Attorney Premises, and Criminal Charges Against Attorneys**

Because of its potential adverse effect upon an attorney-client relationship, staff in all litigating divisions must obtain the authorization of their respective Assistant Attorney General and the Assistant Attorney General for the Criminal Division before issuing a subpoena to an attorney for information relating to the representation of a client. Before seeking authorization to issue a subpoena, staff should attempt to obtain information from alternative sources or voluntarily from the attorney, unless such efforts may compromise the investigation. The following conditions must be met before the Assistant Attorney General will approve the issuance of a subpoena:

- The information must be reasonably necessary to investigate or prosecute a crime that is being or has been committed by any person.

- All reasonable attempts to secure the information from alternative sources must have failed.

- The need for the information must outweigh the adverse impact on the attorney-client relationship.

- The information must not be protected by a valid claim of privilege.

- The subpoena must be narrowly drawn and directed at material information regarding a limited subject matter and cover a reasonable, limited period of time.

*See* United States Attorneys' Manual § 9-13.410.

To obtain the required approvals, staff should submit the following documents to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate special assistant:

- A memorandum to the DAAG for Operations and the Criminal DAAG, through the Director of Criminal Enforcement, setting forth the factual circumstances, the reasons for the request, and an analysis of how the subpoena satisfies each of the conditions set forth above.

- The Criminal Division's Form 264, "Attorney Subpoena."

- If staff proposes to issue a subpoena *duces tecum*, then staff should submit a draft of the subpoena *duces tecum*. The subpoena *duces tecum* must be narrowly drafted and directed at material information regarding limited subject matter and covering a reasonable, limited time period. *See* United States Attorneys' Manual § 9-13.410.

These materials will be forwarded to the Assistant Attorney General and the Criminal Division for approval.

The Department has also issued guidance on searches of premises of subject attorneys, including inhouse counsel, due to the potential adverse effects on attorney-client relationships and the possibility that the Government may encounter material protected by a legitimate claim of privilege during such a search. *See* United States Attorneys' Manual § 9-13.420. Before searching the premises of an attorney, staff should consider obtaining information from other sources or through a subpoena, unless these efforts could compromise the investigation or prosecution, result in obstruction or destruction of evidence, or would otherwise be ineffective.

Staff must obtain the approval of the Assistant Attorney General of the Antitrust Division, and must consult with the Criminal Division, before applying for the search warrant. To obtain the required approvals, staff

must submit the following documents to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate special assistant:

- A memorandum to the DAAG for Operations and the Criminal DAAG, through the Director of Criminal Enforcement, setting forth the factual circumstances, the reasons for the request, and an analysis of how the application satisfies the conditions discussed below.

- The Criminal Division's Form 265, "Attorney Search Warrant," along with a draft of the proposed search warrant, supporting affidavit, and any special instructions to searching agents regarding procedures to ensure the prosecution team is not "tainted" by privileged material inadvertently seized during the search.

The search warrant should be drafted as specifically as possible; procedures should be established to ensure privileged material is not improperly viewed, seized, or retained; and a privilege team of agents and attorneys not involved in the investigation should be designated to protect the attorney-client privilege and to ensure the investigation/prosecution team is not exposed to privileged material. The procedures should ensure that seized materials are reviewed for privilege claims.

Staff should follow the procedures of United States Attorneys' Manual §§ 9-19.220-221 when seeking materials in the possession of a disinterested third party attorney. In such cases, a search warrant should be used only if the use of a subpoena or other less intrusive means would substantially jeopardize the availability or usefulness of the materials, access to the materials is of substantial importance to the investigation or prosecution, and the Criminal DAAG has approved the search warrant application upon the recommendation of the field office chief.

The Antitrust Division must also notify and consult with the Assistant Attorney General of the Criminal Division regarding certain proposed nonantitrust criminal charges against attorneys. *See* United States Attorneys' Manual § 9-2.032. The Criminal Division's Form 86 "Notice to Prosecute an Attorney" should be submitted to the ATR-CRIM-ENF with a cc:/ to the appropriate special assistant, along with the case recommendation package. In addition, the United States Attorneys' Manual advises components to consider providing such notice during the underlying investigation if the existence of the investigation is about to be, or has been, made public.

### d.   Notification of Matters Involving Foreign Government Interests

Various multilateral and bilateral agreements require the United States to notify foreign governments regarding antitrust activities affecting their interests. In accordance with Division Directive ATR 3300.2, "Notification of Antitrust Activities Involving Foreign Companies,

Individuals or Governments," staff must notify the Foreign Commerce Section whenever Division attorneys undertake actions which may affect the interests of a foreign government. (For a list of actions which may trigger notification requirements, *see* Chapter VII, Part D.1.) When a grand jury is involved, staff may need to obtain a 6(e) disclosure order prior to notifying the foreign government.

### 12.   Requesting a Stay of Discovery in Civil Litigation During a Grand Jury Investigation

Frequently during Division grand jury investigations, civil actions, such as treble damages actions, are filed that involve the same subject matter as the grand jury investigation. The civil actions may create a risk of interference with the grand jury investigation and resulting criminal cases. Often these actions are filed as soon as the Division's grand jury investigation becomes public, increasing the risk of such interference. When civil actions create a risk of interference with a grand jury investigation and/or resulting criminal cases, Division attorneys often must move for a stay of discovery in the civil litigation in order to protect the integrity of the investigation and/or resulting criminal cases. The decision of whether to seek a stay of discovery in civil litigation should be made on a case-by-case basis. The Division typically considers factors such as the following in assessing this potential interference and in deciding whether to seek a stay of civil discovery: whether civil discovery will lead to the disclosure of secret grand jury information or covert aspects of an investigation including spinoff investigations; whether civil discovery will expose the identities of Government cooperators and lead to witness intimidation; whether civil discovery will give noncooperating subjects of a grand jury investigation a roadmap to the investigation, revealing its scope and direction; whether civil discovery will allow grand jury subjects or defendants to use civil tools improperly to circumvent the limited discovery rules of the Federal Rules of Criminal Procedure to obtain material in defense of a grand jury investigation or criminal case; and whether potential Government witnesses will be deposed before the witness has been interviewed by the Division or testified before the grand jury or at trial. For a detailed discussion of stay motions, *see* ABA, Criminal Antitrust Litigation Handbook ch. X (2d ed. 2006).

### 13.   Investigating Related Criminal Activity

The Division often uncovers evidence of other criminal offenses while investigating Sherman Act violations. Sometimes the Division refers such evidence to the appropriate U.S. Attorney. When appropriate, the Division investigates and prosecutes these offenses. Typical non-Sherman Act offenses that the Division investigates fall into two general categories: (1) offenses that are related to the conduct under investigation as Sherman Act violations and (2) offenses that affect the integrity of the investigatory process.

As set forth below, the Division must consult with other divisions or agencies prior to investigating or prosecuting certain offenses. While retaining the authority to conduct the investigation or prosecution, Division staff may seek assistance from the Criminal Division or the appropriate U.S. Attorney's Office in conducting or prosecuting the matter.

### a.   Offenses Related to Sherman Act Violations

The Division typically investigates other substantive offenses when they occur in connection with an anticompetitive scheme or impact the competitive process. The Division exercises its prosecutorial discretion when determining whether the prosecution of crimes in addition to a Sherman Act violation is warranted. The Division also charges other crimes independently when appropriate.

The substantive offenses most commonly charged by the Division are conspiracy to defraud the United States (18 U.S.C. § 371), false statements to a Government agency (18 U.S.C. § 1001), mail and wire fraud (18 U.S.C. §§ 1341 and 1343, respectively), and tax offenses (26 U.S.C. § 7201). A conspiracy to defraud count generally is considered when a Government agency has been defrauded by an anticompetitive scheme. A false statement count generally is considered when an affidavit of noncollusion or a certificate of independent bid price determination has been signed in connection with a rigged bid to a Government agency. A mail or wire fraud count generally is considered when the U.S. mails or interstate wires are used in furtherance of an anticompetitive scheme or in instances of anticompetitive conduct that do not violate the Sherman Act (*e.g.,* an unsuccessful attempt to fix prices or rig bids).

With respect to tax offenses, the Division must coordinate all tax investigations with the Criminal Investigative Division of the IRS and obtain authorization from the Tax Division to conduct the grand jury investigation on its behalf. Typically, the Tax Division will assign an IRS special agent to work with Antitrust Division staff. In accordance with the IRS and Tax Division review procedures, the special agent submits a written report to the Office of Regional Counsel for the relevant IRS region at the conclusion of an investigation. The Regional Counsel reviews the report to determine if there is sufficient evidence to justify prosecution and, if so, refers the matter to the Tax Division for its approval. Staff should indicate in its case recommendation memo whether Tax Division approval has been obtained or is pending; in the latter case, staff should notify the appropriate special assistant once the Tax Division has given its approval. The Antitrust Division typically conducts the prosecution of tax matters it has investigated.

**b.      Offenses that Affect the Integrity of the Investigatory Process**

The Division has the authority to protect the integrity of the grand jury system and to prosecute charges of obstruction of justice (18 U.S.C. §§ 1501-1520), perjury (18 U.S.C. § 1621), and false declarations before a grand jury or court (18 U.S.C. § 1623) if the conduct occurred in a Division investigation or case. Staff should forward any such recommendation through the Office of Operations.

## G.      Completing the Investigation and Recommending Civil or Criminal Suit

As staff develops evidence that may establish a criminal or civil violation, it should begin to determine what type of case or cases, if any, will be recommended and how the investigation should be concluded. As indicated earlier in this chapter, staff should be aware of local rules of court governing the filing of civil cases and the return of indictments. This is especially true where staff wishes to seek preliminary relief to stop an acquisition or other practice because district practices differ markedly.

### 1.      Preparing to Recommend a Case

Staff should make every effort to prepare its case fully during the investigation. In most cases, staff should not rely on the potential ability to develop a case using post-complaint or post-indictment discovery. The document production, interrogatory, and deposition powers of the Antitrust Division under the HSR Act and the ACPA, as well as voluntary interviews, declarations, and affidavits, should be fully utilized to prepare a prima facie presentation and rebut likely defenses. The powers of the grand jury should likewise be used to develop all relevant information in a criminal investigation.

#### a.      Role of Antitrust Division Economists

The Division's Economic Analysis Group assigns one or more economists to each merger and civil nonmerger matter to assist the legal staff in investigating, developing, and analyzing the competitive effects of the proposed acquisition or other conduct being investigated. Among other things, the legal staff in civil matters should include such Division economists as participants in formulating theories to investigate, drafting HSR second requests and interrogatory and document CIDs, creating an investigatory plan designed to maximize the potential of developing a triable case, and drafting and asking interview and CID deposition questions. Also, Division economists should participate fully in developing and implementing quantitative analysis of anticompetitive effects of mergers and other business conduct and in providing or securing expert economic testimony.

**b.     Notification to Prospective Defendants**

As the conclusion of an investigation nears, but before the field office or section makes a formal recommendation, staff generally should afford counsel for the parties an opportunity to present their views to staff and the chief, time permitting. Staff should make this offer to all counsel whose clients staff believes, in good faith, may be parties to a suit. This practice allows staff, after a single meeting or series of meetings, to evaluate efficiently the arguments of all prospective defendants and make a better informed assessment of the evidence based on information from such parties. When time constraints are severe, a chief may decide to limit the number and duration of meetings with parties.

In general, counsel should be informed that the Division has identified competitive concerns, but that the Assistant Attorney General has made no determination about a suit. Counsel should not be informed that the Division has determined that the party will be sued or indicted, because the final responsibility for making a decision to file suit or recommend an indictment rests with the Assistant Attorney General. Nor should counsel be told that staff is recommending suit (without express authorization from the Assigned DAAG). Counsel should be informed about the nature of the possible case but should be clear that the Front Office or DAAG may express additional comments. In civil matters, staff should inform counsel of the theories of competitive harm underlying the proposed case, the nature of the evidence that support it (without violating CID, HSR, or grand jury confidentiality provisions or exposing sources or potential witnesses), the staff's economic analysis and the possible scope of relief. This information should be conveyed to counsel sufficiently in advance of the meeting with staff and the section chief so that counsel may respond. In the event staff recommends to close a matter or believes a remedy with particular characteristics may be appropriate, staff should not convey such news to the parties until/unless they have cleared such views with the Front Office.

At an appropriate point in the course of the Division's deliberations, staff also will usually inform counsel that it will forward any request of counsel for an appointment to meet on the matter with senior Antitrust Division officials. In general, parties who may be sued or recommended for indictment are usually afforded an opportunity to meet with a senior Antitrust Division official prior to a decision whether or not to file suit or seek an indictment. However, counsel are not entitled to such a meeting as a matter of right absent an explicit promise in a timing agreement. If it is a close question about whether a meeting would or would not be useful, the appropriate Deputy Assistant Attorney General will advise staff whether there is or is not interest in hearing a presentation on behalf of a particular party. As a general rule, any argument which counsel for a prospective party wishes to be considered by senior officials should first be presented to staff.

c.      **Dual and Successive Prosecution Policy ("Petite" Policy)**

A number of states have enacted antitrust laws that provide for criminal penalties. This raises the question of under what circumstances a Federal prosecution will be instituted or continued following a state criminal prosecution based on substantially the same act or acts. The issue has arisen, for example, in connection with bid rigging on state construction projects.

There is no constitutional bar to Federal prosecution for the same offense as to which there has been a state prosecution. The Double Jeopardy Clause simply does not apply to this situation. *See Abbate v. United States*, 359 U.S. 187 (1959); *Bartkus v. Illinois*, 359 U.S. 121 (1959). Further, while Congress has expressly provided that as to certain specific offenses a state judgment of conviction or acquittal on the merits shall be a bar to any subsequent Federal prosecution for the same act or acts, it has not included violations of the antitrust laws in this category. *See, e.g.*, 18 U.S.C. §§ 659, 660, 2117 and 15 U.S.C. § 80a-36.

Nonetheless, since 1959, the Department of Justice has followed the policy of not initiating or continuing a Federal prosecution following a state prosecution based on substantially the same act or acts unless there is a compelling Federal interest supporting the dual prosecution. This policy is known as the "Petite policy" based on *Petite v. United States*, 361 U.S. 529 (1960) (granting the Solicitor General's petition to vacate the second of two Federal subornation of perjury convictions after the Government indicated its intention to avoid successive Federal prosecutions arising from a single transaction, just as it had earlier announced that it would generally avoid duplicating state criminal prosecutions). The Petite policy provides that only the appropriate Assistant Attorney General may make the finding of a compelling Federal interest, and failure to secure the prior authorization of the Assistant Attorney General for a dual prosecution will result in a loss of any conviction through a dismissal of the charges, unless it is later determined that there was in fact a compelling Federal interest supporting the prosecution and a compelling reason for the failure to obtain prior authorization. This policy is, of course, designed to regulate prosecutorial discretion in order to ensure efficient use of the Department's resources and to protect persons charged with criminal conduct from the unfairness that can be associated with multiple prosecutions and multiple punishments for substantially the same act or acts. *See Rinaldi v. United States*, 434 U.S. 22, 27 (1977).

This dual prosecution policy applies, and authorization must be obtained from the Assistant Attorney General for the Antitrust Division, whenever there has been a prior state proceeding (including a plea bargain) resulting in an acquittal, a conviction, or a dismissal or other termination of the case on the merits. It does not apply, and thus authorization is not required, where the state proceeding has not

progressed to the stage at which jeopardy attaches, or was terminated in a manner that would not, under the Double Jeopardy Clause, preclude a further state prosecution for the same offense. For example, the Division will not hesitate to indict price fixers simply because they have already been indicted by a state.

Where the policy does apply, a subsequent Federal prosecution may proceed only if the Assistant Attorney General makes a finding that there is a compelling Federal interest supporting the dual prosecution. Thus, a Federal prosecution will not normally be authorized after completion of the state proceeding unless the state proceeding left substantial Federal interests demonstrably unvindicated. As a general rule, cases coming within the priority areas of Federal jurisdiction, including the protection of free and unfettered competition under the antitrust laws, are more likely to meet this requirement. Thus, as a general rule, the Division will be inclined to authorize Federal antitrust prosecution despite dismissal of, or an acquittal on, parallel state charges, most particularly when there is a substantial basis for believing that the state result was affected by (1) blatant disregard of the evidence by the court or jury, (2) the failure to prove an element of the state offense that is not an element of the Federal offense, (3) the unavailability of significant evidence in the state proceeding either because it was not timely discovered or because it was suppressed based on state law grounds or on an erroneous view of Federal law, or (4) other substantial prejudice to the state's prosecution.

Even where a state prosecution results in a conviction, there are certain circumstances in which the Division would be inclined to authorize dual prosecution. It is the Division's policy that culpable individuals should be sentenced to incarceration. Accordingly, dual prosecution may be authorized in cases where the Division anticipates an enhanced sentence in its case. This may include situations where the state conviction was for a misdemeanor whereas the Sherman Act violation is a felony. A subsequent Federal prosecution may also be warranted where either the state antitrust charge carried a maximum penalty substantially below the maximum Sherman Act penalty, or the choice by the state prosecutor or grand jury of the state charges, or the state court determination of the severity of the sentence, was affected by any of the factors noted earlier as strengthening the Division's inclination to authorize Federal antitrust prosecution after state acquittal or dismissal.

Finally, dual prosecution will not generally be authorized where there has been a state antitrust prosecution that resulted in a conviction and reasonable sentence. Moreover, even when the state prosecution results in acquittal, dual prosecution will not be authorized if the state prosecutors offered essentially the same evidence the Division would offer, and there was no reason to believe that the verdict of acquittal reflected anything but a good faith reasonable doubt on the part of the judge or jury.

Additional information on the dual prosecution policy may be found in United States Attorneys' Manual § 9-2.031.

## 2.    Case Recommendation Procedures

Upon completing its investigation of the evidence and evaluation of enforcement options, staff, in consultation with its chief, should prepare case recommendation materials for the Division's Front Office communicating staff's summary of the evidence, assessment, and recommendation. In addition to evaluating the strengths and weaknesses of the evidence, staff's assessment should evaluate the main settlement or disposition options. Such advance evaluation of settlement prospects is important because when a matter is submitted to the Front Office the pace of developments often will accelerate, leaving little time for additional study, particularly in fast-track merger matters. Staff should draft its case recommendation materials with a view towards fully explaining the case to individuals with less detailed knowledge of the industry and facts (*e.g.,* the chief and the Front Office). In the event that staff believes that a civil or criminal suit is not warranted, staff should prepare a closing memo explaining its rationale. The closing memo should indicate whether the chief concurs and should be e-mailed to the appropriate special assistant. For more details on closing memos, *see* Chapter III, Part C.7. The case recommendation package submitted by staff should typically consist of the case recommendation memoranda, draft pleadings, a proposed press release (where applicable), and any other documents deemed most relevant to a full consideration of the case, including its critical and contested elements, and its strengths and weaknesses. Because procedures vary somewhat depending on the type of case, unique features of civil nonmerger, merger, and criminal case recommendations are described below.

To help ensure that recommendations are in the format preferred by the Front Office, the appropriate special assistant will, upon request, provide an exemplar of a recent case recommendation memorandum that has been considered particularly effective.

Staff should always submit the case recommendation memorandum and accompanying materials to the chief for review. The chief will analyze the matter and send the recommendation materials to the appropriate Director, Deputy Assistant Attorneys General, and other appropriate Front Office personnel. The case recommendation materials must be delivered to the Front Office sufficiently in advance of any meeting between representatives of the prospective defendants and senior Division officials to permit a meaningful advance review of the material submitted.

### a.    Recommending a Nonmerger Civil Action

Staff should keep the Assigned DAAG and the Directors of Civil Enforcement and Litigation informed as a prospective civil nonmerger

case moves toward settlement or litigation. When settlement is anticipated, staff should engage the Assigned DAAG, the Director of Civil Enforcement, and the General Counsel on prospective settlement issues. Staff recommendations relating to civil nonmerger cases will vary according to the nature and complexity of the matter under consideration. If settlement is uncertain, the legal and economic case recommendations should include at least:

- A brief (one paragraph or less) description of what the prospective case is about.

- A conceptual discussion of the case and why it is an important one for the Division to bring, including the theory and statutes on which a case is recommended; the elements of the theory and statutes being relied upon; theories investigated but not recommended to be pursued; and the justifications or defenses likely to be raised by the prospective defendants.

- An assessment of the litigation risks, including an order of proof (which will typically be attached to the case recommendation as a separate document), a discussion of likely testimony, a summary of the relative strengths and weaknesses of the evidence supporting the case, and a summary of likely defense evidence and arguments .

- The relief to be obtained and a discussion of potential settlement options.

Although staff's recommendation should cover all elements and aspects of the prospective case, it should emphasize and focus on the areas most in dispute and likely to pose the greatest difficulties for the Division at trial. The recommendation should be balanced and objective in tone.

The recommendation should be accompanied by copies of documents deemed by staff to be the most significant evidence to the critical aspects of the case. Normally, the number of appended documents should be limited so that attention to the most critical ones is not obscured. When documents accompany a recommendation, the entire document should be provided, rather than excerpts, although relevant portions may be highlighted. Staff should also include important documents relied on by the parties as well as any white papers or economic analysis they have provided. In addition, staff should attach a draft of the proposed complaint and proposed press release. Any other court papers to be filed with or shortly after the complaint, such as a preliminary injunction (PI) brief, should also be attached.

If settlement is likely, the case recommendation package should include (in addition to the case recommendation memo), a draft complaint, consent decree, stipulation, competitive impact statement, press release, Federal Register notice, and newspaper notice. *See* Chapter IV, Part D (discussing consent decrees). The case recommendation memo

should contain the same basic elements as those discussed above for unresolved cases; however, it is usually not necessary to submit an order of proof or detailed discussion of the evidence and trial risks. The case recommendation memo should, however, contain a discussion of why the case is significant, its theory, and an objective analysis of the advantages and disadvantages of the proposed consent decree.

### b.  Recommending a Merger Action

Staff should keep the Assigned DAAG and the Director of Civil Enforcement informed as a prospective merger case moves towards settlement or litigation. Staff should obtain approval from the Assigned DAAG and the Director of Civil Enforcement prior to engaging in settlement discussions. A draft final judgment or hold separate stipulation must be reviewed by the Assigned DAAG, Director of Civil Enforcement, and General Counsel before it is proposed to the parties. The procedure for recommending merger cases varies depending upon whether staff has been able to reach what it views as an acceptable resolution with the parties.

In the event that staff is proposing a settlement with the parties, the case recommendation memo should be similar to that described below, except that it need not contain an extensive analysis of the evidence but should include a discussion of how the proposed resolution will adequately resolve the identified competitive problem. The case recommendation package should include (in addition to the case recommendation memo), a draft complaint, consent decree, stipulation, competitive impact statement, press release, and Federal Register notice.

In some cases, the parties may agree to a resolution that eliminates the potential competitive problem before the merger is consummated (*i.e.,* a "fix-it-first" solution). Because such a resolution does not involve a case being filed, no competitive impact statement, Federal Register notice, or newspaper notice is necessary. In such cases, the staff should provide a detailed letter agreement describing all of the terms of the fix-it-first agreement. As appropriate, a draft pocket consent decree and stipulation should also be provided. A recommendation memo and draft press release should still be forwarded along with any documents necessary to understand the proposed resolution (*e.g.*, a completed agreement divesting certain assets, a completed license for certain intellectual property).

In the event that staff and the parties have not reached a resolution, it is likely that the parties will want to meet with the Director of Enforcement and the Assigned DAAG. The decision-making process with respect to case recommendations will be greatly facilitated if staff delivers to the Assigned DAAG and the Director of Enforcement, no later than the week before any meeting with opposing parties, a case recommendation memo, an order of proof (of the type described

below), any white papers or economic studies submitted by the merging parties, and a draft complaint. Immediately following any such meeting with parties, staff should finalize its draft complaint, filing papers, declarations, and exhibits. By the time staff completes these documents, it should be prepared to demonstrate mock closing statements for the Government and the defense and mock direct and cross examination of the Government's expert economist.

The case recommendation memo should be brief and contain the date by which the Division must file any TRO or PI papers and any other dates that bear on timing; a brief description of the transaction (including the identity of the merging parties, the form of the transaction, and the consideration); a description and justification of the proposed suit (including proposed defendants, the statutes under which the merger is to be challenged, the proposed judicial district, and the relief sought); a discussion of the impact of the transaction (including the relevant product and geographic markets, volume of commerce, market shares, and Herfindahl-Hirschman Index); a discussion of the theory of competitive harm; and a discussion of the weaknesses of the case (including the principal and most troubling contentions of the merging parties). Staff should address unusual factual, evidentiary, equitable, relief, or legal issues or factors with a direct impact on any exercise of prosecutorial discretion on the decision to challenge the merger and any settlement possibilities. The memo should explain why litigation should be pursued and it should clearly set forth staff's recommendation. The chief's recommendation also needs to be communicated to the Front Office, either in the recommendation memo or in a separate memorandum from the chief.

The order of proof should be in outline format (and should be generated over the course of an investigation). The order of proof should follow the elements of the case, using the Merger Guidelines as a framework, and should include relevant quotations from documents (or attach highlighted key documents) and relevant portions from key transcripts, as well as summarize any quantitative evidence developed by EAG. The order of proof for a merger challenge should identify the key issues in the case, the strength or weaknesses of the evidence by element, contentions of the merging parties, and a summary of how staff will meet those contentions. Time and circumstances permitting, appendices to the recommendation memo and order of proof should include copies of the significant prospective exhibits and other litigation materials.

The recommendation of the economists assigned to the merger should be indicated either in staff's recommendation memo or a separate memo. Normally, the economists assigned to the matter prepare one or more separate memoranda focused on important issues. Legal staff should ensure that the economists have a sufficient opportunity to review the case recommendation memo and order of proof so that they

may provide material for insertion or write a complementary memo; similarly, the economists should ensure that the legal staff has an opportunity to review any separate memo that they write.

### c.   Recommending a Criminal Case

If a matter is being conducted before a grand jury, staff should identify the targets of the investigation. "Target" is defined as a person:

> as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. An officer or employee of an organization which is a target is not automatically considered a target even if such officer's or employee's conduct contributed to the commission of the crime by the target organization. The same lack of automatic target status holds true for organizations which employ, or employed, an officer or employee who is a target.

United States Attorneys' Manual § 9-11.151. A "subject" of an investigation, on the other hand, is a person or entity "whose conduct is within the scope of the grand jury's investigation." *Id.*

The Division will follow the Department's practice of informing individuals under certain circumstances that they are targets of the investigation. *See id.* § 9-11.153. In those circumstances where the individual wishes to appear before the grand jury voluntarily, *see id.* § 9-11.152, the target should be informed that he or she will be required to explicitly waive his or her privilege against self-incrimination and that the Division attorneys may examine the person on all relevant information. Accordingly, the person may not simply read a statement and then leave the grand jury room.

Prior to recommending charges, either via an indictment or an information, Division attorneys should familiarize themselves with the Department's Principles of Federal Prosecution, United States Attorneys' Manual § 9-27.000 *et seq.*; the May 19, 2010 Attorney General Holder Memorandum on Department Policy on Charging and Sentencing; and the Principles of Federal Prosecution of Business Organizations, United States Attorneys' Manual § 9-28.000 *et seq.* Case recommendations should be consistent with these Principles and Memorandum. In both an indictment and information context, Division attorneys should ordinarily recommend charging "the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction." United States Attorneys' Manual § 9-27.300. This determination, however, must be made in the context of "an individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purpose of the Federal criminal code, and maximize the impact of Federal resources on crime." United States Attorneys' Manual § 9-27.300.

Staff ordinarily will inform defense counsel that the Division is seriously considering recommending indictment. As previously discussed, staff should never inform counsel that the corporations or individuals will be indicted. Rather, counsel should be informed that the Division is seriously considering making such a recommendation to the grand jury. This procedure applies to those corporations and individuals whom staff believes pose close questions, as well as those who may ultimately be recommended for indictment.

Counsel for both corporate and individual defendants should be afforded an opportunity to meet with staff and the field office chief regarding the recommendation being considered. Counsel should be encouraged to present all arguments as to why it would be unwise or inappropriate—for factual, legal, or prosecutorial policy reasons—to recommend indictment of their client. If staff and the field office chief, after listening to the views of counsel, believe a case is appropriate, a case recommendation package should be prepared and e-mailed to the ATR-CRIM-ENF mailbox with a cc:/ to the appropriate special assistant.

Counsel do not have any absolute right to be heard by the Front Office, although the Director of Criminal Enforcement and the Criminal DAAG will ordinarily give counsel an opportunity to be heard before recommending an indictment to the Assistant Attorney General. Only in very unusual circumstances will counsel be granted a meeting with the Assistant Attorney General. The Front Office will ordinarily consider the arguments of counsel in making a final recommendation, but only after counsel has already met and discussed the issues with staff. It should be noted that neither the Criminal DAAG nor staff can disclose all relevant factual details to counsel since the secrecy provisions of Rule 6(e) of the Federal Rules of Criminal Procedure apply to the evidence developed before the grand jury.

### i.      Recommending an Indictment

Staff's indictment recommendation memorandum should be addressed from the Chief and staff and to the DAAG for Operations and the Criminal DAAG through the Director of Criminal Enforcement. When sent forward, the indictment recommendation memo must contain a chief's evaluation section either concurring in the staff recommendation or highlighting significant issues in the staff recommendation or any differences with staff's recommendation. Chiefs must make clear their positions on all indictment recommendations, including each count recommended against each defendant.

Staff's indictment recommendation memorandum should generally not exceed thirty (30) pages, except in appropriate circumstances (*e.g.*, multi-count, multi-defendant indictments), and with prior approval of the chief, in consultation with the Director of Criminal Enforcement. When recommending an indictment, the recommendation memo should typically contain the following sections:

(a) Introduction

The first section should briefly summarize the nature of the criminal charge in the proposed indictment (*e.g.*, the name of the defendant, the nature of the offenses to be charged in the indictment, the judicial district in which the proposed indictment would be returned) and when staff expects to present the indictment to the grand jury.

(b) Chief's Evaluation

This section should contain the chief's position on the recommended case, including a discussion of key issues or facts that contributed to the chief's position and/or any disagreements with staff relating to the scope or nature of the charge(s) or defendant(s) recommended. This section must also include an affirmation from the chief that: "On [X] date, the Front Office was notified that staff's recommendation was being prepared for consideration."

(c) Proposed Defendants

The proposed corporate defendants should be listed and described. The proposed individual defendants should be listed, together with their company affiliation and the positions each held during the charged period.

(d) Background of the Investigation

Staff should briefly summarize the background of its grand jury investigation, including when the grand jury investigation was opened, a description of the relevant product or service that is the subject of the investigation, the identity of any dispositions reached with other subject companies or individuals in the investigation, and the status of any plea negotiations with the proposed defendants.

(e) Summary of the Offense

The purpose of this section should be a high-level, big-picture explanation of the charging decision and key events giving rise to the criminal charges in the proposed Indictment. Staff, therefore, should avoid reciting excessive evidentiary or background detail in this section. Additionally, this section should be organized chronologically, when possible.

In conspiracy cases, staff should address two related topics: a description of the conspiracy and each proposed defendant's role in that conspiracy. Therefore, this section should include a summary of the following:

- The formation and scope of the conspiracy, including:

    o   The events giving rise to the formation of the conspiracy.

    o   The identity of the companies that joined the conspiracy.

    o   The products or services that were covered by the conspiracy.

- o   The geographic scope of the conspiracy.

- o   The amount of commerce affected by the conspiracy.

- o   The nature of the anticompetitive agreement that resulted from the conspiracy.

- The operation of the conspiracy, including:

  - o   How the conspirators communicated about the conspiracy during the conspiracy.

  - o   The extent to which the conspirators attempted to and did, in fact, implement the anticompetitive agreement.

  - o   The steps taken by the conspirators to police, enforce, and monitor the conspiracy.

  - o   The steps taken by the conspirators to keep the anticompetitive agreement and their conspiratorial contacts a secret.

  - o   The duration of the conspiracy, including how and when the conspiracy was terminated or ended.

  - o   The role that each proposed defendant played in forming, implementing, and approving the conspiracy.

If the charged offense does not involve conspiratorial activity (*e.g.*, making false statements, obstructing justice), then staff should otherwise provide a chronology of the defendant's conduct and other relevant events that support the proposed criminal charge.

Staff should also identify any alternative charging options considered and/or supported by the evidence and the law, including, for example, the violation to be charged, the possible offense period, or the geographic scope of the conduct, and explain why the recommended charges were chosen.

(f) Summary of the Evidence

This section should be an analytical discussion of the evidence establishing the conspiracy or any other type of criminal conduct to be charged. Staff should begin this section with a legal discussion of the elements necessary to prove the offense, citing the applicable case law from the circuit in which the matter will be litigated. For Sherman Act prosecutions, however, staff need not address the well-established legal elements of such an offense, concentrating instead on how staff intends to prove the existence of a conspiracy and the defendant's role or participation in it. Next, staff should set forth a summary of the evidence establishing the legal elements necessary to prove the crime against each proposed defendant. Staff should also summarize the evidence establishing venue in the proposed district. Staff should organize its discussion of the evidence against each proposed defendant chronologically. When appropriate, staff should consider attaching

relevant portions of transcripts of crucial grand jury witnesses in addition to copies of important documents.

In preparing this section, staff should make every attempt to analyze and summarize the evidence, not simply recite extended passages from witness testimony or from documentary evidence.

(g) Persons and Companies Not Recommended for Indictment

In a separate section, the indictment recommendation memorandum should list the persons and companies that were potential targets of the investigation but are not being recommended for indictment. The evidence against each must be summarized, and staff must set forth the reasons why indictment is not recommended. Relevant factors, such as the extent of cooperation, age, state of health, and unusual hardship, should be described. Staff should explain the impact of the decision not to indict on the overall jury appeal of the proposed case.

(h) Weaknesses and Defenses

Staff should include a candid, detailed analysis of the weaknesses of the case and any anticipated defenses, including those proffered by defense counsel. Matters to be addressed include witness vulnerability, credibility problems, evidentiary problems, potential for jury nullification, and appeals to prosecutorial discretion or leniency. Likely defense motions should also be addressed.

(i) Discovery

This section should discuss the status of discovery, including the definition of the prosecution team, whether discoverable materials have been reviewed and processed, whether the materials are ready for production to the defense, and whether staff is aware of the specific discovery requirements and practices of the district and circuit, including the local U.S. Attorney's Office's practices.

(j) Victims of the Violation and Staff Compliance with the Attorney General Guidelines for Victim and Witness Assistance

Some of the descriptions in this section may be tentative at the indictment recommendation stage, but there should be as complete a discussion as possible of who the victims of the violation are, how they have been harmed, and how the Division will fulfill its responsibility to protect their rights as set forth in the Attorney General Guidelines for Victim and Witness Assistance. At a minimum, the memorandum should identify and discuss:

- The victims' rights issues presented by the violation.

- What victim services are appropriate under the circumstances (*e.g.*, information/referral, protection from harassment/intimidation, consultation/notice, restitution).

- How and when those services have been or will be provided.

Questions to be considered in drafting this section include: Has the Division already had, or is the Division likely to have, formal or informal contact with these victims? Have victims received victim notification letters, information pamphlets, and checklists and, if not, will they? If the case involves a large number of victims, will it be necessary to seek an order under 18 U.S.C. § 3771(d)(2) fashioning a reasonable procedure to effectuate victims' rights and when will such an order be sought? Will there be an opportunity to consult with victims concerning the filing of charges or the disposition of the case? Have the victims sought the Division's assistance in recovering restitution and, when they have, is restitution appropriate or possible? How will the Division assist the victims or the probation office to complete the Victim Impact Statement?

### ii.    Recommending a Plea Agreement

Recommendations to file an information and enter into a plea agreement should be addressed to the DAAG for Operations and the Criminal DAAG through the Director of Criminal Enforcement. If staff is able to reach what appears to be a reasonable resolution of the potential criminal charges, staff should prepare a case plea recommendation memorandum setting forth, at a minimum, the following:

- A brief description of the proposed charges and an identification of the proposed defendants, including the title(s) and employer of any individual defendant.

- A brief section reflecting the chief's concurrence with staff's recommendation. This section should also include an affirmation from the chief that: "On [X] date, the Front Office approved the material plea terms that serve as the basis of this recommendation."

- A brief summary of the background of the investigation, including any dispositions reached with other subjects of the investigation.

- The factual basis for the proposed guilty plea, including a summary of the illegal conduct and the defendant's role or participation in that conduct.

- A brief description of the key provisions of the proposed plea agreement, including:

  - The proposed charging language, as contained in the information and described in the plea agreement.

  - An explanation of the methodology used to compute the defendant's sentencing range under the United States Federal Sentencing Guidelines.

  - An explanation of how staff arrived at the recommended sentence, either within the applicable Guidelines range (*e.g.,*

the lower end of the range) or outside of it (*e.g.*, downward departure for substantial assistance), including the nature of the cooperation, if any, that staff expects the defendant to provide in support of the recommended sentence.

o   Any unique provisions in the plea agreement.

o   Any substantive deviations from the Division's standard plea agreement language, and whether such deviations were previously approved by the Office of Operations.

o   A description of the potential charges faced by the proposed defendant, had the case proceeded to indictment.

o   A discussion of relevant victims' rights issues, including: (i) whether there has been, or will be, an opportunity to consult with the victims of the offense concerning the proposed plea agreement; (ii) whether and how the victims of the violation will be notified of the final resolution of the case and of any public court proceedings; and (iii) if the plea agreement does not provide for restitution to the victims of the offense, why restitution is not necessary, appropriate, or obtainable. This assessment should include whether the defendant has sufficient resources to satisfy any future damage award to victims of the offense in addition to paying the criminal fine if restitution is not provided. If the defendant has already paid damages to the victims or an agreement to do so has already been reached, that should be noted as well.

The plea recommendation memorandum should generally not exceed fifteen (15) pages, except in appropriate circumstances (*e.g.,* multicount, multidefendant informations), and with prior approval of the chief, in consultation with the Director of Criminal Enforcement.

Just as with a recommendation for an indictment, the plea recommendation memorandum should be forwarded with all appropriate pleadings in the matter (typically, a draft information and plea agreement), a press release (*see* Chapter VII, Part H.1), and a completed MTS "New Matter" form to the ATR-CRIM-ENF mailbox, with a cc:/ to the appropriate special assistant, and the ATR-Premerger-MTS mailbox. *See* Division Directive ATR 2810.1, "Matter Tracking System."

### 3.   Procedures for Review of Case Recommendations

Once staff has made its submission and any meetings with counsel for prospective defendants have been conducted, the Division's reviewers assess the merits of the case with a view towards considering all matters consistently and fairly. At the conclusion of the review process, the Assistant Attorney General makes the final decision as to whether to bring the action or to decline prosecution.

The Assistant Attorney General will review the staff recommendation along with the recommendations of the Assigned DAAG and appropriate

Directors of Enforcement. In some civil matters, but only rarely in criminal matters, counsel for the potential defendants may also be provided with an additional opportunity to make a presentation to the Assistant Attorney General.

When a final decision is made by the Assistant Attorney General, staff will be informed immediately. If a case is to be filed, the matter will be returned to staff with the approval papers, signed pleadings, and any other information that will be required for filing. At that point, staff will commence litigation of the matter or make its presentment to the grand jury.

In both civil and criminal actions, staff should submit a draft press release well in advance of the filing date so that it may be finalized and approved for release. Immediately after the case has been filed, staff must advise the assigned special assistant and paralegal in the Office of Operations so that issuance of the press release may be authorized in a timely fashion. At the time the case is filed, staff should follow the procedures set forth in Chapter VII, Part H relating to the Department's Press Policy. Staff should e-mail the ATR-CRIM-ENF mailbox in criminal matters and the Directors of Civil Enforcement and Litigation in civil matters the docket number and the name of the judge assigned to the case. For procedures following the initiation of litigation, see Chapter IV.

## H.    Other Investigative Functions

### 1.    Business Review Procedures

Under the Antitrust Division's Business Review Procedure, 28 C.F.R. § 50.6, business entities can ascertain the Division's current enforcement intentions with respect to proposed business conduct. All business review letters since 1992 appear on the Division's Internet site. The Division also periodically publishes a digest of these letters, which is indexed by commodity, entity, and date, and is circulated to the sections and field offices. The digests and indices back to 1968 are also available on the Division's Internet site.

#### a.    Origin and Development of Procedure

This procedure had its origin in what were known as "railroad release" letters, the first of which was issued by the Division in 1939. Under the "railroad release" procedure, the Division would review proposed business conduct and state whether it would forego the initiation of criminal proceedings should the proposed conduct be carried out. This was subsequently expanded to include a merger clearance procedure under which the Division would state its present enforcement intentions with respect to a merger or acquisition. In 1968, these practices were formalized as the Business Review Procedure, and regulations describing the procedure were issued at 28 C.F.R. § 50.6. The regulations were issued on February 1, 1968, *see* 33 Fed. Reg. 2,442, and have been revised twice, *see* 38 Fed. Reg. 34,804 (1973); 42

Fed. Reg. 11,831 (1977). The Hart-Scott Rodino Antitrust Improvements Act of 1976 eliminated much of the need for a business review procedure in the merger context. Today, the business review procedure is used to evaluate potential civil nonmerger conduct only; with the exception of a very limited number of health care mergers, the Division as a matter of policy does not conduct business reviews for proposed mergers.

### b.    Purpose

The Business Review Procedure provides substantial benefits to the Division and to the business community. From the Division's perspective, the procedure is beneficial since it brings to the Division's attention proposed business conduct that may be of questionable legality and provides a mechanism by which a speedy investigation can be carried out. The business community benefits by having a procedure that enables it to avoid costly litigation and other business problems that may arise when a company is involved in antitrust litigation with the Government. *See Green v. Kleindienst*, 378 F. Supp. 1397, 1398-99 (D.D.C. 1974).

### c.    Manner of Request

The business review process is initiated by a written request to the Assistant Attorney General. (The initiation of a business review request does not in any way alter the responsibility of a requesting party to comply with the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976. *See* 28 C.F.R. § 50.6(7)(b).) At the outset, or at any time it appears appropriate, the Division in its discretion may refuse to consider the request. The Division would refuse a request when it does not qualify for business review treatment. This most frequently involves requests relating to ongoing business conduct, since only proposed business conduct is eligible for consideration. Where the business conduct is subject to approval by a regulatory agency, a business review request may be considered before agency approval has been obtained only where it appears that exceptional or unnecessary burdens might otherwise be imposed on the requesting party or where the agency specifically asks the requesting party to seek a business review letter. In any event, the procedure relates only to enforcement intentions under the Federal antitrust laws, not under any other Federal or state statute or regulatory scheme. *See* 28 C.F.R. § 50.6(7)(a).

### d.    Processing the Request

The Office of Operations logs incoming requests and refers them to the appropriate staff. Staff then follows the normal procedure to obtain preliminary investigation authority. *See* Chapter III, Part B. FTC clearance must be obtained before the review takes place. As with any other investigation, no contacts with parties other than the requesting party

(with the exception of other Federal Government agencies) should be made before preliminary investigation authority is obtained.

### e.   Timing of Investigation

Requests for a business review letter should be handled as expeditiously as possible. Absent unusual circumstances, responses to such requests should be made within 90 days of the receipt of all necessary information from the requesting party. Special deadlines govern business reviews concerning export trade and health care. Export-related requests are to be answered within 30 business days from the date that the Division receives all relevant data concerning the proposed transaction. Business review requests regarding any health care matter addressed in the [Statements of Antitrust Enforcement Policy in Health Care](#) issued by the Department and the Federal Trade Commission, except requests relating to multiprovider networks and hospital mergers outside the Statement 1 safety zone, are to be answered within 90 days after the Division receives all necessary information concerning the proposal. Requests regarding multiprovider networks or other nonmerger health care matters are to be answered within 120 days after the Division receives all necessary information. There is no time deadline for answering any business review request regarding a health care merger other than the 90-day deadline for mergers within the Statement 1 hospital merger safety zone.

In 1992, the Department adopted a pilot procedure to expedite the processing of business review requests for joint ventures and information exchange programs. *See* 58 Fed. Reg. 6132 (1992). Under that procedure, parties can submit with their request certain specified documents and information in order to expedite the investigative process. The types of information listed are those items that are typically requested by the Division after initial review of a request. By submitting these items with their request, parties can help speed the overall process. The Department committed at the time to use its best efforts to respond within 60 to 90 days when all relevant information was submitted with the initial request. Since 1992, many business review requesters have referred to the pilot program for guidance in preparing their initial requests, and Division attorneys have advised those seeking presubmission advice to consult the pilot program to determine what types of information they should send with their request.

### f.   Investigating a Business Review

Under the business review regulations, the requesting parties are under an affirmative obligation to provide the Division with all information and documents in their possession that the Division may need to review the matter. *See* 28 C.F.R. § 50.6(5). The Division may also request additional information from the party or parties seeking review. Staff attorneys should also conduct whatever independent investigation they deem

necessary. Staff is encouraged to involve the economist assigned to the matter in their investigation and, where appropriate, may also wish to seek the assistance of the Legal Policy Section.

g.      **Review Procedures**

After examining a business review request, the Division may "state its present enforcement intentions with respect to the proposed business conduct; decline to pass on the request; or take such other position or action as it considers appropriate." 28 C.F.R. § 50.6(8). Generally, the Division provides the party seeking the business review with one of three responses: (a) that the Department of Justice does not at present intend to bring an enforcement action against the proposed conduct; (b) that the Department of Justice declines to state its enforcement intentions; or (c) that the Department cannot state that it would not challenge the proposed conduct if it is implemented. The second response means that the Division may file suit should the proposed conduct be implemented, while the third response indicates that a challenge is probable. Because the Division is reluctant to commit to a lawsuit (which might consume considerable resources) in a business review letter and because the Division cannot be sure that it would initiate an enforcement action absent a full investigation, the Division rarely states in a business review letter that is likely to challenge proposed conduct. Language indicating that the Division "cannot state that it will not challenge" the proposed conduct is widely understood as a "negative" response and as indicating that the Division sees a competitive problem with the proposed conduct.

Generally, each letter sets forth (a) the procedural history of the request; (b) a description of the representations made by the requestor; (c) a statement of the Division's enforcement intentions; and (d) a description of the Division's procedures in making public the information in the business review file. A business review letter must be signed by the Assistant Attorney General or, in his or her absence, by the Acting Assistant Attorney General.

Staff should prepare a memorandum with its recommendations and submit a draft business review letter setting forth the Division's position. The section or field office chief should review staff's recommendation and the business review letter and submit them, together with the chief's recommendation, to the Office of Operations for review by the Front Office. Staff should also submit a draft press release.

At the same time the Division notifies the requesting party of the Division's action on the business review request, a press release is normally issued describing the action and attaching a copy of the Division's letter of response. Also at this time, the letter requesting the business review and the Division's letter in response are posted onto the Division's Internet site and placed in a file in the Division's FOIA/PA

Unit, where they are available for public inspection. Thirty days after notification, the information supplied in support of the business review request is also placed in the publicly available file unless the submitter has requested confidential treatment for that information.

The business review regulations provide that information submitted by a requesting party may be withheld from disclosure to the public upon a showing that disclosure would have a detrimental effect on the requesting party's operations or its relations with customers, employees, suppliers, stockholders, or competitors. *See* 28 C.F.R. § 50.6(10)(c). Since the amendments to the Freedom of Information Act in 1974, no court cases have discussed the status under that Act of materials supplied to the Government in connection with a business review request. However, the type of information generally withheld from public disclosure is sensitive or proprietary commercial or financial information. Such information is not subject to compulsory disclosure under the Freedom of Information Act. *See* 5 U.S.C. § 552(b)(4).

### h.    Judicial Interpretation and Review

It is important to note that a business review letter states only the enforcement intentions of the Division as of the date of the letter, and the Division remains completely free to bring whatever action or proceeding it subsequently determines is required by the public interest. *See United States v. Grinnell Corp.*, 30 F.R.D. 358, 363 (D.R.I. 1962) (holding that the Department of Justice's statement of a "present intention not to take action" cannot be equated with future immunity); *see also United States v. Associated Gen. Contractors of America, Inc.*, 382 U.S. 17 (1965), *rev'g* 238 F. Supp. 273 (E.D. La. 1965); *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 597-98 (1957); *United States v. Firestone Tire & Rubber Co.*, 374 F. Supp. 431, 434 n.1 (N.D. Ohio 1974).

Where the Division has stated a present intention not to bring suit, the Division has never subsequently exercised its prosecutorial discretion to bring a criminal action if there was full disclosure at the time the business review request was presented to the Division. *See* 28 C.F.R. § 50.6(9).

On only one occasion has judicial review been sought of the Division's statement of its present enforcement intentions in a business review letter. This occurred in *Holly Farms Poultry Indus., Inc. v. Kleindienst*, 1973-1 Trade Cas. (CCH) ¶ 74,535 (M.D.N.C. 1973), where the Division had declined to state a present enforcement intention not to bring an antitrust action against Holly Farms should it become a member of the National Broiler Marketing Association. Holly Farms sought judicial review of this decision, claiming jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701 - 06. The court, relying on 5 U.S.C. § 701(a)(2), dismissed the suit, holding that the decision of whether or not to bring an action for violation of the antitrust laws is sufficiently

committed to the discretion of the Attorney General to remove it from the group of judicially reviewable actions. *See* 1973-1 Trade Cas. ¶ 74,535, at 94,382. In reaching its decision, the court relied in part on the fact that Holly Farms' inquiry concerned a proposed course of conduct. In dicta, the court suggested that there might be a different result where there was reliance on an earlier ruling and actual present conduct subjecting the inquirer to prosecution. *See id.* at 94,383. *See also Greenbrier Cinemas, Inc. v. Atty. Gen. of the United States*, 511 F. Supp. 1046 (W.D. Va. 1981) (holding DOJ press release threatening legal action was judicially reviewable under the Administrative Procedure Act. It was emphasized in the press release that this represented a change in the Department's position.) Of course, an inquiry concerning actual present conduct would not qualify for treatment under the business review procedure.

## 2.   National Cooperative Research and Production Act of 1993

The National Cooperative Production Amendments of 1993, Pub. L. No. 103-42, amended the National Cooperative Research Act of 1984, Pub L. No. 98-462, renamed it the National Cooperative Research and Production Act of 1993, and extended its provisions to joint ventures for production. The Standards Development Organization Advancement Act of 2004, Pub. L. No. 108-237, extended the provisions of the NCRPA to standards development organizations.

### a.   Purpose and Policy

The National Cooperative Research and Production Act of 1993 (NCRPA or Act), 15 U.S.C. §§ 4301-06, is designed to promote innovation, facilitate trade, and strengthen the competitiveness of the United States in world markets by (1) clarifying the applicability of the rule of reason standard to the antitrust analysis of joint ventures and standards development organizations (SDOs) while engaged in a standards development activity, (2) providing for the possible recovery of attorneys fees by joint ventures and SDOs that are prevailing parties in damage actions brought against them under the antitrust laws, and (3) establishing a procedure under which joint ventures and SDOs that notify the Department of Justice and FTC of their cooperative ventures and standards development activities are liable for actual, rather than treble, antitrust damages. However, this damage limitation provision does not apply to a joint venture's production of a product, process, or service unless "(1) the principal facilities for such production are located in the United States or its territories, and (2) each person who controls any party to such venture (including such party itself) is a United States person, or a foreign person from a country whose law accords antitrust treatment no less favorable to United States persons than to such country's domestic persons with respect to participation in joint ventures for production." 15 U.S.C. § 4306.

The legislative history of the NCRPA indicates that "[t]he phrase 'whose law' . . . is intended to include not only a country's domestic antitrust law but also all international agreements and other binding obligations to which that country and the United States are parties." H.R. Rep. No. 103-94, at 20 (1993). Thus, a country that is a party to certain international agreements with the United States such as treaties of Friendship, Commerce and Navigation, Bilateral Investment Treaties, Free Trade Agreements, and various OECD instruments, satisfies the requirements of the Act. *See id.* This includes most countries.

### b.   Notification to DOJ and FTC

The rule-of-reason and attorneys' fees provisions of the NCRPA automatically apply to all joint ventures and SDOs covered by the Act. However, eligibility for the Act's detrebling provision depends on the filing of a notification with the Federal antitrust enforcement agencies. In order to obtain damage protection, any party to a joint venture covered by the Act may, not later than 90 days after entering into a written agreement to form the venture, file simultaneously with the Department of Justice and the Federal Trade Commission a written notification disclosing the identities of all parties to the venture and the nature and objectives of the venture. In the case of a joint venture one of whose purposes is the production of a product, process, or service, the notification must contain additional information: the nationality of all parties and the identity and nationality of all persons who control any party to the venture, whether separately or with one or more other persons acting as a group for the purpose of controlling such party. Notifications by SDOs must be filed within 90 days after commencing a standards development activity engaged in for the purpose of developing or promulgating a voluntary consensus standard and must disclose the name and principal place of business of the SDO as well as documents showing the nature and scope of its standards development activity. An original and one copy of the notification, along with copies of a proposed Federal Register notice, must be filed with the Department, and one copy must be filed with the FTC. Such additional notifications as are appropriate to extend the Act's protection to new or different activities undertaken by a joint venture or SDO, or to disclose changes in membership of a joint venture, also must be filed. In order to maintain the protection of the Act, such supplemental notifications must be filed within 90 days of the change prompting the notification.

Notifications filed under the Act by joint ventures should make clear the identity of all parties to the venture. The list of parties should include "the real parties in interest." Joint Explanatory Statement of the Committee of Conference on S. 1841, H.R. Rep. No. 98-1044, at 19 (1984). Notifications should also include a description of the nature and objectives of the venture, including a concise statement of its purposes. Parties filing notifications of joint ventures for production should state clearly that a purpose of their venture is production. They should also

provide the nationality of all parties and the identity and nationality of all persons controlling such parties. The meaning of "control" of any party is intended to mean having the power to direct the management or policies of a person. This controlling influence may be exercised either directly or indirectly and the means used can vary. For example, it may be exercised through the ownership of voting securities, through a contractual right, or through participation on the board of directors. *See* H.R. Rep. No. 103-94, at 19 (1993); S. Rep. No. 103-51, at 11 (1993). In the case of a corporation, parties should provide the name, place of incorporation, and location of principal executive offices. In the case of an unincorporated firm, comparable identifying information should be provided. *See* S. Rep. No. 103-51, at 13 (1993). Notifications filed by SDOs should provide the name and principal place of business of the organization and should include documents showing the nature and scope of the standards development activities for which protection is being sought.

In general, the manner and extent of the notification is left to the submitting entities; they are to exercise their own discretion in determining the quantity and form of the information required adequately to describe the nature and objectives of their venture, *see* H.R. Rep. No. 98-1044, at 18-19 (1984), or the nature and scope of their standards development activities. Parties should be aware, however, that the damage protection of the Act is dependent on the adequacy of their notification. All written notifications filed pursuant to the Act should be delivered to each of the following offices:

> U.S. Department of Justice (2 copies)
> Antitrust Division
> Premerger Notification Unit
> 950 Pennsylvania Ave., N.W., Room 3335
> Washington, DC 20530 (For overnight delivery, use ZIP Code 20004.)
> Phone: 202-514-2558

> Federal Trade Commission (1 copy)
> Office of Policy and Evaluation
> 6th & Pennsylvania Ave., N.W., Room 392
> Washington, DC 20580

### c.  Review by Section

The Division has certain responsibilities under the NCRPA, including receipt of parties' original and supplemental notifications of their joint venture and standards development activities and publication of Federal Register notices describing joint ventures and SDOs that elect to file notifications under section 6 of the Act.

Once a party submits a notification under the Act, it is date-stamped and recorded. A copy of the notice is then forwarded to the appropriate section for immediate review. NCRPA notifications are reviewed for two purposes. The first is to determine whether the notification discloses

information of antitrust concern that merits the opening of a preliminary investigation into the activities of the joint venture or SDO. The second purpose is to permit the preparation of a Federal Register notice that will provide the joint venture or SDO protection from treble damages. (The preparation and publication of the Federal Register notice proceeds regardless of whether a preliminary investigation is begun.) For this latter purpose, the section reviews the notification expeditiously to determine whether it adequately identifies, for a joint venture, the parties to the venture and the venture's nature and objectives or, for a SDO, the name and principal place of business of the organization and the nature and scope of its activities. Although the legislative history indicates that the extent of the disclosure in the notification is largely up to the joint venture or SDO, sufficient information must be provided to enable the Department to publish the Federal Register notice described below. If there is doubt as to the adequacy of the notification, the section staff should promptly contact the Premerger Notification Unit. Because only conduct that is within the scope of a notification that has been filed under section 6(a) of the Act, 15 U.S.C. § 4305(a), receives protection from treble-damage liability, *see* 15 U.S.C. § 4303(a), persons providing information to the antitrust enforcement agencies for the purpose of obtaining or extending the protections of the NCRPA should always do so in accordance with the statutory requirements.

All information and documentary material submitted as part of a notification filed under the Act, as well as all other information obtained by the Division or FTC in the course of any investigation, administrative proceeding, or case with respect to a potential violation of the antitrust laws by a joint venture or SDO with respect to which such notification was filed, is exempt from disclosure under the Freedom of Information Act and may not be made publicly available except in a judicial or administrative proceeding in which such information and material is subject to a protective order. *See* 15 U.S.C. § 4305(d). Thus, all notifications should be held strictly confidential.

### i.    Original Notifications

Notifications filed under the NCRPA by joint ventures must include the identities of all parties to the venture and a description of the nature and objectives of the venture, including a concise statement of its purpose. Organizations that are parties to joint ventures for research and development only should be identified by name and the location of their principal executive offices (city and state). Notifications concerning joint ventures for production should state clearly that a purpose of their venture is production and must also provide the nationality of all parties and the identity and nationality of all persons controlling such parties. Organizations that are parties (or persons controlling parties) to joint ventures involving production should be identified, in the case of a corporation, by providing the name, place of incorporation (the state of

incorporation if the corporation is domestic and the country of incorporation if the corporation is foreign), and location of principal executive offices. In the case of an unincorporated firm, comparable identifying information must be provided. Notifications submitted by SDOs must disclose the name and principal place of business of the SDO and provide documents showing the nature and scope of the organizations standards development activities. If, after consulting with the Premerger Notification Unit, a determination is made that the required information has not been submitted, filers should be informed as promptly as possible that their notification is not sufficient to qualify for the protections of the Act and that a Federal Register notice will not be published until a proper notification has been submitted.

### ii.    Supplemental Notifications

Notifications may also be filed to preserve or extend the protections of the NCRPA to existing ventures or SDOs whose activities have changed or, with respect to joint ventures, whose membership has changed, since the original notification. Supplemental notifications need only reflect the changes to the venture or SDO being disclosed (*e.g.,* identify the parties being added to or dropped from a joint venture) and need not repeat information that has been disclosed in prior notifications. Thus, supplemental notifications should be reviewed in conjunction with previous filings to ensure that changes to either the parties or purposes disclosed in prior notifications do not now raise antitrust concerns. Federal Register notices are prepared for supplemental notifications in the same manner as for original notifications.

### d.    Preparation of the Federal Register Notice

The Act provides that the Department of Justice or the FTC shall, not later than 30 days after receiving a notification, publish in the Federal Register a notice that identifies the parties to a joint venture and describes in general terms the venture's area of planned activity (*see* sample joint venture notice), or that identifies a SDO engaged in standards development activity and describes such activity in general terms (*see* sample SDO notice). *See* 15 U.S.C. § 4305(b). The Division has assumed the responsibility of publishing notices in the Federal Register for all notifications filed under the NCRPA. Parties filing notifications should submit a draft Federal Register notice along with their notification. Regardless of whether the parties have done so, it is the responsibility of staff to prepare the actual Federal Register notice. Prompt preparation and publication of the notice is required. Staff must keep in mind that both the provisions of the NCRPA and its legislative history indicate concern that competitors not have access to confidential details that a party may wish to provide in its notification, but that need not be made public in order to describe the activities of a joint venture or SDO.

### e.    Notice to Parties

The Act requires that the proposed Federal Register notice be made available to the parties to a venture, or to a standards development organization, as the case may be, for review prior to its publication. Thus, after the notice is prepared, it should be sent to the parties or organization for review as expeditiously as possible. This must be done in writing (*see* sample transmittal letter), and appropriate records kept. It is acceptable to fax the notice to the parties or to the organization.

Any party filing a notification on behalf of a joint venture is invited to include a statement to the effect that it has been authorized to review the Federal Register notice on behalf of all venturers, along with the name and contact information for the person so authorized. Otherwise, the notification must include the names and contact information for all parties to whom the notice should be made available for review. A notification on behalf of a SDO should provide the name and contact information of an individual who is authorized to review the Federal Register notice on behalf of the organization.

In view of the fact that the Federal Register notice must be published within 30 days of the Division's receipt of notification, parties are asked to express any objections they have to the proposed notice no later than two working days after receiving it. An effort should be made to resolve any such objections, keeping in mind the requirements of the Act and the purpose of the notice. If the Division and the parties are unable to agree on the contents of the Federal Register notice, the parties have the option of withdrawing their notification but must do so before publication of the notice.

### f.    Review and Publication of Notice

After the Federal Register notice has been prepared and reviewed by the parties or SDO, they should forward it to the Premerger Notification Unit along with a memorandum setting forth the date on which the notification was received by the Division, a copy of the letter or letters making the notice available to the parties or SDO, and a description of any problems or objections regarding contents. The notice and memorandum should then be forwarded as soon as possible, but no more than 14 calendar days after the section has received the notification from the Premerger Notification Unit. After review and approval by the Office of Operations, the Premerger Notification Unit forwards the notice to the Federal Register for publication and arranges for permanent records of the notifications and Federal Register notices to be maintained.

### 3.    Export Trade Certificates

#### a.    Overview of the ETC Act

The Export Trading Company Act of 1982, Pub. L. No. 97-290, 96 Stat. 1233, ("the ETC Act") is designed to increase U.S. exports of goods and services. Title III of the ETC Act, 15 U.S.C. §§ 4011-4021, reduces uncertainty concerning the application of the U.S. antitrust laws to export trade through the creation of a procedure by which persons engaged in U.S. export trade may obtain an export trade certificate of review (ETCR).

ETCRs are issued by the Secretary of Commerce with the concurrence of the Attorney General. Persons named in the ETCR obtain limited immunity from suit under both Federal and state antitrust laws for activities that are specified in the certificate and that comply with the terms of the certificate. In order to obtain an ETCR, an applicant must show that proposed export conduct will:

- Result in neither a substantial lessening of competition or restraint of trade within the United States nor a substantial restraint of the export trade of any competitor of the applicant.

- Not unreasonably enhance e, stabilize, or depress, prices in the United States of the class of goods and services covered by the application

- Not constitute unfair methods of competition against competitors engaged in the export of the class of goods or services exported by the applicant

- Not include any act that may reasonably be expected to result in the sale for consumption or resale in the United States of such goods or services.

15 U.S.C. § 4013(a). Congress intended that these standards encompass the full range of the antitrust laws, as defined in the ETC Act.

Although an ETCR provides significant protection under the antitrust laws, it has certain limitations. First, conduct that falls outside the scope of a certificate remains fully subject to private and governmental enforcement actions. Second, an ETCR that is obtained by fraud is void from the outset and thus offers no protection from the antitrust laws. Third, any person that has been injured by certified conduct may recover actual (though not treble) damages if that conduct is found to violate any of the statutory criteria described above. In any such action, certified conduct enjoys a presumption of legality, and the prevailing party is entitled to recover costs and attorneys' fees. Fourth, an ETCR does not constitute, explicitly or implicitly, an endorsement or opinion by the Secretary of Commerce or by the Attorney General concerning the legality of such business plans under the laws of any foreign country.

The Secretary of Commerce may revoke or modify an ETCR if the Secretary or the Attorney General determines that the applicant's export activities have ceased to comply with the statutory criteria for obtaining a certificate. The Attorney General may also bring suit under Section 15 of the Clayton Act, 15 § 25, to enjoin conduct that threatens "a clear and irreparable harm to the national interest," even if the conduct has been approved as part of an ETCR. 15 § 4016.

The Commerce Department, in consultation with the Department, has issued regulations for issuing ETCRs, *see* 15 C.F.R. §§ 325.1 et seq., and guidelines setting forth the standards used in reviewing ETCR applications, *see* 50 Fed. Reg. 1786 (1985). The ETC Guidelines contain examples illustrating application of the certification standards to specific export trade conduct, including the use of vertical and horizontal restraints and technology licensing arrangements. In addition, the Commerce Department's Export Trading Company Guidebook provides information on the functions and advantages of establishing or using an export trading company, including factors to consider in applying for an ETCR. The Commerce Department's Office of Export Trading Company Affairs provides advice and information on the formation of export trading companies and facilitates contacts between producers of exportable goods and services and firms offering export trade services.

**b.    Initial Processing of an Application**

Once a complete ETCR application is submitted to the Commerce Department, a determination generally must be made within 90 days. If the Commerce Department proposes to issue a certificate, and the Division does not object within the time provided in the regulations, the certificate may be issued, and the immunity granted, without our express concurrence. Accordingly, it is extremely important that Division attorneys meet the deadlines set forth herein.

All ETCR applications are filed with the Commerce Department, which reviews them to determine if they are complete. The Commerce Department must make its determination within five working days; when the application is complete, it is "deemed submitted" and the statutory 90-day period begins to run. A copy of the application must be given to the Division within seven days after it is deemed submitted. The Division has no role in determining whether an application is complete. If an application has been accepted that, in staff's view, does not contain important information, staff should contact the Foreign Commerce Section.

The Foreign Commerce Section is responsible for receiving, logging, copying, assigning, and circulating applications to the civil litigating components for review, generally making assignments on the basis of industry or regulatory expertise. The Premerger Notification Unit notifies the FTC of pending applications, and determines if the FTC has

any pending matters or particular expertise related to the application. The FTC, however, has no role in determining whether a certificate should be issued, so this clearance process differs from the formal clearance process the Division normally employ in other types of investigations.

Once an application is assigned to a section or field office, no preliminary investigation authority is needed in order to contact third parties to obtain industry information or other information useful in processing an application. The Foreign Commerce Section is responsible for coordinating all ETC activities in order to maintain consistent Division policy and procedure. Accordingly, copies of all memoranda and correspondence should be sent to the Foreign Commerce Section throughout the review process.

### c.   Requests for Supplemental Information

#### i.   Informal Requests

Formal requests for information are permitted by the ETC Act and regulations. Although such requests can be useful, they are not the exclusive means of obtaining information and ordinarily should not be used in the first instance. Rather, the most useful way to obtain information is to arrange very early in the review process for a meeting or telephone conference call with the Commerce Department attorney assigned to the matter and the applicant. During this informal interview, most questions can be answered. This is, therefore, usually the quickest and most efficient means of obtaining supplemental information. If it is necessary to clarify specific information obtained in such an interview, staff should consider whether to send a letter to the applicant confirming the conversation (coordinating with the Commerce Department) or whether to rely on a file memorandum of the interview. If there are questions remaining after an informal interview, the attorney should consider whether to proceed by means of a formal request for information.

#### ii.   Formal Requests

The Commerce Department may seek additional information "necessary to make a determination on the application," and must do so if the Division so requests. 15 C.F.R. § 325.3(g). A formal Request for Supplemental Information may be used to obtain documents or answers to questions, and the rule is arguably broad enough to encompass a request for an interview. The reviewing component, in consultation with the assigned economist and Foreign Commerce, should determine whether such a request is necessary in order to determine if the application meets the standards of the ETC Act. If they conclude that a request is necessary, the reviewing component should submit the proposed request to the Director of Enforcement, through the Foreign Commerce Section, ordinarily by the 20th day of an

application's review. The reviewing component should also notify the Commerce Department that it intends to submit a request prior to doing so.

If the applicant agrees to submit the requested information, the 90-day period is tolled from the date the request is sent to the applicant by the Commerce Department until the date when the information is received by Commerce and is considered complete by Commerce (and by the Division, if Division staff prepared the Request). *See* 15 C.F.R. § 325.3(g). The Commerce Department will notify the Division if the applicant has agreed to supply the information. If the applicant does not agree, the Division may notify the Commerce Department by letter from the Director of Enforcement that the information in the Division's possession is inadequate to make a determination. The Secretary of Commerce is then required to deny the application if it is not withdrawn.

If the Commerce Department makes a request, the information will be provided to the Division when it is received. However, unless the Division has also requested the information, the Commerce Department has sole authority to decide whether the information submitted in response to the request is complete.

When the information is received, the reviewing component should review it promptly (*i.e.*, within five days) to determine if it is complete. Written confirmation that it is a complete response should be sent by the chief to the Commerce Department. The Foreign Commerce Section should also receive a copy of the letter for purposes of recalculating the statutory deadlines. If the response is not complete, the reviewing component should informally contact the Commerce Department to attempt to obtain a complete response from the applicant. The reviewing component should carefully consider whether a determination whether the application should be granted can be made on the basis of the available information or whether the application must be denied because the applicant has not met its burden. In the former case, the reviewing chief should send a letter to the Commerce Department withdrawing the unanswered requests, thus restarting the statutory clock. In the latter case, the reviewing component should prepare a letter for the signature of the Director of Enforcement or Assigned DAAG setting forth the deficiencies in the response and stating that the information in the Division's possession is insufficient to make the determination. The applicant must then withdraw the application or have its application denied.

Except in extraordinary circumstances, only one request will be sent during the review of any application. Accordingly, requests should include all documents and information reasonably necessary to decide whether the proposed activities should be certified but should also be drafted as specifically and narrowly as possible to avoid unnecessary burden and delay. Since only one request will be sent, it is important to

ensure, before certifying the response as complete, that all of the requested documents and information that are reasonably necessary have been received. Technical but unimportant deficiencies will not be asserted as a reason for declining to certify the response as complete.

### d.   Confidentiality of Information

The ETC Act establishes the conditions under which information submitted by any person "in connection with the issuance, amendment, or revocation of a certificate" must be kept confidential and is exempt from disclosure under the Freedom of Information Act. *See* 15 U.S.C. § 4019(a).

In addition, the Division and the Commerce Department are prohibited from disclosing commercial or financial information that is privileged or confidential if disclosure would harm the person who submitted it, except in certain circumstances that are identified in the ETC Act, *see* 15 U.S.C. § 4019(b), and in the regulations, *see* 15 C.F.R. § 325.16(b)(3). (The person that submitted the information may designate it as privileged or confidential, but such designation is not dispositive of whether it falls into that category.) If disclosure is sought in connection with a judicial or administrative proceeding (one of the enumerated exceptions), the Division is required to attempt to notify the person who submitted the information. *See* 15 C.F.R. § 325.16(c).

### e.   Analysis of the Application

The first step in analyzing an application is to determine whether the applicant and conduct sought to be certified are eligible for certification. An applicant must be a "person" as defined in 15 U.S.C. § 4021(5). The ETC Guidelines § III.A provide additional information about the meaning of "person." In addition, conduct must be "limited to export trade," 15 U.S.C. § 4012(a)(1), as that term is defined in 15 U.S.C. § 4021(1). The meaning of export trade activity is discussed in the ETC Guidelines § III.B.

The next step is to determine whether the applicant meets the statutory standards for obtaining a certificate, which are set out above. *See* 15 U.S.C. § 4013(a). As noted above, the statutory standards are intended to encompass the full range of the antitrust laws. The ETC Guidelines § IV provide a detailed discussion of these standards and their application to hypothetical situations. Finally, the reviewing component must determine that the language in the proposed certificate is neither imprecise nor vague. Such language may result in an overbroad grant of antitrust immunity or may subject the certificate holder to liability for conduct it incorrectly assumed was covered by the certificate.

By informal agreement, the Commerce Department and the Division are committed to notifying each other as soon as either agency believes there to be a problem with a certificate. This practice will allow maximum time to resolve any issues without either denying the

application or requesting the applicant's consent to a 30-day extension of the 90-day statutory period. *See* 15 C.F.R. § 325.5(a). In particular, the reviewing component should attempt to have the Commerce Department place in the draft certificate any conditions or modifications the Division believes will be required.

If the Attorney General or the Secretary of Commerce considers it necessary, and the applicant agrees, the deadline for decision may be extended by 30 days. *See* 15 C.F.R. § 325.5(a). Such extensions are sought only in unusual circumstances and are arranged in consultation with the Commerce Department and the applicant.

### f.     Recommendation and Review

The reviewing section or field office will prepare a written recommendation of what action should be taken on the application. Legal and economic staff members are responsible for coordinating their review to ensure appropriate EAG input into the analysis leading to the recommendation. The recommendation package must include the following:

- A memorandum from the chief to the Director of Enforcement explaining the recommendation and the reasons for it. The first page must state clearly the applicable deadline for decision and communication of the Division's decision to the Commerce Department.

- The proposed certificate submitted by the Commerce Department. (Commerce must provide the proposed certificate to the Division no later than the 60th day of the review period.)

- A proposed letter from the Assistant Attorney General to the General Counsel of the Commerce Department stating the Department of Justice's decision on the application. If the recommendation is to decline to concur, the letter must explain the reason for the nonconcurrence.

- If the proposed conduct could be certified in whole or in part, but not on the basis of the language in the Commerce Department's proposed certificate, a proposed revised certificate must be enclosed with the proposed Assistant Attorney General letter.

The original and one copy of the recommendation must be given to the Foreign Commerce Section for forwarding to the Director of Enforcement no later than the 70th day of the review process. (This date will be specified in the cover memorandum from the Foreign Commerce Section making the initial assignment.) Any separate recommendation from EAG must be sent forward on the same day.

The Director of Enforcement will review the recommendation and forward it to the relevant Deputy Assistant Attorney General and the Assistant Attorney General for a determination as to whether to concur

in the issuance of the proposed certificate. The Assistant Attorney General's decision must be made and sent to the Commerce Department by no later than the 80th day (*i.e.*, ten days prior to the expiration of the statutory deadline).

Time may be very short between the receipt of the proposed certificate from the Commerce Department and the time by which the Assistant Attorney General must make a decision on the application. Ordinarily, the Commerce Department and staff will have discussed the proposed certificate well in advance of its formal submission. However, the Division cannot be certain about the terms contained in the proposed certificate until the Commerce Department sends it to the Division 20 days before the expiration of the Division's deadline. Accordingly, staff should endeavor to obtain Commerce Department agreement to any necessary changes before submitting its recommendation to the Director of Enforcement.

**g.    Decision by the Assistant Attorney General**

The Assistant Attorney General must decide whether to concur in the Commerce-proposed certificate and communicate that decision to Commerce no later than ten days prior to the end of the statutory time period for final determination. *See* 15 C.F.R. § 325.5(c)(2). This decision will be communicated to the Commerce Department by letter, with the proposed certificate attached. If the decision is not to concur in the issuance of the certificate, the Assistant Attorney General must "state the reasons for the disagreement" with the proposed certificate. *Id.* Thus, the letter prepared for the Assistant Attorney General by the reviewing section or field office must be adequate in this regard. If the Assistant Attorney General does not communicate a decision to the Commerce Department by the 80-day deadline, the Division is deemed to have concurred in the proposed certificate. *See* 15 C.F.R. § 325.5(c)(3).

If the Assistant Attorney General disagrees with the proposed certificate, the Commerce Department may choose to revise the proposed certificate to respond to the Division's concerns. The certificate may not be issued unless the Assistant Attorney General concurs in the revision. *See* 15 C.F.R. § 325.5(c)(2). The Commerce Department must consult with the applicant before issuing any certificate different from that proposed by the applicant. *See* 15 C.F.R. § 325.5(d). If the matter cannot be resolved before the statutory deadline, the Assistant Attorney General or the Commerce Department may take up to an additional 30 days to make a decision, if one or both agencies consider it necessary and the applicant consents. The request for an extension ordinarily will be made by the Commerce Department.

### h.    ETC Notebook

Each of the Division's civil litigating components should have a copy of the ETC Notebook, which is prepared and periodically updated by the Foreign Commerce Section. The Notebook outlines other procedural aspects of the ETC process, including handling of requests for expedited treatment, requests for reconsideration, and revocation and modification procedures. In addition, the Notebook contains the ETC Act, implementing regulations, ETC Guidelines, excerpts from the ETC Act's legislative history, and sample letters and exemplars.

## 4.    Judgment Monitoring, the JTS System, and Judgment Enforcement

### a.    Judgment Monitoring

Every decree was assigned to an attorney who is responsible for monitoring compliance, initiating any appropriate enforcement actions, and considering whether the decree is a candidate for modification or termination or being placed in a "no monitoring required" status. Judgment monitoring takes place under the oversight of the Office of the General Counsel.

The specific steps necessary to ensure compliance with a decree will vary depending on the nature of the decree. Where a judgment requires affirmative acts (*e.g.,* divestiture, submission of periodic reports), it will be necessary to determine whether the required acts have occurred and to evaluate the sufficiency of compliance. With respect to judgments that prohibit certain actions, it may also be necessary to conduct periodic inquiries to determine whether defendants are observing the prohibitions. Division judgments include inspection provisions that grant access to defendants' records and information. Inspection requests as well as less formal inquires should be scheduled.

When periodic inquiries fall due, they should be conducted in a manner that is designed to detect decree violations and is mindful of costs to parties and of the Division's available resources. The first stage normally involves informal contact with the defendants and an analysis of publicly available information. Review of such information may be sufficient to demonstrate that a firm has not violated a decree provision. If an informal inquiry leads the assigned attorney to believe that there may be a violation, then preliminary investigation authority must be requested with the approval of the General Counsel. As with all investigations, FTC clearance must also be obtained, as a means of notifying the FTC that the Division will be conducting an investigation.

### b.    JTS and Reporting Requirements

As an aid to the Division's judgment monitoring and enforcement efforts, the Division uses a Judgment Tracking System (JTS, formerly known as the Judgment Enforcement Management Information System

or JEMIS), a computer-supported system designed to catalog and track compliance with the Division's decrees. JTS is administered and monitored jointly by the Office of Operations and the Office of the General Counsel. All of the Division's older civil decrees have been coded and placed in the JTS system. The Premerger Office in the Office of Operations is responsible for ensuring that all new judgments are recorded in the database.

The JTS system contains two functional classes of information. The first group contains basic data about each decree, including the type of case and violation, product and geographic descriptions, file numbers, status of the decree, dates of entry of modifications and terminations, and a listing of judgment provisions. The second group contains defendant-specific information, including the names of all defendants, and reflects, for each defendant, dates when affirmative acts are due, and dates of compliance with those requirements.

Each civil section has a judgments coordinator available to assist the monitoring attorney responsible for sending notifications and updates on judgments to JTS. The attorney assigned to a particular judgment is responsible for reporting, through the coordinator, any changes that have occurred with respect to a judgment since its entry. Information commonly reportable includes changes in corporate name, decree terminations or modifications, receipt of compliance reports, dates on which other affirmative acts (such as divestiture) occurred, changes in corporate status, such as bankruptcy, and information relating to successors, acquisitions and mergers.

The Office of the General Counsel in turn tracks all reports to assure ongoing compliance and meets, as appropriate, with the monitoring attorney and other staff working on the matter. The monitoring attorney is responsible for reporting any developments relevant to judgment enforcement to the General Counsel, including any complaint that the judgment is being violated.

### c.    Judgment Enforcement

If, as a result of a preliminary investigation, staff, in consultation with the General Counsel, concludes that the final judgment may have been violated, consideration should be given to instituting an enforcement action. There are two types of contempt proceedings, civil and criminal, and either or both may be used. Attorneys should consult United States Attorneys' Manual § 9-39.000 for additional information about contempt proceedings. Recommendations to enforce a judgment or to close an enforcement investigation should be submitted to the General Counsel for the concurrence and review of the Director of Civil Enforcement, the DAAG for Operations, the Assigned DAAG, and the Assistant Attorney General and his or her designee.

Civil contempt has a remedial purpose: compelling obedience to an order of the court for the purpose of enforcing the Government's rights

or obtaining other relief. *See Int'l Bus. Mach. v. United States*, 493 F.2d 112, 115 (2d Cir. 1973); *Bradley v. Amer. Household, Inc.*, 378 F.3d 373, 378 (4th Cir. 2004). In designing an appropriate remedy, staff should consider seeking both additional injunctive relief and fines that accumulate on a daily basis until compliance is achieved. *See United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979). Civil contempt is established by "clear and convincing" proof that there is a lawful order and that the order was violated. *See Kan. City Power & Light Co. v. NLRB*, 137 F.2d 77, 79 (8th Cir. 1943); *Cromer v. Kraft Foods North Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004). Willfulness need not be shown, and good faith is not a defense. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Al C. Rinaldo, Inc. v. Bach to Rock Music School, Inc.*, 279 F. Supp. 2d 624, 628 (E.D. Pa. 2003).

Criminal contempt is not remedial; its purpose is to punish the violation, to vindicate the authority of the court, and to deter others from engaging in similar conduct in the future. Criminal contempt is established under 18 U.S.C. § 401(3) by proving beyond a reasonable doubt that there is a clear and definite order, applicable to the contemnor, which was knowingly and willfully disobeyed. *See Chapman v. Pac. Tel. & Tel. Co.*, 613 F.2d 193, 195 (9th Cir. 1979); *Yancheng Baolong Biochemical Prods. Co., Ltd. v. United States*, 406 F.3d 1377, 1381 (Fed. Cir. 2005). Willfulness may be inferred from the facts and circumstances, *see United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir. 1974), and from a reckless disregard of obligations to the court, *see In re Allis*, 531 F.2d 1391, 1392 (9th Cir.), *cert. denied*, 429 U.S. 900 (1976); *United States v. Metro. Disposal*, 622 F. Supp. 1262, 1264-65. The penalty may be a fine, imprisonment, or both.

Jurisdiction and venue for contempt proceedings rest with the court whose order has been disobeyed. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932). Both civil and criminal contempt may be instituted by a petition for an order to show cause why the respondent should not be held in contempt. *See* Fed. R. Crim. P. 42. A criminal contempt proceeding may also be instituted by indictment, *see United States v. Snyder*, 428 F.2d 520, 522 (9th Cir.), *cert. denied*, 400 U.S. 903 (1970), or by petition following a grand jury investigation, *see United States v. Gen. Dynamics Corp.*, 196 F. Supp. 611 (E.D.N.Y. 1961). If the proceeding is handled by indictment, the notice requirements of Rule 42 must be satisfied.

The Division has instituted a number of contempt proceedings to enforce its judgments. *See, e.g., United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979); *United States v. Greyhound Corp.*, 508 F.2d 529 (7th Cir. 1974); *United States v. N. Suburban Multi-List, Inc.*, 516 F. Supp. 640 (W.D. Pa. 1981); *United States v. NYNEX Corp.*, 814 F. Supp. 133 (D.D.C.), *rev'd and vacated*, 8 F.3d 52 (D.C.Cir. 1993); *United States v. Twentieth Century-Fox Film Corp.*, 700 F. Supp. 1246 (S.D.N.Y. 1988), *modified*, 882 F.2d 656 (2d Cir. 1989), *cert. denied*, 493 U.S. 1021

(1990); *U.S. v. Smith International, Inc.,* 2000-1 Trade Cas. ¶72,763
(D.D.C. 2000); *U.S. v. American Airlines, Inc.,* 2004-2 Trade Cas. ¶74564
(D.D.C. 2004); *U.S. v. American Bar Ass'n*, 2006-1 Trade Cas. ¶75,295
(D.D.C. 2006). Additional information may be obtained from the Office
of Operations.

In some situations, rather than seeking sanctions for contempt where
the correct interpretation of a judgment is disputed, it may be
appropriate simply to obtain a court order compelling compliance with
the judgment. *See, e.g.*, *United States v. CBS Inc.*, 1981-2 Trade Cas.
(CCH) ¶ 64,227 (C.D. Cal. 1981).

### 5.   Judgment Modifications and Terminations

Perpetual final judgments, whether litigated judgments or consent
decrees, were the norm from the early days of the Sherman Act until
1979, when the Division announced that future settlements would have
"Sunset" provisions that would automatically terminate a decree on a
date certain, usually after a period of 10 years. The 1979 change in
policy was based on a judgment that perpetual decrees were not in the
public interest. In 1994, the FTC made a similar judgment, and
announced a policy of using sunset provisions. It also, through
rulemaking, terminated all of its competition orders 20 years after entry
of the order. The Division's final judgments, in contrast, constitute court
orders and can only be modified or terminated by the relevant court.

In considering the modification or termination of final judgments, the
Division distinguishes between decrees with sunset provisions and pre-
1980, perpetual decrees ("legacy decrees"). Decrees with sunset
provisions all have terms of no more than 10 years. They have been
entered by courts after an APPA proceeding and "public interest"
finding and presumptively remain in the public interest. Attorneys
assigned to such decrees for enforcement purposes should, however,
consider whether the decree has become, in whole or in part,
anticompetitive or otherwise undesirable. If so, consideration should be
given to opening an investigation into possible modification or
termination of the decree, consistent with the Division's resource
availability.

With some exceptions, there is no such presumption that legacy
decrees remain in the public interest. The Division has said in briefs
supporting the termination of legacy decrees that such decrees should
presumptively be terminated except in limited circumstances, such as
when there is a pattern of noncompliance with the decree or there is
longstanding reliance by industry participants on the decree. *See, e.g.,*
http://www.justice.gov/atr/cases/f273400/273471.pdf. Although the
Division has supported terminating many legacy decrees, it routinely
conducted a full investigation into possible changes in the market or law
even when it believed that the decree should be presumptively
terminated.

In 1999, the Division announced a protocol to expedite the review process for legacy decrees because the length of the investigative process discouraged firms from seeking the termination of legacy decrees. The 1999 press release noted: "In the past, when the Division has agreed to support termination or modification, it has taken on average about two years between the party's initial request and the filing of the motion." Under the protocol, parties provided specific information up-front (essentially the information that the Division typically sought in its review) and published a notice of an intent to seek termination and solicit public comments. The 1999 protocol, however, did not significantly expedite decree termination reviews or reduce burdens on legacy defendants. Parties were subject to significant discovery and Division staff reviewed termination requests closely in order to explain to courts in detail why specific legacy decrees were no longer needed.

On March 28, 2014, the Division announced that it was updating its procedures for terminating or modifying qualifying legacy decrees to reduce the burden on defendants by no longer requiring them to submit detailed information and documents required by the 1999 protocol. Instead, the parties would certify that they are in compliance with the decree and have disclosed all known violations; they will notify other defendants bound by the decree; and will publish notification of their intent to seek termination or modification. Under the new procedure, absent information that leads the Division to decide that the requested decree termination or modification should not receive fast track review, the Division will support modification or termination of qualifying legacy decrees at the end of the public comment period on the basis that the decree presumptively is not in the public interest.

The 2014 update, therefore, creates two separate paths to decree modification and termination. The expedited path for qualifying legacy decrees is designed to be quick and to eliminate the burdens on the Division and the defendants of full investigation and discovery. The second path, for decrees with sunset provisions and when the Division believes that a legacy decree should not receive expedited review retains the traditional approach. Questions about whether the Division will likely use a fast track review for a specific judgment should be addressed to the appropriate section chief.

### a.   Obtaining Approval to Consent to Modification or Termination of Qualifying Legacy Decrees

#### i.    Initiation of the Process

When a legacy judgment defendant asks the Division to terminate or modify its qualifying decree, the section or office should promptly request that the judgment defendant certify that they are in compliance with the decree and have disclosed all known decree violations; a commitment to notify other defendants bound by the decree that it is

seeking termination or modification; and a commitment to pay the costs of Division-approved, appropriate public notices of the proposed judgment termination or modification. Ordinarily, publication should appear in the relevant trade press and The Wall Street Journal, but the Division will coordinate with the moving defendant to ensure cost-effective public notice. Staff should be clear that the publication costs for such notices are borne by the defendant and are not trivial. After receipt of a satisfactory response to the request, staff should submit a brief memorandum requesting preliminary investigation authority.

As soon as preliminary investigation authority is received and the Division has clearance from the FTC, the requesting defendant should inform other defendants bound by the decree and publish the Division-approved, appropriate notices. Ordinarily, the public comment period will be set for 30 days. In addition to the defendant's notice publication, the Division also voluntarily publishes on its Internet site a notice of the request to modify or terminate the judgment. The notice should summarize the Division's complaint and the Court's final judgment, provide links to the underlying relevant papers, and invite public comments.

### ii.      Recommendation, Review, and Applicable Standards

Under the expedited review process, absent information that leads the Division to decide that the requested termination or modification should not receive fast track review, staff should prepare a brief memorandum, concurred in by the General Counsel, setting forth its recommendation on whether to consent to terminate or modify the decree. The recommendation should be sent for review and processing to the Director of Civil Enforcement, who will obtain the concurrence of the DAAG for Operations, any Assigned DAAG, and the approval of the Assistant Attorney General. The memorandum should briefly describe the process followed to obtain public comments, describe any comments received from the public, evaluate whether the comments should remove the proposed modification or termination from fast-track approval, and evaluate whether a response to the comments should be filed with the court

### iii.      Necessary Papers

If staff's recommendation is to modify or terminate a decree, the recommendation memorandum should be accompanied by the following papers:

- A draft stipulation package, consisting of the Government's tentative consent to termination of the decree (prepared for the signatures of staff, the chief, the Director of Civil Enforcement, the General Counsel, the DAAG for Operations, any Assigned DAAG, the Assistant Attorney General, and the defendants) and an attached

proposed order terminating or modifying the decree (designated as Exhibit A).

(In some jurisdictions the stipulation and order may be combined in one pleading, depending upon the local rules.)

- A draft response to the decree defendant's memorandum of points and authorities that includes an explanation to the Court of the pre-filing public comment period.

- A draft Department press release.

- The public comments received by the Division and a draft response to such comments.

Samples of each of these documents are available from the FOIA/PA Unit and are available on ATRnet. Since these exemplars are subject to revision over time, particularly the Division's response, staff should consult with the General Counsel to ensure that they have current exemplars before preparing the necessary papers.

The defendant should likewise prepare its motion explaining to the Court why the decree should be terminated or modified. Further, where the Division is not aware of any violation of the decree, and the defendant asserts that it knows of no violations of the judgment, an officer of the defendant must attest to that effect. Before the Division's response is finalized, the moving defendant needs to provide its motion and supporting materials to the relevant section.

### iv.        Review, Filing, and Other Procedural Aspects

The final papers, approved by the General Counsel, including the stipulation already agreed to by the defendants, should be sent to the Director of Civil Enforcement to review and process the papers through the Assigned DAAG and the General Counsel, obtain authorization from the Assistant Attorney General, and then return them to staff.

Staff must coordinate the filing of the papers with the Office of Operations to ensure that the Office of Public Affairs has sufficient lead time to finalize a press release if it wishes to issue one. The actual filing process will vary depending on the jurisdiction, although normally it may be accomplished electronically.

The Division will recommend that a hearing not be held on the termination or modification motion of a qualifying legacy decree. Further, although the Division will not object if interested persons apply to appear as *amici curiae*, it will generally object vigorously if they attempt to intervene as parties.

**b.  Obtaining Approval to Consent to Modification or Termination of Decrees Containing Sunset provisions and Nonqualifying Legacy Decrees**

### i.  Initiation of the Process

When a defendant to a judgment with sunset provisions or a nonqualifying legacy judgment asks the Division to terminate or modify its decree, the section or office should promptly request from each judgment defendant:

1.  A detailed explanation as to (a) why the judgment should be vacated or modified, including information as to changes in circumstances or law that make the judgment inequitable or obsolete, and (b) the actual anticompetitive or other harmful effects of the judgment.

2.  A statement of the changes, if any, in its method of operations or doing business that the defendant contemplates in the event that the judgment is vacated or modified.

3.  A commitment to pay the costs of appropriate public notices in the trade press and The Wall Street Journal, or as may otherwise be required by the Division, in connection with the proposed termination or modification of the judgment. Staff should make clear to the defendant that the publication costs for such notices are borne by the defendant and are not trivial.

After receipt of a satisfactory response to the request, staff should submit a brief memorandum requesting preliminary investigation authority.

As soon as preliminary investigation authority is received and the Division has clearance from the FTC, an investigation, under the oversight of the General Counsel, should commence to determine whether termination or modification is in the public interest. At that time, the requesting defendant should inform other defendants bound by the decree and ensure the publication of the Division-approved, appropriate notices. In addition to the defendant's notice publication, the Division also voluntarily publishes on its Internet site a brief notice of the request to modify or terminate. The notice should summarize the Division's complaint and the Court's final judgment, provide links to the underlying relevant papers, and invite public comments.

### ii.  Recommendation, Review, and Applicable Standards

At the conclusion of the investigation, staff should prepare a memorandum, concurred in by the General Counsel, setting forth its recommendation on whether the Division should consent to terminate or modify the decree. The recommendation shall be sent for review and processing to the Director of Civil Enforcement, who will obtain the concurrence of the DAAG for Operations, any Assigned DAAG, and the

approval of the Assistant Attorney General. For decrees with sunset provisions and for legacy decrees not eligible for fast track treatment, the Division will usually give its consent when changed circumstances in the industry render previously neutral provisions anticompetitive, such as when the decree unnecessarily prohibits a defendant from using efficient marketing techniques that (1) are available to other firms in the market and (2) would not today restrain competition. The Division is less likely to support termination of a decree if there are recent decree violations.

### iii.    Necessary Papers

If staff's recommendation is to modify or terminate a decree, its recommendation memorandum should be accompanied by the following papers:

- A draft stipulation package, consisting of the Government's tentative consent to termination or modification of the decree (prepared for the signatures of staff, the chief, the Director of Civil Enforcement, the General Counsel, the DAAG for Operations, the Assigned DAAG, the Assistant Attorney General, and the defendants) and the following attachments:

    a.  A form of notice to be printed in newspapers and periodicals (designated as Exhibit A).

    b.  A proposed order directing publication of the notice (designated as Exhibit B).

    c.  The proposed order terminating or modifying the decree (designated as Exhibit C).

    (In some jurisdictions the stipulation and order may be combined in one pleading, depending upon the local rules.)

- A draft Division response to the decree defendant's memorandum of points and authorities.

- A draft Department press release.

- The public comments received by the Department during the investigation and a draft response to such comments.

Samples of each of these documents are available from the FOIA/PA Unit and are available on ATRnet. Since these exemplars are subject to revision over time, particularly the Division's response, staff should consult with the General Counsel to ensure that they have current exemplars before preparing the necessary papers.

The Division's response should also recommend whether the Court should rely on the prefiling notice and comment period in making its public interest determination that modification or termination are in the public interest or whether an additional notice and comment period may be beneficial to the Court's review. The Division is likely to

recommend reliance on the prefiling notice and comment period when the modification or termination is not controversial and the Division has received no significant public comments or when the papers are filed shortly after the end of the original prefiling comment period.

The defendant should likewise prepare its motion explaining to the Court why the decree should be terminated or modified. Further, where the Division is not aware of any violation of the decree, and the defendant asserts that it knows of no violations of the judgment, an officer of the defendant must attest to that effect.

### iv.     Review, Filing, and Other Procedural Aspects

The final papers, approved by the General  Counsel, including the stipulation already agreed to by the defendants, should be sent to the Director of Civil Enforcement to review and process the final papers through the Assigned DAAG and the General Counsel, obtain authorization from the Assistant Attorney General, and then return them to staff.

Staff must coordinate the filing of the papers with the Office of Operations to ensure that the Office of Public Affairs has sufficient lead time to finalize a press release if it wishes to issue one. The actual filing process will vary depending on the jurisdiction, although normally it may be accomplished electronically.

The Division will recommend that a hearing be held on the termination or modification motion, only when it appears that it would be useful to the Court's public interest determination. Further, although the Division will not object if interested persons apply to appear as *amici curiae*, it will generally object vigorously if they attempt to intervene as parties.

### v.     Notice, Publication Costs, and Multiple Defendants

If the Division recommends an additional comment period, or the Court otherwise orders an additional comment period, the notice requesting public comment should generally appear in two consecutive issues of (1) the national edition of The Wall Street Journal, and (2) the principal trade periodical serving the industry to which the decree relates, or as may otherwise be required by the Division. If the decree affects more than one industry, the notice should appear in the principal journal for each of the industries involved.

In addition to the defendant's notice publication, the Division may also voluntarily publish on its Internet site a brief notice of the motion to modify or terminate. The notice should summarize the Division's complaint and the Court's final judgment, provide links to the relevant underlying papers, and invite comments.

In cases that involve multiple defendants, it is Division policy to request the nonmoving defendants to provide the Division with affidavits similar to that prepared by the moving defendant (including the sworn

statement of compliance with the decree), and if they do so, to insist that the notice published by the moving defendant recite the Division's consent to termination of the decree as to the other defendants.

# Chapter IV.   Litigation

A.   Beginning Civil Litigation ................................................................. IV-5
   1.   Drafting and Filing the Complaint ............................................... IV-5
   2.   Post-Filing Procedures ................................................................ IV-7
B.   Obtaining Preliminary Relief: Temporary Restraining Orders and Preliminary Injunctions ........ IV-7
   1.   Procedural Requirements ............................................................. IV-8
     a.   Temporary Restraining Order ................................................... IV-8
       i.   Notice ................................................................................ IV-9
       ii.   Content of Affidavits ......................................................... IV-9
       iii.   Hearings .......................................................................... IV-9
       iv.   Duration .......................................................................... IV-10
       v.   Form ................................................................................ IV-11
       vi.   Appeal ............................................................................. IV-11
     b.   Preliminary Injunction ............................................................. IV-12
       i.   Notice and Hearing ........................................................... IV-12
       ii.   Duration and Form ........................................................... IV-13
       iii.   Appeal ............................................................................. IV-13
   2.   Standard for Granting Preliminary Injunction .............................. IV-14
     a.   Probability of Success on the Merits ......................................... IV-14
     b.   Irreparable Injury .................................................................... IV-16
     c.   Balancing the Equities ............................................................. IV-20
     d.   Public Interest ........................................................................ IV-22
     e.   Other Equitable Considerations ................................................ IV-22
       i.   Maintenance of the Status Quo and Mandatory Injunctions ...... IV-22
       ii.   Reluctance to Give Complete Relief ................................... IV-23
       iii.   Delay ............................................................................... IV-24
   3.   Practical Problems and Procedures .............................................. IV-25
     a.   Pleadings and Briefs ................................................................ IV-25
     b.   Filing and Hearing Procedures .................................................. IV-28
     c.   Hold-Separate Orders .............................................................. IV-30
C.   Discovery Under the Federal Rules of Civil Procedure ...................... IV-32
   1.   Initial Disclosures and Planning Discovery ................................... IV-32
   2.   Use of Depositions .................................................................... IV-33
     a.   Applicable Federal Rules of Civil Procedure ............................... IV-33
     b.   Purpose of Depositions ........................................................... IV-34
     c.   Persons Whose Depositions May Be Taken ................................ IV-34
       i.   Requirements Under the Rules ........................................... IV-34
       ii.   Practical Considerations .................................................... IV-35
     d.   Place of Deposition ................................................................. IV-36
       i.   Requirements Under the Rules ........................................... IV-36
       ii.   Practical Considerations .................................................... IV-36
     e.   Length of Depositions .............................................................. IV-36
     f.   Presiding Officer at the Deposition ........................................... IV-36
       i.   Requirements Under the Rules ........................................... IV-36
       ii.   Practical Considerations .................................................... IV-37

g.   Requiring the Presence of Witnesses ........................................................... IV-37
h.   Taking the Deposition .................................................................................. IV-37
    i.    Waiver of Formalities ............................................................................ IV-37
    ii.   Scope of the Examination ..................................................................... IV-38
    iii.  Examination and Cross-Examination ..................................................... IV-38
    iv.   Objections to Evidence ......................................................................... IV-39
    v.    Recording Objections ............................................................................ IV-39
    vi.   Documentary Evidence ......................................................................... IV-39
i.   Formalities at the Conclusion of the Deposition .......................................... IV-40
    i.    Correcting the Transcript and Signing by the Witness ............................ IV-40
    ii.   Certificate of Presiding Officer ............................................................. IV-41
    iii.  Filing in Court and Inspection ............................................................... IV-41
j.   Expenses of Taking Depositions .................................................................. IV-41
k.   Use of Deposition at Trial ........................................................................... IV-41
    i.    Application of the Federal Rules of Civil Procedure ............................... IV-41
    ii.   Application of the Federal Rules of Evidence ......................................... IV-42
    iii.  Use of Part of the Deposition ............................................................... IV-43
    iv.   Objections to Admissibility ................................................................... IV-43
    v.    Effect of Taking or Using Depositions .................................................... IV-43
3.   Use of Interrogatories .................................................................................... IV-43
a.   Applicable Federal Rule of Civil Procedure .................................................. IV-43
b.   Form and Use of Interrogatories .................................................................. IV-44
c.   Objections to Interrogatories ...................................................................... IV-44
4.   Requests to Produce Documents ..................................................................... IV-45
a.   Applicable Federal Rule of Civil Procedure .................................................. IV-45
b.   Use of Requests to Produce Documents ....................................................... IV-45
c.   Drafting the Request ................................................................................... IV-46
d.   Compliance Procedures ............................................................................... IV-46
    i.    Limiting the Scope ................................................................................ IV-46
    ii.   On-Site Screening ................................................................................. IV-46
    iii.  Requiring Originals or Copies ................................................................ IV-46
    iv.   Numbering and Sorting .......................................................................... IV-47
    v.    Privileged Documents; Confidentiality ................................................... IV-47
5.   Requests for Admissions .................................................................................. IV-47
6.   Disclosure of Expert Testimony ....................................................................... IV-48
7.   Disclosure of Witnesses and Exhibits ............................................................... IV-49
8.   Continuing Duty to Correct and Supplement Disclosure ................................... IV-49
9.   Motions to Compel .......................................................................................... IV-50
D.   Negotiating and Entering Consent Decrees .......................................................... IV-50
1.   Antitrust Procedures and Penalties Act ............................................................ IV-50
a.   The Competitive Impact Statement .............................................................. IV-51
b.   Materials and Documents ............................................................................ IV-53
c.   Publications in the Federal Register ............................................................. IV-54
d.   Newspaper Publication ................................................................................ IV-55
2.   Internal Procedures ......................................................................................... IV-55
3.   Consent Decree Checklist ................................................................................. IV-57
4.   Consent Decree Standard Provisions ................................................................ IV-57
5.   Certificate of Compliance with Provisions of APPA .......................................... IV-57

| | | |
|---|---|---|
| 6. | Collection of Taxpayer Identification Numbers in Certain Civil Actions | IV-58 |
| 7. | Dismissal of Filed Complaints | IV-59 |
| E. | Procedures and Suggestions for Litigating a Civil Case | IV-59 |
| 1. | Simplifying and Expediting Civil Litigation | IV-59 |
| 2. | Summary Judgment | IV-61 |
| 3. | Civil Antitrust Trial Methods and Procedures | IV-61 |
| F. | Criminal Litigation | IV-62 |
| 1. | Drafting the Indictment | IV-63 |
| 2. | Returning the Indictment | IV-63 |
| 3. | The Arraignment | IV-63 |
| 4. | Pretrial Discovery and Motions | IV-64 |
| a. | Statements of the Defendant | IV-64 |
| b. | Prior Criminal Record of the Defendant | IV-65 |
| c. | Documents and Tangible Objects | IV-65 |
| d. | Reports of Examinations and Tests | IV-66 |
| e. | Expert Witnesses | IV-66 |
| f. | Continuing Duty to Disclose | IV-67 |
| g. | Materials Not Subject to Discovery | IV-67 |
| h. | Motions for Bills of Particulars | IV-67 |
| i. | Motions to Dismiss the Indictment | IV-68 |
| j. | Motions for Severance | IV-68 |
| k. | Motion to Fix the Order of Proof at Trial | IV-69 |
| l. | Other Defense Pretrial Motions | IV-69 |
| m. | Motions Filed by the Government | IV-69 |
| i. | Conflicts of Interest by Defense Counsel | IV-70 |
| ii. | Other Government Pretrial Motions | IV-70 |
| 5. | Issues Relating to Criminal Trial Procedure | IV-70 |
| a. | The Speedy Trial Act | IV-70 |
| b. | Disclosing Materials to the Defense | IV-71 |
| i. | Department and Division Policies Concerning Discovery | IV-71 |
| ii. | Overview of Division Discovery Policy | IV-71 |
| c. | Trial Briefs | IV-73 |
| d. | *Voir Dire* Procedures | IV-73 |
| e. | Trial Procedures | IV-74 |
| f. | Jury Instructions | IV-74 |
| g. | Defense Motions for Acquittal, New Trial, and Arrest of Judgment | IV-74 |
| 6. | Sentencing Recommendations | IV-75 |
| a. | Internal Procedures | IV-75 |
| b. | Sentencing Guidelines | IV-76 |
| c. | Special Statutes for Fines | IV-79 |
| 7. | Protecting Victims' and Witnesses' Rights | IV-80 |
| a. | General Requirements | IV-80 |
| b. | Responsible Officials | IV-81 |
| c. | Cases with Large Numbers of Victims | IV-82 |
| d. | Restitution | IV-82 |
| G. | The Appellate Process | IV-83 |
| 1. | Procedures When the Division Did Not Prevail in the District Court | IV-84 |
| 2. | Appellate Activity Where the Division Prevailed in the District Court | IV-85 |

3.   Preparing Court of Appeals Briefs........................................................................ IV-85

4.   *Amicus Curiae* Participation by the Antitrust Division ........................................ IV-86

5.   Supreme Court Review ....................................................................................... IV-86

This chapter outlines some of the practices and procedures that the Antitrust Division has used in civil and criminal litigation. The chapter is not intended as a litigation handbook; rather, it selectively addresses a number of practices that are part of any litigation effort.

- Because of the varied nature of matters most common in antitrust litigation, this chapter presents certain issues in a detailed manner and others only as an outline of possible issues or questions. The civil litigation sections contain a brief description of the preparation and filing of the complaint.

- A detailed legal and practical analysis of the requirements and standards for obtaining preliminary relief.

- An outline of issues that may arise during civil discovery.

- A brief discussion of the trial of a civil case and suggested methods of expediting and streamlining litigation

- A detailed description of the manner of negotiating and entering consent decrees.

The criminal litigation section includes

- A description of the preparation and filing of the indictment.

- An outline of pretrial discovery and motion practice.

- A list of practical trial suggestions.

- A description of the considerations in negotiating plea bargains and recommending sentences to the court in appropriate circumstances.

It is impossible to establish any one set of procedures for the conduct of the Division's pretrial and trial efforts. Since each case poses problems that are unique to the particular facts of that case, this chapter should be used only as a starting point from which ideas and strategies may be developed.

## A.    Beginning Civil Litigation

### 1.    Drafting and Filing the Complaint

All civil litigation begins with the filing of the complaint, regardless of the type of violation alleged or whether the Division is seeking preliminary relief. Staff will have prepared a complaint for submission to the section or field office chief and the Director of Civil Enforcement as it submits other materials relating to the case.

The Division's Internet site as well as the Division's Work Product Document Bank contain sample complaints for different violations in different circumstances. These sample complaints provide the basic style and substance of the complaints filed by the Division and may assist staff in drafting a complaint based on particular facts. Generally,

complaints filed more recently are better models. Staff should consider checking with the appropriate special assistant for the best examples.

Staff should also consult the local rules and practices of the district where the complaint will be filed to determine the specific requirements of the district (*e.g.,* size of paper and margins, form of caption). The local U.S. Attorney's Office should be informed of the Division's intention to file a complaint in the district and should be consulted to ensure that staff follows the correct format.

In preparing the complaint, staff should not overlook the significance of venue and interstate commerce allegations. In alleging venue, staff should be alert to where the defendants transact business or are found. At least one of the defendants must meet this venue requirement. While often all of the defendants will meet the venue requirement, there are sometimes situations where one or more of the defendants do not, or may not, meet it. In such instances, the complaint should indicate that fact and, in the prayer for relief, the complaint should ask that the court issue a summons to each defendant not meeting the venue requirement to bring them within the court's jurisdiction for purposes of the litigation. The issuance of a summons is provided for under Section 5 of the Sherman Act, 15 U.S.C. § 5, if the case arises under the Sherman Act, and under Section 15 of the Clayton Act, 15 U.S.C. § 25, if the case arises under the Clayton Act. In many cases, the defendants will stipulate to venue.

In alleging interstate commerce, staff should be as clear and specific as possible, consistent with the facts of the case. Whenever possible, staff should allege such facts as are necessary for both the "affecting" and "in commerce" ("flow") tests. The complaint should also state a general allegation of interstate commerce. In addition, the complaint should be a concise and persuasive statement of the allegations and the relief prayed for by the Division. For a detailed description of the Division's procedures for review and approval of complaints and accompanying papers, *see* Chapter III, Part G.2.

Staff must notify the Director of Civil Enforcement and the appropriate special assistant of the tentative filing date as soon as it is known so that the Office of Operations can send the draft press release to the Office of Public Affairs sufficiently in advance. Staff should not forward the press release directly to the Office of Public Affairs.

The filing of civil complaints should be closely coordinated with the applicable special assistant. The day before the filing date, staff should ensure that the Head Secretary in the Office of Operations and the Office of Public Affairs have a complete and signed set of the papers. Staff should file the complaint with the clerk of the court, together with whatever forms the clerk requires under local procedures, and ensure that it complies with the applicable rules for electronic case filing.

## 2.     Post-Filing Procedures

Immediately after filing the complaint, staff must inform the appropriate special assistant of the filing, the Judge's name, and the case's civil number. The Office of Operations will then notify the Office of Public Affairs that the press release may be issued.

A stamped copy of the complaint and all papers filed with it must be provided to the Office of Public Affairs and the Director of Civil Enforcement as soon as possible after the complaint is filed. In addition, staff should provide a copy of all filed papers to the Antitrust Documents Group and an electronic version of all filed papers to the web contact for its section, so that the filed papers may be posted on the Internet and the Division's intranet (ATRnet). When staff has filed a proposed consent decree, it should also notify the judgment coordinator for its section. The litigating staff is responsible for ensuring that all filed papers are properly posted and recorded by Division staff.

Staff should issue the complaint and summons to the defendants, pursuant to Rule 4 of the Federal Rules of Civil Procedure, and provide defense counsel with a copy of the papers as well. After the parties have been informed of the filing of the complaint and all local district procedures have been completed, staff should follow the local rules and practices and the Federal Rules in setting up whatever conferences are deemed necessary to expedite the matter. When appropriate, procedures for obtaining preliminary relief through a temporary restraining order or preliminary injunction should begin.

## B.     Obtaining Preliminary Relief: Temporary Restraining Orders and Preliminary Injunctions

This section discusses the legal analysis and procedures that will assist Division trial staffs in determining whether to seek preliminary relief. The legal discussion is more extensive than that in any other section of this chapter. Trial staffs are more likely to need a readily available source of case law and analysis in this area since preparation time is usually short and staff is confronted with numerous factual and legal considerations. While this analysis is not exhaustive, it identifies major legal issues that may arise in seeking preliminary relief, as well as procedures that must be completed before a hearing is held. Staff is expected to ensure, in every instance, that papers filed address the relevant legal issues and follow applicable procedures.

The purpose of preliminary relief has been described as creating a state of affairs such that the court will be able, at the conclusion of the full trial, to make a meaningful decision. *See Development in the Law— Injunction*, 78 Harv. L. Rev. 996, 1056 (1965); *see also* Note, *Preliminary Relief for the Government Under Section 7 of the Clayton Act*, 79 Harv. L. Rev. 391 (1965). The Division should seek preliminary relief whenever, in its absence, the relief obtainable following a trial on the merits may not be adequate to restore effective competition in the affected market

or where an interim anticompetitive effect is likely, assuming the legal prerequisites are otherwise met. Preliminary relief is particularly appropriate in Section 7 cases, but is also available in other types of cases, including actions brought under Sections 1 and 2 of the Sherman Act. *See* 15 U.S.C. § 4; *see also De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 219-20 (1945); *United States v. Visa U.S.A., Inc.*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001) (violation of 15 U.S.C. § 1); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (violation of 15 U.S.C. § 2).

A temporary restraining order (TRO) is an extraordinary remedy used to prevent imminent and irreversible developments that may seriously compromise the applicant's right to relief on the merits until the court can hold a hearing on an application for preliminary injunction. A TRO may be issued with or without notice to, or appearance by, the adverse party (although efforts should be made to give notice and the court may require it in an antitrust action). It is strictly limited in duration, and issuance is generally nonappealable.

A preliminary injunction (PI) functions similarly to a TRO, pending a full trial and ultimate disposition of the case, but it is based on a richer record. The affected party must be given a full and fair opportunity to contest the requested relief. In most cases, an evidentiary hearing, often substantial, will be held. The order, if granted, may be of indefinite duration. It must be supported by findings of fact and conclusions of law, and it is immediately appealable.

In merger investigations, it is often necessary to prepare to seek a TRO to stop the merger from being consummated. Unless the defendants are willing to stipulate to interim relief (*i.e.*, an agreement not to consummate a merger) until a PI hearing or full trial can be held, a TRO will be required to ensure that competition will not be irreversibly harmed. In addition, it may be useful to seek a TRO as a means of obtaining an expeditious hearing on the application for a PI. *See* Fed. R. Civ. P. 65(b) (stating that when a TRO is granted without notice, the hearing on the motion for a PI takes precedence over other matters).

### 1.   Procedural Requirements

#### a.   Temporary Restraining Order

Rule 65(b) of the Federal Rules of Civil Procedure permits TROs to be issued *ex parte* and without notice to the adverse party, but it places a variety of restrictions on such TROs, and it provides for a hearing, on motion by the adverse party, for dissolution or modification of such an order. The rule is silent as to the conditions applicable to TROs issued with notice and appearance by the adverse party.

### i.      Notice

Rule 65(b) provides that a TRO may be granted "without written or oral notice" only in circumstances where the applicant "clearly" shows from "specific facts" that "immediate and irreparable injury" will occur before the adverse party can be heard in opposition, and where the applicant certifies in writing the efforts made to give notice and the reasons for proceeding without it. The Advisory Committee Notes to the 1966 amendment to Rule 65(b) state, however, that "informal notice, which may be communicated to the attorney rather than the adverse party, is to be preferred to no notice at all."

The Rule does not specify what written or oral notice is sufficient to take the case out of the category of orders issued "without written or oral notice" and thus sufficient to relieve the applicant of making a Rule 65(b) showing. *See* 11A Charles Alan Wright et al., *Federal Practice and Procedure: Civil 2d* § 2952 (2d ed. 1995) (*Wright*) (suggesting that written notice pursuant to Fed. R. Civ. P. 5(b) should suffice). However, for safety, Division attorneys in applying for a TRO should follow the rules for TROs issued without notice regardless of whether actual notice has been given, while every effort should be made to provide as much actual notice as possible. Staff should research the local rules and practices of the district in which the application will be made and modify its approach accordingly.

### ii.      Content of Affidavits

Rule 65(b) requires a TRO granted without written or oral notice to be based on an "affidavit or ... verified complaint" "clearly" setting out "specific facts" showing (1) immediate and (2) irreparable damage "will result to the applicant before the adverse party or that party's attorney can be heard in opposition." In lieu of sworn affidavits and verifications, unsworn declarations under penalty of perjury may be utilized. *See* 28 U.S.C. § 1746. There is apparently no case law defining the standard for judging the quality and character of a declaration offered in support of a Rule 65(b) motion. *See* 11A *Wright* § 2952. It is reasonable to apply the applicable standards for affidavits supporting an application for PI. *See id*. The declarations specified by Rule 65(b) should not be required to satisfy the more rigorous requirements of Rule 56(e), relating to summary judgments. *See id*. Of course, declarations that rely more heavily on personal knowledge than on information and belief are likely to be accorded greater weight by the court.

### iii.      Hearings

a.    *No hearing prescribed*. No hearing is prescribed by Rule 65(b) for granting of a TRO. When a hearing is held on a TRO application, it is sometimes held in chambers and off the record. A party, however, has a right to have the proceedings recorded, *see* 28 U.S.C. § 753(b);

*Nat'l Farmers' Org., Inc. v. Oliver*, 530 F.2d 815 (8th Cir. 1976), and it is advisable to request that a record be made.

b.  *Preliminary injunction hearing follows*. Rule 65(b) provides that if a TRO is granted without notice, "the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character." When the motion comes on for hearing, the party that obtained the TRO must proceed with the application for a PI, or the court "shall dissolve" the TRO. The purpose of an *ex parte* TRO is to preserve the status quo and prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters, Local 70*, 415 U.S. 423, 439 (1974).

c.  Hearing on Motion to Dissolve. The adverse party may appear and move to dissolve or modify the TRO, after giving two days' notice to the party who obtained a TRO without notice (or such shorter notice as the court may prescribe). The court is directed by Rule 65(b) to "proceed to hear and determine such motion as expeditiously as the ends of justice require."

iv.   Duration

Under Rule 65(b), a TRO issued without notice is effective only for the period set by its terms, not to exceed 10 days. However, within the period set by the order, it can be extended for "a like period" (*i.e.*, 10 days) upon a showing of good cause. The rule also provides that a TRO can also be extended if "the party against whom the order is directed consents." The literal language of the rule permits extensions by consent without regard to the 20-day limit; however, local authority should be consulted on this point, and any extension may not be indefinite, consistent with the order's purpose as "temporary" relief until a hearing can be held. *See, e.g., Fernandez-Roque v. Smith*, 671 F.2d 426, 429-30 (11th Cir. 1982); *Connell v. Dulien Steel Prods., Inc.*, 240 F.2d 414, 417-18 (5th Cir. 1957); 11A *Wright* § 2953. The courts apply the same rule on duration to *ex parte* TROs as to those issued with informal notice. *See Granny Goose Foods, Inc.*, 415 U.S. at 433 n.7 ("Although by its terms Rule 65(b) . . . only limits the duration of restraining orders issued without notice, we think it applicable to the order in this case even though informal notice was given.").

Restraining orders ordinarily should be drafted to specify their duration. If the order does not state how long it will remain in effect, it automatically expires after 10 days, unless extended. *See Granny Goose Foods, Inc.*, 415 U.S. at 443-44; 13 James Wm. Moore, *Moore's Federal Practice* § 65.38 (3d ed. 2006) (*Moore*).

The cases offer little guidance as to the grounds for extending a TRO. *See* 11A *Wright* § 2953. It is clear, however, that the proponent of an extension must move for renewal before the original order expires. *See id.*; 13 *Moore* § 65.38. There is little law as to what constitutes good

cause for extension. It should be sufficient that more time is required to complete the hearing, *see United States v. United Mine Workers of Am.*, 330 U.S. 258, 301 (1947); *Maine v. Fri*, 483 F.2d 439, 441 (1st Cir. 1973), or for submission of additional evidence on the application for PI, *see Weyenberg v. Town of Menasha*, 409 F. Supp. 26, 27-28 (E.D. Wis. 1975), or for the court to prepare its decision, *see Steinberg v. Am. Bantam Car Co.*, 76 F. Supp. 426, 433 (W.D. Pa. 1948), *appeal dismissed as moot*, 173 F.2d 179 (3d Cir. 1949), at least as long as the grounds for originally granting the order continue to exist. *See* 11A *Wright* § 2953; 13 *Moore* § 65.38. If the parties clearly intend it, a hearing to modify or dissolve a TRO can be converted to a PI hearing. *See Granny Goose Foods, Inc.*, 415 U.S. at 441.

### v.     Form

According to Rule 65(b), "[e]very temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice." TROs issued with informal notice and appearance should make comparable recitations. In addition, Rule 65(d) states that every restraining order (and injunction) "shall set forth the reasons for its issuance; shall be specific in its terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." *See* Chapter IV, Part B.3 (summarizing what should be included in a proposed TRO drafted by the Division). Local rules and practice should also be consulted as they may affect the form of the order.

### vi.    Appeal

Issuance or denial of a TRO is generally not appealable. 11A *Wright* § 2962 & n.13. *See, e.g., Connell v. Dulien Steel Prods., Inc.*, 240 F.2d at 418. However, when a TRO is continued beyond the 10 or 20 days permitted by Rule 65(b) (or far beyond this period with the consent of the parties), some courts will treat the TRO as a PI for purposes of appealability. The TRO may then, however, be held inadequate, because it fails to satisfy the requirements for PIs, such as inclusion of findings of fact. *See, e.g., Sampson v. Murray*, 415 U.S. 61, 86 (1974); *In re Arthur Treacher's Franchise Litig.*, 689 F.2d 1150, 1153-55 (3d Cir. 1982); *Telex Corp. v. IBM*, 464 F.2d 1025, 1025 (8th Cir. 1972); *Nat'l Mediation Bd. v. Air Line Pilots Ass'n.*, 323 F.2d 305, 305-06 (D.C. Cir. 1963); *In re Criminal Contempt Proceedings*, 329 F.3d 131 (2d Cir. 2003); 11A *Wright* § 2953. As part of its preparation for a TRO, staff should consult with the Appellate Section.

**b.     Preliminary Injunction**

i.      Notice and Hearing

Rule 65(a)(1) states that "[n]o preliminary injunction shall be issued without notice to the adverse party." Notice is not defined by Rule 65(a), but Rule 6(d) generally requires a motion to be served, along with notice of the hearing, "not later than 5 days before the time specified for the hearing." Since Rule 6(d) allows the time limit to be changed by court order, a shortened time can be requested. Local rules should also be consulted for time limits, including required notice for motions. As to content adequate to provide sufficient notice, a copy of the motion for PI and specification of the time and place of hearing should be adequate. *See* 11A *Wright* § 2949; *but see United States v. Microsoft Corp.*, 147 F.3d 935, 943-45 (D.C. Cir. 1998) (finding notice provided by the United States inadequate).

Although in many courts a PI can be based solely on affidavits and documents, an evidentiary hearing will be requested by one or more of the parties in most antitrust cases. In these cases, live testimony will usually be supplemented with declarations, deposition transcripts, and documents. *See, e.g.*, *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128, 1129-30 (D.D.C. 1986), *vacated*, 829 F.2d 191 (D.C. Cir. 1987). Affidavits must be served not later than one day before the hearing. Fed. R. Civ. P. 6(d). As to the requirements applicable to affidavits, Wright argues that the standards of Rule 56(e) for affidavits submitted in support of summary judgment (*e.g.*, affidavit made on personal knowledge, setting forth facts that would be admissible in evidence and that show that the affiant is competent to testify to those facts) are unnecessarily strict, because the PI is not a permanent adjudication and time is of the essence. *See* 11A *Wright* § 2949. "[I]n practice affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(e), and . . . hearsay evidence also may be considered." *Id.* at 217. However, the motion cannot be based solely on information and belief and hearsay. *See id*.

Preliminary injunction hearings in antitrust cases tend to range from one or two days to one or two weeks in length, or longer. As provided in Rule 65(a)(2), the court may order that the trial on the merits be consolidated with the hearing on the application for PI. Staff must therefore be prepared to explain whether such consolidation is appropriate.

The Division often will have good reason to argue against consolidation. For example, merger challenges raise complex legal and factual issues and may require significant post-complaint discovery. *See SEC v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000) ("'[T]here is no authority which suggests that it is appropriate to limit [an enforcement agency's] right to take discovery based upon the extent of its previous investigation into the facts underlying its case.'" (*quoting SEC v. Saul*, 133 F.R.D. 115,

188 (N.D. Ill. 1990)); *United States v. GAF Corp.*, 596 F.2d 10, 14 (2d Cir. 1979) ("It is important to remember that the [Justice] Department's objective at the pre-complaint stage of the investigation is not to 'prove' its case but rather to make an informed decision on whether or not to file a complaint." (*quoting* H.R. Rep. 94-1343 at 26, Hart-Scott-Rodino Antitrust Improvement Act of 1976)). Consolidation of a trial on the merits with a PI hearing is an abuse of discretion if it deprives a party of its right to fully and fairly present its case on the merits. *See* 11A *Wright* § 2950; *see, e.g., Paris v. HUD*, 713 F.2d 1341, 1345-46 (7th Cir. 1983). Additional issues that may make consolidation inappropriate include the necessity of perfecting evidence in an admissible form and the need to address issues, such as proposed divestitures, that arose late in the investigation.

Rule 65(a)(2) provides that all evidence received upon application for a PI that would be admissible at trial automatically becomes part of the record and need not be repeated at trial; however, it may be reintroduced if there is adequate reason to do so. 11A *Wright* § 2950.

### ii.    Duration and Form

A PI, unlike a TRO, can be of indefinite duration. It ordinarily will remain in effect until completion of a trial on the merits, although the court retains plenary power to dissolve or modify it as circumstances warrant. *See* 13 *Moore* § 65.20.

Rule 65(d) requires that the injunction or restraining order "shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." *See City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 991 (7th Cir. 1980) (holding mere incorporation of language of the Sherman Act insufficient to describe in reasonable detail action sought to be restrained), *cert. denied*, 449 U.S. 1096 (1981). Rule 65(d) also specifies that such orders are binding "only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." In addition, Rule 52(a) requires a statement of "the findings of fact and conclusions of law which constitute the grounds of [the court's] action" in granting or denying interlocutory injunctions.

### iii.    Appeal

Preliminary injunctions are appealable under 28 U.S.C. § 1292(a)(1) ("Interlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions"). Both the district court and the court of appeals are authorized either to grant or to stay a PI pending appeal. *See* Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a). Such orders are frequently granted, and

appeals of the grant or denial of a PI may be heard on an expedited basis.

The articulated scope of review on appeal is narrow. Most courts state that they will reverse only for clear abuse of discretion, *see, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975); *Am. Med. Ass'n v. Weinberger*, 522 F.2d 921, 924 (7th Cir. 1975); *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 360 (2d Cir. 1974), or an error of law, *see, e.g., Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978); *Jones v. Snead*, 431 F.2d 1115, 1116 (8th Cir. 1970). Findings of fact are reviewed for clear error. *See* 11A *Wright* § 2962. The appellate court "ordinarily will not delve any further into the merits of the controversy than is necessary to decide the specific issues being appealed." *Id.*

## 2.  Standard for Granting Preliminary Injunction

The Federal Rules do not prescribe a standard for granting or denying a PI. Traditional equitable considerations apply. Wright describes the most important factors in the decision as:

- The probability that plaintiff will succeed on the merits.

- The significance of the threat of irreparable harm to plaintiff if the injunction is granted.

- The balance between this harm and the injury that granting the injunction would inflict on the defendant.

- The public interest.

11A *Wright* § 2948 (collecting cases). *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. at 931. *See also* Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard*, 22 Rev. Litig. 495 (2003).

### a.  Probability of Success on the Merits

Most commonly, courts have articulated the plaintiff's burden as demonstrating a reasonable probability of success on the merits. While courts have framed this concept in a variety of ways, they agree that the plaintiff must present a prima facie case. A plaintiff, however, need not demonstrate a certainty of winning at trial. *See generally* 11A *Wright* § 2948.3; *see, e.g., United States v. Nippon Sanso*, 1991-1 Trade Cas. (CCH) ¶ 69,377 (E.D. Pa. 1991) (Section 7 case; reasonable probability test); *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 673 (D. Minn. 1990) (Government failed to show probability of success in Section 7 case); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1420 (W.D. Mich. 1989) (Government had established "prima facie" Section 7 case); *FilmTec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568 (Fed. Cir. 1991).

In most nonantitrust cases, the likelihood of success is balanced with the comparative injury to the parties. Where the balance of hardships tips decisively toward the plaintiff, the plaintiff need not make as strong

a showing of likelihood of success to obtain a PI. This balancing has been described as a "sliding scale." *See* 11A *Wright* § 2948.3; *see also*, *e.g.*, *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994). As Judge Frank's often-quoted opinion in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (footnote omitted) states:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (*i.e.*, the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

While this "fair ground for litigation" standard has been applied in a variety of types of private antitrust suits, the Second Circuit has refused to apply the standard in Government Section 7 suits on the ground that, once the Government shows a reasonable probability that Section 7 is violated, irreparable harm is presumed; in light of this presumption, the Government should be required to raise more than a "fair ground for litigation." *In United States v. UPM-Kymmene, Oji*, No. 03-2528, WL 21781902 * 12 (N.D.Ill. 2003), however, the Court required "(1) some likelihood of prevailing on the merits; and (2) that in the absence of the injunction [it] will suffer irreparable harm"; *United States v. Siemens Corp.*, 621 F.2d 499, 505-06 (2d Cir. 1980). *See* also *United States v. Gillette Co.*, 828 F. Supp. 78, 86 (D.D.C. 1993) (holding that in Section 7 case, because showing of irreparable injury was strong, the Government had to make a lesser showing of likelihood of success). Cases in the particular circuit should be consulted to determine what standard of likelihood of success is applied to Government Section 7 cases. In the most recent request for [preliminary relief](), the Division argued that "[t]he United States need show only that the balance of hardships weighs in favor of relief and that it has 'raised questions going to the merits so serious, substantial, difficult and doubtful' as to warrant issuance of the preliminary injunction."

Confusion can result concerning the proper showing of likelihood of success necessary for a PI in Section 7 cases, because Section 7 of the Clayton Act involves a prediction about the effect that mergers or acquisitions may have on competition. Similarly, granting a PI involves a prediction as to the plaintiff's chances of success. Thus, the Government, to obtain a PI, needs only to show a reasonable probability that it will be able to show that competition may be substantially lessened. *See* Comment, *"Preliminary Preliminary" Relief Against Anticompetitive Mergers*, 82 Yale L.J. 155, 157 (1972); *Pargas, Inc. v. Empire Gas Corp.*, 423 F. Supp. 199, 222-23 (D. Md. 1976) (requiring "a substantial probability of establishing that the effect of [the transaction]

'may be' substantially to lessen competition"), *aff'd*, 546 F.2d 25 (4th Cir. 1976).

To establish probability of success unless it can show likely anticompetitive effects directly, the Government must present evidence on geographic and product markets. Because of time and discovery constraints, the Government's additional arguments concerning likely adverse effects on competition often concentrate heavily on structural evidence (the magnitude of and change in the Herfindahl-Hirschman Index and other factors discussed in the *Horizontal Merger Guidelines*) and any other available evidence addressing the harm to consumers the merger is likely to cause. Under the case law, "[s]tatistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power." *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38 (1962); *see also United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963). The Government is entitled to rely on such evidence to make a prima facie case of probable anticompetitive effect and hence illegality, *see Philadelphia Nat'l Bank*, 374 U.S. at 363, but the defendants are entitled to attempt a rebuttal by showing "that the market-share statistics gave an inaccurate account of the acquisitions' probable effects on competition." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *see also Gen. Dynamics Corp.*, 415 U.S. at 497-504; *United States v. Consol. Foods Corp.*, 455 F. Supp. 108, 134-35 (E.D. Pa. 1978); *United States v. Amax, Inc.*, 402 F. Supp. 956, 970 n.53 (D. Conn. 1975). As a result, courts routinely make findings concerning structural factors affecting competition, such as entry conditions, when preliminary relief is sought. *See, e.g.*, *FTC v. Coca-Cola Co.*, 641 F. Supp. 1128, 1135 & n.18 (D.D.C. 1986), *vacated*, 829 F.2d 191 (D.C. Cir. 1987); *United States v. Calmar, Inc.*, 612 F. Supp. 1298, 1305-07 (D.N.J. 1985); *FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001). Staff should be prepared to offer evidence on relevant structural issues in its direct case at a PI hearing.

**b.     Irreparable Injury**

Historically, equity could intervene only when there was no adequate remedy at law (for example, when the alleged injury could not later be repaired by an award of damages). A showing of irreparable harm in the absence of injunctive relief demonstrated that no adequate legal remedy was available, and that equity should intervene to prevent the impending injury. *See* 11A Wright § 2944. Irreparable harm in modern practice is one of the factors to be weighed by the court in considering whether to grant preliminary relief.

Although courts have applied the traditional equity standards of irreparable injury to private actions brought under Section 7 of the Clayton Act, they have recognized that a different test is appropriate where the Government seeks preliminary relief under the Act. Courts have held that where the Government shows a probability of success on

the merits, it need not make a separate showing of irreparable injury. *See FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109, 115-17 (D.D.C. 2004); *United States v. Siemens Corp.,* 621 F.2d at 506; *United States v. Ivaco, Inc.,* 704 F. Supp. 1409, 1429 (W.D. Mich. 1989); *United States v. Culbro Corp.,* 436 F. Supp. 746, 750 (S.D.N.Y. 1977); *United States v. Atl. Richfield Co.,* 297 F. Supp. 1061, 1074 n.21 (S.D.N.Y. 1969), *aff'd mem. sub nom. Bartlett v. United States,* 401 U.S. 986 (1971); *United States v. Wilson Sporting Goods Co.,* 288 F. Supp. 543, 567 (N.D. Ill. 1968); *United States v. Pennzoil,* 252 F. Supp. 962, 986 (W.D. Pa. 1965); *United States v. Chrysler Corp.,* 232 F. Supp. 651, 657 (D.N.J. 1964); *United States v. Crocker-Anglo Nat'l Bank,* 223 F. Supp. 849, 850 (N.D. Cal. 1963). Indeed, the Supreme Court in dictum stated that "[i]n a Government case [under Clayton Act, Section 15] the proof of the violation of law may itself establish sufficient public injury to warrant relief." *California v. Am. Stores Co.,* 495 U.S. 271, 295 (1990).

This doctrine is sometimes characterized as dispensing with the need for the Government to prove irreparable injury, but it is perhaps more accurate to say that the necessary element of irremediable harm is implied as a matter of law from the threatened violation of the statute. *United States v. Ingersoll-Rand Co.,* 218 F. Supp. 530, 544-45 (W.D. Pa. 1963), *aff'd,* 320 F.2d 509 (3d Cir. 1963) ("[T]he threatened violation of the law here is itself sufficient public injury to justify the requested relief."); *see also United States v. Crocker-Anglo Nat'l Bank,* 223 F. Supp. at 850.

Several persuasive arguments can be made for not requiring a showing of irreparable harm in Government cases. First, the "harm" or "injury" at issue must be defined in terms of threats to legally protected rights and interests of the parties. The Government as plaintiff, at least in Section 7 cases, has no private business or property interest at stake. It sues instead as sovereign to vindicate the public interest in a competitive, free-market economy; that interest is violated and, by definition, harm is inflicted whenever the statutory prohibition is violated. A potential violation, therefore, necessarily threatens impairment of protected interests.

Defendants' argument that there has been no showing of irreparable injury to warrant a preliminary injunction is irrelevant. Sec. 7 of the Clayton Act expresses a Congressional proscription of such an acquisition where its effect "may be substantially to lessen competition, or to tend to create a monopoly." This proscription is a legislative declaration that an acquisition having such an effect is against the public interest. The Government need not show that it will suffer irreparable damage qua Government, but only that there is a probability that it would prevail upon a trial on the merits. *United States v. Chrysler Corp.,* 232 F. Supp. 651, at 657 (D.N.J. 1964); *United States v. Crocker-Anglo Nat'l Bank,* 223 F. Supp. at 850-51.

That such injury is sufficiently irreparable to satisfy the traditional standard may be presumed from the intangible nature of the threatened harm; the uncertainty that the anticompetitive impact of even a temporary combination of previously independent companies can ever, after the fact, be fully eliminated; the congressional mandate to prevent competitive injury; and the overriding importance of that policy.

In addition, the alternative to interim injunctive relief—"unscrambling" a merger or acquisition post consummation through the divestiture of stock or assets—is generally not adequate to serve the public interest. Even when aided by the entry of a preliminary hold-separate order, divestiture has proven to be an inadequate remedy.

First, in most cases the illegally acquired company cannot be (or at least is not) reestablished as a viable, independent competitor. Its assets may have been scrambled or sold by the acquiring company and its key managers may have left. Second, even in apparently successful divestiture cases, there may be considerable permanent damage to the market structure due to the temporary disappearance of competition, the delay in innovation or research and development, or the transfer of trade secrets or other confidential information. *See FTC v. PPG Indus., Inc.,* 798 F.2d 1500, 1508-09 (D.C. Cir. 1986). In addition, competition will be adversely affected during the pendency of the case, and this harm cannot be redressed post-trial.

Many courts have recognized the substantial problems involved in unscrambling an accomplished merger and reconstituting the acquired company as a viable competitive entity. *See, e.g., United States v. Ingersoll-Rand Co.,* 218 F. Supp. 530, 542-43 (W.D. Pa.), *aff'd*, 320 F.2d 509 (3d Cir. 1963).

In practice, it is virtually impossible to predict all potential anticompetitive effects with precision. Injury to the competitive process (as opposed to injury to particular competitors, customers, or suppliers, which may not be the same) is likely to be subtle, gradual, and often unquantifiable even after the fact. "[T]he fact that no concrete anticompetitive symptoms have occurred does not itself imply that competition has not already been affected, 'for once the two companies are united no one knows what the fate of the acquired company and its competitors would have been but for the merger.'" *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 505 (1974) (quoting *FTC v. Consol. Foods Corp.,* 380 U.S. 592, 598 (1965)). Remedial adequacy is almost entirely a matter of speculation. The essential issue is who should be forced to bear the risk of this uncertainty; the case law supports the conclusion that it should not be the public. In sum, "divestiture does not always turn out to be a feasible remedy and is never a painless one." *Elco Corp. v. Microdot, Inc.,* 360 F. Supp. 741, 755 (D. Del. 1973). It "is usually fraught with difficulties and presents a whole range of problems which should be avoided if possible." *United States v. Atl. Richfield Co.,*

297 F. Supp. 1061, 1074 (S.D.N.Y. 1969), *aff'd mem. sub nom. Bartlett v. United States*, 401 U.S. 986 (1971); *see also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 n.23 (11th Cir. 1991).

It is important to note that the presumption of irreparable injury is not a doctrinal innovation peculiar to the antitrust laws. The same rule is commonly applied where other important statutorily declared public policies are involved. *See, e.g., Gov't of the Virgin Islands v. Virgin Islands Paving, Inc.,* 714 F.2d 283, 286 (3d Cir. 1983) (Virgin Islands statutes); *United States v. Spectro Foods Corp.,* 544 F.2d 1175, 1181 (3d Cir. 1976) (Federal Food, Drug & Cosmetic Act); *SEC v. Globus Int'l, Ltd.,* 320 F. Supp. 158, 160 (S.D.N.Y. 1970) (Securities Act of 1933 and Securities Exchange Act of 1934); 11A Wright § 2948.4 (collecting cases).

Significant support for the presumption of irreparable injury in Section 7 cases is found in the legislative history of 15 U.S.C. § 53(b), which specifically authorizes the FTC to obtain preliminary relief in merger cases. Until a 1973 amendment, the FTC had no statutory authority to obtain preliminary relief except against false or misleading food, drug, or cosmetic advertising, using 15 § 53(a). The only way the FTC could gain an injunction in merger cases was by applying to the Court of Appeals pursuant to the All Writs Act, 28 U.S.C. § 53(a). The only way the FTC could gain an injunction in merger cases was by applying to the Court of Appeals pursuant to the All Writs Act , 28 U.S.C. § 1651(a), and showing that "an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *FTC v. Dean Foods Co.,* 384 U.S. 597, 605 (1966).

The amended FTC statute provides that a PI may be granted by a district court "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). This amendment was intended to establish essentially the "presumed irreparable injury" standard applied by the courts in Section 7 cases brought by the Department of Justice.

The intent [of the amendment] is to maintain the statutory or "public interest" standard which is now applicable, and not to impose the traditional "equity" standard of irreparable damage, probability of success on the merits, and that the balance of equities favors the petitioner. This latter standard derives from common law and is appropriate for litigation between private parties. It is not, however, appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief.

H.R. Rep. No. 93-624, at 31 (1973), reprinted in 1973 U.S.C.C.A.N. 2417, 2533 (emphasis in original).

The courts, in applying the FTC's statutory standard, have given it the liberal interpretation intended by Congress. *See, e.g., FTC v. Whole Foods Market, Inc.,* 533 3rd 869, 875, (D.C. Civ. 2008) (Brown, J.) and 883 (Tatel, J.); *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 714, 727 (D.C. Cir. 2001); and *FTC v. Univ. Health, Inc.,* 938 F.2d 1206, 1216-17 (11th Cir. 1991); and *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980). In light of the concurrent jurisdiction of the Department of Justice and the FTC to enforce Section 7 of the Clayton Act, the Division should argue that the authority of the Department of Justice to seek preliminary relief under Section 15 of the Clayton Act (15 U.S.C. § 25) should be interpreted in a manner consistent with 15 U.S.C. § 53(b).

The distinction between the burdens of the Government and private plaintiffs is also consistent with the very different language employed by Congress in those sections of the statute respectively authorizing preliminary relief for private plaintiffs and the Government. Section 16 of the Clayton Act, 15 U.S.C. § 26, provides that a private plaintiff may obtain a PI "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity," including "a showing that the danger of irreparable loss or damage is immediate." By contrast, Section 15 of the Clayton Act, 15 U.S.C. § 25, contains no standards for granting preliminary relief other than what is "deemed just in the premises."

The failure of Congress to require that the Government show irreparable loss on the application for a preliminary injunction in a Section 7 action, as is the case with a private plaintiff, 15 U.S.C. § 26, indicates the Congressional desire to lighten the burden generally imposed on an applicant for preliminary injunctive relief. *United States v. Atl. Richfield Co.,* 297 F. Supp. 1061, 1074 n.21 (S.D.N.Y. 1969), *aff'd mem. sub. nom. Bartlett v. United States*, 401 U.S. 986 (1971).

In sum, if the Division establishes probable success on the merits, there is, by definition, a reasonable probability that the transaction will substantially impair competition. Having proved this much, the Government should not be assigned the unrealistic burden of proving the time, manner, and irreparable nature of the harm with the precision assumed by the traditional test. Public policy considerations dictate that the probable injury be irreparable. Similarly, when irreparable injury is proven, such as when an acquired plant is being closed, the Division should face a lighter burden in showing a reasonable probability of success on the merits.

### c.  Balancing the Equities

Even though the Government has shown likelihood of success on the merits when seeking a PI in a Section 7 case, and has satisfied the "threat of irreparable injury" requirement (by virtue of the legal presumptions applicable in Section 7 cases), "a court of equity [must still] balance hardships, *i.e.,* determine whether the harm to the

defendants outweighs the likelihood that adequate relief will be available to the Government if the merger is consummated." *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d. Cir. 1980); *see also, e.g.*, *United States v. Ingersoll-Rand Co.*, 320 F.2d 509, 525 (3d Cir. 1963) (stating that trial court must weigh the possibility of injury to the defendants, the effect of divestiture as opposed to injunctive relief, and the respective positions of the parties); *United States v. ITT Corp.*, 306 F. Supp. 766, 797 n.95 (D. Conn. 1969) (holding that under Clayton Act § 15, balancing of equities "in terms of injury to the public interest if an injunction were denied, as against injury to the defendants if it were granted" becomes relevant once the Government has shown probability of success).

The governmental interest being weighed here is the Government's interest in avoiding irreparable harm that is likely to result if the injunction is not granted. Although this harm is established by a presumption in Section 7 cases, courts nonetheless need to think about the harm in concrete terms in order to weigh the equities. Certainly, the relevant harm includes the harm that will result if a divestiture needs to be carried out after a merger has been consummated. The harm also includes injury to competition caused by the merger, in the interim, before divestiture is ordered. *See United States v. Siemens*, 621 F.2d at 506.

Courts generally give the Government's interest far more weight than private claims when balancing equities in Government Section 7 cases. *See, e.g.*, *United States v. Siemens*, 621 F.2d at 506 (private interests must be subordinated to public ones); *United States v. Columbia Pictures*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) (public interest in enforcement of the antitrust laws and in the preservation of competition "is not easily outweighed by private interests"); *United States v. White Consol. Indus., Inc.*, 323 F. Supp. 1397, 1399-1400 (N.D. Ohio 1971) (balancing possible harm to the defendants against probable antitrust violations; finding "no question that national interests must take precedence"); *United States v. Atl. Richfield Co.*, 297 F. Supp. at 1073 (stating that defendants' claims of financial harm were "entitled to serious consideration" but "[n]evertheless, they cannot outweigh the public interest in preventing this merger from taking effect pending trial" and that "[t]he public interest with which Congress was concerned in enacting Section 7 is paramount"); *United States v. Pennzoil Co.*, 252 F. Supp. at 986 (a showing of injury to the defendant "must be so proportionately persuasive as to submerge the principle that 'the status of public interest and not the requirements of private litigation measure the propriety and need for relief'") (citation omitted). *But see United States v. FMC Corp.*, 218 F. Supp. 817, 823 (N.D. Cal. 1963) (denying PI because of harm to defendants), *appeal dismissed*, 321 F.2d 534 (9th Cir. 1963); *United States v. Brown Shoe Co.*, 1956 Trade Cas. (CCH) 68,244, at 71,116-17 (finding Government case to be weak; denying PI because of harm to defendants; and issuing hold-separate order).

Nevertheless, individual courts may find defendants' argument of injuries to persons associated with the transaction, if it is delayed, to have some merit. Defendants will argue that the injuries allegedly resulting from a delay of the transaction are concrete, immediate, and substantial. The Division should be prepared to explain the transaction's potential anticompetitive impact and the undesirability of divestiture or hold-separate orders. Assuming a substantial probability of success on the merits has been established, it may also be helpful to point out that the private benefits delayed or foregone flow from a transaction that is likely to be found illegal, and therefore claims of private injury should be discounted. In addition, as held in *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001), the timing of a transaction is under the control of the parties; if it made economic sense to them before the injunction, it is likely that it will be attractive in some form later as well.

### d.  Public Interest

Courts often do not make a separate finding on public interest in Government Section 7 cases, because the finding is implicit in the presumption of irreparable harm and in balancing the equities as they affect the governmental plaintiff. *But see United States v. Gillette Co.*, 828 F. Supp. 78, 86 (D.D.C. 1993) ("interests of the public are not necessarily coextensive with the irreparable injury criterion"; where merger is not reversible, public interests favor injunction). Generally, "[a] Federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction." 11A *Wright* § 2948.4; *see also United States v. First Nat'l City Bank*, 379 U.S. 378, 383 (1965). Thus, a showing by the Government that a merger is likely to violate Section 7 should satisfy the public interest test.

### e.  Other Equitable Considerations

Despite the widespread recognition that a Government request for preliminary relief is subject to different rules than those that apply in purely private litigation, such a request remains an equity proceeding. Among the equity issues which Division attorneys should be prepared to address are the following:

#### i.    Maintenance of the Status Quo and Mandatory Injunctions

The goal of preliminary relief is often described as maintenance of the status quo, to preserve the court's ability to exercise its jurisdiction and effect meaningful relief. In addition, if a defendant with notice in an injunction proceeding completes the acts sought to be enjoined, the court may by mandatory injunction restore the status quo. *See* 11A *Wright* § 2948. Courts are sometimes reluctant to issue mandatory injunctions (requiring the defendant to take certain action) if the injunction changes the status quo, even if the injunction is necessary to preserve the court's ability to render a meaningful decision. *See id.* This

reluctance has been criticized as failing to recognize that preservation of the court's ability to grant relief is the cornerstone of preliminary relief. *See id.* at n.17 (collecting cases where courts have acted to change status quo); 11A *Wright* § 2948.2; *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

In a merger case, where an order is sought prospectively to enjoin consummation, the status quo is maintained. However, if relief is sought following completion of a merger or against continuation of a practice alleged to be illegal under the Sherman Act, it may be opposed as a mandatory injunction and a disruption of the status quo. These objections can be rebutted by showing that preliminary relief is necessary to preserve the court's power to render a meaningful decision on the merits. It may also be pointed out that the Government could have phrased the request for relief as a prohibition rather than a mandatory injunction, and that the form of phrasing should not control. *See* 11A *Wright* § 2948.2 ("[W]ith a little ingenuity practically any mandatory injunction may be phrased in prohibitory form."). It may also be possible to argue that the court is merely being asked to restore the status quo as of the "last peaceable uncontested status." 11A *Wright* § 2948 (citation omitted).

ii.      Reluctance to Give Complete Relief

Defendants sometimes argue that a PI should be denied because the injunction would give the plaintiff all the relief it could expect after a trial on the merits. However, the fact that the plaintiff may "temporarily . . . taste the fruits of victory" should not distract the court from applying the relevant criteria; rather, the court should apply the usual analysis—that is, harm to the defendant that will result from preliminary relief, balanced against the harm to the plaintiff if the injunction is denied. 11A Wright § 2948.2; Developments in the Law—Injunctions, 78 Harv. L. Rev. 994, 1058 (1965); Thomas R. Lee, Preliminary Injunctions and the Status Quo, 58 Wash. & Lee L. Rev. 109, 110 (2001).

In merger cases, this principle is often cited by defendants where an injunction might lead to abandonment of the transaction, thus giving the Government a victory by default. *See, e.g., United States v. Atl. Richfield Co.*, 297 F. Supp. 1061, 1073 (S.D.N.Y. 1969), *aff'd mem sub. nom. Bartlett v. United States*, 401 U.S. 986 (1971). In addition to citing the above argument, the Government should respond that the equities weigh in favor of the Government because the claimed private injury is being weighed against public interests. *See id.* at 1073-74. In addition, the alleged injury usually is within the control of the defendants and thus not a legitimate consideration for the court. *See FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 791 (N.D. Ill. 1978). In recent years, courts have been more skeptical of self-created claims of urgency and rejected bare assertions that a deal will unravel. *FTC v. H.J. Heinz Co.*, 246 F.3d 708,

726 (D.C. Cir. 2001). There is no special standard for PI requests involving mergers where the deal might unravel.

### iii.    Delay

Generally, a defendant cannot assert laches as a defense to an antitrust suit brought by the Government; the Supreme Court has consistently adhered to the principle that laches is not a defense against the Government acting as sovereign. *See, e.g., California v. Am. Stores Co.,* 495 U.S. 271, 296 (1990) (dictum); *Nevada v. United States*, 463 U.S. 110, 141 (1983) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917)); *Costello v. United States,* 365 U.S. 265, 281 (1961). However, this doctrine does not extend to Government delay in requesting preliminary relief. If a plaintiff delays in requesting preliminary relief, the court can consider this delay in deciding whether to afford such relief and in choosing the type of preliminary relief to be granted. *See* 11A Wright § 2946. This rule has been applied in antitrust cases where the party requesting preliminary relief is the Government. *See, e.g., United States v. Acorn Eng'g Co.*, 1981-2 Trade Cas. (CCH) ¶ 64,197, at 73,713 n.4 (N.D. Cal. 1981) (considering, in particular, hardship to the defendant); *United States v. Aluminum Co. of Am.*, 247 F. Supp. 308, 314 (E.D. Mo. 1962) (considering, but giving "little weight" to, seven month delay), *aff'd*, 382 U.S. 12 (1965); *United States v. Columbia Pictures Corp.*, 169 F. Supp. 888, 896-97 (S.D.N.Y. 1959); *United States v. Inter-Island Steam Nav. Co.,* 87 F. Supp. 1010, 1022 (D. Haw. 1950). Generally, explainable delays will not be held against the Government. The decision to sue, and the marshaling of sufficient evidence to make a prima facie case, require more time on the part of the Government than for private plaintiffs.

Private plaintiffs can react to a threatened takeover immediately, without considering the merits of the case as a matter of public policy. The Government is expected to, and should, make a more careful and objective determination of the desirability of challenging a merger. Moreover, unlike the usual private plaintiff, the Government does not begin with an intimate knowledge of the industry and the facts surrounding the acquisition. Information gathering is essential and, while it can be done expeditiously, it cannot be done instantaneously.

The desirability of allowing the Government sufficient time to obtain information necessary to analyze properly the competitive effects of a transaction and adequately prepare for trial was explicitly recognized by Congress when it enacted the premerger notification and waiting period provisions of 15 U.S.C. § 18a. In fact, it was the clear congressional intent that the Antitrust Division would use the 20-day period after receipt of second request information "in order to analyze it and prepare a possible case based upon it." H.R. Rep. No. 94-1373, at 6 (1976). Since most actions for preliminary relief will be filed before the expiration of the Hart-Scott-Rodino waiting periods, staff can rely on the statutory framework to rebut any allegation of delay.

Moreover, a policy that penalizes the Government for seeking relief at the eleventh hour, without considering whether it would be realistic or desirable as a matter of policy to require an earlier decision, is itself inequitable. It would encourage the premature filing of ill-considered cases on insufficient facts, a result justifying more significant objections from defendants and courts alike. Furthermore, given the relatively short time span between filing and the PI hearing, a contrary policy would place the Government in the dilemma of choosing between inadequate discovery and preparation (as the price for seeking preliminary relief) and inadequate relief following a plenary trial on the merits. The dilemma intensifies as the legal and factual issues involved become more complex.

Of course, these considerations do not justify unnecessary delay by the Government and, as a matter of both policy and tactics, staff should prepare its case as expeditiously as practicable. Whether warranted or not, courts likely would view with disfavor requests for emergency relief made only days before a scheduled closing when the Government was aware of the merger or acquisition months in advance and the parties likewise provided all the relevant information to make a decision months in advance. Prudence and responsible prosecutorial policy dictate that if a case can be filed and a motion for preliminary relief argued in advance of the merger, it should be done; however, given the timing of mergers under the premerger notification rules and the strategic decisions of many merging parties, this is rarely possible. Staff should take pains to inform the court that it has exercised due diligence and proceeded with all possible dispatch in those situations.

### 3.    Practical Problems and Procedures

Speed of preparation is essential in applying for preliminary relief. When faced with an impending merger or acquisition, most efforts will, of necessity, be directed at fact gathering. Even so, staff should be fully familiar with the case law for the relevant circuit and district, with the local rules of court, and with the opinions of judges that staff will likely draw when a case is filed. Pleadings should be drafted at the earliest possible time and staff is encouraged to review previously filed briefs and pleadings relating to TROs and PIs. These may be obtained from the Division's Internet site, the Work Product Document Bank on ATRnet, the FOIA/PA Unit, or the appropriate special assistant. The legal analysis set forth in this section should also be helpful in developing a quick and usable analysis of the applicable standards.

#### a.    Pleadings and Briefs

When it first appears that a request for preliminary relief may be necessary, a member of the staff should be assigned to complete any unfinished legal research and prepare pleadings and other papers. The following will commonly be required: (1) summons and verified complaint; (2) application or petition for a TRO and PI; (3) notice of

hearing; (4) proposed restraining order; (5) brief in support; (6) supporting declarations; and (7) certificate of service. If parties or potential witnesses cannot be served within the district or within 100 miles of the court, applications and proposed orders for service of summons or subpoenas pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, must also be prepared. Depending on the time available, staff should consider drafting additional pleadings, such as statements of issues and contentions, proposed stipulations, requests for admissions, motions *in limine*, and proposed findings of fact and conclusions of law.

The application for a TRO and PI can be drafted as a single document or as two separate petitions. The latter is common practice in the Division. The application should state: (1) the statutory authority relied on; (2) relevant background information about the proposed transaction; (3) that the proposed transaction will occur on a given date unless restrained; (4) that a verified complaint has been filed alleging that the proposed transaction violates the relevant statute (usually Section 7 of the Clayton Act); (5) that a TRO is necessary because immediate and irreparable injury, loss, and/or damage will result to the public interest before a hearing on the request for a PI can be held; and/or that a PI is necessary to prevent a violation of the statute and to protect the public interest; (6) that a brief and declarations have been filed in support of the motion; (7) that the defendants have been notified of the filing of the application for a TRO, and the method of notification; and (8) the nature of the relief sought.

The notice of hearing on the motion for a PI should be prepared with the dates left blank, to be filled in when a date is set down by the court after ruling on the TRO. A blank copy may be filed with the other pleadings, or the hearing may originally be noticed for a date certain, based on the local rules concerning motion practice (and the judge's motion calendar if the judge to whom the case will be or has been assigned is known). This may be done with the expectation that the judge, in issuing the TRO, will provide for an expedited hearing. A notice is unnecessary if the PI hearing is brought on by order to show cause rather than as a motion.

Staff must submit a proposed TRO. A proposed PI will generally also be offered for filing at the same time. The proposed TRO should conform to the requirements of Rule 65(b) and (d) and, equally important, local rules and practice. It should recite: (1) the court's authority to issue the order; (2) the fact that a complaint has been filed alleging a violation of Section 7 or other statute and a PI has been sought; (3) that the transaction, if not restrained, will occur before a hearing can be held; (4) the materials relied on to support the order (brief, declarations, etc.); (5) the facts and conclusions justifying issuance of the order, defining the injury and stating why it is immediate and irreparable (and, if granted without notice, stating why the order was granted without

notice); (the preferred practice is for the court to file an opinion stating the reasons for issuing the order, but Rule 65 and simple prudence suggest that some reference should be made to substantive issues raised on the merits and irreparable injury in the TRO itself.); and (6) the operative terms of the proposed order, describing in reasonable detail the acts sought to be restrained. The order should contain a place for endorsement of the date and hour of issuance, as well as the place of issuance. It should be directed at the defendants and, tracking the language of Rule 65, "their officers, agents, servants, employees, and attorneys" and "persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." It should specify the date of the PI hearing and the duration of the order, with a provision for renewal.

An attorney's declaration in support of the TRO should verify the complaint, identify and authenticate important documents (which should be attached to the declaration) and other exhibits (such as declarations and depositions), detail the notice given to the defendants of the application for a restraining order, and comply with any other procedural requirements (*e.g.,* a statement that no similar relief has been previously requested). The declaration should also explain the sequence of events leading up to the filing of the case in order to demonstrate due diligence and lack of unnecessary delay in seeking relief. *See* Chapter IV, Part B.2.e.iii.

An economist should be prepared to testify at the initial hearing. Staff should carefully consider whether the testifying economist should prepare a declaration setting forth the economic analysis of the proposed transaction. In each case, it is necessary to weigh the advantages and disadvantages of supplying an economist's declaration.

Every effort should be made to obtain supporting declarations from third parties (unless witnesses will testify at a hearing, in which case staff should consider whether declarations are appropriate). Some courts require a great deal of evidence before granting a TRO. Other courts will hear TROs and PIs on the original papers filed and will not ordinarily conduct an evidentiary hearing. It is better to err on the side of too much evidence rather than too little at this stage. If there is time during the investigation, the taking of CID depositions is useful because they are a useful alternative way to present third-party evidence. They are virtually the only means of getting admissions from the defendants at this stage, and they help to bind the defendants to their testimony.

Before beginning to draft the necessary papers, staff should closely examine the local rules of the district where the action will be filed. It is good practice to provide a copy of the local rules to every member of the staff. Second, staff should contact the local Division field office and U.S. Attorney's Office and arrange to have a liaison person assigned to the case, who should be consulted on all questions of form and procedure. This person can give advice on district customs and

practices, which can greatly affect the manner in which the papers are drawn and the matter presented for hearing. The local attorney will be familiar with how the hearing will be conducted and can help staff tailor its case to the concerns and style of the court. It is often helpful for the liaison person to accompany staff to court. Finally, a local attorney (*e.g.,* the liaison attorney) should be designated for service of papers. Although most defendants will serve their papers on the trial staff, this cannot always be assured. In addition, delays may result if the district court serves orders and notices directed to the United States only on the local U.S. Attorney's Office. Staff should make arrangements for speedy notification and transmission of papers served on a local office, preferably by having them routed directly to the designated local attorney rather than to the U.S. Attorney.

The logistical problems involved are significant when the case is filed in a distant forum. Someone in staff's section or field office should arrange for travel and hotel reservations. Arrangement should also be made for temporary offices, document storage, computer hardware and software, graphic and copying services, and telecommunications services. Procedures should also be worked out for local secretaries on an emergency basis. *See* Division Directive ATR 2510.4, "Administrative Support for Remote Trial Staffs" (describing procedures).

If the U.S. Attorney's Office or Division field office has an office manager or administrative assistant, it will be important to develop a good working relationship with that person. Staff should also keep the field office chief or U.S. Attorney informed of the progress of the case.

### b.    Filing and Hearing Procedures

The usual procedure where a TRO is sought begins with filing the complaint and accompanying papers in the clerk's office, with service on the defendants. The application for a TRO will then be presented to the judge assigned to the case. The court may or may not wish to receive copies of pleadings filed with the clerk's office. Defendants commonly appear in opposition to TROs sought by the Division. The proceedings may be conducted in open court or in chambers. The parties have the right to insist that proceedings be on the record. If the judge to whom the case is assigned is unavailable, the application can be presented to the miscellaneous or emergency judge.

The procedure will obviously be different if the case is filed sufficiently far in advance of the proposed transaction to permit the application for a PI to be brought on as a regular motion. Given the usual time constraints, however, this is rarely possible unless the defendants voluntarily agree to postpone the transaction pending the outcome of a PI hearing. Another variation (primarily in the paperwork, not the procedure) will occur if the preferred practice in the district is for the TRO to include an order to show cause why a PI should not be issued. Whether this is the practice should be determined well in advance.

Given the heavy dockets of most courts, the court usually will urge the parties to agree to a date, often four to six weeks in the future, for a PI hearing, and will urge them to agree to a discovery plan. In other cases, the court will put the matter down for hearing within a matter of days. Staff cannot rely on any significant period of time between the granting of a TRO and the beginning of a PI hearing. Further, trial on the merits may be consolidated with the PI hearing; although such a hearing will almost always be after a more significant period of discovery, it may be more abbreviated than discovery in a normal civil case. *See* Chapter IV, Part B.1.b.i. In short, staff should pursue intensive prefiling discovery aimed at meeting a PI standard and should be prepared to move aggressively after filing to obtain full discovery for a trial on the merits. On occasion, courts have scheduled the trial on the merits only a few weeks after the complaint was filed. Any such proposed schedule should be vigorously contested when it would likely prejudice the ability of the United States to obtain necessary discovery or fairly present its case at trial.

Staff should impress upon reluctant affiants or deponents, for example, that if they do not come forward at this stage, there may be no second chance. Note also that the importance of the prefiling investigation makes document control, as well as adequate staffing, exceedingly important. One person should be assigned the task of document control, and should be responsible for organizing and transporting documents for use at the hearing. One attorney should be assigned early to work with the testifying economist to prepare for a hearing.

There are strong pressures on all parties, including the judge, to complete the hearing as quickly as possible. Many judges will set strict limits on how much time each party has to present its case. Even when time limits have not been set, staff should not test the limits of either the permissible duration of a TRO hearing or the judge's patience. In view of the fact that the Government is insisting by the very act of seeking preliminary relief that the matter is urgent, it is incumbent on the trial staff to pare and streamline its case. Indulging the usual luxury of putting into evidence every scrap of possibly relevant evidence will quickly alienate most judges. Having substantially interfered with the proposed transaction at our behest, the judge will expect an expeditious presentation of the Government's case.

The court will likely insist that the parties stipulate to as many facts as possible, and if the court does not do so, the trial staff should consider taking the initiative and offering proposed stipulations or filing requests for admission. The original declarations presented with the TRO application can be considered by the court in deciding whether to issue a PI. Under extreme time pressures, to expedite the presentation of evidence, it may be possible—albeit usually unwise—at the outset of their testimony for witnesses to adopt their declarations, either those given previously and submitted with the TRO application or those

prepared especially for the PI hearing (and served on the defendants in advance of the hearing). This still permits cross-examination on the subject matter of the declarations, but it economizes on trial time. The same practice may be followed for depositions. The far better practice, however, is to have the court hear both direct testimony and cross-examination live.

The relative speed of the procedure, at least as measured in antitrust terms, is largely disadvantageous to the Government because most relevant information is in the hands of others and because the persuasive burden—whatever the technical legal burden—of convincing a court to interfere with a transaction lies with the Government. The most that can be said is that the fast pace may help the plaintiff maintain the initiative. Where essential data has been difficult to obtain and areas of the case require additional discovery, the fast pace especially works to the defendants' advantage. There is a strong case for conditioning a speedy hearing on an equally speedy disclosure by defendants of all necessary information. Staff may make a similarly strong case when the Government has proceeded with all due diligence but has been unable to discover essential facts. When appropriate, a motion to compel discovery or compliance with the premerger notification rules (where the response has been inadequate and the Division maintains that the parties are not in substantial compliance) on an expedited basis might accompany the request for a TRO.

In deciding whether to recommend that the Division seek preliminary relief, staff should consider: (1) the strength and complexity of our case on the merits; (2) the magnitude of the probable injury to competition from the merger or acquisition, how quickly it is likely to occur, and the extent to which, absent preliminary relief, it can be reversed or forestalled after a trial on the merits (including the practicability and efficacy of divestiture); (3) the amount of harm to public and private interests that the defendants will be able to claim; (4) how far advanced preparation of the case will be at the time of filing; and (5) any special problems or advantages (*e.g.*, logistical considerations, or the necessity for an unusual form of relief such as a mandatory injunction upsetting the current status quo). As a general rule in Section 7 cases, the presumption will be in favor of seeking preliminary relief, given the fact that, in its absence, final relief is almost certain to be less effective than if some form of interlocutory injunction had been entered. Preliminary relief also provides the defendants and the court with a powerful incentive to try the case expeditiously; without it, defendants have incentives to delay.

### c.      Hold-Separate Orders

Staff should be prepared to react to defense arguments that hold-separate orders adequately protect the interests of the Government. Although hold-separate orders are often distinguished from PIs (*i.e.*, absolute prohibitions on consummation of the acquisition or merger),

they are in fact merely a species of PI. Tactically, the decision on how to react to a proposed hold-separate order is extremely important because the courts tend to seek a middle ground. If the Government implies that a hold-separate order may be adequate, the chances of obtaining a complete prohibition on consummation of the transaction are greatly reduced. On the other hand, if the Government refuses to admit that a hold-separate order could be adequate relief when this is true, even as a less desirable alternative, it may be faced with an inadequate order drawn by a judge who has been given little help in its formulation, or the complete denial of relief by a judge who might have been willing to issue a hold-separate order.

Nonetheless, where preliminary relief is sought in Section 7 cases, the Division generally seeks to prohibit consummation of the proposed merger or acquisition. The Division generally opposes hold-separate orders for the following reasons:

> (1) divestiture, which will be necessary if the Division prevails on the merits after a hold-separate order is entered, is often difficult to accomplish; (2) under a hold-separate order, there will often be an interim loss of competition because the two firms have limited incentives to compete against each other while under common ownership; (3) even under a hold-separate order, it is difficult to prevent the acquiring firm from obtaining confidential information from the acquired firm; and (4) under a hold-separate order, acquired firms typically become progressively weaker as time passes, making it less likely that competition will be fully restored even if the Division ultimately prevails on the merits. The case law supports the Division's position that hold-separate orders are usually inadequate. *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1506-09 (D.C. Cir. 1986) (Bork, J.); *United States v. Wilson Sporting Goods Co.*, 288 F. Supp. 543, 569-70 (N.D. Ill. 1968). *But see FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) (upholding order in special circumstances).

Staff also can argue, by analogy to cases interpreting Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), that a hold-separate order is appropriate in lieu of enjoining the acquisition only if "significant equities favor the transaction *and* the less drastic restraint of a hold separate order realistically can be expected (a) to safeguard adequate eventual relief if the merger is ultimately found unlawful, and (b) to check interim anticompetitive harm." *FTC v. Weyerhaeuser Co.*, 665 F.2d at 1085 (emphasis in original). In making this determination, the district court should recognize that a showing by the Government that it is likely to succeed on the merits creates a presumption that the acquisition should be enjoined. *See FTC v. PPG Indus.*, 798 F.2d at 1506-1508. Finally, while private equities can be considered, "private equities alone are insufficient to justify entry of a hold separate order." *Id.* at 1506.

## C.     Discovery Under the Federal Rules of Civil Procedure

After the filing of the complaint, discovery should begin at the earliest time possible. Pretrial discovery will typically proceed at a faster pace in a merger case than it will in a nonmerger civil case. With the investigatory powers available to the Antitrust Division under the amendments to the Antitrust Civil Process Act and the premerger notification procedures established by the Antitrust Improvements Act of 1976, the Division has substantial prefiling investigatory tools to develop its case during the investigation. For example, CID depositions of employees of defendants are admissible at trial as admissions (however, CID depositions of third parties are not typically admissible for the Government, but may be for the defendants under Rule 32. Staff should therefore consider whether information needed from third parties can be obtained effectively through interviews as well as whether the deposition is useful to lock-in testimony). While these tools are of great assistance in developing the case, discovery is still a necessary element in case development. To expedite the case, staffs should use pretrial discovery procedures chiefly to isolate and narrow the issues of the litigation. Consulting the language of the most recent cases can help staff better formulate requests for admissions, interrogatories, and deposition questions.

The discovery provisions of the Federal Rules of Civil Procedure were substantially revised in 1993. For example, the revisions imposed limits on the number of depositions and interrogatories and established a procedure for parties to meet and prepare a discovery plan for presentation to the court. Each Federal district court has the option to accept all, part, or none of the new rules. It is essential that staff consult with the local U.S. Attorney's Office regarding the extent to which the court in the district in which the case is filed has adopted the 1993 amendments. Staff should obtain a copy of the local rules prior to filing the case and inquire of the U.S. Attorney's Office if there are accepted practices and procedures in the district that may not be reflected in the local rules or in general orders issued by the court.

### 1.     Initial Disclosures and Planning Discovery

Absent agreement, court order, or local rule, no discovery may be commenced until the parties meet to develop a discovery plan. *See* Fed. R. Civ. P. 26(d), (f). The meeting must be held at least 21 days prior to the first scheduling conference or due date specified in the court's scheduling order. *See* Fed. R. Civ. P. 26. Form 35 is provided for the proposed discovery plan. The subjects to be addressed in the discovery plan include subjects of discovery; changes in the timing, form, or requirement for Rule 26(a) disclosures; timing of discovery; changes to limitations on discovery. *See* Fed. R. Civ. P. 26(f); Form 35. The proposed discovery plan must be submitted to the court within 14 days after the meeting. In formulating the initial scheduling order, the court is to consider the proposed discovery plan.

The Federal Rules of Civil Procedure also provide that within 14 days after the parties meet to develop a discovery plan, and without waiting for a discovery request, each party must disclose certain information "that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1). This requirement may be suspended by stipulation, court order, or local rule. The required disclosures include the name, address, and telephone numbers of individuals likely to have the information and copies or descriptions by category of documents containing such information. The initial disclosure must be based on information "reasonably available" to the disclosing party, and a party "is not excused from making the disclosures because it has not fully completed its investigation of the case." Fed. R. Civ. P. 26(a)(1). It is anticipated that supplementation of disclosure information may be required.

Rule 29 provides that the parties may by written stipulation modify any of the discovery limits imposed by the rules without leave of the court, unless the court orders otherwise. However, any stipulations extending time for discovery responses cannot interfere with the times set by the court for completion of discovery, hearing of motions, or trial.

Consistent with the scheduling order, staff may obtain, or be asked to provide, discovery through the use of interrogatories, requests to produce documentary materials, requests for admissions, and depositions. The following is a brief description of some practical considerations that might arise during the discovery period.

### 2.    Use of Depositions

Depositions are often the most useful means of conducting pretrial discovery. If properly employed, depositions can narrow the issues of the case, expedite agreements and stipulations between the parties, authenticate documents, and shorten the amount of trial time required for the case.

This section is not intended as a comprehensive review of the legal principles applicable to, or techniques for, conducting depositions, because there are many valuable texts on these subjects. *See, e.g.*, 8 Wright §§ 2101-2300; 6 Moore. This section is intended only to suggest general methods and practices that have been used successfully by Division attorneys in the past.

#### a.    Applicable Federal Rules of Civil Procedure

During the preparation for and taking of depositions, staff should be familiar with Rules 26 to 32 of the Federal Rules of Civil Procedure, as well as the sanctions provisions of Rule 37 and the evidentiary and subpoena provisions of Rules 43 and 45, respectively. Staff should consult the relevant sections of such texts as *Wright* and *Moore* in determining how to prepare and conduct depositions.

Absent leave of the court, agreement of the parties, or a differing local rule, no more than 10 depositions per side may be noticed. *See* Fed. R. Civ. P. 30(a)(2)(A), 31(a)(2)(A). A Rule 30(b)(6) deposition is treated as a single deposition even if more than one person is designated to testify. *See* Advisory Committee Notes to Rule 30(a)(2)(A). The ten-deposition limit applies to all depositions, oral depositions and depositions by written question, unless changed by leave of court or stipulation of the parties. *See* Fed. R. Civ. P. 31(a)(2)(A). No person may be deposed more than once without leave of the court or agreement of the parties. *See* Fed. R. Civ. P. 30(a)(2)(B), 31(a)(2)(B). No deposition may be taken before the initial discovery meeting unless the deponent is expected to leave the country and be unavailable for examination. *See* Fed. R. Civ. P. 30(a)(2)(C).

**b.    Purpose of Depositions**

Under Rule 26, depositions may be taken for use as evidence at trial or for discovery. As a discovery tool, a deposition may be used to find facts that relate to the claim or a defense of a party taking the deposition. Depositions of party opponents and, in some circumstances, of nonparty witnesses, may be admissible as substantive evidence at trial. *See* Fed. R. Evid. 801(d)(2), 804(b)(1).

Under certain circumstances, it may be advisable to take the depositions of witnesses who reside more than 100 miles from the place of the trial because the court, in its discretion, may refuse to issue trial subpoenas to witnesses residing that distance from the place of trial. Staff should ascertain whether there is any possibility that the court might refuse to issue trial subpoenas for distant witnesses and may, out of an abundance of caution, find the deposition procedure to be the best available means of obtaining and preserving the testimony for possible trial use. While a witness may be more effective presenting his or her testimony live at trial, circumstances peculiar to the witness may make it necessary or advisable to obtain the witness's testimony through deposition even if the court would issue a subpoena.

The deposition of any witness may be used for impeachment purposes at trial. *See* Chapter IV, Part C.2.k (describing other procedures involving the use of depositions as evidence at trial).

**c.    Persons Whose Depositions May Be Taken**

**i.    Requirements Under the Rules**

Under Rule 26, any party may take the testimony of any person, including a party, by deposition. This includes corporations, partnerships, and other associations, as well as individuals. Rule 30(b) provides that reasonable notice of the taking of the deposition be given to every party. The notice must set forth the time and place of the taking of the deposition, the name and address of each person to be examined, if known, or, if the name is not known, a general description

to identify the particular class or group of persons to which he or she belongs. A notice and accompanying subpoena may name as a deponent a corporation, partnership, association, or Government agency and describe with reasonable particularity the matters upon which examination is requested. The organization must then designate one or more of its officers, directors, managing agents, or other persons to testify on its behalf about the matters stated in the notice and subpoena. A subpoena to a nonparty corporation, partnership, association, or governmental entity must advise that party of a duty to make such a delegation. *See* Fed. R. Civ. P. 30(b)(6). Under § 13 of the Clayton Act, the court may grant a motion for nationwide service of process in antitrust cases brought by the United States. *See* 15 U.S.C. § 23.

The notice must also state the method by which the testimony shall be recorded. Unless the court orders otherwise, the testimony may be recorded by audio, audiovisual, or stenographic means. A party other than the one noticing the deposition may arrange, at its own expense, for the recording of a deposition stenographically. *See* Fed. R. Civ. P. 30(b)(3). If a party offers deposition testimony recorded by nonstenographic means in a court proceeding, the party must provide the court with a transcript of the portions used. *See* Fed. R. Civ. P. 32(c). Where it may be important or tactically advantageous to provide to a judge or jury an audio and visual presentation of the testimony of a nonappearing witness, staff should consider videotaping a deposition. If staff is taking a deposition of a Government witness in lieu of an appearance at trial, staff should weigh the advantages of having its witness seen and heard against the possible discomfort and self-consciousness to the witness that videotaping might cause.

### ii.    Practical Considerations

When the Division decides to take the depositions of certain individuals or representatives of corporations, it should give adequate advance notice to all parties to the action. It is good practice to inform the witness or his or her attorney of the tentative date of the deposition prior to filing the notice and serving the subpoena. When practicable, efforts should be made to interview the witness in advance of this testimony. Staff should also attempt to interview a third party prior to a deposition noticed by the defendants. When staff also contemplates requiring documents from the deponent by means of a subpoena *duces tecum,* staff should allow the deponent adequate time to assemble the materials.

Notice of the taking of a deposition should be filed in the jurisdiction where the case is pending and in the jurisdiction where the deposition will be taken. The local rules may not allow the issuance of a deposition subpoena until such time as the clerk of the district court in the jurisdiction where the case is pending receives a certified copy of a notice.

If a subpoena *duces tecum* is to be served on a third party, a list of the materials to be produced, as set forth in the subpoena, must be attached to, or included in, the notice. *See* Fed. R. Civ. P. 30(b). If the notice is to a party deponent, it may be accompanied by a request for production of documents under Rule 34 at the time of the taking of the deposition. *See* Chapter IV, Part C.4 (discussing Rule 34 document requests).

### d.   Place of Deposition

#### i.   Requirements Under the Rules

If the parties and the witness agree on the location, a deposition can be scheduled anywhere. In the absence of such an agreement, the deponent usually must be deposed within 100 miles of where he or she is employed, resides, or regularly transacts business. *See* Fed. R. Civ. P. 45(c)(3)(a)(ii). The court may be willing to issue an order altering the place of the deposition upon the motion of a party or the deponent if necessary to avoid undue burden or expense. *See* Fed. R. Civ. P. 26(c)(2).

#### ii.   Practical Considerations

Prior to the time of the deposition, staff should make arrangements for adequate space for taking the deposition, the presence of an officer authorized to administer oaths, and the attendance of a court reporter to record testimony (often the court reporter is a designated officer who can administer oaths).

The U.S. Attorney in the district in which the deposition is to be taken, or the Antitrust Division field office, if one is found in that district, is usually accommodating in making arrangements for taking depositions. In addition, the U.S. Attorney's staff or field office chief can provide staff with advice as to the local practice for taking depositions.

### e.   Length of Depositions

Pursuant to Rule 30(d)(1), depositions are limited to one day of seven hours. The parties should consider whether to modify the time limits on depositions at the discovery planning meeting. *See* Fed. R. Civ. P. 26(f). The court can also limit the length of depositions through an order or local rule. The court "must" allow extra time for a deposition if necessary for a fair examination or if the deponent or another party impedes or delays the examination. Fed. R. Civ. P. 30(d)(1). The court can also impose sanctions for such delays or interference. *See* Fed. R. Civ. P. 30(d)(2).

### f.   Presiding Officer at the Deposition

#### i.   Requirements Under the Rules

Under Rule 28, depositions taken within the United States will be taken before an officer authorized to administer oaths by the laws of the

United States and the place where the examination is held or before a person appointed by the court where the action is pending. The person so appointed may administer oaths and take testimony.

### ii.     Practical Considerations

Where practicable, the court reporter should be qualified to administer oaths in these matters. In arranging for court reporting services, staff should consult Division Directive ATR 2570, "Payment of Litigation-Related Expenses."

### g.     Requiring the Presence of Witnesses

All witnesses, other than parties to the action, must be subpoenaed. Parties may also be subpoenaed as a matter of caution, although Rule 37(d) provides that willful failure of parties to appear authorizes the court, on motion, to strike the pleadings of that party or to take other punitive action. Depositions to occur in districts other than where the action is pending are noticed pursuant to Rule 45(a). A blank subpoena form can be obtained from the clerk of the court of any district and may be issued by counsel. One should check the local rules and the U.S. Attorney's Office to ensure that the particular district does not have any special requirements, such as the signature of the clerk of the court. Assuming it does not, the blanks in the form should be filled out to show the district in which the deposition will occur and whether it is for deposition only, or for production of documents as well. Subpoenas *duces tecum* may also be served upon nonparties and Rule 34 document requests may be used to obtain documents from parties. *See* Chapter IV, Part C.4.

Counsel may sign the subpoena as the issuing officer. Service on the deponent is made by delivery of a copy of the subpoena by any person over 18, although generally counsel for the witness will agree to accept service. If service must be done formally, staff should consult with the U.S. Attorney's Office in the district in which the deposition will be taken to arrange for service. *See* Fed. R. Civ. P. 45(b). Notice of service of the subpoena should also be provided to opposing counsel and filed in the jurisdiction where the case is pending.

### h.     Taking the Deposition

Once the witness is sworn and counsel's appearances are noted for the record, the following procedures are suggested for conducting the deposition.

### i.     Waiver of Formalities

As part of the discovery plan, the parties should stipulate waiver of certain of the formalities provided for by the Rules for depositions that do not appear to be necessary. Rule 29 authorizes the parties to agree among themselves, by written stipulation, "that depositions may be taken before any person, at any time or place, upon any notice, and in

any manner and when so taken may be used like other depositions" taken in strict observance of the rules. The requirement that stipulations be in writing is met by having them included in the discovery plan. These stipulations can also be recorded in the transcript of a deposition if not included in the discovery plan.

Although the rules provide that many defects in deposition procedures are automatically waived unless a timely objection is made, it is desirable for clarity of the record and for trial preparation purposes to eliminate before trial all possible objections related to formalities. Stipulations waiving such deposition formalities should be limited to (1) objections to the qualification of the presiding officer (after ascertaining whether or not he or she is a relative or employee of the deponent or opposing counsel, or has a financial interest in the case) and the time, place, and notice of taking the deposition; (2) objections to any errors or irregularities in the completion and return of the deposition by the presiding officer; (3) an agreement that the deponent may sign the transcript of his or her testimony before any notary; and (4) an agreement that attorneys for the respective parties may agree to corrections of the transcript at any time prior to submission to the court. Stipulations relating to deposition procedures should be included in the discovery plan.

Any defects that occur during the deposition may be cured by a stipulation at that time or at the end of the deposition session.

### ii.     Scope of the Examination

Rule 26(b) provides that the deponent may be examined regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of either party. The deponent may also be questioned concerning the existence, description, and location of any books or records and the location of persons having knowledge of discoverable matter. Inadmissibility at trial is not a proper ground for objection if the testimony appears reasonably calculated to lead to the discovery of admissible evidence.

It is permissible for the witness to offer hearsay evidence. The witness should answer all nonprivileged questions, leaving the determination of their admissibility as evidence for the trial.

### iii.    Examination and Cross-Examination

Pursuant to Rule 30(c), examination and cross-examination may proceed as permitted at trial. Leading questions may be used in the direct examination of a hostile witness, an adverse party, or a witness identified with an adverse party. *See* Fed. R. Evid. 611(c). The credibility of the deponent may be attacked by any party, including the party calling him or her. *See* Fed. R. Evid. 607. While cross-examination of the deponent should be limited to the subject matter of the direct examination and to matters affecting the credibility of the witness, Fed.

R. Evid. 611(b) allows the court, at its discretion, to permit inquiry into additional matters as if on direct examination.

### iv.    Objections to Evidence

Objections to questions during a deposition are to be stated "concisely and in a nonargumentative and nonsuggestive manner." Fed. R. Civ. P. 30(d)(1). A party may "instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion [for a protective order]." *Id.* Rule 32(d)(3)(A) provides that objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of a deposition, unless the ground for the objection is one which might have been obviated or removed if presented at that time.

Objections to irregularities of a more formal nature, such as the form of questions and answers, the oath, the conduct of the parties, and other similar matters which might be obviated, removed, or cured if promptly presented, are waived unless "seasonable" objections are made at the taking of the deposition. *See* Fed. R. Civ. P. 32(d)(3)(B).

Rule 30(d) permits any party or the deponent, upon a showing that the examination is being conducted in bad faith or in a manner to annoy, embarrass, or oppress the deponent or party unreasonably, to move the court in which the action is pending or the court in the district in which the deposition is being taken for an order to cease taking the deposition or to limit the scope and manner as provided in Rule 26(c). Upon demand of the moving person, the deposition shall be suspended for the time necessary to make such a motion. The court may award reasonable expenses, including attorneys' fees, to the prevailing party. *See* Fed. R. Civ. P. 37(a)(4).

### v.    Recording Objections

Rule 30(c) provides that the presiding officer shall note upon the deposition all objections made at the time of the examination to the qualifications of the officer taking the deposition; the manner of taking; the evidence presented; the conduct of any party; and any other objections. Evidence objected to shall be taken subject to the objections.

### vi.    Documentary Evidence

Any documents to be used during the deposition should be submitted to the presiding officer prior to use to be numbered serially and marked for identification. The defendant may also use documents during cross-examination. It is good practice to mark each exhibit with the witness's name as well as a number or letter (*e.g.,* "Allen No. 1") and to attach copies of all exhibits to the transcript. Because local rules or practices may be applicable, staff should consult the local rules and the court

clerk. *See* Chapter VI.B (providing a fuller discussion of organizing exhibits and employing them in examination).

### i.   Formalities at the Conclusion of the Deposition

#### i.   Correcting the Transcript and Signing by the Witness

Review and signature are required only if requested by the deponent or a party before completion of the deposition. It is advisable for staff to request the reading and signing of the transcript by every witness it deposes. If the request is made, the deponent has 30 days after notification by the officer that the transcript is available in which to review the transcript and, if there are changes in form or substance, to sign a statement setting forth the changes and the reasons for making them. The officer should state in the certificate if review and signing were requested and list the changes made by the deponent within the period allowed. *See* Fed. R. Civ. P. 30(e). The parties may wish to include in the discovery plan an agreement that witnesses will read and sign the transcript within a period less than 30 days. As a practical matter, the parties review the deposition transcript and discuss and agree on corrections that should be made in the record before it is signed. If the changes made by the deponent contradict or materially change the testimony, it may be advisable, under certain circumstances, to seek leave of the court to reopen the deposition to examine the witness, under oath, on the reasons for the new statements and changes. Many courts hold that the changes to a deposition transcript do not replace the original answers, which remain part of the record and can be used at trial; some courts have even rejected critical alterations. *See* 8A Wright § 2118.

Mechanical errors and irregularities, such as the way the reporter transcribed the testimony or prepared the transcript for filing, or otherwise dealt with the deposition as he or she is required to do under Rules 30(c) and 31(b), may be corrected by agreement of the parties. In the absence of agreement on such mechanical matters, Rule 32(d)(4) authorizes a party to move, with reasonable promptness after a defect is or might have been ascertained, for suppression of the deposition or any part of it. Such a motion may be used to obtain court approval of the corrections sought.

As a matter of convenience, the parties should stipulate at the deposition that, if the deponent does not wish to make any material changes in his or her testimony after it has been transcribed, the deponent may sign before any notary public. This obviates the need to bring back the presiding officer. However, the deposition should then be returned to the presiding officer, or reporter, so that the officer may comply with Rule 30(f).

### ii.    Certificate of Presiding Officer

Rule 30(f)(1) requires that the presiding officer certify on the deposition that the witness was duly sworn by him and that the deposition is a true record of the testimony given by the witness. Unless subsequent formalities are waived, the officer should then seal the deposition in an envelope endorsed with the title of the action and marked "Deposition of [_____]" and promptly file it with the court in which the action is pending or send it to the attorney who arranged for the transcript. Any protective orders affecting public filing should also be marked on the envelope.

### iii.    Filing in Court and Inspection

Rule 30(f)(1) provides that the presiding officer shall promptly file the deposition with the court where the action is pending or send it to the attorney who arranged for the transcript. A deposition that has not been filed, and thereby made part of the record of the case, cannot be considered by appellate courts hearing interlocutory appeals. Fed. R. App. P. 10(a). Mere filing, however, does not make the deposition part of the trial record. Moreover, many districts have adopted rules prohibiting filing of all transcripts due to the paperwork burden. Staff should, as always, check the local rules.

## j.    Expenses of Taking Depositions

The party taking the deposition bears the cost of recording the deposition. *See* Fed. R. Civ. P. 30(b)(2). Some of the costs of taking depositions may later be recovered by the prevailing party pursuant to 28 U.S.C. § 1920, which enumerates costs that may be taxed against losing parties in the Federal courts. *See also* 28 U.S.C. § 2412.

Among the taxable costs allowed by § 1920 are marshal's fees, the costs of deposition stenographic transcripts, and witnesses' travel expenses. These items of cost may later be awarded in the court's discretion.

Certain expenses may also be awarded to prevailing parties under Rule 37, including penalties imposed upon parties who fail to appear at their own depositions and upon parties, deponents and their counsel who fail to answer, or give evasive or incomplete answers to, questions at depositions.

## k.    Use of Deposition at Trial

### i.    Application of the Federal Rules of Civil Procedure

Rule 32(a) provides that a deposition, or any part thereof, may be used at trial or in any preliminary hearing so far as admissible under the Federal Rules of Evidence, against any party that was present or represented at the deposition or that had reasonable notice of the deposition.

The following provisions of Rule 32(a) are applicable:

1. A deposition may be used by any party to contradict or impeach the testimony of deponent as a witness.

2. The deposition of a party (including its officers, directors, or managing agents, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party) may be used by an adverse party for any purpose.

3. The deposition of any person may be used by any party for any purpose if the court finds one of the following:

    • The witness is dead.

    • The witness is more than 100 miles from the place of trial or is out of the United States, unless the absence was caused by the party offering the deposition.

    • The witness is unable to attend or testify because of age, illness, infirmity, or imprisonment.

    • The party offering the deposition has been unable to procure the attendance of the witness by subpoena.

    • Upon application and notice, a showing of exceptional circumstances is made.

A deposition cannot be used against a party who, having received fewer than 11 days' notice of a deposition, promptly filed for a protective order under Rule 26(c)(2) requesting that the deposition not be held or be held at a different time or place, and the motion is pending at the time the deposition is taken. A deposition also cannot be used against a party who demonstrates that, when served with the notice, it was unable to obtain counsel to represent it at the deposition, despite diligent efforts to do so. *See* Fed. R. Civ. P. 32(a)(3).

### ii.   Application of the Federal Rules of Evidence

The Federal Rules of Evidence allow more liberal use of depositions than Rule 32(a):

1. Deposition statements of a nonparty witness may also be offered at trial as substantive evidence if the deponent testifies at trial and is subject to cross-examination concerning the statements, and one of the following applies:

    • The statements are inconsistent with his or her trial testimony, *see* Fed. R. Evid. 801(d)(1)(A).

    • The statements are consistent with his or her trial testimony and offered to rebut a charge that the trial testimony is fabricated or improperly influenced or motivated, *see* Fed. R. Evid. 801(d)(1)(B).

2. A statement that is an admission by a party-opponent is admissible as substantive evidence under the circumstances described in Fed. R. Evid. 801(d)(2).

3. If a witness is unavailable, as defined by Fed. R. Evid. 804(a), the deposition will not be excluded as hearsay when offered against a party if that party had an opportunity and similar motive to develop the testimony of the witness at his or her deposition by direct, cross, or redirect examination. *See* Fed. R. Evid. 804(b)(1).

### iii.    Use of Part of the Deposition

If only part of a deposition is offered in evidence, an adverse party may require the contemporaneous introduction of any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts. *See* Fed. R. Civ. P. 32(a)(4); Fed. R. Evid. 106.

### iv.    Objections to Admissibility

Rule 32(b) provides that objections may be made at trial to the admissibility of any deposition for any reason which would require the exclusion of the evidence if the witness were then present and testifying. The only exceptions to this Rule relate to objections that must be made at the time of the deposition. *See* Fed. R. Civ. P. 32(d)(3).

### v.    Effect of Taking or Using Depositions

The Federal Rules of Evidence have eliminated the concept that a party calling or taking the deposition of a witness vouches for that witness and is barred from impeaching the witness.

Fed. R. Evid. 607 provides that the credibility of a witness may be attacked at trial by any party, including the party calling the witness. Fed. R. Evid. 611(c) provides that when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party at trial, interrogation may be by leading questions. Taking the deposition of a witness does not bind the party to frame questions as on direct examination.

## 3.    Use of Interrogatories

### a.    Applicable Federal Rule of Civil Procedure

Under Rule 33, a maximum of 25 written interrogatories, including "all discrete subparts," may be served upon any party. A question asking about communications of a particular type counts as one interrogatory, even though it requests the time, place, persons present, and contents separately for each communication. *See* Advisory Committee Notes to Rule 33(a). The limitation can be altered by local rule, order of the court, or stipulation of the parties. *See* Fed. R. Civ. P. 33(a).

**b.** **Form and Use of Interrogatories**

Each interrogatory must be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated. Unless the court rules or the parties agree otherwise, answers and objections must be served within 30 days after the service of the interrogatories.

An interrogatory is proper so long as it is directed at obtaining information reasonably calculated to lead to the discovery of admissible evidence relevant to the subject matter involved in the pending action. *See* Fed. R. Civ. P. 33(c), 26(b)(1). Under certain circumstances, a party may answer an interrogatory by specifying the records from which the answer may be ascertained and affording the serving party an opportunity to examine and copy such records. *See* Fed. R. Civ. P. 33(d). Where defendants respond to interrogatories by directing Division attorneys to a mass of business records, or even to all of the defendants' records, the response may be objected to since Rule 33(d) specifies that the option of producing records is permitted only where "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served." Further, Rule 33(d) requires that the answering party "specify" the records from which an interrogatory may be answered. Such specification must "be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained." Fed. R. Civ. P. 33(d). Interrogatories requiring statements of opinion or contentions may be helpful as a means of narrowing the issues and determining whether defendants will raise affirmative defenses. Such interrogatories are important in establishing what the affirmative defense is and how it is framed. In circumstances not involving affirmative defenses, it is usually the better practice for Division attorneys to avoid asking numerous and detailed "contention" interrogatories. The court may order that this type of interrogatory "need not be answered until after designated discovery has been completed or until a pre-trial conference or other later time." Fed. R. Civ. P. 33(c). Interrogatories are an important tool in obtaining information such as the identification of corporate officers, the company's business in the relevant products or geographical markets, names of personnel having information that is relevant to the subject matter of the action, the description and location of documents that may later be subject to a Rule 34 request, dates and places of meetings, and other information of material value to the extent not already collected prior to the filing of the complaint.

**c.** **Objections to Interrogatories**

Interrogatories that are objectionable in part must be answered to the extent not objectionable. *See* Fed. R. Civ. P. 33(b)(1). Grounds for objections must be stated with specificity and "[a]ny ground not stated

in a timely objection is waived unless the party's failure to object is excused by the court for good cause shown." Fed. R. Civ. P. 33(b)(4).

Claims of privilege must be made in writing and described with specificity. *See* Fed. R. Civ. P. 26(b)(5). A party claiming privilege must "describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." *Id.*

The courts tend to be quite liberal in requiring answers to interrogatories, and objections to those served upon the Division usually should be based on factors that create an undue burden or that would not lead to the discovery of evidence admissible at trial. Staff should be careful, however, not to waive any of the Division's rights with respect to information of a privileged nature.

### 4.    Requests to Produce Documents

#### a.    Applicable Federal Rule of Civil Procedure

Under Rule 34, a party may, without leave of court, serve upon any other party a request to produce and permit the inspection and copying of designated documents, not privileged, that are relevant to the subject matter of the action and which are admissible as evidence or appear reasonably calculated to lead to the discovery of admissible evidence. Rule 34 also permits service of a request to permit entry upon designated land or other property, such as a plant, for inspection, photographing, surveying or any other operation within the scope of Rule 26(b). Staff can also have an expert inspect the property.

Documents may be obtained from nonparties by subpoena issued under Rule 45, which may also command the respondent to appear at a deposition. Such a deposition may be useful to authenticate or explain the documents produced.

#### b.    Use of Requests to Produce Documents

Rule 34 requires that the request specify the items to be inspected either by individual item or by category and describe each item and category with reasonable particularity. The request must also specify a reasonable time, place, and manner of carrying out the inspection and copying.

The party upon whom the request is made is required to serve a written response within 30 days after service of the request, unless the court orders or the parties agree to a different time. Unless objection is made, the response must state, with respect to each item and category, that inspection and copying will be permitted as requested. If objection is made to the request, the reasons for the objection must be stated; if objection is made to only part of an item or category, the part shall be specified and inspection permitted of the remaining parts.

**c.      Drafting the Request**

Many of the same considerations that apply to drafting grand jury subpoenas *duces tecum* and documentary CIDs are equally relevant to Rule 34 requests. *See* Chapter VI, Part B. Requests should be as specific as possible. Careful consideration should be given to limiting the time frame of the documents requested. Under most circumstances, it is likely that some documents will have been obtained during the investigation stage by means of CIDs or premerger notification procedures. This may limit the need for extensive document discovery from defendants.

**d.      Compliance Procedures**

**i.       Limiting the Scope**

Attorneys for the parties frequently attempt to narrow the scope of document requests through negotiation. Good faith agreements of this nature are much preferred to time-consuming litigation over such matters. Information about the corporate filing system may permit agreements limiting file searches to specific locations or files. It may also be possible to exclude certain kinds of documents, such as invoices or other transaction documents. The terms of any negotiated agreement related to a Rule 34 request should always be reduced to writing, and staff should preserve its right to require production of all documents originally requested at a later time.

**ii.      On-Site Screening**

A preliminary screening at defendants' offices is one method of dealing with a large volume of documents that are responsive to a document request and of eliminating a great many unimportant documents. Moreover, defendants' employees and attorneys are available to answer questions and facilitate the review.

Conversely, there is a tendency during such on-site screenings to move too fast, thereby missing some important documents. The better procedure is to use such screenings to eliminate voluminous, clearly unnecessary categories of documents and to reserve remaining documents for more deliberate review later.

**iii.     Requiring Originals or Copies**

Staff should require the production of originals for inspection and copying. While originals are preferable to copies, the differences in quality are often not significant, assuming the defendant has made a good faith effort to provide good copies. Division attorneys may well decide to accept delivery of copies in their offices, reserving the right to inspect originals. This may be advantageous if defendants also agree to number and segregate the documents.

### iv.    Numbering and Sorting

Numbering documents facilitates their control. In most cases it is obviously preferable for defendants to number the documents, and defendants usually desire to do so for their own organizational purposes. The request should describe the numbering system staff prefers. The documents should be numbered so that they are distinguishable from second request and CID documents.

### v.    Privileged Documents; Confidentiality

The Rule 34 request should require identification of all documents withheld on any basis of privilege, using a form similar to those used for grand jury subpoenas or documentary CIDs.

Defendants may also desire to limit the Division's use of documents containing competitively sensitive or highly confidential information. In evaluating the defendants' request for protection, staff should consider the Government's preference for open proceedings, the age of the information the defendants seek to protect, and the significance of the information in the case. *See United States v. IBM*, 67 F.R.D. 40 (S.D.N.Y. 1975). Under appropriate circumstances, the Division will enter into agreements to protect the sensitive portions of documents, and, pursuant to Rule 26(c), move for a protective order. Protective orders should not be broader than necessary to protect the parties' legitimate interests and should not significantly interfere with the conduct of discovery or trial. Staff should always consult with the FOIA/PA Unit before entering into agreements for protective orders. *See also* Chapter III, Part E.6.b.(5)(c).

In appropriate circumstances, staff may agree to provide defendants with notice of the intention to disclose such documents to third parties. Such agreements should be reduced to writing and specifically exclude economists, computer personnel, or other individuals working for the Division on a contractual basis. The agreement should be drafted to avoid committing the Division to procedures that would significantly affect the use of such information at trial or in pretrial depositions with third parties that are important to the Government's case.

This issue is often raised during discovery conferences. The Division customarily opposes sealing or otherwise limiting access to the trial record by the public, although the Division is amenable to protection of third parties' confidential information when such protection can be provided without compromise of the need to have the case tried in open court (*e.g.*, redaction of confidential information irrelevant to the case from exhibits). *See* 28 C.F.R. § 50.9.

## 5.    Requests for Admissions

Under Rule 36, a party may serve upon any other party a request for the admission of the truth of any matter, not privileged, that is relevant to the subject matter of the pending action and that relates to statements

or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request and served with it.

Rule 36 is designed to reduce trial time by eliminating issues from the case and by facilitating proof with respect to issues that cannot be eliminated. A party denying a requested admission may be subject to court ordered payment of the expenses, including attorneys' fees, incurred by the party in proving the matter at trial. *See* Fed. R. Civ. P. 37(c)(2).

A request for admission must set out separately each matter as to which an admission is requested, and the matters are deemed admitted unless the party to whom the request is directed serves upon the requesting party a written answer or objection within 30 days after service of the request, unless the court orders or the parties agree to a different time schedule.

Under Rule 36, the effect of admitting a matter is to establish the truth or genuineness of that matter for the purpose of the pending action. It is not an admission for any other purpose and may not be used against the admitting party in any other proceeding. Rule 36 also authorizes the court to permit the withdrawal or amendment of an admission under appropriate circumstances. The Rule does not require that answers to requests for admissions be sworn; it merely requires the answers to be signed by the party or by his or her attorney.

Rule 36 requests for admission are typically used less often than the more common discovery devices of depositions, interrogatories, and document requests. Such requests can, however, aid significantly in identifying and narrowing issues in a complex case. Rule 36 requests can most efficiently be used as part of a comprehensive pretrial plan for resolution of issues, and such a program should be subject to close supervision by the court.

The requests for admission may be used in conjunction with other pretrial devices, such as statements of contentions and stipulations of fact.

### 6.     Disclosure of Expert Testimony

At least 90 days before trial (absent other direction from the court or stipulation by the parties), parties must disclose the identity of any expert witnesses to be used at trial. *See* Fed. R. Civ. P. 26(a)(2). If the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party in an expert report, the disclosure of expert testimony shall be made within 30 days after the disclosure made by the other party.

An expert witness disclosure must include a written report, prepared and signed by the expert, containing:

a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support of the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B).

Amendments to Rule 26 (effective December 1, 2010) clarify the scope of permissible discovery relating to testifying experts. Draft expert reports and communications between counsel and the expert are afforded work product protection as trial preparation materials and are therefore not discoverable absent a showing of special need. Fed. R. Civ. P. 26(b)(4)(B). However, any facts provided to the expert that are "considered in forming the opinions to be expressed" or any assumptions provided "that the expert relied on in forming the opinions to be expressed" are discoverable even if provided by counsel. Fed. R. Civ. P. 26(b)(4)(C).Until court rulings clarify the scope of these changes, caution should be exercised to ensure that potentially discoverable communications with the expert are preserved.

An expert may not be deposed until the required report has been submitted. *See* Fed. R. Civ. P. 26(b)(4)(A). The parties have a continuing duty to supplement or correct the disclosure of expert testimony (as contained in the expert report or provided through a deposition of the expert) whenever the party learns the information is incomplete or incorrect. *See* Fed. R. Civ. P. 26(e)(1). The supplementary or corrected information must be provided at least 30 days before trial, unless otherwise directed by the court. *See* Fed. R. Civ. P. 26(e)(1), (a)(3).

### 7.    Disclosure of Witnesses and Exhibits

Unless otherwise directed by the court, parties must identify all witnesses and exhibits to be used at trial at least 30 days before trial, except if they are to be used solely for impeachment. *See* Fed. R. Civ. P. 26(a)(3).

### 8.    Continuing Duty to Correct and Supplement Disclosure

As with expert testimony, parties have a continuing duty to notify the other parties in writing if they learn that information disclosed is incomplete or inaccurate and if the additional or corrected information has not otherwise been made known to the other parties through discovery or in writing. Prior responses to an interrogatory, request for production, or request for admission must be amended if the party learns that the response is materially incomplete or incorrect. *See* Fed. R. Civ. P. 26(e).

### 9.    Motions to Compel

If the party or person on which discovery is served objects, or if an answer is evasive or incomplete, the burden is on the party seeking discovery to move to compel compliance under Rule 37(a). The exception to this rule is that any party may move to compel if a party fails to provide the initial disclosure required by Rule 26(a). Motions to compel may only be made to the forum court, unless they are directed to nonparty witnesses outside the forum. *See* Fed. R. Civ. P. 37(a)(1). A motion to compel must include a certification that parties have in good faith conferred or attempted to confer to resolve the dispute. *See* Fed. R. Civ. P. 37(a)(2)(B).

If the motion to compel is granted or if the response is provided after the motion is filed, the court "shall" impose sanctions, including costs. The court need not do so if the withholding was "substantially justified" or if the movant failed to make a good faith effort to resolve the dispute before seeking a court order. *See* Fed. R. Civ. P. 37(a)(4).

A party that does not disclose information required under Rule 26(a) (initial disclosure) or 26(e)(1) (expert testimony) without substantial justification may be barred from using the information or witness as evidence, unless the failure is harmless. The jury may be informed of the failure to disclose. *See* Fed. R. Civ. P. 37(c)(1).

Rule 37 also provides that a failure by any party to participate in good faith in the development and submission of a proposed discovery plan as required by Antitrust Division Manual, Fourth Edition Rule 26(f) may subject that party to the reasonable expenses, including attorneys' fees, caused by the failure. *See* Fed. R. Civ. P. 37(g).

## D.    Negotiating and Entering Consent Decrees

In general, adequate relief in a civil antitrust case is relief that will (1) stop the illegal practices alleged in the complaint, (2) prevent their renewal, and (3) restore competition to the state that would have existed had the violation not occurred. Normally, the Government is entitled to any relief that is reasonable and necessary to accomplish these ends. While the scope of relief obtained in prior antitrust cases may be viewed as precedent, the theory behind equitable relief is that it should be fashioned to fit the particular facts of the case at issue.

It is often possible to obtain effective relief without taking the case to trial. This section describes the procedures used by the Antitrust Division in negotiating and entering civil consent judgments under the Antitrust Procedures and Penalties Act of 1974, 15 U.S.C. § 16 (APPA, Act, or Tunney Act).

### 1.    Antitrust Procedures and Penalties Act

The APPA was enacted in 1974 and amended in 2004. The APPA subjects the Division's consent judgments to public scrutiny and

comment. The Division must ensure complete compliance with the requirements of the APPA.

### a.     The Competitive Impact Statement

The first significant requirement of the APPA is that the Government file with the court a Competitive Impact Statement (CIS) at the time the proposed consent judgment is filed. This document must be self-contained, setting forth the information necessary to enable the court and the public to evaluate the proposed judgment in light of the Government's case. Its object is to explain why the proposed judgment is appropriate under the circumstances and why it is in the public interest. Because the CIS is directed to the public, as well as to the court, it should be written in a narrative style that avoids technical jargon. As a general rule, the CIS should not use extensive verbatim quotations from the complaint and judgment. Rather, care should be taken to make the CIS as understandable and persuasive as possible. Although the CIS should be tailored to each matter, the Division has developed standard language that should be used to reduce the drafting burden.

The CIS is the Division's explanation of its case, the judgment, and the circumstances surrounding the judgment. Therefore, it should not be the subject of discussion or negotiation with defense counsel, and defense counsel will not be permitted to review the CIS prior to its filing with the court.

The APPA requires that the CIS "recite" certain topics, and all CISs are organized according to the statutory requirements: (1) the nature and purpose of the proceeding; (2) a description of the practices giving rise to the alleged violation; (3) an explanation of the proposed final judgment; (4) the remedies available to potential private litigants; (5) a description of the procedures available for modification of the judgment; and (6) the alternatives to the proposed final judgment considered by the Division. Although the statute does not specify that the CIS must discuss determinative documents, a seventh section on determinative documents is usually added to the CIS as this is a convenient place to publicly state what the determinative documents are or, more commonly, that there are no determinative documents. *See Massachusetts School of Law v. United States*, 118 F.3d 776, 784-85 (D.C. Cir. 1997) (discussing what qualifies as a determinative document). CISs also routinely discuss the standard of judicial review under the Tunney Act, even though this discussion is not required by the APPA.

The CIS's description of the nature and purpose of the proceeding and the practices or events giving rise to the alleged violation should go beyond the allegations in the complaint. The CIS should describe the defendants, the trade and commerce involved, and the challenged activity in sufficient detail to convey the essence of the alleged violation. For instance, in a merger case, the industry, the parties'

relationship to the industry and to each other, and the theory of the violation should be explained. In a nonmerger case, the CIS should make clear what the defendant did and explain the resulting competitive harm. The Division drafts CISs not only to meet the requirements of the APPA, but also to provide the bar with useful instruction and guidance on the Division's enforcement intentions.

The CIS should describe the proposed relief in a manner that the public will understand. All material provisions of the proposed judgment should be discussed. The reasoning behind the Division's acceptance of the proposed relief and the anticipated competitive effect of the relief must also be set forth. Although this discussion should be persuasive, it should be candid as well.

The CIS must also describe and evaluate alternative forms of relief actually considered. This does not mean that negotiated language changes must be discussed unless such changes significantly alter the judgment's scope. Similarly, defendant's proposals which were unacceptable need not be discussed, unless they would have provided significantly broader relief than that ultimately accepted. Even if a proposal met either of these two criteria, in general it would not qualify as an alternative form of relief actually considered unless it was (a) in the prayer of the complaint, (b) submitted to defense counsel in writing during negotiations, or (c) submitted to the Assistant Attorney General in final form for approval. In rare instances, a seriously considered alternative that does not meet these three criteria may exist (*i.e.*, where extended negotiations were conducted with the defendant concerning a specific relief proposal). In such cases, staff should consult with the chief, the Director of Civil Enforcement, and the General Counsel about whether it is appropriate to include a discussion of that proposal in the CIS. The discussion of alternatives and the Division's reasons for not adopting them should be candid.

The court must approve the relief accepted by the Government if it is within the "reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461-62 (D.C. Cir. 1995) (citations omitted). In making that determination, the Court is required to consider:

- The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

- The impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the

complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the Government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.,* 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F.Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act). "More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree." *United States v. Bechtel Corp*., 648 F.2d 660, 666 (9th Cir. 1981) (citations omitted). With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc*., 858 F.2d 456, 462 (9th Cir. 1988) (citing *Bechtel Corp*., 648 F.2d at 666); *see also Microsoft*, 56 F.3d at 1460-62. Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint. The United States District Court for the District of Columbia recently confirmed in SBC Communications, that courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: [t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.

The CIS must also discuss the remedies available to potential private plaintiffs. This discussion will be brief and in most instances will be standardized.

**b.    Materials and Documents**

The APPA requires the Division to file with any proposed consent judgment all materials and documents considered determinative in formulating the judgment. This is to be distinguished from materials and

documents supportive of the litigation. *See Massachusetts School of Law v. United States*, 118 F.3d 776, 784-85 (D.C. Cir. 1997). In most cases, the relief is determined by the sum total of the Division's investigation and evidence. There will seldom be any particular document or documents that influenced the formulation or rejection of a particular item of relief. The materials and documents to be filed, if any, might consist of submissions by the defendants or other persons, including other Government agencies or experts' studies that were determinative in formulating the judgment, or contracts that embody the terms of a divestiture. Staff should consult with the Director of Civil Enforcement and the General Counsel if there is any question about interpreting this requirement in a given case.

**c.      Publications in the Federal Register**

The APPA requires that the proposed judgment and the CIS be published in the Federal Register "at least 60 days prior to the effective date of such judgment." There is, however, at least a five-working-day delay between submission of materials to the Federal Register and their publication. Because the Division does not request publication until the filings are made with the court, there consequently will usually be at least an additional five days added to the 60-day waiting period.

The APPA also requires that before the judgment can be entered, the Division must publish in the Federal Register any public comments the Division receives about the proposed judgment during the notice and comment period and the Division's reply to them. The Division may respond to each comment directly by letter and attach each letter to a court filing, or it may have a choice unified response. Although which choice is appropriate depends on the circumstances, it is generally preferable to answer comments by a single response, filed and published, if possible, before the expiration of the waiting period. If meeting that target date is not practicable because of, for example, the actual or possible receipt of comments just prior to the close of the waiting period, the Division should file and publish all comments and one unified response as promptly as possible after the period has expired. As a matter of policy, the Division calculates the 60-day comment period from the date of publication in the Federal Register, or the last date of publication in the newspaper, whichever occurred later.

The Office of Operations will arrange for the necessary Federal Register publications. Federal Register notices are standardized, and should be prepared for the signature of the Director of Civil Enforcement. *See* Sample Federal Register Notice. This sample is typical of a merger case requiring a divestiture. Notices for civil nonmerger cases are similar but tend to exhibit more variation given the diversity of practices being challenged and of proposed relief. Staff can obtain copies of recent published Federal Register notices from the appropriate special assistant.

### d.    Newspaper Publication

The newspaper notices required by the APPA, which summarize the proposed judgment and CIS and outline procedures available for the submission of comments, must begin appearing at least 60 days prior to the effective date of the judgment and must appear in the legal notice section. To provide interested persons with at least 60 days to submit comments, the Division calculates the 60-day comment period from the date of publication in the Federal Register, or the last date of publication in the newspaper, whichever occurred later.

Newspaper notices should be brief—if at all possible limited to 30 typewritten lines—to reduce the costs of publication. *See* [Sample Newspaper Notice](). As with the sample Federal Register notice, the same newspaper notice is typical of a merger case requiring a divestiture. Staff can obtain copies of recent notices from the appropriate special assistant.

The APPA requires that in every case a newspaper notice be placed in a newspaper in general circulation in the district where the action was filed and in a newspaper of general circulation in the District of Columbia. The Court may also order additional publications. Normally, the defendants are expected to arrange and pay for publication of a newspaper notice written by the Division in its sole discretion. The defendants are also required to submit the necessary affidavits of publication that will provide the basis for the Division to certify to the court that such publication has occurred.

Because newspapers occasionally fail to publish a notice or do so inaccurately, staff should check the text of the copy of the notice that the defendants will send them from the newspaper in which publication is made, to ensure the correctness of the notice. If the newspaper notice is incorrect, the Office of Operations should be notified immediately and the defendants should be advised to take corrective action.

## 2.    Internal Procedures

It is the general practice of the Division not to begin settlement discussions until the Assigned DAAG has decided that there is good cause to believe that the antitrust laws have been broken. Once defense counsel has broached the issue, however, the component to which the case is assigned is free to prepare a proposed first draft of a judgment if its chief believes it is advisable for the Government to make a proposal.

The chief and the staff must submit to the Director of Civil Enforcement any written settlement proposal they want to submit to defense counsel. Under no circumstances should a draft settlement proposal be submitted to the defendants without the approval of the Director of Civil Enforcement and concurrence of the General Counsel and the Assigned DAAG.

Judgment negotiations are conducted by staff under the immediate supervision of the chief. In some cases, the negotiations will be fairly straightforward and follow the general parameters of the original written settlement proposal. Where negotiations raise significant issues that were not addressed in drafting the original proposal, staff should seek further consultation with the Director of Civil Enforcement, the General Counsel, and the Assigned DAAG. The chief should provide a summary of the new issues involved, describe any areas of disagreement, and recommend the appropriate scope of relief.

Staff should make clear to defense counsel that final authority to approve the judgment rests with the Assistant Attorney General and, pursuant to the APPA, the judgment is subject to withdrawal or change at any time prior to its formal entry by the court. Defense counsel should also be advised that the APPA requires each defendant to file a description of specified oral and written communications with the Government concerning the decree. 15 U.S.C. § 16(g). Defense counsel should also be informed that they will not be permitted to review court papers, other than the proposed judgment and hold separate stipulation and order, prior to filing with the court.

In preparing its proposed draft decree, staff should consult the Division's Internet site and Work Product Document Bank for form and language used by the Division in its recent decrees. For merger decrees, staff should start with the model consent decree. Once staff's proposed draft decree has been approved, staff should conduct negotiations consistent with the overall plan of relief contained in the approved draft. Staff may consult informally with the Director of Civil Enforcement and the General Counsel to determine current Division practice and alternative relief proposals. Also highly useful to staff in framing appropriate relief is the [Division's Policy Guide to Merger Remedies](#).

With regard both to the preparation of proposed draft decrees by staff as well as to decree proposals that may be made by defendants, note that the Division's standard decree language requires that the consent decree expire on the tenth anniversary of its entry by the court. Staff should not negotiate any decree of less than 10 years' duration absent unusual circumstances and the approval of the Front Office, although decrees of longer than 10 years may be appropriate in certain circumstances.

When the proposed final version of the consent judgment is submitted for approval, the chief will submit a recommendation to the Director of Civil Enforcement. The recommendation should be processed through the General Counsel and the Assigned DAAG and requires the approval of the Assistant Attorney General. The recommendation should include all necessary papers, including the stipulation, the decree, the competitive impact statement, the Federal Register, and the proposed press release. The Federal Register notice should be prepared for the

signature of the Director of Civil Enforcement. All papers should be forwarded for review with the recommended consent judgment. In many merger cases, a hold-separate order has been appropriate. The hold-separate order and stipulation should be combined into the same document.

At the time of filing the judgment with the court, the requirements of the APPA and the procedures for complying with the Act should be explained to the court by filing an explanation of the procedures, with a copy to counsel, if local practice permits. It should be emphasized that the waiting period may exceed 60 days because of the publication requirements and the possibility of receiving last-minute comments and that the judgment cannot validly be entered before the comment period is complete. The court should not sign and enter the decree until the requirements of the APPA have been met. Staff will file a certificate of compliance when the requirements are met. The Office of Operations must be notified immediately after the case has been filed and provided with the name of the judge and the file number. In addition, the Office of Operations must be notified as soon as the decree has been entered.

### 3.    Consent Decree Checklist

Staff should keep track of the various requirements of the APPA for each consent decree. *See* sample checklist.

### 4.    Consent Decree Standard Provisions

The Antitrust Division uses a number of decree provisions that are essentially standardized in form and that appear in virtually all decrees. Such provisions cover matters such as the form of stipulation, the preamble to the decree, jurisdictional and applicability clauses, notice of corporate changes provisions, the visitorial clause, the term of the judgment, and retention of jurisdiction. Division decrees also contain provisions (*e.g.,* the compliance provisions) that may vary somewhat from one decree to another, due to the nature of the violation alleged or the specific circumstances of the industry or defendant involved. To ensure appropriate Division consistency in the selection and wording of decree provisions, staff should always (1) consult the Division's Policy Guide to Merger Remedies, (2) review several of the most recent decrees contained in the Division's Internet site and Work Product Document Bank that closely parallel the case being settled; and (3) obtain from Operations the current standardized decree provisions. The Work Product Document Bank may also be reviewed to obtain recent copies of pleadings that are filed with the court during the process of entering consent decrees.

### 5.    Certificate of Compliance with Provisions of APPA

Upon completion of compliance with the APPA, staff should file a Certificate of Compliance setting forth precisely how compliance was accomplished. *See, e.g.,* sample Certificate of Compliance, United

State's Revised Certificate of Compliance with the Antitrust Procedures and Penalty Act *(United States v. Alcan Inc., et al)*. The Certificate serves as a check-off schedule, assuring that compliance has actually been effected and serving as a court record of that compliance. When appropriate, staff may wish to send an accompanying letter to the court explaining the significance of the Certificate of Compliance.

At the time of filing the proposed Final Judgment, counsel for each of the defendants should be reminded of his or her responsibilities under Section 16(g) of the APPA. If there have been no reportable communications, counsel should file a statement to that effect. Because the Certificate of Compliance certifies compliance with the APPA, staff should ascertain that the necessary filings have been made under Section 16(g).

Because circumstances in each case will vary and the Antitrust Division does not have complete control of the mechanics of complying with the APPA, there should be constant communication during this period between the office of the appropriate Director of Enforcement and the section or field office handling the case in order to prevent mistakes.

## 6.  Collection of Taxpayer Identification Numbers in Certain Civil Actions

The Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, § 31001, 110 Stat. 1321-1 - 1321-43, (DCIA) provides that Federal agencies shall require each person doing business with that agency to furnish to that agency such person's Taxpayer Identification Number (TIN). "Doing business with" is defined by the DCIA to include entities that have been assessed a fine, fee, royalty, or penalty by the agency. *See* 31 U.S.C. § 7701. The Department has determined that this provision applies to civil penalties and damages imposed in cases litigated by the Department. Therefore, in Antitrust Division cases in which a civil penalty has been imposed, such as an action under 15 U.S.C. § 18a(g)(1) to enforce the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, or in which damages have been imposed, such as a treble damage action under 15 U.S.C. § 15a, the Division must obtain each liable defendant's TIN.

The DCIA further requires that each person from whom a TIN has been obtained pursuant to the above provision be notified of the agency's intent to use such number for purposes of collecting and reporting on any delinquent amounts arising out of such person's relationship with the Government. Therefore, in any civil action brought by the Division that results in the imposition of a fine or damages, whether by consent decree or litigated judgment, the sample TIN letter (or one substantially similar) should be sent to a representative of each party that is liable to pay such fine or damages, with two possible exceptions.

The first exception is where the Division already has a party's TIN and knows that the party has been notified that its TIN may be used to assist

in collecting delinquent moneys owed the Government. This may be the case, for example, in certain HSR enforcement actions if the FTC has previously acquired a party's TIN (or required its submission as part of a premerger notification filing) and has given the party notice of its possible use for DCIA purposes. The second exception concerns parties, likely to consist largely of foreign persons and corporations that do not possess taxpayer identification numbers. In these cases, the Division is not required to comply with the TIN notification requirement.

### 7.    Dismissal of Filed Complaints

The Division has dismissed filed complaints during Tunney Act proceedings on rare occasions, such as when the parties abandoned a proposed merger. The Division has dismissed such cases by filing a notice of dismissal pursuant to Rule 41 of the Federal Rules of Civil Procedure. Filing a Rule 41 notice is appropriate when no defendant has filed an answer or a motion for summary judgment, even if the parties have appeared in court and engaged in discovery. Rule 41 also allows for dismissal of an action by filing a stipulation of dismissal signed by all parties who have appeared in the action.

## E.    Procedures and Suggestions for Litigating a Civil Case

### 1.    Simplifying and Expediting Civil Litigation

Division attorneys should endeavor to expedite and streamline civil litigation to the greatest extent practicable, consistent with obtaining a fair trial and a full opportunity for both sides to present a case. While the following suggested procedures are not mandatory and may not be appropriate in every case, they are procedures that experience has demonstrated to be helpful in many cases. Staff should also consider in each case other ways of simplifying litigation. Judicial management and the cooperation of the parties should result in a speedy and fair determination of the issues in controversy and effective resolution of the suit.

- It is preferable if the Federal district judge assigned to the case handles all decisions in the case. This will familiarize the judge with at least some aspects of the case prior to trial. There are, however, circumstances where the judge may wish to use a magistrate to supervise certain pretrial matters, particularly discovery. Subject to local rules, a court may designate a special master for certain matters and, with the consent of the parties, a magistrate may serve as a special master without regard to the limitations of F.R.C.P. 53(b). *See* 28 U.S.C. § 636(b)(2); 28 C.F.R. § 52.01(a). The Division may determine, on a case-by-case basis, the type of argument that will be made either proposing or opposing the use of a magistrate or special master, but Departmental policy encourages their use. *See* 28 C.F.R. § 52.01(b).

- Close supervision and control by the court of procedures should be encouraged as a means to curb undue delay and abuse of discovery. Division attorneys should give serious consideration to moving for relief under Rule 37 when faced with unreasonable discovery demands or recalcitrance by defense counsel in responding to discovery requests, since the court must be made aware of wasteful and dilatory pretrial techniques and the need to control the situation.

- Stipulations of objective facts should be sought to the maximum extent possible in litigation, time permitting. This may limit substantially the number of witnesses and exhibits introduced at trial. In merger cases, staff should, at a minimum, seek stipulations regarding jurisdiction, venue, interstate commerce, and market shares. Time constraints may prevent staff from spending time preparing, reviewing, or negotiating other stipulations.

- Judicial notice should be sought when appropriate. The possibility of judicial notice can help overcome the hesitancy of counsel to stipulate the facts that are not substantially disputed. *See* Fed. R. Evid. 201(b), (c), (f).

- Partial or full summary judgment under Rule 56 in some cases may expedite litigation by narrowing, resolving, or eliminating issues, reducing the scope of discovery, shortening the length of trial, and increasing settlement prospects. In civil nonmerger cases, it is almost always advisable to seek summary judgment on some issues.

- In a merger case, staff should evaluate the pros and cons of seeking or opposing an order consolidating the PI hearing with a trial on the merits pursuant to Rule 65(a)(2). Although consolidation could give staff a longer preparation period before evidence is presented to the judge, staff should prepare so that they can proceed to obtain a PI quickly if necessary. If staff proceeds with a PI followed by a trial on the merits, the combined court preparation time for the two proceedings may in fact be longer than would precede a consolidated hearing.

- Trial proof should be simplified and streamlined in advance of trial. Staff should consider filing motions *in limine* or preparing bench memos on legal issues that they anticipate arising during trial.

- Relief issues should be considered from the earliest stages of the discovery process. The manner of discovery and pretrial activity should concentrate heavily on the relief to be sought if the Division prevails on the merits. The Division's major reason for challenging behavior or structure by a civil suit is to obtain adequate relief; in civil nonmerger cases, relief may be a difficult issue. Information that will assist the Division in establishing evidence to support such relief should be organized and determined early in the process.

## 2.    Summary Judgment

In many civil cases, either the Division or the defendants may move for summary judgment in order to expedite a decision on the issues in the case. Either partial or full summary judgment motions are proper in certain circumstances. Rule 56 provides for the timing and requirements of the motion. The local rules of the district should also be consulted in preparing for summary judgment.

Before making a motion for summary judgment, staff should consult with the chief. If the chief approves the request, it should be sent to the Director of Litigation and the Assigned DAAG for approval before filing. A copy of the motion papers and accompanying affidavits and exhibits should be approved by the chief and submitted to the appropriate Director before staff informs any party of the Division's intention to move for summary judgment.

Examples of summary judgment motions and briefs, both in support of Government motions and in opposition to defendants' motions, may be obtained from the Work Product Document Bank on ATRnet, the FOIA/PA Unit, or the appropriate special assistant.

## 3.    Civil Antitrust Trial Methods and Procedures

This chapter has concentrated on the pretrial procedures that are central to any civil antitrust case. As to the conduct of the trial itself, there are numerous handbooks and guides that discuss trial methods and skills. One of the best practical sources is the Handbook of the Attorney General's Advocacy Institute. The Handbook sets out in detail methods used in civil trials, including suggestions for opening statements, closing arguments, cross-examination, and examination of expert witnesses. In addition, the Handbook offers a series of checklists and suggested models for admission of demonstrative evidence and documentary evidence, including suggestions for laying the foundation for admission of business records and summaries, the impeachment of witnesses, objections, trial motions, and rebuttal evidence.

The Handbook describes how to prepare trial witnesses and how to prepare and negotiate stipulations. Preparation for direct examination of Government witnesses and anticipation of cross-examination of defense witnesses is also discussed in the Handbook.

In addition to the Handbook, trial staffs should consult Chapter VI.B regarding specific skills, including advice for preparing Government experts for direct and cross-examination. That section also describes the Division resources available to support trial staffs in developing and presenting their cases.

Staff should always consult with the field office with responsibility for the district where the trial is held and with the U.S. Attorney's Office and the clerk of the court in that district to determine local procedures. Familiarity with local custom and practice will assist staff in presenting

its case. Staff should also attempt to obtain a clear statement of the procedural aspects of the trial at the final pretrial conference or in a pretrial order. Especially significant are local rules and practices of the district or circuit regarding the manner in which co-conspirator declarations are admitted into evidence and the manner in which the court admits testimony of expert witnesses. At all times, staff should make timely objections or motions to protect the Division's position in the event of an appeal.

Prior to filing, staff should annotate an order of proof with CID depositions, documents, interviews, and declarations. The annotation process should continue post filing with exhibits and the results of discovery. The factual points will become more refined through this process and more numerous, as points are broken down into subparts. The annotation process should continue during trial through digesting of trial transcripts and exhibits, so that staff has a preliminary set of findings of fact by the end of trial. This process will assist staff in preparing its briefs and final arguments. They are also extremely valuable for use in the appellate process.

The trial itself is based on the preparation and analysis that have preceded it. It is important to be as completely prepared for the proceedings as possible, remembering that the Division is not only an advocate for a position but the representative of the Attorney General and the Government in the courtroom.

## F.    Criminal Litigation

A significant number of Antitrust Division cases that are litigated are brought as criminal violations of Section 1 of the Sherman Act. Although this section of the manual is not intended to set forth all of the issues relevant to proper preparation for a criminal trial, the Division's collective experience has identified a number of common problems and procedures that have arisen in Division criminal cases. Among other topics, this section sets forth suggested methods that attorneys in the Division have used in: (a) conducting pretrial discovery; (b) making and opposing pretrial motions; (c) preparing trial briefs; (d) selecting a jury; and (e) opposing defense motions for judgment of acquittal and other post-trial motions. This section also discusses the Division's practice of making sentencing recommendations to the court. The materials in this section are intended only as a broad overview of methods of approaching criminal litigation issues. Trial staffs also should consult:

- The Work Product Document Bank on ATRnet, the FOIA/PA Unit, or the Office of Operations for pleadings, briefs, and transcripts from earlier Division criminal cases.

- The United States Attorneys' Manual.

- Chapter II of this manual.

- ABA, Criminal Antitrust Litigation Handbook (2d ed. 2006).

### 1. Drafting the Indictment

Copies of indictments used by the Division in previous cases may be found on the Division's Internet site, in the Work Product Document Bank on ATRnet, in the files of each field office and section that does criminal work, and in the FOIA/PA Unit. If staff is considering charging violations not routinely charged or if there are unusual facts that need to be explained in the indictment, the Office of Operations should be contacted for advice. That office may be able to refer staff to sample indictments with similar violations or facts. Other information concerning specific charging matters is found at United States Attorneys' Manual § 9-12.000.

### 2. Returning the Indictment

Staff should consult with the U.S. Attorneys' Office or the clerk of the court in the district where the indictment is to be returned about any peculiarities of local practice, such as forms that must be completed at the time of indictment.

After the indictment is returned, staff must notify the Office of Operations immediately and provide the docket number and the name of the judge, if available. The Office of Operations will inform the Office of Public Affairs, which will issue the press release. Staff should not make any statements to anyone concerning the indictment until the Department's press release is issued in Washington and, thereafter, press inquiries should be handled in accordance with the policies set out in Chapter VII.H. Staff may give a copy of the proposed press release to the U.S. Attorney in the relevant district in advance of the return of the indictment.

Once the Office of Operations has been notified, it is customary for staff to call counsel for each defendant, inform them that an indictment has been returned, and give them the date of arraignment, if known. This courtesy is intended to give notice to defense counsel and defendants before they learn about the indictment from the news media. Upon return of an indictment in open court, a summons ordinarily will be issued to each defendant who agrees in advance to appear for arraignment at a specified time. *See* Fed. R. Crim. P. 9. In cases where a defendant does not agree to appear for arraignment before a summons is issued, an arrest warrant will be issued and executed by a U.S. Marshal.

### 3. The Arraignment

Under most local rules, an arraignment will take place on a date certain after the return of the indictment. Neither the Federal Rules of Criminal Procedure nor the Speedy Trial Act requires that arraignment occur within a set period after indictment. At the arraignment, staff should be prepared to respond to pleas of *nolo contendere* that may be tendered, discuss bail or release on personal recognizance, and take a position on

such procedural details as photographing and fingerprinting the defendants. The Division follows the procedures of the local U.S. Attorney's Office and U.S. Marshal's Office.

The Division will oppose pleas of *nolo contendere* at the arraignment. For Department and Division policy on the subject of *nolo* pleas, *see* Principles of Federal Prosecution, United States Attorneys' Manual §§ 9-27.500 - .530.

At arraignment, the court may establish a briefing schedule for pretrial motions and set a trial date. Staff should be prepared to state its position with respect to the timing of pretrial discovery, trial, and other matters that can be anticipated. Under normal circumstances, staff should argue for an early trial date. Staff should also be mindful of the 70-day trial deadline under the Speedy Trial Act, 18 U.S.C. § 3161(c)(1). Failure to comply with the Speedy Trial Act deadlines, even if due to an error on the part of the court or the clerk's office, may result in dismissal of the indictment.

### 4.    Pretrial Discovery and Motions

The local rules in most districts set a timetable for pretrial criminal discovery and motions practice. In some districts, the local rules require that an informal discovery conference take place within a certain period after arraignment. Because of the timing of these conferences and the desire to expedite pretrial procedures, staff should evaluate what information is required to be disclosed to the defendants and prepare to have the information available as soon as practicable. One alternative to this procedure is to negotiate a stipulation governing discovery. Such stipulations are quite helpful in achieving a wide range of objectives for both sides that go beyond conventional discovery. For a more detailed discussion of both prosecution and defense discovery and motion practice, *see* ABA, Criminal Antitrust Litigation Handbook, Chs. VI - X (2d ed. 2006).

Typical requests for pretrial discovery by defendants may include the materials and information discussed below. Pursuant to the Antitrust Division's Criminal Discovery Policy, discussed below, Division attorneys should typically begin making Rule 16 discovery material available immediately following indictment without waiting to receive a formal request from the defense. Also, as discussed below and as set forth in the Division's Criminal Discovery Policy, it is the practice of the Division to provide discovery beyond what the rules, statutes, and case law mandate.

#### a.    Statements of the Defendant

Under Fed. R. Crim. P. 16(a)(1)(A) & (B), defendants are entitled, upon request, to all of their prior statements in the possession of the Government. The rule applies to four types of statements: (1) the substance of any other relevant oral statement made by the defendant

in response to interrogation by any person then known by the defendant to be a Government agent if the Government intends to use the statement at trial; (2) any relevant written or recorded statement made by the defendant; (3) that portion of any written record containing the substance of any relevant oral statements made by the defendant in response to interrogation by any person then known by the defendant to be a Government agent; and (4) any grand jury testimony of the defendant relating to the offense charged.

In the case of corporate defendants, Fed. R. Crim. P. 16(a)(1)(C) provides that the defendant corporation may obtain any of the above types of statements of any witness who the Government contends: (1) was, at the time of making the statement, so situated as a director, officer, employee, or agent as to have been legally able to bind the defendant corporation in respect to the subject of the statement; or (2) was, at the time of the offense, personally involved in the alleged illegal conduct and so situated as a director, officer, employee, or agent as to have been legally able to bind the defendant corporation with respect to the alleged conduct in which the person was involved.

### b.   Prior Criminal Record of the Defendant

Fed. R. Crim. P. 16(a)(1)(D) provides that the defendant's prior criminal record should be made available to the defendant. Staff should request FBI assistance to obtain the prior record of each defendant and check with the Office of Operations to determine the past criminal antitrust record of corporate and individual defendants. Staff should provide this material to the defendants after FBI and Division checks are completed.

### c.   Documents and Tangible Objects

Under Fed. R. Crim. P. 16(a)(1)(E), a defendant, upon request, may obtain access to items such as books, papers, documents, photographs, and tangible objects within the possession of the Government that are material to the preparation of the defense, are intended for use by the Government as evidence in chief at trial, or were obtained from, or belong to, the defendant. The courts have interpreted the meaning of documents "material to preparing the defense" in various ways. A determination of what must be disclosed to the defense under this provision depends upon the facts of each particular case.

Under this provision, staff will usually provide defendants with its trial exhibits on a date certain before trial. When the Division discloses its trial exhibits under this provision, it should invoke the provisions of Rule 16(b)(1)(A) and obtain a written commitment from defense counsel for reciprocal discovery of all defense trial exhibits by a date certain prior to trial.

Defense counsel often argue that they cannot determine what materials they will use at trial until the close of the Government's case. The Division may face the same situation (*i.e.*, that it cannot predict exactly

what exhibits will be used until the case is underway). Nonetheless, because the Division is ordinarily required to turn over all proposed exhibits, the same should be required of the defense. Staff should argue that the defense should provide all proposed exhibits to the Government in the same fashion as the Division must provide its proposed exhibits to the defense.

Failure of the defense to comply in good faith with this reciprocal discovery provision should be raised with the court prior to trial. This is especially relevant in situations where the defendants plan to present substantial expert economic and statistical evidence.

Depending upon the circumstances of the case, it may be appropriate to establish a document depository either at the courthouse in the district where the case will be tried or in the section or field office. Access to this depository can be controlled by a protective order, as can copying documents and further disclosure of their contents. This may be particularly suitable in a large document case. *See* ABA, Criminal Antitrust Litigation Handbook, Ch. VII (2d ed. 2006).

Another useful device is a written stipulation between staff and defense counsel that addresses all pretrial discovery. Such stipulations can include: a stipulation of facts (*e.g.*, parties, job title, tenure, interstate commerce); waiver of filing a request for a bill of particulars in exchange for a voluntary bill; or negotiated disclosure of all relevant grand jury transcripts required under Rule 16(a)(1)(B)(iii) at a reasonable time after arraignment, of Jencks and Brady materials, or of trial witness and exhibit lists. Such stipulations usually map out the road to trial with relative certainty and avoid unnecessary intervention by the court. These stipulations, however, rarely avoid motion practice altogether.

### d.   Reports of Examinations and Tests

Under Fed. R. Crim. P. 16(a)(1)(F), defendants may obtain results or reports of physical or mental examinations and of scientific tests and experiments that are material to the preparation of the defense or intended for use by the Government as evidence in chief at trial. In criminal antitrust investigations and trials, such materials are generally not used. However, in the event that materials are available, the Government should move for reciprocal discovery under Rule 16(b)(1)(B).

### e.   Expert Witnesses

Under Fed. R. Crim. P. 16(a)(1)(G), defendants may obtain a written summary of the expected expert testimony the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial. The summary must describe the witness's qualifications and opinions and the bases and reasons for those opinions. If the Government discloses materials under this provision, it should move for reciprocal discovery under Rule 16(b)(1)(C).

**f.    Continuing Duty to Disclose**

Under Fed. R. Crim. P. 16(c), both parties have a continuing duty prior to trial to disclose promptly upon discovery any additional evidence or material that was previously requested under Rule 16 or ordered to be disclosed.

**g.    Materials Not Subject to Discovery**

Fed. R. Crim. P. 16(a)(2) provides that internal memoranda, reports, or other documents made by the Government are not subject to disclosure under Rule 16 except as provided for in Rule 16(a)(1). The Antitrust Division's Criminal Discovery Policy, however, should be consulted regarding the disclosure of notes, memoranda of interviews, and discoverable information contained in other internal documents. In some instances, the Division's discovery policy calls for broader disclosure than provided for in Rule 16. For example, the Division's discovery policy calls for the disclosure of all memoranda of interviews of testifying trial witnesses, even though the memoranda are not witness statements unless signed or otherwise adopted by the witness.

Fed. R. Crim. P. 16(a)(2) also provides that statements of potential Government witnesses are not subject to disclosure during pretrial discovery except as provided in 18 U. S.C. § 3500. Written or recorded statements of Government witnesses are discoverable under the Jencks Act, 18 U.S.C. § 3500, which has, in essence, also been codified in Fed. R. Crim. P. 26.2. Under the Jencks Act materials are subject to production only after the witness has testified on direct examination at trial. However, arrangements are often made to provide Jencks Act materials to the defendants at some reasonable time prior to trial. Division attorneys should consult with the local USAO about how soon before trial Jencks material are typically produced and comply with the local practice for the district or judge handling the case, unless there is a significant reason related to the circumstances of a specific case not to do so and the office chief or assistant chief approves an alternative approach. *See* Chapter IV, Part F.5.b. The names, addresses, and prior criminal records of Government witnesses also may be produced at trial.

Under Rule 26.2(a), the defense also is required to produce any statement of a witness it calls that relates to the subject of the witness's testimony, after the witness testifies on direct examination. Failure to produce such a statement can result in striking the witness's testimony. *See* Fed. R. Crim. P. 26.2(e). This Rule is not intended to discourage voluntary disclosure, which also may be negotiated by stipulation. *See* ABA, Criminal Antitrust Litigation Handbook, Ch. IX (2d ed. 2006).

**h.    Motions for Bills of Particulars**

Defendants will usually move for a bill of particulars pursuant to Fed. R. Crim. P. 7(f). Generally speaking, defendants' motions for bills of

particulars are within the discretion of the court. Although our response to a motion for a bill of particulars is considered on a case-by-case basis, the Division typically opposes requests for bills of particulars on the ground that the indictment provides the defendants with a basic statement of the charges against them. Moreover, courts have not hesitated to deny motions for bills of particulars which are designed primarily as discovery devices. *See, e.g., United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir. 1990). Generally, discovery under Rule 16 provides sufficient information for defendants to prepare a defense, avoid surprise at trial, and protect against a second prosecution for the same offense.

Alternatively, the Antitrust Division may prepare a voluntary bill of particulars setting forth information relevant to the case. Defendants have sometimes moved to seal the bill of particulars, if one is voluntarily provided or ordered by the court. The Division will generally oppose motions to seal the bill.

**i.     Motions to Dismiss the Indictment**

There are numerous grounds on which defense counsel may make motions to dismiss the indictment. These include: (a) the indictment does not charge an offense under the statute; (b) the indictment, or the statute, is unconstitutionally vague and indefinite; (c) the indictment does not fully advise the defendants of the charges against them; or (d) the indictment should be dismissed because of grand jury abuse. Motions to dismiss an indictment are limited to allegations relating to the four corners of the indictment, such as lack of jurisdiction, failure to allege the elements of an offense, and vagueness of either the indictment or the statute. In addition, defendants may attempt to establish that there is an insufficient evidentiary basis for the indictment or raise other factual questions or procedural problems relating to the conduct of the grand jury. Such motions often assert groundless bases to dismiss an indictment because they relate to factual issues that will be developed during the course of the trial. The Division has responded to each type of motion to dismiss.

**j.     Motions for Severance**

Defendants, especially in conspiracy cases involving numerous defendants, will often move for severance pursuant to Fed. R. Crim. P. 14. In Sherman Act cases, defendants usually move for severance on the basis that evidence against co-conspirators will be introduced at trial and the moving defendant will be prejudiced by such evidence. Generally, in a criminal antitrust case, the conspiracy in question involves all of the defendants, and evidence will be introduced that each defendant knowingly joined the conspiracy.

Defendants also may move for severance in cases where additional crimes are charged together with an antitrust offense (*e.g.*, mail fraud, wire fraud, tax evasion based on payoffs, perjury).

The Division will generally oppose motions for severance on the grounds that a single conspiracy occurred and that the proof relates to the conduct of all defendants, or that collateral crimes are integrally related to the antitrust offense alleged and that the defendants will not be prejudiced.

### k.    Motion to Fix the Order of Proof at Trial

Defendants may move to fix the order of proof at trial. Defendants generally will argue that the conspiracy must be demonstrated and each co-conspirator must be shown to be a member of it by independent evidence before any co-conspirator declarations are admitted into evidence against a conspirator pursuant to Fed. R. Evid. 801(d)(2)(E). The Division generally opposes such motions because such a requirement would make orderly presentation of the case difficult, if not impossible. In responding to such a motion, staff should be familiar with *Bourjaily v. United States*, 483 U.S. 171, 178-81 (1987), in which the Supreme Court held that under Fed. R. Evid. 104, the trial court, in making a preliminary determination under Rule 801(d)(2)(E), may consider hearsay, including co-conspirators' statements, and need not rely solely on independent evidence to decide whether the Government has established the existence of a conspiracy. The Court also held that the appropriate standard of proof in this instance for establishing the existence of the conspiracy is the preponderance standard. *See id*. at 176. The various circuits have acknowledged the trial court's discretion to allow the Government to present co-conspirator statements on the condition that sufficient independent evidence subsequently demonstrates that a conspiracy existed. Staff should be familiar with the circuit practice in determining the best manner to answer such motions and to present evidence during the trial.

### l.    Other Defense Pretrial Motions

In general, there are many pretrial motions that may be made in the circumstances of specific cases. Motions for change of venue, motions for materials collected by use of electronic surveillance (*see* United States Attorneys' Manual § 9-7.000), motions under the Speedy Trial Act (*see* United States Attorneys' Manual § 9-17.000), motions to suppress evidence, motions to dismiss on grounds of double jeopardy, and other motions are often made by defendants during the course of the pre-trial proceedings. *See* generally ABA, Criminal Antitrust Litigation Handbook, Ch. X (2d ed. 2006).

### m.    Motions Filed by the Government

In certain circumstances, the Government may wish to file pretrial motions. Some of the typical motions are discussed below.

### i. Conflicts of Interest by Defense Counsel

In many circumstances, defense counsel endeavor to represent more than one defendant or a defendant and a Government witness at trial. The Division should attempt to establish the conflict of interest that counsel may have and file appropriate motions, if necessary. Before filing such motions, staff should consult with the Deputy Assistant Attorney General for Criminal Enforcement (Criminal DAAG). Generally speaking, the Government will ask for a hearing, at which time the individual defendant may be questioned about actual or potential conflicts of interest. *See* Fed. R. Crim. P. 44(c); *see also United States v. Register*, 182 F.3d 820, 830-32 (11th Cir. 1999); *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975), abrogated on other grounds by *Flanagan v. United States*, 465 U.S. 259 (1984). Under most circumstances, the Division will argue that the same counsel cannot represent a corporation and an individual, represent two individuals in the same corporation, or represent a defendant and a potential Government witness. *See* ABA Criminal Antitrust Litigation Handbook, Chs. II & X (2d ed. 2006). By requesting a hearing on the issue, staff should be able to avert post-trial motions based on ineffective assistance of counsel. Staff also should use the hearing as an opportunity to obtain a ruling that the attorney-client privilege available to a witness represented by a defendant's attorney has been waived.

### ii. Other Government Pretrial Motions

To avoid specific problems of evidence or procedure at trial, Government counsel may wish to raise various issues with the court prior to trial by motions *in limine*. Such motions may be used to obtain prior to trial a court ruling on the admissibility of certain types of evidence, either testimonial or documentary, or to obtain an order that would prevent or limit certain defense actions during trial. Motions *in limine* may be especially helpful in assuring the orderly presentation of trial evidence. Rulings may assist the Government in knowing what it may comment upon in opening statements and what lines of testimony will be allowed by the court. Such a motion might prove very helpful on the issue of Government and defense use of statistical and other expert evidence. For a detailed discussion, see ABA, Criminal Antitrust Litigation Handbook, Ch. X (2d ed. 2006).

## 5. Issues Relating to Criminal Trial Procedure

Several significant issues relating to trial procedure and evidence should be considered by staff in advance of trial. These issues and procedures provide staff with a reasonable expectation of what will happen during its trial presentation and what issues may be raised on appeal.

### a. The Speedy Trial Act

Antitrust Division staffs should be familiar with the provisions of the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, and the specific local plans to

implement the Act established in each district. Staff should consult with the local U.S. Attorney to determine the local practice and should always be cognizant of the time periods applicable under the statute.

**b.     Disclosing Materials to the Defense**

To ensure complete and timely compliance with discovery obligations in criminal cases, the Department and the Division have developed policies concerning the disclosure of materials to the defense. These policies are discussed below.

### i.      Department and Division Policies Concerning Discovery

On January 4, 2010, Deputy Attorney General David W. Ogden issued Guidance for Prosecutors Regarding Criminal Discovery (hereafter referred to as "DAG Guidance Memorandum"). As set forth in the DAG Guidance Memorandum, "[t]he guidance is intended to establish a methodical approach to consideration of discovery obligations that prosecutors should follow in every case to avoid lapses that can result in consequences adverse to the Department's pursuit of justice." DAG Guidance Memorandum, at 1.

The same day, the Deputy Attorney General issued a directive requesting that each component develop its own office discovery policy for criminal matters. The Division developed a Criminal Discovery Policy (the "Policy"), effective March 31, 2010.

Staff should thoroughly review and meticulously follow the guidance set forth in the DAG Guidance Memorandum and the Policy in the course of criminal matters. The Policy does not cover every issue staff will face in making discovery decisions, and instead is meant to provide a framework for making these decisions and to direct Division attorneys to additional resources to consult in the course of the discovery process. In particular, the Policy notes that attorneys should consult with the Division's Criminal Discovery Coordinators and Professional Ethics Officers in evaluating discovery obligations in specific matters. The Policy also explains that it continues to be the practice of the Division to provide discovery beyond what the rules, statutes, and case law mandate in many circumstances.

The DAG Guidance Memorandum and the Policy make clear that careful review and consideration of discovery issues should be a high priority for each attorney serving in the Department of Justice and in this Division. Staff's efforts toward complete and timely compliance with discovery obligations significantly facilitate the achievement of the overriding goal in the pursuit of criminal prosecution: reaching a fair and just result in every case.

### ii.     Overview of Division Discovery Policy

The Policy is designed to aid compliance by Division attorneys with disclosure obligations, identify discovery-related issues common to the

practice of all Division attorneys, and ensure that Division attorneys have adequate resources, training, and guidance to enable them to make appropriate disclosure decisions, either on their own or in consultation with the chief and assistant chief of their office or section and the leadership of the Division. This guidance is intended to be sufficiently flexible to give Division attorneys discretion where permitted by law and to account for the fact that they operate in numerous jurisdictions that have different discovery laws and practices.

It is the practice of the Division to provide discovery beyond what the rules, statutes, and case law mandate. When faced with a close call as to whether material needs to be disclosed, staffs should always err on the side of disclosure. In some situations, materials that do not have to be disclosed should be withheld because of important considerations, such as the need to protect a witness or safeguard investigations of other people or other crimes. However, attorneys should provide discovery beyond what is legally required whenever and wherever possible. Expansive discovery may facilitate plea negotiations or otherwise expedite litigation. Moreover, in the long run, expansive discovery will foster and support a reputation for candor and fair dealing by Division attorneys.

Discovery training has been—and will continue to be—vital to the Division's mission to do justice and to maintain the highest level of professional and ethical conduct. Division attorneys are strongly encouraged to participate on a regular basis in discovery training.

The Policy does not cover every issue a Division attorney will be faced with in making discovery decisions, but it is meant to provide a framework for making these decisions. Each Division office or section that does criminal work has a Criminal Discovery Coordinator who is available to assist staffs in properly meeting discovery obligations and determining whether and when disclosure is required. State rules of professional conduct also impose ethical obligations regarding discovery in criminal cases, and Division attorneys are bound by these rules to the same extent and in the same manner as private attorneys. *See* 28 U.S.C. § 530B. If you have questions regarding applicable ethics rules, consult with one of the Division's Professional Responsibility Officers (John Powers, Marvin Price, Kristen Limarzi, or Anne Purcell White). Difficult discovery issues may also be submitted to the Court *ex parte* for decision. Rule 16(d)(1); *United States v. Mejia*, 448 F.3d 436, 457 (D.C. Cir. 2006); *United States v. Napue*, 834 F.2d 1311, 1317-19 (7th Cir. 1987).

The Government's disclosure obligations are generally established by Federal Rules of Criminal Procedure 16 and 26.2; 18 U.S.C. § 3500 (the Jencks Act); *Brady v. Maryland*, 373 U.S. 83 (1963), followed by *United States v. Bagley*, 473 U.S. 667, 682 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (explaining the Government's duty to disclose evidence favorable to an accused and material to guilt or punishment); and *Giglio*

*v. United States*, 405 U.S. 150 (1972) (information tending to impeach Government witnesses must be disclosed to the defendant). Staffs should carefully review and comply with United States Attorneys' Manual 9-5.001, which details Department policy regarding disclosure of exculpatory and impeachment information and provides for broader and more comprehensive disclosure than required by *Brady* and *Giglio*. For the purposes of the Policy, "discovery" or "discoverable information" includes information required to be disclosed by Federal Rules of Criminal Procedure 16 and 26.2, the Jencks Act, *Brady,* and *Giglio*, and additional information disclosable pursuant to United States Attorneys' Manual 9-5.001.

The Policy is organized into two parts. Part I of the Policy describes the discovery process and provides guidance to Division attorneys on what should be gathered for review, what needs to be disclosed, when it needs to be disclosed, and how it should be disclosed. Part II of the Policy describes a number of matters that Division attorneys should discuss with case agents and others to ensure that discoverable information is appropriately identified and preserved throughout the course of the investigation and provides guidance concerning specific situations in which issues concerning discovery may occur.

### c.    Trial Briefs

In criminal cases, the court may require a brief that sets forth the theory of the Government's case, the factual basis of the Government's proof, and various legal issues that may arise at trial. On occasion, the brief also may be the proper place to list the Government's witnesses and trial exhibits. If unusual issues of law or policy are involved in the case, the trial brief should be submitted to the Office of Operations for review prior to submission to the court. The U.S. Attorney in the district also should be consulted as to form and content of the trial briefs submitted to judges in that district.

### d.    *Voir Dire* Procedures

Jury selection in the Federal system is governed by Fed. R. Crim. P. 24. Because the manner of jury selection varies among the districts and even among judges within a district, the trial staff should consult with the local U.S. Attorney's Office to determine the procedure used by the judge assigned to the case. Staff should also discuss jury selection with the judge at a pretrial conference to determine specific procedures and the manner of inquiry that will be followed. Staff should be prepared to submit proposed *voir dire* questions to the court if local practice does not permit the attorneys to question prospective jurors directly.

When jury selection begins, a staff unfamiliar with the region from which the jury pool is drawn should ask an experienced local Assistant U.S. Attorney to assist staff in selecting jurors.

**e.**     **Trial Procedures**

A prosecutor's success in criminal trials is based in large measure on thorough pretrial preparation and on understanding the procedures that will be followed in the courtroom. It should also be emphasized that the local U.S. Attorney's Office may provide valuable assistance concerning local practices and the manner in which each judge conducts trials. This is especially important regarding the judge's manner of handling opening statements, closing arguments, trial objections, and conferences outside the hearing of the jury.

For a general discussion of preparation immediately before trial, *see* ABA, Criminal Antitrust Litigation Handbook, Ch. XIII (2d ed. 2006).

**f.**     **Jury Instructions**

Under Fed. R. Crim. P. 30, both the Government and defendants are permitted to file proposed jury instructions with the court. The Division generally files a rather comprehensive set of instructions, which increases the likelihood that the judge will use the Government's instructions and decreases the likelihood of reversal on appeal. It is advisable to consult the pattern jury instructions published by the circuit in which the district court sits. Other helpful sources when drafting jury instructions include ABA, Criminal Antitrust Litigation Handbook, Ch. XIV (2d ed. 2006); 1 & 2 Kevin F. O'Malley et al.; Federal Jury Practice and Instructions (5th ed. 2003); ABA, Model Jury Instruction in Criminal Antitrust Cases (2009); and past instructions used by the Division in similar cases. Be aware though that some publications are oriented toward providing suggested instructions to the defense bar, and staff should not feel compelled to adopt language that clearly is slanted toward supporting defense arguments. The local U.S. Attorney should be consulted on the practice of the district, or of particular judges, on requesting instructions and their format. Because of the significance of jury instructions to the appellate disposition of a criminal case, the Division's instructions should be grounded on established case law and, where possible, on language that has been upheld by the appellate courts. Staff attorneys should be fully prepared to argue for appropriate instructions during instruction conferences with the court and defense counsel, which may be held at any time on short notice. These conferences are very important to the Government because deficient instructions that contribute to or result in an acquittal cannot be appealed. The FOIA/PA Unit maintains copies of some of the Division's past proposed instructions in the docket files of each case.

**g.**     **Defense Motions for Acquittal, New Trial, and Arrest of Judgment**

At the conclusion of the Government's case, trial staffs should be prepared to oppose a defense motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. Rule 29 motions may be renewed before the case is submitted to the jury. If the jury returns a guilty verdict or is

discharged without returning a verdict, a motion for judgment of acquittal may be made within 14 days, unless the court extends the time for such motions. *See* Fed. R. Crim. P. 29(c)(1). Generally, defendants will renew their motions for judgment of acquittal after a guilty verdict and make a motion for a new trial under Fed. R. Crim. P. 33. Defendants may also make motions for arrest of judgment under Fed. R. Crim. P. 34 if there is an argument that the indictment does not charge an offense or raises an issue relating to the court's jurisdiction. These motions may require briefing and oral argument. Courts frequently issue opinions when ruling on these motions; therefore, careful preparation in responding to these motions is important, as they may affect the appellate disposition of the case. Staffs are encouraged to consult with the attorneys in the Appellate Section before filing post-trial briefs. Sentencing of convicted defendants will not take place until all post-trial motions have been ruled upon by the district court.

## 6.    Sentencing Recommendations

### a.    Internal Procedures

Soon after the filing of the indictment, staff should begin to consider its recommendations for sentencing corporate and individual defendants. Before formulating recommendations, staff should familiarize itself with this section of the manual; any separate Division sentencing policy directives; the May 19, 2010 Attorney General Holder Memorandum on Department Policy on Charging and Sentencing, which superseded the prior Ashcroft and Comey memoranda on charging and sentencing; pertinent provisions of the Principles of Federal Prosecution, *see* United States Attorneys' Manual, §§ 9-27.710 - .760; and the United States Sentencing Guidelines. Staff should also consult with the local U.S. Attorney's Office and the Probation Office to determine the local practice on sentencing recommendations by the Government and on other sentencing matters. After convicting a defendant at trial or upon receiving notice that a defendant intends to plead guilty without a plea agreement (*i.e.*, the defendant pleading "open"), staff should submit to the chief a sentencing memorandum setting forth, separately for each defendant to be sentenced, the recommended sentence and all considerations bearing on that recommendation. Those considerations should at least include the defendant's role in the offense, extent of cooperation, culpability relative to defendants already sentenced or to be sentenced, and financial condition and ability to pay a fine. Staff should set out its calculation of the sentencing ranges under the Sentencing Guidelines, as well as any departures or other special provisions that are applicable to staff's sentencing recommendation. After reviewing staff's recommendation, the chief will forward it along with his or her position to the ATR-CRIM-ENF mailbox and the appropriate Special Assistant. At this point, staff should not inform defense counsel of its proposed sentencing recommendation. The Criminal DAAG and the DAAG for Operations, as well as in appropriate

circumstances, the Assistant Attorney General, will review the recommendation memorandum and approve the sentencing recommendation of the Division. Upon request by defense counsel, staff may inform counsel of the Division's final recommendation before the recommendation is made to the Probation Office and the court.

If the defendant is pleading pursuant to a plea agreement, staff should prepare a plea recommendation memorandum with the applicable sections from Chapter III, Part G.2.c.ii., and should follow the approval procedures for plea agreements contained in Chapter III. Staff should make sure that the plea negotiations are conducted in accordance with Division policy directives; the May 19, 2010 Attorney General Holder Memorandum on Department Policy on Charging and Sentencing; and the Principles of Federal Prosecution, United States Attorneys' Manual, §§ 9-27.400 - .450. *See also* ABA Criminal Antitrust Litigation Handbook, Ch. V (2d ed. 2006) (providing an extensive discussion of plea bargaining in criminal antitrust cases). Division prosecutors should seek a plea to the most serious offense that is consistent with the nature of the defendant's conduct, is likely to result in a sustainable conviction, and is informed by an individualized assessment of the specific facts and circumstances of the particular case. *See* May 19, 2010 Attorney General Holder Memorandum on Department Policy on Charging and Sentencing.

The procedures for imposing a sentence differ not only from district to district, but also from judge to judge within the same courthouse. It is recommended that staff, in preparing for the sentencing hearing, consult with the local U.S. Attorney's Office, the Probation Office, and the sentencing judge's clerk to learn as much as possible about the judge's sentencing procedures and what sentencing forms must be completed. Fed. R. Crim. P. 32 governs the imposition of sentence in Federal cases. Rule 32(c)-(g) sets out the conditions under which the Probation Office must complete a presentence investigation and report. Rule 32(i)(4)(A)(iii) provides that the Government must be given an opportunity to make an allocution at the hearing, which staff should take advantage of unless it is the policy of the local U.S. Attorney's Office not to make one. Rule 32(i) specifies a number of actions the judge must take at the hearing to ensure that the defendant's rights are protected. It is advisable for a staff member to check off each of these as they are completed and advise the judge if any are omitted.

**b.      Sentencing Guidelines**

All Division sentencing recommendations, whether or not incorporated in a plea agreement, should reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and offer defendant the opportunity for effective rehabilitation. Although the Supreme Court in January 2005 changed the nature of the Guidelines from mandatory to advisory in *United States v. Booker*, 543 U.S. 220 (2005), Department of Justice

policy recognizes that the Guidelines remain important in promoting national sentencing uniformity. Department policy further recognizes that while sentencing recommendations must be based on an individualized assessment of the facts and circumstances of each case, prosecutors should generally continue to advocate for a sentence within the applicable Guidelines range and in the typical case the Guidelines will reflect the appropriate balance among the purposes of sentencing. Any prosecutorial requests for departures or variances from the otherwise applicable Guidelines range must be based on specific and articulable factors and require supervisory approval.

*Booker's* change in the status of the Guidelines was due to the Court's holding that "the Sixth Amendment is violated by the [mandatory] imposition of an enhanced sentence under the United States Sentencing Guidelines based on the sentencing judge's determination of a fact (other than a prior conviction) . . . not found by the jury or admitted by the defendant." *Booker,* 540 U.S. at 245. The Court, however, found that there would be no Sixth Amendment violation if the Guidelines are applied in an advisory manner. *Id*. Thus, sentencing courts are still required to consult the Guidelines, but courts can "tailor the sentence in light of other statutory concerns as well." *Id*. (citing 18 U.S.C. § 3553(a), which includes as sentencing factors: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence to afford adequate deterrence and protect the public from further crimes by the defendant; the need to provide the defendant with rehabilitation; the kinds of sentences available; and the need to provide victims with restitution).

The special provisions for antitrust offenses for both individual and corporate defendants are contained in § 2R1.1 of the Guidelines. Special provisions covering other types of offenses also are contained in Chapter 2, and general provisions applicable to all types of offenses, including antitrust, are found in other chapters of the Guidelines. Special provisions governing the sentencing of corporations and other organizations for all types of offenses, including antitrust, are contained in Chapter 8 of the Guidelines. *See* Chapter II, Part B.

One of the primary objectives of the Guidelines is to minimize disparities in the sentencing of like offenses across the country. To achieve that goal, the Guidelines set out largely mechanical formulas for each type of offense that can be applied in consistent and predictable ways in each courtroom. The Government's discretion in choosing an appropriate sentence to recommend will often be limited to deciding where the sentence should fall within the calculated Guidelines ranges for periods of incarceration and fine amounts.

One of the few ways that the Government can have a substantial impact on the determination of the sentence is by filing a motion for a

departure below the Guidelines range because of the defendant's substantial assistance in the investigation or prosecution of others. Under the Guidelines, such a departure—which is provided for in § 5K1.1 for individuals and § 8C4.1 for organizations—can only be triggered by a motion by the Government. The Guidelines permit the Government to make a recommendation on how much the court should depart based on the value of the defendant's cooperation. However, once the motion has been filed, the judge is not bound by the Government's recommendation and has wide discretion in deciding how much or little to depart based on the circumstances surrounding the defendant's cooperation. *United States v. Pizano*, 403 F.3d 991 (8th Cir. 2005); *United States v. Pippin*, 903 F.2d 1478, 1485 (11th Cir. 1990). Because of the potential these motions have for greatly reducing the sentences otherwise called for under the Guidelines, they should be reserved for situations in which the defendant's cooperation has been truly valuable, timely, and substantial. A recommendation for a substantial assistance departure or any other downward or upward departure under the Guidelines must be clearly set out by staff in the sentencing memorandum to the chief.

The calculated Guidelines fine ranges for both individuals and organizations may call for amounts beyond the ability of the defendants to pay, even with installment payments. Guidelines provisions (§ 5E1.2 for individuals and § 8C3.3 for organizations) permit the court to impose a fine below the calculated range if the defendant is found to have an inability to pay a fine within the range. Staff should consult with the Division's Corporate Finance Unit whenever a question is likely to be raised about a corporate defendant's ability to pay a fine within the applicable Guidelines range. The financial analyst will normally determine the maximum amount the corporation can afford to pay in installments without substantially jeopardizing its continued viability. Probation Offices and courts tend to rely heavily on the recommendations of our analysts in these situations. The Corporate Finance Unit also may be able to provide assistance in making similar determinations for individual defendants.

The final Guidelines sentencing ranges are determined in part by factoring in a number of upward or downward adjustments based on particular facts or circumstances relative to the offense, offender, or investigation. Such factors include the defendant's role in the offense, whether the defendant attempted to obstruct the investigation, and the nature, degree, and timeliness of the defendant's cooperation. The courts and Probation Offices often rely on the Government to provide the underlying facts needed to support the findings on which these adjustments apply. The Principles of Federal Prosecution state that "the Department's policy is only to stipulate to facts that accurately represent the defendant's conduct. If a prosecutor wishes to support a departure from the [G]uidelines, he or she should candidly do so and not stipulate to facts that are untrue." <u>United States Attorneys' Manual</u>

§ 9-27.430(B)(2). Furthermore, prosecutors are not authorized to hide relevant information from the court and should provide all reasonably relevant information to the United States Probation Office whenever possible so that an accurate and complete presentence report can be prepared. *Id*. at § 9-27.720.

Department policy requires honesty in sentencing. *See* United States Attorneys' Manual § 9-27.400. Thus, staff attorneys, as officers of the court, must ensure that facts relevant to sentencing are brought to the court's attention fully and accurately. *See* United States Attorneys' Manual § 9-27-710. However, when a good-faith doubt exists concerning the existence or provability of certain facts, staffs may discuss with defendants the extent to which the Government will present such facts to the court and Probation Office for use at sentencing. Staffs may negotiate to limit the effect that certain facts have on sentencing calculations where Guidelines provisions (such as § 1B1.8) expressly permit such limiting agreements. Staffs must oppose sentencing adjustments, including downward departures, not supported by the facts or law, whether requested by a defendant or made *sua sponte* by a court. *See* United States Attorneys' Manual § 9-27-745. Thus, a prosecutor may not agree in a plea agreement to "stand silent" regarding a defendant's request for an adjustment not supported by facts or law. *See* United States Attorneys' Manual § 9-27-430(B)(2).

Staffs should report all sentences imposed to the ATR-CRIM-ENF mailbox. If a sentence is imposed that the staff attorney believes is inconsistent with the proper Sentencing Guidelines calculation or is in violation of 18 U.S.C. § 3553 or otherwise unlawful, the attorney must oppose the sentence and make sure the record is sufficient for any appeal. *See* United States Attorneys' Manual § 9-27.745. If the staff believes that the Division should appeal a sentence, it should make a formal recommendation, preferably in writing, to the Operations DAAG, the Criminal DAAG, the Director of Criminal Enforcement, and the Appellate Section explaining why the Division should recommend an appeal to the Solicitor General. The Appellate Section will then make a recommendation to the Assistant Attorney General.

**c.      Special Statutes for Fines**

There will be cases in which the maximum potential fine under the Sentencing Guidelines exceeds the statutory maximum fine provided for in Section 1 of the Sherman Act. However, it may be possible to increase the available statutory maximum in particular cases by applying the provisions of 18 U.S.C. § 3571. That statute provides that the court may impose a fine up to twice the gross pecuniary gain derived by the conspirators or cartel (not just the defendant) from the crime or twice the gross loss suffered by the victims of the crime, unless the court decides that the imposition of such a fine would unduly complicate or prolong the sentencing process.

Another statute related to fines, 18 U.S.C. § 3572, lists a number of factors that the court must consider in determining the amount of the fine, provides that the amount of the fine should not interfere with the ability to make restitution, and sets forth a number of technical provisions regarding the imposition and payment of a fine.

### 7.    Protecting Victims' and Witnesses' Rights

#### a.    General Requirements

Victims of, and witnesses to, Federal crimes, whether individuals or organizations, are entitled by law to receive a variety of services and assistance from Federal prosecutors. The first Federal victims' rights legislation was the Victim and Witness Protection Act of 1982 (VWPA). Congress amended and expanded on the provisions of the VWPA in subsequent legislation, primarily the Victims of Crime Act of 1984, the Victims' Rights and Restitution Act of 1990 (VRRA), the Violent Crime Control and Law Enforcement Act of 1994, the Antiterrorism and Effective Death Penalty Act of 1996, the Victim Rights Clarification Act of 1997, and the Crime Victims' Rights Act (also known as the Justice for All Act of 2004) (CVRA). In addition, in the VWPA Congress instructed the Attorney General to develop and implement guidelines for the Department of Justice consistent with the purposes of the Act. Congress set forth the objectives of the guidelines, which include the provision of services to victims; notification about protection, services, and major case events; consultation with the Government attorney; a separate waiting area at court; the return of property; notification of employers; and training for law enforcement and others.

The AG Guidelines for Victim and Witness Assistance set forth in detail the obligations of all Division prosecutors toward crime victims and witnesses. All Division attorneys (and appropriate support staff) engaged in criminal law enforcement activities should be fully conversant with these Guidelines. Article IV of the AG Guidelines summarizes mandatory services due to crime victims under the VRRA, and Article V summarizes the rights of victims of crime under the CVRA.

The CVRA provides crime victims, as defined in Article III.C., with two mechanisms for enforcing their rights. First, crime victims, or the Government on their behalf, may move in Federal district court for an order enforcing their rights. 18 U.S.C. § 3771(d)(3) ("The district court shall take up and decide any motion asserting a victim's right forthwith. If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus."). Second, a crime victim may also file an administrative complaint if Department employees fail to respect the victim's rights. The Attorney General must take and "investigate complaints relating to the provision or violation of the rights of a crime victim" and provide for disciplinary sanctions for Department employees who "willfully or wantonly fail" to protect those rights. 18 U.S.C. § 3771(f)(2).

Under the statutes and the AG Guidelines, a limited amount of discretion exists with respect to implementing certain provisions concerning the protection of victims' rights and the furnishing of victim and witness services. For example, many Division cases will present responsible officials with the need to exercise discretion in determining to whom or when victim and witness services will be provided. The AG Guidelines also recognize that the right to consult with an attorney for the Government must be limited in some cases (*e.g.,* to avoid jeopardizing an ongoing investigation or official proceeding). To the extent possible, however, if the Division is contacted by victims, Division attorneys should afford the victims or their lawful representatives an opportunity to discuss any concerns they have about the investigation of the case or status as victims. *See* Attorney General Guidelines, Article V.G. Other provisions of the AG Guidelines also require judgments on a case-by-case basis of how they should best be implemented, consistent with both the purposes of the statutes and the law enforcement needs of the Department.

Nevertheless, all Department of Justice officers and employees engaged in the detection, investigation, or prosecution of crime are required to make their best efforts to ensure that all victims of Federal crime who have suffered physical, financial, or emotional harm receive the assistance and protection to which they are entitled under the law. In addition, each litigating Division of the Department is required to report to the Attorney General each year on the "best efforts" it has made during the preceding fiscal year in ensuring that victims of crime are accorded the rights to which they are entitled, which means that each field office within the Division engaged in criminal law enforcement activities must also report internally on an annual basis concerning its own best efforts to implement the requirements of these Acts and the AG Guidelines.

### b. Responsible Officials

Under the AG Guidelines, with respect to specific criminal cases handled entirely by a litigating division of the Department, the chief of the section having responsibility for the case is responsible for determining to whom, when, and the extent to which victim and witness services should be provided. This authority may be delegated, but the chief is responsible for ensuring the delegated responsibilities for a specific case are discharged.

To assist in this process, each criminal field office will appoint a victim-witness coordinator. The victim-witness coordinator is responsible for: (1) keeping abreast of Department and Division policy regarding victim-witness services; (2) ensuring that these services are being appropriately provided; (3) maintaining liaisons with the victim-witness coordinators in the local U.S. Attorneys' Offices when necessary; and (4) making sure that records are sufficient to permit the Division to report annually to the Attorney General on the "best efforts" it has made

during the preceding fiscal year in ensuring that victims of crime are accorded the rights to which they are entitled.

The Division has designated the Criminal Deputy General Counsel of its General Counsel's Office with overall responsibility to ensure that the victim-witness requirements of the Acts are being carried out within the Division. Any questions that arise concerning the implementation of the AG Guidelines relating to services to victims and witnesses, or any other provisions or requirements of the Acts or Guidelines, should be discussed with the Criminal Deputy General Counsel.

### c.   Cases with Large Numbers of Victims

Although implementing the AG Guidelines is relatively straightforward in cases in which the number of victims is limited, doing so can present challenges as the number of victims grows into the hundreds and thousands. Division employees should consider the possibility of using new technology in order to provide victims in large cases with rights and services to the greatest extent possible, given the circumstances and resources. If the responsible official deems it impracticable to afford all of the victims of a crime any of the rights enumerated in 18 U.S.C. § 3771(a), the attorney for the Government should move the appropriate district court at the earliest possible stage for an order fashioning a reasonable procedure to effectuate those rights to the greatest practicable extent. 18 U.S.C. § 3771(d)(2).

### d.   Restitution

Congress has continued to extend and strengthen criminal restitution. First, it passed the Violent Crime and Law Enforcement Act of 1994, which, among other provisions, requires a court to order a defendant to pay a victim mandatory restitution in four classes of Federal crimes (domestic violence, sex crimes, sexual exploitation and other offenses involving abuse of children, and telemarketing fraud), none of which would likely be prosecuted by the Antitrust Division. Then, in 1996, Congress passed the Mandatory Victims Restitution Act of 1996 (MVRA), once again expanding the classes of crimes subject to mandatory restitution. The MVRA mandates restitution for: (1) victims of a crime of violence, as defined in 18 U.S.C. § 16; (2) victims of an offense against property under title 18, including any offense committed by fraud or deceit; and (3) victims of offenses defined in 18 U.S.C. § 1365, relating to tampering with consumer products. *See* 18 U.S.C. § 3663A(c)(1)(A)-(B). The Division does charge violations of Title 18 property offenses involving fraud and deceit. However, restitution for such offenses is not mandated in cases where the court finds that "(A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to

any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3).

Although none of the statutory provisions authorizing restitution apply directly to antitrust offenses, the Crime Victims' Rights Act provides that victims have the right to "full and timely restitution, as provided in law." 18 U.S.C. § 3771(a)(6). Restitution may be ordered in any criminal case to the extent agreed to by the parties in a plea agreement. *See* 18 U.S.C. § 3663(a)(3). In addition, the U.S. Sentencing Guidelines call for courts to order restitution as a condition of probation or supervised release in cases in which restitution would be appropriate under 18 U.S.C. §§ 3663-3664 except for the fact that the offense of conviction is not a Title 18 or covered Title 49 offense, unless full restitution has already been made or the court finds, from facts on the record, that "(A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." U.S.S.G. §§ 5E1.1(b)(2), 8B1.1(b)(2). Finally, the AG Guidelines state that Department employees working at each stage of a criminal case must give careful consideration to the need to provide full restitution to the victims of the offenses.

The Division can be expected rarely to encounter a case combining the prosecution of an antitrust offense and an offense in which restitution is truly mandated. Restitution has not been ordered (directly or as a condition of probation) in many cases brought by the Division as the result of several factors: in many of our criminal matters, civil cases have already been filed on behalf of the victims at the time of sentencing, which potentially provide for a recovery of a multiple of actual damages (plus costs and attorneys' fees); the complexity of antitrust cases; the resulting difficulty of determining damages; and the per se nature of antitrust criminal violations, which relieves the prosecution from having to introduce evidence of harm resulting from the violation to secure a conviction. Nevertheless, Division attorneys should consider seeking orders for restitution in cases in which victims are unable or unlikely to seek treble damages or where the fashioning of such an order would not unduly complicate or prolong the sentencing process, and should also consider including restitution as part of plea agreements, particularly in circumstances where it appears that a defendant has insufficient resources to pay both a Guidelines criminal fine and damages to the victims of the violation. *See* 18 U.S.C. § 3572(b); U.S.S.G. §§ 5E1.1(c), 8C3.3(a).

## G.    The Appellate Process

The DAAG for Operations, the Assigned DAAG, and the Appellate Section should be contacted as soon as possible when a final judgment has been entered in the district court, even when the Division prevailed.

When staff believes that an appeal is likely, the DAAG for Operations, the Assigned DAAG, and the Appellate Section should be contacted even prior to the entry of a final judgment. Finally, the DAAG for Operations, the Assigned DAAG, and the Appellate Section should be contacted immediately with respect to (1) any interlocutory order that the Division should consider appealing, if possible, or that opposing counsel may attempt to appeal; and (2) any sentence in a criminal case or judgment in a civil case that contains unlawful conditions.

### 1.     Procedures When the Division Did Not Prevail in the District Court

If the Division did not prevail at the district court level, staff should prepare a concise memorandum discussing the critical facts of the case, the proceedings in the district court, and the reasons why staff believes appeal is either warranted or unwarranted. The issues upon which an appeal, if any, would be based should be discussed in terms of the applicable standard of judicial review. The staff memorandum should be reviewed by the section or field office chief who should attach his or her own recommendation. The memorandum should be sent to the DAAG for Operations, the chief of the Appellate Section, the Assigned DAAG, and to the appropriate Director of Enforcement. Copies of all relevant court orders and pleadings should accompany the memorandum. Finally, a copy of the transcript, if available, should be sent to the Appellate Section attorney assigned to the case. If a transcript has not yet been obtained by the trial staff, then staff should consult with the Appellate Section attorney assigned to the case to determine if the transcript should be ordered.

If there appear to be appealable issues in a criminal case (and in every civil case), an Appellate Section attorney, after reviewing the recommendations of the trial staff and obtaining the views of other interested persons within the Division, will prepare a draft memorandum for the Solicitor General, either recommending an appeal or recommending against appeal. The trial staff will be given an opportunity to comment on the draft before it is sent forward. This draft memorandum, along with whatever memoranda have been prepared by the trial staff or others, is then sent to the DAAG for Operations who has supervisory responsibility for the Appellate Section.

Final reviewing authority within the Division is exercised by the DAAG for Operations with supervisory responsibility for the Appellate Section or, in certain circumstances, the Assistant Attorney General. The views of other Deputy Assistant Attorneys General, especially the Assigned DAAG, may also be requested by the Assistant Attorney General.

After the Division decides whether to recommend appeal, the Appellate Section prepares the final version of a memorandum to the Solicitor General, for the signature of the Assistant Attorney General or DAAG for Operations, and transmits it to the Solicitor General's Office. There, the

Antitrust Division's recommendation generally is reviewed by an Assistant to the Solicitor General and a Deputy Solicitor General. They, in turn, make a recommendation to the Solicitor General. The reviewers in the Solicitor General's Office may ask for additional information or may meet with Appellate Section attorneys and the appropriate Division personnel.

In situations where the review process will take some time, the Appellate Section will file, or request the trial staff to file, a protective notice of appeal with the appropriate district court so the Department does not allow the filing period set by the Federal Rules of Appellate Procedure to expire before a decision regarding appeal has been made. *See* Fed. R. App. P. 4.

### 2.      Appellate Activity Where the Division Prevailed in the District Court

Where the Division prevailed in the district court in a criminal or civil case, or where the district court issues any order that another party might attempt to appeal, the trial staff should immediately notify the Appellate Section. At the same time, the Appellate Section should be informed of the general nature of the case and provided with any relevant pleadings by the trial staff. The transcript, if one exists, should immediately be made available to the Appellate Section, and the assigned attorney from the Appellate Section and the trial staff should discuss the matter.

The DAAG for Operations and the Appellate Section should be notified immediately when the trial staff receives a copy of a notice of appeal or learns that one has been filed.

### 3.      Preparing Court of Appeals Briefs

Once an appeal has been filed, trial staff normally will be asked to assist the Appellate Section attorneys assigned to the case in designating the record on appeal and determining what parts of the record will be reprinted in the appendix, if there is to be one, as well in ordering any needed transcripts. The trial staff also normally will be asked to review the draft brief. Finally, in certain emergency situations, the trial staff may be asked to prepare or assist in preparing briefs or other appellate pleadings under Appellate Section supervision.

As a general matter, attorneys from the Appellate Section will handle the briefing and argument of appeals at the circuit court level under the supervision of the chief or one of the assistant chiefs in the Appellate Section.

The chief or an assistant chief in the Appellate Section and the Appellate attorney assigned to the appeal will be designated as the attorneys of record in the matter. As such, Appellate Section attorneys should be informed of all relevant issues relating to the appeal and all conversations between the trial staff and opposing counsel regarding

issues in the case and the appeal. All documents received by the trial staff relating to the appeal should be forwarded at once to the Appellate Section; in the early stages of an appeal, such documents often are mailed only to the trial staff. Conversely, the trial staff should be advised of any substantive meetings between Appellate Section attorneys and opposing counsel concerning these matters.

In normal circumstances, the Division's brief and reply brief (if any) will be discussed with the trial staff, provided to the DAAG for Operations, the Assigned DAAG, and the appropriate Director of Enforcement. It will also be reviewed by the chief or an assistant chief of the Appellate Section. Finally, the Assistant Attorney General, or his or her designee, will approve the brief. Other interested persons within the Division may become involved in the review process when certain issues of policy arise in the appeal or where conflicts must be resolved.

### 4.   *Amicus Curiae* Participation by the Antitrust Division

The Appellate Section welcomes recommendations from section or field office staff, as well as third parties, concerning *amicus* participation in a private case. Such recommendations may take the form of a memorandum or less formal communications. Recommendations may concern issues that require *amicus* participation by the Division or where the Division's views may clarify, strengthen, or advance the law in areas affecting the Division's policy goals. *Amicus* participation in any appellate court (state or Federal) and the Supreme Court must be approved by the Solicitor General. Other formal appearances before Federal or state appellate courts, such as the filing of comments or proposed bar rules affecting competition, must also be approved in advance by the Solicitor General.

### 5.   Supreme Court Review

Once a court of appeals has decided a case, the Solicitor General may petition for *certiorari* to the Supreme Court or will respond to a petition from the other party in a case in which the Division prevailed. The Government may also file an *amicus* brief in a case for which a petition for *certiorari* is pending before the Supreme Court or an *amicus* brief on the merits. Appellate Section attorneys, under the supervision of the chief or an assistant chief of the Appellate Section, are responsible for drafting petitions for *certiorari*, briefs in opposition to petitions for *certiorari*, and briefs on the merits in Antitrust Division cases, as well as any *amicus* briefs on antitrust issues.

In Supreme Court cases, the Solicitor General's Office reviews the briefs and argues most antitrust cases before the Supreme Court. The Appellate Section works closely with the Solicitor General's Office in the preparation of the briefs and arguments before the Supreme Court and may request the assistance of the trial staff as well.

# Chapter V.    Competition Advocacy

A.  The Division's Role as a Competition Advocate ............................................................. V-2
   1.  The Division's Analytical Model ............................................................ V-2
   2.  The Methodology of Competition Advocacy ........................................ V-3
     a.  Activities Within the Executive Branch ........................................ V-3
     b.  Testimony and Comments on Legislative and Regulatory Initiatives ................................. V-4
     c.  Publication of Reports on Industry Performance ............................ V-4
     d.  Intervention in Regulatory Agency Proceedings ............................ V-5
     e.  Procedures for Filing Pleadings Before Federal Agencies ................... V-5
     f.  Litigation Activities ..................................................... V-6
B.  Procedures Affecting the Regulatory Sections ............................................................. V-7

In addition to enforcing the antitrust laws, the Antitrust Division also acts as an advocate for competition throughout the economy. In particular, the Division seeks to promote competition in those sectors of the economy that are or may be subject to Government regulation. This chapter will set forth the major policies and practices of the Division in these competition advocacy activities.

## A.    The Division's Role as a Competition Advocate

Competition is the central organizing principle of the American economy, and its preservation and promotion are important Division goals. The Antitrust Division's advocacy efforts focus on strengthening markets and preserving economic freedom and fairness. Indeed, promoting competition principles through broad advocacy efforts and regulatory outreach is one of the Antitrust Division's highest priorities. These efforts include extensive cooperation and engagement with Federal agencies, as well as with Congress, state agencies and legislatures, courts, and foreign antitrust authorities. Through its competition advocacy efforts the Division works to promote economic freedom and fairness, and seeks to secure efficient and well-functioning markets for American consumers. The items in its toolkit for these efforts are numerous, including regulatory comments or views letters on antitrust exemptions, workshops, hearings, *amicus* briefs, speeches, articles, testimony, personnel details, video conferences, and consultations with regulatory agencies, among others.

The Division's competition advocacy efforts primarily focus on Federal and state regulations and regulatory frameworks in which competition and competitive principles can produce better outcomes for consumers consistent with important regulatory goals. The Division's competition advocacy efforts span virtually the entire economy, including, but not limited to, the agricultural, banking, communications, energy, healthcare, insurance, intellectual property, finance, media, professional and occupational licensing, transportation, and real estate sectors.

While the competition issues raised by regulation can be numerous and factually diverse, the Division's role is relatively simple: to promote reliance on competition rather than on regulation where appropriate and to ensure that where regulation is appropriate, it is aligned as much as possible with competition principles. These goals should be reflected in all of the Division's competition advocacy efforts.

### 1.    The Division's Analytical Model

Through its competition advocacy program, the Division seeks to prevent unnecessary regulations that impede competition and, where possible, to align necessary and beneficial regulations, adopted to achieve important noncompetition goals, with competition principles. In analyzing potential competition advocacy opportunities, the Division

examines a diverse set of factors, but the following are major considerations:

- If the regulatory scheme or antitrust exemption is an existing one, do the economic and social conditions that originally justified the regulations or exemption still exist and are they as valid now as they were when the departure from full competitive principles first went into effect? In some industries, such as airlines and motor carriers, economic regulation was eliminated after the justifications for such regulation were reexamined and found invalid.

- If a regulatory scheme or antitrust exemption is valid, is it aligned with competition policy in a way that would both advance the noncompetition policy goals of the regulation or exemption and promote competition? In some industries, such as agriculture and banking, there are Congressionally-approved, legitimate, noncompetition policy goals at stake. The Antitrust Division has an important role to play in working with other Federal agencies to promote those goals in ways that are consistent, to the extent possible, with competition principles. Indeed, by embracing these other policy goals while bringing competition tools to bear, the Antitrust Division can improve both governmental oversight and consumer welfare.

## 2.      The Methodology of Competition Advocacy

The Antitrust Division conducts its program of competition advocacy through collaboration between its economists and attorneys, particularly those with expertise in various regulated industries. This advocacy includes participation on Executive Branch policy-making task forces, preparation of testimony on a wide variety of legislative initiatives, publication of reports on regulated industry performance, workshops, review of proposed licensing and leasing applications, and intervention in regulatory agency proceedings.

### a.      Activities Within the Executive Branch

The Division's activities within the Executive Branch have included, for example, its ongoing participation in White House and interagency task forces dealing with a variety of regulatory issues arising in areas such as agricultural, energy, financial services, healthcare, intellectual property, and telecommunications. Whether by informal advice or formal comment, the Division's role in this regard is to advise the President and other Government agencies regarding the competitive impact of proposed policy, legislation, and agency action.

Under 40 U.S.C. § 559, Executive Branch agencies must obtain the Attorney General's antitrust advice before selling Government property to a private interest, with exceptions for real or personal property (other than a patent, process, technique, or invention) with an estimated fair market value less than $3 million. The Attorney General is

required to furnish the advice within 60 days after receiving notice from the agency. If assigned to review a proposed disposition of property by an executive agency to a private interest, staff should ensure that the agency has competitive procedures in place for the sale. Staff should draft a letter from the Assistant Attorney General to the executive agency and the Administrator of General Services with advice on whether the proposed disposal of property would be inconsistent with antitrust law.

**b.      Testimony and Comments on Legislative and Regulatory Initiatives**

Division officials routinely testify concerning the competitive impact of proposed Federal legislation. Such testimony typically promotes competition principles in the crafting of new legislation or in amendments to existing laws. It may also oppose efforts to extend unnecessary regulation or to extend regulation to previously unregulated markets.

Similarly, the Division, both individually and jointly with the FTC, has submitted comments to state legislatures, other state regulatory boards, and state officials, urging the rejection of proposed state legislation or regulations that would restrict competition. For example, the Division has filed comments on proposed restrictions on competition between lawyers and nonlawyers. *See, e.g.*, Letter from Scott D. Hammond, Acting Assistant Attorney General, and Jon Leibowitz, Chairman, Federal Trade Commission, to Hawaii Judiciary Public Affairs Office (April 20, 2009); Letter from Scott D. Hammond, Acting Assistant Attorney General, to the Montana Supreme Court (April 17, 2009). The Division also has filed comments on proposed "minimum service laws", which would restrict the provision of limited service real estate brokerages. *See, e.g.*, Letter from J. Robert Kramer II, Director of Operations, to Hon. Mark Boitano, New Mexico State Senator (Feb. 13, 2009).

**c.      Publication of Reports on Industry Performance**

The Division has authored a number of in-depth studies of the competitive performance of various regulated industries, including airlines, communications, healthcare, insurance, ocean shipping, and numerous energy industries. *See, e.g.*, Voice, Video and Broadband: The Changing Competitive Landscape and Its Impact on Consumer (2008); Competition in the Real Estate Brokerage Industry (2007); Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007); Improving Health Care: A Dose of Competition (2004). The purpose of such reports is to create greater public awareness of the proper role of competition in these sectors of the economy and thereby to advance regulatory reform efforts.

### d.    Intervention in Regulatory Agency Proceedings

One of the Division's major competition advocacy efforts involves submitting comments and intervening in the proceedings of Federal regulatory agencies in an effort to focus attention on competitive issues and to suggest adoption of the least anticompetitive and best designed forms of regulation where continued regulation is deemed necessary. When filing public comments with independent regulatory agencies, the Division must coordinate, in advance, the content and timing of the comments with the relevant White House policy council. This policy is designed to ensure that Executive Branch departments do not take contradictory positions in their filings. Such issues do not apply to situations where only the Department of Justice is mandated to make filings, such as competitive factor reports with bank regulatory agencies.

In the communications area, for example, the Division participates in proceedings before the Federal Communications Commission. The Division also serves as a competition advocate in the banking, finance, and securities industries, submitting comments to and appearing as necessary before such agencies as the Federal Reserve Board, Securities and Exchange Commission, and Commodity Futures Trading Commission.

In addition, the Division appears before or files comments with the Department of Transportation, the Federal Maritime Commission, and the Surface Transportation Board on a wide variety of issues including proposed mergers and acquisitions, conference agreements, pooling agreements, airline code share agreements, and other various rulemakings. Through comments, consultation, or otherwise, the Division also participates in proceedings before the Federal Energy Regulatory Commission, the Nuclear Regulatory Commission, the Environmental Protection Agency, and the Interior Department on competitive issues raised by agency action concerning electricity, the interstate transmission of natural gas, and other issues involving energy policy. And the Division may participate in regulatory proceedings involving USDA marketing orders, which regulate the production of various agricultural commodities.

While the Division's competition advocacy cuts across a vast and diverse cross section of industries in regulated sectors of the economy, the issues raised in regulatory proceedings tend to involve the same types of questions, *e.g.*, whether competition is feasible, whether an industry is naturally monopolistic, whether cross subsidies exist and, if so, whether they are desirable, whether economies of scale are substantial, and whether particular regulations are likely to accomplish their stated objectives.

### e.    Procedures for Filing Pleadings Before Federal Agencies

There are a number of means by which legal and economic sections may become aware of agency proceedings in which the Division should

become involved. For example, each section should review the Federal Register and the trade press to identify important regulatory matters. At times, the Division may be invited by an agency to participate in rulemaking proceedings. Either the legal or economic staff may lead the effort to develop appropriate pleadings, but both legal and economic staffs should be assigned to support the effort and ensure that the Division makes an important contribution to the proceedings.

When preparing to file any pleading in a regulatory matter, the legal and economic staff should prepare a memorandum for the Assistant Attorney General ("AAG memo"). The AAG memo should set forth the nature of the regulatory matter, the reasons for becoming involved, the Division's role in the proceedings, and a summary of the position taken in the pleading. The AAG memo should also describe the Division's prior positions, if any are relevant. Unless the pleading is noncontroversial, the AAG memo should be accompanied by a draft press release announcing the pleading. The press release should contain a concise description of the regulatory matter and the Division's position.

Because most regulatory proceedings have short time limits, it is vital that the staff prepare pleadings promptly. The legal and economic staff should consult with the relevant Deputy Assistant Attorneys General regarding the substance of any pleading well in advance of the filing deadline. No later than two weeks before the filing date, the legal and economic staff should forward to the relevant Deputy Assistant Attorneys General a copy of the AAG memo and the draft press release. In addition, no later than one week before the filing deadline, the relevant legal and economic staff should forward the filing, in final form, to the relevant Deputy Assistant Attorneys General.

The legal and economic staffs should be conscious of prohibitions on *ex parte* contacts with agencies. Many agencies' regulations prohibit any contact with outside parties, including the Department of Justice (*e.g.*, Department of Transportation regulations, 14 C.F.R. § 300.2), and may require such contacts to be placed on the public record. Attorneys and economists should avoid any agency contacts that may violate these regulations. Economists should consult with the lead attorney before making any contacts.

f.   **Litigation Activities**

Sections that are primarily concerned with competition advocacy in regulated industries also have the responsibility for enforcing the antitrust laws in these industries through litigation. Civil antitrust litigation can complement the Division's competition advocacy role. Cases under the Sherman or Clayton Act can ensure that the regulatory scheme does not protect or vindicate a wider scope of anticompetitive activity than is necessary or intended. For example, the Division was successful in litigation to establish that mergers between ocean carriers

were not subject to Federal Maritime Commission approval and antitrust immunity under Section 15 of the Shipping Act.

Litigation activities are described generally in Chapter IV, supra. Litigation activities in regulated industries are reviewed by the appropriate Director of Enforcement, the appropriate Deputy Assistant Attorney General, and the Assistant Attorney General.

## B.  Procedures Affecting the Regulatory Sections

To ensure the consistent quality of the Division's advocacy before regulatory agencies and to coordinate its varied efforts, all Division regulatory filings must be reviewed by the appropriate Deputy Assistant Attorneys General. Each pleading that commences the Division's participation in a regulatory proceeding, states the Department's position on the merits, or raises significant policy issues is reviewed and signed by the Assigned DAAG or, in some cases, by the Assistant Attorney General. Except for litigation matters, which first go through the appropriate Director of Enforcement, all memoranda, filings, and reports made in regulatory proceedings should be transmitted directly from the section chief to the appropriate Deputy Assistant Attorneys General.

# Chapter VI.   Division Resources

A.   Information and Technical Services Available in the Antitrust Division ....................................... VI-3
   1.   Section and Field Office Resources ........................................................ VI-3
   2.   Office of Operations .............................................................................. VI-3
   3.   Freedom of Information Act/Privacy Act Unit ...................................... VI-4
   4.   Library System and Services ................................................................. VI-5
   5.   Economic Analysis Group ...................................................................... VI-5
     a.   Corporate Finance Unit .................................................................. VI-6
       i.   Resources ................................................................................ VI-6
       ii.   Procedures for Obtaining Assistance ..................................... VI-6
     b.   Expert Witnesses ........................................................................... VI-7
     c.   Policy Analysis and Research Program ........................................... VI-8
   6.   Information Systems Support Group ...................................................... VI-8
     a.   Purpose ........................................................................................... VI-8
     b.   Automated Litigation Support ........................................................ VI-8
     c.   Management Information Systems .................................................. VI-9
     d.   Office Automation Program ............................................................ VI-11
       i.   Computer Services, Customer Support, and Training ............. VI-11
       ii.   Systems Operations and Administration ............................... VI-12
       iii.   Systems Engineering and Development ............................... VI-12
       iv.   Computer Security ................................................................ VI-13
       v.   Miscellaneous Applications and Services .............................. VI-13
     e.   Information Technology Security .................................................... VI-14
     f.   Web Services ................................................................................... VI-14
   7.   Training .................................................................................................. VI-14
     a.   Programs ......................................................................................... VI-15
       i.   Conferences, Seminars, and Lectures .................................... VI-15
       ii.   Special Assistants in United States Attorneys' Offices .......... VI-15
       iii.   Office of Legal Education at the National Advocacy Center ... VI-16
     b.   Library of Independent Learning Resources ................................... VI-16
     c.   Application Procedures .................................................................. VI-17
B.   Obtaining and Using Information and Documents in an Antitrust Investigation .................... VI-17
   1.   Preliminary Sources of Information ...................................................... VI-17
     a.   Prior Division Investigation and Litigation ..................................... VI-17
       i.   Investigative Files .................................................................. VI-18
       ii.   Pleading Files ......................................................................... VI-18
     b.   Public Information Sources ............................................................ VI-18
       i.   Market Share Information ...................................................... VI-18
       ii.   Trade Association Information ............................................... VI-19
       iii.   Trade Press ........................................................................... VI-20
       iv.   Corporate Information .......................................................... VI-20
       v.   Legal Information .................................................................. VI-21

2.    Obtaining and Using Information and Documents During the Course of an Investigation ... VI-21
    a.    Obtaining Information and Documents from Corporate Entities ..................................... VI-22
        i.    Noting Unique or Specialized Industry Practices .......................................... VI-22
        ii.    Consulting with the Economic Analysis Group ............................................. VI-23
        iii.    Consulting with the Corporate Finance Unit ................................................ VI-23
        iv.    Consulting with Litigation Support Staff ....................................................... VI-23
        v.    Consulting Previous Work Product ................................................................ VI-24
        vi.    Drafting Production Requests ........................................................................ VI-24
        vii.    Managing Data and Document Production ............................................... VI-24
    b.    Using Documents and Materials in the Investigation ....................................... VI-25
        i.    Locating Witnesses ................................................................................. VI-25
        ii.    Preparing Immunity Requests ........................................................................ VI-26
        iii.    Preparing for Interviews and Testimony....................................................... VI-26
        iv.    Using Documents for Economic or Financial Analysis ................................. VI-27
    c.    Using Internal Legal Resources.......................................................................... VI-27
    d.    Using Public Sources.......................................................................................... VI-27
    e.    Preparing and Retrieving Testimony, Interview Materials, Electronic Data,
          and Documents ................................................................................................. VI-28
3.    Information Services and Technical Assistance During the Litigation Stage ........................ VI-28
    a.    Preparing Expert Economic or Statistical Evidence.......................................... VI-28
        i.    Exhibits for Economic or Statistical Experts ................................................. VI-29
        ii.    Defense Economic and Statistical Evidence................................................. VI-29
        iii.    Computer-Based Information ...................................................................... VI-29
    b.    Sound Recordings and Other Technical Assistance........................................... VI-29
    c.    Courtroom/Trial Support and Preparation........................................................ VI-29
    d.    Sources of Information About Trial Witnesses................................................... VI-30

The purpose of this chapter is to describe briefly the information and technical services available to Division attorneys, economists, and paralegals in conducting investigations and litigation, and to provide a resource guide to antitrust investigations and cases. This chapter provides a useful checklist for Division personnel in researching specific issues and obtaining data services, litigation and technical support, and training in various investigation and litigation skills.

## A.    Information and Technical Services Available in the Antitrust Division

This section describes the various research and technical services available to the Antitrust Division. These include the resources of each section and field office, the Office of Operations, the FOIA/PA Unit, the Antitrust Library, the Economic Analysis Group and its Corporate Finance Unit, the Information Systems Support Group, and the Division's training program.

### 1.    Section and Field Office Resources

Each section and field office of the Division maintains substantial resources to assist attorneys, economists, and paralegals in obtaining information quickly and efficiently. Each section and field office receives the major legal publications that report new developments in antitrust and various industry and trade journals that relate to the component's assigned commodity and service expertise.

The combined expertise of the attorneys and economists of the Division is, in many ways, the most valuable information resource available within the Division.

### 2.    Office of Operations

The Office of Operations maintains information about civil and criminal cases and investigations in numerous databases. As an aid to criminal prosecutors, studies of cases filed are available upon request, including specific defendant information, pleas, sentences, trials, and restitution. Fiscal year statistical summaries are maintained. Information concerning opened or closed grand jury investigations as well as formal and informal immunity authorizations is also available, subject to the requirements of Rule 6(e) of the Federal Rules of Criminal Procedure. Frequently requested are searches of databases to determine whether the Division has ever investigated or filed cases against particular companies or individuals or in certain industries.

The Premerger Notification Unit, in the Office of Operations, maintains substantial information about open and closed civil investigations and cases in numerous databases. Statistics—including fiscal year summaries—regarding cases filed, litigated, won or lost, and remedies imposed are maintained. Frequently requested are searches of databases to determine whether the Division ever investigated or filed a

case against a particular corporation or individual or in a certain industry. The Premerger Notification Unit also maintains information on all filings under the National Cooperative Research and Production Act (NCRPA) and the HSR statute. Information on clearances, the resolution thereof, and timing statistics involving the clearance program are also available.

### 3.    Freedom of Information Act/Privacy Act Unit

The Freedom of Information Act/Privacy Act Unit (FOIA/PA Unit) provides several major functions for the Division and serves as a Division resource. The FOIA/PA Unit is part of the Office of the General Counsel, and reports to the General Counsel. The FOIA/PA Unit specializes in confidentiality, privacy, and disclosure laws, regulations, policies and practices. It is responsible for receiving, evaluating, and processing requests for information made to the Division under the Freedom of Information Act and the Privacy Act of 1974, and for defending the Division's positions in the event of administrative appeals or litigation under those statutes. *See infra* Chapter VII, Part G. It is also responsible for processing requests for information by state attorneys general under Section 4F of the Clayton Act, 15 U.S.C. § 15f(b). In addition, the FOIA/PA Unit, in conjunction with the Directors of Enforcement, administers the clearance of outside communications under Division Directive ATR-3030.1. The Unit also assists the General Counsel with special projects relating to confidentiality and disclosure, and advises the civil litigating sections and criminal enforcement sections on confidentiality, privacy, and disclosure issues in the context of investigations, litigation, business reviews, NCRPA, and competition advocacy.

The Antitrust Documents Group (ADG) within the FOIA/PA Unit serves as the official custodian of public antitrust documents and other matters of interest. ADG offers staffs access to much of the Division's prior litigation and policy materials including:

- Pleading files of many Division cases, including trial and appellate briefs and complete dockets, particularly of older matters not included on the Division's Intranet (ATRnet) or Internet sites.

- Complaints, indictments, informations, plea agreements, judgment and commitment orders, final judgments, and many court orders and opinions.

- Division filings with regulatory agencies.

- Civil investigative demands (CIDs) issued by the Division. (All persons not employed by the Federal Government must make a FOIA request for CIDs.)

- Business review letters since 1968 and the complete public files of materials submitted in connection with business reviews issued in the current year.

- Publications of the Antitrust Division.

- Published speeches and testimony given by Division personnel, particularly older matters not included on the Division's Intranet (ATRnet) or Internet sites.

Staffs are required to furnish ADG with copies of all complaints, indictments, informations, plea agreements, judgment and commitment orders, substantive court orders, opinions, and final judgments. Such materials should be sent promptly to ADG by the section or field office responsible for the matter. All of the data and materials maintained by ADG are available to Division personnel. In most instances, a telephone call, fax, or e-mail is sufficient to request assistance.

### 4.    Library System and Services

Library services are available to Division personnel through the Antitrust Division Library and the Justice Management Division (JMD) Library System.

The Antitrust Library contains general and specialized reporters, treatises, and legal periodicals; trade, business and census publications necessary to monitor industry activity; and academic economics journals and treatises. Library assistance is provided to Division personnel in the form of reference and research, online database searching, interlibrary loan and document retrieval, collection development, and circulation. Requests for assistance may be made via e-mail, telephone, or fax, as well as in person. To find out more about Antitrust Library resources and services, staff should view the Antitrust Library page on ATRnet.

Most Antitrust Library materials circulate, including trade and business journals. If a source of information is not held in the JMD Library System, patrons will be referred to nearby libraries where the material is available or the items will be borrowed through interlibrary loan. Book and journal selection is done primarily by library staff, but Division personnel are encouraged to recommend items for addition to the library collection.

The collection in the Main Library is available to Division personnel as are the other JMD branch library collections. The Justice Libraries' online catalog is accessible by Division personnel via computer, making available the complete holdings of all JMD libraries.

### 5.    Economic Analysis Group

The Economic Analysis Group (EAG) provides economic analysis in all matters involving economic issues of substance. Economists identify the economic issues involved in an investigation or case, assist in the development of the theory of the case, identify and present data necessary to support the Division's position, assist in the development of trial strategy relating to the economic issues, and sometimes testify

in Division litigation. More specifically, economists evaluate the competitive effects of business activities proposed for investigation; analyze proposed mergers and acquisitions by determining product and geographic markets, identifying potential entrants, and estimating competitive effects; analyze evidence related to alleged price fixing and bid rigging; participate in the formulation of relief necessary to restore competition; and analyze the economic effect of proposed consent decree modifications. EAG economists are trained in statistics and econometrics and regularly employ these tools.

**a.    Corporate Finance Unit**

The Corporate Finance Unit (CFU) consists of financial analysts and support staff and has as its primary purpose counseling and advising the Division on financial and corporate matters arising in antitrust enforcement. CFU may be of assistance in the following areas:

- Investigating merger candidates' "failing company" claims.

- Participating in divestiture negotiations and assessment of the viability of divestiture proposals, locating trustees, and evaluating potential purchasers.

- Analyzing the efficiencies defense of a merger candidate.

- Evaluating financial issues relating to damages.

- Determining the ability of a company to pay a fine or damage settlement.

CFU is available to assist trial staffs in preparing Division financial witnesses, assist at depositions, prepare Division attorneys to cross-examine financial witnesses, and locate financial experts, such as investment bankers. In addition, CFU can assist in analyzing and understanding organizational structures and the financing of merger transactions. CFU is also available to prepare affidavits and present testimony on financial and accounting matters.

### i.    Resources

CFU has access to various financial databases with information on financial and corporate subjects. For example, CFU subscribes to the Bloomberg Financial Markets database, which contains financial profiles (including financial statements, SEC reports, and news articles) on publicly traded U.S. and some foreign companies. CFU also uses the Internet to access information related to financial and corporate issues. CFU maintains a small library of reference materials often used to research specific topics. CFU can assist staff in obtaining publicly available information on specific companies and industries.

### ii.    Procedures for Obtaining Assistance

CFU should be called upon to lend assistance in court proceedings where financial and management witnesses are expected to be

examined. Even if only a short period of time is available for preparation, CFU can provide quite effective assistance. Where written reports subject to court-imposed deadlines are needed, a financial analyst should be notified as soon as practicable. Requests for the assistance of CFU must be approved by the chief of the section or field office desiring assistance. In addition, the assigned financial analyst should be placed on the distribution list for the matter in question. Requests can be made to the chief or assistant chief of the Economic Litigation Section. CFU is also available to discuss matters with Division personnel informally and can assist staff in understanding complex issues such as the structure of a transaction, transaction financing (understanding where motivations and incentives lie), and the likelihood that a monopoly premium is included in the acquisition price.

### b.    Expert Witnesses

The selection of prospective expert witnesses in Division investigations involves collaboration between the legal component, EAG, and the appropriate Director of Enforcement, the DAAG for Economic Analysis, and the Assigned DAAG. The lead attorney, the legal component's chief and assistant chief, and the EAG manager should confer about the investigation's expert needs.

For economic analysis expertise, EAG typically provides an initial list of candidates. The discussion usually focuses on whether, for this particular matter, an EAG economist has special expertise and experience, or whether an outside academic or consultant offers qualifications more suited to the case. After a consensus is reached, the EAG manager contacts the candidate, discusses that candidate's interest and availability, and, if the candidate is a non-EAG economist, negotiates the scope of work and fees of the contract. The manager prepares a package including a completed OBD-47 Form and supporting memo that is processed by the Executive Office. All such packages for economist experts must be approved by the Assigned DAAG and the DAAG for Economic Analysis, who signs the OBD-47 Form. *See* Division Directive ATR 2110.1, "Employment of Expert Witnesses."

Special attention is paid to discovery concerns associated with the testifying economist. The "inside" EAG economist has full access to all materials and discussions, writes comprehensive economic memoranda, and participates fully in all case strategy and enforcement decision meetings. The "outside" economist is the prospective testifying economist, from either within EAG or outside the Division. The materials provided to the "outside" economist will depend upon the needs of the case and must be monitored so that an appropriate record is maintained for use later in discovery.

EAG maintains a file of affidavits, testimony, and exhibits presented by economists and other experts in antitrust cases, regulatory proceedings, and related matters. The contents are listed by type of case (*e.g.*,

Section 1 or 7), name of expert, case and date, and type of material. To ensure the completeness of the file, Division attorneys are requested to provide any EAG manager with copies they obtain of testimony, affidavits, and exhibits presented by experts in antitrust trials and regulatory proceedings. Such material should not be limited to the Government's testimonial evidence, but should include defense testimony and testimony introduced in private antitrust litigation and regulatory proceedings. Information about the file or access to it can be obtained by calling the Economic Regulatory Section.

### c. Policy Analysis and Research Program

Economists in EAG conduct economic research directly related to the Division's antitrust enforcement and competition advocacy programs and in connection with the Division's policy analysis of competitive issues. The major results of this research are available through EAG's discussion paper series.

## 6. Information Systems Support Group

### a. Purpose

The Information Systems Support Group (ISSG) is part of the Division's Executive Office and is responsible for the operation and management of the Division's information technology infrastructure which provides a suite of automated tools, computer services, and technical support to all Division personnel. The mission of ISSG is to develop, implement, and supervise an integrated approach for effectively and efficiently planning and managing all of the Division's information technology resources.

ISSG provides support services in five distinct functional areas: litigation support, management systems, office automation, information technology security, and web services. Each of these areas has senior information technology (IT) professional staff who work together to provide professional technical services to support the Division's attorneys, economists, and managers in gathering and organizing information related to case support, economic analysis, and administration. These services range from securing IT operations, to developing and maintaining a reliable network infrastructure that provides basic computer services (such as electronic mail, file management, Internet access, word processing, and database access), to offering Division litigation staffs the latest technology available for courtroom presentations at hearings and trials, to preparing the management and financial reports which ultimately determine the Division's overall operating budget, and publishing content on Division web sites. Each functional area is described in detail below.

### b. Automated Litigation Support

ISSG's Litigation Support Staff (LSS) provides advice and assistance for every Division investigation. LSS uses a wide variety of automated

litigation support services. Automated litigation support (ALS) encompasses a broad range of services and products that help attorneys acquire, organize, develop, and present evidence. Through the use of advanced computer and image management and other technologies, litigation materials are organized so that the litigating attorney can rapidly locate and use information. The enormous volume of case materials and the complexity of the information to review necessitate the use of computers and advanced technology equipment to be effective. Databases designed by ISSG allow Division staff to perform complex data analysis using data and document control systems. LSS can provide a variety of support including services in the following areas:

- Document acquisition.

- Database creation. A customized database can be created by LSS personnel and maintained by staff.

- Electronic data acquisition and production. Automated support techniques prove especially valuable in price-fixing and bid-rigging investigations, where electronic data is available.

- Database utilization. LSS personnel provide beginner and advanced training for use of the systems.

- Pretrial support.

- Other litigation support services obtained through contract support.

Contact with LSS should occur at the earliest stages in the investigation. After being contacted by staff, LSS reviews all the relevant information regarding the investigation and suggests a plan of support. LSS will work directly with staff to outline what needs to be done by LSS or a private contractor and to estimate the costs and resources necessary. The chief of the section or field office may authorize smaller support projects. Larger projects require prior approval from the appropriate Director of Enforcement before work can begin. For additional information, *see* Division Directive ATR 2850.1, "Requests for Litigation Support Services."

### c.      Management Information Systems

The Management Systems Staff (MSS) is responsible for developing and supporting the Division's management information systems (MIS) which are broadly characterized as those information technology solutions which provide managers with tools for organizing, evaluating, and efficiently running the Antitrust Division. More specifically, the MIS encompasses a set of application systems which provide the 30,000-foot view of the Division's overall workload, resource allocations, and litigation outcomes which serve as an essential resource for (1) management of day-to-day investigative and administrative operations, (2) presenting and defending the Division's budget submissions, and

(3) a first-line source of vital statistics responsive to inquiries from oversight agencies such as the Office of Management and Budget (OMB), General Accountability Office (GAO), and the Congress.

Two of the principal functions of the Division's management systems are tracking (1) Division investigation and litigation workload, and (2) the allocation of Division resources to handle that workload.

Section and field office staffs play a vital role in ensuring that the information in these databases is accurate and up to date. When authority is requested to open a preliminary investigation or to file a complaint, staff is required to supply basic descriptive information concerning the proposed matter for the MTS. The information required includes matter title, judge, court, staff assigned, parties being investigated, industry, alleged violations, and geographic area. After approval to open an investigation is granted or the complaint is filed, the Premerger Notification Unit assigns the new matter a DOJ file number and enters this basic information into the MTS database. Subsequently, if any of the basic information about the matter changes or if the matter progresses to the next stage (such as moving from a preliminary investigation to a grand jury investigation) staff is required to provide the Premerger Notification Unit with updated information for the MTS database.

Another major element of the Division's management information systems involves tracking the allocation of staff resources across the wide array of enforcement and regulatory functions which the Division performs. The Time Reporting System (TRS) permits staff to report the number of regular and overtime hours worked on a daily basis on Division matters.

The Management Systems Staff also facilitates the substantive development of the evidence associated with individual investigations and cases, as follows. First, it develops, deploys, and supports the computational servers which Division economists use to conduct econometric analyses of massive litigation support databases obtained through the discovery and subpoena processes. Secondly, it provides a virtual collaborative environment, eRoom, for investigation and litigation teams to use in organizing, analyzing, and conferring about investigation-related evidence, filings, interviews, subpoenas, depositions, and other data which must be managed and organized for effective litigation administration purposes.

Finally, in addition to the systems which facilitate management of the Division's substantive workload, the MSS leverages database technology for purely administrative purposes. The Human Resources Tracking System facilitates the administration of the Division's overall staffing levels, personnel costs, staff allocations, and staff promotion and retirement schedules.

Executive level correspondence with the Congress and oversight agencies, as well as antitrust-related complaints from the public at large, are tracked in the Correspondence and Complaint Tracking System (CCTS), while requests from the public for information on Division activities are tracked in the FOIA Tracking System (FTS).

**d.    Office Automation Program**

The mission of the Office Automation Staff (OAS) is to provide a highly secure and reliable IT infrastructure that enables information sharing and fulfills program needs throughout the Antitrust Division. OAS achieves this through the acquisition, development, deployment, operation, and maintenance of an IT infrastructure that includes computing platforms, telecommunications networks, desktops, messaging, web services, training, and contract services. OAS provides support in five major functional areas: (1) Computer Services, Customer Support, and Training; (2) Systems Operations and Administration; (3) Systems Engineering and Development; (4) Computer Security; and (5) Miscellaneous Applications and Services. These five areas are integrated to meet the computer support needs of the Division. The tools offered by ISSG staffs depend upon a solid infrastructure that is stable, reliable, and available 24/7. Virtually everything any Division employee does on his or her computer is made possible through the services offered by the Office Automation Staff. Below is a brief description of the five OAS functional areas and how they support OAS's and the Division's mission.

i.    Computer Services, Customer Support, and Training

Adhering to computer security guidelines from the Departments of Justice and Homeland Security, OAS has developed a standard desktop suite that currently includes the Windows Operating System, Microsoft Outlook for electronic mail, iManage WorkSite for document management, the Microsoft Office Suite (Word, Excel, and PowerPoint), Internet access, automated research tools (*e.g.* LexisNexis and Westlaw), litigation support tools, and TRS (Time Reporting System from MSS). To ensure the stability and safety of the desktop, anti-virus and patch management software run continuously in the background. In addition to the standard applications, OAS provides all Division users with a wide array of software packages to assist them in meeting the Division's mission (such as travel preparation software and economic analysis software). OAS subscribes to a three- to four-year hardware refresh schedule for all desktop computers as well as walk-up desktops in general use areas. High speed, high volume printers, standard production printers, and scanners that create output from the desktop suite are also part of the Division's hardware inventory. In addition, OAS evaluates new versions of the applications in the current software suite and upgrades as necessary to ensure that Division staff have up-to-date, stable, and reliable tools.

Day-to-day support is provided via a 24-hour centralized Help Desk and escalation procedures which allow for the quick resolution of the simplest problem (such as printer paper jams) to the most difficult problems affecting large segments of Division staff (such as communications outages). This support is available 24/7 simply by calling the ATR Help Desk. The ATR Help Desk should be the first call for virtually any computer issue a user has. If it is determined that the problem is an issue related to LSS, MSS, or WCLS, the Help Desk analyst will forward the information to the appropriate staff. In addition, each field office employs a computer specialist (a.k.a. ITSFO) who provides day-to-day support to field office staff.

OAS provides training at its training center in the Liberty Square Building. The trainers offer a wide variety of classes for both beginners and advanced users. Every new Division employee is required to attend at least six hours of training before obtaining access to the Division's computer network. The training staff also provides training for the new software products both in D.C. and in the field offices. Besides instructor-led training, OAS works with the Executive Office to offer Department- and Division-mandated training via the Department's online learning management system, learnDOJ.  learnDOJ is also utilized by the Division users for career enhancement training.

### ii.        Systems Operations and Administration

This functional area involves all of the "back room" operational tasks essential to a reliable, stable network. Systems Operations Staff is responsible for, among other things, maintaining the servers that run the applications and store the Division's electronic data; ensuring that the communications lines, routers, and switches that connect all of the Washington and field offices are up and running efficiently; administering the directories that determine who has access to what data; maintaining e-mail address lists; performing data backups to ensure efficient recovery should data be lost; and maintaining the computer facilities in each Washington building and field office.

### iii.       Systems Engineering and Development

Systems Engineering and Development (SED) staff is responsible for ensuring that Division employees have available to them the most stable "state-of-the-art" tools to meet the Division's overall mission. SED staff has a fully functioning computer lab that mirrors the production system. Every new software application or version is tested to ensure that the application works and that the software integrates well with the standard desktop suite.

In addition to evaluating software applications, SED staff is responsible for the design and development of the Division's standard infrastructure architecture. SED staff consistently reviews new tools and products. SED staff also works closely with the Department's JCON Program

Management Office to ensure that the Division's standard infrastructure architecture meets Departmental requirements regarding configuration and security.

### iv.    Computer Security

The OAS security staff is responsible for ensuring that the Division's computing environment meets all security standards mandated by the Department of Justice. These standards come from many sources including the National Institute for Standards and Technology (NIST) and the Office of Management and Budget (OMB). Tasks include risk analyses regarding changes to the production network and incident reporting of security breaches (such as lost equipment and viruses). The OAS security staff works closely with the Department's IT Security staff. The security staff is also responsible for preparing the Certification and Accreditation (C&A) documentation every three years which is necessary to receive the Authority to Operate for our system within the Department of Justice.

### v.    Miscellaneous Applications and Services

OAS offers services to Division staff outside of the four areas described above. These services include audiovisual (AV) support, remote access, remote trial setup, and computer facilities setup for staff relocations. AV support includes presentation equipment, videoconferencing, and, to a limited extent, videotaping training sessions so that Division staff members have training material readily available. The AV staff also works with LSS to operate the Mock Courtroom. To request AV support, a user should call the Help Desk. More information regarding AV support can be found on ATRnet.

Remote access allows Division staff to work from any location with a phone line or high-speed Internet hookup via the Justice Secure Remote Access (JSRA) network. Each remote access user has a JSRA token which provides a secure entry into the Division's computer network from any remote location. Through JSRA, users are able to access their e-mail, iManage files, and litigation support databases; work on documents and spreadsheets; and report their time via TRS. To request remote access, a staff member should contact the Help Desk.

OAS also works with the Executive Office to support trial teams. Unless a trial is held in a city with a Division field office, OAS sets up a new field office for each trial. This involves acquiring voice and data communications lines, building file and application servers to mirror staff's "home" server, migrating the trial staff's data to the new server (including all litigation support databases), supplying a PC for every trial team member, and, most importantly, providing on-site Help Desk support.

OAS is also responsible for ensuring that all computer services are maintained with as little disruption as possible in any staff relocation,

whether one person or an entire office. When a Division staff member is transferred to another section or office, OAS is responsible for taking the steps necessary to make sure that all data is transferred, including transporting the desktop computer if necessary. For entire office relocations, OAS works closely with other Executive Office staff members to design computer facilities that will satisfy current needs as well as anticipate future needs.

 In sum, OAS, in conjunction with all of ISSG, works to provide all Antitrust Division staff with the automated tools necessary to meet the Division's strategic goals and fulfill the Division's mission.

### e.   Information Technology Security

The Executive Office has established within ISSG an Information Technology Security (ITS) group to function as an independent and unbiased auditing service for monitoring the Division's major computing environment and information technology security practices to ensure compliance with the Federal Information Security Management Act and with new Departmental security requirements.

In addition to monitoring the computer systems managed within ISSG, ITS staff reports on the status of implementing various security related requirements such as security awareness training, IT professional training, incident response, contingency planning, and configuration management to the Department's Deputy CIO for Information Technology Security.

### f.   Web Services

Recognizing the importance of the Division's Internet and intranet web sites in helping to fulfill the Division's mission, the Executive Office established the Web Customer Liaison Staff (WCLS) within ISSG in 2008. WCLS is responsible for maintaining the Division's web sites including audio/video media, posting case filings, guidance documents, reference and resource information, and for designing new web pages and program areas to support Division initiatives and staff requirements.

WCLS is also responsible for undertaking long-term design and development efforts to improve the usability, accessibility, and search ability of the Division's web sites. The web staff manages the Division's Work Product Document Bank, provides customer support and training to content submitters, assists with contingency and continuity of operations program, aids other ISSG units, and serves as liaison to the Department's E-Government, Internet Services Office.

## 7.   Training

The Antitrust Division offers an extensive program of training opportunities to Division attorneys, economists, paralegals, and other personnel each year. The Special Counsel for Professional Development in the Office of Operations has overall responsibility for Division training

courses. That individual develops a comprehensive training program, formulates and coordinates specific training sessions, issues calendars and memoranda to notify employees of the opportunities available, and provides a brief description of the programs to be conducted. Antitrust Division employees interested in attending a course should contact their chiefs, in advance of the training course deadlines, to request permission to attend.

The Department's Office of Legal Education (OLE) publishes a training calendar with information on executive, professional development, management, supervisory, interagency, and other job-related training. Most of these programs are conducted in the OLE training center and are open to Division personnel. In addition, the Division supports participation in and pays for training by private vendors as long as the program contributes directly to the performance of the employee's official duties. The Division regularly sends attorneys to courses sponsored by the American Bar Association, the Federal Bar Association, law and business organizations, continuing legal education (CLE) groups, and law schools.

### a.    Programs

The training programs offered by the Antitrust Division fall into four broad categories:

#### i.    Conferences, Seminars, and Lectures

Since the fall of 1993, the Division has offered a substantial in-house training program that offers courses in litigation skills, antitrust law, economics, and other areas. These courses range in length from lunch-hour sessions to multiday seminars. A structured in-house training plan for first through third year attorneys is available, as well as a separate series of training programs for experienced attorneys in the Division. A schedule of Division training classes is accessible on the Antitrust Training Program page on ATRnet. CLE credit may be available for some programs.

#### ii.    Special Assistants in United States Attorneys' Offices

For many years, Division attorneys stationed in Washington have served tours of about six months as Special Assistant United States Attorneys in the U.S. Attorney's Office for the Eastern District of Virginia and other U.S. Attorney's Offices. Similar programs are available for attorneys assigned to the field offices. These details provide the opportunity to gain trial experience. Despite the fact that the prosecutions do not involve Sherman Act conspiracies, the skills learned from these tours have direct applicability to the Division's work.

Participation as a Special Assistant U.S. Attorney involves a full range of criminal practice. Special Assistants are involved in misdemeanor prosecutions in Magistrate Court, grand jury work, motions, pleas,

probation revocations, and trials in District Court, as well as appellate briefs and arguments. If interested in applying for a Special Assistant U.S. Attorney tour of duty, attorneys should speak to their chief. Since the Special Assistant U.S. Attorney tours are intended to augment the trial experience of Division attorneys, anyone accepting a Special Assistant U.S. Attorney position must agree to return to the Division for at least eighteen months after completing the detail.

### iii. Office of Legal Education at the National Advocacy Center

Division attorneys are eligible to participate in training courses offered by OLE at the National Advocacy Center (NAC) in Columbia, South Carolina. Courses in civil and criminal trial practice, as well as courses in evidence, grand jury practice, supervisory skills, and white collar crime are available. In addition, OLE televises courses through its Justice Television Network. OLE's main purpose is to train Assistant United States Attorneys; however, OLE does reserve spaces at its courses for attorneys from the Department's litigating divisions. Antitrust Division attorneys, along with attorneys from all other divisions at the Department, may attend OLE courses when space is available. Notice of OLE courses is sent to section and field office chiefs, who nominate attorneys to attend the OLE courses.

The Civil and Criminal Trial Advocacy Courses were established to provide basic training in the skills of trial advocacy. The course formats include complementary lectures, workshops, and mock trials. The lectures center on the practical aspects of trial preparation and technique. The workshops and mock trials are designed to increase skills and cover basic trial problems. In the Civil and Criminal Trial Advocacy Courses, emphasis is on the skills of advocacy and trial practice rather than substantive law. The courses are designed for attorneys with little or no trial experience. They are intensive programs featuring lectures by experienced litigators and simulated trials before Federal judges.

### b. Library of Independent Learning Resources

The Department and the Division have established a library of videotapes, DVDs, and written materials on various training topics. A list of the available materials can be found on the Training Resources page on ATRnet. Division attorneys can obtain materials through the Office of Professional Development.

OLE sponsors free videotaped lecture series each year. The taped lectures include Irving Younger's Trial Advocacy and Discovery Techniques series. These videotaped seminars are offered periodically in Washington and other cities with substantial numbers of Federal attorneys such as New York. CLE credit may be available for watching the videotapes.

### c.    Application Procedures

Training opportunities and materials available for Division personnel and selected programs of interest are announced periodically in memoranda from the training program and the Executive Office. Training requests should be approved in advance by the applicant's chief. *See* Division Directive ATR 1410.1, "Employee Training."

## B.    Obtaining and Using Information and Documents in an Antitrust Investigation

Over the years, Antitrust Division attorneys and economists have accumulated considerable experience in investigating, analyzing, and litigating antitrust matters. In their work, Division attorneys and economists have found some sources and practices particularly useful in obtaining, assembling, and retrieving information.

At the outset, investigations typically require a quick accumulation of data about the companies, the industry, and the alleged violation that are the subject of the probe. Section 1 below describes some resource materials that are publicly available or found within the Division. Section 2 below discusses how staffs can obtain and use information and documents during the course of an investigation. Finally, after a case is approved, if it is not settled, staff will need services tailored to assembling or retrieving the information necessary to the proper presentation of evidence in court. Section 3 below describes services available to staff at this stage.

### 1.    Preliminary Sources of Information

When an attorney, economist, or paralegal initially receives a complaint that a course of conduct or proposed transaction may violate the antitrust laws, he or she has immediately available a number of information sources within the Division. These sources include (1) material developed during the course of previous Division investigations and litigation, and (2) trade and industry data available through the library, EAG, and ISSG.

### a.    Prior Division Investigation and Litigation

The Division's official records of past investigations and litigation are a major source of industry and company information. Reports on recent Division activity in particular industries may be obtained from MTS using ATRnet, or by contacting ISSG or the Premerger Notification Unit. Details about past matters, including copies of related documents in the work product data bank, may be obtained from ATRnet. Copies of case filings may be obtained either from ATRnet or the Division's Internet site. Files on matters may be obtained from the responsible section or field office. Files on closed matters may be obtained from the GSA records center by contacting the Support Services Staff in the Executive Office.

### i.        Investigative Files

The MTS database contains a wide array of searchable data elements, including company names, industry identifiers (Standard Industrial Classification (SIC) codes or North American Industrial Classification System (NAICS) codes), and violation descriptions for both current and historical investigations and cases. Queries against these and many other descriptive data elements may be performed via "point-and-click" search tools within ATRnet. Once relevant matters have been retrieved, detailed descriptive information can be displayed along with the full text of key documents associated with those investigations (such as press releases, opening and closing memos). To obtain access to the original hard copy files associated with a prior investigation, staff can contact the handling section, or, if the files have been retired to the Federal Records Center, the Support Services Staff in the Executive Office. Additional information about current investigations and cases may be obtained from the appropriate special assistant in the Office of Operations.

### ii.        Pleading Files

ADG of the FOIA/PA Unit maintains a precomputer card index of the Division's litigation history by commodity, defendant, type of violation, and case name. In addition, the group maintains regulatory filings by agency and date, as well as a collection of all complaints, indictments, informations, and final judgments. Finally, the group has copies of all speeches, testimony by Division officials, Division publications, and business reviews. Both ATRnet and the Division's Internet site contain copies of pleadings filed in numerous cases.

## b.    Public Information Sources

In addition to the Division's internal files, considerable public information is available that can be quite helpful during the initial stages of an investigation. Useful investigative sources of publicly available information include:

### i.        Market Share Information

Preliminary market share information should be determined at the beginning of any merger investigation and many civil nonmerger investigations. Market share information is available from various public sources:

- U.S. Department of Commerce, Bureau of the Census reports: The Economic Censuses include the Censuses of Manufactures, Mineral Industries, Retail Trade, Wholesale Trade, Finance and Insurance, Real Estate and Leasing, Construction, Utilities, Transportation, and others. The Censuses are conducted every five years, in years ending in two and seven. Between those years, they are updated by various surveys.

- Most of the Censuses are classified by 6-digit product codes, called NAICS codes (North American Industrial Classification System), with the Manufacturing and Mineral Industries Censuses classified by up to 10 digits. The Censuses provide the number of establishments or companies in a NAICS code and the value of shipments or sales, for either the United States as a whole or a smaller geographic area. The Census of Manufactures also reports concentration ratios by 6-digit NAICS codes. The NAICS replaced the Standard Industrial Classification (SIC) system in 1997, and was revised in 2002. However, the SIC system is still used to classify information in many business directories and business databases. Other sources of Government information include the National Trade Data Bank and Stat-USA databases, available in the Division libraries.

- Directories and Online Databases: Other sources of market share information include directories such as: Manufacturing USA, Service Industries USA, Finance, Insurance and Real Estate USA, Ward's Business Directory, and Market Share Reporter (MSR) (MSR is searchable on LexisNexis). These directories provide information by 4-digit SIC or 6-digit NAICS code, ranking companies in terms of sales. For initial information on a firm's market presence in certain specific industries, the Division has online access to various computerized databases. For example, for data on airlines, the Division can access the Back Information Services Aviation Listing; for data on hospitals, the Division has the American Hospital Association Guide to Hospitals; and for information in bank loans, the Division has online access to the FDIC database. Online sources of market share information include the Dialog and LexisNexis databases. Approximately 130 files on Dialog are searchable by SIC, NAICS, or product code. Some files index their contents by 7- or 8-digit SIC-based codes. Full-text market research reports and stock brokerage analyses are also available.

Staff should consult with the Antitrust Library and with EAG to determine which databases are currently available and in use. Dialog and market research reports may be requested from the Antitrust Library.

### ii.    Trade Association Information

Several directories identify associations serving particular industries or commodity areas: *National Trade and Professional Associations*, *Encyclopedia of Associations*, and *Associations Yellow Book*. Once an investigation is approved, the associations themselves may be contacted, and they will often provide information that can help to determine the scope of the market, the companies in that market, and market share data. The Antitrust Library either maintains these directories in print or has online access to them. The *Encyclopedia of Associations* is searchable on LexisNexis.

### iii.    Trade Press

There are a large number of trade periodicals, industry yearbooks, almanacs, and directories that contain information useful at the early stages of an investigation. The Division's library staff can identify industry specific directories, yearbooks, and almanacs, and provide bibliographic assistance by searching for articles on companies and industries. Bibliographic sources include the online databases Dialog, Westlaw, LexisNexis, Newsbank, and EBSCOhost. Staff may be able to access full-text articles online, find them in print or microform in the Antitrust Library, or request them through document delivery.

### iv.    Corporate Information

- General Information: The online library tutorial contains an overview of corporate information sources. Sources of general data on public corporations, including officers, subsidiaries, sales, and general corporate history, include: *Billion Dollar Directory*, *Million Dollar Directory*, *Standard & Poor's Register*, *Directory of Corporate Affiliations*, *Principle International Businesses*, and *Mergent Manuals*. *Mergent Manuals* provide concise descriptions of domestic and foreign companies, including information on company history, products, plants, stock prices, and recent acquisitions. These directories are available in the Antitrust Library. *Standard & Poor's Register* and *Directory of Corporate Affiliations* are also available on LexisNexis and are included in the LexisNexis Analyzer, a new due diligence tool providing corporate information. The Internet is also a source of corporate information. A company may have a home page that contains information on its perception of itself and the industries in which it does business.

- Specialized Information: Dun and Bradstreet produces specialized Business Information Reports/Federal Information Reports on both domestic and foreign corporations that provide up-to-date economic and business information on public and privately-held companies. Dun and Bradstreet reports may be requested from the Antitrust Library. The field offices may generate their own Dun and Bradstreet reports. An abbreviated record is available in the Dun and Bradstreet Library on LexisNexis.

- U.S. Securities and Exchange Commission (SEC) Filings: SEC filings for public companies, including 10-K reports (annual reports to the SEC) and annual reports to stockholders, provide useful corporate information, especially relating to a company's perception of its markets, market shares, and industry position. They may provide useful comparisons with subsequently obtained documents and materials. These filings are available in full-text on LexisNexis, Westlaw, and the SEC's Edgar Database from 1995 onward. Filings not available online can be obtained from Primedia, Inc., usually on a same-day basis. To request filings through Primedia, contact the

Antitrust Library. The Antitrust Library also has a microfiche collection of the 10-K reports and annual reports of all Fortune 1000 companies for the years 1976–1995.

### v.    Legal Information

Information on company litigation can be obtained from the full-text legal databases, Westlaw and LexisNexis, both of which are available to all Division personnel. For information on sources of public records information, consult the online library tutorial. The public records databases, such as Choicepoint, contain records that can be searched by company or individual name. Choicepoint searches are available through the Antitrust Library. The Federal court docket systems, Pacer, can be searched by company name, as can the LexisNexis court docket service, Courtlink. Dun and Bradstreet Business Information Reports include information on liens and judgments. Dun and Bradstreet Reports are available through the Antitrust Library and in the field offices. The indexes to BNA's Antitrust & Trade Regulation Report (ATRR) and CCH's Trade Regulation Reporter (TRR) can help an investigator determine whether a company or industry has been the subject of antitrust investigation or litigation by the Division, the Federal Trade Commission, states, or private parties. ATRR is available on LexisNexis. TRR is available through Library Resources on ATRnet, and in the Division libraries, some sections, and all field offices.

## 2.    Obtaining and Using Information and Documents During the Course of an Investigation

Before preliminary investigation authority is requested, the attorney already should have reviewed much of the publicly available information and developed a preliminary legal theory upon which to proceed. Generally, an economist should be consulted at this stage. Once authority is granted, the focus shifts to more specialized information on a transaction or practice. Staff will begin to develop information through voluntary requests. Once compulsory process is authorized, it may be used in connection with the subject companies, customers, trade associations, and other industry sources. At this stage, the investigators must consider not only what information will be sought, but also how such information is to be stored, indexed, and retrieved. In merger investigations, staff must work within the time frame for the premerger notification rules in requesting additional information from the companies and in issuing CIDs. *See supra* Chapter III, Part D.

Staff should begin to assess the strategy to be used in both the investigative and litigation stages of the proceeding. It is never too early for staff to begin to discuss the type of relief that would be feasible if a case were brought since, as a practical matter, the reason the Division would bring a case would be to correct or prevent anticompetitive activity. In civil or criminal conduct investigations, staff should also

assess the possibility of a damage case on the Government's behalf. Staff should determine if there were significant Government purchases or if Government funds were less efficiently utilized because of anticompetitive practices. In essence, planning the investigation involves contemplating all of the litigation options available to staff, as well as an orderly use of the resources available in conducting the investigation.

EAG provides an analytical assessment of all the economic issues raised in each civil investigation: product or geographic market definitions, entry issues, and competitive effects. Coordination between the legal and economic staffs at the early stages of the investigation allows the economist to assist in framing the questions to be asked in a subpoena, CID, second request, or voluntary request, as well as in interviews and depositions. EAG managers are copied on all opening memoranda and routinely assign economists to most matters at the time preliminary investigation authority or grand jury authority is granted. EAG also receives copies of all HSR filings (without attachments). Those are screened within EAG, and many are quickly assigned to economists. In merger investigations, where staff usually has a limited time to obtain information and prepare its case, it is critical that the assigned attorney and economist make contact with each other quickly. If legal staff does not already know the economist assigned to a matter, that information can be obtained by calling any EAG manager's office.

### a.    Obtaining Information and Documents from Corporate Entities

Whether the investigation is conducted under the premerger notification procedures, by CID, by grand jury, or by voluntary requests, it is almost always necessary to obtain information from the corporate entities that are the subjects of the investigation, as well as those that may have useful information or may be victims of the conduct (such as customers). Although these techniques differ in merger cases and behavioral cases, certain principles in obtaining information from corporate entities apply to either type of investigation.

### i.    Noting Unique or Specialized Industry Practices

In researching the public sources set forth above, staff should look for unique or unusual industry structural and behavioral characteristics. Examples of the types of information that are helpful in Sherman Act investigations include (a) manner in which the product is priced; (b) terms of sale (such as delivered pricing or pricing zones); (c) who in the corporate structure is responsible for pricing, attending trade association meetings, and the like; (d) how sales are transacted (for example, bidding, negotiation, price lists); and (e) economic factors that affect the industry. Similarly, in merger investigations, staff should promptly gather information about (a) the relevant markets, both product and geographic; (b) the market shares of the companies; (c) other products produced or considered for production by the

companies; (d) the financial condition of the companies; (e) which products are the closest substitutes for one another; (f) the competitive effects of the transaction; and (g) industry or marketing studies that provide a basic understanding of the markets. This information will help the investigator to draft a more focused document request.

### ii.    Consulting with the Economic Analysis Group

Before a subpoena, CID, second request letter, or voluntary request is drafted, the investigator should consult with the economist assigned to the matter. Coordination at the early stages of the drafting process allows the economists to assist in framing questions to obtain the most useful information in its best form and to draft questions that consider relief options and damage possibilities. An economist familiar with the industry also may assist the attorney in sharpening questions about specific industry practices or activities. Cooperation between the attorneys and economists at this stage will result in better information and a more focused investigation.

### iii.   Consulting with the Corporate Finance Unit

When the document request calls for company financial documents relating to justifications for certain types of behavior, or where structural considerations are present (*e.g.*, failing company defense or divestiture as a relief option), CFU should be consulted to determine what types of information are necessary, how that information may be obtained, and how the request should be framed to obtain specific data. This may be especially important in a merger investigation at the second request or CID stage. *See supra* Chapter VI, Part A.6.b (providing a more complete discussion of CFU and procedures for obtaining assistance).

### iv.    Consulting with Litigation Support Staff

When staff is beginning to frame questions for subpoenas, CIDs, or second requests, ISSG's LSS personnel can assist in several ways. Consultation will help attorneys plan for problems of data and document acquisition, organization, and retrieval before actual submission of documents. Investigators should review with LSS personnel all options regarding document or data production. Even if staff anticipates only a small volume of documents, LSS personnel can provide a computer database for controlling and analyzing the information. LSS personnel can help staff determine what type of electronic data a company may possess and how the Division can best frame requests for access to such data. These types of document requests can be very specialized and technical; accordingly, the expertise of LSS should be utilized in framing data, documentary, or interrogatory requests.

### v.    Consulting Previous Work Product

The Division has a model second request. An office's official files also can provide staff with samples of how the Division has requested similar information in the past. The special assistants to the Directors of Enforcement will also be knowledgeable about recent requests for information used by attorneys in other sections in civil investigations.

All CIDs issued by the Division, including supplemental schedules of each CID, are available from the FOIA/PA Unit. The special assistants may also be aware of forms of questions, definitions, and other document request strategies, based upon their review of a wide variety of CIDs and second requests, including possibly previous requests of the particular subjects of an investigation. In addition, the Division already may have information from the company from previous investigations. Such information may be retrieved through MTS on ATRnet.

### vi.   Drafting Production Requests

Consultation with the personnel and use of the resources indicated above should assist staff in drafting requests. Since staff is educating itself about the behavior or transaction in question by reviewing data and documents, the goal of the request should be to obtain the data and documents that will assist staff in facilitating a case decision and preparing the case, if warranted, as quickly and efficiently as possible. This is achieved in part by making requests that result in the production of data and documents that staff actually wants to obtain. All data and documents produced should be reviewed, so it is in staff's interest not to obtain more data and documents than it needs to reach a case decision and prepare a case, if one is warranted. Again, this is a matter that depends on staff's prior knowledge of the industry and the activity, and specificity is not always possible or practicable. Where the request is necessarily drafted in broad language, staff should narrow the initial production as much as possible after learning what responsive data and documents the recipient possesses.

### vii.  Managing Data and Document Production

Nearly 80% of all productions received by the Division in both criminal and civil matters are in electronic format. Division attorneys use standard language for requesting electronic data and documents from parties. Most attorneys and responding parties are uncertain about the time, labor, and costs involved in an electronic discovery project. Part of the confusion stems from the fact that there has been no standard definition of electronic discovery. LSS personnel will consult with the various Division attorneys and outside parties to ensure that clear advice and process instructions are provided. LSS has developed specifications documents for the production of materials to the Division. All discussion about electronic discovery technology should evolve from

a common understanding of the response needed and the format in which the data and documents are to be produced.

True electronic discovery is characterized by technology that keeps electronic files in electronic form from start to finish. With this process, electronic data and documents are gathered from respondent's computers in many different file formats, processed by the parties and produced in an agreed upon format, and then LSS personnel load the data and documents into a software product that staff can use for review. The review process includes document review, annotations, Bates numbering, and categorization. If electronic files are reduced to paper format at any stage in the review process, the benefits of true electronic discovery technology are diminished. LSS personnel will assist in the analysis and reporting of such data and documents.

Upon receipt of the first data and documents, it is wise to consult with LSS regarding an indexing system if this has not already been done. LSS can also provide assistance on using tools to determine compliance of the production. Screening the document collection is imperative in order to identify key documents. LSS will design a database in a manner to ensure that the database is accurate, consistent, and built according to case specifications. LSS will also provide assistance for staffs who wish to perform the coding tasks directly from their desktops. LSS will provide assistance in designing searches and provide training on all database specific functionality including full text searching, clustering, or other assisted review technologies.

Data and documents should be securely maintained in the files of staff or in a central repository. *See* Division Directive ATR 2710.4, "Safeguarding Sensitive Information."

**b.     Using Documents and Materials in the Investigation**

Once staff has obtained electronic data and documents, staff should begin to assemble such information for the interrogation of witnesses. Staff should be able to use the database systems developed by LSS for this purpose.

### i.      Locating Witnesses

Documents and electronic data can help in locating potential witnesses. Witnesses can be identified by the submitted documents they authored, their position within the corporate structure, or their other responsibilities. To assist in this process, staff may ask in a civil investigation for the names and present business addresses and phone numbers of all relevant current and former employees of the corporation. Staff also may ask for last known home or work information as well, if the employee has left the company. In a criminal investigation, staff should ask for the last known home address and phone number, and the Social Security number of relevant present and former employees.

### ii.      Preparing Immunity Requests

Staff should use information derived from electronic data, documents, and interrogatory responses to prepare information necessary to process witness immunity requests. As is indicated in Chapter III, Part F.7, the Witness Records Unit of the Criminal Division requires a minimum of 10 full working days from the date of receipt to process an immunity request through the Department's records. If the information provided is not complete, the process may take longer. The immunity request form, Form OBD-111, asks for substantial identifying information about the individual, such as home and business address, Social Security number, and date of birth.

Information obtained through data and document requests to the companies can facilitate the preparation of immunity requests, thereby saving staff considerable time in later locating information. Delays in processing immunity papers can force staff to cancel sessions with the witness.

Division attorneys have found it helpful to request witness immunity as far in advance of the witness interview or appearance as possible. This allows staff to develop as much information as possible about the witness before the witness actually testifies. It also allows immunity clearance to be obtained prior to staff making any promises or commitments to the witness or counsel.

### iii.     Preparing for Interviews and Testimony

In both civil and criminal investigations, staff should know as much as possible about the witness, the witness's company, and his or her activities with respect to the transaction or conduct in question before staff interviews the witness or takes testimony. In preparing for a witness interview or testimony, staff should review and evaluate all relevant electronic data and documentary materials about the witness, including desk calendars, diaries, telephone records, expense accounts, and corporate documents prepared by, sent to, or commented upon by the witness. LSS has developed standard databases to facilitate this process.

It is also extremely valuable when using a litigation support system to search for all prior statements or testimony attributed to the witness to detect any contradictions in the witness's presentation. LSS can provide database systems to facilitate searching the full text of prior testimony. The Antitrust Library may also be able to assist in finding earlier public statements of the witness. When electronic data or documents are used during the witness's interview or testimony, such documents should always be appropriately marked and verified by the witness as exhibits. In this way, the witness has explained a specific document on the record and may have authenticated it.

### iv.    Using Documents for Economic or Financial Analysis

Documents that contain information to be analyzed by the economists or financial analysts should be provided to those individuals upon receipt. In that way, they can contribute to the development of the case and assist in the preparation of witness questions and materials, as well as in interviews and depositions. Economists and financial analysts are considered antitrust "investigators" under the Antitrust Civil Process Act. *See* 15 U.S.C. § 1311(e). By this time, economic analysis of price and market conditions will be underway, as well as the determination of possible Federal damages in a price-fixing or bid-rigging investigation. If, upon review, the economist believes that the economic data can best be analyzed using data processing techniques, the economist either handles this internally within EAG with research assistants or (often with the attorney) consults with ISSG.

The economists also will begin to chart the relevant information in graphic form. EAG and ISSG can produce the final product with in-house or contractor staff. ISSG will assist in obtaining the services of Department or other graphics assistance. Staff should provide at least several weeks for courtroom quality graphics work to be completed. *See* Division Directive ATR 2510.1, "Printing, Photocopying, Graphics, Audiovisual, and Photographic Services."

### c.    Using Internal Legal Resources

The legal theory shapes the framework for conducting the investigation and seeking information. Staff should research legal issues as soon as they develop, and throughout the course of an investigation. This is especially significant when the theory of the case is complex.

The Division has accumulated extensive research work product over the years, which is readily available on ATRnet. For earlier work product contained in a filed brief, but not included on the Division's Internet site, the FOIA/PA Unit may be able to provide copies. Additionally, requests for research assistance in a particularly complex area may be directed to the chief of the Appellate Section. Such requests should be specific, related to a significant investigative issue of some complexity, and must be submitted with substantial lead time, allowing for a response on or before the anticipated deadline. Finally, the appellate attorneys or the appropriate Director of Enforcement or special assistant in the Office of Operations may be able to identify other instances where similar issues arose.

### d.    Using Public Sources

Public information sources available during the investigation are the same as those available in the preliminary stage. *See supra* Chapter VI, Part B.1.b., "Public Information Sources."

**e.**     **Preparing and Retrieving Testimony, Interview Materials, Electronic Data, and Documents**

As staff is interviewing individuals or taking testimony before the grand jury or by CID deposition, staff should begin to assemble the information into a summary format by using the various database features. Data and documents are readily retrievable for analyzing the evidence in a case recommendation or drafting an order of proof, preparing for discovery, and preparing for trial. Staff should obtain CID and grand jury testimony in an electronic format for use in the Division's database. LSS can provide the format specifications to provide to court reporters. Staff may also want to consider using real-time transcription, which gives the ability to view and annotate testimony as the court reporter types.

As staff begins employing the computerized indexing and retrieval of transcripts, paralegals should begin to digest and reference the transcripts and interview memoranda as the transcripts are received and the interviews are conducted. Using tools provided by LSS, staff can digest testimony, affix comments and dates, issue codes to a portion of testimony, and isolate and capture key excerpts of testimony without having to retype them. This system also allows staff both to update its preparation for additional witnesses and to assess its investigatory findings at each stage of the investigation. Digesting, coding, and retrieval that begin early in the investigation and continue throughout the process make it less likely that particular areas or lines of questions will be missed, and facilitate preparation of a case recommendation and evidence for trial.

**3.**     **Information Services and Technical Assistance During the Litigation Stage**

Once the complaint or indictment is filed, staff's primary goal shifts from compiling information to developing a framework for organizing and presenting the information to the court or the jury. The system employed at the beginning of the investigation should be continued at trial. Further, it is advisable that one person coordinate this information during trial. The attorney who will make the closing arguments is usually the best person to supervise this process. Data and documentary evidence that might be cited in pleadings should be properly grouped with the testimonial information using specific trial tools provided by LSS.

**a.**     **Preparing Expert Economic or Statistical Evidence**

The economists who have been working with staff through the investigation—and have been preparing data for staff—will continue to play an important role at trial. EAG staff and outside experts may serve as witnesses (either during the case-in-chief or on rebuttal) but the "in-house" EAG economists will be playing an integral role within the trial team. *See supra* Chapter VI, Part A.5.b. (discussing the selection of

expert witnesses and the distinction between "inside" and "outside" economists).

### i.    Exhibits for Economic or Statistical Experts

If an economic or statistical expert is going to testify at trial and employ any type of charts, graphs, or other visual aids, such as pictures or slides, the economist or statistician, together with staff, should prepare the appropriate materials. A variety of methods might be used to generate such materials. These include preparation through internal graphics packages, use of private vendors, and reliance on other branches of the Department. Consultation with staffs of recent trials and with LSS can usually identify the full set of possibilities.

### ii.    Defense Economic and Statistical Evidence

Staff attorneys and economists should attempt to obtain, as early as possible in the discovery process, the exhibits, back-up data, and other relevant information that the defense experts are likely to use. This ensures that there will be adequate time to study and analyze the material, especially where the defense is relying on computer-based data or statistical samples. EAG, through its economists, statisticians and research assistants, can assist staffs in developing this information for use in depositions, cross-examination, and for other purposes.

### iii.    Computer-Based Information

When the Division employs computer-based economic or statistical information, legal staff, the economists and statisticians, and LSS should develop the method of presentation at the earliest stage possible. Using LSS's database tools allows staff to categorize facts and organize them by issues important in each case. LSS will assist staff in performing a variety of searches to retrieve documents and data germane to particular issues.

### b.    Sound Recordings and Other Technical Assistance

If staff or the expert needs sound recordings or other technical audio support, LSS can typically provide such services through its own capabilities or through the use of contract vendors. If support such as handwriting or typewriting analysis or fingerprint identification is required, staff or the expert should request FBI assistance. Unless staff has already been working with the FBI on the investigation, a request for FBI assistance should be made through Operations as discussed in Chapter III, Part C.2.a.i. In appropriate circumstances, FBI special agents may testify concerning their findings and analysis.

### c.    Courtroom/Trial Support and Preparation

The Division has uniformly moved toward presenting evidence at trial in an electronic format. Electronic courtroom technology can facilitate trial

management, reduce trial time and associated costs, and improve fact finding, jury understanding, and access to court proceedings.

Indexed material needs to be retrieved quickly for motion practice at trial, to respond to motions at the conclusion of the Government's case, to prepare for closing argument, and to draft proposed findings of fact, post-trial briefs, and any appellate briefs.

Primarily, this has meant scanning evidentiary documents as images and displaying them on monitors or projection screens in court. However, the Division has also gained substantial expertise in presenting audio evidence, videotaped depositions, and even remote trial testimony through video teleconferencing.

LSS works closely with each trial team to determine which visual strategy to use. LSS works with trial attorneys and discusses how to effectively present the evidence, and trains the paralegals to run the software and courtroom equipment. LSS contracts with outside graphics vendors for additional support. LSS also provides on-site support at trial.

### d.   Sources of Information About Trial Witnesses

Staff should formally request the FBI to check the prior criminal records of the defendants, all potential witnesses for the Government and defense, and all coconspirators. Staff should also request an MTS report from ISSG and consult with the Premerger Notification Unit and Operations to check former Division cases involving the defendants. CCH's Trade Regulation Reporter may provide staff with information about other antitrust cases involving the defendants, including private actions and FTC cases.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 322 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

# Chapter VII.  Antitrust Division Relationships with Other Agencies and the Public

A.   The FTC.......................................................................................................... VII-3
  1.   Clearance................................................................................................... VII-3
    a.   Clearance Procedures.......................................................................... VII-4
      i.   FTC Requests for Clearance............................................................ VII-4
      ii.   Division Requests for Clearance..................................................... VII-4
      iii.   Preclearance Contacts in HSR Matters ......................................... VII-5
    b.   Objections to Clearance ...................................................................... VII-5
    c.   Resolution of Contested Matters ........................................................ VII-6
    d.   Criteria for Resolving Contested Clearances ...................................... VII-6
  2.   Criminal Referrals...................................................................................... VII-7
  3.   Exchange of Information and Access Requests .......................................... VII-7
B.   U.S. Attorneys ................................................................................................ VII-8
C.   State Attorneys General ................................................................................. VII-9
  1.   Antitrust Enforcement by State Attorneys General .................................. VII-9
    a.   National Association of Attorneys General ......................................... VII-11
    b.   NAAG Antitrust Task Force ................................................................. VII-11
  2.   Seeking Assistance from State Attorneys General .................................... VII-12
  3.   Providing Assistance and Information to State Attorneys General ........... VII-12
    a.   Procedures Under Section 4F of the Clayton Act ............................... VII-12
      i.   Informing State Attorneys General of Division Suits .................... VII-12
      ii.   Providing State Attorneys General with Investigative Files and Other Materials ........ VII-13
      iii.   Limitations on Disclosure of Investigative Files and Materials .................... VII-14
      iv.   Restrictions on Use of Materials ................................................ VII-16
      v.   Disclosure of Rule 6(e) Material for State Criminal Enforcement ........ VII-16
    b.   Informal Requests for Information and Assistance ............................ VII-19
  4.   Referrals to and from State Attorneys General ....................................... VII-19
  5.   Cooperating with State Attorneys General in Merger Investigations......... VII-19
    a.   Information Sharing Issues ................................................................ VII-20
    b.   Joint or Closely Coordinated Merger Investigations .......................... VII-22
      i.   Interviews ................................................................................... VII-22
      ii.   CID Depositions .......................................................................... VII-23
      iii.   Joint Settlements ...................................................................... VII-23
  6.   Cooperating with State Attorneys General in Civil Nonmerger Investigations ........ VII-23
  7.   Cooperating with State Attorneys General in Criminal Investigations ........ VII-24
    a.   Cross-Designation Program ............................................................... VII-24
    b.   NAAG/Antitrust Division Protocol ..................................................... VII-25
    c.   Dual and Successive Prosecution Policy (Petite Policy)...................... VII-26
    d.   Parallel State Civil Investigations...................................................... VII-27
    e.   Global Settlements of Criminal Charges and State Attorneys General Civil Claims.......... VII-28
D.   Foreign Governments, International Organizations, and Executive Branch Agencies with
     International Responsibilities ........................................................................ VII-29
  1.   Background and Procedures ..................................................................... VII-29
  2.   Liaison with the Department of State........................................................ VII-31

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 323 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

    3.    Liaison with the Department of Homeland Security .............................................. VII-31
    4.    Bilateral Mutual Legal Assistance Treaties ............................................................ VII-32
    5.    Bilateral Antitrust Cooperation and Consultation with Foreign  Governments .................. VII-32
    6.    Cooperation with International Organizations ........................................................ VII-33
        a.    The International Competition Network ............................................................ VII-33
        b.    The Organization for Economic Cooperation and Development ...................... VII-34
        c.    The United Nations ........................................................................................ VII-34
        d.    Regional Trade Agreements .......................................................................... VII-34
    7.    Competition Advocacy in U.S. International Trade Policy and Regulation ........................ VII-35
E.    Federal Agencies That May Be the Victim of Anticompetitive Conduct ................................... VII-35
    1.    General ................................................................................................................ VII-35
    2.    Defense Industry Merger Investigations ................................................................ VII-36
    3.    Defense Debarment Reporting Obligations ........................................................... VII-37
F.    Congressional and Interagency Relations ............................................................................. VII-37
    1.    Legislative Program .............................................................................................. VII-37
    2.    Testimony and Written Legislative Reports ........................................................... VII-37
    3.    Interagency Clearance and Approval Procedures .................................................. VII-38
    4.    Congressional Correspondence ............................................................................ VII-39
    5.    Informal Congressional Inquiries .......................................................................... VII-39
    6.    Resources ............................................................................................................. VII-40
G.    Freedom of Information Act Requests and Procedures ......................................................... VII-40
    1.    Organization ......................................................................................................... VII-40
    2.    Procedures ........................................................................................................... VII-41
    3.    Exemptions ........................................................................................................... VII-41
        a.    Classified Documents ..................................................................................... VII-41
        b.    Internal Personnel Rules and Practices ........................................................... VII-41
        c.    Materials Exempted by Other Statutes ........................................................... VII-42
        d.    Sensitive or Proprietary Business Information .................................................. VII-42
        e.    Civil Privileges ............................................................................................... VII-43
            i.    Attorney Work Product Doctrine .............................................................. VII-44
            ii.    Deliberative Process Privilege .................................................................. VII-44
            iii.    Attorney-Client Privilege ........................................................................ VII-44
        f.    Materials That Involve Invasion of Personal Privacy ........................................ VII-44
        g.    Investigatory Records .................................................................................... VII-44
        h.    Financial Records ........................................................................................... VII-45
        i.    Geological and Geophysical Information ......................................................... VII-45
    4.    Other Records ....................................................................................................... VII-45
        a.    Personal Papers ............................................................................................. VII-45
        b.    Records Subject to Court-Ordered Protective Orders ...................................... VII-46
    5.    Division Records Maintenance and Procedures ..................................................... VII-46
H.    News Media ....................................................................................................................... VII-46
    1.    Press Releases ...................................................................................................... VII-47
    2.    Press Inquiries and Comments to the Press .......................................................... VII-47

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 324 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

## A.      The FTC

The Antitrust Division and the FTC have concurrent statutory authority to enforce Sections 2, 3, 7, and 8 of the Clayton Act. Judicial interpretation of Section 5 of the FTC Act permits the FTC to challenge conduct that also may constitute a Sherman Act violation; thus, there is an overlap between the Division and FTC in this area as well. This overlapping antitrust enforcement authority necessitates coordination between the two agencies to ensure both efficient use of limited resources and fairness to subjects of antitrust investigations.

Traditionally, duplication of investigations has been avoided in two areas. First, pursuant to a liaison agreement, the Department has referred all civil Robinson-Patman Act matters to the FTC for action. Second, the FTC routinely refers possible criminal violations of the antitrust laws, such as price fixing, to the Division. (The procedure to be followed on criminal referrals is discussed below.) The two agencies enforce the balance of the antitrust laws—particularly merger investigations (Section 7 of the Clayton Act) and civil nonmerger investigations (Sections 1 and 2 of the Sherman Act)—concurrently.

### 1.      Clearance

Coordination is accomplished through the clearance procedure. This procedure was established pursuant to an interagency agreement to determine, as each case arises, which agency would be the more appropriate one to handle the matter. The first interagency agreement was informally instituted in 1938 and, since 1948, has been modified and formalized by several exchanges of correspondence between the Assistant Attorney General for Antitrust and the Chairman of the FTC. On December 2, 1993, the FTC and DOJ jointly issued Clearance Procedures for Investigations. These procedures, among other things, state the criteria for resolving "contested matters" (matters on which both agencies have sought clearance). On March 23, 1995, the FTC and DOJ jointly announced Hart-Scott-Rodino Premerger Program Improvements, which includes a commitment by each agency to resolve clearance on matters where an HSR filing was made within, at most, nine business days of filing.

The agencies have agreed to seek clearance from each other (1) where either proposes to investigate a possible violation of the law; and (2) where either receives a request for a statement of agency enforcement intentions (*i.e.,* the Division's Business Review or the FTC's Advisory Opinion procedures). Clearance must be obtained for all preliminary investigations, business reviews, grand jury requests that have not stemmed from an existing preliminary investigation, and any expansion of a previously cleared matter (to include, for instance, new parties or different conduct). Neither agency may begin an investigation until clearance is granted, although publicly available information may be collected and Government sources consulted prior to obtaining

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 325 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

clearance. Outside private parties—except for complainants who approach an agency on their own initiative—cannot be contacted until clearance is obtained. Also, complainants should be advised that clearance is unresolved before they invest substantial time and effort in making a presentation, although some will wish to proceed anyway.

**a.** **Clearance Procedures**

i.      FTC Requests for Clearance

In the Division, clearance of proposed investigations is principally handled by the FTC Liaison Officer and the Premerger Notification Unit. The clearance procedure operates as follows: When the FTC wishes to investigate a particular matter, it requests, through its liaison officer, the Division's clearance for the proposed investigation. This request is made through a clearance request form entered into an electronic database to which the Division's Premerger Notification Unit and the FTC have access. For a typical investigation, the clearance request specifies the firms to be investigated, the product line involved, the potential offenses, the geographic area, and the source of the allegation.

The Division's Premerger Notification Unit circulates the FTC's request for clearance by e-mail to all section chiefs. A section chief may object to clearing the investigation and contest clearance by e-mailing a preliminary investigation memo to the PI Requests mailbox. Requests for additional information about the FTC's proposed investigation should be made to the Division's FTC Liaison Officer, who will obtain additional information from the FTC. Chiefs notified about an FTC clearance request should indicate their decision no later than the return date indicated on the e-mail. If no chief objects and the Deputy Director of Operations and the FTC Liaison Officer approve, clearance is granted to the FTC. A clearance request that generates no objection or conflict should be processed promptly.

ii.      Division Requests for Clearance

Similarly, clearance by the FTC of proposed Division investigations is also the responsibility of the Division's Premerger Notification Unit and FTC Liaison Officer. As part of their responsibility to approve and supervise investigations undertaken by the Division, the Directors of Enforcement are ultimately responsible for clearances. Once a preliminary investigation memo, grand jury request memo, or short-form clearance request is submitted to the PI Requests mailbox (and a courtesy copy is sent to the appropriate special assistant), the Division's clearance request is submitted to the FTC so that the clearance process can begin. For HSR matters, a preliminary investigation memo should be e-mailed to the PI Requests mailbox no later than five days after the HSR filing (three days if the matter is a cash tender offer or 15-day bankruptcy matter, or two days for a 10-day bankruptcy matter). The FTC processes

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 326 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

Division clearance requests in roughly the same manner as that used by the Division to process FTC requests.

Routine clearances generally take a few days. Non-HSR matters typically take longer than HSR matters. Matters that are subject to time pressure can receive expedited treatment. If expedited treatment is needed, that fact (and the reasons for it) should be indicated in the e-mail accompanying the preliminary investigation memo and should also be communicated by phone to the FTC Liaison Officer. Except in extraordinary circumstances, clearance requests will not be relayed to the FTC until a preliminary investigation memo has been submitted by e-mailing it to the PI Requests mailbox. Once clearance has been granted and a preliminary investigation or grand jury investigation has been authorized, the Premerger Notification Unit will notify the appropriate chief by e-mail.

### iii.    Preclearance Contacts in HSR Matters

Because the FTC clearance procedure applies to matters in which an HSR filing has been made, inquiries may not be made to filing parties, even if just for clarification of the filing, before clearance has been obtained. Should a question arise regarding the sufficiency of an initial HSR filing before clearance has been granted, inquiry to the filing party will be made by the FTC Premerger Office. That office has responsibility for administering the Premerger Reporting Program and historically has supervised the determination of the sufficiency of initial filings. Division attorneys should channel such inquiries through their chiefs to the FTC's Premerger Office. Other than contact with a filing party through the FTC's Premerger Office for this limited purpose, no attorney of either agency should contact any filing party or any other private person or firm in connection with a premerger filing without having first obtained clearance. Should a party initiate contact with either agency, the preclearance contacts policy requires that the other agency be given an opportunity to participate in any meetings or phone conversations. Accordingly, should a party contact the Division prior to clearance being granted, a meeting or phone call may be set up, but the FTC Liaison Officer should immediately be notified so that the FTC can be invited to participate. Similarly, chiefs may occasionally be contacted by the FTC Liaison Officer to determine whether the Division is interested in participating in a meeting or phone call arranged by the FTC. Should a party submit documentary material prior to clearance being granted, the party should be encouraged to also make that material available to the FTC.

### b.    Objections to Clearance

Objections to clearance typically arise when both agencies have requested clearance to investigate the same matter. Sometimes both agencies request clearance simultaneously, but more often in a contested matter an agency requests clearance only after learning that

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 327 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

the other agency has sought clearance. How contested matters are resolved is discussed below.

On rare occasions, an agency may refuse to grant clearance without seeking to investigate the matter itself. This may occur, for instance, if the agency denying clearance has an ongoing investigation or litigation with which the proposed investigation might interfere, or if the agency denying clearance has already examined the conduct in question and found no significant evidence of illegal activity. In such cases, the FTC Liaison Officer will typically discuss the matter with staff, the section chief, the Director of Civil Enforcement (or the Director's designee), and the relevant individuals at the FTC in an attempt to resolve the matter.

### c.    Resolution of Contested Matters

Once a matter is contested, staff should prepare a Contested Matter Claim. The Contested Matter Claim describes the conduct or merger sought to be investigated and describes the Division's relevant expertise with the product in question. *See* Chapter VII, Part A.1.d (discussing criteria used to resolve contested clearances). Examples of Contested Matter Claims are available from the FTC Liaison Officer and on the Division's intranet (ATRnet). Staff should work closely with the FTC Liaison Officer in preparing the claim. Contested Matter Claims should be completed within a day after a matter is contested.

Contested Matter Claims are simultaneously exchanged between the Division and the FTC, and then the respective liaison officers discuss the merits of each agency's claim. In a majority of cases, the liaison officers are able to resolve the dispute and the matter is either cleared to the Division or (after approval by the Director of Civil Enforcement or Director's designee) to the FTC. If the liaison officers are unable to resolve clearance, the matter is escalated to the Director of Civil Enforcement (or the Director's designee) and his or her counterpart at the FTC. If the matter remains unresolved following a discussion at this level, the matter is escalated to the relevant Deputy Assistant Attorney General and his or her FTC counterpart. In the rare instance where a matter is still unresolved after discussion at this level, the Assistant Attorney General and the FTC Chairman will resolve the matter. After a contested matter has been resolved, the Premerger Notification Unit will notify the section by e-mail. Should an attorney at any time want to know the status of a clearance request, he or she should contact the FTC Liaison Officer.

### d.    Criteria for Resolving Contested Clearances

The criteria for resolving contested merger matters are set forth in some detail in the 1993 Clearance Procedures for Investigations. The principal ground for clearance is expertise in the product in question gained through a substantial investigation of the product within the last five years, or within ten years, if neither agency has a substantial

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 328 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

investigation within five years. Substantial investigation means any civil investigation where compulsory process (*i.e.*, CIDs or second requests) was issued and documents were received and reviewed. Expertise in the product is obtained when the product involved in the prior substantial investigation was the same product as that involved in the contested clearance matter or a substitute product, a major input or output product, or one produced using the same manufacturing process (in decreasing order of significance). Should both agencies have at least one substantial investigation of the same category (*i.e.*, same product), the order of priority is as follows (in decreasing order of significance): litigated case, filed case, announced challenge or fix-it-first, second request merger investigation, and civil conduct investigation. Only if neither agency has a relevant substantial investigation will nonsubstantial investigations be considered as expertise, if appropriate. The process is somewhat flexible, and if either agency has an ongoing investigation or an existing decree with which the proposed investigation may conflict, the matter will often be cleared so as to avoid conflicts.

The criteria for resolving civil nonmerger contested matters are similar to those used for merger matters. While rewarding expertise, more weight is given to initiative: in the absence of overwhelming expertise in a product, the matter generally will be awarded to the agency that first identified the potential competitive problem and developed the proposed investigation.

## 2.    Criminal Referrals

When a matter is before the FTC and the FTC determines that the facts may warrant criminal action against the parties involved, the FTC will notify the Division and make available to the Division the files of the investigation following an appropriate access request. *See infra* Chapter VII, Part A.3. The Director of Criminal Enforcement, through the Premerger Notification Unit, will refer the matter to the appropriate section or field office for review of the materials and for determination as to whether the matter should be investigated by or presented to a grand jury. Determination should be made by the section or field office within 30 days of the referral, so that the Division can inform the FTC of its position in timely fashion.

If the Division determines that a matter should be a grand jury matter, the Division will request that the FTC transfer the matter. If, on the other hand, the Division decides not to pursue the matter with a grand jury investigation, then the FTC may proceed with its own investigation.

## 3.    Exchange of Information and Access Requests

The liaison procedure between the Division and the FTC also provides for the exchange of information and evidence between the agencies to the extent permitted by law and internal policies. If the FTC has conducted an investigation that involved materials that could be useful

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 329 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

in an investigation being conducted by the Division, the section or field office chief should contact the Division's FTC Liaison Officer, who will make arrangements for the Division to obtain access to the appropriate files. If, upon examination, it is determined that copies of any of the materials would be of assistance to staff, arrangements for copying should be made with the FTC staff. Requests by the FTC for access to materials in the Division's possession are processed through the FTC Liaison Officer. If an attorney or economist receives a direct request for access to, or copies of, Division files, such materials should not be made available until the matter is cleared through the Division's Liaison Officer.

## B.   U.S. Attorneys

Relationships between the Antitrust Division and U.S. Attorneys are controlled by policies of the Department of Justice and the Division. For example, Department of Justice policy provides that U.S. Attorneys' Offices should watch for manifestations of price-fixing, bid-rigging, or other types of collusive conduct among competitors that would constitute criminal violations of Section 1 of the Sherman Act. A U.S. Attorney's Office with evidence of a possible antitrust violation should consult with either the chief of the Antitrust Division's closest field office or the Deputy Assistant Attorney General for Criminal Enforcement and the Director of Criminal Enforcement to determine who should investigate and prosecute the matter. Most criminal antitrust investigations are conducted by the Antitrust Division's field offices because of their specific expertise in particular industries and markets.

The Division may refer certain antitrust investigations to U.S. Attorneys, particularly those involving localized price-fixing or bid-rigging conspiracies. According to an Attorney General's Policy Statement, U.S. Attorneys are assigned the responsibility of enforcing Section 1 of the Sherman Act against offenses which are "essentially of local character, and which involve price fixing, collusive bidding, or similar conduct. The U.S. Attorneys shall handle such investigations and proceedings as the Assistant Attorney General in charge of the Antitrust Division may specifically authorize them to conduct." Once a U.S. Attorney's Office accepts a referral, it will be primarily responsible for the investigation and prosecution of that matter.

All antitrust investigations conducted by a U.S. Attorney's Office, whether initiated by that office or referred by the Division, are subject to supervision by the Assistant Attorney General for Antitrust. *See* 28 C.F.R. § 0.40. Accordingly, the Division's approval is required at various stages of the investigation, such as empaneling a grand jury, recommending an indictment, or closing the matter. These procedures are described at United States Attorneys' Manual § 7-2.000, "Prior Approvals."

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 330 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015     Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

It is the policy of the Division to create and maintain good working relationships with all U.S. Attorneys. The chiefs of the Division's field offices should maintain contact with all of the U.S. Attorneys within their geographic areas of responsibility. This liaison provides U.S. Attorneys with a convenient contact to whom to refer complaints or other evidence of local antitrust violations and from whom to obtain information about antitrust matters and Division procedures. Additionally, close liaison provides the Division field offices with a ready source of information and support in complying with local court rules, procedures, and practices when Division attorneys are conducting investigations and litigating cases within the U.S. Attorney's jurisdiction. The relationship also is valuable when Division attorneys need the approval of the U.S. Attorney to apply to the local district court for immunity orders or otherwise need local assistance. In order to develop and continue good relationships with U.S. Attorneys, Division attorneys must keep U.S. Attorneys apprised of all significant Division activities occurring within their districts. It is, for example, normal practice to present and explain indictments, informations, and plea agreements to U.S. Attorneys.

Division attorneys who have particular questions or issues regarding dealings with U.S. Attorneys in criminal matters should consult with their field office or section chiefs, or, where appropriate, with the DAAG for Criminal Enforcement or the Director of Criminal Enforcement.

## C.    State Attorneys General

The Division is committed to cooperating with state attorneys general. Effective cooperation between the Division and the states benefits the public through the efficient use of antitrust enforcement resources. Cooperation with the states gives the Division the benefit of local counsel who know the local markets well. It also promotes consistent enforcement and minimizes the burden of duplicative investigations.

The purpose of this section is to provide information and guidance regarding cooperation and interaction with state enforcers. Although it is the Division's policy to cooperate whenever possible with state attorneys general, there is no formula or checklist for cooperation. The nature and level of cooperation are decided on a case-by-case basis, keeping in mind that conducting an effective and efficient investigation is the Division's first priority. For example, investigations affecting primarily local markets within a state are more suitable for joint enforcement efforts or possibly for referring the matter entirely to the state. Other factors include the experience, interests, and resources of a particular state attorney general's office.

### 1.    Antitrust Enforcement by State Attorneys General

The functions and organization of offices of state attorneys general are similar to those of the Department of Justice. A state attorney general is

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 331 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015      Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

the chief legal officer of the state. State attorneys general bring civil suits on behalf of the state; represent the state and state agencies in civil suits; handle criminal appeals; and enforce antitrust, consumer protection, and environmental statutes. The majority of resources in a state attorney general's office are devoted to defending the state in civil litigation and criminal appeals.

State attorneys general are authorized to bring civil Federal actions seeking injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and damages under Section 4, 15 U.S.C. § 15, as direct purchasers of goods or services. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261-64 (1972) (recognizing that a state is a "person" under Sections 4 and 16 and holding that Section 4 does not authorize a state to sue as *parens patriae* for damages for injuries to the state's general economy). Further, Section 4C of the Clayton Act, 15 U.S.C. § 15c, authorizes state attorneys general to bring damage actions, as *parens patriae*, on behalf of natural persons residing within their states. State attorneys general may also bring Federal injunction actions as *parens patriae* based on injury to their general economies under Section 16 of the Clayton Act and common law. *See, e.g., Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447-48 (1945).

Most states have enacted a civil antitrust statute of general application prohibiting combinations and conspiracies in restraint of trade. *See* State Laws, 6 Trade Reg. Rep. (CCH) ¶ 30,000. These statutes typically authorize the state attorney general to seek treble damages on behalf of natural persons residing within the state, state agencies and institutions, and political subdivisions; civil penalties; injunctive relief; and attorneys' fees and costs. They also typically authorize the state attorney general to issue civil investigative demands compelling oral testimony, the production of documents, and responses to written interrogatories to individuals and corporations in connection with antitrust investigations. State antitrust statutes also usually expressly require that they be interpreted in conformity with comparable Federal antitrust statutes. *See generally* ABA Section of Antitrust Law, *Antitrust Law Developments* 809-11 (5th ed. 2002).

It is the practice of most state attorneys general to file cases in Federal court with pendent state antitrust claims. Most states are reluctant to bring actions in state court because most state court judges generally have little or no experience with antitrust cases.

Few state attorneys general's offices have significant experience prosecuting criminal antitrust violations. However, many states have some form of criminal penalty for anticompetitive conduct. *See* ABA Section of Antitrust Law, State Antitrust Enforcement Handbook (2008).

The level of antitrust enforcement—both civil and criminal—varies from state to state. State antitrust attorneys are often responsible for consumer protection as well as antitrust enforcement.

Most state antitrust units are financed through direct appropriations from their state legislatures. Several states, however, finance their antitrust units, at least in part, through revolving funds that are funded by attorneys' fees and costs paid to the state in connection with settlements and judgments.

State attorneys general, under the auspices of the National Association of Attorneys General (NAAG), often form working groups and ad hoc committees to coordinate investigations and litigation involving several states. The states participating in multistate investigations usually execute cost-sharing agreements apportioning their costs based on population. Multistate investigations and litigation are also supported by a fund established by NAAG for expert witness fees and expenses.

### a.   National Association of Attorneys General

Comprised of the attorneys general of the fifty states and the chief legal officers of the District of Columbia, the Commonwealths of Puerto Rico and the Northern Mariana Islands, and the territories of American Samoa, Guam, and the Virgin Islands, NAAG facilitates cooperation among state attorneys general on legal and law enforcement issues and conducts policy research and issue analysis. The U.S. Attorney General is an honorary member.

The attorney general is popularly elected in 43 states and appointed by the governor in five states (Alaska, Hawaii, New Hampshire, New Jersey, and Wyoming). In Maine, the legislature elects the attorney general, and in Tennessee, the state Supreme Court appoints the attorney general. In the District of Columbia, the Mayor appoints the attorney general, whose duties are similar to those of a state attorney general.

NAAG has a full-time staff, headed by an Executive Director. Reporting to these officials are counsels who are responsible for specific projects and subject areas, including antitrust.

The Antitrust Committee, a standing committee of the organization, is responsible for all matters relating to antitrust policy (*e.g.,* adoption of guidelines and resolutions). The President of NAAG appoints the Chairperson, who serves up to a two-year term.

### b.   NAAG Antitrust Task Force

The NAAG Antitrust Task Force is comprised of state staff attorneys responsible for antitrust enforcement in their states. The Task Force recommends policy and other matters for consideration by the Antitrust Committee, organizes training seminars and conferences, and coordinates multistate investigations and litigation. The Chairperson of the Task Force, who is appointed by the Chairperson of the Antitrust Committee, is the principal spokesperson for the states on antitrust enforcement.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 333 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

### 2.     Seeking Assistance from State Attorneys General

State attorneys general's offices can assist the Division in certain investigations and cases. The Division often seeks information in the possession of state officials and agencies. Division attorneys should consult with the Division's state liaison in the Legal Policy Section about contacting the state attorney general's office whenever the need arises to contact a state agency employee. State attorneys general, as the chief legal officers of their states, can be of tremendous assistance in obtaining information from state officials and agencies.

### 3.     Providing Assistance and Information to State Attorneys General

#### a.     Procedures Under Section 4F of the Clayton Act

Pursuant to Section 4F of the Clayton Act, 15 U.S.C. § 15f, the Division has the statutory responsibility to provide state attorneys general with information, to the extent permitted by law, that may assist them in determining whether to bring an action under the Clayton Act based upon a violation of the Federal antitrust laws.

The Division has adopted the following procedures to implement Section 4F consistently.

##### i.     Informing State Attorneys General of Division Suits

Under Section 4F(a), 15 U.S.C. § 15f(a), the Division notifies state attorneys general when it believes the state may be entitled to bring an action under the Clayton Act based substantially on the same violation of the antitrust laws alleged in a civil or criminal antitrust prosecution filed by the United States. This notification, which supplements the routine notification of state attorneys general when any Division action is filed, is made when, in the Division's judgment, more specific notification should be made because a state may have a particular interest in bringing an action based substantially on the same violation alleged by the Division. In making its judgment in such instances, the Division considers, among other relevant factors, the factual circumstances of the alleged violation, the posture of the state as a potential claimant under existing law, and the likely effect of the alleged violation on cognizable state interests.

For example, a more specific notification might be appropriate where the alleged Federal antitrust violation has already occurred and had likely resulted in harm limited primarily to the citizens, governmental entities, or general economy of that particular state.

A notification of the state attorneys general should be recommended by the investigative staff and assessed by the appropriate Director of Enforcement. The section chief will make all notifications to the affected states under Section 4F(a). This notification is accomplished by sending the Complaint, Indictment, or other action-commencing pleading to the

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 334 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

state attorney general for the applicable state or states, as well as a cover letter stating, "Pursuant to 15 U.S.C. § 15f(a), we respectfully notify you that the Attorney General of the United States has brought an action under the antitrust laws against [Defendant] of [principal place of business or headquarters]. Enclosed please find a copy of the [complaint or indictment]. We look forward to discussing the issues with you."

Even without specific notification pursuant to Section 4F(a), state attorneys general have authority to bring a Clayton Act damages action arising from any Federal civil or criminal antitrust prosecution and to request, under Section 4F(b), investigative files and other materials of the Division relevant to that actual or potential cause of action. This data will be made available to state attorneys general under the standards for Section 4F(b) disclosure, as described in the next section.

ii.     Providing State Attorneys General with Investigative Files and Other Materials

(a) Division Policy

Section 4F(b), 15 U.S.C. § 15f(b), requires disclosure to the state attorneys general "to the extent permitted by law" of any investigative files or other materials that may be relevant or material to an actual or potential state cause of action for damages under the Clayton Act. The Division will disclose materials from its files to assist state attorneys general to the maximum extent appropriate in fulfilling their state antitrust enforcement responsibilities. There are, however, certain instances where, because of statute, case law, or other constraints, nondisclosure or at least protective limitations upon the disclosure may be necessary. The Division retains discretion to determine the proper scope of Section 4F(b) disclosures. This discretion will be exercised to further the overall policies embodied in the Federal antitrust laws. These policies favor vigorous Federal and state enforcement of the antitrust laws, but occasionally a balance must be struck between immediate disclosure of investigative files and Federal enforcement priorities and necessities. While it is the Division's policy to cooperate fully with state attorneys general, in some instances disclosures may be delayed or limited to preserve the integrity of Division prosecutions or investigations, its work product, and deliberations. Normally, the Division will not release work product or deliberative process materials in response to a 4F(b) request, as doing so may compromise the ability to preserve the privileges applicable to these materials or otherwise may compromise pending Division litigation. In some circumstances, privileged material may be shared with state attorneys general under a common interest agreement approved by the supervising DAAG with the concurrence of the General Counsel.

(b) Procedures Employed in Responding to 4F(b) Requests

Requests for access to investigative files or other materials of the Division, pursuant to Section 4F(b), should be made to the chief of the FOIA/PA Unit, who is responsible for responding to such requests. A request from a state attorney general may be made by the attorney general or his or her designee, who shall be an official of the state government (*e.g.*, an assistant attorney general in charge of antitrust enforcement in the state attorney general's office). Requests on behalf of a state should not be made, and will not be honored, if they come from private counsel, even though the state may retain such counsel for the purpose of considering and filing an antitrust damage action on the state's behalf. *See* 15 U.S.C. § 15g(1). The FOIA/PA Unit will seek assurance that materials disclosed by the United States can be shielded from involuntary disclosure under state law and will not be voluntarily disclosed except in connection with antitrust litigation.

The response from the chief of the FOIA/PA Unit to a request made under Section 4F(b) will indicate the general nature of the proposed disclosure and any conditions that may be imposed on further disclosure, such as protective arrangements or limitations. Generally, the chief of the FOIA/PA Unit sends the state attorney general relevant material such as the indictment or complaint in the case. The letter also informs the state attorney general of the Division's intention to disclose other relevant nongrand jury material that the state may request, the Division's position regarding disclosure of grand jury materials, and the name, address, and telephone number of the section or field office chief supervising the case whom the state antitrust attorneys may contact for further information regarding the case. The FOIA/PA Unit will handle the arrangements for the disclosure of investigative files or other material.

### iii.  Limitations on Disclosure of Investigative Files and Materials

In response to a Section 4F(b) request, the Antitrust Division will make all relevant files and materials available to state attorneys general with certain exceptions and limitations. These exceptions and limitations are not exhaustive, and peculiar circumstances may require modification or extension of these standards. Any such modification that affects the interests of the state attorneys general under Section 4F(b) will be made known to them promptly.

(a) Grand Jury Matters

Where the Division has an open criminal investigation or case, disclosure of investigative files pursuant to Section 4F(b) generally will be denied. The effectiveness of the investigation or case is potentially compromised by making investigative files available during its pendency. As a matter of practice, the Division will deny investigative file disclosure until the end of any grand jury investigation or subsequent case. If a state moves for disclosure of grand jury materials

during an ongoing investigation or case, the Division will oppose such a motion.

(b) Civil Investigative Demand Materials

Materials obtained by Civil Investigative Demand will not be disclosed under Section 4F(b). There is no provision in the law for disclosure of such materials, except where the party from whom the materials are obtained consents to the disclosure. *See* 15 U.S.C. § 1313(c)(3).

(c) Confidential Sources

The identity of confidential sources will not be disclosed pursuant to Section 4F(b). This is necessary to ensure the future cooperation of these and other sources, especially since they often rely on a promise that their identities will not be revealed.

(d) Confidential Business Information

Confidential business information is protected from disclosure by the Freedom of Information Act, 5 U.S.C. § 552(b)(4). Accordingly, where such information is part of investigative files, that data will not be disclosed to state attorneys general under Section 4F(b).

(e) Premerger Notification Materials

All files or materials obtained by the Division under the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, are protected by law from disclosure. Accordingly, such data will not be disclosed to state attorneys general under Section 4F(b) except when the party from whom the materials were obtained consents to the disclosure. This includes the fact that a filing has been made and its date.

(f) Materials Obtained from Other Agencies

Files or materials obtained from the Internal Revenue Service or other Federal investigative agencies frequently are protected by law from disclosure outside the Department of Justice. Federal investigative agencies, as a matter of practice, frequently require the Division to limit disclosure of files or materials generated by those agencies. Therefore, access by state attorneys general to investigative files and material generated outside of the Antitrust Division will be denied unless the agency in question permits release and disclosure is not otherwise prohibited by law. Certain FBI files and materials may not be disclosed. Frequently, the FBI conducts or assists in conducting Federal criminal antitrust investigations. Information derived from its efforts may be incorporated in Division files and, as such, revealed under Section 4F(b). However, raw FBI investigative reports will not be disclosed under Section 4F(b) as a matter of course, unless the FBI allows disclosure. State attorneys general may request such materials directly from the FBI or under the Freedom of Information Act.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 337 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

### (g) Division Work Product

The Division ordinarily will not disclose its work product analyses and other deliberative memoranda to state attorneys general under Section 4F(b). This is necessary to protect the candor and effectiveness of communications within the Division and to preserve and foster the integrity of its enforcement programs and the recommendations and analyses of its staff.

These limitations may not result in complete denial of access to investigative files or materials. In appropriate cases, particular memoranda or portions of such memoranda may be produced. Often this limits the timing and extent of such disclosure rather than preventing disclosure altogether. Finally, Division staff may be able orally to discuss issues relating to the investigation in a way that substantially assists the state attorneys without jeopardizing or unduly exposing internal Division deliberations. In addition, in some circumstances work product materials may be shared with state attorneys general under a common interest agreement approved by the supervising DAAG with the concurrence of the General Counsel.

### iv.    Restrictions on Use of Materials

Except as described above, the Division usually will not seek to impose additional restrictions on the use by state attorneys general of investigative materials disclosed pursuant to Section 4F(b). Under special circumstances, the Division may set other restrictions on investigative data if there is a need for continued secrecy.

### v.    Disclosure of Rule 6(e) Material for State Criminal Enforcement

Rule 6(e)(3)(E)(iv) of the Federal Rules of Criminal Procedure was amended by P.L. 108-458 (effective December 17, 2004). It reads as follows:

> (E) The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand jury matter:
>
>> (iv) at the request of the Government if it shows that the matter may disclose a violation of State, Indian tribal, or foreign criminal law, as long as the disclosure is to an appropriate state, state-subdivision, Indian tribal, or foreign government official for the purpose of enforcing that law.

It is both the intent of the rule and the policy of the Department of Justice (as stated in a memorandum dated December 9, 1985, from the Assistant Attorney General in charge of the Criminal Division to the other Divisions' Assistant Attorneys General) to share such grand jury information whenever it is appropriate to do so. Thus, the phrase "appropriate state [or] state-subdivision … official" shall be interpreted to mean any official whose official duties include enforcement of the

state criminal law whose violation is indicated in the matters for which permission to disclose is to be sought. This policy is, however, subject to the caution in the Advisory Committee's notes that "[t]here is no intention … to have Federal grand juries act as an arm of the state."

It is thus clear that the decision to release or withhold such information may have significant effects upon relations between Federal prosecutors and their state and local counterparts, and that disclosure may raise issues that go to the heart of the Federal grand jury process. In this respect, the Assistant Attorney General in charge of the Criminal Division (who is a member of the Advisory Committee) promised the Advisory Committee that prior to any request to a court for permission to disclose such grand jury information, authorization would be required from the Assistant Attorney General in charge of the Division having jurisdiction over the matters that were presented to the grand jury. It is the policy of the Department that such prior authorization be requested in writing in all cases. A copy of such requests shall be sent to all Federal investigating agencies involved in the grand jury investigation. In the case of a multiple-jurisdiction investigation (*e.g.*, tax), requests should be made to the Assistant Attorney General of the Division having supervisory responsibility for the principal offenses being investigated.

To ensure that grand jury secrecy requirements are not violated in the submission of such requests, the following legend should be placed at the top and bottom of each page of the request:

<u>GRAND JURY INFORMATION</u>:

Disclosure restricted by Rule 6(e), Federal
Rules of Criminal Procedure

In addition, the entire packet should be covered with a plain white sheet having the word "SENSITIVE" stamped or typed at the top left and bottom right corners.

Division attorneys seeking permission to apply for a disclosure order for materials obtained in a criminal antitrust investigation must submit a memorandum to the DAAG for Civil and Criminal Operations and the Criminal DAAG through the Director of Criminal Enforcement, so that the approval of the Assistant Attorney General may be sought. The memorandum should provide the following information:

- Title of grand jury investigation and involved targets.

- Origin of grand jury investigation.

- General nature of investigation.

- Status of grand jury investigation.

- States for which authorization to disclose grand jury matters is sought.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 339 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

- Nature and summary of information to be disclosed.

- General nature of potential state offenses.

- Impact of disclosure to states on ongoing Federal grand jury investigative efforts or prosecutions.

- Extent of prior state involvement, if any, in Federal grand jury proceedings under Rule 6(e)(3)(E)(iv).

- Extent, if any, of state knowledge or awareness of Federal grand jury investigation.

- Existence, if any, of ongoing state investigations or efforts regarding grand jury matters sought to be disclosed.

- Any additional material necessary to enable the Assistant Attorney General to evaluate fully the factors set forth in the following paragraph.

In determining whether to authorize obtaining permission to disclose, the Assistant Attorney General must consider all relevant factors including whether:

- The state has a substantial need for the information.

- The grand jury was convened for a legitimate Federal investigative purpose.

- Disclosure would impair an ongoing Federal trial or investigation.

- Disclosure would violate a Federal statute (*e.g.*, 26 U.S.C. § 6103) or regulation.

- Disclosure would violate a specific Departmental policy.

- Disclosure would reveal classified information to persons without an appropriate security clearance.

- Disclosure would compromise the Government's ability to protect an informant.

- Disclosure would improperly reveal trade secrets.

- Reasonable alternatives exist for obtaining the information contained in the grand jury materials to be disclosed.

There is no requirement that a particularized need be established for the disclosure under Rule 6(e)(3)(E)(iv), but there should be substantial need. The need to prosecute or investigate ongoing or completed state or local felony offenses will generally be deemed substantial.

If the request is authorized, the staff attorney who seeks permission to disclose shall include in the proposed order a provision that further disclosures by the state officials involved shall be limited to those required in the enforcement of state criminal laws.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 340 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015     Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

A copy of any order *denying* a request for permission to disclose should be sent to the Office of Operations.

### b.    Informal Requests for Information and Assistance

The overwhelming majority of state attorney general requests for assistance and information are informal. State attorneys general's offices often have limited antitrust resources and occasionally will request assistance from the Division. State attorneys may find consulting informally with Division attorneys and economists to be very helpful. It is the policy of the Division to comply with informal requests for information and assistance by state attorneys general whenever possible. Sharing information with state enforcers is critical to enhancing state antitrust enforcement. The chief of the FOIA/PA Unit should, however, be consulted before sharing any nonpublic documents with the state.

## 4.    Referrals to and from State Attorneys General

The Division actively encourages state attorneys general to refer to the Division significant criminal and civil matters. Whenever a state refers a matter to the Division, the state should be advised generally of the status of any subsequent investigation. Providing the state with information will encourage future referrals. If a referral results in an enforcement action, the state attorney general's referral of the matter to the Division should be publicly acknowledged.

The Division often refers matters whose possible effects are predominantly local to state attorneys general for possible investigation. When referring a matter to a state attorney general, as much information as practical regarding the matter should be communicated to the state official responsible for antitrust enforcement.

## 5.    Cooperating with State Attorneys General in Merger Investigations

State attorneys general have become increasingly active in merger enforcement. They are more likely to have an interest in transactions involving goods or services purchased directly by consumers or state and local governments and that primarily affect local markets. It is the policy of the Division to cooperate when practical with state attorneys general on mergers that affect local markets.

Early coordination with state attorneys general on mergers of common interest benefits the Division, the states, and the parties. It is not uncommon for the parties to want the Division and the state attorneys general to coordinate their respective investigations. Close coordination allows the parties to avoid the additional costs of responding to duplicative investigations. Moreover, close cooperation between the Division and the states facilitates the consistent application of the

antitrust laws, making it less likely that a state attorney general and the Division will arrive at different conclusions concerning a merger. State attorneys general have authority to challenge and seek divestiture in transactions that a Federal agency declines to challenge. *See California v. Am. Stores Co.*, 495 U.S. 271 (1990); *New York v. Kraft Gen. Foods, Inc.,* 926 F. Supp. 321 (S.D.N.Y. 1995). The likelihood of such a challenge is reduced when there is significant coordination and cooperation.

### a.    Information Sharing Issues

The HSR Act and the Antitrust Civil Process Act (ACPA) significantly restrict the Division's ability to share with state enforcement officials information or material the Division receives through precomplaint compulsory process.

Two Court of Appeals decisions prohibit disclosure of HSR materials to state attorneys general. *Lieberman v. FTC*, 771 F.2d 32 (2d Cir. 1985); *Mattox v. FTC*, 752 F.2d 116 (5th Cir. 1985). The Division also treats the filing of HSR forms, the date the resulting waiting periods end, the issuance of second requests, and the receipt of second request filings as confidential information under the HSR Act. While the ACPA, like the HSR Act, prohibits the disclosure of information or materials produced in response to CIDs, the ACPA does allow the Division to provide the states with CID schedules and the identity of the CID recipients. Any confidential information appearing in the schedules should be excised, including the home address of an individual CID recipient.

In response to the 1985 Court of Appeals decisions prohibiting disclosure of HSR materials to state attorneys general, NAAG in 1988 adopted the [Voluntary Pre-Merger Disclosure Compact](#) (NAAG Compact) (amended in 1994). The NAAG Compact allows parties to an HSR merger to file with a designated state liaison copies of the initial HSR filing, any second request, and any second request responses. The states agree to keep all information they receive pursuant to the NAAG Compact confidential, except in connection with a state challenge of the transaction. In exchange for providing the information to the state, the state agrees not to issue compulsory process during the waiting period. Under the NAAG Compact, the states reserve the right to issue compulsory process for any information the parties decline to produce voluntarily.

In addition, in 1997, the Division, the FTC, and NAAG reached agreement on a protocol to facilitate coordination of parallel state and Federal merger investigations. *See* [Protocol for Coordination in Merger Investigations Between the Federal Enforcement Agencies and State Attorneys General](#). Prior to the Division disclosing certain confidential documents or information to state attorneys general, the protocol requires the parties to (1) agree to provide the states with all information submitted to the Division and (2) submit a letter to the Division waiving the HSR and CID confidentiality provisions to the extent

necessary to allow communications between the Division and state attorneys general. The Protocol includes an example of such a letter at Exhibit 1B.

It is the responsibility of the state attorneys general, and not of the Division's staff, to ensure that the parties submit satisfactory waiver letters to the Division. The Division generally looks with disfavor upon any waiver letter that does not permit the Division to share and discuss otherwise confidential HSR or CID materials or information fully with each state attorney general participating in the investigation. It is also the responsibility of the state attorneys general, and not of the Division's staff, to obtain from the parties all of the information the parties have submitted to the Division.

Once the waiver letters from the parties are received, the Division will provide the designated state liaison with (1) the second request schedules the Division served upon the parties to the transaction, and (2) the HSR waiting period expiration date. The Division, however, will not provide the state attorneys general with information or materials the Division received from third parties in response to compulsory process unless the third parties consent to disclosure. It is the responsibility of the state attorneys general, and not the Division's staff, to receive any such consent from a third party.

In addition to complying with these statutorily imposed confidentiality requirements, the Division, when cooperating in merger investigations with state attorneys general, must also take appropriate steps to protect any legally recognized privilege the Division may have. As a general rule, work product is protected "[s]o long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing the fruit of the trial preparation efforts." *United States v. Amer. Tel. and Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980). Work product protection is even stronger "[w]hen the transfer to a party with such common interests is conducted under a guarantee of confidentiality." *Id.* at 300. The wording of a state's public records or open government act may be such, however, that it is unclear whether there would be a "guarantee of confidentiality" if the Division provides documents to that state's attorney general. Before sharing confidential information with state attorneys general, the Division must be confident that no privilege available to the Division is lost and that the information will not otherwise be disclosed. In order to preserve the Division's ability to protect privileged information, the Division generally will not share work product or other privileged material with state attorneys general in civil litigation or investigations in the absence of a written common interest agreement approved by the supervising DAAG with the concurrence of the General Counsel. The Division generally will consider sharing privileged information with state attorneys general under a common interest agreement only after litigation has commenced or in

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 343 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

the later stages of an investigation where the commonality of interests is reasonably clear, such as when a litigation hold notice has been issued and the state attorneys general in question have decided to join the Division's complaint. Division staff considering entry into a common interest agreement with state attorneys general should consult the Office of General Counsel.

As the above shows, information sharing with a state can be restricted, particularly in absence of a waiver from at least the parties to the merger. Division staff on a merger investigation can and should, however, feel free to direct state attorneys general to any public source of pertinent information. In addition, the Division will be able frequently to share with the state attorneys general much of the information the Division obtains voluntarily from third parties.

**b.     Joint or Closely Coordinated Merger Investigations**

At the outset of any cooperative effort with state enforcers, Division attorneys should discuss with state attorneys general the level and nature of possible cooperation. Early discussions will help to avoid misunderstandings between the state and the Division that could prove harmful not only to the investigation but also to the Division's relationships with state attorneys general. In initial discussions with state staff, Division attorneys should determine the level of state interest in the transaction. If the state wishes to take an active role in the investigation, issues that should be discussed include mechanisms for communication, coordination of witness interviews and CID depositions, meetings with the parties, and review of documents.

### i.     Interviews

There may be several advantages to conducting interviews jointly with state attorneys general. Conducting joint interviews with state staff conserves state and Division resources by avoiding duplicative interviews. Many witnesses desire to be interviewed jointly by state attorneys general and the Division to avoid the time and expense of separate interviews. Joint interviews also help avoid inconsistent statements by potential witnesses. Joint interviews can be done only with the advance consent of the interviewee. In some cases, however, joint interviews may not be practical or feasible. The needs of the investigation and the enforcement interests should dictate the best approach.

Division staff and state attorneys general should establish ground rules for interviews. A state, for instance, may wish to participate only in interviews of certain witnesses. On the other hand, a state may wish to be given notice, when possible, of all interviews and the opportunity to participate. Similarly, Division staff may wish to obtain a commitment from state attorneys general to give Division staff notice of and the opportunity to participate in witness interviews. Agreement should be

reached in advance as to who will be the primary questioner in the interview and whether an opportunity will be provided to other participants to ask their own questions either during the course of the interview or after the primary questioner has completed his or her questions.

### ii.     CID Depositions

With the oral or written consent of the witness, state attorneys general may be permitted to attend CID depositions. A state's attendance at CID depositions avoids possible duplicative depositions under state CID statutes. On the other hand, having additional attorneys present may tend to make the witness more circumspect. Before inviting state attorneys general to participate in CID depositions, staff should consult with the appropriate Director of Enforcement and consider alternatives such as reviewing questions with the state(s) in advance and providing a copy of the transcript to the state(s), which may be done with the written consent of the witness.

Participation by Division staff in state CID depositions may be an alternative when a witness declines to consent to the participation of the state attorneys general in CIDs under the ACPA. Most state attorneys general interpret their state CID statutes to allow the participation of Division attorneys without the consent of the witness. Division attorneys may participate in state CID depositions as long as it is clear that the depositions can be used in any subsequent Division challenge of the transaction regardless of whether the state is a party to the litigation.

### iii.    Joint Settlements

The parties may wish to pursue a settlement with the Division and the states simultaneously. In those instances, Division staff and state attorneys general should reach an understanding in advance concerning a state's participation in settlement discussions with the parties and the appropriate scope of relief.

## 6.     Cooperating with State Attorneys General in Civil Nonmerger Investigations

As with merger investigations, the appropriate level of cooperation with state attorneys general in a civil nonmerger investigation is determined on a case-by-case basis, depending upon a state's need for support, the benefit to the parties of governmental coordination, the cost of any delay the coordination would entail, and the complexities of coordination. Many of the coordination issues in merger investigations—including the sharing of confidential information—are also present in civil nonmerger investigations. Thus, discussions with state attorneys general in the early stages of the investigation are crucial. And, just as with merger investigations, Division attorneys should discuss with their state counterparts such issues as mechanisms

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 345 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015       Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

for communication, coordination of joint interviews and CID depositions, meetings with the parties, and document review, as well as the timing of phases of the investigation.

An additional issue that should be discussed early in the investigation is whether a state intends to seek damages, a civil penalty, or attorneys' fees. A state's pursuit of these remedies may make joint settlement negotiations difficult. Because the Division usually seeks injunctive relief, the states generally must negotiate damages, penalties, or attorneys' fees separately for inclusion in their own decree.

### 7. Cooperating with State Attorneys General in Criminal Investigations

As stated above, most state attorneys general are concerned primarily with civil antitrust enforcement, including recovering civil damages on behalf of natural persons residing within their states, state agencies, institutions, and political subdivisions harmed by unlawful conduct. An increasing number of state attorneys general, however, have established criminal antitrust enforcement programs.

#### a. Cross-Designation Program

In 1984, as part of the Division's efforts to strengthen cooperation with state attorneys general in the prosecution of criminal antitrust matters, the Division instituted the cross-designation program, which allows the Division to stretch enforcement resources through the appointment of state prosecutors to assist the Division on grand jury investigations. As with civil investigations, state attorneys general often have special knowledge of local markets that may prove helpful in a grand jury investigation. The program also provides state attorneys general opportunities to gain experience in criminal antitrust enforcement, which hopefully will result in increased state prosecution of criminal antitrust offenses.

Every attorney selected for the program will be appointed as a special assistant to the United States Attorney General, pursuant to 28 U.S.C. § 515(b), and will be detailed to the Antitrust Division. Section 515(a) authorizes special assistants, when specifically directed by the Attorney General, to conduct any legal proceedings, including grand jury proceedings, that United States Attorneys are authorized by law to conduct.

Special assistants initially will be appointed for six months, on the basis of a name and fingerprint check, pending completion of a full-field background investigation by the FBI. The appointment may be extended upon satisfactory completion of the background investigation.

Special assistants will serve without compensation other than that which they receive through their existing employment with the state. A special assistant will report to and act under the direction of the chief of the field office or section conducting the investigation or prosecution or

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 346 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

such other attorney or Division attorneys as the chief may designate. A special assistant may be terminated at any time and without cause or notice. Each special assistant must take an oath of office and must agree to abide by all restrictions applicable to attorneys employed by the Department against the disclosure to unauthorized persons of information obtained in the course of service as a special assistant, including Rule 6(e) restrictions regarding the disclosure of grand jury materials.

Requests to participate as a cross-designee for a particular investigation should be made to the DAAG for Civil and Criminal Operations and the Director of Criminal Enforcement, who will arrange with the Personnel Unit for the appropriate forms to be sent to the state attorney general. Upon the return of the completed forms to the Division, including three fingerprint cards, the Personnel Unit will arrange for a name and fingerprint check by the FBI. Once this has been completed, the applicant will be notified of his or her six-month appointment pending completion of the FBI's full-field background investigation. The special assistant must sign the appointment letter and oath of office and return them to the Division. A copy of the appointment letter and oath should be filed with the clerk of court in the district where the investigation is being conducted. The section or field office chief should request a grand jury letter of authority for the special assistant, which should also be filed with the clerk. Upon completion of the full-field investigation, the special assistant's term of appointment may be extended to one year from the original appointment date.

**b.  NAAG/Antitrust Division Protocol**

In 1996, NAAG and the Division agreed upon a protocol concerning the cross-designation of state attorneys. *See* Protocol for Increased State Prosecution of Criminal Antitrust Offenses. The purpose of this protocol is to address several of the issues that may arise in connection with the cross-designation of state attorneys general, particularly when the state has potential civil treble damage claims involving the same subject matter as the grand jury investigation.

The simultaneous participation by a special assistant in the grand jury investigation and a civil action brought by the state attorney general involving the same subject matter presents potentially significant Rule 6(e) problems. The state commits under the protocol to delay the filing of any damage action involving the subject matter of the grand jury investigation until the completion of all prosecutions at the district court level. There is an exception when the state faces the possible expiration of the statute of limitations of its civil claims.

Simultaneous civil and criminal proceedings may be unavoidable in many circumstances because the Clayton Act and most state antitrust statutes impose a four-year statute of limitations on civil treble damage antitrust actions. *See* 15 U.S.C. § 15b; *but see* 15 U.S.C. § 16(i) (tolling

the statute of limitations during pendency of an antitrust suit by the United States). By contrast, criminal antitrust actions have a five-year statute of limitations. *See* 18 U.S.C. § 3282. Whenever the state attorney general files a civil action during the pendency of a grand jury investigation to preserve a civil claim, the protocol requires the state attorney general to assign separate staff to handle the civil action and to ensure that the civil staff and any person supervising the civil staff be screened from any information obtained in connection with the grand jury investigation.

Simultaneous criminal and civil proceedings provide opportunities for defense counsel to use civil discovery to depose Government witnesses. The commitment under the protocol to delay the filing of civil damage actions significantly benefits the Division because it prevents this potential misuse of civil discovery.

It is crucial to the success of any joint effort that Division and state attorneys general discuss at the outset the issues covered by the protocol. Division staff should obtain a commitment that the state will adhere to the protocol from the official in the state attorney general's office for antitrust enforcement.

### c.    Dual and Successive Prosecution Policy (Petite Policy)

In making decisions about whether the Division will investigate a matter, refer a matter to a state for prosecution, or investigate a matter while a state is conducting a parallel criminal investigation, staffs should be aware of the Department's Dual and Successive Prosecution Policy (Petite Policy). This policy addresses the question of under what circumstances a Federal prosecution will be instituted or continued following a state criminal prosecution based on substantially the same act or acts. There is no constitutional bar to Federal prosecution for the same offense as to which there has been a state prosecution. The Double Jeopardy Clause simply does not apply to this situation. *See Abbate v. United States*, 359 U.S. 187 (1959); *Bartkus v. Illinois*, 359 U.S. 121 (1959). Further, while Congress has expressly provided that as to certain specific offenses a state judgment of conviction or acquittal on the merits shall be a bar to any subsequent Federal prosecution for the same act or acts, it has not included violations of the antitrust laws in this category. *See*, *e.g.*, 18 U.S.C. §§ 659, 660, and 2117; and 15 U.S.C. § 80a-36.

Nonetheless, since 1959, the Department has followed the policy of not initiating or continuing a Federal prosecution following a state prosecution based on substantially the same act or acts unless there is a compelling Federal interest supporting the dual prosecution. This policy is known as the "Petite policy" based on *Petite v. United States*, 361 U.S. 529 (1960) (granting the Solicitor General's petition to vacate the second of two Federal subornation of perjury convictions after the Government indicated its intention to avoid successive Federal

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 348 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

prosecutions arising from a single transaction, just as it had earlier announced that it would generally avoid duplicating state criminal prosecutions). The Petite policy provides that only the appropriate Assistant Attorney General may make the finding of a compelling Federal interest, and failure to secure the prior authorization of the Assistant Attorney General for a dual prosecution will result in a loss of any conviction through a dismissal of the charges, unless it is later determined that there was in fact a compelling Federal interest supporting the prosecution and a compelling reason for the failure to obtain prior authorization. This policy is discussed in full in Chapter III, Part G.1.c of this Manual and the United States Attorneys' Manual § 9-2.031.

**d.    Parallel State Civil Investigations**

It is not uncommon for a state attorney general to conduct a civil investigation at the same time the Division is conducting a grand jury investigation of the same conduct. It is in the interests of the Division and the state attorney general to coordinate their respective investigations to the extent practical. For the reasons stated in the previous section, the Division may request that the state attorney general defer filing a civil action involving the subject matter of a grand jury investigation during the pendency of the investigation if it appears that a state civil action may interfere with an ongoing Division prosecution. The Division will not make such a request if the state is faced with the possible expiration of the statute of limitations. The state has significant incentives to ensure that a state civil action does not interfere with possible criminal prosecutions by the Division. Guilty pleas and convictions constitute prima facie evidence of liability in Sherman Act civil actions. 15 U.S.C. § 16(a).

Division staff should also determine whether the state is contemplating taking CID depositions of possible targets and Government witnesses. Since most state CID statutes authorize the state attorney general to grant immunity to and compel the testimony of witnesses, state CID depositions of possible targets of a grand jury investigation could present significant problems for the Division in any subsequent prosecution of a state CID witness. *See Kastigar v. United States*, 406 U.S. 441 (1972).

Testimony compelled under a state grant of immunity cannot be used against the witness in a Federal criminal prosecution. *Murphy v. Waterfront Comm'n*, 378 U.S. 52 (1964) (constitutional privilege against self-incrimination protects a state witness against incrimination under Federal as well as state law and a Federal witness against incrimination under state as well as Federal law). Accordingly, when a defendant in a Federal criminal trial has previously testified pursuant to a state grant of immunity, the Division has the burden of establishing that the immunized testimony has not tainted its evidence. *See id*. at 79.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 349 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

Division attorneys should ensure that they are not exposed to the immunized CID testimony of a potential target. The state should be requested not to disclose to the Division the CID deposition testimony of any witness. Since most state CID statutes contain strict confidentiality provisions, there should be little likelihood of public disclosure of the testimony, except for use in a state proceeding. In most instances, the Federal criminal proceeding will be concluded prior to any state proceeding in which the CID deposition testimony might be disclosed.

Insulating Division staff from exposure to immunized testimony does not end the inquiry concerning the use of the testimony against a defendant. *See United States v. North*, 920 F.2d 940 (D.C. Cir. 1990). The court in *North* found that *Kastigar* is "violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of *how or by whom* he was exposed to that compelled testimony." *Id*. at 942.

The state's use of a defendant's immunized testimony in interviews or depositions of individuals who subsequently testify in a criminal trial raises *Kastigar* issues similar to those in *North*. In the course of questioning witnesses, a state prosecutor might disclose portions of the defendant's immunized testimony, which the witnesses arguably could then use to shape their testimony in the subsequent Federal criminal trial. Demonstrating that witnesses questioned by state prosecutors under these circumstances did not shape their testimony could be difficult and time consuming. Accordingly, the Division may request that the state, in the spirit of cooperation, refrain from immunizing possible targets of Division grand jury investigations.

State CID depositions of cooperating witnesses also may present problems. Because state CID deposition transcripts may be discoverable, transcripts of testimony of cooperating witnesses are sources of possible impeachment. If Government witnesses are willing to cooperate with the state, Division staff should consider requesting that the state refrain from taking the witness's CID depositions until the completion of the criminal trial. This type of request has been made of state attorneys general in the past with good results for all involved.

### e.  Global Settlements of Criminal Charges and State Attorneys General Civil Claims

One area of concern for state attorneys general is the situation in which the Division accepts a plea from a defendant requiring the payment of a substantial fine that renders the defendant unable to pay civil damages to the state. Where the state has potential civil claims arising out of conduct that is the subject of a Division criminal enforcement action and the defendant may be experiencing financial difficulties, Division staff should explore two options with state attorneys general. Division staff could attempt to negotiate a plea agreement that requires the

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 350 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

defendant to pay restitution to the state. The state should be consulted concerning the amount of restitution. The other option is a global settlement that includes a plea agreement with the Division and a civil settlement with the state. The Division and the state would determine the maximum amount of criminal fines and civil damages the defendant could pay and remain viable and then decide on the amounts to be paid as criminal fines and civil damages. The Division has successfully negotiated plea agreement restitution provisions and global settlements with state attorneys general in the past.

## D.   Foreign Governments, International Organizations, and Executive Branch Agencies with International Responsibilities

### 1.   Background and Procedures

The Division's work frequently requires contact with governments, companies, and individuals from around the world. Contact with such individuals and entities is subject to the requirements of various international agreements to which the United States is a party. In addition, direct contact by Division attorneys with citizens and entities of other countries may raise sovereignty concerns in some countries and, in some instances, constitute a violation of that country's laws. Matters with international aspects, therefore, often raise issues of special concern and should be brought to the attention of the Foreign Commerce Section.

In addition to imposing obligations on the Department, many of the international agreements to which the United States is a party (as well as many of the international relationships that the Department maintains) present opportunities both for obtaining assistance in specific investigations and for enhancing overall cooperation efforts in international antitrust enforcement. It is the responsibility of the Foreign Commerce Section to maintain good working relationships with non-U.S. governments and international organizations, as well as to work with the Department of State and other Executive Branch agencies with international responsibilities in order to ensure that the Department fulfills its responsibilities under its international agreements.

Various countries, including some of the United States's important trading partners, have domestic laws or policies that may impact efforts by the Division to obtain information from foreign nationals or corporations. Because of the varying requirements that other countries impose, it is important that the Foreign Commerce Section be apprised of any proposed actions by Division attorneys that may raise international issues.

The United States is also party to a number of bilateral and multilateral international agreements that require the notification of other nations about proposed Division actions that may affect such nations' interests.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 351 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

Many countries consider their interests to be affected by Division actions in a wide range of circumstances, such as when the Division seeks information or documents located in their countries; when the Division investigates or otherwise has dealings with their firms or citizens even on a voluntary basis; or when conduct that the Division is investigating occurred in whole or in part in their jurisdictions. Notification of contemplated Division investigative or enforcement action that may affect another country's interests is intended to avoid misunderstandings that may affect the Division's future ability to enforce the antitrust laws. The Foreign Commerce Section is responsible for implementing the Department's notification obligations under these agreements.

In accordance with Division Directive ATR 3300.2, "Notification of Antitrust Activities Involving Foreign Companies, Individuals or Governments," any section or field office chief responsible for a matter that may involve substantial interests of another country or its nationals should keep the Foreign Commerce Section fully apprised so that the Foreign Commerce Section can perform its various responsibilities. Proposed actions as to which the Foreign Commerce Section must receive advance notification are set forth more fully in Directive 3300.2, but, in essence, staff must inform the Foreign Commerce Section:

- When authorization is requested for an investigation (including business reviews), case, or competition advocacy that may involve substantial interests of another nation's government, citizens, or corporations. Most commonly, this will involve situations in which (i) a foreign national, foreign corporation, or a U.S. corporation in which a non-U.S. company owns a substantial interest is a subject or target of a criminal or civil nonmerger investigation or a merging party in a merger investigation; (ii) the investigation involves conduct that occurred in whole or part outside the United States; or (iii) the activities that are the subject of the investigation may have been wholly or in part required, encouraged, or approved by another country's government.

- As soon as Division staff learns or has reason to believe that any of the circumstances listed above are present in the investigation.

- Before seeking information, documents, or evidence (whether through subpoena, second request, CID, or voluntary request) that may be located outside the United States.

- Before seeking information from a non-U.S. national (even if such national is located in the United States when the request is made).

- Before seeking to conduct interviews or depositions in another country.

- Before requesting information or cooperation from another nation's antitrust authorities or other agencies of that nation's government.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 352 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

- Before sending out target letters in a criminal investigation to citizens or corporations of another country, or U.S. corporations in which a non-U.S. entity owns a significant interest.

- Before entering into settlement discussions or plea negotiations with citizens or entities of another country or a U.S. company in which a non-U.S. entity has a substantial ownership interest.

- When staff is contacted by or on behalf of a non-U.S. individual, entity, or government.

- Before any significant change in the status of a matter in which there previously has been notification to another nation's government.

## 2.  Liaison with the Department of State

The notifications described above are generally transmitted to the relevant foreign governments through the Department of State. Notifications are sent by the Division to the State Department's Office of Multilateral Trade Affairs for transmission through diplomatic channels. That office also routes notifications to State Department desk officers responsible for the countries to which the notifications are addressed. This procedure allows the State Department to consider whether the actions or proposed actions described in the notifications have any foreign policy implications and to consult with the Division on any issues raised by the notification. The Foreign Commerce Section is charged with the responsibility to act as liaison with the Department of State with regard to these notifications.

## 3.  Liaison with the Department of Homeland Security

As the number of Division investigations involving potential foreign subjects and witnesses increases, the Division has, with increasing frequency, requested the U.S. Department of Homeland Security to establish border watches to check for the entry of relevant non-U.S. nationals into the United States. Such requests are coordinated through the Office of Operations. If a border watch is implemented, the Director of Criminal Enforcement should be notified as soon as the need for the watch passes to ensure that the border watch be lifted.

The increase in the Division's international enforcement effort has also resulted in an increase in the number of non-U.S. citizens charged in the Division's criminal cases. For many of these defendants, an important inducement to submit to U.S. jurisdiction is the ability to resume travel for business activities in the United States. Because, however, the U.S. Immigration and Customs Enforcement of the Department of Homeland Security (ICE, formerly Immigration and Naturalization Service (INS)) considers criminal violations of the Sherman Act to constitute "crimes involving moral turpitude," *see* 8 U.S.C. § 1182 (a)(2)(A)(i)(I), non-U.S. citizens convicted of such crimes may be subject to exclusion or deportation from the United States. The Division therefore entered into

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 353 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015      Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

a Memorandum of Understanding (MOU) with the INS, now implemented by ICE as successor to INS, pursuant to which each component agrees to cooperate with the other in their respective enforcement obligations. The MOU, signed in 1996 by the Assistant Attorney General and the Commissioner of the INS, established a protocol whereby the Division may petition ICE to preadjudicate the immigration status of a cooperating alien before the alien enters into a plea agreement. Division attorneys who wish to consider whether the MOU might be applicable in their matters should consult with the Criminal DAAG or the Director of Criminal Enforcement before entering into discussions with counsel.

### 4.  Bilateral Mutual Legal Assistance Treaties

Among the international agreements likely to be of interest to Division attorneys are the bilateral mutual legal assistance treaties, pursuant to which the United States and other countries agree to assist each other in criminal law enforcement matters. Bilateral Mutual Legal Assistance Treaties (MLATs) create a routine channel for obtaining a broad range of legal assistance in other countries, including taking testimony or statements from witnesses, providing documents and other physical evidence in a form that would be admissible at trial, and executing searches and seizures. The United States currently has MLATs in force with approximately 80 jurisdictions.

The Criminal Division's Office of International Affairs (OIA) acts as liaison for the Department with regard to incoming and outgoing assistance requests under MLATs. OIA also maintains relationships with many other non-U.S. governments for the purpose of obtaining legal assistance in criminal law enforcement matters. Assistance requests to governments with which the United States does not have a MLAT usually take the form of letters rogatory (*i.e.*, requests from a U.S. court to a foreign court), although some such countries may accept a less formal MLAT-like request. The Foreign Commerce Section works closely with OIA on matters relating to efforts to obtain foreign-located evidence and is responsible for assisting Division attorneys who desire to obtain foreign-located information. The Foreign Commerce Section should be consulted prior to the transmission of any assistance request to OIA.

### 5.  Bilateral Antitrust Cooperation and Consultation with Foreign Governments

In order to further the Division's goal of promoting the cooperation of foreign governments in its antitrust enforcement efforts, the Foreign Commerce Section is responsible for seeking and maintaining bilateral understandings with antitrust enforcement agencies in other jurisdictions. The Division has developed close bilateral relationships with antitrust officials of many jurisdictions. In certain instances, informal understandings have been reached on the obligations of

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 354 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

governments as to notification, consultation, and cooperation in antitrust matters.

Formal bilateral antitrust cooperation agreements exist with many countries, including Australia, Brazil, Canada, Chile, the European Commission, Germany, Israel, Japan, and Mexico. The Department of Justice and FTC have bilateral memoranda of understanding (MOUs) on cooperation with the Chinese, Indian, and Russian competition agencies, respectively. These agreements provide for cooperation between the parties on matters relating to each other's enforcement interests. These agreements, however, do not override domestic laws of either country, including confidentiality laws. The Division has often obtained waivers from relevant parties to facilitate the sharing of confidential information with non-U.S. antitrust enforcement agencies. In addition to complying with statutorily imposed confidentiality requirements, the Division, when cooperating on investigations with non-U.S. competition authorities, must also take appropriate steps to protect the Division's legally recognized privileges. Work product and other privileged material may only be shared with non-U.S. antitrust enforcement authorities when the common interest is clear and with the approval of the supervising DAAG and General Counsel.

Regular consultations are held with antitrust officials of Canada, China, the European Commission, Japan, Mexico, and South Korea; similar consultations are held on an ad hoc basis with other countries. Close informal ties are maintained with antitrust authorities in other countries. Relationships with non-U.S. antitrust authorities, whether or not they have resulted in formal agreements, are often helpful in facilitating the execution of law enforcement assistance requests.

The International Antitrust Enforcement Assistance Act of 1994 (IAEAA), 15 U.S.C. §§ 6201-6212, gives the Department and the FTC the authority to enter into bilateral agreements with non-U.S. antitrust authorities that would, among other things, allow the exchange of otherwise confidential information. In a memorandum and order approved May 22, 2008, the attorney general delegated the authority under the IAEAA to make and respond to requests for legal assistance in international antitrust investigations to the Assistant Attorney General for the Antitrust Division. In 1999, the United States entered into an agreement on mutual antitrust enforcement assistance under the IAEAA with Australia.

### 6.   Cooperation with International Organizations

#### a.   The International Competition Network

In October 2001, the Antitrust Division and the FTC joined with antitrust agencies from around the world to create the International Competition Network (ICN). The ICN is the only international body devoted exclusively to antitrust law enforcement. It is a virtual network of antitrust authorities focused on improving international antitrust

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 355 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

cooperation and promoting greater procedural and substantive convergence based on sound competition principles. Membership is voluntary and open to any national or multinational authority entrusted with the enforcement of antitrust laws. The ICN has over 120 member antitrust agencies from all over the world. The ICN does not exercise any binding rule-making function, but instead approves consensus-based recommended practices and reports on practical procedural and substantive issues. The ICN holds annual conferences, and members participate in project-oriented, informal working groups that communicate via conference calls and e-mail. ICN members cooperate with and seek input from nongovernmental advisers that include representatives of international organizations, associations and private practitioners of antitrust law, and members of the global economic and academic communities. The ICN website contains a vast array of useful information about international convergence and cooperation and how the ICN promotes efficient and effective antitrust enforcement worldwide.

### b.    The Organization for Economic Cooperation and Development

The Division, along with the FTC and the Department of State, represents the United States in the Competition Committee of the Organization for Economic Co-operation and Development (OECD). This Committee and its working groups normally meet three times a year at OECD headquarters in Paris to consider issues of common concern to the 34 member countries of OECD, and the 15 observer countries in the Competition Committee, including cooperation in antitrust enforcement, the role of competition policy in regulatory reform, and the sharing of experience in particular substantive antitrust areas.

### c.    The United Nations

The Division participates in antitrust-related conferences of the United Nations. These include meetings of Experts on Competition Law and Policy, held under the auspices of the United Nations Conference on Trade and Development (UNCTAD), to monitor a voluntary international antitrust code of conduct adopted in 1980 by the U.N. General Assembly and to discuss competition law and policy generally. This work is carried out in the Division by the Foreign Commerce Section, with the cooperation of other sections when needed, and is coordinated with the Department of State and other U.S. Government agencies.

### d.    Regional Trade Agreements

The Antitrust Division participates in a number of antitrust-related negotiations and working groups related to regional and bilateral trade agreements. The Division has chaired or co-chaired delegations negotiating competition chapters in current and proposed free trade agreements with Chile, Singapore, Australia, Thailand, and the Andean countries (Colombia, Peru, and Ecuador). The Division participates with

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 356 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015      Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

other U.S. Government agencies in competition policy working groups associated with, inter alia, the Asia-Pacific Economic Cooperation forum. The Division also played an important role in the World Trade Organization working group established in 1997 to study issues relating to the interaction between trade and competition policy and will continue to monitor any competition policy initiatives at the World Trade Organization.

### 7.   Competition Advocacy in U.S. International Trade Policy and Regulation

The Division, through the Foreign Commerce Section, represents the Attorney General at the staff level in several interagency committees involved in the formulation and implementation of U.S. international trade and investment policies. In addition to regular participation in interagency deliberations, the Division from time to time participates in U.S. Government delegations negotiating agreements with other governments. These activities usually are coordinated by the Office of the United States Trade Representative (USTR) and other parts of the Executive Office of the President. USTR conducts interagency work through the Trade Policy Review Group, a body on which the Division usually represents the Department of Justice.

The Division is a principal advocate of competition as the cornerstone of U.S. international economic policy. In addition, the Division actively seeks to provide advice in trade negotiations on the competition implications of proposed trade agreements. Finally, the Division occasionally advises USTR or other agencies on the antitrust implications of various trade policy options, in order to ensure consistency with the antitrust laws.

## E.   Federal Agencies That May Be the Victim of Anticompetitive Conduct

In some instances, Federal agencies may be the victims of conduct that violates the antitrust laws. Agencies involved in procurement may be victimized by bid-rigging or other criminal conspiracies. Similarly, Federal agencies can be adversely affected by civil antitrust violations; in particular, mergers in industries such as defense can have their greatest impact on Federal Government procurement.

### 1.   General

Before contacting an agency with which the Division has a regular relationship, staff should contact the relevant section within the Division to coordinate contacts with that agency. For example, contact with the Department of Defense on civil matters should be coordinated through the Litigation II Section. For additional information on dealing with the Department of Defense, *see* Chapter VII, Part E.2. Generally, when information is required from other Federal agencies, it is obtained relatively informally on a consensual basis. In the event that a Federal

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 357 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

agency is reluctant to provide information voluntarily, staff should consult with the appropriate Director of Enforcement or Deputy Assistant Attorney General.

In addition, if an investigation involves procurement by a Federal agency, staff should consider seeking the assistance of that agency's Inspector General's Office. IG agents have in the past proven to be helpful in collecting and analyzing bid or pricing data, interviewing potential witnesses, and explaining a particular agency's procurement system and regulations. No special Division procedures are required for obtaining the assistance of IG agents, and staff should make whatever arrangements are appropriate directly with the Inspector General's office for the agency involved.

## 2.    Defense Industry Merger Investigations

The Defense Science Board Task Force on Antitrust Aspects of Defense Industry Consolidation, which included representatives of the Division and the FTC, issued a report in 1994 that creates the framework for investigations of mergers in the defense industry. *See* [Office of the Under Secretary of Defense for Acquisition & Technology, U.S. Department of Defense, Report of the Defense Science Board Task Force on Antitrust Aspects of the Defense Industry Consolidation (1994)](). The report recognized that the Department of Defense's (DoD) knowledge of the defense industry can contribute to an informed review of defense mergers by the enforcement agencies. *Id.* at 39. Although the Division makes the ultimate decision on whether to challenge any defense merger that it investigates, it has committed to "give DoD's assessment substantial weight in areas where DoD has special expertise and information, such as national security issues." *Id.*

On a practical level, the report established the Office of the Deputy Under Secretary of Defense for Industrial Affairs and Installations (DUSD) as the central point of contact on antitrust issues. The DUSD uses both its own permanent staff and attorneys detailed from the DoD General Counsel's office. Throughout any defense merger investigation, the Office of the DUSD will arrange all interviews with knowledgeable DoD staff and will coordinate information provided to the Division while conducting a parallel investigation. Division staff should contact the Director of Operations before initiating contact with DUSD on a matter. Division staff members are expected to develop strong working relationships with DoD staff working on the investigation and should seek appropriate waivers to share confidential information received through discovery with DoD staff. In most cases, at the completion of its review and discussion with Division staff, DoD will formally communicate its views on the competitive impact of a proposed transaction and any proposed relief to the Division.

When reviewing HSR filings in the defense industry, staff should not early terminate the waiting periods without clearance from the

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 358 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

appropriate Deputy Assistant Attorney General so that DoD can convey any competitive concerns to the Division.

### 3.   Defense Debarment Reporting Obligations

The Division is required to report to the Defense Procurement Fraud Debarment Clearinghouse within the Department of Justice individual defendants who have been convicted of any felony in connection with a contract with DoD or a first-tier subcontract of a defense contract. *See* 10 U.S.C. § 2408; 48 C.F.R. § 252.203-7001. Pursuant to 10 U.S.C. § 2408, these individuals are prohibited from serving in certain capacities on defense contracts or first-tier subcontracts or serving in certain capacities for defense contractors or first-tier subcontractors. Qualifying defendants are also listed in the Federal procurement database known as the System for Award Management, www.sam.gov. Questions regarding the qualification of defendants for the reporting should be directed to the Division's Office of the General Counsel.

## F.   Congressional and Interagency Relations

The Legal Policy Section is responsible for ensuring consistency in the Division's congressional relations and in its dealings with other Federal agencies on matters affecting the Division's legislative program.

### 1.   Legislative Program

The Legal Policy Section advises the Assistant Attorney General and other senior policy officials on matters affecting the Division's legislative program. The section draws on the resources of the entire Division in identifying legislative matters of importance to the Division and in developing and articulating the Division's position on pending legislation.

Division staff should contact the Legal Policy Section if they become aware of legislation that may affect the policy interests of the Antitrust Division or the enforcement of the antitrust laws. Division staff members are also encouraged to bring possible legislative initiatives to the attention of the chief of the Legal Policy Section, who is responsible for evaluating, developing, and presenting such initiatives to the Division's senior policy officials. Legislative proposals must be approved by the Assistant Attorney General before being discussed outside of the Division. Staff acting in an official capacity should not offer views on pending legislation or discuss legislative initiatives outside of the Division without first consulting the chief of the Legal Policy Section.

### 2.   Testimony and Written Legislative Reports

The Division is often asked to testify before Congress or to prepare a written report stating the Administration's views on pending or proposed legislation. The Legal Policy Section is responsible for coordinating the Division's response to such requests. The preparation of testimony and written reports is supervised by the chief of the Legal

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 359 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

Policy Section, working closely with senior Division policy officials. When appropriate, the Legal Policy Section will consult others in the Division. Both testimony and written comments require the approval of the Assistant Attorney General and clearance by the Department; in addition, both are subject to interagency review and final clearance by the Office of Management and Budget (OMB). The Legal Policy Section is responsible for obtaining all necessary clearances.

In reviewing proposed legislation, attorneys and economists should consider carefully the potential impact of such legislation on the antitrust laws and the enforcement of those laws. A proposal's impact on the operations of the Division should also be considered. Written comments and reports should be tailored according to the significance and complexity of the legislation and its importance to the Division. As written testimony and legislative reports frequently become part of the public record, careful attention is necessary at all stages of the drafting process.

### 3.  Interagency Clearance and Approval Procedures

Before transmittal to Congress, legislative proposals or comments from Executive Branch agencies, including testimony and written reports, must be reviewed and cleared by OMB. The Division participates in OMB's interagency clearance process in both an originating and reviewing capacity.

In the case of legislative materials originating within the Division, once such materials have been approved by the Assistant Attorney General, the Legal Policy Section transmits them to the Department's Office of Legislative Affairs (OLA), which in turns submits them to OMB for interagency clearance and approval.

OMB referrals of other agencies' proposals that are sent to the Department for comment are transmitted to OLA where they are logged in and, if designated for review by the Division, delivered to the Legal Policy Section. In many instances, the Legal Policy Section will forward these proposals to the section or field office with substantive responsibility for the subject matter for review and comment. Such referrals may be subject to only cursory review by the Legal Policy Section prior to delivery to the appropriate component. After receipt by the appropriate component, OMB referrals require priority handling and strict attention to internal deadlines established by OLA and the Legal Policy Section.

Staff comments, including written comments intended for submission to OMB, should be e-mailed to the appropriate person in the Legal Policy Section. Whenever possible, comments should be cleared by a section supervisor; however, this requirement may be waived for referrals requiring a same-day response. "No comment" replies also should be e-mailed to the Legal Policy Section for record purposes.

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 360 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

Draft comments need not be prepared as formal memoranda; however, written comments must be in a form that is suitable for direct transmission to OMB clearance officials. Given the strict deadlines that accompany OMB referrals, the Legal Policy Section generally does not provide drafting assistance.

### 4.    Congressional Correspondence

Incoming congressional mail addressed to Main Justice or bearing the Department's central ZIP code, 20530, is sorted by the Department's Mail Referral Unit and entered into a Department-wide correspondence management database. It is then transmitted to the Department's Executive Secretariat, where each item is assigned a file number and specific instructions for reply. Correspondence designated for handling by the Division is then transmitted to the Legal Policy Section, where it is downloaded, logged on the Division's Correspondence and Complaint Tracking System, and assigned to the appropriate section or field office within the Division for the preparation of a draft reply.

Drafts must conform to standards developed by the Office of the Attorney General for controlled correspondence, *see DOJ Correspondence Policy, Procedures, and Style Manual*, as well as all relevant Department and Division policy guidelines on communications with Members of Congress and the disclosure of confidential information, *see* Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases." Attorneys are expected to meet the internal reply deadline assigned by the Legal Policy Section and any item-specific drafting instructions contained in the transmittal materials.

Prior to transmitting a draft to the Legal Policy Section, staff should clear proposed replies with their section or field office supervisor, who should review drafts not only for their content but also for conformance to Department standards.

Staffs are expected to notify the Legal Policy Section whenever it appears that additional time will be needed for the preparation of a draft reply. In addition, all congressional correspondence delivered directly to an individual or office within the Division should be referred to the Legal Policy Section for handling. Specific procedures for the management of congressional correspondence and other high priority mail are addressed in Division Directive ATR 2710.1, "Procedures for Handling Division Documents and Information."

### 5.    Informal Congressional Inquiries

The Division often receives informal inquiries from congressional staff and other congressional sources. In order for the Division to be aware of the nature and extent of its congressional contacts, all telephone, fax, and e-mail inquiries from congressional sources should be directed to the Legal Policy Section. The Legal Policy Section will screen the

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 361 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

inquiries and, when necessary, refer them to a section or field office for appropriate handling. If a Division attorney or economist has an impromptu discussion regarding a matter of interest to the Division with congressional staff without prior clearance, the Legal Policy Section should be informed as soon as possible of the nature and content of the communication. *See* Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases." These occasions should be rare and unanticipated, as congressional inquiries ordinarily should be referred to the Legal Policy Section.

### 6.    Resources

The Legal Policy Section maintains extensive legislative files on congressional activities. Its files include archival materials from previous sessions of Congress and records of the Division's contacts with Congress, such as written testimony, legislative reports prepared at the request of a congressional committee, and correspondence with individual members of Congress. These materials and other legislative resources are available to Division staff upon request. These permanent files are a useful record of the Division's participation in past legislative initiatives, and their use is encouraged.

The Legal Policy Section also has access to a variety of resources that can be made available upon request to Division personnel. Legislative resources include the *CQ Today*, the *Congressional Record*, the *Congressional Quarterly*, the *Weekly Compilation of Presidential Documents*, and various online databases. In addition, the Legal Policy Section can search the Department's correspondence database for information on the Division's correspondence history with particular members of Congress and for correspondence statistics generally.

All Division professionals are encouraged to use these legislative resources and to contact the Legal Policy Section whenever they need information or have questions about legislative matters.

## G.    Freedom of Information Act Requests and Procedures

### 1.    Organization

Since the passage in 1966 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552, as amended, individuals, public interest groups, corporations, and other entities have been provided access to various categories of governmental records unless access is specifically limited by one of the exemptions to FOIA. The 1996 amendments to FOIA make clear that information maintained electronically is covered by FOIA. Requesters have a right, within reasonable limits, to request that information be provided in the format of their choice. In response to FOIA, the Department of Justice established FOIA offices in its various organizational entities, including the Division. Interim denial determinations of FOIA matters within the Division are made by the Chief of the FOIA/PA Unit. The final Departmental responsibility for

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 362 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

making a determination relating to the FOIA generally rests with the Office of Information and Policy. The Division's FOIA/PA Unit, which is part of the Office of the General Counsel, is staffed by a FOIA Unit Chief, attorneys, paralegals, and support personnel.

## 2.     Procedures

FOIA requests that relate to the work of the Division should be directed to the Division's FOIA/PA Unit for processing. It should be noted that the requester of the information is responsible for the cost of reproducing the materials requested, as well as search and review charges where applicable.

Division attorneys who directly receive requests for nonpublic Division documents either by telephone or in person should advise the requestor to contact the FOIA/PA Unit. The request should be in writing and should describe as specifically as possible the documents requested.

Attorneys in the Division who have worked on a matter about which information has been requested are consulted regularly by the Unit. The 1996 amendments to FOIA impose strict time limits for responding to FOIA requests. Accordingly, attorneys who are consulted by the FOIA/PA Unit should respond expeditiously and provide all possible assistance.

## 3.     Exemptions

All agency records are available to the public under FOIA, except nine categories of information that are exempt from disclosure under the Act. 5 U.S.C. § 522(b). Drafts and handwritten notes that are not distributed to staff or placed in the official file are generally not considered agency records and hence are not required to be produced. The application of some of these exemptions is discretionary and information falling within their scope may be released to the public. The exemptions to the FOIA are:

### a.     Classified Documents

Portions of documents containing national security information properly classified under the standards and procedures of the appropriate executive order are exempt from disclosure pursuant to 5 U.S.C. § 552(b)(1). Classified documents can be processed only by employees in the FOIA/PA Unit with the appropriate security clearance.

### b.     Internal Personnel Rules and Practices

Documents consisting of "internal personnel rules and practices" of an agency may be withheld under the FOIA. 5 U.S.C. § 552(b)(2). The Supreme Court held that Exemption 2 "encompasses only records relating to issues of employee relations and human resources." *Milner v. Dep't of the Navy*, 131 S.Ct. 1259, 1271 (2011).

**c.    Materials Exempted by Other Statutes**

Information that is specifically exempt from disclosure by another statute can be withheld pursuant to Exemption 3 of the Act. 5 U.S.C. § 552(b)(3). The statutes that pertain to Division matters are: (1) Fed R. Crim. P. 6(e) (grand jury information); (2) 15 U.S.C. § 18a(h) (HSR premerger notification information); (3) 15 U.S.C. § 1314(g) (CID material); (4) 15 U.S.C. § 4305(d) (National Cooperative Research and Production Act filings); and (5) 15 U.S.C. § 4019 (commercial or financial information protected by the Export Trading Company Act). Information obtained from other agencies also may be protected by statutes applicable to their areas of responsibility (*e.g.*, the FTC Improvements Act and the income tax statutes).

The coverage of the different statutes varies. For example, copies of CID schedules generally are not protected while HSR second request letters and grand jury subpoenas generally are protected. Excerpts from and descriptions of information received pursuant to the statutes noted above as they appear in transmittal letters and internal memoranda are exempt to the same extent as the source documents.

The circuit courts are divided about the scope of protection under Rule 6(e), which prohibits the disclosure of any information that would reveal a "matter occurring before the grand jury." The majority of circuits, including the D.C. Circuit, agree that "[t]here is no per se rule against disclosure of any and all information which has reached the grand jury chambers." *Senate of Puerto Rico v. Dep't of Justice*, 823 F.2d 547, 582 (D.C. Cir. 1987) (Justice, then Judge, Ruth Bader Ginsburg); *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1412-1414 (9th Cir. 1993) (explaining the various approaches established by the circuits). Rule 6(e) only protects information that would reveal the inner workings of the grand jury, such as "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (*en banc*). Thus, courts have generally held that documents created "for independent corporate purposes" are not protected by 6(e) just because they have been presented to the grand jury, but documents which might "elucidate the inner working of the grand jury" may be withheld. *Senate of Puerto Rico*, 823 F.2d at 582-83 (internal citation omitted). In the Sixth Circuit, however, there is a rebuttable presumption that confidential nonpublic documents obtained by grand jury subpoena are protected by Rule 6(e). *See In re Grand Jury Proceedings*, 851 F.2d 860, 866-67 (6th Cir. 1988). (Note that documents to which 6(e) does not apply may be exempt pursuant to other exemptions.)

**d.    Sensitive or Proprietary Business Information**

FOIA exempts (1) trade secrets, and (2) commercial or financial information obtained from a person that is confidential or privileged. 5

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 364 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

U.S.C. § 552(b)(4). This exemption covers information obtained from outside the Federal Government but very little commercial or financial information is generated by the Government. This exemption protects the interests of those who submit proprietary business information, as well as the interests of the Government in obtaining access to such information.

The term "trade secret" has been defined narrowly by the courts to mean "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *See, e.g., Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1288 (D.C. Cir. 1983). Under this definition of trade secret, there must be a direct relationship between the information and the production process.

Applicable standards under the commercial or financial information exemption generally depend upon whether the person who provided the information was obliged to provide the information or submitted it voluntarily. Information that the person was required to provide generally must be released unless disclosure either would impair the Government's ability to obtain similar information in the future or cause substantial competitive harm to the person. *Nat'l Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770-71 (D.C. Cir. 1974). Commercial or financial information submitted voluntarily is categorically protected provided it is not customarily disclosed to the public by the person who submitted the information. *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc), *cert. denied*, 507 U.S. 984 (1993); *accord Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 15051 (D.C. Cir. 2001). If coverage is unclear, the FOIA/PA Unit will consult with staff attorneys and economists to determine the nature of the commercial or financial information and whether it is exempt under FOIA. In addition, under the Department's regulations, 28 C.F.R. § 16.8, the FOIA/PA Unit will consult with the person who submitted the information, as appropriate.

Promises of confidentiality by the Division are pertinent in applying this exemption, but they are not always dispositive. The FOIA/PA Unit *always* should be consulted before any promises of confidentiality are given to parties from whom the Division has requested information. *See* Chapter III, Parts C.3, E.6. A model confidentiality letter, providing assurances for voluntarily produced commercial or financial information, may be found on ATRnet.

**e.     Civil Privileges**

"Inter-agency or intra-agency memoranda or letters" that would normally be privileged in civil discovery are exempt from disclosure pursuant to Exemption 5 of the FOIA. 5 U.S.C. § 552(b)(5); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). This exemption

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 365 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015       Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

encompasses the attorney work product doctrine and the deliberative process, attorney-client, and other discovery privileges.

### i.    Attorney Work Product Doctrine

The attorney work product doctrine protects documents prepared by attorneys in contemplation of litigation. The doctrine also applies to documents prepared by other Division employees and outside expert consultants who are working with an attorney on a particular investigation or case. Unlike the deliberative process privilege, discussed below, factual information generally is included within the attorney work product doctrine. *See Martin v. Office of Special Counsel*, 819 F.2d 1181, 1187 (D.C. Cir. 1987). The termination of an investigation or case does not alter the applicability of the attorney work product doctrine. *FTC v. Grolier, Inc.*, 462 U.S. 19 (1983).

### ii.   Deliberative Process Privilege

The deliberative process privilege (often referred to as the executive privilege) is more limited as it covers only internal Government communications that are deliberative and made prior to a final decision. The purpose of the privilege is to prevent injury to the quality of agency decisions. The privilege does not cover documents announcing a final decision or those explaining decisions that already have been made. Further, it usually does not apply to essentially factual information unless such information is so intertwined with the analysis or so clearly reflects the internal deliberative process employed by the Division as to make segregation of factual portions impossible.

### iii.  Attorney-Client Privilege

The attorney-client privilege covers confidential communications between an attorney and the attorney's client relating to a legal matter for which the client has sought advice. This privilege seldom arises with regard to Division documents. It may apply in certain circumstances to communications between the Division and another Government agency.

### f.   Materials That Involve Invasion of Personal Privacy

Personnel, medical, and similar files that would cause an unwarranted invasion of personal privacy if disclosed are exempt under the FOIA. 5 U.S.C. § 552(b)(6). In applying this exemption, the Division must balance the public interest in disclosure against the invasion of privacy the disclosure would cause. The public interest seldom outweighs an individual's privacy interest.

### g.   Investigatory Records

Under 5 U.S.C. § 552(b)(7), six categories of investigatory records are exempt.

Exemption 7(A), which protects records or information that "could reasonably be expected to interfere with enforcement proceedings," applies to nonpublic documents relevant to an open investigation or case, as well as to closed files that are relevant to another open or contemplated investigation or case. To support a claimed 7(A) exemption, the agency must be able to describe with particularity the harm disclosure would cause.

Exemption 7(B) protects materials that would deprive a person of a right to a fair trial or an impartial adjudication.

Exemption 7(C) protects records that could reveal personal privacy information similar to, but broader than, the exemption for personnel and medical files (*e.g.,* the identity of interviewees).

Exemption 7(D) protects the identity of a confidential source and, in criminal and lawful national security intelligence investigations only, confidential information furnished by that source. In other investigations, this exemption protects the identity of confidential sources but not necessarily the information furnished except to the extent that the information could be used to identify the confidential source. Sources are considered confidential if they request an express promise of anonymity or if they have provided information in circumstances where the assurance of confidentiality may reasonably be inferred. This exemption applies not only to real persons but also to corporations, trade associations, domestic and foreign governments, and law enforcement sources.

Exemptions 7(E) and (F) respectively protect confidential investigative techniques and procedures the disclosure of which would risk circumvention of the law and information that, if released, could endanger the life or safety of law enforcement personnel.

### h.    Financial Records

FOIA exempts from disclosure matters that are contained in or related to examination, operating, or condition reports by or for agencies that supervise or regulate financial institutions. 5 U.S.C. § 552(b)(8).

### i.    Geological and Geophysical Information

FOIA exempts records containing geological and geophysical information about wells. 5 U.S.C. § 552(b)(9). This exemption generally does not arise in the Division's matters.

## 4.    Other Records

### a.    Personal Papers

Personal papers of individual employees are not subject to disclosure under FOIA. Such personal papers include handwritten documents as well as other papers and information that are maintained for private use, are not distributed to staff, and are not part of the official record of

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 367 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015        Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

any investigation or case. *See* Division Directive ATR 2710.1, "Procedures for Handling Division Documents"; *Bureau of Nat'l Affairs v. U.S. Dep't of Justice*, 742 F.2d 1484 (D.C. Cir. 1984).

**b.      Records Subject to Court-Ordered Protective Orders**

Where records are under seal pursuant to court-ordered protective orders, they may be released only upon application to the court. Unless the protective order clearly prohibits the Division from disclosing records as long as the order remains in effect, the FOIA/PA Unit may contact the court that issued the protective order to clarify the scope of the protective order. *See Morgan v. United States*, 923 F.2d 195 (D.C. Cir. 1991).

### 5.      Division Records Maintenance and Procedures

Division attorneys, economists, and paralegals should carefully review hardcopy and electronic materials that are placed in official files of the Division to determine that they are official records and are properly within those files. If it is clear to the attorney at the time the record is made or placed in the file that it would involve confidential information or material that would be exempt from FOIA, it is appropriate to make a notation on the document at the time it is placed within the Division files stating that the document is "FOIA sensitive." This will assist the FOIA/PA Unit in determining whether the document comports with a proper exemption or is not otherwise subject to FOIA. When confidentiality agreements are made under the terms and conditions outlined above, such agreements should be placed in the file in writing to make those reviewing the files for FOIA purposes aware of the circumstances and the reasons for such confidentiality.

Consistent with the Division's commitment to release information under FOIA that is responsive to the request and that does not fall within a specific exemption or is not subject to FOIA, attorneys, economists, and paralegals should be familiar with the Division's directives relating to sensitive information and document retention and destruction. Division Directive ATR 2710.4, "Safeguarding Sensitive Information"; Division Directive ATR 2710.1, "Procedures for Handling Division Documents and Information."

If any other questions arise as to a proper application of FOIA, or regarding confidentiality commitments, Division personnel should confer with the Division's FOIA/PA Unit.

## H.      News Media

The Division generally communicates with the media through the Department's Office of Public Affairs (OPA). A Public Affairs Press Officer from OPA is assigned to handle all antitrust press matters and a close liaison is maintained with that Press Officer and OPA, through the Assistant Attorney General, the Deputy Assistant Attorneys General,

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 368 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

and the Directors of Enforcement. Where appropriate, OPA may contact a section or field office chief or an attorney to obtain specific information about a matter. The chief or attorney contacted should provide clarifying information to OPA and should point out whatever information is sensitive or cannot be released publicly and the reasons for that practice.

### 1.    Press Releases

The Division communicates with the media through the issuance of press releases describing significant matters such as case filings and (in appropriate circumstances) closings, business review letters, consent decrees, judgment terminations, regulatory filings, and important administrative and policy decisions of the Division. News conferences are held to announce significant enforcement actions. When submitting a recommendation or pleadings for approval, staff should also submit a proposed press release when appropriate. The appropriate Director of Enforcement will review and modify the proposed press release and then send it to the appropriate Deputy Assistant Attorney General and to the Public Affairs Press Officer who handles Division matters. That Press Officer will discuss the matter with the appropriate individuals within the Division and obtain approval on the final text of the press release from the relevant Deputy Assistant Attorney General and the Assistant Attorney General. For additional information, *see* Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases."

When an indictment, civil case, or consent decree is publicly filed, the attorney immediately should inform the office of the appropriate Director of the filing. That office will then inform OPA that the press release should be issued. The attorney handling the matter should not call OPA to authorize release of a press statement.

The Division uses relatively standardized press statements relating to the return of indictments, filing of civil cases, termination of cases by consent decree, consent to termination of judgments, and issuance of business review letters. Press releases are available on the Division's Internet site. Staff should contact the appropriate special assistant if assistance is needed in finding examples of press releases issued in cases similar to their own.

### 2.    Press Inquiries and Comments to the Press

The policy of the Department of Justice and the Antitrust Division is that public out-of-court statements regarding investigations, indictments, ongoing litigation, and other activities should be minimal, consistent with the Department's responsibility to keep the public informed. Such comments as are made are handled through OPA.

Because charges that result in an indictment or a civil action should be argued and proved in court, not in a newspaper or broadcast, public

CASE 0:23-cv-03009-JRT-JFD   Doc. 19-2   Filed 10/06/23   Page 369 of 370

Antitrust Division Manual | Fifth Edition | Last Updated April 2015          Ch. VII. Antitrust Division Relationships with Other Agencies and the Public

comment on such charges should be limited out of fairness to the rights of individuals and corporations and to minimize the possibility of prejudicial pretrial publicity.

Division attorneys should be familiar with the provisions of Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases"; 28 C.F.R. § 50.2, "Release of information by personnel of the Department of Justice relating to criminal and civil proceedings"; and the Department's guidelines on media relations.

The following summarizes the applicable policy considerations:

- Information about investigations, indictments, and civil cases should be provided equally to all members of the news media subject to specific limitations imposed by law or court rule or order. Written releases relating to the essentials of the indictment, complaint, or other pleadings are usually prepared and distributed as outlined above. *See* Chapter VII, Part H.1.

- Any comments that need to be made on a particular investigation or series of investigations should be handled by OPA, which will coordinate with the appropriate Director of Enforcement or Deputy Assistant Attorney General. Attorneys should not take it upon themselves to make such comments to the press or even to release the identity of staff members or others involved in the course of the investigation. In virtually every instance where a Division attorney or other representative receives a press inquiry, he or she should refer the inquiry to OPA.

- In antitrust investigations, reference to the name of an individual or particular company should be subject to the Department's general "no acknowledgment" rule except in merger investigations.

- The Division will not disclose the fact that companies have filed under the HSR Act. However, the Division and OPA will confirm an investigation of a proposed transaction based on the fact that the Department and the FTC are required under the law to look at transactions that meet certain threshold requirements. A Division attorney should never comment further.

- Where the Division has undertaken an investigation or inquiry as a result of a referral from another agency or individual, and that agency or individual has publicly said that such referral has been made, or if the matter has received a significant amount of publicity, the Department, upon inquiry, may acknowledge the existence of an investigation into a particular industry. Investigation of overall industry or market practices may be acknowledged by OPA, the appropriate Director of Enforcement, or Deputy Assistant Attorney General (*e.g.,* "The Antitrust Division is conducting an investigation into the marketing practices of the widget industry.").

- Generally, even the existence of particular criminal investigations should not be acknowledged or commented upon.

In general, the Division and the Department have a policy of openness, fairness, decency, and civility to all. The Division does not wish to prejudice the rights or affect the interests of anyone accused of a crime or a civil violation of the law. Accordingly, press relations should be based on a common sense view of the guidelines set forth herein.