# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637 <br><br> Judge Thomas M. Durkin |

**AMENDED MEMORANDUM OPINION AND ORDER**

Purchasers of chicken meat (a product known as "Broilers") allege that Broiler producers conspired to raise prices in violation of the Sherman Act.[i] Defendants have moved for summary judgment,[ii] in the form of 38 separately filed and briefed motions.[iii] The motions are denied in part and granted in part.

In accordance with the parties' stipulation of September 27, 2023, R. 6903, this amended opinion and order is entered to correct scrivener's errors in the original opinion and order entered on June 30, 2023. R. 6641. This amended opinion and order makes no change to the Court's findings and judgments entered in the June 30 order.

## Analysis

The foundation of this case is the apparently anomalous decreases in Broiler production in 2008-09 and 2011-12 depicted in this chart:



*See* R. 6226 at 53.[1] Plaintiffs claim that the decreases were intentionally implemented as part of a conspiracy to increase price, whereas Defendants argue that they were caused by market conditions and Defendants' independent reactions to those conditions.

Section 1 of the Sherman Act prohibits every "contract, combination . . . or conspiracy in restraint of trade." This "language does not ban *all* contracts, but instead reaches only agreements that restrict competition." *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 933 (7th Cir. 2018) (emphasis in original). "Price

---

[1] "RTC" means "ready to cook" and is sometimes used as a descriptor for Broilers.

2

fixing is a per se violation of the Sherman Act." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002). Output reduction with the intent to increase price can be a form of price fixing. *See Kleen*, 910 F.3d at 931.

Defendants' "information exchange" through Agri Stats is part of the evidence Plaintiffs use to prove their per se price fixing claim. The End Users also argue that the Agri Stats information exchange is anticompetitive and itself violates the Sherman Act. Such a claim is evaluated under a "rule of reason" framework. *See Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("There is a closely related but analytically distinct type of claim, also based on § 1 of the Sherman Act, where the violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement. This exchange of information is not illegal *per se,* but can be found unlawful under a rule of reason analysis."). The Court will address this claim later and separately from the per se price fixing claim.

Whether summary judgment is appropriate on the per se claim depends on whether the evidence is sufficient for a reasonable jury to find a conspiracy by a preponderance of the evidence. *See Kleen*, 910 F.3d at 934 (Plaintiffs need "evidence that would allow a trier of fact to nudge the ball over the 50-yard line and rationally to say that the existence of an agreement is more likely than not."); *id.* ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007))); *see also Fructose*, 295 F.3d at

3

661 ("Another and equivalent way to put this is that they must present evidence that would enable a reasonable jury to reject the hypothesis that the defendants foreswore price competition without actually agreeing to do so."). "Put more directly, [a plaintiff] must put on the table some evidence which, if believed, would support a finding of concerted behavior." *Kleen*, 910 F.3d at 934. As usual, summary judgment is the moment in a lawsuit "when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) ("put up or shut up").

## A.    Opinion Evidence

Plaintiffs' case begins with the opinions of several economists and other experts. According to the experts, the Broiler market is conducive to collusion for several reasons. First, Broilers function as a commodity product, because the chicken meat produced in the United States is genetically identical. Second, Defendants are vertically integrated, meaning that they control all the levers of supply. Third, the market is highly concentrated. While there are 20 defendant producers, the top four control nearly 60 percent of the market, and the top eight control almost 80 percent.

| | | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Defendant and Co-Conspirator Share of Market | | | 96.1% | 96.1% | 96.5% | 96.4% | 96.0% | 97.1% | 98.0% | 97.9% | 96.8% |
| Defendant and Co-Conspirator (with acquisitions) Share of Market | | | 98.1% | 98.1% | 98.0% | 98.2% | 98.0% | 98.1% | 98.0% | 97.9% | 98.0% |

**Company Market Shares (%)**

| Company | Processor | Cat. | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tyson Foods | Tyson Foods | D | 21.4% | 21.3% | 21.6% | 20.6% | 20.0% | 19.4% | 21.3% | 21.1% | 20.8% |
| | Keystone Foods | C/AD | 2.5% | 2.3% | 2.4% | 2.4% | 2.7% | 2.6% | - | - | 1.8% |
| | MBA Poultry | AD | 0.2% | 0.2% | 0.2% | 0.3% | 0.3% | 0.3% | - | - | 0.2% |
| Pilgrim's Pride | Pilgrim's Pride | D | 19.0% | 17.5% | 16.9% | 16.6% | 16.3% | 17.2% | 17.3% | 16.9% | 17.2% |
| | Gold'n Plump Poultry | AD | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | - | - | 0.6% |
| Sanderson Farms | Sanderson Farms | D | 7.3% | 7.4% | 7.2% | 7.8% | 8.3% | 9.2% | 9.6% | 9.4% | 8.3% |
| Perdue Farms, Inc. | Perdue Farms, Inc. | D | 7.0% | 7.1% | 6.9% | 7.2% | 7.2% | 7.0% | 7.1% | 6.6% | 7.0% |
| Koch Foods | Koch Foods | D | 6.1% | 6.1% | 5.9% | 5.6% | 5.7% | 5.6% | 5.5% | 6.4% | 5.9% |
| Mountaire Farms | Mountaire Farms | D | 5.0% | 5.2% | 5.3% | 5.4% | 5.3% | 5.4% | 5.4% | 6.0% | 5.4% |
| Wayne Farms | Wayne Farms | D | 4.7% | 5.4% | 5.5% | 5.6% | 5.4% | 5.2% | 5.3% | 5.2% | 5.3% |
| Peco Foods | Peco Foods | D | 2.9% | 3.0% | 2.9% | 3.1% | 3.3% | 3.9% | 4.0% | 3.8% | 3.4% |
| House of Raeford Farms | House of Raeford Farms | D | 2.8% | 3.0% | 3.2% | 3.2% | 3.1% | 3.1% | 3.0% | 2.9% | 3.0% |
| George's | George's | D | 2.4% | 2.5% | 2.5% | 2.4% | 2.5% | 2.5% | 3.2% | 3.1% | 2.7% |
| | Ozark Mountain Poultry | AD | - | - | 0.3% | 0.4% | 0.7% | 0.7% | - | - | 0.3% |
| Foster Farms | Foster Farms | D | 2.7% | 2.7% | 2.5% | 2.4% | 2.3% | 2.3% | 2.7% | 3.0% | 2.6% |
| Amick Farms/OSI Group | Amick Farms/OSI Group | C | 2.0% | 2.0% | 2.1% | 2.3% | 2.5% | 2.4% | 2.4% | 2.5% | 2.3% |
| Case Foods | Case Foods | C | 2.0% | 2.1% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.1% | 2.1% |
| Fieldale Farms | Fieldale Farms | D | 1.9% | 1.6% | 1.8% | 1.9% | 1.8% | 1.8% | 1.8% | 1.7% | 1.8% |
| Mar-Jac Poultry, Inc. | Mar-Jac Poultry, Inc. | D | 0.9% | 0.9% | 1.7% | 1.8% | 1.8% | 1.8% | 1.8% | 1.7% | 1.6% |
| | Marshall Durbin Companies | AD | 0.9% | 0.8% | - | - | - | - | - | - | 0.2% |
| O.K. Foods | O.K. Foods | D | 1.9% | 1.9% | 1.8% | 1.7% | 1.6% | 1.5% | 1.5% | 1.6% | 1.7% |
| Simmons Foods | Simmons Foods | D | 1.6% | 1.7% | 1.6% | 1.6% | 1.5% | 1.5% | 1.5% | 1.5% | 1.6% |
| Claxton Poultry Farms | Claxton Poultry Farms | D | 0.9% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 0.9% | 1.0% |
| Allen Family Foods | Allen Family Foods | C | 0.6% | 0.7% | 0.7% | 0.8% | 1.0% | 0.9% | 0.8% | 0.8% | 0.8% |
| Harrison Poultry | Harrison Poultry | D | 0.7% | 0.7% | 0.7% | 0.7% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Golden-Rod Broilers | Golden-Rod Broilers | N | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| Farmers Pride | Farmers Pride | N | 0.4% | 0.4% | 0.3% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| Holmes Foods | Holmes Foods | N | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Miller Poultry | Miller Poultry | N | 0.2% | 0.2% | 0.2% | 0.1% | 0.2% | 0.3% | 0.3% | 0.2% | 0.2% |
| Hain Pure Protein | Hain Pure Protein | N | 0.1% | 0.1% | 0.1% | 0.1% | 0.2% | 0.1% | 0.2% | 0.2% | 0.2% |
| | Empire Kosher Poultry | AN | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | - | - | - | 0.1% |
| Gerber's Poultry | Gerber's Poultry | N | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Jamaica Broilers | Gentry Poultry | AN | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | - | 0.1% |
| | Jamaica Broilers | | - | - | - | - | - | - | - | 0.1% | 0.01% |
| Murray's Chickens/MB Food Pro | Murray's Chickens/MB Food Proc. | N | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.10% |
| Agri Star Meat & Poultry, LLC | Agri Star Meat & Poultry, LLC | N | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% | 0.03% |
| Shenandoah Valley Organic | Shenandoah Valley Organic | N | - | - | - | - | - | - | - | 0.08% | 0.01% |
| Eberly Poultry, Inc. | Eberly Poultry, Inc. | N | 0.01% | 0.01% | - | - | - | - | - | - | 0.002% |
| Lincoln Premium Poultry | Lincoln Premium Poultry | N | - | - | - | - | - | - | - | 0.03% | 0.004% |
| *Grand Total* | | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Notes: Base data on ready-to-cook pounds by broiler processor is from Watt Poultry News. Workpapers: all verticles.xlsm. Category Key: D = defendant, C = co-conspirator, AD = processor acquired by a listed defendant, AC = processor acquired by a listed co-conspirator, N = non-defendant or co-conspirator, AN = processor acquired by a non-defendant or co-conspirator, C/AD = co-conspirator later acquired by a listed defendant.

R. 6226-5 at 64 (p. 58).

Lastly, reports from Agri Stats—a company that surveys Broiler producers and prepares reports about industry statistics—provided an opportunity for Defendants to learn information about their competitors' businesses.[2] The reports compared the

---

[2] *See* R. 6226-3 (Carter report); R. 6226-3 (Mangum report); R. 6226-5 (Sunding report); R. 5898-1 (Frankel report); R. 6226-4 (Williams report).

subscriber's data to anonymized data of other subscribers. Critically, the supply data was redacted on a report except for the subscriber who supplied it. But there is evidence that some defendants exchanged reports, and evidence that other defendants were able to deanonymize the reports by cross-referencing different sections of the reports and applying their own knowledge of their competitors and the industry. The extent of the information sharing through Agri Stats is unusual for competitors. *See Kleen*, 910 F.3d at 938 ("this type of information flow, especially between executives, may be probative of conspiracy").

The experts explain that in an industry with these characteristics, an unusual production cut is likely the result of express agreement among the producers. The alternative—unilateral action based on merely tacit agreement or what is known as conscious parallel conduct—is less likely because it is too easy for a competitor to jump in and satisfy any supply decrease implemented unilaterally. *See* R. 5624 at 160:12-13, 24 (Mangum, the Indirects' expert, testified that in a competitive marketplace "other competitors [should be] watching to see if [a competitor] stumbles," and be ready to "step up"). According to Plaintiffs' experts, the commodity nature of Broilers and the vertical integration that allows producers to easily ramp up production, especially by the largest producers, means that a large decrease in production by the industry as a whole is likely a result of agreement among the competitors.[3]

---

[3] *See* R. 6226-3 (Carter report); R. 6226-3 (Mangum report); R. 6226-5 (Sunding report); R. 5898-1 (Frankel report); R. 6226-4 (Williams report); R. 5864-1 (Elhauge report).

Notably, in the years immediately preceding the alleged conspiracy period, Tyson, the second largest producer at the time, attempted unilateral production cuts to no avail. This failure led Tyson to rejoin Agri Stats in 2007—having dropped the subscription in 2004, *see* R. 6415 at 12 (¶ 5)—to gain access to information about its competitors, and, according to Plaintiffs, was the impetus for the conspiracy alleged in this case.

The unusual production decreases in 2008-09 and 2011-12, in an industry that historically experiences consistently increasing production, justify examining whether the economic conditions were sufficient to cause the production decreases without an agreement among the producers. Several of Plaintiffs' experts conducted regression analyses accounting for supply and demand factors such as the price of feed, the price of transportation, the cost of alternative proteins like beef, and the unemployment rate. The analysts compared production in the alleged conspiracy period to a preceding benchmark period. They all found that industry-wide production was lower than it should have been and prices were higher than they should have been, had there been active competition, taking account of the relevant economic context. Based on these analyses, they concluded that the production decreases and price increases were the result of collusion among the producers to restrict supply.[4]

---

[4] *See* R. 6226-3 (Carter report); R. 6226-3 (Mangum report); R. 6226-5 (Sunding report); R. 5921-2 (Lamb).

7

## B. *Daubert* Motions

Defendants have moved to exclude each of the expert opinions Plaintiffs offer. But like Defendants' *Daubert* motions at the class certification stage, Defendants do not actually contend that any of the experts' methods are unreliable or lack a reasonable basis. With respect to the opinions reviewed above—about (1) the Broiler industry's characteristics, and (2) the regression analyses—Defendants merely offer alternative interpretations of the industry's characteristics and disagree with the data Plaintiffs' experts use to conduct their regression analyses. As the Court explained in much greater detail in certifying the three classes, these are issues for a jury to consider and not reasons to exclude any experts' testimony. *See* R. 5644 (*In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *1 (N.D. Ill. May 27, 2022)); *see also Fructose*, 295 F.3d at 660 ("Resolving this dispute requires a knowledge of statistical inference that judges do not possess. . . . [W]e must accept that the plaintiffs have presented some admissible evidence that higher prices during the period of the alleged conspiracy cannot be fully explained by causes consistent with active competition, such as changes in the price of corn."). The Court's reasons for denying Defendants' motions to exclude the classes' experts on class certification (primarily the experts Carter, Mangum, and Sunding) are sufficient to deny Defendants' renewed *Daubert* motions on summary judgment, and the Court will not repeat that reasoning here.

Additionally, Defendants' *Daubert* motions on summary judgment focus, in part, on opinions that the Court has not relied on in deciding summary judgment. It

8

may be that some of those opinions are not properly presented to a jury. But it is unnecessary to decide those issues to decide summary judgment. Therefore, the Court's analysis of each of Defendants' Daubert motions will be relatively brief and targeted at the opinions necessary to decide summary judgment.

### 1. Carter

Defendants argue that Carter's opinions, in addition to being unreliable (an argument the Court rejected for reasons stated in the opinion granting class certification) should be excluded because his "one-size-fits-all approach is misleading and highly likely to confuse the jury." R. 5895 at 1. But Defendants believe Carter's opinions will confuse a jury for the same reasons they argue the opinions are unreliable—largely because they disagree with his approach to analyze the industry as a whole rather than each individual defendant. This is not an issue of confusion but of the weight to be given to Carter's opinions, and is not a reason to exclude them.

Defendants also argue that "Dr. Carter's opinion that an agreement can be inferred from circumstantial evidence absent parallel conduct should be excluded" because it is an incorrect "legal conclusion." *Id.*; *see also id.* at 4-6. To the extent this is Carter's opinion, the Court agrees that it is a legal conclusion. In any event, the Court has not relied on this opinion, and the Court will decide what constitutes parallel conduct and whether that evidence is sufficient to meet Plaintiffs' burden.

Further, Defendants argue that Carter should not be permitted to offer his opinions about the meaning of documentary evidence. *See* R. 5895 at 2 ("DPPs have deployed Dr. Carter to 'parrot [their] beliefs' as a mouthpiece under the guise of

economic analysis."). Defendants are particularly concerned with Carter's conclusions based on documentary evidence about the extent of production cuts and Defendants' understanding of their "fair share" of the conspiracy. The Court tends to agree with Defendants' argument, and the Court has not relied on any of Carter's opinions based on his interpretation of documentary evidence such as Defendants' communications. The Court has made its own findings about the significance of the documentary evidence without assistance from any Plaintiffs' expert.

### 2.    Mangum

Defendants argue that the Court's denial of the motion to exclude Mangum's testimony in connection with the class certification motion is no longer relevant because Mangum "materially changed his opinion" at his deposition when he answered a question by acknowledging that in the Broiler industry "there's a lot of companies competing [and] they're looking for a chance of [sic] someone to give them a shot to produce more." R. 5867 at 1. It is not clear how this single statement at a deposition, appearing to concede that "competition" existed in the Broiler industry, can undermine the extensive and detailed analysis in Mangum's prepared report. To the extent it does, Defendants can use it during cross examination. It is not a reason to bar Mangum's testimony as unreliable.

Defendants next make a rather sophistical argument. They point out that Mangum believes the Broiler industry to be an oligopoly in which "production decisions" are not made solely based on cost and demand, but also by information competitors can glean by simply observing each other's conduct. Mangum's regression

analysis accounts for cost and demand factors and concludes that they do not explain the production cuts and price increases during the alleged conspiracy period, so he concludes that they must be caused by a conspiracy. Defendants contend that they also could be the result simply of a tacit agreement, which, unlike an express agreement, is not prohibited by the Sherman Act. Many authorities note that tacit agreement is in the nature of an oligopoly. Fair enough. But this does not undermine Mangum's opinion. It just highlights the fact that he has taken a side in what is the primary question in this case: whether conspiratorial agreement or unilateral competitive behavior caused the decreases in production and increases in price. And in any case, Mangum's and the other experts' opinions are not sufficient, by themselves, to satisfy Plaintiffs' preponderance burden. Those opinions are the evidentiary foundation of Plaintiffs' case and move them part of the way to the "50-yard line," as *Kleen* puts it. But they only establish that the economic circumstances of the Broiler industry were ripe for conspiracy and might have even encouraged it. Just because there is an alternative explanation that is contrary to that proffered by Mangum and Plaintiffs' other experts does not mean that Mangum's opinion should be excluded.

Defendants also argue that Mangum's opinion should be excluded "because he opines that up to 40% of the broiler chicken industry could have done nothing to restrain their own supply of broiler chicken and still been a part of the alleged supply restraint conspiracy." R. 5867 at 2. As discussed with respect to Carter's opinions, the Court has not relied on expert testimony to evaluate the evidence with respect to

11

whether any defendant actually joined the conspiracy. Whether it is possible for a defendant to join the conspiracy without actually cutting production is a question for the Court to decide on summary judgment. But the fact that Mangum offers these opinions, which the Court will disregard, does not undermine the other opinions that the Court has relied upon.

### 3.   Sunding

Like their motions to exclude the testimonies of Carter and Mangum, Defendants do not argue that Sunding's regression analysis and his opinion that the Broiler industry is conducive to collusion are unreliable. Instead, their motion focuses on opinions that are not necessary to the Court's summary judgment analysis.

For instance, Sunding states in his report that the normal "unilateral competitive response to production cuts on the part of one processor would be for its rivals to increase production." R. 6226-5 at 93. And in his rebuttal report, Sunding cites several instances when he believes certain Defendants "made supply decisions that were against their unilateral self-interest." R. 6226-6 at 125-72. But at his deposition, Sunding incorrectly cited certain instances of Defendants' conduct against self-interest. And in their brief in opposition to Perdue's motion for summary judgment, Plaintiffs made a similar mistake. These citation mistakes, however, do not undermine the reliability of Sunding's method to identify actions against unilateral self-interest. His "method" is simply the commonsense observation that a producer acts against its self-interest when it fails to fill a supply gap caused by a competitor's supply cut, as long as price sufficiently exceeds cost. Defendants do not

quibble with examples of conduct against self-interest as they are stated in Sunding's reports. To the extent his misstatements at his deposition are material, they might be subject matter for cross-examination. But this is not a reason to exclude his testimony.

Defendants also object to Sunding's opinions about what Defendants meant when they used the terms "fair share" and several other statements he reviewed in Defendants' documents. As discussed, the Court does not require Sunding's expertise to determine what reasonable interferences can be drawn from the documentary evidence. That fact that Sunding does so is not a reason to exclude his testimony on other matters. And it is unnecessary to decide now whether Sunding can testify to such issues in front of a jury.

The last of Defendants' three arguments against Sunding is that he "cannot be allowed to tell a jury that the supposed conspiracy started in 2008 when his own math proves it did not." R. 6391 at 8. Sunding is an expert for the End-User Class, whose class period begins in 2012. Sunding's analysis focuses on the period beginning in 2012, but he opines that the conspiracy began in 2008. It is unnecessary to decide whether Sunding should be permitted to "tell a jury" that the conspiracy started in 2008, when that question is not necessary for the Court to decide summary judgment.

### 4. Frankel

The Court has not previously addressed the opinions of Dr. Alan Frankel because he has been retained by Direct Action Plaintiffs whose claims were of course not at issue on the class certification motions. Frankel offers opinions about the

13

Broiler industry's susceptibility to collusion and a regression analysis of supply and price during the alleged conspiracy period that are as similar to the work of Carter, Mangum, and Sunding, as those three are to each other. Like their attacks on Carter, Mangum, and Sunding, Defendants contend that Frankel's regression analysis produces unreasonable results. But as the Court explained in its opinion granting class certification, this is material for cross-examination, and not a basis to exclude Frankel's testimony.

Defendants primarily attack Frankel's method of determining which of Defendants' production cuts were contrary to their self-interest. He does this by analyzing when Defendants cut production even when costs were lower than the prevailing price. Defendants concede that this is a well-accepted method. But Defendants claim that when their expert ran Frankel's equations on the benchmark period the result is that more than 95% of cuts were against self-interest. Defendants argue that this is an absurd result which indicates that Frankel's method and opinion should be excluded.

To start, it is not inherently unreasonable or surprising to find that 95% of production cuts are against self-interest. If prices were generally higher than costs during the benchmark period, then production cuts would generally be against self-interest. This is especially possible in an industry with the characteristics of the Broiler industry, where there is increasing demand and it is relatively easy to increase production to meet that demand.

14

Further, Frankel explains that his method was not merely to identify production cuts that took place when price exceeded cost, but also to examine other factors explaining the context of the production cuts, as exhibited in the documentary evidence. He also used his judgment to determine when the cuts were not actually against self-interest despite prices being higher than costs. Defendants argue that judgment calls are not an admissible scientific method.

However, Frankel's individualized document review only serves to *decrease* the number of production cuts he finds are against self-interest, which is actually helpful to Defendants' position. Presumably he can be cross-examined on any cuts he includes as being against self-interest. As discussed, Defendants do not dispute the underlying theory for the calculation that identifies which cuts are against self-interest, that being when price is greater than cost. It is difficult to see why they would object to Frankel finding that many of those cuts are not actually against self-interest. Notably, Defendants argue throughout most of the rest of their *Daubert* motions that Plaintiffs' experts insufficiently examine individual data and alternative explanations for production cuts. Here, Frankel appears to undertake just the kind of analysis Defendants argue Plaintiffs' other experts should have undertaken but did not. Frankel's opinions are admissible to the extent the Court relies on them in deciding these motions.

### 5. Williams

Like Frankel, the Court has not previously reviewed the report and testimony of the Indirects' expert Dr. Michael A. Williams, because it was not submitted with

the motions for class certification. However, like Carter, Mangum, Sunding, and Frankel, Williams performed a regression analysis with reference to a benchmark period to determine that Broiler production was lower and prices were higher than they should have been during the alleged conspiracy period absent the conspiracy. Defendants make the same arguments against this method that the Court has rejected with respect to the other four experts.

Williams's analysis includes 2008 in the benchmark period, even though 2008 is part of Plaintiffs' alleged conspiracy period. Williams's reasoning for this decision is that the impact of any conspiracy beginning in 2008 would not be felt until 2009. Defendants argue that it is unreasonable to include a year from the alleged conspiracy period in the benchmark period. Perhaps this is true. But it is a question for cross-examination and does not undermine the reliability of Williams's method.

Defendants take issue with several other of Williams's opinions. First, they criticize his opinion that it is possible for some producers to increase production and still be part of a conspiracy to decrease production. Defendants argue that this opinion is not helpful because Williams does not contend that any defendants increased production, and so the theory does not conform to the facts of the case. But the Court has previously suggested that a producer might restrict supply by slowing the rate of increase of production as opposed to an overall production cut. This may result in an increased production number, but one that would have been higher but for the conspiracy. To the extent the facts bear out this possibility, Williams's opinion on this issue is helpful and will not be excluded.

16

Defendants then argue that Williams's analysis of certain defendants' production data is "unscientific" and incomplete. This argument is based on taking a statement from Williams's deposition out of context. And the argument that it is incomplete ignores the fact that Williams undertook the particular analysis Defendants criticize as a response to Defendants' experts' criticisms of him. In other words, it is not the analysis that directly produced his primary opinions. This analysis on reply has no direct bearing on the reliability of Williams's primary opinions.

Defendants also argue that Williams improperly concluded that early slaughter of breeder hens and subscription to Agri Stats reports constitutes "parallel conduct." Defendants use this argument to attack Williams's opinions that: (1) earlier slaughter of breeder hens directly decreases supply; and (2) that all Defendants deanonymized Agri Stats reports because Agri Stats's information is "de facto non-anonymous due to its specificity." R. 6271 at 13. Of course, "parallel conduct" is a legal term of art courts use to describe the weight of evidence of a conspiracy. As mentioned, the Court will decide what constitutes parallel conduct and whether that evidence is sufficient to meet Plaintiffs' burden. In any case, whether Williams improperly couched his conclusion in terms of "parallel conduct" is beside the point and easily rectified with a motion in limine if necessary. Defendants certainly disagree with these opinions, but they do not argue that either is unreliable. And the fact that Williams concludes that this conduct demonstrates parallel conduct is not a reason to exclude the substantive opinions themselves.

Lastly, as they do in their motions concerning Carter, Sunding, and Frankel, Defendants argue that Williams improperly offers opinions about the meaning of Defendants' documented communications. As discussed, the Court will draw its own conclusions in this regard.

### 6. Lamb

Russell Lamb has been retained by Direct Action Plaintiff Associated Wholesale Grocers ("AWG") to provide opinions in this case. Like the classes' experts, Lamb conducted a regression analysis to demonstrate that production decreased and prices increased relative to a benchmark period. Defendants argue that his analysis is unreliable because he was unaware of defendant Pilgrim's bankruptcy in 2008. AWG responds that this is of no moment because Lamb "does not opine on any causal effect issues." R. 6266 at 3. But Lamb clearly does. He states in his report: "I have concluded that the alleged conspiracy artificially inflated prices for broiler products." R. 5921-2 at 5. It is not clear why AWG denies this.

Regardless, Lamb's ignorance of Pilgrim's bankruptcy does not undermine the reliability of his methodology. The Court addressed this issue in detail in the order certifying the classes. To the extent its bankruptcy was the cause of Pilgrim's decrease in production, the bankruptcy does not explain why Pilgrim's competitors did not jump in to fill the gap in supply. Lamb's analysis, like that of the other experts in this case, highlights this unusual circumstance by demonstrating that production overall was lower that it should have been. Pilgrim's bankruptcy is not an economic condition that affected the market generally. It is a historic event that affected one

18

producer. By contrast, Lamb and the other experts analyzed the industry as a whole. Facts about individual producers are not relevant to that sort of analysis. Like the other experts' opinions, Lamb's opinion about the market generally is relevant and helpful to that extent. Lamb's failure to account for a specific piece of information about one producer is not a reason to exclude his opinion on a different issue.

### 7.    Elhauge

Einer Elhauge is a well-known professor of antitrust law at Harvard retained by AWG to provide opinions in this case. Similar to several of the other experts already discussed, Elhauge believes that the conditions of the Broiler industry are conducive to a conspiracy and that many of Defendants' actions are indicative of the existence of a conspiracy. Defendants argue that Elhauge's opinions are improper legal conclusions that must be excluded. But Elhauge's opinions are valuable not because he offers an ultimate conclusion that a conspiracy existed in fact—an opinion he was careful not to make—but because he evaluated the Broiler market and Defendants' actions. These opinions are not legal conclusions, but opinions based in economic knowledge and training.

Defendants' more specific argument is that Elhauge relied upon the results of Lamb's regression analysis in preparing his report without having read Lamb's report. But even though Elhauge had not read Lamb's report prior to preparing his own, he had been made aware of Lamb's methodology and conclusions. Being familiar with the sort of analysis Lamb conducted, Elhauge assumed Lamb's methods were sound in order to prepare his own report in a timely fashion. Elhauge testified that

19

he later read Lamb's report and confirmed that he concurred with Lamb's analysis. There is nothing about this process that requires that Elhauge's testimony be excluded.

### C.    Parallel Conduct

Apart from questioning the reliability of Plaintiffs' experts' regression analyses, Defendants argue that their opinions are fundamentally contrary to reality because, according to Defendants, they did not all cut production during the relevant time periods. Defendants support this argument with the following charts produced by their expert Dr. James A. Levinsohn:



R. 5997 at 27; R. 6019-1 at 98 (p. 92).



R. 5997 at 28; R. 6019-1 at 100 (p. 94). Defendants argue that without parallel production decreases, Plaintiffs cannot prove a conspiracy. On its face, these charts appear to present a compelling argument.

It is possible to prove a conspiracy without evidence of parallel noncompetitive conduct. *See Fructose*, 295 F.3d at 655 ("Neither form of economic evidence [i.e., expert evidence or parallel conduct] is strictly necessary[.]"). The absence of parallel conduct would not be fatal to Plaintiffs' claims. But the presence of parallel conduct is generally thought to be an integral part of the economic evidence necessary to prove price fixing with circumstantial evidence. *See id.* ("The economic evidence will in turn generally be of two types," one being "evidence that the market behaved in a noncompetitive manner.").

Plaintiffs argue that there are counter-explanations for Defendants' statistics which show that many of them actually decreased production. For instance, they

argue that some apparent increases are only a product of a defendant acquiring a competitor's production plant, which is merely a shift of ownership of production.

It is unnecessary, however, for the Court to delve into disputes about the accuracy of Defendants' evidence of increased production, because Plaintiffs have provided enough alternative evidence for a reasonable jury to find that Defendants *decreased* production in parallel. Two historical documents in the record—one prepared by defendant Tyson, and the other by defendant Agri Stats—recorded production cuts for all Defendants at issue on this motion except for Case, Foster, Fries-Claxton, Harrison, and Tyson. *See* R. 6226 at 23. Even so, there is sufficient evidence that those five defendants engaged in similar conduct. Although not mentioned in the Tyson or Agri Stats documents, Case admits that it cut production by 10% at one of its plants in 2011, decreased bird weight at its Winesburg facility from May 2011 to May 2012, and reduced the number of birds at its Goldsboro facility from September 2012 to February 2013. *See* R. 5928 at 5; R. 6399 at 5. Foster abandoned a plan to build a new Broiler complex in Colorado on July 2, 2008. *See* R. 6226-3 at 72. And an internal Tyson email noted that Foster reduced production at is Farmersville plant between March and July 2011. *See* R. 6239-4 at 257. Fries-Claxton cut back production 6% in 2011. See R. 6226-3 at 74. Harrison cut production 5% in 2008 and another 5% in 2011. *See* R. 6226-3 at 72, 74. And a number of documents show that Tyson made significant production cuts in 2008 and 2011. *See* R. 6226-3 at 72, 74; R. 6229-11 at 128-29. The inference that Defendants' supply reductions would

22

have then led to increased prices is an uncontroversial inference based on well-established economic theory.

Defendants argue that there are alternative explanations for the production decreases and price increases. But like all circumstantial evidence, "parallel conduct" always has an "alternative explanation." Only direct evidence lacks an alternative explanation. Potential alternative explanations are what makes it circumstantial. *See Fructose*, 295 F.3d at 662 ("[Direct evidence] is evidence tantamount to an acknowledgment of guilt; [circumstantial evidence] is everything else *including* ambiguous statements. These are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial.").

Furthermore, many of Defendants' alternative explanations are based on the economic conditions of the relevant time period. But Plaintiffs' experts took economic conditions into account in conducting their regression analyses, and determined that market conditions were insufficient to explain the production decreases and price increases but for a conspiracy.

The parties have offered conflicting explanations for the apparent production decreases. Some of these also appear very compelling. But it is not the Court's province to resolve such factual disputes. *See Fructose*, 295 F.3d at 655 ("In deciding whether there is enough evidence of price fixing to create a jury issue, a court asked to dismiss a price-fixing suit on summary judgment must be careful to avoid three traps . . . . The first is to weigh conflicting evidence (the job of the jury)[.]").

23

That being said, the economists' opinions and the evidence of parallel noncompetitive conduct alone are insufficient to prove a price fixing conspiracy. Parallel conduct in particular can be the result of mere tacit collusion. To the extent the Broiler industry is properly characterized as an oligopoly—where a small group of producers control the market—tacit collusion would itself be unsurprising. *See Kleen*, 910 F.3d at 931 ("Tacit collusion is easy in those markets[.]"). Tacit collusion does not violate the Sherman Act—only express agreement is prohibited. And generally, economic evidence (expert opinion and/or parallel conduct) merely *suggesting* express agreement is insufficient by itself to prove a Sherman Act violation by a preponderance of the evidence. *See Fructose*, 295 F.3d at 661 ("To repeat, there is evidence that the defendants were not competing; we might go so far as to say they had tacitly agreed not to compete, or at least to compete as little as possible; but the plaintiffs must prove that there was an actual, manifest agreement not to compete. Another and equivalent way to put this is that they must present evidence that would enable a reasonable jury to reject the hypothesis that the defendants foreswore price competition without actually agreeing to do so.").

As the Seventh Circuit explained in *Fructose*, non-economic evidence of express agreement is generally necessary to prove a Sherman Act violation. The extent of non-economic evidence necessary to satisfy the preponderance standard varies in inverse proportion to the strength of the economic evidence; in other words, the stronger the economic evidence, the weaker the non-economic evidence can be and still demonstrate a conspiracy by a preponderance of the evidence. *See Fructose*, 295

24

F.3d at 661 ("More evidence is required the less plausible the charge of collusive conduct.").

Here, as in *Fructose* and *Kleen*, the economic evidence is relatively strong, because the "charge is of a garden-variety price-fixing conspiracy." *Fructose*, 295 F.3d at 661. As discussed: (1) the Broiler industry is conducive to collusion; (2) unilateral production cuts would generally be ineffective in raising prices suggesting that any industry-wide production decrease is the product of agreement; and (3) the regression analyses find that economic factors did not cause the production decreases. This evidence strongly suggests the presence of an agreement. Nevertheless, some non-economic evidence specifically indicating express agreement is necessary for Plaintiffs to meet their burden to show that a reasonable jury could find by a preponderance of the evidence that Defendants agreed to reduce production thereby increasing the price of Broilers.

### D.  Non-Economic Evidence of Agreement

In this case, the non-economic evidence of conspiracy takes the form of suspicious statements by, and communications among, Defendants in emails and various public statements. Of course, none of these documented communications are the proverbial "smoking gun." They all require inferences to conclude that Defendants had an agreement to fix prices. But the necessity of inferences does not destroy the evidentiary value of the documented communications. The question is whether, when taken together with the economic evidence, the documented communications are of sufficient evidentiary weight for a reasonable jury to find by a preponderance of the

evidence that an agreement existed. *See Fructose*, 295 F.3d at 661 ("The question is simply whether this evidence, considered as a whole and in combination with the economic evidence, is sufficient to defeat summary judgment.").

By any measure, this is a massive case. With several thousand pages filed in support of and in opposition to summary judgment, the Court was concerned that it had as complete a grasp as possible of the evidence in the case.[5] To that end, the Court held two full days of oral argument. The second day focused on issues regarding individual defendants specifically, as opposed to the larger legal issues in the case generally to which the first day was dedicated. In an effort to make that day as efficient and productive as possible, the Court prepared a memorandum in advance listing the evidence against each defendant the Court had been able to identify from its review of the summary judgment papers. The Court emailed the memo to the parties and ordered Plaintiffs to review the memo and present any additional evidence at oral argument. *See* R. 6552. Defendants were ordered to prepare a response to the evidence the Court identified. *See id.* The parties prepared PowerPoint slides for each defendant listing any additional evidence and their arguments. The Court has considered any additional record evidence identified by Plaintiffs at oral argument, and Defendants' counter arguments, in determining

---

[5] "Summary judgment" addressed by this opinion consisted of: (i) eight separate motions addressing various aspects of the case; (ii) a separate motion filed by each of 20 defendants addressing issues specific to that defendant; and (iii) ten *Daubert* motions, totaling more than 1,500 pages of briefing. Additionally, the parties filed statements of fact pursuant to Local Rule 56.1 totaling thousands of pages, which the Court has not counted.

whether Plaintiffs have met their burden of proof with respect to each individual defendant. Any evidence the Court has considered is available on the docket.[6]

As discussed with the evidence of parallel conduct, Defendants have provided an alternative explanation and contrary evidence for the documented communications reviewed below. The Court's job, however, is not to balance the evidence on either side. *See Fructose*, 295 F.3d at 655. Rather, the Court must weigh Plaintiffs' evidence to determine whether, when taken in the light most favorable to Plaintiffs, a reasonable jury could find the existence of an agreement to restrict supply and increase price by a preponderance of the evidence.

### 1. Sufficient Evidence

In the context of the economic evidence already discussed, and having reviewed the evidence presented in the briefing and at oral argument, the evidence against the following Defendants is sufficient for a reasonable jury to find by a preponderance of the evidence that these defendants reached an agreement to restrict supply in order to increase price: Tyson, Pilgrim's, Sanderson, Harrison, Koch, Mountaire, Keystone, OK Foods, Peco, Raeford, and Simmons. The following analysis does not document every fact posited by Plaintiffs to support denial of summary judgment. The Court only addresses the evidence sufficient to require denial. But as discussed below, there are numerous examples of supposed competitors regularly exchanging sensitive

---

[6] All that being said, it is the parties' responsibility to highlight the material evidence in their briefs and statements of fact. *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020) "[A]s we have said on many other occasions, it is not the role of the court to search the record to find support for a party's assertion. . . . Judges are not like pigs, hunting for truffles buried in the record.").

production data with each other. A jury could find that such conduct is not the behavior of active competitors.

**Tyson**. After several years of abstaining, Tyson again subscribed to Agri Stats in the fall of 2007. *See* R. 6415 at 12 (¶ 5). Seven months later, an internal Tyson email noted "[r]estraint" in the industry and Tyson's reluctance to join because "the industry has always 'backfilled' our production cuts" in the past. *See* TF-0002728193. In other words, Tyson had tried to unilaterally reduce market supply before, but its competitors had always increased production to satisfy and take advantage of the demand Tyson abandoned.

The industry was aware of Tyson's reluctance. Harrison's board minutes from August 21, 2008 record the following statement: "Tyson is holding out and refusing to cut back as retribution to the industry for not cutting back with them last time the industry was struggling and they lead [sic] the way with cut backs." R. 6240-4 at 6. However, by October 2008, Tyson was reaching out to its competitors. Don Tyson wrote to Jim Perdue and Joe Sanderson stating, "I was wondering if we could join together in some areas where our interests are aligned. We would ensure that anything we do together would be strictly in compliance with all applicable laws and our people would work together." R. 6388-6 at 2.[7] Despite Tyson's initial reluctance

---

[7] This letter goes on to provide a list of potential "areas" of "review" including: "1. Insurance; 2. Commodity Purchasing; 3. Pool buying; 4. Railroad/Transportation Opportunities; 5. Exchange seat; 6. Join together on political issues affecting our business." R. 6388-6 at 2. And at his deposition, Joe Sanderson testified that he only attended the meeting to be polite and did not believe it would be productive to collaborate on any of these issues. *See* R. 5995-4 at 421-22. But the fact that the list did not expressly include an item concerning "supply reduction" or "price fixing" is of

28

to join the production decreases, it implemented a five percent production cut in December 2008. *See* TF-0007881276. Tyson implemented further cuts in 2009.

Tyson continued production cuts in 2011. These cuts were coupled with what is known as Tyson's "Buy-vs.-Grow" strategy. This is the name Tyson gave to its practice of buying chicken from its competitors to satisfy its customers. Tyson contends that this program was geared towards providing chicken parts Tyson was short on, because of course chickens can only be grown whole, not for specific parts. But the evidence suggests that Tyson used this program to manage overall supply and encourage its competitors to join in that goal.

In November 2011, Peco's National Sales Manager offered Tyson a price of "10 cents back," saying, "I know you're the reason [the market is] tightening." R. 6229-14 at 60. The following week, they reached a deal after Tyson responded by saying, "I have taken care of you for 2 months brother, the market is going up daily making you $$$." R. 6229-14 at 62. Then in March 2012, Peco again offered to sell chicken to Tyson at below-market prices explaining that "[i]f that's what you have to have, I will do it. Like I said, you are the reason for the season and I want you to continue doing lots of business with me." R. 6229-14 at 57.

---

similar evidentiary weight to the fact that the letter stated that anything they would do together would be "strictly" legal. The weight of the letter is the fact one of the largest producers in the industry was interested in reaching out to its competitors to suggest joint action. In the context of other evidence, both economic and non-economic, this letter could contribute to a reasonable basis for the jury to find that Tyson reached an agreement with defendants with whom Tyson later exchanged sensitive production information.

Another example of Tyson using Buy-vs.-Grow to manage market supply in coordination with a competitor came on April 25, 2012. Pilgrim's and Tyson's buyers communicated about Pilgrim's sales to Tyson:

> Tyson:      Come [on] dude, I'm buying this stuff and keeping it off the street, good for you, good for the market.
>
> Pilgrim's:  I agree, and it is working well between both our companies . . . . Never quote you anything more than what a trader is paying and keep you a penny or 2 under what they can get it to you for."

R. 6229-14 at 52-55. These communications are evidence that Tyson was conspiring with competitors to reduce supply under the guise of its "Buy-vs.-Grow" program. Such collaborative action is not expected of active competitors.

In light of these documented communication, Tyson's application of the "Buy-vs.-Grow" strategy appears to be a result of Tyson's invitation in 2008 to its competitors to "join together" where their "interest aligned." Tyson of course has an alternative explanation. But this evidence is sufficient for a reasonable jury to find by a preponderance of the evidence that Tyson joined a conspiracy with its competitors to reduce supply and increase price.

**Pilgrim's**. Pilgrim's believed that it bore the brunt of the need for industry production cuts in 2007. *See* R. 6229-14 at 14-15. As a result, Pilgrim's sent strong messages to its competitors at the beginning of 2008 through public statements that its competitors needed to "pick-up a fair share in order for the production to come out

of the system." *Id.* By May 2008, Pilgrim's knew that "about one-third of the total industry volume has stepped up to the plate with production cuts." R. 6406 at 8 (¶ 7).

Then on June 10, 2011, Pilgrim's was contacted by staff of Tip Top Poultry ("Tip Top"), a company many defendants used to slaughter their breeder hens (breeder hens cannot be sold as meat for consumption). Tip Top's Advisory Board included many defendants in this case. In 2011, Tip Top saw a dramatic increase in breeder hen slaughter and contacted the Advisory Board members (including Wayne, Mar-Jac,[8] Keystone, Harrison, Mountaire, and Case) to inform them and ask for their assistance in processing the extra load. *See* R. 6247-5 at 42. Pilgrim's was not on the Advisory Board at this time (although it was later). But Tip Top forwarded the same email to Pilgrim's to ask for its assistance as well. *See* R. 6283-13 at 540. That email explained that Tip Top was working to "to pull their breeder kill dates up closer so that everyone can get breeders out of houses quickly. With the industry in its current condition, the urgency has only increased. . . . [But] we believe their effort will help the industry as a whole." R. 6247-5 at 45. This email provided Pilgrim's with assurance that its competitors were working to reduce supply.

With this renewed confidence, Pilgrim's continued to work with competitors to restrict supply into 2012. As discussed, Pilgrim's and Tyson buyers communicated about Pilgrim's sales to Tyson through its Buy-vs.-Grow program on April 25, 2012.

---

[8] Mar-Jac settled the claims against it that would have been at issue here on summary judgment.

*See* R. 6229-14 at 52-55. In a similar vein, a Pilgrim's executive relayed the following communication in an internal email:

> I received a call today from a friendly competitor telling me it's all over the market that Pilgrim's is taking contract pricing up. They thanked us for taking the lead and told me that contrary to what we might hear regarding their company, they are following as are others. Courage . . . keep it up guys.

R. 6229-15 at 193 (ellipses in original). That email was followed with another stating, "Do not [forward]. *[N]ot exactly a legal conversation.*" *Id.* (emphasis added).

As with Tyson, Pilgrim's communications are a sufficient basis for a reasonable jury to find by a preponderance of the evidence that Pilgrim's conspired with its competitors to reduce supply and increase price.

***Sanderson****.* On an August 2008 earnings call, Sanderson announced a production cut and called on the industry to cut. R. 6270-4 at 308 ("So long as this weakness continues, the poultry industry will need to cut production further to bring supply in line with demand. . . . I believe it will take another round of production cuts this fall to bring supply into balance with weak demand."). Documented communications show Sanderson sharing production information with competitors Perdue and Peco. *See* R. 6226-6 ¶ 171.

In addition to emailed communications, Sanderson shared its Agri Stats reports with Pilgrim's and Perdue. *See* R. 6227 at 639 (Q: "How many times would you estimate you shared Agri Stats numbers with Perdue during your tenure at Sanderson? Would you say it was more than 20 times?" A: "Possibly."); *id.* at 633 (78:1-2) ("I exchanged some Agri Stats information with competitors, yes."); *id.* at 684

32

(282:12-15) (Q: "During your time at Sanderson, did you share Agri Stats information with competitors?" A: "I shared information with Perdue and some with Pilgrim's."). Apparently based on those reports, and potentially others, Sanderson's CEO stated the following on a December 2009 earnings call:

> We cut back significantly for four months last year . . . . It makes no sense for us to ramp up. Basically what we see out there is a year of demand similar to 2009 and there's not reason to ramp up, and my judgment is that based on what I see in Agr[i] [S]tats nobody is planning on, [sic] pullet placements say no ramp up and what I've gleaned from Agr[i] [S]tats, people are not planning on ramping up. I see a lot of information from Agr[i] [S]tats that tells me that nobody is going to ramp up.

R. 6229 at 146.

On a May 24, 2011 earnings call, Sanderson's CEO again said that production cuts by the industry were necessary and he believed they would be "forthcoming." R. 6229-14 at 19. Sanderson subsequently communicated production plans with Peco in September 2011 and with Raeford in December 2012. *See* R. 6228-5 at 139 (Peco); R. 6227-10 at 82.

The extent of production information sharing by Sanderson, and the confidence of Sanderson's CEO with respect to predicted production cuts, are sufficient facts from which a jury could reasonably infer by a preponderance of the evidence that Sanderson conspired with its competitors to reduce supply and increase price.

***Harrison***. As noted with reference to Tyson, Harrison's August 2008 board minutes record Harrison's CEO stating that "Tyson is holding out and refusing to cut back as retribution to the industry for not cutting back with them the last time the

33

industry was struggling and they lead the way with cut backs." R. 6240-4 at 6. This statement is strong evidence that Harrison believed that Broiler producers had agreed to reduce supply at Tyson's behest. Harrison reduced supply in the context of this information.

Harrison was a member of the Tip Top Advisory Board and was copied on the May 31 and June 16, 2011 emails from Tip Top that were later forwarded to Pilgrim's. The email of May 31, 2011 informed Harrison and the rest of the Advisory Board that "I bring good news: we are running full and working extra time to provide the kill capacity that you need. Our suppliers are sending us more breeders and younger breeders." R. 6247-5 at 42. Then on June 16, 2011, Harrison received the email stating that Tip Top was working to "to pull their breeder kill dates up closer so that everyone can get breeders out of houses quickly. With the industry in its current condition, the urgency has only increased. . . . [But] we believe their effort will help the industry as a whole." R. 6247-5 at 45. A reasonable inference can be drawn that Harrison and the other defendant-producers who received this email were assured that their competitors were planning to reduce supply.

But not only did Harrison just receive these emails, Harrison's CEO apparently had helped Tip Top staff prepare the "plan" they proposed for slaughtering breeder hens in those emails. In an email to Tip Top in response to the June 16 email, Harrison's CEO indicates that he had suggested the plan to Tip Top in order to reassure the other Advisory Board members that it was safe to slaughter their breeder hens and reduce supply. *See* R. 6227-9 at 28 ("This accomplishes most of the

objective . . . . getting hens killed so they can't lay eggs.) (ellipses in original); *see also id.* ("By having a drastic plan with a volunteer already willing . . . . you're [sic] plan will be better accepted now than had it been your first volley.").

A week later, Harrison's CEO forwarded emails to Fries-Claxton with "good news" that producers were "getting extra hens out of the field to finally reduce supply." R. 6227-9 at 40-41. And a month later in another email, Harrison's CEO confirmed to Fries-Claxton that Harrison was in "cutback mode." R. 6240-4 at 11. Harrison's CFO testified that this information about supply was "private Harrison information" that should not have been "shared." R. 6240-4 at 355 (64:4-11). Additionally, in December 2011, another Harrison employee, who later became CEO, communicated with a Peco employee about their companies' respective production numbers and plans. *See* R. 6240-4 at 381-82.

These email communications, in the context of the economic evidence, are sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that Harrison conspired with other defendants to reduce the supply of Broilers in order to increase the price.

***Koch****.* In January 2008, Koch publicly announced a production cut. *See* R. 6228-6. In June of that year, Koch confirmed its production in an email to Peco. *See* R. 6241-4 at 546. And later in October 2008, Koch told Peco that it was "depopulating some breeder hens in line with Sanderson's request." R. 6241-4 at 571.

Similar to 2008, in July 2011, Koch's CEO told industry media that Koch would be cutting production and called on the industry to cut production as a whole. *See* R.

35

6228 at 89-90. There is evidence that prior to this announcement, Koch communicated with Peco, Wayne, and Tyson about their production plans. *See* R. 6226-17; R. 6241-4; R. 6012-14; R. 6274-2. Then in October, Amick[9] sent Koch its Agri Stats report with the comment, "we might be able to figure out who some of these are by comparing," and Koch's CEO responded by promising to send Koch's Agri Stats report to Amick. R. 6228 at 83. Finally, in January 2012, an internal email shows a Koch employee reacting to a proposed price increase by stating that "Pilgrim only asked for $.15 and will settle for what sticks." R. 6229-14 at 50.

The extent of public and private communications about plans to reduce supply, and particularly the exchange of Agri Stats reports, is sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Koch joined a conspiracy to reduce supply.

***Mountaire***. There is evidence that Mountaire reduced production in 2009. And in an internal email in December 2009, a Mountaire employee stated that Mountaire and Case were "trying to work this [market] up together." R. 6235-6 at 14.

In 2011, Mountaire was copied on the emails from Tip Top in which Tip Top communicated to its Advisory Board that the industry was working to slaughter breeder hens early and at higher rates. Prior to those emails in May 2011, Mountaire's vice-president of marketing emailed Tyson to say he "hoped" that Tyson was "cutting back." R. 6228-4 at 47. This communication with Tyson continued after

---

[9] Amick is a defendant that has settled the claims against it that would have been at issue on these motions for summary judgment.

the Tip Top emails. The Mountaire employee told Tyson that "the overall industry would have been a whole lot better off with less chicken on the market" if Mountaire had been successful in acquiring the assets of another producer and been able to decrease production there. *See* R. 6229-6 at 129. The Mountaire employee explained further that "Mountaire was trying to do our part to reduce . . . supply." *Id.* He then asked whether there was "any truth to the speculation that [Tyson is] making some adjustments to the supply side of [its] chicken business." *Id.* During this time period, Mountaire employees were deanonymizing Agri Stats reports. *See* R. 6228-4 at 23-24; R. 6226-20 at 1263-64, 1281-82 (109:12-111:20, 181:9-182:2).

This documentary evidence from Mountaire is in line with the evidence that Tyson had communicated to the rest of the industry that production cuts were needed but that Tyson needed to see its competitors cut first before Tyson took action. This evidence is sufficient for a reasonable jury to find that the industry took heed of Tyson's directive and worked to find ways to cut production, and then inquired of Tyson as to whether Tyson believed these efforts were sufficient. In the context of the economic evidence, a jury could reasonably make the further inference that Mountaire eventually reached agreement with other defendants to cut production in order to increase prices.

***Keystone***. Like Fieldale, Harrison, Koch, and Mountaire, Keystone was on the Tip Top Advisory Board and was copied on the May and June 2011 emails describing the increase in demand for breeder hen slaughter. Keystone also communicated directly with competitors about production: in February 2011 with Case, *see* R. 6385-

1 at 11 (¶ 6); in April 2011 with Tyson, *see* R. 6385-1 at 50 (¶ 46); and again in March 2012 with Wayne, *see* R. 6385-1 at 17 (¶ 12).

Keystone contacted Case in order to "determine good % produced goals for plants." *See* R. 6385-1 at 11 (¶ 6). Like other Defendants, Keystone communicated with Tyson to assure Tyson that its leadership in production cuts was appreciated and reciprocated. *See* R. 6385-1 at 50 (¶ 46) ("Keystone appreciated the 'system first' leadership that Tyson continues to display."). And after attending an industry conference in October 2011, a Keystone executive shared the following observation internally: "the mood of the industry continues to be somber with heavy losses and continued oversupply. There appears to be some reduction planned for next spring." *See* R. 6385-1 at 30 (¶ 23).

The extent of these communications, in the context of the economic evidence, is sufficient for a reasonable jury to find by a preponderance of the evidence that Keystone also joined the alleged conspiracy to reduce supply and increase price.

***OK Foods***. OK Foods publicly announced production cuts twice in 2008. *See* R. 6242-4 at 455 (51:22-52:8). There is evidence that OK Foods shared production information with other Defendants during the relevant time periods. In January 2008, defendant George's[10] sent its production information to OK Foods. *See* R. 6242-7 at 212. In May 2008, OK Foods CEO emailed a financing company a "rumor" that Tyson would not reduce production because Tyson believes "it is others [sic] turn." R.

---

[10] George's has settled the claims against it that would have been at issue in these motions.

6242-4 at 742. In August 2008, OK Foods's vice-president of production attended a fishing trip with representatives from Sanderson, Perdue, Mountaire, and Pilgrim's. The Perdue employee took notes stating that Sanderson and Mountaire shared production information during the trip, and OK Foods's vice-president suggested the representatives visit each others' facilities to learn about production and explained that he knew "a lot about Pilgrim's operations" from an earlier visit. *See* R. 6234-11 at 14-17; R. 6226-19 at 426-27 (135:22–139:15). In September 2008, the CFOs of OK Foods and Simmons emailed about making plans to meet to "figure out next moves." R. 6242-4 at 466-67; R. 6242-7 at 218. And internal OK Foods emails from February 2009 reflect OK Foods's communications with Pilgrim's about production plans. *See* R. 6242-6 at 6.

OK Foods again communicated with defendant-competitors beginning in 2010. In December 2010, OK Foods CEO told defendant Simmons "very confidentially, effective the first week of February we are going to cut off one shift at one plant and raise bird weights a little and want to give you a heads up." R. 6242 at 8; *see also* R. 6229-3 at 10 (Simmons learned on March 20, 2011 that OK Foods will cut 25%). There is also evidence that OK Foods shared production information in this time period with defendants Peco, Raeford, and Wayne. *See* R. 6242-6 at 145; R. 6227-3 at 9. Although OK Foods was not a member of the Tip Top Advisory Board when the emails discussed above were sent in 2011, it had joined by 2012. *See* R. 6361 at 17 (¶13). There is also evidence that OK Foods was deanonymizing Agri Stats reports. *See* R. 6226 at 58.

The documentary evidence shows regular communication between OK Foods and its competitors about production plans. While none of these documented communications directly refers to or describes an agreement among Defendants, in the context of the economic evidence indicating opportunity and incentive to collude, they are a sufficient basis for a reasonable jury to infer by a preponderance of the evidence that OK Foods reached an agreement with other defendants to restrict supply and increase price.

***Peco***. The evidence that Peco communicated about supply plans with its competitors is primarily testimony rather than the documented communications reviewed so far. Peco's COO testified that it was regular practice for Broiler producers to exchange their production plans. *See* R. 6226-17 at 200 (81:1-22) (Q: "So if a competitor called and asked whether Peco was cutting back, you would provide them an answer?" A: "Most of the time, yes." Q: "And would you ask them to reciprocate and tell you whether they were cutting back?" A: "I would ask that question."). Peco's COO confirmed that he had communicated with, or that it was possible he had communicated with, several of the defendants in this case. *See id.* at 201 (83:7-11) (Sanderson, Case, Wayne); *id.* at 219 (155:20-24) (Simmons); *id.* at 219 (156:21-25) (Mountaire).

In addition to this testimony, there is documentary evidence that Peco sold chicken to Tyson at below market rates because of Tyson's efforts to reduce supply in the market. As discussed in analyzing Tyson's motion, in November 2011, Peco's National Sales Manager offered Tyson a price of "10 cents back," saying "I know

you're the reason [the market is] tightening." R. 6229-14 at 60. The following week they reached a deal after Tyson responded by saying, "I have taken care of you for 2 months brother, the market is going up daily making you $$$." R. 6229-14 62. Then in March 2012, Peco again offered to sell chicken to Tyson at below-market prices explaining that "[i]f that's what you have to have, I will do it. Like I said, you are the reason for the season and I want you to continue doing lots of business with me." R. 6229-14 at 57.

Testimony that Peco regularly exchanged production information with competitors indicates a willingness to reach a broader agreement to restrict supply. The reasonable inference from the communications with Tyson are that Peco reached such an agreement. With this evidence a reasonable jury could find by a preponderance of the evidence that Peco conspired with its competitors to reduce supply and increase price.

***Raeford***. In August 2008, Raeford publicly announced that it would reduce its production by 5%, even though as a private company it was under no reporting obligation. *See* R. 6236-4 at 131. In considering this production cut, an internal Raeford email noted that the cut "would only help the tone of the market and may be a good political thing in our industry." R. 6236 at 1. In announcing the cut, Raeford stated that the cut was made to help "the industry" bring "supply . . . in line with demand" and to "contribute to more stable market conditions." R. 6236 at 1. This cut is followed by documented communications regarding pricing from Raeford to competitors Cagle's in February 2009 and Case in November 2009. *See* R. 6227-10 at

41

69 (Cagle's); R. 6227-10 at 63 (Case). (Cagle's is a Broiler producer, but Plaintiffs did not bring any claims against it.)

On January 4, 2011, Raeford told competitor Cagle's that, "just between us" Raeford's owner had called for a production decrease, and that it would be implemented "to some degree at each location." R. 6236 at 6. Later in January, Raeford told staff at the Urner Barry price index that "everyone" in the industry "is finally reducing weights and headcounts." R. 6236 at 6.[11] There is also evidence that Raeford told other competitors about its production plans because Mar-Jac and Amick discussed Raeford's plans in an email in February 2011. R. 6236 at 6. Raeford publicly announced a production cut in March 2011. *See* R. 6227-10 at 71. Later in August 2011, Raeford communicated to Case that "one more round of cuts on placements would do the trick," referring to production cuts. See. R. 6227-3 at 31. Raeford then had further communications with Urner Barry in an attempt to learn about and communicate production plans with competitors. *See* R. 6236-4 at 217.

The regularity of Raeford's communications with its competitors about production plans indicates a desire to reach agreement in the industry. A reasonable jury could infer from this evidence that an agreement in fact existed, and that Raeford was a part of it.

**Simmons**. In April 2008, Simmons announced production cuts even though it had no legal obligation to report such information. Additionally, Simmons's president

---

[11] Along with the USDA index, the Urner Barry price index is one of the two primary price indexes for Broilers. The Georgia Dock was the third, but it was discontinued after events that are part of Plaintiffs' claims in this case and will be discussed below.

testified that he may have told competitors about Simmons's production plans "in passing." R. 6226-19 at 720 (139:3–140:6).

In 2010, Simmons received "confidential" production information from OK Foods. *See* R. 6229-5 at 17. In June 2011, Simmons received information from Tip Top and Southern Hens (another breeder slaughter business) that many competitors were slaughtering high numbers of breeder hens and asking Simmons to provide their slaughter plants for this extra business. *See* R. 6233-1 at 6-7 (¶¶ 22-26). Peco's COO testified, and Tyson internal documents show, that Tyson received production information from Simmons. *See* R. 6233-at 4 (¶ 12).

In June 2011, a Simmons internal document stated, "Rumor is the industry supply cut will be in the 5-7% range. We will need that to reduce boneless supply by approximately 10%." R. 6229-5 at 3. The document continued, "We are hearing from multiple sources, seeing the hatch egg market go to 0$ per dozen, and custom processing hens for Southern Hens to validate there is a supply cut occurring." *Id.* Simmons's president testified that this reference to "multiple sources" included information learned directly from competitors. *See* R. 6233-04 at 39 (83:13–85:4); R. 6227 at 224 (147:18–148:10).

This evidence of communications about production among Simmons and its competitors permit the reasonable inference that Simmons agreed with Defendants to reduce supply in order to increase the price of Broilers.

### 2. Insufficient Evidence

Unlike the evidence relevant to the foregoing defendants, the Court finds that there is insufficient evidence for a reasonable jury to find by a preponderance of the evidence that the following producer defendants joined a conspiracy: Perdue; Fieldale; Case; Foster; Fries-Claxton; and Wayne. Although the economic evidence showing opportunity and incentive to conspire applies to these defendants just as it does to the defendants discussed above, there is simply a lack of evidence that these defendants communicated with their competitors, which would permit a reasonable inference of agreement. To be sure, some of the documented communications discussed above mention these six defendants. But as will be explained below, none of those documented communications include statements by or from these five defendants, and so are insufficient to infer action by these defendants to join a conspiracy. This difference is subtle yet critical. Plaintiffs have had years to find additional evidence to bolster the evidentiary weight of the evidence discussed below. Nothing has come of their discovery efforts with respect to these six producer defendants. Therefore, the evidence is too weak to meet Plaintiffs' preponderance burden and summary judgment must be granted in the six defendants' favor.

*Perdue*. As discussed, in 2008, Don Tyson sent a letter to Joe Sanderson and Jim Perdue inviting them to "join together." R. 6388-6 at 2. This letter is strong evidence against *Tyson* because it is direct evidence of Tyson's intent. But there is no evidence in the record that Perdue accepted the invitation to *act* jointly.

44

To be sure, Perdue attended the suggested meeting with Tyson and Sanderson. But this is only one instance of the many regular meetings and communications executives of the defendants producers had with each other. These meetings and communications, however, merely provided the *opportunity* to conspire. Absent direct evidence of agreement, there must be some evidence that each defendant in question took some action from which agreement to restrict supply can be inferred. The most common such evidence in this case being documented communications in which a defendant revealed sensitive production information to a competitor. The defendants discussed above all took such action. Mere opportunities to communicate such information—whether in the form of the Tyson letter; the meeting between Tyson, Sanderson, and Perdue; the many industry conventions and junkets; or information merely received *from* competitors—are insufficient to infer the act of entering into an agreement. Without evidence of such action, the Court finds that a reasonable jury could not infer an agreement to reduce supply and increase price by a preponderance of the evidence.

Perdue was also a member of the Tip Top Advisory Board, and so received the email communications from Tip Top staff in 2011 with information about increased breeder hen slaughter. But again, there is no evidence that Perdue directly acted on this information.

Plaintiffs identify five documented communications they argue demonstrate that Perdue joined the alleged conspiracy among Defendants. First, Plaintiffs point to an email from Perdue to Sue Trudell of EMI (an Agri Stats subsidiary that is not

a defendant in this case) attaching a spreadsheet with detailed information about the magnitude and timing of Perdue's 2008 production cuts and competitors' 2008 production cuts, including some cuts that were listed as "not announced." *See* R. 6227-1 at 37-38. But there is only one production cut listed as "not announced" (Keystone's), and the heading of the chart is "cutbacks announced publicly." Plaintiffs argue that it is appropriate to infer that Perdue had communicated with Keystone to learn this information and argue further that it is reasonable to infer an agreement to restrict production from this one supposed communication. The Court finds these proposed inferences too tenuous.

Plaintiffs next note that after attending a fishing trip with other defendant producer executives, a Perdue executive returned with information about Perdue's competitors' production goals, supply cuts and target bird weights. *See* R. 6234-11 at 15-18. But this document memorializes what Perdue learned from its competitors. It is not direct evidence that Perdue asked for this information or gave any information to its competitors; an inference is necessary to reach that conclusion. And then another inference would be necessary from the exchange of information to find that a conspiratorial agreement had been reached. This document is certainly relevant to the issue of whether an agreement existed. But it alone is an insufficient basis to find that Perdue was part of that agreement by a preponderance of the evidence.

Similarly, Perdue had a conversation with Fieldale about the potential effect of supply cuts in February 2012. A Perdue executive stated, "Still waiting for these cutbacks to take hold so maybe we can make some money here"; and a Fieldale

executive replied, "hoping companies continue the cutbacks and do not try to get ahead of everyone and ramp up production again." *See* R. 6247-5 at 55. This email is evidence that Perdue and Fieldale were aware that the industry was cutting production. Neither Perdue nor Fieldale communicate their own production plans in this email. They do not discuss the specific production plans of any other defendants. They simply make observations about the state of the market. Considering the limited substance of the email, too many inferences are required to find that Perdue agreed with other defendants to restrict supply based on this email.

Plaintiffs also point out that Perdue asked Agri Stats to "pass the word you need to create demand before you supply the product." R. 6234-11 at 30. But this email was in response to an email from Agri Stats suggesting that the industry needed to cut supply. As the Court will address in more detail below with respect to Agri Stats, general advice regarding supply and demand is not evidence of a conspiracy. And Perdue's email here is not an attempt to create an agreement. It is simply a reaffirmation of the advice Agri Stats had provided.

Plaintiffs note that Perdue directed its employees to examine Tyson's earnings call "for production cuts and increases and major news topics." *See* R. 6229-11 at 131. But to the extent this can be construed as an attempt to conform conduct to a competitor's, thereby implying agreement—which is an unreasonable stretch—it is equally consistent with an intent to compete with Tyson.

While the Court has separately analyzed the relevance of each piece of evidence, the Court considers the totality of the evidence in determining whether it

is sufficient to defeat summary judgment. *See Fructose*, 295 F.3d at 655 ("The second trap to be avoided in evaluating evidence of an antitrust conspiracy . . . is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment."). The evidence against Perdue all shows that Perdue was aware it had the opportunity to join other defendants in a conspiracy to restrict supply. But there is no evidence that Perdue took an action to join any such agreement. Taking the evidence "as a whole," it is simply not of the same weight as the evidence reviewed above with respect to other defendants, and it is insufficient for a reasonable jury to find by a preponderance of the evidence that Perdue conspired with its competitors.

***Fieldale***. Fieldale made public statements to industry media the "industry would be better off" if "everybody" cut production like Fieldale had. R. 6247-5 at 14. Fieldale's president also testified that he communicated this belief directly to his competitors when he "encouraged" the industry "to cut production in order to raise prices" at an industry conference in January 2009. R. 6247-4 at 618 (103:4-7). There is also evidence that Fieldale employees had been informed that Fieldale was aware that "the industry" was engaged in supply cuts. *See* R. 6247-5 at 52 ("I thought the entire industry was supposed to be cutting back as well.").

Additionally, as a member of the Tip Top Advisory Board, it received the 2011 emails from Tip Top staff discussed above. See R. 6247-5 at 42, 45. And as discussed, a Fieldale executive communicated with Perdue about the anticipated supply cuts. *See* R. 6247-5 at 55.

48

But as with Perdue, none of this evidence indicates that Fieldale acted to join a conspiracy. The evidence suggests that Fieldale was aware that its competitors were cutting supply. But there is no evidence that Fieldale was part of any agreement to do so. There was no evidence of the sharing of its own sensitive data, but rather just the generalized statements noted above. Therefore, a reasonable jury could not find by a preponderance of the evidence that Fieldale joined an agreement to restrict supply and increase the price of Broilers.

***Case.*** Plaintiffs offer only three documented communications they contend demonstrate Case's agreement to participate in the alleged conspiracy. The first is a statement from Bill Lovette who at various times was a senior executive at Tyson, CEO of Pilgrims, and president of Case. On a Pilgrim's earnings call on April 27, 2012, Lovette stated that he was "comfortable" that the industry would "remain constrained." *See* R. 6228-7 at 34. This is a public statement about the state of the industry when Lovette worked for Pilgrim's. It does not mention Case and is irrelevant to whether Case agreed to conspire with other defendants. Plaintiffs argue that an adverse inference should be drawn against Case based on Lovette invoking the Fifth Amendment at his deposition and refusing to answer questions about his work for Case. But Lovette clearly refused to testify because he was being criminally investigated on charges of bid-rigging for his work at Pilgrim's. That criminal case was only tangentially related to the allegations in this case. It is not a basis for an adverse inference against Case.

49

The second documented communication is an email from a Raeford employee sent to a Case employee stating with respect to pricing for a certain customer, "I can promise you that I won't participate close to those numbers" in reference to prices being requested by a customer, to which the Case employee responded, "Got it . . . we're on the same page." R. 5940-70 at 2. To the extent an agreement could be inferred from the comment about "being on the same page," the Raeford employee sends a follow-up email breaking the agreement a day later. This email chain is hardly evidence of agreement between Raeford and Case, let alone Case and the entire industry.

The third documented communication is again between the same Raeford and Case employees. On August 17, 2011, the Raeford employee wrote in an email that "supply is just a little better than demand," and "one more round of cuts on placements would do the trick." R. 6227-3 at 31. To the extent an agreement about supply reduction can be inferred from this statement, it is a statement by Raeford to which Case does not respond. An inference of agreement by Case through a statement made to it by an alleged co-conspirator could only be imputed to Case if there was additional evidence against it establishing its membership in the conspiracy. But this is the only potential evidence of a conspiracy. And the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and Case's participation. *See United States v. Harris*, 585 F.3d 394, 399 (7th Cir. 2009) ("[T]he record must contain at least some facts confirming the existence of the conspiracy and [the defendant's] participation in it before we could find the disputed

50

portions of [the co-conspirator's statement] admissible under Rule 801(d)(2)(E)."). There must also be some supporting evidence corroborating Case's participation in the conspiracy, and Plaintiffs have none.[12]

*Fries-Claxton*. The only evidence Plaintiffs' cite of Fries-Claxton's agreement to conspire is an internal text message from November 2012 in which a Fries-Claxton employee relays a conversation he had with a Pilgrim's employee about pricing. The Fries-Claxton employee says the Pilgrim's employee urged Fries-Claxton to "raise our prices," and the response from Fries-Claxton was, "we are trying." R. 6238-5 at 108.

Certainly, this text message is evidence that Fries-Claxton communicated with Pilgrim's about pricing, and an inference can be drawn that the two companies believed it was in their best interest to work together to raise prices. But the principal claim in this case is that Defendants conspired to reduce supply. And the economic evidence in this case shows that supply was reduced in 2009 and 2012. To infer a supply reduction conspiracy that resulted in a production decrease in 2012 from a text message about pricing that was sent at that end of 2012 is an unreasonable inference. In this case, there is of course only circumstantial evidence that Defendants conspired. So, there is always one level of inference necessary to find a conspiracy. Here, Plaintiffs would ask the jury to make an additional inference from a single pricing conversation to an agreement to reduce supply. Further, the jury would be required to infer that a communication from the end of 2012 is indicative of

---

[12] As noted above, Peco's COO testified that it was possible he communicated with Case. *See* R. 6226-17 at 219 (155:20-24). This is not evidence of what Case may have communicated to Peco, and so it cannot contribute to an inference of conspiracy.

an agreement that is alleged to have been established at least a year earlier. And these are only the subject matter inferences. There remains the ultimate inference of an industry-wide conspiracy. This one text message is simply an insufficient basis for a reasonable jury make such a finding.

*Wayne*. Plaintiffs cite a number of documents they argue constitute evidence that Wayne agreed with its competitors to reduce supply. Most of these documents, however, are evidence of Wayne's supply reductions or evidence that Wayne attended industry meetings and events. The Court has already found that there is evidence that Wayne acted in parallel with other defendants to reduce supply. And nearly all defendants attended industry meetings. Neither is sufficient evidence of agreement without evidence of communication.

Plaintiffs argue that evidence relevant to the allegation that Wayne reached an agreement with its competitors is contained in the following documents: (1) an internal report in which Wayne's CFO noted in that "larger players in the industry communicating and acting more disciplined"; (2) emails Wayne received as a member of the Tip Top Advisory Board noting the industry was "pressing . . . hard" for greater breeder hen kill capacity; and (3) an email from Sanderson veterinarians indicating that Sanderson was in possession of at least part of Wayne's Agri Stats report regarding chicken vaccination. The first two indicate that Wayne knew most of the industry was reducing supply and at least the "larger" companies had communicated and were working together in that regard. It is possible that a producer who knows that its competitors are conspiring would want to join that conspiracy. But it is

equally possible that the producer would decide to remain on the sidelines and reap the benefits of decreased supply without risking the legal peril of joining the conspiracy. Merely observing in an internal email what the larger players are doing is not enough.

The evidence that Sanderson possessed a part of Wayne's Agri Stats report, however, is evidence that Wayne communicated with a competitor about its business. Such a communication is unlikely without a reciprocal agreement. Plaintiffs, however, have the burden to show that Wayne joined a conspiracy to reduce supply, and there are too many inferences required from the Sanderson email to reach that conclusion. The extensive discovery conducted in this case apparently did nothing to turn the inference into evidence. The email does not reveal whether Sanderson had the full report or only the portions about vaccination data discussed by the veterinarians. Even if Sanderson had the full report, the email does not indicate whether Wayne was the source of the report or whether Sanderson obtained the report without Wayne's cooperation. Only if Wayne provided the report, and the report contained information about production, can the inference be reasonably made that Wayne joined a conspiracy (at least with Sanderson). These inferences are too attenuated to satisfy Plaintiffs' burden to defeat Wayne's motion for summary judgment. If Plaintiffs had discovered documentary evidence that Wayne communicated with its competitors—as Plaintiffs discovered with many other Defendants—then the Sanderson email, combined with the evidence of Wayne's knowledge of a conspiracy embodied in the Tip Top emails and the internal report

might have been sufficient to defeat summary judgment. But without evidence of communication that requires fewer inferences than are required to find that existence of an agreement from the Sanderson email, the Court cannot say that a reasonable jury could find by a preponderance of the evidence that Wayne joined a conspiracy to reduce supply.

*Foster.* Plaintiffs cite no evidence that Foster joined the alleged conspiracy at any point in time. The Court noted this absence of evidence in the memo it provided to the parties. Plaintiffs responded by pointing out, without elaboration, that Foster "changed practices" during the 2008-09 period. R. 6607 at 50. Such a bare assertion has no evidentiary value.

Plaintiffs also argued that a reasonable inference can be drawn that Foster joined the conspiracy because in October 2010, Foster told "meatingplace.com" that it "decided it will not increase production at its Farmerville, LA, poultry complex, as earlier planned." R. 6239-4 at 264. Plaintiffs argue that since Foster is not a public company, this public statement can be construed as "sharing plans" with its competitors, from which an agreement to join the alleged conspiracy can be inferred. But this statement is not from a Foster document. It is from a document titled "Trader Joe's: Cost of Grain 2011 Outlook," with a sub-heading of "Coleman Natural." This document in turn quotes what is apparently an industry reporter called "Meatingplace," which in turn quotes a statement from Foster "emailed to Meatingplace." This is hearsay and the Court will not consider it. In any case, Foster making a public statement to industry media about its plans that is not plainly

54

directed at its competitors, is, by itself, an insufficient basis to infer that Foster joined a conspiracy.

Similarly, Plaintiffs cite an email from grower Cobb Vantress to Tyson noting that it experienced customer cutbacks in 2011 including by Foster. *See* R. 6226-5 at 32. This is hearsay with respect to Foster. Further, it is merely evidence that Foster cut production in parallel with other Defendants. It is not evidence that Foster communicated with its competitors about those cuts. It is therefore not evidence that Foster's cuts were the result of a conspiracy to restrict supply.

When pressed on this point, Plaintiffs' counsel argued that Defendants' participation in Agri Stats is "plus conduct" sufficient to establish that Defendants conspired to reduce supply of Broilers. *See* R. 6607 at 51-52; *see also* R. 6226 at 47 (arguing that "data sharing via Agri Stats is indicative of agreement"). But not even Plaintiffs argue that participating in Agri Stats alone is sufficient to establish an intent to conspire. Rather, Plaintiffs argue that deanonymizing the reports is the evidence that shows that Plaintiffs agreed to restrict supply. However, Plaintiffs do not contend that Foster did this. *See* R. 6226 at 58 (listing the Defendants that Plaintiffs contend deanonymized Agri Stats reports). In any event, the Court would be hard pressed to find that deanonymizing Agri Stats reports alone would be sufficient evidence to reasonably infer a conspiracy. Attempting to deanonymize Agri Stats reports is simply a rational response of competitors trying to gain an advantage over each other. Unlike the evidence of direct exchange of Agri Stats reports by other defendants, deanonymization is not evidence of agreement.

Plaintiffs' argument boils down to the idea that it is irrational to divulge detailed information to Agri Stats knowing that your competitors can deanonymize it and use it against you. But what is irrational is to refrain from participation in Agri Stats when all your competitors are doing so. Greater information exchange alone does not demonstrate a conspiracy. With the information exchange provided by Agri Stats creating the baseline in the Broiler industry, competing businesses participating in Agri Stats could believe that they had to participate in order to keep pace with their competitors and that they would need to work harder to make sure that they took better advantage of the information in the reports than their competitors. The act of trying to deanonymize information in the Agri Stats reports is not evidence of a conspiracy—it is additional evidence that the Broiler industry was ripe for conspiracy. But that fact has already been well established by the economic evidence in this case. What is lacking here with respect to Foster is evidence suggesting that it accepted the invitation to conspire.[13]

*　　*　　*　　*

Having addressed the evidence against all the producer defendants it remains only for the Court to assess the evidence against Agri Stats. Before doing that, the Court notes that the line the Court has drawn between defendants who have been granted summary judgment and those who have not may appear somewhat artificial

---

[13] At oral argument, Plaintiffs also argued that evidence that Foster "shorted" customers is evidence that Foster joined the conspiracy. Similar to Plaintiffs' other arguments with respect to Foster, shorting customers is evidence that Foster acted in parallel to other Defendants to decrease the supply of Broilers. It is not evidence that Foster conspired to do so. That subtle difference is critical.

56

to the parties who invariably possess more facts about what actually transpired than the Court does. But that kind of artificiality is an inherent characteristic of litigation. The Court can only decide the case on the facts before it, which have been developed over several years of discovery. That discovery revealed documented evidence that some producer defendants communicated about supply reductions, whereas it failed to uncover such evidence with respect others. Of course, it is possible that the producer defendants who have been granted summary judgment simply communicated on the phone or that their documented communications were simply never discovered. That is nevertheless a fact of the record before the Court, on which these summary judgment decisions are based.

*Agri Stats*. In their complaints, Plaintiffs allege that Agri Stats reports contained "producer-specific production" and price data. *See*, *e.g.*, R. 3935 at 46-47 (¶ 149). Plaintiffs allege further that, although the reports did not identify the producers by name, Defendants were able to "deanonymize" the data and thereby use the report to establish and enforce their alleged conspiracy. Plaintiffs made these allegations on information and belief because the "Agri Stats reports are not publicly available." *Id.* at 47.

Discovery has shown, however, that Agri Stats reports included only the production and pricing information of the recipient producer receiving the report, and not that of their competitors. *See* R. 6237-2 ¶¶ 17-19, 23-25, 44-45 (in these paragraphs, Defendants make the assertion that production and pricing information was not included in the report; Plaintiffs respond with references to their expert

57

report noting that the information was helpful in understanding the industry, but do not cite evidence contradicting Defendants' assertion). Even if Defendants succeeded in deanonymizing the reports, they could not have learned their competitors' production and pricing information because Agri Stats redacted that information. The lack of production and pricing information in the Agri Stats reports undermines their usefulness for communicating intent to reach agreement to reduce production, as Plaintiffs originally alleged.

Plaintiffs argue, however, that there was additional information left unredacted that allowed Defendants to infer their competitors' production plans. *See* R. 6237 at 11 ("Agri Stats collected and published forward-looking information that gave participants *insight* into competitors' future production information.") (emphasis added). But there is no evidence that such inferences would be a sufficient basis to establish or monitor a conspiracy. The data might provide some general "insight" into competitors' plans, but in the end, the information is only sufficient to permit an educated guess. Guesses, even educated ones, are not evidence of an express agreement. And the fact that the defendant producers were making educated guesses about their competitors' production plans by analyzing or deanonymizing Agri Stats reports is not evidence that Agri Stats agreed with the defendant producers to restrict supply and increase price.

Plaintiffs' expert on the effect of Agri Stats reports—Luis Cabral—states that "industry-wide information exchanges pose a threat to competition when they involve information that . . . concerns output or prices," among other factors. *See* R. 6226-7 at

58

3. And he implies that Agri Stats reports contained such information when he states that "Agri Stats . . . had all of these problematic features." *Id.* But Agri Stats reports did not actually contain output or pricing information for individual producers. Cabral acknowledges this later in his report. In the section of his report titled, "Agri Stats Reports Allowed Chicken Processors to Monitor Whether Firms Were Doing Their Fair Share to Keep Output Low," Cabral acknowledges that the only information relevant to "output" in the Agri Stats reports were "bird weights" and "average profit per pound of chicken produced." *Id.* at 26-27. Cabral states that these "two metrics *help* [Defendants] monitor whether competitors are doing their fair share to keep production low." *Id.* (emphasis added). But what these metrics do not do is inform Defendants about their competitors' production. Certainly, this is valuable information to competitors. But it is not evidence of communication of confidential production and pricing information.

Elsewhere in Cabral's report, he notes how Agri Stats reports "helped" Defendants navigate the market. *See*, *e.g.*, *id.* at 30, 39, 42. But "helping" is not "communicating." And without communication, Agri Stats cannot have joined the conspiracy. As mentioned, they allow for an educated guess. But they do not communicate production or pricing. While Cabral describes the pricing information in Agri Stats reports as "current," it is at least a month old. *See id.* at 40 ("[W]hat is the average net price each complex would have received for a pound of chicken *last month*?") (emphasis added); *see also id.* at 41 ("last month").

59

There is evidence that the Agri Stats reports played a role in the alleged conspiracy. But that is because Defendants traded them with each other, thereby directly communicating their production and pricing information to their competitors, and crashing through the firewall of redacted information Agri Stats built. *See*, *e.g.*, R. 6228 at 83 (Amick gave its report to Koch); R. 6227 at 633, 639, 684 (Sanderson gave its report to Perdue and Pilgrim's). They could have communicated this information without the Agri Stats reports. Just because Agri Stats provided a convenient form to transmit the information does not mean that Agri Stats itself joined the conspiracy. And there is no allegation that Agri States encouraged Defendants to exchange their reports with each other.

Aside from the information in the reports, Plaintiffs argue in their brief that Agri Stats participated in the alleged conspiracy as a communications conduit through its staff analysts. *See* R. 6237 at 1 ("Agri Stats did more than transmit reports: it facilitated the conspiracy by secretly telling defendants to cut production and calculating exactly how much they should cut."). The evidence Plaintiffs cite includes documented communications from Agri Stats employee Mike Donohue and Sue Trudell, who was actually an employee of Agri Stats subsidiary EMI. (EMI is not a defendant in this case.) Plaintiffs identify the following communications:

- An August 2011 email from Trudell to Sanderson providing market analysis and advice about potential production cuts, R. 6237-4 at 234-36;

- A June 2011 email from Donohue to Fieldale stating, ""I am finally seeing and hearing of cutbacks that I can believe in. Most are coming from small and midsized

companies. One plant I visited today said they were cutting back 10% as of Monday." R. 6227-2 at 104.

- An April 2008 email from Trudell to Tyson, "There is a lot of 'talk' about other cuts, but nothing concrete." R. 6227-1 at 93.

- An internal Tyson email from April 2008 replaying a conversation with Trudell in which she recommended a 6% industry cut and reportedly said that, "she believes smaller companies and one of the largest are counting on Tyson to cut production as we have always done." R. 6229-6 at 148.

- A September 2008 email from Trudell to Raeford predicting that the "industry will make modest production cuts through 2009 and most of 2010." R. 6227-1 at 96.

As an initial matter, it is not clear that statements by Trudell who was employed by EMI, can be attributed to EMI's parent Agri Stats. In any event, the more substantive problem with these communications for Plaintiffs' case is that none of them indicate that one producer asked Donohue or Trudell to convey any information to another producer.

Donohue's and Trudell's communications with Defendants were general market analysis based on publicly available information. Their advice to reduce production in order to increase prices for the health of the industry is mere economic common sense applied to complicated data. Even their suggestion of specific production cuts are the results of calculations made based on publicly available aggregate industry data and constitute unremarkable analyst advice. Such communications are not evidence that they acted as a conduit for an agreement to

61

reduce supply. Market analysts are paid to provide advice. That Agri Stats and EMI did so is not remarkable. Without evidence that the communications went beyond generic advice, such as the disclosure of specific confidential information, it is unreasonable to infer that they also facilitated communication about a supply reduction conspiracy.

This is particularly true because Agri Stats is not a Broiler producer and so did not stand to profit directly from restricted supply and increased prices. This means that the economic evidence that is the foundation of Plaintiffs' claims against the producers is fairly irrelevant to proving a claim against Agri Stats. This means, in turn, that the evidence that Agri Stats joined the producers' alleged agreement to cut supply must be stronger than the suspicious communications that allowed Plaintiffs to defeat summary judgment with respect to certain defendants. And evidence that Donohue and Trudell communicated with Defendants about their predictions and advice about the market is insufficient for the reasonable jury to infer that Agri Stats joined a price fixing conspiracy with Defendants.

At bottom, to the extent there is any evidence that Agri Stats conspired with the producer defendants, it is weak. Agri Stats of course wanted the producers to continue paying it subscription fees. But Agri Stats's distance from the benefits of the alleged conspiracy makes it less likely that Agri Stats would have joined. The evidence that it did join, then, must be much stronger. Despite years of discovery, Plaintiffs simply have not produced sufficient evidence for a reasonable jury to find

by a preponderance of the evidence that Agri Stats agreed with the producer defendants to restrict supply and increase the price of Broilers.

### E.  Rule of Reason

The End User Plaintiffs argue that "Defendants violated the rule of reason when they agreed to exchange competitively sensitive information through Agri Stats and EMI." R. 6226 at 64. "To determine whether a restraint violates the rule of reason, . . . a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

The "nature of the information exchanged" is key in determining whether its exchange has a "substantial anticompetitive effect." *See Todd*, 275 F.3d at 211. Courts look to: (1) whether the information is current or past; (2) whether it identifies particular parties, transaction, and prices; and (3) whether the data is publicly available. *See id.* at 212-13. It is undisputed that much of the information in Agri Stats reports was available only to producer subscribers and not the public, so the Court will focus its analysis on the nature of the information contained in the reports.

The Agri Stats information is generally 45 days old. *See* R. 6237-2 at 7-8 (¶ 8) (Defendants assert that the "historical data Agri Stats collects regarding production and prices . . . is, on average, 45 days old." Plaintiffs do not dispute this assertion, but note only that Agri Stats's reports are provided "weekly."). Plaintiffs argue that the "Federal Trade Commission and Department of Justice warn that data exchanges between competitors raise concern unless 'the information provided by participants is more than three months old.'" R. 6237 at 4 (citing the FTC website). But "raising concerns" does not necessarily satisfy Plaintiffs' burden on summary judgment. And Plaintiffs have cited no authority that exchange of 45 day old information can constitute anticompetitive conduct.

Furthermore, as discussed, the Agri Stats reports did not reveal competitors' production and pricing data. Only a producer's own production and pricing data was included in their version of the report. Even if Defendants deanonymized the reports, they would not have learned their competitors production and pricing data because it was not contained in the version of reports Agri Stats provide to them.

Agri Stats provided Defendants with general market production and pricing data. For instance, according to Plaintiffs' expert Luis Cabral, the Agri Stats's *Express Sales Report* "help[ed] chicken processors get a *high-level* picture of how their prices compare to competitors' prices." R. 6226-7 at 330 (p. 39) (emphasis added). Cabral goes on to describe a section of the *Express Sales Report* titled *Economic Impact of Sales for Company/Complex* as providing "a much more granular assessment of how chicken processors' prices compare to those of competitors." *Id.* at

331 (p. 40). But that section only compares the producer's data to market averages, including: "how many pounds of the reported product the *entire industry* sold last month"; "how many complexes in *the industry* sold the report product last month"; "the difference between [the producer's] net price for the reported product and *the industry average* net price"; and "the difference between [the producer's] net price for the reported product and *the average net price* received by the 25% of complexes who charged the most of the product." *Id.* at 332 (p. 41) (emphases added). By contrast, the *Customer Sales Report* included information about specific transactions, but only those for the producer who received the report. *See* R. 6226-7 at 332 (p. 41). In other words, each producer received a report of its own transactions, but not those of its competitors.

In granting Agri Stats's motion for summary judgment on Plaintiffs' per se price fixing conspiracy claim, the Court noted that the primary role of the Agri Stats reports in the alleged conspiracy appears to have been as a form of communication if and when some Defendants directly exchanged the reports. The record shows that the literal exchange of the proprietary reports was the cause of any anticompetitive effect. As discussed earlier, sufficient evidence exists that some Defendants directly exchanged production information through emails, public statements, and other forms of communication. But there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect. Therefore, summary judgment must be granted on the End User's rule of reason claim.

## F.    2015-16 Early Breeder Hen Slaughter

The "class period" alleged by Plaintiffs is 2008 through 2019. This is primarily based on Plaintiffs' experts' analyses, which show production below historically normal levels during those years.

While Plaintiffs' experts use the unusual supply decrease to calculate damages from Defendants' alleged conspiracy, Plaintiffs do not allege that Defendants engaged in anticompetitive parallel conduct throughout the entire class period. Instead, Plaintiffs allege that Defendants engaged in parallel anticompetitive conduct during three discrete periods within the class period: (1) the production decrease in 2008-09; (2) the production decrease in 2011-12; and (3) the early breeder hen slaughter in 2015-16. A reasonable jury could conclude that these three campaigns of anticompetitive conduct constitute one continuing conspiracy because of: (1) their identical goals to increase price through supply reduction; (2) their close temporal proximity; (3) and the identity of the conspirators.

The Court has found that there is sufficient evidence for a reasonable jury to find the existence of the alleged conspiracy by a preponderance of the evidence with respect to certain defendants, but not others. This finding is founded upon the strength of the economic evidence, including evidence that Defendants acted in parallel to reduce supply in 2008-09 and 2011-12.

With respect to 2015-16, however, Plaintiffs' claim cannot be founded upon a supply reduction because they concede that supply increased at that time, as it had been steadily increasing since 2013. Instead, Plaintiffs argue that the conspiracy

continued based on their contention that Defendants acted in parallel to slaughter breeder hens at an earlier age, which theoretically should reduce the number of chickens produced.

As the Court discussed with respect to the evidence against each individual defendant, there is significant evidence that early breeder hen slaughter was a primary mechanism used by Defendants to implement the supply reductions of 2008-09 and 2011-12. The emails to and from Tip Top staff reflect this effort, as do some other documented communications in the record. Additionally, this chart shows a drastic decrease in breeder hen slaughter age during 2008-09 and 2011-12:



Figure 9: Average Slaughter Age of Defendant Breeder Hens, 2004-2019

R. 6226 at 25.

Plaintiffs point out that this chart also shows a decrease in breeder hen slaughter age during 2015-16. This is the foundation of Plaintiffs' claim that the conspiracy extended through this time. Plaintiffs also point to a number of

67

documented communications among Defendants similar to those from the 2008-09 and 2011-12 periods concerning the sharing of production information. Plaintiffs argue that, as with the two earlier periods, the Court should find that a reasonable jury could infer by a preponderance of the evidence that the conspiracy continued through 2015-16 because of the parallel breeder hen slaughter and the suspicious communications.

But as the Court explained in analyzing the 2008-09 and 2011-12 periods, the suspicious communications were only sufficient to infer the existence of a conspiracy because of the strength of Plaintiffs' economic evidence, including parallel anticompetitive conduct. Parallel conduct is not always necessary to prove an antitrust conspiracy. But when the evidence of agreement is as weak as it is in this case, parallel anticompetitive conduct is necessary to satisfy the preponderance standard of proof.

Plaintiffs have failed to make a sufficient showing of parallel conduct with respect to the 2015-16 period. There is an apparent decrease in breeder hen age in this period. But it is not nearly as dramatic as the earlier two periods. Also, Plaintiffs and their expert (Sunding) concede that not all Defendants slaughtered breeder hens early in 2015-16. *See* R. 6226-5 at 43 (p. 37) ("*Most* defendants also have a decrease in breeder slaughter age in 2015-2016.") (emphasis added).

Furthermore, Plaintiffs' evidence with regard to which particular Defendants slaughtered breeder hens in 2015-16 is ambiguous and weak. Plaintiffs rely on the

following exhibit of several charts produced by their expert Sunding to demonstrate which Defendants slaughtered breeder hens early:



R. 6226-5 at 43 (p. 37). Sunding states that each of these charts show a defendant slaughtering breeder hens at an early age. This is a relatively straightforward fact the Court should be able to confirm by examining the charts. But the charts in the exhibits are difficult to read, and not all of them have a labeled X-axis making it impossible for the Court to confirm this contention. Furthermore, from what the Court can discern from examining the charts, not all of the defendants in these charts

had a material decrease in breeder hen slaughter age in 2015-16, e.g., Mountaire, Wayne, Fieldale, Koch, OK Foods, and Pilgrim's appear to be close to zero.

The weakness of the evidence that Defendants slaughtered breeder hens in parallel in 2015-16 is accentuated by the fact that production increased during that period. True, success is not an element of liability for an antitrust conspiracy. *See Fructose*, 295 F.3d at 656 ("The third trap is failing to distinguish between the existence of a conspiracy and its efficacy."). But success is *some evidence* that a conspiracy existed. Here, the evidence shows that to the extent a conspiracy existed in 2015-16, it was unsuccessful in decreasing production. Plaintiffs might have argued that despite the increase in production, the rate of increase continued to be suppressed by the early breeder hen slaughter. But the Court is not aware of any such year-by-year analysis of the rate of production in the record. Without it, the evidence of parallel early breeder hen slaughter is too weak to find that Defendants were engaged in parallel anticompetitive conduct in 2015-16. And without evidence of parallel conduct, Plaintiffs' evidence of agreement—in the form of suspicious communications—is not strong enough to push Plaintiffs' allegations of agreement "across the fifty-yard line." *See Kleen*, 910 F.3d at 934.

This is in contrast to the evidence of conspiracy with respect to the 2008-09 and 2010-11 supply reductions. For those time periods, the economic evidence was compelling, the documented communications were more extensive. and the inference that Defendants formed an agreement was entirely reasonable. Without sufficient evidence of parallel conduct in 2015-16, the documented communications would need

to be even stronger than those from the 2008-09 and 2010-11 periods. But the Court has reviewed the documented communications from the 2015-16 period and finds them to be less suspicious, more ambiguous, and the required inferences more tenuous. The weak evidence of parallel conduct, combined with the paltry evidence of communications indicating agreement, means that a reasonable jury could not find by a preponderance of the evidence that Defendants engaged in a conspiracy during 2015-16.

### G.    Georgia Dock

In addition to alleging supply restraint, Plaintiffs allege that Defendants conspired to manipulate and artificially inflate the Georgia Dock price index (the "Georgia Dock"). The Georgia Dock was compiled by the Georgia Department of Agriculture ("GDA"), and for many years was one of the three primary price indexes for Broilers, along with the Urner Barry and the USDA. The Class Plaintiffs and the DAPs allege the Georgia Dock conspiracy is part of their Sherman Act claims. Certain DAPs also claim that the Georgia Dock conspiracy violated the federal racketeering statute.

### 1.    Sherman Act Claim

The GDA publishes the Poultry Market News ("PMN"). The PMN maintained and published the Georgia Dock. The Georgia Dock was prepared by PMN staff soliciting pricing information from Broiler producers in Georgia for various Broiler and other chicken products on various days of the week. The GDA collected information from the following poultry producers with operations in Georgia:

Claxton; Harrison; Koch;[14] Mar-Jac; Pilgrim's; Sanderson; Wayne; Fieldale, and Tyson. The parties refer to these defendants as the "Georgia Dock Defendants." The GDA also created a PMN Advisory Committee, comprised of representatives from all the Georgia Dock Defendants, except Sanderson. The other defendants in this case did not make submissions to the Georgia Dock.

Like the alleged supply restraint conspiracy, Plaintiffs' claim of a conspiracy to fix the Georgia Dock price index is founded on a suspicious chart:



R. 6226-3 at 87.[15] Plaintiffs point out that the Georgia Dock price becomes significantly higher than the Urner Barry and USDA prices beginning in May 2014. Plaintiffs argue that this discrepancy was the result of a meeting of the PMN

---

[14] Koch did not join until it purchased a Georgia facility in 2012.

[15] The labels identifying the lines on the chart are added by the Court.

Advisory Committee at which the Georgia Dock Defendants agreed to call for a "reevaluation" of the Georgia Dock price. After this meeting, Plaintiffs allege that the Georgia Dock Defendants began to submit pricing information to the Georgia Dock that was higher than the prices they were actually charging.

The following chart shows that there is evidence that the Georgia Dock Defendants' submissions to Georgia Dock after the May 2014 meeting were higher than their actual prices:



R. 6226-3 at 87.[16] Defendants, however, argue that the PMN staff did not ask them for their actual prices. Rather, they were asked for predictions about what prices would be for the "coming week." *See* R. 5883 at 22 (citing R. 6226-19 at 211 (175:12-

---

[16] In this chart, "Defendant Data" means Defendants' prices. "The Defendant price is a weighted-average price for WOGs across all Defendant transaction data." R. 6226-3 at 87. "WOGs" generally means Broilers. The labels identifying the lines on the chart are added by the Court.

16); R. 6226-20 at 1379 (69:18-22). Defendants offer other examples of solicitation emails from PMN staff using future oriented language. *See* R. 5883 at 22 (citing documents). They cite deposition testimony from PMN staff and Defendants' employees stating that the future oriented and hypothetical nature of the Georgia Dock was common knowledge. *See* R. 5883 at 4 (citing testimony). And they contend that they did not always sell the particular size of chicken that the PMN staff inquired about, and that they were instructed to submit a hypothetical price. *See* R. 5883 at 3-4. Defendants also contend that they were asked to report their prices within a range of a half cent above or below the previous week's price. *See* R. 5883-2 at 2-3.

By contrast, Plaintiffs rely on evidence that the Georgia Dock was intended to be based on actual, not hypothetical, prices. They point to emails that they say demonstrate that the majority of solicitations by PMN staff sought the Defendants' "offering price," which Plaintiffs contend is the "actual" price Defendants asked for their products. *See* R. 6252 at 12 (citing documents and testimony); R. 6332. They also point to documentary evidence indicating that Defendants knew they were supposed to be submitting "actual" prices. *Id.* They also cite evidence that Defendants sold at least comparable products that would have been the basis for actual pricing data relevant to the Georgia Dock. *See* R. 6252-1 at 8.

Defendants argue that, regardless of what they were asked and whether their submissions reflected their actual prices, the majority of the submissions to the Georgia Dock after May 2014 were to either *decrease* it or to keep it steady. *See* R. 5883-2 at 2-3 (PMN staffer notes to ask whether price is "steady, weak, firm, lower,

or higher"). They point out that only Pilgrim's consistently made submissions that were consistently higher than the previous week's price. Plaintiffs point out however, that another way to interpret this same data is that the majority of the submissions either kept the Georgia Dock steady or *increased* it. And they argue, keeping the Georgia Dock price steady at a price that was significantly higher than the other price indexes amounts to price fixing.

Defendants also argue that the spread between the Georgia Dock and the other two price indexes after 2014 was not historically unusual:



R. 5883 at 15.

In any case, this review of the evidence demonstrates that a reasonable jury could find that the Georgia Dock Defendants acted in parallel to knowingly submit falsely inflated prices to the Georgia Dock with the intent of keeping it artificially high. Defendants have submitted evidence that they were merely following the

instructions of PMN staff. And there the parties dispute whether the discrepancies between the Georgia Dock and other indexes, and the Georgia Dock and Defendants' prices, are material. But these are questions of fact for the jury, and there is sufficient evidence to the contrary for a jury to find that the Georgia Dock Defendants made false submissions to PMN staff with the intent of artificially inflating the Georgia Dock.

Even so, Plaintiffs still must have evidence that the Georgia Dock Defendants *agreed* to take these actions together. Plaintiffs' primary evidence of agreement is the Georgia Dock Defendants' request to "reevaluate" the Georgia Dock and the May 2014 meeting ratifying that request. But Plaintiffs admit that "reevaluation" was an established process of the PMN. *See* R. 6252-1 at 62-63 (¶ 31). The Advisory Committee members could request a reevaluation, but the PMN staff had to agree. *See id.* (defendants "called [the PMN staffer] and *requested* that the Georgia Dock be re-evaluated") (emphasis added). And the fact that the Georgia Dock price was lower than the Urner Barry price weighs against the contention that the reevaluation request was an illegal manipulation rather than a reasonable correction the regulations allowed. Further, the May 2014 meeting included only three of the nine Georgia Dock Defendants. The primary PMN staff person was also present at that meeting. That staff person testified that there was no mention of an agreement at the meeting. *See* R. 5883-4 at 259 (315:1-3). The presence of a non-conspirator at the meeting where Defendants are alleged to have hatched their conspiracy strongly weighs against finding that the meeting is evidence of a conspiracy.

76

Plaintiffs present scant additional evidence of agreement. The only documentary evidence are internal Pilgrim's emails in which the person responsible for making submissions to the Georgia Dock is congratulated for the index increasing. *See* R. 6252-2 at 15 (¶ 12). But this is not evidence of communications among the Georgia Dock Defendants about the Georgia Dock. And the communications are not even direct evidence that Pilgrim's was making fraudulent submissions. It might be possible to make that inference in the context of evidence that Pilgrim's submissions were higher than its actual prices. But even assuming that inference is reasonable, it is not reasonable to make the further inference that it is evidence of a conspiracy among the Georgia Dock Defendants based on internal Pilgrim's emails that do not suggest communication among the competitors.

Fraudulently high submissions were in the unilateral interest of each of the defendants. For that reason, even assuming the submissions were fraudulent, the submissions themselves are not a basis to infer a conspiracy. Plaintiffs have simply not identified any evidence that the Georgia Dock Defendants communicated about the Georgia Dock with the intent to conspire to inflate it.

Plaintiffs argue that the evidence of communications about supply reduction permits the inference that the Georgia Dock Defendants were also conspiring to manipulate the Georgia Dock. But as discussed, the suspicious communications about production require an inference to find the existence of an agreement. None of the documented communications expressly embody an agreement. Plaintiffs' argument would require yet another inference that an agreement about supply reduction

77

implies an agreement to manipulate the Georgia Dock. That is simply too attenuated. This further inference step makes it unreasonable and insufficient for a reasonable jury to find a conspiracy to manipulate the Georgia Dock by a preponderance of the evidence. Summary judgment must be granted to Defendants on Plaintiffs' Sherman Act claims alleging manipulation of the Georgia Dock.

### 2.    RICO Claims

The DAPs also claim that Defendants' Georgia Dock submissions constitute a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The DAPs allege that "the enterprise was the group of Georgia Dock Defendants *associated in fact* through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry." R. 3922 ¶ 1043 (emphasis added). And they allege that the enterprise "acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omission for the benefit of the enterprise and the individual defendants." *Id.* ¶ 1044.

The problem with the DAPs RICO claims with respect to Georgia Dock is that "RICO does not penalize parallel, uncoordinated fraud." *United Food v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013). As discussed, Plaintiffs have demonstrated a triable question of fact regarding whether Defendants made false submissions to the PMN. But the DAPs have not presented any evidence that Defendants did so in a coordinated manner. Without evidence of coordination other than parallel racketeering activity, the DAPs have not established the existence of an enterprise apart from the racketeering activity. *See United Food*, 719 F.3d at 855 ("[The plaintiff] cannot bootstrap its allegations of illegal conduct into allegations that [the defendants] conducted the affairs of an enterprise by asking us to infer that because the activities were illegal, they therefore must also have been coordinated activity undertaken on behalf of the . . . enterprise."). And without sufficient evidence for a reasonable jury find the existence of an enterprise, the Court must grant summary judgment to Defendants.

The DAPs allege that the Georgia Dock Defendants' goal and purpose in allegedly forming an "association in fact" was to inflate the Georgia Dock. But the DAPs have presented no evidence that the Georgia Dock Defendants actually formed such an association in fact other than their parallel allegedly fraudulent price submissions. The DAPs might have simply alleged that each Georgia Dock Defendant violated subsection (c) by "participating it the conduct" of PMN and the Advisory Committee through racketeering activities. *See* 18 U.S.C. § 1962(c). But the DAPs have made no such allegation and it is far too late to amend the complaint.

To be clear, the DAPs do not allege the legal (and lawful) entities of the PMN, the GDA, or the PMN Advisory Committee are the enterprise. Nor do they make such an argument in their brief where they focus on arguing that they have sufficiently demonstrated the existence of an "association in fact." The PMN, the GDA, and the PMN Advisory Committee are not mere "associations in fact"—they are existing entities. The GDA is a government agency; the PMN is a department of a government agency; and the PMN Advisory Committee is a group created and defined by PMN regulations. There is no need to prove that any of these entities or groups are associations in fact because they are already existing enterprises. If the DAPs had intended to allege or argue that any of these entities were the relevant enterprise, they would not have needed to address the elements of an association in fact.

And to the extent the DAPs come close to alleging that the PMN Advisory Committee is the relevant enterprise when they allege that they were "associated in fact through . . . their role on the PMN Advisory Committee," they also allege that the purpose of the alleged "enterprise" was "to artificially inflate the Georgia Dock price index." R. 3922 at 243 (¶ 777) (alleging that Defendants undertook their racketeering activities "for the benefit of the enterprise"). Clearly, "inflating the Georgia Dock" was not the Advisory Committee's purpose, which was only to advise the PMN and provide pricing information. By alleging that the "enterprise's" purpose was to inflate the Georgia Dock, the DAPs exclude the possibility that they are claiming that the PMN Advisory Committee was the relevant enterprise.

In any case, even if the DAPs had made such an allegation, the Court would sever it from the trial of the supply reduction conspiracy. Fraud on the Georgia Dock is not related to a conspiracy to reduce supply. The two claims might have been properly tried together if both relied upon coordination or conspiracy among Defendants. The DAPs argue that the "evidence presented here showing regular communications among the competitors regarding confidential information similarly raises issues of fact in dispute as to the *scope* of the conspiracy." R. 6231 at 7. But as discussed, Plaintiffs have failed to present evidence that the Georgia Dock Defendants collectively agreed to manipulate the Georgia Dock. Further, as discussed with respect to the 2015-16 early breeder hen slaughter allegation, Plaintiffs have failed to present evidence that the supply reduction conspiracy was continuing at the same time as the alleged Georgia Dock conspiracy. Without evidence that any supply reduction conspiracy was active at the time the Georgia Dock Defendants made their allegedly fraudulent Georgia Dock submissions, the evidence is only sufficient to prove unilateral fraudulent submissions. And unilateral fraud is a categorically different activity from coordinated price fixing.

Therefore, summary judgment must be granted to Defendants on all of Plaintiffs' Georgia Dock claims.[17]

---

[17] Plaintiffs included all Defendants in their Georgia Dock claims, even though only the Georgia Dock Defendants made submissions to the Georgia Dock. The Georgia Dock Defendants and the Non-Georgia Dock Defendants filed separate motions for summary judgment, with the Georgia Dock Defendants focusing on the issues just discussed, and the Non-Georgia Dock Defendants arguing that they could not be liable for Georgia Dock submissions they didn't make. The Court's findings that

## H.    Overarching Conspiracy

A question that has had significant impact on the management of this case is whether Plaintiffs plausibly alleged an "overarching conspiracy" to fix the price of Broilers. The original complaints alleged that this overarching conspiracy spanned the supply reductions of 2008-09 and 2011-12, the breeder hen slaughters of 2015-16, and the Georgia Dock conspiracy. Later, Plaintiffs amended their complaints to add allegations of bid-rigging based on facts alleged in criminal indictments against some of the producers in this case and their executives.[18] Plaintiffs alleged that these bid-rigging claims also contributed to the claim of an overarching conspiracy.

The Court found that these new allegations were made so late in the case that they could not be incorporated into the current case management schedule. The Court initially ordered that the bid-rigging claims be stayed until the supply reduction and Georgia Dock claims were resolved. *See* R. 3835 (*In re Broiler Chicken Antitrust Litig.*, 2020 WL 5648304 (N.D. Ill. Sept. 22, 2020)). Some plaintiffs objected to this order because they insisted on pursuing the overarching conspiracy claim with the bid-rigging claims included. In response, the Court suggested splitting the case into two tracks: parties that were willing to forgo the bid-rigging claim would continue on the

---

summary judgment should be granted on the Georgia Dock claims is sufficient to address and grant both motions.

Additionally, Defendants filed a motion for summary judgment on their affirmative defenses related to the Georgia Dock claims. In light of the Court's grant of summary judgment on those claims, the motion on the affirmative defenses is moot and it is unnecessary to address it.

[18] Those criminal cases in the District of Colorado resulted in dismissals, two mistrials, and five acquittals.

then-current case schedule to summary judgment on the supply reduction and Georgia Dock claims as Track One; parties that insisted on pursuing the supply reduction, Georgia Dock, and bid-rigging claims all together would be delayed to Track Two until Track One was complete. *See* R. 5128 (*In re Broiler Chicken Antitrust Litig.*, 2021 WL 5504762 (N.D. Ill. Oct. 15, 2021)); *see also* R. 5315 (transcript of hearing).

All three Classes and some DAPs chose to proceed on track one to summary judgment on the supply reduction and Georgia Dock claims, thereby forgoing an overarching conspiracy claim including bid-rigging. *See*, *e.g.*, R. 5307 ("Direct Purchaser Plaintiffs' Notice and Stipulation of Intent to Proceed on Track One"). Hence, the supply reduction and Georgia Dock claims are at issue on these summary judgment motions for Track One, while an additional group of DAPs is waiting on a separate Track Two to finish pursuing all their claims together. *See* R. 5305 (order staying "Track Two").

Nevertheless, the Classes and DAPs on these motions continue to argue that there is a separate overarching conspiracy claim for Broiler price fixing that includes the 2008-09 and 2011-12 supply reductions, the 2015-16 breeder hen slaughters, and the Georgia Dock manipulation. The Court has previously expressed skepticism that any such claim could exist apart from the facts relevant to each aspect of the alleged conspiracy. *See* R. 4722. Plaintiffs' argument for the existence of an "overarching conspiracy" is primarily based on the Supreme Court's decision in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962). But as the Court

explained, Plaintiffs give too broad a reading to this decision. *See* R. 4722 at 3 ("It does not appear that *Continental Ore* or any of the other cases [plaintiff] cites concerned a multi-faceted conspiracy like this case or had anything to say about how such a case should be discovered and tried."); *see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1168-69 (E.D. Pa. 1981) (*Continental Ore* does not condone the "synergistic effect" of permitting an overarching conspiracy claim to survive summary judgment on the backs of three underling conspiracy claims. "Lawsuits in the federal courts are decided by proof, not sorcery."). Plaintiffs have not cited any authority sufficient for the Court to change its perspective.

Now on summary judgment, the Court has found the evidence sufficient to go to trial as to certain defendants with regard to the 2008-09 and 2011-12 supply reductions, but insufficient with regard to the claims about 2015-16 breeder hen slaughters and the Georgia Dock. To the extent that Plaintiffs argue that the evidence of the 2008-09 and 2011-12 supply reduction is sufficiently strong to rehabilitate the weak evidence of conspiracy in 2015-16 and Georgia Dock—such that a trial can be held on an "overarching conspiracy"—the Court disagrees. The sufficiency of the evidence controls which claims go to trial, not Plaintiffs' theory of the case. Because there isn't sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Defendants agreed to fix prices in 2015-16 through early breeder hen slaughters or that Defendants conspired to manipulate the Georgia Dock, those alleged agreements cannot be part of a claim for an overarching conspiracy. Plaintiffs

are left with their claims of a conspiracy to reduce supply in 2008-09 and 2011-12. Those are the claims that will go to trial.

## I. Statute of Limitations

As an initial matter, there is no question that the Sherman Act's four-year statute of limitations permits claims based on alleged actions by Defendants as far back as September 2012 because the initial complaints in this case were filed in September 2016. The supply cuts that began in 2011 and continued into 2012, constitute a continuing violation that extends into the period covered by the statute of limitations. Therefore, the question is whether the Court should find the Sherman Act claims based on the 2008-09 supply reduction to be untimely.

The "discovery rule" tolls the statute of limitations until a plaintiff could reasonably have discovered that they had been injured. *See Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) ("The rule postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured."). Defendants argue that this rule does not apply to Sherman Act claims. *See* R. 5970 at 6 (citing *Rotkiske v. Klemm*, 140 S.Ct. 355, 360-61 (2019)). The Court, however, agrees with the analysis of other courts in this district that are to the contrary. *See Carbone v. Brown Univ.*, 2022 WL 3357249, at *9 (N.D. Ill. Aug. 15, 2022).

Even if the discovery rule applies to Sherman Act claims, Defendants argue that Plaintiffs should have discovered their injury as early as 2009, when much of the data demonstrating an unusual supply decrease was already available. But this is an

observation that it was *possible* for Plaintiffs to have identified their claims in 2009. It is not an argument that a *reasonable* plaintiff would have done so. The question is whether Plaintiffs had reason prior to September 2012 to undertake the analysis they sought from their experts.

The impetus for such an investigation could not be the market facts alone; rather, Plaintiffs had to have some reason to suspect a conspiracy. Indeed, Defendants' primary argument in this case is that the market facts are more reasonably explained by economic conditions and unilateral business decisions, not a conspiracy. Defendants make no credible argument that Plaintiffs had reason to suspect a conspiracy prior to September 2012.

Other courts have acknowledged that general public information that does not "mention . . . collusive behavior" is insufficient to put Plaintiffs on notice. *See*, *e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 855 (N.D. Ill. 2010). "[E]ven if Plaintiffs had harbored suspicions early on, it remains unclear whether a reasonable investigation would have revealed incriminating evidence sufficient to support an antitrust claim against Defendants." *Id.* at 856. "The point at which a reasonable person would have appreciated the need for diligent inquiry, or whether a resulting investigation would have produced useful results, are ultimately questions of fact for a juror to decide." *Id.*

Moreover, Plaintiffs were prevented from discovering Defendants' conspiracy because they concealed it. When Plaintiffs inquired as to the reason for supply decreases, Defendants provided many explanations, none of which, of course, was

86

that they had agreed to intentionally limit supply. "[I]t is not enough for summary judgment to point to facts which *might* have caused a plaintiff to inquire, or *could* have led to evidence supporting his claim. A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment." *In re Copper Antitrust Litig.*, 436 F.3d 782, 792 (7th Cir. 2006). And because a trial is necessary it is not appropriate to grant summary judgment on any claims based on the statute of limitations.

## Conclusion

Therefore:

- Defendants' joint motion for "summary judgment concerning alleged agreement to restrict broiler supply," [5996] [6033] is denied in part and granted in part in accordance with this order.

- Defendants' joint motion by certain defendants for "summary judgment on statute of limitations grounds," [5966] is denied.

- Defendants' joint motion for "partial summary judgment as to overarching conspiracy claims," [5901] is granted.

- The motion by certain defendants for "partial summary judgment on all Track 1 plaintiffs' claims alleging a 'Georgia Dock conspiracy,'" [5527] is granted.

- The motion by certain defendants for "summary judgment dismissing Track 1 plaintiffs' Georgia Dock claims," [5878] is granted;

- Plaintiffs' motion for partial summary judgment on three affirmative defenses, [5869] [5870] is denied as moot.

- Defendants' Daubert motions [5938] [5892] [5885] [5862] [5896] [5910] [5865] [5891] [5897] [5929] are denied as to the issues addressed in this order, and denied without prejudice to raising in a motion in limine with respect to all other issues.

- The following motions by individual defendants are denied:

    – Harrison [5866];
    – Keystone [5936];
    – Koch [6006];
    – Mountaire [5886];
    – OK Foods [5879] [5880];
    – Peco [5912];
    – Pilgrim's [5893]
    – Raeford [5935];
    – Sanderson [5990];
    – Simmons [5890]; and
    – Tyson [5991].

- The following motions by individual defendants regarding Plaintiffs' Sherman Act and RICO claims are granted:
    – Agri Stats [5899];
    – Case [5926];
    – Fieldale [5848]
    – Foster [5876];
    – Fries-Claxton [5915];
    – Perdue [5987]; and
    – Wayne [5851].

- Defendants' joint motion for "summary judgment dismissing track 1 plaintiffs' state law claims" [5846] is granted in part and reserved in part. The motion is granted with respect to the claims against Agri Stats, Case, Fieldale, Foster, Fries-Claxton, Perdue, and Wayne, because Plaintiffs concede that it is "undisputed that each of Plaintiffs' state claims is premised on the same conduct as their federal Sherman Act claims," *see* R. 6230 at 9, and the Court has granted summary judgment on the Sherman Act claims with respect to the seven defendants just listed. The Court reserves ruling on the motion with respect to the other twelve defendants until necessary for the September trial of the Directs and DAPs claim. The parties should inform the Court whether such rulings are needed prior to trial. The Court will issue a more fulsome opinion on the state law issues relevant to the Indirects and End Users in time to prepare for any trial of their claims once they are scheduled.

- It was unnecessary for purposes of these motions to address the DAP's motion to exclude portions of certain Defendants' economists' opinions. Thus, that motion [5914] is denied without prejudice to refiling as a motion in limine.

The Court is aware that the Track Two motion to dismiss is pending. The Court will address it in due course. However, the parties should inform the Court promptly if any of the findings in this opinion and order negates the need for a decision on that motion, or otherwise alter their plans for pursuing or defending the case.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: November 2, 2023, *nunc pro tunc*, June 30, 2023

---

i Plaintiffs on these motions are three classes and more than 50 opt-out plaintiffs. As the Court discussed in greater detail in certifying the classes, the three classes are: (1) the Direct Purchaser Plaintiffs ("Directs"); (2) Commercial and Institutional Indirect Purchaser Plaintiffs ("Indirects"); and (3) the End User Plaintiffs ("End Users"). The opt-out plaintiffs are known to the Court and the parties as "Direct Action Plaintiffs" or "DAPs." The DAPs are all direct purchasers that opted out of the Directs Class. Many of their claims are at issue on these motions. More than an additional 50 DAPs are waiting in the wings for Track Two of this case—a case management decision discussed in greater detail below in analyzing Plaintiffs' claim for an "overarching conspiracy."

ii The defendants who filed these motions are:
- Case Foods, Inc., Case Farms, LLC, and Case Farms Processing, Inc. ("Case");
- Fieldale Farms Corporation ("Fieldale");
- Foster Farms, LLC and Foster Poultry Farms ("Foster");
- Harrison Poultry, Inc. ("Harrison");
- House of Raeford Farms, Inc. ("Raeford");
- Keystone Foods LLC, Equity Group Eufaula Division LLC, Equity Group Kentucky Division LLC, and Equity Group - Georgia Division LLC ("Keystone");
- Koch Foods Incorporated, JCG Foods of Alabama LLC, JCG Foods of Georgia LLC and Koch Meat Co., Inc. ("Koch");
- Mountaire Farms Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. ("Mountaire);
- Norman W. Fries, Inc. d/b/a Claxton Poultry Farms ("Fries-Claxton");
- O.K. Foods, Inc., O.K. Farms, Inc., and O.K. Industries, Inc. ("OK Foods");
- Peco Foods, Inc. ("Peco");

- Perdue Farms, Inc. and Perdue Foods LLC ("Perdue");
- Pilgrim's Pride Corporation ("Pilgrim's);
- Sanderson Farms, LLC (f/k/a Sanderson Farms, Inc.), Sanderson Farms Foods, LLC (f/k/a Sanderson Farms, Inc. (Foods Division)), Sanderson Farms Production, LLC (f/k/a Sanderson Farms, Inc. (Production Division)), and Sanderson Farms Processing, LLC (f/k/a Sanderson Farms, Inc. (Processing Division)) ("Sanderson");
- Simmons Foods, Inc. and Simmons Prepared Foods Inc. ("Simmons");
- Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Poultry, Inc., Tyson Breeders, Inc. ("Tyson"); and
- Wayne Farms LLC ("Wayne");
- Agri Stats, Inc. ("Agri Stats"). Agri Stats is the only defendant that is not a chicken producer. Agri Stats is a subscription analyst company that prepared reports about the Broiler industry to which the producer defendants subscribed.

Defendants who filed motions but settled prior to this decision are:

- George's, Inc. and George's Farms, Inc. ("George's"); and
- Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC, and Mar-Jac Holdings, Inc. ("Mar-Jac").

Defendants Amick Farms, LLC, The Amick Company, Inc., Amick-OSI Broilers, LLC, Amick-OSI Processing, LLC ("Amick"), settled before the motions were filed.

[iii] The motions are the following:

- Joint motion for "summary judgment concerning alleged agreement to restrict broiler supply," R. 5996, R. 6033;
- Joint motion for "summary judgment dismissing track 1 plaintiffs' state law claims," R. 5846;
- Joint motion by certain defendants for "summary judgment on statute of limitations grounds," R. 5966;
- Joint motion for "partial summary judgment as to overarching conspiracy claims," R. 5901;
- Joint motion by certain defendants for "partial summary judgment on all track 1 plaintiffs' claims alleging a 'Georgia Dock conspiracy,'" R. 5527;
- Joint motion by certain defendants for "summary judgment dismissing track 1 plaintiffs' Georgia Dock claims," R. 5878;
- Joint motion by plaintiffs for partial summary judgment on three affirmative defenses, R. 5869; R. 5870;
- A motion by the DAPs to exclude portions of certain Defendants' economists' opinions, R. 5914;
- Ten joint motions to exclude the testimony of Plaintiffs' experts: R. 5938 (Cabral); R. 5892 (Carter); R. 5885 (Coenen); R. 5862 (Elhauge); R. 5896 (Frankel); R. 5910 (Lamb); R. 5865 (Mangum); R. 5891 (McClave); R. 5897 (Sunding); R. 5929 (Williams); and

- Twenty individual motions, one filed by each originally implicated defendant: R. 5899 (Agri Stats); R. 5926 (Case); R. 5848 (Fieldale); R. 5876 (Foster); R. 5915 (Fries-Claxton); R. 5916 (George's) (withdrawn per settlement, R. 6583); R. 5866 (Harrison); R. 5936 (Keystone); R. 6006 (Koch); R. 5871 (Mar-Jac) (withdrawn per settlement, R. 6583); R. 5886 (Mountaire); R. 5879; R. 5880 (OK Foods); R. 5912 (Peco); R. 5987 (Perdue); R. 5893 (Pilgrim's); R. 5935 (Raeford); R. 5990 (Sanderson); R. 5890 (Simmons); R. 5991 (Tyson); and R. 5851 (Wayne).