## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>AGRI STATS, INC.,<br><br>    *Defendant*. | Case No.: 0:23-cv-03009-JRT-JFD |

## MEMORANDUM IN SUPPORT OF DEFENDANT AGRI STATS INC.'S MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

LEGAL STANDARD .......................................................................................... 7

ARGUMENT ...................................................................................................... 8

    I.      PLAINTIFFS' PORK AND TURKEY CLAIMS ALLEGE NO ARTICLE III CASE OR CONTROVERSY .................................................. 8

    II.     THE PORK AND TURKEY COUNTS DO NOT ALLEGE CLAIMS FOR INJUNCTIVE RELIEF UNDER SECTION 4 OF THE SHERMAN ACT OR SECTION 16 OF THE CLAYTON ACT ........................................................................................................ 13

    III.    THE PLAINTIFF STATES LACK ANTITRUST STANDING TO BRING THE PORK AND TURKEY CLAIMS ........................................ 15

    IV.    PLAINTIFFS' BROILER CHICKEN CLAIM HAS BEEN RESOLVED BY THE NORTHERN DISTRICT OF ILLINOIS ON THE SAME EVIDENCE ALLEGED IN THE COMPLAINT AND THUS IS BARRED UNDER THE DOCTRINE OF *STARE DECISIS* ............................................................................................... 16

          A.     Plaintiffs' Allegations Are the Same as Those Adjudicated in *Broilers* ........................................................................................ 18

          B.     Additional Considerations Support Dismissal of the Chicken Claim under the Doctrine of *Stare Decisis* .................................... 25

CONCLUSION ................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 7

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .............................................................................................. 15

*Avenoso v. Reliance Standard Life Ins. Co.*,
  19 F.4th 1020 (8th Cir. 2021) .............................................................................. 18

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ................................................................................. 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................... 7, 8, 18

*In re Broiler Chicken Antitrust Litig.*,
  1:16-cv-8637, 2023 WL 7220170 (N.D. Ill. June 30, 2023, amended
  Nov. 2, 2023) ................................................................................................. *passim*

*C.f. Amory Invs., LLC v. Utrecht-America Holdings, Inc.*,
  74 F.4th 525 (7th Cir. 2023) (Easterbrook, J.) .................................................... 23

*California v. American Stores Co.*,
  495 U.S. 271 (1990) .............................................................................................. 14

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ........................................................................................ 14, 15

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .................................................................................................. 9

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................................ 11, 12

*Connecticut v. Massachusetts*,
  282 U.S. 660 (1931) .............................................................................................. 15

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................................................ 8, 9

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008) ................................................................... 8

*Eaton v. Dorchester Dev., Inc.,*
692 F.2d 727 (11th Cir.1982) ................................................... 7

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.,*
No. C-02-2708 JCS, 2006 WL 2130905 (N.D. Cal., July 28, 2006) ........................... 13

*Fair Isaac Corp. v. Experian Info. Sols. Inc.,*
645 F. Supp. 2d 734 (D. Minn. 2009) ...................................... 15

*FTC v. Qualcomm Inc.,*
969 F.3d 974 (9th Cir. 2020) .................................................. 12

*Harmon v. City of Kansas City,*
197 F.3d 321 (8th Cir. 1999) .................................................. 9

*Kronholm v. Fed. Deposit Ins. Corp.,*
915 F.2d 1171 (8th Cir. 1990) ................................................ 7

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................... 11

*Maple Flooring Mfrs.' Ass'n v. United States,*
268 U.S. 563 (1925) ............................................................... 8

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
522 F.3d 6 (1st Cir. 2008) ...................................................... 16

*New York v. Facebook, Inc.,*
549 F. Supp. 3d 6 (D.D.C. 2021), *aff'd sub nom.*
*New York v. Meta Platforms, Inc.,* 66 F.4th 288 (D.C. Cir. 2023) .................. 12, 14, 15

*O'Shea v. Littleton,*
414 U.S. 488 (1974) ............................................................... 9

*Osborn v. United States,*
918 F.2d 724 (8th Cir. 1990) .................................................. 7

*Park v. Forest Serv. of U.S.,*
205 F.3d 1034 (8th Cir. 2000) ................................................ 9

*Payne v. Tennessee,*
501 U.S. 808 (1991) ............................................................... 16

*In re Pork Antitrust Litig.*,
   1:18-cv-1776 (D. Minn. June 28, 2018) ("*Pork*") ............................................... 5, 6, 27

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*,
   814 F.2d 358 (7th Cir. 1987) (Easterbrook, J.) ................................................ 17, 18, 27

*Steger v. Franco, Inc.*,
   228 F.3d 889 (8th Cir. 2000) ...................................................................................... 8

*Taylor v. Charter Med. Corp.*,
   162 F.3d 827 (5th Cir. 1998) .................................................................................... 20

*Titus v. Sullivan*,
   4 F.3d 590 (8th Cir. 1993) .......................................................................................... 7

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .................................................................................. 8, 10

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................................... 9

*In re Turkey Antitrust Litig.*,
   1:19-cv-8318 (N.D. Ill. Dec. 19, 2019) ("*Turkey*") ............................................... 6, 27

*United States v. Blosser*,
   104 F.2d 119 (8th Cir. 1939) .................................................................................... 17

*United States v. Mendoza*,
   464 U.S. 154 (1984) .................................................................................................. 16

*United States v. Penn*,
   No. 20-cr-00152-PAB, (D. Colo. Dec. 8, 2021) ................................................ 3, 4, 27

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) .............................................................................................. 8, 10

*United States v. W.T. Grant Co.*,
   345 U.S. 629 (1953) .................................................................................. 9, 13, 14, 15

*United States v. West Virginia*,
   295 U.S. 463 (1935) .................................................................................................. 10

*V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*,
   235 F.3d 1109 (8th Cir. 2000) .................................................................................... 7

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990)..................................................................................... 12

*Zenith Radio Corp. v. Hazeltine Rsch.,*
    395 U.S. 100............................................................................................... 14

**Statutes**

15 U.S.C. § 26 ............................................................................... 2, 13, 14, 15

15 U.S.C. § 4 ............................................................................................ *passim*

**Other Authorities**

Rule 12(b)(1) ........................................................................................................ 7

Rule 12(b)(6) ........................................................................................................ 7

U.S. Const., art III, § 2 .......................................................................................... 8

Defendant Agri Stats, Inc. ("Agri Stats") submits this memorandum in support of its motion to dismiss the Second Amended Complaint ("Complaint") of the United States and the six plaintiff states (the "States," and collectively with the United States, the "Plaintiffs") for lack of subject matter jurisdiction and for failure to state a claim.

## INTRODUCTION

Agri Stats is a small benchmarking company based in Fort Wayne, Indiana. For nearly 40 years, it has provided reports to chicken producers to help make those producers more efficient. It began offering similar reports to turkey producers in 2001 and pork producers in 2007, but has not produced any pork or turkey reports since 2019. Agri Stats does not produce or sell chicken, pork, or turkey. It does not share in any of the revenues that its customers earn from chicken, pork, or turkey sales, but instead charges flat fees for its services.

To produce its benchmarking reports, Agri Stats receives certain data from its customers, audits and anonymizes those data, and prepares reports that allow its customers to compare the efficiency of their respective operations with that of other Agri Stats customers. Agri Stats' reports prepared for one customer contain no price or output information for any other customer. Nevertheless, Plaintiffs claim that Agri Stats shares "sensitive" information among producers, which, in turn, supposedly will enable these producers to reduce output and raise prices in the future.

Plaintiffs seek only prospective relief—an amorphous injunction prohibiting Agri Stats and its subsidiary Express Markets, Inc. ("EMI") from "facilitating the exchange of sensitive information." But they do not actually identify what "sensitive" data fields in Agri

Stats reports cause anticompetitive effects and therefore should be enjoined. Information exchanges violate the Sherman Act only if they harm consumers. Plaintiffs allege no facts showing that its chicken reports will have such an effect, and they say nothing about what may occur in the future with respect to any pork or turkey reports because such reports do not exist. The Complaint contains three counts—one each for broiler chicken, pork, and turkey. Each of those counts suffers from fatal defects.

*First*, the pork and turkey counts assert no case or controversy and must be dismissed for lack of subject matter jurisdiction. Agri Stats has not produced a pork or turkey report in four years and has no plans to do so in the future. The Complaint does not allege any such plans, and Agri Stats cannot restart those reports because it has no data or customers to do so. Furthermore, the Complaint alleges no facts showing that any hypothetical future pork and turkey reports would contain the unspecified "sensitive" data Plaintiffs are concerned about, or that such data would have anticompetitive effects. There is nothing to enjoin and thus nothing for this Court to adjudicate. The claims are thus outside the scope of Article III. This Court lacks subject matter jurisdiction over them.

*Second*, and relatedly, the Complaint lacks any allegations of an imminent threat of harm to competition in the pork and turkey businesses. Both section 4 of the Sherman Act, 15 U.S.C. § 4, and section 16 of the Clayton Act, 15 U.S.C. § 26, require Plaintiffs to allege an imminent and concrete threat of future harm to competition to obtain prospective relief. Here, the Complaint is bereft of such allegations concerning pork and turkey. Accordingly, even assuming that there is a case or controversy, the pork and turkey claims fail and must be dismissed.

***Third***, the plaintiff States lack antitrust standing to bring their pork or turkey counts. Unlike the United States, the plaintiff States are treated as private parties when seeking to enforce federal antitrust law. Accordingly, the States must plead an antitrust injury to their respective interests to obtain injunctive relief. They have failed to do so.

***Finally***, Plaintiffs' only live claim concerns Agri Stats' chicken reports, but the very information exchange claim they assert already has been resolved by the Northern District of Illinois. *See In re Broiler Chicken Antitrust Litig.*, 1:16-cv-8637, 2023 WL 7220170 (N.D. Ill. June 30, 2023, amended Nov. 2, 2023) ("*Broilers*"). Mimicking *Broilers*, the core of Plaintiffs' Complaint alleges that Agri Stats reports contain "information regarding prices and output of individual competitors." Opp. to Mot. to Transfer (ECF No. 66) at 2. Based on a massive discovery record, Judge Durkin concluded otherwise, holding that "Agri Stats reports did *not* reveal competitors' production and pricing data." *Broilers*, 2023 WL 7220170, at *27-28 (emphasis added). The United States ***agreed*** with Judge Durkin during its thrice-failed bid-rigging prosecutions of several chicken executives. In fact, in closing arguments the United States affirmatively argued to the jury that Agri Stats and EMI "***don't even tell you your competitors current pricing for a customer. They are much more higher level than that. And they cannot be used to figure out this kind of information*** . . . ." *United States v. Penn*, No. 20-cr-00152-PAB, ECF No. 1156, Trial Tr. Day 24, 4788:5-9 (D. Colo. Dec. 8, 2021) (*Penn*) (closing argument of the United States) (emphasis added).

While neither *res judicata* nor collateral estoppel bars Plaintiffs' chicken claim, that claim asserts the same legal theory and relies on the same evidence that was before the

*Broilers* court. In such circumstances, *stare decisis* bars relitigation of a decided claim unless Plaintiffs plead facts showing that the outcome will be different from *Broilers*. The Complaint does not even try. In fact, it makes clear that Plaintiffs seek a do-over of Judge Durkin's *Broilers* summary judgment ruling and a reversal of the position the United States took in *Penn*. Relitigation wastes this Court's resources and those of a small company that must defend yet again the same claim on which it has already prevailed. Plaintiffs sat by for seven years while the theory they espouse here and the evidence on which they rely was tested and found wanting in *Broilers*. *Stare decisis* exists precisely to prevent such seriatim cases hoping for different result in different fora. Plaintiffs' chicken claim should be dismissed as well.

## BACKGROUND

Agri Stats is a small Indiana corporation headquartered in Fort Wayne that was founded in 1985. *See* Compl. ¶ 12; ECF No. 44-2 ¶ 3 (Declaration of Eric Scholer in Support of Agri Inc's Motion to Transfer Venue dated November 8, 2023 ("Transfer Decl.")). It has approximately 70 United States employees. *Id*. The company prepares benchmarking reports to help protein producers identify areas to improve the efficiency of their operations. Compl. ¶ 3; Transfer Decl. ¶ 4. Agri Stats began providing benchmarking reports to chicken producers in 1985. Compl. ¶ 12; Transfer Decl. ¶ 5. Agri Stats later developed turkey and pork reports, modeled after its chicken reports. Transfer Decl. ¶ 6.

Agri Stats offered its first turkey reports in 2001 and its first pork processing reports in 2007. *Id*. It ceased both in 2019. *Id*. ¶ 8.

This is not the first time the United States has investigated Agri Stats' business. In 2010, Agri Stats received a Civil Investigative Demand from the Department of Justice ("DOJ") and cooperated with an antitrust investigation focused on whether its reports enable producers to coordinate on output or price—the same issue this Complaint raises. *Id*. ¶ 14. After a nearly two-year inquiry, DOJ closed the investigation without seeking any changes to Agri Stats' reports. *Id*.; ECF No. 44-3 (AGSTAT-00018237 attached as Exhibit A to the Transfer Decl.). Despite the fact that Agri Stats' reports have not changed materially since DOJ closed its investigation 11 years ago, Compl. ¶¶ 2, 11; Transfer Decl. ¶ 5, DOJ began another investigation of Agri Stats in 2022. Transfer Decl. ¶ 14. The only material change to Agri Stats' business between the investigations was cessation of the pork and turkey reports in 2019.[1] Agri Stats currently produces only the chicken reports alleged, which are consistent with the chicken reports it has been producing for decades. Compl. ¶¶ 15, 104; Transfer Decl. ¶ 6, 8.

In 2016, private plaintiffs filed a class action alleging that Agri Stats conspired with chicken producers to reduce output and increase prices. *See Broilers* Compl., ECF No. 1. They brought an information exchange claim identical to that Plaintiffs assert here. In 2018, some of the same private plaintiffs, represented by the same counsel, filed a class action in

---

[1] Agri Stats currently produces "Swine Live" reports, which concern the growth of hogs. Neither Plaintiffs here nor the those in *Pork* challenge the "Swine Live" reports. Plaintiffs' Complaint, like the *Pork* complaint, concerns only pork products destined for consumption.

this Court on the same theories but for pork. *See* Compl., ECF No. 1, *In re Pork Antitrust Litig.*, 1:18-cv-1776 (D. Minn. June 28, 2018) ("*Pork*"). In 2019, a private plaintiff, again represented by counsel in both *Broilers* and *Pork*, filed another class action on the same theories but for turkey. *See* Compl., ECF No. 1, *In re Turkey Antitrust Litig.*, 1:19-cv-8318 (N.D. Ill. Dec. 19, 2019) ("*Turkey*").

*Broilers* has been resolved on the merits. On June 30, 2023, the Northern District of Illinois granted Agri Stats' summary judgment, concluding that plaintiffs had failed to raise a triable issue that Agri Stats' broiler chicken reports violated section 1 of the Sherman Act. *See Broilers*, 2023 WL 7220170. Notably, Judge Durkin rejected an information exchange claim identical to that advanced here, concluding that "Agri Stats reports did not reveal competitors' production and pricing data" and "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect." *Id.* at *27-28. Judge Durkin had before him 4,500 pages of summary judgment briefing and exhibits, all culled from a discovery record with 150 million pages of documents, over 450 depositions, and thousands of pages of expert reports, including three reports from an expert dedicated to analyzing Agri Stats.

Brushing aside its prior investigation and the *Broilers* summary judgment ruling, the United States sued Agri Stats in this Court on September 28, 2023, offering no legal theory or factual allegations beyond those in *Broilers*, *Pork*, and *Turkey*. Thus, some *13 years* after its initial investigation of these same theories, *seven years* after *Broilers* was filed, and three months *after* Judge Durkin resolved the merits of the same information exchange theory in Agri Stats' favor, all that the United States and its state cohorts can

- 6 -

muster is a Complaint differing from the private cases in only two respects: (1) it combines the three alleged proteins into a single pleading; and (2) it seeks only injunctive relief— not damages—even though Agri Stats no longer offers pork and turkey reports.

## LEGAL STANDARD

"Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case." *Kronholm v. Fed. Deposit Ins. Corp.*, 915 F.2d 1171, 1174 (8th Cir. 1990). The party asserting subject matter jurisdiction has the burden of proving it. *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000). A Rule 12(b)(1) motion may challenge a complaint either facially or on the factual truthfulness of its averments. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). On the former, the court accepts the well-pleaded allegations of the complaint as true and determines whether they establish subject matter jurisdiction. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993) (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731–32 (11th Cir.1982)). On the latter, the court may consider matters outside the pleadings and weigh the accuracy of the allegations. *Titus*, 4 F.3d at 593; *accord Osborn*, 918 F.2d at 729 n.6.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs' Complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678. A plaintiff must "provide the 'grounds' of his 'entitle[ment]

to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted). Information exchanges are presumptively lawful and evaluated under the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582–83 (1925); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). Plaintiffs must, therefore, plausibly allege, and ultimately prove, that the purported information exchange harmed competition in properly defined relevant markets. *Gypsum*, 438 U.S. at 441 n.16; *Todd*, 275 F.3d at 198 (2d Cir. 2001).

## ARGUMENT

## I.   PLAINTIFFS' PORK AND TURKEY CLAIMS ALLEGE NO ARTICLE III CASE OR CONTROVERSY.

Under Article III of the Constitution, the judicial power of the United States extends only to "Cases, in Law and Equity, arising under . . . the Laws of the United States" and "Controversies to which the United States shall be a Party . . . [and] . . . between a State and citizens of another State." U.S. Const., art III, § 2; *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) ("Federal jurisdiction is limited by Article III, § 2, of the U.S. Constitution to actual cases and controversies."). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation and internal quotations omitted). A case or controversy must exist for *each claim* Plaintiffs assert and for each form of relief sought. *See Davis v.*

*Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler*, 547 U.S. at 352) (a plaintiff must demonstrate a case or controversy "'for each claim he seeks to press' and 'for each form of relief'"). In cases seeking injunctive relief, a case or controversy exists only when there is a "threat of ongoing or future harm." *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000). That threat of future harm must be "real and immediate," not "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citations omitted). Even alleged past illegal conduct "'does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Park*, 205 F.3d at 1037 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)); *see also Lyons*, 461 U.S. at 102 ("[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . .") (citation omitted); *Harmon v. City of Kansas City*, 197 F.3d 321, 327 (8th Cir. 1999) ("The mere fact that injurious activity took place in the past does nothing to convey standing to seek injunctive relief against future constitutional violations."); *cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").

Here, Plaintiffs' pork and turkey claims do not raise any justiciable case or controversy.[2] Agri Stats no longer produces pork and turkey-related reports and has not

---

[2] The status of the United States as a governmental entity does not alter these principles. A case or controversy is a prerequisite for federal jurisdiction regardless of the parties or the capacity in which they act. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633–34, (1953) (a live case or controversy related to the injunctive relief sought must exist even when the United States seeks that relief). Even the United States acting in its sovereign capacity must still allege a live case or controversy to invoke federal jurisdiction. *See*

done so for *four years*. Compl. ¶¶ 15, 104; Transfer Decl. ¶ 8. Moreover, the Complaint

contains no allegations that Agri Stats will, or even can, restart the pork and turkey reports,

much less that any restarted reports will result in any future anticompetitive effects.

Agri Stats no longer has access to the pork or turkey data necessary to produce the

reports challenged here. *See* Ex. A, Scholer Declaration ¶ 6. To recommence its pork and

turkey reports, Agri Stats would need pork and turkey producers to provide their data and

it also would need customers to purchase any resulting reports. *Id*. ¶ 7. It has neither. *Id*.

Even assuming that Agri Stats leaped those hurdles, the mere fact that Agri Stats

might restart its pork and turkey reports would not mean some instantaneous violation of

the antitrust laws. Information exchanges are judged under the rule of reason, *Gypsum*, 438

U.S. at 441 n.16, *Maple Flooring*, 268 U.S. at 582–83, *Todd*, 275 F.3d at 198, and thus are

presumptively lawful. They are only unlawful when the participants use the exchanged

information to raise prices or reduce output in a manner that they could not absent the

exchange. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999) ("[T]here

must be evidence that the exchanges of information had an impact on pricing decisions"

not just amorphous claims that the exchange of information "impacted the market as a

whole."). In other words, the competitive vice of information exchanges is that they allow

producers to achieve oligopoly outcomes that they could not otherwise achieve. *See Todd*,

275 F.3d at 214 (2d Cir. 2001) (finding that a "[p]laintiff will have to make a substantial

---

*United States v. West Virginia*, 295 U.S. 463, 473-74 (1935) (dismissing a claim brought
by the United States in its sovereign capacity for failure to allege a live case or controversy
in the court with original jurisdiction).

presentation of evidence to support her claim that [the anticompetitive effects could not occur] without the [alleged] information exchange").

The pork and turkey counts address *none* of these matters. The *only* averment concerning those reports asserts that Agri Stats "paused its turkey and pork processing reports in late 2019 in response to private antitrust litigation, but its executives have stated that they want to resume reporting in these industries once that litigation concludes." Compl. ¶ 15. Mere desire to restart a business does not allege a live case or controversy. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions— without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.") (emphasis omitted). That allegation does not show that Agri Stats has any plan actually to begin offering pork and turkey reports, which is unsurprising because to revive the reports, Agri Stats needs pork and turkey data *it does not possess* to generate the reports, as well as actual customers for such reports that similarly *do not exist*. Scholer Decl. ¶ 4-7. The Complaint is silent on these points. Plaintiffs' injunction theory is highly speculative and turns on the actions of third parties, none of whom are parties to this case. Article III requires that Plaintiffs allege an "imminent" threat of a "concrete, particularized" future harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[S]peculation about 'the unfettered choices made by independent actors not before the court,'" *id*. at 414 n.5 (quoting *Lujan*, 504 U.S. at 562), does not suffice.

Moreover, Agri Stats reports contain thousands of data elements that have nothing to do with price or output. Plaintiffs do not (and cannot) allege that any hypothetical future

pork and turkey reports will actually contain the unspecified "sensitive" data elements that Plaintiffs believe are problematic, or that exchange of such sensitive data elements actually will cause anticompetitive effects under unknown future market conditions. Mere desire to resume work in an industry does not mean that a company will somehow violate the law in that industry. Plaintiffs must allege facts demonstrating as much, and they have not done so. The Complaint does not allege what hypothetical future pork and turkey reports would look like, what data elements they would contain, how hypothetical future customers might use them, the market conditions under which they will be used, and how that use might impact competition. *See id.*, 568 U.S. at 409 (reaffirming that the alleged "'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient") (emphasis omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Plaintiffs get no pass on these obligations at the pleading stage. *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 46 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) (plaintiff must "plausibly plead[] risk" of imminent harm to justify forward-looking injunctive relief; dismissing complaint because challenged conduct ceased two years before lawsuit and furnished no basis for injunctive relief sought); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020) (holding that injunction would be inappropriate for allegedly unlawful conduct that terminated "two years before the FTC filed its action"). Plaintiffs here have only mustered one averment concerning the speculative desires of Agri Stats executives. That allegation only shows the specious nature of Plaintiffs' pork and turkey counts.

Article III compels Plaintiffs to allege that pork and turkey reports that have been defunct for four years will not only reappear, but will necessarily include certain "sensitive" data elements and harm competition under *future* market conditions. Plaintiffs have not done so. There is no case or controversy on the pork and turkey claims. Accordingly, this Court lacks subject matter jurisdiction over them.

## II.   THE PORK AND TURKEY COUNTS DO NOT ALLEGE CLAIMS FOR INJUNCTIVE RELIEF UNDER SECTION 4 OF THE SHERMAN ACT OR SECTION 16 OF THE CLAYTON ACT.

Apart from their failure to bring a live case or controversy before this Court on their pork and turkey claims, Plaintiffs have failed to allege facts warranting prospective relief under the antitrust statutes. Whether proceeding under section 4 of the Sherman Act (the United States), 15 U.S.C. § 4, or section 16 of the Clayton Act (the States), 15 U.S.C. § 26, the relevant statutes require Plaintiffs to allege facts showing a concrete and imminent threat of future harm to competition.

While both the Sherman Act and Clayton Act authorize injunctions against prospective anticompetitive conduct, injunctions do not issue cavalierly. Even in antitrust cases, ordinary equitable principles apply. The United States must allege "some cognizable danger of recurrent violation, something more than the mere possibility that keeps the case alive." *See, e.g.*, *W.T. Grant Co.*, 345 U.S. at 633; *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, No. C-02-2708 JCS, 2006 WL 2130905, at *11 (N.D. Cal., July 28, 2006) ("Where past actions have been withdrawn and there is only a 'possibility' that they will recur, courts are generally reluctant to grant injunctive relief enjoining future violations, even where

- 13 -

there may be a constitutional case or controversy."). The burden lies with the United States to plead that injunctive relief is "needed." *W.T. Grant Co,*, 345 U.S. at 633.

The same rule applies to the States. The States seek injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, and, as such, are treated as private parties. *See California v. American Stores Co.*, 495 U.S. 271 (1990) (treating state seeking injunctive relief under federal antitrust law as a private party); *Facebook*, 546 F. Supp. 3d at 38 (same). Injunctions issue under Section 16 only "under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26. Each State, therefore, must allege "threatened loss or damage" to its own interests in order to obtain injunctive relief. *American Stores*, 495 U.S. at 296 (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986)); *see also Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 130 (A plaintiff must "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur"); *Facebook*, 546 F. Supp. 3d at 46 (requiring that state plaintiff plausibly plead threat of future harm to state a claim for prospective relief under Section 16).

The pork and turkey claims do not satisfy these standards. Plaintiffs allege no concrete threat of any future competitive harm from potential resumption of the pork and turkey reports. Plaintiffs concede that the reports ceased four years ago. Compl ¶¶ 15, 104. They allege nothing suggesting that (a) the reports will resume, much less imminently; or (b) how resumed reports might affect competition. In fact, Plaintiffs have not even alleged that Agri Stats itself has the capacity to recommence the reports. *See* Scholer Decl. ¶¶ 4-9.

On the United States' claims, no relief is "needed." *W.T. Grant Co.*, 345 U.S. at 633; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) ("[Injunctions] will not be granted against something merely feared as liable to occur at some indefinite time in the future."). On the States' respective claims, no allegation shows any threat to some state interest. Accordingly, the Complaint fails to allege a claim for injunctive relief on the pork and turkey counts and must be dismissed for this reason as well.

## III.   THE PLAINTIFF STATES LACK ANTITRUST STANDING TO BRING THE PORK AND TURKEY CLAIMS.

The Plaintiff States' pork and turkey claims also fail because they do not allege any threatened "antitrust injury." *See Cargill,* 479 U.S. at 113 (to bring a federal antitrust claim, "[a] private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful") (citation and quotations omitted). Antitrust injury is injury of the type that the antitrust laws were designed to prevent and that flows from an anticompetitive aspect of the challenged practice. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990). It is a necessary but not sufficient condition for antitrust standing. *Cargill*, 479 U.S. at 110 n.5. Because the States are considered private parties under Section 16 of the Clayton Act, *see Facebook*, 549 F. Supp. 3d at 38, they must plausibly allege that each is threatened with a concrete, impending antitrust injury. *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 754 (D. Minn. 2009) ("[C]ourts have explained that the requirement of threatened [antitrust] injury 'dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and

- 15 -

immediate, not conjectural or hypothetical.'") (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008)) (internal quotation omitted). For the reasons discussed in Sections I and II, the States have not alleged any actionable threat of antitrust injury to themselves involving a resumption of Agri Stats' pork and turkey reports. Their pork and turkey claims fail for this reason as well.

## IV. PLAINTIFFS' BROILER CHICKEN CLAIM HAS BEEN RESOLVED BY THE NORTHERN DISTRICT OF ILLINOIS ON THE SAME EVIDENCE ALLEGED IN THE COMPLAINT AND THUS IS BARRED UNDER THE DOCTRINE OF *STARE DECISIS*.

The only conceivable case or controversy Plaintiffs allege concerns Agri Stats' broiler chicken reports, the only reports at issue that the company produces today. The claim Plaintiffs bring, however, has already been adjudicated and resolved in *Broilers*. It is true that neither *res judicata* nor collateral estoppel bind the Plaintiffs here because they were not parties in *Broilers. Cf. United States v. Mendoza*, 464 U.S. 154 (1984) (holding that doctrine of offensive collateral estoppel does not run against the government when the government previously chose not to appeal an adverse district court decision in a constitutional case). Nevertheless, this court need not expend its resources relitigating claims that another federal court has resolved. *Stare decisis* relieves both the courts and the prevailing parties in the initial suit from the burdens of repetitive litigation.

*Stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). Plaintiffs' broiler chicken claim has already been resolved by the Northern District of

Illinois. *Broilers*, 2023 WL 7220170, at *27-28 (Durkin, J.) (granting Agri Stats summary judgment on information exchange claim based on same evidence alleged in Plaintiffs' Complaint here). *Stare decisis*, therefore, bars relitigation of the claims here unless Plaintiffs allege facts showing that the outcome here will be different. *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358 (7th Cir. 1987) (Easterbrook, J.) (*stare decisis* bars relitigation of same claim previously adjudicated in a different district court involving same defendant but different plaintiff); *see also United States v. Blosser*, 104 F.2d 119, 121 (8th Cir. 1939) (discussing that Eighth Circuit "would not be justified in refusing to follow the decision of the Seventh Circuit" unless that decision was "clearly erroneous" where case in the Seventh Circuit involved the same written will and facts but different beneficiary and considered and decided the same legal questions). Plaintiffs do not distinguish *Broilers*; they embrace it. In fact, the broiler chicken allegations in this case were all before Judge Durkin in *Broilers*. He concluded that those allegations viewed against a massive discovery record—which Plaintiffs here possess—did not raise a fact issue for trial. *Broilers*, 2023 WL 7220170, at *27-28. Having done nothing to separate their putative chicken claims from those already adjudicated, Plaintiffs have no reason to expect a different outcome. Indeed, the only difference between their case and *Broilers* is the location of the courthouse. That does not compel this Court or Agri Stats to slog through lengthy and expensive litigation that leads to the same result as *Broilers*. The broiler chicken claim, therefore, should be dismissed.

**A.      Plaintiffs' Allegations Are the Same as Those Adjudicated in *Broilers*.**

Agri Stats does not quibble with the general principle that, at this stage, Plaintiffs' well-pleaded factual allegations must be taken as true. *Twombly*, 550 U.S. at 555. But Plaintiffs' problem is that another district court has already considered these allegations and supporting evidence and concluded that there is no factual issue warranting a trial. That is a legal determination. *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (district court summary judgment decisions concluding no genuine issues of material facts exist are "legal determination[s]"). That legal determination warrants dismissal here. While *Broilers* does not bind this Court as a decision of the Supreme Court or Eighth Circuit would, "it is entitled to respect, both for its persuasive power and because it involves the same facts." *Premier Elec. Contr. Co.*, 814 F.2d at 367. In fact, *stare decisis* is at its apex when the second court is dealing with the same set of facts as the first. *Id.* at 368 (benefits of *stare decisis* "particularly apparent when the two courts are dealing with the same set of facts"). That is the situation here.

A comparison of Plaintiffs' broiler chicken allegations to the summary judgment record in *Broilers* exposes that Plaintiffs have nothing differentiating their claim from that Judge Durkin has already resolved. The *Broilers* plaintiffs brought the exact same rule of reason information exchange claim that Plaintiffs bring here. *See Broilers*, ECF No. 3748 ¶¶ 197-198 ("*Broilers* EUCP Complaint"). Based on a massive discovery record with over 150 million pages of documents, over 450 depositions, thousands of pages of expert reports, and 4,500 pages of summary judgment briefing and exhibits, Judge Durkin granted Agri Stats summary judgment on that information exchange claim on June 30, 2023, with

an entire "Rule of Reason" section in his 90-page opinion. *Broilers*, 2023 WL 7220170, at *27. Judge Durkin held that "Agri Stats reports do not reveal competitors' production and pricing data" and that "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect." *Id*. at *27-28. Judge Durkin also noted that, "[d]espite years of discovery, Plaintiffs simply have not produced sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Agri Stats agreed with the producer defendants to restrict supply and increase the price of Broilers." *Id*. at *27.

Plaintiffs' Complaint brings the same claim, and is based on the same discovery record before Judge Durkin, which Plaintiffs obtained through Civil Investigative Demands before filing their lawsuit. Plaintiffs chicken allegations fall into seven sections outlined in Plaintiffs' Complaint:

1.   "Agri Stats Reports" generally, *see* Compl. Section IV(A), V(B);

2.   "Agri Stats Sales Reports" with alleged competitor pricing information, *see* Compl. Sections IV(A)(1), V(A)(1)-(2);

3.   "Agri Stats Live Reports" with alleged competitor output information, *see* Compl. Sections IV(A)(2), V(C);

4.   "Agri Stats Sales Consulting" services, *see* Compl. Section IV(B);

5.   Chicken processors "Exchange and Deanonymize Agri Stats Reports," "Facilitate[d]" by Agri Stats, *see* Compl. Section V(D);

6.   "Agri Stats Entered Into Anticompetitive Agreements to Share Competitively Sensitive Information," *see* Compl. Section VI; and

7.   "The Sale of Broiler Chicken in the United States Is a Relevant Market," *see* Compl. Section VII(A).

- 19 -

Judge Durkin addressed these allegations in *Broilers*, and the supporting evidence, and granted Agri Stats summary judgment on them. The Complaint's allegations here parrot the evidence and allegations in *Broilers*. We address each.

### 1. "Agri Stats Reports" Generally.

Plaintiffs' chicken allegations focus on the reports and services that Agri Stats provides to chicken producers. *See, e.g.*, Compl. Sections IV(A), V(B), ¶¶ 10, 22, 27-45, 68, 76-77, 80, 100, 113 (identifying and explaining chicken reports, how data is provided to Agri Stats, and who subscribes to the reports). The *Broilers* plaintiffs alleged these same facts and provided Judge Durkin with evidence of them at summary judgment. Agri Stats submitted a complete set of chicken reports with its summary judgment motion, as well as an exemplar EMI report. *See Broilers*, ECF Nos. 5899-15 through 5899-22 and 5899-30 (Agri Stats' Exs. 12 through 17 and 25 ).[3] The *Broilers* plaintiffs submitted a copy of the "Freezer Inventory Report" that Plaintiffs also cite. *See* Compl. ¶ 30; *Broilers*, ECF No. 6237-4 (Plaintiffs' Exs. 1024 and 1025). Both Agri Stats and the *Broilers* plaintiffs presented evidence regarding chicken report subscribers. *See, e.g.*, *Broilers*, ECF No. 5899-2 ¶¶ 5-28 (Agri Stats' Statement of Undisputed Facts); ECF No. 6237-1 ¶ 6 (Plaintiffs' Statement of Additional Facts). Judge Durkin had a complete record regarding

---

[3] This Court may "take judicial notice of a 'document filed in another court . . . to establish the fact of such litigation and related filings.'" *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) (internal citation omitted). Portions of the *Broilers* summary judgment record, including materials cited here, were provisionally filed under seal. The *Broilers* parties are in the process of de-designating materials in the summary judgment record to be filed publicly on that docket. Should this Court wish to review any portions of the record cited in this memorandum, Agri Stats can provide those materials to the Court consistent with the protective order in *Broilers*.

Agri Stats' chicken reports and ultimately concluded that they "did not reveal competitors' production and pricing data." *Broilers*, 2023 WL 7220170, at *27-28.

### 2. "Agri Stats Sales Reports" With Alleged Competitor Pricing Information.

Plaintiffs allege that chicken producers have used Agri Stats reports to increase prices of broiler chicken. *See, e.g.*, Compl. Sections IV(A)(1), V(A)(1)-(2), ¶¶ 53-60, 67, 81, and 113. So did the *Broilers* plaintiffs. Specifically, the *Broilers* plaintiffs claimed that chicken producers used Agri Stats reports to identify opportunities to increase prices—a claim which Judge Durkin also rejected. *Broilers*, 2023 WL 7220170, at *27 ("Plaintiffs simply have not produced sufficient evidence for a reasonable jury to find by a preponderance of the evidence that Agri Stats agreed with the producer defendants to restrict supply and increase the price of Broilers."). In addition to a complete set of Agri Stats reports, Judge Durkin had before him Plaintiffs' expert analyses of those reports. *See Broilers*, ECF Nos. 5899-15 through 5899-22 and 6226-7 (Agri Stats' Exs. 12-17 and Plaintiffs' Exs. 14 and 21). He specifically concluded that producers could not use Agri Stats' reports to coordinate on price. *Broilers*, 2023 WL 7220170, at *28 (finding that Agri Stats Express Sales report "only compares the producer's data to market averages;" Agri Stats Customer Sales report "included information about specific transactions, but only those for the producer who received the report").

### 3. "Agri Stats Live Reports" With Alleged Competitor Output Information.

Plaintiffs allege that producers looked at Agri Stats reports when making production decisions and that those reports revealed competing chicken producers' output. *See, e.g.*,

Compl. Sections IV(A)(2), V(C), ¶¶ 47, 75-77, 113. *Broilers* plaintiffs likewise alleged a coordinated output reduction conspiracy facilitated by Agri Stats reports. *See, e.g.*, *Broilers*, ECF No. 3922 Compl. ℙ 301 (*Broilers* DAP Complaint) ("Defendants exchanged information regarding anticipated future production through Agri Stats"); ECF No. 3935 Compl. ℙ 148 (*Broilers* DPP Complaint) ("[t]he Producer Defendants then used [Agri Stats] information to reach agreement on supply constraints . . . ."); EUCP Compl. ℙ 159 ("producers then used [Agri Stats] information to reach agreement on supply constraints . . . "). Again, Agri Stats submitted a complete set of chicken reports showing the absence of competitor output information. Agri Stats reports specifically exclude from the reports sent to one subscriber any output information of a competing company. *See Broilers,* ECF 5899-15 through 5899-22 (Agri Stats' Exs. 12-17). Plaintiffs here also allege that chicken producers used certain metrics from Agri Stats in making production decisions. *See, e.g.*, Compl. ¶¶ 47, 75-77. So did the *Broilers* plaintiffs. *See, e.g.*, *Broilers* DPP Compl. ¶ 164 (alleging that Agri Stats participants shared "egg production, hatchery data, and information regarding flocks sold"). Again, Judge Durkin considered the evidence and concluded that the reports do not reveal competitor output and that putative proxies (such as bird size, age, hatchery capacity, and costs associated with breeder flocks) are not sufficient to coordinate on output. *Broilers*, 2023 WL 7220170, at *26 ("Agri Stats . . . do[es] not communicate production . . . .").

### 4.    "Agri Stats Sales Consulting" Services.

Plaintiffs' Complaint also contains allegations concerning "consulting" services that Agri Stats supposedly provides to subscribers. *See, e.g.*, Compl. Section IV(B), ¶¶ 1, 13,

48, 50, and 86. These allegations, too, parrot the claims of the *Broilers* plaintiffs.
Specifically, Plaintiffs allege that Agri Stats supposedly identifies "opportunities" for
broiler chicken producers to raise prices. *See, e.g.*, Compl. ¶¶ 48, 50. The *Broilers* plaintiffs
presented evidence regarding those same allegations. *See, e.g.*, *Broilers*, ECF No. 6226-17
(Plaintiffs' Ex. 66) (discussing identification of "opportunities" related to pricing).
Plaintiffs also allege that Agri Stats and EMI employees provided market analyses that
supposedly "enabled and encouraged" producers to increase prices and reduce output. *See,
e.g.*, Compl. ¶¶ 48, 50, 86. Evidence from one Agri Stats employee and one EMI employee
was central in *Broilers* and also features in Plaintiffs' Complaint. *See, e.g.*, ECF Nos. 6226-
17, 6227-1, 6227-2, 6237-4, 6237-6 (Plaintiffs' Exs. 66, 118, 124, 126, 1012, 1046)
(communications involving Agri Stats employee Mike Donohue and EMI employee Sue
Trudell). Judge Durkin specifically addressed these communications, finding that
"Donohue's and Trudell's communications with Defendants were general market analysis
based on publicly available information." *Broilers*, 2023 WL 7220170, at *26. As Judge
Durkin determined, such general analysis that does not reveal competitively sensitive
information cannot form the basis of an information exchange claim. *C.f. Amory Invs., LLC
v. Utrecht-America Holdings, Inc.*, 74 F.4th 525, 527 (7th Cir. 2023) (Easterbrook, J.)
("Delivering a lesson in microeconomics does not violate the Sherman Act.").

>    **5.    The Broiler Chicken Processors "Exchange and Deanonymize
>          Agri Stats Reports," "Facilitate[d]" By Agri Stats.**

Plaintiffs allege that chicken producers attempted to identify competitor information
in the Agri Stats reports, a process *Broilers* plaintiffs dubbed "deanonymization." *See*

Compl. Section V(D), ¶¶ 89-91. The *Broilers* plaintiffs emphasized this issue on summary judgment. *See, e.g.*, *Broilers*, ECF Nos. 6227-3, 6228, 6228-4, 6229-6, 6237-4 (Plaintiffs' Exs. 136, 208, 238, 326, 1009, 1040, 1041) (purported examples of "deanonymization" attempts). Judge Durkin had the document Plaintiffs quote in paragraph 89 of their Complaint before him, *see Broilers*, ECF No. 6229-6 (Plaintiffs' Ex. 336), and addressed that and other "deanonymization" evidence. He concluded that "deanonymization" failed to raise a triable issue. *Broilers*, 2023 WL 7220170, at *25 ("[T]he fact that the defendant producers were making educated guesses about their competitors' production plans by analyzing or deanonymizing Agri Stats reports is not evidence that Agri Stats agreed with the defendant producers to restrict supply and increase price."). Judge Durkin concluded that "[e]ven if Defendants deanonymized the reports, they would not have learned their competitors' production and pricing data because it was not contained in the version of reports Agri Stats provide to them." *Id.* at *27.

### 6.   "Agri Stats Entered Into Anticompetitive Agreements to Share Competitively Sensitive Information."

Plaintiffs allege that "Agri Stats agreed with the broiler chicken . . . processors . . . to exchange competitively sensitive information." Compl. ¶ 103. That "information exchange" theory is central to the *Broilers* plaintiffs' claims. *See Broilers*, EUCP Complaint ¶ 197 (challenging "defendants' agreement to unlawfully exchange competitively sensitive information amongst Broiler Producers"). In addition to their claims regarding a supposed output reduction theory, the *Broilers* plaintiffs specifically alleged a distinct claim for an unlawful information exchange under the rule of reason—

the same claim brought by Plaintiffs here. Judge Durkin considered that claim on summary judgment and rejected it. *Broilers*, 2023 WL 7220170, at *27-28 (finding that "Agri Stats reports did not reveal competitors' production and pricing data" and that "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect").

### 7.     "The Sale of Broiler Chicken in the United States Is a Relevant Market."

Finally, Plaintiffs allege that "broiler chicken meat in the United States is a relevant market" and that "Broiler chicken refers to broiler chicken meat that comes in a variety of forms, fresh or frozen." Compl. ¶ 120. That is the same market at issue in *Broilers*, *see Broilers*, EUCP Complaint ¶ 212, and the same the market before Judge Durkin on the information exchange claim on which he granted Agri Stats summary judgment, *see Broilers*, 2023 WL 7220170, at *1 (noting that "[p]urchasers of chicken meat (a product known as 'Broilers') allege that Broiler producers conspired to raise prices in violation of the Sherman Act").

***

Before Plaintiffs subject this Court and Agri Stats to a burdensome replay of *Broilers*, the doctrine of *stare decisis* requires that they be compelled to allege a different claim. Because they have not done so, their claim should be dismissed.

### B.     Additional Considerations Support Dismissal of the Chicken Claim under the Doctrine of *Stare Decisis*.

Two additional considerations warrant application of *stare decisis* here. *First*, not only did the allegations against Agri Stats in *Broilers* fail as a matter of law, but certain

*Broilers* plaintiffs tried their claims against Sanderson Farms. Their trial presentation again focused extensively on Agri Stats. They labeled Agri Stats a "tool for supply discipline" in "the conspirators' toolbox" and explained that Agri Stats is "a benchmarking company that we'll talk about a lot in this trial" because "Agri Stats was a tool for Sanderson and its coconspirators to violate the Sherman Act" through its "sharing a Sears Tower worth of nonpublic data" between broiler producers. *Broilers,* Trial Tr. Volume 5A, 663:21-22; 671:25; 672:11-12; 686:7-8; 677:19-20 (N.D. Ill. Sept. 28, 2023). The *Broilers* plaintiffs were true to their word. The *Broilers* parties mentioned Agri Stats over 400 times.[4] The *Broilers* plaintiffs played video depositions from multiple Agri Stats and EMI employees and introduced into evidence numerous documents relating to Agri Stats. None of that availed; the jury returned a verdict for Sanderson, finding that plaintiffs had not established *any agreement* among chicken producers. In short, both Judge Durkin and a jury have considered Plaintiffs' claims and rejected them. This Court need not be put to the burden of relitigating claims already rejected by both judge and jury.

*Second*, Agri Stats is no stranger to the United States. In fact, the Government spent two years investigating Agri Stats and ultimately closed the inquiry without seeking any alterations to Agri Stats reports. Since that time, the reports have not materially changed. Transfer Decl. ¶ 5. The United States then watched for seven years as Agri Stats litigated the same theory the Government asserts here and won summary judgment. Along the way,

---

[4] That number excludes references to Agri Stats in video depositions played at trial, which was a majority of testimony presented to the jury. Video deposition testimony was not captured in the stenographic record.

the United States issued civil investigative demands,[5] collecting the entire discovery record in *Broilers* (and the *Pork* and *Turkey* records as well), but never bothered to make a claim until Judge Durkin had already decided that one did not exist. For good measure, during a criminal antitrust trial against several chicken executives in the District of Colorado, the United States sought Agri Stats' assistance in proving the very point that negates Plaintiffs' claims here: that one competitor could not use the Agri Stats report to ascertain another competitor's prices. Scholer Decl. ¶¶ 10-13. Not only that, but in closing arguments the United States *affirmatively argued* to the jury that Agri Stats and EMI "don't even tell you your competitors' current pricing for a customer. They are much more higher [sic] level than that. And they cannot be used to figure out this kind of information . . . ." *United States v. Penn*, No. 20-cr-00152-PAB, ECF No. 1156, Trial Tr. Day 24, 4788:5-9 (D. Colo. Dec. 8, 2021).[6] Plaintiffs, and particularly the United States, could have asserted their claim over the last decade. They failed to do so. Only now, after losing their criminal cases, and being told by another court that a civil information exchange claim does not exist, does the United

---

[5] The States joined the United States' complaint without ever conducting any independent investigation of Agri Stats, which may explain why none of them asserts any threatened future injury to any State interest. *See supra* Sections II-III.

[6] The United States subjected the *Penn* defendants to multiple trials. It tried 10 defendants in an initial trial in 2021, which ended with a hung jury. It retried the same 10 defendants again in 2022, which again ended with a jury unable to reach a unanimous verdict. Failing to get the message, the United States dropped five defendants—thus conceding that it could not prevail against them—and took the remaining five to trial a third time. In that proceeding, the jury acquitted the remaining defendants, thus putting the Government out of its misery. This case is straight out of the *Penn* playbook. *Stare decisis* allows this Court to prevent the United States from heaping on it the burdens it foisted on the District of Colorado. *See Premier Elec. Constr. Co.*, 814 F.2d at 368 (noting "strong presumption" in favor of prior disposition of case on the same facts).

States, with a small amen chorus of States, come to this Court and ask for the proverbial playground do-over. Under the doctrine of *stare decisis*, this Court should reject that overture.

## CONCLUSION

For the foregoing reasons, Agri Stats respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

Dated: January 5, 2024                    Respectfully submitted,

                                          */s/ Peter H. Walsh*

                                          Peter H Walsh (MN# 0388672)
                                          Hogan Lovells US LLP
                                          80 South 8th Street Ste 1225
                                          Minneapolis, MN 55402
                                          Tel: (612) 402-3017
                                          Fax: (612) 339-5167
                                          Email: peter.walsh@hoganlovells.com

                                          William L. Monts III (Pro Hac Vice)
                                          Justin W. Bernick (Pro Hac Vice)
                                          HOGAN LOVELLS US LLP
                                          555 Thirteenth Street, N.W.
                                          Washington, D.C.  20004
                                          Tel: (202) 637-5600
                                          Fax: (202) 637-5910
                                          william.monts@hoganlovells.com
                                          justin.bernick@hoganlovells.com

                                          *Counsel for Defendant Agri Stats, Inc.*