## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF MINNESOTA,<br>STATE OF CALIFORNIA,<br>STATE OF NORTH CAROLINA,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS, and<br>STATE OF UTAH,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>AGRI STATS, INC.,<br><br>     *Defendant.* | No. 0:23-CV-03009-JRT-JFD<br><br>__PUBLIC REDACTED VERSION__ |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

    A.  Agri Stats Operates Anticompetitive Information Exchanges ..................... 3

    B.  Agri Stats and Its Co-Conspirators Intend to Resume Their Pork and Turkey Conduct .................................................................................... 5

LEGAL STANDARD ................................................................................................... 10

ARGUMENT ................................................................................................................. 11

I.    The Court May Enjoin Agri Stats' Pork and Turkey Conduct ............................. 11

    A.  The Court Has Jurisdiction Over Plaintiffs' Pork and Turkey Claims ...... 11

    B.  The Court Has Authority to Enjoin Agri Stats' Anticompetitive Conduct ...................................................................................................... 18

    C.  Plaintiff States Have Adequately Alleged Antitrust Injury Related to Agri Stats' Pork and Turkey Conduct .......................................................... 20

II.    *Stare Decisis* Cannot Bar Plaintiffs' Broiler Chicken Claim ................................. 21

    A.  *Stare Decisis* Does Not Apply ................................................................... 21

    B.  *Stare Decisis* Would Not Warrant Dismissal ............................................ 22

    C.  Developments in Prior Cases Do Not Support Dismissal Here ................ 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

*Adams v. Bowater Inc.*,
313 F.3d 611 (1st Cir. 2002) .................................................................. 14

*Am. Forest & Paper Ass'n v. EPA.*,
137 F.3d 291 (5th Cir. 1998) .................................................................. 14

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ................................................................. 13

*Arrington v. Colortyme, Inc.*,
972 F. Supp. 2d 733 (W.D. Pa. 2013) ..................................................... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................ 10

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ................................................................................ 21

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) .................................................................. 10

*Burch v. Goodyear Tire & Rubber Co.*,
554 F.2d 633 (4th Cir. 1977) .................................................................. 20

*Cath. Mut. Relief Society of Am. v. Arrowood Indem. Co.*,
334 F. Supp. 3d 986 (D. Minn. 2018) ..................................................... 12

*City of Kennett v. EPA*,
887 F.3d 424 (8th Cir. 2018) .................................................................. 13

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................. 17

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................... 13, 17

*Croyle by & through Croyle v. United States*,
908 F.3d 377 (8th Cir. 2018) .................................................................. 10

*Ctr. for Special Needs Trust Admin., Inc. v. Olson*,
676 F.3d 688 (8th Cir. 2012) ............................................................. 12, 13

*F. Hoffmann–La Roche Ltd. v. Empagran S.A.,*
  542 U.S. 155 (2004) .................................................................................. 11

*FTC v. Accusearch, Inc.*,
  2007 WL 4356786 (D. Wyo. Sept. 28, 2007) ............................................ 16

*FTC v. Accusearch*,
  570 F.3d 1187 (10th Cir. 2009) ...................................................... 16, 19, 20

*FTC v. Qualcomm Inc.*,
  969 F.3d 974) (9th Cir. 2020) ................................................................... 20

*Georgia v. Pennsylvania R.R. Co.*,
  324 U.S. 439 (1945) .................................................................................. 20

*Gould Elecs. Inc. v. United States*,
  220 F.3d 169 (3d Cir. 2000) ..................................................................... 17

*Gould v. Bowyer*,
  11 F.3d 82 (7th Cir. 1993) ........................................................................ 22

*Harmon v. City of Kansas City*,
  197 F.3d 321 (8th Cir. 1999) .................................................................... 15

*Hawaii v. Standard Oil Co. of Cal.*,
  405 U.S. 251 (1972) .................................................................................. 20

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  2000 WL 204061 (N.D. Ill. Feb. 10, 2000) .............................................. 23

*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d. 753 (D. Minn. 2020) ...................................................... 10

*Johnson v. United States*,
  534 F.3d 958 (8th Cir. 2008) ...................................................................... 5

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................. 17

*Moragne v. States Marine Lines, Inc.*,
  398 U.S. 375 (1970) .................................................................................. 22

*Moss v. United States*,
  895 F.3d 1091 (8th Cir. 2018) .................................................................. 10

*Muellner v. U.S. Bank, N.A.,*
  2015 WL 4374180 (D. Minn. July 15, 2015) ............................................................. 17

*Nat'l Soc'y of Pro. Eng'rs v. United States,*
  435 U.S. 679 (1978) ............................................................................................ 11, 18

*New York v. Facebook, Inc.,*
  549 F. Supp. 3d 6 (D.D.C. 2021) ............................................................................. 20

*Osborn v. United States,*
  918 F.2d 724 (8th Cir. 1993) ..................................................................................... 5

*Park v. Forest Serv. of the U.S.,*
  205 F.3d 1034 (8th Cir. 2000) ................................................................................. 17

*Portland Pipe Line Corp. v. City of South Portland,*
  164 F. Supp. 3d 157 (D. Me. 2016) .......................................................................... 14

*Premier Electrical Construction Co. v. National Electrical Contractors Ass'n,*
  814 F.2d 358 (7th Cir. 1987) ............................................................................... 22, 23

*Pueblo Entero v. Abbott,*
  604 F. Supp. 3d 512 (W.D. Tex. 2022) ..................................................................... 12

*Reid v. BCBSM, Inc.,*
  787 F.3d 892 (8th Cir. 2015) ................................................................................... 22

*Rubbermaid, Inc. v. FTC,*
  575 F.2d 1169 (6th Cir. 1978) ................................................................................. 16

*Sam Fox Publ'g Co. v. United States,*
  366 U.S. 683 (1961) ................................................................................................ 22

*Seattle Sch. Dist. No.,*
  *1,* 551 U.S. 701 (2007) ............................................................................................ 15

*SEC v. First Am. Bank & Trust Co.,*
  481 F.2d 673 (8th Cir. 1973) ................................................................................... 15

*Sheely v. MRI Radiology Network, P.A.,*
  505 F.3d 1173 (11th Cir. 2007) ............................................................................... 15

*Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC,*
  588 F.3d 963 (8th Cir. 2009) ................................................................................... 22

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ............................................................... 13, 14

*Taylor v. Sturgell,*
  553 U.S. 880 (2008) ...................................................................... 21

*United States v. Auginash,*
  266 F.3d 781 (8th Cir. 2001) .......................................................... 22

*United States v. Borden,*
  347 U.S. 514 (1954) ................................................................. 21, 24

*United States v. Parke, Davis & Co.,*
  362 U.S. 29 (1960) ........................................................................ 13

*United States v. W.A. Foote Mem'l Hosp.,*
  2017 WL 6513013 (E.D. Mich. Dec. 20, 2017) ............................... 16

*United States v. W.T. Grant Co.,*
  345 U.S. 629 (1953) ...................................................... 13, 14, 18, 19

**STATUTES**

15 U.S.C. § 4 ....................................................................... 12, 18

15 U.S.C. § 26 ............................................................................ 18

**OTHER AUTHORITIES**

15 Charles Alan Wright & Arthur R. Miller,

  *Federal Practice and Procedure* § 3531.11 (3d Ed. 2023) ............................................ 12

Tara Grove, *Standing Outside Article III*, 162 U. Pa. L. Rev. 1311 (2014) ...................... 12

## INTRODUCTION

Agri Stats seeks to use the voluntary cessation of its pork and turkey programs to deny the United States and Plaintiff States their day in court—all while defending the legality of its conduct and planning to resume such conduct absent judicial intervention. Further, Agri Stats invokes an erroneous conception of *stare decisis* to contend that a summary judgment decision in a different case, involving different facts and parties, can bar Plaintiffs' claims relating to Agri Stats' ongoing conduct. Agri Stats is wrong on all points. This Court has the power to remedy Agri Stats' violations of Section 1 of the Sherman Act, the case is justiciable, and no prior cases preclude this enforcement action.

As Plaintiffs allege, Agri Stats' pork and turkey information exchanges have caused widespread harm, and Agri Stats has both the means and desire to resume this conduct with its co-conspirators. In response, Agri Stats offers a carefully worded, narrow declaration from one of its officers, Eric Scholer, asserting that Agri Stats has "no current plans" to resume its pork and turkey conduct. In every forum other than this litigation, however, Agri Stats has stated that it both *wants* and *plans* to resume those information exchanges in the future. Those statements are consistent with Agri Stats' internal documents. For example, Agri Stats' documents state, among other things, that it "Expect[s] [to] Restart" its pork conduct if the *Pork* antitrust "case is dismissed." And Mr. Scholer told industry representatives that he was "optimistic" that the turkey industry "would resume more complete participation in Agri-Stats after the [*Turkey*] case has settled." Mr. Scholer also shared with Agri Stats' European financial backers projections of anticipated revenue from Agri Stats' pork and turkey conduct restarting in 2024 and 2025 respectively. These

1

documents all post-date Agri Stats' pause of its pork and turkey conduct, and all post-date the *Pork* and *Turkey* litigations in which Agri Stats remains a defendant. Further, in direct response to this suit, Agri Stats issued a press release (still present on Agri Stats' website) stating that this case "threatens serious harm to American consumers of chicken, *pork, and turkey* because protein producers depend upon Agri Stats' reports[.]" (emphasis added). In short, Agri Stats has repeatedly communicated to a variety of audiences that it intends to restart its pork and turkey conduct once it resolves the antitrust suits against it, and Agri Stats offers no evidence—aside from Mr. Scholer's recent declarations—to the contrary. The record evidence is consistent with Plaintiffs' Complaint, and easily suffices to establish this Court's authority to proceed with this action on all three of Plaintiffs' claims.

Agri Stats fares no better in invoking what it calls "*stare decisis*" to challenge Plaintiffs' broiler chicken claim. Whatever Agri Stats may mean by that term, *stare decisis* does not apply to factual determinations made by a different district court, in a different posture, based on different facts. It is also not a preclusion doctrine that could "bar" Plaintiffs' claim in any event.

Agri Stats' motion to dismiss should be denied.[1]

---

[1] As shown in the Declaration of Katherine Moerke, Agri Stats' Meet and Confer Statement, ECF No. 81, is inaccurate and does not comply with the Court's Local Rules. Plaintiffs seek to move expeditiously in this case and therefore only seek to correct the record.

## FACTUAL BACKGROUND

### A.      Agri Stats Operates Anticompetitive Information Exchanges

Agri Stats earns millions of dollars each year administering information exchanges among protein processors. Compl. ¶¶ 5, 168.[2] These information exchanges harm competition by enabling competing processors in the broiler chicken, pork, and turkey markets to share competitively sensitive information about their operations and sales. *Id.* ¶¶ 2-3, 16. Every major competitor in these markets has participated: Agri Stats' subscribers have collectively comprised market shares of 80-90% or greater for each of these three markets. *Id.* ¶¶ 14, 110-12.

Several features of Agri Stats' information exchanges make harm to competition likely. *Id.* ¶ 109. Agri Stats collects and shares business information that competitors ordinarily would not provide to one another. *Id.* ¶ 17. This includes sensitive price (*id.* ¶¶ 33-40), output (*id.* ¶¶ 41-47), and cost (*id.* ¶¶ 29, 67) data that Agri Stats audits, standardizes, and publishes—often on a facility-by-facility and company-by-company basis (*id.* ¶¶ 19-20, 29, 33; *see also id.* ¶ 43, Fig. 5). Through Agri Stats, processors that should be vigorous competitors receive highly specific, sensitive information about rival facilities and companies. *Id.* Processors monitor this information and use it to make business decisions. *E.g.*, *id.* ¶¶ 6, 47, 56. Processors have deanonymized Agri Stats reports to track competitors' sales price data. *See, e.g.*, *id*. ¶ 93 Fig. 12. While disseminating this sensitive information freely among ostensible competitors, Agri Stats will not sell the same

---

[2] "Compl." refers to Plaintiffs' Second Amended Complaint, filed on November 15, 2023, ECF No. 50.

data to other industry participants, including meat purchasers. *Id.* ¶¶ 67-68, 109(d). This information-sharing asymmetry between processors and purchasers allows processors to collectively charge higher prices. *Id.* ¶¶ 67-68.

The data in Agri Stats' reports are current. *Id.* ¶ 109(b). The company issues regular weekly reports that generally supply information from the prior week, as well as monthly reports that include data from the past one to two months. *Id.* Some information in the reports, as Agri Stats admits, is forward-looking and predictive. *Id.* ¶¶ 45, Fig. 6, 109b. For example, Agri Stats' customer manual explains that the "purpose" of reporting on "breeder chick placements" is "to help forecast [b]roilers & pounds produced for future months." *Id.* ¶ 45 Fig. 6. In other words, Agri Stats provides information that enables processors to forecast their competitors' output.

In addition to providing competitively sensitive information in written reports, Agri Stats offers consulting services, such as "on-site reviews," that tell processors how to exploit its data to raise prices or otherwise undermine competition. *Id.* ¶¶ 10, 48-50. Indeed, Agri Stats advises processors to *raise* prices when price competition is relatively unlikely. *Id.* ¶¶ 4, 10, 70. One pork processor summarized Agri Stats' consulting advice in four words: "Just raise your price." *Id.* ¶ 4. The Complaint includes numerous examples of processors following this advice and using Agri Stats information to implement price increases in all three markets. *Id.* ¶¶ 53-57 (Tysons, chicken), ¶¶ 58-60 (Sanderson, chicken), ¶¶ 61-62 (Cargill, turkey), ¶¶ 63-65 (Butterball, turkey), ¶ 66 (JBS, pork). Processors similarly use Agri Stats data to monitor and coordinate meat output. *Id.* ¶¶ 6, 75.

This course of conduct has caused and will likely continue to cause anticompetitive harm in the national broiler chicken, turkey, and pork markets. *Id.* ¶¶ 113-117.

**B.     Agri Stats and Its Co-Conspirators Intend to Resume Their Pork and Turkey Conduct**

In each of the markets addressed in the Complaint, Agri Stats recruited all major competitors to participate in its anticompetitive information exchanges. *Id.* ¶ 167. In 2019, Agri Stats paused most elements of its pork and turkey information exchanges in response to private antitrust lawsuits. *Id.* ¶ 15. Agri Stats continues to operate information exchanges in the broiler chicken and live hog industries. *Id.* ¶ 104; Scholer Decl. in Supp. of Mot. to Transfer ¶ 7, ECF No. 44-2.[3] Agri Stats' executives want to resume the pork and turkey information exchanges once the private litigation concludes, which could be accomplished relatively easily because several members of the ongoing broiler chicken information exchange conspiracy are also members of the turkey or pork conspiracies (*e.g.*, Tyson, Perdue, JBS/Pilgrim's, House of Raeford). *Id.* ¶¶ 14, 15, 124.

After the filing of this lawsuit, Agri Stats submitted three carefully worded declarations from Eric Scholer, Agri Stats' Vice President of Operations and the President of Agri Stats' subsidiary Express Markets Inc. ("EMI"). *See* ECF Nos. 44-2, 75-2, 80. In the latest of these declarations, Mr. Scholer claims that "Agri Stats did not cease producing the turkey and pork-related reports alleged in Plaintiffs' Complaint because of any

---

[3] The Court may consider evidence outside the pleadings when assessing a factual attack on jurisdiction pursuant to Rule 12(b)(1). *See* Mot. at 7 (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1993)); *see also Johnson v. United States*, 534 F.3d 958, 962 (8th Cir. 2008).

litigation risk to Agri Stats from those reports," but rather "because there were not enough subscribers to maintain those reports." Scholer Decl. in Supp. of Mot. to Dismiss ("Scholer Decl.") ¶¶ 3-5, ECF No. 80. Mr. Scholer does not mention, however, that the reason why "there were not enough subscribers to maintain those reports," as Agri Stats' employees have explained, is the antitrust litigation risk associated with private lawsuits alleging that Agri Stats' conduct is anticompetitive.[4]

Mr. Scholer further denies that Agri Stats has "current plans" to resume its pork and turkey conduct. *Id.* ¶ 8. By denying only "current plans," Mr. Scholer does not actually deny that Agri Stats would attempt to restart its pork and turkey conduct once the related antitrust litigation is resolved. And any suggestion by Mr. Scholer that Agri Stats does not intend to resume pork and turkey reports after the resolution of the pork and turkey antitrust suits runs contrary to Agri Stats' internal documents, engagement with protein processors, statements to its financial backers, representations in litigation, and public statements.

***Internal Documents.*** Agri Stats' internal documents express an intent to resume its pork and turkey programs. For example, in 2020, Agri Stats created a presentation that specifically anticipated restarting these programs once the litigation was resolved:

---

[4] *See* Decl. of William M. Friedman ("Friedman Decl.") Ex. 1, Edwards Dep. at 207:10-208:5 (June 2, 2022) (testifying that processors "cited concerns regarding the broiler litigation" as a reason for leaving Agri Stats); Friedman Decl. Ex. 2, Edwards Dep. at 23:5-14 (Jan. 25, 2022) ("Q: Do you recall one pork processor quitting Agri Stats over litigation concerns? A: Yes.").

6



Figure 1[5]

In Agri Stats' own words, the company "[e]xpect[s]" the pork program to "[r]estart" if the

"case is dismissed." The company also acknowledged that its decision to "suspend"—not

cease—its turkey program was prompted by antitrust litigation, describing the "Pork

Lawsuit" as an "Important" reason that the turkey program was "Suspended." Other Agri

Stats documents make similar statements. For example, Agri Stats board minutes from the

fall of 2019, after Agri Stats discontinued its pork and turkey reporting, forecast profits to

grow "by 2024 as swine and turkey are assumed to come back to previous levels."

Friedman Decl. Ex 4, AGS-0000024571 at -571; *see also* Friedman Decl. Ex 5, AGS-

---

[5] Friedman Decl. Ex. 3, AGS-0000025123 at -127.

0000020704 at -707 (stating that pork processing is "likely not to return until litigation over").

**Engagement with Processors.** Even after "suspending" its turkey operations, Agri Stats has continued to engage with turkey processors. As part of that engagement, in July 2019, Mr. Scholer met with members of the National Turkey Federation (the "NTF" referred to in Fig. 1), including representatives from the turkey conspiracy alleged in the Complaint. Friedman Decl. Ex. 6 at -077; Scholer Decl. ¶ 4. According to minutes from that meeting, a participant asked "if Scholer believed the turkey industry would resume more complete participation in Agri-Stats after the case has settled, and Scholer was optimistic that it would." Ex. 6 at -077.

Additionally, less than a year ago, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Friedman Decl. Ex. 7, AGS-0000019926 at -926, -932-933. Mr. Scholer is both the president of EMI and an officer of Agri Stats. Scholer Decl. ¶ 2.

**Statements to Financial Backers.** Agri Stats has also continued to tell its own financial backers that it intends to resume pork and turkey reporting. In early 2021, Mr. Scholer sent a presentation to a representative of the Thyssen-Bornemisza Group (TBG AG), the owner of Agri Stats' primary financial backer, that included a chart showing Agri Stats' plan to restart its pork and turkey programs in 2024 and 2025, respectively, and

projecting revenues from both lines of business for those years. Friedman Decl. Ex. 8, AGS-0000020703 at -708.[6]

*Case-Related Representations.* After this litigation commenced, Agri Stats asked this Court to maintain under seal the prices it charged to participants in the pork and turkey program several years ago, contending that these prices are "competitively sensitive" because "Agri Stats negotiated its rates with each subscriber individually and they can remain static for years." *See* Joint Mot. Re: Continued Sealing at 3-4, ECF No. 76. Those rates can only be competitively sensitive if Agri Stats has plans to resume—and resume charging clients for—its pork and turkey reporting. Moreover, during the Department of Justice's investigation, Agri Stats never previously indicated that it had no plans to restart its pork and turkey conduct.

*Ongoing Conduct.* Agri Stats continues to advertise on its website that it "service[s] customers in the chicken, turkey, commercial egg, and swine industries."[7] Agri Stats also issued a press release in response to the filing of this lawsuit stating that it "threatens serious harm to American consumers of chicken, pork, and turkey because protein producers

---

[6] Ex. 8 provides revenue associated with Agri Stats' "swine" business generally, including its "swine live" operations (*i.e.*, Agri Stats' conduct with respect to live hog operations) that have never ceased, *see* Scholer Decl. in Supp. of Mot. to Transfer ¶ 7, ECF No. 44-2. Presumably this is why swine revenues in Ex. 8 never went to zero, as they did with Agri Stats' turkey operations. A projected jump in revenue from 2023-2025 is consistent with an intent to restart Agri Stats' pork processing program.

[7] Friedman Decl. Ex. 9; *see also* https://www.agristats.com/partnership (last visited Jan. 25, 2024).

depend upon Agri Stats' reports," suggesting either current or planned activity in all three industries.[8]

## LEGAL STANDARD

"In deciding a motion under Rule 12(b)(1), the district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings." *Croyle by & through Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018). Where, as here, a defendant brings a factual attack, a plaintiff may submit "affidavits or other documents" so that the court can resolve jurisdictional facts based on the preponderance of the evidence. *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018).

"When reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for 'relief that is plausible on its face.'" *In re Pork Antitrust Litig.* ("*Pork*"), 495 F. Supp. 3d 753, 767 (D. Minn. 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d 585.

---

[8] Friedman Decl. Ex. 10; *see also* https://www.agristats.com/news (last visited Jan. 25, 2024).

## ARGUMENT

### I.   The Court May Enjoin Agri Stats' Pork and Turkey Conduct

Agri Stats argues in varying ways that the current suspension of its pork and turkey programs precludes injunctive relief. But a court is not powerless to enjoin violations of the Sherman Act merely when a defendant purports to cease conduct when threatened with litigation. This is especially true where, as here, "[a] Government plaintiff . . . seek[s] to obtain relief necessary to protect the public from *further* anticompetitive conduct and to redress anticompetitive harm." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 170 (2004) (emphasis added). It is "entirely appropriate" for a court to order an injunction "beyond a simple proscription against the precise conduct previously pursued." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978). Here, Agri Stats' voluntary cessation arose from litigation, and ample evidence indicates that, absent judicial relief, Agri Stats will likely resume that conduct.

### A.   The Court Has Jurisdiction Over Plaintiffs' Pork and Turkey Claims

Agri Stats argues that there is no case or controversy under Article III with respect to its pork and turkey programs. Mot. at 8-13. This is plainly wrong. Plaintiffs allege that Agri Stats violated Section 1 of the Sherman Act and judicial intervention is necessary to redress those violations and prevent future violations; Agri Stats disagrees. The Court has Article III authority to address this dispute.

Agri Stats attempts to cloud the issue by citing justiciability cases involving private plaintiffs. But Plaintiffs here are sovereign entities, not private citizens. Plaintiff United States, for example, is a law enforcement agency that Congress has specifically tasked "to

*prevent* and restrain" violations of Section 1 of the Sherman Act. 15 U.S.C. § 4 (emphasis added). "Standing to pursue the general interests of the public is easily recognized when federal officials responsible for enforcing specific statutory schemes bring suit under the aegis of the statute." 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.11 (3d Ed. 2023); Tara Grove, *Standing Outside Article III*, 162 U. Pa. L. Rev. 1311, 1324 (2014) ("[T]he Supreme Court has consistently recognized the executive branch's standing to enforce federal law. Indeed, the Court has never denied executive standing when it had statutory authorization.").[9] Plaintiff States similarly have standing to sue. *See infra* § I(C). Agri Stats' failure to cite *any* cases dismissing a statutory enforcement action for lack of justiciability is telling.

Typically, courts analyze a defendant's voluntary cessation of conduct in response threatened litigation as a question of mootness. *Ctr. for Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688, 697 (8th Cir. 2012) (applying voluntary cessation doctrine and addressing whether pre-complaint abandonment of allegedly unlawful policy deprived court of jurisdiction); *Cath. Mut. Relief Society of Am. v. Arrowood Indem. Co.*, 334 F. Supp. 3d 986, 990-91, 994 (D. Minn. 2018) (applying voluntary cessation doctrine and analyzing whether a "compromise" made in the year before the complaint was filed

---

[9] *See also La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 520 n.7 (W.D. Tex. 2022) (collecting scholarly authority rejecting the conclusion that sovereigns are subject to the modern standing inquiry).

deprived court of jurisdiction).[10] A defendant bears the "heavy burden" of proving that "it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Olson* 676 F.3d at 697. Courts must be especially vigilant when the government brings an enforcement action and must "beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 n.5 (1953) (citation and quotation omitted). For example, the Court had the authority to enjoin anticompetitive conduct in *United States v. Parke, Davis & Co.* despite the pre-litigation cessation of that conduct. 362 U.S. 29, 48 (1960).

But even if viewed through the lens of standing, rather than mootness, a plaintiff need only show "there is a 'substantial risk' that the harm will" recur in order for the court to have jurisdiction. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)); *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018). Under either standard, Agri Stats' stated intent to repeat the conduct, its longstanding course of conduct, its adamancy that its conduct is legal (and continuance of similar conduct in the broiler industry), establish that a case or controversy exists and, if a violation has occurred, injunctive relief is proper.

Judicial intervention is necessary to redress Agri Stats' past conduct and prevent future violations. In every forum other than this litigation, Agri Stats has stated that it both

---

[10] *See also Aref v. Lynch*, 833 F.3d 242, 251 n.6 (D.C. Cir. 2016) (voluntary cessation need not be "undertaken *because of* the litigation," citing case where the doctrine was applied to "policy change announced before litigation began").

*wants* and *plans* to resume those information exchanges in the future. *Supra* Factual Background § B. In Agri Stats' own words, this Court should "expect" Agri Stats to restart the "suspended" pork and turkey programs. Friedman Decl. Ex. 3, AGS-0000025123 at 127. These repeated statements of intent, combined with Agri Stats' current conduct in the broiler chicken market and past conduct in the pork and turkey markets, is sufficient to establish jurisdiction for all of Plaintiffs' claims. "[W]here a defendant is unwilling to give any assurance that the conduct will not be repeated, a natural suspicion is provoked" that the conduct "may well" recur. *Adams v. Bowater Inc.*, 313 F.3d 611, 615 (1st Cir. 2002); *see also Am. Forest & Paper Ass'n v. EPA.*, 137 F.3d 291, 296 (5th Cir. 1998) (holding that defendant agency's stated intention to deny future permit applications under certain conditions was a sufficient injury for purposes of Article III because its "frank announcement of its intentions [] belies the agency's claim that any injury is speculative"); *cf. Driehaus*, 573 U.S. at 160 (considering statements of "intention" in finding standing).

Jurisdiction is more easily established when a suit challenges a defendant's longstanding course of conduct. "[W]hen defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of the antitrust laws, courts will not assume that it has been abandoned without clear proof." *W.T. Grant Co.*, 345 U.S. 632 n.5; *see also Portland Pipe Line Corp. v. City of South Portland*, 164 F. Supp. 3d 157, 171-81 (D. Me. 2016) (court had jurisdiction regarding company's challenge to ordinance prohibiting north-south oil transport despite company having "no plans" to do so because company was "in the oil pipeline business" and had transported oil north to south "in the past"). Here, Agri Stats organized and operated pork and turkey information exchanges for

14

well over a decade and paused those operations only after the legality of those exchanges was challenged in court. Compl. ¶ 15.

Moreover, Agri Stats insists that its information sharing is lawful, which further reinforces the likelihood that it will resume that activity absent relief. Scholer Decl. ¶ 5; *see also* Agri Stats Mem. in Supp. of Mot. to Dismiss, *Pork*, No. 18-cv-1776 (D. Minn. Jan. 15, 2020), ECF No. 461 (describing Agri Stats' conduct as "lawful commercial business of providing valuable benchmarking services to its customers"). "[A] defendant's failure to acknowledge wrongdoing . . . suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1187 (11th Cir. 2007); *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (rejecting challenge to standing based on cessation of allegedly unconstitutional conduct because defendant "vigorously defends the constitutionality" of conduct "and nowhere suggests that if this litigation is resolved in its favor it will not resume" it); *SEC v. First Am. Bank & Trust Co.*, 481 F.2d 673, 682 (8th Cir. 1973) (past improper conduct raises an "inference that such conduct will continue in the future even though the improper conduct has been discontinued" and that "[t]his inference is even stronger when the wrongdoers insist that their actions are legitimate").[11]

---

[11] *Harmon v. City of Kansas City*, 197 F.3d 321, 327 (8th Cir. 1999), which Agri Stats cites (Mot. at 9), is inapposite because there the government admitted that the plaintiffs' conduct "was fully protected under the constitution" and that the city's complained-of ordinance did not prohibit such conduct, despite misapplications in the past.

Plaintiffs' allegations are not unduly "speculative" simply because Agri Stats would need pork and turkey processors' participation to resume reporting in these industries. Mot. at 11. These "third parties," like Agri Stats, paused their participation in response to litigation. Compl. ¶ 15, Friedman Decl. Ex. 1 at 207:10-208:5, Ex. 2. at 23:5-14. And since pausing its pork and turkey reporting, Agri Stats has continued to engage with processors in those industries about resuming those reports. *Id.* Ex. 6 at -077. Agri Stats itself believes resumption of that conduct is likely enough that it has forecast specific revenues associated with its co-conspirators purchasing reports from restarted pork and turkey information exchanges. *Id.* Ex. 4 at -571; Ex. 8 at -708.[12]

Against this evidence, Agri Stats' carefully worded disavowal of "current plans" to resume its pork and turkey reporting carries no weight. Scholer Decl. ¶ 8. Indeed, the same declaration acknowledges that Agri Stats may "resume the production of reports related to turkey and/or pork products at some unknown point in the future." *Id.* ¶ 9. Even if Agri Stats' denial of "current plans" were relevant to assessing jurisdiction, such a "short self-serving affidavit with no supporting documentation cannot itself sustain a factual attack on

---

[12] Agri Stats also postulates that the possibility of differences between its current and future reports precludes injunctive relief. *See* Mot. at 11-12. Agri Stats cites no case indicating that Plaintiff must show precisely how Agri Stats would reconstitute its pork and turkey services (and certainly not at the pleading stage). Plaintiffs have no such burden. *United States v. W.A. Foote Mem'l Hosp.*, 2017 WL 6513013, at *3 (E.D. Mich. Dec. 20, 2017) ("'The crucial question, of course, is to what degree one can be *certain* that the same *or related* practices will not recur.'") (quoting *Rubbermaid, Inc. v. FTC*, 575 F.2d 1169, 1172 (6th Cir. 1978)); *cf. FTC. v. Accusearch, Inc.*, 2007 WL 4356786, at *9 (D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009) ("[T]he Commission need not show that the defendants are likely to engage in the same precise conduct found to be in violation of the law, but rather only that similar violations are likely to occur.").

16

the Court's subject-matter jurisdiction." *Arrington v. Colortyme, Inc.*, 972 F. Supp. 2d 733, 742 (W.D. Pa. 2013) (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000)). Here, there is not only no corroboration for Agri Stats' self-serving claims; there is significant evidence that *contradicts* those claims, including Agri Stats' own documents and representations to customers and investors.

Agri Stats' cited authorities do not counsel otherwise. This case does not involve allegations of a discrete action undertaken in the past that is unlikely to reoccur,[13] nor does it involve an unknown or unrecognized harm.[14] Agri Stats' past conduct, the circumstances surrounding its cessation of that conduct, and the evidence showing that conduct is likely to resume all establish that the Court has jurisdiction over Plaintiffs' challenge to Agri Stats' pork and turkey conduct.[15]

---

[13] Agri Stats mistakenly relies on several cases where private plaintiffs sought injunctions after they were exposed to discrete individual instances of unlawful conduct by the government. *Park v. Forest Serv. of the U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000) (no standing to challenge exposure to one "unconstitutional check point" at the entrance of a national forest where government admitted the checkpoint was impermissible); *City of Los Angeles v. Lyons*, 461 U.S. 95, 97-98 (1983) (unlawful chokehold by police department). Those cases are not relevant to this analysis.

[14] Unlike the circumstances in *Clapper*, 568 U.S. at 410-11, and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-64 (1992), relied on by Agri Stats, here there is a demonstrated history of the challenged conduct and a stated intention to resume that conduct at a specific point in time (*i.e.*, upon resolution of litigation).

[15] If the Court disagrees with Plaintiffs and believes there is a legitimate factual dispute regarding Agri Stats' plans to restart its pork and turkey information exchanges, the Court should conduct an evidentiary hearing, and permit jurisdictional discovery rather than dismiss the case. *E.g.*, *Muellner v. U.S. Bank, N.A.*, 2015 WL 4374180, at *1 (D. Minn. July 15, 2015) (permitting jurisdictional discovery to determine Article III standing).

Finally, Agri Stats makes the ungrounded assumption that equitable relief must necessarily be limited to preventing future misconduct. Antitrust relief is not limited to stopping ongoing anticompetitive conduct; it also includes preventing its recurrence and "eliminat[ing] its consequences." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 697. Plaintiffs ask the Court to ensure that any anticompetitive effects of past conduct are dissipated, and the Court has the authority to act in such circumstances. *Id.*; Compl. ¶ 169(f) (seeking relief sufficient to "prevent the recurrence of the alleged violations and to dissipate their anticompetitive effects").

### B.    The Court Has Authority to Enjoin Agri Stats' Anticompetitive Conduct

Agri Stats' challenge to the Court's authority to issue an injunction rehashes its jurisdictional arguments, and it fails for similar reasons. Section 4 of the Sherman Act empowers the United States "to institute proceedings in equity *to prevent* and restrain . . . violations" of Section 1, 15 U.S.C. § 4 (emphasis added), and Section 16 of the Clayton Act authorizes Plaintiff States to receive injunctive relief "under the same conditions and principles" as "courts of equity." 15 U.S.C. § 26. It is black-letter law that a "court's power to grant injunctive relief survives the discontinuance of the illegal conduct." *W.T. Grant Co.*, 345 U.S. at 633.

To withstand a motion to dismiss, Plaintiffs need only plausibly allege "that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* at 629. "In assessing the likelihood of recurrence, a court may consider 'all the circumstances,' including 'the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the

character of the past violations.'" *FTC v. Accusearch*, 570 F.3d 1187, 1201 (10th Cir. 2009) (quoting *W.T. Grant*, 345 U.S. at 633). For the same reasons that this Court has subject-matter jurisdiction over Plaintiffs' pork and turkey claims, it also has the power to issue an injunction in connection with those claims. *See supra* § I(A).

On this point, *Accusearch* is instructive. In that case, the FTC sued the operator of a website that sold personal data, including unlawfully obtained telephone records. *Accusearch*, 570 F.3d at 1190. Four months prior to the FTC's lawsuit, the defendant had ceased offering telephone records, *id.* at 1192, and the defendant argued that the district court was unable to enjoin that conduct. *Id.* at 1201-02. The court rejected that argument because the defendant "remained in the information brokerage business" and "had the capacity to engage in similar unfair acts or practices in the future." *Id.* at 1202 (cleaned up). Just like in *Accusearch*, Agri Stats remains in the "information brokerage" business and has "the capacity to engage in similar unfair acts or practices in the future." *Id.*

In prior briefing, Agri Stats has attempted to distinguish *Accusearch*, arguing that (1) FTC sued four months after cessation, whereas Plaintiffs sued multiple years later; and (2) Accusearch could "unilaterally" resume its conduct, whereas Agri Stats would need its pork and turkey co-conspirators to sign up again to resume its unlawful conduct. *See* ECF No. 75 at 8. Neither point has merit. Agri Stats stopped issuing its pork and turkey reports only *after* private plaintiffs sued it. Compl. ¶ 15. And as its own documents make clear, Agri Stats remains keen to restart as soon as that litigation resolves. *Supra* Factual Background § B. Also, the company in *Accusearch* could not have "unilaterally" provided the offending telephone records—it still required customers and third-party researchers for

19

its business to operate. *Accusearch*, 570 F.3d at 1191-92. Like Agri Stats, it managed an unlawful scheme that involved the participation of parties other than itself. And as in *Accusearch*, the likelihood of Agri Stats' unlawful pork and turkey conduct recurring is sufficiently high that injunctive relief is necessary to prevent its recurrence.[16]

### C.   Plaintiff States Have Adequately Alleged Antitrust Injury Related to Agri Stats' Pork and Turkey Conduct

Finally, Agri Stats argues that Plaintiff States failed to allege antitrust injury related to Agri Stats' pork and turkey conduct. This argument relies on the same flawed factual premise as Agri Stats' challenge to justiciability and the Court's power to issue an injunction. *See* Mot. at 15-16. The Court should reject it for the same reasons.

Plaintiff States seek prospective injunctive relief to prevent anticompetitive conduct that harms their general economies. Agri Stats' argument that they lack standing to do so lacks any basis in fact or law. *See, e.g.*, *Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 634-35 (4th Cir. 1977) ("Allegations of injury to the general economy of the State of Maryland are sufficient to confer standing upon the Attorney General of Maryland in an antitrust suit filed in a parens patriae capacity where the Attorney General seeks to sue on behalf of the citizens of Maryland for injunctive relief.") (citing *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 447 (1945), and *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257-60 (1972)). As Plaintiff States clearly allege, Agri Stats, through its anticompetitive

---

[16] Agri Stats' reliance on *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 46 (D.D.C. 2021) and *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005) (9th Cir. 2020), is similarly misplaced. Mot. at 12. In both cases, there was no evidence the offending conduct would recur, let alone an expressed intent to resume. Moreover, in *Facebook*, the court based its ruling on a timeliness defense that Agri Stats does not assert. 549 F. Supp. 3d at 46.

conduct, has and will continue to cause their citizens to bear the actual and likely effects of stabilizing and increasing prices and reducing output for broiler chicken, turkey, and pork, unless injunctive relief is granted. Compl. ¶¶ 51-52, 116-117, 160-161, 163, 165, 167. Such harm is precisely the type of harm the antitrust laws were intended to prevent and surely constitutes injury that state attorneys general have standing to challenge. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).

## II.   *Stare Decisis* Cannot Bar Plaintiffs' Broiler Chicken Claim

With respect to Plaintiffs' broiler chicken claim, Agri Stats argues that it cannot face an enforcement action by the United States and Plaintiff States because Agri Stats secured summary judgment against private plaintiffs in a different matter. Mot. at 25. Not so. Agri Stats' argument relies on a misunderstanding of the doctrine of *stare decisis* and fails to provide the Court with any basis to dismiss Plaintiffs' broiler chicken claim.

### A.   *Stare Decisis* Does Not Apply

At the outset, it is not clear what Agri Stats means by "*stare decisis*." Agri Stats appears to invoke the concept as a preclusion doctrine, *e.g.*, Mot. at 16-17 ("Plaintiffs' broiler chicken claim has already been resolved by the Northern District of Illinois."), despite acknowledging that "neither res judicata nor collateral estoppel bars Plaintiffs' chicken claim," *id*. at 3; *see also id.* at 16. As Agri Stats appears to concede, preclusion does not apply here because "a litigant is not bound by a judgment to which she was not a party." *Taylor v. Sturgell*, 553 U.S. 880, 898 (2008). That is especially true when a defendant seeks to use private litigation to bar a government action. *United States v. Borden*, 347 U.S. 514, 519 (1954) ("[T]he Government's right and duty to seek an

21

injunction to protect the public interest exist without regard to any private suit or decree.”);
*see also Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 690 (1961) (“[T]he
Government is not bound by private antitrust litigation to which it is a stranger.”).

“*Stare decisis*,” as the term is typically used, does not apply here. *Stare decisis* is a
prudential doctrine that governs legal holdings, based on “the principle that courts should
not lightly overrule past decisions.” *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375,
403 (1970). It encourages “uniformity in the law . . . wherever reasoned analysis will
allow.” *United States v. Auginash*, 266 F.3d 781, 784 (8th Cir. 2001). A district court's
ruling “cannot be used as stare decisis because ‘[a] district court decision binds no judge
in any other case, save to the extent that doctrines of preclusion (not stare decisis) apply.'”
*Reid v. BCBSM, Inc.*, 787 F.3d 892, 895 n.2 (8th Cir. 2015) (quoting *Gould v. Bowyer*, 11
F.3d 82, 84 (7th Cir. 1993)); *accord Se. Stud & Components, Inc. v. Am. Eagle Design
Build Studios, LLC*, 588 F.3d 963, 967 (8th Cir. 2009) (“[O]ne district court is not bound
by the holdings of others, even those within the same district.”). The Court's consideration
of Agri Stats' *stare decisis* argument can end there.

### B.   *Stare Decisis* Would Not Warrant Dismissal

Even if principles of *stare decisis* were relevant, they would not “bar[]” any claim,
as Agri Stats contends. Mot. at 4. *Stare decisis* is not a “doctrine[] of preclusion” and
therefore does not bar claims or issues from being litigated. *Reid*, 787 F.3d at 895 n.2. Agri
Stats' primary authority in support of its *stare decisis* argument, *Premier Electrical
Construction Co. v. National Electrical Contractors Association*, recognized that *stare
decisis* is, at most, a presumption that “does not eliminate the need for independent

22

analysis." 814 F.2d 358, 367 (7th Cir. 1987). Accordingly, *Premier* did not bar any claim on the basis of *stare decisis* and instead concluded that because "principles of issue preclusion do not apply, we must afford [plaintiff] the opportunity to" pursue its claim in the district court. *Id.* at 371; *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204061, at *2-4 (N.D. Ill. Feb. 10, 2000) (recognizing *Premier's* discussion of *stare decisis* as dicta and rejecting attempt to bar claims of opt-out plaintiffs who had "no say in the presentation or defense of evidence" in a prior class-action case).

If, by invoking *stare decisis*, Agri Stats means that the Court can rely on the *Broilers* decision to the extent it is persuasive, it is merely confirming the common-law tradition of considering legal precedent. But the *Broilers* court's summary judgment decision, based on evidence that differs from Plaintiffs' factual allegations here, is not relevant or persuasive authority.[17]

Plaintiffs have made detailed factual allegations in the Complaint—which must be taken as true—that directly address what the *Broilers* court found lacking. For example, Defendants cite the *Broilers* court's conclusion "that producers could not use Agri Stats' reports to coordinate on price" (Mot. at 21), but Plaintiffs have alleged multiple specific examples of processors using Agri Stats' reports in a way that would lead to anticompetitive effects, including price coordination. *See, e.g.*, Compl. ¶¶ 54-57 (Tyson

---

[17] Agri Stats repeatedly attempts to reframe Plaintiffs' case so that it appears to replicate the *Broilers* litigation. For example, Agri Stats claims that Count I "concerns Agri Stats' broiler chicken reports." Mem. at 16. While this is true in part, Agri Stats' reports are only "[t]he most apparent way Agri Stats shares information among competitors." Compl. ¶ 29. As the Court will learn through the course of this litigation and as discussed in Plaintiffs' Complaint, Agri Stats' anticompetitive conduct is much more extensive.

using Agri Stats reports to raise prices on broiler chicken items); *id.* ¶¶ 58-59 (similar example involving Sanderson); *id.* ¶ 62 (Cargill using Agri Stats benchmarking information to increase turkey prices). Similarly, Agri Stats cites the *Broilers* court's conclusion that Agri Stats reports "do not reveal competitor output" (Mot. at 22), but the Complaint alleges facts to the contrary, including (1) excerpts of reports showing the level of detail in production data, Compl. ¶¶ 41-47, (2) an Agri Stats' customer manual stating the "purpose" of including certain data is "[t]o help forecast Broilers & pounds produced for future months," *id.* ¶ 45, and (3) specific examples of competitors using Agri Stats' reports and information to understand competitor output, *e.g.*, *id.* ¶¶ 6, 47 (examples of Sanderson using Agri Stats information to monitor output). Plaintiffs have also alleged that Agri Stats has provided detailed advice about specific negotiations, *id.* ¶¶ 98-99, that goes beyond the limited "general market analysis" on which the *Broilers* court relied, Mot. at 23. Despite its protestations, holding Agri Stats liable in this litigation for its anticompetitive information exchanges would not offend the principles of preclusion, *stare decisis*, or any other legal doctrine. *See Borden*, 347 U.S. at 519.

## C.    Developments in Prior Cases Do Not Support Dismissal Here

Finally, Agri Stats refers to statements made by government prosecutors in a prior criminal trial against certain chicken processors (*United States v. Penn*, No. 20-cr-0152 (D. Colo.)) and the acquittal of non-party Sanderson Farms in a recent *per se* price-fixing trial to support dismissal. Both are irrelevant. This case involves a different civil violation: that Agri Stats' collection and provision of information suppressed competition. The statements made during closing arguments in the *Penn* trial dealt with a different criminal price fixing

conspiracy than the information-exchange conspiracy alleged here. Similarly, the jury's verdict in *Broilers* regarding Sanderson Farms involved only a *per se* output restriction claim and concerned different parties than the present case. Mot. at 25-26.

## CONCLUSION

For the foregoing reasons, the Court should deny Agri Stats' motion to dismiss.

Dated: January 26, 2024

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

ANN M. BILDTSEN
Attorney ID No. 0271494
First Assistant United States Attorney
Attorney for the United States Acting Under Authority Conferred by
28 U.S.C. § 515

/s/ Liles H. Repp
LILES H. REPP
Attorney ID No. 0400692
Assistant United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: (612) 664-5600
Fax: (612) 664-5788
Liles.Repp@usdoj.gov

*/s/* Mark H.M. Sosnowsky
MARK H.M. SOSNOWSKY (*Pro Hac Vice*)
EUN-HA KIM
Senior Trial Counsel

*/s/* William M. Friedman
WILLIAM M. FRIEDMAN (*Pro Hac Vice*)

25

JAMES H. CONGDON (*Pro Hac Vice*)
SILVIA J. DOMINGUEZ-REESE (*Pro Hac Vice*)
PETER A. NELSON (*Pro Hac Vice*)
DEVIN L. REDDING (*Pro Hac Vice*)
Trial Attorneys

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 812-4723
Facsimile: (202) 307-5802
Mark.Sosnowsky@usdoj.gov
Eun-Ha.Kim@usdoj.gov
William.Friedman2@usdoj.gov
James.Congdon@usdoj.gov
Silvia.Dominguez-Reese2@usdoj.gov
Peter.Nelson@usdoj.gov
Devin.Redding@usdoj.gov

*Attorneys for United States of America*

**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON
Attorney General of Minnesota

*/s/* Katherine A. Moerke
JAMES CANADAY (No. 030234X)
Deputy Attorney General
KATHERINE A. MOERKE (No. 0312277)
ELIZABETH ODETTE (No. 0340698)
SARAH DOKTORI (No. 0403060)
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
elizabeth.odette@ag.state.mn.us
Telephone: (651) 728-7208
sarah.doktori@ag.state.mn.us

Telephone: (651) 583-6694

*Attorneys for State of Minnesota and Local Counsel for States of California, North Carolina, and Tennessee*

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General of California

/s/ Robert McNary
ROBERT MCNARY (*Pro Hac Vice*)
Deputy Attorney General
NICOLE GORDON (*Pro Hac Vice*)
Deputy Attorney General
JAMIE MILLER (*Pro Hac Vice*)
Supervising Deputy Attorney General
PAULA BLIZZARD (*Pro Hac Vice*)
Senior Assistant Attorney General
Office of the Attorney General
California Department of Justice
300 S. Spring St.
Los Angeles, California 90013
Telephone: (213) 269-6283
Robert.McNary@doj.ca.gov

*Attorneys for State of California*

**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN
Attorney General of North Carolina

/s/ Jonathan R. Marx
JASMINE MCGHEE (*Pro Hac Vice*)
Senior Deputy Attorney General
JONATHAN R. MARX (*Pro Hac Vice*)
Special Deputy Attorney General
KUNAL CHOKSI (*Pro Hac Vice*)
Special Deputy Attorney General
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-8611

27

jmarx@ncdoj.gov

*Attorneys for State of North Carolina*

**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI
Attorney General of Tennessee

*/s/* Ethan Bowers
ETHAN BOWERS (*Pro Hac Vice*)
Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Ethan.Bowers@ag.tn.gov
Telephone: (615) 741-8091

*Attorneys for State of Tennessee*

**FOR PLAINTIFF STATE OF TEXAS:**

KEN PAXTON
Attorney General of Texas

*/s/* Trevor Young
BRENT WEBSTER (*Pro Hac Vice*)
First Assistant Attorney General
GRANT DORFMAN (*Pro Hac Vice*)
Deputy First Assistant Attorney General
JAMES LLOYD (*Pro Hac Vice*)
Deputy Attorney General for Civil Litigation; Chief, Antitrust Division
TREVOR YOUNG (*Pro Hac Vice*)
Deputy Chief, Antitrust Division
WILLIAM SHIEBER (*Pro Hac Vice*)
JONATHAN WOODWARD (*Pro Hac Vice*)
Assistant Attorneys General

Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701

28

Telephone: (512) 463-1710
Email: Trevor.Young@oag.texas.gov

*Attorneys for State of Texas*

**FOR PLAINTIFF STATE OF UTAH:**

SEAN D. REYES
Attorney General of Utah

*/s/* Marie W.L. Martin
MARIE W.L. MARTIN (*Pro Hac Vice*)
Assistant Attorney General

Utah Office of the Attorney General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
Tel: (801) 366-0375
Fax: (801) 366-0378
Email: mwmartin@agutah.gov

*Attorneys for State of Utah*