# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
STATE OF MINNESOTA,
STATE OF CALIFORNIA,
STATE OF NORTH CAROLINA,
STATE OF TENNESSEE,
STATE OF TEXAS, and
STATE OF UTAH,

*Plaintiffs*,

v.

AGRI STATS, INC.,

*Defendant.*

No. 0:23-CV-03009-JRT-JFD

**PUBLIC REDACTED VERSION**

## PLAINTIFFS' OPPOSITION TO AGRI STATS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION .............................................................................................. 1

FACTUAL BACKGROUND................................................................................ 3

   A. Agri Stats Agrees to Exchange Competitively Sensitive Information Between Processors. ................................................................................................ 4

   B. Agri Stats' Information Sharing Scheme Is Not Limited to Agri Stats' Standard Reports........................................................................................................ 6

   C. Agri Stats Helps Processors Raise Prices........................................... 10

      1. Documents and Testimony Demonstrate that Processors Regularly Relied on Information Exchanged Through Agri Stats to Raise Prices. ................... 10

      2. Plaintiffs' Expert Analyses Confirm that Agri Stats' Conduct Has Harmed Competition in the Broiler Chicken, Pork, and Turkey Markets. .................. 13

   D. Agri Stats Intends to Resume Pork and Turkey Reporting. .................... 14

LEGAL STANDARD ...................................................................................... 16

ARGUMENT.................................................................................................. 16

I.  AGRI STATS' INFORMATION EXCHANGES HAVE SUBSTANTIALLY REDUCED COMPETITION AND LED TO HIGHER PRICES. .............................. 17

   A. The Court Should Reject Agri Stats' Attempts to Restrict and Compartmentalize the Record Evidence. .................................................... 17

   B. Direct and Indirect Evidence Support Plaintiffs' Allegations................... 19

   C. Agri Stats' Information Exchange Had a Substantial Anticompetitive Effect in the Broiler Chicken Market. ..................................................................... 23

      1. Documentary Evidence Show That Broiler Chicken Processors Frequently Used Agri Stats Information to Identify and Implement Price Increases........ 23

      2. Economic Analysis Confirms That Agri Stats' Information Exchanges Systematically and Disproportionately Yielded Price Increases in the Broiler Chicken Market. ...................................................................................... 26

      3. Empirical and Documentary Evidence from the Pork and Turkey Markets Further Demonstrate That Agri Stats' Information Exchanges Are Anticompetitive. ...................................................................................... 29

   D. The Nature of Agri Stats' Information Exchange Poses a Substantial Threat to Competition. ........................................................................................... 32

II.  RECORD EVIDENCE SHOWS AGRI STATS' INTENTION TO RESUME PORK AND TURKEY REPORTING.......................................................... 38

III. AGRI STATS IMPROPERLY SEEKS SUMMARY JUDGMENT AS TO EMI...... 42

CONCLUSION ............................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir. 1982) .................................................................. 18

*Brazil v. Ark. Dep't of Hum. Servs.*,
  892 F.3d 957 (8th Cir. 2018) ................................................................... 40

*Brown v. JBS USA Food Co.*,
  773 F. Supp. 3d 1193 (D. Colo. 2025)...................................................... 21

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
  715 F.2d 1115 (6th Cir. 1983) .................................................................. 27

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962)........................................................................... 17, 18

*Disability Support All. v. Heartwood Enters.*,
  885 F.3d 543 (8th Cir. 2018) ................................................................... 42

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
  111 F.4th 337 (4th Cir. 2024) .................................................................. 17

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ........................................................ 19, 20, 29

*Equip. Mfrs. Inst. v. Janklow*,
  300 F.3d 842 (8th Cir. 2002) ................................................................... 20

*Falco Lime, Inc. v. Tide Towing Co.*,
  29 F.3d 362 (8th Cir. 1994) ..................................................................... 20

*Fercello v. Cnty. of Ramsey*,
  612 F.3d 1069 (8th Cir. 2010) ................................................................. 16

*Fishman v. Est. of Wirtz*,
  807 F.2d 520 (7th Cir. 1986) ................................................................... 22

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
  788 F. Supp. 1042 (D. Minn. 1992)......................................................... 27

*FTC v. Accusearch Inc.*,
  570 F.3d 1187 (10th Cir. 2009) .......................................................... 40, 41

*FTC v. Indiana Fed. of Dentists*,
    476 U.S. 447 (1986) ................................................................................. 36

*In re Comp. of Managerial, Pro. & Tech. Emps. Antitrust Litig.*,
    2008 WL 3887619 (D.N.J. Aug. 20, 2008) ............................................ 27

*In re Dealer Mgmt. Sys.*,
    581 F. Supp. 3d 1029 (N.D. Ill. 2022) .................................................. 29

*In re Local TV Advertising Antitrust Litig.*,
    2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ........................................... 21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    714 F. Supp. 3d 65 (E.D.N.Y. 2024) ..................................................... 28

*In re Pork Antitrust Litig.*,
    781 F. Supp. 3d 758 (D. Minn. 2025) ............................................*Passim*

*Indep. Fed'n of Flight Attendants v. Cooper*,
    134 F.3d 917 (8th Cir. 1998) ................................................................. 43

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*,
    661 F. Supp. 2d 1039 (D. Minn. 2009) .................................................. 16

*Jien v. Perdue Farms, Inc.*,
    2020 WL 5544183 (D. Md. Sept. 16, 2020) ........................................... 21

*Le v. Zuffa, LLC*,
    2024 WL 195994 (D. Nev. Jan. 18, 2024) .............................................. 26

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................. 40

*Moehrl v. Nat'l Ass'n of Realtors*,
    2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) .......................................... 29

*Nat'l Collegiate Athletic Assoc. v. Alston*,
    594 U.S. 69 (2021) ................................................................................... 19

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978) ................................................................................. 43

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ................................................................................. 27

iv

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ............................................................................*Passim*

*Park v. Forest Serv. of U.S.*,
    205 F.3d 1034 (8th Cir. 2000) ................................................................ 38

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) .............................................................. 28

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) ................................................................... 22

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ................................................... 21, 27, 36, 38

*Tops Mkts, Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ..................................................................... 20

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) ....................................................................... 21

*United States v. Container Corp.*,
    393 U.S. 333 (1969) .......................................................................... 19, 32

*United States v. Or. State Med. Soc.*,
    343 U.S. 326 (1952) ................................................................................ 39

*United States v. Patten*,
    226 U.S. 525 (1913) ................................................................................ 18

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953) .......................................................................... 38, 39

*United States v. Ward Baking Co.*,
    376 U.S. 327 (1964) ................................................................................ 43

## INTRODUCTION

For decades, Agri Stats has operated as a conduit for America's largest chicken, turkey, and pork processors to exchange their most competitively sensitive information, harming competition in each of these vital markets and resulting in higher prices for American families trying to put dinner on the table.

Agri Stats uses a variety of methods (not just reports) to provide processors with near-total visibility into their rivals' costs, supplies, and pricing. Processors share this information through Agri Stats with the understanding that Agri Stats will not make it available to purchasers such as grocers, restaurants, or food distributors. Processors recognize their information will not be used to foster competition, but instead to "████████ ███████████████████████." Ex. 1 (AGSTAT-P-0003415358) at p.31 (emphasis added).

The record is replete with evidence of the anticompetitive effects of Agri Stats' information exchanges. Documentary and testimonial evidence demonstrate that processors have used metrics supplied by Agri Stats and derived from competitors to monitor production, supply, and output, and to implement actual price increases. At trial, Plaintiffs will supplement this evidence with expert analyses confirming, through well-established economic tools, that processors use information received by Agri Stats to increase prices, and in markets where Agri Stats operated information exchanges and then stopped, prices went down. In the face of overwhelming evidence of anticompetitive harm, Agri Stats has offered no evidence that its information sharing schemes impart any actual procompetitive benefits. Instead, Agri Stats seeks to avoid trial by positing an unjustifiably

1

narrow view of its conduct and urging the Court to apply an evidentiary standard contrary to law. The Court should reject Agri Stats' flawed arguments for the following reasons:

**First**, Agri Stats urges the Court to confine its analysis to a review of six self-selected "books" of monthly reports that Agri Stats publishes. By focusing solely on those books, and considering each independently, Agri Stats argues that the Court can conclude that any anticompetitive harm comes solely from its sales reports. But Agri Stats' proposed approach is legally flawed and ignores the full scope of Agri Stats' information sharing. As one Agri Stats employee wrote, "████████████████████████████████████ ████████████████████████" Ex. 2 (AGS-0043729184). Although some of the most blatant examples of anticompetitive harm are linked to the sales reports, the evidence shows that a broader range of information and services provided by Agri Stats and used by processors harm competition.

**Second**, Agri Stats' motion incorrectly implies that Plaintiffs can prevail only by adducing direct evidence of market-wide price increases. This argument ignores controlling precedent holding that Plaintiffs can prove anticompetitive effects *either* through "[d]irect evidence . . . such as reduced output, increased prices, or decreased quality in the relevant market" *or* through "[i]ndirect evidence . . . of market power plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018); *see also In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 868-72 (D. Minn. 2025). Documentary evidence, deposition testimony, and multiple regression analyses by Plaintiffs' economic expert establish—both directly and indirectly—that Agri Stats' information exchanges helped processors raise prices.

2

***Third***, Agri Stats rehashes an argument from its motion to dismiss: that Plaintiffs' turkey and pork claims present no "justiciable case or controversy" because Agri Stats does not currently exchange information in those markets. Mot. at 26. Evidence obtained in discovery reinforces this Court's prior ruling rejecting this argument. As Agri Stats' President, Eric Scholer, testified, Agri Stats will " ██████████████████████████ ██████████████ " and " ██████████████████ " if processors ██████████ ██████████████████████ . Ex. 3 (Scholer Dep.) 180:6-181:6, 208:6-15. These claims remain justiciable.

***Finally***, Agri Stats seeks summary judgment on Plaintiffs' "claims against EMI." Mot. at 28. But EMI, Agri Stats' wholly owned subsidiary, is not a named party. To the extent Agri Stats seeks to exclude its subsidiary from injunctive relief the Court may ultimately order, that request is premature and unwarranted.

Plaintiffs respectfully request that the Court deny Agri Stats' motion.

## FACTUAL BACKGROUND

Agri Stats has, in its own words, operated "substantively identical" information exchanges in the broiler chicken, pork, and turkey markets for many years. Mot. at 5. These information exchanges have caused substantial harm to competition in each market.[1]

---

[1] Agri Stats' motion cites several purportedly undisputed facts not relevant to the Court's analysis of the issues. Plaintiffs' decision not to address in this memorandum any particular fact cited by Agri Stats does not mean Plaintiffs concede that fact is uncontested.

A.    **AGRI STATS AGREES TO EXCHANGE COMPETITIVELY SENSITIVE INFORMATION BETWEEN PROCESSORS.**

Agri Stats has entered into agreements with the largest broiler chicken, pork, and turkey processors to share their highly sensitive information regarding costs, production, and pricing with Agri Stats in exchange for access to the same information from their competitors. Agri Stats' broiler chicken subscribers accounted for over 95% of the broiler chicken products processed in the United States from 2007 through 2021. Ex. 4 (Rysman Report) at ¶ 150. Its pork subscribers accounted for 84% or more of all U.S. pork slaughter capacity from 2012 through 2018, including 89% in 2017. *Id.* at ¶ 174. And its turkey subscribers accounted for over 80% of all turkey products produced in the United States from 2007 through 2018, including 89% in 2015 and 2016. *Id.* at ¶ 194. Processors pay Agri Stats ▮▮▮▮▮▮▮▮ each year to participate in these information exchanges. *See* Ex. 5 (AGS-0000000098) at -103.

Agri Stats rarely puts its agreements with processors in writing. Instead, processors routinely send their most sensitive cost, production, and pricing information to Agri Stats pursuant to "▮▮▮▮▮▮▮▮" or "▮▮▮▮▮▮▮▮." Ex. 6 (Snyder Dep.) 272:18-273:6; Ex. 7 (Snyder *Broilers* Dep.) 53:8-54:22. Accordingly, there are few limits on how Agri Stats can share this information among competing processors. *See* Ex. 8 (McDaniel Dep.) 213:21-214:15 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮).

Participating processors provide Agri Stats with ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. Ex. 9 (Grismore Dep.) at 35:16-36:4. When a new

processor joins, Agri Stats ███████████████████████████████████████

███████████████████████████. *Id.* at 32:1-33:5, 35:16-36:4. Agri Stats then

████████████████████████ so processors can make "████████████" ████████████

████████████. *See* Ex. 10 (Agri Stats' Responses and Objections to Plaintiffs'

Requests for Admission) at Response 29; Ex. 11 (Dombrowski Dep.) 62:13-63:4. Agri

Stats generally requires each processor to █████████████████████████. Ex.

6 (Snyder Dep.) 19:20-23; *see also* Ex. 12 (AGSTAT-T-03358286) (████████████

████████████).

Participating processors know which competitors share information with Agri Stats.

Agri Stats ████████████████████████████in its reports. ECF 396-

20 at 3; *see also* Ex. 13 (Weatherford Dep.) 232:12-233:1. Agri Stats also briefs processors

on its efforts to increase participation. Ex. 14 (SMITHFIELD00655991) (████████

████████████████████████████████).

In some cases, Agri Stats ████████████████████████████

████████████████████████████████████████

████████████████████. *See, e.g.*, Ex. 15 (AGSTAT-09354898)

at -899 (████████████████████████████████

████████████████████████████████████████

████"); Ex. 16 (AGSTAT-T-03406400) at -402 (████████████

████████████████████████████████████████

████████████████████████.").

5

### B.    AGRI STATS' INFORMATION SHARING SCHEME IS NOT LIMITED TO AGRI STATS' STANDARD REPORTS.

Agri Stats suggests that its conduct is limited to publishing "six different 'books' . . . of reports." Mot. at 1, 16-20. This greatly understates the breadth and depth of Agri Stats' information sharing.

In addition to the six structured "books" Agri Stats acknowledges, the company creates any number of bespoke weekly and monthly reports for individual processors. For example, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████." Ex. 17 (AGS-0042683516) at -517-19. These include ████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████.[2] *Id.* ████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████.[3] *See, e.g.*, Ex. 18 (AGSTAT-T-03340299). The data shared is sometimes only ████████████. Ex. 13 (Weatherford Dep.) 45:21-46:10.

---

[2] Mr. Scholer purports to offer a ███████████████████████████████ ███████████████ *See* ECF 396-2 (Declaration of Eric Scholer) at ¶¶ 23-48. But Mr. Scholer ████████████████████████████████████. For example, Mr. Scholer testified that ████████████████████████████████████ ███████. Ex. 3 (Scholer Dep.) 153:19-154:24 (responding to a question about ████ ████████████████████████████.").

[3] Agri Stats account managers had discretion to ████████████████████ ████████. Ex. 8 (McDaniel Dep.) 213:21-214:15.

The information Agri Stats shares tracks a processor's entire operation. For example, for broiler chicken, Agri Stats collects and distributes information on ████████ ████████████████████████████████████████████████████████████ ████████████████████████" Ex. 19 (AGSTAT-00020237) at -240; *see also* ECF 396-12 (Agri Stats Ex. 13, Live Production Book at Rpt. 1.1 & 1.2) at -263-74.[4] Processors receive ████████████████████ as well as ████████████████████████████████ ████████████, giving processors insight into █████████████████████████ ████. *Id.* at Rpt. 1.2. Agri Stats also provides ████████████ so that processors can ████ █████████████████████████████████████████████. *Id.*

Other Agri Stats metrics allow processors to ████████████████████████ ████████████████████████████. Figures such as ████████████████████████ ████████ allow processors to ████████████████████████████████. *See* Ex. 20 (Donohue Dep.) 45:8-18, 116:22-118:6. Agri Stats employees also ████████████ ████████████████████████████████████████████████████████████████ ████████████████. *See* Ex. 21 (AGSTAT-09408655) at -677 ("████████████████ ████████████████████████████████████████████████████████████████ ████████"); Ex. 20 (Donohue Dep.) 226:16-228:15.

---

[4] Agri Stats claims it exchanges only ████████████████, but this metric is one of many examples of ████████████████████████████████████████████████████ ████████████████████. *Compare* ECF 396-2 (Scholer Decl.) at ¶¶ 9, 14 *with* Ex. 20 (Donohue Dep.) 38:12-40:22, 43:10-44:1.

Agri Stats provides broiler processors with the ███████████████████

████████████████████████████████████████████████████████. *See,*

*e.g.*, Ex. 22 (MTADOJ31562-00014579) at -583. Agri Stats also provides information

broken out by ███████████████████████████████████████████████

███████████████████████████████. *Id.* Agri Stats also published a "████████

██████████" report that ██████████████████████████, which closely correlate to

████. Ex. 23 (AGS-0040223759); Ex. 20 (Donohue Dep.) 221:1-222:5, 236:1-237:8.

To provide ██████████████, Agri Stats breaks down each processor's ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ so that

processors can ██████████████████████████████████████████████████.

ECF 396-11 (Agri Stats Ex. 12, Express Sales Book) at 170. A processor can learn ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████. *Id.* Often, at this level of granularity, the data shows ████████

██████████████████████. Ex. 24 (Rysman Rebuttal Report) at ¶ 240.

Agri Stats also provides reports ██████████████████████████████████

██████████████████. The "██████████████████" report ████████████████

███████████████████████████████████████████████████████████████

█████████████████████. Products with the most significant ████████████████

███████████████████████████████████████████████████████████████:

8



Ex. 4 (Rysman Report) at ¶ 442, Fig. 45. Similarly, Agri Stats provides processors with a

"████████████████" that allows processors to ████████████████████████

████████. *See, e.g.*, ECF 396-10 (broiler chicken customer sales report); ECF 396-23

(turkey customer sales report).

Processors can access additional sales information not included in the reports by

contacting Agri Stats directly. As discussed in detail below, processors can call their Agri

Stats representative for more details on competitor pricing, which can be used in

negotiations. *See, e.g.*, Ex. 18 (AGSTAT-T-03340299). ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████. Ex. 6 (Snyder Dep.) 293:15-294:6.

Agri Stats does not make this detailed and granular information available to

everyone interested in purchasing it. Ex. 13 (Weatherford Dep.) 185:2-13 ("█████████

████████████████████████████████████████████.");

*see also* Ex. 25 (AGSTAT-15204946) (████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████ "). Processors freely admit that the information they provide to Agri Stats (and thus to their competitors) is █████████████████████████████████████.

*See, e.g.*, Ex. 26 (Edwards Dep.) 142:6-22; Ex. 27 (Jackson *Turkey* Dep.) 118:23-119:3; Ex. 28 (Stone *Turkey* Dep.) 64:11-25. Agri Stats' information exchanges thus create an information asymmetry between processors and purchasers that processors exploit to raise prices.

### C.     AGRI STATS HELPS PROCESSORS RAISE PRICES.

Agri Stats allows processors to monitor each other's confidential and non-public production, pricing, and profits in a way purchasers cannot. This market visibility allows processors to precisely target price increases for times when the market is particularly susceptible, sustain higher prices for longer, and raise the price floor by flagging for processors those products that are substantially underpriced relative to competitors. This has resulted in higher prices, even if processors do not rely on Agri Stats for all pricing and production decisions.

### 1.   Documents and Testimony Demonstrate that Processors Regularly Relied on Information Exchanged Through Agri Stats to Raise Prices.

Processors in the broiler chicken, turkey, and pork industries regularly used Agri Stats to monitor and act on opportunities for price increases. For example:

**Broiler Chicken:**

- ████████████████████████████████████
  ████████████████████████████████████
  ████████████████████ Ex. 29 (Price *Broilers* Dep.) 57:14-58:5.

10

- ████████████████████████████████████████████
  ██████████████████████████████████. Ex. 46 (FF-BC-
  00018752).

- ████████████████████████████████████████████
  ████████████████████████████. Ex. 31 (PILGRIMS-
  0005938913); Ex. 32 (PILGRIMS-0005939590).

- ████████████████████████████████████████████
  ████████████████████████████████████. Ex. 33
  (SAFM-00152444).

- ████████████████████████████████████████████
  ████████████████████████. Ex. 34 (FIELDALE_1401008).

**Turkey:**

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████" Ex. 35
  (CMS0000011947).

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████. Ex. 36 (PERDUE0000245268).

**Pork:**

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████. Ex. 4 (Rysman Report)
  at ¶¶ 330-335.

- ████████████████████████████████████████████
  ████████████████████████████████. Ex. 37 (JBS-PORK-00035611).

- ████████████████████████████████████████████
  ████████████████████████████████████████. Ex. 38
  (SBF0088132).

Agri Stats regularly highlighted specific opportunities for processors to raise prices.

For example, Agri Stats account manager Chuck McDaniel told House of Raeford, a broiler

11

chicken processor, that ██████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████" Ex. 39 (AGSTAT-14731071). Agri Stats account

manager Stacey Edwards highlighted for Farbest, a turkey processor, ███████████

████████████████████████████████████████████████████████

███████████████████████████████." Ex. 40 (FARBEST0000604229). Ms.

Edwards even identified ██████████████████████████████████████

█████████████. *Id.* As account manager Mike Donohue noted in an internal email to Brian

Snyder, helping a processor "████████████████████████████████████

███████████████████████. Ex. 41 (AGSTAT-09353483).

Processors regularly relied not only on Agri Stats' sales reports and data, but also

on Agri Stats' production and supply-related information to allow them to control prices.

For example, Tyson received ███████████████████████████████████

████████████████████████████████████████████████████████

███████████████████. Ex. 42 (TF-0007878967). Butterball employees similarly used ████

████████████████████████████████████████████████████████

██████████████████████████████████. *See, e.g.*, Ex. 43 (BB001391778). That

information—which was only available through Agri Stats—confirmed for Butterball that

12

████████████████████████████████████████████

████████████. Ex. 44 (Canale *Turkey* Dep.) 118:4-12, 120:8-18.[5]

## 2. Plaintiffs' Expert Analyses Confirm that Agri Stats' Conduct Has Harmed Competition in the Broiler Chicken, Pork, and Turkey Markets.

The record evidence showing processors utilizing Agri Stats to raise prices is confirmed by expert testimony. Professor Marc Rysman, a PhD economist and professor at Boston University, relied on peer-reviewed economic literature discussing the effect of information exchanges on competition to analyze whether the unique features of Agri Stats' information exchanges can harm competition. Ex. 4 (Rysman Report) at § V. Professor Rysman then reviewed the substantial record compiled in this case and explained in detail how meat processors in fact *do* use Agri Stats' information exchange to harm competition as economic theory predicts. *Id.* § VI, App'x G.

Professor Rysman also conducted a series of econometric analyses to further assess the economic impact of Agri Stats' information exchanges. In the broiler chicken market, where Agri Stats continues to operate an information exchange, empirics confirmed that processors systematically used competitor sales information received from Agri Stats to raise prices. Specifically, Professor Rysman determined that processors are disproportionately more likely to increase prices on products that Agri Stats identifies as relatively low-priced than they are to decrease prices on relatively high-priced products. *Id.* at ¶¶ 339-347. Professor Rysman also analyzed the impact of Agri Stats' suspension of

---

[5] The record contains numerous other examples of similar conduct, some of which are provided in Professor Rysman's report. *See* Ex. 4 (Rysman Report) at ¶¶ 473-491. Plaintiffs reserve the right to rely on these and all other record evidence at trial.

information exchanges in the pork, bacon, and turkey markets—an analysis not limited to the sales reports—and found that for each protein, prices fell after Agri Stats stopped sharing competitor information. *Id.* ¶¶ 371, 415.[6]

## D.    AGRI STATS INTENDS TO RESUME PORK AND TURKEY REPORTING.

Agri Stats suspended its turkey program and most of its U.S. pork program in 2019 ███████████████████████████████████. Ex. 6 (Snyder Dep.) 81:19-82:14. However, Agri Stats maintains both the ability and intention to restart these programs after litigation concludes.

Agri Stats' President, Eric Scholer, testified that t███████████████████████ ███████████████████. Ex. 3 (Scholer Dep.) 180:6-181:6. Agri Stats has ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. Ex. 6 (Snyder Dep.) 83:13-84:12. Agri Stats maintains contact to this day with those same turkey processors to "████████████████." *Id.* at 87:19-88:8. ████████████████████████████████████████ ████████████████████████████████████████

---

[6] In addition, because there was a clear "start" date for Agri Stats' bacon information exchange program—unlike other pork products, turkey, and broiler chicken—Professor Rysman was also able to confirm that prices *rose* when that program began. Ex. 4 (Rysman Report) ¶ 371.

██████████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* at 88:10-17.[7]

Agri Stats likewise has retained the interest and ability to restart those parts of its pork programs that have been suspended. Although processors stopped sending Agri Stats pork processing and sales data in the United States, Agri Stats continues to ███████████

████████████. Ex. 6 (Snyder Dep.) 84:20-85:15. Agri Stats has similarly engaged with processors in the United States who stopped sharing data on pork processing and sales. For instance, in September 2023, Agri Stats discussed a sales plan intended to "███████████

███████████████████████████████████████████████████. *Id.* at 202:9-12; Ex. 45 (AGS-0041653376). ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████. Ex. 3 (Scholer Dep.) 203:17-204:4.

Faced with the considerable evidence showing Agri Stats has repeatedly planned for restarting these programs, Agri Stats claims in its briefs that it is incapable of restarting because it does not have data. That is a red herring. Agri Stats ██████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████. Ex. 9 (Grismore Dep.) 24:25-25:8, 43:19-44:15. If and when processors sign up, Agri Stats will get ████████████████████

███████████████████████████████████████████. *Id.* Agri Stats has also routinely

---

[7] *See* https://www.eatturkey.org/leadership/ (last visited Nov. 16, 2025).

██████████████████████████

████████████. *See, e.g.*, Ex. 26 (Edwards Dep.) 48:4-23. And many former Agri Stats pork and turkey subscribers maintain a relationship with Agri Stats by subscribing to its ongoing broiler chicken services. *Infra* at pp. 40-41.

## LEGAL STANDARD

As the party moving for summary judgment, Agri Stats must show "there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party[.]" *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010). The Court "must view the facts in the light most favorable to" Plaintiffs and give them "the benefit of all reasonable inferences that can be drawn from those facts." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1051 (D. Minn. 2009) (Tunheim, J.).

## ARGUMENT

Agri Stats' summary judgment motion challenges the sufficiency of the evidence supporting the merits of Plaintiffs' claims related only to its broiler chicken program (Count I). It confines its motion on the pork and turkey claims (Counts II and III) to an argument that those claims are not justiciable because Agri Stats suspended those programs several years ago. Plaintiffs' response therefore focuses on (1) the evidence showing that Agri Stats' information sharing program in broiler chicken has caused substantial actual or likely anticompetitive effects, and (2) evidence of Agri Stats' interest and ability to restart its pork and turkey programs, which threaten similar future harm in those markets.

I.    **AGRI STATS' INFORMATION EXCHANGES HAVE SUBSTANTIALLY REDUCED COMPETITION AND LED TO HIGHER PRICES.**

Agri Stats' summary judgment motion presents this Court with a strawman argument that fails to consider the actual conduct at issue or that conduct's demonstrated anticompetitive effects. Agri Stats' information sharing schemes involve substantially more than the publication of six books of reports—they involve the collection of comprehensive details of each competitor and the indiscriminate sharing of that information in a variety of ways for the benefit of the whole industry. Documentary evidence shows processors routinely used Agri Stats' programs to raise prices and econometric analyses confirm that Agri Stats' programs lead to higher prices.

A.    **The Court Should Reject Agri Stats' Attempts to Restrict and Compartmentalize the Record Evidence.**

Agri Stats' motion rests on two flawed propositions: first, that the Court must confine its review of the evidence to six principal "books" that Agri Stats produces, ignoring all the other ways in which Agri Stats shares information among competitors, and second, that the Court should examine each book individually and in isolation, ignoring the information exchanges' overall anticompetitive effects. Each proposition should be rejected.

"[W]hen a plaintiff alleges that a scheme or course of conduct was anticompetitive, the scheme or conduct must be considered as alleged, not in manufactured subcategories." *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024). "In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after

scrutiny of each," as Agri Stats would have the Court do here. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)) (cleaned up).

As this Court has already recognized, "Plaintiffs' claims, as pleaded, allege that the information in Agri Stats reports *in conjunction with its other services* constitute the sharing of competitively sensitive information among competitors." ECF 364 at 8 (emphasis added). There is no evidence that Agri Stats' agreements with processors are somehow limited to the publication of six "books" of reports. The record abounds with evidence of Agri Stats exchanging information via telephone calls and emails, in-person and remote review sessions, industry updates, data downloads, and other special reports and projects. *See supra* at pp. 6-13.

Agri Stats has tried to reframe this case to exclude the full scope of its conduct under review and then explain away the small portion of its conduct that it selectively acknowledges. This flawed approach is contrary to law. *See Cont'l Ore Co.*, 370 U.S. at 699; *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1207-08 (8th Cir. 1982) (rejecting defendants' attempts to "[p]iece by piece . . . explain away the record evidence," and instead looking to the "totality of the record"). The Court should reject Agri Stats' attempts to restrict its analysis to a portion of Agri Stats' conduct and should instead consider the full record.

**B.     Direct and Indirect Evidence Support Plaintiffs' Allegations.**

Information exchange claims are evaluated using the rule of reason, which employs a multi-step burden shifting process. *See In re Pork*, 781 F. Supp. 3d at 867 ("A standalone information exchange itself can constitute a § 1 violation, even without proof of an agreement to fix prices, if it tends to lead to anticompetitive effects") (citing *United States v. Container Corp.*, 393 U.S. 333, 334 (1969)). Plaintiffs have "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* (quoting *Amex*, 585 U.S. at 541). If Plaintiffs meet that burden, Agri Stats then bears the burden "to show a procompetitive rationale for the restraint." *Id.* at 867-68 (quoting *Amex*, 585 U.S. at 542). Then, "the burden shifts back to the plaintiff to demonstrate the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 868.[8] Here, Agri Stats challenges the sufficiency of Plaintiffs' evidence regarding only the first step: whether Plaintiffs can show that Agri Stats' information exchange in the broiler chicken market has a "substantial anticompetitive effect."[9]

---

[8] These "steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis." *Nat'l Collegiate Athletic Assoc. v. Alston*, 594 U.S. 69, 97 (2021). In addition, even where a "plaintiff's case comes up short at step three, the district court must . . . balance the restriction's anticompetitive harms against its procompetitive benefits." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 994 (9th Cir. 2023).

[9] Agri Stats suggests in a footnote that "Plaintiffs and their experts fail entirely to address the 'procompetitive purposes' of Agri Stats reports" and therefore their claims fail at the remaining steps of the burden shifting framework. Mot. at 13 n.3. Of course, it is *Agri Stats*' burden, not Plaintiffs', to present evidence of procompetitive effects, which it has not done. *Amex*, 585 U.S. at 541. Agri Stats does not develop this flawed argument at all in its motion, seek any ruling from the Court on the argument, or even explain why it

Although Agri Stats agrees that the rule of reason applies, it severely misstates how that analysis is to be applied at its first step. In *American Express*, the Supreme Court ruled that plaintiffs can satisfy the first step in one of two ways: *first*, by "direct evidence" of anticompetitive effects, meaning "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality"; or, *second*, by "[i]ndirect evidence," meaning "proof of market power plus some evidence that the challenged restraint harms competition." *Amex*, 585 U.S. at 542 (cleaned up); *see also Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) (indirect evidence includes market power plus "ground[s] for believing that the challenged behavior could harm competition in the market").[10] Evidence the challenged restraint harms competition "need not always be extensive or highly technical," and can include whether the "defendant's conduct, as a matter of economic theory, harms competition." *Epic Games*, 67 F. 4th at 983.

---

believes Plaintiffs have an affirmative burden at summary judgment to proffer evidence addressing procompetitive benefits or any subsequent rule of reason steps that Agri Stats did not move on. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 848 n.2 (8th Cir. 2002) (rejecting cursory footnote argument); *Falco Lime, Inc. v. Tide Towing Co.*, 29 F.3d 362, 367 n.7 (8th Cir. 1994) (same).

In any event, Professor Rysman testified that ███████████████████████████ ███████████████████████. *See* Ex. 72 (Rysman Dep.) 341:20-343:12, 419:19-420:21. Tellingly, ██████████████████████. *See* Ex. 73 (Nguyen Dep.) 22:21-23:6 ("████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.").

[10] Agri Stats' motion does not challenge the sufficiency of Plaintiffs' evidence of anticompetitive effects in the turkey and pork markets, Plaintiffs' market definition in all three markets at issue, or that Agri Stats' subscribers had market power in those markets.

Ignoring governing law, Agri Stats argues that information exchanges are evaluated under a different standard that can be satisfied only through direct econometric evidence "that the exchange resulted in a market-wide price increase or output reduction." Mot. at 14. But courts reviewing information exchanges regularly hold that anticompetitive effects can be proven by either the direct or indirect evidence described in *Amex*. *See, e.g.*, *In re Pork*, 781 F. Supp. 3d at 868 (plaintiffs' burden on an information exchange claim "can be satisfied with a showing of direct or indirect evidence"); *Brown v. JBS USA Food Co.*, 773 F. Supp. 3d 1193, 1224 (D. Colo. 2025) (ruling that plaintiffs can establish anticompetitive effects in an information exchange claim "directly" or "indirectly"); *In re Local TV Advertising Antitrust Litig.*, 2020 WL 6557665, at *13 (N.D. Ill. Nov. 6, 2020) (ruling on information exchange claim that "[p]laintiffs can show proof of anticompetitive effects either directly or indirectly").[11] Agri Stats' insistence that a plaintiff can prove anticompetitive effects only through a "before-and-after" regression analysis showing net price increases is inconsistent with what the law requires. *See United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993) (allowing proof of anticompetitive effects by market power and other means because proof of actual higher prices "is often impossible to make . . . due

---

[11] Agri Stats argues that information exchanges bear a "presumption of legality." Mot. at 12. To the extent Agri Stats suggests a special heightened standard of evidence applies to Plaintiffs' claims, that is incorrect. Challenges to information exchanges are subject to the same "rule of reason" analysis that applies to most antitrust claims. *In re Pork*, 781 F. Supp. 3d at 800 ("[I]nformation exchanges are evaluated under the rule of reason.") (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)); *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *9 (D. Md. Sept. 16, 2020) (plaintiffs bear the burden of "establish[ing] that the putative information exchange has an overall anticompetitive effect") (quoting *Todd*, 275 F.3d at 198-99).

to the difficulty of isolating the market effects of challenged conduct"); *see also Fishman v. Est. of Wirtz*, 807 F.2d 520, 536 (7th Cir. 1986) ("The antitrust laws are concerned with the competitive *process*, and their application does not depend in each particular case upon the ultimate demonstrable consumer effect."); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1101 (1st Cir. 1994) (finding a rule anticompetitive because "regardless of the exact price effects," it could "injure[] competition by making the relevant market unresponsive to consumer preference") (cleaned up).

This Court's holding in *Pork* is consistent with this approach. The Court expressly recognized that plaintiffs can show substantial anticompetitive effects by either "direct or indirect evidence." *In re Pork*, 781 F. Supp. 3d at 867-68. It thus considered record evidence, including "qualitative analysis," at length before turning to the plaintiffs' regression analysis and finding that it "bolstered" other evidence that Agri Stats' information exchange harmed competition and left "a genuine issue of material fact" precluding summary judgment. *Id.* at 871-72.

The central question at the first step of the rule of reason is whether the "challenged restraint has a substantial anticompetitive effect." *Amex*, 585 U.S. at 541. Here, Plaintiffs have compiled an extensive record of documentary evidence, deposition testimony, and expert economic analysis, that overwhelmingly shows the answer to that question is *yes,* Agri Stats' information sharing has harmed competition.

**C.    Agri Stats' Information Exchange Had a Substantial Anticompetitive Effect in the Broiler Chicken Market.**

The record shows that Agri Stats' information exchanges have harmed competition. First, contemporaneous record evidence shows how broiler chicken processors use Agri Stats to restrain competition and raise prices. Second, expert analysis confirms empirically that processors are more likely to use Agri Stats to raise, rather than lower, prices. Third, similar record evidence and expert analyses show how pork and turkey processors also used Agri Stats to raise prices.

**1.    Documentary Evidence Show That Broiler Chicken Processors Frequently Used Agri Stats Information to Identify and Implement Price Increases.**

Documentary evidence and testimony show that processors regularly used Agri Stats information to raise prices and not to lower them. For instance, Professor Rysman studied a February 2010 initiative by Tyson to ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. Ex. 29 (Price *Broilers* Dep.) 57:14-58:5. ████████████████████████████ ████████████████████████████████████████████████ ██████. Ex. 4 (Rysman Report) at ¶¶ 312-319.

Similarly, after joining Agri Stats' sales reports in 2014, Foster Farms regularly identified ██████████████████████████████████████████ ████████████████████████████████████████████████

23

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████. Ex. 46 (FF-BC-00018753); *see also* Ex. 4

(Rysman Report) at ¶ 475. Similarly, Pilgrim's Pride ██████████████████████

██████████████████████████████████████████. *Id.* at ¶ 476.

Sanderson Farms held ████████████████ in which it ████████████████████

██████████████████████████████████. *Id.* at ¶ 475. Perdue

was even more explicit, instructing its sales staff that ████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████" Ex. 47 (PERDUETKY0000471309) at -310.

Not only did processors systematically use Agri Stats to identify opportunities to

raise prices, but there is no evidence they did the opposite. For example, a sales executive

at Tyson, the largest broiler processor in the United States, testified that ████████████

████████████████████████████████████████████████. Ex. 29

(Price *Broilers* Dep.) 220:9-14. Another broiler chicken sales executive at Koch Foods

testified ████████████████████████████████████████████████████████

██████████████████████████████████. *Compare* Ex. 48 (Tolbert

Dep.) 57:22-58:2 ("██████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████") *with id.* at 60:23-61:3 ("████████████████████

█████████████████████████████████████████████████████████

███.").

Agri Stats argues that Plaintiffs have no evidence of harm to competition from any of its conduct outside of its sales reports. Mot. at 16-20. Not so. Processors use the granular and recent information in Agri Stats Live and Processing reports to forecast future supply in the broiler chicken market and to make supply decisions consistent with that information. *See* Ex. 4 (Rysman Report) at ¶¶ 216-33. For example, when asked in an earnings call whether Sanderson Farms would increase production, then-CEO Joe Sanderson stated he would not because his competitors would not: "[B]ased on what I see in Agri Stats nobody is planning on, pullet placements say no ramp up [. . .] I see a lot of information from Agri Stats that tells me that nobody is going to ramp up" production levels. Ex. 49 (Sanderson-0002633942) at -962. On that call, Sanderson repeatedly referenced Agri Stats data broken down by segments like bird debone and tray pack when making inferences about future broiler chicken supply. *See id.* at -949-50, -954-55.[12]

Tyson used the information to the same effect. In 2014, Tyson shared ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████." Ex. 41 (AGSTAT-09353483); Ex. 20 (Donohue Dep.) 345:17-354:17. Mr. Donohue regularly sent "████████████" to broiler

---

[12] Mr. Sanderson gave conflicting testimony about this statement, first testifying that ████ ████████████████████████████████████████████████████████████. *Compare* Ex. 50 (Sanderson Feb. 11, 2021 *Broilers* Dep.) 241:4-242:7 *with* Ex. 51 (Sanderson Feb. 12, 2021 *Broilers* Dep.) 544:21-546:19. This discrepancy highlights that credibility and factual determinations remain to be made at trial.

chicken processors that include ██████████████████████████. *Id.* at

207:13-208:4. ████████████████████████████████████████████████

████████████████████." Ex. 52 (AGSTAT-15296766). ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████" Ex. 42 (TF-

0007878967). ████████████████████████████████████████████████

██████████████████." *Id.*

     This documentary evidence and testimony create a genuine dispute of material facts

related to the anticompetitive effects of all Agri Stats' conduct—not just the sales reports.

*E.g.*, *Le v. Zuffa, LLC*, 2024 WL 195994, at *4-6 (D. Nev. Jan. 18, 2024) (denying summary

judgment where witness testimony and documentary evidence "establish[ed]" the

"anticompetitive conduct").

        **2.    Economic Analysis Confirms That Agri Stats' Information Exchanges Systematically and Disproportionately Yielded Price Increases in the Broiler Chicken Market.**

     Plaintiffs' economic expert also confirmed empirically a specific way in which

processors systematically use information exchanged through Agri Stats to raise prices.

Each month Agri Stats provides each processor with a sales report that includes "█████████

████████████████████████████████████████████████████████████████

███████. Professor Rysman showed that the top ten items on each processor's █████████

26

██████████████ are approximately twice as likely to experience price increases the following month than products in the bottom ten are to experience price decreases. Ex. 4 (Rysman Report) at ¶ 346.

Agri Stats argues that the economic impact rank regression says "nothing about whether market-wide broiler chicken prices were higher, lower, or unchanged as a result of Agri Stats reports." Mot. at 21. This argument misconstrues the law and ignores what the analysis actually shows. The requirement to demonstrate market-wide harm means that a plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). None of the cases Agri Stats cites stand for the proposition that Plaintiffs can *only* prove anticompetitive effects through a regression analysis showing average price increases on all consumers in a market.[13] In any event, the economic impact regression is

---

[13] In *Continental Cablevision of Ohio, Inc. v. American Electric Power Co.*, the court found "the exchange of price information had no anticompetitive effect" not because plaintiffs' economic analysis failed to show a net price increase, but because "the parties stipulated that no competition exists among them." 715 F.2d 1115, 1119 (6th Cir. 1983). Agri Stats also cites *Todd v. Exxon* and its progeny to claim that Plaintiffs must "prove price effects." Mot. at 13-14. But *Todd*, decided at the motion to dismiss stage, simply held that to succeed in proving its claim, a plaintiff in an information exchange case must make a "substantial presentation of evidence." 275 F.3d at 214. It says nothing about what *type* of evidence suffices or how much is "substantial." The claims in *In re Compensation of Managerial, Professional & Technical Employees Antitrust Litigation* were dismissed at summary judgment for failure to prove a "relevant market and market power"—issues Agri Stats does not challenge in its motion. 2008 WL 3887619, at *2, *8-10 (D.N.J. Aug. 20, 2008). Finally, in *Five Smiths, Inc. v. National Football League Players Association* the court relied on the market structure and nature of the information exchange—not the absence of market-wide empirical evidence—in granting defendants' motion to dismiss. 788 F. Supp. 1042, 1054-55 (D. Minn. 1992). In fact, the court noted that the information exchange was

evidence of market-wide harm because it demonstrates how processors systematically used Agri Stats to raise prices. Moreover, the economic impact regression is far from Plaintiffs' only evidence of harm to competition in the broiler chicken market.

Professor Rysman's conclusion is also consistent with his application of economic theory to the facts at issue, which is further evidence that Agri Stats harms competition. Providing competitors with meaningful insight into their rivals' strategic decisions and choices ("market observability") softens competition and can lead to price increases. Ex. 4 (Rysman Report) at ¶¶ 83-86. Those effects hold true "even if the information exchanged reveals an average of rivals' prices, rather than the exact price set by each rival." *Id.* at ¶ 86. The effects are exacerbated by information asymmetry that can tilt the negotiating playing field towards the side with the information advantage—the processors who are exchanging their information through Agri Stats. *Id.* at ¶¶ 104-122.[14]

---

unlikely to harm competition because it eliminated information asymmetries, precisely the opposite of what Agri Stats' information exchanges do. *Id.* at 1055.

[14] Courts regularly treat economic theory as relevant evidence of anticompetitive effects. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 96 (E.D.N.Y. 2024) ("[theoretical] evidence is not precluded from supporting an indirect case" of anticompetitive effects); *see also In re Pork*, 781 F. Supp. 3d at 871 (crediting plaintiffs' expert's "qualitative analysis that [Agri Stats'] information exchange had problematic features that are associated with anticompetitive effects") (cleaned up). *Procaps S.A. v. Patheon, Inc.* does not support Agri Stats' contention that "theory is not evidence." Mot. at 18. The *Procaps* court recognized that anticompetitive effects can be established *either* directly or indirectly and simply held that "theoretical effects *stated only at the highest level of abstraction*" are not direct evidence of an *actual* detrimental effect on competition. 845 F.3d 1072, 1084-85 (11th Cir. 2016) (emphasis added).

### 3. Empirical and Documentary Evidence from the Pork and Turkey Markets Further Demonstrate That Agri Stats' Information Exchanges Are Anticompetitive.

Agri Stats ignores entirely Plaintiffs' evidence relating to the pork and turkey markets, offering only the conclusory argument that evidence from those markets "prove[s] nothing about market-wide price effects in the separate alleged market for chicken products." Mot. at 17 n.4. Agri Stats' unsupported assertion is wrong.

Agri Stats admits that its information exchanges in broiler chicken, pork, and turkey "were substantively identical." Mot. at 5; *see also* ECF 396-2 (Scholer Decl.) at ¶ 20. Accordingly, evidence showing that Agri Stats' information exchanges resulted in higher prices in the pork and turkey markets is *highly* probative of whether Agri Stats also caused higher prices in the broiler chicken market. Courts regularly compare outcomes in related or analogous markets to determine the existence or magnitude of an anticompetitive effect in an at-issue market. *See Epic Games*, 67 F. 4th at 985 (affirming district court's finding of indirect evidence of anticompetitive effects where a similar market provided a "vivid illustration" of effects of challenged conduct); *see also Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *7-10 (N.D. Ill. Mar. 29, 2023) (comparing markets affected by challenged restraint to similar markets unaffected by those restraints was a reliable methodology to prove existence and magnitude of anticompetitive effects); *In re Dealer Mgmt. Sys.*, 581 F. Supp. 3d 1029, 1073 (N.D. Ill. 2022) (same).

Here, the evidence points in one direction. Because Agri Stats suspended its turkey and pork programs after the filing of private antitrust litigation in 2019, a natural experiment exists that does not exist in broiler chicken: did prices go up or down once

29

competitors stopped sharing information through Agri Stats? Professor Rysman, using well-accepted economic methodologies, ran "before-and-after" regressions showing the price impact that Agri Stats had on the turkey and pork markets (including a bacon-specific report Agri Stats offered between 2011 and 2018). Ex. 4 (Rysman Report) at ¶¶ 13, 365. The results are stark: Professor Rysman estimated that pork prices decreased up to █████% when pork processors stopped participating in Agri Stats, that turkey prices decreased by up to ████% when turkey processors stopped participating in Agri Stats, and that bacon prices decreased by up to ████% after Agri Stats ended the bacon program. *Id.* at ¶¶ 371, 395 n.652; Ex. 24 (Rysman Rebuttal Report) at ¶ 185. Significantly, those regressions were not limited to the effect of Agri Stats' sales reports—they evaluated the effects of the *entirety* of Agri Stats' conduct. The Court can and should consider this analysis of Agri Stats' conduct in the pork and turkey markets as evidence of the effect of its "substantively identical" conduct in the broiler chicken market.

Ordinary-course documents from turkey and pork processors further confirm Professor Rysman's conclusions. For instance, internal Cargill sales presentations made clear Cargill used Agri Stats to "████████████████████████████████████." Ex. 53 (CMS0000126638) at -670. Cargill used that "██████████" to raise prices. ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████. Ex. 35 (CMS0000011947). ████████████████████████████████████

████████████████████████████████████████████. Ex. 54 (CMS0000037481).

Other examples abound. Professor Rysman analyzed how Perdue used Agri Stats' information to ███████████████████████████████████████ ███████████████████████████████████████. Ex. 4 (Rysman Report) at ¶¶ 320-329. Pork processors did the same: in 2016 and 2017, Agri Stats' account managers regularly highlighted ████████████████████████████ ███████████████████████████████████████. *Id.* at ¶¶ 330-335.

Similarly, pork and turkey processors regularly used industry-wide supply insights gleaned from Agri Stats reports to inform their own production decisions. For example, Butterball employees used Agri Stats ████████████████████████████████ ███████████████████████████████████. *See, e.g.*, Ex. 43 (BB001391778). Internal Butterball market projections stated that "██████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████" *See* Ex. 55 (BB001786480); Ex. 56 (BB001786481); Ex. 57 (AGSTAT-T-03350092) at -096. One Butterball employee testified that ██████████████████ ███████████████████████████████████████████████ █████████████████████. Ex. 44 (Canale *Turkey* Dep.) 118:4-12, 120:8-18.

In sum, evidence shows that processors in the pork and turkey industries used Agri Stats in the same manner as broiler chicken processors did, and that Agri Stats' "substantively identical" conduct led to anticompetitive effects in those markets. That

evidence is further support for Plaintiffs' broiler chicken claims, which should proceed to a full trial on the merits.

### D.    The Nature of Agri Stats' Information Exchange Poses a Substantial Threat to Competition.

In addition to the evidence showing how processors used Agri Stats to raise prices and confirming empirically that high prices in fact resulted, the features of Agri Stats' information-sharing scheme themselves—in light of the market power of its subscribers— further support the conclusion that Agri Stats' conduct poses a threat to competition. As this Court held in *Pork*, "information exchanges with certain features have the potential to generate anticompetitive effects. Such features include the sensitivity of the data, its granularity, whether the data is publicly available, and the contemporariness of the information that is exchanged." *In re Pork*, 781 F. Supp. 3d at 869 (citing cases). And just as the Court previously found in *Pork*, these factors all indicate that Agri Stats' information exchange "pose[s] a threat to competition for a myriad of reasons." *Id.*

**Market Power.** As in *Pork*, there is no genuine dispute here that the broiler chicken participants in Agri Stats' information exchange possess collective market power. *See id.* at 868; *see also Container Corp.*, 393 U.S. at 336-37 (finding information exchange illegal where the participants accounted for "about 90%" of the output in the relevant market). Agri Stats' broiler chicken subscribers accounted for over 95% of the broiler chicken products processed in the United States from 2007 through 2021 and still exceeded 75%

as of 2023. Ex. 4 (Rysman Report) at ¶ 150.[15] Moreover, there are high barriers to entry in the broiler chicken market. *See* Ex. 4 (Rysman Report) at ¶¶ 151-155.

**Sensitivity and Granularity.** The information exchanged among processors via Agri Stats includes each company's most granular cost, production, sales, and pricing data ████████████████████████████████████████████████. Ex. 9 (Grismore Dep.) 35:16-36:4. Processors freely admit that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████. *See, e.g.*, Ex. 26 (Edwards Dep.) 142:6-22; Ex. 27 (Jackson *Turkey* Dep.) 118:23-119:3; Ex. 28 (Stone *Turkey* Dep.) 64:11-25.

Agri Stats has argued that its information exchange *cannot* harm competition because its reports are aggregated and anonymized. As this Court previously noted, however, information exchanges "that provide only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors." *In re Pork*, 781 F. Supp. 3d at 870-71. The "legality of information exchanges that report only aggregated data depends on whether the information tends to suppress competition, not on the format of the reported data." *Id.* (citing *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 390 (1923)). The record, including Professor Rysman's regression analysis that focused on sales data exchanged in the broiler chicken market shows that processors used

---

[15] Agri Stats' subscribers in its turkey and pork information exchanges similarly possessed collective market power. *See* Ex. 4 (Rysman Report) at ¶ 174 (pork subscribers accounted for 84% or more of all U.S. pork slaughter capacity from 2012 through 2018), ¶ 194 (turkey subscribers accounted for over 80% of all turkey products produced in the United States from 2007 through 2018).

anonymized and aggregated data from Agri Stats to systematically raise prices—concrete evidence of harm to competition.

Agri Stats offers whole market visibility to processors. This begins with detailed information ██████████████████████████████████████████████████ ████████████████████████████████████████████████. For broiler chicken, Agri Stats has also ███████████████████████████ ████████████████████████████ (not in the principal "books"). *See* Ex. 20 (Donohue Dep.) 235:3-237:21. This information gave processors insight into conditions influencing their ability to raise prices. *See id.* at 226:16-227:16. ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

Agri Stats' information exchange is *not* limited to its reports. Agri Stats' account managers have a long history of disclosing competitively sensitive information not available in reports. In one example, in 2014, a █████████████████████████████████, ████████████████████████████████████████████████████

34

██████████████████████████████████████████████████████." Ex. 18

(AGSTAT-T-03340299) at -300. ███████████████████████████

████████████████████████████████████████████████

████████████r:

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

*Id.* at -299.

    Ms. Edwards testified that ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████. Ex. 26 (Edwards Dep.) 219:9-

15.[16] When presented with this exchange at deposition, both Ms. Edwards and Agri Stats'

---

[16] Ms. Edwards' deposition testimony directly contradicts Agri Stats' declaration, submitted by Eric Scholer, which claims that Agri Stats provides processors with only information "based on the same underlying data that otherwise exists in the already provided reports." ECF 396-2 at ¶ 43.

President, Brian Snyder, refused to say that 

. *Id.* at 219:17-220:11; Ex. 6 (Snyder Dep.)

292:18-295:14.[17]

**Public Availability.** In evaluating information exchanges, courts have recognized

that "[p]ublic dissemination is a primary way for data exchange to realize its

procompetitive potential." *Todd*, 275 F.3d at 213. That is because "in negotiations between

a buyer and seller, if one side has information that the other does not, the side with more

information often benefits." Ex. 4 (Rysman Report) at ¶ 104. Evidence that an information

exchange is asymmetrical and benefits only one side of a transaction supports finding that

the exchange has anticompetitive effects. *See FTC v. Indiana Fed. of Dentists*, 476 U.S.

447, 459 (1986); *see In re Pork*, 781 F. Supp. 3d at 869-870 (information asymmetry can

be evidence of the "potential threat to competition" of information exchanges).

Agri Stats' does not allow protein purchasers or others not "allied" with the

processors to subscribe to its programs. Ex. 13 (Weatherford Dep.) 185:2-13 (█████████

█████████████████████████████████████████████████████████████████).

The reason is clear: as Agri Stats' account manager Chuck McDaniel wrote in an email

denying access to a protein purchaser, "[█████████████████████████████████

---

[17] Agri Stats' only written policy governing confidential information is █████████

█████████████████████████████████████████████████████████████████████

████. *See, e.g.*, Ex. 58 (Edwards *Turkey* Dep.) 86:4-87:25; Ex. 11 (Dombrowski Dep.)

135:13-20. ███████████████████████████████████████████████████████████

████████████████████████. *See, e.g.*, Ex. 9 (Grismore Dep.) 80:21-82:3.

███████████████████████████████████████████████████████████

████████████████████████████████████████.” Ex. 25 (AGSTAT-15204946);

*see also* Ex. 59 (AGSTAT-14583861) (“████████████████████████████████

████████████████████████████████.”). ███████████████████████████

█████████████████████████████████████████████. *See* Ex. 60

(Leitch Dep.) 44:15-45:9 (“████████████████████████████████████████

████████████████████████████████.”); Ex. 61 (Miller Dep.)

194:3-194:19 (“██████████████████████████████████████████████████

███████████████████████████████████████.”).

**Contemporariness.** Agri Stats maintains and distributes timely data between and

among competitors. Agri Stats' monthly reports include data that is generally between ██

████████████. *See, e.g.*, Ex. 62 (AGSTAT-02795682) at -684. Some data is forward-

looking: ████████████████████████████████████████████████████████

████████████████████████████. *See* Ex. 4 (Rysman Report) at ¶ 222;

*see also* Ex. 19 (AGSTAT-00020237) at -240 (the purpose of the breeder placement

metrics is to “████████████████████████████████”). Agri Stats also distributes a

wide number of weekly reports, including ████████████████████████████

████████████████████████████████. *See* Ex. 13 (Weatherford

Dep.) 37:23-41:8. ██████████████████████████████████████████████.

*Id.* at 45:21-46:10. ██████████████████████████████████████████████

████████████████████████████████████████████████” *Id.* at

64:2-7.

37

Agri Stats also uses contemporary data to address ad hoc client requests outside the context of reports. For instance, when ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████. Ex. 13 (Weatherford Dep.) 176:18-177:8; Ex. 63 (AGS-0042690444).

*      *      *

In sum, Agri Stats' information exchanges have *all* the hallmarks that "arouse suspicion of anticompetitive activity under the rule of reason." *Todd*, 275 F.3d at 213. There are more than sufficient evidence and genuine disputes of material fact to raise a triable issue whether Agri Stats' information exchanges had anticompetitive effects. *See In re Pork*, 781 F. Supp. 3d at 871-72.

## II.   RECORD EVIDENCE SHOWS AGRI STATS' INTENTION TO RESUME PORK AND TURKEY REPORTING.

Agri Stats repeats its motion to dismiss argument that Plaintiffs lack standing to pursue this case as to Agri Stats' pork and turkey programs. Mot. at 24-27. That argument fails again. *See* ECF 118.

Plaintiffs have standing to bring claims related to Agri Stats turkey and pork reporting because of the "threat of ongoing or future harm." *Id.* at 16 (quoting *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000); *see also United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (permanent injunction appropriate where "there exists

38

some cognizable danger of recurrent violation . . . ."). That threat is particularly acute given that it was litigation that spurred the suspension of Agri Stats pork and turkey programs, and evidence demonstrates the company is poised to restart those programs once the litigation passes. *See United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *see also W. T. Grant*, 345 U.S. at 632 ("[V]oluntary cessation of allegedly illegal conduct . . . does not make the case moot.").

Agri Stats suspended its turkey program and the bulk of its U.S. pork program in 2019 ███████████████████████████████████. *See, e.g.*, Ex. 6 (Snyder Dep.) 81:19-82:14 (regarding Cargill); Ex. 58 (Edwards *Turkey* Dep.) 207:11-208:5 (regarding Jennie-O); Ex. 64 (Edwards *Pork* Dep.) 23:10-14 (regarding Indiana Packers). But Agri Stats has maintained interest in restarting those programs should it prevail in litigation. Earlier this year, Mr. Scholer testified Agri Stats would "███████████████ ████████████████████████████████████████ ████████████████████." Ex. 3 (Scholer Dep.) 180:6-181:6, 208:6-15. Mr. Snyder similarly testified that whether Agri Stats would restart its turkey program "████████████ █████████████████." Ex. 6 (Snyder Dep.) 83:5-12.

Additional evidence of the threat Agri Stats will restart these programs includes the following:

- o  Mr. Snyder testified that ████████████████████████████████ ████████████████████████████████████████

███████████████████████████████████████
██████." Ex. 6 (Snyder Dep.) 83:5-84:12.

o   Shortly before the Complaint was filed in this case, Brian Snyder, Agri Stats'
    CEO, told investors that Agri Stats' budget for 2024 would include
    "███████████████████████████████████████."
    Ex. 66 (AGS-00045416956) at -957.

o   On September 25, 2023, Mr. Snyder wrote to two executives in an email with
    the subject line "████████████████████████████
    ███████████████████████████████████████
    ███████████████████████████████████████
    ██████████████████████████." Ex. 45 (AGS-0041653376).

o   On December 1, 2023 Agri Stats executives circulated an "██████████████
    ███████████████████████████████████████
    ████████████████████████. Ex. 67 (AGS-0042684638)
    at -690, -708.

o   ███████████████████████████████████████
    ███████████████████████████████. Ex. 6
    (Snyder Dep.) 88:10-89:7.

The evidence differentiates this case from those Agri Stats relies on in which the

risk of future harm depended on a "far-fetched sequence of events . . . ." *Brazil v. Ark.*

*Dep't of Hum. Servs.*, 892 F.3d 957, 960 (8th Cir. 2018); *see also Lujan v. Defs. of Wildlife*,

504 U.S. 555, 564 (1992) (evidence of future harm limited to vague affidavit from

Plaintiff). Agri Stats remains in the information sharing business, producing broiler chicken

reports and offering its range of pork reports for international customer, and it continues to

have the "capacity to produce pork and turkey reports in the future . . . ." ECF 118 at 18,

19; *see also FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (affirming

injunction under similar circumstances). Many of Agri Stats' former pork and turkey

subscribers maintain relationships with Agri Stats through its broiler chicken program: Perdue and Foster Farms operate turkey businesses; Wayne-Sanderson is a corporate affiliate of Cargill, one of the largest turkey processors in the country; and Pilgrim's is a corporate affiliate of JBS, one of the largest pork processors. Agri Stats also continues to insist that its information sharing conduct in all three protein markets is lawful.

Agri Stats alternatively argues that it *cannot* restart past programs because it has no customers and no data on which to base its reporting. *See* Mot. at 25-26. This circular argument ignores that Agri Stats has no turkey and pork customers *because of ongoing litigation*—litigation to which those pork and turkey customers are parties. Agri Stats has repeatedly recognized that litigation needs to end before clients agree to fully reengage. Ex. 65 (AGS-0046456525) ("



); *see also* Ex. 68 (Scholer *Turkey* Ex. 317) at 77 (

").[18]

Record evidence demonstrates a "substantial risk" that Agri Stats will restart its U.S. pork and turkey programs at the conclusion of successful litigation. ECF 118 at 18. The Court should accept such evidence as true and draw all reasonable inferences from that

---

[18] Nor is it a meaningful argument that Agri Stats cannot produce its reports "without the employees who were terminated when the programs ceased." Mot. at 25-26. Agri Stats— like any business—recognizes that programs require an initial investment before becoming profitable, and this ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 6 (Snyder Dep.) 126:15-127:9.

evidence at this stage of the litigation. *See Disability Support All. v. Heartwood Enters.*, 885 F.3d 543, 545 (8th Cir. 2018).

## III. AGRI STATS IMPROPERLY SEEKS SUMMARY JUDGMENT AS TO EMI.

Agri Stats seeks summary judgment on "Plaintiffs' claims against EMI." Mot. at 28. But EMI is not a named party in the case and Plaintiffs brought no claims against EMI individually. SAC ¶¶ 162-167. Accordingly, summary judgment—which is available under Rule 56 as to any "claim or defense," Fed. R. Civ. P. 56(a)—is unavailable as to EMI.

Plaintiffs seek to enjoin Agri Stats from operating unlawful information exchanges between and among protein processors. *See* SAC ¶¶ 168-169. This relief may necessarily extend to EMI, a wholly owned subsidiary of Agri Stats that also collects, receives, and stores data from protein processors. *See* Ex. 69 (Martin Dep.) 14:23-16:11.[19] Although Mr. Scholer insists "████████████████████████████████," ECF 396-2 (Scholer Decl.) at ¶ 63, ample evidence refutes that assertion. Agri Stats fully owns EMI and ████████ ████████████████████████. Ex. 6 (Snyder Dep.) 44:21-45:6; 46:22-47:3. ████ ████████████████████████████████████████████████. Ex. 3 (Scholer Dep.) 13:2-14:15. ████████████████████████████████████████████████████████████ ████████. *See* Ex. 11 (Dombrowski Dep.) 223:20-224:16; Ex. 70 (Schwartz Dep.) 63:4-11. ████████████████████████████████████████████████████████. Ex. 8

---

[19] *See also* Express Markets, Inc., "Reports and Services," *available at* https://www.expressmarketsinc.com/reports-and-services/ (last accessed November 13, 2025) ("Price reports are based on actual invoice transactions sent electronically from primary producers to EMI.").

(McDaniel Dep.) 136:22-137:8 (█████████████████████████████████);
Ex. 70 (Schwartz Dep.) 112:18-113:6 ("██████████████████████████████
██████████"). █████████████████████████████. Ex. 71 (AGSTAT-
14713886) (███████████████████████████████████████████████
█████████████).

Remedies must be structured to "avoid a recurrence of the violation . . . ." *See Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 697 (1978). Given EMI's close relationship with Agri Stats, the Court may need to structure any final injunction to ensure Agri Stats cannot achieve through EMI what Agri Stats is barred from doing itself. *See* Fed. R. Civ. Proc. 65(d)(2)(C); *see also Indep. Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir. 1998) (explaining Rule 65 ensures a defendant may not carry out prohibited acts through non-parties). In any event, the terms of an injunction will turn on facts established at trial. *See United States v. Ward Baking Co.*, 376 U.S. 327, 330-31 (1964) ("a full exploration of facts is usually necessary in order for the District Court properly to draw an antitrust decree") (cleaned up). It would be premature now, before trial, to dictate what terms can or cannot be included in any injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Agri Stats' Motion for Summary Judgment.

Dated: November 20, 2025


Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

JOSEPH H. THOMPSON
Acting United States Attorney
Attorney for the United States Acting Under
Authority Conferred by
28 U.S.C. § 515

/s/ Liles H. Repp
LILES H. REPP
Attorney ID No. 0400692
Assistant United States Attorney
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: (612) 664-5600
Fax: (612) 664-5788
Liles.Repp@usdoj.gov


*/s/* Mark H.M. Sosnowsky
MARK H.M. SOSNOWSKY (*Pro Hac Vice*)
EUN HA KIM
KYLE BRIGHT (*Pro Hac Vice*)
JAMES H. CONGDON (*Pro Hac Vice*)
SILVIA J. DOMINGUEZ-REESE (*Pro Hac Vice*)
WILLIAM M. FRIEDMAN (*Pro Hac Vice*)
JOHN J. SULLIVAN (*Pro Hac Vice*)
PETER A. NELSON (*Pro Hac Vice*)
ANNA WANG (*Pro Hac Vice*)

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 812-4723
Facsimile: (202) 307-5802
Mark.Sosnowsky@usdoj.gov
Eun-Ha.Kim@usdoj.gov
Kyle.Bright@usdoj.gov
James.Congdon@usdoj.gov
William.Friedman2@usdoj.gov
John.Sullivan@usdoj.gov
Peter.Nelson@usdoj.gov
Silvia.Dominguez-Reese2@usdoj.gov
Anna.Wang@usdoj.gov

*Attorneys for United States of America*

**FOR PLAINTIFF STATE OF
MINNESOTA:**

KEITH ELLISON
Attorney General of Minnesota

*/s/* Katherine A. Moerke
JAMES CANADAY (No. 030234X)
Deputy Attorney General
KATHERINE A. MOERKE (No. 0312277)
ELIZABETH ODETTE (No. 0340698)
SARAH DOKTORI (No. 0403060)
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
elizabeth.odette@ag.state.mn.us
Telephone: (651) 728-7208
sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

45

*Attorneys for State of Minnesota and Local Counsel for States of California, North Carolina, Tennessee, Texas, and Utah*

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General of California

*/s/ Quyen Toland*
QUYEN TOLAND (*Pro Hac Vice*)
Deputy Attorney General
NICOLE GORDON (*Pro Hac Vice*)
Deputy Attorney General
MICHAEL JORGENSON (*Pro Hac Vice*)
Supervising Deputy Attorney General
PAULA BLIZZARD (*Pro Hac Vice*)
Senior Assistant Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Ste. 11000
San Francisco, CA 94102
Telephone: 415.510.3554
E-mail: Quyen.Toland@doj.ca.gov

*Attorneys for State of California*

**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JEFF JACKSON
Attorney General of North Carolina

*/s/ Kunal Choksi*
KUNAL CHOKSI (Pro Hac Vice)
Senior Deputy Attorney General
Francisco Benzoni (Pro Hac Vice)
Special Deputy Attorney General
114 W. Edenton Street
Raleigh, NC 27603

46

Telephone: (919) 716-8611
kchoksi@ncdoj.gov
fbenzoni@ncdoj.gov

*Attorneys for State of North Carolina*

**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI
Attorney General of Tennessee

*/s/* Daniel Lynch
ETHAN BOWERS (*Pro Hac Vice*)
Senior Assistant Attorney General
DANIEL LYNCH (*Pro Hac Vice*)
Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Ethan.Bowers@ag.tn.gov
Daniel.Lynch@ag.tn.gov

Telephone: (615) 741-8091

*Attorneys for State of Tennessee*

**FOR PLAINTIFF STATE OF TEXAS:**

KEN PAXTON
Attorney General of Texas

*/s/* William Shieber
BRENT WEBSTER
First Assistant Attorney General
RALPH MOLINA
Deputy First Assistant Attorney General
AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation
WILLIAM SHIEBER (*Pro Hac Vice*)
Senior Staff Attorney, Antitrust Division
PAIGE ETHERINGTON (*Pro Hac Vice*)

47

Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Telephone: (512) 463-1710
William.Shieber@oag.texas.gov

*Attorneys for State of Texas*

**FOR PLAINTIFF STATE OF UTAH:**

DEREK E. BROWN
Attorney General of Utah

*/s/* Matthew Michaloski
MATTHEW MICHALOSKI (*Pro Hac Vice*)
Assistant Attorney General
MARIE W.L. MARTIN (*Pro Hac Vice*)
Deputy Division Director
Utah Office of the Attorney General
P.O. Box 140811
160 E. 300 South
Salt Lake City, UT  84114
Telephone: (801) 366-0375
Fax: (801) 366-0378
mmichaloski@agutah.gov
mwmartin@agutah.gov

*Attorneys for State of Utah*