**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA,
STATE OF MINNESOTA,
STATE OF CALIFORNIA,
STATE OF NORTH CAROLINA,
STATE OF TENNESSEE,
STATE OF TEXAS, and
STATE OF UTAH,

　　　　　　　　　　*Plaintiffs*,

v.

AGRI STATS, INC.,

　　　　　　　　　　*Defendant.*

No. 0:23-CV-03009-JRT-JFD

**PLAINTIFFS' PRE-TRIAL BRIEF**

# Table of Contents

I.    INTRODUCTION ...................................................................................................... 1

II.   FACTS PLAINTIFFS INTEND TO PROVE ................................................................ 1

    A.  Agri Stats' Information Sharing Scheme................................................................. 1

    B.  Processors Use Agri Stats' Information Exchange to Raise Prices
        and Reduce Output ................................................................................................. 6

III.  LEGAL FRAMEWORK ............................................................................................... 8

IV.  ARGUMENT............................................................................................................... 10

    A.  Agri Stats' Agreement with Its Processor Clients Constitute
        Concerted Action Under the Sherman Act............................................................ 11

    B.  Plaintiffs Will Show that Agri Stats' Information Exchanges Have
        Substantial Anticompetitive Effects ..................................................................... 12

        i.    Plaintiffs have Properly Defined Relevant Markets................................... 13

        ii.   Agri Stats' Processor Clients Possess Market Power ................................ 14

        iii.  Agri Stats' Information Exchanges Harm Competition in the
            Relevant Markets....................................................................................... 15

            1.  Agri Stats' Information Exchanges Led Directly to Higher Prices ....... 16

            2.  Features of Agri Stats' Information Exchanges Likely to
               Harm Competition ......................................................................... 17

    C.  Agri Stats Cannot Rebut the Harms to Competition .......................................... 21

    D.  Agri Stats Could Achieve Any Claimed Procompetitive Benefits
        through Less Restrictive Alternatives.................................................................. 22

    E.  A Remedy Should be Broad Enough to Ensure There is No Recurrence
        of Anticompetitive Activity.................................................................................. 25

V.    UNRESOLVED ISSUES .......................................................................................... 28

    A.  Plaintiffs' Outstanding Motions ......................................................................... 28

    B.  Agri Stats' Outstanding motions ........................................................................ 29

VI.  LENGTH OF TRIAL ................................................................................................ 29

VII. CONCLUSION ......................................................................................................... 29

## Table of Authorities

**CASES**                                                                **PAGE**

*Am. Needle v. Nat'l Football League,*
560 U.S. 182 (2010) .................................................................................. 11, 22

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962) ........................................................................................ 13

*Double D Spotting Serv., Inc. v. Supervalu, Inc.,*
136 F.3d 554 (8th Cir. 1998) ............................................................................ 8

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ........................................................................................ 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) ........................................................................................ 13

*Epic Games v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ........................................................................... 14

*F. Hoffman-La Roche Ltd. v. Empagran S.A.,*
542 U.S. 155 (2004) ........................................................................................ 25

*Flegel v. Christian Hosp., Ne.-Nw.,*
4 F.3d 682 (8th Cir. 1993) ................................................................................ 9

*Ford Motor Co. v. United States,*
405 U.S. 562 (1972) .......................................................................................... 9

*Frank v. Gaos,*
586 U.S. 485 (2019) ........................................................................................ 27

*FTC v. Cement Inst.,*
333 U.S. 683 (1948) ........................................................................................ 12

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) ............................................................................. 9, 12, 18

*Impax Lab'ys, Inc. v. FTC,*
994 F.3d 484 (5th Cir. 2021) .......................................................................... 23

*In re Intuniv Antitrust Litig.*,
    496 F. Supp. 3d 639 (D. Mass. Oct. 9, 2020) ............................................................. 14

*In re Pork Antitrust Litig.*,
    781 F. Supp. 3d 758 (D. Minn. 2025).................................................................*passim*

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939)............................................................................................... 12

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947)............................................................................................... 25

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984) ............................................................................... 22

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) .................................................................................. 11

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978)........................................................................................ 10, 25

*NCAA v. Alston*,
    594 U.S. 69 (2021)....................................................................................... 8, 22, 23

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)........................................................................................ 9, 21, 22

*Ohio v. Am. Express Co.*,
    585 U.S. 541 (2018).............................................................................................. 8, 9

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ......................................................................... 8, 11, 18

*United States v. Agri Stats, Inc.*,
    2026 WL 508844 (D. Minn. Feb. 24, 2026)......................................................... 8, 9

*United States v. Am. Airlines Grp. Inc.*,
    675 F. Supp. 3d 65 (D. Mass. 2023) ...................................................................... 15

*United States v. Am. Airlines Grp. Inc.*,
    121 F.4th 209 (1st Cir. 2024)................................................................................. 23

*United States v. Bausch & Lomb Optical Co.*,
    321 U.S. 707 (1944)............................................................................................... 25

*United States v. Borden Co.*,
   347 U.S. 514 (1954)..................................................................................26

*United States v. Container Corp.*,
   393 U.S. 333 (1969).............................................................................. 8, 11

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)..................................................................................13

*United States v. E.I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961)..................................................................................25

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).............................................................................. 9, 10

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)...................................................................... 9

*United States v. United Shoe Mach. Corp.*,
   391 U.S. 244 (1968).................................................................................. 10

*United States v. U.S. Gypsum Co.*,
   340 U.S. 76 (1950).................................................................................... 10

*United States v. Visa, Inc.*,
   344 F. 3d 229 (2d Cir. 2003) ....................................................................15

*United States v. Vulcan Soc'y, Inc.*,
   2010 WL 2160057 (E.D.N.Y. May 26, 2010) ..........................................27

*United States v. Ward Baking Co.*,
   376 U.S. 327 (1964)................................................................................... 9

## STATUTES

15 U.S.C. § 1 ................................................................................................. 8

28 U.S.C. § 1715(d)......................................................................................26

## OTHER AUTHORITIES

Charles Alan Wright & Arthur R. Miller,
   *Federal Practice and Procedure* § 2602.1 (3d ed. 2008) .........................27

Plaintiffs United States of America and the States of Minnesota, California, North Carolina, Tennessee, Texas, and Utah ("Plaintiffs") respectfully submit this Pre-Trial Brief pursuant to Local Rule 39.1 and the Court's orders.

## I.     INTRODUCTION

For years, Agri Stats has operated illegal information exchanges among rival processors in each of the broiler chicken, pork, and turkey industries. These information exchanges have caused higher prices for grocery stores, restaurants, and other customers who buy meat from those processors—anticompetitive effects akin to those that would result from a processor cartel. Families across America, in Minnesota, and in each of the other Plaintiff states, ultimately pay the price. At the end of trial, Plaintiffs will ask the Court to enjoin Agri Stats from operating such unlawful information exchanges.

## II.     FACTS PLAINTIFFS INTEND TO PROVE

### A.     Agri Stats' Information Sharing Scheme

Agri Stats' business model is to share information and provide "consulting" services exclusively to meat processors and their affiliates, for the purpose of jointly maximizing the profits of those meat processors. For decades, it has operated its information sharing schemes in several meat industries (or "protein" industries, as insiders call them) in the United States, including the broiler chicken (i.e., chickens for human consumption), pork, and turkey industries. Agri Stats remains active today in the broiler chicken industry. It suspended its pork and turkey programs in the face of private antitrust litigation, but its executives have expressed a desire to resume those programs as soon as the company is able to do so. Agri Stats' clients (its coconspirators) have included an all-star list of

1

massive, powerful, and profitable protein producers—names that are familiar from the grocery store aisle, like Tyson, Perdue, Smithfield, JBS, Butterball, and Cargill.

Agri Stats exists to increase these processors' collective profits while avoiding heightening competition that might pit its processor subscribers against each other. Agri Stats trumpets this joint profit maximization motive for the world to see: the company's mission statement—displayed on its website until a few weeks ago and published on the cover of each report it provides to processors—is to "***Improve the bottom line profitability of our participants*** by providing accurate and timely comparative data while preserving the confidentiality of individual companies." (Emphasis added.)

To serve the interests of its meat industry clients, Agri Stats collects vast amounts of competitively sensitive information directly from competing protein processors' ledgers and accounting systems. Once collected, Agri Stats standardizes the data into common metrics so that processors can make "apples to apples" comparisons with each other. Agri Stats then disseminates this information through written reports in which its customers can check up on the competition, an online customer portal that allows processors to access data, "review sessions" where Agri Stats' employees advise processors on how to make more money, and through other means such as phone calls and emails where Agri Stats shares information beyond what is contained in the reports.

Agri Stats distributes its reports in a series of standard "books" which broadly correspond to the life cycle of a protein. Agri Stats' books include a live production book relating to the current and future supply of animals for slaughter, a processing book relating to the costs and operations associated with protein processing facilities, sales books

2

detailing prices for specific products, and operations profit and bottom-line books that detail and rank processors by profit margin. With few exceptions (reserved for entities "allied" with processors), Agri Stats' reports are not made available to market participants other than processors. They are not made available to distributors who sell meat to American consumers or to protein buyers such as grocery stores and restaurants. Agri Stats refuses to make its reports available to protein buyers because buyers could use the information in Agri Stats' reports in their negotiations with processors to level the playing field, narrow processor margins, encourage processors to become more efficient and reduce their own costs to be able to offer more competitive prices, and ultimately bargain for better prices that they could pass on to consumers,. When a former chicken processor employee joined the procurement division of a large restaurant chain, having used Agri Stats in his previous job, he asked Agri Stats if he could acquire some of their reporting information. Agri Stats refused, stating, "Can you imagine if Tyson came in to negotiate with you and you started the conversation with, 'well Agri Stats gave us profit information and it says………..' That would not be a good situation for us." PX412 (ellipses in original).

Agri Stats has entered into agreements with all large processors in the United Stats in each of the broiler chicken, turkey, and pork markets, enabling those processors to share their information amongst each other. These processors are conspirators with Agri Stats. Agri Stats' broiler chicken subscribers accounted for over 95% of the broiler chicken products processed in the United States from 2007 through 2021. PX898 at ¶ 150. Its pork subscribers accounted for 84% or more of all U.S. pork slaughter capacity from 2012 through 2018 (when Agri Stats lost its major pork subscribers and thereafter suspended its

3

pork program), including 89% in 2017. *Id.* at ¶ 174. And its turkey subscribers accounted for over 80% of all turkey products produced in the United States from 2007 through 2018 (when Agri Stats lost its major turkey subscribers and thereafter suspended its turkey program), including 89% in 2015 and 2016. *Id.* at ¶ 194.

Processors pay handsomely—sending Agri Stats millions of dollars each year—to participate in these processor-only information exchanges. *See* PX20 at -103. Most of Agri Stats' agreements with processors are "handshake deals" that provide no guardrails or restrictions on the conduct of Agri Stats or the participating processors. With these agreements, the processors simultaneously agree to *provide* their most sensitive cost, production, and pricing information to Agri Stats, while knowing that Agri Stats will ensure that they will also *receive* the same competitively sensitive about their competitors. The processors understand tacitly (and sometimes explicitly) that their competitors are also participating in these "handshake deals."

Despite the competitive sensitivity of the information Agri Stats collects and distributes, and despite the clear risk of facilitating collusion or other anticompetitive effects by exchanging information among competitors, Agri Stats has no in-house counsel or compliance officer. PX1236 at ¶¶ 24–25. There are few, if any, guardrails limiting how Agri Stats can share this information among competing processors.

Participating processors know which of their competitors share information with Agri Stats in several ways. First, Agri Stats lists participating companies—and even individual plants—in most of its reports. So, each week or month that a processor receives a report, it knows exactly which of its competitors' data is included in that report. This also

4

allows processors to track when new rival processors join or drop out of Agri Stats and even identify specific competitors' data with a high degree of confidence. Second, there is substantial evidence of processors conditioning their participation in Agri Stats on Agri Stats' ability to bring the processors' primary rivals onboard as subscribers. For example, to entice Tyson into providing data for all its pork plants, Agri Stats made a "commitment to get JBS and Hormel completely onboard as well." PX49 at -899. And Agri Stats suspended both its pork and turkey reporting after a few of its largest processors dropped out, which led the remaining processors to follow suit. Finally, Agri Stats' promotional materials tout the identities of participating processors and the percentage of the domestic market for each protein those processors represent. *See* PX6 at -228-29.

Agri Stats' information sharing is not limited to its standard books of reports. Agri Stats has long provided "custom" or "special analysis" reports for customers. It produced "freezer inventory" reports that calculated the amount of broiler chicken products held in cold storage. And for several years, Agri Stats produced bacon-specific reports that focused on bacon products that were not otherwise included in its pork reports. Agri Stats also regularly conducts individualized "review sessions" for processors that focus on specific "opportunities" to increase profit margins (including by raising prices). The same account managers regularly deliver review sessions with many competing processors, often within the same month. Agri Stats also shares information—including competitively sensitive information that goes even beyond its reports—informally with its processor clients via email and phone.

**B.**     **Processors Use Agri Stats' Information Exchange to Raise Prices and Reduce Output**

Processors in the broiler chicken, turkey, and pork industries regularly use (or used) information shared through Agri Stats to monitor and act on opportunities for price increases. For instance, Perdue used Agri Stats reports to identify opportunities to raise prices on turkey products and then successfully implemented those price increases. Similarly, Tyson spent years using Agri Stats reports to identify specific opportunities to raise prices on "tray pack" chicken products (the familiar packages sold at grocery stores). And Agri Stats regularly highlighted "opportunities" for Smithfield to raise prices on its bacon products, which it succeeded in doing for the vast majority of bacon products identified over a two-year period.

By contrast, in a case involving terabytes of discovery—what Agri Stats has described as a "discovery record likely larger than any other in the history of antitrust litigation," *see* ECF 394 at 1—neither Plaintiffs nor Agri Stats have found any comparable evidence that processors use Agri Stats to lower prices. Instead, Agri Stats' processor customers have testified repeatedly that they use Agri Stats *only* to raise prices, not lower them.

Economic analysis confirms this evidence. Plaintiffs' expert, Boston University Professor Marc Rysman, collected more than 200,000 observations over a ten-year period from Agri Stats' broiler chicken sales reports. Professor Rysman analyzed the likelihood that processors would implement price increases on the "top" ten products (where they were priced lower than the competition) compared to the likelihood that broiler processors

6

would implement price decreases on the "bottom" ten products (where they were priced higher than the competition). Professor Rysman's study shows that broiler chicken processors were nearly twice as likely to raise prices on the "top" products as they were to lower prices on the "bottom" products, confirming that broiler chicken processors consistently use Agri Stats to drive up prices.

Processors also regularly rely on Agri Stats information to monitor the supply of protein products to allow them to control prices. For example, Tyson received industry-wide supply information from Agri Stats and encouraged its salespeople to have "price courage" given the trends in future supply that it saw from Agri Stats. PX362. Similarly, Mountaire, a broiler chicken processor, used weekly "freezer inventory reports" sent by Agri Stats to monitor supply and encouraged its employees to "be aggressive on leading the market up" and "raise sales prices" when it looked like future supply would be low. PX371; *see also* PX384 (Tyson relying on Agri Stats' freezer inventory reports to "have courage" to raise prices). Agri Stats fully understands how processors use this information to raise prices and profits. As one Agri Stats senior executive noted in connection with one of the "Industry Updates" he routinely circulated to processors showing supply-related trends, "Tyson lifted pretty much my entire slide set" to use in negotiations with a customer. "I'd imagine that helped them hold or increase their pricing. A 'soft' part of what we offer, but obviously valuable." PX44.

Expert testimony at trial will confirm that these exchanges of information led to higher prices market-wide. Professor Rysman will demonstrate that in *every* market where Agri Stats operated and then ceased operation, prices in that market were higher when Agri

7

Stats' information sharing scheme was in operation. That is direct evidence that Agri Stats' conduct—in total, not just limited to sales reports—had significant anticompetitive effects.

## III.    LEGAL FRAMEWORK

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. An information exchange between competitors can constitute such a violation under Section 1 of the Sherman Act. *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 867 (D. Minn. 2025) ("*Pork*") (citing *United States v. Container Corp.*, 393 U.S. 333, 334 (1969)); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (identifying "the information exchange itself" as an "analytically distinct type of claim [under] §1 of the Sherman Act"). Information exchange claims are analyzed under the "rule of reason." *Todd*, 275 F.3d at 199. Courts typically undertake a rule of reason analysis using a multi-step burden-shifting framework. *NCAA v. Alston*, 594 U.S. 69, 96 (2021).

At the first step, Plaintiffs' burden to prove a challenged restraint is unreasonable and harms competition "can be satisfied with a showing of direct or indirect evidence." *Pork*, 781 F. Supp. 3d at 868. Thus, Plaintiffs can meet their burden indirectly through defining relevant markets and offering "proof of market power," coupled with "some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 585 U.S. 541, 542 (2018) ("*Amex*"); *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998); *United States v. Agri Stats, Inc.*, 2026 WL 508844, at *7 (D. Minn. Feb. 24, 2026). Alternatively, Plaintiffs can offer direct evidence of anticompetitive effects, including "reduced output, increased prices, or decreased quality

8

in the relevant market." *Amex*, 585 U.S. at 542 (cleaned up). For the exchange participants'

horizontal agreement, such direct effects evidence "can obviate the need for an inquiry into

market power, which is but a surrogate for detrimental effects." *FTC v. Ind. Fed'n of

Dentists*, 476 U.S. 447, 460-61 (1986) (cleaned up).

Once the plaintiff proves likely harm to competition, the burden shifts to the

defendant to "show a procompetitive rationale for the restraint." *Agri Stats*, 2026 WL

508844 at *7 (citing *Amex*, 585 U.S. at 541); *see also Pork*, 781 F. Supp. 3d at 867-68.

Where a plaintiff has shown significant anticompetitive effects, the defendant faces a

"heavy burden" at this second step. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85,

113 (1984).

If—and only if—the defendant can satisfy its burden at step two, the burden returns

to the plaintiff to demonstrate that any proven procompetitive efficiencies "could be

reasonably achieved through less anticompetitive means." *Amex*, 585 U.S. at 542.

Ultimately, the Court "weighs the harms and benefits to determine if the behavior is

reasonable on balance." *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993)

(citation omitted).

Once liability has been established, an appropriate remedy may have broad scope.

An appropriate remedy should (1) "unfetter a market from anticompetitive conduct," *Ford

Motor Co. v. United States*, 405 U.S. 562, 577–78 (1972); (2) "prevent future violations

and eradicate existing evils," *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir.

2001) (en banc) (quoting *United States v. Ward Baking Co.*, 376 U.S. 327, 330–31 (1964));

(3) "deprive the defendants of any benefits of the illegal conduct," *United States v. Grinnell*

*Corp.*, 384 U.S. 563, 577 (1966); and (4) "deny to the defendant the fruits of its statutory violation," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). To ensure that there is no "recurrence of the violation," an injunction need not be limited to a "simple proscription against the precise conduct previously pursued." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978). Rather, relief may "range broadly through practices connected with acts actually found to be illegal." *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 89 (1950).

## IV.   ARGUMENT

At trial, Plaintiffs will prove that Agri Stats' information exchanges violate Section 1 of the Sherman Act. First, the evidence will show that Agri Stats' agreements with processors to exchange competitively sensitive price, cost, and supply information have directly led to higher prices for consumers. In addition, the evidence will show that the processors participating in Agri Stats' information exchanges collectively have market power in properly defined markets and that the nature of the information exchange agreements is likely to harm competition. By contrast, Agri Stats will *not* be able to prove any concrete procompetitive benefits—indeed, its economic expert expressly disavowed the opinion that Agri Stats has caused any procompetitive benefits—and thus the inquiry should end at step two. However, even if the Court were to accept Agri Stats' self-interested lay opinions that its practices benefit competition, the evidence will show that less restrictive alternatives to Agri Stats' current business model exist.

10

**A.      Agri Stats' Agreements with Its Processor Clients Constitute Concerted Action under the Sherman Act**

An agreement to exchange information constitutes concerted action under Section 1. *Pork*, 781 F. Supp. 3d at 867 ("A standalone information exchange itself can constitute a § 1 violation, even without proof of an agreement to fix prices, if it tends to lead to anticompetitive effects") (citing *Container Corp.*, 393 U.S. at 334); *see also Todd*, 275 F.3d at 198. This agreement need not be formal or written to constitute concerted action. *See Container Corp.*, 393 U.S. at 335 (condemning information exchange even when exchange was "infrequen[t]" and "irregular[]" because "the essence of the agreement" was to furnish the "information whenever requested").

Concerted, anticompetitive conduct that would be illegal if engaged in directly by competitors is not inoculated from antitrust liability solely because an intermediary facilitates the conduct. *Am. Needle v. Nat'l Football League*, 560 U.S. 182, 202 (2010) ("competitors 'cannot simply get around' antitrust liability by acting 'through a third-party intermediary'") (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 (2d Cir. 2008) (Sotomayor, J., concurring)).

Agri Stats and the processors understand exactly what they have agreed to here: the processors pay money and provide their own data to Agri Stats and in return receive standardized and audited data Agri Stats collects from their rivals. Each processor knows which of its competitors contribute to Agri Stats' reports. This is sufficient to establish concerted action under Section 1 of the Sherman Act. *See Pork*, 781 F. Supp. 3d at 867 ("It is uncontested that Clemens, Seaboard, Triumph, and Tyson all subscribed to and shared

11

confidential information with Agri Stats during the Relevant Period, that Agri Stats took that information and formulated reports that were shared with competitors, and that Defendants knew which competitors were participating in each of the reports. Thus, though Defendants do not necessarily contest it, the Court finds that the Consumer IPPs have established concerted action for purposes of their information exchange theory of conspiracy.").

The agreements between Agri Stats and its processor-customers are sufficient to demonstrate concerted action on their own. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) (restraints of trade include "express or implied agreement[s] or understanding[s]"). Here, however, the evidence shows that Agri Stats' processor-customers also agreed with each other to share information through Agri Stats. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226-27 (1939) ("It was enough that, knowing that concerted action was contemplated and invited, [the competitors] gave their adherence to the scheme and participated in it."); *see also U.S. Gypsum* , 333 U.S. at 393-94; *FTC v. Cement Inst.*, 333 U.S. 683, 716 n.17 (1948). Both methods of concerted action meet Plaintiffs' burden.

**B.**   **Plaintiffs Will Show that Agri Stats' Information Exchanges Have Substantial Anticompetitive Effects**

"Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for an inquiry into market power." *Ind. Fed. of Dentists*, 476 U.S. at 460-61 (citation omitted). Even beyond

12

showing actual direct effects, however, Plaintiffs here have properly defined relevant markets and will show that Agri Stats' processor clients possessed market power in each of those markets.

### i. Plaintiffs Have Properly Defined Relevant Markets

A relevant market has two components: a relevant product market and a relevant geographic market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324-28 (1962). A relevant product market consists of those products that are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). The product market is established by examining the substitutes that a consumer might employ and "the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the 'cross-elasticity of demand.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 (1992) (quoting *du Pont*, 351 U.S. at 400). "The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market." *Brown Shoe*, 370 U.S. at 336.

Here, there are three relevant product markets: sale of broiler chicken, pork, and turkey. Practical indicia, such as industry and public recognition, unique production facilities, and limited substitution all point to each being relevant markets. *See Brown Shoe*, 370 U.S. at 325. Most notably, Agri Stats itself has structured its entire business model around each of these markets. Agri Stats' broiler chicken program, for instance, is focused entirely on broiler chicken processors, and its reports contain information about broiler chicken products—but not turkey, pork, or other protein products. The same was true with

13

respect to Agri Stats' pork and turkey programs when they were in place. Production facilities for each of broiler chicken, pork, and turkey are unique and specialized and do not overlap with each other. And academic studies and industry sources all recognize that broiler chicken, pork, and turkey products have limited substitution with other protein products and that demand for each is relatively inelastic.

The hypothetical monopolist test, a well-accepted method to define markets, confirms these relevant product markets. *See In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 664 (D. Mass. Oct. 9, 2020) (the hypothetical monopolist test "remains . . . the touchstone of market definition, even in contexts outside of horizontal mergers"). Professor Rysman will show that a hypothetical monopolist of broiler chicken sales in the United States could likely profitably impose a small but significant non-transitory price increase, and the same is true with respect to pork and turkey, confirming the common-sense conclusion that each of these is a relevant market.

The relevant geographic market is the United States. Imports do not play a meaningful role at all in the markets for broiler chicken, pork, and turkey—meaning that substitution is largely limited to products produced and sold within the United States.

### ii. Agri Stats' Processor Clients Possess Market Power

Plaintiffs can demonstrate market power by establishing that Agri Stats' processor clients—the parties with whom Agri Stats entered into the information sharing agreements at issue—controlled a "high market share" in the broiler chicken, pork, and turkey markets, and the existence of significant barriers to entry in those markets. *Epic Games v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023). Courts have found market shares greater than 30%

14

sufficient to support a finding of market power under Section 1 of the Sherman Act. *See, e.g.*, *United States v. Am. Airlines Grp., Inc.*, 675 F. Supp. 3d 65, 118 (D. Mass. 2023) (finding market power where market shares exceeded 30 percent); *United States v. Visa, Inc.*, 344 F. 3d 229, 239-40 (2d Cir. 2003) (sustaining finding of market power with 26 percent market share). Here, Agri Stats' clients possess (or possessed) market power in the relevant markets. Professor Rysman will show:

- Agri Stats' broiler chicken customers collectively produced more than 95% of broiler chicken products in every year from 2007 through 2021 and over 75% of the market from 2022 to present;
- Agri Stats' turkey customers collectively produced more than 80% of live pounds of turkey processed in every year between 2007 and 2018; and
- Agri Stats' pork customers produced more than 78% of pork slaughter capacity between 2007 and 2019.

Agri Stats' ordinary course documents corroborate Professor Rysman's testimony. In pitching its services to clients, Agri Stats regularly boasted that it had participation of 95% of the broiler chicken market. *See* PX6 at -228. It did the same for turkey and pork. Fact and expert testimony will also confirm that there are barriers to entry in each of these markets, making it difficult for new competitors to enter.

### iii. Agri Stats' Information Exchanges Harm Competition in the Relevant Markets

The evidence that processors used and continue to use Agri Stats' information exchange to raise prices is overwhelming. In each of the three markets at issue, processors have regularly used Agri Stats information to identify opportunities to raise prices—but not to lower them. Moreover, empirical analysis proves that this practice was widespread and systematic. In every market for which Agri Stats provided information exchange

15

among processors and then ceased doing so, prices were *higher* when Agri Stats was in service than when it was not.

**1.  Agri Stats' Information Exchanges Led Directly to Higher Prices**

Professor Rysman will show that Agri Stats' conduct has directly resulted in increased prices for protein products. He performed well-accepted economic "before-and-after" regression analyses and found that in three separate programs—pork, turkey, and bacon-specific reports—Agri Stats' information exchange agreements led to higher prices while those agreements remained in place. Because Agri Stats suspended these programs, natural experiments exist: were prices higher when those programs were active compared to when they were inactive? In each program, the results are clear: prices were higher when Agri Stats' information exchange was in effect. In particular:

- Turkey prices decreased by 8% once processors disengaged from Agri Stats' turkey program in March 2018.

- Pork prices decreased by almost 15% once processors disengaged from Agri Stats' pork program in March 2018.

- Bacon prices decreased by more than 8% after Agri Stats ended its bacon program in April 2018.

Those economic results (and others that Professor Rysman will describe) match Plaintiffs' evidence from documents and testimony: processors use Agri Stats information to raise prices but not to lower them. For example, a sales executive at Tyson, one of the largest broiler and pork processors in the United States, testified that he could not recall a single instance where he used Agri Stats information to reduce price. In contrast, ordinary course documents will show myriad examples of processors using Agri Stats' information

16

to identify opportunities to raise prices. Witnesses from other processors in all three proteins will say the same. And that evidence is not anecdotal or hypothetical. Professor Rysman will present evidence that processors regularly and systematically use Agri Stats to *raise* prices, not lower them.

Processors use other Agri Stats reports in much the same way. Broiler chicken processors such as Sanderson, Tyson, and Mountaire used Agri Stats' reports showing supply-related information to determine where production levels would be. In turn, subscribing processors have the ability to charge the highest profitable prices based on the collective knowledge of the industry about current and future supply. This is not by accident. Agri Stats acknowledges that one purpose of its live production statistics showing, for instance, breeder chick placements and breeder turkey placements, is to help forecast the future supply of protein products coming on the market. PX262; PX945 at -096.

### 2. Features of Agri Stats' Information Exchanges That Harm Competition

In addition to this direct evidence of anticompetitive effects, the evidence at trial will show that Agri Stats' information exchanges have many other features that generate anticompetitive effects. These features—including the sensitivity and granularity of the data, the lack of public availability, and the recency of the information—underscore the conclusion that Agri Stats' information exchanges, in light of the market power of its processor clients, are likely to harm competition. *See Pork*, 781 F. Supp. 3d at 869.

17

**Sensitivity and Granularity.** With Agri Stats' facilitation, processors exchange their most granular and competitively sensitive cost, production, sales, and pricing data. Processors refuse to share their information with their customers and freely acknowledge that this information, which they download directly from their general ledgers and share with Agri Stats, is competitively sensitive. That the information is aggregated or anonymized in certain ways does not provide a safe harbor. Information exchanges "that provide only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors." *Id.* at 870-71.

Agri Stats' data gives processors whole market visibility about their competitors' operations even though it is aggregated and anonymized. Agri Stats provides detailed information on future supply from processors' live growth operations and future planning (information that Agri Stats admits is not related to performance or efficiency) and then tracks protein through competitors' processing operations and provides detailed information on how much those products (at the near-item level) sell for. As Plaintiffs' expert, North Carolina State University Professor Jeffrey Dorfman, will testify, Agri Stats provides significantly more detailed information than other industry sources, such as information produced by the United States Department of Agriculture.

**Public Availability.** In evaluating information exchanges, courts have recognized that "[p]ublic dissemination is a primary way for data exchange to realize its procompetitive potential." *Todd*, 275 F.3d at 213. Evidence that an information exchange is instead asymmetrical and benefits only one side of a transaction supports finding that the exchange has anticompetitive effects. *Ind. Fed'n. of Dentists*, 476 U.S. at 459; *see Pork*,

18

781 F. Supp. 3d at 869-870 (information asymmetry can be evidence of the "potential threat to competition" of information exchanges).

As Professor Rysman will demonstrate, information asymmetry distorts negotiations in favor of the side that has more information. Here, Agri Stats, by agreement, reveals output and price information to processors but not to buyers on the other side of the negotiating table. The evidence will show that this information asymmetry is at the heart of processors' anticompetitive use of Agri Stats. Cargill salespeople touted the edge that Agri Stats gave them, explaining in a presentation that a "salesperson's worst fear" is "what they don't know" but that Agri Stats gives them "info & confidence." PX987 at -336. To preserve this pricing advantage, Cargill warned its salespeople never to share Agri Stats' information with customers. *Id.* at -340. Similarly, an Agri Stats executive refused several protein customers' requests for information because he was concerned processors would be upset that protein purchasers had useful information in negotiations. PX412.

Agri Stats' information asymmetry is not limited to sales information. Foster Farms, a broiler chicken processor, internally discussed how to handle a request from a customer for "very detailed cost information." PX1068. Foster confirmed that it would use in negotiations "the higher of our internal number or agristats average," information to which its customer did not have access. *Id*.

**Recency.** The information Agri Stats shares among competitors is not only granular but timely as well. Agri Stats' monthly reports contain information that was collected the previous month. In addition, Agri Stats issues weekly reports (including previously issuing weekly broiler chicken and pork sales reports) that include data that is as little as six to

19

thirteen days old. Both Agri Stats and processors recognized the importance of having this up-to-date information on pricing. For example, Tyson instructed its salespeople to have "price courage"—that is, to be bold about demanding higher prices—based on what Tyson saw in Agri Stats' weekly sales reports. PX393 at -404.

**Additional Anticompetitive Features.** Other factors contribute to the anticompetitive nature of Agri Stats' information exchange as well. Agri Stats' mission is to "improve the bottom line profitability for our participants." Agri Stats' reports are designed to promote processors' joint profit maximization ahead of price competition that benefits consumers. For instance, Agri Stats' bottom-line and operations profit reports rank processors entirely on profit *margin*, rather than aggregate profits or total revenues. Margins increase and customers pay more, all while processors use these profit margin rankings to set bonuses and other employee compensation metrics. As Professor Rysman will explain, in competitive markets, a profit-maximizing company would not raise its price if the resulting decline in sales would outweigh the increase in profit margin. But where, as here, a company prioritizes improving its profit margin, rather than its overall profitability—as processors using Agri Stats do—the company might increase its prices even at the cost of significant sales losses. That behavior resembles a collusive cartel, not competition. *See* PX382 (a Tyson sales executive monitoring his team's success at raising prices based on Agri Stats' rankings: "As we have discussed we not only have to increase our price we also have to outrun our competitors' improvements.").

20

C.     **Agri Stats Cannot Rebut the Harms to Competition**

Because Plaintiffs have established a prima facie case that Agri Stats' information exchange agreements have substantial anticompetitive effects, the burden shifts to Agri Stats to rebut it. To meet this "heavy burden," Agri Stats must prove "an affirmative defense which competitively justifies th[e] apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S. at 113. Agri Stats falls far short of meeting this burden.

Agri Stats does not meaningfully contest that its information exchange relating to sales and prices is anticompetitive and has no redeeming value. However, it argues that its reports on live production and processing are not anticompetitive. But even there, the most it can offer is self-serving testimony from its processor conspirators that they used Agri Stats to identify "opportunities" to lower costs or be more efficient. As an initial matter, much of the information Agri Stats provides in these reports are—as its own witnesses admit—**not** performance or efficiency-related at all. Further, Agri Stats' own expert disclaims having any opinion that Agri Stats itself **causes** any procompetitive benefits and does not even attempt to attribute any cost savings (or other purported benefits) to Agri Stats—in stark contrast to Professor Rysman, who performs econometric analyses to show the actual impact Agri Stats has had in the form of higher prices.

Moreover, even if there were evidence of cost savings that could be attributed to Agri Stats—and there is not, beyond the vague, self-serving testimony from Agri Stats' customers—there is certainly no evidence anywhere in the record that such cost savings are passed on to consumers. To the contrary, the only evidence in the case touching on this question shows that consumers do not benefit from any of Agri Stats' reports. Professor

21

Rysman's empirical tests for pork and turkey are not limited to sales reports—they account for all of Agri Stats' reports and other forms of information exchange. Those empirical tests establish conclusively that Agri Stats' information exchanges lead to higher prices. If Agri Stats were correct that its information exchanges were procompetitive, higher prices should have followed when Agri Stats' bacon, turkey, and pork programs ended. But they did not. Prices uniformly declined.

That Agri Stats helps processors collectively profit at the expense of processors' customers and consumers is a feature, not a bug. Once again, in Agri Stats' own words—printed on every Agri Stats report—its mission was to "improve the bottom line profitability for our participants"—in other words, the processors. PX6 at -224. Joint industry profitability at the expense of competition is not a procompetitive rationale. *See Am. Needle*, 560 U.S. at 198 ("illegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties").

### D.    Agri Stats Could Achieve Any Claimed Procompetitive Benefits Through Less Restrictive Alternatives

Even if Agri Stats could meet its "heavy burden" of proving that some procompetitive benefits justify its harms to competition, *Bd. of Regents*, 468 U.S. at 113, its information sharing scheme would still be unlawful because "less restrictive means exist to achieve any proven procompetitive benefits." *Alston*, 594 U.S. at 100; *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) ("the rule of reason inquiry requires us to consider . . . whether the putative benefits can be achieved by less restrictive means"). Where a less restrictive alternative to a restraint exists,

22

the restraint is unreasonable. *See Alston*, 594 U.S. at 97, 100; *see also Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 497 (5th Cir. 2021) ("it is unreasonable to justify a restraint of trade based on a purported benefit to competition if that same benefit could be achieved with less damage to competition"); *United States v. Am. Airlines Grp. Inc.*, 121 F.4th 209, 227 (1st Cir. 2024) (upholding liability under Section 1 where "the procompetitive benefit achieved . . . could plainly be achieved through less restrictive means") (cleaned up).

Here, several means exist, which, individually or in combination, could reduce the anticompetitive effects of the current agreements to exchange live production and processing information to varying degrees. First, to the extent a single processor needs a "benchmark" to see how efficient one of its plants is, that processor can compare its own plants against each other. Processors recognize this as a reasonable way to benchmark using information collected by Agri Stats.

Second, Agri Stats could remove information asymmetry entirely and make the anonymized and aggregated information in its reports publicly available for purchase by all industry participants—processors and protein buyers alike—and anyone else who wants to use them. If it is true that processors can achieve efficiencies by benchmarking their information against industry averages, there is no reason those efficiencies would disappear should those averages be available to everyone.[1]

---

[1] To be clear, Plaintiffs are ***not*** proposing that anyone be able to purchase each individual company's competitively sensitive information. Rather, less granular averages could be made available for public purchase.

23

Agri Stats' arguments against making the anonymized and aggregated data in its reports publicly available are not compelling. Agri Stats has repeatedly invoked a "free rider" problem, claiming that if reports are available for purchase without requiring the provision of data, no one will provide data. That is easily dealt with, though. Processors could still be required to submit data in order to participate, while non-processors would not and could still purchase reports. Agri Stats does not have to look far to see how this example could occur in practice: EMI, Agri Stats' wholly-owned subsidiary that provides publicly-available (and much less granular) data reports, operates in precisely this way. Notwithstanding the public availability of EMI reports, processors continue to provide data to EMI.

Third, Agri Stats could make the information less current. There is no evidence that processors require data to be from the previous week or previous month to achieve any purported efficiency-enhancing benefit. To the contrary, certain processors have testified that they preferred data to be older and cover a greater time period.

Fourth, Agri Stats could remove granular plant-level data. There is no reason that competitors need to know specific supply and cost-related information of their competitors on a plant-level basis (which allows them to monitor individual facilities). If the purpose is truly only for "benchmarking," as Agri Stats claims, then processors can just as easily use Agri Stats to compare themselves to industry averages and do not need to see each other's plant-level data.

**E.    A Remedy Should Be Broad Enough to Ensure There is No Recurrence of Anticompetitive Activity**

In antitrust cases, an appropriate remedy may have broad scope. *See* supra at 11. "[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961); *see also F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170–71 (2004) (quoting same). "[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests." *E.I. du Pont*, 366 U.S. at 326. The Court is not limited to entering a permanent injunction that only ends the exact violation it found and prevents its exact recurrence. Instead, an antitrust judgment should "fit the exigencies" of the case. *Int'l Salt Co. v. United States*, 332 U.S. 392, 400-01 (1947) (abrogated on other grounds). "[A] mere prohibition of the precise scheme would be ineffectual to prevent restraints." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 727 (1944). For instance, the permanent injunction may ban other ways to achieve the same violation that the plaintiffs proved. "When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *Nat'l Soc'y of Prof. Eng'rs*, 435 U.S. at 698 (citing *Int'l Salt Co.*, 332 U.S. at 400).

Here, the proper remedy is to restore competition in the affected markets by removing the fundamental restraint at issue: information sharing among competitors that gives them extraordinary visibility into their rivals' most sensitive operational data,

25

resulting in information asymmetry and, ultimately, artificially inflated prices borne by consumers. That may mean, in many instances, simply enjoining Agri Stats from sharing the most sensitive price and output-related information. It also means removing the fundamental problem of information asymmetry. To the extent the exchange of this information has *any* redeeming value, that value should not go away if the market at large has access to it.  Processors have acknowledged that they have every incentive to be as efficient as possible *regardless* of whether "benchmarking" information is publicly available.

Agri Stats may argue that its private settlements should narrow the remedy here, but they are of little, if any, relevance. For starters, it is well-settled that private settlement agreements have no impact on the issue of liability in a government enforcement action. *See United States v. Borden Co.*, 347 U.S. 514, 518-19 (1954) (holding that the district court erred in refusing to enjoin anticompetitive conduct in a government enforcement action because doing so would be duplicative of the relief secured by private plaintiffs against the same parties). That is because it is squarely the province of government enforcers—and not private plaintiffs—to "protect[ ] the public, by means of contempt proceedings, against a recurrence of antitrust violations." *Id.* at 519. Moreover, the private settlements are preliminary and have not yet received final court approval. Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised *only with the court's approval*." (emphasis added)); 28 U.S.C. § 1715(d) (Class Action Fairness Act requiring at least 90 days for government officials' review).

26

Until the agreements receive final approval and are implemented by Agri Stats, it is not clear how the settlement agreements would impact the likelihood of illegal activity recurring. *See Frank v. Gaos*, 586 U.S. 485, 492 (2019) (distinguishing non-class claims, which may be settled without court order, from class claims, which require court approval).

Even on the merits, the private settlements do not resolve the issues in this case or the need for a thorough injunction. While the private settlements do call for the elimination of sales reports, they leave in place many other problematic aspects of Agri Stats' information exchanges and also allow Agri Stats to largely recreate the sales reports through EMI. For instance, they leave in place the exchange of plant-level data for many categories of information. More significantly, the private settlements provide for very little public availability—the default is that the information exchange remains available only to competitor processors. The evidence will show at trial that processors use Agri Stats' information exchanges in all manner of ways, both via Agri Stats reports and otherwise. Allowing Agri Stats to continue to collect and exchange all that information with only a minimum amount of public availability leaves the door open for processors to continue to use Agri Stats in anticompetitive ways.

Finally, the private settlements only have a term of five years (as contrasted with the decades of Agri Stats' anticompetitive conduct), and do no not provide for a monitor— a standard provision in government antitrust enforcement actions "when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransigent or special skills are needed." *United States v. Vulcan Soc'y, Inc.*, 2010 WL 2160057, at *4 (E.D.N.Y. May 26, 2010) (quoting 9C Wright & Miller, *Federal Practice*

27

*& Procedure* § 2602.1 (3d ed. 2008)). Given Agri Stats' refusal to hire in-house counsel or a compliance officer, coupled with its lengthy history of operating an information exchange with no guardrails and an insistence that such behavior is lawful, a monitor is essential to ensure Agri Stats complies with any changes to its business model.

## V.    UNRESOLVED ISSUES

Aside from the factual and legal disputes on the merits described above, the following issues remain to be addressed before trial.

### A.    PLAINTIFFS' OUSTANDING MOTIONS

Plaintiffs have filed the following motions that remain to be addressed:

1. Plaintiffs' Motion in Limine to Exclude Live Testimony by Plaintiffs' Rule 30(b)(6) Designee (ECF 652)

2. Plaintiffs' Motion in Limine to Allow Plaintiffs to Ask and Prohibit Agri Stats from Asking Leading Questions of Certain Witnesses (ECF 660)

3. Plaintiffs' Motion in Limine to Exclude Non-Public Documents and Depositions that Were Not Produced in Discovery in this Case (ECF 669)

4. Plaintiffs' Motion to Take a Limited 30(b)(6) Deposition of Agri Stats on New Settlement Agreements (ECF 694)

For the reasons provided in Plaintiffs' memoranda in support of these motions, each of these motions should be granted.

In addition, on April 17, 2026—nine months after the close of expert discovery and less than three weeks before trial—Agri Stats disclosed an untimely "supplemental" expert report. Plaintiffs intend to move to strike any testimony based on that disclosure as untimely.

28

**B.    AGRI STATS' OUTSTANDING MOTIONS**

Agri Stats has submitted an "omnibus" motion in limine, ECF 644, seeking to exclude the following categories of evidence:

1. Features of Agri Stats Reports Eliminated Through Settlement

2. Settlement Agreements as Evidence of Liability

3. Employee Compensation and Personal Financial Documents

4. Conduct Not Alleged in the Second Amended Complaint

5. Cross-Market Evidence of Anticompetitive Effects

6. Agri Stats' Executives' Desire to Restart Pork and Turkey Benchmarking

7. Testimony of Gary Redner

For the reasons provided in Plaintiffs' opposition to that motion, ECF 706, Agri Stats' omnibus motion in limine should be denied in its entirety.

## VI.    LENGTH OF TRIAL

Consistent with the Court's oral rulings at the April 10, 2026 pre-trial status conference, Plaintiffs estimate that the trial—in total—will take three weeks, with each side allotted 40 hours of total trial time.

## VII.    CONCLUSION

The evidence at trial will show that Agri Stats' information exchanges are anticompetitive and have harmed consumers in the markets for broiler chicken, pork, and turkey, raising prices for these protein products that are ultimately paid by American families. There will be little evidence in support of any pro-competitive effects claimed by Agri Stats, and in any event, the evidence will show that those benefits could easily be

29

achieved by less restrictive means. Judgment should be entered for Plaintiffs and Agri Stats

should be enjoined from operating its unlawful information exchanges.


Dated: April 20, 2026                    Respectfully,

                                               **FOR PLAINTIFF UNITED STATES OF AMERICA:**

                                               DANIEL N. ROSEN
United States Attorney
Attorney for the United States Acting Under
Authority Conferred by
28 U.S.C. § 515

*/s/* Mark H.M. Sosnowsky
MARK H.M. SOSNOWSKY (*Pro Hac Vice)*
KATE M. RIGGS (*Pro Hac Vice*)
JAMES H. CONGDON (*Pro Hac Vice)*
WILLIAM M. FRIEDMAN (*Pro Hac Vice*)
RACHEL S. HANSEN (*Pro Hac Vice*)
GRIFFIN S. KENNY (*Pro Hac Vice*)
STEVEN KRAMER (*Pro Hac Vice*)
PETER A. NELSON (*Pro Hac Vice*)
DAVID M. TESLICKO *(Pro Hac Vice)*
ANNA WANG (*Pro Hac Vice*)


United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 812-4723
Facsimile: (202) 307-5802
Mark.Sosnowsky@usdoj.gov
Kate.Riggs@usdoj.gov
James.Congdon@usdoj.gov
William.Friedman2@usdoj.gov

Rachel.Hansen@usdoj.gov
Griffin.Kenny@usdoj.gov

30

Steven.Kramer@usdoj.gov
Peter.Nelson@usdoj.gov
David.Teslicko@usdoj.gov
Anna.Wang@usdoj.gov

*Attorneys for United States of America*


**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON
Attorney General of Minnesota

*/s/* Katherine A. Moerke
JAMES CANADAY (No. 030234X)
Deputy Attorney General
KATHERINE A. MOERKE (No. 0312277)
ELIZABETH ODETTE (No. 0340698)
SARAH DOKTORI (No. 0403060)
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2130
james.canaday@ag.state.mn.us
Telephone: (651) 757-1421
katherine.moerke@ag.state.mn.us
Telephone: (651) 757-1288
elizabeth.odette@ag.state.mn.us
Telephone: (651) 728-7208
sarah.doktori@ag.state.mn.us
Telephone: (651) 583-6694

*Attorneys for State of Minnesota and Local Counsel for States of California, North Carolina, Tennessee, Texas, and Utah*


**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General of California

31

/s/ Michael Jorgenson
NICOLE GORDON (*Pro Hac Vice*)
Deputy Attorney General
MICHAEL JORGENSON (*Pro Hac Vice*)
Supervising Deputy Attorney General
PAULA BLIZZARD (*Pro Hac Vice*)
Senior Assistant Attorney General
CASEY KOVARIK (*Pro Hac Vice*)
Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Ste. 11000
San Francisco, CA  94102
Telephone: 415.510.3534
E-mail:  Michael.Jorgenson@doj.ca.gov

*Attorneys for State of California*


**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JEFF JACKSON
Attorney General of North Carolina

/s/ Kunal Choksi
KUNAL CHOKSI (*Pro Hac Vice*)
Senior Deputy Attorney General
FRANCISCO BENZONI (*Pro Hac Vice*)
Special Deputy Attorney General
CHARLES G. WHITE, II (*Pro Hac Vice*)
Assistant Attorney General
114 W. Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-8611
kchoksi@ncdoj.gov
fbenzoni@ncdoj.gov
cwhite@ncdoj.gov

*Attorneys for State of North Carolina*

**FOR PLAINTIFF STATE OF TENNESSEE:**

32

JONATHAN SKRMETTI
Attorney General of Tennessee

/s/ Daniel Lynch
ETHAN BOWERS (*Pro Hac Vice*)
Senior Assistant Attorney General
DANIEL LYNCH (*Pro Hac Vice*)
Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Ethan.Bowers@ag.tn.gov
Daniel.Lynch@ag.tn.gov

Telephone: (615) 741-8091

*Attorneys for State of Tennessee*


**FOR PLAINTIFF STATE OF TEXAS:**

KEN PAXTON
Attorney General of Texas

/s/ William Shieber
BRENT WEBSTER
First Assistant Attorney General
RALPH MOLINA
Deputy First Assistant Attorney General
AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation
WILLIAM SHIEBER (*Pro Hac Vice*)
Senior Staff Attorney, Antitrust Division
PAIGE ETHERINGTON (*Pro Hac Vice*)
Assistant Attorney General
Office of the Attorney General, State of Texas
300 West 15th Street
Austin, Texas 78701
Telephone: (512) 463-1710
William.Shieber@oag.texas.gov

*Attorneys for State of Texas*

33

**FOR PLAINTIFF STATE OF UTAH:**

DEREK E. BROWN
Attorney General of Utah

*/s/* Matthew Michaloski
MATTHEW MICHALOSKI (*Pro Hac Vice*)
Assistant Attorney General
MARIE W.L. MARTIN (*Pro Hac Vice*)
Division Director
Utah Office of the Attorney General
P.O. Box 140811
160 E. 300 South
Salt Lake City, UT  84114
Telephone: (801) 366-0375
Fax: (801) 366-0378
mmichaloski@agutah.gov
mwmartin@agutah.gov

*Attorneys for State of Utah*

34