## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| *IN RE PORK ANTITRUST LITIGATION*<br><br>This Document Relates To:<br><br>ALL ACTIONS BROUGHT BY DIRECT ACTION DAPS | Civil No. 18-cv-1776-JRT-JFD<br><br>The Honorable Judge John R. Tunheim |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE DIRECT-ACTION PLAINTIFFS' CLAIMS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    SUMMARY OF ALLEGATIONS ...................................................... 4

    A.    The Court Rejects Allegations that Defendants Fraudulently Concealed the Alleged Conspiracy. ........................................................ 4

    B.    DAPs File Their Individual Complaints, Making Identical Allegations as Class Plaintiffs. ........................................................ 6

    C.    Like the Class Plaintiffs, DAPs Allege Defendants Publicly Revealed Their Alleged Supply Cuts. ........................................................ 6

    D.    Agri Stats Publicly Marketed Its Services Since at Least 2008. ........................ 9

    E.    DAPs Allege That the Effects of the Alleged Conspiracy Were Demonstrated in Data Published by the Government Since 2009. ......................... 12

III.    LEGAL STANDARD ..................................................................... 13

IV.    ARGUMENT ................................................................................. 14

    A.    DAPs' Time-Barred Claims Must Be Dismissed. ........................... 14

        1.    DAPs Have Not Sufficiently Pleaded Fraudulent Concealment............ 15

            a.    Plaintiffs Plead Disclosure, Not Concealment. ............................ 15

            b.    DAPs Failed to Sufficiently Allege Diligence. ............................ 20

        2.    *American Pipe* Does Not Apply to Claims that Were Not Pleaded in the Class Actions................................................. 22

    B.    DAPs Have No Private Right of Action Under the PSA. ................ 23

    C.    Certain DAPs Fail to Plausibly Allege that Multi-Ingredient Products and By-Products Were Affected by the Purported Conspiracy. ................... 25

V.    CONCLUSION .............................................................................. 27

# TABLE OF AUTHORITIES

**Page**

**CASES**

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974)................................................................................3, 22

*Ashanti v. City of Golden Valley*,
    666 F.3d 1148 (8th Cir. 2012) ...........................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................13, 27

*United States ex rel. Cairns v. D.S. Med. LLC*,
    42 F.4th 828 (8th Cir. 2022) .............................................................24

*In re Cattle Antitrust Litig.*,
    2021 WL 7757881 (Sept. 14, 2021) ..................................................24

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
    523 F.2d 389 (6th Cir. 1975) ............................................................21

*Ecodyne Corp. v. Guthrie N. Am., Inc.*,
    716 F. Supp. 1132 (N.D. Ill. 1989) ...................................................18

*Hinds County, Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ..............................................21

*Hope v. Klabal*,
    457 F.3d 784 (8th Cir. 2006) ............................................................21

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    2014 WL 943224 (D. Minn. Mar. 11, 2014), *aff'd,* 797 F.3d 538 (8th Cir. 2015) .....13, 20

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)..........................................................................14

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ............................................................13

*Lundgren v. Bank of Am., N.A.*,
    2012 WL 929706 (N.D. Cal. Mar. 19, 2012) ................................................15

*Maplevale Farms, Inc., v. Agri Stats, Inc.*,
    No. 0:18-cv-01803, Dkt. 1 (D. Minn. June 29, 2018) ...................................4, 22

*In re Merrill Lynch Ltd. P'ships Litig.*,
    154 F.3d 56 (2d Cir. 1998) .............................................................................22

*In re Milk Prods. Antitrust Litig.*,
    84 F. Supp. 2d 1016 (D. Minn. 1997), *aff'd,* 195 F.3d 430 (8th Cir. 1999).... 3, 15, 18, 19, 20, 21

*In re Monosodium Glutamate Antitrust Litig.*,
    2003 WL 297287 (D. Minn. Feb. 6, 2003) ......................................................19

*New Prime, Inc. v. Eaton Corp.*,
    2017 WL 5992466 (W.D. Mo. Mar. 16, 2017) .................................................19

*Nitro Distrib., Inc. v. Alticor, Inc.*,
    565 F.3d 417 (8th Cir. 2009) ..........................................................................14

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
    2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ...................................................27

*In re Optical Disk Drive Antitrust Litig.*,
    2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ...................................................26

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) ..........................................................................18

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020).............................. 1, 5, 6, 14, 15, 16, 17, 18, 19, 20

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) ........................................................................14

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*,
    9 F. Supp. 3d 1032 (D. Minn. 2014).................................................................13

*Ripplinger v. Amoco Oil Co.*,
    916 F.2d 441 (8th Cir. 1990) .........................................................................3, 19

*Summerhill v. Terminix, Inc.*,
    637 F.3d 877 (8th Cir. 2011) ......................................................................13, 14

iii

*Varner v. Peterson Farms*,
371 F.3d 1011 (8th Cir. 2004) ...................................................................13, 14

*Wesman v. United Parcel Serv., Inc.*,
2008 WL 2564458 (D. Minn. June 24, 2008).....................................................15

*In re Wholesale Grocery Prods. Antitrust Litig.*,
722 F. Supp. 2d 1079 (D. Minn. 2010).......................................... 15, 18, 20, 21

*In re WorldCom Sec. Litig.*,
496 F.3d 245 (2d Cir. 2007) ...............................................................................22

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,
413 F.3d 553 (6th Cir. 2005) ..............................................................................22

*Zarecor v. Morgan Keegan & Co.*,
801 F.3d 882 (8th Cir. 2015) ..............................................................................22

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)............................................................................................14

**STATUTES**

7 U.S.C. § 182(3).........................................................................................................24

7 U.S.C. § 182(4).........................................................................................................24

7 U.S.C. § 182(5).........................................................................................................24

7 U.S.C. § 192 ..............................................................................................................23

7 U.S.C. § 209 ..............................................................................................................24

7 U.S.C. § 209(a) ...........................................................................................................3

15 U.S.C. § 15b ............................................................................................................14

**OTHER AUTHORITIES**

H. Rep. No. 94-1043 ....................................................................................................25

# I.    INTRODUCTION

In their Consolidated Complaint ("DAPCC"), Direct-Action Plaintiffs ("DAPs") attempt an end-run around the Court's prior rejection of the class-action plaintiffs' ("Class Plaintiffs") claim that Defendants fraudulently concealed the alleged conspiracy. As the Court observed, "the heart of the complaint is that this conspiracy was agreed to and conducted in part via public statements between the Defendants. It is difficult to reconcile the Plaintiffs['] belief that Defendants conducted this conspiracy via public statements with its assertion that Defendants were also concealing it." *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 774 (D. Minn. 2020). Attempting to revisit this holding, DAPs repeat and repackage the same types of allegations made by the Class Plaintiffs that this Court has already rejected. Even with the benefit of completed discovery, DAPs plead no basis to depart from the Court's prior ruling.

Just like the Class Plaintiffs, DAPs allege a conspiracy to restrict pork supply that supposedly began in 2009. DAPs allege that the Packer/Processor Defendants carried out this conspiracy by using public statements to coordinate supply cuts and exchanging competitively sensitive information through their co-conspirator, Agri Stats, to monitor and enforce the conspiracy. According to DAPs, by late 2009, the alleged conspiracy to restrict supply achieved its intended effect of artificially inflating pork prices, as evidenced by abnormal price movements reflected in publicly available data. Yet DAPs did not file suit until more than ten years later, belatedly asserting claims for violation of (1) Section 1 of

the Sherman Act and (2) the Packers & Stockyards Act (the "PSA").[1]

Under the applicable four-year statutes of limitations, DAPs' claims that accrued more than four years before they filed their respective original complaints are time-barred.[2] Like the Class Plaintiffs, DAPs rely on fraudulent concealment to avoid the statute of limitations.

DAPs' Complaint offers nothing new that warrants departing from this Court's prior ruling in the class cases. Just like the Class Plaintiffs, DAPs have "made public statements an essential part of their conspiracy allegations." *Id.* Indeed, DAPs' Complaint copies copiously from the Class Plaintiffs' rejected allegations and cites the same public statements, news articles, and published data—all of which were in the public domain long before their suits were initiated. And just as the Court previously held, the theory that Defendants conducted their supposed conspiracy via public statements remains irreconcilable with the assertion that Defendants also concealed it.

DAPs' allegations of Defendants' pretextual explanations and secret communications offer nothing beyond the same types of allegations offered by the Class Plaintiffs that this Court already rejected. The Court's order was consistent with the well-settled law in this district that fraudulent concealment cannot be established by alleging that

---

[1] Only 34 of 66 DAPs assert a PSA claim: all *Action Meats* DAPs other than PFD Enterprises; the *Kroger* DAPs; and the *Publix* DAPs. *See, e.g.*, DAPCC § II, Chart of DAPs, Defendants, and Causes of Action, pp. 5-21.

[2] Defendants deny that there was any conspiracy or that the alleged conspiratorial acts DAPs complain of continued beyond 2014. In light of the Court's prior ruling in the class cases, however, for the purpose of this motion only, Defendants do not challenge the adequacy of DAPs' allegations of continuing violation.

Defendants denied the existence of a conspiracy and instead attributed price increases to non-conspiratorial factors. *See, e.g.*, *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022-24 (D. Minn. 1997), *aff'd,* 195 F.3d 430 (8th Cir. 1999). Nor can DAPs establish fraudulent concealment by pointing to secret communications to coordinate supply cuts, as these are same acts that constitute the alleged conspiracy. *See id.*; *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990). Fraudulent concealment of a conspiracy requires something more than the acts involved in the conspiracy itself, which by nature is conducted in secrecy. If these allegations sufficed to establish fraudulent concealment, every conspiracy case would be subject to fraudulent concealment, effectively nullifying the statute of limitations in these cases. That is not the law.

In addition to fraudulent concealment, DAPs assert that the filing of the *Maplevale Farms* putative class action on June 29, 2018, tolled the statute of limitations under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), rendering timely their claims that accrued after June 29, 2014. But even if *American Pipe* tolling applied, that doctrine cannot be extended to DAPs' PSA claims or claims concerning multi-ingredient products and pork by-products because the Class Plaintiffs did not plead them. Those claims that accrued more than four years prior to the filing of DAPs' individual complaint must thus be dismissed.

Additionally, DAPs' PSA claims must be dismissed in their entirety on the separate ground that DAPs lack standing to assert them. The PSA affords a private right of action only to those who have sustained injuries "relating to the *purchase, sale, or handling of livestock*." 7 U.S.C. § 209(a) (emphasis added). No DAP is alleged to have purchased, sold,

or handled livestock.

DAPs' claims based on multi-ingredient products and pork by-products must also be dismissed in their entirety on the ground that DAPs have failed to plausibly allege that these products were the subject of any purported conspiracy. DAPs' Complaint offers no allegations supporting their claim that the Defendants conspired to restrict the supply of nearly infinite number of products that contain pork as an ingredient or pork by-products. DAPs' sole reference to such products in their definition of "pork" is insufficient to state a claim.

Accordingly, Defendants respectfully request that the Court dismiss (1) DAPs' Sherman Act claims that accrued prior to June 29, 2014; (2) DAPs' PSA claims in their entirety or any such claims that accrued four years before DAPs first asserted those claims; and (3) DAPs' claims based on multi-ingredient products or pork-by products in their entirety or any such claims that accrued four years before DAPs first asserted those claims.

## II.     SUMMARY OF ALLEGATIONS

### A.     The Court Rejects Allegations that Defendants Fraudulently Concealed the Alleged Conspiracy.

On June 29, 2018, Maplevale Farms, Inc. filed a putative class action on behalf of direct purchasers of pork, alleging that since 2009, Defendants conspired to limit the supply of pork in order to raise prices in violation of Section 1 of the Sherman Act. *See Maplevale Farms, Inc., v. Agri Stats, Inc.*, No. 0:18-cv-01803, Dkt. 1 (D. Minn. June 29, 2018) ("Maplevale Complaint"). Two other putative classes filed suit asserting identical allegations. The Class Plaintiffs alleged that Defendants carried out the supposed conspiracy in two ways: (1) by signaling their planned supply cuts using public statements, Dkt. 431 ¶ 5, and (2) by exchanging detailed, competitively sensitive, and non-public information through Agri Stats

to monitor and enforce the alleged conspiracy. *Id.* ¶ 3. The Class Plaintiffs claimed that, as a result of the conspiracy, pork prices started to increase in 2009 and remained artificially inflated. *Id.* ¶ 7. The Class Plaintiffs relied extensively on public information to support their allegations.

After initially dismissing the complaints filed by the Class Plaintiffs, the Court permitted the suit to proceed. The Court, however, rejected the Class Plaintiffs' allegations that Defendants fraudulently concealed the alleged conspiracy. *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 774 (D. Minn. 2020). The Class Plaintiffs alleged that Defendants took affirmative actions to fraudulently conceal the conspiracy by using "secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats—a 'proprietary, privileged, and confidential' system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators." *Id.* at 773. To buttress these allegations, the Class Plaintiffs argued that "(1) Agri Stats has described itself as a quiet company that does not advertise what it does; and (2) some defendants gave pretextual (non-conspiracy) reasons to explain why production was slowing." *Id.*

The Court, however, concluded that the Class Plaintiffs' allegations were insufficient to plausibly show that Defendants engaged in a fraudulent-concealment campaign. As the Court reasoned, "the heart of the complaint is that this conspiracy was agreed to and conducted

in part via public statements between the Defendants. It is difficult to reconcile the Plaintiffs['] belief that Defendants conducted this conspiracy via public statements with its assertion that Defendants were also concealing it." *Id.* at 774.[3]

## B.    DAPs File Their Individual Complaints, Making Identical Allegations as Class Plaintiffs.

Between 2019 and 2022, 66 DAPs filed their individual complaints, *see* DAPCC § II, asserting a violation of Section 1 of the Sherman Act based on the same publicly available information relied on by the Class Plaintiffs. 34 DAPs assert an additional cause of action for violation of the PSA. DAPCC § II, ¶¶ 460-71. On December 5, 2022, DAPs filed their Consolidated Complaint.

The Consolidated Complaint largely parrots the allegations contained in the Class Plaintiffs' complaints, including allegations that Defendants fraudulently concealed their supposed conspiracy. To be sure, DAPs cite documents produced in discovery to show that Defendants communicated internally as well as publicly, but as demonstrated below, these allegations do not show that any Defendant actively or fraudulently concealed the alleged conspiracy from any DAP.

## C.    Like the Class Plaintiffs, DAPs Allege Defendants Publicly Revealed Their Alleged Supply Cuts.

Like the Class Plaintiffs, DAPs allege that Defendants freely and *publicly* revealed the alleged conspiracy by "signaling or communicating with each other publicly about their

---

[3] In light of this Court's rejection of the fraudulent-concealment doctrine, in their motions for class certification, the Class Plaintiffs modified their class definitions such that the class period starts in June 2014. Dkt. 1318 at 1; Dkt. 1334 at 2-3; Dkt. 1340 at 1. Therefore, the class cases are being litigated with damages periods starting at June of 2014.

intention to restrict pork supply." DAPCC ¶ 192. According to DAPs, such *public* signals started as early as 2008, with Smithfield *publicly* announcing its plan to reduce its sow herd and supposedly urging all others to follow suit. *Id.* ¶ 6; *see also id.* ¶¶ 231, 269.

In February 2009, Defendants' alleged co-conspirator AgStar *publicly* called on U.S. pork producers to reduce production, "noting that the U.S. pork industry needed to reduce the sow herd by 5-10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows." *Id.* ¶ 275. DAPs freely admit that Smithfield "continued to speak publicly about the progress of Smithfield's efforts to reduce supply," supposedly to provide additional public assurances to its competitors. *Id.* ¶ 278. Like the Class Plaintiffs, DAPs cite a June 16, 2009, Smithfield earnings call during which the CEO stated that the company had already cut its hog supply by 10%, that it was closing its Texas operations that would further cut its supply by 3%, but "our 3% will not fix the hog industry ... Somebody else has got to do something." *Id.* ¶ 283. Like the Class Plaintiffs, DAPs allege that in its July 2009 annual report, Smithfield again "confirmed publicly—in a call to action to its co-conspirators—that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd." *Id.* ¶¶ 231, 296.

Like the Class Plaintiffs, DAPs allege that other Defendants agreed to or accepted Smithfield's invitation to collude by *publicly* announcing their own supply reduction. *Id.* ¶ 286, 298. Like the Class Plaintiffs, DAPs allege that during 2010 and beyond, Defendants continued to use *public* channels, particularly earnings calls and SEC filings, to coordinate their alleged collusive efforts to reduce, or refrain from increasing, pork supply. *See, e.g.,*

*id.* ¶¶ 231, 234, 240, 244, 247, 250, 260, 306, 307, 308, 309, 310, 312, 318, 320, 324, 328, 337, 338, 340, 347.

In addition to these public statements that are recycled from the class complaints, DAPs allege that Defendants discussed pork supply at trade group meetings and public events that were widely attended by non-conspirators, including retailers and pork purchasers like DAPs. DAPs allege that the American Meat Institute was particularly important to the operation of the alleged conspiracy. *Id.* ¶¶ 193, 265. The AMI (and later, its successor, NAMI) sponsored the industry's Annual Meat Conference, which included sessions where attendees extensively discussed pork supply, demand, and prices in the domestic and export markets. *Id.* ¶¶ 211-13. According to documents cited by DAPs, the Conference is dedicated to the retail segment of the meat and poultry industry, with more than 200 retailer representatives participating. *See* Robison Decl. Ex. A at 1; Ex. B at 1; Ex. C at 9. Indeed, several DAP executives—from Albertsons, Alex Lee, Associated Food Stores, Harris Teeter, Kroger, Meijer, Supervalu and Target—served on the planning committee for the Conference. *See* Robison Decl. Ex. A at 9; Ex. B at 9; Ex. C at 2.

DAPs allege that the Pork Club also played an important role in the alleged conspiracy. DAPCC ¶¶ 193, 265. According to DAPs, Defendants openly discussed their plans regarding the production, supply, and/or pricing of swine or pork at a number of Pork Club meetings. *Id.* ¶¶ 204, 259, 270, 299. In the 2009 Pork Club meeting in particular, Steve Meyer allegedly "gave a presentation to attendees detailing the degree of supply reductions that the pork industry needed to return to high levels of profitability." *Id.* ¶ 299. As DAPs acknowledge, however, the Pork Club's members include 60 industry participants,

the vast majority of which are not alleged to have had anything to do with the purported conspiracy. *Id.* ¶ 204. DAPs also allege that the Packer/Processor Defendants discussed sow liquidation at the 2012 National Pork Industry Conference, "the largest annual conference in the US that is held for the swine industry, and which has had 750 to over 900 attendees each year." *Id.* ¶ 197 (internal quotations omitted). As a document cited by DAPs shows, NPIC's sponsors include pork purchasers like Plaintiff Nestlé Purina. Robison Decl. Ex. D.

**D.    Agri Stats Publicly Marketed Its Services Since at Least 2008.**

Like the Class Plaintiffs, DAPs allege that "Agri Stats was key to the formation, operation, and continuing stability of the conspiracy alleged in this Complaint." DAPCC ¶ 115. Like the Class Plaintiffs, DAPs admit that Agri Stats *publicly* marketed its services—including the type of detailed information contained in its reports—since at least 2008. Like the Class Plaintiffs, DAPs cite a 2008 article in the trade journal *Advances in Pork Production* in which Greg Bilbrey of Agri Stats encouraged every commercial swine operation to participate in some benchmarking effort. *Id.* ¶ 110 (citing Robison Decl. Ex. E at 43). The *public* article explained that Agri Stats offered such services to swine producers as well as their slaughtering and processing plants. Robison Decl. Ex. E at 41. The article *publicly* revealed the type of information available through Agri Stats benchmarking services:

> Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's costs and financials are reconciled to their general ledger. Participants receive monthly detailed reports and performance summaries that allow them to compare their performance to other participants, the average of all companies and the top 25%. Current month, current quarter and previous twelve

month periods are reported.

*Id.*; *see also* DAPCC ¶ 120.  Additionally, the article explained that "Agri Stats account managers conduct on-site live reviews to assist with report utilization and analysis." Robison Decl. Ex. E at 41-42.

In another article published in 2009 by the London Swine Conference,[4] which was also cited by the Class Plaintiffs, Agri Stats again *publicly* disclosed the type of information offered through its benchmarking services and invited pork processors to participate in benchmarking efforts.  DAPCC ¶ 112 (citing Robison Decl. Ex. F at 80).  In that article, Agri Stats publicly disclosed that it collects and audits detailed financial and production data directly from its participants and that "[r]aw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way."  Robison Decl. Ex. F at 75.  Agri Stats also *publicly* disclosed that "[p]articipants receive monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25% and the top five companies" and that "[e]ach monthly report contains nine sections for analysis and comparison: [1] Performance Summary, [2] Feed Mill, [3] Ingredient Purchasing, [4] Weaned Pig Production, [5] Nursery, [6] Finishing, [7] Wean-to-Finish, [8] Market Haul, and [9] Profit and Sales."  *Id.* at 75-76; *see also*

---

[4] As DAPs note, "[t]he London Swine Conference began in 2001, and its main aim is to provide a forum for the exchange of credible, science-based information for decision makers and influencers in the pork industry."  DAPCC ¶ 118, n.11.  The London Swine Conference has been sponsored by a variety of industry participants, including Plaintiff Nestlé Purina.  *See* https://www.londonswineconference.ca/sponsors.  The London Swine Conference makes its published articles—including Mr. Bilbrey's 2009 article—freely available to the public on its website.  *See* https://www.londonswineconference.ca/resources/benchmarking-and-tools-to-maximize-profit.

DAPCC ¶ 120.

The *public* article also included a table from an exemplar Agri Stats report to further demonstrate the type of information available through Agri Stats services. Robison Decl. Ex. F at 77. The table shows that Agri Stats reports provide the average historical sales price, costs, and profits (which equal sales prices minus costs) of all of the participants and the top 25%, as well as each subscriber's individual ranking compared to other participants. *Id.* "[I]ncluding only production measurements in a benchmark comparison can lead to ineffective efforts," the article explained. *Id.* As the article noted, the ultimate goal of a business "is increasing profitability–not simply increasing level of production." *Id.* (noting that a "common saying in the Agri Stats circle is 'you cannot produce your way to the top of the page.'"). While DAPs infer some nefarious intent from efforts to maximize profits, *see* DAPCC ¶ 123, 125, their own allegations make clear that Agri Stats has made it no secret that its benchmarking services provide detailed and audited production and financial information to allow its subscribers to improve costs, efficiency, and profitability, *id.* ¶ 110-12, 120, 128, 130. Indeed, in addition to Mr. Bilbrey's 2008 and 2009 published articles, DAPs cite to disclosures by Agri Stats in a variety of other *public* sources as the bases of their allegations that Agri Stats reports contained an unusual level of detail about pork producers' operations.[5]

Not only that, DAPs allege that Packer/Processor Defendants freely disclosed that they had access to their competitors' information. *Id.* ¶ 313. DAPs allege, for example, that Smithfield's CEO publicly acknowledged during a December 2010 earnings call that

---

[5] *See, e.g.*, DAPCC ¶¶ 118, 122-24, 126, 127.

Smithfield had nonpublic information about its competitors' pork supply, such as "how many they kill, what their processing levels are and things like that," and that Smithfield had been "impressed with how our competitors have been able to achieve margins that we have not been able to achieve." *Id*. Smithfield's CEO further disclosed that "we are doing some very heavy benchmarking across our operating plants." Robison Decl. Ex. G at 12. DAPs allege that other Defendants expressly cited to Agri Stats data in their price negotiations with DAPs. *Id.* ¶¶ 148, 397.

**E.  DAPs Allege that the Effects of the Alleged Conspiracy Were Demonstrated in Data Published by the Government Since 2009.**

Like the Class Plaintiffs, DAPs allege that, by late 2009, Defendants' alleged conspiracy had the intended effect of increasing pork prices. DAPCC ¶¶ 14, 15. DAPs claim that these effects are evident in *publicly* available data published by the government. For example, DAPs cite aggregate prices published by the USDA to allege that "prices for pork products were less than $1.40/lb from 2000 to 2009," but thereafter "increased dramatically, rising to more than $1.80/lb in 2014, and never dropping below $1.40/lb again." *Id.* ¶ 371. DAPs claim that "[p]ublicly available data also demonstrates that Packer/Processor Defendants and Co-Conspirators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits resistant to changes in price during the conspiracy." *Id.* ¶ 372. According to DAPs, various wholesale and consumer price indices published by the Bureau of Labor Statistics further "show[] a marked increase beginning in 2009 and continuing through 2017." *Id.* ¶ 383; *see also id.* ¶¶ 384-87.

## III.   <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).   A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557.

In deciding a Rule 12(b) motion, a court may consider documents "necessarily embraced by the complaint," *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 9 F. Supp. 3d 1032, 1045 n.6 (D. Minn. 2014), including "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *accord Ashanti v. City of Golden Valley,* 666 F.3d 1148, 1151 (8th Cir. 2012); *Twombly*, 550 U.S. at 568 n.13.   Moreover, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. at 555.

"Generally, a motion to dismiss may be granted when a claim is barred under a statute of limitations." *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004); *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880-81 (8th Cir. 2011) (affirming dismissal of plaintiff's claims on limitations grounds); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 2014 WL 943224, at *4-9 (D. Minn. Mar. 11, 2014), *aff'd,* 797 F.3d 538 (8th Cir. 2015). Although the statute of limitations is an affirmative defense, "if it is clear from the face of the complaint that the action is barred by the applicable limitations period, the burden shifts

to the plaintiff to prove by a preponderance of the evidence that the statute of limitations was in fact tolled." *Varner*, 371 F.3d at 1016. "Under Rule 9(b)'s heightened pleading standard, allegations of fraud, including fraudulent concealment for tolling purposes, must be pleaded with particularity." *Summerhill*, 637 F.3d at 880 (cleaned up).

## IV.   ARGUMENT

### A.   DAPs' Time-Barred Claims Must Be Dismissed.

DAPs allege that Defendants' conspiracy began "at least as early as January 2009" and had the intended effect of increasing pork prices "[b]y late 2009." DAPCC ¶¶ 1, 14. Yet DAPs did not file their complaints until 2019, with some failing to sue until 2022.

Section 4b of the Clayton Act—which governs both DAPs' Section 1 and PSA claims, *see Varner*, 371 F.3d at 1019—"states that any claim for damages under § 4 shall be forever barred unless commenced within four years after the cause of action accrued." *In re Pork*, 495 F. Supp. 3d at 772 (quoting 15 U.S.C. § 15b). An antitrust cause of action "accrues 'when a defendant commits an act that injures a plaintiff's business.'" *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 427 (8th Cir. 2009) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). "In the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years ... each sale to the plaintiff ... starts the statutory period running again." *In re Pork*, 495 F. Supp. 3d at 775 (quoting *In re Pre-Filled Propane Tank Antitrust Litig.,* 860 F.3d 1059, 1064 (8th Cir. 2017)). Even then, plaintiffs "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Propane Tank,* 860 F.3d at 1068 (quoting *Klehr*

*v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997)).

DAPs' claims that are predicated on pork purchases outside the four years preceding the filing of their original complaints are subject to dismissal. *See Wesman v. United Parcel Serv., Inc.*, 2008 WL 2564458, at *4 (D. Minn. June 24, 2008) (dismissing plaintiff's claims based on acts that occurred outside of the limitations period); *Lundgren v. Bank of Am., N.A.*, 2012 WL 929706, at *6 (N.D. Cal. Mar. 19, 2012) (dismissing parts of plaintiff's claims that were time-barred). Plaintiffs seek to escape the statute of limitations by invoking two exceptions: (1) fraudulent concealment and (2) and *American Pipe* tolling. DAPCC ¶ 390, 449. Neither doctrine can salvage DAPs' time-barred claims.

## 1. DAPs Have Not Sufficiently Pleaded Fraudulent Concealment.

DAPs have not and cannot establish that their claims were tolled by fraudulent concealment. To invoke this doctrine, DAPs must allege facts showing: "(1) Defendants' concealment of Plaintiffs' cause of action, (2) failure by Plaintiffs to discover the existence of their cause of action, and (3) due diligence by Plaintiffs in attempting to discover the claim." *In re Pork*, 495 F. Supp. 3d at 772 (quoting *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999)); *accord In re Wholesale Grocery Prods. Antitrust Litig.*, 722 F. Supp. 2d 1079, 1084 (D. Minn. 2010). "Failure to properly allege any one of these elements is fatal to Plaintiffs' claim." *Milk Prods.*, 84 F. Supp. 2d at 1022.

### a. Plaintiffs Plead Disclosure, Not Concealment.

DAPs' fraudulent-concealment allegations fail on the first prong. As this Court stated in rejecting the Class Plaintiffs' fraudulent concealment claim on the first prong, "the

heart of the complaint is that this conspiracy was agreed to and conducted in part via public statements between the Defendants.  It is difficult to reconcile the Plaintiffs['] belief that Defendants conducted this conspiracy via public statements with its assertion that Defendants were also concealing it." *In re Pork*, 495 F. Supp. 3d at 774.

DAPs' allegations of fraudulent concealment suffer from the same defect.  Just like the complaints of the Class Plaintiffs, DAPs' Complaint is replete with allegations that Defendants openly and publicly revealed and executed the supposed conspiracy.  Specifically, Plaintiffs allege that since 2008, Smithfield repeatedly disclosed its intentions to reduce the supply of pork in numerous public statements and publicly called upon other Packer/Processors Defendants to join its efforts.  *See, e.g.,* DAPCC ¶¶ 6, 231, 269, 278, 283, 296.  Other Defendants publicly accepted Smithfield's alleged invitation to collude and announced their own supply reductions.  *See, e.g., id.* ¶¶ 258, 286, 294, 295, 298.  Throughout the entire alleged conspiracy, Defendants allegedly coordinated their supply-restriction efforts via public statements made in earnings calls and widely distributed publications.  *See, e.g., id.* ¶¶ 231, 234, 240, 244, 247, 250, 260, 306, 307, 308, 309, 310, 312, 318, 320, 324, 328, 337, 338, 340, 347.  Not only that, DAPs allege that Defendants extensively and openly discussed their alleged coordinated supply restrictions at trade group meetings and conferences attended by dozens and sometimes hundreds of non-conspirators, including events that DAPs sponsored, planned, and attended.  *See, e.g., id.* ¶¶ 193, 197, 204, 211-213, 259, 265, 270, 299.

Moreover, as numerous publications cited by DAPs show, Agri Stats publicly marketed its services and disclosed the supposedly unusual level of detailed information that

it collected, verified, and distributed to its subscribers in the pork industry. *See, e.g., id.* ¶ 110-112, 118, 120-124, 126-128, 130; *see also* Robison Decl. Exs. E-F. Agri Stats even disclosed sample reports showing that it provided subscribers information about other producers' sales prices, costs, and profits, as well as their production metrics. *See* DAPCC ¶ 122-23; Robison Decl. Ex. F at 77. Indeed, Plaintiffs rely on these public disclosures to allege that Agri Stats services evince a conspiracy because competitors would normally protect such information "unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other as occurred in the pork industry." DAPCC ¶ 125; *see also id.* ¶ 123 (alleging that the financial information contained in Agri Stats reports "underscores" the conspiratorial purpose of Agri Stats services); ¶ 151 (alleging that "[t]here is no plausible, non-conspiratorial justification" for Defendants to provide and receive benchmarking information "at the level of detail at which they did" through Agri Stats).

Despite basing their conspiracy allegations on information Defendants publicly disclosed, DAPs nevertheless assert that Defendants fraudulently concealed the conspiracy by providing "pretextual statements to their customers and to the public in justifying supply cuts and price increases" and "communicat[ing] in secret to coordinate their supply reductions and price increases." *Id.* ¶ 391, 400. The Class Plaintiffs made similar allegations, but the Court found such assertions failed to plausibly allege that the Defendants engaged in a fraudulent-concealment campaign. *See In re Pork*, 495 F. Supp. 3d at 774. The same result is compelled here.

DAPs cannot satisfy the requirements for fraudulent concealment by alleging that

Defendants denied the existence of a conspiracy and instead attributed price increases to non-conspiratorial factors. DAPCC ¶¶ 391-96, 398-99. *Milk Products* is instructive here. The plaintiffs in that case alleged that defendants fraudulently concealed their conspiracy by "publicly den[ying] price fixing allegations" and instead attributing their high profits to other factors, such as "diversified operations, improved efficiency, drought, tight supplies, and state law." 84 F. Supp. 2d at 1022-24. The court held that plaintiffs' allegations were insufficient to toll the limitations period because "[s]imply denying the existence of an antitrust violation" or "attribut[ing] the change in prices to factors other than an illegal conspiracy" "does not constitute fraudulent concealment." *Id.* at 1023-24. "[T]o hold otherwise 'would effectively nullify the statute of limitations in these cases.'" *Id.* (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987)); *accord In re Pork,* 495 F. Supp. 3d at 773 (holding that Class Plaintiffs' allegations that "some defendants gave pretextual (non-conspiracy) reasons to explain why production was slowing" was insufficient to establish fraudulent concealment); *In re Wholesale Grocery*, 722 F. Supp. 2d at 1085 (holding that plaintiffs' argument that defendant fraudulently concealed its wrongdoing by attributing price increases to "unavoidable business conditions rather than disclosing that it had entered into a non-compete agreement" was "unrealistic and untenable"); *Ecodyne Corp. v. Guthrie N. Am., Inc.,* 716 F. Supp. 1132, 1137 (N.D. Ill. 1989) (denial of wrongdoing "is not sufficient to constitute an affirmative act of concealment").

Plaintiffs' allegations that Defendants secretly coordinated their supply reductions fare no better. DAPCC ¶¶ 400-426. As the Eighth Circuit has held, fraudulent concealment

"requires an act of affirmative misrepresentation over and above the acts creating the alleged cause of action." *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990); *accord Milk Prods.*, 84 F. Supp. 2d at 1022 ("Plaintiffs must make specific allegations of affirmative acts taken solely to conceal a price fixing conspiracy."). But the alleged conduct that underlies DAPs' fraudulent-concealment claim are the very same acts that form the bases of DAPs' conspiracy allegations—namely, exchange of information between Defendants. *Compare id.* ¶¶ 402, 406, 409, *with id.* ¶¶ 282, 283, 315, 322, 323, 326, 327, 330, 346, 360. DAPs' only additional allegation is that Defendants kept these alleged conspiratorial communications "secret" by not disclosing them to the public. *Id.* ¶ 400. "Non-disclosure is not enough to qualify as fraudulent concealment," however. *New Prime, Inc. v. Eaton Corp.*, 2017 WL 5992466, at *3 (W.D. Mo. Mar. 16, 2017) (citing *Ripplinger*, 916 F.2d at 442); *accord Milk Prods.*, 84 F. Supp. 2d at 1023 ("silence or passive conduct is not fraudulent unless parties' relationship imposes duty to disclose") (internal quotation marks omitted). If fraudulent concealments can be established by merely alleging that defendants kept their conspiratorial acts "secret," every conspiracy claim would be subject to tolling. *See In re Monosodium Glutamate Antitrust Litig.*, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003) ("Fraudulent concealment of a conspiracy encompasses something more than the acts involved in the conspiracy itself, which is by nature a crime of secrecy and cover-up."); *cf. In re Pork*, 495 F. Supp. 3d at 773 (holding that merely alleging that a conspiracy was self-concealing is not sufficient to establish fraudulent concealment). That is not the law, as this Court's prior order recognized.

### b. DAPs Failed to Sufficiently Allege Diligence.

Because DAPs' fraudulent-concealment theory fails on the first prong of the doctrine, the Court need not address any other prongs. However, DAPs' theory fails for the additional reason that DAPs did not adequately allege facts showing that they diligently attempted to discover their claims. *In re Pork*, 495 F. Supp. 3d at 773; *Milk Prods.*, 84 F. Supp. 2d at 1024; *Insulate*, 2014 WL 943224, at *5; *In re Wholesale Grocery*, 722 F. Supp. 2d at 1084-86. DAPs assert in conclusory fashion that they "engaged in due diligence" by "seeking price quotes and bids from their suppliers and/or investigating reasonably available public information" and believed in good faith that they were receiving competitive pork prices. DAPCC ¶ 448.

DAPs' vague and conclusory assertions are insufficient in light of the information that was publicly available. As DAPs allege, since 2009, publicly available data demonstrated abnormal wholesale and consumer pork prices, as well as unusual profits earned by Defendants. DAPCC ¶¶ 371-72, 383-87. "This fact alone would seem to excite attention and thus put [DAPs] on inquiry notice." *Milk Prods.*, 84 F. Supp. 2d at 1024; *accord Wholesale Grocery*, 722 F. Supp. 2d at 1085 (experiencing higher prices "would create notice and excite attention").

But there was much more. By 2009, Defendants were allegedly signaling and communicating their intentions to restrict pork supply through public statements. DAPCC ¶¶ 231, 258, 278, 283, 286, 294-96, 298, 305. Agri Stats also disclosed the type of detailed information contained in its reports in articles published in 2008 and 2009. Robison Decl. Exs. E, F. According to DAPs, Defendants likewise publicly disclosed that they had access

to their competitors' information. DAPCC ¶ 313. Indeed, nearly every element of DAPs' conspiracy theory was available in the public record by 2009.

Unlike an ordinary consumer who may not have been in a position to heed these storm warnings, DAPs are some of the largest and most sophisticated businesses in the country that purchase millions of dollars' worth of pork every year. *See, e.g.,* DAPCC ¶ 42 ("Sysco is one of the leading marketers and distributors of food products and food services throughout the United States."). A reasonable business in DAPs' position undoubtedly should have investigated the purported abnormal pork prices observed in 2009. *See Hope v. Klabal*, 457 F.3d 784, 792 (8th Cir. 2006) (detailing the standard of reasonable diligence for "a sophisticated business person").

While DAPs allege in nonspecific, conclusory fashion that they conducted a reasonable investigation, they "fail to allege the specific questions posed in those inquiries or that Plaintiffs ever *pursued* their inquiries." *Wholesale Grocery*, 722 F. Supp. 2d at 1086 (emphasis in original). Bereft of any specific details, DAPs' bare assertions are insufficient to establish the diligence required for fraudulent concealment. *See id.*; *Milk Prods.*, 84 F. Supp. 2d at 1024-25 (Plaintiffs failed to satisfy the diligence element of fraudulent concealment because they offered no explanation of the steps they took to discover their claims and did not "explain why the facts underlying their claim were not available to them at an earlier date"); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir. 1975) ("mere allegation of due diligence without asserting what steps were taken is insufficient"); *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 521 (S.D.N.Y. 2009) (holding that due diligence is not adequately pleaded when a plaintiff fails to make

allegations of "'specific inquiries [or to] detail when such inquiries were made, to whom, regarding what, and with what response.'") (quoting *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)).

2. ***American Pipe* Does Not Apply To Claims That Were Not Pleaded In the Class Actions.**

DAPs assert that the filing of the *Maplevale* class action on June 29, 2018, suspended the running of the statute of limitations under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), rendering timely claims that accrued after June 29, 2014. DAPCC ¶ 388, 390. Even if *American Pipe* applied, the statute of limitations for claims that were not pleaded in the class actions cannot be tolled under that doctrine.[6] The Eighth Circuit has held that "*American Pipe* tolling should be limited to claims filed in a later action that are the same as those pleaded in the putative class action." *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 888 (8th Cir. 2015).

The direct purchaser class plaintiffs did not assert any PSA claims. *See* Maplevale Complaint at 42-44 (asserting a single cause of action for violation of section 1 of the Sherman Act). Instead, those claims were first asserted by Kroger and Publix DAPs in December 2021

---

[6] The Circuits are split on whether plaintiffs who file their individual complaints before the court has ruled on class certification can rely on *American Pipe* tolling. *See, e.g., Wyser-Pratte Mgmt. Co. v. Telxon Corp.,* 413 F.3d 553, 568 (6th Cir. 2005) (holding that "a plaintiff who chooses to file an independent action without waiting for a determination on the class certification issue may not rely on the *American Pipe* tolling doctrine."); *In re WorldCom Sec. Litig.,* 496 F.3d 245, 255 (2d Cir. 2007) (holding that plaintiffs who file their complaints before class certification decision can rely on *American Pipe* tolling). The Eight Circuit has not ruled on this issue. For purposes of this motion only, Defendants do not contest that DAPs may rely on *American Pipe* tolling for their Sherman Act claims based on pork products covered in the *Maplevale* Complaint but reserve all rights related to this issue.

and by Action Meat DAPs in April 2022.  This means that Kroger and Publix DAPs' PSA claims that accrued before December 2017 and Action Meat DAPs' PSA claims that accrued before April 2018 must be dismissed.

Additionally, the direct purchaser class plaintiffs' claims were limited to "pig meat purchased fresh or frozen, smoked ham, sausage and bacon."  Maplevale Complaint ¶ 2, n.1. *American Pipe* tolling does not apply to DAPs' claims based on products that were not encompassed by Class Plaintiffs' complaint, such as "products and by-products containing pork," including "offal and individual parts . . . used in pet foods . . . and/or rendered products (e.g., meat meals and bone meal)."  DAPCC ¶ 1 n.4.  Accordingly, any claims based on purchases of those products that accrued four years prior to the filing of DAPs' individual complaints must be dismissed.

**B.**     **DAPs Have No Private Right of Action Under the PSA.**

Certain DAPs assert a claim under the PSA.  DAPCC § II, ¶¶ 460-71.  DAPs are correct that the PSA prohibits a variety of unfair conduct "with respect to livestock, meats, meat food products, or livestock products in manufactured form."  DAPCC ¶ 462 (describing 7 U.S.C. § 192). The PSA's private right of action, however, is limited to livestock.  Because DAPs did not buy, sell, or handle livestock, their PSA claim must be dismissed.

DAPs baldly misstate the law when they claim that the PSA provides a private right of action against a person that "violates *any* of the provisions of the PSA."  *Id.* at ¶ 470 (emphasis added).  The plain text of the PSA limits its private right of action to conduct not at issue:

> If any person subject to this chapter violates any of the provisions of this chapter, or of any order of the Secretary under this chapter, *relating to the purchase, sale, or handling of livestock*, the purchase or sale of poultry, or relating to any poultry growing arrangement or swine production contract, he shall be liable to the person

or persons injured thereby for the full amount of damages sustained in consequence of such violation.

7 U.S.C. § 209 (emphasis added).

DAPs—large grocers, foodservice distributors, or restaurant chains—do not allege they bought, sold, or handled livestock. Instead, DAPs claim that Defendants "caused [DAPs] damages by forcing them to pay inflated supra-competitive prices for *pork*." DAPCC ¶ 471 (emphasis added). DAPs define "Pork" as:

> a variety of *meat products* from pigs (also referred to in the industry as porcine or swine) purchased fresh, frozen, processed, rendered or non-rendered, including but not limited to any and all processed pork *products*, (e.g., smoked ham, sausage, bacon, pepperoni, lunch meats), and other processed *products* and *by-products* containing pork.

*Id.* at ¶ 1 n.4 (emphases added). "Pork" as DAPs define it is not livestock under the PSA, but a "meat food product" or "livestock product," both of which are defined separately from livestock. The PSA defines "meat food products" as "all products and byproducts of the slaughtering and meat-packing industry—if edible," and "livestock products" as all other "products and byproducts . . . derived in whole or in part from livestock." 7 U.S.C. § 182(3), (5). In contrast, the PSA defines "livestock" as "cattle, sheep, swine, horses, mules, or goats—whether live or dead." 7 U.S.C. § 182(4).[7]

The clear and unambiguous language of the statute thus makes it clear that DAPs cannot assert a private right of action, and the Court can dismiss DAPs' claim on that ground alone. *See,*

---

[7] Defendants have not identified any cases addressing whether purchasers of meat products may assert a private right of action under the PSA, further illustrating the novelty of DAPs' claim. No plaintiff brought a PSA claim in the *Broilers* or *Turkey* cases. Certain of the same DAPs that bring the PSA claim in this case recently filed complaints asserting the same claim in the *Beef* case, but as the Court said in that case, "[o]nly Producer Plaintiffs may bring a PSA claim." *In re Cattle Antitrust Litig.*, 2021 WL 7757881, *9 n.15 (Sept. 14, 2021).

*e.g.*, *United States ex rel. Cairns v. D.S. Med. LLC,* 42 F.4th 828, 836 (8th Cir. 2022).  But the legislative history of Section 209 further both confirms that DAPs' claim does not come within the scope of that section and explains why.  The sole purpose of the amendment granting any private right of action against packers at all was to protect livestock producers.  *See, generally,* Robison Decl. Ex. H (H. Rep. No. 94-1043) at 4-5.

Permitting DAPs' PSA claim to continue would both contradict the letter of the law and undermine the carefully balanced legislative scheme intended by Congress.  DAPs do not allege any violation relating to the purchase, sale, or handling of livestock.  They allege only a claim relating to their purchase of pork—a "meat product"—and their claim under the PSA should be dismissed.

## C.    Certain DAPs Fail to Plausibly Allege That Multi-Ingredient Products and By-Products Were Affected By the Purported Conspiracy.

Certain DAPs purport to include within the scope of the alleged conspiracy all "products and by-products containing pork," including "offal and individual parts . . . used in pet foods . . . and/or rendered products (e.g., meat meals and bone meal)."  *See, e.g.*, DAPCC ¶ 1 n.4.  But DAPs offer no non-conclusory factual allegations supporting a conspiracy to fix, increase, maintain, and/or stabilize the price of multi-ingredient, downstream products like burritos or by-products like bone meal.  Nor have they alleged that the prices DAPs paid for such products would have been affected by the purported conspiracy.  DAPs' Complaint's sole reference to any such product is the single footnote defining "pork."  *See id.*  That single conclusory assertion that "pork" includes products like burritos and bone meal is not sufficient to bring those products within the scope of any purported conspiracy.  The Court should dismiss 1) multi-ingredient products and 2) by-products from the scope of this action.

All of DAPs' factual allegations relate to pork meat for human consumption. DAPs' allegations mirror those asserted by the putative Class Plaintiffs, who alleged a narrower definition of "pork" limited to single-ingredient and minimally processed "*pig meat* purchased fresh or frozen, smoked ham, sausage, and bacon." *See* Dkt. 808 at 4 n.2 (emphasis added); Dkt. 1110 at 7 n.5; Dkt. 431 at 4 n.2 (defining "pork"); c*ompare, e.g.*, DAPCC ¶¶ 159-60 (discussing "meat products" and primals like "loin, bacon, [and] ribs"), 167 (describing supply chain for "[w]holesale cuts . . . sold as boxed pork"), 179-91, 370-78, 379-87 (describing effect of alleged conspiracy on price of "commodity[y]" pork meat), *with, e.g.*, Dkt. 808 ¶¶ 72-85, 86-99, 101, 166-73, 174-82. DAPs' specific allegations actually *exclude* multi-ingredient products from the scope of the conspiracy, with an entire section devoted to the proposition that "Pork is a Commodity Product." DAPCC ¶¶ 158-161. Burritos are not commodity products.

DAPs also do not allege that Defendants control the market for burritos, that each Defendant even makes burritos, or that any Defendants that do make burritos conspired with non-Defendant burrito makers. DAPs in fact allege that the "supply chain" for the products at issue ends when "[w]holesale cuts are sold as boxed pork to further processors, retailers or foodservice operators who further process the meat into retail cuts or value-added products." *Id.* ¶ 167 Fig. 7. What happens after that—*e.g.,* turning actual pork along with other ingredients into a burrito—is beyond the scope of the conspiracy actually alleged. And courts have rejected the proposition that increased prices for downstream end products—here, multi-ingredient products—can be inferred merely from an increase in prices of inputs—like pork—that are subject to a conspiracy. *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *8 (N.D. Cal. Aug. 3, 2011) (dismissing claims related to Optical Disk Drive devices in case relating to conspiracy to price fix Optical Disk

Drives based in part on "the uncertainties discussed in *Illinois Brick* as to when and under what circumstances the price of a finished product will reflect the effects of any price-fixing of a component").

DAPs' allegations regarding non-meat products like bone meal fare no better. As noted above, DAPs offer no allegations at all regarding nonmeat products, other than the cursory and conclusory reference to them in the footnote defining "pork." *Cf. Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *8 (N.D. Ill. Oct. 19, 2020) (dismissing Kraft because "[t]here [was] no price information in the Complaint for processed turkey products like deli meat that Kraft sells"). Additionally, nothing in the Consolidated Complaint suggests that bone meal produced from hogs is distinguishable in any way from bone meal produced from any other animal. DAPs have thus provided no support for the proposition that, e.g., "there is limited substitution between" bone meal from hogs and bone meal from cows, a key point underlying DAPs' claims. *See* DAPCC ¶ 159. DAPs have thus failed to push any alleged conspiracy from "conceivable" to "plausible" with respect to by-products. *Twombly*, 550 U.S. at 570.

The entire Complaint is about pork meat, not the nearly infinite number of products made with pork as an ingredient, and not by-products. *See, e.g.*, *id.* at ¶¶ 137 (discussing "[m]obility within the *meat* production industries"), 166 (life cycle of "piglets grown for *meat* consumption"), 167 ("path for pork raised for *meat* consumption"), 180 ("[m]*eatpacking* concentration levels"), 231 ("profits earned from the sale of packaged *meats*") (emphases added). Multi-ingredient products and by-products must therefore be dismissed.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant this

motion.

Dated: January 20, 2023

/s/ Richard Parker
Richard Parker (*pro hac vice*)
Josh Lipton (*pro hac vice*)
GIBSON, DUNN &CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
rparker@gibsondunn.com
jlipton@gibsondunn.com

Brian Robison (*pro hac vice*)
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
(972) 707-1809
brian@brownfoxlaw.com

John A. Cotter (#0134296)
John A. Kvinge (#0392303)
LARKIN HOFFMAN DALY &
LINDGREN LTD.
8300 Norman Center Drive, Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

**Counsel for Smithfield Foods, Inc.**

/s/ Daniel E. Laytin, P.C.
Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
Jenna M. Stupar (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
Jenna.stupar@kirkland.com

**Counsel for Clemens Food Group, LLC**
**and The Clemens Family Corporation**

/s/ Craig S. Coleman
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

**Counsel for Hormel Foods Corporation and**
**Hormel Foods, LLC**

/s/ Sami H. Rashid

Sami H. Rashid (*pro hac vice*)
Michael B. Carlinsky (*pro hac vice*)
Richard T. Vagas (*pro hac vice*)
David B. Adler (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
samirashid@quinnemanuel.com
michaelcarlinsky@quinnemanuel.com
richardvagas@quinnemanuel.com
davidadler@quinnemanuel.com

Donald G. Heeman (#0286023)
Jessica J. Nelson (#0347358)
Randi J. Winter (#0391354)
SPENCER FANE LLP
100 South Fifth Street, Suite 1900
Minneapolis, MN 55402-4206
(612) 268-7000
dheeman@spencerfane.com
jnelson@spencerfane.com
rwinter@spencerfane.com

***Counsel for JBS USA Food Company***

/s/ William L. Greene

William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
William D. Thomson (#0396743)
Jon W. Ripa (#0402069)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
william.thomson@stinson.com
jon.ripa@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

***Counsel for Seaboard Foods LLC***

/s/ Christopher A. Smith

Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com

**Counsel for Triumph Foods, LLC**

/s/  Tiffany Rider Rohrbaugh

Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

**Counsel for Tyson Foods, Inc., Tyson
Prepared Foods, Inc. and Tyson Fresh Meats,
Inc.**

*/s/ William L. Monts III*

Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**