# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION | Case No. 18–cv–01776–JRT–JFD |
| | Honorable John R. Tunheim |
| This Document Relates To: | **DEFENDANT TRIUMPH FOODS, LLC'S MEMORANDUM OF LAW IN SUPPORT ITS MOTION FOR SUMMARY JUDGMENT** |
| ALL ACTIONS BROUGHT BY DIRECT ACTION PLAINTIFFS | |

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iii

I.   INTRODUCTION ............................................................................................ 1

II.  FACTUAL BACKGROUND ........................................................................... 4

III. ARGUMENT .................................................................................................. 11

    A. Summary Judgment Is Appropriate When There Is No Genuine Dispute of Material Fact Under the Governing Law ......................................................... 11

    B. To Withstand Summary Judgment, the DAPs Must Come Forward With Evidence That Excludes the Possibility of Independent Action, and That Evidence Must Be Specific to Triumph ............................................................. 12

    C. The DAPs' Sherman Act Claim Fails Because They Have No Evidence That Triumph Entered Into an Unlawful Agreement ....................................... 14

    D. Certain DAPs' Packers & Stockyards Act Claim Fails Because the DAPs Have No Private Right of Action Under the PSA and, Even If They Did, It Is Wholly Derivative of—and Rises and Falls With—Their Sherman Act Claim.................. 16

IV. CONCLUSION .............................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018) .......................................................................... 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................... 12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................... 12

*Blomkest Fertilizer, Inc. v. Potash Corp. of,*
   *Sask.*, 203 F.3d 1028 (8th Cir. 2000) (en banc .................................. 13, 14, 16

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ..................................................................................... 12

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004) ....................................................................... 14

*Crews v. Monarch Fire Prot. Dist.*,
   771 F.3d 1085 (8th Cir. 2014) ..................................................................... 11

*De Jong Packing Co. v. U.S. Dep't of Agriculture*,
   618 F.2d 1329 (9th Cir. 1980) ..................................................................... 18

*Doe v. Dardanelle Sch. Dist.*,
   928 F.3d 722 (8th Cir. 2019) ....................................................................... 12

*Hall v. United Air Lines, Inc.*,
   296 F. Supp. 2d 652 (E.D.N.C. 2003) ......................................................... 13

*In re Appraiser Foundation Antitrust Litig.*,
   867 F. Supp. 1407 (D. Minn. 1994) ............................................................. 13

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ........................................................................ 14

*In re Cattle Antitrust Litig.*,
   2020 WL 5884676 (D. Minn. Sept. 29, 2020) ............................................. 18

iii

*In re Pork Antitrust Litig.*,
   495 F. Supp. 3d 753 (D. Minn. 2020) ......................................................... 1, 2

*In re Pork Antitrust Litig.*,
   No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................ 1, 14, 16

*Jackson v. Swift Eckrich, Inc.*,
   53 F.3d 1452 (8th Cir. 1995) ......................................................................... 18

*Kempf v. Hennepin Cty.*,
   987 F.3d 1192 (8th Cir. 2021) ....................................................................... 11

*Kleen Prods. LLC v. Int'l Paper*,
   276 F. Supp. 3d 811 (N.D. Ill. 2017) ............................................................. 14

*Lovett v. Gen. Motors Corp.*,
   998 F.2d 575 (8th Cir. 1993) ......................................................................... 12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................. 12, 13

*McConnell v. Anixter, Inc.*,
   944 F.3d 985 (8th Cir. 2019) ......................................................................... 11

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .................................................................................. 12, 13

*Org. for Competitive Markets v. U.S. Dep't of Agric.*,
   912 F.3d 455 (8th Cir. 2018) ......................................................................... 18

*Robbins v. Becker*,
   794 F.3d 988 (8th Cir. 2015) ......................................................................... 12

*Schumacher v. Cargill Meat Sols. Corp.*,
   515 F.3d 867 (8th Cir. 2008) ......................................................................... 18

## **Statutes**

15 U.S.C. § 1 .................................................................................................. 12

7 U.S.C. § 209(a) ........................................................................................... 17

**<u>Rules</u>**

Fed. R. Civ. P. 56(a) ......................................................................................................... 11

## I.  INTRODUCTION

Plaintiffs have struggled for four years to pinpoint how Triumph could have participated in their alleged supply reduction conspiracy.  Triumph is not a hog producer.  Triumph owns no sows.  Triumph does not price or sell pork.  Triumph is a pork processor only.  That matters because false allegations to the contrary are the only reason any plaintiffs' claims against Triumph have lasted this long.

Triumph was initially dismissed from this litigation because the Court recognized that, in a circumstantial case like plaintiffs', neither parallel conduct nor plus factors alone establish an agreement under Section 1 of the Sherman Act, and plaintiffs failed to allege parallel conduct as to any defendant, including Triumph.  *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497, at *5-9 (D. Minn. Aug. 8, 2019).  Plaintiffs amended their complaints and withstood a second round of motions to dismiss.  There, the Court framed the "critical question" before it as whether plaintiffs sufficiently alleged how **each defendant** "affirmatively acted to reduce the supply of pork."  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 768-69 (D. Minn. 2020).  With respect to Triumph, the Court found just two allegations nudged Plaintiffs' claims over the line: (a) that "[a] farm member of Triumph announced that it was reducing its herd by 11,000 sows in September 2008"; and (b) that "[i]n 2009, Triumph further reduced its herd by 6% (24,500 sows)."  *Id.*  The Court found these allegations, along with similar allegations against certain other defendants, to be the "most specific allegations of herd-size reductions" and that, taken as a whole, they plausibly alleged parallel conduct.  *Id*. at 769-70.

After the plaintiffs survived this second round of motions to dismiss, Direct Action Plaintiff ("DAP") complaints began pouring in, each copying liberally from prior complaints and cutting and pasting *verbatim* the allegations that Triumph reduced "its" sow herd in furtherance of the alleged conspiracy.   Before the DAPs filed their Consolidated Complaint (Doc. 1659, hereinafter "DAP Complaint" or "DAP Compl.") in December 2022, they had completed fact discovery and were advised by counsel for Triumph that Triumph does not own—and has never owned—sows.   But rather than withdrawing their claims against Triumph, the DAPs pushed ahead, while at the same time back-pedaling from earlier allegations that Triumph itself undertook any concrete actions to reduce pork supply.   Specifically, the DAPs now allege that:

> In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back approximately 11,000 sows.  In 2009, Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of ***its members'*** sow herd, contributing to historic production restraints in the pork industry.

DAP Compl. ¶ 258 (emphasis added) (footnotes omitted).   But the DAPs admit that "Triumph ***did not directly own*** its members' sows." *Id*. n.66 (emphasis added).   And, while the DAPs continue to allege that Triumph somehow exported in furtherance of their alleged conspiracy, they offer no specifics, instead parroting the same allegations the Court previously rejected.  *Id*.; *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 769-70 (noting that "Plaintiffs allege that Triumph focused its production on exports but do not provide specifics" and crediting only "specific allegations of increased exports" in concluding plaintiffs' plausibly alleged parallel conduct (cleaned up)).

Fact discovery has closed, and the DAPs' allegations are untenable.  The record is clear, as the DAPs concede, that Triumph does not own sows.  Triumph never has.  So in a case like this without direct evidence of a conspiracy, the alleged sow-herd cuts fail to demonstrate conduct by Triumph, much less parallel conduct in furtherance of some conspiracy, and thus fail to support any claim that Triumph entered into an unlawful agreement to join the alleged cartel.  And the vague export allegations fare no better, because the pork Triumph processes is not marketed or sold by Triumph, whether domestically or abroad: it is sold by Seaboard.  Triumph does not control exports.

What the record actually shows as to Triumph is the opposite of conspiratorial conduct aimed at reducing pork supply.  From Triumph's inception in 2006 onward, Triumph has consistently expanded its pork processing output.  In 2009, the year the DAPs accuse Triumph of reducing its non-existent sow herd, Triumph processed 50 million more pounds of pork than it did in 2008.  And Triumph's processing volume from 2008 to 2018 steadily and dramatically trended upward, increasing by more than 3,000 head per day and by nearly 230 million pounds of pork per year.

The DAPs' case against Triumph rests on the thinnest of allegations and no facts.  And at the close of fact discovery, they have no evidence that Triumph entered any alleged conspiracy.  What was true four yours ago is true now: Triumph does not own or supply hogs.  Triumph does not market or sell pork products.  Triumph is simply a processing plant and should not be a defendant in this litigation.  Summary judgment is appropriate.

## II.     FACTUAL BACKGROUND

Triumph is a pork processor located in St. Joseph, Missouri.[1]  Triumph cannot and does not produce or own its primary raw material: hogs.[2]  As the DAPs concede, Triumph does not own breeding sows and never has.[3]  Nor does Triumph produce hogs itself—it has no hog production assets with which to do so.[4]  Triumph instead purchases every hog

---

[1] Decl. of Christopher Smith ("Smith Decl.") Ex. A, **Triumph Vice President of Hog Procurement Jerry Lehenbauer Dep. Tr. ("Lehenbauer Tr.")** at 221:9-17.

[2] Smith Decl. Ex. B, **Triumph CEO Matt England Dep. Tr. ("England Tr.")** at 298:13-299:4 (Triumph is "pretty unique" in that "we're just focused specifically on operations.  We don't own pigs, we don't produce pigs.  We just process pigs and turn them into pork.").

[3] DAP Compl. ¶ 258 n.66; **England Tr.** at 241:14-242:4 (Triumph's members "owned sows before Triumph was even conceived," "continued [their] ownership after Triumph was started," and "did not transfer [their] ownership").  Triumph's current CEO and both former CEOs, along with Triumph's vice president of hog procurement, all testified that Plaintiffs' allegations that Triumph owns sows was false and that Triumph does not own sows and never has.  **England Tr.** at 266:8-10, 245:11-16; **Lehenbauer Tr.** at 221:18-222:22, 227:9-228:1, 228:3-15, 228:17-229:4; *accord* Smith Decl. Ex. C, **Former Triumph CEO Mark Campbell Dep. Tr. ("Campbell Tr.")** at 195:10-196:7, 196:25-197:6, 197:7-13, 197:14-21 (noting that the notion that Triumph owned sows left him "speechless"), 198:2-11 (describing the allegation as "silly" because "there's no ownership of sows at Triumph Foods"), 198:18-23 (allegation was "just an inappropriate statement"), 199:8-11 ("[W]e don't own any sows so we can't reduce a herd.  That's not been any of the responsibility or authority of Triumph Foods.  We don't own sows."), 200:5-6; Smith Decl. Ex. D, **Founding Triumph CEO Rick Hoffman Dep. Tr. ("Hoffman Tr.")** at 149:14-22.

[4] **Campbell Tr.** at 196:15-19 ("There's no production done by Triumph Foods.  We are not a producer."); *id.* at 197:17-21 ("we do not engage in the operations, ownership of the sows or the offspring thereof" of any hog producer member); *id.* at 198:18-23, 211:21-212:10; **England Tr.** at 233:20-234:23 (Triumph does not own sows, piglets, inventory associated with raising pigs, futures contract associated with grain); *id.* at 243:18-245:9 (Triumph doesn't disclose any ownership of hog production assets or contracts in its financial statements because "that's not the business we're in").

it processes at the time that hog is slaughtered, and Triumph has always done so.[5]  The

majority of these hogs are acquired through contractual agreements with, or

extracontractual purchases from, Triumph's five LLC members, each of which produces

hogs to sell to pork processors including (but by no means limited to) Triumph.[6]  Triumph

does not control its members' production levels, decisions, operations, or sales.[7]

---

[5] **Lehenbauer Tr.** at 222:24-224:6; **England Tr.** at 249:14-250:12 (Triumph only contracts for delivery of hogs, it does not purchase hogs before delivery).  Triumph only processes hogs; it does not process sows.  **England Tr.** at 267:2-269:2 ("Triumph doesn't have any sows.  So the first part would be Triumph couldn't have made any cuts, didn't make any cuts in its sow herd because it didn't have a sow herd. . . .We are interested in pigs. . .And the decision or the reduction made by anybody out in the market related to sows does not by itself necessarily influence that availability of market hogs, which is what we process at our plant to produce pork.").

[6] **Lehenbauer Tr.** at 50:15-23, 242:15-247:9; **Campbell Tr.** at 202:21-203:11 (members have sold, and some continually sell, hogs to other pork processors).

[7] **England Tr.** at 246:2-9 ("We don't have a sow herd to reduce.  And we don't have the ability to make that decision.  We've never made that decision."); *id.* at 252:12-253:19 ("So we don't get involved in the members' business outside of Triumph."); *id.* at 250:19-251:2; *id.* at 251:11-21 ("So not only do I not have any say in how many sows [a particular member] has, but it really wouldn't be appropriate because I've got five minority shareholders, members in the company, and to try to influence what they do with their sow production would be inappropriate given their different circumstances, different markets, different history, different relative sizes."); *id.* at 270:4-13 (Triumph has no control over Triumph member Christensen Farms' sows, hog production, or approaches to marketing because "[t]hose decisions are all made by Christensen Farms, and they have a staff that does that on their behalf"); *id.* at 270:19-271:2 (Triumph makes no decisions for member New Fashion Pork); *id.* at 271:8-13 (Triumph makes no decisions for member Eichelberger Farms); **Campbell Tr.** at 196:25-197:6 (Triumph does not control hog production); *id.* at 198:18-23 (Triumph has "no control[,] management[,] oversight[,] engagement" of hog production assets owned by its owners); *id.* at 202:8-15; **Lehenbauer Tr.** at 240:15-241:19 (Triumph has no control over any members' decisions re sow herds or hog production levels).  And while Triumph does not control the actions of its members, there is no admissible evidence that any of them reduced their sow herds anyway.  If any member did, it certainly did not impact the number of hogs the members collectively supplied to Triumph, as both member-supplied hogs and total hogs processed by Triumph ***increased*** during the years DAPs allege production levels decreased. Declaration of Jerry Lehenbauer

Just as Triumph does not control hog production, Triumph also does not sell pork products, set prices for those products, or decide whether those products will be exported or sold domestically. Prior to the formation of Triumph, and five years before the alleged conspiracy "began," Triumph "contracted that out" to Seaboard Foods ("Seaboard").[8] In accordance with a 2004 marketing agreement between the two companies, Seaboard markets, schedules, prices, and sells the pork products that leave Triumph's processing plant.[9] Triumph does not (and, in accordance with the marketing agreement, cannot) sell the pork products it produces at its plant.[10]

Put another way, Triumph occupies the space between hog production and sales: pork processing.[11] And in that narrow and discrete space, Triumph has done its only job

---

("Lehenbauer Decl.") ¶¶ 4-6 (Triumph's members supplied Triumph with 4,289,475 hogs in 2009, 4,412,864 hogs in 2010, and 4,510,723 hogs in 2011, and Triumph processed more hogs in each of those years than the previous year, as well). So while plaintiffs have alleged that Triumph reduced "its" sow herds by 6% in 2009—whatever they believe that means— the facts are that Triumph's members alone supplied Triumph with more than 5% more hogs between 2009 and 2011, and this increase does not even account for the hogs Triumph purchased from non-member hog producers. *Id*.

[8] **England Tr.** at 298:20-22 ("We don't sell pork products. We've contracted that out.").

[9] **England Tr.** at 303:24-304:9 ("For the sale of pork … we agreed [in the Marketing Agreement] that we would not engage in direct or indirect efforts to market our pork products and that Seaboard would handle and be obligated to handle the sale of those products."); **Campbell Tr.** at 200:13-201:11, 212:6-10, 226:10-17; **Lehenbauer Tr.** at 239:6-11; **Hoffman Tr.** at 150:13-16, 155:13-21, 156:7-9.

[10] **England Tr.** at 78:7-20 ("So what happened, Triumph entered into this [Marketing Agreement], and for pork, Triumph was precluded from selling or to making marketing efforts directly or indirectly for the products produced at the St. Joe plant."); *id*. at 303:24-304:9.

[11] **England Tr.** at 242:14-24 ("[W]e're different than other hog companies. I mean, we are not involved in the sales of our pork products. We don't raise pigs. We just

exceptionally well. Throughout the alleged conspiracy period, Triumph has consistently increased its plant's capabilities so it can process more pork each day, breaking all-time processing records throughout the alleged conspiracy time period.[12] Triumph is one of only a handful of plants in the industry that operates two shifts;[13] Triumph made efforts throughout the alleged conspiracy period to increase and improve its output;[14] and Triumph operated well more than 30 weekend days during every year of the alleged conspiracy period.[15] Triumph also made substantial capital investments to increase the amount of pork

---

[12] Smith Decl. Ex. F ("Triumph Production Summary"), TRI0000544439-40; *see also* **Lehenbauer Tr.** at 252:18-253:21; **England Tr.** at 346:2-350:12; **Campbell Tr.** at 220:22-221:15.

[13] **England Tr.** at 261:20-265:8.

[14] **England Tr.** at 347:15-349:12 (recalling being "personally out there on the floor with a stopwatch as we were looking to shrink our sanitation time, and in some cases engaged in a little bit of scrubbing as well, because we would say okay, we can't run the lines any faster than 1,106 … [s]o the only thing we can do to get more volume through this plant is figure out how we can lengthen the day for our harvest side" and "we engaged in all these efforts and figured out how we could get the most possible capacity"); *id.* at 276:23-277:4 (Triumph added new positions to "enable continuous throughput" to further expand capacity); **Campbell Tr.** at 217:3-219:18, 220:5-9 (describing the various ways Triumph has worked to increase its throughput, including reducing cleaning/sanitization time, conducting its own QA inspections, and rearrangement of lunch and break times).

[15] Each year between 2009 and 2018 had 251 working days, meaning weekdays that were not holidays, except for 2010 and 2017 (250 working days). 2008 had 252 working days. *See* Smith Decl. ¶ 10 & Ex. E. Triumph operated between 33 and 41 more days than each year had working days through the alleged conspiracy period. *See* Triumph Production Summary (listing number of operating days per year from 2006 to 2021). The chart below demonstrates the number of days Triumph's plant operated ("Triumph Working Days") over the number of weekday workdays per year. The baseline workdays

its plant could process each day,[16] along with a massive capital investment in a 50-50 joint
venture with Seaboard to open a brand new processing plant, Seaboard Triumph Foods
("STF"), in Sioux City, Iowa, which cost approximately $330 million to launch.[17]
Triumph's efforts resulted in a production increase of approximately 3,000 head per day
on average between 2008 and 2018.[18]   As Matt England, Triumph's current CEO who has
worked in numerous positions at Triumph since 2006, testified:

> I've spent my career in pork processing entirely at Triumph
> Foods, and every day figured out how do I process more pigs

─────────────────────

per year ("Working Days") were calculated by taking the number of days in the given year
and subtracting weekends and public holidays.



*Accord* **England Tr.** at 341:1-24 ("[Y]ou can see that we would be working usually in
excess of 30 Saturdays.  And it's a lot of work.").

[16] **Campbell Tr.** at 230:13-231:11 (Triumph has spent approximately $8-10 million
per year on capital projects to process more pork); **England Tr.** at 276:8-277:14 (noting
2007 addition of equilibration bay, 2008 addition of snap chill, and various other
expansions); **Lehenbauer Tr.** at 254:9-255:22 (describing capital investments in
equilibration bay, equipment to provide automated technology, and an additional freezer
to allow temporary storage, all of which expanded Triumph's production capacity).

[17] **Campbell Tr.** at 231:12-21.

[18] Triumph Production Summary (Triumph's head processed per day in 2018 was
21,083, compared with 18,179 in 2008).

.... And I know plaintiffs don't understand all of that or appreciate it, but really, at Triumph Foods, we were working to try to produce the highest quality, the most product at the most efficient cost we possibly could.[19]

Triumph's operating numbers drive home this point. From 2008 to 2018, when the DAPs allege it was conspiring to reduce pork supply, Triumph was pouring it on. According to the DAPs, the alleged conspiracy began in 2009.[20] That year, Triumph increased its production over 2008 levels by approximately 130,000 head and 50 million pounds, slaughtering nearly 5.4 million head and producing approximately 1.15 billion pounds of pork in 2009 alone.[21] Triumph continued to set new records in 2010 and 2011, processing more than 50,000 more head and producing nearly 30 million more pounds of pork in 2010, and then jumping its levels by more than 230,000 head and nearly 50 million more pounds in 2011.[22] And that trend repeated itself year over year during the alleged conspiracy period.[23]

This does not even account for the hogs processed by Triumph's 2017-initiated joint venture—STF. If half of STF's output were attributed to Triumph to reflect its 50% investment in the company, Triumph's contribution to pork production between 2008 and

---

[19] **England Tr.** at 349:13-350:12.

[20] DAP Compl. ¶ 1.

[21] Triumph Production Summary (Triumph processed 5,385,144 head of hog in 2009 compared with 5,253,794 in 2008; and produced 1,144,343,100 pounds of pork in 2009 compared with 1,094,365,290 pounds in 2008).

[22] Triumph Production Summary (Triumph processed 5,449,110 head in 2010 and 5,688,920 head in 2011, producing 1,171,558,650 pounds of pork in 2010 and 1,219,135,556 pounds in 2011).

[23] *Id.*

2018 grew by more than 500 million pounds of annual output (from approximately 1.094 billion to 1.630 billion pounds), a nearly 50% increase in annual processing volume.[24]  The chart below demonstrates Triumph's up-ramping production during this period:

*Figure 1*[25]



---

Triumph's efforts meant that Triumph produced approximately **2.2 billion more** pounds of pork during the supposed "reduction conspiracy" than it would have had it simply maintained its 2008 (pre-conspiracy) output levels.[26]

It is against this record that Plaintiffs allege Triumph joined and participated in a cartel to reduce pork supply.  The claim is absurd.  Contrary to Plaintiffs' allegations (and entire case theory), Triumph's throughput grew, and it grew at record levels.[27]

## III.   ARGUMENT

### A.   Summary Judgment Is Appropriate When There Is No Genuine Dispute of Material Fact Under the Governing Law.

"Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Kempf v. Hennepin Cty.*, 987 F.3d 1192, 1195 (8th Cir. 2021) (citing Fed. R. Civ. P. 56(a)).  To show a "genuine dispute of material fact," the nonmoving party "has an affirmative burden to designate specific facts creating a triable controversy" and "must provide more than conjecture and speculation." *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019) (cleaned up). "[T]he requisite genuine dispute must appear in admissible evidence." *Crews v. Monarch*

---

[26] Had Triumph simply replicated its 2008 output levels every year through 2018, Triumph would have produced approximately 12 billion pounds of pork, but Triumph ended up producing approximately 14.2 billion pounds of pork during that period. *Id.* Triumph's St. Joseph facility processed 6,029,637 head of hog in 2018, compared with 5,253,794 in 2008; and Triumph processed 1,324,108,285 pounds of pork in 2018, compared with 1,094,365,290 pounds in 2008.  *Id.*  Attributing one-half of STF's production to Triumph brings Triumph's 2018 production to a record 1,629,918,409 pounds, a nearly 50% increase in its annual production level over 2008.  *Id.*

[27] *Id.*

11

*Fire Prot. Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014) (cleaned up).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

> **B.    To Withstand Summary Judgment, the DAPs Must Come Forward With Evidence That Excludes the Possibility of Independent Action, and That Evidence Must Be Specific to Triumph.**

The Sherman Act explicitly requires an agreement, not unilateral action, to establish a violation.  *Robbins v. Becker*, 794 F.3d 988, 997 (8th Cir. 2015) (citing 15 U.S.C. § 1). Whether an agreement existed is the "crucial question" in Section 1 cases.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quotations omitted).  "[T]he Sherman Act does not prohibit unreasonable restraints of trade as such" but "only restraints effected by a contract, combination, or conspiracy."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984).  "Independent action is not proscribed."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 760 (1984).

In light of Section 1's exclusive focus on agreements, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), and Section 1 cases "based on highly ambiguous evidence should not be submitted to a jury."  *Lovett v. Gen. Motors Corp.*, 998 F.2d 575, 581 (8th Cir. 1993).  Even if a plaintiff shows conduct somehow consistent with a conspiracy (which DAPs have not and cannot), that is not enough to survive summary judgment.  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 588.  Instead, "[t]o survive a motion for summary judgment," a Section 1 plaintiff "must present evidence

12

'that tends to **exclude** the possibility' that the alleged conspirators acted independently."
*Id*. (quoting *Monsanto*, 465 U.S. at 764 (emphasis added)). "[I]f it is as reasonable to infer
from the evidence a price-fixing conspiracy as it is to infer permissible activity, then the
plaintiffs'[] claim, without more, fails on summary judgment." *Blomkest Fertilizer, Inc. v.
Potash Corp. of Sask.*, 203 F.3d 1028, 1032 (8th Cir. 2000) (en banc) (the Eighth Circuit
"appl[ies] *Monsanto* and *Matsushita*, broadly, and in both horizontal and vertical price
fixing cases").

Moreover, Section 1 requires "a factual showing" on summary judgment "that **each
defendant** conspired in violation of the antitrust laws," and plaintiffs cannot avoid
summary judgment based on "a 'walking conspiracy' theory in place of such a showing."
*Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 106 (2d Cir. 2018) (quotation
omitted; emphasis added), *cert. denied*, 139 S.Ct. 1375 (2019); *see also, e.g.*, *Hall v. United
Air Lines, Inc.*, 296 F. Supp. 2d 652, 660-61 (E.D.N.C. 2003) (collecting authority), *aff'd*,
118 F. App'x 680 (4th Cir. 2004) ("[T]o survive a motion for summary judgment, antitrust
plaintiffs … must establish that each defendant had a conscious commitment to a common
scheme designed to achieve an unlawful objective" and, thus, "must produce evidence with
respect to each defendant that is alleged to be part of the conspiracy" (cleaned up)); *In re
Appraiser Foundation Antitrust Litig.*, 867 F. Supp. 1407, 1419 (D. Minn. 1994), *aff'd*, 64
F.3d 1130 (8th Cir. 1995) (similarly recognizing that summary judgment is appropriate
where an antitrust plaintiff fails to "show that each defendant had a conscious commitment
to a common scheme designed to achieve an unlawful objective" because such a plaintiff
is "required to prove concerted action not mere guilt by association" (cleaned up)).

13

Analyzing the specific evidence against each defendant, individually, is required because, "even in a conspiracy case, liability remains individual and is not a matter of mass application." *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 821 (N.D. Ill. 2017) (quotation omitted), *aff'd*, 910 F.3d 927 (7th Cir. 2018) (stating that summary judgment evidence would be "assessed individually" as to moving defendants to determine whether plaintiffs carried their burden as to those specific defendants).

### C.    The DAPs' Sherman Act Claim Fails Because They Have No Evidence That Triumph Entered Into an Unlawful Agreement.

The DAPs have two ways to show Triumph entered into an unlawful agreement: direct evidence or circumstantial evidence. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004). "Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). The DAPs have no direct evidence that Triumph entered into an unlawful agreement, so they must make a circumstantial case. Here, that means the DAPs must at minimum show both parallel conduct and "plus factors." *See, e.g.*, *Blomkest Fertilizer, Inc.*, 203 F.3d at 1033 (stating that an agreement can be inferred based on circumstantial evidence ***only*** when conscious parallelism is shown ***in combination with*** certain "plus factors"); *see also In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7 (citing cases from pleading and summary judgment stages, and recognizing that neither parallel conduct nor "plus factors," on their own, suffice to establish an agreement).

Now, months after fact discovery closed, the DAPs simply have no evidence to demonstrate that Triumph entered into their alleged cartel.  Turning first to their only specific allegations of parallel conduct by Triumph—that a hog producer member of Triumph (but not Triumph itself) reported a sow-herd cutback in 2008 and that Triumph reported cutbacks of its members' sow herds in 2009 (DAP Compl. ¶¶ 258, 298)—these do not even purport to assert that ***Triumph*** cut back ***anything***.  But even if the allegations were to that effect, they fail.  Triumph does not own and has never owned a sow herd.[28] Triumph does not raise and has never raised hogs.[29]  Triumph could not have reduced a sow herd or hog production level it did not have.[30]  So there is no evidence that Triumph entered into an agreement by parallel conduct or otherwise.  These facts are not subject to genuine dispute: Triumph did not enter into an agreement with any defendant to reduce "its" sow herd or restrict "its" hog production levels.

Moreover, Triumph did not, and could not have, entered into an agreement to somehow control the price of its pork products or the percentage of its pork products that were exported.  Triumph does not sell its pork products; Seaboard does that via the parties' marketing agreement, in effect since Triumph's inception, which requires that Seaboard price, market, schedule, and sell Triumph's pork products.[31]   Triumph does not (and

---

[28] *See supra* nn. 3 & 5 and accompanying above-line text; *see also* **England Tr.** at 267:2-8 ("Triumph doesn't have any sows. … Triumph couldn't have made any cuts, didn't make any cuts in its sow herd because it didn't have a sow herd.").

[29] *See supra* nn. 2 & 4-5 and accompanying above-line text.

[30] *See supra* nn. 2-5 and accompanying above-line text.

[31] *See supra* nn. 8-11 and accompanying above-line text.

cannot) set prices for its pork.[32]  Triumph does not (and cannot) control or make decisions regarding to whom its products are sold.[33]  Triumph does not (and cannot) control or make decisions regarding what portion of its products are exported versus sold to domestic customers.[34]

The undisputed evidence demonstrates that Triumph did not, and could not have, engaged in the parallel conduct alleged, sufficient to support the existence of an agreement to fix pork prices by reducing pork supply.[35]  And the evidence shows conduct by Triumph that is antithetical to an alleged supply reduction conspiracy.[36]  These problems are fundamental and fatal for the DAPs.  Without evidence of conduct demonstrating that Triumph entered into any conspiracy, the DAPs' Sherman Act claim fails as to Triumph. *Blomkest Fertilizer, Inc.*, 203 F.3d at 1033; *In re Pork Antitrust Litig.*, 2019 WL 3752497, at *7.

**D.** **Certain DAPs' Packers & Stockyards Act Claim Fails Because the DAPs Have No Private Right of Action Under the PSA and, Even If They Did, It Is Wholly Derivative of—and Rises and Falls With—Their Sherman Act Claim.**

Only some of the DAPs—the Kroger DAPs, the Publix DAPs, and most of the Action Meat DAPs[37]—decided to assert claims for a violation of the Packers and

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *See supra* nn. 2-5, 8-11 and accompanying above-line text.

[36] *See supra* nn. 12-18, 21-26 and accompanying above-line text.

[37] DAP Compl. § 2 (Chart of Direct Action Plaintiffs, Defendants and Causes of Action).

Stockyards Act (the "PSA").[38]   These DAPs (the "PSA DAPs") allege that Defendants violated Section 202 of the PSA by exchanging information through Agri Stats and by "coordinating with each other to restrict pork production in the United States."[39]   To support their claims under the PSA, the PSA DAPs repackage the same allegations and theories they offer to support their Sherman Act claim.[40]

For reasons detailed in Defendants' Joint Motion to Dismiss filed on January 20, 2023, the DAPs do not have a private right of action to bring these claims.  The PSA affords a private right of action only to those plaintiffs who have sustained injuries "relating to the purchase, sale, or handling of livestock."  7 U.S.C. § 209(a).  None of the DAPs is alleged to have purchased, sold, or handled livestock, nor can any DAP show it.

But even if these DAPs had a private right of action under the PSA on the facts they allege, their PSA claims against Triumph fail for the same reasons their Sherman Act claims do.  The PSA DAPs do not bother to state which specific prong or prongs of Section 202 their claims are asserted under.  Regardless, Section 202 "incorporates the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation such as the Clayton Act and the Fair Trade Commission Act.  Thus, the courts that have considered [Section] 202 have consistently looked to decisions under the Sherman Act for guidance, although recognizing that [Section] 202 in some cases proscribes practices which the Sherman Act would permit."  *De Jong Packing Co. v. U.S. Dep't of Agriculture*, 618 F.2d

---

[38] DAP Compl. ¶¶ 460-471.

[39] DAP Compl. ¶¶ 465-467.

[40] DAP Compl. ¶¶ 460-471.

1329, 1335 n.7 (9th Cir. 1980), *quoted with approval in Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995).  More to the point, a claim under Section 202 of the PSA requires some showing of intentional, conspiratorial conduct adverse to competition.  *See Org. for Competitive Markets v. U.S. Dep't of Agric.*, 912 F.3d 455, 457 (8th Cir. 2018) (plaintiffs must show conduct with "an actual or potential adverse effect on competition"); *Schumacher v. Cargill Meat Sols. Corp.*, 515 F.3d 867, 872 (8th Cir. 2008); *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *7 (D. Minn. Sept. 29, 2020).  Because the DAPs fail on their Sherman Act claim, summary judgment is also warranted as to the PSA DAPs' claims against Triumph.

## IV.   CONCLUSION

Triumph respectfully requests that its motion for summary judgment be granted on all DAPs' Sherman Act and PSA claims.

Dated: January 20, 2023

Respectfully submitted,

*/s/ Christopher A. Smith*
Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (MDL registered)
Kate Ledden (MDL registered)
Tanner Cook (MDL registered)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com
kate.ledden@huschblackwell.com
tanner.cook@huschblackwell.com

**Counsel for Triumph Foods, LLC**