# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST
LITIGATION

This Document Relates to:

All Consumer Indirect Purchaser Actions

Civil No. 18-1776 (JRT/JFD)

**[FILED UNDER SEAL]**

**CONSUMER INDIRECT
PURCHASER PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
JOINT MOTION TO EXCLUDE
THE EXPERT REPORT AND
TESTIMONY OF DR. HAL SINGER**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

LEGAL STANDARD ....................................................................................... 2

ARGUMENT .................................................................................................... 3

    I.      Dr. Singer did not assume vertical integration, because it is
           "analytically irrelevant" to his analysis and, in any event, the
           "power of the packer" allowed processor defendants to influence
           hog supply and prices. ................................................................... 3

    II.     Dr. Singer did not assume that Agri Stats performed the work of
           a cartel: processor defendants systematically used Agri Stats data
           in making their own, and monitoring each other's, output and
           pricing decisions. .......................................................................... 4

    III.    By controlling for supply and demand factors, Dr. Singer used
           hornbook regression analysis to demonstrate the artificially
           inflated price caused by defendants' unlawful conduct. .............. 9

    IV.    There is no legal or econometric requirement for Dr. Singer to
           separately model artificially deflated output resulting from
           various anticompetitive activities. ............................................... 12

    V.      Defendants' unlawful supply restraint was pervasive and ongoing
           throughout the class period—and not explained away by market
           factors. ......................................................................................... 15

    VI.    Dr. Singer's regression model is reliable notwithstanding
           Dr. Haider's flawed critiques of the benchmark and conduct
           periods. ........................................................................................ 19

    VII.   Dr. Mintert's opinions should be afforded no weight in the
           Court's analysis of the reliability of Dr. Singer's opinions ....... 24

CONCLUSION ............................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apotex, Inc. v. Cephalon, Inc.*,
   321 F.R.D. 220 (E.D. Pa. 2017) ................................................................. 14

*Bazemore v. Friday*,
   478 U.S. 385 (1986) ................................................................................... 11

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ..................................................................... 13

*Blue Cross & Blue Shield United of Wis. v. Marshfield*,
   152 F.3d 588 (7th Cir. 1998) ..................................................................... 13

*In re Broiler Chicken Antitrust Litig.*,
   No. 16-cv-8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) (*Broilers*)
   .................................................................................................... 9, 13, 14

*In re Capacitors Antitrust Litig.* ,
   No. 14-CV-03264-JD, 2020 WL 870927, at *3 (N.D. Cal. Feb. 21,
   2020) ......................................................................................................... 15

*CellTrust Corp. v. ionLake, LLC*,
   No. 19-CV-2855, 2022 WL 4018042 (D. Minn. Sept. 2, 2022) .................. 11

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................... 12, 13

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ............................................................. 12, 13

*Day v. Celadon Trucking Servs., Inc.*,
   827 F.3d 817 (8th Cir. 2016) ..................................................................... 12

*Infogroup, Inc. v. DatabaseLLC*,
   956 F.3d 1063 (8th Cir. 2020) ................................................................... 13

*Infogroup, Inc. v. DatabaseUSA.com LLC*,
   No. 8:14-CV-49, 2018 WL 6624217 (D. Neb. Dec. 18, 2018) .................. 13

*Johnson v. Mead Johnson & Co*,
   754 F.3d 557, 562 (8th Cir. 2014) ............................................................... 2

*Kleen Prods. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ................................................................. 14

*In Re: Macbook Keyboard Litig.*,
    No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *6 (N.D. Cal. Apr. 5,
    2021) ................................................................................................. 14, 15

*Morgan v. United Parcel Serv. of Am., Inc.*,
    380 F.3d 459 (8th Cir. 2004) ................................................................. 11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651, 677 (9th Cir. 2022) ............................................................ 9

*Persian Gulf Inc. v. BP West Coast Prods. LLC*,
    No. 15-cv-1749-JO, 2022 WL 4830698 (S.D. Cal. Sept. 30, 2022)........................... 22

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442, 459 (2016)................................................................. 11, 12

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) (*Wholesale Grocery III*)................................. 20

*In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090
    ADM/TNL, 2018 WL 3862773, at *8-9 (D. Minn. Aug. 14, 2018)
    (*Wholesale Grocery II*) ................................................................. 12, 13

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    No. 09-MD-2090 ADM, 2017 WL 4876277 (D. Minn. Oct. 24, 2017)
    (*Wholesale Grocery I*)............................................................... 2, 3, 24

*In re Zurn Pex Plumbing Liab. Litig.*,
    644 F.3d 604, 614 (8th Cir. 2011) ............................................................ 3

## Other Authorities

2 Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law §395 (4th ed.
    2021) ......................................................................................... 14

# TABLE OF ABBREVIATIONS

| Short Cite | Long Cite |
|---|---|
| Compl. | Consumer Indirect Purchaser Plaintiffs' Fourth Amended Consolidated Class Action Complaint, ECF No. 1111 (Jan. 12, 2022) |
| Consumer Mot. | Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification, ECF No. 1343 (May 2, 2022) |
| Singer Decl. | Declaration of Dr. Hal Singer in Support of CIPPs' Motion for Class Certification, ECF No. 1347 (May 2, 2022) |
| Omnibus Opp. | Defendants' Omnibus Memorandum in Opposition to All Class Plaintiffs' Motions for Class Certification, ECF No. 1441 (Aug. 24, 2022) |
| Consumer Opp. | Memorandum of Law in Opposition to CIPPs' Motion for Class Certification, ECF No. 1460 (Aug. 24, 2022) |
| Haider Report | Expert Report of Dr. Laila Haider, ECF No. 1442-1 (Aug. 24, 2022) |
| *Daubert* Mot. | Memorandum of Law in Support of Defendants' Joint Motion to Exclude the Expert Report and Testimony of Dr. Hal Singer |
| Singer Reply | Reply Declaration of Dr. Hal Singer in Support of CIPPs' Motion for Class Certification (Nov. 18, 2022) |
| Ex. | All exhibit references are to the Further Declaration of Shana E. Scarlett in Support of CIPP's Reply in Support Class Certification and CIPP's Opposition to Defendants' Motion to Exclude the Testimony of Dr. Hal Singer (Nov. 18, 2022), unless stated otherwise |
| *Broilers* 23(f) Denial | Order Denying Petition for Permission to Take an Interlocutory Appeal, No. 22-8007, Doc. No. 00714036758 (7th Cir. July 18, 2022) |
| **PARTIES** | |
| Agri Stats | Defendant Agri Stats, Inc. |
| Clemens | Defendants Clemens Food Group, LLC, the Clemens Family Corporation, Hatfield Quality Meats |

| CIPP | Consumer Indirect Purchaser Plaintiffs |
| --- | --- |
| Hormel | Defendant Hormel Foods Corporation |
| JBS | Defendant JBS USA Food Company |
| Seaboard | Defendant Seaboard Foods LLC |
| Smithfield | Defendant Smithfield Foods, Inc. |
| Triumph | Defendant Triumph Foods, LLC |
| Tyson | Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc. and Tyson Prepared Foods, Inc. |

**INTRODUCTION**

Defendants repackage their flawed arguments in opposition to class certification to also argue that Dr. Singer's opinions should be excluded under *Daubert*. This motion has no merit. First, Dr. Singer did not assume vertical integration—which he considers irrelevant to his analysis—and, in any event, substantial evidence establishes that processor defendants were able to influence hog supply and prices. *See* section I. Neither did Dr. Singer assume that Agri Stats performed the work of a cartel. Instead, the evidence again shows that processor defendants systematically used Agri Stats data in making their own—and monitoring each other's—output and pricing decisions. *See* section II. Thus, Dr. Singer's opinions are well grounded in the facts of the case.

Likewise, his regressions analyses are well grounded in textbook econometrics and widely accepted by courts as reliable evidence capable of showing common impact. Here, by controlling for supply and demand factors, Dr. Singer's overcharge regression analysis demonstrates the artificially inflated price caused by defendants' unlawful conduct. *See* section III. And there is no legal or econometric requirement for Dr. Singer to separately model artificially deflated output resulting from various anticompetitive activities. *See* section IV. Nor does defendants' fact presentation on the merits undermine Dr. Singer's analysis, which rests on facts demonstrating that defendants engaged in herd liquidations, harvest reductions, increasing exports, and the benchmarking of competitively sensitive information via Agri Stats throughout the conduct period. *See* section V. Finally, Dr. Singer's regression model is reliable notwithstanding defense expert Dr. Laura Haider's flawed critiques of the benchmark and conduct periods.

Indeed, even taking Dr. Haider's criticisms at face value, her variant overcharge model yields a different, but still statistically significant overcharge of 2.9%—which supports the reliability of Dr. Singer's work.  *See* section VI.  And Dr. Mintert's opinions should be afforded no weight in the Court's analysis of the reliability of Dr. Singer's opinions, because Dr. Mintert's are completely untethered to the facts of this case.  *See* section VII.

In short, defendants' *Daubert* motion should be denied.

## LEGAL STANDARD

"Rejection of expert testimony is the exception rather than the rule."[1]  As the Eighth Circuit stated in *Johnson v. Mead Johnson & Co.,* "cases are legion that, correctly, under *Daubert,* call for the liberal admission of expert testimony."[2]  And "district courts are admonished not to weigh or assess the correctness of competing expert opinions."[3]  So in *Johnson* the Eighth Circuit held that the district court abused its discretion in excluding the plaintiff's expert, because it "violated these liberal admission standards by resolving doubts in favor of keeping the testimony out and relying upon its own assessment of the correctness of the expert opinions."[4]  And by doing so, "it disallowed the adversarial process to work."[5]

---

[1] *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM, 2017 WL 4876277, at *6 (D. Minn. Oct. 24, 2017) (*Wholesale Grocery I*).  Internal citations and quotations omitted, and emphasis added throughout, unless otherwise indicated.

[2] 754 F.3d 557, 562 (8th Cir. 2014).

[3] *Id*.

[4] *Id*.

[5] *Id.*; *see also Wholesale Grocery I*, 2017 WL 4876277, at *8 (challenge was "appropriate fodder for cross examination" but "not a sufficient basis for excluding"

Similarly, in *In re Zurn Pex Plumbing Liab. Litig.*, the Eighth Circuit stated that "as a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility."[6]  Importantly, an "expert's opinions are not inadmissible simply because an underlying assumption may be contestable."[7]  So in *Zurn Pex* the Eighth Circuit affirmed the district court's refusal to exclude the class plaintiffs' expert, because there was "nothing in the record" to show that his opinions were "so fundamentally unsupported as to require exclusion."[8]  So too here.

## ARGUMENT

I.  **Dr. Singer did not assume vertical integration, because it is "analytically irrelevant" to his analysis and, in any event, the "power of the packer" allowed processor defendants to influence hog supply and prices.**

Defendants wrongly claim that Dr. Singer's opinions are undermined by his "false assumption of vertical integration."[9]  This is a classic strawman argument.  As Dr. Singer puts it: "This [] is simply untrue: I never assume vertical integration anywhere in my report. . . . I simply do not discuss Defendants' vertical integration anywhere in my report outside of the context of the phrase appearing in record evidence"[10]  Moreover, "this point is analytically irrelevant, because none of my analyses in my initial report turn on

---

expert opinion).

    [6] 644 F.3d 604, 614 (8th Cir. 2011).

    [7] *Id.* at 615.

    [8] *Id*.

    [9] *Daubert* Mot. at 8-12.

    [10] Singer Reply at ¶ 12.

Defendants' vertical integration or lack thereof."[11]  As Dr. Singer explains, "[a]s a matter of economics, in the market for Pork a *monopolist* producer of Pork (the output) reduces the output and raises the price of Pork *regardless of the situation* in the hog (the input) market."[12]  Dr. Singer further explains "the relevant antitrust market at issue is the market for Pork products—not hogs—owing to Defendants' alleged price fixing conspiracy in the market for *Pork*."[13]  So in Dr. Singer's view opinions regarding processor defendants' lack of control over the supply of hogs are "a distraction and not relevant to the case."[14]

In any event, the argument is also wrong, as the evidence Dr. Singer considered demonstrates, because defendant processors influenced hog supply and prices by virtue of their hog purchasing decisions.[15]  To avoid repetition, CIPPs refer the Court to their reply in support of class certification, Common Evidence section I.

## II. Dr. Singer did not assume that Agri Stats performed the work of a cartel: processor defendants systematically used Agri Stats data in making their own, and monitoring each other's, output and pricing decisions.

Ignoring the vast majority of facts regarding Agri Stats in Dr. Singer's declaration,[16] defendants make certain false assertions, once again as to merits issues, that are completely at odds with the common evidence that Dr. Singer considered.  First, defendants claim they were inadequately subscribed to Agri Stats for it to be the hub of

---

[11] *Id.*

[12] *Id.* at ¶ 33.

[13] *Id.* at ¶ 32.

[14] *Id.* at ¶ 33.

[15] *Id.* at ¶¶ 36-38.

[16] Singer Decl. at ¶¶ 95-142.

the conspiracy.[17] ████████████████████████████████████████

████████████████████████████████████████████████:[18]

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

And while Hormel did not subscribe to the sales report for the entire relevant time period, it coordinated with its co-conspirators by pegging its own prices to be "slightly above" Smithfield.[19]

Second, defendants claim there is no evidence that Agri Stats was the monitoring mechanism of a cartel.[20]  But defendants ignore the evidence Dr. Singer considered that Agri Stats provided information on participating processors' production and export levels.  For example, Triumph ████████████████████████████████

---

[17] *Daubert* Mot. at 13.

[18] Singer Decl. at Appx. T.1.

[19] Ex. 230, Schweitzer Depo. at 49:4-7.

[20] *Daubert* Mot. at 12.



.[21]  Email

correspondence from Matt McNeil of Agri Stats provides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓"[22]  And Clemens stated that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"[23]—with a Smithfield analysis using Agri Stats data

showing deanonymized competitor share of exports.[24]  And Agri Stats's measure of

profitability (the index of operating efficiency (IOE)), which was deanonymized by

Tyson, also provided insight into competitors' actions.  One internal Tyson spreadsheet

looked at this Agri Stats index and cautioned that with the sustained profitability, it "▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"[25]

Moreover, defendants ignore troves of evidence Dr. Singer considered

demonstrating that processor defendants relied on pricing data from Agri Stats, enabling

them to see "opportunities" to *increase* the price of pork relative to their competitors.[26]

An internal JBS email states that Agri Stats ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"—and that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[21] Ex. 257, SBF0459029, at 31; *see also* Singer Decl. at ¶ 101 & F.16.

[22] Ex. 258, SMITHFIELD04934968.

[23] ECF No. 1345-4, Ex. 34, CLMNS-0000529020, at native 22.

[24] Ex. 284, SMITHFIELD00676667, at native 3; *see also* Singer Decl. at ¶ 101 & F.17.

[25] Ex. 285, TF-P-002345939, at 002345951.

[26] *See*, *e.g.*, Singer Decl. at ¶¶ 123-128.



."[27]  An internal Tyson email discusses a directive "

"[28]  And the common evidence further demonstrates that defendants used the Agri Stats data for purposes of monitoring their cartel.  A prime example is an internal email from Tim Hiller, Head of Processor Sales at JBS: "

"?[29]

Lastly, defendants claim that not all of them engaged in deanonymization.[30]  But evidence to date shows that most of them did—and some may have been more cautious than others in documenting it.  Tyson's accounting department deanonymized the kill/cut reports for the entire conspiracy time period.  **Tyson**'s Deborah McConnell directed a colleague: "

"[31]—and on another occasion stated that such

"[32]  **JBS** too acknowledged that it "

"[33]  **Clemens** likewise referenced deanonymized

---

[27] Ex. 286, JBS-PORK-01335804, at 804-05.

[28] Ex. 287, TF-P-002420429.

[29] Ex. 260, JBS-PORK-00754219, at 222.

[30] *Daubert* Mot. at 14.

[31] Ex. 261, TF-P-000304473.

[32] Ex. 262, TF-P-000538548.

[33] ECF No. 1345-8, Ex. 72, JBS-PORK-01389262.

Agri Stats data: "

"[34] And **Smithfield** also

.[35] Similarly, **Triumph** shared with **Seaboard** deanonymized Agri Stats

data with "," explaining it was "

."[36] And

contemporaneous correspondence refers to a similar report as "

."[37] Indeed, **Agri Stats** employees themselves testified that

"'[38] or

[39]

In sum, Dr. Singer made no assumption here: he considered significant evidence

demonstrating that processor defendants did in fact routinely use Agri Stats data in

effectuating and monitoring the cartel's production and pricing.

---

[34] ECF No. 1345-8, Ex. 71, CLMNS-0000670325.

[35] Ex. 284, SMITHFIELD00676667, at native 3.

[36] Ex. 257, SBF0459029, at 29, 31; *see also* Ex. 265, TRI0000089336 (4/5/2016 internal Triumph email from Matt England to Shane Brewer:

").

[37] Ex. 266, SBF0490482 (attaching SBF0490487); *see also* Ex. 267, SBF0538947 (Agri Stats review with " and attaching SBF0538949).

[38] Ex. 288, McNeal Depo. at 219:18-21.

[39] Ex. 249, Stegall Depo. at 30:23-31:5; *see also* Ex. 289, J. Edwards Depo. at 100:11-18 ().

III.   **By controlling for supply and demand factors, Dr. Singer used hornbook regression analysis to demonstrate the artificially inflated price caused by defendants' unlawful conduct.**

Just as in *Tuna* and *Broilers*, Dr. Singer (like Drs. Williams and Mangum for DPPs and CIIPs) performed a "regression analysis to determine whether factors other than a conspiracy could have caused the supply decrease by analyzing what [pork] prices would have been 'but for' the conspiracy."[40]  "[I]n antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members."[41]  As Judge Durkin explained: "Plugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable allows the experts to calculate the portion of price not accounted for by the market factors."[42]  And each expert here—as in *Tuna* and *Broilers*—did just that.

Defendants, however, wrongly contend that "because Dr. Singer is oblivious to the prevalence of independent hog farmers," he failed to account for certain market factors, including hog producer returns and the cost of acquiring hogs.[43]  This is incorrect. Indeed, it is defendants who appear oblivious to the market factors Dr. Singer employed

---

[40] *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022) (*Broilers*); see also *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022), cert. denied (*Tuna*).

[41] *Id*. at 677.

[42] *Broilers*, 2022 WL 1720468, at *12.

[43] *Daubert* Mot. at 10-11.

in his regression.  Defendants claim that hog producer returns were driven by decreased demand due to swine flu, an expanding hog supply due to the success of the circovirus vaccine, the soaring cost of corn, and the economic effects of the Great Recession.[44] Dr. Singer controlled for each of these.  His swine flu variable "control[led] for the fact that domestic pork demand dropped sharply because of (misplaced) consumer fears that eating pork might result in infection."[45]  His piglet mortality variable controlled for an expanding hog supply due to the success of the circovirus vaccine.[46]  His total cost variable controlled for the higher cost of corn.[47]  And his general economic indicator controlled for the Great Recession.[48]

Moreover, Dr. Singer chose to use a "hog cost" variable reflecting the cost of raising hogs rather than purchasing them, because the price of hogs "is itself determined, in large part, by the price of Pork products."[49]  So using hog purchase data introduces a form of endogeneity termed "simultaneity bias" into the model, which Dr. Singer's variable selection avoids.[50]

---

[44] *Id.*

[45] Singer Decl. at ¶ 154.

[46] Singer Reply at ¶ 63 & T.7.

[47] *Id.*

[48] *Id.*

[49] Singer Reply at ¶ 91.

[50] *Id.* at ¶ 89.

Dr. Singer likewise did not ignore variables critical to analyzing export levels.[51] Annual farm bills and changes in trade bans and barriers were not the major developments that defendants contend.[52] And Dr. Singer controlled for increasing global demand using a linear time trend.[53] While he did not previously control for currency fluctuations, "[w]hen a defendant attacks a plaintiff's regression, he must typically do more than point out the flaws in his opponent's analysis" and instead "must show that the omission had an impact on the result."[54] Dr. Haider failed to do this. In any event, Dr. Singer tested *all* such allegedly "omitted variables" relating to exports and found the overcharge "virtually unchanged at 12 percent."[55]

Thus, Dr. Singer controlled for all potentially relevant variables and, even if he had not, a regression's "failure to include variables will affect the analysis's probativeness, not its admissibility.'"[56] And, of course, its probativeness is a question for the trier of fact, with the Supreme Court in *Tyson Foods, Inc. v. Bouaphakeo* stating that the

---

[51] *Daubert* Mot. at 24, 26-27.

[52] Consumer Reply, Common Evidence section II.D. *See* Omnibus Opp. at 25.

[53] Singer Reply at ¶ 57; *see also* Ex. 290, Singer Depo. 218:5-8 ("the time trend is probably what's most aimed at capturing a steady secular trend -- upward trend [in] exports for US pork").

[54] *Morgan v. United Parcel Serv. of Am., Inc*., 380 F.3d 459, 468-69 (8th Cir. 2004).

[55] Singer Reply at ¶ 58. Putting aside speculation about possible factors for which Dr. Singer could have controlled, *see Daubert* Mot. at 5, he does in fact control for every variable that defendants' expert, Dr. Haider, actually contended should be controlled for in her report. *Id*. at ¶ 79 & T.9.

[56] *CellTrust Corp. v. ionLake, LLC*, No. 19-CV-2855 (WMW/TNL), 2022 WL 4018042, at *28 (D. Minn. Sept. 2, 2022) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

resolution of the persuasiveness of such common evidence is the "near-exclusive

province of the jury."[57]

## IV.   There is no legal or econometric requirement for Dr. Singer to separately model artificially deflated output resulting from various anticompetitive activities.

A model is inadmissible for failing to "separate lawful from unlawful conduct"

when it "does not control for non-conspiratorial factors."[58]  Dr. Singer has controlled for

all relevant market factors, as discussed above.  Besides incorrectly contending that

Dr. Singer did not account for all variables in his pricing regression, defendants also

argue he should have created a separate model to measure artificially deflated output

caused by *each of defendants' various efforts to restrain supply*.[59]  There is no such

requirement.

As the Eighth Circuit has explained, the Supreme Court's decision in *Comcast*

requires only that damages be "capable of measurement on a classwide basis"[60] and

"consistent with the [plaintiff]'s liability case."[61]  The district court in *Wholesale Grocery*

*II* likewise explains that a model is inadmissible for failing to "separate lawful from

---

[57] 577 U.S. 442, 459 (2016) ("Reasonable minds may differ as to whether the average time [the expert] calculated is probative as to the time actually worked by each employee.").

[58] *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2018 WL 3862773, at *8-9 (D. Minn. Aug. 14, 2018) (*Wholesale Grocery II*) (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)).

[59] *Daubert* Mot. at 15-17.

[60] *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

[61] *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 833 (8th Cir. 2016).

- 12 -

unlawful conduct" under the Eighth Circuit's decision in *Concord Boat* when it "does not control for non-conspiratorial factors."[62]  Indeed, in *Infogroup, Inc. v. DatabaseUSA.com LLC,* the district court gets exactly to the point: the "problem" in *Concord Boat* was "not, as [defendant] suggests, that the jury was unable to parse out the amount of damage associated with each allegation of unlawful conduct."[63]  "Rather, the problem [wa]s that there was *no* evidence on the *amount* of damages attributable only to the unlawful conduct."[64]

Thus, a methodology that matches the unlawful conduct—to the exclusion of other lawful conduct—with the damages ensures that they are the "result of the wrong."[65] Indeed, **defendants acknowledge** that "using a benchmark can satisfy this requirement" to "separate lawful from unlawful conduct," but the "methodology must correct for any nonconspiratorial factors that might have caused the prices that are being compared to be different from each other."[66]  That is exactly what Dr. Singer did here.  By "[p]lugging in known prices and market factor data from the class period and running the regression equation to solve for the dummy variable," Dr. Singer "calculate[d] the portion of price

---

[62] 2018 WL 3862773, at *8; *Concord Boat*, 207 F.3d at 1057.

[63] No. 8:14-CV-49, 2018 WL 6624217, at *3 (D. Neb. Dec. 18, 2018), *aff'd sub nom. Infogroup, Inc. v. DatabaseLLC*, 956 F.3d 1063 (8th Cir. 2020).

[64] *Id*. (emphasis in original).

[65] *Comcast*, 569 U.S. at 37; *see also Broilers*, 2022 WL 1720468, at *10 (rejecting *Comcast* argument).

[66] *Daubert* Mot. at 16 (discussing *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005), and *Blue Cross & Blue Shield United of Wis. v. Marshfield*, 152 F.3d 588 (7th Cir. 1998)).

not accounted for by the market factors."[67]  As a leading treatise likewise puts it, the

"coefficient on the dummy variable" is "an estimate of the collusive overcharge—that is,

the increase in price *due solely to the anticompetitive behavior*."[68]  Thus, the Seventh

Circuit recently denied the *Broilers* defendants' 23(f) petition premised on this same

ground.[69]

   Defendants then claim that Dr. Singer's opinions have been excluded for these

reasons in other cases, omitting to mention these same cases also permitted his

opinions.[70]  In *Apotex*, for example, the court permitted Dr. Singer's primary damages

model because there was a "rational factual basis underlying Dr. Singer's assumptions,"

with "[c]ross-examination [] the appropriate means of challenging this expert

testimony."[71]  The court, however, excluded two other models—one which piggybacked

off the other and both "prepared at the request of counsel"—for which Dr. Singer

"admit[ted] that he [wa]s unaware of any factual basis."[72]  Similarly, in *In Re: Macbook*

---

[67] *Broilers*, 2022 WL 1720468, at *12.  *See also* Singer Decl. at ¶¶ 144 & n.289, 146 & n.296; Singer Reply at ¶ 31.

[68] 2 Phillip E. Areeda & Herbert J. Hovenkamp, Antitrust Law §395 (4th ed. 2021).

[69] *Broilers* 23(f) Denial.  *See also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) (affirming class certification where the plaintiffs' expert modeled damages to "control for other influences on price and to isolate the impact of the conspiracy" using a dummy variable).

[70] *Daubert* Mot. at 16-17 & n.8.

[71] *Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 231 (E.D. Pa. 2017).

[72] *Id.* at 235; *see also* Ex. 290, Singer Depo. at 21:2-7 ("plaintiff's counsel had asked me to calculate damages under an alternative legal theory in which Apotex, the one generic that did not go along with the illegal scheme, was entitled to 100 percent of the ill-gotten gains of all conspiring generic defendants"); *id.* at 23:3-5 ("My other opinion

*Keyboard Litig.* the court excluded a hedonic analysis but allowed Dr. Singer's choice-based conjoint analysis, which the court found "reliable and relevant to Plaintiffs' theory of class-wide damages."[73]  Likewise, in *In re Capacitors Antitrust Litig.*, the court excluded Dr. Singer's analysis of qualitative evidence based on criteria recognized by antitrust agencies, but allowed such an analysis based on criteria recognized by economists as "sufficiently reliable and relevant under *Daubert*."[74]  None of these opinions has any bearing on the models proposed in this case.

### V.  Defendants' unlawful supply restraint was pervasive and ongoing throughout the class period—and not explained away by market factors.

CIPPs have established that hornbook pricing regressions controlling for relevant supply and demand factors and solving for the dummy variable allow experts to calculate the portion of price not accounted for by market factors.[75]  That is the methodology that Dr. Singer employed and Dr. Haider points to no market factor for which Dr. Singer failed to control.[76]  So his model therefore successfully isolates the price impact resulting from anticompetitive conduct.[77]  As Dr. Singer testified, his "mandate was to remove the challenged conduct, which [he] interrupted to mean . . . this price-fixing conspiracy held

---

was accepted, and I even got to testify in front of the jury on that matter.").

[73] No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *6 (N.D. Cal. Apr. 5, 2021).

[74] No. 14-CV-03264-JD, 2020 WL 870927, at *3 (N.D. Cal. Feb. 21, 2020).

[75] *See* section III, above.

[76] *Id.*

[77] *Id.*

together by information exchange."[78]  So he used a "conduct dummy that tracks when

Agri Stats started sharing competitively sensitive information among defendants" as his

"measure of the challenged conduct, not these ancillary mechanisms by which output was

suppressed."[79]

Defendants would turn this scientifically rigorous econometric analysis upside

down to examine it—not through the market factors used by experts in the field—but

through the prism of defendants' counter-narrative of the case.[80]  In repeatedly pointing

out that Dr. Singer did not separately measure the effects of sow liquidation, harvest

reductions, or increased exports in his econometric model, defendants pretend that this

matters—despite Dr. Haider failing to identify any variable for which Dr. Singer fails to

control.  Take liquidation: defendants contend some liquidation may have been a natural

response to market factors; Dr. Singer controls for these.[81]  Defendants contend that some

exports would have occurred despite the conspiracy; again, Dr. Singer controls for all the

market factors affecting exports.[82]  Thus, in his view, it would be "a bit of a fool's

errand" to determine whether a given export, for example, was reasonable, because he

was "trying to figure out the pricing model, what portion of the price increase the

---

[78] Ex. 290, Singer Depo. at 39:14-18.

[79] *Id.* at 229:18-21; *see also id.* at 56:11-24.

[80] *Daubert* Mot. at 17-27.

[81] *See* section III, above.

[82] *Id.*

defendants took that could be attributed to the challenged conduct."[83]  And while he has an "associated output model," he was "not trying to simulate what exports would have been in the absence of a challenged conduct."[84]

In short, because market factors in his regression model cannot explain the price effect that Dr. Singer finds, this provides common evidence that the price effect was instead ***caused by collusive conduct***—including information sharing, price bench-marking, and the portion of the sow liquidation, harvest reductions, and/or increased exports that would not have occurred but-for the conspiracy.  Thus, Defendants' presentation on the merits as to how and why their conduct during the conspiracy was "perfectly lawful," or "temporary" and "isolated," is misplaced.  As set forth in CIPPs' reply in support of class certification, Common Evidence sections II-III, the facts here support the results of Dr. Singer's regression, demonstrating that defendants' herd liquidations, capacity restraints, and increased exports were not the inevitable result of market conditions.[85]

Besides these facts, which CIPPs again cross reference to avoid repetition here, CIPPs also add two points.  First, in response to defendants' argument that every hog gets slaughtered, such that harvest reductions have no market effect, defendants ignore that ongoing kill cuts also created a feedback loop that slowed production.  Instead of an environment where packers were trying to kill every hog as quickly as possible—creating

---

[83] Ex. 290, Singer Depo. at 192:5-11.

[84] *Id.* at 192:12-15; *see also* Singer Reply at ¶¶ 26-31.

[85] *Daubert* Mot. at 19, 21, 23.

incentives for farmers to raise more hogs—the environment was one where hogs had

nowhere to go.  *See* TF-P-001564729 

"); TF-P-002574206 (

).[86]

Second, defendants themselves acknowledge that they increased pork exports for

the purpose of decreasing domestic availability and increasing U.S. pork prices.[87]  Defen-

dants take issue with certain snippets of evidence on the merits,[88] pretending that the

same evidence does not keep coming up in document after document and deposition after

deposition.  For example, the Chief Supply Officer for Smithfield testified that "if we

export product, there's less of it to sell in the United States and so it would be easier to

sell . . . because there is less pork in the United States."[89]  And he stated that when "we're

trying to increase exports to use up the excess pork, it wouldn't just be us it would be the

whole pork industry."[90]  And Dr. Singer testified that "the Agri Stat export report itself

was allowing the defendants to coordinate in their decisions of how much to export."[91]

---

[86] Exs. 291-292; Singer Reply at ¶ 175.

[87] Singer Decl. at ¶¶ 42-45, 129-133, 216-222.

[88] *Daubert* Mot. at 25-26.

[89] Ex. 248, Saunders Depo. at 96:24-97:4; *id*. at 98:16-20 (agreeing that "by exporting some of the excess pork, it will allow the prices to go back up" domestically).

[90] *Id*. at 98:6-9.

[91] Ex. 290, Singer Depo. at 189:23-190:1.

In short, defendants urge a fool's errand on Dr. Singer to model the effect of each activity defendants engaged in during the conspiracy, because the hornbook pricing regression that Dr. Singer chose to perform examines *prices* caused by defendants' collusion, by controlling for market factors.  Moreover, Dr. Singer's model is well grounded in the facts of this case, which demonstrate defendants' sustained and continuous unlawful activity—not only in using Agri Stats to share competitively sensitive information and engage in price benchmarking—but also in effectuating output restraint via herd liquidations, harvest reductions, and increasing exports throughout the class period.

## VI.   Dr. Singer's regression model is reliable notwithstanding Dr. Haider's flawed critiques of the benchmark and conduct periods.

Defendants contend that Dr. Singer's model is econometrically unreliable for two reasons.[92]  <u>First</u>, defendants contend that Dr. Singer should not have "chose[n] the year 2008 as his benchmark" as if that is the only benchmark year he used.[93]  This is incorrect: the clean data for his benchmark period actually extends back to 2004.[94]  What defendants presumably intended to argue is that Dr. Singer should not have included 2008 *as part of* the benchmark period because it was such an "outlier."[95]  But market participants did not view 2008 as the outlier that defendants contend.  For example, according to ████████████████████████████████████

---

[92] *Daubert* Mot. at 27-31.

[93] *Id.* at 29; *see also id.* at 31 (referencing Dr. Singer's "2008 benchmark year"); *cf. id.* at 5 (referring to 2004-2008 as benchmark).

[94] Singer Decl. at ¶ 147 & T.10.

[95] *Daubert* Mot. at 29.

███████████████████████████████████████████████████████████

████████████████████████████████[96]

In any event, Dr. Singer controlled for all of the market factors that defendants contend made 2008 such an outlier—including decreasing demand due to swine flu, pig mortality reduction caused by circovirus vaccine, soaring corn costs, and the global financial crisis.[97]  So it is inappropriate to also include an indicator variable for that year, as Dr. Haider did.  Indeed, it "is an extremely crude tool for controlling for these events because it introduces a new structural break in the data for phenomenon that did not end and begin on the calendar year."[98]  And *even if* Dr. Singer's regression had missed some allegedly omitted variable that was "unusual" in 2008 (it did not), the "econometrically correct way to proceed is to *identify* the alleged omitted variable and include it in the regression."[99]  But Dr. Haider did not and cannot identify any such variable because there is none.[100]

---

[96] ██████████████████████████████.

[97] Singer Reply at ¶ 63 & T.7, ¶ 79 & T.9, ¶ 93 & T.11.

[98] *Id.* at ¶ 94.  *Wholesale Grocery III* is inapposite on this point because it involved not a dispute about the inclusion of certain benchmark years, but an entirely different type of construct with the plaintiffs' expert opining that the largest retail grocery chain in New England, "although not an independent grocer and much larger than the class plaintiffs, served as a reliable and relevant benchmark."  *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 999 (8th Cir. 2019) (*Wholesale Grocery III*).  *See Daubert* Mot. at 28.

[99] Singer Reply at ¶ 94.

[100] *Id.* at TT. 9 & 11.

Second, Dr. Haider breaks up the conduct period into two separate periods—as though the legal statute of limitations period running backwards from the complaint filing (and forming the class period) has anything to do with the factual basis for the conspiracy.[101]  It does not.  Instead, Dr. Singer determined that the conspiracy began in 2009, because that was when Agri Stats began offering certain reports targeted to pork processors and "dramatically" revamped its sales reports to enable processor defendants to coordinate on prices.[102]  And that "information exchange of competitively sensitive information was the same . . . across the conduct period."[103]

Moreover, the common record evidence demonstrates that defendants' conduct was ongoing throughout the entire conduct period, including (1) the exchange of competitively sensitive information via Agri Stats and benchmarking of prices; (2) liquidations with long-lasting effect on the national herd; (3) available processing capacity on a per capita basis remaining restrained throughout the conduct period; (4) capacity utilization remaining below historical levels during the conduct period; and (5) exports surging as a percentage of production as defendants targeted foreign markets to prop up domestic prices.[104]  Indeed, in his reply report Dr. Singer finds this artificially

---

[101] *Daubert* Mot. at 29-31.  *See* Singer Reply at ¶ 74 (discussing American Statistical Association's warning against such p-hacking).

[102] Singer Reply at ¶ 75; *see also* Ex. 290, Singer Depo. at 57:12-25, 78:2-19 (describing new sales report that Agri Stats rolled out 2009 to its pork customers as a "dramatic improvement to the legacy platform in evaluating sales").

[103] Ex. 290, Singer Depo. at 248:6-9.

[104] *See* Consumer Reply, Common Evidence sections II-III.

restrained output for *each year* of the conduct period.[105]  So there is no credible basis for the structural break Dr. Haider introduces into the model.

Further, a supplemental decision that defendants submitted purportedly in support of their *Daubert* motion actually supports CIPPs.[106]  In *Persian Gulf*, the court excluded the experts' opinions because they selected a clean benchmark running from 2005 to 2015 when the plaintiffs' post-discovery contention-interrogatory response stated that the conspiracy began in 2011, such that the supposedly clean benchmark period "contained more than four years of anticompetitive misconduct."[107]  The reason for this strange choice: a statute of limitations ruling prevented the plaintiffs from seeking damages prior to 2015.[108]  The court was not impressed: the "fact that Plaintiffs were foreclosed from collecting damages for the years 2011-2014 does not render those years conspiracy free," so the "statute of limitations may impact available damages, but it does not excuse an expert from following econometric principles."[109]  This error is exactly what Dr. Singer avoids with his conduct period running from 2009 to 2018[110]—and what Dr. Haider commits by breaking it up.

---

[105] Singer Reply at ¶ 26 & TT. 5-6.

[106] ECF No. 1531-1, Ex. A.

[107] *Persian Gulf Inc. v. BP West Coast Prods. LLC*, No. 15-cv-1749-JO, 2022 WL 4830698, at *36 (S.D. Cal. Sept. 30, 2022).

[108] *Id.* at *38.

[109] *Id*.

[110] Ex. 290, Singer Depo. at 334:24-335:12 ("[T]he 2014 start date is limited by the statute of limitations, as I understand it. So there's not an economically significant phenomenon that would cause me to think that you would want to treat 2014 special.").

In addition, Defendants incorrectly claim that "essentially all the price increases [Dr. Singer] calculates occurred before the Class Period and are not even an issue in this lawsuit."[111]  This is flat wrong.  As Dr. Singer reports, "[r]oughly half of all Conduct observations (48.9%) occur in the Class Period."[112]  Perhaps this is why defendants later dial down their mistaken assertion in a footnote, claiming that it is "not clear what the precise sales volume was" for 2009-2014 "compared to the 2014-2018 Class Period."[113]  This is actually simple to calculate and Dr. Singer has done so.[114]

Lastly, Dr. Singer explains that "[if] Dr. Haider were truly interested in 'measuring the effects of the alleged conspiracy during the last four years of the alleged conduct period' as she claims, she could have 'interacted' my Conduct variable with some standard dimension of time, such as a calendar year" to compare each calendar year of the conduct period against the benchmark period.[115]  Indeed, such a regression shows positive and economically significant price overcharges in every year of the class period.[116]  And the "results by year are similar if the regression is run on a per-primal cut basis," similar to Dr. Singer's product subgroup regressions in his initial report.[117]  In any event, even Dr. Haider's redefinition of the class period still shows "economically and statistically

---

[111] *Daubert* Mot. at 2.

[112] Singer Reply at ¶ 68 n.131.

[113] *Daubert* Mot. at 30.

[114]  Singer Reply at ¶ 68 n.131.

[115] *Id*. at ¶ 76.

[116] *Id.*

[117] *Id.* at ¶ 78.  *Daubert* Mot. at 31.

CASE 0:18-cv-01776-JRT-JFD Doc. 1835 Filed 10/18/23 Page 30 of 37

significant price overcharges," albeit lower than what Dr. Singer calculates, of 2.9%.[118]

So Dr. Haider's analysis actually supports the reliability of Dr. Singer's work.

**VII.   Dr. Mintert's opinions should be afforded no weight in the Court's analysis of the reliability of Dr. Singer's opinions**

Defendants' arguments that factors other than the conspiracy account for the price

of pork during the relevant time period rest heavily on one of their experts, Dr. Mintert.

But Dr. Mintert's analysis is so completely untethered from the data and information in

this case, so as to run afoul of Federal Rule of Evidence 702.  Given that "[r]ejection of

expert testimony is the exception rather than the rule,"[119] CIPPs do not move to exclude

it.  But CIPPs urge the Court to give his declaration very little (if any) weight.

Dr. Mintert opines that factors other than conspiracy impacted hog and pork

supplies during the conspiracy period (corn, soybean meal, the H1N1 virus, and

circovirus) (section IV); and that Dr. Singer failed to consider multiple factors in the pork

export markets, such as the Great Recession, disease outbreaks and other changes in trade

policies (section V).  But Dr. Mintert's opinions that factors ***other than*** the conspiracy

account for the overcharge measured by Dr. Singer fail, because he himself failed to look

at any of the data or documents specific to this case, and his opinions have very limited

relevance to the questions before the Court.

---

[118] Singer Reply at ¶¶ 5-7 & T.1, ¶ 68.

[119] *Wholesale Grocery I,* 2017 WL 4876277, at *6.

- 24 -

Dr. Mintert is not an expert in antitrust cases;[120] he has no expertise in terms of the existence of a cartel;[121] he is not an econometrician.[122]  He acknowledged he did not review the transactional data produced by the defendants in this case to perform any regression;[123] nor did he evaluate any of Dr. Singer's econometric models.[124]  And Dr. Mintert admitted that he was not specifically criticizing "to the specifics of [Dr. Singer's] individual regression equations" and whether they included certain variables.[125]

Most egregiously, however, despite his opinion on whether Dr. Singer had adequately investigated the factors impacting hogs and pork supplies, Dr. Mintert **failed to look at even one** Agri Stats report, which are central to the conspiracy here.  Dr. Mintert testified that he "didn't see any reason why I needed to access the Agri Stats reports."[126] It was his understanding that the purpose of the Agri Stats reports was to benchmark costs.[127]  (But Agri Stats reports were used extensively by defendants to increase prices.) And Dr. Mintert made no inquiry—despite having over 3.8 million documents available to him—to determine how "any of the individual firms exactly . . were using" the Agri

---

[120] Ex. 161, Mintert Depo. at 38:5-17.

[121] *Id.* at 38:18-21.

[122] *Id.* at 150:21-151:5.

[123] *Id.* at 151:12-14.

[124] *Id.* at 151:6-11.

[125] *Id.* at 158:15-20.

[126] *Id.* at 166:17-167:3.

[127] *Id.* at 168:10-14.

Stats reports.[128]  Dr. Mintert was not aware of the secret nature of the Agri Stats reports—
that you had to give data to get data, ensuring only pork processors could receive the
kill/cut processing reports.[129]  When asked if he was aware of the export sales report
introduced by Agri Stats in 2013, he responded: "I was not aware of that, again, because I
haven't examined anything that Agri Stats has done in any detail."[130]  And when asked
whether he made any inquiry into "whether the Agri Stats export sales reports were used
to coordinate export levels between the defendants," he responded: "Again, I did not
examine the Agri Stats reports in any way.  So the answer is no."[131]

This is particularly egregious, given that Dr. Mintert agreed that "open, transparent
price discovery, which provides all market participants, both large and small, with
comparable levels of market information, is an important goal."[132]  And Dr. Mintert
believes that it is important that USDA aggregate pork pricing reports are available to "all
participants in the market."[133]  When asked if he thought it was "important for all market
participants to have comparable levels of information," he responded: "As an economist,
my perspective is that information is good."[134]  Of course, Agri Stats reports are not
available to "all participants in the market."

---

[128] *Id.* at 168:15-169:2.

[129] *Id.* at 169:15-24.

[130] *Id.* at 190:21-25.

[131] *Id.* at 192:8-13.

[132] *Id.* at 160:4-9.

[133] *Id.* at 160:10-13.

[134] *Id.* at 165:11-17.

Dr. Mintert professes to opine that factors *other than* the conspiracy account for hog supply, pork production and exports during the relevant time period, but he failed to undertake even the most minimal of investigation into the facts and data relevant to this case.  So Dr. Mintert's opinions should be afforded no weight in the Court's analysis of the reliability of Dr. Singer's opinions.

## CONCLUSION

For all of these reasons, CIPPs respectfully request that the *Daubert* motion to exclude the report and testimony of Dr. Singer be denied.

DATED: November 18, 2022      Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Shana E. Scarlett*
SHANA E. SCARLETT
Rio Pierce
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.om

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Elaine T. Byszewski
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920

Pasadena, CA 91101
(213) 330-7150
elaine@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Proposed Co-Lead Counsel for Consumer
Indirect Purchaser Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST
LITIGATION

---

*This Document Relates to*:

All Consumer Indirect Purchaser Plaintiff
Actions

---

Civil No. 0:18-1776 (JRT/JFD)

**CERTIFICATE OF COMPLIANCE
ON CONSUMER INDIRECT
PURCHASER PLAINTIFFS'
OPPOSITION TO DEFENDANTS'
JOINT MOTION TO EXCLUDE
THE EXPERT REPORT AND
TESTIMONY OF DR. HAL SINGER**

I, SHANA E. SCARLETT, certify that this brief complies with the type-volume limitation of D. Minn. L.R. 7.1(f)(1) of 12,000 words, and with the type-size limit of D. Minn. L.R. 7.1(h)(1).

The brief has 6,699 words of type, font size 13 and was prepared using Microsoft Word, which includes all text, including headings, footnotes, and quotations in the word count.

DATED:  November 18, 2022   Respectfully submitted,

         HAGENS BERMAN SOBOL SHAPIRO LLP

         By: */s/ Shana E. Scarlett*
            SHANA E. SCARLETT
         Rio Pierce
         715 Hearst Avenue, Suite 202
         Berkeley, California 94710
         Telephone: (510) 725-3000
         Facsimile: (510) 725-3001
         shanas@hbsslaw.com
         riop@hbsslaw.om

         Steve W. Berman
         Breanna Van Engelen
         HAGENS BERMAN SOBOL SHAPIRO LLP
         1301 Second Avenue, Suite 2000
         Seattle, Washington 98101
         Telephone: (206) 623-7292
         Facsimile: (206) 623-0594
         steve@hbsslaw.com
         breannav@hbsslaw.com

         Elaine T. Byszewski
         HAGENS BERMAN SOBOL SHAPIRO LLP
         301 North Lake Avenue, Suite 920
         Pasadena, CA 91101
         (213) 330-7150
         elaine@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

*Interim Co-Lead Counsel for Consumer
Indirect Purchaser Plaintiffs*

010736-11/2072373 V1