# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **In re Pork Antitrust Litigation** | |
| This Document Relates To: | Case No. 18-cv-01776-JRT-HB |
| Consumer Indirect Purchaser Plaintiff Actions | **[FILED UNDER SEAL]** |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. HAL J. SINGER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.    Dr. Singer's Factual Errors And Unreliable Application of His Model To
      Plaintiffs' Allegations Render His Opinions Inadmissible ...................................... 3

      A.    Dr. Singer's Reply Declaration Invents a New Antitrust Theory
            Divorced from Plaintiffs' Allegations............................................................. 4

      B.    Dr. Singer Cannot Run from His Gross Distortions of the Record
            Regarding Agri Stats ...................................................................................... 9

II.   Dr. Singer's Model Does Not Isolate Unlawful from Lawful Conduct ................ 10

III.  Dr. Singer's Regression Analysis is Unreliable ................................................... 13

      A.    Dr. Singer's Flawed Reliance on 2008 as a Benchmark Year Renders
            His Analysis Unreliable................................................................................. 14

      B.    Dr. Singer Cannot Dispute that His Models Are Unreliably Sensitive ....... 18

CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                 **Page(s)**

*Bison Advisors LLC v. Kessler*,
    2016 WL 3525900 (D. Minn. Jan. 21, 2016) ................................................................. 4

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ..................................................................................... 12

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ........................................................................... 5, 11, 13

*Damgaard v. Avera Health*,
    2015 WL 1608209 (D. Minn. Apr. 10, 2015) ................................................................. 7

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...................................................................................................... 5

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...................................................................................................... 5

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
    442 F. Supp. 3d 1329 (D. Or. 2020) ........................................................................... 14

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) ............................................................................. *passim*

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    No. 09-MD-2090 ADM/TNL, 2018 WL 3862773
    (D. Minn. Aug. 14, 2018)............................................................................................. 10

*Union Pac. R. Co. v. Progress Rail Servs. Corp.*,
    778 F.3d 704 (8th Cir. 2015) ........................................................................................ 5

*Williams v. TESCO Servs., Inc.*,
    719 F.3d 968 (8th Cir. 2013) ........................................................................................ 7

**Rules**

Fed. R. Civ. P. 37(c)(1) ..................................................................................................... 7

Fed. R. Evid. 702(b), (d).................................................................................................... 5

Fed. R. Civ. P. 12............................................................................................................ 3, 8

Fed. R. Civ. P. 26(a)(2)(B)(i) ............................................................................ 7

Fed. R. Evid. 702 ................................................................................... *passim*

## **INTRODUCTION**

In response to Defendants' Joint Motion to Exclude the Expert Report and Testimony of Dr. Hal Singer ("Defendants' Joint Motion"), Dr. Singer tries to salvage his opinions with a 109-page Reply Declaration. Dr. Singer protests too much, and the length of his Reply Declaration fails to mask the fundamental flaws of his methodology. Dr. Singer's Reply Declaration is riddled with concessions that necessitate exclusion of his model, such as the extraordinary pronouncement that he now deems Defendants' lack of vertical control over hog production to be "analytically irrelevant" and "a distraction." Reply Declaration of Dr. Hal Singer, ECF No. 1626 ("Reply Declaration") ¶¶ 12, 33.

Dr. Singer's opinions should be excluded as unreliable. First, while Dr. Singer attempts to distance himself from false claims about the structure of the Pork industry that formed the basis of his opinions, he has now shifted to new theories that are divorced from the record and inconsistent with Plaintiffs' allegations. At minimum, these new theories should be struck from Dr. Singer's Reply Declaration. But more fundamentally, a model failing to account for the reality that hog production is controlled by independent farmers cannot reliably explain reductions in hog supply, assess Defendants' decisions related to acquiring hogs, or assist a trier of fact in evaluating Plaintiffs' allegation that Defendants conspired to reduce the availability of their primary raw material. An economic model predicated on a fundamental misunderstanding of the industry must be excluded under Rule 702.

Second, Dr. Singer's model continues to conflate lawful and unlawful conduct, in direct contravention of the law of this Court and the Eighth Circuit. Dr. Singer accepts

1

Plaintiffs' allegations that Defendants entered a nebulous agreement to pull various "levers" to restrict pork supply, but freely admits that his model cannot tell a factfinder how many hogs would have been produced, how much Pork would have been exported, or how Defendants' processing capacity would have been different "but-for" the purported conspiracy. Notwithstanding the law, he now makes the remarkable claim that measuring the effects of these actions is "not relevant." *Id.* ¶ 27. Yet it is undeniably true that industry participants had perfectly lawful reasons to reduce hog production, increase exports, or make strategic decisions about how much processing capacity to maintain or utilize. An economic model that cannot distinguish lawful from unlawful conduct must be excluded.

Finally, Dr. Singer cannot cure the unreliability of his regression analysis. His regression is premised on a comparison of pork prices in a benchmark period to prices during the purported conspiracy. The validity of the model therefore depends entirely on a reliable benchmark period, but Dr. Singer is forced to admit that his model failed to control for the unexpected abundance of hogs (and therefore Pork) in 2008. Rather than correcting for that error, Dr. Singer doubles down and asks the Court to find that the supply of Pork would have continued an unprecedented upward trajectory for years. *Id.* ¶ 49. Moreover, the drastic changes the model produces based on the time periods evaluated demonstrate the unreliability of the model, and asking the Court to use it to certify a class seeking billions of dollars of damages flies in the face of Rule 702.

For these reasons, Defendants respectfully request that the Court exclude Dr. Singer's analysis.

## ARGUMENT

### I. DR. SINGER'S FACTUAL ERRORS AND UNRELIABLE APPLICATION OF HIS MODEL TO PLAINTIFFS' ALLEGATIONS RENDER HIS OPINIONS INADMISSIBLE

The Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs" or "Plaintiffs") alleged that Defendants' supposed vertical control over hog production was a core component of the conspiracy described in their Third Amended and Consolidated Class Action Complaint ("Consumer IPPs' Third Amended Complaint"). ECF No. 432. Plaintiffs alleged:

- Defendants control the supply and production of pork in the United States "through vertical integration and the exclusive production contracts with hog farmers." Consumer IPPs' Third Amended Complaint ¶ 71.

- Vertical integration is "pervasive" and "allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms . . . ." *Id.* ¶ 72.

- Barriers to entry include the cost of building a production facility and "[t]he prevalence of contracts in the market for hogs . . . ." *Id.* ¶¶ 98-99.

- Defendants "acted in a concerted way to decrease supply," *id.* ¶ 124, by liquidating sow herds, *id.* ¶ 145-50, reducing the supply of hogs, *id.* ¶ 124-25, and increasing exports, *id.* ¶ 126.

- Individual Defendants, such as Hormel Foods, are "vertically integrated company[ies] with control over live hog operations as well as pork processing and production facilities." *Id.* ¶ 84.

Based on those allegations and Plaintiffs' allegations of a conspiracy to restrict hog supply as a mechanism to increase Pork prices, the Court denied Defendants' motion to dismiss. *See* Amended Memorandum Opinion and Order, ECF No. 520 at 12-15 (reviewing allegations against Defendants of "herd-size reductions" and finding alleged reductions in "hog production" sufficient to survive Rule 12). Discovery proceeded based on Plaintiffs'

theory that Defendants used vertical control and ownership of hog production to restrict hog supply and raise prices.

Facing Dr. Mintert's and Dr. Haider's reports documenting the *lack* of vertical integration in the Pork industry—and the implausibility of Defendants conspiring to raise their input costs—Dr. Singer has been forced to disavow Plaintiffs' theory of the case. With the discovery record complete, Dr. Singer cannot pivot to new theories that have never been pleaded or established in discovery. The Federal Rules do "not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' initial report and that indeed should have been included in the lawsuit from the outset." *Bison Advisors LLC v. Kessler*, 2016 WL 3525900, at *14-15 (D. Minn. Jan. 21, 2016). Dr. Singer's new opinions must be struck, and his remaining opinions excluded as unreliable: they cannot aid the trier of fact because they (1) are premised on factual errors, and (2) are divorced from Plaintiffs' theory of the case.

## A. Dr. Singer's Reply Declaration Invents a New Antitrust Theory Divorced from Plaintiffs' Allegations

In his initial report, Dr. Singer "assume[d] Plaintiffs' allegations regarding the existence of such a collusive agreement to be true," and proceeded to claim that Defendants used control over sows as a central component of that supposed conspiracy. Declaration of Hal J. Singer, Ph.D. in Support of Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification, ECF No. 1474-1 ("Singer Report") ¶¶ 6, 208-09. Indeed, his initial report expressly claimed that Defendants used "herd liquidation" to decrease supply. *Id.* ¶¶ 210-11. In marked contrast, Dr. Singer's Reply Declaration now announces that "[w]hether

4

Defendants also 'control' hogs (however defined) has no bearing on any of my empirical analysis." Reply Declaration ¶ 33. And realizing that a conspiracy predicated on vertical control over hog production is untenable given the evidence Defendants presented, Dr. Singer's Reply Declaration announces, "I never assume vertical integration anywhere in my report." Reply Declaration ¶ 12. Dr. Singer further attempts to distance himself from Plaintiffs' vertical integration theory, claiming that it is "analytically irrelevant, because none of my analyses in my initial report turn on Defendants' vertical integration or lack thereof." *Id.* This pronouncement cannot be squared with Plaintiffs' theory that Defendants' vertical integration enabled them to limit hog production and liquidate hogs as a mechanism of the conspiracy. With Dr. Singer now disavowing that premise, his analysis has become untethered from Plaintiffs' allegations and cannot support Plaintiffs' theory of liability.

Rule 702 requires that expert testimony be "sufficiently tied to the facts of the case [in order to] aid the jury in resolving a factual dispute." Fed. R. Evid. 702(b), (d); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (internal quotation omitted). To be admissible, an expert's opinions must "fit" the claims being evaluated by the trier of fact. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000). Courts must exclude testimony that has "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Union Pac. R. Co. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 710 (8th Cir. 2015).

The incongruity between Plaintiffs' theory of the case and Dr. Singer's opinions is particularly intractable here. The problem is not just that Dr. Singer followed Plaintiffs in

assuming that Defendants could control and liquidate hogs, only to reverse course when faced with the facts. An assumption of a vertically controlled industry is baked into Dr. Singer's model, and he cannot simply disregard the reality that the pork industry is not characterized by vertical integration. Most problematic, his model wholly misses the economic incentives of both hog farmers and pork processors by using the price of corn to control for hog costs. *See* Singer Report ¶ 153. For hog farmers, decisions about hog production are a function of the profitability of raising hogs—namely the *price they get for market hogs*, less costs. Similarly, decisions by pork processors about how many hogs to slaughter are informed by the profitability of purchasing and processing hogs—namely, the market value of processed pork primals, less the *price of hogs*. By ignoring hog prices in favor of the price of corn, Dr. Singer's model fails to account for the basic economic decisions of *both* hog producers *and* pork processors. Whether or not corn costs might explain the decisions of a vertically integrated operation, a model that ignores the actual prices of hogs (and the profitability of raising, selling, purchasing, and harvesting them) cannot reliably explain decision making in an industry that is not vertically integrated. And Dr. Singer only indicts his methodology further by claiming that his model cannot account for hog prices without introducing error into the method he chose. *See, e.g.*, Reply Declaration ¶¶ 88-89.

Moreover, Dr. Singer's attempt to pivot to new theories directly contradicts Plaintiffs' theory of the case from the inception of the litigation. While Plaintiffs alleged that Defendants reduced hog supply through sow-herd reduction to *increase* hog prices, Dr. Singer uses his Reply Declaration to invent a new monopsony theory that Defendants

limited hog processing, decreased demand for hogs, and thereby limited hog production by *decreasing* hog prices. *See id.* ¶¶ 35-38. Dr. Singer's new theory is that Defendants' "willingness to purchase" hogs was the mechanism they used to "control" hog production. *Id.* ¶ 38. Rule 26(a)(2)(B)(i) requires a party to disclose a retained expert's written report that includes "a complete statement of **all** opinions the witness will express and the basis and reasons for them." Plaintiffs may not disclose "new opinions under the guise of supplementation" or rebuttal. *Damgaard v. Avera Health*, 2015 WL 1608209, at *7 (D. Minn. Apr. 10, 2015). Because Dr. Singer's new monopsony theory was not disclosed in his initial report, it must be struck. Fed. R. Civ. P. 37(c)(1); *see also Williams v. TESCO Servs., Inc.*, 719 F.3d 968, 976 (8th Cir. 2013) (striking expert report where expert "was materially altering, not merely clarifying his original report").

Dr. Singer's about-face confirms his original opinions should be excluded, too. This Court now faces competing, inconsistent economic theories. Did Defendants make sow cuts to reduce the number of hogs and raise hog prices? Or did Defendants limit harvest capacity, thereby depressing demand for and prices of hogs? Because Dr. Singer presents opinions that are inconsistent with Plaintiffs' allegations, his analysis is unreliable and unhelpful to the trier of fact.

Not only is it untenable for a plaintiff's expert to expound theories contradicting the plaintiff's theory of the case, but Dr. Singer's new theory of vertical control departs entirely from the discovery record. As if to prove that point, in support of his monopsony theory,

Dr. Singer cites an economics textbook and nothing else. *Id.* ¶¶ 35-38. Not surprisingly, he also has not conducted any empirical analysis to substantiate his new conjectures.[1]

Dr. Singer's shift away from Plaintiffs' allegation of a vertically integrated industry is fatal under Rule 702. Fact discovery is closed. Plaintiffs have never pleaded or pursued the monopsony theory that Dr. Singer invents in his Reply Declaration. *See, e.g.*, *id.* ¶ 40 (claiming "it is very likely that Defendants . . . enjoy some degree of monopsony power"). Responding to Plaintiffs' allegations of vertically integrated industry and Dr. Singer's claim of a conspiracy to "liquidate hogs," Defendants submitted a report from an industry expert, Dr. Mintert, detailing why such claims are not true. The submission of a reply declaration offering new opinions that fundamentally contradict a plaintiff's antitrust theory presents the Court with a glaring abuse of expert-opinion testimony.[2]

Plaintiffs' allegations of vertically integrated industry may have been sufficient to survive Rule 12, but their theory that Defendants conspired to reduce hog production was

---

[1] Highlighting his lack of factual analysis, Dr. Singer claims that he has identified hog contracts that include requirements related to genetics or meat quality, *see* Reply Declaration ¶¶ 44-45, but he has conducted no analysis about how pervasive such terms are, whether such terms increase or decrease supply, or how hog contracts have impacted farmer decision making. Hog contracts and contractual terms related to production incentivize production and facilitate farmer access to capital, and it is not acceptable to use the veil of expertise to cloak an utter lack of evidentiary support for conjecture.

[2] Underscoring the problem, Plaintiffs argue that the Court should give "no weight" to Dr. Mintert's opinions because his report has "very limited relevance to the questions before the Court." Consumer IPPs' Opposition, ECF No. 1625, at 24. Plaintiffs commenced this litigation by alleging that the Pork industry is vertically integrated. They now tell the Court it should ignore as irrelevant an industry expert's report determining their allegations were false.

never going to survive reality. For his part, Dr. Singer is left with economic models that depart from the factual record and opinions that contradict not only Plaintiffs' theory of the case, but his own initial analysis. His reports and testimony should be excluded.

### B.  Dr. Singer Cannot Run from His Gross Distortions of the Record Regarding Agri Stats

Dr. Singer's opinions regarding Agri Stats further demonstrate his departure from the facts. Defendants' Joint Motion documented the profound disconnect between Dr. Singer's opinion that Agri Stats functioned as the monitoring mechanism of a cartel and the actual evidence. Defendants' Joint Motion at 12-14.

In his initial report, Dr. Singer claimed that Defendants "used Agri Stats as a means to communicate competitively sensitive information concerning firm specific, plant level pricing and output." Singer Report ¶ 95. He asserted that "Defendants could deanonymize the individual facilities in the report," *id.* ¶ 97, and claimed that Defendants "routinely" did so, *id.* ¶ 99. Dr. Singer relied on those claims to proclaim that Agri Stats engaged in the "day-to-day work" and "standard operations of a cartel." *Id.* ¶ 136. Once again, those claims were divorced from the record. The record contains no evidence of communications by Agri Stats facilitating deanonymization, any decoding mechanism communicated among the supposed cartel, any effort by multiple Defendants to deanonymize reports, or any confirmation that a Defendant accurately identified another participant in an Agri Stats report. Defendants' Joint Motion at 12-14. And Dr. Singer's Appendix highlights that at no time during the alleged conspiracy did all Defendants subscribe to Live reports or Plant reports. *See* Consumer IPPs' Opposition at 5.

Dr. Singer's pattern repeats itself. Faced with the actual record, his only response is to declare that he never "'assumed' that Agri Stats performed the work of a cartel." Reply Declaration ¶ 13. Rather than address the reality that most Defendants never attempted to deanonymize Agri Stats reports or monitor output by particular competitors, Dr. Singer sweeps the issue aside. *Id.* (asserting that the record shows "apparent deanonymization" of Agri Stats reports).

Dr. Singer's opinion that Defendants used Agri Stats to establish and enforce a cartel cannot be squared with the record, and his inability to defend his claims about Agri Stats is laid bare in his Reply Declaration. Given the unbridgeable gap between the record and Dr. Singer's conclusions, his opinions cannot be helpful to the trier of fact and should be excluded.

## II.  DR. SINGER'S MODEL DOES NOT ISOLATE UNLAWFUL FROM LAWFUL CONDUCT

Neither the Consumer IPPs nor Dr. Singer dispute that, with respect to the actions that Plaintiffs allege to violate the antitrust laws, Dr. Singer's model cannot distinguish lawful from unlawful conduct. As discussed in Defendants' Joint Motion, "[a]n expert opinion on antitrust impact is inadmissible if it fails to 'separate lawful and unlawful conduct.'" Defendants' Joint Motion at 15-16 (quoting *In re Wholesale Grocery Prod. Antitrust Litig.*, 2018 WL 3862773, at *8 (D. Minn. Aug. 14, 2018), *aff'd*, 946 F.3d 995 (8th Cir. 2019) (citing *Concord Boat Corp.*, 207 F.3d at 1057)). Such a failing establishes an independent basis for exclusion. *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019) (affirming district court's exclusion of expert opinion which

10

failed to control for non-conspiratorial factors). With 140 pages of additional argument from Dr. Singer and the Consumer IPPs, Defendants' core point remains unrebutted: regarding Defendants' decisions about hog production, pork processing, and exports, Dr. Singer's methodology fails to distinguish lawful from unlawful conduct. His models treat perfectly legitimate and even procompetitive actions as conspiratorial conduct subject to damages. *See* Defendants' Joint Motion at 17-24.

Dr. Singer's admissions demand exclusion of his methodology. As Defendants' Joint Motion noted, Dr. Singer admitted that there are sound economic reasons for firms to reduce hog production, reduce harvest levels, or export Pork. *Id.* at 18. In reply, Dr. Singer freely admits that his methodology does not permit him to measure the extent to which any of these actions would have occurred but-for the conspiracy or the extent to which any of the specified conduct was lawful. Reply Declaration ¶ 27. According to Dr. Singer, such "analyses are not relevant to assessing Plaintiffs' theory of harm." *Id.* And he asserts that there is no requirement that his analysis establish but-for levels of hog production, pork processing, or exports that would have occurred absent the conspiracy. *Id.* ¶ 30.

The law requires more. "It is the plaintiffs' burden to establish the reliability of the posited expert testimony, including a determination of whether other factors affected the pricing at issue, if only to eliminate those factors, specifically using the relevant data and time frame presented." *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d at 1003 (citing *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004)); *see also* C*oncord Boat Corp.*, 207 F.3d at 1057 (excluding opinion where model did not account for market events that were not anticompetitive).

11

Courts are exacting on this requirement. Dr. Singer admits that hog producers may have good economic reasons to cut production—like losing money on every hog raised during certain periods—but he has never identified *any* decision by *any* Defendant that he contends was economically unsound, unlawful, or explainable only by participation in an antitrust conspiracy. *See* Defendants' Joint Motion at 17-25. Likewise, Dr. Singer recognizes that a processor facing negative margins may decide to scale back harvest for sound financial reasons, but he cannot point to a *single* instance in which *any* Defendant processed fewer hogs for an unlawful purpose. *Id.* And increasing exports of pork products has been a long-standing policy goal of the federal government, but Dr. Singer never identifies *any* export transaction by *any* Defendant that did not further that company's own economic interests or was otherwise collusive. *Id.* It is unacceptable for an economic model to be incapable of parsing lawful from unlawful conduct because that failure risks a fact finder subjecting defendants to liability for entirely legitimate decisions. *See, e.g.*, *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (citations omitted).

Dr. Singer says he controlled for every non-conspiratorial market factor, but "[s]tating that a benchmark controls for all factors does not make it so . . . ." *In re Wholesale Grocery*, 946 F.3d at 1003. Nowhere in his hundreds of pages of reports does Dr. Singer support those claims. But a court may "not admit opinion evidence that 'is connected to existing data only by the ipse dixit of the expert.'" *Id.* at 1000. Dr. Singer has failed to account for obviously relevant non-conspiratorial market factors. As just one example, Dr. Singer does not dispute that the cost and profitability of acquiring and harvesting hogs are

12

key metrics that drive a pork processor's decisions, yet he declined to use hog prices as a variable in his model. *Supra* Section I(A).

Dr. Singer's analysis raises the most serious Rule 702 concerns that lie at the heart of *Daubert*. Rule 702 does not permit an economics expert to inform factfinders that it is "irrelevant" whether Defendants made prudent economic decisions to cut hog production, scale harvest capacity, or export pork and that the factual record should be disregarded in favor of the expert's regression. *Concord Boat Corp.*, 207 F.3d at 1057. Unable to specify how much hog production should have fallen, capacity should have expanded, or exports should have increased given lawful competition and competitive market forces, Dr. Singer's methodology presents factfinders with the impossible task of trying to unravel extremely complex econometric analysis to assess antitrust injury while accounting for evidence of economically rational decision making.[3] Because his model is incapable of distinguishing lawful from unlawful conduct, Dr. Singer's methodology is fundamentally unreliable and must be excluded.

## III.   DR. SINGER'S REGRESSION ANALYSIS IS UNRELIABLE

Factual errors and instability render Dr. Singer's models unreliable and inadmissible. *See* Defendants' Joint Motion at 27-30. First, Dr. Singer's Reply Declaration confirms that he cannot validate the validity of his benchmark period. Second, Dr. Singer

---

[3] As just one example, if a factfinder concludes that Tyson or Smithfield had sound, procompetitive reasons for closing certain sow farms, they are left with no realistic possibility of reconciling that fact with Dr. Singer's regression. The factfinder cannot adjust, modify, or run regressions to assess antitrust injury in light of the facts. Dr. Singer's response that the factfinder should simply ignore such facts as irrelevant is a blatant violation of *Daubert*.

13

does not dispute Dr. Haider's findings that his models are unreasonably sensitive to minor changes. A model that produces drastically different overcharges based on inputted variables cannot reliably prove common impact and class injury. As such, Dr. Singer's opinion and testimony should be excluded.

### A. Dr. Singer's Flawed Reliance on 2008 as a Benchmark Year Renders His Analysis Unreliable

An accurate and reliable benchmark period is indispensable for a reliable regression analysis. *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 442 F. Supp. 3d 1329, 1360 (D. Or. 2020) ("A 'poor benchmark cannot supply sufficient evidence' in a 'but for' damage analysis."). Here, a valid benchmark period is all the more essential given Dr. Singer's inability to identify any particular actions by a Defendant that were inconsistent with its own economic interests. In that vacuum, any assessment of anticompetitive effects or antitrust injury depends entirely on the validity of the comparison between Dr. Singer's chosen benchmark period and the supposed conspiracy period.

Adopting substantially the same approach as Dr. Williams and Dr. Mangum, Dr. Singer's benchmark period suffers from the same defects, and his model should be excluded for the reasons set forth in Defendants' briefing. *See* Defendants' Joint Motion to Exclude the Expert Report and Testimony of Dr. Russell Mangum, ECF No. 1450, pp. 13-18; Defendants' Joint Motion to Exclude the Testimony of Dr. Michael Williams, ECF No. 1459, pp. 13-16. The point that bears repeating is Dr. Singer's failure to account for the significant spike in hog supply that occurred in 2008 due to the circovirus vaccine. Without elaboration, Dr. Singer claims in his Reply Declaration that he controlled for the impact of

14

the vaccine by using what he terms a "Piglet Loss Rate." Reply Declaration ¶ 93.



*See id.* ¶ 153 & n.312. The truth is that Seaboard's farms were unaffected by circovirus, so its data cannot serve as a control. Defendants' Reply Memorandum in Support of Motion to Exclude the Testimony of Dr. Michael Williams, p. 9.

Dr. Singer's oversight on this point is fatal to his methodology. Dr. Haider's report reviewed the extensive record evidence—including third-party witnesses—describing the significant effects of the vaccine on hog supply. *See, e.g.*, Haider Report ¶ 74; *see also* Mintert Report ¶ 124. The 2008 spike in hog production is central to Dr. Singer's claim about what supposedly should have happened to pork production in subsequent years—indeed, it is what allows him to draw his unrealistic trend line for his counterfactual world.



Reply Declaration ¶ 49, Fig. 2; *see also* Mintert Report ¶ 188, Ex. 14. In the real world, the 2008 spike in hog supply had a compounding effect that makes 2008 unreliable as a benchmark to project or compare subsequent years: 1) hog supply spiked at an unsustainable rate inconsistent with demand or normal market forces, and 2) hog prices crashed even as corn prices increased, making it inevitable that producers would decide to produce fewer hogs. *See, e.g.*, Mintert Report ¶ 124.

The truth is that Dr. Singer had never heard of circovirus at his deposition. Deposition Tr. of Hal Singer, ECF No. 1474-2, at 104:12-18. Dr. Singer's attempt to respond to the issue underscores that he cannot correct his oversight now: rather than use an appropriate control to accurately measure the effects of the vaccine in his reply or justify his exclusive reliance on a single producer's piglet-mortality data on this critical point, he

simply reasserts that he controlled for the vaccine with his flawed piglet-mortality variable. Reply Declaration ¶ 93. This is exactly the sort of *ipse dixit* proffered by an economist that the Eighth Circuit rejects as insufficient under the *Daubert* standard. *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d at 1002.

Dr. Singer's failure to reliably account for the circovirus vaccine is compounded by his additional failures to control for the real world in 2008. Dr. Singer provides little or no empirical evidence to respond to Dr. Haider's concerns that his model did not control for multiple outlier events. *Compare, e.g.*, Haider Report ¶ 126 n.239 (explaining why Dr. Singer's GDP per capita variable fails to control for national economic shocks such as the Great Recession) *with* Singer Reply ¶¶ 92-94 (reasserting that the GDP control was sufficient with no explanation). Dr. Singer also quibbles with Dr. Haider's use of a twelve-month dummy variable to account for the outlier events in 2008, but Dr. Haider applied this dummy variable in the same way Dr. Singer used dummy variables in relation to H1N1 (June 2009 to August 2010) and the COVID-19 pandemic (2020). Singer Report ¶¶ 154, 156 n.314, 322.

These are not the type of issues that should be thrown to the factfinder to sort out. *See In re Wholesale Grocery Prods.*, 946 F.3d at 1002 (holding that the trial court's gatekeeper role should be used to exclude an expert economist's unjustified and unsupported reliance on a benchmark to measure antitrust impact). Here, claiming he applied a "conservative base case," Dr. Singer uses complex econometric calculations to opine that damages to the class amounted to **$1.37 billion** before trebling. Singer Report ¶ 198. That extreme claim is entirely predicated on Dr. Singer's selection of a misleading

benchmark that he has failed to substantiate—precisely the kind of "house of cards" this Court rejects as unreliable. *In re Wholesale Grocery Prods.*, 946 F.3d at 1002. Dr. Singer's econometric analysis should be excluded.

### B. Dr. Singer Cannot Dispute that His Models Are Unreliably Sensitive

In their opening brief, Defendants argued that Dr. Singer's model is susceptible to significant swings when Dr. Haider made changes to account for the economic realities in the pork industry or the time periods at issue. For example, Dr. Haider found that when the same benchmark period was compared to the class period at issue in this case (rather than the *conduct period* as defined by Consumer IPPs), the alleged overcharge disappears. Haider Report ¶ 134; Defendants' Joint Motion at 31. Likewise, "breaking down the analysis by particular cut yields similar results: the alleged overcharge for the actual Class Period is always either 'negligible' or completely nonexistent." Defendants' Joint Motion at 31 (citing Haider Report ¶ 179, App. D).

Rather than engage, Dr. Singer attempts to distract by claiming that Dr. Haider's calculations still showed small overcharges. Reply Declaration ¶ 78. But the salient point for the Rule 702 is the reliability of a model that produces wild variation when accounting for basic industry facts or specific time periods. *See* Haider Report ¶ 252 n.253 (citing econometrics textbooks regarding the concerns associated with unstable results). And these concerns shed additional light on the unreliability of a gerrymandered benchmark period that generates the overcharges.

Dr. Singer's model reliably establishes class-wide proof of antitrust injury, and his opinions and testimony should be excluded.

## **CONCLUSION**

For the foregoing reasons and those expressed in Defendants' opening brief, the

Court should exclude the opinion and testimony of Dr. Hal Singer.

Dated: January 6, 2022

Respectfully submitted,

/s/ *Craig. S. Coleman*
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

/s/ *Tiffany Rider Rohrbaugh*
Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP

20

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

**Counsel for Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc.**

/s/ Christopher A. Smith
Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (*pro hac vice filed*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com
kate.ledden@huschblackwell.com
tanner.cook@huschblackwell.com

**Counsel for Triumph Foods, LLC**

/s/ Peter H. Walsh
Peter H. Walsh (#0388672)

One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

**Counsel for Hormel Foods Corporation**

/s/ Mark L. Johnson
Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

**Counsel for Clemens Food Group, LLC and The Clemens Family Corporation**

/s/ William L. Greene
William L. Greene (#0198730)
Peter J. Schwingler (#0388909)
William D. Thomson (#0396743)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com

HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**

peter.schwingler@stinson.com
william.thomson@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

**Counsel for Seaboard Foods LLC and
Seaboard Corporation**