# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: PORK ANTITRUST LITIGATION | Case No. 18-cv-1776-JRT-JFD<br><br>MDL No. 2998 |
| THIS DOCUMENT RELATES TO:<br><br>*All Direct Action Cases* | Redacted Public Filing |

## DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................... 1

LEGAL STANDARD ..................................................................... 3

ARGUMENT ................................................................................. 6

    I.     DAPs Have Sufficiently Pled Defendants Fraudulently Concealed Their Conspiracy .............................................................................. 6

         A.     The Complaint Establishes that DAPs Were Not Aware of the Conspiracy and Exhibited Diligence ............................. 8

         B.     The Complaint Provides New and Detailed Allegations Demonstrating that Defendants Concealed Their Conspiracy .......................................................................... 11

         C.     The Complaint's Allegations Are More Than Sufficient to Overcome Defendants' Motion ............................................ 21

         D.     The Statute of Limitations was Tolled by the Filing of the Class Complaints ............................................................... 28

    II.    The Packers and Stockyards Act Confers a Private Right of Action on DAPs .................................................................... 30

    III.   There is No Basis to Dismiss DAPs' Claims as to Certain Pork Products ................................................................................. 32

         A.     DAPs' Claims for Pork Products Are Broadly Defined ...... 34

         B.     DAPs Do Not Assert Claims for "Downstream" Products Sold by Non-Defendants ..................................................... 37

CONCLUSION .............................................................................. 41

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (1974) .............................................................................. 28, 29

*Armour and Co. v. U.S.,*
    402 F.2d 712 (7th Cir. 1968)...................................................................... 30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................3

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................ 3, 34

*BJC Health Sys. v. Columbia Cas. Co.,*
    348 F.3d 685 (8th Cir. 2003).........................................................................5

*Braden v. Wal-Mart Stores, Inc.,*
    588 F.3d 585 (8th Cir. 2009).........................................................................3

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
    441 U.S. 1 (1979)........................................................................................ 33

*Conmar Corp. v. Mitsui & Co. (U.S.A.),*
    858 F.2d 499 (9th Cir. 1988)...................................................................... 24

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.,*
    720 F.3d 33 (1st Cir. 2013) ...........................................................................4

*Gibb v. Scott,*
    958 F.2d 814 (8th Cir. 1992).........................................................................5

*In re Bulk Popcorn Antitrust Litig.* (*Bulk Popcorn I*),
    No. 3-89-0710, 1990 WL 123753 (D. Minn. Jun. 19, 1990)...........................4

*In re Capacitors Antitrust Litig.,*
    106 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................... 34

*In re Linerboard Antitrust Litig.,*
    223 F.R.D. 335 (E.D. Pa. 2004) .................................................................. 29

*In re Lithium Ion Batteries Antitrust Litig.*,
  2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................................................. 34

*In re Midwest Milk Monopolization Litig.*,
  730 F.2d 528 (8th Cir. 1984)......................................................................... 39

*In re Milk Prods. Antitrust Litig.*,
  84 F. Supp. 2d 1016 (D. Minn. 1997) ....................................................... 4, 8

*In re Monosodium Glutamate Antitrust Litig.*,
  MDL 1328, 2003 WL 297287 (D. Minn. Feb. 6, 2003) ......................... 23, 26

*In re Optical Disk Drive Antitrust Litig.*,
  2011 WL 3894376 (N.D. Cal. Aug. 3, 2011)................................................. 40

*In re Packaged Seafood Prod. Antitrust Litig.*,
  MDL 2670, 2022 WL 789177 (S.D. Cal. Feb. 7, 2022) ............................... 12

*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d 753 (D. Minn. 2020) ...................................................*passim*

*In re Processed Egg Prod. Antitrust Litig.*,
  2011 WL 4945864 (E.D. Pa. 2011) ............................................................... 41

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  2020 WL 5016922 (D.D.C. Aug. 25, 2020) ................................................... 28

*In re Sugar Indus. Antitrust Litig.*,
  579 F.2d 13 (3d Cir. 1978) ............................................................................ 39

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................................... 12, 39, 40

*In re Wirebound Boxes Antitrust Litig.*,
  128 F.R.D. 262 (D. Minn. 1989) ...................................................... 24, 26, 27

*J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*,
  No. 12-cv-00754, 2015 WL 12696209 (E.D. Ark. Dec. 3, 2015) ....................4

*Jessie v. Potter*,
  516 F.3d 709 (8th Cir. 2008)...........................................................................6

*Maplevale Farms Inc. v. Agri Stats, Inc.*,
  No. 18-cv-01803 (D. Minn.) (Jan. 15, 2020), ECF No. 431 ...........................1

*McAuley v. Fed. Ins. Co.*,
  500 F.3d 784 (8th Cir. 2007) ................................................................. 5, 38

*Morton v. Becker*,
  793 F.2d 185 (8th Cir. 1986) .................................................................... 4

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
  468 U.S. 85 (1984) ................................................................................ 33

*NRT Tech. Corp. v. Everi Holdings Inc.*,
  2020 WL 340 3091 (D. Del. June 19, 2020) ............................................. 34

*Nucor Corp. v. Nebraska Pub. Power Dist.*,
  891 F.2d 1343 (8th Cir. 1989) .................................................................. 6

*Olean Wholesale Grocery Cooperative, Inc. v. Agri Stats, Inc.*,
  2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) ........................................ 40, 41

*Porous Media Corp. v. Pall Corp.*,
  186 F.3d 1077 (8th Cir. 1999) .................................................................. 4

*Ripplinger v. Amoco Oil Co.*,
  916 F.2d 441 (8th Cir. 1990) .................................................................. 24

*State of New York v. Hendrickson Bros., Inc.*,
  840 F.2d 1065 (2d Cir. 1988) .................................................................. 25

*Summerhill v. Terminix, Inc.*,
  637 F.3d 877 (8th Cir. 2011) .................................................................. 23

*Swift & Co. v. U.S.*,
  393 F.2d 247 (7th Cir. 1968) .................................................................. 30

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .................................................................. 34

*Topchian v. JPMorgan Chase Bank, N.A.*,
  760 F.3d 843 (8th Cir. 2014) .................................................................... 3

*Tosti v. City of Los Angeles*,
  754 F.2d 1485 (9th Cir. 1985) ................................................................ 29

*Westcott v. City of Omaha*,
  901 F.2d 1486 (8th Cir. 1990) .................................................................. 3

*Zean v. Fairview Health Servs.*,
    149 F. Supp. 1129 (D. Minn. 2016) ....................................................................4

**STATUTES**

7 U.S.C. §§ 192 .............................................................................................. 30

7 U.S.C. §§ 208 .............................................................................................. 30

7 U.S.C. § 209 ................................................................................................ 30

**OTHER AUTHORITIES**

HOW TO HIDE A PRICE-FIXING CONSPIRACY: DENIAL, DECEPTION,
    AND DESTRUCTION OF EVIDENCE," Christopher R. Leslie, 2021 U. Ill.
    L. Rev. 1199, at p. 32
    ................................................................................................................ 28

## **INTRODUCTION**

Defendants' memorandum in support of their partial motion to dismiss is notable because it does not contend that Direct Action Plaintiffs' ("DAPs") Complaint has failed to adequately plead that Defendants engaged in a years-long conspiracy to reduce the supply and raise the price of pork. Instead, Defendants' memorandum ("Memo") raises three narrow questions, all of which are easily answered.

First, Defendants argue that DAPs' allegations are insufficient to toll the running of the Clayton Act statute of limitations.  But DAPs' extensive and specific factual allegations demonstrating that Defendants fraudulently concealed their wrongdoing are more than sufficient to toll the statute of limitations.  DAPs' allegations go well beyond the Direct Purchaser Plaintiffs' ("DPPs") Third Amended Class Complaint[1] and include Defendants' willful destruction of evidence, Defendants' attendance and participation at secret meetings, and Defendants' pretextual reasons offered to explain the decrease in domestic pork supply and increase in prices to U.S. customers.  *See infra*, Argument at § I.

---

[1] The Direct Purchaser Plaintiffs' Third Amended and Consolidated Class Action Complaint: *Maplevale Farms Inc. v. Agri Stats, Inc.*, No. 18-cv-01803 (D. Minn.) (Jan. 15, 2020), ECF No. 431.

Second, Defendants claim that certain DAPs do not have standing to assert claims under the Packers and Stockyards Act ("PSA"). The plain text of the PSA, however, entitles DAPs to recover damages and should not be limited according to Defendants' tortured reading. *See infra*, Argument at § II.[2]

Third, Defendants criticize DAPs' allegations concerning certain pork products. But DAPs have also sufficiently pled claims relating to the contested pork products by defining and including allegations inclusive of a broad variety of pork products. In fact, the allegations set forth in the Complaint relating to specific pork products have already been found plausible by this Court. *See infra*, Argument at § III.

While Defendants spend much of their Memo discussing claims asserted by different plaintiffs (the representatives of the three Classes), the DAPs are separate plaintiffs, with a separate Complaint containing their own factual allegations, which differ from those set forth in Class pleadings that were filed more than three years ago, without the benefit of any discovery.[3] Defendants' motion should be denied.

---

[2] The discussions of the PSA, including Section II, are joined only by those DAPs that have asserted a PSA claim. *See* ECF No. 1659 (DAP Consolidated Complaint) at § II.

[3] This MDL governs only pretrial proceedings, and the trials of all DAP claims (but one) will take place in the transferor courts, where DAPs filed their own respective cases—separate from the trials of any Class cases.

## <u>LEGAL STANDARD</u>

Defendants improperly filed a motion to dismiss under Rule 12(b)(6) despite having filed Answers.  "[A] Rule 12(b)(6) motion cannot be filed after an answer has been submitted."  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

If the Court elects to convert Defendants' motion into one brought under Rule 12(c), because the applicable legal standard is similar under both Rule 12(b)(6) and 12(c), the Court should consider all facts alleged in the Complaint as true to determine if the Complaint states a claim for "relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief," providing the defendant "fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  *Twombly* does "not require a heightened fact pleading of specifics." *Id.* at 570.  An antitrust plaintiff need only allege "plausible grounds to infer an agreement"; there is no "probability requirement at the pleading stage." *Id.* at 556.  On a motion to dismiss, courts must accept plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. *Topchian*

3

*v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1019 (D. Minn. 1997).

Defendants' Memo (at 8-12) improperly relies on "evidence" extrinsic to the Complaint.[4]  But at the pleading stage, courts cannot weigh "competing inferences" or "credit a defendant's counter allegations." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013).  "When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *see also Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *Zean v. Fairview Health Servs.*, 149 F. Supp. 1129, 1133 (D. Minn. 2016) ("When considering a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials outside the pleadings."); *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel*, No. 12-cv-00754, 2015 WL 12696209, at *2 (E.D. Ark. Dec. 3, 2015); *In re Bulk Popcorn Antitrust Litig.* (*Bulk Popcorn I*), No. 3-89-0710, 1990 WL 123753, at *4 (D. Minn. Jun. 19, 1990).

---

[4] Defendants provide a Declaration of Brian Robison (Smithfield counsel) (ECF No. 1757) attaching eight exhibits, including brochures of three American Meat Conferences (2015-2017) pulled off the Web, a website page for a 2023 National Pork Industry Conference, two articles by Agri Stats in 2008-2009, and a transcript of a 2011 Smithfield earnings call. (See Memo at 8). Defendants also seek to rely (Id. at 10) on website links to a London Swine Industry Conference.

4

Rule 12(d) is clear: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion *must* be treated as one for summary judgment under Rule 56." (emphasis added).  In *Gibb v. Scott*, 958 F.2d 814, 815-817 (8th Cir. 1992), the Eighth Circuit accordingly reversed an order of dismissal under Rule 12(b), finding that the court improperly relied upon matters outside of the complaint and failed to treat the motion as one for summary judgment under Rule 12(d).[5] The *Gibb* court held that "[t]he [district] court's failure to convert the motions and provide the parties with notice and an opportunity to further supplement the record constituted prejudicial error…" *Id.* at 817; *see also McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787-88 (8th Cir. 2007) (reversed on similar grounds); *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687-688 (8th Cir. 2003) (reversed on similar grounds).

The Court has entered a Scheduling Order providing that summary judgment motions are to be filed on May 17, 2024, and it recently enforced that Order. (ECF No. 1651 12/1/22; ECF No. 1819 2/17/23).

---

[5] "Most courts ... view 'matters outside the pleading' as including any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings."  958 F.2d at 816 (*citing* Wright & Miller, Federal Practice and Procedure § 1366 (footnotes omitted)).

## ARGUMENT

### I.   DAPs Have Sufficiently Pled Defendants Fraudulently Concealed Their Conspiracy

The Complaint alleges with specificity and particularity dozens of affirmative acts by Defendants that concealed their conspiracy from DAPs (and the public).[6]  Although Defendants urge the Court to extend its ruling from the Class cases to DAPs, it would be error to do so because DAPs plead detailed facts about Defendants' concealment that were not part of any Class Complaint and therefore were not considered by the Court when it ruled on the adequacy of different allegations made by the Classes before any discovery took place.

As the Court has recognized, "[b]ecause the statute of limitations is 'typically an affirmative defense' and a defendant 'does not render a complaint defective by pleading an affirmative defense,' an argument by a defendant that a claim is time barred 'is not ordinarily a ground for Rule 12(b)(6) dismissal *unless the complaint itself establishes the defense.*'"  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 772 (D. Minn. 2020) (citing *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008)) (emphasis added).  Instead, "issues of fraudulent concealment relating to a statute of limitations defense are normally questions of fact for the jury…" *Cf. Nucor Corp. v. Nebraska Pub. Power Dist.*, 891 F.2d

---

[6] The term "conspiracy" is used in DAPs' Complaint and this Opposition to encompass all forms of conduct actionable under the causes of action asserted against Defendants.  *See* Compl. ¶ 10 n. 5.

6

1343, 1351 (8th Cir. 1989).   Here, the Complaint does not establish the defense—and, in attempting to argue otherwise, Defendants offer only a contorted and myopic reading of DAPs' Complaint.

For example, DAPs have numerous detailed allegations demonstrating that Defendants intentionally destroyed evidence of their conspiratorial communications. *See, e.g.*, Compl. ¶¶ 311, 404, 408.   DAPs also allege with much detail that Defendants met in secret and established rules for those meetings that prohibited the dissemination or attribution of statements made by the conspiring attendees.  *See id.* ¶¶ 251-56, 265, 299, 300, 315, 323, 326, 327, 330, 332, 333, 336, 341-43, 345, 351, 403, 407, 410, 412, 415, 418, 420, 423, 426.   The Complaint also alleges that Defendants instructed their sales executives to affirmatively misrepresent to DAPs and other customers the reasons why pork supply was decreasing while pork prices were increasing, in order to deflect attention from the conspiracy.  *See id.* ¶¶ 392, 393, 395-97, 398, 399, 426, 434-38.   There are many more examples of similar acts of concealment, all of which answer "who, what, when, where, and how" Defendants concealed their anticompetitive conduct.[7]

_____

[7] As just one example, DAPs allege that ████████████████████████ at Tyson, complained internally to a colleague about Tyson's decision to limit its production in accordance with Defendants' collusive agreement to allocate market share for pork processing. ██████████████████████████

As this Court has previously acknowledged, "[t]o invoke fraudulent concealment, Plaintiffs must allege facts showing: (1) Defendants' concealment of Plaintiffs' cause of action, (2) failure by Plaintiffs to discover the existence of their cause of action, and (3) due diligence by Plaintiffs in attempting to discover the claim." *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 772–773 (D. Minn. 2020) (citing *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999)) (Plaintiffs put on inquiry notice by DOJ announcement of investigation).  DAPs' Complaint amply establishes each of these elements.

### A.   The Complaint Establishes that DAPs Were Not Aware of the Conspiracy and Exhibited Diligence

Contrary to Defendants' suggestion that DAPs simply copy-pasted into their own Complaint the fraudulent concealment allegations made years ago by Class Plaintiffs, DAPs' fraudulent concealment allegations include far more detail and specificity.  Moreover, Defendants fail to mention that even Class Plaintiffs were found by the Court to have satisfied *two of the three* required elements—i.e., Defendants' concealment of Plaintiffs' cause of action and due

---

█████████████████████████████████████████████████████████ Likely recognizing that this complaint revealed the existence of Defendants' conspiracy, ███████ then closed the email by instructing and warning his colleague that ████████████████████████ █████████" *See* Compl. ¶ 408 (emphasis added).  Class Plaintiffs did not include this allegation in their complaint.  For other examples, *see infra* Argument at § I.B.i.

diligence.  *See In re Pork*, 495 F. Supp. 3d at 774 (holding that Class Plaintiffs had sufficiently alleged that they did not discover their cause of action and they exhibited diligence).  That omission—while not surprising—is telling, as DAPs' allegations go well beyond what was asserted by Class Plaintiffs, and Defendants' arguments on these two elements have already been rejected.  For example, the DAP Complaint contains allegations that Defendants intentionally and successfully concealed the existence of the conspiracy from DAPs.  Additionally, each DAP used methods to ensure they were receiving competitive pork prices throughout the conspiracy that caused DAPs to believe in good faith they were receiving competitive prices for the pork purchased from Defendants.  Compl. ¶ 448.

Defendants' efforts to side-step these well-pled allegations fail for the same reasons they failed with respect to the Class Complaints.  Defendants previously argued, as they do here, that "Plaintiffs were on inquiry notice as early as the start of the conspiracy because the public statements, the increased price for pork, and the slowing production were public knowledge."  *In re Pork,* 495 F. Supp. 3d at 774.  The Court rejected this argument, holding that, "although public statements made by the Defendants could have tipped off a savvy consumer to the conspiracy, that does not mean that a reasonable person must have discovered the conspiracy through the statements."  *Id.*

Thus, it is Defendants that offer, in their words, "nothing new."  Defs.'
Memo at 2.  Indeed, to the extent that anything has changed since the Court
ruled on the Class allegations in 2020, the record is considerably more
favorable to DAPs.  For example, the initial Class Complaints did not allege
the existence of the market allocation agreement in which each Defendant
processed pork consistent with its "slaughter market share," nor did the Class
Plaintiffs allege overt coordination between Defendants on exports, as DAPs
do.  *See* Compl. ¶¶ 232, 243, 251-56, 322.  Moreover, the Class Plaintiffs did
not allege that Defendants made knowingly untrue statements to their
customers that falsely portrayed the supply cuts as the result of the H1N1 and
PEDv outbreaks, or the price increases as necessitated by raw material price
increases, which would have further deflected diligent inquiries into the
conspiracy. *See supra* § I.

Further, DAPs' Complaint satisfies this diligence element.   The
Complaint alleges that all DAPs were unaware of their claims as of June 28,
2014 (four years before the first Class Complaint), and that DAPs exercised
diligence in pursuing their claims.  "For example, and without limitation, each
Plaintiff used a method of purchasing pork—including, for example and
without limitation, seeking price quotes and bids from their suppliers and/or
investigating reasonably available public information—that caused it to

10

believe in good faith at the time that it was receiving competitive prices for pork." *See* Compl. ¶¶ 445-47.

Defendants also complain that the Complaint lacks DAP-specific allegations about due diligence. Defs.' Memo at 20. This is ironic, given that Defendants insisted that DAPs file a single complaint, and DAPs were forced into group pleading over DAPs' objections. *See,* Joint Statement of the Parties in the Direct Action Plaintiff Cases Regarding Case Management Issues, ECF. No. 1046 at 5. If the Court believes DAP-specific allegations are necessary, DAPs should be afforded the opportunity to file individual, supplemental allegations.

## B. The Complaint Provides New and Detailed Allegations Demonstrating that Defendants Concealed Their Conspiracy

Although the Court previously determined that the Class Complaints did not adequately plead fraudulent concealment, that does not foreclose DAPs' reliance on fraudulent concealment to toll the statute of limitations.

*First*, DAPs do not allege a conspiracy conducted primarily through public statements. Here, although the statements made in the earnings calls by Tyson, JBS, and Smithfield and relied on in the early Class Complaints offer some evidence of the conspiracy, *these public statements are only a part of the conspiracy that DAPs allege*. Instead, as DAPs detail in the Complaint, the core of the conspiracy was conducted through surreptitious communications

11

and secret meetings, which allowed Defendants to keep their conduct a secret. On this point, Defendants are wrong on the law.  The fact that *some* evidence of Defendants' conspiracy existed in the public domain is insufficient to negate an inference of fraudulent concealment as a matter of law.  *See, e.g., In re Packaged Seafood Prod. Antitrust Litig.*, MDL 2670, 2022 WL 789177, at *7 (S.D. Cal. Feb. 7, 2022) ("there is no reason a particular piece of information should have a fixed amount of relevance regardless of the context in which it is viewed.… [A] lone puzzle piece may, in isolation, give no further indication as to the larger picture into which it fits, and yet at the same time be an integral component of the final product once all corresponding pieces are assembled.").  Further, courts have found sufficient allegations of fraudulent concealment even where plaintiffs relied on defendants' public statements as proof of the conspiracy.  *See, In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119-20 (N.D. Cal. 2008).

Defendants' truncated quotation of the Court's prior holding concerning the Classes' fraudulent concealment allegations[8] also elides a second

---

[8] Although Defendants provide only a partial quotation (*see* Memo at 1), the Court found in the Class cases that "none of the alleged acts of concealment meet Rule 9(b)'s heightened pleading standard.  Plaintiffs do not provide any information regarding the 'who, what, when, where, and how' that could lead the Court to plausibly assume that the Defendants engaged in a fraudulent concealment campaign.  Further, the heart of the Complaint is that this conspiracy was agreed to and conducted in part via public statements between

conclusion the Court reached that is relevant here.  Although the Court found that the Class Plaintiffs' "vague allegations" were insufficient to satisfy the Rule 9(b) pleading standard, the Court also concluded that the information in the public domain did not put the Class Plaintiffs on notice of the conspiracy. *In re Pork*, 495 F. Supp. 3d at 774.  Instead, the Court ruled that, "although public statements made by the Defendants could have tipped off a savvy consumer to the conspiracy, that does not mean that a reasonable person must have discovered the conspiracy through the statements." *Id.*  Based on this reasoning, the Court determined plaintiffs were not reasonably on notice of the conspiracy until after the *Broilers* class action lawsuit and the 2017 *Bloomberg* article detailing the anticompetitive uses of Agri Stats reports.  *Id.*

*Second*, the Court's prior holding does not apply here because DAPs have alleged fraudulent concealment with abundant specificity.  Whereas the Class Plaintiffs did not identify a single specific act, reference any specific employee of any Defendant, provide any specific date when concealment occurred, or detail any specific statement or meeting, DAPs have supported their allegations with ample factual details.  Far from offering "nothing new," DAPs' allegations of fraudulent concealment are numerous and detailed.  As

---

the Defendants.  It is difficult to reconcile the Plaintiffs belief that Defendants conducted this conspiracy via public statements with its assertion that Defendants were also concealing it." *In re Pork*, 495 F. Supp. 3d at 773-74.

explained below, Defendants destroyed (or attempted to destroy) evidence of their wrongdoing, mandated confidentiality and non-attribution for their collusive communications and made many knowingly false representations to DAPs about the reasons for supply shortages and price increases, all of which had the effect of concealing the conspiracy from DAPs.  These allegations distinguish DAPs' allegations from those of the Class Plaintiffs and give the Court ample basis to reject Defendants' motion as to fraudulent concealment.

### i.   *Destruction of evidence*

██████████   2011 directive that his colleague delete their discussion of Tyson's adherence to the conspiracy (Compl. ¶ 408) was not the only allegation by DAPs of Defendants taking steps to destroy evidence of their wrongdoing. For example, on July 8, 2009, ██████  was directed by ██████████ of Tyson to ████████████" information Padgett received on current pricing offered by Seaboard, Smithfield, JBS, and Cargill.  Compl. ¶ 404.  Similarly, on April 21, 2017,██████████ (Tyson) spoke with a contact at Clemens about Clemens's new pork plant and the impact of this plant on the industry.████████████ of Tyson forwarded██████  account of this meeting internally but instructed the recipients to████████████████  Compl. ¶ 422.  In yet another example involving██████████, on June 21, 2010, a JBS sales executive shared pricing details for████████  with her former colleagues at Tyson, and upon receipt of the conspiratorial communication,██████████  instructed his colleagues:

███████████████████████████████████ Compl. ¶ 311. [9] These examples—not included in the Class Complaints—demonstrate the secret nature of Defendants' conspiracy.

### ii. Concealment of communications and meetings

DAPs also allege that, in addition to destroying (or trying to destroy) evidence of their misconduct, Defendants also took affirmative steps to hide their communications and conceal their disclosure. For example, Defendants organized multiple meetings through the "21st Century Pork Club," an industry group that established a rule requiring, according to a frequent attendee from Hormel, that ████████████████████████████ ████████████████████████████ Compl. ¶ 204. Put differently, this "no attribution" rule prohibited █████████████ ████████████████████████████████████," which allowed Defendants' executives to discuss with their competitors their company's future production and pricing plans under an expectation of secrecy and confidentiality. Compl. ¶ 265. Defendants held important conspiracy meetings through this club, which met twice a year. For example, in September 2009, ████████████████████—used the club's meeting

---

[9] It is plainly the case that not all copies of these communications were deleted by Tyson. But the fact that these Tyson executives frequently instructed colleagues to delete incriminating emails begs the question how much evidence of the conspiracy *was* destroyed by Defendants.

in Philadelphia to encourage his competitors to reduce supply, while an industry economist gave a presentation detailing the degree of supply cuts necessary to restore the conspirators' desired profitability levels. Compl. ¶ 299.

DAPs allege that Defendants also frequently shared their current pricing—both directly and through intermediaries—with admonitions to keep the exchanges confidential. For example, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Compl. ¶ 403. There are numerous examples of similar exchanges detailed in the Complaint. *See, e.g.,* Compl. ¶ 407 (Smithfield to Seaboard through intermediary), ¶ 415 (Smithfield to Seaboard); ¶ 418 (JBS to Hormel through intermediary); ¶ 420 (Smithfield and Tyson); ¶ 426 (JBS to Hormel).

In some exchanges, Defendants communicated through family members or former colleagues, in order to give their collusive communications the appearance of propriety. For example, the ████████████████████████

███████████████████████████) regularly exchanged their companies' future pricing and export plans with each other, and also shared other intelligence that each received from other conspirators. In one example, on January 11, 2012, ██████ asked ██████ about ██████ thoughts on future loin

pricing, given the lack of recent exports to China.  ███  responded that ███

███████████████████████████████████████████████████████████████████████

███  and the  ███████  then confirmed to each other that each of their

employers had cut back on their kill rates to adjust.  *See* Compl. ¶ 323.  There

are numerous other examples of the ████████████  engaging in similar

exchanges.  *See, e.g.,* Compl. ¶ 315 (███  asking  ███  ████████████████

████████████████);  ¶ 319 (███  asking  ███  if JBS intended additional

exports);  ¶ 326 (███  forwarding to  ███  information about Smithfield pulling

low pricing it had been offering to one customer).  *See also* Compl. ¶¶ 327, 330,

332, 333, 336, 341, 342, 343, 345.

Defendants also took steps to speak by telephone where possible—in

order to avoid a paper trail of their collusive discussions—and then used codes

to further conceal the information discussed in these calls.  For example, on

May 22, 2015, Hormel's ████████  emailed Tyson's ████████, asking ███

to give  ███  a call.  ███  then reported to colleagues only that he and ███

had ████████████,'' during which  ███  conveyed to  ███  problems that

Hormel was having with a customer referenced only as "█  *See* Compl. ¶ 351.

Although context—and years of discovery—support the inference that Tyson's

███  and Hormel's  ███  discussed issues with Wal-Mart,  ███  use of just a

single letter to reference the customer reflects both his consciousness of guilt

and his efforts to conceal his collusive communications.

17

Similarly, ████████, a Seaboard executive and the sales agent for Triumph's exports, engaged in overt price-fixing by telephone with ████ ████, his counterpart at Farmland/Smithfield. The two reached agreements to increase prices on exports between 2009 and 2012, but only spoke by telephone. *See* Compl. ¶ 251–256.

Additionally, the DAP Complaint includes allegations that Defendants and co-conspirators took steps to limit the number of attendees at conspiracy meetings and the number of executives briefed on collusive communications with competitors. For example, on June 9, 2017, ████████ of Clemens reported internally on a discussion he had with Seaboard's ████████ in which the two discussed confidential information "████████████████████████ ████████████████████████████████ ████████ instructed the recipients of his email that he ████████████████████████████ ████████████████████████████████████ ████████████████████ Compl. ¶ 423. In another example, ████████—the founder of the secretive "Pork Club"—extended an invitation to Seaboard from Smithfield's ████████ that one of its executives (and only one) to ████████████████████ Compl. ¶ 300. The Pork Club also founded a subgroup in 2012 intended to further limit attendees to just the major packers (i.e., the Defendants). *See* Compl. ¶ 410.

18

These factual details—all but one of which are absent from the Class Complaints—support DAPs' reliance on fraudulent concealment to toll the statute of limitations.

### iii.   *False Representations to Customers*

The DAP Complaint also establishes that Defendants made numerous false representations to DAPs and other customers to justify price increases "and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices conceal[ing] the fact that the collusive supply restraints were the true cause of those increased prices."  Compl. ¶ 392.

For example, Defendants claimed that the H1N1 virus in 2009 and the PEDv outbreak in 2013 and 2014 were causing higher prices, despite internal recognition that these claims were mere pretext.  *See, e.g.,* Compl. ¶ 393 █████ ████ of Seaboard stating in an email on May 6, 2009, that "████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████); ¶ 398 ████████████ of JBS commenting in an email on February 7, 2014, that ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████); ¶ 399 ████████████████ of Seaboard acknowledging on November 4,

2014, that "█████████████████████████████████████████

█████████████████████████████████████████████████████

Defendants also frequently claimed that raw material price increases and other input costs were responsible for their increases in pork prices, despite internal recognition that these claims were untrue. For example, a January 2011 presentation deck that Hormel prepared for its sales executives noted that increased exports and low domestic supply allowed for price increases, but ████████████████████████████████████████████████████

█████████████████████████████████████." Compl. ¶ 394. The presentation deck further noted on the top of every page: ████████████████████████████████████ *Id.* Similarly, in public statements on 2012, Tyson's CEO claimed that Tyson ██████████████████████████████████████████████████

████████████ Compl. ¶ 395. Hormel tried this tactic again on March 11, 2014, when Dennis Clougherty sent Marketing Director Jennifer Johnson ███ ██████████████████████████████████████████████████

████████████" Compl. ¶ 396. But Hormel's █████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████ *Id.*

DAPs also allege that Defendants increased their pricing to DAPs and other customers based on the data they received from Agri Stats reports, but then falsely attributed these price increases to other factors, in order to conceal the collusive advantage that Agri Stats gave to its recipients.  For example, Clemens made ████████████████████ in its pricing to Nestle Purina based on its Agri Stats report.  However, in communications with Nestle Purina explaining the increase, Clemens ████████████████, directed his sales executives to cite ████████████████████████████████ ████████████████████████████████████ Compl. ¶ 397. Additionally, Defendants Hormel, Tyson, and JBS all touted antitrust compliance and other internal policies that purported to prohibit sharing confidential information with competitors, but the information that both companies sent to and received from Agri Stats plainly violated these policies. *See* Compl. ¶¶ 426, 434-38.

## C.   The Complaint's Allegations Are More Than Sufficient to Overcome Defendants' Motion

In sum, the DAP Complaint alleges with detailed factual support that Defendants in this MDL:

1)  took steps to destroy evidence;[10]

---

[10] *See, e.g.,* Compl. ¶¶ 363, 400, 404, 408, 422.

2) routinely marked collusive communications as "confidential";[11]

3) established rules for their trade association that prohibited attribution of statements to meeting attendees;[12]

4) sought to limit attendance at their conspiracy meetings;[13]

5) sought to limit the number of individuals who were privy to information discussed with competitors;[14]

6) communicated by telephone to avoid creating a paper trail of their collusive communications;[15]

7) communicated in code;[16]

8) allocated their market share;[17] and

9) made knowingly false representations to customers about the reasons for supply shortages and price increases.[18]

These details demonstrate the secret nature of Defendants' conspiracy and support DAPs' reliance on fraudulent concealment to toll the statute of limitations. For all of the allegations discussed above, DAPs have alleged with specificity *who* performed each act of concealment, *when* each act was

---

[11] *See, e.g.,* Compl. ¶¶ 140, 391, 394, 403, 407, 415, 418, 420, 432, 434.
[12] *See, e.g.,* Compl. ¶¶ 198, 204, 265, 299, 300, 410.
[13] *See, e.g.,* Compl. ¶¶ 300, 410.
[14] *See, e.g.,* Compl. ¶ 423.
[15] *See, e.g.,* Compl. ¶¶ 251–256, 280, 351, 402, 412, 429.
[16] *See, e.g.,* Compl. ¶ 351.
[17] *See, e.g.,* Compl. ¶¶ 232, 243, 322.
[18] *See, e.g.,* Compl. ¶¶ 392, 393, 395–99, 426, 434-38.

committed, *where* the act was committed (including the location for in-person meetings, and whether by phone or email for communications), *what* each act of concealment entailed, and *how* each act allowed Defendants to conceal their conspiracy.   DAPs therefore allege significantly more than the "vague allegations" asserted by the Class Plaintiffs and previously rejected by the Court. *In re Pork*, 495 F. Supp. 3d at 773.  This is plainly sufficient to satisfy the pleading standard.  *See Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011).

Indeed, other courts in this District found antitrust plaintiffs adequately pleaded fraudulent concealment with less extensive showings.  For example, in *Monosodium Glutamate*, the Court held that plaintiffs established a fact question on fraudulent concealment by presenting "evidence that Defendants falsified travel and expense reports, used secret codes, orchestrated price increases to avoid arousing customers' suspicions, allocated customers, communicated by phone so as not to leave a 'paper trail,' and gave false reasons for price increases." *In re Monosodium Glutamate Antitrust Litig.*, MDL 1328, 2003 WL 297287, at *3 (D. Minn. Feb. 6, 2003).

Similarly, in *Wirebound Boxes*, the court rejected defendants' challenge to fraudulent concealment, based on plaintiffs' allegations that:

> throughout the period of the alleged conspiracy each of the
> defendants used various secretive means of communication in
> establishing and maintaining their unlawful activity such as using

23

plain stationery, circulating a single copy of their "rules," avoiding the use of telephones, and marking their correspondence 'personal and confidential.' It also charges that all of the defendants participated in the submission of rigged bids in order to create the illusion of active competition, and that all the defendants met secretly regarding the conspiracy while falsely representing that they were holding legitimate trade association meetings.

*In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 262, 266 (D. Minn. 1989).

DAPs' allegations of concealment compare favorably with both of these cases for two reasons. First, DAPs allege significantly more acts of concealment by Defendants than the plaintiffs in either of these cases. Indeed, DAPs allege more acts of concealment than the plaintiffs did in these two *combined*.

Second, both the *Wirebound Boxes* and the *Monosodium Glutamate* courts applied a more rigorous "separate and apart" standard than the Eighth Circuit requires. Indeed, the Eighth Circuit has never adopted the "separate and apart" standard; instead, the Eighth Circuit "requires an act of affirmative misrepresentation over and above the acts creating the alleged cause of action." *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442 (8th Cir. 1990). This is essentially the same standard as applied by the majority of the circuits, including the Ninth Circuit. *See, e.g., Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 505 (9th Cir. 1988) ("A plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claim was the result of affirmative conduct by the defendant . . . . Passive concealment of information

24

is not enough to toll the statute of limitations."). Accordingly, to the extent that the Court declines to apply the Second Circuit's self-concealing standard,[19] the Court should apply the "affirmative conduct" majority rule.

Ultimately though, even if the Court applies the "separate and apart" standard that the Eight Circuit has yet to adopt, DAPs' allegations meet this more stringent standard. For example, the instructions that Tyson employees gave their colleagues to ▮▮▮▮▮▮▮▮▮▮" incriminating information was part of the Defendants' concealment. The same applies for the many exhortations that Defendants keep collusive communications "confidential," their use of code in certain emails, and their decision to conduct meetings through a forum that prohibited the attribution of any statements made by meeting attendees.

Defendants' argument to the contrary makes little sense and is contradicted by courts that apply the "separate and apart" standard. Specifically, Defendants argue that DAPs cannot prove fraudulent concealment because "the alleged conduct that underlies DAPs' fraudulent-concealment claim are the very same acts that form the bases of DAPs' conspiracy allegations—namely, exchange of information between Defendants." *See* Defs.' Memo at 19. But the conspirators in *Monosodium*

---

[19] DAPs believe that that the Second Circuit's self-concealing standard should apply. *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

*Glutamate* "communicated by phone so as not to leave a 'paper trail,'" *see* 2003 WL 297287, at *3, while the defendants in *Wirebound Boxes* exchanged correspondence marked as "personal and confidential." 128 F.R.D. at 266. These communications were in furtherance of the conspiracies in those cases and those courts still considered those allegations in determining that the plaintiffs had sufficiently established fraudulent concealment.

Defendants, relying upon extrinsic evidence, make several material misrepresentations of fact in their Memo regarding DAPs, particularly with respect to DAP Nestlé Purina PetCare. Defendants incorrectly contend that documents relied upon by the DAPs demonstrate the NPIC and the London Swine Conference were sponsored by pork purchasers like Nestlé Purina. *See* Defs.' Memo at 8-9. Contrary to Defendants' assertions, these documents refer to animal feed producer Purina Mills owned by Land O'Lakes, which is not affiliated with DAP Nestlé Purina or any other DAP in this case. In fact, no DAPs sponsored either the NPIC or the London Swine Conference as Defendants falsely assert (while also relying on purported facts outside the Complaint) to avoid their fraudulent concealment.

Defendants, again relying upon extrinsic evidence, also seek to make much of the fact that *some* DAPs served on the planning committee for the Annual Meat Conference. *See* Defs.' Memo at 8. This contention is misleading, because DAPs allege that Defendants conspired primarily through the Pork

26

Club (a separate organization with mandated secrecy rules) and the AMI *Board of Directors* (which was separate from the Annual Meat Conference, and which included only high-level executives from Defendants). *See* Compl. ¶¶ 206—210, 265, 270, 280, 299, 300, 410. Defendants also do not contend that any DAP was in attendance when Defendants made any of the collusive exhortations to their colleagues to reduce supply. But even if Defendants had, the Court may not consider the Declaration and Exhibits, as those materials create issues of fact that cannot be decided on a Rule 12 motion.

And to the extent that the Annual Meat Conference was relevant to the conspiracy, DAPs allege that, in some of these conferences, Defendants used their access to each other during legitimate trade association events to collude. For example, following one industry event in 2014, ███████ of Clemens reported on discussions he had with Triumph, Tyson, and Smithfield about production schedules, and commented that ████████████████████ ████████████████████████████████████ ███████ *See* Compl. ¶ 416.

Thus, this allegation is similar to the fact pattern in *Wirebound Boxes*, where Defendants conspired during what they claimed were legitimate trade association meetings. 128 F.R.D. at 266. Here, Defendants colluded during

27

some legitimate events, which gave their contacts the appearance of propriety.[20]

### D. The Statute of Limitations was Tolled by the Filing of the Class Complaints

The filing of the Direct Purchaser Class case in June 2018 tolled the statute of limitations because the DAPs allege the same basic pork supply reduction conspiracy as the Direct Purchaser Class and were absent members of that Class.[21]  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  In addition, because the DPP Class Complaint provides an inclusive and not a "limited" definition of Pork, Defendants' *American Pipe* tolling argument fails out of the gate.[22]  *See In re Rail Freight Fuel Surcharge Antitrust Litig.,* 2020 WL 5016922 at *11 (D.D.C. Aug. 25, 2020) ("courts assess whether defendants'

---

[20] *See*, "HOW TO HIDE A PRICE-FIXING CONSPIRACY: DENIAL, DECEPTION, AND DESTRUCTION OF EVIDENCE," Christopher R. Leslie, 2021 U. Ill. L. Rev. 1199, at p. 32 ("Federal judges should better appreciate the affirmative steps that price-fixing conspirators take to conceal their cartel operations and to make their criminal conduct appear benign. Price fixing is not a casual conspiracy. Business executives invest great effort into camouflaging their crimes from the outside world.")

[21] Notably, two Defendants, Smithfield and JBS, have entered into settlements with the Direct Purchaser Class Plaintiffs which establish the settlement class period as beginning on January 1, 2009.  *See* ECF No. 543-1, DPP/JBS Settlement at 9, ¶ 5; ECF No. 831-2, DPP/Smithfield Settlement at 9, ¶ 5.

[22] DPP's pork definition "<u>includes</u> pig meat purchased fresh or frozen, smoked ham, sausage, and bacon."  ECF No. 431, DPP 3d Am. Compl. at 4 (emphasis added).

'liability' in the former class action and the present individual action 'is predicated on the same acts,' such that 'there can be no doubt that the defendants have received sufficient notice of the contours of potential claims.") (citations omitted).

Defendants' reliance on *Zarecor* is unavailing. *See* Defs.' Memo at 22. *American Pipe* tolling does not require that every single factual allegation contained in the DAPs' Complaint need be identical with the Class Complaint. Rather, *American Pipe* tolling applies so long as DAPs' Complaint shares a common factual basis and ultimate legal nexus with the Class Complaint sufficient to put Defendants on notice of DAPs' claim. *See Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) ("We find no persuasive authority for the rule which would require that the individual suit must be identical in every respect to the class suit for the statute to be tolled."); *In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 351 (E.D. Pa. 2004) ("For tolling to apply, claims do not have to be identical but only substantially similar to those brought in the original class action.").

Adopting Defendants' unduly restrictive reading of *American Pipe* would require Plaintiffs to pursue separate suits for some pork products only or require every plaintiff to file a partially duplicative suit. Such a reading would contravene the federal class action's purpose of "avoid[ing], rather than

29

encourag[ing], unnecessary filings of repetitious papers and motions." *Am. Pipe*, 414 U.S. at 550.

## II.   The Packers and Stockyards Act Confers a Private Right of Action on DAPs

Defendants assert that DAPs do not have a private right of action under the PSA (7 U.S.C. §§ 192 & 208) because DAPs do not buy or sell "livestock." They are wrong.  Whether a private action can be brought under the PSA does not depend on any actions of the plaintiff.  Instead, it depends on whether the defendant has violated the PSA in certain ways that are set forth in the statute, and whether the plaintiff has been injured by that violation.

The PSA provides for a private right of action for persons injured by a violation of its provisions.  *See* 7 U.S.C. § 209.  The statute provides:

> If any person subject to this chapter violates any of the provisions of this chapter, or of any order of the Secretary under this chapter, relating to the purchase, sale, or handling of livestock, the purchase or sale of poultry, or relating to any poultry growing arrangement or swine production contract, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

The PSA is remedial legislation and should be construed liberally to give effect its purposes.  *See Armour and Co. v. U.S.*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. U.S.*, 393 F.2d 247, 253 (7th Cir. 1968).

Defendants' argument ignores the plain text of the statute.  Defendants concede that DAPs allege that Defendants committed violations of the PSA

relating to the "purchase, sale, or handling or livestock." Defendants further acknowledge in their motion that livestock is defined to include swine. And because pork is dead swine, the pork purchases by DAPs from Defendants at inflated, conspiratorial prices give rise to a PSA claim. Moreover, Defendants ignore that DAPs allege that Defendants' conspiracy included the reduction of swine, both their own herds of breeding sows and the herds of the independent producers from which they purchase live animals, to lower the supply of live hogs (or swine) in the market. According to the plain text of the statute, Defendants "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation."

Under Defendants' reading of the statute, however, the clause "relating to the purchase, sale, or handling of livestock" should be read to modify the "persons injured" clause. This is clearly incorrect. *Violators* of the statute must purchase, sell, or handle livestock. But there is no such limitation on the persons to whom those violators are liable.

Thus, there is no plausible reading of the statute that limits the private right of action under § 209 to livestock producers. Instead, Congress acknowledged that violations could extend to the sale of livestock, and further provided that all persons injured by such violations could recover their damages. The statute places no limitation at all on the category of "persons" that may recover, and Defendants' suggestion that this Court rewrite the

statute to impose such a limitation would violate all principles of statutory construction, as well as Congress's intent that the PSA be construed liberally.

Accordingly, DAPs are entitled to recover damages on their PSA claims for the period beginning four years prior to when each DAP filed its PSA claim.

## III.   There is No Basis to Dismiss DAPs' Claims as to Certain Pork Products

Defendants argue that certain pork products are not properly within the scope of DAP's claims because DAPs fail to allege that pork products were affected by the alleged supply reduction conspiracy, and specifically that certain multi-ingredient products (like "burritos") are "downstream."  Defs.' Memo at 25-27.  This argument is baseless.  For starters, Defendants fail to identify what specific pork products they seek to exclude.  While they make passing references to undefined categories of "multi-ingredient products and pork by-products," the precise products are not mentioned or listed with specificity, giving DAPs insufficient opportunity to even respond to their argument.  Because Defendants obviously can identify each and every pork product that they sold to DAPs, their lack of specificity is reason enough to deny the motion.

Moreover, this Court has already deemed plausible identical allegations that Defendants conspired to reduce the supply of pork.  *See* Oct. 16, 2020 Memorandum Opinion and Order, ECF No. 519 at 16; *In re Pork*, 495 F. Supp.

3d at 771-72.  If the conspiracy to reduce the supply of <u>pork</u> is plausible, then it is equally plausible that the supply of <u>all pork products</u> (*i.e.,* products derived from hogs) would also have been reduced and their prices increased. Defendants point to nothing that undermines this obvious conclusion.

Instead, Defendants improperly invent their own version of "facts" (*e.g.,* that DAPs' Complaint asserts claims for "burritos"), ask the Court to draw incorrect and impermissible inferences in Defendants' favor (*e.g.,* that DAPs' claims are limited to only specific unprocessed meat products), and try to impose extraordinary pleading obligations on DAPs (*e.g.,* DAPs must "allege Defendants control the market for burritos" or that "there is limited substitution between bone meal from hogs and bone meal from cows, a key point underlying DAPs' claims") for which they offer no support.  This is contrary to well-established antitrust law. [23]

---

[23] Defendants essentially seek to dismiss DAPs' claims based on a supposedly improper product market definition.  Market definition is a "deeply fact-intensive inquiry," and courts thus "hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001). Courts "should reject motions to dismiss on market definition grounds unless the plaintiff's proposed definition is inherently implausible." *NRT Tech. Corp. v. Everi Holdings Inc.*, 2020 WL 340 3091, at * 7 (D. Del. June 19, 2020).  There is nothing inherently implausible about DAPs' pork definition, or the fact that a reduction in the sow herd and pork slaughter would impact prices for all parts of the hog, including offal and bone meal. Further, horizontal price fixing and output restriction conspiracies are ordinarily illegal *per se* and, in such circumstances, a restraint is presumed

It is also contrary to well-established federal pleading requirements, which do *not* require that a plaintiff identify every precise product (*e.g.,* by SKU number) in their Complaint or how the defendants' conspiracy impacted each and every such precise product. *See, e.g.*, *Twombly*, 550 U.S. at 555. Defendants cite no authority to the contrary. "There is no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter." *See In re Lithium Ion Batteries Antitrust Litig.* ("Batteries I"), 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) ("The question in this case is not whether any conspiracy existed, only how far it reached. That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings."); *see also In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015).

## A.   DAPs' Claims for Pork Products Are Broadly Defined

Much like the DPPs' claims already upheld by the Court,[24] DAPs allege that Defendants engaged in a conspiracy to restrict pork supply and raise pork

---

unreasonable without inquiry into the particular market context in which it is found." *See NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85,100, 104 (1984); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 19-20 (1979).

[24] Contrary to Defendants' suggestion, the DPP class did not confine their claims to a limited definition of pork consisting only of "minimally-processed,"

prices by, among other things, liquidating the sow herd and reducing pork processing/slaughter. Reducing hog supply and operating packing plants under-capacity by a reduction of hog slaughter would necessarily impact all pork products as defined by DAPs, including, but not limited to, bacon, "bone meal," smoked hams, offal, varietal meat, and sausage.

The full definition of "pork" in DAPs' Complaint, which does not appear in Defendants' Memo, is set forth below:

> Because this is a consolidated Complaint, "pork" may include, depending on Plaintiff, a variety of meat products from pigs (also referred to in the industry as porcine or swine) purchased fresh, frozen, processed, rendered or non-rendered, including but not limited to any and all processed pork products, (*e.g.,* smoked ham, sausage, bacon, pepperoni, lunch meats), and other processed products and by-products containing pork. "Pork by-products" can include, depending on Plaintiff, offal and individual parts or organs from pigs used in pet foods (*e.g.,* livers, kidneys, lungs, hearts, cheeks) and/or rendered products (*e.g.,* meat meals and bone meals).

---

"single-ingredient products." Defs.' Memo at 26. This is another invention, as those terms appear nowhere in the class or the DAP Complaints. In fact, DPP's pork definition provides that it "includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon." ECF No. 431, DPP 3d Am. Compl. at 4 (emphasis added). And these were merely examples; DPPs did not limit or confine their definition to just ham, bacon, and sausage, and nowhere in DPP's Third Amended Complaint are "smoked ham" or "sausage" even mentioned. In its October 16, 2020 Order (ECF No. 519), the Court denied Defendants' motion to dismiss the DPP's Third Amended Complaint, finding that DPPs had plausibly alleged parallel conduct by the Defendants to restrict "pork" supply as broadly defined by the classes. The Court also found plausible that defendants used Agri Stats to raise pork prices. *In re Pork*, 495 F. Supp. 3d at 766-767. Significantly, the Agri Stats reports Defendants buy cover the very pork products that Defendants seek to exclude (*e.g.*, offal and by-products).

Compl. ¶ 4.

The DAPs' broad definition of "Pork" is not new to this case. Rather it was embraced by Defendants JBS (in 2020) and Smithfield (in 2021) in their settlement agreements with the classes, as well as in forms of class notice sent to class members, which were approved by the Court. The Long-Form Settlement Agreement Between Direct Purchaser Class Plaintiffs and Smithfield broadly defines pork as:

> Porcine or swine products processed, produced or sold by Smithfield, or by any of the Defendants or their co-conspirators, including but not limited to: primals (including but not limited to loins, shoulders, picnics, butts, ribs, bellies, hams, or legs), trim or sub-primal products (including but not limited to backloins, tenderloins, backribs, boneless loins, boneless sirloins, riblets, chefs prime, prime ribs, brisket, skirt, cushion, ground meats, sirloin tip roast, or hocks) further processed and value added porcine products (including but not limited to bacon, sausage, lunch meats, further processed ham, or jerky products), offal or variety products (including but not limited to hearts, tongues, livers, hear products, spleens, kidneys, feet, stomach, bladder, uterus, snoot, ears, tail, brisket bone, intestines, jowls, neck bones or other bones, skin, lungs, glands, hair, or pet food ingredients), rendered product or byproducts (including but not limited to lard, grease, meat meal, bone meal, blood meal, or blood plasma), casings (included but not limited to mucosa), and carcasses.[25]

---

[25] The JBS settlement with DPPs relied on the same broad definition of pork that included everything from the hog. *See* Mem. of Points and Auth. in Supp. of Mot. for Prelim. Appr. of Class Action Settlement between Direct Purchaser Pls. and Def. JBS, at 2 n. 2. (Dec. 1, 2020; ECF No., 542).

DPPs' class settlement definitions of Pork covered the entire hog—"everything but the oink."[26] "Bone meal" is expressly included in Smithfield's settlement with the DPP class, and it is certainly "plausible" that the price for bone meal, like every product made from a hog carcass, rose due to the artificial supply cuts that reduced the supply of hogs and pork. Significantly, the Court approved not only both of these settlement agreements containing a broad definition of pork, it also approved the class notice forms using the broad definition of pork that was sent to class members. DAPs therefore used this broad definition of pork in their Complaint.

## B. DAPs Do Not Assert Claims for "Downstream" Products Sold by Non-Defendants

Defendants fabricate an entire strawman argument regarding the supposed inclusion of "burritos" in the DAPs Complaint, citing "burrito" or "burritos" *eight* times.[27] It might therefore surprise the Court, given this frontal assault on "burritos," that DAPs' Complaint does not contain a single reference to burritos. DAPs' Complaint is focused on pork, not "burritos" or, in

---

[26] The National Pork Board states on its website that: "No other animal provides a wider range of products than the hog. The amazing utility of the hog has motivated the saying, 'We use everything but the oink.'"

[27] *See*, *e.g.*, Defs.' Memo at 26 ("Burritos are not a commodity product"; "DAPs do not allege that Defendants control the market for burritos"; DAPs do not allege "that each Defendant even makes burritos"; no allegations "that any Defendants that do make burritos conspired with non-defendant burrito makers.").

Defendants' words, "the nearly infinite number of products made with pork as an ingredient." A Rule 12(c) or 12(b)(6) motion is limited to the complaint. *See, e.g., McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787-88 (8th Cir. 2007) ("[C]ourts are limited to the complaint when deciding a motion to dismiss."). Accordingly, Defendants' motion, which seeks to inject language into the DAP Complaint that does not exist, must be rejected.

While DAPs' product definition does not reference "burritos," or any other of the "nearly infinite" multi-ingredient pork products Defendants purport to rail against, it does include processed pork products containing price fixed pork products, like pepperoni, that Defendants sold to DAPs. The definition of Pork used in the JBS and Smithfield class settlements, as noted above, expressly provides for further processed and value-added products, *i.e.,* "further processed and value-added porcine products (including but not limited to bacon, sausage, lunch meats, further processed ham, or jerky products)." It should therefore not be surprising to Defendants or the Court that DAPs seek to include such products in their claims here.[28]

---

[28] The Court has already found that transactional data for multi-ingredient pork products and pork by-products that DAPs purchased from Defendants were relevant to DAPs' claims. (ECF No. 1608 at 12-13). Accordingly, this Court has already recognized that DAPs' Complaint asserted claims for the products Defendants now seek to exclude.

It is well established that antitrust plaintiffs can assert claims for their purchases from defendants of the price-fixed product <u>and</u> the products that contain that price-fixed product if directly purchased from the defendants. *See, e.g., In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 17-18 (3d Cir. 1978) (plaintiff could pursue claim for price fixing of sugar incorporated into the candy it purchased from defendants);[29] *see also In re: TFT–LCD (Flat Panel) Antitrust Litig.,* 586 F. Supp. 2d 1109, 1118-19 (N.D. Cal. 2008) (denying motion to dismiss that asserted plaintiffs did not buy thin film transistor liquid crystal display (TFT-LCD) panels (the price-fixed product) from defendants, but bought products containing those panels as well as numerous additional components to create the finished product). In the *Flat Panel* case, the court held, "[t]o the extent that defendants raise questions about the scope of the market, or contend that damages will be difficult to ascertain, the Court finds

---

[29] *See id*. ("In this antitrust action it is alleged that defendant refiners of sugar have engaged in a conspiracy to fix the price of that product. At least two of the defendants use the sugar to manufacture candy which they sell to the plaintiff wholesaler. The question raised in this appeal is whether the plaintiff has run into an (Illinois) brick wall in his efforts to secure treble damages arising out of his candy purchases. We conclude that plaintiff's action is not barred…. As the defendants here point out, the product which plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the price. To this extent, there will be some additional complications underlying the damage claims. However, this must not be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator."); *see also In re Midwest Milk Monopolization Litig.*, 730 F.2d 528, 529-30 n. 2 (8th Cir. 1984).

that these are factual questions that are better addressed on a fuller record, and not at the pleadings stage." *Id.*

Defendants' reliance on *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376 *5 (N.D. Cal. Aug. 3, 2011) is misplaced. There, plaintiffs alleged a conspiracy to fix, not only optical disk drive prices, but also devices containing optical disk drives sold to third party sellers that were neither (1) defendants nor (2) directly affiliated with any defendant. In other words, Plaintiffs were seeking damages both as direct purchasers and as indirect purchasers. *See id.* Plaintiffs defined the market to "include devices sold by an untold number of other [non-defendant] companies." *Id.* at *6. By contrast, there are no such indirect purchase issues here. DAPs do not seek damages for products they purchased from non-defendant or non-conspirator packers. All of the pork products at issue here were directly sold by Defendants to DAPs.

Defendant's reliance on *Olean Wholesale Grocery Cooperative, Inc. v. Agri Stats, Inc.*, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) is also off the mark. The class plaintiffs in that case alleged a broad turkey market, but their complaint provided information only as to whole turkeys (which Kraft did not sell) and no information on the downstream market of turkey products (in which Kraft competed). *Id.* at *8. In particular, "they failed to allege that [defendants' conduct] has any anti-competitive impact on the output or prices of Kraft's products." *Id.* Here, to the contrary, the Complaint contains

40

abundant information on the nature and impact of the Defendants' conduct on reducing pork supply and increasing prices in the pork products market in which Defendants compete.

There is simply no basis to allow Defendants to arbitrarily cut out portions of DAPs' claims against them. DAPs' claims relate to pork as it has been broadly defined by DAPs, by the classes, and even by Defendants themselves in settlement agreements. Defendants' Memo puts the cart before the horse—improperly asking the Court to opine on the market parameters at the pleading stage. *See, e.g.*, *In re Processed Egg Prod. Antitrust Litig.,* 2011 WL 4945864 at *7 (E.D. Pa. 2011) (noting that "Defendants' requested relief appears to be merely an invitation for the Court to interpret the SAC in a manner akin to a form of declaratory judgment or advisory opinion"). Defendants' motion seeking to carve out certain pork products must therefore be denied.

## <u>CONCLUSION</u>

Defendants' motion to dismiss should be denied in its entirety.


Dated: March 6, 2023                         Respectfully submitted,

*s/ Robert N. Kaplan*
Robert N. Kaplan
Matthew P. McCahill
Jason A. Uris
KAPLAN FOX & KILSHEIMER, LLP
850 Third Avenue, 14th Floor
New York, New York 10022
T: (212) 687-1980
rkaplan@kaplanfox.com
mmccahill@kaplanfox.com
juris@kaplanfox.com

*/s/ Bernard D. Marcus*
Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
MARCUS & SHAPIRA LLP
One Oxford Center, 35th Floor
Pittsburgh, Pennsylvania 15219
T: (412) 471-3490
marcus@marcus-shapira.com
cain-mannix@marcus-shapira.com
hill@marcus-shapira.com

*/s/ Eric R. Lifvendahl*
Eric Lifvendahl
Lifvendahl Law, LLC
265 Latrobe Avenue
Northfield, Illinois 60093
T : (847) 830-7002
eric@liflaw.com

*/s/ Richard L. Coffman*
Richard L. Coffman
THE COFFMAN LAW FIRM
3355 W. Alabama St., Suite 240
Houston, Texas 77098
T: (713) 528-6700
rcoffman@coffmanlawfirm.com

**Counsel for Action Meat Distributors, Inc.; Topco Associates, LLC; Alex Lee, Inc. / Merchants Distributors, LLC; Associated Food Stores, Inc.; Brookshire Grocery Company; Colorado Boxed Beef Co.; Certco, Inc.; The Golub Corporation; Nicholas & Co.; PFD Enterprises, Inc.; SpartanNash Company; Springfield Grocer Company; The Distribution Group d/b/a Van Eerden Foodservice Co.; Troyer Foods, Inc.; URM Stores, Inc.; Giant Eagle, Inc.; and UniPro Foodservice, Inc.**

*/s/ David C. Eddy*
David C. Eddy
Dennis J. Lynch
Travis C. Wheeler
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, South Carolina 29201
T: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

**Counsel for Conagra Brands, Inc.; Nestlé USA, Inc.; Nestlé Purina PetCare Co.; Compass Group USA, Inc.; and Howard Samuels, solely as the Chapter 7 Trustee for the estate of Central Grocers, Inc.**

Chase C. Keibler
Keibler Law Group LLC
6923 N. Trenholm Road
Columbia, SC 29206
Telephone: (803) 830-7241
Facsimile: (803) 803-7264
Chase@KeiblerLaw.com

Daniel R. Karon
Beau D. Hollowell
KARON LLC
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com
bhollowell@karonll.com

**Counsel for Howard B. Samuels, solely as the Chapter 7 trustee for the estate of Central Grocers, Inc.**

*/s/ David B. Esau*

**CARLTON FIELDS, P.A.**
David B. Esau
Email: desau@carltonfields.com
Kristin A. Gore
Email: kgore@carltonfields.com
Garth T. Yearick
Email: gyearick@carltonfields.com
Amanda R. Jesteadt
Email: ajesteadt@carltonfields.com
Casey Hardy McGowan
Email:
chardymcgowan@carltonfields.com
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida 33401
Tel: (561) 659-7070
Fax: (561) 659-7368

Holli M. Credit
Email: hcredit@carltonfields.com
700 NW 1st Avenue, Suite 1200
Miami, FL 33136
Tel: (305) 530-0050
Fax: (305) 530-0055

**CARLTON FIELDS, LLP**
Scott L. Menger
Email: smenger@carltonfields.com
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Tel: (310) 843-6300
Fax: (301) 843-6301

Roger S. Kobert
Email: rkobert@carltonfields.com
405 Lexington Avenue, 36th Floor
New York, New York 10174-3699
Tel: (212) 785-2577
Fax: (212) 785-5203

Aaron A. Holman
Email:  aholman@carltonfields.com
200 S. Orange Avenue, Suite 1000
Orlando, Florida 32801
Tel: (407) 849-0300
Fax: (407) 648-9099

*Counsel for Cheney Brothers, Inc.; Subway Protein Litigation Corp., as Litigation Trustee of the Subway® Protein Litigation Trust; Buffalo Wild Wings, Inc.; Jimmy John's Buying Group SPV, LLC; Sonic Industries Services Inc.; CKE Restaurants Holdings, Inc.; Wawa, Inc.; Restaurant Services, Inc.; and McLane Company, Inc. et al.*

*/s/ Scott E. Gant*
Scott E. Gant
Michael S. Mitchell
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
T: 202-237-2727
sgant@bsfllp.com
mmitchell@bsfllp.com

Colleen Harrison
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
T: 914-749-8204
charrison@bsfllp.com

Sarah Jones
BOIES SCHILLER FLEXNER LLP
735 South Figueroa Street
Los Angeles, CA 90017
T: 213-629-9040
sjones@bsfllp.com

**Counsel for Sysco Corporation and Amory Investments LLC**

/s/ *Patrick J. Ahern*
Patrick J. Ahern
Mark Schirmer
**AHERN & ASSOCIATES, P.C.**
Willoughby Tower
8 South Michigan Avenue, Suite 3600
Chicago, Illinois 60603
T: (312) 404-3760
patrick.ahern@ahernandassociatespc.com

**Counsel for Plaintiffs Winn-Dixie Stores, Inc.; Bi-Lo Holdings, LLC; and Kraft Heinz Foods Company**

*/s/ David P. Germaine*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Phillip F. Cramer
Alberto Rodriguez
Jeffrey H. Bergman
**SPERLING & SLATER, LLC**
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
pes@sperling-law.com
jvanek@sperling-law.com
dgermaine@sperling-law.com
pcramer@sperling-law.com
arodriguez@sperling-law.com
jbergman@sperling-law.com

*Counsel for Associated Grocers of the South, Inc.; Dollar General Corporation; Dolgencorp, LLC; Meijer, Inc.; Meijer Distribution, Inc.; Publix Super Markets, Inc.; Raley's; United Natural Foods, Inc.; Supervalu, Inc.; Associated Grocers of Florida, Inc.; Unified Grocers, Inc.; Tony's Fine Foods; and Wakefern Food Co.*

/s/ *Philip J. Iovieno*
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Lawrence S. Brandman
Jack G. Stern
Gillian Groarke Burns
Mark A. Singer
Elizabeth R. Moore
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
T: (212) 504-6000
philip.iovieno@cwt.com
nicholas.gravante@cwt.com
lawrence.brandman@cwt.com
jack.stern@cwt.com
gillian.burns@cwt.com
mark.singer@cwt.com
elizabeth.moore@cwt.com

*Counsel for Aramark Food and Support Services Group, Inc.; Target Corporation; Gordon Food Service, Inc.; Glazier Foods Company; Quality Supply Chain Co-Op, Inc.; Sherwood Food Distributors, L.L.C.; Harvest Meat Company, Inc.; Western Boxed Meat Distributors, Inc.; Hamilton Meat, LLC; Jetro Holdings, LLC; and BJ's Wholesale Club, Inc.; and Co-Counsel for Plaintiffs Kraft Heinz Foods Company; Winn-Dixie Stores, Inc.; and Bi-Lo Holdings, LLC*

/s/ *Christopher P. Wilson*

William C. Lavery
Michael Calhoon
Julie B. Rubenstein
Brian C. Kerr
Christopher P. Wilson
Danielle Morello
Wyatt M. Carlock
BAKER BOTTS L.L.P.
700 K Street NW

47

Washington, DC 20001
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
william.lavery@bakerbotts.com
michael.calhoon@bakerbotts.com
julie.rubenstein@bakerbotts.com
brian.kerr@bakerbotts.com
christopher.wilson@bakerbotts.com
danielle.morello@bakerbotts.com
 wyatt.carlock@bakerbotts.com

***Counsel for ALDI Inc.***

_/s/ Samuel J. Randall_
Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
Michael A. Ponzoli, Esquire
Kenny Nachwalter, P.A.
1441 Brickell Avenue, Suite 1100
Miami, Florida  33131
Tel:   (305) 373-1000
Fax:  (305) 372-1861
E-mail:      rarnold@knpa.com
        wblechman@knpa.com
        kmurray@knpa.com
        dpatton@knpa.com
        srandall@knpa.com
        mponzoli@knpa.com
***Counsel for The Kroger Co., Albertsons Companies, Inc., Hy-Vee, Inc., Save Mart Supermarkets, and US Foods, Inc.***