## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE PORK ANTITRUST
LITIGATION

_____

This Document Relates to:

All Consumer Indirect Purchaser Plaintiff
Actions

_____

Civil No. 18-1776 (JRT/JFD)

**MEMORANDUM OF LAW IN
SUPPORT OF FINAL APPROVAL
OF THE CLASS ACTION
SETTLEMENT BETWEEN
CONSUMER INDIRECT
PURCHASER PLAINTIFFS AND
DEFENDANT SMITHFIELD
FOODS, INC.**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................. 1

II.  BACKGROUND .................................................................................. 2

     A.   Settlement Terms ..................................................................... 2

     B.   Notice to class .......................................................................... 5

     C.   Plan of Distribution ................................................................. 7

III. ARGUMENT ....................................................................................... 7

     A.   The parties have complied with the Class Action Fairness Act. .................. 8

     B.   The settlement class meets all requirements of Rule 23(e). ........................ 8

          1.   Courts apply a relaxed standard under Rule 23(b) when the class is
               being certified for settlement. ............................................. 9

          2.   An illegal price-fixing scheme impacts all purchasers of a price-
               fixed product in a conspiratorially affected market. ....................... 11

          3.   The record contains ample evidence that Plaintiffs' claims are
               subject to common proof. ................................................... 13

               a.   Consumer IPPs can show through common proof that
                    Defendants successfully conspired to restrain supply during
                    the class period. ..................................................... 14

               b.   Consumer IPPs can show through common proof that
                    Defendants' conspiracy inflated the price of pork during the
                    class period. ......................................................... 15

               c.   Consumer IPPs can show through common proof that
                    overcharges due to the cartel were passed through to the
                    indirect purchaser class. ............................................. 15

          4.   Class action is a superior means of resolving Consumer IPPs'
               claims. ...................................................................... 16

     C.   The proposed settlement is fair, adequate, and reasonable. ....................... 19

          1.   The settlement is entitled to a presumption of fairness. .................... 20

2. Four fairness factors weigh in favor of settlement. ........................... 20

    a. The strength of the plaintiffs' case, weighed against the terms of the settlement, supports final approval. ............................ 21

    b. The Smithfield Defendants' financial condition and ability to pay did not impact the amount of settlement. ....................... 22

    c. The complexity and expense of further litigation supports final approval. ................................................................... 22

    d. Settlement class members' positive reaction supports final approval. ...................................................................... 23

D. Plaintiffs have complied with Rule 23(c) notice requirements. .................. 24

E. The plan of allocation is fair, reasonable, and adequate. ........................... 25

IV. **CONCLUSION** ............................................................................... 25

010736-11/1703766 V4

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Alcoholic Beverages Litig.*,
　　95 F.R.D. 321 (E.D.N.Y. 1982) ............................................................ 12

*Amchem Prods., Inc. v. Windsor*,
　　521 U.S. 591 (1997) ............................................................ 10, 12, 17

*In re Broiler Chicken Antitrust Litig.*,
　　No. 16-cv-8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) .................................. 15

*In re Catfish Antitrust Litig.*,
　　826 F. Supp. 1019 (N.D. Miss. 1993) ........................................................ 12

*In re Charter Commc'ns, Inc.*,
　　No. 4:02-cv-1186 CAS, 2005 WL 4045741 (E.D. Mo. June 30, 2005) ...................... 25

*DeBoer v. Mellon Mortg. Co.*,
　　64 F.3d 1171 (8th Cir. 1995) ............................................................ 20

*Grier v. Chase Manhattan Auto Fin. Co.*,
　　No. CIV. A.99-180, 2000 WL 175126 (E.D. Pa. Feb. 16, 2000) ................................ 19

*Grunin v. Int'l House of Pancakes*,
　　513 F.2d 114 (8th Cir. 1975) ............................................................ 19

*In re Hyundai & Kia Fuel Econ. Litig.*,
　　926 F.3d 539 (9th Cir. 2019) ............................................................ 9, 17

*Kleen Prods. LLC v. Int'l Paper Co.*,
　　831 F.3d 919 (7th Cir. 2016) ............................................................ 15

*In re Linerboard Antitrust Litig.*,
　　MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) .................................... 22

*Lumco Indus., Inc. v. Jeld-Win., Inc.*,
　　171 F.R.D. 168 (E.D. Pa. 1997) ............................................................ 12

*In re Master Key Antitrust Litig.*,
　　528 F.2d 5 (2d Cir. 1975) ................................................................ 12

*Minnesota v. U.S. Steel Corp.*,
 44 F.R.D. 559 (D. Minn. 1968)................................................................. 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
 31 F.4th 651 (9th Cir. 2022), cert. denied................................................. 15

*In re Optical Disk Drive Antitrust Litig.*,
 No. 3:10-MD-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ............. 13, 15, 16

*Petrovic v. Amoco Oil Co.*,
 200 F.3d 1140 (8th Cir. 1999) ................................................................... 20

*In re Potash Antitrust Litig.*,
 159 F.R.D. 682 (D. Minn. 1995)....................................................*passim*

*Transamerican Refining Corp. v. Dravo Corp.*,
 130 F.R.D. 70 (S.D. Tex. 1990) ................................................................ 12

*Tyson Foods, Inc. v. Bouaphakeo*,
 577 U.S. 442 (2016) ................................................................................. 11

*In re Vitamins Antitrust Litig.*,
 209 F.R.D. 251 (D.D.C. 2002).................................................................. 12

*White v. Nat'l Football League*,
 822 F.Supp. 1389 (D. Minn. 1993)............................................................ 19

*In re Wholesale Grocery Prod. Antitrust Litig.*,
 No. 09-MD-2090................................................................................... 13

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
 396 F.3d 922 (8th Cir. 2005) ....................................................*passim*

*In re Workers' Compensation*,
 130 F.R.D. 99 (D. Minn. 1990)................................................................. 12

*Yarrington v. Solvay Pharms., Inc.*,
 No. 09-CV-2261, 2010 WL 11453553 (D. Minn. Mar. 16, 2010) ............... 23

*In re Zurn Pex*,
 2013 WL 716088 (D. Minn. Feb. 27, 2013) ......................................*passim*

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
 267 F.R.D. 549 (D. Minn. 2010)........................................................ 10, 17

010736-11/1703766 V4

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ............................................................ 9, 10, 17

## STATUTES

28 U.S.C. § 1715(b) ............................................................................................ 8

28 U.S.C. § 1715(d) ....................................................................................... 7, 8

Class Action Fairness Act (CAFA) ................................................................ 7, 8

## FEDERAL RULES

Fed. R. Civ. P. 23 ..................................................................................... *passim*

## OTHER AUTHORITIES

2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ................... 10

*4 Alba Conte & Herbert Newberg, Newberg on Class Actions* § 11.41 (4th
    ed. 2002) ....................................................................................................... 20

7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1778,
    (3d ed. 2005) ................................................................................................ 11

# I.    INTRODUCTION

Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs") respectfully move for final approval of the settlement with Defendant Smithfield Foods, Inc. ("Settling Defendant" or "Smithfield"). On November 9, 2022, this Court granted preliminary approval of this settlement, certifying the settlement class and preliminarily approving the settlement.[1] In that same order, the Court ordered dissemination of notice to class members.[2]

Notice of this settlement has since been sent directly to 17 million class members. An online media campaign resulted in an additional 421 million impressions. This robust campaign ensured reach to 83.1 percent of the Consumer IPP class, certainly within the range of what is constitutionally required. Schacter Decl., ¶¶ 5-6, Exs. A, B, C.[3] The notice administrator provided notice in accordance with this Court's order. Of the millions of class members who received notice, none requested exclusion from the class, and none objected to the settlement or the Consumer IPPs' fee request.

The $75 million settlement with Smithfield is the result of arm's-length negotiations, conducted in front of an experienced mediator, which provides substantial monetary and non-monetary relief to the Consumer IPP class. Smithfield's agreement to

---

[1] Order Granting Prelim. Approval of the Class Action Settlement Agreement Between Consumer Indirect Purchaser Pls. and Defs. Smithfield Foods, ECF No. 1588 (hereinafter "Prelim. App. Order").

[2] *Id.* at 3.

[3] "Schachter Decl." refers to the Declaration of Eric Schachter in Support of Plaintiffs' Motion for Final Approval of Settlement, filed concurrently herewith.

provide cooperation will also strengthen Plaintiffs' case against remaining Defendants. This settlement thus represents an outstanding result for the consumer indirect purchaser class and guarantees compensation for consumers in this long-running litigation. All factors regarding the fairness, adequacy, and reasonableness of these settlements support final approval. Respectfully, Consumer IPPs request that this Court grant final approval.

## II.  BACKGROUND

This Court is familiar with plaintiffs' allegations and the procedural posture of this case, and Consumer IPPs therefore do not repeat them here. Consumer IPPs included a detailed discussion of the procedural history and IPPs' efforts in litigating this case in their motions for preliminary approval[4] and for attorneys' fees.[5]

### A.  Settlement Terms.

The settlement between Smithfield and the Consumer IPPs is the product of confidential, protracted, intense arm's-length negotiations by experienced counsel for all parties, and includes monetary relief for the class, certain injunctive relief, and cooperation in the Consumer IPPs' litigation against the non-settling Defendants.[6]

The settlement provides that Smithfield will pay $75 million into a settlement fund that will be used to compensate the Consumer IPP class and cover litigation fees and

---

[4] *See* Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of the Class Action Settlement between Consumer Indirect Purchaser Plaintiffs and Defendant Smithfield Foods, Inc. and to Direct Notice to the Settlement Class, ECF. No 1515 (filed Sept. 27, 2022) (hereinafter "Memo. in Support of Prelim. App.") at 1-5.

[5] *See* Memorandum in Support of Consumer Indirect Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses, ECF No. 1765, (filed Jan. 24, 2023) at 6-12.

[6] Memo. in Support of Prelim. App. at 5-7.

expenses, including the cost of notifying class members and administering the settlement.[7] Lead Counsel believe this sum is fair and reasonable in light of Smithfield's market share of class products and the significant cooperation Smithfield agreed to provide:

> Cooperation by Smithfield is a material term of this Settlement Agreement and shall include the following categories of cooperation:
>
> a. To the extent applicable during the pendency of the IPPs' action in the *In re Pork Antitrust Litigation*, Settling Defendant shall contemporaneously provide to IPPs (a) any discovery responses, documents, or information it provides to any other plaintiff in the *In re Pork Antitrust Litigation*, and (b) any discovery responses, documents, data, or information it provides to government entities making substantially similar allegations regarding competition in the Pork industry.
>
> b. Settling Defendant shall not object to IPPs participating in the depositions of up to five Smithfield witnesses, within the scope of discovery in the *In re Pork Antitrust Litigation*.
>
> c. Settling Defendant agrees to make all good faith efforts to assist IPPs in obtaining the authentication and admissibility of Settling Defendant's documents for purposes of summary judgment and/or trial.
>
> d. Settling Defendant agrees to make available to testify live at a single IPP trial the following: (a) one then-current Smithfield employee who can authenticate a specific set of documents (all of which IPPs will provide to Smithfield at least forty-five (45) days before jury selection starts), and (b) one then-current Smithfield employee who can serve as a fact witness on material fact issues on which that employee has

---

[7] Decl. of Shana E. Scarlett in Supp. of Prelim. Approval of Class Action Settlement between Consumer indirect Purchaser Plaintiffs and Def. Smithfield Foods, Inc. and to Direct Notice to Settlement Class ("Scarlett Prelim. App. Decl."), ECF No. 1516, (filed Sept. 27, 2022) Ex. A at 6-9, 12.

personal knowledge to the extent those fact issues remain in dispute at the time of trial.

e.     The Settlement does not prohibit IPPs from seeking phone records from third party phone carriers relating to Smithfield's current or former employees' phone records but only for the time between January 1, 2008and June 30, 2018 when those employees were employed by Smithfield.[8]

In exchange, Consumer IPPs agree to release:

> [T]he Smithfield Released Parties from any and all claims, demands, actions, suits, and causes of action, whether statutory, administrative, or common-law, whether at law or in equity, whether seeking injunctive relief or money damages, whether class, individual, or otherwise in nature (whether or not any member of the Settlement Class has objected to the Settlement Agreement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively or in any other capacity) that the Releasing Parties ever had, now have, or hereafter can, shall, or may ever have, that exist as of the date of the order granting Preliminary Approval, on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, losses, damages, and the consequences thereof that have been asserted, or could have been asserted, under federal or state law in any way arising out of or relating in any way to the indirect purchase of Pork produced, processed or sold by Smithfield or any of the Defendants or their co-conspirators, and purchased indirectly by the Releasing Parties (the "Released Claims").[9]

The released claims "do not include (i) claims asserted against any Defendant or co-conspirator other than the Smithfield Released Parties; (ii) any claims wholly unrelated to the allegations in the Actions that are based on breach of contract, any negligence,

---

[8] *Id.*, Ex. A at 12-13.

[9] *Id.*, Ex. A at 15-16.

personal injury, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, or securities claim; or (iii) damages claims under the state or local laws of any jurisdiction other than an Indirect Purchaser State."[10] For the purposes of this settlement, Pork means:

> [P]orcine or swine products processed, produced or sold by Smithfield, or by any of the Defendants or their co-conspirators, including but not limited to: primals (including but not limited to loins, shoulders, picnics, butts, ribs, bellies, hams, or legs), trim or sub-primal products (including but not limited to backloins, tenderloins, backribs, boneless loins, boneless sirloins, riblets, chef's prime, prime ribs, brisket, skirt, cushion, ground meats, sirloin tip roast, or hocks), further processed and value added porcine products (including, but not limited to bacon, sausage, lunch meats, further processed ham, or jerky products).[11]

## B.    Notice to class

The notice administrator undertook and completed the proposed notice plan, pursuant to this Court's order directing notice.[12] The notice administrator provided direct notice via e-mail (obtained from retailers of the products at issue in this case) to approximately 27,551,906 unique email addresses, to which 17,560,555 were successfully delivered.[13] On July 22, 2021, the notice administrator established a case-specific website, www.overchargedforpork.com.[14] The website address appeared on the

---

[10] *Id.*, Ex. A at 16.

[11] *Id.*, Ex. A at 5-6.

[12] Schacter Decl., ¶¶ 2-3.

[13] *Id.* ¶ 5.

[14] *Id.* ¶ 10.

Email Notice, Long-Form Notice, and *PR Newswire.*[15] The website includes case specific

information, including relevant deadlines, and downloadable versions of the Complaint,

the Settlement Agreement, the Notice in English and Spanish, and other relevant

documents.[16] The website also includes functionality for Settlement Class Members to

submit an online claim.[17] To date, the website has over 768,492 hits;[18] of those, 325,372

hits have occurred since the Smithfield Settlement noticing beginning on December 9,

2022.[19] On January 24, 2023, the website was updated to include Consumer Indirect

Purchaser Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses and

associated documents.[20] A toll-free automated telephone support line was activated to

provide answers to frequently asked questions by class members.[21] The notice

administrators also engaged in an extensive public notice campaign, including:

    a. Digital banner and newsfeed advertisements appearing on various websites and social media platforms. Over 421 million impressions have been delivered across Google Display Network, Google AdWords, Facebook, Instagram, and YouTube;

    b. Creating a case-specific Facebook page as a landing page for the links in the Facebook and Instagram newsfeed advertisements;

    c. Releasing a national, party-neutral press release. This news release was distributed via PR Newswire to the news desks of approximately 10,000

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.* ¶ 11.

[21] *Id.* ¶ 9.

010737-11 1449936V1

newsrooms, including those of print, broadcast, and digital websites across the United States. The news release was also translated and published to PR Newswire's U.S. Hispanic media contacts and Hispanic news websites.[22]

In total, the indirect notice efforts generated over 421 million impressions.[23] The notice administrator confirms that at an estimated 83.1% of the target audience (and thus potential Settlement Class Members) were effectively reached by the notice plan.[24]

## C.     Plan of Distribution

Funds will be awarded based on the purchase of qualifying class products. Given that this is only the second settlement for the Consumer IPP class, distribution is not being requested at this time, although class members are able to submit claims through a simplified form on the settlement website.

## III.     ARGUMENT

To approve a settlement in a class action, district courts in the Eighth Circuit conduct a multiple-step inquiry. *First*, courts assess whether defendants have met the notice requirements under the Class Action Fairness Act (CAFA).[25] *Second*, courts determine whether the provisions of Rule 23(e) have been satisfied. *Third,* courts determine whether the constitutional notice has been provided to the class pursuant to Federal Rule of Civil Procedure 23(c)(2)(B). *Finally*, courts conduct a hearing to

---

[22] *Id.* ¶¶ 6-7.

[23] *Id.* ¶ 6.

[24] *Id.* ¶ 14.

[25] *See* 28 U.S.C. § 1715(d).

determine whether the settlement agreement is "fair, reasonable, and adequate."[26] Each of these requirements are met here.

## A.   The parties have complied with the Class Action Fairness Act.

CAFA requires that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official[.]"[27] The court may not grant final approval of a class action settlement until the CAFA notice requirement is met.[28] Here, the Settling Defendant provided the required CAFA notice to all Attorneys General and the U.S. Department of Justice.[29] No Attorneys General have submitted statements of interest or objections in response to these notices.

## B.   The settlement class meets all requirements of Rule 23(e).

In its order granting preliminary approval on November 9, 2022, the Court provisionally certified the settlement class after reviewing the Consumer IPP's Motion for Preliminary Approval.[30] The same analyses—which also address the adequacy of counsel and class representatives consistent with the requirements of Rule 23(e)(2)(a)—

---

[26] *See* Fed. R. Civ. P. 23(e)(2).

[27] 28 U.S.C. § 1715(b).

[28] 28 U.S.C. § 1715(d) ("An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b).]").

[29] Scarlett Decl., ¶ 2, Ex. A.

[30] Prelim. App. Order at 1-2, ECF No. 1588.

should also apply here, and the Court should affirm its order certifying the class for settlement purposes. There are no objectors to and no opt-outs from this settlement.

### 1. Courts apply a relaxed standard under Rule 23(b) when the class is being certified for settlement.

Rule 23(b)(3)'s requirement that common issues of fact or law must predominate over individual questions "tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation."[31] Individual issues are those which require "evidence that varies from member to member" to make a prima facie showing.[32] Common questions are those for which a prima facie case can be established through common evidence.[33] The predominance question at class certification is not whether the plaintiffs have already proven their claims through common evidence.[34] Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions.[35]

"[W]hether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement."[36] A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the

---

[31] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

[32] *In re Zurn Pex*, 644 F.3d at 618.

[33] *Id.*

[34] *Id.* at 619.

[35] *Id.*

[36] *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019)

need to litigate individualized issues that would make a trial unmanageable.[37] When a class is being certified for settlement, "a district court need not inquire whether the case, if tried, would present intractable management problems."[38]

The inquiry required is a "preliminary" look behind the pleadings to determine whether, given the factual setting of the case, "if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class."[39] This does not mean that the court must call witnesses and review documents to determine that common questions of law predominate, only that the court must analyze "the underlying elements necessary to establish liability for plaintiffs' claims" to determine whether those elements "can be proven on a systematic, class-wide basis."[40] At this stage, the court's analysis is "necessarily prospective."[41]

Consumer IPPs here share a common grievance in this case concerning inflated prices of pork during the class period. This common remedial theory—recovery of a portion of the supra-competitive price paid for pork products—is reflected in the settlement agreement and negotiations.[42] Notably, the release in this settlement agreement

---

[37] *Id.* (citing 2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts ... regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns.")).

[38] *Amchem*, 521 U.S. 591 at 620.

[39] *In re Zurn Pex*, 644 F.3d at 618.

[40] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 560 (D. Minn. 2010).

[41] *In re Zurn Pex*, 644 F.3d at 613.

[42] Scarlett Prelim. App. Decl., Ex. A.

contains an exclusion for claims not related to an overcharge for price-fixing, such as "breach of contract, any negligence, personal injury, bailment, failure to deliver lost goods, damaged or delayed goods, product defect or securities claim."[43] It also excludes "damages claims under the state or local laws of any jurisdiction other than an Indirect Purchaser State."[44]

The common remedial theory proffered by this settlement is thus precisely the sort of common question that courts hold predominate when analyzing a settlement between sophisticated parties reached after years of protracted litigation.[45] As the Supreme Court has stressed, even if just one common question predominates, "the action may be considered proper under Rule 23(b)(3)."[46] Predominance is thus easily satisfied here.

### 2. An illegal price-fixing scheme impacts all purchasers of a price-fixed product in a conspiratorially affected market.

Even in the context of litigated classes, predominance is routinely satisfied in antitrust actions alleging a conspiracy to fix prices.[47] Because the gravamen of a price-fixing claim is that the price in a given market is artificially high, courts recognize a

---

[43] *Id.* at 16.

[44] *Id.*

[45] *In re Zurn Pex*, 2013 WL 716088, at *5 (D. Minn. Feb. 27, 2013) (final approval).

[46] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) (quoting 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1778, pp. 123-124 (3d ed. 2005)).

[47] *See Amchem Prod.*, 521 U.S. at, 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995); *In re Workers' Compensation*, 130 F.R.D. 99, 108 (D. Minn. 1990).

010737-11 1449936V1

presumption that an illegal price-fixing scheme affects all purchasers of a price-fixed product in the market affected by the conspiracy.[48] The presumption of predominance exists because liability evidence in a price fixing conspiracy "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members."[49] As aptly described by the *In re Potash* court, proof that defendants agreed to inflate prices "relates solely to Defendants' conduct, and as such proof for these issues will not vary among class members."[50] Likewise, identifying "reasonable substitute" products (if any exist) when proving the relevant product market in a price fixing case is a common inquiry.[51] Finally, showing pass-through of the overcharges to the retail consumer class

---

[48] *In re Potash.*, 159 F.R.D. at 695–97; *see also In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327 (E.D.N.Y. 1982); *In re Catfish Antitrust Litig.,* 826 F. Supp. 1019, 1041 (N.D. Miss. 1993) ("[i]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price"); *In re Master Key Antitrust Litig.,* 528 F.2d 5, 12 n. 11 (2d Cir. 1975) ("jury could reasonably conclude that [Defendants'] conduct caused injury to each [class member]" if national conspiracy had the effect of "stabilizing prices above competitive levels").

[49] *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (citing in re *Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 29 (D.D.C. 2001) ("As is true in many antitrust cases, the alleged violations of the antitrust laws at issue here respecting price-fixing and monopolization relate 'solely to Defendants' conduct, and as such proof for these issues will not vary among class members.'"); *Lumco Indus., Inc. v. Jeld-Win., Inc.,* 171 F.R.D. 168, 172 (E.D. Pa. 1997) ("The fact-finder's focus of inquiry will be on the ... Defendants' words and actions; it will not vary among individual class members.").

[50] *In re Potash.*, 159 F.R.D. at, 694 (citing *In re Catfish.*, 826 F.Supp. at 1039 ("[e]vidence of a national conspiracy to fix the prices of catfish and processed catfish would revolve around what the defendants did, and said, if anything, in pursuit of a price fixing scheme")); *see also Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70, 75 (S.D. Tex. 1990) (holding that proof of conspiracy is susceptible to generalized proof because focus is on what defendants did and said).

[51] *In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-MD-2090 ADM/TNL, 2016 WL 4697338, at *14 (D. Minn. Sept. 7, 2016).

010737-11 1449936V1

here, is also demonstrated using data from non-parties and documents from the Defendants' own files—all of which is common to the class.[52] Courts need only be satisfied that this case is not "so dissimilar from the litany of antitrust price-fixing cases" routinely found to be appropriate for 23(b)(3) certification.[53]

### 3. The record contains ample evidence that Plaintiffs' claims are subject to common proof.

Further supporting certification is the evidence offered by Consumer IPPs in their memorandum in support of their motion for class certification,[54] as well as in their reply in support of that motion.[55] Consumer IPPs have proffered ample evidence of: (a) Defendants' conduct—common to all pork consumers—illegally agreeing to stabilize price and supply; (b) inflated wholesale prices—again, common to all pork consumers— that broke significantly from the Defendants' pre-class-period margins; and (c) analyses of the consumer price index showing that overcharges were passed through from

---

[52] *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 467444, at *8 (N.D. Cal. Feb. 8, 2016) (accepting proposed theory and methodology to permit Consumer IPPs to attempt to prove pass-through on a class-wide basis and certifying a Rule 23(b) class.).

[53] *In re Potash*, 159 F.R.D. at 697.

[54] Memorandum in Support of Consumer Indirect Purchaser Plaintiffs' Motion for Class Certification, ECF No. 1343 (filed May 2, 2022) (hereinafter "Memo ISO Class Cert.").

[55] Consumer Indirect Purchaser Plaintiffs' Reply in Support of Motion for Class Certification, ECF No. 1624 (filed November 18, 2022) (hereinafter "Reply ISO Class Cert.").

producers to all consumer indirect purchaser plaintiffs.[56] The focus of this litigation is on the conduct of Defendants and the stabilization of the pricing and supply of pork.

### a. Consumer IPPs can show through common proof that Defendants successfully conspired to restrain supply during the class period.

Consumer IPPs demonstrate through common proof that Defendants restrained pork supply throughout the conduct period.[57] Consumer IPPs have provided evidence that a majority of processor Defendants engaged in herd liquidations,[58] ran their processing plants below capacity,[59] and encouraged the export of pork product overseas,[60] all in an attempt to restrain the domestic supply of pork during the class period. Consumer IPPs have also demonstrated that Defendants relied heavily on Agri Stats to effectuate and monitor the cartel's output and pricing decisions.[61] Together, this evidence constitutes common proof that Defendants successfully conspired to restrain the supply of pork during the class period.

---

[56] Memo ISO Class Cert.; Reply ISO Class Cert.

[57] Memo ISO Class Cert. at 5-20; Reply ISO Class Cert. at 2-28.

[58] Memo ISO Class Cert. at 5-6; Reply ISO Class Cert. at 11-14.

[59] Reply ISO Class Cert. at 14-21.

[60] Memo ISO Class Cert. at 10-14; Reply ISO Class Cert. at 21-26.

[61] Memo ISO Class Cert. at 6-24; Reply ISO Class Cert. at 26-28.

010737-11 1449936V1

### b. Consumer IPPs can show through common proof that Defendants' conspiracy inflated the price of pork during the class period.

Consumer IPPs offer evidence in the form of a multiple regression analysis that proves empirically that Defendants' collusion caused higher prices.[62] By controlling for supply and demand factors, Consumer IPPs' expert, Dr. Singer, is able to demonstrate the artificially inflated prices caused by Defendants' anticompetitive conduct.[63] The aggregate results of regression analyses are widely accepted by courts as evidence capable of showing common impact.[64]

### c. Consumer IPPs can show through common proof that overcharges due to the cartel were passed through to the indirect purchaser class.

Consumer IPPs likewise will all win or lose together on the issues of the overcharge and pass-through. Pass-through damages are subject to common proof measuring the inelasticity of the pork market.[65] And Consumer IPPs have measured pass-

---

[62] Memo ISO Class Cert. at 40.

[63] Reply ISO Class Cert. at 35.

[64] *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022), cert. denied (recognizing that "[i]n antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members"); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927-29 (7th Cir. 2016); *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2022 WL 1720468, at *12 (N.D. Ill. May 27, 2022) ("Courts have held that a pooled regression analysis can be an appropriate tool to demonstrate class-wide impact even when the market involves diversity in products, marketing, and prices.").

[65] *See In re ODD*, 2016 WL 467444, at *8 ("[T]he IPPs have presented a sufficient theory and methodology to permit them to attempt to prove pass-through on a class-wide basis.

through based on millions of observations from market participants, finding consistently high, positive rates of pass-through for each and every market participant.[66] In fact, Consumer IPPs have found that the average pass-through rate is 105.7% for distributors and 113.6% for retail stores.[67] In addition, Defendants themselves repeatedly acknowledged that direct purchasers passed through cost changes.[68] This constitutes admissible common evidence that supra-competitive prices were passed through to consumers.

### 4. Class action is a superior means of resolving Consumer IPPs' claims.

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In price-fixing litigation, some courts hold that superiority is satisfied "almost *a fortiori* if common questions are found to predominate."[69]

Rule 23(b)(3) lists four non-exclusive factors "pertinent" to a superiority finding: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of

---

In broad terms, plaintiffs have proffered evidence that in competitive markets, economic theory (supported by empirical studies) consistently predicts that pass-through rates will be at or near 100%").

[66] Memo ISO Class Cert. at 46-48.

[67] *Id.* at 48.

[68] *Id.* at 45.

[69] *In re ODD*, 2016 WL 467444, at *12.

concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.[70] These factors must be considered in light of the reason for which certification is sought—litigation or settlement.[71] As noted above, in deciding whether to certify a settlement-only class, "a district court need not inquire whether the case, if tried, would present intractable management problems."[72] So the fourth factor is moot in the settlement context because there will not be any further litigation or trial for the Court to manage.[73]

The first Rule 23(b)(3) factor is readily satisfied—no class member has opted out of the Consumer IPP settlement with Smithfield, and no individual class member has expressed an interest in litigating these claims separately.[74] The second factor is also easily met. Consumer IPPs were the first to file litigation against the pork industry for their antitrust violations. Consumer IPPs are unaware of other litigation (other than the later-filed direct, commercial indirect and direct-action plaintiffs, all consolidated with this case), by indirect purchasers seeking recovery of the overcharge paid for Pork resulting from Defendants' alleged conspiracy to fix prices.

As to the third superiority factor, here again the nature of antitrust price fixing

---

[70] Fed. R. Civ. P. 23(b)(3); *In re Zurn Pex.*, 267 F.R.D. at 566 (D. Minn. 2010) (district court order on certification of the litigation class); *aff'd*, 644 F.3d 604 (8th Cir. 2011).

[71] *See In re Hyundai*, 926 F.3d at 558; *Amchem*, 521 U.S. at 619.

[72] *Id.* at 620, 117 S.Ct. 2231.

[73] *See Amchem*, 521 U.S. at 620.

[74] *See In re Zurn Pex*, 2013 WL 716088, at *5.

litigation supports superiority. Courts explain that separate proceedings would produce duplicate efforts, generate unnecessary litigation costs, create an "unwarranted burden on this Court and other courts throughout the country," and risk inconsistent results for similarly situated parties.[75] And most importantly, the cost of pursuing an individual claim would prohibit most indirect purchasers from bringing suit, resulting in unjust enrichment to the Defendants, which is "precisely the result antitrust laws are designed to remedy."[76] As the *United States Steel* court explained:

> [I]t is extremely difficult to bring an antitrust action against six major steel fabricators without the financial aid made possible by the class action device. Few are the individual claimants with a sufficient interest at stake or resources to bring a suit requiring proof of a conspiracy among business corporations. Discovery expense alone normally would be prohibitive. The court therefore deems the class action device to be superior to any other alternative.... Since avoidance of multiplicity of litigation is greatly to be favored, the class action device as invoked in this instance well serves such purpose.[77]

Here, as in *U.S. Steel*, the average pork purchaser does not have the resources to take on the major pork producers like Smithfield, Tyson, and JBS. Nor would it make sense for the Court and others to expend resources in the litigation and trial of tens of thousands of claims, most with less than 100 dollars at stake. As the Eighth Circuit has cautioned, courts have "a duty to the silent majority as well as the vocal minority" in evaluating

---

[75] *In re Potash Antitrust Litig.*, 159 F.R.D. at 699.

[76] *Id.*

[77] *Minnesota v. U.S. Steel Corp.,* 44 F.R.D. 559, 572 (D. Minn. 1968).

class settlements.[78] Granting Final Approval is consistent with that duty.

## C. The proposed settlement is fair, adequate, and reasonable.

"The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context."[79] But the approval of a class action settlement is nevertheless in the Court's sound discretion, and district courts must review class action settlements to ensure that they are "fair, reasonable, and adequate."[80]

The Consumer IPPs' settlement is fair, adequate, and reasonable under Rule 23(e)(2). First, the settlement is presumptively valid because courts attach "[a]n initial presumption of fairness . . . to a class settlement reached in arm's-length negotiations between experienced and capable counsel after meaningful discovery."[81] Second, even without this presumption, the settlement meets the four-factor test established by the Eighth Circuit for evaluating fairness under Rule 23(e)(2).[82]

---

[78] *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005).

[79] *White v. Nat'l Football League*, 822 F.Supp. 1389, 1416 (D. Minn. 1993).

[80] Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2)(C)(iii) also requires courts to consider "the terms of any proposed award of attorney's fees, including timing of payment." Plaintiffs address this subsection in their brief requesting attorney's fees, ECF No. 951.

[81] *Grier v. Chase Manhattan Auto Fin. Co.*, No. CIV. A.99-180, 2000 WL 175126, at *5 (E.D. Pa. Feb. 16, 2000); *see also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *White*, 836 F. Supp. at 1476-77. *See also, 4 Alba Conte & Herbert Newberg, Newberg on Class Actions* § 11.41 at 90 (4th ed. 2002) ("There is usually a presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for approval.").

[82] *See In re Zurn Pex*, 2013 WL 716088, at *7 (applying four-factor test after determining that the settlement was presumptively valid).

010737-11 1449936V1

### 1. The settlement is entitled to a presumption of fairness.

Counsel involved here are experienced complex antitrust litigators, both in class actions generally and in antitrust class action litigation specifically. The negotiations between counsel were conducted before a well-respected mediator the Hon. Layn Phillips (Ret.)), who ensured that the negotiations were conducted at arm's length.[83] Given this, the Court is entitled to rely on the judgment of the litigants and their counsel concerning the adequacy of the settlement.[84]

Furthermore, as set forth in Consumer IPPs' Motion for Preliminary Approval, Consumer IPPs have conducted meaningful investigations and discovery to assess the merits of their claims, starting at least six months before the first complaint was filed.[85] These efforts have given the Consumer IPPs sufficient information to understand the strength and weaknesses of their claims and Smithfield's defenses. The settlement should therefore be accorded a presumption of fairness.

### 2. Four fairness factors weigh in favor of settlement.

Even if a presumption of fairness does not attach, the settlement meets the four-factor test established by the Eighth Circuit for evaluating fairness, reasonableness, and adequacy under Rule 23(e).[86] Under that test, district courts consider: (1) the merits of the

---

[83] Memo. in Support of Prelim. App. at 10; Scarlett Prelim. App. Decl. at 2.

[84] *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1149 (8th Cir. 1999); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

[85] Memo. in Support of Prelim. App. At 1-3, 8-9; Scarlett Prelim. App. Decl. at 1-2.

[86] *See In re Zurn Pex*, 2013 WL 716088, at *7 (applying four-factor test after determining that the settlement was presumptively valid).

plaintiff's case weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement.[87] District courts "need not make a detailed investigation consonant with trying the case," rather, they need only provide a basis for determining that the decision rests on "well-reasoned conclusions" and is not "mere boilerplate."[88] The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."[89]

> ### a. The strength of the plaintiffs' case, weighed against the terms of the settlement, supports final approval.

The settlement provides substantial relief for the class. The $75 million settlement represents $2.36 million for each point of the Smithfield Defendants' market share (an increase from the approximately $1 million per market share point of the JBS settlement),[90] putting the value of this case well over $200 million at this stage in the litigation. This is an outstanding result. In addition to the financial compensation, the cooperation that Consumer IPPs have secured from the settlement will bolster Consumer IPPs' claims against the remaining non-settling Defendants. Weighing the uncertainty of

---

[87] *In re Wireless*, 396 F.3d at 932–33.

[88] *Id.*, *citing Van Horn v. Trickey,* 840 F.2d 604, 607 (8th Cir. 1988) (citations omitted).

[89] *Petrovic,* 200 F.3d at 1150 (internal quotations omitted).

[90] Consumer IPPs estimate that the Smithfield Defendants have approximately 32 percent of the market share for Consumer IPP class products. *See* Scarlett Prelim. App. Decl. at ¶ 7.

relief against the immediate benefit provided to the class,[91] this factor supports final approval of the settlement terms.

### b. The Smithfield Defendants' financial condition and ability to pay did not impact the amount of settlement.

While Plaintiffs believe that Smithfield is a well-funded company, its financial condition and ability to pay is a neutral factor in the analysis.[92]

### c. The complexity and expense of further litigation supports final approval.

The third factor—complexity and expense of further litigation—also supports final approval. "An antitrust class action is arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome."[93] This case thus represents one of the most complex types of litigation—a conspiracy spanning eight defendant families alleging nationwide concerted action to reduce supply and raise the price of pork that started over a decade ago. This case has been pending since June of 2018, and all parties have demonstrated a willingness to continue to contribute significant time and resources to the case. Class certification presents one hurdle, but the class must also survive summary judgment and a trial on the merits. Any resolution could be further delayed by appeals, and "all the while class members would

---

[91] *In re Wireless*, 396 F.3d at 933.

[92] *Id.; see also Petrovic*, 200 F.3d at 1152 ("While it is undisputed that Amoco could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate.").

[93] *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (citations omitted).

receive nothing."[94] Thus even if Plaintiffs could theoretically recover more after a trial and appeal than in this settlement, it is uncertain whether an additional sum—recovered after years of protracted and costly litigation—would be more valuable to the class than an immediate payment of $75 million and the cooperation of Smithfield in the ongoing litigation against the remaining defendant families.[95] Because the Settlement Agreement will yield a certain, substantial, and prompt recovery, without further delay and expense, it substantially benefits the Consumer IPP class and approval is appropriate.

### d. Settlement class members' positive reaction supports final approval.

Of the millions of potential settlement class members, no settlement class members have opted out, and no settlement class member has objected.[96] This is particularly significant in light of the success of the Notice Program, which is estimated to have reached 83.1% of the target demographic of the Settlement Class. The amount of opposition to the settlement is thus substantially less even than what the Eighth Circuit called "miniscule" in *In re Wireless*,[97] a fact that weighs in favor of final approval of the settlement.[98]

---

[94] *In re Wireless*, 396 F.3d at 933.

[95] *See Yarrington v. Solvay Pharms., Inc.*, No. 09-CV-2261 (RHK/RLE), 2010 WL 11453553, at *10 (D. Minn. Mar. 16, 2010).

[96] Scarlett Decl., ¶ 3.

[97] *In re Wireless*, 396 F.3d at 933.

[98] *Id.*; *see also*, *Petrovic*, 200 F.3d at 1152 ("[F]ewer than 4 percent of the class members objected to the settlement, significantly fewer than the number of objectors to other settlements that have been approved.").

**D.    Plaintiffs have complied with Rule 23(c) notice requirements.**

Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), and upon settlement of a class action, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."[99] Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice" of particular information.[100]

This Court approved the form of the proposed class notice and notice program.[101] Eric Schachter of A.B. Data Ltd., the Court-appointed notice administrator, implemented a direct notice campaign via email, as well as an indirect notice campaign in both hard-copy publications and on the Internet.[102] The notice administrators state that an estimated 83.1 percent of the target demographic (the Settlement Class) has received notice.[103] The notice itself informed class members of the nature of the action, the terms of the proposed settlements, the effect of the action and the release of claims, as well as class members' right to exclude themselves from the action and their right to object to the proposed settlements.[104] This notice complies with all of the requirements of Rule 23.

---

[99] Fed. R. Civ. P. 23(e)(l).

[100] Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

[101] ECF No. 811.

[102] Schachter Decl., ¶¶ 4-7.

[103] *Id.* ¶ 14.

[104]  *Id.* at Exhibits A-C.

**E.     The plan of allocation is fair, reasonable, and adequate.**

A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel."[105] Here, the Settlement provides for a cash payment of $75 million which has been deposited into the Settlement Fund.[106] The Agreement provides that the Settlement Fund will fund the payment of valid claims of Settlement Class members, costs of notice, claims administration, payment for service awards to the Named Plaintiffs and attorneys' fees and costs.[107]

The proposed settlement also "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Funds will be awarded based on the *pro rata* share per class member of qualifying class products purchased and will be distributed through an electronic method. For efficiency's sake, however, Consumer IPPs propose that this plan of distribution and the distribution itself wait until later in the litigation when more settlement monies are available for distribution.

## IV.    CONCLUSION

For these reasons, Consumer IPPs respectfully requests that the Court grant final approval of the settlement agreement with Smithfield and certify the proposed Settlement Class.

---

[105] *In re Charter Commc'ns, Inc.*, No. 4:02-cv-1186 CAS, 2005 WL 4045741, at *10 (E.D. Mo. June 30, 2005) (citation omitted).

[106] Scarlett Decl., ¶ 4.

[107] *See* Scarlett Prelim. App. Decl., Ex. A.

010737-11 1449936V1

DATED: March 16, 2023

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:  */s/ Shana E. Scarlett*
 SHANA E. SCARLETT
Rio Pierce
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.om

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
breannav@hbsslaw.com

Abigail D. Pershing
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
Michelle J. Looby (#388166)
Joshua J. Rissman (#391500)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

jrissman@gustafsongluek.com

*Interim Co-Lead Counsel for Consumer*
*Indirect Purchaser Plaintiffs*

010737-11 1449936V1