## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE PORK ANTITRUST LITIGATION

This Document Relates To:

ALL CLASS ACTIONS

Civil No. 18-1776 (JRT/JFD)

MDL No. 21-2998

**MEMORANDUM OPINION AND ORDER GRANTING CLASS PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND DENYING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY**

---

In this multidistrict litigation alleging price-fixing in the pork industry, three groups of pork purchasers seek class certification: (1) Direct Purchaser Plaintiffs ("DPPs"); (2) Commercial and Institutional Indirect Purchaser Plaintiffs ("Commercial IIPPs" or "CIIPPs"); and Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs" or "CIPPs") (together, "Class Plaintiffs"). Each class submitted expert testimony in support of its motion for class certification. Defendants oppose the Class Plaintiffs' motions and urge the Court to exclude the experts' testimony.

Because the Court finds the less stringent *Daubert* standard employed at the class certification stage satisfied, it will deny the Defendants' motions to exclude the experts' testimony. After conducting a rigorous analysis, the Court also finds that the Class Plaintiffs have satisfied their burden under Federal Rule of Civil Procedure 23 for class certification. The Court will therefore certify the DPPs' damages class, the Consumer IPPs'

damages class, and the Commercial IIPPs' damages and injunctive relief classes.

## BACKGROUND

### I.    FACTS

This case represents the consolidation of many separately filed actions alleging that Defendants,[1] among America's largest pork producers and integrators, conspired to limit the supply of pork and thereby fix prices in violation of federal and state antitrust laws.  Together, Defendants control over 80 percent of the wholesale pork market.  (3rd Am. DPP Compl. ("DPP Compl.") ¶ 1, Jan. 15, 2020, Docket No. 431.)  Plaintiffs allege that, from at least 2009–2018, Defendants conspired to "fix, raise, maintain, and stabilize the price of pork."  (*Id.* ¶ 2.)  Plaintiffs allege that this was accomplished principally "by coordinating output and limiting production with the intent and expected result of increasing pork prices in the United States."  (*Id.*)  This price-raising and fixing allegedly caused Class Plaintiffs to pay artificially inflated pork prices.  (*Id.* ¶ 7.)

There are three categories of Class Plaintiffs who purchased, either directly or indirectly, pork products from Defendants: Direct Purchaser Plaintiffs ("DPPs"), Consumer Indirect Purchaser Plaintiffs ("Consumer IPPs"), and Commercial and Institutional Indirect

---

[1] "Defendants" here refers to Agri Stats, Inc. ("Agri Stats"); Clemens Food Group, LLC and The Clemens Family Corporation (together and separately, "Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (together and separately, "Hormel"); Seaboard Foods LLC and Seaboard Corporation (together and separately, "Seaboard"); Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (together and separately, "Tyson").  Though other defendants are identified and involved in this action, the Class Plaintiffs' remaining allegations are against the Defendants listed.

Purchaser Plaintiffs ("Commercial IIPs").  All three allege that Defendants engaged in a price-fixing conspiracy to artificially constrict the supply of pork products in the United States, a *per se* violation of the Sherman Act.  Consumer IPPs also bring a rule of reason theory against Defendants.

## II.    PROCEDURAL HISTORY

Named Plaintiffs initiated this action in 2018.  (Compl., June 28, 2018, Docket No. 1.)  The Court first considered a joint motion to dismiss brought by Defendants against the three class complaints in 2019.  The Court concluded that Plaintiffs had not adequately alleged parallel conduct, an essential element in showing that Defendants engaged in an agreement to limit the supply of pork, and granted the motion to dismiss without prejudice.  *In re Pork Antitrust Cases*, No. 18-1776, 2019 WL 3752497, at *9–10 (D. Minn. Aug. 8, 2019).

Plaintiffs then filed amended complaints, which Defendants again moved to dismiss.  The Court largely denied the motion to dismiss because Plaintiffs' amended complaints adequately pled parallel conduct and the claims were not time-barred.  *In re Pork Antitrust Litigation*, 495 F. Supp. 3d 753, 764 (D. Minn. 2020).  Since then, this multidistrict litigation has grown exponentially as many Direct Action Plaintiffs ("DAPs")

joined the litigation.[2]


### III.   CLASS CLAIMS

Class Plaintiffs all moved for class certification on May 2, 2022.[3]   Defendants

oppose all three class certification motions.[4]

### A.   Direct Purchaser Plaintiffs

The proposed DPP class broadly represents individuals and businesses that are the

first in the chain of distribution, purchasing directly from Defendants.   DPPs bring claims

under federal law and ask the Court to certify the following damages class pursuant to

Rule 23(b)(3):

> All persons and entities who directly purchased one or more
> of the following types of pork, or products derived from the
> following types of pork, from Defendants, or their respective
> subsidiaries or affiliates, for use or delivery in the United
> States from June 29, 2014 through June 30, 2018: fresh or
> frozen loins, shoulders, ribs, bellies, bacon, or hams. For this
> lawsuit, pork excludes any product that is marketed as organic
> or as no antibiotics ever (NAE); any product that is fully
> cooked or breaded; any product other than bacon that is
> marinated, flavored, cured, or smoked; and ready-to-eat

---

[2] Since the DAPs are not relevant to the present motions for class certification and motions to exclude expert testimony, they will not be discussed in detail.

[3] (DPPs' Mot. Certify Class, Docket No. 1318; Commercial IIPPs' Mot. Certify Class, Docket No. 1334; Consumer IPPs' Mot. Certify Class, Docket No. 1340.)

[4] (*See* Defs.' Omnibus Mem. Opp., Aug. 24, 2022, Docket No. 1441; Defs.' Mem. Opp. DPPs' Mot., Aug. 24, 2022, Docket No. 1445; Defs.' Mem. Opp. Consumer IPPs' Mot., Aug. 24, 2022, Docket No. 1460; Defs.' Mem. Opp. Commercial IIPPs' Mot., Aug. 25, 2022, Docket No. 1473.)

bacon.[5]

(DPPs' Mem. Supp. Mot. Certify Class at 41, May 2, 2022, Docket No. 1320.)  DPPs propose

the following named Plaintiffs serve as class representatives:  Maplevale Farms, Inc.; John

Gross and Company, Inc.; Ferraro Foods, Inc. and Ferraro Foods of North Carolina, LLC;

and Olean Wholesale Grocery Cooperative, Inc.  (*Id.* at 9.)  All named DPPs assert claims

arising from Defendants' alleged conspiracy to raise pork prices and share the same

interest in establishing Defendants' liability and maximizing classwide damages.  Likewise,

they and their counsel have actively participated in the litigation.  (*E.g.*, Decl. Bobby

Pouya, Ex. 3, ¶ 6, May 2, 2022, Docket No. 1322-4.)  DPPs also ask the Court to appoint its

interim co-lead counsel, Lockridge Grindal Nauen P.L.L.P. and Pearson & Warshaw, LLP,[6]

as class counsel.  (*See* DPPs' Mot. Certify Class at 1.)

### B.    Commercial and Institutional Indirect Purchaser Plaintiffs

The Commercial IIPP class broadly represents indirect purchasers who are not end

users of pork products.  Commercial IIPPs bring claims under state laws and ask the Court

to certify the following injunctive relief class pursuant to Rule 23(b)(2) and damages class

---

[5] Excluded from this Class are the Defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Co-Conspirator identified in this action.

[6] The law firm Pearson, Simon & Warshaw, LLP was renamed Pearson Warshaw, LLP as of January 1, 2023.  (Notice Change Firm Name E-mail Addresses, Jan. 3, 2023, Docket No. 1715.)

pursuant to Rule 23(b)(3):

> **Proposed Injunctive Class:**   All entities that indirectly purchased uncooked pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the United States from June 28, 2014 to June 30, 2018. For this lawsuit, pork excludes any product that is marketed as organic and/or no antibiotics ever and any product other than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.[7]

> **Proposed Damages Class**:   All entities that indirectly purchased uncooked pork bacon, or one or more of the following types of raw pork, whether fresh or frozen: loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators for their own use in commercial food preparation in the Repealer Jurisdictions[8] from June 28, 2014 to June 30,

---

[7] Excluded from the class are: Natural persons who purchased pork for their personal use and not for commercial food preparation (End-User Consumers); purchases of pork directly from Defendants; purchases of pork for resale in unaltered form; purchases of pork from an intermediary who has further processed the pork; the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and any coconspirator identified in this action.

[8] "Repealer Jurisdictions" are those states that have "repealed" the Supreme Court's holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and provide standing to indirect purchasers.  Commercial IIPPs assert damages claims in: Arkansas, Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. The class period for Kansas, Massachusetts, Mississippi, South Carolina, and Tennessee class members is proposed to begin June 28, 2015.  (Commercial IIPPs' Mot. Certify Class at 2–3 n.2.)

> 2018. For this lawsuit, pork excludes any product that is marketed as organic and/or no antibiotics ever and any product other than bacon that is marinated, seasoned, flavored, or breaded, but it includes uncooked and cooked ham water added products.

(Commercial IIPPs' Mot. Certify Class at 2–3.)  Commercial IIPPs propose the following class representatives:  Sandee's Bakery; Francis T. Enterprises d/b/a Erbert & Gerbert's; Joe Lopez, d/b/a Joe's Steak and Leaf; Longhorn's Steakhouse; The Grady Corporation; Mcmjoynt LLC d/b/a The Breakfast Joynt; Edley's Restaurant Group, LLC; Basil Mt. Pleasant, LLC, Basil Charlotte, Inc.; Farah's Courtyard Deli, Inc.; Tri-Ten LLC.  (*Id.* at 1 n.1.)  Commercial IIPPs also ask the Court to appoint existing interim co-lead counsel, Cuneo Gilbert & LaDuca, LLP and Larson King, LLP, to serve as class counsel.[9]  (*Id.* at 1.)

### C.    Consumer Indirect Purchaser Plaintiffs

Lastly, the Consumer IPPs represent end-users of pork products.  They are largely individual consumers who purchased pork at allegedly elevated prices indirectly from Defendants.  Consumer IPPs bring *per se* and rule of reason theories against Defendants under various state laws and ask the Court to certify the following damages class pursuant to Rule 23(b)(3):

> All persons and entities who indirectly purchased raw pork, bacon, or one or more of the following types of raw pork,

---

[9] In their class certification motion, Commercial IIPPs furth request the Court appoint Barnett Law Group, P.A., Tostrud Law Group, P.C., Zimmerman Reed LLP, and Bozeman Law Firm, P.A. to a Commercial IIPP-specific Plaintiffs' Steering Committee.  Because the Court has since appointed leadership for this multidistrict litigation, it finds this request from the Commercial IIPPs moot.  (*See* Am. Pretrial Order No. 3 at 2–4, Dec. 12, 2022, Docket No. 1670.)

whether fresh or frozen: bellies, loins, shoulder, ribs or pork chops from defendants or co-conspirators for personal consumption in the Repealer Jurisdictions[10] from June 28, 2014 to June 30, 2018.  For this lawsuit, pork excludes any product that is marketed as organic, no-antibiotics ever (NAE) and any product other than bacon that is marinated, seasoned, flavored, or breaded.[11]

(Consumer IPPs' Mot. Certify Class at 2.)   Consumer IPPs identified the following individuals to serve as class representatives: Michael Anderson, Sandra Steffen, Michael Pickett, David Look, Joseph Realdine, Ryan Kutil, Kory Bird, Duncan Birch, Robert Eccles, Jennifer Sullivan, Kenneth King, Sarah Isola, Wanda Duryea, Edwin Blakey, Michael Reilly, Jeffrey Allison, Kenneth Neal, Chad Nodland, Chris Deery, Laura Wheeler, Christina Hall, Donya Collins, Thomas Cosgrove, Charles "Rich" Dye, Eric Schaub, Kate Smith, Stacey Troupe, James Eaton, and Isabelle Bell.  (Consumer IPPs' Mem. Supp. Mot. Certify Class at 10, May 2, 2022, Docket No. 1343.)   Consumer IPPs ask the Court to appoint their existing interim co-lead class counsel, Hagens Berman Sobol Shapiro LLP and Gustafson Gluek PLLC, as co-lead class counsel.  (*Id.* at 61.)

---

[10] The Consumer IPPs' "Repealer Jurisdictions" are Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, Tennessee, Utah, and West Virginia.  (Consumer IPPs' Mem. Supp. Mot. Certify Class at 13 n.4, May 2, 2022, Docket No. 1343.)   The class period for Kansas, Tennessee, and South Carolina class members is proposed to begin June 28, 2015.  (*Id.*)

[11] Excluded from the class are defendants, the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and any coconspirator identified in this action.

**IV.     MOTIONS TO EXCLUDE**

The Class Plaintiffs each submitted expert testimony in support of their motions

for class certification.  The Consumer IPPs offer Dr. Hal Singer's testimony, the DPPs offer

Dr. Russell Mangum's testimony, and the Commercial IIPPs offer Dr. Michael Williams's

testimony.  (*See* Decl. of Hal J. Singer ("Singer Decl."), May 2, 2022, Docket No. 1347;

Expert Rep. of Russell W. Mangum III ("Mangum Rep."), May 2, 2022, Docket No. 1330;

Corrected Expert Rep. of Michael A. Williams ("Williams Rep."), Aug. 18, 2022, Docket No.

1429.)

Defendants ask the Court to exclude each of the three experts' testimony.  (Defs.'

Mot. Exclude Singer Test., Aug. 24, 2022, Docket No. 1466; Defs.' Mot. Exclude Mangum

Test., Aug. 24, 2022, Docket No. 1449; Defs.' Mot. Exclude Williams Test., Aug. 24, 2022,

Docket No. 1453.)  Defendants also offer the testimony of their own experts: Dr. Laila

Haider and Dr. James Mintert, which Class Plaintiffs have not moved to exclude.  (*See*

Expert Rep. of Dr. Laila Haider ("Haider Rep."), Aug. 24, 2022, Docket No. 1442-1; Expert

Rep. of James Mintert ("Mintert Rep."), Aug. 24, 2022, Docket No. 1442-2.)


**MOTIONS TO EXCLUDE**

The  expert  testimony  in  this  case  is  a  necessary  component  of  each  class

certification  motion.  Therefore,  the  Court  will  first  consider  Defendants'  motions  to

exclude that testimony before turning to Federal Rule of Civil Procedure 23.

## I.   STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony.   An

expert's opinion testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is
> based on sufficient facts or data; (c) the testimony is the
> product of reliable principles and methods; and (d) the expert
> has reliably applied the principles and methods to the facts of
> the case.

Fed. R. Evid. 702.  In essence, there are three prerequisites to admitting expert testimony:

(1) the evidence is relevant and helpful for the trier of fact, (2) the proposed witness is

qualified to assist the trier of fact, and (3) the proposed evidence must be reliable.  *Lauzon*

*v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  For evidence to be reliable, it must

be based upon sufficient facts or data, be a product of reliable principles and methods,

and the witness must apply the principles and methods reliably to the facts of the case.

*Id.*

The district court acts as a gatekeeper to the consideration of expert testimony by

engaging in a *Daubert* analysis to ensure "that an expert's testimony both rests on a

reliable foundation and is relevant."  *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579,

597 (1993); *Lauzon,* 270 F.3d at 686.  *Daubert* and its progeny have generated a number

of factors for courts to consider in this analysis.  *Lauzon*, 270 F.3d at 686–87.  And "the

inquiry envisioned by Rule 702 is . . . a flexible one."  *Daubert*, 509 U.S. at 594.

At the class certification stage, the Court only conducts a focused *Daubert* inquiry to assess whether the opinions of the proposed experts, based on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 610 (8th Cir. 2011); *see also Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925 n.2 (8th Cir. 2015). The main purpose of the full *Daubert* analysis is for the district court to act as a gatekeeper to protect "juries from being swayed by dubious scientific testimony." *In re Zurn Pex*, 644 F.3d at 613. There is less need for the Court to protect only itself, so the Court may conduct a less stringent application of Rule 702 and *Daubert* at the class certification stage. *See id.*

As a result, when deciding whether to exclude testimony at this preliminary stage, where evidence is still evolving and uncertain, the Court considers "the expert testimony in light of the criteria for class certification and the current state of the evidence." *Id.* at 614. The Court need not decide conclusively if the evidence it considers at this stage "will ultimately be admissible at trial." *Id*. at 611. The rule clearly "is one of admissibility rather than exclusion." *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991). And the Eighth Circuit has generally stated that "district courts are admonished not to weigh or assess the correctness of competing expert opinions." *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014).

Although the Court need not engage in a complete *Daubert* analysis at this stage,

*Daubert* and its progeny are still relevant to the Court's inquiry.  The proposed evidence (1) must be useful, (2) the witness must be qualified to provide the proposed evidence, and (3) the evidence must be reliable or trustworthy.  *Lauzon*, 270 F.3d at 686.  Because many of the Defendants' arguments overlap between the three experts, the Court will consider them together.

## II.   RELEVANCE

The Court will first ask if each expert's testimony is relevant.  Opinion testimony is admissible only if it is "relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  This means that the Court should consider whether the "opinion offered by the expert is sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute."  *Lauzon*, 270 F.3d at 694.

### A.  Dr. Singer

Neither party disputes that Dr. Singer's expert testimony is relevant to the Consumer IPPs' class certification motion.  Dr. Singer provides both qualitative and quantitative analyses.  First, he uses qualitative evidence common to the putative class members to analyze whether Defendants were engaged in an alleged price-fixing cartel. (Singer Decl. ¶ 10.)  Then, he analyzed quantitative evidence of the Defendants' alleged conduct. (*Id.* ¶ 11.)  He conducted a regression analysis, which requires comparing prices during the alleged "contaminated" time period (called the "conduct period" or "conspiracy period," when Defendants were allegedly price fixing), to prices during a

-12-

"benchmark period," when there was no alleged conspiracy.  (*Id.*)  Dr. Singer then estimated a pass-through rate, which is the rate by which indirect purchasers like the Consumer IPPs paid inflated pork prices.  (*Id.* ¶ 12.)  He also showed how damages can be calculated for the class using the overcharge amount and pass-through rate.  (*Id.* ¶ 14.)

Dr. Singer's analysis is relevant to the Consumer IPPs' class certification motion because the Court must consider if there are questions of law or fact common to class members that predominate over individual questions.  Fed. R. Civ. P. 23(b)(3).  This requires the Court to consider if there is classwide impact, and if it is possible to calculate classwide damages.  Dr. Singer's report addresses these issues.

### B.    Dr. Williams

Unlike with Dr. Singer, the parties dispute if Dr. Williams's expert report is relevant. The Commercial IIPPs use Dr. Williams's testimony to show common evidence of widespread impact, including if each named Plaintiff paid an overcharge on at least one of their purchases.  (Williams Rep. ¶¶ 258–280.)  Dr. Williams quantified classwide damages by comparing the prices Plaintiffs and Class Members paid for pork products to the estimated prices they would have paid but for the Defendants' alleged conspiracy. (*Id.* ¶ 13.)  Like Dr. Singer, Dr. Williams used regression methodology to estimate the effects of the alleged conspiracy on the supply of pork.  (*Id.* ¶ 145.) Dr. Williams concludes that common evidence shows that several pork industry characteristics are conducive to cartel behavior and that Defendants engaged in a number of actions that, but for the existence of the alleged conspiracy, were contrary to their independent self-interests.

(Williams Rep. ¶¶ 9–11.)  This evidence is relevant because Dr. Williams determined the overcharge paid by the Commercial IIPPs as a result of the Defendants' conspiracy, which can be used to calculate damages and show causation.

Defendants argue that Dr. Williams's opinions are irrelevant because his regression models do not focus on the impact during the class period only, so they cannot assist the factfinder in deciding whether Defendants' alleged conspiracy injured members of the class.

However, like the other experts, Dr. Williams properly analyzed the entire alleged conspiracy period (2009–2018), rather than only the class period (2014–2018).  Class Plaintiffs allege that the conspiracy began in 2009.  To truncate the analysis to only the damages period would be divorced from economic reality and the Class Plaintiffs' theory in this case.  *Cf. Persian Gulf Inc. v. BP West Coast Prods. LLC*, No. 15-1749, 2022 WL 4830698, at *38 (S.D. Cal. Sept. 30, 2022) ("the statute of limitations may impact available damages, but it does not excuse an expert from following econometric principles").  Further, Class Plaintiffs allege there was a continuing violation, which requires the Plaintiffs to show "that the conspiracy continued into the non-time-barred class period." *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 775.  Because the Plaintiffs must show that the conspiracy began before the class period and continued into it, it is both logical and necessary for Dr. Williams to analyze conduct prior to 2014.

Defendants also incorrectly rely on *Comcast* to argue that Dr. Williams's models

are irrelevant because they do not fit the Commercial IIPPs' theory of liability.  *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  In *Comcast*, customers brought an antitrust class action against Comcast, alleging that it obtained a monopoly via transactions with competitors for allocation of regional cable markets.  *Id.* at 30.  The Supreme Court held that the district court erred in certifying the class because the expert report failed to establish that damages could be measured on a classwide basis.  *Id.* at 34.  The Supreme Court emphasized that an expert's model must "measure damages resulting from the particular antitrust injury" on which the plaintiffs' theory of liability in the action is premised.  *Id.* at 36.  Of import, the plaintiffs had asserted four theories of antitrust impact, but the expert's model did not attribute damages to any one theory of anticompetitive impact.  *Id.*  This was a problem because, by the time the Court ruled on the class certification motion, only one theory of anticompetitive impact remained.  *Id.* The Supreme Court explicitly said that the expert's methodology "might have been sound, and might have produced commonality of damages," if all four theories of anticompetitive impact remained in the case.  *Id.* at 37.

This is what makes *Comcast* distinct. Defendants contend that Commercial IIPPs assert two theories for how Defendants restricted hog supply: sow liquidations and increased exports.  However, these are not independent theories of anticompetitive impact like in *Comcast*; they are merely two levers by which the Class Plaintiffs assert Defendants could have artificially raised and fixed pork prices.  Even if they were

considered independent theories, there is no evidence that the Class Plaintiffs abandoned either.  Accordingly, it is not a problem that Dr. Williams failed to attribute damages to each of those theories of liability individually.  *Comcast* does not apply here, and Dr. Williams's testimony is relevant.  Accordingly, this element is satisfied.

### C.   Dr. Mangum

Lastly, the parties do not dispute that Dr. Mangum's testimony is relevant to the DPPs' class certification motion.  DPPs tasked Dr. Mangum with analyzing whether the pork industry has structural characteristics that are conducive to the formation of a conspiracy, to determine whether there is evidence that DPPs were impacted by the alleged conspiracy, and to specify a methodology by which classwide damages may be determined.  (Mangum Rep. ¶ 14.)  Like Dr. Singer and Dr. Williams, Dr. Mangum conducted a regression analysis.  He created an econometric model to identify and quantify the effect of the alleged conspiracy on pork prices and conducted correlation analysis that supports his conclusions.  (*Id.* ¶¶ 202, 218.)

Dr. Mangum's report addresses whether the pork industry's characteristics could support a conspiracy as the DPPs allege and whether damages could be calculated on a classwide basis.  These are highly relevant and the success of the DPPs' class certification motion rests on those two issues.  Accordingly, Dr. Mangum's expert report satisfies the relevancy requirement.

### III.   QUALIFICATIONS

-16-

The Court will next consider if the experts have sufficient qualifications. The parties do not dispute that Dr. Singer and Dr. Williams are qualified. Dr. Singer's scholarship focuses on issues of competitiveness, and he has testified before Congress on the interplay between antitrust and sector-specific regulation. (Singer Decl. ¶ 19.) He served as an expert for U.S. State Attorneys General, and he teaches Advanced Pricing to MBA candidates at Georgetown University's McDonough School of Business. (*Id.* ¶¶ 17, 20.) Dr. Williams holds a Ph.D. in economics from the University of Chicago and specializes in antitrust, industrial organization, and regulation analyses. (Williams Rep. ¶¶ 1, 4.) He has been retained as an economic consultant for the U.S. Department of Justice, Antitrust Division, and has testified extensively in other courts. (*Id.* ¶ 2.) Both Dr. Singer and Dr. Williams are assuredly antitrust experts.

Likewise, the parties do not dispute that Dr. Mangum is an **economics** expert. Dr. Mangum is the Executive Vice President of an economic consulting firm and a professor at the Concordia University Irvine, School of Business and Economics. (Mangum Rep. ¶ 1.) Dr. Mangum previously served as an economist at the United States Federal Trade Commission in the Antitrust Division of the Bureau of Economics and has 25 years' experience using econometrics and economic analysis to model anticompetitive behavior, including evaluating anticompetitive effects of business conduct. (*Id.* ¶¶ 2, 4.) He has previously analyzed relevant markets, barriers to entry, market power, and monopolization. (*Id.* ¶ 4.)

The concern Defendants raise is that Dr. Mangum is not a **pork industry** expert.  In his report, Dr. Mangum provides background on the industry, including on pork products, pork consumption, pork production processes, hog production, and pork packing.  (*See generally id.* ¶¶ 32–55.)  While it is true that expert testimony is generally only admissible to the extent that conclusions are supported by the experts' background and methods,[12] and Dr. Magnum's expertise is economics and not the pork industry, Dr. Mangum's testimony is permissible at this stage.  He includes background information about the pork industry to support his expert opinion, which is economic in nature.  *See* Fed. R. Civ. P. 26(2)(B)(ii) (requiring an expert to recite facts relied upon to arrive at their conclusion); *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424 (E.D. Pa. 2015) (admitting expert testimony and finding it is "sound economic practice to review the factual record and formulate a hypothesis that can be tested using economic theory," so "examination of the factual record is necessary to determine which tests to run and to confirm that the stories drawn from the data and from the factual record are consistent").  That he is not pork industry expert is not grounds to exclude Dr. Mangum's testimony.

All three experts are sufficiently qualified to testify on the matters presented to them by the Class Plaintiffs.

---

[12] *See, e.g.,* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.").

**IV.     RELIABILITY**

Lastly, the Court will consider if each expert's testimony is reliable.  For evidence to be admissible, it must be "reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Lauzon*, 270 F.3d at 686 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[3] (2001)).  Evidence is reliable if (1) it is based upon sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.  *Id.*; Fed. R. Evid. 702.  The Court will address each of these three conditions individually.

**A.     Sufficient Facts and Data**

The parties do not dispute that the experts based their analyses upon numerous facts and data.  Rather, Defendants challenge Dr. Singer and Dr. Mangum's testimony as dependent on what they believe to be factual inaccuracies.  Generally, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility."  *In re Zurn Pex*, 644 F.3d at 614.  Though an "expert's opinions are not inadmissible simply because an underlying assumption may be contestable," *id.* at 615, where the "expert's analysis is unsupported by the record, exclusion of that analysis is proper, as it can offer no assistance to the jury."  *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010).

Defendants argue that Dr. Singer's testimony is unreliable because he wrongly assumed Defendants are vertically integrated and Agri Stats performed the work of a

cartel, which is contradicted by the record.  However, this is unfounded.  The record indicates that Dr. Singer did not assume either of these facts.  (Reply Decl. Singer. ¶¶ 12, 13, Nov. 18, 2022, Docket No. 1626.)  And even if Dr. Singer had assumed those facts to be true, they would not justify excluding his testimony at the class certification stage because neither would render his analysis fundamentally flawed.  Instead, they would simply impact the weight the Court gives his testimony.

Likewise, Defendants proclaim Dr. Mangum's testimony is unreliable because he assumed certain market characteristics that Defendants uphold as untrue.  "[W]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of facts . . . '[S]ufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  Fed. R. Evid. 702 advisory committee's notes (2000).  The disputed market characteristics do not render his analysis "of little to no assistance," and again speak only to the weight the Court gives his findings.

Further, Defendants assert that Dr. Mangum erroneously analyzed the "pork packing market" generally, rather than the upstream hog market—where hogs are grown and raised—and the downstream pork market—where hogs are processed and pork is sold.  They argue this discrepancy is at odds with the facts of the case and the DPPs' theory of liability.  Defendants rely on *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1079–80 (10th Cir. 2006) (affirming exclusion of an economics expert because their

analysis was "predicated entirely" on the downstream market, while the plaintiff's theory was premised on the defendant's upstream market share).  Dr. Mangum's testimony might be excluded if it was premised entirely on the upstream hog production market, but that is not the case here.  (*See* Mangum Reply Rep. ¶ 17, Nov. 18, 2022, Docket No. 1617.)  Dr. Mangum focused his analysis on the pork market and the prices paid for pork, which aligns with the DPPs' theory of liability.  (*Id.*)  *Champagne Metals* does not apply.

Thus, the Court concludes that all three experts based their analysis on sufficient facts and data.

### B.   Reliable Principles and Methods

Next, the Court considers if the experts used reliable principles and methods.  All three experts created regression models.  Regression analysis compares actual prices to hypothetical prices that would have been paid but for the alleged conspiracy.  *See Comcast Corp.*, 569 U.S. at 32.  Regression analysis is "a generally accepted econometric approach to determining causation and damages in the antitrust context," but the Court still needs to determine if an expert's application of that methodology meets the Rule 702 and *Daubert* standards for reliability and relevance.  *Persian Gulf Inc.*, 2022 WL 4830698, at *35; *see also Midwestern Machinery v. Northwest Airlines, Inc.*, 211 F.R.D. 562, 567 (D. Minn. 2001) (collecting cases).  Courts have found regression analyses admissible and effective in similar meat packing antitrust cases.  *E.g., In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 328 (S.D. Cal. 2019), *aff'd sub nom.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022); *In re Broiler*

*Chicken Antitrust Litig.*; No. 16-8637, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022).

Conducting a regression analysis requires the expert to select a benchmark period, which is a period when there was no anticompetitive conduct. This is because "[t]he fundamental premise of a forecasting regression approach is that prices in the [benchmark period] were influenced only by lawful economic variables . . . and prices during the conspiracy were influenced by the same lawful economic variables plus the conspiracy's anticompetitive conduct." *Persian Gulf Inc.*, 2022 WL 4830698, at *35.

Defendants challenge the experts' regression models and argue they (1) failed to distinguish lawful from unlawful factors and (2) failed to account for all supply and demand variables. Neither argument constitutes grounds for excluding the experts' testimony at the class certification stage.

First, it is true that failure to distinguish lawful from unlawful conduct may be grounds for excluding an expert's regression analysis. *E.g., In re Wholesale Grocery Prod. Antitrust Litig.*, No. 09-2090, 2018 WL 3862773, at *8 (D. Minn. Aug. 14, 2018), *aff'd*, 946 F.3d 995 (8th Cir. 2019); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). Defendants identify a swath of lawful factors that they contend the experts erred in not distinguishing from conspiratorial conduct, such as the role of nondefendant hog producers, pig imports, the circovirus vaccine, government action to reduce hog supply and stabilize pork prices, overseas pork suppliers, overseas demand, and currency exchange rates.

However, courts faced with similar questions have explained that an expert need not fully disaggregate lawful and unlawful conduct. *E.g.*, *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468 at *10 ("Comcast does not impose a requirement to 'disaggregate lawful and unlawful conduct.'"). Rather, the expert's theory of harm must simply match the plaintiff's. *Id.* Moreover, the record indicates that the experts did in fact account for many lawful factors that could impact pork price and availability. (*E.g.*, Williams Rep. ¶¶ 153–163, 222; Mangum Reply Rep. ¶¶ 138–140; Singer Decl. ¶¶ 153–156, T11.) Additionally, Dr. Williams ran his model again, adopting the lawful factors that Defendants suggested he erred by excluding, and his results indicated "virtually the same estimated overcharges" as his previous model. (Williams Reply Rep. ¶ 126, Nov. 18, 2022, Docket No. 1635.) The Court finds that the experts sufficiently separated unlawful from lawful factors.

Second, the experts' failure to account for each and every possible supply and demand variable is not grounds for excluding their testimony. It is impossible to perfectly consider every factor that might impact the market. "[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented[.]" *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 (8th Cir. 1998). The Eighth Circuit has instructed district courts to consider an expert's ability to rule out other possibilities when contemplating the expert testimony's admissibility but that "this requirement cannot be carried to a quixotic

extreme." *Lauzon*, 270 F.3d at 693.  An expert's conclusion should not be excluded "because he or she has failed to rule out *every* possible alternative cause." *Id.* (emphasis in original) (internal citation omitted).  Rather, existence of causes not eliminated pertains to weight—not admissibility.  *Id.*  Ultimately, the experts here accounted for dozens of variables that impact the market, and that is sufficient at the class certification stage.

Defendants raise an additional argument only in relation to Dr. Mangum: that his averaging methodology and correlation analyses are unreliable.  Defendants assert that Dr. Mangum uses an averaging methodology that conceals variations among direct purchasers.  Though courts often frown upon averaging methodologies, they may still be admissible if plaintiffs "have laid a sufficient foundation for the inferential finding that the impact reflected in a single average overcharge was shared by virtually every class member." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015). Because averaging methodologies are not inherently unreliable and are permissible in some circumstances, this alone is not grounds for excluding Dr. Mangum's testimony.[13] Whether or not the averaging methodology is capable of showing common impact is a matter best left for the Rule 23 analysis.

Because the experts all employed widely-accepted regression methodology and

---

[13] Likewise, the fact that Dr. Mangum conducted a correlation analysis alone is not grounds for excluding his testimony.  Though correlation analysis may not be common evidence of classwide injury on its own, Dr. Mangum uses his correlation analysis merely to supplement his robust regression analysis.

the Defendants' objections speak only to weight—not admissibility—the Court finds this requirement satisfied.

### C.    Applied Reliably to the Facts

Lastly, the Court must consider if the experts reliably applied the principles and methods to the facts.  Defendants assert that all three experts failed to reliably employ regression methodology because (1) they erred in including 2008 in the benchmark period; and (2) their analysis should have been limited only to the class period, rather than the entire alleged conspiracy period.  Defendants raise additional objections specific to Dr. Williams's models.

First, Defendants assert that the experts erroneously included 2008 in their benchmark period for their regression analyses, which was an outlier year.  Courts have held that an expert report that fails to use a reliable benchmark period should be excluded.  For instance, in *In re Wholesale Grocery Products Antitrust Litigation*, the District of Minnesota excluded an expert report in part because the benchmark period included a period when there were many relevant changes in the market.  2018 WL 3862773, at *8.  The court found the expert's analysis and resulting opinions to be "fundamentally unsupported" because of his erroneous benchmark period.  *Id.*

Here, Dr. Singer, Dr. Williams, and Dr. Mangum all included 2008 in their benchmark periods, which Defendants contend is fatal because 2008 was a "historic" year that was catastrophic for hog producers.  In 2008–2009, fears of swine flu decreased pork demand and farmers introduced a circovirus vaccine that meant an unexpectedly high

-25-

percentage of those hogs survived. Corn costs also soared, making it more expensive for farmers to care for hogs, and farmers lost money on every hog they sold. In response to these circumstances, farmers raised fewer hogs. (Mintert Rep. ¶¶ 107–110, 124–125, 132.)

However, including 2008 is not grounds for excluding the experts' testimony because they accounted for many of the factors that made 2008 an outlier year. For example, Dr. Singer's report accounted for the decreased demand due to swing flu, pig mortality reduction because of new vaccines, increased corn costs, and the Great Recession. (Reply Decl. Singer ¶ 63.) Dr. Williams similarly considered changes in hog mortality and the circovirus vaccine, and Dr. Mangum accounted for the drop in pork demand, cost of raising and slaughtering hogs, swing flu, and hog mortality rates. (Williams Reply Rep. ¶¶ 119–120; Mangum Reply Expert Rep. ¶ 139.) Including 2008 in the benchmark period does not inherently render the experts' models unreliable because they controlled for many of the factors that made that year a potential outlier.

Defendants also assert that each expert erred in analyzing the entire alleged conspiracy period (2009–2018), rather than focusing on the class period (2014–2018). As already discussed, disaggregating the damages period based on the statute of limitations lacks support in economic theory, and the analysis should be guided by economic and not legal factors. *Cf. Persian Gulf Inc.*, 2022 WL 4830698, at *38. Moreover, experts in similar meat processing antitrust cases likewise analyzed the entire alleged conspiracy period,

rather than only the period for which the plaintiffs could recover damages. *See In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. at 335 (finding that looking at data beyond the 5-year damages period "does not show flaws in the methodology"); *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *11, 20 (relying on exert testimony, including from Dr. Mangum, that modeled data for a conspiracy outside of the class period). Considering data from before the class period is not grounds for excluding the experts' testimony. To the contrary, it is in fact proper.

Lastly, Defendants raise a few arguments directed to Dr. Williams's report. They assert that his models fail routine tests for reliability and are internally inconsistent, and they urge the Court to strike large portions of his testimony where he presents arguments that are not based on his work as an economist. It is true that sensitivity and robustness testing, which ask whether the models are sensitive to small changes, may be helpful in a *Daubert* analysis because they can speak to the model's reliability. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018) ("Robustness testing and sensitivity testing that produces contradictory or otherwise implausible results strongly suggest that a methodology has been insufficiently tested and that the methodology has a high potential rate of error.").

However, Dr. Williams considered his model's statistical reliability and robustness. (Williams Rep. ¶ 258.) He also conducted many tests that, though not formally termed "sensitivity tests," achieved the same result. (*E.g.*, Williams Rep. ¶ 263.) For example, he

made small changes to variables to see how they affected the outcome, which is essentially what a sensitive test does. (*Id.*) Further, Dr. Williams's models yielded almost the same overcharge rate when they accounted for factors that Dr. Haider believes Dr. Williams erred in excluding. (Williams Reply Rep. ¶ 126.) This also suggests that Dr. Williams's models are reliable. It is not dispositive that Dr. Williams failed to conduct formal sensitivity and robustness tests.

Further, that Dr. Williams's models may appear internally inconsistent does not justify excluding them. In addition to the overcharge regression model, Dr. Williams also presents several regressions that show the pass-through rate; the amount of overcharge that passes through from the direct purchasers to the indirect purchasers. He first presents a model aimed at the pass-through rates for foodservice distributors and multi-channel distributors. (Williams Rep. ¶ 256.) He determined that the average pass-through is approximately 100%. (*Id.*) He then corroborated this model by applying it to three individual distributors, finding their pass-through rates to be between 97.8% and 99.8%. (*Id.* ¶¶ 269–74.) Though the overall overcharge rate (approximately 100%) is different from the overcharge rates of the three distributors (ranging from 97.8% to 99.8%), they are all positive values—meaning that Dr. Williams's models all indicate some amount of overcharge. It is logical that different models analyzing different data would reach different results and does not suggest that they are "internally inconsistent." Any discrepancy in these models speaks to the weight the Court gives the testimony, not its

admissibility.

Lastly, Defendants argue that portions of Dr. Williams's expert report should be excluded because he discusses the Defendants' possible motives and claims, which are unrelated to his work as an economist.  (*E.g.,* Williams Report ¶¶ 106–42, 173–97.)  An expert may not give an opinion based on factual assumptions, the validity of which is for the jury to determine.  *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014).  However, the "'Supreme Court has held that 'an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true,' and that it then becomes the responsibility of the party calling the expert 'to introduce other evidence establishing the facts assumed by the expert.'"  *Id.* (quoting *Williams v. Illinois*, 567 U.S. 50, 57 (2012) (internal citation omitted)).

Here, the Commercial IIPPs directed Dr. Williams to assume that they would prove the Complaint's factual core allegations, and that Dr. Williams should analyze "whether economic evidence and methods common to the Class as a whole are capable of demonstrating" certain issues related to causation and damages.  (Williams Rep. ¶ 7.)  Though Dr. Williams made some factual assumptions for the purpose of completing his analysis, it is the responsibility of the Commercial IIPPs—not Dr. Williams—to provide the support for those factual assumptions.  Therefore, this is not grounds for excluding portions of Dr. Williams's testimony at this time.

Because the experts did not err in analyzing the entire alleged conspiracy period,

they accounted for factors that made 2008 an outlier year, and the arguments related to Dr. Williams fail, the Court finds that all three experts reliably applied the principles and methods to the facts.   The experts have satisfied the relevance, qualifications, and reliability requirements and thus surpassed the less stringent *Daubert* standard employed at the class certification stage.   The Court will therefore deny the Defendants' motions to exclude the testimony of Dr. Singer, Dr. Williams, and Dr. Mangum.

## MOTIONS TO CERTIFY CLASSES

Having determined that the Court may consider the experts' testimony, it will now turn to the class certification motions.

## I.      STANDARD OF REVIEW

To certify a class, Class Plaintiffs must demonstrate compliance with Federal Rule of Civil Procedure 23.   Rule 23 sets forth more than "a mere pleading standard."   *Comcast Corp. v. Behrend*, 569 U.S. at 33.   Rather, Class Plaintiffs must provide evidentiary proof of each of Rule 23's elements.   *Id.*   It is the Court's duty to conduct a rigorous analysis before certifying a class, which necessarily requires that the Court consider some issues that bear on the merits of a claim.   *Id.* at 33–34.   But courts considering class certification are not expected to resolve questions regarding the merits at this time.   *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459–60 (2013).

To certify a class, Class Plaintiffs must first show they meet the requirements of Rule 23(a).   *See generally* Fed. R. Civ. P. 23.   Then, Class Plaintiffs must satisfy one of the

23(b) categories.  *Id.*  Class Plaintiffs all ask the Court to certify damages classes pursuant to Rule 23(b)(3), and the Commercial IIPPs also ask for certification of an injunctive relief class pursuant to Rule 23(b)(2).  The Court will begin its analysis with Rule 23(a)'s preliminary requirements before turning to Rule 23(b) and the remaining issues.

## II.    23(A) ANALYSIS

The Court must first consider if the requirements of Rule 23(a) are met.  *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005).  These requirements are:

> (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Each of these elements will be analyzed individually.

### A.  Numerosity

There is no clear-cut rule for numerosity.  Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a).  Though there are no arbitrary rules regarding the necessary size of classes, courts typically consider the number of persons involved in the class, the nature of the action, the value of each individual claim, and the inconvenience of trying individual suits.  *Belles v. Schweiker*, 720 F.2d 509, 515 (8th Cir. 1983); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559–60 (8th Cir. 1982).

Here, the parties do not dispute that each of the three proposed classes satisfies the numerosity requirement.  DPPs are composed of thousands of entities that purchased pork directly from Defendants.  (Mangum Rep. ¶ 84.)  There are estimated to be tens of millions of individuals within the Consumer IPP class, and Commercial IIPPs also have thousands of members.  (Singer Decl. ¶ 196; Williams Rep. ¶¶ 271–73.)  The Rule 23(a) numerosity requirement is plainly satisfied.

### B.   Commonality

To establish commonality under Rule 23(a)(2), class claims "must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  In other words, the Court considers whether proceeding as a class will "generate common **answers** apt to drive resolution of the litigation."  *Id.* (emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  For Rule 23(a)(2) commonality, dissimilarities between class members may be relevant if they preclude a finding that there is "even a single common question."  *Id.* at 359 (cleaned up).

Some dissimilarities, however, do not defeat the existence of commonality provided there is a single common question that can drive answers. *See id.*  Minnesota courts have previously found that allegations of a nationwide horizontal price-fixing conspiracy in violation of Section 1 of the Sherman Act primarily involves common issues

of fact and law.  *See e.g., In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D. Minn. 1989).

First, Class Plaintiffs all seek class certification for a *per se* antitrust claim:[14] that they overpaid for pork due to the Defendants' conspiracy to restrict supply and stabilize prices in the pork market.  (*E.g.*, Consumer IPPs' Mem. Supp. Mot. Certify Class at 10.) The parties do not dispute that these claims satisfy the commonality requirement.  Proof of and defenses to the Defendants' alleged conspiracy will be common to all class members, as is typical of all nationwide horizontal price-fixing conspiracy class actions. *See In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 271.

Second, the Consumer IPPs also seek certification for a "rule of reason" antitrust claim: that Defendants conspired to participate in an anticompetitive information exchange.  (Consumer IPPs' Mem. Supp. Mot. Certify Class at 10.)  At the class certification

---

[14] The Supreme Court has found both rule of reason and *per se* claims to be acceptable means of analyzing the reasonableness of a restraint on trade.  *See Craftsmen Limousine, Inc. v. Ford Motor Co.* ("*Craftsmen I*"), 363 F.3d 761, 772 (8th Cir. 2004).  Technically, rule of reason and *per se* are not separate claims, but rather ways to analyze an antitrust claim, but are often dubbed "claims" by courts.  *See In re Pork Antitrust Litig.*, No. 18-1776, 2021 WL 728841, at *1 (D. Minn. Feb. 4, 2021).  *Per se* analysis typically applies when there is a restraint on trade that "always or almost always tend[s] to restrict competition and decrease output."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018).  This usually only occurs in horizontal restraints, such as the alleged price fixing across the pork processing industry.  *See id.*  In contrast, rule of reason claims are considered the "prevailing standard" for determining a restraint's effect upon competition in the relevant market.  *Craftsmen I*, 363 F.3d at 772.  Under this approach, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997).  Determining whether conduct violates the rule of reason is a fact-specific assessment.  *Am. Express Co.*, 138 S. Ct. at 2284.

stage, the Court must consider if the party bringing a rule of reason claim has properly defined the relevant markets. *Craftsmen Limousine, Inc. v. Ford Motor Co.* ("*Craftsmen II*"), 491 F.3d 380, 388 (8th Cir. 2007). The plaintiff must define both the relevant geographic market, meaning the "area in which consumers can practically seek alternative sources of the product," and the relevant product market, meaning "all reasonably interchangeable products." *Id.* (internal citations omitted).

Because rule of reason requires a more specialized analysis than *per se* claims, courts have recognized that "the rule of reason raises more individualized issues precluding class certification." *See Conrad v. Jimmy John's Franchise, LLC*, No. 18-133, 2021 WL 3268339, at *10 (S.D. Ill. July 30, 2021). A rule of reason claim cannot be certified as a class unless the proposed class members can show commonality—meaning that they participated in the same geographic market and product market. *E.g., DeSlandes v. McDonald's USA, LLC*, No. 17-4857, 2021 WL 3187668, at *11 (N.D. Ill. July 28, 2021) (refusing to certify a class for a rule of reason claim because the plaintiff failed to show the relevant geographic market).

Here, the Consumer IPPs have established commonality as to the relevant geographic and product markets. Dr. Singer extensively analyzed the geographic market and determined that the entire United States is the proper antitrust market because domestic pork processors "face little competition from foreign pork imports." (Singer Decl. ¶ 51.) Though it is true that a consumer in Alabama would likely not view pork sold

in California as a viable alternative, to end the analysis there "would be to overlook the very purpose of the geographic market." *See Jein v. Perdue Farms, Inc.*, No. 19-2521, 2020 WL 5544183, at *10 (D. Md. Sept. 16, 2020). The Defendants operate on a national scale, so the entire United States is the appropriate geographic market. *See id.* at 11 (finding that the entire continental United States is the appropriate geographic market for poultry processor employees because defendants operated on a national scale when it came to employees' compensation).

Consumer IPPs also correctly assert that pork products including all forms of "raw pork bacon," plus "fresh or frozen" pork "bellies, loins, shoulder, ribs, or pork chops," are the appropriate product market. (*See* Consumer IPPs' Mem. Supp. Mot. Certify Class at 13.) The Supreme Court has explained that "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (determining the relevant markets to be men's, women's, and children's shoes, but declining to use the submarkets based on price/quality and age/sex). Generally, the "outer boundaries of a product market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it." *Id.* However, various submarkets may be combined into a single market, even if they do not have perfectly interchangeable products or services, "where that combination reflects commercial realties." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) (combining

burglar alarms, fire alarms, waterflow alarms, and other types of alarm companies into a single relevant market because home security companies "recognize that to compete effectively, they must offer all or nearly all types of service").

Accordingly, the pork products Consumer IPPs list are the relevant market because they constitute a comparable cluster of products. Though bacon may not be interchangeable for ribs, the commercial reality is that Defendants operate in all these submarkets. Subdividing into different types of processed pork would be to ignore economic realities.

Because the entire United States and all pork products constitute the relevant geographic and product markets for the Consumer IPPs' rule of reason claim, they have satisfied the commonality requirement here.

### C.    Typicality

To establish typicality under Rule 23(a)(3), the Court must determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff[s]." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995).

Variations between class members will not preclude finding typicality "if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th

Cir. 1996). And antitrust price fixing cases generally "will involve claims sufficiently similar to satisfy Rule 23(a)(3)." *In re Workers' Comp.*, 130 F.R.D. 99, 106 (D. Minn. 1990); *see also In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa 2001) (explaining that where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical") (citation omitted).

The parties do not dispute that the Consumer IPPs and the Commercial IIPPs satisfy the typicality requirement. The named representatives in both classes purchased pork during the class period, represent others in the same position, and the Defendants' alleged conspiracy impacted the prices those representatives paid. Though there may be some factual variation among class members, those differences will not preclude class certification because their claims arise under the same legal or remedial theory. *See Khoday v. Symantec*, No. 11-180, 2014 WL 1281600, at *16 (D. Minn. Mar. 13, 2014). The Consumer IPPs and Commercial IIPPs indisputably satisfy the typicality requirement.

Likewise, the DPPs satisfy the typicality requirement. Though there may be some disparities in the circumstances surrounding the proposed class representatives' purchases, such as different purchasing mechanisms, negotiating abilities, and geographic reach, those purported disparities do not defeat class certification. *See In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *5 (finding typicality satisfied despite differences in the plaintiffs' bargaining power because "the Defendants fixed a market

-37-

price that was the starting point for negotiations across the market, regardless of a purchaser's bargaining power").  The District of Minnesota has noted that typicality "is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory."  *In re Zurn Pex,* 267 F.R.D. 549,559, *aff'd*, 644 F.3d at 604.  It is inconsequential that there may be some disparities in the DPPs' circumstances, as they all allege injury under the same legal claim.  Thus, the DPPs fulfill the typicality requirement.

### D.      Adequacy of Representation

Finally, the Court must decide whether the proposed representatives and counsel will "fairly and adequately protect the interests of the Class."  Fed. R. Civ. P. 23(a)(4).  To demonstrate adequacy of representation, a plaintiff must show that "(1) the representative and its attorneys are able and willing to prosecute the action competently and vigorously; and (2) the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge."  *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D. Minn. 2012).

Defendants do not dispute that the Consumer IPPs' proposed class representatives are adequate.  They do, however, challenge the adequacy of the DPPs' and the Commercial IIPPs' representatives.

The DPPs identify a handful of direct purchasers to serve as representatives who have vigorously participated in discovery and whose interests align with the entire class

because "if the common claims of an antitrust conspiracy are not proven, none of the class members, including the named Plaintiffs, will recover." *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229, 233 (D. Minn. 2001). Defendants challenge the adequacy of two of the DPPs' proposed representatives: Olean Wholesale Grocery Cooperative, Inc ("Olean") and John Gross and Company, Inc. ("John Gross").

Defendants first argue that Olean is an inadequate class representative because it failed to meet some discovery obligations and its corporate representative was not particularly knowledgeable about the company's pork purchases and purported injury. However, this is a mischaracterization of the discovery record and, given the complexity of antitrust actions, courts have recognized that the depth of the named representative's knowledge is irrelevant because class representatives need not have, and often will not have, personal knowledge of the facts needed to make out a prima facie case. *In re Monosodium*, 205 F.R.D. at 233. (*See also* Reply Decl. Bobby Pouya, Ex. 1, Nov. 18, 2022, Docket No. 1616-1 (summarizing the Olean discovery dispute).) Defendants' arguments here are not persuasive and the Court finds that Olean is an adequate representative.

However, the Court agrees that John Gross is an inadequate class representative because it has intra-class conflicts. John Gross adds a percentage margin to its purchase price when determining the price for which it will resell pork products, meaning that John Gross earns a higher profit when the price of pork increases. (Decl. Allison M. Vissichelli, Ex. 7, at 28:6–25, Aug. 24, 2022, Docket No. 1446-7.) Accordingly, John Gross is an

inadequate representative because it benefits from the same conduct that harms other class members. *See e.g., Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003). But this is not dispositive to the DPPs' class certification motion because "[t]he adequacy of representation requirement is satisfied as long as **one** of the class representatives is an adequate class representative." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) (emphasis added) (citation omitted). Since the DPPs have other acceptable class representatives, the Court can proceed with its consideration of the DPPs' class certification motion.

Defendants also challenge the adequacy of the Commercial IIPPs' class representatives. The Commercial IIPPs assert violation of state antitrust, consumer protection, and unjust enrichment laws in twenty-eight states. However, the named plaintiffs reside in only eleven of those states. Defendants argue that they are inadequate representatives because Commercial IIPPs lack standing to bring claims in the remaining states. Defendants urge the Court to follow *In re: Domestic Drywall Antitrust Litigation.* No. 13-2437, 2016 WL 4409333, at *1 (E.D. Pa. Aug. 18, 2016) (requiring the proposed class to add new class representatives because they only resided in eight of the twenty-nine states under which they asserted antitrust claims and "[i]t is well settled that Indirect Purchasers lack standing to sue under the laws of states in which they do not reside or did not purchase [the price-fixed product]").

Though the Eighth Circuit has not yet decided if named plaintiffs must reside in all

states in which the class is seeking judgment, other circuits allow the practice when state claims are sufficiently similar. *E.g.*, *Langan v. Johnson & Johnson Consumer Co.*, 897 F.3d 88, 93 (2d Cir. 2018); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018); *Morrison v. YTB Int'l*, 649 F.3d 533, 536 (7th Cir. 2011). In essence, the Defendants' position conflates the requirements of Article III with those of Rule 23. *See Langan*, 897 F.3d at 93 ("[A]s long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3) . . . not a question of 'adjudicatory competence' under Article III.").

Here, there is no issue of standing because the named plaintiffs have each alleged that they suffered an injury in fact sufficient to confer standing and "[r]equiring that the claims of the class representative be in all respects identical to those in each class member in order to establish standing would 'confuse[] the requirements of Article III and Rule 23.'" *In re Asacol*, 907 F.3d at 49. What matters at this stage is that the claims of the named plaintiffs "parallel those of the putative class members" so that "success on the claim[s] under one state's law will more or less dictate success under another state's law." *Id*. Though there are some slight variations between state antitrust, consumer protection, and unjust enrichment laws, the Court finds that those laws sufficiently parallel each other. Therefore, the Court finds the class representatives adequate even though they do not reside in all states in which the Commercial IIPPs seek class certification.

Having found the Class Plaintiffs' representatives adequate, the Court concludes that they meet Rule 23(a)'s preliminary class certification requirements. The Court may now consider if the classes qualify under one of the Rule 23(b) categories.

### III.      23(B)(3) ANALYSIS

If a class meets the Rule 23(a) requirements, it must also qualify as one of three Rule 23(b) class action types to be certified. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule 23(b)(1) covers cases in which separate actions by class members would "risk establishing incompatible standards of conduct for the party opposing the class." *Id.* (internal quotation omitted). Rule 23(b)(2) specifically allows declaratory or injunctive relief when the party opposing the class "has acted or refused to act on grounds generally applicable to the class." *Id.* (internal quotation omitted). And Rule 23(b)(3) actions secure judgments that bind all class members—unless those class members affirmatively elect to be excluded from the class. *Id.* at 614–15. All Class Plaintiffs claim that they satisfy the requirements of Rule 23(b)(3), and Commercial IIPPs also seek an injunctive relief class pursuant to Rule 23(b)(2). The Court will first analyze the requirements of Rule 23(b)(3) and separately address Defendants' assertion that the indirect purchaser classes cannot satisfy Rule 23(b)(3) due to material variations in state laws. The Court will then consider if the Commercial IIPPs satisfy Rule 23(b)(2).

Rule 23(b)(3) requires "that the questions of law or fact common to class members **predominate** over any questions affecting only individual members, and that a class

action is **superior** to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Thus, there are two main requirements: (1) predominance and (2) superiority. In analyzing these two requirements, courts must consider:

> (A) The class members' interests in individually controlling the prosecution or defense of separate action;
>
> (B) The extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) The likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The predominance requirement is the meat of the parties' class certification dispute.

### A. Predominance

"The predominance requirement is 'demanding'; a court considering certification pursuant to Rule 23(b)(3) must take a 'close look at whether common questions predominate over individual ones.'" *Hudock v. LG Electronics U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021) (quoting *Comcast Corp*, 569 U.S. at 34). However, "there are no bright lines for determining whether common questions predominate." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995) (citation omitted). A claim will meet the predominance requirement "where there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the

need to examine each class member's individual position." *Id.*

Analysis of this question may overlap with the merits of the case, but a court should not resolve the merits at this stage. *In re Zurn Pex*, 644 F.3d at 617. Rather, "Rule 23(b)(3) requires a showing that **questions** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc.*, 568 U.S. at 459 (emphasis in original). While rigorous, the inquiry at this stage is limited to determining whether common evidence **could** suffice to make out a prima facie showing of liability on the plaintiffs' theory. *In re Zurn*, 644 F.3d at 618.

The Eighth Circuit has advised that "[t]he closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005). Factual and merits disputes "may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's allegations were true, to make out a prima facie case for the class." *Id.* Plaintiffs may use any admissible evidence at this stage in the litigation. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–55 (2016).

Predominance is "readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc.*, 521 U.S. at 625; *see also In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 271 ("Plaintiffs have alleged a nationwide horizontal price fixing

conspiracy . . . [p]roof of such an antitrust violation involves primarily common issues of law and fact."). But predominance is also often the determining factor in declining to certify a class in an antitrust action. *E.g., Blades,* 400 F.3d at 572 (refusing to certify a class because the plaintiffs could not prove classwide injury with common evidence, as required for predominance).

To be successful in this litigation, Class Plaintiffs must prove (1) that Defendants conspired to violate federal antitrust laws, (2) that class members suffered injury because of the violation ("impact"), and (3) plaintiffs can measure the damages. *Blades*, 400 F.3d at 566. Common evidence must be used to satisfy all three of these elements to meet Rule 23(b)(3)'s predominance requirement. Accordingly, the Court will consider predominance as to each element individually.

### 1.    Antitrust Conspiracy

First, the Court must consider whether common evidence can be used to prove the existence of the alleged antitrust conspiracy. Defendants do not dispute that common evidence can be used here. The Eighth Circuit and Minnesota courts have acknowledged that evidence of a conspiracy relates solely to the defendant's conduct, so proof would not vary among class members. *Blades*, 400 F.3d at 572 ("Evidence that appellees entered into a conspiracy that would affect all class members would perforce be evidence common to all class members for proving the conspiracy."); *In re Potash Antitrust Litig.*, 159 F.R.D. at 694. Accordingly, this element is satisfied as to all Class Plaintiffs.

### 2.    Impact

-45-

Next, the Court must consider whether common evidence can show classwide impact of the Defendants' conspiracy. "Impact" generally refers to the injury caused by an antitrust violation. *See Blades*, 400 F.3d at 569. The Supreme Court has noted that an increase in price resulting from "a dampening of competitive market forces is assuredly one type" of common injury. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482 (1982). The Eighth Circuit has repeatedly held that plaintiffs can prove injury in a price-fixing case by showing that the plaintiff, as a result of the conspiracy, "had to pay supracompetitive prices." *Blades*, 400 F.3d at 569. And to establish such impact, plaintiffs typically provide experts who "construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat*, 207 F.3d at 1055 (citation omitted). Regression analysis is one way to accomplish this. *See Olean Wholesale Grocery Coop., Inc.,* 31 F.4th at 663, 676; *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *12.

While direct purchasers must show common evidence of classwide impact, indirect purchasers must take their analysis one step further. Consumer IPPs and Commercial IIPPs "must first demonstrate a common impact—in the form of an overcharge—incurred by all or nearly all" direct purchasers. *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-2567, 2021 WL 5632089, at *6–7 (W.D. Mo. Nov. 9, 2021). They "must then demonstrate that this impact—those overcharges—were passed on by the [direct purchasers] to all or nearly all of the end customers." *Id; see also In re Fla. Cement &*

*Concrete Antitrust Litig.*, 278 F.R.D. 674, 682 (S.D. Fla. 2012) (noting that indirect purchasers "have a double burden . . . [of] first prov[ing] common impact on direct purchasers who bought . . . from Defendants, and then show[ing] that impact was passed through to the indirect purchaser class").

The Court will first analyze each class individually and then address the Defendants' universal arguments.

**a.      Direct Purchaser Plaintiffs**

DPPs use Dr. Mangum's report to demonstrate common evidence of impact. Dr. Mangum conducted a rigorous regression analysis and concluded that "the structure and characteristics of the pork industry made it conducive to the formation and maintenance of the alleged price-fixing conspiracy." (Mangum Rep. ¶ 181.) Dr. Mangum came to this conclusion after considering the highly concentrated market, Defendants' influence over the market, the commodity-like nature of pork products, barriers to entry, and the opportunities to form and enforce a conspiracy. (*Id.* ¶¶ 96, 109, 121, 145, 146.)

Dr. Mangum explicitly found that a conspiracy would have impacted prices paid by all or nearly all DPPs. (*Id.* ¶¶ 181–184.) He noted how pork prices are determined by supply and demand conditions absent "central planning or an extreme degree of regulation." (*Id.* ¶ 185.) Changes in supply and demand—such as the alleged conspiracy to restrict pork production and drive up prices—would cause changes in the cutout values, which then "largely determine the prices paid by DPPs for pork in the United States." (*Id.* ¶ 189.)

Correlation analysis conducted by Dr. Mangum further bolsters that all DPPs would be impacted by the price increase. He determined that Defendants' prices were highly correlated with each other, which is evidence that all DPPs were impacted "because DPPs would not have been able to avoid the impact of the alleged conspiracy by switching from one Defendant to another." (*Id.* ¶ 205.) Dr. Mangum conducted a similar correlation analysis across customers and likewise found that individual customers "could not have avoided impact from the alleged conspiracy." (*Id.* ¶ 207.) Lastly, Dr. Mangum applied his model to class members and determined that over 99% of DPPs paid elevated prices at least once during the Class Period. (Mangum Rep. ¶ 256.) He concluded that "**each** DPP would have been impacted" by the alleged conspiracy. (*Id.* (emphasis added).)

This type of market-wide economic analysis has been accepted by many courts to show predominance as to antitrust impact. *See e.g., Olean*, 31 F.4th at 676; *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *31 (collecting cases). Moreover, though each DPP must show injury to ultimately recover, courts "have not insisted on this level of proof at the class certification stage." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016). Dr. Mangum's report satisfies the impact predominance requirement.

### b.   Consumer Indirect Purchaser Plaintiffs

Similarly, Dr. Singer's testimony demonstrates that the Consumer IPPs are capable of proving classwide impact using common evidence. First, like Dr. Mangum, Dr. Singer considered the market structure of the pork industry. The laws of supply and demand are

key in this consideration, and Dr. Singer took into account Defendants' market power, high barriers to entry, risk of entering the market, and knowledge barriers, among other factors. (Singer Decl. ¶¶ 66–86.) The market concentration, lack of adequate pork substitutions, and standardization of pork all make it easier for competing firms to collude. (*Id.* ¶¶ 233–236.) This qualitative evidence is permissible evidence of impact in antitrust cases. *See In re Capacitators Antitrust Litig.*, 2018 WL 5980139, at *8 (certifying a class after noting that plaintiff's expert "provided considerable material about how the structure of the market for capacitators was conducive to price fixing").

Dr. Singer presents a multiple regression analysis that tends to show that the alleged conspiracy inflated prices over competitive levels. (Singer Decl. ¶¶ 123–28, 144–165.) He controlled for many factors that could lawfully increase pork prices, determined that Defendants overcharged direct purchasers for pork, that Defendants overcharged direct purchasers by approximately 12.8 to 15.3 percent, and that those overcharges were then passed on to indirect purchasers. (*Id.* ¶¶ 141, 161, 168.) This analysis satisfies the burden that indirect purchasers have to show both common impact and pass-through. Dr. Singer corroborated his findings using data submitted by thirty-nine industry participants, who represent a variety of resellers in the pork supply chain. (Singer Decl. ¶ 181.) This analysis affirmatively demonstrates that Consumer IPPs can show common evidence of classwide impact.

### c.    Commercial and Institutional Indirect Purchaser Plaintiffs

Lastly, Dr. Williams's analysis shows that the Commercial IIPPs are capable of

showing classwide impact via common evidence.  First, the Commercial IIPPs present common evidence of general price inflation.  Dr. Williams controlled for factors unrelated to collusion to isolate the price effects of the alleged conspiracy, called a "dummy" model. (Williams Rep. ¶ 206.)  He determined that the Defendants' alleged conspiracy increased pork prices paid by direct purchasers.  (*Id.* ¶ 226.)  He then used a pass-through regression methodology and found that average pass-through rates to be between 95.5% and 100.2%, depending on the type of distributor.  (*Id.* ¶ 227.)

Like the other Class Plaintiffs, Commercial IIPPs point to market factors that support pass-through.  For example, class members purchase pork products in the same packaging as Defendants originally sold the products.  Further, Commercial IIPPs bought from distributors, which means the chain of distribution is relatively simple.  *E.g.*, *In re Korean Ramen Antitrust Litig.*, No. 13-4115, 2017 WL 235052, at *19 (N.D. Cal. Jan. 19, 2017) (suggesting that common impact is more easily established when the chain of distribution is simple and products are not bundled).  Dr. Williams also noted that pork distribution is a very competitive industry.  (Williams Rep. ¶¶ 265–68.)  This means that there are small profit margins and it is more likely that overcharges would be passed through because distributors cannot absorb those losses.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 601–02 (N.D. Cal. 2010) ("When an industry is perfectly competitive . . . the pass-through rate is 100%.").

Dr. Williams then tested his findings by applying his overcharge regression model

to three distributors.  (Williams Rep. ¶ 269.)  He used the model to predict but-for prices and compare those prices to the actual prices during the damages period.  (*Id.* ¶ 270.)  His analysis supports his conclusion that "all or virtually all CIIPP Class Members were injured by Defendants' alleged conspiracy."  (*Id.* ¶ 274.)   Dr. Williams's analysis demonstrates that the Commercial IIPPs satisfy the impact predominance requirement.

Defendants challenge the Commercial IIPPs' analysis.  Many of their assertions are repetitive of the arguments they put forth against the other Class Plaintiffs' certification and in their *Daubert* motions.  The Court need not reiterate that analysis here.  However, Defendants uniquely argue that Dr. Williams did not determine if the overcharge was actually passed through to class members.  Defendants point to a portion of Dr. Williams' testimony where he states that "if the price paid by distributors were increased . . . as a result of Defendants' alleged conspiracy **or other factors**, the price they charge their customers [would also increase]."  (Williams Rep. ¶ 228 (emphasis added).)  Defendants assert this shows that Dr. Williams did not actually identify if the overcharge was caused by the conspiracy or if it had other causes.  However, fully reading the cited portion of Dr. Williams's report reveals he is merely explaining pass-through regressions generally—not detailing his specific methodology.  Dr. Williams was able to isolate the impact of the alleged conspiracy.

Dr. Williams's report affirmatively demonstrates that Commercial IIPPs are capable of showing classwide impact with common evidence.

### d.   Defendants' Universal Arguments

In their Omnibus Memorandum, Defendants assert several arguments against Class Plaintiffs generally and their supposed inability to prove classwide impact with common evidence.   Their arguments fall into four categories: model flaws, averaging methodology, uninjured class members, and market conditions.

***Model Flaws***

First, Defendants assert that Class Plaintiffs cannot show predominance as to impact because the models test the wrong time period and use incorrect benchmark periods.  Both arguments are incorrect.

Defendants assert the same argument that failed in their *Daubert* motions: Class Plaintiffs' models are incapable of establishing impact because they focus on the wrong time period—the entire alleged conspiracy period (2009–2018), rather than only the time period for which Class Plaintiffs may pursue damages (2014–2018).  Again, this is without merit.  Artificially curtailing analyses to only the statutory damages period has no basis in economic theory and does not align with the Class Plaintiffs' theory in this case.  *Cf. Persian Gulf Inc.*, 2022 WL 4830698, at *38 (explaining that the expert's analysis should not be limited only to the damages period because "the statute of limitations may impact available damages, but it does not excuse an expert from following econometric principles, and it cannot erase the voluminous evidence Plaintiffs have placed before the Court to establish a conspiracy" that began prior to the damages period).  And other courts considering similar meat packing price-fixing allegations found analyses starting at

the beginning of the conspiracy—rather than at the beginning of the class period—acceptable at the class certification stage. *See In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. at 335; *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *11, *20. Sound economic principles dictate that the experts analyze the entire alleged conspiracy period.

Defendants also wrongly assert the experts' models cannot show predominance as to impact because they use an erroneous benchmark period. They argue the models are unreliable because they include 2008 in the benchmark period, which was an outlier year. This argument failed in their *Daubert* motions and it fails again here. Even if 2008 was a historic year, the experts accounted for market factors that made 2008 such an outlier, such as increase corn costs, pig mortality reduction due to the circovirus vaccine, the Great Recession, and swine flu. (Reply Decl. Singer ¶ 63, T7; Williams Reply Rep. ¶ 118; Mangum Reply Expert Report ¶ 139.) It is true that "[s]tating that a benchmark controls for **all** factors does not make it so." *In re Wholesale Grocery Prods*, 946 F.3d 995, 1003 (8th Cir. 2019) (emphasis in original). But that is not the case here. The experts all identified and controlled for many relevant factors that made 2008 an outlier year, so their models are not inherently flawed based on their benchmark periods and are capable of proving classwide impact.

### *Averaging Methodology*

Second, Defendants argue that Class Plaintiffs cannot show classwide impact

because their models use an averaging approach that masks individualized differences between class members.  This same argument has been rejected in similar meat packing antitrust cases.  In its review of *In re Packaged Seafood Products Antitrust Litigation*, the Ninth Circuit held that any alleged "averaging assumptions" were permissible because regression models "have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 677.  The Ninth Circuit explained that "[i]t is not implausible to conclude that a conspiracy could have a class-wide impact, even where the market involves diversity in products, marketing, and prices, especially where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations." *Id.* at 677–678.  The Northern District of Illinois similarly concluded that the experts' opinions were not improper averages because individual negotiations and contracts took place within the greater context of the market that was allegedly manipulated through collusive supply reduction.  *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *15.

The same logic applies here.  There is extensive evidence that market prices generally set the individual Defendants' prices.[15]  Individual differences between

---

[15] For instance, Class Plaintiffs point to an internal Hormel email from 2015 that states: "Markets have quickly risen which will force us to move our retails up.  We need to move from $2.55 to $2.75/unit cost . . . we expect the rest of the category to follow."  (Decl. Shana E. Scarlett,

negotiations and transactions do not disrupt the fact that the Defendants' conspiracy, if true, would cause all prices to increase. "[I]ndividualized inquiries into the class members' injuries" are not required. *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 681.

***Uninjured Class Members***

Third, Defendants assert that the Class Plaintiffs cannot show predominance as to impact due to the high number of uninjured class members. Many circuits have instructed district courts to "ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 (9th Cir. 2016) (internal quotation omitted). *See also Blades*, 400 F.3d at 571 (refusing to certify classes where "not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy").

A class cannot be certified if more than a *de minimis* portion of the class is uninjured. The Eighth Circuit has not yet determined what constitutes *de minimis*, but other courts have held between approximately five and ten percent would justify refusing to certify the class. *See e.g., In re Asacol Antitrust Litig.*, 907 F.3d at 58 (reversing certification after finding 10% of class members uninjured was not *de minimis*); *Vista*

---

Ex. 274, at 4, Nov. 18, 2022, Docket No. 1630-26.) The record also indicates that Defendants generally set their prices based on USDA base market price with adjustments. (*E.g.,* Decl. Shana E. Scarlett, Ex. 273, 36:19–25, 1630-25.)

*Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-1833, 2015 WL 3623005, at *20 (E.D. Pa. June 10, 2015) (finding 5% to be more than *de minimis*).

Here, all three class experts determined that nearly 100% of direct purchasers were impacted. (Mangum Rep. ¶ 256; Williams Rep. ¶ 262; Singer Decl. ¶ 170.) Though Dr. Haider believes that their methodology may yield a large number of false positives, Dr. Haider's own analysis shows that at least 96.2% of direct purchasers yielded positive and statistically significant overcharges. (Reply Decl. Singer ¶ 98.) The experts also dispute whether Dr. Haider even correctly construed their methodology. (*E.g.*, Williams Reply Rep. ¶¶ 153–159; Mangum Reply Rep. ¶ 127.)

Though the Eighth Circuit has not yet determined what constitutes *de minimis*, this certainly is not it. Rule 23(b)(3) only requires courts to determine whether common questions predominate over individual ones. Fed. R. Civ. P. 23(b)(3); *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 668–69. Common questions predominate, so the alleged small number of uninjured class members is insufficient to defeat class certification.

### *Market Conditions*

Fourth, Defendants argue that the experts ignore economic reality and failed to isolate the effects of the alleged conspiracy. For instance, Defendants assert that there is lawful conduct that could impact pork prices such as decisions made by non-Defendant hog suppliers, other factors impacting hog producer returns, and export levels.

These critiques may be appropriate, but it would be improper to arbitrate these

factual issues at the class certification stage.  "[T]he question for the Court at this stage is not whether defendants actually engaged in a price-fixing conspiracy but whether, once a conspiracy is established, plaintiffs will also be able to prove impact through predominantly common proof."  *In re Blood Reagents*, 2015 WL 6123211, at *31 (finding predominance despite the possibility of lawful and unlawful factors affecting the market). *See also In re Packaged Seafood Prods. Litig.*, 332 F.R.D. at 335 ("The possible presence of large amounts of non-Defendant Tuna sold . . . do[es] not persuade the Court that the methodology put forward . . . will create individualized issues that will overwhelm the common ones.").  Failure to account for each and every possible factor that could impact the market does not render the experts' methodology unreliable or suggest it is unable to show predominance as to impact.

Because the Class Plaintiffs present considerable expert testimony that demonstrates they are capable of showing impact with common evidence, the Court will find predominance as to impact.

### 3.    Damages

As the final predominance component, the Court must consider if the Class Plaintiffs can use common evidence to show damages.  Plaintiffs must show that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Comcast*, 569 U.S. at 35.  "Calculations need not be exact, but at the class-certification stage . . . any model supporting a plaintiff's damages case must be consistent with its liability case."  *Id.* (cleaned up).  Here, the Plaintiffs' theory of liability is that

-57-

Defendants artificially raised Pork prices by means including but not limited to restricting supply. (*E.g.,* Mangum Rep. ¶¶ 7, 13.)   Therefore, a successful damages model must align with that price-raising theory.

"[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995).   And at the class certification stage, the Plaintiffs need only demonstrate that they have a valid method for calculating damages.

On behalf of the Consumer IPPs, Dr. Singer creates a "but-for world" damages model that determines what economic outcome would have occurred in the real world absent the alleged conspiracy.   (Singer Decl. ¶ 195.)   The difference between the actual prices and the but-for prices is the measurement of damages.   (*Id.*)   Though Defendants argue that the need for individual proof of damages bars class certification for the Consumer IPPs, this argument is not persuasive because Defendants have not shown that individual damages inquiries would predominate over common issues.   *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375 (8th Cir. 2018) ("A class may be certified based on common issues 'even if other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'") (quoting *Bouaphakeo*, 577 U.S. at 453).

On behalf of the Commercial IIPPs, Dr. Williams calculated classwide damages

based on the percentage overcharged to direct purchasers, pass-through rates, and the share of Defendants' sales of class products to direct purchasers ultimately purchased by class members.  (Williams Rep. ¶ 281.)  Using this data, he determined the total sales to class members of pork products between 2014 and 2018.  (*Id.* T.11, at 137.)

On behalf of the DPPs, Dr. Mangum conducted a multiple regression analysis, which is a well-accepted method of calculating damages in antitrust cases.  (Mangum Rep ¶¶ 212–213.)  *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 681–82; *see also In re Processed Egg Prods.*, 312 F.R.D. at 193.  He used this multiple regression analysis to determine the amount of overcharge DPPs paid.  (Mangum Rep ¶¶ 213.)  Dr. Mangum also showed that damages can be found by multiplying the relevant overcharge to the total sales amount.  (Mangum Rep. ¶¶ 257–258.)

Defendants generally assert that the Plaintiffs cannot meet their burden of showing predominance because their damages models are inconsistent with their theory of liability.  Plaintiffs focus on two types of alleged supply restraints: (1) hog production, and (2) increased exports.  Defendants rely on *Comcast* to argue that the Plaintiffs' experts erred in not attributing certain portions of the overcharge to each theory of liability.  *See* 569 U.S. at 35 ("[A]ny model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.").

But, as previously discussed, *Comcast* is not dispositive here.  The Plaintiffs are still

asserting the same theory of liability as they did at the beginning of the case: Defendants conspired to raise prices of pork products. Though Defendants argue that the Plaintiffs needed to attribute the impact and damages specifically to either hog production or increased exports, that is untrue. Those are merely levers by which the Plaintiffs believe Defendants executed the alleged conspiracy. And unlike in *Comcast*, the experts' damages methodologies align with the theory of Plaintiffs' case. Therefore, there is no *Comcast* issue. Class Plaintiffs have successfully shown that damages can be established with classwide evidence. Rule 23(b)(3)'s predominance requirement is satisfied.

### B. Superiority

As the next piece of the Rule 23(b)(3) puzzle, the Court must consider if a class action is the superior method of adjudicating this controversy. "There is no bedrock standard upon which a Court determines that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 265 (D. Minn. 2001) (internal quotation marks omitted). Rather, courts generally look to the following non-exhaustive list of relevant factors: (1) the interest of class members in individually controlling their claims, (2) the extent to which litigation has already begun, (3) the desirability of concentrating the litigation in a particular forum, and (4) the likely difficulties of managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). Class actions are also superior if the alleged damages are small, and absent a class action most plaintiffs would not realistically have a day in court. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

Defendants do not dispute that a class action is the superior method for the DPPs, Commercial IIPPs, and Consumer IPPs to bring their claims. Given that there are hundreds of millions of potential class members in this action, the difficulty for those class members to successfully bring individual claims, that the Court has controlled this litigation for five years, and managing a class action—though difficult—is certainly more efficient than juggling a multitude of individual actions, the superiority requirement is readily satisfied.

### C.    State Law Claims

Separately, Defendants contend that the Commercial IIPPs failed to show predominance and superiority because they bring state law claims under the theories of antitrust, unjust enrichment, and consumer protection. Defendants believe that material variations in state law prohibit class certification under Rule 23(b)(3). Though Defendants only challenge the Commercial IIPPs on these grounds, the Court will also consider this issue as it pertains to the Consumer IPPs.

The Eighth Circuit has acknowledged that "[v]ariations in state law **may** swamp any common issues and defeat class certification under Rule 23(b)(3)." *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019) (internal quotation omitted) (emphasis added). *See also Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 985–86 (8th Cir. 2021) (affirming denial of class certification of a case involving material misrepresentations under six states' laws because they would require individual investigations and would create challenges for trial management); *Webb v. Exxon Mobil Corporation*, 856 F.3d 1150, 1157 (8th Cir. 2017) (affirming denial of class certification because the class would join claims

arising under four states' contract, property, and tort law due to potential conflicts between state laws).

Here, the variations in states' antitrust, consumer protection, and unjust enrichment laws Defendants identified are not **material**.  It is a close call, but the slight differences between state laws do not "swamp any common issues."  *Hale*, 942 F.3d at 403.  For instance, any differences in antitrust duplicative liability provisions are not material because most states have such provision, and the states' antitrust laws are harmonious with the Sherman act.  (*See* Commercial IIPPs' Reply Supp. Mot. Class Cert., App. A, Nov. 18, 2022, Docket No. 1632-1 (identifying the duplicative liability provisions); Commercial IIPPs' Mem. Supp. Mot. Class Cert., App. A, Aug. 18, 2022, Docket No. 1428-2 (harmonizing state antitrust laws with federal law).)

It is true that state consumer protection laws ordinarily differ greatly.  *See In re St. Jude Med., Inc.*, 425 F.3d at 1120 (identifying those differences as "material variances").  But those differences are irrelevant within the antitrust context because states provide a remedy under consumer protection laws for antitrust violations.  *See In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *10 ("[T]he differences in consumer protection laws concerning reliance and intent are simply not relevant to a price-fixing claim.").

Similarly, state unjust enrichment laws typically vary greatly because they have different approaches and elements, making them often ill-suited for class actions.  *In re Processed Egg Prods.*, 312 F.R.D. 124, 164 (E.D. Pa. 2015) (collecting cases).  Accordingly,

numerous courts have found that the variation in state unjust enrichment laws "prevents common issues of law from predominating over a proposed class." *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-2709, 2019 WL 1418292, at *17 (W.D. Mo. Mar. 21, 2019). To overcome state law variances and show predominance, Plaintiffs may undertake an "extensive analysis" of the variances. *Id.* (internal quotation omitted).

Here again, the differences that typically defeat class certification in other cases are not material in this matter because unjust enrichment claims are nearly identical in the antitrust context. *See In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (certifying a class for unjust enrichment claims in the antitrust context because "[t]he standards for evaluating each of the various states classes' unjust enrichment claims are virtually identical").[16] Class Plaintiffs also conducted the necessary extensive analysis of the state law variations. (*See e.g.*, Commercial IIPPs' Mem. Supp. Mot. Class Cert., Apps. A, B, C, Aug. 18, 2022, Docket Nos. 1468-2, 1468-3, 1468-4; Consumer IPPs' Mem. Supp. Mot. Certify Class at 63–72.)

The discrepancies in state law are not material. Moreover, many of the variations Defendants identified relate only to damages—not liability. The Court is confident that

---

[16] *See also In re: McCormick & Company, Inc.*, 217 F. Supp. 3d 124, 145 (D.D.C. 2018) (noting that in some cases, "special situations have allowed plaintiffs to demonstrate injustice without addressing individual circumstances"); *In re Broiler Antitrust Litig.*, 2022 WL 1720468, at *20 (finding variations in unjust enrichment laws to not be material because "any state where the unjust enrichment claim is the primary basis for recovery will be satisfied by proof of a Sherman Act violation").

such differences will not confuse a jury.  Further, the Court may subdivide the classes in the future if necessary.  *See In re Dollar Gen. Corp.*, 2019 WL 1418292, at *17 ("Variances of state law may also be overcome through the use of subclasses to allow common issues of fact or law to predominate over individual issues of state law.").

All three classes have satisfied the rigorous requirements of Rule 23(b)(3).  The Court will therefore certify all three damages classes proposed by the Class Plaintiffs.

## IV.     23(B)(2) ANALYSIS

In addition to their Rule 23(b)(3) damages class, Commercial IIPPs ask the Court to certify an injunctive relief class pursuant to Rule 23(b)(2).  Rule 23(b)(2) provides:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole

Fed. R. Civ. P. 23(b)(2).  This is a substantially lower bar to surpass than Rule 23(b)(3).  If the Rule 23(a) requirements are met and the plaintiffs seek injunctive or declaratory relief, certification under Rule 23(b)(2) is generally appropriate.  *See DeBoer*, 64 F.3d at 1175 (citing 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1775 (1986)).  Although Rule 23(b)(2) does not include the predominance inquiry required by Rule 23(b)(3), 23(b)(2) class claims must still be cohesive because unnamed class members are bound to the outcome without the opportunity to opt out.  *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010); *In re St. Jude Med., Inc.*, 425 F.3d

at 1121.  Certification under 23(b)(2) is not appropriate if the monetary relief sought by the class is not incidental to the requested injunctive or declaratory relief.  *Dukes*, 564 U.S. at 360.

Because the Commercial IIPPs have satisfied Rule 23(a), and the Court finds the class claims cohesive, the Court will certify the Commercial IIPPs' injunctive relief class.

## V.   ASCERTAINABILITY

Defendants challenge the Commercial IIPPs and Consumer IPPs' ascertainability. Though not an explicit requirement under Rule 23, most courts acknowledge that ascertainability is inherently required for class certification.  The Eighth Circuit has explained that "[i]t is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *Ihrke v. N. States Power Co.*, 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972).  The Eighth Circuit does not view ascertainability as a separate, preliminary requirement, but rather requires district courts to conduct "a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'"  *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); *see also Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012).

Defendants argue that the Commercial IIPPs have not met their burden to show the class is ascertainable.  *See Burum v. Mankato State Univ.*, No. 98-696, 2002 WL 27123, at *2 (D. Minn. Jan. 8, 2022) (noting the party seeking class certification bears the burden

of establishing each class certification prerequisite).  However, this is not obviously the Commercial IIPPs' burden because ascertainability is not an explicit requirement under Rule 23.  And even if it was, Commercial IIPPs have in fact established that class membership is capable of being ascertained via objective criteria—which is all that is required at the class certification stage.  *See Sandusky*, 821 F.3d at 996 ("[T]he court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria.").  There are objective criteria that can be used to ascertain class membership, such as the nature of the pork purchasers' businesses. Further, Dr. Williams has already analyzed extensive data from entities that are part of the Commercial IIPP class, which demonstrates Commercial IIPPs are readily identifiable. (*E.g.,* Williams Rep. ¶¶ 230.)  The Court finds that the Commercial IIPP class is ascertainable.

Defendants next contend the Consumer IPPs are unascertainable because very few individual pork consumers have records of what pork products they purchased, and, even if they did, it would be impossible to tell if the purchased pork was processed by a Defendant or a non-Defendant pork packer.  But Dr. Singer's testimony demonstrates this is untrue.  Most Consumer IPP class representatives purchased multiple pork products routinely.  (*See generally* Consumer IPP's Reply Supp. Mot. Certify Class, Ex. 268, Nov. 18, 2022, Docket No. 1627-9 (highlighting portions of representatives' testimony that illustrate repeated purchase of pork products from the same brands).)  Therefore,

individual consumers are capable of self-identifying using affidavits, which is a permissible means of ascertaining class membership.  *See In re Dollar General Corp.*, 2019 WL 1418292, at *16.  Therefore, the Defendants' argument that the Consumer IPPs cannot be certain that they purchased pork processed by a Defendant is unfounded.  *See also In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *20–21 (similarly concluding that end-users of meat products are an ascertainable class).  All three classes are sufficiently ascertainable for certification.

## VI.    CLASS COUNSEL

Lastly, if a court certifies a class, the court must also appoint class counsel.  Fed. R. Civ. P. 23(g)(1).  When considering whether to appoint class counsel, courts

> (A) must consider:
>
> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class; [and]
>
> (B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.

*Id.* Additionally, "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Only if class counsel is adequate under all of these considerations may a court appoint the applicant as class counsel. Fed. R. Civ. P. 23(g)(2).

Because the firms that currently serve as interim co-lead counsel have vigorously represented the classes thus far in the litigation and are all well-versed in antitrust law, the Court will appoint them as class counsel:

1. Hagens Berman Sobol Shapiro LLP and Gustafson Gluek PLLC for the Consumer IPPs;

2. Lockridge Grindal Nauen P.L.L.P. and Pearson & Warshaw, LLP for the DPPs;

3. Cuneo Gilbert & LaDuca and Larson King, LLP for the Commercial IIPPs.

## CONCLUSION

Three classes of pork purchasers asked the Court to certify their classes as part of this multidistrict price-fixing litigation. Each class submitted expert testimony in support of its motion. Because each expert report satisfies the less stringent *Daubert* standard employed at the class certification stage, the Court will deny the Defendants' motions to exclude the experts' testimony. After conducting the rigorous analysis required under Federal Rule of Civil Procedure 23, the Court finds that all three classes satisfy the requirements of Rule 23(b)(3). The Court will therefore certify their damages classes accordingly. The Court also finds that the Commercial IIPPs satisfy the requirements of Rule 23(b)(2) and will certify their injunctive relief class.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Direct Purchaser Plaintiffs' Motion to Certify Class [Docket No. 1318] is **GRANTED**;

2. Commercial and Institutional Indirect Purchaser Plaintiffs' Motion to Certify Class [Docket No. 1334] is **GRANTED**;

3. Consumer Indirect Purchaser Plaintiffs' Motion to Certify Class [Docket No. 1340] is **GRANTED**;

4. Defendants' Motion to Exclude Expert Testimony of Dr. Russell Mangum [Docket No. 1449] is **DENIED**;

5. Defendants' Motion to Exclude Expert Testimony of Dr. Michael Williams [Docket No. 1453] is **DENIED**; and

6. Defendants' Motion to Exclude Expert Testimony of Dr. Hal Singer [Docket No. 1466] is **DENIED**.

DATED:  March 29, 2023
at Minneapolis, Minnesota.

John H. Tunheim

JOHN R. TUNHEIM
United States District Judge

-69-