1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
2
       ------------------------------------------------------------
3                                        )
       In Re:  Pork Antitrust            )   File No. 21MD1776
4      Litigation                        )        (JRT/JFD)
                                         )
5                                        )
                                         )   Minneapolis, Minnesota
6                                        )   June 28, 2023
                                         )   10:12 A.M.
7                                        )
                                         )
8                                        )
       ------------------------------------------------------------
9
                  BEFORE THE HONORABLE JUDGE JOHN R. TUNHEIM
10
                    UNITED STATES DISTRICT COURT JUDGE
11

12
            (JOINT MOTION TO DISMISS DIRECT-ACTION PLAINTIFFS' CLAIM)
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1     APPEARANCES

2     For the Commonwealth      Hausfeld
      of Puerto Rico:           KYLE G. BATES, ESQ
3                               600 Montgomery Street
                                Suite 3200
4                               San Francisco, CA 94111

5     For Kroger DAPs:          Kenny Nachwalter
                                SAMUEL RANDALL, ESQ.
6                               1441 Breckell Avenue
                                Suite 1100
7                               Miami, FL 33131

8     For Topco DAPs:           Kaplan Fox & Kilsheimer LLP
                                ROBERT N. KAPLAN, ESQ.
9                               850 Third Avenue
                                New York, NY 10022
10
      For Aldi:                 Baker Botts LLP
11                              CHRISTOPHER WILSON, ESQ.
                                JULIE B. RUBENSTEIN, ESQ.
12                              700 k Street, NW
                                Washington, DC 20001
13
      For Deft Hormel Foods     Faegre Drinker Biddle & Reath
14    Corporation:              EMILY E. CHOW, ESQ.
                                90 South Seventh Street
15                              Suite 2200
                                Minneapolis, MN 55402
16
      For Deft JBS USA:         Spencer Fane LLP
17                              DONALD G. HEEMAN, ESQ.
                                100 South Fifth Street
18                              Suite 1900
                                Minneapolis, MN 55402
19
      For Defendant             Stinson LLP
20    Seaboard Foods, LLC:      WILLIAM THOMSON, ESQ.
                                50 South Sixth Street
21                              Suite 2600
                                Minneapolis, MN 55402
22
                                Jones Day
23                              PETER J. SCHWINGLER, ESQ.
                                90 South Seventh Street
24                              Suite 4950
                                Minneapolis, MN 55402
25
```

```
 1     For Deft Smithfield:     Gibson Dunn & Crutcher
                                BRIAN EDWARD ROBISON, ESQ.
 2                              2100 McKinney Avenue, Ste 1100
                                Dallas, Texas 75201
 3
                                Larkin Hoffman Daly & Lindgren
 4                              JOHN A. KVINGE, ESQ.
                                8300 Norman Center Drive
 5                              Suite 1000
                                Minneapolis, MN 55437
 6
       For Deft Triumph Foods,
 7     LLC:                     Husch Blackwell
                                CHRISTOPHER A. SMITH, ESQ.
 8                              190 Carondelet Plaza
                                Suite 600
 9                              St. Louis, MO 63105

10     For Defendant Tyson
       Foods:                   Axinn Veltrop & Harkrider LLP
11                              JAROD TAYLOR, ESQ.
                                950 F Street NW
12                              7th Floor
                                Washington, DC 20004
13
       For Cargill:             Greene Espel
14                              X. KEVIN ZHAO, ESQ.
                                222 South Ninth Street
15                              Suite 2200
                                Minneapolis MN 55402
16

17

18

19

20

21

22

23

24

25
```

```
 1                          10:12 A.M.

 2

 3                       (In open court.)

 4              THE COURT:  You may be seated.  Good morning,

 5      everyone.

 6              All right.  Good to see you all today.

 7              This is Multi District Litigation Number 21-2998,

 8      In re:  Pork Antitrust Litigation.

 9              We have the joint defense motion to dismiss the

10      Direct Action Plaintiffs' consolidated complaint.  So

11      let's -- the Court has read the briefs.  I think we've got,

12      well, let's have whoever is intending to speak note their

13      appearances for me this morning first.

14              Okay?

15              MR. ROBISON:  Good morning, Your Honor.  Brian

16      Robison here representing Smithfield Foods.

17              I will be arguing part of the motion to dismiss

18      for the defense group.

19              THE COURT:  All right.

20              MR. TAYLOR:  Jarod Taylor for the Tyson

21      defendants.

22              I will be arguing for all defendants on the other

23      parts of the motion to dismiss.

24              THE COURT:  All right.  Excellent.

25              MR. RANDALL:  Good morning, Your Honor.  Samuel
```

1    Randall on behalf of the Kroger DAPs, and I will be arguing

2    on behalf of all DAPs today.

3              MR. KAPLAN:  Robert Kaplan.  I am liaison counsel

4    for the DAPs.

5              But Mr. Randall is going to argue.

6              THE COURT:  All right.  Good morning to you, and

7    good morning to everybody else.

8              All right.  Let us proceed.  Are you going to

9    start first, Mr. Robison?

10             MR. ROBISON:  I am, Your Honor.  Your Honor, I

11   will be addressing the statute of limitations and the

12   fraudulent concealment issue.

13             Your Honor, the DAPs have alleged a widely

14   publicized conspiracy.  Like all the plaintiffs before

15   them, they rely on four categories of public facts that

16   they say state a conspiracy claim.

17             Number one, earnings calls.  The DAPs rely

18   heavily on calls with Wall Street analysts and others where

19   they say the participants in the conspiracy described in

20   detail how they were reducing supply, communicating with

21   each other about reducing supply and also sharing

22   confidential information.

23             Second category is Agri Stats.  The DAPs quote

24   extensively from Agri Stats public presentations and

25   marketing materials where the DAPs say that Agri Stats was

1    freely telling everybody in the audience how their

2    operations work, how their reports work and how their

3    reports could be used to raise price.

4            Number three, the DAPs, like all the plaintiffs

5    before them, rely heavily on newspaper articles and

6    magazine articles.  They relay what happened at trade

7    association meetings and how the defendants were supposedly

8    implementing the conspiracy by not running a second shift

9    or not running a plant at full capacity.

10           Fourth category relates to pricing data.

11   According to the DAPs' complaint, they say the conspiracy

12   worked, and the abnormal pricing increases were reflected

13   in public data circulated by multiple government agencies.

14           Now, we disagree with the idea there was a

15   conspiracy.  I think the Court understands that today we're

16   not here to fight about that.  We'll fight about whether

17   there was a conspiracy when we get to summary judgment, but

18   for today's purposes we have to take these public facts the

19   DAPs have alleged as true and assume they state a

20   conspiracy claim the way the DAPs claim.

21           Now, this is the same conspiracy the Court faced

22   a few years ago when it first considered fraudulent

23   concealment, and back then, the Court's common sense

24   decision was that it's really tough to reconcile all these

25   public facts I just ran through with the idea that this

1     conspiracy was somehow secret, was somehow concealed.

2             So after the Court rejected fraudulent

3     concealment a few years ago, the class plaintiffs abided by

4     that ruling.  For years the class's cases have moved

5     forward on the basis of a four-year damages period.  That

6     was true with class certification experts, class

7     certification briefing, class certification hearing, Your

8     Honor's class certification ruling.

9             And now just two weeks ago the classes served

10    expert reports for the merits phase that also had a

11    four-year damages period.

12            The DAPs are not satisfied with a four-year

13    damages period.  They are seeking to reach back in time to

14    '08 or '09 with a nine- or ten-year damages period at least

15    to make these enormous cases even larger.

16            THE COURT:  Doesn't the complaint allege a lot

17    more nonpublic, secret, concealed information than the

18    earlier class complaint?

19            MR. ROBISON:  Your Honor, I think what the new

20    complaint alleges is more examples of exactly what the

21    class complaint alleged, and I've got some slides I will

22    work through, but just kind of at a high level, the class

23    complaints all alleged secret meetings, surreptitious means

24    of communication.

25            THE COURT:  Without that much detail.

1        MR. ROBISON:  True.  They didn't have the dates

2    of the e-mails.  They didn't have the dates of the

3    meetings, that sort of thing, but under the law, a

4    communication between one conspirator and another

5    conspirator is not concealment.

6        In any conspiracy, we would expect conspirators

7    to be talking to each other.  So under the law, like the

8    *Milk* case, the *Wholesale Grocery* case, the other cases we

9    have cited, communications between conspirators does not

10   constitute fraudulent concealment.  Conspirators you would

11   think would always be talking to each other about their

12   conspiracy.

13       Another category that the class plaintiffs

14   alleged was pretextual statements.  The DAPs are relying on

15   the same pretextual statements.  They filed some other

16   examples, but under the law, pretextual statements are not

17   fraudulent concealment.

18       That's the *Milk* case.  That's the *Pocahontas* case

19   that *Milk* relies on.  *Wholesale Grocery* is another one.

20   These cases say you would never expect somebody in a

21   conspiracy to freely admit they were in a conspiracy, so we

22   are not going to consider pretextual statements as proof of

23   concealment.

24       So what they have added is, the who, what, where,

25   when to some allegations, but those allegations are not

1      fraudulent concealment.  So adding more detail to

2      allegations that are not fraudulent concealment doesn't get

3      them to concealment.

4            Now, I've got some slides I can hand out now that

5      would, I think would kind of illustrate some of the things

6      we are talking about.  We exchanged these slides last

7      night.  Both sides have them.

8            THE COURT:  All right.

9            MR. ROBISON:  Your Honor, the first slide repeats

10     one of the quotes from the Court's prior opinion.  That

11     really is crucial here because the DAPs have cases that

12     talk about fraudulent concealment, but they don't have a

13     case where the Court found fraudulent concealment with the

14     kind of public facts we have here.

15           *Monosodium Glutamate* didn't have public facts

16     like we have here.  So I think the Court's comment in its

17     first opinion is crucial to keep in mind here.  The class

18     plaintiffs had all the same facts, all these same public

19     facts, that the DAPs are relying on to state a conspiracy

20     claim.

21           So all these facts that are used to get past

22     *Twombly* come back to haunt them when they then come back

23     and try to say the conspiracy was concealed.

24           Slide 3 goes through in a little more detail, and

25     it shows you exactly how the DAPs are relying on these

1    public statements.  The earnings calls lay out in detail

2    how the supply cuts were supposedly coordinated, how one

3    defendant said I'm doing my part.  Everybody else has to

4    chip in.

5         These sorts of things are out in the open in the

6    public.  Trade association meetings, again, they're

7    reported publicly in newspaper articles.  Agri Stats,

8    according to the DAPs, is showing samples of its reports,

9    Power Point slides explaining how the reports are made, how

10   audits are done.

11        Again, this is all public, and then the DAPs say

12   their conspiracy worked, and there is an increase in price

13   that is abnormal.  And the proof of that they put in the

14   complaint are charts from the USDA or the Bureau of Labor

15   statistics showing this.

16        So then you've got the participants, the

17   mechanism, the monitoring service, Agri Stats, and the

18   price impact.  This is all that they needed to state a

19   conspiracy claim before discovery, which is why certain

20   DAPs and the class plaintiffs did so.

21        Now, their answer to all of this is fraudulent

22   concealment.  We don't, don't need to spend a lot of time

23   on slide 4.  It just alleges the elements they have to

24   allege.  They have to allege facts for each, and failure to

25   allege fact on any of them fails, means that they failed

1    fraudulent concealment.

2          And then the first element, the acts of

3    concealment have to be separate from the conspiracy

4    themselves, separate and apart or over and above.  The

5    language is different, but the concept in the *Ripplinger*

6    case, the *Milk* case and the other cases is the same, that

7    you can't rely on conspiracy acts or conspiracy

8    communications to show fraudulent concealment.

9          So if we go to slide 5, we see again the Court

10   goes through the fraudulent concealment allegations before,

11   secret meetings, surreptitious means of communication,

12   being careful in drafting e-mails, exchanges through Agri

13   Stats, not confessing to a conspiracy and coming up with

14   pretextual statements, and the DAPs allege the exact same

15   kinds of concealment.

16         So if we go to the next slide, slide 6, this I

17   think answers Your Honor's question.  It's true for sure

18   the DAPs now have more details on dates.  No doubt about

19   it.  The problem for them is, they have more details on

20   dates for communications that are still not fraudulent

21   concealment.

22         So the first category, meetings and surreptitious

23   means of communication, first these are not separate from

24   the conspiracy.  These are not actions that are solely

25   designed to conceal the conspiracy, so they failed the

 1      *Ripllinger* test.

 2              But beyond that, we have five cases in our brief,

 3      the *Milk* case, *Premium Products*, *Litovich*, *RX.com* and *SD3*

 4      that say simply having conspirators talk to each other or

 5      have meetings is neither fraudulent nor concealment.

 6      That's just part and parcel of a conspiracy.  So that's not

 7      concealment.

 8              Having a meeting where the DAPs are not invited

 9      is not concealment.

10              THE COURT:  So reading through the class

11      complaint, it seemed, and I believe put in the order as

12      well, that the heart of the complaint was all the public

13      statements that led to the alleged conspiracy on prices.

14              This time it seems a little different.  It seems

15      like the heart of the complaint is much more focused on

16      concealment issues.

17              Why am I incorrect about that?

18              MR. ROBISON:  Your Honor, I think if we're

19      talking about the conspiracy itself, it's the same

20      conspiracy.  It's a conspiracy to reduce the supply of pork

21      in the U. S. somehow, either by reducing hogs or reducing

22      plant capacity or increasing exports.

23              THE COURT:  The issue, you know, that we're

24      looking at is whether there is fraudulent concealment, and

25      the class complaint really didn't get too deeply into the

1    who, what, when, where, why allegations.  It just was a
2    little bit more of a broad brush.
3              There is much more here, and it seems like it's
4    more of a focus on the concealment, rather than on the
5    sharing public statements that might lead to price fixing.
6              MR. ROBISON:  Again, Your Honor, I think the DAPs
7    for sure have added details.  They have added dates.  They
8    have added names of people.  They've got quotes from
9    e-mails.
10             THE COURT:  But not enough in your view?
11             MR. ROBISON:  The quotes in the e-mails or the
12   meetings are not concealment.  It's not something
13   specifically designed to throw the DAPs off and keep them
14   from suing.
15             THE COURT:  What about all the allegations about
16   e-mails that keep this confidential or destroy this after
17   reading, those kinds of references?
18             MR. ROBISON:  Yep.  Your Honor, that is new.
19   That is new.  That is new.  Slide 8 covers that.  That's
20   the one piece of the complaint on concealment that I would
21   concede is new.
22             It's not concealment, though.  Again the cases we
23   cite, *Premium Products* talks about this.  In that case the
24   plaintiffs sued, lost on fraudulent concealment, and one of
25   its arguments on appeal was, wait a minute, I didn't know

1    they had all these internal e-mails that would have

2    supported my case.

3              And the Court said, no, you're not entitled to

4    internal e-mails.  The DAPs were never going to see

5    internal e-mails from these defendants.  So as far as this

6    idea of destroying evidence, first off, nothing was

7    destroyed because the DAPs have the e-mails.  That's how

8    they can tell you about them.

9              So number one, there was no destruction of

10   e-mails.  Number two, even if somebody sends an e-mail and

11   says please delete, that didn't conceal anything from the

12   DAPs.  These were internal e-mails within a company.  The

13   DAPs never knew about them.  The DAPs were never going to

14   see these e-mails.

15             So whether they're preserved, whether they are

16   printed and put on a desk or whether they're deleted or

17   attempting to delete them has no bearing on the DAPs and

18   whether they can sue.  They're not an internal e-mail

19   monitoring system for Tyson or Smithfield or anybody else.

20             So they're never seeing internal e-mails.  They

21   would have no way of knowing whether they're preserved or

22   deleted.  So when somebody says please delete, that doesn't

23   conceal anything from anybody outside the company.

24             You know, maybe the compliance department would

25   have a problem if they're monitoring people's e-mails, but

1    the DAPs are not.  They're never going to have access to

2    these e-mails.  They would have no idea whether they are

3    preserved or deleted.

4           So if we flip back real quick to slide 6, I think

5    we will see what we're talking about again.  The second

6    bullet point about using code names, the DAPs found one

7    e-mail where one defendant supposedly referred to Walmart

8    by W, and they say this is a code, and they're speaking in

9    code.

10          Not much of a code, but again, it's an internal

11   e-mail that the DAPs were never going to see.  So using W

12   as a code for Walmart inside a company doesn't fool the

13   DAPs because they never saw it.  So it didn't fraudulently

14   induce them to not filing a lawsuit.  They never saw it.

15          The next bullet point, exchanging information

16   through Agri Stats, again this is just communications

17   within the conspiracy.  So this can't be fraudulent

18   concealment under the *Milk* case and the other cases we

19   cited.

20          And the last two are kind of similar, not

21   confessing to a conspiracy and coming up with pretextual

22   statements, we list I think seven cases that say you would

23   never expect anybody to just confess to a conspiracy if

24   they're in it.

25          So being silent or not disclosing is not

1    concealment.  That's *Ripllinger* from the Eighth Circuit.

2    That is *Milk*, *Wholesale Grocery* and a whole host of other

3    cases.  And then the pretextual statements, same thing.

4            Your Honor was right when it ruled earlier that

5    these statements are not fraudulent concealment.  That's

6    what *Milk* says.  That's what *Wholesale Grocery* says.  *SD3*

7    is another one.

8            So if you look at slide 7, we have more details

9    about what you saw in the class complaints.  This is all

10   repeats.  This is all old news, but the details, the who,

11   what, when, where and why might match up with Rule 9(b),

12   but substantively these are not concealment allegations.

13           So I've gone through the one new allegation about

14   destruction of e-mails.  The last thing I would mention,

15   Your Honor, is on the last slide, and that's due diligence.

16   That's the third element that needs to be alleged, and

17   there are literally no facts in this lengthy complaint.

18           It is more than 400 paragraphs, no facts from any

19   DAP as to how they exercised any diligence.  We have all

20   these earnings calls, all these newspaper articles, all

21   these Agri Stats presentations, all these USDA pricing

22   charts coming out.

23           And nobody asked a question.  Not one DAP said I

24   picked up the phone and called a defendant to ask what was

25   going on.  Not one DAP said here is what a defendant said

1    to me that threw me off and made me think I didn't have a

2    case.

3             All they say is boilerplate, we exercised due

4    diligence.  Then they say we asked our supplier for bids.

5    Calling somebody and saying what is your price for bacon or

6    what is your price for ham is not due diligence.

7             So, again, when we look at the *Wholesale Grocery*

8    case or *RX.com* case that we cite in our brief, just typing

9    the words "due diligence" into a complaint doesn't satisfy

10   the pleading standard.  There is nothing in here about

11   questions asked.  Nothing in here about answers given that

12   were false.

13            So I think on both the affirmative acts of

14   concealment, they fail again.  They have a whole bunch more

15   detail of things that are not fraudulent concealment under

16   the case law, and then again, we have got sophisticated

17   buyers here with procurement departments, in-house lawyers,

18   et cetera, who apparently didn't do any investigation,

19   didn't ask any questions.  There is no diligence at all.

20            THE COURT:  All right.  Thank you, Mr. Robison.

21            Mr. Taylor?

22            MR. TAYLOR:  Good morning, Your Honor.

23            THE COURT:  Good morning.

24            MR. TAYLOR:  Defendants seek to dismiss DAPs'

25   Packers and Stockyards Act claim in its entirety because

1    DAPs failed to allege any violation of a provision relating

2    to the purchase, sale or handling of livestock.

3            And to illustrate that deficiency, I'm going to

4    begin by highlighting the discrepancy between what DAPs

5    alleged in Count II of their complaint, which is their PSA

6    count, and what the PSA actually provides a private right

7    of action for.

8            So turning to Count II, DAPs describe how

9    defendants purportedly violated the PSA starting in

10   paragraph 465, and they allege that the defendants violated

11   the PSA in two ways there.

12           First, they allege that, quote unquote,

13   "competitively sensitive information" is an article under

14   the PSA and that defendants violated the PSA by exchanging

15   articles for the purpose and with the effect of raising

16   prices for pork, purportedly in violation of the

17   prohibition on exchanging any article, for the purpose or

18   with the effect of manipulating prices, which they describe

19   in paragraph 462D.

20           And the second way DAPs allege that defendants

21   violated the PSA is found in 467, and they say that

22   defendants, quote, "Engaged in other conduct, including

23   without limitation, communicating and otherwise

24   coordinating with each other to restrict pork production."

25           So notice the focus of those allegation, sending

1    articles to manipulate the price of pork, communicating

2    about production of pork.  Not a word about any conduct

3    relating to livestock there, and that's --

4              THE COURT:  So really the question here boils

5    down to whether we're talking about or whether livestock is

6    the same as meat products or whether it's a different,

7    different category, correct?

8              MR. TAYLOR:  I agree that is an important

9    question, and we addressed that in our brief.

10             Meat products are defined separately from

11   livestock.  Livestock is defined as the whole animal, and

12   meat products are defined as edible.  So really they're

13   mutually exclusive.

14             THE COURT:  The PSA has a direct action clause

15   for just livestock, correct?

16             MR. TAYLOR:  Yes, Your Honor.  And so the reason

17   we see all of these allegations about a meat product

18   instead of livestock is because DAPs allege, they claim in

19   paragraph 470 that the private right of action, "Provides

20   that if any person subject to the PSA violates any

21   provisions of the PSA then that person shall be liable to

22   the person injured."

23             But DAPs got the private right of action all

24   wrong.  That's not what it says.  As Your Honor noted, it's

25   limited to livestock, and I believe in fact there was no

1       private right of action originally.  It has accreted over
2       time to add private rights of action for certain violations
3       over time.
4               And since 1976, there has been this provision for
5       violations of any provision relating to purchase, sale or
6       handling of livestock.  And it's not just relating to
7       livestock.  It's relating to the purchase, sale or handling
8       of livestock.
9               And the DAPs conspicuously avoid giving any
10      response to the legislative history that we provided as an
11      attachment in our memorandum because that legislative
12      history makes clear that this provision was designed to
13      address direct transactions in livestock.  It was to
14      protect the farmers from the packers who had a lot more
15      buying power than the farmers did.
16              So DAPs were forced to pivot in their opposition
17      from this focus on articles or communications about pork to
18      try to fit the square peg of a conspiracy to limit pork
19      production into the round hole of a statute about
20      livestock.
21              But what they never do is identify a provision of
22      the PSA relating to the purchase, sale or handling of
23      livestock that defendants purportedly violated.
24              THE COURT:  You don't think too much of the dead
25      livestock argument.

 1          MR. TAYLOR:  I don't, Your Honor.  In my notes

 2     right here, I have a bullet on that, but I literally wrote

 3     "skip" next to it because to me, they're defined mutually

 4     exclusively.

 5          I don't think you can say that there is a cause

 6     of action for pork because pork is a dead livestock.  That

 7     would render this limitation a complete nullity, right?

 8     Anyone who had any dealing in meat would automatically have

 9     a private right of action, and that's not what was intended

10     under the legislative history, and it's not what it states

11     in the language itself.

12          But they do, DAPs do argue in their opposition

13     now, and I'm sure they will argue in a few moments, that

14     the conspiracy does include the reduction of swine, but

15     notice how they try to ally the precise language of the

16     private right of action to DAPs.

17          Anyone who does something wrong that vaguely

18     impacts livestock in any way, whether directly or

19     indirectly, in whole or in part, provides a private right

20     of action, but again, that's not what the language says.

21     The language is very precise.

22          Reducing a defendant's own sow herd isn't a

23     purchase.  It's not a sale.  It's not the type of

24     commercial transaction that handling seems to be referring

25     to in this statute, especially when you look at it in

1        context and you look at that legislative history again.

2                So the case here is a bad fit.  Again, this is a

3        pork conspiracy that is affected by a number of mechanisms,

4        including, for example, exports.  That doesn't involve the

5        purchase or sale or any type of touching livestock at all.

6        That's your processed meat products.

7                And it's not going to be possible to disentangle

8        damages from the overall pork conspiracy with damages from

9        one sale here or one purchase here or one reduction here,

10       even if they had alleged specific purchases or sales, which

11       they do not.

12               So in conclusion, the retailers, downstream

13       retailers' purchases of pork products are outside the zone

14       of interest that were intended to be protected by the PSA's

15       private right of action, which is why there has never been

16       a case holding that someone in DAPs' position could assert

17       such a claim.

18               So I'll pause for questions from the Court here

19       before I move on to the portion of the motion on the

20       product scope.

21               THE COURT:  You can move on.

22               MR. TAYLOR:  Okay.  So defendants seek to dismiss

23       two categories of products from DAPs' complaint.  One,

24       multi-ingredient products, like mixed-meat franks,

25       sandwiches, burritos, pizzas, and I'll stop the list there.

1          And secondly, byproducts like blood and bone

2     meal, and this motion is prompted by certain DAPs' motion

3     to compel structured data filed in September relating to

4     these products, yes, even burritos.  DAPs in their

5     opposition did not like our reference to burritos, but they

6     sought structured data on it, and we assumed then that they

7     were including that within their complaint, and that's why

8     we're seeking to dismiss that as well.

9          In this courthouse here is a lot of sophisticated

10    legal argument based on important policy considerations and

11    complex economics, but some circumstances, I would submit,

12    call for just common sense, and I would submit this is one

13    of those circumstances.

14         This case has always been about pork meat.  All

15    the nonconclusory allegations in the complaint are about

16    pork meat.  Lots of comments about shoulders, ribs,

17    et cetera.  It has never been about bone meal or pet food.

18         And DAPs in their opposition rely heavily on

19    their definition of pork to say, well, we say right here

20    that pork does include bone meal, but that's not a

21    nonconclusory factual allegation, and referring to it just

22    begs the question.  It doesn't answer the question.

23         There are no factual allegations anywhere in the

24    complaint about products like bone meal and/or blood and

25    the like or about the market for pork products once they go

1    downstream and get into a pizza or a multi-meat hot dog or

2    something like that.

3             And to be clear, defendants do not seek to

4    dismiss, on this motion, to dismiss products with a di

5    minimus amount of other ingredients.  So the glaze on a

6    smoked ham or something like that is not what we're talking

7    about.  We're talking about products where the primary

8    ingredient is not pork.

9             Defendants rely on two arguments to defend their

10   lack of allegations about those types of products.  First,

11   they claim in their opposition, they don't allege it, but

12   they claim that products like bone meal comes from hogs,

13   and if you're reducing hogs, the price of everything from

14   the hog is going to go up.

15            But that's actually not a given from an economic

16   basis, and DAPs' allegations don't support it.  So to take,

17   reiterate one example we gave in our complaint, there is no

18   reason to assume that bone meal from pigs are special and

19   that, you know, these defendants can even try to control

20   the supply of bone meal in the market.

21            Why can't they be substituted with bone from any

22   other animals?  There is nothing about that in the

23   complaint, and DAPs fault defendants for purportedly

24   requiring heightened pleading standards, but all we're

25   asking for is some allegations, any allegations.

1          There are none in the complaint, and our point is

2     not, for example, that we think DAPs have to prove that

3     that there is limited substitution between bone meal from

4     hogs and bone meal from other animals.

5          It's that the allegations that DAPs lodge in

6     support of their conspiracy for pork products don't

7     necessarily map on to other products like bone meal,

8     et cetera.

9          THE COURT:  Doesn't this start getting into

10    factual distinctions among the products, perhaps a better

11    argument for summary judgment?

12         MR. TAYLOR:  So, Your Honor, I would agree with

13    that to an extent.  In the abstract, defendants or excuse

14    me.

15         DAPs have a quote about not needing to define the

16    product scope with a diamond cutter, and we agree with

17    that, but that doesn't mean there are no obvious

18    boundaries.  There are no, again, to reiterate, there are

19    no allegations about bone meal.

20         I think bone meal is as a matter of common sense

21    that Your Honor is entitled to rely on is facially a much

22    different product from something we all eat.  All of the

23    allegations, 400 paragraphs plus of allegations full of

24    what -- how defendants view -- excuse me -- how DAPs view

25    the market for pork meat.

1          Nothing about how they view the market for
2    downstream multi-ingredient products or products like
3    blood.  So I think it is fair for Your Honor to use an axe
4    here instead of a diamond cutter and make broad
5    distinctions between obviously very different products.
6          And with that, I can conclude, Your Honor,
7    subject to any questions you have.
8          THE COURT:  That's fine.  Thank you, Mr. Taylor.
9          All right.  Mr. Randall.
10          MR. RANDALL:  Thank you, Your Honor.  If I can
11    approach and pass up my slides.
12          THE COURT:  You may.
13          MR. RANDALL:  I think Your Honor is on point that
14    there are substantial differences between the complaint
15    that we pled at the end of 2022 and the one that the class
16    plaintiffs pled without the benefit of discovery in January
17    of 2020.
18          That our complaint is almost 100 pages longer
19    than the class complaint.  Admittedly, about half of the
20    additional 100 pages relate to just naming all of the
21    Direct Action Plaintiffs, but there are roughly 50 pages of
22    substance there that are not included in the class
23    complaint.
24          Now, the conspiracy we've alleged is much broader
25    than the one that the class alleged was based on public

1    statements in 2021.  Again, the class did not have the

2    benefit of discovery, and so they were not able to go into

3    the detail that we have done.

4           Now, we certainly include the public statements

5    that the classes included.  It would be malpractice I think

6    not to include that, I think.  The Court entered a 100-page

7    order determining that certain allegations were necessary

8    to make this conspiracy legally plausible.

9           We've included those same allegations that the

10   Court relied on in finding the conspiracy plausible.  We

11   have also included substantially more than that.  For

12   example, we've alleged substantial detail about market

13   allocation, that, again, it was not known to the class in

14   2020.

15          It's certainly part of the same conspiracy, but

16   this was just -- we needed discovery to know about the

17   market allocation aspect of defendants' agreement, the idea

18   that the defendants were constrained by this concept of

19   fair share or slaughter market share and that they followed

20   this historical market allocation during the conspiracy.

21   It was just not known to the plaintiffs in 2020, to the

22   class plaintiffs in 2020.

23          Now, the allegations that the class included in

24   2020, they alleged on page one of the slide dec, they

25   alleged secret meetings.  They allege surreptitious

1    communications, limiting explicit reference to pricing, and

2    the Agri Stats allegations.

3         The Court evaluated those allegations and

4    recognized that these are the whole allegations.  We're

5    cutting and pasting these allegations from the class

6    complaint, that there was not detail to these allegations,

7    that these allegations, as I read the Court's order, could

8    constitute fraudulent concealment, but in order for them to

9    do so, Rule 9 requires the who, what, when, where and how.

10        So in contrast to the class plaintiffs, we have

11   included all of that, the who, what, when, where and how of

12   fraudulent concealment.

13        Now, just to be clear, the defendants chose to

14   bring this as a 12(b)(6) argument, so there is no dispute

15   that the traditional 12(b)(6) notice pleading generally

16   applies here subject to the heightened standard under

17   Rule 9(b) limited to the allegations of fraud.

18        Defendants are not able to go beyond the

19   complaint.  The defendants, again, they chose to bring this

20   as a motion to dismiss, and so they have to live by that

21   chance -- that choice.

22        As I read Mr. Robison's or as I heard him say,

23   there is the admission that we have included the who, what,

24   when, where and how for numerous allegations in our

25   complaint.  We have a specific section of our complaint

1      devoted to fraudulent concealment.

2            There are -- it's 15 pages long, 43 numbered

3      paragraphs in this section.  Again, none of this

4      information was available to the class in 2020, and so the

5      allegations we've included do far more than support the

6      existence of the conspiracy.

7            Now the defendants rely -- argument is relying on

8      two points, I think.  First, they need the separate and

9      apart standard to apply, but they're not even really

10     arguing for the separate and apart standard.  There are

11     three potential standards for fraudulent concealment.

12           There is the self-concealing standard.  Your

13     Honor in 2020 rejected the application of that standard,

14     but then there is the affirmative acts standard which most

15     courts apply, and then there is the separate and apart

16     standard, which says that you have to include acts that are

17     separate and apart from the conspiracy.

18           But the defendants ignore the two cases from this

19     circuit, from this district, where the courts have found

20     that the separate and apart standard is satisfied in

21     *Wirebound Boxes* first and then in *Monosodium Glutamate*.  In

22     both of those cases, the Court applied the separate and

23     apart standard and found that it was satisfied.

24           Our allegations compare very favorably to the

25     allegations in both of those cases.  It's demonstrably

1    wrong, the argument that the defendants are making, that

2    communications in furtherance of the conspiracy can't also

3    be used to satisfy the separate and apart standard.

4           Essentially all of the conduct that both

5    *Wirebound Boxes* and *Monosodium Glutamate,* both of those

6    courts relied on, were communications between the

7    defendants, but there was some aspect of the communications

8    that -- where -- or some conduct where the defendants took

9    steps beyond just communicating to, to impart a degree of

10   confidentiality or concealment.

11          So that's, again, that's what we're dealing with

12   here.  Even under the separate and apart standard, again we

13   disagree that it should apply, but we meet it even if it

14   does.

15          Importantly, *Monosodium Glutamate* is a summary

16   judgment case.  So again, I mean we're at the 12(b)(6)

17   stage, but even under the heightened standard of summary

18   judgment, our allegations compare very favorably to the

19   allegations in that case.

20          The slide dec at page 5 there, we have included

21   specific examples.  Again, none of these allegations, and

22   these are just representative examples of what we include,

23   were available to the class in 2020.  You know, the e-mail

24   from a Seaboard executive on November 23rd, 2010, again

25   providing the date, providing the person's specific name

1     and exactly what he said.

2            Now, importantly, this is demonstrative of how

3     the separate and apart standard could apply.  So this is a

4     conspiracy communication, but the statement "want to keep

5     this confidential" is separate and apart from the

6     conspiracy communication itself.

7            It's not strictly necessary to the communication

8     itself, and so under the separate and apart standard, as

9     applied by courts in this district, this is the type of

10    allegation that does satisfy even that heightened standard.

11           You know, we've alleged similar examples.  Again

12    with -- in every single one of these instances, the who,

13    what, when, where and how as to Tyson, as to Smithfield, as

14    to Clemens.

15           Skipping ahead to page 7 of the slide dec, we

16    have also alleged instructions to destroy.  Now, I

17    appreciate the creativity of the defendants' argument on

18    this point.  This is an argument for a jury, not a motion

19    to dismiss.

20           The idea that an instruction to someone to

21    destroy evidence of a conspiracy can't be used to prove

22    fraudulent concealment would turn that standard on its

23    head.  No court has ever held that.  The cases the

24    defendants cite do not stand for that proposition.

25           This is, and this is the type of evidence or the

1    type of allegation that goes far beyond what was available

2    to the plaintiffs in either *Wirebound Boxes* or *Monosodium*

3    *Glutamate*.  The example on, I think it's page 8 of the

4    slide dec, the October 19th, 2011, exchange between Tyson

5    executives.  This is, again, another example of how this

6    meets the separate and apart standard.

7          The Tyson executive, you know, again I don't need

8    to say his name, but we have identified him by name in the

9    complaint.  We've identified the date of communication, how

10   it was communicated by e-mail, and specifically what he

11   said.

12         And so in addition to the conspiracy

13   communication, which essentially acknowledges the existence

14   of this fair share agreement, acknowledging that Tyson felt

15   constrained in its production decisions to go above its

16   fair share.

17         In addition to that statement, he also says, "I

18   trust you will read and delete and not repeat this."

19   That's separate and apart from the conspiracy

20   communication.

21         Now, the idea that we have all of the evidence of

22   defendants' conspiracy, we strenuously dispute that, and

23   again, these are questions of fact that can be argued to

24   the jury.  The fact that the defendants included

25   instructions to each other to delete evidence certainly

1    lends itself to the conclusion that evidence was in fact

2    deleted.

3         We have found almost 15 years after the fact

4    examples that were not successfully deleted, but this

5    certainly supports the reasonable inference that evidence

6    of their conspiracy was in fact deleted.  I think we're

7    fully entitled to argue that to a jury.

8         The defendants, Mr. Robison, can make the same

9    argument that he made here today, but that's to a jury.

10   It's not, it's not a legal argument at the 12(b)(6) stage.

11   Again, we've included specific allegations of pretextual

12   statements.

13        Now again, it's not the law that pretextual

14   statements cannot support fraudulent concealment.  As I

15   read the Court's order and the *Milk Products* case, there is

16   something -- which we understand, that to the extent there

17   is a conspiracy, failing to own up to that conspiracy can't

18   be used to support fraudulent concealment.  We understand

19   that.

20        The allegations we've made show a recognition by

21   the defendants that their public statements or their

22   statements to customers were misleading.  Just as they have

23   done in this litigation, the defendants have pointed to the

24   H1N1 virus or the PED virus as a reason why supply was

25   decreasing.

1          Their internal statements reflected the
2     recognition that this wasn't really accurate, that these
3     things were out there, but the effect was minimal, and it
4     really was not having a material effect on supply.
5          And finally, the fourth category of evidence, the
6     secret meeting, again, the class plaintiffs made the
7     allegation of secret meetings.  We've alleged the existence
8     of secret meetings supported by all the detail required by
9     9(b).  That's the difference between what we have done and
10    what the class did in 2020.
11         So we have alleged the dates of these meetings,
12    and we have alleged specifically how these meetings were
13    used to conceal the conspiracy.  So, for example, The Pork
14    Club had this no attribution rule where the people who
15    attended the meetings were not allowed to attribute
16    statements made at these meetings to the attendees.
17         Again, it provides an ideal environment for the
18    defendants to get together in what we fully acknowledge is
19    a legitimate group, a legitimate trade association, but to
20    have a forum with the air of legitimacy to conduct the
21    conspiracy and keep it secret.
22         Now, the defendants are also arguing due
23    diligence here.  Again, the Court resolved this in its 2020
24    order.  In the November 2020 order, the Court evaluated
25    what the class alleged and said that the class's

1    boilerplate allegation on diligence was sufficient to

2    satisfy that element.

3           We have relied on that holding in crafting the

4    consolidated complaint.  Again, I don't need to belabor the

5    point.  As the Court, as the Court is aware, we were

6    required to file a consolidated complaint that included --

7    you know, to get a consensus for all the DAPs that, you

8    know, in a single document.

9           To include plaintiff-specific allegations of due

10   diligence in that complaint, given the Court's prior order

11   on that, I think is directly inconsistent with the purpose

12   of requiring the consolidated complaint.

13          THE COURT:  There are two dates that are used for

14   knowledge of the claims.  I think the complaint says that

15   you couldn't have knowledge of the complaints prior to June

16   24th, and then there is another date, June 28th.

17          MR. RANDALL:  Yeah.  It's a mistake, Your Honor.

18   The operative date should be June 28th.

19          THE COURT:  The 28th?

20          MR. RANDALL:  That's four years back from when

21   the class filed a complaint.  That's just a typo.  The

22   operative date should be June 28th, 2014.  Thank you.

23          So, again, the defendants haven't included any

24   argument here why the Court was wrong about the issue of

25   diligence in 2020, but it's also not true that we have

1    included literally no detail.  I mean, I don't pretend that

2    we have included detail of allegations that are DAP

3    specific.

4            But as the defendants' own slide dec

5    acknowledges, we have given representative examples of the

6    types of due diligence that DAPs employed during the

7    conspiracy, which we viewed as really just kind of extra

8    credit because it wasn't required by the Court at all under

9    the Court's prior holding.

10           Quickly, under the PSA, even if the defendants

11   are right about the meat products issue, which we disagree

12   with, we have also alleged violations related to the

13   purchase of livestock and handling of livestock.  So there

14   is no requirement that someone alleged violations of all

15   three of the clauses of PSA.

16           Anyone who is injured by the purchase, sale or

17   handling of livestock can bring a cause of action.  The

18   defendants have made no argument that we haven't alleged

19   violations related to purchase or handling.

20           I mean, much of the complaint details the sow

21   liquidation.  That plainly relates to the handling of

22   livestock.  If the defendants were liquidating their sows,

23   killing their sows, for the purpose of reducing supply,

24   that is something that satisfies the PSA.

25           The same thing.  We have alleged the defendants

1    used their relationships with contractual hog farmers to

2    reduce supply, to pressure -- for those defendants that

3    purchased sows to pressure their suppliers to reduce

4    supply.  Again, that plainly meets the purchase standard.

5            So I don't think the Court even needs to reach

6    the issue that the defendants are raising, which we

7    disagree with, because it would undermine the purpose of

8    this private right of action.

9            If someone could not bring a claim related to the

10   purchase of meat products in an industry where most

11   defendants are fully vertically integrated, it would cut

12   off the application of the PSA entirely, which, you know,

13   the case law interpreting it says that the PSA should be

14   liberally construed.

15           And so it would undermine the purpose of the PSA

16   to put in the reading that the defendants are asking for

17   here.

18           THE COURT:  I guess the question there is whether

19   that's too indirect an impact.

20           MR. RANDALL:  Well --

21           THE COURT:  The killing, the liquidating of sows,

22   for example.

23           MR. RANDALL:  Frankly, I don't see what type of

24   handling, what handling could mean other than, you know --

25   if handling means anything, it certainly relates to how the

1    defendants managed the sows under their control when they

2    had them.

3              THE COURT:  Okay.

4              MR. RANDALL:  Lastly, we think the defendants are

5    just wrong about the multi-products issue.  This is a

6    conspiracy to reduce the supply of pork available for sale

7    in the United States.

8              The complaint, as the defendants acknowledged

9    today, our complaint defines pork to include these

10   products.  There is no issue that we've pled this in our

11   complaint, and there is really no argument.

12             We agree that common sense should apply here, and

13   common sense says, if you reduce the supply of pork, then

14   all pork sold is going to be affected, affected by that.

15   So, again, the defendants make a big deal out of burritos,

16   so let's use that which we think is an extreme example.

17             This is, it's really a damages argument that

18   they're wrapping up in a 12(b)(6) argument.  The defendants

19   are fully entitled to raise this as a *Daubert* challenge as

20   a motion in limine and say that the plaintiffs, the DAPs,

21   haven't traced the conduct alleged in the conspiracy to

22   specific products.

23             To use an axe, as Mr. Taylor asked you to do,

24   would be legally inappropriate and lead to, we think,

25   bizarre results.

1          So applying this to burritos, Tyson should not be

2     able to escape liability for its conduct by wrapping pork

3     it sold in a burrito or wrapping it in a tortilla.  There

4     is no principled way of applying the ruling that the courts

5     want this Court to enact.  It would lead to chaos and

6     confusion.

7          There is no reason why a burrito with 49 percent

8     pork should be treated differently than a burrito with 75

9     percent pork.  It would have consequences, we think, for

10    all future antitrust cases.

11         In the Beef case, if a beef burrito under

12    Mr. Taylor's definition, a beef burrito that has mostly

13    beef would be fine.  A beef and cheese burrito, depends on

14    the, you know, depends on, you know, how it's prepared.

15         Then, you know, if you include eggs in that, then

16    you're getting below the 50 percent standard and it's out.

17    There is no principled way to apply this at the 12(b)(6)

18    stage of the case.  This is a damages argument.  The

19    defendants are fully entitled to bring this as a *Daubert*

20    challenge, and we think that's the appropriate time to

21    bring this.

22         THE COURT:  All right.  Thank you, Mr. Randall.

23         Mr. Robison, did you have any brief rely?

24         MR. ROBISON:  Yes, Your Honor.  Thank you.

25         I want to be incredibly clear that the conspiracy

1    here has not changed.  The same defendants are accused

2    today of reducing the supply of pork in the U. S. somehow,

3    either through exports or reducing hogs or reducing plant

4    capacity.

5         The DAPs may have found additional documents they

6    like that they think support that conspiracy claim, but the

7    fundamental conspiracy claim has not changed.  It's the

8    same conspiracy, and as I noted before, slide 3 shows you

9    how the participants were publicly identified.  The

10   mechanisms for reducing supply were publicly disclosed.

11        The monitoring system, Agri Stats, publicly

12   advertised its marketing materials, and the price effect of

13   this conspiracy was reported by the government.  All of

14   that is public.

15        That's all sufficient to file a case, which is

16   why certain DAPs like Winn-Dixie did file cases years ago,

17   and that's why the class actions were filed years ago.

18   They didn't have to wait to get all this discovery and all

19   these additional e-mails and all these additional examples

20   that don't matter under the law in order to file a case.

21        And that's where I think we ought to take a step

22   back and think about the fraudulent concealment doctrine at

23   a higher level.  The point of this doctrine is, a plaintiff

24   that has been directly duped, there was something that was

25   directed toward a plaintiff to convince a plaintiff it

1    didn't have a case, that can be fraudulent concealment.

2              Here, we don't have that.  Here, we have a public

3    conspiracy that is already out in the open.  It's already

4    been disclosed, and the DAPs have never identified anything

5    directed at them that fooled them into thinking they didn't

6    have a case.

7              If you look at the pretextual statements in the

8    complaint, the DAPs don't even allege they saw them.  Not

9    once did the DAPs allege somebody from Kroger or somebody

10   from Winn-Dixie or somebody from Sysco saw these pretextual

11   statements and was duped into thinking he didn't have a

12   lawsuit.

13             The internal e-mail exchanges where somebody says

14   keep this confidential or delete it, never directed at a

15   DAP.  They never saw it.  That didn't fool them into

16   thinking they didn't have a case.  So I agree they have

17   added additional details.

18             They have added details that do not matter.  They

19   flat out do not matter under the law.  The DAPs have no

20   answer for the *Milk* case that says pretextual statements

21   are not fraudulent concealment.  They have no answer for

22   *Wholesale Grocery* or *Litovich* or *New Prime*, the cases we

23   cite that have the publicly disclosed conspiracy.

24             Where the courts reject fraudulent concealment,

25   those courts say when you have got a public conspiracy, you

1    literally cannot have fraudulent concealment.  You cannot

2    say you were fooled into thinking you did not have a case

3    when your case is in the public eye.  The DAPs have no

4    answer for those cases.

5              They bring up *Monosodium Glutamate* and *Wirebound*

6    *Boxes*.  I encourage the Court to read those.  They are

7    entirely different here.  There are no public facts alleged

8    in either case.

9              Neither one of those cases has what we have here,

10   earnings calls, Agri Stats public marketing, government

11   reports showing price effects, all these things that the

12   classes and Winn-Dixie used to get past *Twombly*, all these

13   public facts completely absent from *Wirebound* and *MSG*.

14   Simply not there.

15             Those cases also have fake bids and bid-rigging

16   and other things that are not here, but the fundamental

17   problem with those cases is, they don't have everything I

18   put on slide 3.  They don't have all the public facts.

19             Again, on the destroying evidence, nothing

20   directed at the DAPs.  They never saw these e-mails.  They

21   never would have seen these e-mails.  There is nothing in

22   the complaint alleged that somebody at Kroger decided in

23   2010 he didn't have a lawsuit because he thought Tyson was

24   deleting e-mails.

25             I mean, this is completely far afield from

1    fraudulent concealment.  There is nothing here saying that

2    these DAPs were fooled into not suing earlier because of

3    what was going on internally at Tyson.  The DAPs never saw

4    these e-mails.  Never would have seen them.

5         They weren't doing audits, so whether they were

6    preserved, printed or deleted would have no effect on

7    whether the DAPs sued.  The pretextual statements, pages

8    1022 to 1023 of the *Milk* case address this.  *Wholesale*

9    *Grocery* rejects it.  *SD3* is another case that rejects it.

10        These pretextual statements, they can add all the

11   detail they want, all the names and dates, and they still

12   don't amount to fraudulent concealment.

13        Meetings, they talk about The Pork Club.  Pork

14   Club had a no attribution rule.  This was also publicly

15   disclosed.  Paragraph 204 of the complaint talks about

16   these rules at The Pork Club.  It cites a 2011 Agri

17   marketing article that publicly disclosed the rules of The

18   Pork Club.

19        The rules didn't say you can't repeat what was

20   said at a meeting.  It said you can't attach a name to it,

21   no attribution.  So there is no confidentiality over what

22   was said there.  You just don't link it back to a

23   particular person.

24        That's all that they have alleged.  That's all

25   that is in the newspaper article that again is public.

1    Again, even these Pork Club rules are not secret.  Even The

2    Pork Club rules were out in the public.  Even The Pork Club

3    rules are in the public domain in news articles they quote

4    in the complaint.

5          So, again, that fails to show that the DAPs were

6    fooled into thinking they didn't have a case because of

7    some rule at a Pork Club meeting attended by 60 people.

8          Finally on due diligence, we apologize if we

9    misread Your Honor's prior order.  It looked like to us the

10   due diligence ruling in the prior order was focused on

11   consumers.  The Court repeatedly used consumers, reasonable

12   consumers, et cetera.

13         In our mind that may have been directed more at

14   the IPP plaintiffs, the consumer plaintiffs.  That's not

15   what we have here.  These are massive companies with

16   thousands of employees.  They have got entire procurement

17   departments that negotiate price.

18         And after paragraph upon paragraph of public

19   facts, all of the talk about USDA charts showing price

20   increases, all the talk about earnings calls, all the talk

21   about what Agri Stats is doing, there is not a single fact

22   saying anything about a DAP picking up the phone and asking

23   about these price increases.

24         Nothing about a pretextual statement made to a

25   DAP.  This consolidated complaint has individual

1    allegations about certain other DAPs.  Certain other facts

2    are alleged about each plaintiff.  They could have easily

3    added that here, and they didn't.

4         At no point in the prior complaints when the DAPs

5    were filing individual complaints, they also didn't put any

6    due diligence in there.  They didn't allege anything.  So

7    we think, again, under *Wholesale Grocery* and the other

8    cases we cite, just typing boilerplate words "we did due

9    diligence" is not enough.  We think that fails.

10        We have got a case here that is unlike the ones

11   they are citing.  We have a case here that has widespread

12   public distribution of facts.  The class cases have been

13   abiding by your order with a four-year damages period.

14        We think the Court got it right the first time,

15   and we would urge the Court to make the same ruling today.

16        THE COURT:  All right.  Thank you, Mr. Robison.

17        Did you have anything else, Mr. Taylor?

18        MR. TAYLOR:  If I may, Your Honor.

19        THE COURT:  Go ahead.

20        MR. TAYLOR:  A few discrete points in rebuttal.

21   With respect to whether sow liquidation is handling, the

22   word "handling" should be looked at in context with the

23   other types of activities that are listed there, sales,

24   purchases.

25        This is a transaction.  It's like when a grower

1    hands over their livestock to a stockyard, the stockyard is

2    responsible for the animals.  It's a third party that has

3    obligations to the grower, sells the livestock or a

4    transporter, something like that.

5         This is not an animal welfare statute or

6    something else that is about how an entity treats its own

7    livestock.  If I go to a farm and I trip over their lamb or

8    whatever it is, I can't bring a claim under the PSA because

9    they didn't handle their own livestock well.

10        To the extent, to the extent there is any

11   ambiguity and to your point about whether what DAPs are

12   claiming is really too indirect of an injury, again I would

13   direct the Court to the legislative history, which is very

14   clear about the wrongs, the injuries, that this private

15   right of action was seeking to remedy, and it's quite

16   limited.  It's not about downstream retailers.

17        With respect to DAPs' point about whether

18   defendants' theory would cut off their -- anyone's rights

19   under the PSA, of course it wouldn't cut off those who are

20   purchasing livestock, selling livestock or paying someone

21   to handle their livestock.

22        For other violations, it's not that there is no

23   remedy.  It's that it is a different remedy.  The Secretary

24   of Agriculture handles that.

25        The real risk here is not cutting off liability.

1    It's unleashing a whole new type of case under this statute

2    that was never intended to be brought under it without any

3    limiting principle.

4           So then turning to the product scope, to the

5    point about whether this is really a damages question that

6    should be argued at summary judgment or at *Daubert*, the

7    reason it is a pleading issue now is because defendants are

8    not saying it's impossible to bring a claim on downstream

9    products.

10          If Tyson is integrated and didn't sell pork

11   products and only sold burritos that it incorporated the

12   pork products into, it's not that you couldn't bring a case

13   against Tyson.

14          But you would have to make some allegations about

15   those products, about why the defendants had market power

16   for those products, et cetera, and there is none of that in

17   the complaint.

18          Thank you, Your Honor.

19          THE COURT:  All right.  Thank you, Mr. Taylor.

20          Thank you, Counsel, for your arguments today.

21   Excellent.  I appreciate it.

22          The Court will take the motion under advisement

23   and will issue an order as quickly as possible.

24          MR. ROBISON:  Thank you, Your Honor.

25          THE COURT:  We will be in recess.

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

```
 1              COURTROOM DEPUTY:  All rise.

 2                      (Court was adjourned.)

 3                   *          *          *

 4          I, Kristine Mousseau, certify that the foregoing

 5   is a correct transcript from the record of proceedings in

 6   the above-entitled matter.

 7

 8

 9

10   Certified by:  s/  Kristine Mousseau, CRR-RPR
                        Kristine Mousseau, CRR-RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```