IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE PORK ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>THE DIRECT PURCHASER PLAINTIFF CLASS ACTION | Case No.: 0:18-cv-01776 (JRT) |

**DECLARATION OF ERIC SCHACHTER IN SUPPORT OF DIRECT PURCHASER PLAINTIFFS' MOTION FOR FIRST DISTRIBUTION OF NET SETTLEMENT PROCEEDS**

I, Eric Schachter, declare as follows:

1. I am a Senior Vice President of A.B. Data, Ltd.'s Class Action Administration Division ("A.B. Data"). Pursuant to the Court's January 13, 2021, Order Granting Motion for Preliminary Approval of the Class Action Settlement Between Direct Purchaser Plaintiffs and Defendant JBS (ECF No. 631), and the Court's August 5, 2021, Amended Order Granting Motion for Preliminary Approval of the Class Action Settlement Between Direct Purchaser Plaintiffs and Smithfield Foods, Inc. (ECF No. 870) (the "Preliminary Approval Orders"), A.B. Data was authorized to act as the Settlement Administrator in connection with the Settlement in the above-captioned action (the "Action"). I am over 21 years of age and am not a party to this Action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. This Declaration describes the implementation of the Settlement Class claims administration process, as described in the Declaration of Eric Schachter in Support of Direct Purchaser Plaintiffs' Motion for Approval of Notice Plan and Claims Process, dated February 14, 2022 (ECF No. 1194).

**CLASS MEMBER DATA**

3. As described in A.B. Data's prior declarations, in connection with the Settlements with JBS and Smithfield, A.B. Data worked closely with Class Counsel[1] and their data team to develop a list of Class Members that would receive notice. As further described in the Final Approval Declarations, A.B. Data, prior to sending Notice in the

---

[1] All capitalized terms not defined herein have the meanings given to them in the Final Approval Declaration.

JBS Settlement, received 12 data files from various Defendants with the names and contact information of 116,788 potential Class Members. A.B. Data electronically processed, consolidated, and deduplicated the data, which ultimately identified 68,160 unique potential Class Member records to use for direct notice. Utilizing the JBS data and after significant collaboration, consolidation of records at the request of potential Class Members, and removal of records reported to be undeliverable by the United States Postal Service ("USPS")[2], a final list comprised of 55,532 unique potential Class Members was developed for the Smithfield Settlement.

4. Producer Defendants produced data (to the extent available) to Class Counsel showing their customers' purchases of affected Pork products during the Class Period. Class Counsel and their data team provided A.B. Data with this purchase data for each Class Member with respect to each of the Producer Defendants and Co-Conspirators. As further explained in the Final Approval Declarations, where Class Counsel's data team determined that Class Member records were related, the records were associated and assigned a "standardized" name and each associated record was assigned the exact same purchase data. Notwithstanding this standardization, each Class Member's name and contact information remained as a distinct record in A.B. Data's database. Class Counsel's data team provided purchase data for 36,774 records, which comprised 12,065 unique standardized customer names.

5. Using the purchase data provided by the data team, A.B. Data prepopulated the

---

[2] Undeliverable records are comprised of notice records that were returned as undeliverable and where a skip trace was unable to locate a new address or where a second mailing to an updated address was also returned by the USPS as undeliverable.

Claim Forms with each Class Member's annual Pork purchase information during the relevant time periods. The Claim Forms also contained a unique ID that could be utilized to file claims online through the Settlement Website. Class Members were permitted to challenge the prepopulated amounts by submitting a Direct Purchaser Antitrust Purchase Audit Request Form ("Audit Form"), along with supporting documentation. A.B. Data also prepared blank Claim Forms for Class Members for whom purchase data was not available.

**NOTICE CAMPAIGNS**

6. As described in the Final Approval Declarations, for JBS executed on July 12, 2021, and Smithfield executed on January 12, 2022, A.B. Data commenced a notice mailing campaign and notice emailing campaign. The mailing consisted of a package containing the Court-approved Long-Form Notice and either a prepopulated Claim Form (for Class Members for which the data team provided purchase information) or a blank Claim Form (collectively, the "Notice Packet"). On March 29, 2021, A.B. Data mailed Notice Packets to 68,160 potential Class Members in the JBS Settlement and on September 3, 2021, A.B. Data mailed Notice Packets to 55,532 potential Class Members in the Smithfield Settlement.

7. On March 29, 2021, A.B. Data emailed the Court-approved Email Notice to 3,506 potential Class Members, where an email address was provided in the JBS Settlement.

8. On September 3, 2021, A.B. Data emailed the Court-approved Email Notice to 1,728 potential Class Members, where an email address was provided in the Smithfield Settlement. The Email Notice included the Class Member's unique ID for filing a claim

online through the Settlement Website.

**PUBLICATION NOTICES**

9. A.B. Data caused the Court-approved Publication Notice to be published in the April 2021 edition of *Food Logistics*, a trade journal targeting supply chain executives and food industry professionals. A.B. Data also effectuated a thirty-day digital media banner ad campaign on www.foodlogistics.com.

10. A.B. Data caused the Court-approved Publication Notice to be published in the October 2021 editions of *Nation's Restaurant News* and *Supermarket News*, trade journals targeting supply chain executives and food industry professionals. A.B. Data also effectuated a thirty-day digital media banner ad campaign on www.nrn.com and www.supermarketnews.com.

**CLAIM FORM CAMPAIGN**

11. On April 15, 2023, A.B. Data mailed the Court-approved Claim Form to 54,023 potential Class Members. Of those Claim Forms mailed, 36,515 contained prepopulated purchase information and 17,508 were generic Claim Forms where purchase information was not available. The mailed prepopulated Claim Forms included the Class Member's unique ID for filing a claim via mail or online through the Settlement Website. On the same day, A.B. Data commenced an email campaign and sent the Email Notice to Class Members. The Email Notice included the Class Member's unique ID for filing a claim online through the Settlement Website.

12. A.B. Data caused the Court-approved Publication Notice to be published in the May 2022 editions of *Nation's Restaurant News* and *Supermarket News*, trade journals

targeting supply chain executives and food industry professionals. A.B. Data also effectuated a thirty-day digital media banner ad campaign on www.nrn.com and www.supermarketnews.com.

## SETTLEMENT WEBSITE

13. A.B. Data has continued to maintain the Settlement Website, www.PorkAntitrustLitigation.com, which continues to host copies of important case documents related to the Settlements, answers to frequently asked questions, and contact information for Class Counsel and the Settlement Administrator. The website content, along with the Long-Form Notice, Claim Form, and Audit Form, are available in both English and Spanish.

14. During the claims period, the Settlement Website featured an online Claim Form with document upload capabilities for the submission of Claim Forms and supporting documents, as needed. A.B. Data prepopulated the online Claim Form with the Class Member's name, contact information, and purchase data where possible. Class Members were able to access their Claim Form using their unique ID (printed on their hard copy Claim Form and in their Email Notice). If the Class Member agreed with the purchase information, no further information or documentation had to be submitted and their submission was complete. If they disagreed with the amounts, they were able to complete an Audit Form electronically.

15. As of July 6, 2023, the Settlement Website has tracked a total of 32,360 unique users who registered 127,719 page views.

## TOLL-FREE INFORMATION LINE AND EMAIL INBOX

16. A.B. Data has continued to maintain the case-specific toll-free number (1-866-797-0864), which individuals may call to obtain information regarding the Settlements. Callers have had the opportunity to leave a message for a Claims Administrator familiar with the Settlements who responded to common questions and provided assistance. The line is available 24 hours a day, seven days a week. Claims Administrators returned inquiries received as noted above, generally within 1-2 business days. As of July 6, 2023, the toll-free number has received 1,290 calls.

17. A.B. Data has also continued to maintain the informational email inbox, info@PorkAntitrustLitigation.com, where individuals are able to contact A.B. Data to request information about the Settlements and the claims process. As of July 6, 2023, the case inbox has received 1,997 unique email exchanges.[3]

## OBJECTIONS AND EXCLUSIONS

18. As noted in the Final Approval Declarations, the Notices informed recipients that any Class Member who wanted to object to part or all of the proposed Settlements could do so by submitting a written statement on or before May 28, 2021, for JBS and on or before November 2, 2021, for Smithfield. No objections were received by A.B. Data.

19. The Long-Form Notice, Mail Notice, and Email Notice all stated that any Class Member who wanted to exclude themselves from the Settlement Class ("opt out") was required to email or mail a letter to A.B. Data so that it was submitted or postmarked by May

---

[3] This number reflects the number of email threads and does not account for each reply and response.

28, 2021, for the JBS Settlement or November 2, 2021, for the Smithfield Settlement.

20. A.B. Data has received a total of 179 opt-out requests, all of which were timely. Of the 179 opt-out requests, 85 opted out of the JBS Settlement and 94 opted out of the Smithfield Settlement. The entities that requested to opt out (and any named affiliates and assignees) from the JBS Settlement were attached as Exhibit A to the Declaration of Eric Schachter in Support of Motion for Final Approval of the Class Action Settlement Between Direct Purchaser Plaintiffs and the JBS Defendants (ECF Nos. 827 and 827-1). Those entities that requested to opt out (and any named affiliates and assignees) from the Smithfield Settlement were set forth in Amended Exhibits A and B to the Declaration of Eric Schachter in Support of Direct Purchaser Plaintiffs' Motion for Final Approval of the Settlement with Smithfield Foods Inc. (ECF Nos. 1140 and 1140-1).

## CLAIM REVIEW

21. Class Members were able to submit their Claim Forms via mail, email, or online through the Settlement Website.

22. As of the date of this Declaration, A.B. Data has received a total of 4,161 Claim Forms (including claims submitted by Class Members requesting audits of their prepopulated data). Of those, 3,999 Claim Forms were timely submitted and 162 Claim Forms were submitted after the submission and postmark deadline. Of the 162 late claims, 61 claims were determined to be otherwise valid. Of these, 24 Claim Forms were filed within two weeks of the filing deadline of June 14, 2022, and all 61 Claim Forms were filed by November 1, 2022. All of the otherwise valid late claims that were filed after the June 14, 2022, deadline did not delay the claim review process.

23. Of the Claim Forms submitted, 1,412 claimants accepted the amounts in their prepopulated Claim Forms and 2,435 Claim Forms were submitted by claimants that self-identified and did not have prepopulated data.

24. In addition to the Claim Forms described above, A.B. Data received 314 audit requests, wherein Class Members disputed the purchase amounts reflected in their prepopulated Claim Forms.

25. A.B. Data carefully reviewed all Claim Forms, Audit Forms, and supporting documentation, as described below.

## FACIAL REVIEW OF CLAIM FORMS

26. Initially, A.B. Data reviewed Claim Forms for any facial deficiencies. For example, any Claim Forms missing signatures or other required information were flagged as deficient.

27. A.B. Data also programmatically reviewed the claim submissions to identify potentially duplicate claims filed by the same claimant. Where exact duplicates were identified, they were flagged for rejection. Where claims were filed by the same claimant with a standardized name, A.B. Data carefully reviewed the address information and other contact information provided by the claimants to determine whether the claims were filed by the same entity. If it was determined that these claimants' addresses were different, the claims were not immediately flagged as duplicates for rejection; rather, additional analysis was undertaken, and often additional claimant outreach was required to determine which claim should "survive" and which should be consolidated and rejected. Through this process, A.B. Data has rejected 290 claims that are either exact duplicates or were

submitted for the same Class Member and were consolidated.

28. A.B. Data also conducted a review to identify claimants that were ineligible because the claimant was an excluded federal, state, or local government entity. All such entities were researched and reviewed with Class Counsel. A.B. Data identified 1 claim that was submitted by excluded government entities and that claim was rejected.

29. A.B. Data also conducted a review to identify claimants that were ineligible because the claimant was an excluded entity. All such entities were researched and reviewed with Class Counsel. A.B. Data identified 1 claim that was submitted by an excluded government entity, 1 claim that was submitted by a Defendant affiliate, and 3 claims filed by entities that did not meet the Class Definition. These 5 claims were rejected.

30. A.B. Data reviewed claims to identify any claimants that had opted out of any of the Settlements. The names of all claimants were programmatically compared to the opt-out entities coded in A.B. Data's database, as described above. For any Settlements from which a claimant opted out, the claimant was further coded to deny the claim as to that Settlement; for Settlements from which the claimant did not opt out (if any), the claim was honored based on Defendants' data. A.B. Data received 13 claims from entities that validly opted out of one or more Settlements. Of these claimants, 6 participated in the JBS Settlement but opted out of the Smithfield Settlement and 5 participated in the Smithfield Settlement but opted out of the JBS Settlement. The remaining 2 opt outs submitted a claim despite filing a valid timely opt out for both settlements.

31. Finally, for Claim Forms that were submitted without prepopulated data, A.B. Data conducted a comparison against the purchase data to determine if data for that

claimant had been provided. To the extent A.B. Data located a match or similar entity or where no match was located, A.B. Data escalated these claims to Class Counsel and their data team for confirmation from Class Counsel. If a match was confirmed, the Class Member's record was updated accordingly in A.B. Data's database.

## REVIEW OF SUPPORTING DOCUMENTS

32. For claims other than those accepting prepopulated data, A.B. Data carefully reviewed all submitted documents, such as invoices and structured transactional data. In its review, A.B. Data confirmed that the purchases were for products defined in the Settlement Agreements and were purchases by the claimant directly from a Defendant or Co-Conspirator.

33. Where the documentation indicated that purchases were made from a distributor or otherwise from an entity that was not a Defendant or Co-Conspirator, the claim was flagged as deficient in whole or in part because these would not be qualifying direct purchases. A.B. Data also reviewed documentation to confirm that the claimed purchases were eligible purchases for covered products during the relevant Class periods. Where claim submissions reflected assignment agreements, the assigned purchases were carefully credited to the assignee's claim and debited from the assignor's claim, as appropriate.

34. In most cases, the review required both a programmatic review of any transactional purchase data, as well as a manual review of the invoices and any other submitted documentation.

35. For example, many claimants submitted extensive structured data that included

both eligible and ineligible purchases, such as beef or seafood products and/or purchases from entities unrelated to the Settlements. In addition, many submissions included products that were shipped outside the United States or were otherwise ineligible. Where claimants did not have structured transactional data, they submitted invoices to evidence their purchases. In many instances, this review required line-by-line verification of hundreds or thousands of invoices to verify the claimed data.

36. In every case, A.B. Data methodically reviewed each submission and tabulated the purchase data in order to verify the claimed amounts and to verify that the purchases were eligible. Where the data did not fully support the claimed amount, the claim was flagged as deficient in whole or in part.

37. Each claim submission that provided facially valid supporting documentation received several rounds of review. After an initial review of each submission by A.B. Data's processing team, each submission was reviewed again by a senior member of A.B. Data's operations team and finally reviewed by A.B. Data's Quality Assurance Department.

38. A.B. Data has identified 2 distinct entities that are the subject of multiple submitted claims. There is a question as to the ownership of the underlying entities or the right to file a claim. A.B. Data has informed the claimants of the ownership discrepancy and has requested that the parties provide proof of ownership. A.B. Data has made an initial determination and approved 1 claim for each entity pending receipt of proof of ownership/right to file a claim. A.B. Data will reserve funds for each approved claim but will not distribute the awards until such time as the discrepancy is resolved.

39. Further, where a claimant with prepopulated data claimed more purchases than

reflected in the prepopulated Claim Form, and where a claimant who had not received a prepopulated Claim Form claimed eligible Pork purchases, A.B. Data reviewed the claim submission in detail with Class Counsel and their data team to confirm validity. A.B. Data also worked closely with Class Counsel to resolve questions about specific purchase data, including whether certain products were eligible, to the extent product descriptions in the claimant's data were unclear. Where Class Counsel determined that a claimant had proven purchases that were not reflected in the prepopulated data, A.B. Data recorded the approved amount in its database for this case. Where Class Counsel determined that the claimed amounts were not proven, A.B. Data's database was updated accordingly, and the claim was marked to receive a deficiency notice.

## **DEFICIENCY PROCESS**

40. Once an initial review of the claim submissions and audit request submissions had been completed, A.B. Data sent deficiency notices to claimants who submitted either new Claim Forms or Audit Forms and whose submissions were determined to be inadequate or otherwise deficient. The notices were sent via email to third-party filers and via First-Class Mail to all other deficient claims. The deficiency notice provided a list of all reasons why the claim was determined to be deficient. Furthermore, the deficiency notice informed the claimant how to cure any deficiencies and the time frame in which to do so.

41. In addition to the deficiency notices, A.B. Data had extensive communication with many claimants, via email and telephone, to explain in detail the nature of the claim deficiency and the information required to validate their claimed amounts. Many of these

communications were directly with the Project Manager reviewing the claim.

42. As of the date of this Declaration, A.B. Data received approximately 409 submissions from claimants that attempted to cure their deficiencies. A.B. Data carefully reviewed each submission, using the same methodical approach described above to determine whether it cured the claim deficiency and validated the full amount of the claim. In many cases, where the initial response did not cure the claim's deficiency, claimants submitted several rounds of documentation to attempt to fully support their claim. A.B. Data carefully reviewed each submission and revised claim. Where appropriate, A.B. Data conferred with Class Counsel and its data team to determine whether the additional submissions were sufficient to support a given claim. Of the 409 responses, 385 cured their deficiency in whole or in part and 24 deficiencies were not curable, *i.e.*, non-direct purchasers.

43. Once claim amounts were finalized, A.B. Data tabulated qualifying purchases for the full Class period, from January 1, 2009, to January 12, 2021, excluding those Class Members that opted out of one or both Settlements accordingly.

## **CLAIM DETERMINATIONS**

44. Through the multi-layered review process described above, A.B. Data has made the following claim determinations.

45. A.B. Data has rejected 2,697 claims. The most common reasons for rejecting claims were: (i) claimants who did not accept prepopulated data either did not submit any supporting documentation or their submitted documentation was not sufficient to prove any of their claimed purchases; (ii) claimants' supporting documentation indicated that the

claimed purchases were not direct and therefore not eligible; or (iii) the claim was submitted by an excluded government entity. The number of rejected claims also includes claims that were withdrawn.

46. A.B. Data validated 1,403 timely submitted claims, in whole or in part, totaling $112,433,962,501.03 in purchases. Of these, 1,118 accepted prepopulated amounts, 233 have validated purchase amounts that differed from their prepopulated Claim Form, and 52 were submitted by claimants that did not receive prepopulated Claim Forms. A.B. Data recommends that these timely claims be approved by the Court.

47. In addition, A.B. Data received 61 claims that were filed after the claim filing deadline but were otherwise valid. As noted above, 24 of these late claims were filed by June 28, 2022, and all otherwise valid late claims were filed by November 1, 2022, and did not delay the claim review process. The aggregate amount of the validated purchases of the late claims is $8,874,014,977.25. A.B. Data recommends that the late claims be approved.

48. A total of 1,465 claims have been validated by A.B. Data, including the late claims. The purchases validated in these claims total $121,307,977,478.28[4]. A list of Claimant Numbers for claimants with validated claims, and the purchase amounts that have been validated for each claimant in each Settlement, is annexed hereto as Exhibit A.

49. In sum, A.B. Data has determined the following:

---

[4] A.B. Data continues to review claims received and perform advanced quality assurance auditing; therefore, this amount is subject to change.

- 1,464 claims were determined to be valid in whole or in part, which total $121,307,977,478.28 in validated Pork purchases; 2,697 claims were rejected for the following reasons:
    - 293 claims were rejected for having no supporting documents or insufficient supporting documentation;
    - 290 claims were rejected or consolidated as duplicates;
    - 6 claims were submitted by excluded entities and rejected;
    - 83 claims were withdrawn; and
    - 2,025 claims were rejected because the claimant was not a direct purchaser.

## **DISTRIBUTION PREPARATION**

50. A.B. Data will issue payments to claimants with approved claims promptly after Court approval.

51. A.B. Data recommends that the checks disbursed to qualified claimants bear the notation "Non-Negotiable After 90 Days" and that no check be negotiable more than 120 days after the date of the check. The additional 30 days will allow for bank processing and a small period of time for individuals who present their checks to the bank after 90 days but the bank continues to accept the check for payment.

52. Through the date of this Declaration, A.B. Data has provided to Class Counsel invoices detailing the fees and expenses it has incurred to administer all the Settlements and the claims process, totaling $642,995.31. To date, A.B. Data has been paid in full for its invoices. A.B. Data's estimated fees and expenses, including the anticipated cost of completing this initial distribution, are $842,995.31.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of July 2023, at Milwaukee, Wisconsin.

By: _____
Eric Schachter