# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: PORK ANTITRUST LITIGATION | Case No. 0:18-cv-01776-JRT-JFD |
| This Document Relates To:<br><br>ALL COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS ACTIONS | **REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF DR. MICHAEL WILLIAMS**<br><br>**(FILED UNDER SEAL)** |

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.  Dr. Williams offers no method for showing common impact during the Class Period.................................................................................................. 3

II.  Dr. Williams' opinions do not fit CIIPPs' theories of impact....................... 5

III.  Dr. Williams offers no econometric justification for including 2008 in his benchmark. ...................................................................................... 7

IV.  Dr. Williams confirms that he does not, and cannot, account for supply reduction decisions by non-Defendant hog producers in the United States and Canada. ...................................................................................... 10

V.  Dr. Williams offers no method for isolating the effects of lawful exports from the effects of purportedly collusive exports. ............................................... 14

VI.  Dr. Williams' reply report merely confirms his impact model is unreliable. ...................................................................................................... 15

   a.  Dr. Williams' effort to manufacture an overcharge during the Class Period is unreliable........................................................................... 16

   b.  CIIPPs concede that Dr. Williams' models generate wildly inconsistent results. ...................................................................... 18

CONCLUSION ................................................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................................... 3

*Bison Advisors LLC v. Kessler*,
    2016 WL 3525900 (D. Minn. Jan. 21, 2016)................................................. 5

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).......................................................................................... 6

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ....................................................................... 6

*Daubert v. Merrell Dow Pharms. Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ......................................................................... 3

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y 2018)........................................................... 18

*Persian Gulf Inc. v. BP W. Coast Prods. LLC.*,
    2022 WL 4830698 (C.D. Cal. Sept. 30, 2022) .................................... 7, 8, 10

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015) .............................................................. 11, 14

*Scott v. City of Sioux City, Iowa*,
    68 F. Supp. 3d 1022 (N.D. Iowa 2014)......................................................... 3

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    2018 WL 3862773 (D. Minn. Aug. 14, 2018) .............................................. 8

CORE/3508162.0002/179562374.1

**INTRODUCTION**

Expert testimony must, among other things, be relevant and reliable. As Defendants' opening brief explains, Dr. Williams' opinions are neither.

Dr. Williams' opinions are not relevant because they do not advance a material aspect of CIIPPs' claims. Although CIIPPs' must show an overcharge during the Class Period—June 2014 to June 2018—Dr. Williams fails to analyze impact during that period. He also makes no effort to connect his models to CIIPPs' theory of the case, which posits that Defendants restricted pork supply by cutting hog production and increasing exports, and that they supposedly "monitored" their "agreed-upon production limits" using the benchmarking service Agri Stats. But Dr. Williams offers no opinion that Defendants actually restricted hog production, increased exports, or used Agri Stats to monitor each other's production levels. As a result, his model predicts the same overcharge regardless of whether Defendants conspired in the manner CIIPPs allege.

Dr. Williams' models are also unreliable. Notably, Dr. Williams does nothing to validate a benchmark that includes 2008, an outlier year in the pork industry. He fails to account for key factors impacting pork prices, including the decisions of independent hog producers responsible for *70%* of U.S. hog supply. He offers no means by which to separate the effects of lawful exports from allegedly collusive exports. And his models contradict each other, with his main overcharge and common impact regressions generating wildly different results.

CIIPPs offer no meaningful response. Rather than confront the substance of Defendants' arguments, CIIPPs attack one strawman after another. They hide behind

CORE/3508162.0002/179562374.1

economic jargon, seeking to create the appearance of a "battle of the experts." They even suggest, contrary to *Daubert*'s core holding, that the Court should simply punt class-certification issues to the jury. But, critically, CIIPPs do not dispute that Dr. Williams:

- Designed his model to estimate the same overcharge each year of the alleged conspiracy, even though CIIPPs' allegations focus on the years before the Class Period;

- Did nothing to analyze the economically distinct theories of impact in CIIPPs' complaint, including sow liquidations and increased exports; and

- Did nothing to validate including 2008 in his benchmark, even though 2008 is an outlier year and including it is outcome-determinative.

CIIPPs also do not dispute that Dr. Williams' overcharge model, by design, does not account for changes in the profitability of raising hogs *or* the substantial drop in pig imports from Canada, even though he does not dispute that both factors have a material impact on domestic pork prices.

In sum, the essential facts of Defendants' motion remain undisputed. Dr. Williams' opinions are neither relevant nor reliable. They cannot support CIIPPs' motion for class certification.

CORE/3508162.0002/179562374.1

## ARGUMENT

**I.    Dr. Williams offers no method for showing common impact during the Class Period.**

Expert testimony is relevant only if it "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). As Defendants explained in their opening brief, Dr. Williams' opinions fail this requirement. *See* ECF No. 1459 ("Defs.' Br.") at 1-2, 9-13. CIIPPs seek damages from June 2014 to June 2018, and thus must prove impact during *this period*. But Dr. Williams estimates a single overcharge for a nine-and-a-half-year period—January 2009 to June 2018—that includes over five years of purchases outside the Class Period. As a result, Dr. Williams' model proves nothing about 2014-2018, specifically. *See Scott v. City of Sioux City, Iowa*, 68 F. Supp. 3d 1022, 1040-43 (N.D. Iowa 2014) (excluding expert report that purported to calculate damages by assessing time period that included both time-barred and non-time-barred conduct). Given that CIIPPs' allegations focus on supply restraints that supposedly occurred *before* the Class Period, Dr. Williams was required to analyze whether the effects of the alleged conduct may have varied over time. *See* Defs.' Br. 11. Because he did not, his model tells us nothing about "common impact" during the period that matters. *E.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020) (excluding expert model for assuming constant price impact despite variation in allegations over time).

CIIPPs respond with three arguments, each meritless. First, they attack a strawman, pretending Defendants' position is that "CIIPPs' proof will be restricted to the post-2014

3

period." ECF. No. 1637 ("Opp.") at 15. But Defendants' actual position—which CIIPPs ignore—is that, given the allegations here, an expert cannot reliably assume that the alleged conspiracy had the same impact at all times. This has nothing to do with the admissibility of pre-2014 evidence.

Second, CIIPPs argue that because the statute of limitations is a legal (as opposed to economic) concept, Dr. Williams may ignore it and calculate a single overcharge across the entire conspiracy period. *See* Opp. 13-16, 24. This makes no sense. *Of course* the statute of limitations is a legal construct—it defines the Class Period, and CIIPPs cannot prevail without showing an overcharge in that period, specifically. Thus, regardless of whether CIIPPs allege that the conspiracy existed during a broader period, Dr. Williams' failure to identify an overcharge during the Class Period prevents him from showing *legally relevant* antitrust impact on a class-wide basis.

Third, CIIPPs claim that Dr. Williams' model does, in fact, show impact during the Class Period. *See* Opp. 16. This is false. As Dr. Williams admitted, his overcharge model does not allow the effects of the alleged conspiracy to vary over time, and in particular "doesn't offer a specific estimate of an overcharge in [the Class] period." ECF No. 1465-1 ("Williams Dep.") at 29:21-30:4. And he does not challenge Dr. Haider's finding that, when his model is allowed to vary between the pre-Class and Class Periods, it shows *no overcharge during the Class Period*.

CIIPPs do not dispute any of this. Instead, they cite a grab-bag of "modified" regressions that Dr. Williams disclosed for the first time in his reply report, which CIIPPs claim show impact in the Class Period. Opp. 8. As discussed further below, however, Dr.

CORE/3508162.0002/179562374.1

Williams' new regressions are junk economics, designed to manufacture an overcharge where his model previously found none. Even Dr. Williams does not stand by them, conceding that his modifications make the model less reliable, and imploring the Court to apply the timely-disclosed model in his opening report. ECF No. 1635 ("Williams Reply Rep.") ¶¶ 105, 106 n.150. Accordingly, these untimely "modified" models cannot cure Dr. Williams' failure to analyze impact during the Class Period.[1]

## II.     Dr. Williams' opinions do not fit CIIPPs' theories of impact.

Dr. Williams' opinions also fail *Daubert*'s relevancy prong because they do not fit CIIPPs' theories of impact. As explained in Defendants' opening brief, CIIPPs allege several mechanisms by which Defendants purportedly restricted supply (sow liquidations and increased exports) or could have restricted supply (capacity and slaughter reductions). *See* Defs.' Br. 12. But Dr. Williams does not analyze whether any of these metrics changed due to the alleged conspiracy. *Id.* Instead, his models calculate the same purported impact regardless of whether Defendants actually restricted hog production, coordinated slaughter rates, reduced capacity, or colluded to increase exports. As a result, they cannot isolate the effects (if any) of Defendants' alleged conduct.

CIIPPs do not contest the factual premise of this argument. Rather, they argue Dr. Williams does not need to tie his analysis to Defendants' alleged conduct, specifically,

---

[1] If Dr. Williams believed these models represented the correct method for analyzing impact, he was required to disclose them in his initial report. *See Bison Advisors LLC v. Kessler*, 2016 WL 3525900, at *14-15 (D. Minn. Jan. 21, 2016) (striking new damages theory from supplemental expert report because the Federal Rules do "not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' initial report" (cleaned up)).

CORE/3508162.0002/179562374.1

because "CIIPPs have never advanced distinct, economically differentiated theories of antitrust injury." Opp. 17. Instead, CIIPPs claim, they assert only one theory that consists of Defendants "engag[ing] in several types of conduct aimed at decreasing the domestic supply of pork products and increasing prices." *Id.*

But this does not help CIIPPs, for at least two reasons. First, CIIPPs are simply wrong that they do not allege economically distinct theories of harm: the allegedly conspiratorial mechanisms they identify—herd liquidations, exports, slaughter rates, capacity reductions—would impact pork prices in different ways, at different times, and for different durations.[2] Second, CIIPPs miss the point: regardless of whether CIIPPs characterize their case as separate theories or one theory consisting of "several types of conduct," Dr. Williams' regressions must still isolate the impact of that alleged conduct— they must "measure only those damages attributed" to Defendants' alleged supply-reduction mechanisms. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (rejecting model that did not "separate lawful from unlawful conduct"). Dr. Williams' models do not attempt to

---

[2] CIIPPs allege that Defendants reduced sow herds primarily at the beginning of the conspiracy period, thereby reducing hog supply. If this was true, one would expect a reduction in the supply of all primal cuts (bellies, loins, hams, etc.) early in the alleged conspiracy and lasting until hog supply recovered. By contrast CIIPPs allege that exports increased relative to production in some, but not all years, and do not claim that exports in one period would somehow reduce supply in others. Compl. ¶ 126 & Fig. 8. Moreover, exports would only impact the supply of products that were actually exported, a point Dr. Williams does not dispute. 2d Thomson Decl. Ex. 1 ("Williams II Dep.") at 83:6-14. As for capacity restrictions and coordinated slaughter rates, Dr. Williams identifies no examples of either. He does not explain whether or when they actually occurred, if they were temporary or sustained, or how they led to higher prices in the Class Period.

CORE/3508162.0002/179562374.1

discern whether *any* damages are attributable to the particular conduct CIIPPs allege.  Put differently, they do not translate "the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."  *Comcast*, 569 U.S. at 38.  Because Dr. Williams' models do not fit CIIPPs' theory of liability, they must be excluded.

## III.  Dr. Williams offers no econometric justification for including 2008 in his benchmark.

In addition to failing *Daubert*'s "fit" requirement, Dr. Williams' models are unreliable for a host of reasons.  Prominent among these is that he relies on an inappropriate and unvalidated benchmark.

Just weeks ago, the Central District of California excluded Dr. Williams' regressions for this same error, explaining that "a sound econometric approach to selecting [benchmark] periods is essential to the validity of the entire analysis."  *Persian Gulf Inc. v. BP W. Coast Prods. LLC.*, 2022 WL 4830698, at *35 (C.D. Cal. Sept. 30, 2022).  "To be admissible, a regression analysis must examine an appropriate set of data," and thus "some passably scientific analysis *must* undergird the selection of the frame of reference."  *Id.* at *37 (quotation omitted, emphasis added).

Just like in *Persian Gulf*, Dr. Williams skipped that analysis here.  As Defendants have shown—and CIIPPs have not contested—2008 was an outlier year for the pork industry, with demand reaching a thirty-year low at the same time both hog supply and input costs were skyrocketing.  *See* ECF No. 1442-1 ("Haider Rep.") ¶¶ 126-27; ECF No. 1442-2 ("Mintert Rep.") ¶¶ 107-127.  This was due in large part to the introduction of the circovirus vaccine, which greatly decreased hog mortality.   Haider Rep. ¶ 127.

Nonetheless, Dr. Williams failed to conduct *any* analysis to determine whether pricing and supply in 2008 are "reliable predictor[s]" of what pricing and supply would have been but-for the alleged conspiracy. *In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018); Williams Dep. 137:13-15, 137:16-138:9, 142:13-143:23. This failure is significant: if one controls for 2008 but otherwise leaves Dr. Williams' overcharge model unchanged, the model predicts *no effect* during the Class Period. Haider Rep. ¶¶ 128, 130.

CIIPPs do not respond to these arguments. They do not dispute (and Dr. Williams has now conceded) that benchmarks must reflect normal conditions, and that experts must assess whether the relationship between control variables and the dependent variable (here, pork prices) was similar during the benchmark and conduct periods. *See* Defs.' Br. 14, 16 (collecting authorities); Williams II Dep. 216:14-218:2 (confirming he does not dispute that "[i]t is essential that the non-impact period be as similar as possible to the impact period" or that "[i]t is important to test whether prices react differently to the supply and demand factors in the conspiracy period than they did in the non-conspiracy period"). They do not dispute that Dr. Williams' model is sensitive to including 2008, *i.e.*, that adding a variable to account for 2008 flips the results. They do not dispute that Dr. Williams' only reason for including 2008 in the benchmark is that it came before 2009—the same reasoning that led to the exclusion of his opinions in *Persian Gulf*. *See* 2022 WL 4830698, at *36 (rejecting benchmark chosen because it immediately preceded claimed conduct period, without further justification). And they do not dispute that he fails to analyze whether 2008 is a reliable predictor of but-for pricing in the conspiracy period.

CORE/3508162.0002/179562374.1

Dr. Williams also fails to respond to Defendants' criticisms. Instead, he simply claims, without explanation, that his "demand and cost factors" account for everything that happened in 2008. Williams Reply Rep. ¶ 119. But he conducts no analysis to confirm this. For example, Dr. Williams does not dispute that, as a result of the circovirus vaccine, hog supply (and thus pork supply) expanded rapidly throughout 2008 even though hog producers were losing money. Williams II Dep. 172:9-173:14, 184:25-185:18. Instead, he claims "piglet loss rate" data—which he has for only one Defendant, Seaboard—controls for the new vaccine. Williams Reply Rep. ¶ 118. But he does nothing to back this up. Had Dr. Williams conducted any analysis whatsoever, he would have learned that Seaboard's data could not "control" for the circovirus vaccine because Seaboard *never had a system-wide or sustained outbreak of that disease. See* 2d Thomson Decl. Ex. 2 (Seaboard vet records making no reference to circovirus outbreaks prior to vaccine availability in 2007). As a result, Seaboard's "piglet loss rate," as Dr. Williams defines it, actually *increased* in 2008—meaning the data plainly could not "control" for an industrywide *decrease* in mortality due to the vaccine. *See id.* Ex. 3 at Tab "Nursery-Yearly" (showing increase in "Nursery % Total Loss" from 3.31% in 2007 to 4.16% in 2008); Tran Decl. ¶¶ 3-4; Williams II Dep. 233:11-24 (admitting that vaccine would lead to "decrease in mortality").

Moreover, Dr. Williams ignores the substance of Defendants' argument. The problem with including 2008 is that hog supply was extremely high relative to cost and demand variables in 2008 due to farrowing decisions made in 2007. Thus, regardless of whether Seaboard's piglet loss statistic captured the effect of the vaccine on sow

9

productivity in 2008, it tells us nothing about the decisions that led to the oversupply in the first place.[3]

Instead of addressing Defendants' arguments, CIIPPs attack yet another strawman, arguing that Defendants contend Dr. Williams should have conducted a "structural break test" to validate the conspiracy's start date.  Opp. 22.  Although CIIPPs have stumbled into another reason to exclude Dr. Williams' model,[4] they miss the point.  Defendants' argument was not about the conspiracy's start date, but rather that Dr. Williams was required to do something—anything—to test whether including an obvious outlier like 2008 in his benchmark was appropriate.  Having failed to do that, his models are unreliable. *Persian Gulf*, 2022 WL 4830698, at *37 ("Where the selection of the benchmark period is neither grounded in econometric principles nor the record, all of the econometric assumptions that flow from the identification of a 'clean' period are rendered unsound.").

## IV.   Dr. Williams confirms that he does not, and cannot, account for supply reduction decisions by non-Defendant hog producers in the United States and Canada.

Defendants' opening brief pointed out another critical flaw in Dr. Williams' model: it fails to account for the decision-making of independent hog producers who controlled roughly *70%* of U.S. hog production during the alleged conspiracy period.  Defs.' Br. 18-

---

[3] The same is true for Dr. Williams' hog cost variable, which he also claims can account for changes in mortality.  But as he admitted in his second deposition, he did nothing to verify this claim, and he does not contend that the hog cost variable reflects the information available to hog producers in 2007 when they made their production decisions.  Williams II Dep. 238:13-24, 245:4-13.

[4] CIIPPs allege that "Defendants' conspiracy to restrict pork supply began in the last part of 2008."  Compl. ¶ 137.  Thus, just like in *Persian Gulf*, Dr. Williams included periods of alleged "anticompetitive misconduct" in his benchmark.  2022 WL 4830689, at *36.

19.  Given CIIPPs' allegation that hog production drives pork supply, this failure renders Dr. Williams' model unreliable.  *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015) (holding regression unreliable where expert "fail[ed] to account for non-conspiring producers").

In response, neither CIIPPs nor Dr. Williams contest that independent producers account for the vast majority of hog production, that hog supply expands or contracts based on hog producer profitability, or that Defendants cannot slaughter hogs that do not exist. Instead, they make three meritless arguments.

**First**, CIIPPs claim that Dr. Williams need not account for independent producers because demand for hogs is "derived" from demand for pork.  Opp. 28. Citing Dr. Williams' reply report, CIIPPs claim that, because the alleged conspiracy had the "effect" of "decreasing market demand for hogs," the conspiracy must also have resulted in fewer hogs being sold regardless of whether Defendants actually controlled hog supply.  *Id.*  But as Dr. Williams conceded at his second deposition, his logic starts from the premise that Defendants' alleged conspiracy caused pork prices to increase, leading consumers to buy less pork, leading packers to buy fewer hogs.  Williams II Dep. 129:16-130:18. The flaw in this reasoning is obvious: it assumes precisely what Dr. Williams is supposed to be testing—that the alleged conspiracy caused higher pork prices.  *Cf.* ECF No. 1429 ("Williams Rep.") ¶ 208 (claiming "I do not assume that pork prices were raised during the damages period by Defendants' alleged conspiracy").

Perhaps more importantly, Dr. Williams' logic flips CIIPPs' case on its head. CIIPPs (like all plaintiff groups) allege Defendants increased pork prices by reducing hog

supply, not that Defendants reduced hog supply by increasing pork prices. This distinction is crucial. Under CIIPPs' theory of the case, Defendants' alleged sow reductions led to higher prices for both hogs and pork. CIIPP 4th Am. Compl. ("Compl.") ¶¶ 167, 169. Yet under Dr. Williams' new theory, Defendants' (unspecified) conduct would lead to higher prices for pork but *lower* prices for hogs. *See* Williams Reply Rep. ¶ 53 & Fig. 1 (showing reduction in hog prices due to alleged conspiracy). The key word is "theory," as Dr. Williams offers no opinion that the alleged conspiracy *actually* caused hog prices to drop. *See* Williams II Dep. 131:13-20 (claiming his report "doesn't offer an opinion" on whether "hog prices [fell] below but-for levels as a result of the defendants' alleged conduct"). Thus, Dr. Williams' *post hoc* justification for ignoring independent producers is not only at odds with CIIPPs' complaint; it is also entirely hypothetical. It does nothing to rescue his overcharge model.

**Second**, CIIPPs claim that Dr. Williams' control variables already account for the cost and demand factors that impacted hog production. Opp. 25-26 & n.11. But even Dr. Williams does not claim his overcharge model controls for hog prices or hog producer returns, the fundamental driver of hog (and thus pork) supply. *See* Mintert Rep. ¶¶ 22-24 (discussing importance of producer returns to understanding hog and pork supply). Indeed, he claims he *cannot* validly control for them because they are "endogenous" to (that is, impacted by) the variable of interest: pork prices. Opp. 26 n.11; Williams Reply Rep. ¶¶ 124-14 & n.162. This, however, does not excuse his failure to account for these key factors affecting hog production. To the contrary, it merely demonstrates that the simplistic model he designed is incapable of isolating the effects of the challenged conduct.

12

Critically, Dr. Williams *does not dispute this point*.  Dr. Haider's report was crystal clear: Dr. Williams' use of hog production costs, instead of Defendants' actual cost of acquiring hogs (*i.e.*, hog prices), resulted in "artificially inflated overcharge estimates." Haider Rep. ¶ 118.  In other words, failing to control for hog prices injected bias into his model.  *Id.* ¶ 114.  Unable to disagree, Dr. Williams simply ignores this criticism in his reply report.  It is therefore undisputed that Dr. Williams' overcharge model is biased. And, as Dr. Williams concedes, that renders his model invalid.  *See* Williams Dep. II 267:25-268:3 ("You just don't rely on a regression that has biased coefficients.").[5]

In addition to failing to account for hog prices or producer returns, Dr. Williams ignores the drastic reduction in hog imports from Canada.  These fell from 9.9 million head in 2007, representing 9% of hogs slaughtered in the United States, to only 6.3 million in 2009, and continued at that level for the next decade.  Haider Rep. ¶ 75 n.118.  This amounts to a 3.3% reduction in hogs available for slaughter by American pork processors—accounting for roughly half the total decline in "domestic supply" that Dr. Williams purports to find in the alleged conspiracy period.  *Id.*; Williams Rep. ¶ 170. Tellingly, although CIIPPs acknowledge this criticism, Opp. 25, 27, neither they nor Dr. Williams respond to it.  Dr. Williams' failure to account for such a significant driver of U.S. pork supply renders his model unreliable.

---

[5] That is not the only concession Dr. Williams made about his modeling choice.  He also admitted that there are methods for overcoming the so-called endogeneity problem, *yet he chose not to use them*.  Williams II Dep. 268:18-269:17.  Instead, he simply proceeded with a control variable that resulted in a biased and unreliable overcharge estimate.  *Id.*

**Third**, CIIPPs attempt to distinguish *Processed Eggs*, which holds that a "failure to account for non-conspiring producers. . . undermin[es] the reliability" of an expert's model. 312 F.R.D. at 153 (excluding expert and denying class certification). But CIIPPs resort to mischaracterization, claiming the decision turned on the failure to analyze *purchasers* rather than non-conspiring producers. Opp. 28-29. This is plainly wrong: *Processed Eggs* references purchasers only as an example of why non-defendant *producers* made supply decisions not accounted for by plaintiffs' model. 312 F.R.D. at 153-54. Dr. Williams' regressions suffer the same flaw: he does nothing to account for independent decisions by non-defendant hog producers who make up 70% of the industry.

## V.    Dr. Williams offers no method for isolating the effects of lawful exports from the effects of purportedly collusive exports.

Defendants' opening brief explained that, although CIIPPs claim Defendants used exports to inflate domestic pork prices, Dr. Williams makes no effort to differentiate *lawful* exports from those resulting from the alleged conspiracy. Defs.' Br. 20-21. Indeed, Dr. Williams offers no opinion that Defendants' alleged agreement resulted in higher export levels than the "but for" world. As a result, he is unable to isolate the effects of allegedly collusive exports—which CIIPPs have never identified—from the effects of lawful exports by Defendants and other packers.

CIIPPs do not dispute any of this. Instead, accusing Defendants of ignoring the "economic realities" of the "domestic pork market," they suggest that lawful exports are irrelevant because *in theory* Defendants could have offset increased exports by producing more pork. Opp. 31.

14

But CIIPPs offer no evidence that Defendants even had the *ability* to offset exports by simply increasing production.  Critically, they do not (and cannot) offer evidence that export sales are booked far enough in advance to permit an offsetting increase in supply. *See* Compl. ¶ 55 (alleging that any significant expansion in hog production could take up to two years); *id*. ¶¶ 98-99 (alleging that significant increases in slaughter capacity can cost hundreds of millions of dollars and take substantial time); *see also* Williams II Dep. 194:11-18, 197:14-21 (confirming he offers no opinion about how far in advance packers typically book export sales or how quickly packers could "bring about an increase in pork supply").  In short, CIIPPs' new theory is as divorced from the evidentiary record as their original claim that Defendants colluded to increase export sales.  It does nothing to justify Dr. Williams' failure to differentiate between lawful and allegedly unlawful exports.

## VI.   Dr. Williams' reply report merely confirms his impact model is unreliable.

Dr. Williams' errors matter. As Defendants explained in their opening brief—and Dr. Haider establishes in her report—Dr. Williams' model shows no overcharge in the Class Period if (1) the effects of the alleged conspiracy are allowed to vary between the pre-Class and Class Periods; or (2) a control variable is added for 2008.  Haider Rep. ¶¶ 111, 128, 130.  Dr. Haider also demonstrates that Dr. Williams' alternative approaches to estimating impact generate wildly different results, and that Dr. Williams does nothing to control for lawful exports.  *Id.* ¶¶ 97-101, 191-95.

Dr. Williams does not dispute these points.  Instead, he devotes over 100 pages to attacking strawmen, flipping the burden of proof onto Defendants, and discussing a litany of alternative regressions that (1) he falsely claims were "suggested" by Dr. Haider, and

(2) he and CIIPPs concede are "methodologically inappropriate."  Opp. 8, 27.  These opinions merely confirm that Dr. Williams' simplistic approach is insufficient to carry CIIPPs' burden.

### a. Dr. Williams' effort to manufacture an overcharge during the Class Period is unreliable.

As discussed above, Dr. Williams does not dispute that his model shows no overcharge during the Class Period, specifically.  Instead, hiding behind the lack of allegations that "the alleged conspiracy had different effects in different parts of the [conspiracy] period," he argues that it is inappropriate to subdivide the nine-and-a-half-year conspiracy period *at all*.  Williams Reply Rep. ¶ 105.  Indeed, he contends, the "magnitude of the estimated price effect becomes *less accurate* as one starts to slice and dice the [conspiracy] period into smaller subperiods."  *Id.* (emphasis added).

Nonetheless, in order to manufacture an overcharge in the Class Period, Dr. Williams does precisely what he claims an expert should not do: he subdivides the conspiracy period into *three* subperiods: January 2009 to December 2010; January 2011 through February 2014; and March 2014 through June 2018.  Williams Reply Rep. ¶ 106.  Dr. Williams claims that his subdivisions are based on "economic events discussed by Dr. Haider in her report."  *Id.* ¶ 106.  This is nonsense: Dr. Haider nowhere suggests Dr. Williams should divide the alleged conspiracy into those periods, which have no

connection to CIIPPs' theory of the case.  Dr. Williams' attribution of his subperiods to Dr. Haider is a transparent attempt to disguise his own failure to justify them.[6]

That Dr. Williams' new regressions are unreliable is apparent from their results. Recall that his original regression predicted a 10.3% overcharge across the entire conspiracy period, and that allowing the results to vary between the pre-Class and Class Periods resulted in *no* overcharge for the Class Period.  By subdividing the conspiracy period and adding a variable for the Class Period, however, Dr. Williams manufactures an overcharge of ***25.0%***.  Williams Reply Rep. ¶ 108 (Table 6).  And, amazingly, Dr. Williams reveals that when he removes the Class Period variable but retains the three sub-periods, the overcharge during the 2014 to 2018 period skyrockets to ***38.7%***, or nearly four times the "common" overcharge he uses to estimate damages.  *Id.* ¶ 107 (Table 5).

All of this reveals the contrived nature of Dr. Williams' modifications.  More importantly, it shows that his model is sensitive to minor changes in assumptions.  Indeed, the problems multiply as Dr. Williams swaps in and out variables in an attempt to respond to Dr. Haider's other criticisms of his model.  Through this process, Dr. Williams' model predicts overcharges in the 2014 to 2018 period ranging from 0% (when unmodified) to

---

[6] CIIPPs allege the following conduct that purportedly reduced domestic pork supply:  sow reductions by certain Defendants in 2008, 2009, and 2010; industrywide hog reductions in 2009, 2010, and 2013; and increased exports (as a percentage of total production) in some years, but not in others, between 2009 and 2017.  *See* Compl. ¶¶ 124-26, 128 & Figs. 7-8. Nothing about those allegations suggests there is an "economic basis" for subdividing the alleged conspiracy period into the three periods Dr. Williams uses in his reply report, which he claims coincide with the "period of early production cuts," the "interim period before [PEDv] significantly affected pork production," and the "period after the onset of PEDv." Williams Reply Rep. ¶ 106.  Indeed, if Dr. Williams controls for the effects of PEDv using a mortality variable, as he claims, then his sub-periods based on PEDv make no sense.

17

38.3%, and overcharges across the entire conspiracy period of between 2.9% and 18.3%. A model that swings so wildly based on small changes is not reliable. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y 2018).

Unsurprisingly, not even Dr. Williams stands by the results of his modified regressions. As he states in a footnote, "the magnitude of the price effect is estimated less accurately when the damages period is disaggregated into subperiods." Williams Reply Rep. ¶ 106 n.150. He thus urges the Court to accept his original, deeply flawed model—not the modified versions in his reply report. *Id.*

### b. CIIPPs concede that Dr. Williams' models generate wildly inconsistent results.

Defendants' opening brief explained that Dr. Williams' two approaches for calculating overcharges generate wildly inconsistent results for customers of several direct purchasers, including ██████████████████████. Defs.' Br. 25-28. Indeed, Dr. Williams' main overcharge regression, which he uses to estimate class-wide damages, identifies an overcharge ███████████████████████████████████ ██████████████. *Id.* at 27. CIIPPs do not dispute this; instead, they claim such wild discrepancies are *to be expected* given Dr. Williams' modeling choices. *See* Opp. 35-36; Williams Reply Rep. ¶¶ 162-63. This merely confirms the problem: because Dr. Williams' models are divorced from CIIPPs' theory of liability *and* the basic structure of the pork industry, they generate arbitrary and inconsistent results. They cannot accurately identify an overcharge by any member of the proposed class, let alone the class as a whole.

## <u>CONCLUSION</u>

For the foregoing reasons and those expressed in Defendants' opening brief, Dr.

Williams' opinions should be excluded.

Dated: January 6, 2023

Respectfully submitted,

*By: /s/ Peter J. Schwingler*
Peter J. Schwingler (#0388909)
William L. Greene (#0198730)
William D. Thomson (#0396743)
Jon W. Ripa (#0402069)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
william.thomson@stinson.com
jon.ripa@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

***Counsel for Seaboard Foods LLC and
Seaboard Corporation***

/s/ Mark L. Johnson
Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

/s/ Craig. S. Coleman
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Wells Fargo Center

19

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

***Counsel for Clemens Food Group, LLC
and The Clemens Family Corporation***

90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE &
REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

***Counsel for Hormel Foods Corporation***

/s/ *Peter H. Walsh*
Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP

/s/ *Christopher A. Smith*
Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)

CORE/3508162.0002/179562374.1

80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

***Counsel for Agri Stats, Inc.***

/s/  *Tiffany Rider Rohrbaugh*
Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)

Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (*pro hac vice filed*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com

***Counsel for Triumph Foods, LLC***

21

AXINN, VELTROP & HARKRIDER
LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

***Counsel for Tyson Foods, Inc., Tyson
Prepared Foods, Inc. and Tyson Fresh
Meats, Inc.***