# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: PORK ANTITRUST LITIGATION | Case No. 0:18-cv-01776-JRT-JFD |
| This Document Relates To:<br><br>ALL COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS ACTIONS | **MEMORANDUM IN OPPOSITION TO THE COMMERCIAL AND INSTITUTIONAL INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**[REDACTED]** |

**Table of Contents**

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 3

I.    CIIPPs reside near the end of the pork distribution chain. ......................... 3

II.   Each link in the distribution chain shows widespread variation in pricing. ............. 5

III.  CIIPPs offer no evidence of "common impact" during the Class Period. ................. 7

ARGUMENT ....................................................................................................... 8

I.    To certify a damages class, Plaintiffs must establish that antitrust impact can be proven on a class-wide basis. ...................................................... 8

II.   Plaintiffs offer no method for establishing injury through common proof. ............... 9

      A.    CIIPPs mischaracterize their expert's work. .................................... 10

      B.    Dr. Williams fails to present a reliable method for determining overcharges, if any, paid by the putative class. ............................. 13

            1.    Dr. Williams' overcharge regressions cannot establish common impact at the direct purchaser level. .................................. 14

            2.    Dr. Williams does not present a reliable method for showing common pass-through. .................................................. 14

                  (a)   Dr. Williams' pass-through models undermine his main overcharge regression. ......................................... 15

                  (b)   Dr. Williams' pass-through regressions have the same methodological flaws as his main overcharge regression. ............... 16

                  (c)   Dr. Williams' models do not show that virtually all commercial end-users paid at least one overcharge. ............................. 17

      C.    Dr. Williams improperly uses averages to mask differences between putative class members. .......................................... 17

      D.    Statistical tests reject Dr. Williams' assumption of a single overcharge at the direct purchaser level and reveal many uninjured class members. ................. 20

III.  CIIPPs cannot show predominance or superiority because of material variations in the many state laws governing their claims. .......................... 21

      A.    State antitrust laws vary as to whether and to what extent CIIPPs may recover. .......................................................... 23

      B.    State consumer protection laws vary materially. .............................. 23

i

     C.    State unjust enrichment law varies materially..................................................... 25

     D.    The jury would be forced to consider myriad statutes of limitations. ............... 27

IV.  Named Plaintiffs lack standing and are inadequate class representatives to bring claims under the laws of states in which they were not injured. .............................. 28

V.   CIIPPs have not shown the proposed class is ascertainable...................................... 30

CONCLUSION ............................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraham v. WPX Energy Production, LLC,*
    20 F. Supp. 3d 1244 (D.N.M. 2014) ........................................................................... 26

*Adams v. K.C. Life Ins. Co.,*
    192 F.R.D. 274 (W.D. Mo. 2000) .................................................................................. 22

*In re Aggrenox Antitrust Litig.,*
    No. 3:14-md-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016) ................................ 25

*In re Aluminum Warehousing Antitrust Litig.,*
    336 F.R.D. 5 (S.D.N.Y. 2020) ............................................................................... 19, 20

*BASF Corp. v. Cesare's Collision Repair & Towing, Inc.,*
    364 F. Supp. 3d 1115 (E.D. Cal. 2019) ........................................................................ 27

*In re Baycol Prod. Litig.,*
    218 F.R.D. 197 (D. Minn. 2003) ................................................................................... 25

*Bennett v. Visa U.S.A. Inc.,*
    198 S.W.3d 747 (Tenn. Ct. App. 2006) ....................................................................... 27

*Blades v. Monsanto Corp.,*
    400 F.3d 562 (8th Cir. 2005) ..................................................................................... 1, 9

*Brown v. Wells Fargo & Co.,*
    284 F.R.D. 432 (D. Minn. 2012) (Tunheim, J.) ........................................................... 30

*Burum v. Mankato State Univ.,*
    No. 98–696, 2002 WL 27123 (D. Minn. Jan. 8, 2002) ................................................ 30

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.,*
    227 F.R.D. 313 (C.D. Cal. 2004) ........................................................................... 29, 31

*Clayworth v. Pfizer, Inc.,*
    233 P.3d 1066 (Cal. 2010) ........................................................................................... 23

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
    No. 09 CV 3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .................................. 29

*Dolmage v. Combined Ins. Co. of Am.*,
    No. 14 C 3809, 2017 WL 1754772 (N.D. Ill. May 3, 2017) ...................................... 30

*In re Domestic Drywall Antitrust Litig.*,
    No. 13-MD-2437, 2017 WL 3700999 (E.D. Pa. Aug. 24, 2017) ............................... 32

*In re Domestic Drywall Antitrust Litig.*,
    No. 13-MD-2437, 2016 WL 4409333 (E.D. Pa. Aug. 18, 2016) ............................... 28

*Dowling Fam. P'ship v. Midland Farms*,
    865 N.W.2d 854 (S.D. 2015) .................................................................................... 26

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
    No. 17-md-2785, 2020 WL 1180550 (D. Kan. Mar. 10, 2020) ........................... 23, 24

*Fenerjian v. Nongshim Co.*,
    72 F. Supp. 3d 1058 (N.D. Cal. 2014) ...................................................................... 26

*Ferrari v. Best Buy Co.*,
    No. 14–2956, 2015 WL 2242128 (D. Minn. May 12, 2015) ...................................... 29

*Foster v. St. Jude Med., Inc.*,
    229 F.R.D. 599 (D. Minn. 2005) ........................................................................... 22, 28

*Graham v. Catamaran Health Sols. LLC*,
    940 F.3d 401 (8th Cir. 2017) .................................................................................... 27

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ......................................................................... 16, 18

*Hale v. Emerson Elec. Co.*,
    942 F.3d 401 (8th Cir. 2019) .................................................................................... 21

*Hall v. Lhaco, Inc.*,
    140 F.3d 1190 (8th Cir. 1998) .................................................................................. 30

*Hoekman v. Education Minn.*,
    335 F.R.D. 219 (D. Minn. 2020) ............................................................................. 3, 31

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    No. 13–2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014) ...................................... 28

*Johannessohn v Polaris Indus. Inc.*,
    9 F.4th 981 (8th Cir. 2021) ...................................................................................... 21

*Kanne v. Visa U.S.A., Inc.*,
    723 N.W.2d 293 (Neb. 2006)................................................................... 27

*Kwikset Corp. v. Superior Ct.*,
    246 P.3d 877 (Cal. 2011) ....................................................................... 24

*In re Lamictal Direct Purchaser Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020).................................................................... 18

*LaMotte v. Punch Line of Columbia, Inc.*,
    370 S.E.2d 711 (S.C. 1988) .................................................................... 24

*McAteer v. Target Corp.*,
    No. 18-349, 2018 WL 3597675 (D. Minn. July 26, 2018) .......................... 29

*Nelson v. Lusterstone Surfacing Co.*,
    605 N.W.2d 136 (Neb. 2000).................................................................... 24

*In re Packaged Ice Antitrust Litig.*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011)..................................................... 29

*Paweltzki v. Paweltzki*,
    964 N.W.2d 756 (S.D. 2021) .................................................................... 27

*In re Pharm. Benefit Mgrs. Antitrust Litig.*,
    No. 06-1782, 2017 WL 275398 (E.D. Pa. Jan. 18, 2017)............................ 18

*Phillips v. Apple Inc.*,
    725 F. App'x 496 (9th Cir. 2018) .............................................................. 24

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020) ........................................................ 20

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    No. 14–02567, 2016 WL 6963059 (W.D. Mo. Jan. 13, 2016) ..................... 29

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    No. 14-02567, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ................. 9, 18

*In re Prempro Prod. Liab. Litig.*,
    230 F.R.D. 555 (E.D. Ark. 2005).................................................. 22, 25, 28

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015)........................................... 19, 21, 22, 25

*Rapp v. Green Tree Servicing, LLC*,
    302 F.R.D. 505 (D. Minn. 2014)..................................................................... 25

*Reed v. Advocate Health Care*,
    No. 06-C-3337, 2009 WL 3146999 (N.D. Ill. Sept. 29, 2009) .................................... 18

*Shoots v. iQor Holdings US Inc.*,
    325 F.R.D. 253 (D. Minn. 2018)..................................................................... 22

*Southard v. Visa U.S.A., Inc.*,
    734 N.W.2d 192 (Iowa 2007) ....................................................................... 26

*In re St. Jude Med., Inc.*,
    425 F.3d 1116 (8th Cir. 2005) ..................................................................... 23

*Sultanis v. Champion Petfoods USA Inc.*,
    No. 21-cv-00162, 2021 WL 3373934 (N.D. Cal. Aug. 3, 2021) ................................. 30

*Thompson v. Bayer Corp.*,
    No. 4:07CV00017, 2009 WL 362982 (E.D. Ark. Feb. 12, 2009) ................. 25, 26, 27

*True v. Conagra Foods, Inc.*,
    07–00770, 2011 WL 176037 (W.D. Mo. Jan. 4, 2011) ............................................ 30

*Tyler v. Alltel Corp.*,
    265 F.R.D. 415 (E.D. Ark. 2010).................................................................... 25

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
    No. 2:06–cv–1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015) ............................. 26

*Webb v. Exxon Mobil Corp.*,
    856 F.3d 1150 (8th Cir. 2017) ...................................................................... 21

**Statutes**

Ark. Code § 4-88-115 .......................................................................................... 27

Cal. Bus. & Prof. Code § 16750.1 ...................................................................... 27

Cal. Bus. & Prof. Code § 17200 ......................................................................... 24

Minn. Stat. § 325D.57 ......................................................................................... 23

N.M. Stat. § 57-12-2(E)....................................................................................... 24

N.Y. Gen. Bus. Law § 340(6).............................................................................. 23

Neb. Rev. Stat. § 59-821.01(2) ........................................................................ 23

R.I. Gen. Laws § 6-36-11(a) ........................................................................... 23

S.D. Codified Laws § 37-1-33 ......................................................................... 23

Vt. Stat. tit. 9, § 2451a(1) ............................................................................... 25

Vt. Stat. tit. 9, § 2465(b) ................................................................................. 23

**Other Authorities**

ABA Section of Antitrust Law, *Econometrics* (2d ed. 2014) ........................... 18

1 *McLaughlin on Class Actions* § 4:2 (18th ed.) ........................................... 32

The undersigned Defendants respectfully submit this memorandum in opposition to the Commercial and Institutional Indirect Purchaser Plaintiffs' ("CIIPPs") motion for class certification.

## INTRODUCTION

To establish the requirements for a damages class, an antitrust plaintiff must show—among other things—that "both conspiracy and impact can be proven on a systematic, class-wide basis." *Blades v. Monsanto Corp.*, 400 F.3d 562, 569 (8th Cir. 2005). CIIPPs cannot do so here. The cornerstone of their motion is the testimony of Dr. Michael Williams, who offers a series of regressions that he claims show a common overcharge passed-through uniformly to the class. But these models cannot establish class-wide impact for remarkably simple reasons.

First and foremost, Dr. Williams' models do not analyze impact during the Class Period. CIIPPs seek damages from June 2014 to June 2018. To establish liability, therefore, they must prove antitrust impact during *this period*. But, by his own admission, Dr. Williams never analyzed whether an overcharge existed between June 2014 and June 2018—let alone whether that overcharge was passed on to the CIIPPs. Instead, his models estimate an average overcharge across a much longer period: 2009 to 2018. Because a nine-year average tells us nothing about the last four years, it follows that Dr. Williams' models are incapable of showing impact during the Class Period.

This error is crucial. When Defendants' expert, Dr. Laila Haider, re-ran Dr. Williams' models focusing on the *relevant* period, the purported overcharge disappeared.

1

Put bluntly, the results show CIIPPs have no case. More pertinently, they show CIIPPs cannot prove impact on a class-wide basis.

The problems with Dr. Williams' approach continue from there. For instance, Dr. Williams failed to analyze whether Defendants' alleged agreement affected hog supply or exports—even though CIIPPs claim Defendants conspired to increase pork prices by restricting hog supply and increasing exports. Similarly, Dr. Williams ignored key non-conspiratorial factors affecting hog supply, including that non-Defendant producers account for *70%* of hog production. And Dr. Williams' pass-through models are equally flawed: notably, although he claims that a common overcharge of 10.3% was passed on at roughly a 100% rate, his own studies of individual distributors suggest overcharges as low as ██%, demonstrating his models cannot show impact "common" to the class. Likewise, Dr. Williams opines that 99.6% of direct purchasers were overcharged between 2009 and 2018 based on a method so flawed it also shows over 80% of direct purchasers were overcharged during the benchmark period—that is, *before the alleged conspiracy even started*. In sum, Dr. Williams' opinions are unreliable and cannot support class certification.

CIIPPs' motion suffers from other flaws. CIIPPs seek to certify a single class to pursue claims under the laws of *twenty-eight* jurisdictions, including twenty-three antitrust claims, eleven consumer protection claims, and twenty-six unjust enrichment claims. Contrary to CIIPPs' assertions, these state laws are anything but uniform. In these circumstances, not only is predominance lacking, but a class-action would be unmanageable—and, hence, not a superior method of adjudication.

Similarly, CIIPPs reside and operate in only eleven states, but seek to represent class members in seventeen additional jurisdictions.  Not only do they lack standing to do so, but for those jurisdictions they are inadequate class representatives and their claims are atypical.

Finally, CIIPPs' class definition requires them to identify which of hundreds of thousands of entities within the United States (1) indirectly purchased (2) specific pork products (3) from Defendants (4) over a limited time period (5) "for their own business use in commercial food preparation."   Proposed Order ¶ 1(b), ECF No. 1346 ("Proposed Order").  CIIPPs do not explain how they could do this, let alone "with reference to objective criteria."  *Hoekman v. Education Minn.*, 335 F.R.D. 219, 249 (D. Minn. 2020).  Accordingly, they have failed to show that their class is ascertainable.

## BACKGROUND

Defendants' main brief sets forth the evidence relevant to all three plaintiff groups' motions for class certification.  The sections below provide additional context specific to the CIIPPs.

## I.    CIIPPs reside near the end of the pork distribution chain.

Defendants do not sell pork directly to CIIPPs.  Instead, Defendants sell pork to hundreds of distributors.  These direct purchasers then resell the products to other intermediaries or to restaurants and other commercial end-users.  The distributors that resell to members of the putative class range from huge corporations like ███—which purchased ████ of Class Products between January 2009 and June 2018—down to small entities that purchased less than $50,000 of pork products during the same period.

3

Corrected Expert Rep. of Dr. Williams, ECF No. 1429 ("Williams Rep.") ¶ 230. Some distributors sell to commercial end-users throughout the country; others sell primarily in a single state or region. *E.g.*, ███████████████████████.[1] Some, like ████, resell pork under their own private-label brands. Others employ a "cash and carry" model, under which they resell pork products through brick-and-mortar stores.

Further variation exists at CIIPPs' level of the distribution chain. The putative class includes hundreds of thousands of indirect purchasers, ranging from large entities like hospital systems, universities, and national restaurant chains down to small, local restaurants and caterers. Williams Rep. ¶¶ 271-73. Many CIIPPs bought large volumes from broadline distributors like ████; others bought small quantities from smaller, regional distributors like █████████ or from club stores like Sam's Club and Costco. Ex. 2 (Longhorn's Dep.) at 56:21-57:16, 152:8-152:24; Ex. 3 (Farah's Dep.) at 39:24-40:16; Ex. 4 (Grady Corp. Dep.) at 103:5-104:2, 104:11-25; Ex. 5 (Edley's Dep.) at 51:25-52:16; Ex. 6 (Tri-Ten Dep.) at 53:3-21. The putative class includes major restaurant chains that negotiate directly with the pork processors even though they ultimately "purchase" the pork from a distributor. These class members have significant leverage and can negotiate their own product specifications (which are "close-coded" and not available to other customers), discounts, and rebates. *E.g.*, Ex. 4 (Grady Corp. Dep.) at 84:5-11; Ex. 5 (Edley's Dep.) at 79:10-22. The putative class also includes local or independent restaurants with one or two locations. These class members have no leverage and pay list

---

[1] With the exception of the expert reports, all exhibits are attached to the Declaration of Peter Schwingler filed concurrently with this memorandum.

prices for open-coded products (*i.e.*, products available to anyone) without a customer-specific rebate. *E.g.*, Ex. 2 (Longhorn's Dep.) at 49:10-18; Ex. 3 (Farah's Dep.) at 37:11-20, 62:10-21; Ex. 6 (Tri-Ten Dep.) at 54:11-55:6.

## II.     Each link in the distribution chain shows widespread variation in pricing.

At each link in the distribution chain, pork prices can vary based on differences in pricing mechanism, bargaining power, time of year, region, and product type. Starting with direct purchasers, different distributors can pay significantly different prices for the same product. *See, e.g.*, ███████████████████ (showing rival distributor was reselling product for 10% less than price ████████ was buying it for); ███████████████ at 260:20-25 (agreeing ██████ was selling product "for several dollars less than ██████████ was paying for it"). This can occur for several reasons. In some instances, for example, a distributor will secure guaranteed (or fixed) pricing for a given product and period of time. ████████████████████████; Ex. 5 (Edley's Dep.) at 51:25-52:16. This insulates the distributor from any increase in market price that might occur during the term of the agreement. Distributors without such protection, by contrast, would see their prices change along with the market. Differences in wholesale prices can also result from differences in scale and bargaining power. ██████, for example, uses the combined scale of its over 400 distributor-members to negotiate lower prices than its members could get on their own. ██████████████████████

Moving down the distribution chain, commercial end-users buy pork using a variety of pricing mechanisms. Some members of the putative class—typically larger chains—are able to negotiate lower prices through rebates from the pork processor. Under these

arrangements, the class member pays the lower negotiated price to the distributor, who then seeks reimbursement or credit from the processor. ███████████. Some members of the putative class pay the distributor's cost (the price it paid the processor) plus a per-case distribution fee. ██████████. Others pay the distributor's cost plus a negotiated markup. ██████████; Ex. 4 (Grady Corp. Dep.) at 220:4-12; Ex. 5 (Edley's Dep.) at 65:16-66:2.

Some members of the putative class take advantage of fixed pricing agreements with distributors on certain products, which protect them against increases in the prices of those products during the period covered by the agreement. For example, The Grady Corporation took advantage of fixed annual pricing for ribs, but paid market prices for shoulders. Ex. 4 (Grady Corp. Dep.) at 84:5-86:4. Other restaurants purchased all their pork products, including ribs, at market prices. Ex. 3 (Farah's Dep.) at 37:11-20; 62:10-21; Ex. 2 (Longhorn's Dep.) at 89:21-90:3. Thus, during the course of a single year, pork prices can vary dramatically from product to product *and* from class member to class member.

Finally, some members of the putative class pay prices that are not based in any respect on the distributor's cost for the product (*i.e.*, the upstream price charged by the processor). For example, some distributors will stockpile and freeze certain products, like ribs, in anticipation of supply shortages or price increases. Indeed, the record shows that processors, including Defendants, sometimes advise distributors of expected shortages or price increases, allowing the distributors to buy up inventory for later use. ███████████████████████████████. The distributor will eventually sell the ribs at the then-market price, regardless of its costs of acquiring that product and regardless of whether market prices went up or down in the meantime. █████████████.

In short, pricing mechanisms vary across products and purchasers at each level of the pork distribution chain. This leads to significant variation in the prices paid by direct purchasers *and* the resale prices paid by members of the putative class.

## III.   CIIPPs offer no evidence of "common impact" during the Class Period.

CIIPPs seek to represent a class of commercial end-users that "reside or purchased pork" in twenty-seven states and the District of Columbia. Proposed Order ¶ 1(b). Due to statutes of limitation, CIIPPs define the "class period" for twenty-three of those jurisdictions as June 28, 2014, through June 30, 2018. *Id.* at 2 n.1. For five jurisdictions, CIIPPs define a class period of June 28, 2015, through June 30, 2018. *Id.* For ease of reference, Defendants refer to the longer of these two periods—June 2014 through June 2018—as the "Class Period" throughout this brief.

This period is central to CIIPPs' motion. To certify a damages class under Rule 23(b)(3), CIIPPs must establish that antitrust impact—that is, whether the alleged conspiracy caused a given purchaser to pay higher prices for pork—can be shown for all or nearly all class members through common proof. This means CIIPPs must show both that pork prices were inflated in general *during the Class Period* and that price inflation had a widespread effect across class members *during the Class Period*. *See* CIIPP Mem. at 34, ECF No. 1428 ("CIIPP Mem.") (describing "standard two-step impact analysis").

Yet CIIPPs make no effort to demonstrate impact during that period. Instead, they instructed their expert, Dr. Williams, to calculate a purportedly "common" overcharge over a different, and much longer, period. Williams Rep. ¶ 218. This so-called "damages period" spans 2009 through mid-2018 and includes over *five years* of purchases that are

irrelevant to CIIPPs' motion.  Thus, as Dr. Williams confirmed during his deposition, his empirical models do not analyze impact during the Class Period.  *E.g.*, Ex. 8 (Williams Dep.) at 29:18-30:4 (agreeing that model "doesn't offer a specific overcharge in that time period [June 2014 through June 2018]").

## ARGUMENT

CIIPPs' motion should be denied for at least four reasons.  First, CIIPPs cannot establish impact on a class-wide basis.  Second, the laws of the twenty-eight jurisdictions under which CIIPPs bring claims vary materially, defeating both predominance and superiority.  Third, CIIPPs lack standing to represent putative class members in the seventeen jurisdictions in which they neither reside nor purchased pork.  And fourth, CIIPPs have not even attempted to show that their proposed class is ascertainable.

## I.    To certify a damages class, Plaintiffs must establish that antitrust impact can be proven on a class-wide basis.

As a threshold matter, CIIPPs misstate the legal standard.  Relying on out-of-circuit authorities, they argue that "[w]hether a conspiracy exists" is a common question "that predominates over other issues."  CIIPP Mem. at 30; *see also id.* at 32 ("[T]he existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present." (quotation omitted)).  Under this logic, class certification would be a formality in antitrust cases.  Any plaintiff could establish predominance just by alleging a conspiracy.

This, of course, is not the law.  As the Direct Purchaser Plaintiffs acknowledge, an antitrust plaintiff cannot establish predominance without first showing that "both

conspiracy *and* impact can be proven on a systematic, class-wide basis." *Blades*, 400 F.3d at 569 (emphasis added); *see also id.* at 566 ("For a class to be certified, plaintiffs need to demonstrate that common issues prevail as to the existence of a conspiracy and the fact of injury."); DPP Mem. at 43, ECF No. 1320 (quoting *Blades*). The Western District of Missouri recently explained:

> Plaintiffs must do more than present common evidence that defendants colluded to raise [prices]; they must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy. Otherwise, individual trials are necessary to establish whether a particular [plaintiff] suffered harm from the [conspiracy].

*In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567, 2021 WL 5632089, at *5 (W.D. Mo. Nov. 9, 2021) (quotations omitted, alterations in original). Accordingly, "predominance is lacking in circumstances where a plaintiff's common proof of impact fails to show that all or nearly all class members were in fact injured." *Id.* at *4.

## II.     Plaintiffs offer no method for establishing injury through common proof.

CIIPPs offer Dr. Williams' models as "common proof" that Defendants' alleged conspiracy caused all or nearly all putative class members to pay higher prices for pork. Specifically, CIIPPs point to: (a) Dr. Williams' direct purchaser overcharge regression, which purports to show that direct purchasers on average paid about 10% too much for pork between 2009 and June 2018; and (b) Dr. Williams' pass-through regressions, which CIIPPs claim show that certain direct purchasers (foodservice and multi-channel

distributors) passed on about 100% of those alleged overcharges to members of the putative class.  CIIPP Mem. at 37-47.[2]

CIIPPs' reliance on Dr. Williams is misguided.  Not only do CIIPPs mischaracterize his findings, but Dr. Williams' models fail for several reasons:  they do not analyze impact during the Class Period; they fail to control for non-conspiratorial supply-and-demand factors; and they use averages to mask important differences in customers and products. In short, they are incapable of showing impact to all or nearly all class members.

### A.   CIIPPs mischaracterize their expert's work.

CIIPPs begin their "common impact" argument by rewriting their expert's report. According to CIIPPs, Dr. Williams: (i) "finds that Defendants imposed overcharges during the Class Period ranging from 8.4% to 14.9%"; and (ii) "further finds that the distributors from which the Class members made purchases passed along on weighted average 100.5% and 95.5% of those overcharges for the foodservice and multi-channel distributors, respectively."  CIIPP Mem. at 38.  Plaintiffs then claim that "99.6% of the sales during the Class Period to relevant distributors were subject to a positive and statistically significant overcharge."  *Id.* at 40.  These contentions find no support in Dr. Williams' report.

As an initial matter, CIIPPs cite the wrong model.  Though Dr. Williams does run a "modified" version of his regression in which he allows the price effects "to vary by

---

[2] Plaintiffs do not cite Dr. Williams' so-called "production regression," which purports to analyze whether pork production was lower between 2009 and June 2018 than it would have been but-for the alleged conspiracy.  Regardless, this model is similar to his overcharge regression and fails for the same reasons set forth in Defendants' motion to exclude Dr. Williams' testimony.  *E.g.*, Defs.' Mem. in Supp. of Mot. to Exclude Testimony at 22 n.8, ECF No. 1459.

Defendant," Williams Rep. ¶ 263, he does not rely on that version when calculating class-wide damages. Indeed, he could not do so, because he lacks sufficient data to estimate an overcharge for Clemens. *Id.* n.230. Dr. Williams instead relies on his main overcharge model to estimate a single, average overcharge to direct purchasers of 10.3%. *Id.* ¶ 226 (estimating single overcharge of 10.3%); *id.* ¶ 288 & Tbl. 12 (applying 10.3% overcharge in calculating damages).

But this oversight is trivial compared to CIIPPs description of what Dr. Williams supposedly "found." First and foremost, Dr. Williams does not find *any* overcharge "during the Class Period." To the contrary, Dr. Williams purports to show an average overcharge across a much longer period of time. *Id.* ¶ 218 ("I was instructed by counsel to use the period January 1, 2009 through June 30, 2018, as the damages period."). During his deposition, Dr. Williams confirmed that his report does not "offer an overcharge estimate for the period June of 2014 through June of 2018." Ex. 8 (Williams Dep.) at 29:18-30:4. He also confirmed that his report does not offer overcharge estimates for any given year within the so-called "damages period" of January 2009 through June 2018. *Id.* at 173:16-19 ("The production regression has a single dummy variable for the time period January 2009 through June 2018. It does not break that period up into, for example, individual years.").

Remarkably, when Defendants asked Dr. Williams whether his results changed "if you split the damages period into smaller segments," Plaintiffs' counsel *instructed him not to answer*. *Id.* 203:2-209:17. What counsel surely knew—and what Dr. Haider has now confirmed—is that Dr. Williams' regression predicts no overcharge whatsoever when the

price effects are allowed to vary between the early years in the alleged conspiracy and the Class Period.  Decl. of Lindsay Strang Aberg Ex. 1 ("Haider Rep.") ¶ 111, ECF No. 1442.  In short, Dr. Williams' models provide *no* evidence of common impact during the only period relevant to liability—the Class Period.  That is reason enough to deny class certification.

CIIPPs' description of Dr. Williams' pass-through analysis is equally misleading.  Regardless of how Dr. Williams estimated direct purchaser overcharges, he plainly does not opine that distributors "passed along" any percentage "of those overcharges."  CIIPP Mem. at 38.  Instead, as Dr. Williams makes clear, his pass-through studies estimate how much resale prices would increase if "the price paid by distributors were increased . . . as a result of Defendants' alleged conspiracy *or other factors*."  Williams Rep. ¶ 228 (emphasis added).  In other words, Dr. Williams does not purport to calculate pass-through rates specific to anticompetitive overcharges, but instead for cost increases in general, regardless of the reason for those increases.  Haider Rep. ¶ 186.

Lastly, CIIPPs are wrong in two respects when they claim that "99.6% *of the sales* during the Class Period to relevant distributors were subject to a positive and statistically significant overcharge."  CIIPP Mem. at 40 (emphasis added).  First, Plaintiffs again conflate the Class Period (June 2014 to June 2018) with Dr. Williams' so-called "damages period" (January 2009 to June 2018).  Dr. Williams conducted no analysis of whether overcharges existed in the Class Period itself.  Second, as paragraph 262 of his report makes clear, Dr. Williams does not opine that 99.6% of all sales during his "damages period" had a positive overcharge.  Instead, he opines that 99.6% of all direct purchasers had "at least

one overcharge observation" during that period.  Williams Rep. ¶ 262.  As Defendants explain elsewhere, the methodology underlying this opinion is so unreliable that it also suggests over 80% of direct purchasers paid at least one overcharge during the benchmark period—that is, *before the alleged conspiracy*.  *See* Omnibus Mem. at 49-51, ECF. No. 1441.  But apart from whether Dr. Williams' finding in paragraph 262 is admissible, it lends no support to CIIPPs' contention that nearly 100% of all sales over a ten-year period "were subject to a positive and statistically significant overcharge."  CIIPP Mem. at 40.

### B.   Dr. Williams fails to present a reliable method for determining overcharges, if any, paid by the putative class.

Dr. Williams offers a series of regressions intended to establish that CIIPPs paid a "common" overcharge for pork products between January 2009 and June 2018.  He first presents a direct purchaser overcharge regression.  After purporting to determine a "common" overcharge at the direct purchaser level, he then presents a series of regressions ostensibly showing that all distributors passed through approximately 100% of the "common" direct purchaser overcharge, such that all or nearly all putative class members paid higher prices for pork as a result of the alleged conspiracy.

The problems with Dr. Williams' approach multiply at each step.  At the direct purchaser stage, for the reasons set forth in Defendants' joint brief and *Daubert* motion, Dr. Williams' overcharge model is incapable of showing that distributors paid inflated prices for pork at *any* time, much less during the Class Period.  *See* Omnibus Mem. at 37-47, 53-63; Defs.' Mem. in Supp. of Mot. to Exclude Testimony at 9-11, 13-25, ECF No. 1459 ("Williams *Daubert* Mem.").  And at the commercial end-user stage, Dr. Williams'

efforts to show pass-through are not just plagued by the same errors as his overcharge model. His so-called "common impact" regressions, which analyze prices class members paid to three distributors, also predict markedly different "overcharges" than the model he uses to calculate damages. These distributor-specific regressions show that Dr. Williams' method cannot estimate a "common" overcharge paid by all or nearly all restaurants over a roughly ten-year period.

### 1. Dr. Williams' overcharge regressions cannot establish common impact at the direct purchaser level.

Defendants address the many flaws in Dr. Williams' overcharge regressions in their joint opposition to class certification, Omnibus Mem. at 37-47, 53-63, and their motion to exclude Dr. Williams' testimony, Williams *Daubert* Mem. at 9-11, 13-25. Defendants will not repeat those arguments here, other than to note that Dr. Williams' models suffer many of the same flaws as those of the other Class Experts: they do not answer the relevant question (whether pork prices were impacted by the alleged conspiracy during the Class Period); they do not account for the non-Defendant producers who supply roughly 70% of all domestic hogs; and they fail to control for non-conspiratorial factors that affect the supply and price of pork. In short, the models offer no means to isolate the effects of the alleged conspiracy from the effects of lawful conduct.

### 2. Dr. Williams does not present a reliable method for showing common pass-through.

Dr. Williams presents several additional regressions that he claims are capable of showing that certain direct purchasers—namely, foodservice distributors and multi-channel distributors—passed on roughly 100% of the "common" overcharge to members

of the CIIPP class.  The first regression, presented at Table 5 in his report, estimates pass-through rates for twenty-five distributors.  Williams Rep. ¶ 256 & Tbl. 5.  These pass-through rates range from ███% to ████%, with a weighted average near 100%.  *Id.*  Dr. Williams then presents two alternative versions of his main overcharge regression:  one where he allows the effects to vary by Defendant (except ██████, for which he has insufficient data); and one where he allows the effects to vary by product category.  *Id.* ¶¶ 263-64 & Tbls. 6-7.  Finally, Dr. Williams purports to "test whether all or virtually all CIIPP Class Members paid higher prices for pork products during the damages period [defined as January 2009 through June 2018] than they would have paid but for Defendants' alleged conspiracy."  *Id.* ¶ 269.  He attempts to do this by applying his overcharge regression model to three distributors—██████████████████████— ████—with "sufficient sales data to estimate overcharges."  *Id.*  Based on these regressions, he claims that ████% of ██████████ customers, ████% of █████ customers, and █████ of ███████ customers had at least one "overcharge observation" between January 2009 and June 2018.  *Id.* ¶¶ 271-73.  But these regressions cannot reliably show common pass-through, for three reasons.

(a)    <u>Dr. Williams' pass-through models undermine his main overcharge regression.</u>

First, as discussed in Defendants' *Daubert* brief, Dr. Williams' pass-through studies generate remarkably different results than his main overcharge regression.  Williams *Daubert* Mem. at 25-27.  In particular, Dr. Williams' backup materials reveal that his models predict overcharges of only ███% for customers who purchased from ██████ and

█% for customers who purchased from ██. Because Dr. Williams' methodology would calculate overcharges for these customers by multiplying the 10.3% "common" overcharge by pass-through rates of just over 100%, *see* Ex. 8 (Williams Dep.) at 252:3-21, he generates overcharges for these two sets of class members roughly *ten times* greater than those predicted by his distributor-specific regressions.

These results undermine Dr. Williams' opinion that common impact can be proven on a class-wide basis by applying distributor-specific pass-through rates to the purportedly "common" direct purchaser overcharge of 10.3%. They show instead that impact must be analyzed on a distributor-by-distributor basis. This is yet another reason why CIIPPs cannot meet their burden of showing class-wide impact under Rule 23(b)(3). *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 505 (N.D. Cal. 2008) (denying certification of indirect purchaser class where plaintiffs' method of showing pass-through "requires a reseller-by-reseller analysis").

      (b)      <u>Dr. Williams' pass-through regressions have the same methodological flaws as his main overcharge regression.</u>

Second, although Dr. Williams' distributor-specific regressions generate markedly different results than his main overcharge model, they are constructed in substantially the same way as the main regression. Accordingly, they share the same methodological flaws.

Like the main regression, Dr. Williams' three distributor-specific regressions do not compare prices in the Class Period to prices in the benchmark period. And like the main regression, correcting this error flips the result. As Dr. Haider found, running Dr. Williams' distributor-specific models over the Class Period generates no overcharge for

███ and ███. Haider Rep. ¶ 182. Moreover, Dr. Haider applied the same model to five additional distributors with sufficient data; for two of them, the model predicted no overcharge between June 2014 and June 2018. *Id.* Thus, even ignoring the other flaws in Dr. Williams' approach, his models show that many putative class members paid *no overcharge* during the Class Period. Such a method plainly cannot establish that all or nearly all class members were injured by Defendants' alleged conspiracy.

> (c)     Dr. Williams' models do not show that virtually all commercial end-users paid at least one overcharge.

Third, as explained in Defendants' main brief and *Daubert* motion, Dr. Williams' overcharge models are not capable of showing that nearly all putative class members paid inflated prices on at least one transaction during the Class Period. Omnibus Mem. at 49-51; Williams *Daubert* Mem. at 27-28. His claim that 99.6% of all direct purchasers "had at least one overcharge observation" relates to the "damages period" of January 2009 through June 2018, *not* the Class Period. Williams Rep. ¶ 262. The same is true for his claims about customers who bought from ███████████. *Id.* ¶¶ 271-73. He thus offers no opinion showing impact during the Class Period. Regardless, his methodology is deeply flawed and finds no support in peer-reviewed literature. Omnibus Mem. at 49-51. Even if his models targeted the correct time period, they would not support his claims about common impact.

**C.     Dr. Williams improperly uses averages to mask differences between putative class members.**

Dr. Williams' regression models are incapable of showing common impact for all the reasons set forth above. But the problems do not end there. Dr. Williams' regressions

also cannot establish common impact because these models use averages to mask real-world variations in the distribution and pricing of pork products.[3]

As CIIPPs note, courts have approved the use of regression models, in conjunction with other evidence, to show common impact. But regressions have important limitations. One is that regressions generate averages—that is, they pool large volumes of transactions and report an average overcharge across all of them. ABA Section of Antitrust Law, *Econometrics* § 13.B.1.c.2 (2d ed. 2014) ("ABA *Econometrics*") (noting that regression model "yields an estimate of average impact"). But averaging "by definition glides over what may be important differences" between class members. *Reed v. Advocate Health Care*, No. 06-C-3337, 2009 WL 3146999, at *17 (N.D. Ill. Sept. 29, 2009) (quotation omitted); *see also* ABA *Econometrics* § 13.B.1.c.2 (explaining that "averages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact)." Courts have thus rejected impact models where the use of averages "masked important differences between products and purchasers." *In re Graphics*, 253 F.R.D. at 494.[4] Courts have also rejected the use of averages "across a class

---

[3] At his deposition, Dr. Williams resisted using the term "average" when describing his model. This is pure semantics. As other experts readily agreed, a regression model "yields an estimate of average impact." ABA Section of Antitrust Law, *Econometrics* § 13.B.1.c.2 (2d ed. 2014); Ex. 9 (Singer Dep.) at 289:13-14 (testifying that overcharge predicted by model "[o]n average" is 12.4%).

[4] *See also In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (reversing class certification where district court failed to resolve factual disputes over "acceptability of averages" and noting that averages are acceptable only "where they do not mask individualized inquiry"); *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567, 2021 WL 5632089, at *6 (W.D. Mo. Nov. 9, 2021) ("[R]epresentative or aggregate evidence fails Rule 23 if it masks individualized issues or predicts injury where none otherwise exists."); *In re Pharm. Benefit Mgrs. Antitrust Litig.*, No. 06-1782, 2017

18

period" where the plaintiffs' allegations "reflect significant variation in the level of purported conspiratorial activity at any given moment." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 57 (S.D.N.Y. 2020).

Dr. Williams runs into both problems. The record contains ample evidence of variance across products and purchasers. As to products, the record shows that exports of different products "followed different trajectories during the alleged conduct period." Haider Rep. ¶ 102. If, as Plaintiffs claim, the alleged conspiracy involved increased exports, there is no reason to believe such increases would have a similar effect on all products within the class definition. And as to purchasers, the record shows that some restaurants purchased certain products using long-term, fixed price contracts, while other purchasers bought those same products at market or "spot" prices. Ex. 4 (Grady Corp. Dep.) at 84:5-11; Ex. 5 (Edley's Dep.) at 79:10-22; Ex. 3 (Farah's Dep.) at 37:11-20; 60:10-21; Ex. 6 (Tri-Ten Dep.) at 54:11-55:6. Yet Dr. Williams assumes these differences away by relying on a single "common" overcharge across all purchasers and products.

More importantly, Dr. Williams' single overcharge masks differences in impact over time. Although Plaintiffs allege a generic "conspiracy" that lasted a decade, they do not allege that Defendants' conduct was uniform or even similar throughout the period. Instead, they allege that Defendants conspired to reduce sow inventories at the beginning

---

WL 275398, at *21 (E.D. Pa. Jan. 18, 2017) ("Numerous courts have rejected the use of average price differentials to show evidence of antitrust impact that is common to the class."); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 159 (E.D. Pa. 2015) ("The case law understandably allows for averages and aggregations, but only if the court is convinced that the averages and aggregations are not masking individualized issues that are likely to predominate.").

of the alleged conspiracy, and that export levels increased in some years but not others. CIIPP 4th Am. Compl. ¶¶ 124, 126 & Fig. 8, ECF No. 1111 ("CIIPP 4th Am. Compl."). Significantly, their Complaint is nearly silent with respect to the Class Period. *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 769-70 (D. Minn. 2020) (only one Defendant allegedly reduced herd after 2014). Dr. Williams' approach thus suffers the same flaw as the model in *Aluminum Warehousing*: he calculates an average for the entire Alleged Conspiracy Period despite "significant variation in the level of purported conspiratorial activity at any given moment."[5] *Aluminum Warehousing*, 336 F.R.D. at 57.

### D. Statistical tests reject Dr. Williams' assumption of a single overcharge at the direct purchaser level and reveal many uninjured class members.

As Defendants explain in their motion to exclude Dr. Williams, his models also fail a routine test that asks whether a single overcharge is appropriate. Williams *Daubert* Mem. at 22-25. When Dr. Haider tested what would happen if Dr. Williams allowed the alleged overcharge to vary among top direct purchasers, the results were stark: his model predicted that 140 of the top 803 direct purchasers sustained no overcharge during Dr. Williams'

---

[5] That Defendants participated in Agri Stats during the class period does not change this result. Despite the importance of Agri Stats to their theory of the case, Class Plaintiffs do not identify a single instance—in the Class Period or otherwise—in which Defendants used Agri Stats to enforce the alleged conspiracy or coordinate production. And Dr. Williams has disavowed any opinion that Defendants used Agri Stats in the manner Plaintiffs' allege. Ex. 8 (Williams Dep.) at 289:13-290:5 (denying any opinion that Agri Stats "in fact facilitated monitoring and enforcement by the defendants in this case" or "facilitated collusion between defendants"); *id.* 290:24-291:5 (denying any opinion that "two or more defendants used information from Agri Stats to coordinate their production of pork"). Thus, Defendants' continued participation in Agri Stats is no excuse for Dr. Williams' failure to analyze whether the effects of the alleged conspiracy varied over time.

"damages period."  Haider Rep. ¶ 145 & n.268.  Dr. Williams own model thus reveals many direct purchasers who incurred no overcharge, and thus had no overcharge to pass on to members of the CIIPP class.

These results are hardly surprising.  Given the many differences among distributors, one would not expect to see uniform or even similar overcharges.  Dr. Haider's statistical tests thus comport with market realities and industry facts; Dr. Williams' use of averages, which mask real-world differences among class members, does not.

## III.   CIIPPs cannot show predominance or superiority because of material variations in the many state laws governing their claims.

Besides their inability to show impact on a class-wide basis, Plaintiffs cannot establish predominance or superiority for another reason: they attempt to aggregate too many state-law claims, with too many legal standards, in a single class action.

"Variations in state law may swamp any common issues and defeat class certification under Rule 23(b)(3)."  *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019) (quotation omitted).  Twice in recent years, the Eighth Circuit has held that claims arising under only four states' laws defeated predominance and superiority.  *Johannessohn v Polaris Indus. Inc.*, 9 F.4th 981, 986 (8th Cir. 2021); *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1157 (8th Cir. 2017).  Here, Plaintiffs assert claims across *twenty-eight* jurisdictions, including twenty-three antitrust claims, eleven consumer protection claims, and twenty-six unjust enrichment claims.  *See* ECF Nos. 1337-2, 1337-4, 1338-3. Unsurprisingly, differences in these jurisdictions' laws swamp any common issues and render a class action unmanageable.  *See Processed Egg Prods.*, 312 F.R.D. at 143

21

(rejecting "attempt[] to place 21 square pegs into a single round hole, asking the Court to envision 21 statewide classes under the antitrust laws of 21 states, the consumer protection laws of seven states, and the unjust enrichment laws of 17 states, all tried in a single proceeding as if it were a nationwide class under federal antitrust law").

CIIPPs bear the burden of "providing an extensive analysis of state law variations, and establishing that there are not insuperable obstacles to class certification." *In re Prempro Prod. Liab. Litig.*, 230 F.R.D. 555, 562 (E.D. Ark. 2005) (cleaned up); *accord Foster v. St. Jude Med., Inc.,* 229 F.R.D. 599, 605 (D. Minn. 2005). To do this, they should "provide the court with model jury instructions and verdict forms, as well as a grouping of state laws by their relevant differences." *Prempro*, 230 F.R.D. at 562 (cleaned up); *accord Processed Egg Prods.*, 312 F.R.D. at 165; *see also Shoots v. iQor Holdings US Inc.*, 325 F.R.D. 253, 269-70 (D. Minn. 2018) (explaining need to show how jury could be instructed). CIIPPs have done none of this: they proffer no jury instructions or verdict forms, and their "extensive analysis" of state law variations consists of a handful of citations discussing their causes of action at the highest level of abstraction. *See Adams v. K.C. Life Ins. Co.*, 192 F.R.D. 274, 278 (W.D. Mo. 2000) (analysis that merely focuses on elements of claims "does not address numerous potentially divergent state law issues subsumed" within those elements). In reality, there are significant variations among the state laws relevant to CIIPPs' claims.

A. **State antitrust laws vary as to whether and to what extent CIIPPs may recover.**

First, some, but not all, state antitrust statutes require courts to prevent duplicate liability—that is, to ensure that a defendant does not pay damages for the same overcharge passed on through multiple levels of distribution. *See, e.g.*, N.Y. Gen. Bus. Law § 340(6) (providing "in any action in which claims are asserted against a defendant by both direct and indirect purchasers, the court shall take all steps necessary to avoid duplicate liability"); 6 R.I. Gen. Laws § 6-36-11(a) (similar); Vt. Stat. tit. 9, § 2465(b) (similar); Minn. Stat. § 325D.57 (similar); Neb. Rev. Stat. § 59-821.01(2) (similar); S.D. Codified Laws § 37-1-33 (similar); *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) (similar). Accordingly, damages calculations for some state law claimants would turn on complicated questions of pass-through and duplication inapplicable to other state-law claims. Plaintiffs do not explain how a jury could manage this in a single trial.

B. **State consumer protection laws vary materially.**

Second, as the Eighth Circuit has recognized, "state consumer-protection laws vary considerably, and courts must respect these differences." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (cleaned up). These variations mean that a jury attempting to decide liability would be faced with multiple standards. For instance:

- "The state laws at issue here use a variety of tests to define the form of conduct that will qualify as anticompetitive or unfair conduct prohibited under the consumer statutes." *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-md-2785, 2020 WL 1180550, at *55 (D. Kan. Mar. 10, 2020). In New Mexico, for example,

plaintiffs must show that Defendants' conduct "takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or "results in a gross disparity between the value received by a person and the price paid."  N.M. Stat. § 57-12-2(E); *see* CIIPP 4th Am. Compl. ¶ 257.  Other states "consider the following factors: (1) whether the practice offends public policy, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers."  *In re EpiPen*, 2020 WL 1180550 at *55 (discussing, among others, Florida, North Carolina, and Vermont); *see also, e.g.*, *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 142 (Neb. 2000) (requiring conduct "have an impact upon the public interest"); *LaMotte v. Punch Line of Columbia, Inc.*, 370 S.E.2d 711, 713 (S.C. 1988) (same).  "And, in California, there is internal dissonance about the test courts should use," with courts applying "two different tests to determine what is an unfair practice under the California Unfair Competition Law."  *In re EpiPen*, 2020 WL 1180550 at *55 (discussing Cal. Bus. & Prof. Code § 17200, *et seq.*).

- The measure of damages varies by state.  In some states, plaintiffs are entitled to damages, whereas in others they are limited to "injunctive relief and restitution."  *Phillips v. Apple Inc.*, 725 F. App'x 496, 498 (9th Cir. 2018) (discussing California Unfair Competition Law).  "A restitution order against a defendant . . . requires both that money or property have been lost by a plaintiff, on the one hand, *and* that it have been acquired by a defendant, on the other."  *Kwikset Corp. v. Superior Ct.*,

246 P.3d 877, 895 (Cal. 2011) (emphasis added).  A "loss by the plaintiff without any corresponding gain by the defendant" is not recoverable.  *Id.*

- States differ regarding whether a business is a "consumer" protected by consumer-protection laws.  In some states, this turns on the purpose for which a business purchases products—an issue irrelevant under other states' laws.  *See, e.g.*, Vt. Stat. tit. 9, § 2451a(1) (defining "consumer" as one who purchases "not for resale in the ordinary course of the person's trade or business but for the use or benefit of the person's business or in connection with the operation of the person's business"); *In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (explaining narrow scope of "consumer" under Vermont law).  A business's purpose in purchasing products is plainly an individual question.

### C.   State unjust enrichment law varies materially.

Third, unjust enrichment is not suitable for multi-state class treatment because "the states' different approaches to, or elements of, unjust enrichment are significant."  *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 513 (D. Minn. 2014) (quoting *Thompson v. Bayer Corp.*, No. 4:07CV00017, 2009 WL 362982, at *4 (E.D. Ark. Feb. 12, 2009)); *accord, e.g.*, *Processed Egg Prods.*, 312 F.R.D. at 164 (denying class certification and explaining "courts have noted the extent to which unjust enrichment laws vary across states and found them unmanageable in a single class litigation"); *In re Baycol Prod. Litig.*, 218 F.R.D. 197, 214 (D. Minn. 2003) (similar); *Tyler v. Alltel Corp.*, 265 F.R.D. 415, 423 (E.D. Ark. 2010); *In re Prempro*, 230 F.R.D. 555, 563 (E.D. Ark. 2005) (similar).  Among the material differences:

25

- "[S]tate laws vary widely regarding how 'unjust' a defendant's conduct must be to give rise to a recovery on an unjust-enrichment claim." *Rapp*, 302 F.R.D. at 514. For example, in South Dakota, unjust enrichment requires the plaintiff to show "mistake, coercion, or request," *Dowling Fam. P'ship v. Midland Farms*, 865 N.W.2d 854, 864 (S.D. 2015), while other states do not impose such a requirement. *See Rapp*, 302 F.R.D. at 514 (discussing different standards under state law).

- Some states require "a plaintiff to demonstrate a 'relationship or connection between the parties that is not too attenuated." *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06–cv–1833, 2015 WL 3623005, at *29 (E.D. Pa. June 10, 2015) (quoting *Georgia Malone & Co., Inc., v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012)); *see also Fenerjian v. Nongshim Co.*, 72 F. Supp. 3d 1058, 1088 (N.D. Cal. 2014) (holding "the transactions and relationships between the indirect purchaser plaintiffs and the defendants are too attenuated to state an unjust enrichment claim under Michigan law"); *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 199 (Iowa 2007) (similar); *see also Thompson*, 2009 WL 362982, at *5 (explaining that some states, including North Carolina, require that the benefit must be conferred "directly" on the defendant by the plaintiff). Other states similarly hold that the party receiving a benefit from the plaintiff "has to know that he has received a benefit," and the "more attenuated their relationship, the less likely it is that a defendant would be aware that it is receiving a benefit at plaintiff's expense." *Abraham v. WPX Energy Production, LLC*, 20 F. Supp. 3d 1244, 1278 (D.N.M. 2014). Given that CIIPPs are

several steps removed from Defendants, this poses a significant bar to recovery in several class states—and one which cannot be analyzed on a class-wide basis.

- Some states hold that a downstream antitrust plaintiff cannot establish unjust enrichment where the defendant has separately disgorged any overcharge to upstream plaintiffs, and thus has not "unjustly retained" any money. *E.g.*, *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 302-03 (Neb. 2006); *Bennett v. Visa U.S.A. Inc.*, 198 S.W.3d 747, 756 (Tenn. Ct. App. 2006). As discussed above, this presents difficult problems of allocation and proof that will apply only to some claims and not others.

- Many states prohibit unjust enrichment claims where a plaintiff has an adequate remedy at law. *See, e.g.*, *Paweltzki v. Paweltzki*, 964 N.W.2d 756, 769 (S.D. 2021). Others do not. *See, e.g.*, *Thompson*, 2009 WL 362982, at *6 (explaining Arkansas does not have such a requirement).

### D.   The jury would be forced to consider myriad statutes of limitations.

Finally, a jury would have to navigate the numerous limitations periods applying not just to each state, but to different claims within each state. *Compare, e.g.*, Ark. Code § 4-88-115 (five-year limitations period for deceptive trade practices claim), *with Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 408 (8th Cir. 2017) (three-year limitations period for unjust enrichment under Arkansas law), *and* Cal. Bus. & Prof. Code § 16750.1 (four-year period for antitrust claim), *with BASF Corp. v. Cesare's Collision Repair & Towing, Inc.*, 364 F. Supp. 3d 1115, 1122 (E.D. Cal. 2019) (three-year period for unjust enrichment based on fraud or mistake, and two years for claim based on quantum meruit).

This presents, at minimum, a clear "risk of jury confusion" when assessing liability and damages. *Johannessohn*, 9 F.4th at 986.

*       *       *

Case law is clear: "If more than a few of the laws of the fifty states differ, courts would face an impossible task of instructing a jury on the relevant law, making class certification inappropriate." *Foster*, 229 F.R.D. at 605 (cleaned up). Here, state law differs materially on each of CIIPPs' claims. CIIPPs have done nothing to explain to the Court how they could overcome this "insuperable obstacle[]" and present a manageable trial. *Prempro*, 230 F.R.D. at 562. Accordingly, they have not carried their burden of proving predominance or superiority.

## IV. Named Plaintiffs lack standing and are inadequate class representatives to bring claims under the laws of states in which they were not injured.

CIIPPs' attempt to bring claims under the differing laws of twenty-eight jurisdictions should also be rejected because CIIPPs lack standing and thus are inadequate class representatives with atypical claims. "[I]t is well settled that Indirect Purchasers lack standing to sue under the laws of states in which they do not reside or did not purchase" products. *In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2016 WL 4409333, at *1 (E.D. Pa. Aug. 18, 2016); *accord, e.g.*, *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13–2664, 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014) ("Named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in

which they suffered no injury.").[6]  Here, named Plaintiffs reside in only eleven states,[7] yet

seek to bring claims under the antitrust, consumer protection, and unjust enrichment laws

of an additional sixteen states plus the District of Columbia.  Plaintiffs neither allege nor

submit evidence showing they purchased class products in those seventeen jurisdictions.[8]

Accordingly, they cannot pursue claims under those jurisdictions' laws.[9]

---

[6] *See also, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14–02567, 2016 WL 6963059, at *7 (W.D. Mo. Jan. 13, 2016); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013); *McAteer v. Target Corp.*, No. 18-349, 2018 WL 3597675, at *3 (D. Minn. July 26, 2018).

[7] The named Plaintiffs reside in New York, Florida, Minnesota, California, Mississippi, Arkansas, Arizona, Tennessee, South Carolina, North Carolina, and Iowa.  *See* CIIPP 4th Am. Compl. ¶¶ 14-27.  Former Plaintiffs Confetti's, Betty's Eat Shop, and Ziggy's BBQ Smokehouse & Ice Cream Parlor, LLC, were voluntarily dismissed.  *See* ECF No. 981.

[8] In January 2021, Defendants served on CIIPPs an interrogatory seeking a description of any pork purchases they had made, including, among other things, "the identify of all persons or entities from which You purchased any pork products."  Ex. 10 at 10.  CIIPPs refused to answer on the grounds this was, supposedly, a "premature contention interrogatory."  Ex. 11 at 9.  CIIPPs have not supplemented.  Having failed to provide information about their pork purchases, they cannot now rely on that information in support of their motion.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."); *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 323-25 (C.D. Cal. 2004) (holding that, where plaintiff refused to answer interrogatories on ground they were premature contention interrogatories, it could not use requested information to oppose summary judgment).

[9] In their opposition to Defendants' motion to dismiss, CIIPPs argued that states' antitrust and consumer protection laws "can plainly be construed to not require in-state residency or an in-state purchase."  ECF No. 478 at 4 n.7.  As the citations above make clear, this is incorrect: plaintiffs lack standing if they neither resided nor purchased a product in a state. But even if some states' laws *could* be interpreted to apply more broadly, this would necessitate a state-by-state analysis that would introduce yet another individualized issue into this case.  *See, e.g.*, *Ferrari v. Best Buy Co.*, No. 14–2956, 2015 WL 2242128, at *9-10 (D. Minn. May 12, 2015) (rejecting argument that Massachusetts plaintiff who suffered injury in Massachusetts had standing to sue Minnesota defendant under Minnesota consumer protection laws).

It is axiomatic that a plaintiff without standing to pursue a claim cannot represent absent class members on that claim. *See Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998) ("Hall is not a proper representative of the class where he himself lacks standing to pursue the claim."). That is particularly so here, where state law varies on every claim: named Plaintiffs have no personal stake in litigating *any* issue arising under other states' laws. In these circumstances, named Plaintiffs are inadequate class representatives and have atypical claims with respect to the seventeen jurisdictions in which they do not reside. *See Sultanis v. Champion Petfoods USA Inc.*, No. 21-cv-00162, 2021 WL 3373934, at *8 (N.D. Cal. Aug. 3, 2021) (variations in the consumer protection laws of thirteen states meant plaintiff, who had connections with only one state, was inadequate representative and her claims atypical); *Dolmage v. Combined Ins. Co. of Am.*, No. 14 C 3809, 2017 WL 1754772, at *8 (N.D. Ill. May 3, 2017) (named plaintiff's claims atypical where "different states' laws will govern her claim and those of class members living in [other] states").

## V.   CIIPPs have not shown the proposed class is ascertainable.

Finally, CIIPPs offer no evidence that their proposed class is ascertainable. Because the "party seeking class certification bears the burden of establishing every prerequisite element to certification," *Burum v. Mankato State Univ.*, No. 98–696, 2002 WL 27123, at *2 (D. Minn. Jan. 8, 2002), and because arguments in support of class certification not raised in opening briefs are waived, *True v. Conagra Foods, Inc.*, 07–00770, 2011 WL 176037, at *7 n.1 (W.D. Mo. Jan. 4, 2011), this is fatal to CIIPPs' motion.

To satisfy Rule 23, "Plaintiffs must establish that the class, as proposed, is objectively ascertainable and a precise definition of the class must be given." *Brown v.*

30

*Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012) (Tunheim, J.).   To be ascertainable, class members must be "identifi[able] with reference to objective criteria, so that Courts are not required to resort to speculation, or engage in lengthy, individualized inquiries to ascertain the class."  *Hoekman v. Education Minn.*, 335 F.R.D. 219, 249 (D. Minn. 2020) (cleaned up).

CIIPPs' class definition requires them to identify which of hundreds of thousands of "entities" across the United States "indirectly purchased uncooked pork bacon" or "raw . . . loins, shoulder, ribs, hams, or pork chops from defendants or co-conspirators" during the Class Period "for their own business use in commercial food preparation." Proposed Order ¶ 1(b). The definition includes numerous exceptions, including, for example, "purchases of pork from an intermediary who has further processed [it]."  *Id.*  In sum, CIIPPs must show they can identify entities that indirectly purchased specific products, made by specific Defendants, for a specific purpose ("commercial food preparation"), from a specific time period.

CIIPPs make no such showing.   Notably, CIIPPs have not demonstrated they possess records that would permit this identification.[10]  And CIIPPs cannot rely on putative class members' self-identification.  Self-identification is not an objective criterion, and thus

---

[10] In January 2021, Defendants asked CIIPPs, via interrogatory, "how the members of the putative class may be identified, including a description of all records supporting Your membership in the putative class."  Ex. 10 at 11.  CIIPPs refused to answer, claiming this was a "premature contention interrogatory."  Ex. 11 at 13.  CIIPPs have not supplemented. They should not now be permitted to submit information requested by this interrogatory in support of their motion.  *See* Fed. R. Civ. P. 37(c)(1); *Cambridge Elecs. Corp.*, 227 F.R.D. at 323-25.

class-membership "may not rest solely on a putative member's sworn statement that he or she qualifies for membership."[11]  1 *McLaughlin on Class Actions* § 4:2 (18th ed.); *see In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2017 WL 3700999 at *9-10 (E.D. Pa. Aug. 24, 2017) (holding class of indirect purchasers not ascertainable because "[a]ffidavits, without sufficient indicia of reliability, are not sufficient to satisfy the ascertainability requirement," and available sales data was "incomplete").

Because CIIPPs have not shown—or even attempted to show—that they can ascertain the class they seek to represent, their motion should be denied.

## <u>CONCLUSION</u>

CIIPPs have no reliable evidence of common impact.  They also cannot show that a single class action brought under the varying laws of twenty-eight jurisdictions would be manageable, that they can adequately represent class members from seventeen states in which they do not reside, or that they can ascertain the members of their requested class. Whether taken individually or collectively, these flaws are fatal to their motion. Defendants respectfully request that the Court deny class certification.

---

[11] On the rare occasions where courts have allowed self-identification, they have done so only in "consumer class actions concerning low-cost products or services where class members are unlikely to retain purchasing records and financial incentives to falsify are low." 1 *McLaughlin on Class Actions* § 4:2.  This is not a consumer class action, and there is no reason to believe that a potential recovery is so small that "financial incentives to falsify are low."  Additionally, CIIPPs have offered no evidence regarding the likelihood that class members would "retain purchasing records."

Dated: August 24, 2022

Respectfully submitted,

By: */s/ Peter J. Schwingler*
Peter J. Schwingler (#0388909)
William L. Greene (#0198730)
William D. Thomson (#0396743)
Jon W. Ripa (#0402069)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
peter.schwingler@stinson.com
william.thomson@stinson.com
jon.ripa@stinson.com

J. Nicci Warr (*pro hac vice*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

**Counsel for Seaboard Foods LLC and Seaboard Corporation**

*/s/ Mark L. Johnson*
Mark L. Johnson (#0345520)
Davida S. McGhee (#0400175)
GREENE ESPEL PLLP
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
mjohnson@greeneespel.com
dwilliams@greeneespel.com

Daniel Laytin, P.C. (*pro hac vice*)
Christa Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 861-2000

*/s/ Craig. S. Coleman*
Richard A. Duncan (#0192983)
Aaron D. Van Oort (#0315539)
Craig S. Coleman (#0325491)
Emily E. Chow (#0388239)
Isaac B. Hall (#0395398)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
richard.duncan@faegredrinker.com
aaron.vanoort@faegredrinker.com
craig.coleman@faegredrinker.com

daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

**Counsel for Clemens Food Group, LLC and The Clemens Family Corporation**

emily.chow@faegredrinker.com
isaac.hall@faegredrinker.com

Jacob D. Bylund (*pro hac vice*)
Stephanie A. Koltookian (*pro hac vice*)
Robert C. Gallup (#0399100)
FAEGRE DRINKER BIDDLE &
REATH LLP
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
(515) 248-9000
jacob.bylund@faegredrinker.com
stephanie.koltookian@faegredrinker.com
robert.gallup@faegredrinker.com

Jonathan H. Todt (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 842-8800
jonathan.todt@faegredrinker.com

John S. Yi (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2200
Philadelphia, PA 19103
(215) 988-2700
john.yi@faegredrinker.com

**Counsel for Hormel Foods Corporation**

/s/ *Peter H. Walsh*

Peter H. Walsh (#0388672)
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
(612) 402-3000
peter.walsh@hoganlovells.com

William L. Monts (*pro hac vice*)
Justin W. Bernick (*pro hac vice*)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
william.monts@hoganlovells.com
justin.bernick@hoganlovells.com

**Counsel for Agri Stats, Inc.**

/s/  *Tiffany Rider Rohrbaugh*

Tiffany Rider Rohrbaugh (*pro hac vice*)
Rachel J. Adcox (*pro hac vice*)
Lindsey Strang Aberg (*pro hac vice*)
Allison Vissichelli (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
radcox@axinn.com
lstrang@axinn.com
avissichelli@axinn.com

Jarod Taylor (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

/s/ *Christopher A. Smith*

Aaron Chapin (#0386606)
Christopher A. Smith (*pro hac vice*)
Tessa K. Jacob (*pro hac vice*)
A. James Spung (*pro hac vice*)
Jason Husgen (*pro hac vice*)
Sarah L. Zimmerman (*pro hac vice filed*)
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Ste 600
St. Louis, MO 63105
Telephone: (314) 480-1500
aaron.chapin@huschblackwell.com
chris.smith@huschblackwell.com
tessa.jacob@huschblackwell.com
james.spung@huschblackwell.com
jason.husgen@huschblackwell.com
sarah.zimmerman@huschblackwell.com

**Counsel for Triumph Foods, LLC**

Craig M. Reiser (*pro hac vice*)
Kail Jethmalani (*pro hac vice*)
AXINN, VELTROP & HARKRIDER
LLP
114 West 47th Street
New York, NY 10036
(212) 728-2200
creiser@axinn.com
kjethmalani@axinn.com

David P. Graham (#0185462)
DYKEMA GOSSETT PLLC
4000 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

***Counsel for Tyson Foods, Inc., Tyson
Prepared Foods, Inc. and Tyson Fresh
Meats, Inc.***