# EXHIBIT 8

# FILED UNDER SEAL

**In the Matter Of:**

*In Re: Pork Antitrust Litigation*

*MICHAEL WILLIAMS, PH.D.*

*June 21, 2022*



1

```
 1                              VOLUME 1
                                PAGES:  1-303
 2                              EXHIBITS:  See Index

 3

              UNITED STATES DISTRICT COURT
 4             FOR THE DISTRICT OF MINNESOTA

 5

 6   _____)
     IN RE:                         )  No. 0:18-cv-01776-JRT-HB
 7                                   )
     PORK ANTITRUST LITIGATION )
 8                                   )
     _____)
 9

10

11

12

13            VIDEOTAPED DEPOSITION of

14            MICHAEL A. WILLIAMS, PH.D.

15        - CONDUCTED BY VIDEOCONFERENCE -

16            Tuesday, June 21, 2022

17        8:01 a.m. Pacific Daylight Time

18

19

20

21

22        Michelle Keegan, RMR, CRR

23                  Lexitas

24     508-478-9795 ~ 508-478.0595 (Fax)

25            www.LexitasLegal.com
```

28

1    I'm getting at.  Are you assuming that the

2    defendants used each of the alleged mechanisms in

3    each year of the alleged conspiracy?

4         MR. FINLEY:  Objection, form, and on the

5    basis of expert stipulation.

6         A. Well, again, just coming back to the first

7    sentence in Paragraph 12, I have assumed that "For

8    the purpose of estimating overpayments, if any,

9    caused by the Defendants' alleged conspiracy," I

10   have assumed, as any damage expert must, that the

11   allegations in the complaint are true.

12        So obviously the complaint speaks for

13   itself about what the allegations are.  My report

14   doesn't contain a specific statement about the

15   question you just raised.

16        But if it would be considered as part of

17   the allegations in the complaint pertaining to the

18   alleged conspiracy, then again, I have, as any

19   damage expert must, assumed for purposes of

20   calculating overpayments that those allegations

21   are correct.

22        Q. For purposes of calculating overpayments

23   in 2016, what conduct did you assume defendants

24   engaged in that impacted prices that year?

25        MR. FINLEY:  Objection, lack of

29

1    foundation.

2        A. Yeah.  So my overcharge regression doesn't

3    have a specific overcharge for 2016.

4            It has -- as you mentioned earlier, it has

5    a dummy variable that answers the question of

6    whether or not there is or is not a statistically

7    significant difference between actual prices and

8    but-for prices over the period January 2009 to

9    June 2018.

10           So my report doesn't offer a specific

11   opinion on the subject of your question.

12       Q. Your report doesn't offer a specific

13   opinion on whether there was an overcharge in 2015

14   either.  Correct?

15       A. Yeah.

16           MR. FINLEY:  Hold on.  Objection, you may

17   have mischaracterized prior testimony.

18       A. My report does not offer different

19   overcharge estimates for different years within

20   the damages period.

21       Q. It's also true your report doesn't offer

22   an overcharge estimate for the period June of 2014

23   through June of 2018.  Correct?

24           MR. FINLEY:  Same objection.

25       A. It does not offer a separate estimate of

30

1    any alleged -- of any possible overcharge,

2    assuming any existed.  It doesn't offer a specific

3    estimate of an overcharge in that time period.

4    That is correct.

5         Q. And you're not making any assumptions

6    about defendants' actual conduct between June

7    of 2014 and June of 2018 other than what's

8    specifically stated in the complaint.  Correct?

9         MR. FINLEY:  Objection, form.

10        A. Your question was a little vague.

11        But again, I'll just come back again to

12   the first sentence in Paragraph 12.  "For the

13   purpose of estimating overpayment, if any, caused

14   by the Defendants' alleged conspiracy."

15        And that conspiracy is alleged to have

16   existed between -- at least the damages, between

17   January 2009 and June 2018.

18        And I have -- as I've said several times

19   now, I have assumed, as any damage expert must,

20   that the allegations in the complaint are true.

21        Q. Yeah.  And so that's what I'm trying to

22   get at.  So for 2016, just to pick a year, what

23   are you assuming the defendants did that then led

24   to the overcharge you purport to measure?

25        MR. FINLEY:  Objection, asked and

31

1   answered, lack of foundation.

2       A. Yeah.  I'm assuming that in 2016 the

3   defendants engaged in the conduct that's alleged

4   in the complaint as it relates to conduct that

5   allegedly supported the claimed conspiracy.

6       Q. Are you assuming that all decreases in sow

7   inventory between January of 2009 and June of 2018

8   were a result of the alleged conspiracy?

9       MR. FINLEY:  Hold on.  And objection,

10  form, also on the basis of expert stipulation.

11  This is something possibly considered, not

12  necessarily relied on.

13      A. My report doesn't offer such an opinion.

14  My report doesn't make such.  It doesn't have a

15  statement about that.

16      Q. Are you assuming that all decreases in hog

17  production between January of 2009 and June

18  of 2018 were a result of the conspiracy?

19      MR. FINLEY:  Same objection.

20      A. Again, the -- I mean, the complaint speaks

21  for itself.  So I'm assuming that the allegations

22  in the complaint are true as it pertains to those

23  allegations that are relevant to the alleged

24  conspiracy.

25          I don't specifically recall right now if

172

1    that.

2        Q. How would you phrase it?

3        A. I would phrase it the way I just phrased

4    it.  I would phrase it as saying that there is a

5    dummy variable that covers the period January 2009

6    through June 2018 and that the coefficient on that

7    dummy variable was minus 0.073, which implies that

8    there is a difference in -- that the percentage

9    effect over that time period is 7 percent

10   difference in production between the actual world

11   and the but-for world in the absence of the

12   alleged conspiracy.

13       Q. So you didn't like the word "average."  So

14   let me make sure I understand.

15           You're not testifying or opining that the

16   average production of pork net of net exports

17   between January of 2009 and June of 2018 was

18   7 percent lower than the but-for world.  Am I

19   understanding that correctly?

20           MR. FINLEY:  Objection, form.

21       A. Yes.  The word" average" is highly

22   inappropriate in this regard.

23       Q. And you also disagree with the word

24   "total."  Right?

25           So your regression does not tell us that

173

1    total pork production between net of net exports

2    between January of 2009 and June 2018 was

3    7 percent lower than it would have been in the

4    but-for world.  Correct?

5         MR. FINLEY:  Objection, may

6    mischaracterize prior testimony.

7       A. I just -- that's not how I would phrase

8    it.

9       Q. And I believe you said your regression

10   doesn't tell us that in any particular quarter

11   within that roughly 10-year period that pork

12   production was 7 percent lower than it would have

13   been in the but-for world.  Correct?

14        MR. FINLEY:  Objection, form, may

15   mischaracterize prior testimony.

16      A. The production regression has a single

17   dummy variable for the time period January 2009

18   through June 2018.  It does not break that period

19   up into, for example, individual years.

20      Q. Why did you choose to use a single period

21   of January '09 to June of 2018 to analyze the

22   impact of the conspiracy on production?

23        MR. FINLEY:  Objection on the basis of

24   expert stip to the extent this calls for materials

25   considered but not relied on.

In Re: Pork Antitrust Litigation                                    Michael Williams, Ph.D.
June 21, 2022

174

1      A. I think it's the appropriate -- I think

2   it's the appropriate way to test what's being

3   tested in the production regression.

4      Q. Why is it appropriate?

5         MR. FINLEY:  Same objection.

6      A. It's answering the question that was posed

7   in Paragraph 144.

8      Q. If the jury wanted to know whether pork

9   production net of net exports was lower in 2017

10   than it would have been but for the conspiracy,

11   your production model would not answer that

12   question.  Correct?

13         MR. FINLEY:  Objection, form.

14      A. I don't think I would state it quite like

15   that.

16         There's a dummy variable that includes

17   2017.  The effect is being measured over the

18   period January 2009 through June 2018.

19         As I said, there's not a specific dummy

20   variable that would include the four quarters of

21   2017 to see if there was a different effect in

22   2017.

23      Q. So that last point -- I just want to make

24   sure I understood that correctly.

25         So your production regression doesn't

In Re: Pork Antitrust Litigation                                    Michael Williams, Ph.D.
                                                                    June 21, 2022

202

1      Q. And I can't remember.  I know I asked you

2   these questions about your production regression.

3   I'm drawing a blank on whether I asked as to the

4   overcharge.  So apologies if we're double-dipping

5   here.

6          Did you run any sensitivity checks on the

7   overcharge regression that you report -- that you

8   disclose in your report?

9          MR. FINLEY:  Sure.  And so the question

10  has changed.  I'll object on the basis of expert

11  stip to the extent this is calling for calculation

12  that is not shown in the report or relied upon.

13     A. So the only overcharge regression that I'm

14  showing in my report is the one shown in Table 4.

15     Q. And you're not defending this overcharge

16  report -- the overcharge regression that you

17  disclose in your report on the basis that it is

18  not sensitive to slight modifications and

19  assumptions.  Is that fair?

20         MR. FINLEY:  Objection, form.

21     A. I would say that what I'm relying on are

22  the analyses that I've undertaken to perform the

23  overcharge regression results.  And that's -- and

24  all of the bases for that, all of the facts, all

25  of the data, all the modeling, that is all

203

1    disclosed in my report.

2       Q. Is your overcharge regression sensitive to

3    your decision to designate one damages period

4    covering 2009 through June 2018?

5          MR. FINLEY:  Objection on the basis of the

6    expert stip.

7       A. My report only shows -- only relies on a

8    single dummy variable for that period January 2009

9    through June 2018.

10         MR. SCHWINGLER:  I want to make sure the

11   record is clear on this and I'm not -- this isn't

12   an attempt to be argumentative.

13         Blaine, are you instructing him not to

14   answer my question?

15         MR. FINLEY:  Well, I thought I did.

16         MR. SCHWINGLER:  You objected.  I didn't

17   hear an instruction.  He did not answer my

18   question.  I want to make sure the record is clear

19   as to why.

20         MR. FINLEY:  What's the pending question?

21         MR. SCHWINGLER:  Let me do the question

22   again.  This isn't an attempt to -- this isn't

23   rhetorical.  I just want to make sure the

24   transcript is clear.

25         So I need to scroll back up -- here we go.

204

1           So my question is, "Is your overcharge

2    regression sensitive to your decision to designate

3    one damages period covering 2009 through

4    June 2018?"

5           MR. FINLEY:  Sure.  And so I will object

6    on the basis of the expert stip to the extent that

7    the only basis of knowledge is preliminary

8    calculations or other preliminary work product

9    done in anticipation of this report.

10          Otherwise, the witness may answer.

11       A. So the answer is, I have reported one

12   regression result for the overcharge regression.

13          And the bases for that regression are all

14   disclosed in my report, everything I've relied on,

15   all the data I've relied on, all the modeling I've

16   relied on, and that's what's presented in Table 4.

17       Q. And are you unwilling to answer the

18   question whether you -- whether your model is

19   sensitive to using one damages period?

20          MR. FINLEY:  Objection, form, lack of

21   foundation.  Also objection on the basis of the

22   expert stip.

23       A. I think I've answered your question.  My

24   answer -- I won't repeat the answer I just gave

25   because I've given it two or three times now.  I

205

1   really don't have anything else to add.

2      Q. Your answer didn't state whether or not

3   your regression model was sensitive to the

4   decision to use one damages period.

5          And I'm just trying to understand, is that

6   a question you're not answering based on Counsel's

7   objections?  Is it a question you don't know the

8   answer to?

9          It's unclear to me from the record right

10   now which is which.

11          MR. FINLEY:  It's a broad question.  But

12   also, are you asking him about something in his

13   report or are you just asking this general

14   proposition that may touch on preliminary work

15   product?

16          MR. SCHWINGLER:  I'm asking him whether

17   his overcharge regression is sensitive to using

18   one damages period.  That's the question.

19          Look, this is your opportunity to let your

20   expert defend his work.  If you're going to

21   instruct him not to do that, then the record is we

22   asked the question, "Is your model sensitive?"

23          Plaintiff counsel instructed the witness

24   not to answer.

25          MR. FINLEY:  Now you're mischaracterizing

Michael Williams, Ph.D.
                                                                  June 21, 2022

206

1    the record.  And I disagree with that

2    characterization of the record.  And there would

3    be a lot of criticism to this line of questioning

4    that I would level that maybe doesn't make sense

5    to go into right now on the record, but we can.

6         MR. SCHWINGLER:  If you're not instructing

7    him not to answer, then I want an answer to the

8    question.

9         MR. FINLEY:  Part of the problem is the

10   question is very broad and vague and ambiguous;

11   and therefore, it's unclear to what degree this

12   question will touch on preliminary work product.

13        But it seems that it may well, since -- I

14   mean, is there anything labeled "sensitivity

15   analysis" in the report you're asking him about?

16        MR. SCHWINGLER:  I have not seen it.

17        MR. FINLEY:  Then that . . .

18   BY MR. SCHWINGLER:

19     Q. Dr. Williams, do you understand what I

20   mean by -- when I ask you whether your model is

21   sensitive to a certain choice you make and how you

22   constructed the model?

23     A. I would say it's very vague because a

24   model can be sensitive for different reasons.  As

25   I've said, my regression results are shown in

207

```
1    Table 4, period.

2         Q. I'm going to ask the question one more

3    time.

4         MR. SCHWINGLER:  Blaine, you're going to

5    have to be clear on what you're doing or not

6    doing.  And I'm not going to ask it again.  We'll

7    reserve our rights to come back and get an answer

8    to the question --

9         MR. FINLEY:  We always reserve our rights.

10   Absolutely.

11        Q. Just one more time.  And I will move on

12   after this.

13        Dr. Williams, is your overcharge

14   regression sensitive to your decision to designate

15   one damages period covering 2009 through

16   June 2018?

17        MR. FINLEY:  Sure.  And I'll object on the

18   basis of the expert stipulation, among other

19   reasons, because this question seems -- is vague

20   and ambiguous and also seems to be directed toward

21   preliminary calculations and work product that may

22   or may not exist, since it has not been specified

23   what analysis, in particular sensitivity analysis,

24   in the report is being referenced, since Counsel

25   will not identify any sensitivity analysis that
```

208

1   this question pertains to.

2        But if outside of preliminary analysis

3   work product there's an answer to this question,

4   Dr. Williams may answer.

5       A. I really don't have anything else to add

6   to my prior answers.

7       Q. All right.  And what happens to the

8   results in your overcharge regression if you split

9   the damages period into smaller segments?

10       MR. FINLEY:  Same objection.  This is

11  clearly -- objection on the basis of the expert

12  stip.  This seems clearly directed toward

13  preliminary work product analysis.

14       MR. SCHWINGLER:  Is that an instruction

15  not to answer?

16       MR. FINLEY:  Yes, unless there's something

17  in the report that touches on this.  I mean, is

18  there something in the report you're referencing?

19       MR. SCHWINGLER:  I have not seen anything

20  in the report on this.

21       MR. FINLEY:  Well, then is your goal to

22  pierce the expert stip?

23       MR. SCHWINGLER:  I'm asking a question.

24  You can decide whether you want to instruct the

25  witness not to answer.

209

1      MR. FINLEY:  Then I will because I don't

2  understand how this isn't directed toward just

3  going right around or piercing the expert stip.

4      MR. SCHWINGLER:  I'm not going to debate

5  this point on the record any more.  You just make

6  a decision whether you're instructing the witness

7  not to answer the question or not, and we'll deal

8  with it later.

9      MR. FINLEY:  I definitely am making that

10  decision.

11      MR. SCHWINGLER:  And you're instructing

12  him not to answer?

13      MR. FINLEY:  Like I've put on the record a

14  number of times, I'm instructing the witness not

15  to answer to the extent that the answer is

16  exclusively or really is intertwined with

17  preliminary work product.

18      And as per our back-and-forth, that would

19  seem to be a binding instruction, since you've

20  refused to identify anything concrete specifically

21  in the report that is a sensitivity analysis that

22  you're asking a question about.

23      MR. SCHWINGLER:  And I'm not refusing to

24  do anything.  You and I both know it's not in the

25  report.  I've been clear about that.

210

1          Why don't I ask a few questions and then

2     we'll move on.

3     BY MR. SCHWINGLER:

4          Q. Dr. Williams, isn't it true that your

5     report contains no sensitivity analysis of your

6     overcharge regression?

7          MR. FINLEY:  Objection, form.

8          A. Well, I suppose it depends on what you

9     think "sensitivity analysis" means.

10          But my report contains -- with respect to

11    the overcharge regression, it contains a single

12    overcharge regression.  And my report explains all

13    of the data and modeling choices and variables on

14    which I'm relying to perform the regression that's

15    shown in Table 4.

16         Q. Your report contains no -- it does not

17    report any results for your regression where the

18    damages period has been split into smaller

19    segments.  Correct?

20          MR. FINLEY:  Objection, form.

21         A. That is correct.  There is a single dummy

22    variable for the damages period in the overcharge

23    regression in Table 4.  There is a single dummy

24    variable for the period January 2009 through

25    June 2018.

251

1          So we start with a regression that

2     estimates that pass-through elasticity -- so

3     that's a regression that in general form would

4     have a retail price on the left and a wholesale

5     price and other control variables on the right.

6     And then that would give us that pass-through

7     elasticity.

8          And then we would multiply the

9     pass-through elasticity by that price-cost ratio.

10    So for example, in the first row for REDACTED , you

11    see the pass-through elasticity is REDACTED and you

12    see the price-cost ratio is REDACTED percent.

13         So we multiply the REDACTED by the

14    REDACTED percent and that yields the pass-through rate

15    which is the REDACTED percent number.

16    Q. How does a pass-through rate help

17    determine whether a given class member paid an

18    overcharge?

19    A. Well, it's part of the analysis.

20    Obviously I have a whole section called "Common

21    Impact Analysis."

22         But the pass-through rate is showing

23    whether or not the distributor shown in Table 5

24    did or did not pass through price increases that

25    they paid for pork products in the prices that

252

1    they charged their customers, in particular, the

2    class members.

3        Q. If I took, let's just say, a REDACTED

4    customer, to calculate that customer's overcharge

5    on purchases from REDACTED do you take the

6    10.3 percent overcharge from your overcharge

7    regression and multiply it by the pass-through

8    rate for REDACTED?

9        MR. FINLEY:  Objection, form, scope.

10       A. I think the answer to your question is

11   yes, if I heard it right.

12           Maybe it would help if we just read the

13   last sentence in Paragraph 256.  I'll just read

14   it.  "These estimated pass-through rates can be

15   multiplied by the estimated overcharge percentages

16   discussed above to determine the overcharge

17   percentages for CIIPP Class Members."

18       Q. And the overcharge percentage as discussed

19   above in that sentence, is that a reference to the

20   10.3 percent from your overcharge regression?

21       A. Yes.  That is correct.

22       Q. So I'd like to -- how does pass-through

23   elasticity relate to pass-through rate?

24       A. Well, I thought I just explained that.

25   But let's do it again.

253

1    So the pass-through elasticity -- do you

2    see that in Table 5?  For example, for REDACTED, do

3    you see the REDACTED?

4    Q. Yes.

5    A. So that's the number that comes out of the

6    regression.  So remember, we're regressing -- it

7    is a log-log regression.  So it's an elasticity.

8    So the regression is giving us back that

9    REDACTED number.  We then multiply -- to get the

10   pass-through rate, we multiply the pass-through

11   elasticity by that variable called the price-cost

12   ratio.

13   So as I said earlier, if we take the

14   pass-through elasticity for REDACTED of REDACTED,

15   multiply it by the cost-price ratio of

16   REDACTED percent, that's what gives us the pass-through

17   rate of REDACTED percent.

18   Q. So let's just stay with REDACTED for a

19   minute.  If the average direct -- sorry.

20   If the direct purchaser overcharge from

21   your overcharge regression is 10.3 percent and

22   REDACTED has a pass-through elasticity of REDACTED and a

23   pass-through rate of REDACTED percent, would you

24   expect to see overcharges of close to REDACTED percent

25   for REDACTED customers?

288

1          And their quote out of their Michigan Law

2     Review article was, "modern cartels are more

3     focused on monitoring, communication, and

4     redistribution so as to prevent cartels" -- I'm

5     sorry -- "so as to prevent breakdowns in cartel

6     discipline than on some punishment."

7        Q. In order to successfully monitor and

8     punish noncompliance with a cartel, does the

9     information the members of the cartel use for

10    monitoring have to be accurate?

11         MR. FINLEY:  Objection, form, lack of

12    foundation, calls for speculation.

13       A. My report doesn't offer a specific opinion

14    about that.

15         Remember that the point to this whole

16    discussion is that -- remember we're in section --

17    that we're in Subsection III.B. of the report,

18    which asks the question, did the defendants take

19    actions that were against their unilateral or

20    independent self-interest but for the existence of

21    a conspiracy.

22         So the analysis that's in these paragraphs

23    is about that.  It's about did the firms in fact

24    engage in conduct that will be against their

25    unilateral self-interest but for the existence of

In Re: Pork Antitrust Litigation                               Michael Williams, Ph.D.
June 21, 2022

289

```
1   a conspiracy.

2        The analysis in these paragraphs is not

3   about the optimal way to run a cartel.  And my

4   report doesn't have any specific opinions about

5   the optimal mechanisms firms use to run cartels

6   other than, as I said, it generally -- this

7   discussion that we're looking at right now in

8   Paragraph 186 about generally what do cartels

9   attempt to do.

10       And again, with the important contribution

11  from Professor Kovacic, et al., about what modern

12  cartels attempt to do.

13    Q. You're not offering an opinion that

14  Agri Stats in fact facilitated monitoring and

15  enforcement by the defendants in this case.  Is

16  that fair?

17       MR. FINLEY:  Objection, form, may

18  mischaracterize prior testimony.

19    A. I don't believe my report offers an

20  opinion that says that.  The discussion of

21  Agri Stats really is in the vein I just described

22  earlier.  It's about whether or not there's

23  evidence that the firms took actions that were

24  against their unilateral self-interest in the

25  absence of an agreement.
```

Michael Williams, Ph.D.
                                                                June 21, 2022

                                                                      290

1      Q. Is it your opinion that Agri Stats

2    facilitated collusion between defendants?

3          MR. FINLEY:  Objection, form, scope.

4      A. My report doesn't offer a specific opinion

5    that says that.

6          Again, we talked about Paragraph 183.  So

7    whether or not someone would regard 183 as

8    evidence that Agri Stats facilitated an alleged

9    agreement, I suppose that would be up to the

10   person reading Paragraph 183.  I certainly stand

11   by what's in Paragraph 183.

12     Q. You say in Paragraph 185, you refer to

13   "information sharing through Agri Stats."

14         And then the second sentence says, "Such

15   information sharing can facilitate collusion

16   because the detailed knowledge that Defendants

17   gained regarding their competitors' pricing and

18   production decisions is the type of information

19   that would be useful for coordinating price

20   increases and/or production decisions, including

21   production cuts, among firms."

22         Did I read that correctly?

23     A. I believe so.

24     Q. So can you give me an example in this case

25   where two or more defendants used information from

291

1   Agri Stats to coordinate their production of pork?

2        A. I don't believe --

3            MR. FINLEY:  Objection, form.

4        A. I don't believe my report offers such an

5   opinion.  Again, the point to these paragraphs is

6   to ask the question did -- particularly in the

7   context of information exchanges related to

8   Agri Stats, did the firms engage in conduct that

9   was against their unilateral self-interest in the

10  absence of an agreement.  That's what's being

11  discussed here.

12           My report doesn't offer a specific opinion

13  about the -- about your specific question.

14       Q. So when your report says Agri Stats would

15  be useful for coordinating production decisions,

16  you're not -- that's a sort of hypothetical

17  observation?  You're not opining that in fact

18  defendants used Agri Stats to coordinate

19  production?

20           MR. FINLEY:  Objection, form.

21       A. I don't know that I'd agree with the way

22  you're stating that.

23           The whole discussion of Agri Stats is, in

24  my opinion, demonstrating that the firms --

25  including Agri Stats itself, as discussed in

292

1    Paragraph 183 -- that they did take actions that

2    are against their unilateral self-interest in the

3    absence of an agreement.

4         And then that's summarized really in

5    Paragraph 188 about what are the three primary

6    takeaways from the type of information that

7    Agri Stats is collecting and then disseminating.

8         And again, this goes back to the comments

9    made in the article by Professor Kovacic, in the

10   book by Professors Marshall and Marx, and then in

11   the document cited in Footnote 190, which was a

12   statement by the United States to the competition

13   committee about information exchanges that are

14   likely to be highly problematic from an antitrust

15   perspective, which I think certainly in my opinion

16   the Agri Stats data certainly falls into that

17   category.

18      Q. Take a look at Paragraph 57 of your report

19   and Table 1 that comes immediately after it.

20        THE VIDEOGRAPHER:  Counsel, you said

21   Paragraph 167?

22        MR. SCHWINGLER:  Paragraph 57, five seven.

23   It's on page 25.

24      Q. Paragraph 57 and Table 1 discuss

25   "International Trade in Live Pigs."  Is that