1       UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2
        ------------------------------------------------------
3                                )
        IN RE PORK ANTITRUST      )    File No. 18-cv-1776
4       LITIGATION                )              (JRT/JFD)
                                  )
5       This document relates to: )
                                  )    St. Paul, Minnesota
6       Sysco Corp. v. Agri Stats,)    August 21, 2023
        Inc., et al.              )    10:00 a.m.
7       Case No. 21-cv-1374(D. Minn.) )
        ------------------------------------------------------
8       IN RE CATTLE AND BEEF     )    File No. 22-md-3031
        ANTITRUST LITIGATION      )              (JRT/JFD)
9       ------------------------------------------------------

10

11

12

13

14

15           BEFORE THE HONORABLE JOHN F. DOCHERTY
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
16
                    **(MOTION HEARING)**
17

18

19

20

21

22

23

24
            Proceedings recorded by mechanical stenography;
25      transcript produced by computer.

1    APPEARANCES

2        **For Carina Ventures, LLC:**

3            Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
             DEREK HO, ESQ.
4            DUSTIN GRABER, ESQ.
             1615 M Street NW
5            Suite 400
             Washington, DC 20036
6
             Boies Schiller Flexner LLP
7            SCOTT E. GANT, ESQ.
             1401 New York Avenue NW
8            Washington, DC 20005

9        **For Sysco Corporation:**

10           Baker Botts L.L.P.
             JULIE B. RUBENSTEIN, ESQ.
11           700 K Street NW
             Washington, DC 20001
12
13       **For Direct Purchaser Plaintiffs:**

             Hausfeld LLP
14           KYLE G. BATES, ESQ.
             888 16th Street NW
15           Suite 300
             Washington, DC 2006
16
17       **For the Consumer Indirect Purchaser Plaintiffs:**

             Lockridge Grindal Nauen PLLP
18           ROBERT DAVID HAHN, ESQ.
             100 Washington Avenue South
19           Suite 2200
             Minneapolis, Minnesota 55401
20
21       **For the Commercial and Institutional Indirect Purchaser
         Plaintiffs:**

22           Cuneo, Gilbert & LaDuca, LLP
             ALEC BLAINE FINLEY, ESQ.
23           Suite 200
             4725 Wisconsin Avenue NW
24           Washington, DC 20016

25

```
 1          For Defendants Cargill Meat Solutions Corporation and
            Cargill, Inc.:
 2
                Wilkinson Stekloff LLP
 3              KOSTA STOJILKOVIC, ESQ.
                2001 M Street NW, 10th Floor
 4              Washington, DC 20036

 5              Greene Espel PLLP
                X. KEVIN ZHAO, ESQ.
 6              222 South Ninth Street
                Suite 2200
 7              Minneapolis, Minnesota 55402

 8          For Defendant JBS USA Food Company:

 9              Spencer Fane LLP
                DONALD HEEMAN, ESQ.
10              100 South Fifth Street
                Suite 2500
11              Minneapolis, Minnesota 55402

12              Quinn Emanuel Urquhart & Sullivan LLP
                SAMI H. RASHID, ESQ.
13              51 Madison Avenue
                New York, New York 10010
14
            For Defendant Tyson Foods:
15
                Perkins Coie
16              SUSAN E. FOSTER, ESQ.
                1201 Third Avenue
17              Suite 4900
                Seattle, Washington 98101
18
                Axinn Veltrop & Harkrider, LLP
19              LINDSEY STRANG ABERG, ESQ.
                1901 L Street NW
20              Washington, DC 20036

21          For National Beef Packing Company, LLC:

22              Jones Day
                BENJAMIN L. ELLISON, ESQ.
23              90 South Seventh Street
                Suite 4950
24              Minneapolis, Minnesota 55402

25
```

1       **For Hormel Foods Corporation:**

2           Faegre Drinker Biddle & Reath LLP
            CRAIG S. COLEMAN, ESQ.
3           EMILY ELIZABETH CHOW, ESQ.
            90 South Seventh Street
4           Minneapolis, Minnesota 55402

5       **For Seaboard Foods LLC:**

6           Stinson Leonard Street LLP
            PETER J. SCHWINGLER, ESQ.
7           50 South Sixth Street
            Suite 2600
8           Minneapolis, Minnesota 55402

9       **For Smithfield Foods, Inc.**

10          Larkin Hoffman Daly & Lindgren Ltd.
            JOHN A. KVINGE, ESQ.
11          8300 Norman Center Drive
            Suite 1000
12          Minneapolis, Minnesota 55437

13      **For Clemens Food Group, LLC:**

14          Greene Espel PLLP
            DAVIDA S. WILLIAMS, ESQ.
15          222 South Ninth Street
            Suite 2200
16          Minneapolis, Minnesota 55402

17      **For Triumph Foods, LLC:**

18          Husch Blackwell LLP
            CHRISTOPHER SMITH, ESQ.
19          8001 Forsyth Boulevard
            Suite 1500
20          St. Louis, Missouri 63105

21      **Court Reporter:**

22          ERIN D. DROST, RMR-CRR
            Suite 146
23          316 North Robert Street
            St. Paul, Minnesota 55101

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  Good morning, everyone.  Please be seated.

All right.  We're here this morning for a hearing on a motion brought by Sysco and a non-party named Carina for substitution in two cases; the In Re Pork Multidistrict Litigation and the In Re Cattle and Beef Multidistrict Litigation.

I understand that appearances got taken before I came in and so we won't be redoing that.

I also understand that counsel on both sides have prepared presentation PowerPoints.  My thought would be to have the moving party do their presentation, I'd ask any questions I have, and then we'd move to the defendants for their presentation and any questions I've got for them.  If that sounds all right to the parties -- if it doesn't, let me know, and we can modify things if needed.  But if that sounds all right to the parties, then I'd ask counsel for Sysco and Carina to come to the lectern and get us started.

MR. GANT:  Good morning, Your Honor.  That procedure is acceptable for the movants.

THE COURT:  Okay.  Can you get the microphone a little closer, please?  I'm sorry.

1              MR. GANT:  Yes.  Yes.

2              THE COURT:  Yeah.  Thanks.  And there are buttons

3    also on the lectern that move it up and down if that's at

4    all helpful to you.

5              MR. GANT:  Thank you, Your Honor.

6              THE COURT:  Okay.  All right.  I know that we had

7    appearances, but I wasn't here for them, so would you please

8    identify yourself.  Thank you.

9              MR. GANT:  I will.  Scott Gant from Boies Schiller

10   Flexner for Carina.  I'd like to introduce my colleagues

11   Derek Ho from --

12             THE COURT:  Good morning.

13             MR. GANT:  -- the Kellogg Hansen firm.  He'll be

14   speaking in a moment.  I'll turn to that.

15             Next to him is Kelly Daley who is from Burford

16   Capital.  She's a managing director of Burford Capital, and

17   she's the secretary of Carina Ventures, one of the movants

18   here, Your Honor.

19             THE COURT:  Okay.

20             MR. GANT:  And with your permission, what we

21   propose to do is to have Mr. Ho start off for some

22   background and context, Your Honor.  Mr. Ho and his firm

23   represented Burford and Carina in connection with the

24   arbitration proceedings in which Sysco and Buford

25   subsidiaries were involved, and then in the resolution and

1    settlement of that.  And he's intimately familiar with many

2    of the cases and the background.  I have a longer tenure, as

3    you may know, in these cases, so there may be some issues

4    about which it's more appropriate for me to address.  But

5    with your permission, I'd like to turn it over to Mr. Ho.

6         THE COURT:  That's fine.  And, again, I have read

7    everything that was submitted in this case -- or in

8    connection with this motion, excuse me.  I have a number of

9    questions, but, again, since you've got a -- you know, a

10   presentation teed up, I intend to let that run to

11   completion, assuming it's not, you know, terribly long,

12   before I -- before I start interrupting with questions.

13        MR. GANT:  We're all here for you to answer

14   questions, including Ms. Daley.  We brought her here to

15   ensure that if you had any questions that were more

16   appropriately addressed to Burford or Carina, that she's

17   here to answer those as well.

18        THE COURT:  Okay.  Thank you.

19        Mr. Ho, you're up.

20        MR. GANT:  I'll turn it over to Mr. Ho.

21        MR. HO:  Good morning, Your Honor.  Derek Ho from

22   Kellogg Hansen on behalf of Carina Ventures.  I'm hoping not

23   to mess with the technology today, so I have hard copies of

24   the PowerPoint deck.  With the Court's permission, may I

25   hand those up?

1          THE COURT:  Yes.  Of course.  I think I've got

2     one, so --

3          MR. HO:  Oh, you do?

4          THE COURT:  Yes.

5          MR. HO:  My apologies.  Great.

6          Perfect.  Thank you, Your Honor, and may it please

7     the Court.

8               After a protracted and expensive arbitration and

9     extensive settlement negotiations, Sysco and Burford have

10    voluntarily settled their dispute by Sysco assigning all

11    right, title, and interest in the Sherman Act claims in both

12    of these MDLs to Carina, which is a Burford subsidiary.

13              There's no secret about the reason for the

14    assignment because much of the record of the parties'

15    arbitration is now in the public docket.  And the undisputed

16    facts make clear that the assignment is valid, not only

17    under federal law, which governs the assignability of

18    federal antitrust claims, but also because of the strong

19    federal policy favoring settlement of disputes.

20              Given that valid assignment, substitution is

21    appropriate under Rule 25(c) because Carina is the only

22    party that now has the right to prosecute these claims.  And

23    substitution will not prejudice defendants' substantive

24    rights.

25              If Your Honor turns to the second slide, the first

one after the cover page, our motion rests on two legal

points.  The first is that the assignment is valid as a

matter of federal law, under which, federal antitrust claims

are freely assignable.  Defendants' argument under state

champerty law is wrong because states can't restrict the

assignability of federal claims.  And even if they could,

Illinois, New York, Delaware do not prohibit this

assignment.

The second point is that substitution will

facilitate the conduct of the litigation, the standard set

forth in *Jalin Realty*, because Sysco no longer has any

substantive right to prosecute this case.  Carina is the

real party in interest.  And that is why substitution is

routine and why refusal to substitute has been reversed by

the Eighth Circuit in cases of complete assignment.

So before I get into the details of those two

points, I did want to just talk a little bit about the

language of Rule 25(c), which is on Slide 3 of the deck.

Rule 25(c) provides that if there is a transfer of interest,

the action may be continued by the original party unless the

Court grants either substitution or joinder upon motion.

So if there is neither substitution nor joinder,

then the original party, Sysco, may continue the action.

And that speaks to the purpose of Rule 25(c), which we set

out on the next slide, which is to allow this action to

continue unabated when the interest in the lawsuit changes

hands without requiring the initiation of an entirely new

lawsuit.  So the emphasis of Rule 25(c) is on what will

facilitate the continuation of this lawsuit.

And then the second purpose set out in the slide

is to ensure that the litigation be conducted by the real

party in interest.  So when *Jalin Realty* says that the test

is what will facilitate the conduct of the litigation, what

that really means is what will allow the real party in

interest, now that the interest has been transferred, to

continue this litigation unabated without the need to file a

new lawsuit.  So that's the overarching purpose of

Rule 25(c).

You're going to hear a lot about other things that

sound like they relate to the facilitation of the conduct of

the litigation, but when the Court uses the phrase

"facilitate the conduct of the litigation," it is alluding

to the purposes of Rule 25(c), and that is the continuation

of the lawsuit by the real party in interest.

And so here when you think about what choice would

facilitate the conduct of the litigation in that relevant

sense, as between the three choices that Rule 25(c) offers,

the original party continuing, substitution, or joinder,

substitution is the only choice that actually facilitates

the conduct of the litigation in the sense of allowing the

real party in interest to continue this litigation unabated without the need to file a new lawsuit, because Sysco no longer has an interest in this claim. It cannot prosecute this claim under the assignment. It's not the real party in interest under Rule 17. Only Carina is the real party in interest. Only Carina has the power under the assignment to prosecute the claims. And that's why under Rule 25, the only choice that actually achieves the purposes of the rule and the test set out in the cases is substitution.

So let me show that by first looking at -- or pointing the Court to the relevant provisions of the assignment. That's on Slide 5. I don't think there's any dispute about this. It's attached as Exhibit A to the joint motion. And the relevant provisions are Sections 2 and 4 of the Assignment Agreement, but let me just walk through it.

So in Section 2, Sysco, the assignor, unconditionally sells, assigns, and transfers to Carina, the assignee, all of assignor's right, title, and interest in the transferred assets. It is a complete assignment. The word "all" is very clear.

And then paragraph 4, Section 4 of the agreement clarifies what is already made clear in Section 2, which is, that the assignee possesses all rights to prosecute, enforce, and collect the claims and to exercise and enjoy the benefit of the other transferred assets, to the

1    exclusion of the assignor, which shall retain no rights to

2    do so.

3           So, again, under the Assignment Agreement, Sysco

4    has no right to prosecute these claims.  Carina has the full

5    right, title, and interest in these claims.

6           And the next slide just makes clear that when the

7    agreement speaks of transferred assets, that includes,

8    specifically, the rights associated with these two

9    litigations as defined in paragraph (a)(ii) and (a)(iii) of

10   the definition of transferred assets.

11          THE COURT:  I promised no questions -- I promised

12   no questions, but --

13          MR. HO:  I will --

14          THE COURT:  -- a quick one at this point.  Is the

15   list on Slide 6 all of the interests that are being

16   transferred, or are there other cases as well as those

17   three?

18          MR. HO:  There is *Turkey* as well, so because there

19   wasn't a ton of room on the slide --

20          THE COURT:  I wondered, yeah.

21          MR. HO:  -- it does go on.

22          THE COURT:  Okay.

23          MR. HO:  And if you look at Docket 1940 at page 8,

24   you'll be able to see the entire provision.

25          THE COURT:  Okay.

1          MR. HO:  The next point and really the major

2     premise of our argument is on Slide 7, which is that federal

3     antitrust claims are freely assignable.  And there is case

4     law in the Circuit Courts that goes back more than a

5     century, literally to two years after the enactment of the

6     Clayton Act in 1914, that makes clear that federal antitrust

7     claims are freely assignable.

8          They are on the slide here.  I won't go through

9     them all.  But it starts with the *United Copper Securities*

10    case looking to the general common law of the United States

11    and saying, federal antitrust claims -- and that was a

12    federal antitrust case -- are assignable.  And you can see

13    the litany of cases sort of culminating in the *Gulfstream*

14    case, which recognized, after an extensive analysis, that

15    that is the federal rule relating to antitrust claims.

16         And there's an important reason for that rule,

17    which we set out in the next slide, which is that private

18    litigation is critical to the enforcement of the antitrust

19    laws.  The Supreme Court has recognized that time and time

20    again.

21         We recite the language from the *Perma Mufflers*

22    case, which we cited in our brief as well, about how private

23    actions are a vital means for enforcing the antitrust policy

24    of the United States.

25         I could have added a lot more cases, but I'll also

mention the *Illinois Brick* case, which, of course, is not
the origin of the direct purchaser rule, but which confirmed
the direct purchaser rule.

And one of the three important policy reasons that
the Court gave for the direct purchaser rule is that it
concentrates the right of action in a single direct
purchaser.  And why did the Court decide that that was the
right way to interpret the Sherman Act and the Clayton Act?
It did that because it said that will facilitate private
litigation.  It will incentivize the direct purchaser, which
now will have a much larger and concentrated claim, to bring
those claims.

Why is that important?  Because, again, the
Supreme Court has always recognized that private enforcement
of the antitrust laws is critical to its deterrent function
and to the proper functioning of our markets.

*Illinois Brick* also said another thing which is
important here.  It said, the one reservation we have about
concentrating all this power in the direct purchasers is
that the direct purchasers may have relationships with
its -- with their suppliers, and that might deter the direct
purchaser from bringing suit.  Nonetheless, it said, it's
better to concentrate the power to bring private lawsuits in
the direct purchaser rather than have that essentially
fragmented among all of the indirect purchasers.

1        But the Court was commenting about that potential

2   deterrent effect of the supplier-distributor or

3   supplier-customer relationship not because that was a good

4   thing, but because it viewed that as a potential problem for

5   the enforcement of the antitrust laws.  And that's going to

6   be important, because what we have here is an assignment by

7   a direct purchaser that has felt that commercial impediment

8   to bringing its antitrust claims.

9        These defendants have put commercial pressure on

10  Sysco to refrain, frankly, from litigating these claims

11  zealously.  And so it is -- it advances the purposes of the

12  antitrust laws as articulated by *Illinois Brick* itself for

13  Sysco to be able to say, Okay, well, if we are impeded from

14  pursuing these claims zealously because we need beef and

15  pork from these suppliers, we can, instead, assign these

16  claims to a third party that isn't impeded by this supply

17  relationship.  And that assignee, in this case Carina, can

18  do exactly what the antitrust laws want to have done in this

19  case, which is to have these claims zealously prosecuted so

20  that price-fixing and other constraints, unlawful restraints

21  on markets don't go unremedied.

22       And that's exactly what the *Wallach* case

23  recognized in the Third Circuit, which is the next case on

24  the slide.  That impeding the assignability of federal

25  claims impedes the purposes of the federal antitrust laws

1   because it prevents valid claims from being zealously

2   enforced.

3           So against that backdrop -- and now I'm turning to

4   the next slide, Slide 9 -- state law has no power to

5   restrict the assignability of federal claims.  Two basic

6   reasons:  One is the Supremacy Clause.  This is a federal

7   cause of action created by Congress.  Congress has the right

8   to decide whether these claims are freely assignable, and

9   federal common law, as I noted, dating back almost to the

10  time of the enactment of the Clayton Act, says that federal

11  causes of action are freely assignable unless Congress says

12  otherwise.  So under the Supremacy Clause, states simply

13  don't have the constitutional authority to restrict the free

14  assignability of claims.

15          And the second related reason is that if states

16  did have the power to restrict the free assignability of

17  claims, it would lead to an untenable result, which is that

18  you would have 50 different state law regimes for the

19  assignability of claims that are inconsistent.  These cases

20  before Your Honor are MDLs, and MDLs highlight the reason

21  why that is not a tenable regime.  You have cases that have

22  been transferred here from other courts, cases that may have

23  been directly filed here.  That already creates complicated

24  choice of law problems in other contexts.  But those

25  complicated choice of law problems cannot exist with respect

1   to the assignability of federal claims.  As the Courts have

2   recognized, there has to be a uniform federal rule regarding

3   the assignability of claims.

4        The *Carlson* against *Green* case, which we cite in

5   the slide, is about survivability, not assignability, but

6   the two are deeply-related contexts and concepts.  And the

7   Supreme Court said very clearly that with respect to

8   survivability, because this was a *Bivens* action, because

9   it's a federal cause of action, federal law applies, and

10  there has to be a uniform federal rule of survivorship under

11  federal law.  And same with the other two cases that we put

12  on the slide.  There are more cases that we cite at Notes

13  Two and Three of our reply brief that are to the same

14  effect.

15       With respect to the next slide, the Supreme

16  Court's decision in the *Sprint* case from 2008 confirms that

17  federal claims are freely assignable.  That's not just my

18  reading of *Sprint*.  That's the reading of the Federal

19  Circuit in the *Mojave Desert* case.  It's the reading of the

20  Second Circuit in the *John Wiley* case; that federal causes

21  of action are freely assignable unless Congress says

22  otherwise.  It's also what the Supreme Court said as far

23  back as 1920 in the *Spiller* against *Atchison case*.

24       And I'll add one more case because it's from this

25  circuit.  In 1965, the Eighth Circuit -- and we cite this

case in our brief at Footnote 3 -- in the *Western Auto Supply* case, adopted *Spiller* and said exactly what *Spiller* said, which is, if you have a federal cause of action, it -- the assignability of that cause of action is governed by federal law. And unless Congress has said it's not assignable, it is. And it applied that general rule to claims brought by an assignee under Section 16(b) of the 1934 Act -- the 1934 Securities Act, and it said, because the 1934 Act doesn't say that claims are not assignable, they are.

And that same conclusion would apply to the antitrust laws. There is nothing in the Sherman Act or the Clayton Act that says they are not assignable. To the contrary, all of the policy reasons that I alluded to before indicate that they are.

Slide 11 is our fallback position, which is that state law -- state champerty law doesn't prohibit this assignment in any event. I won't go through all of the reasons because for all the reasons that I have just given, we think that the correct answer here is that federal law applies, but all roads basically lead to Rome. Even if you were to say state law applies, if you apply the law of Illinois, which is the law that governs this contract, there can be no -- the assignment is valid because defendants don't have standing to raise champerty in Illinois. And, at

any rate, there is no champerty.  Minnesota has abolished
champerty altogether.  And in Delaware, which we don't think
applies, there also is no champerty for the reasons that we
give in our brief.

Slide 12 just lays out the very clear law in
Illinois dating back more than a century now that says that
the defendants here have no standing in Illinois to raise
champerty.  You know, again, we could have put more
quotations on our slide, but for purposes of space, we kept
it at those three.

Slide 13, even if defendants could raise
champerty, champerty doesn't apply because fundamentally
champerty is about a third party officiously intermeddling
in someone else's litigation.  And as I said at the outset
of this presentation, there was not officious intermeddling
by Carina.  This was a voluntary settlement agreement
arising out of hotly contentious arbitration.  And where
parties voluntarily settle their claims, there's a policy
that favors the enforcement of that dispute.  There's no
policy that says that that is some kind of officious
intermeddling.

So for all those reasons, we think that the first
point that the Court ought to decide is that the assignment
here is, in fact, valid.

And that then leads us to our second point, which

1  is that because the assignment is valid, the only real

2  choice, as I alluded to at the outset, under Rule 25(c) is

3  for Carina to be substituted for Sysco because only Carina

4  has the ability and the right to prosecute these claims

5  going forward.

6          If I could ask Your Honor to turn to Slide 16, I

7  want to spend a little bit of time just talking about the

8  case law in this district and in this circuit that we think

9  guides the way.

10          So there are four cases that you see.  *Jalin*

11  *Realty* sets out, as Your Honor knows, the basic standard.

12  And it was a case involving an assignment of a claim much

13  like in this case as part of a settlement between an insured

14  and an insurer.  In that settlement, the insured said, Okay,

15  we'll settle this policy dispute, coverage dispute, and as

16  part of that, we'll assign our claim to attorneys fees to

17  Hartford, the insurer.

18          And the question was whether the insurer could be

19  substituted.  And the answer was, yes.  And the simple

20  reason -- this is not -- shouldn't be complicated because

21  the reason is simple.  The simple reason is that the

22  insurer, much like in this case, had a complete assignment

23  of the claim and was, therefore, the real party in interest.

24  And the assignor was no longer the real party in interest

25  and had no further right to prosecute the claim.  And that's

what the Magistrate Judge said in their Report and

Recommendation, and that's what Judge Tunheim adopted.  And

so we think that *Jalin Realty* is really the blueprint for

what this Court ought to do in this case.

Similarly, I'm not sure if I'm pronouncing this

correctly, but the Couf case, C-o-u-f, same thing; an

assignment from an assignor to an assignee, and the

substitution was granted on the ground that the assignee had

become the real party in interest, the assignor was no

longer the real party in interest, and it was really as

simple as that.

*Columbian Bank* affirmed a grant of substitution in

much the same posture.  The Columbian Bank was taken over by

the FDIC, and then the receiver assigned the bank's interest

in a judgment to a third party.  The District Court granted

substitution.  No fuss.  And the Eighth Circuit affirmed.

There was no evidentiary hearing.  There was no discovery.

The simple point was that the assignee had become the real

party in interest, and under Rule 25, that's the whole

point, to let the action continue unabated in the name of

the real party in interest.

And then lastly, the *ELCA* case, that involved a

transfer of property from one company to a newly created

company, ELCA Properties.  And that -- in that case, the

District Court didn't let the original party proceed, and

1      then it denied substitution to the assignee. And the Eighth

2      Circuit said that that was an abuse of discretion, and it

3      not only reversed but remanded with an order to allow

4      substitution. Why? Because the assignee, the transferee,

5      was now the real party in interest. It had all the rights

6      related to the property and so was the proper party in this

7      litigation.

8           Again, you're going to hear a lot of arguments

9      from the other side about discovery concerns, about

10      admissibility, about things that relate to matters that are

11      simply outside of the core scope of Rule 25, not only as

12      evidenced by the purposes that I articulated earlier, but as

13      evidenced by these cases. Because what you don't see in

14      these cases is discussion of whether there have been

15      commitments about whether the assignee is, you know,

16      financially stable or judgment proof or is in the same

17      financial condition as the assignor. You don't see anything

18      in these cases about the assignor committing to, you know,

19      be a party for purposes of discovery.

20           We have gone farther in trying to reassure the

21      defendants that they are not going to suffer any prejudice

22      from this assignment than what any of these cases actually

23      demands. What these cases stand for is the straightforward

24      proposition that where there has been a complete assignment

25      and the real party in interest has switched from the

1          assignor to the assignee, substitution is the appropriate

2          remedy.

3                    If we go to the next slide, I think it's helpful

4          to look at the question from the other direction, which is,

5          what happens if substitution is denied?  Sysco, under

6          Rule 25, would be entitled to continue the litigation.  But

7          as we've seen from the language of the assignment, Sysco has

8          no right to prosecute these claims.  Under the agreement,

9          Sysco is legally powerless to continue as the plaintiff in

10         this case.  And so if Sysco remains the plaintiff and Carina

11         is not substituted in, you have an untenable situation where

12         the party before the Court is not actually the party that's

13         empowered to litigate these claims.

14                   And it's sort of ironic that this is what the

15         defendants want because the defendants are almost always, in

16         my experience, you know, criticizing litigation funding

17         because they feel like the litigation funder is in the

18         shadows as opposed to before the Court.  Here, Carina

19         doesn't seek to be a litigation funder.  Carina is seeking

20         to be the party before the Court.  And now the defendants,

21         ironically again, want Sysco to be the party before the

22         Court even though it doesn't control the litigation, and for

23         Carina to be precluded from participating in this litigation

24         even though it is the real party in interest.

25                   I think another way to look at this is what would

have happened had this assignment occurred before this litigation was commenced? This has occurred in a lot of other cases that I understand to be before the Court. If Sysco had assigned these cases the day before Carina brought suit, there would be no doubt that Carina would be the proper plaintiff. And there would also be no doubt that Sysco would not need to be joined as a co-plaintiff in order for Carina to proceed as the assignee.

All that has happened here is that that assignment occurred in the middle of the litigation, and so technically speaking, Rule 25, rather than Rule 17, applies. But it doesn't change the fundamental point that when you have an assignment from an assignor to an assignee, the assignee has the power and the privilege to pursue that litigation without the need for the assignor to be involved, otherwise, in all the cases in which there has been an assignment, you would have to start asking questions about whether the assignor needs to be joined as a party for discovery purposes or for some other purpose. That's just not how it works in practice, and nothing in Rule 25 compels a different result just because this has occurred in the course of litigation.

So I want to end with this point about prejudice, because I think you're going to hear a lot from the other side about prejudice. And I'd ask again the Court to focus

on what Rule 25 is about and view the question of prejudice
through that lens.  Rule 25 is fundamentally about
substituting an assignee for an assignor, which, by
operation of law, means that Carina is going to stand in the
shoes of Sysco.  And so when we hear -- when the cases talk
about prejudicing defendants' substantive rights, what the
cases are focusing on is the fact that when there is a
transfer of interest that triggers Rule 25, the assignee
stands in the shoes of the assignor; and by operation of
that principle, there is no change to the substantive rights
of the defendant.

That's best articulated, I would say, by the *ELCA*
case in Footnote 5, which we cite in the slide, which says,
As the new property owner -- here we've just plugged in
Carina for the parties in the ELCA -- Carina seeks the same
relief and assumes an identical position to Sysco in the
lawsuit.  The defendants are free to assert the same
defenses against Carina that it would have asserted against
Sysco.  That means there is no prejudice to defendants'
substantive rights.

Now on top of that, as I say, we have tried to
provide additional reassurances to the defendants that Sysco
will remain amenable to party discovery, and that we will,
you know, try to -- we've tried to address in many ways all
of the other concerns that they have about the practical

implications of this assignment, but as the cases that I

alluded to before indicate, those are not the core question

of prejudice under Rule 25.  The core question of prejudice

is answered by the fact that an assignee, like Carina,

stands in the shoes of the assignor, and the claims and

defenses against Carina will be no different.  Otherwise,

like I say, every assignment would require an inquiry about

whether the assignor needs to make commitments about

discovery, whether statements by the assignor are

attributable to the assignee, and you just don't see that

kind of analysis in any of these cases because that's

fundamentally not what Rule 25 is about.

            THE COURT:  Question time?

            MR. HO:  Absolutely.

            THE COURT:  So I think you've done a very good

job, Mr. Ho, in laying out the public policy in favor of

free assignment of federal antitrust claims, but there is

another policy that I think is in tension here, and this is

the way I'm looking at the case, is you've got, on the one

hand, a federal antitrust claim that, for reasons of public

policy, as you say, laid out in *Illinois Brick*, should be

freely assignable in opposition to a public policy that

litigation funders should not control litigation but rather

should provide investment funds and hope that they've chosen

wisely and that they will recoup their investment plus a

1   profit.

2          I understand everything you're saying about Carina

3   no longer being a litigation funder but being a party, but I

4   can't close my eyes to the fact that this is a special

5   investment vehicle set up by Burford Capital, which has

6   taken possession of this lawsuit -- these lawsuits, and that

7   their interest in these lawsuits appears to be their only

8   asset.

9          In deciding which of the two counterpoised public

10  policies I ought to go with, what's the rule of decision?

11  Which one -- I mean, I know you're going to say that free

12  assignment ought to prevail, but tell me why.  And as I say,

13  when I read the briefs, I didn't see much of a free

14  assignability in the defense brief, and I didn't see much

15  about limits on litigation funders' participation in

16  litigation in your brief.  So a bit you've talked past each

17  other.

18          MR. HO:  Absolutely, Your Honor, so I'll try to

19  answer that very directly.  So I think Point Number One is

20  that when you -- Your Honor is thinking about public

21  policies, they have to be federal policies.  And whatever

22  you might try to find in case law from state courts, there

23  is no federal policy along the lines of what Your Honor

24  articulated.  There never has been.  All of the policies

25  that are articulated by the defendants in their brief are

1  state law policies. And they are the policies of only

2  certain, in fact, a minority of states.

3         If Your Honor looks at federal policy, what this

4  Court has said, what the Eighth Circuit has said, if you are

5  looking for federal policy, you look to federal common law,

6  and you look -- sometimes when you are trying to discern

7  federal common law, you look to the Restatement.

8         So I laid out all the cases that I think already

9  establish that federal common law doesn't recognize this

10 policy, but if -- but I'll also add the Restatement. If you

11 look to the Restatement, the Restatement does acknowledge

12 that at one point, there were policies in our ancient past,

13 in our ancient history about, you know, disfavoring the

14 commercialization of claims, let's say. But those have

15 largely gone away, and the Restatement does not adopt them.

16 In fact, says that those are now disfavored and have more or

17 less vanished.

18        So Point Number One is: These have to be federal

19 policies, and the policy that the defendants have

20 articulated doesn't get them past the starting gate because

21 they are not federal policies.

22        Number Two, even if you were to look beyond that,

23 the policies with respect to litigation funding are not --

24 are kind of a red herring here. You know, the defendants

25 have this kind of like Pavlovian response that every time

1       there's a litigation funder in the frame, they make all

2       these arguments about control and how a third party

3       shouldn't have control of another party's litigation, but

4       that's not at all what's happening here.  Carina isn't

5       seeking to be a litigation funder that controls someone

6       else's litigation.

7               THE COURT:  Well, but the other thing that I have

8       on my mind is the history of this particular -- you know,

9       this case, this motion didn't come, you know, on a clean --

10      on a clean sheet of paper, and many of the things that are

11      said about control were not said by the defendants, they

12      were said by Sysco when it was having an argument with

13      Burford and when it found it necessary to discharge

14      Mr. Gant's firm as a result, which resulted in this

15      litigation being put on hold for a couple of months while

16      Sysco obtained new counsel.

17              And so this comes from a place where a litigation

18      funder did seek apparently -- and I understand that there

19      are disputed questions of fact there -- but where Burford

20      did seek to control Sysco's ability to settle at least

21      portions of this lawsuit.  And to put it just very, very

22      clearly, why should I not allow Sysco to settle the lawsuit?

23      Why should this lawsuit continue in order that Burford and

24      Carina can achieve a greater return on investment than they

25      might already have?

1    MR. HO:  I think a couple points.  One, that

2    question is not before this Court on this motion.  That was

3    a question that was presented because -- by virtue of the

4    parties' arbitration agreement in the claim prosecution

5    agreement to a panel of arbitrators.  Sysco said they should

6    be allowed to settle.  The defendants -- I'm sorry --

7    Burford said that it shouldn't be allowed to settle.

8         The arbitrators sided, at least on a preliminary

9    injunction, with Burford and said that Sysco should not --

10   had contractually committed to certain obligations to

11   Burford with respect to settlement that it had not complied

12   with.

13        Now, how -- what happened --

14        THE COURT:  You know, pardon me for finding that a

15   little bit unsatisfactory when the practical consequence of

16   granting this motion will be continuance of at least

17   portions of a lawsuit that it looks to me that there was a

18   good chance would have settled.

19        MR. HO:  Well, Your Honor, I'm not -- I think that

20   that is beyond the scope of Rule 25.  Rule 25 is asking a

21   much narrower question, which is, is Sysco the real party in

22   interest or is Carina the real party in interest.  Which of

23   those two parties ought to be able to proceed.

24        With respect -- to the extent the Court has

25   concerns that Sysco should have been able to settle the

underlying litigation, the parties, again, had a -- an

arbitration agreement where they agreed that that issue

would be resolved by arbitration. And then after the

arbitration, Sysco was entitled to and did seek to have the

preliminary injunction ruling vacated under the Federal

Arbitration Act. Now it brought that to Judge Durkin in

Illinois, not to this Court, so even Sysco didn't present

that issue to this Court. We brought that issue to a Court

in New York. But then, at that point, the parties resolved

their claims.

And so it does not seem to me that the fact that

this arose out of a dispute where one party was saying that

the prior arrangement between the parties violated state

law -- and, again, I want to make very clear, Sysco -- even

Sysco never once argued that the old claim prosecution

agreement violated federal law. They were arguing that it

violated New York law.

And so, again, if, as you say, it is -- if

Your Honor accepts that there is a federal policy in favor

of free assignability of claims, whatever the policy of New

York may be in terms of restricting the power of the

litigation funder to control litigation cannot supersede

that federal policy. But -- and, so, the fact that the

parties had this dispute and have now settled it doesn't

taint this assignment with some kind of illegality. It is

1    just another instance of parties litigating claims, having

2    disputes over claims, and then voluntarily and amicably

3    resolving those claims in a way that is fully consistent

4    with federal law.

5              THE COURT:  So you mention in your papers that

6    there have been other assignments in this case.  And I think

7    one of the ones that you mentioned was Amory Investments or

8    Armory Investments.  All I can tell you is that this is the

9    first Rule 25 substitution motion that I have heard in

10   either *Pork* or *Cattle*.  Can -- what can you tell me?  Are

11   there other litigation funders that have taken over

12   litigation for a -- for a plaintiff in this -- in either of

13   these cases?

14             MR. HO:  Other than -- other than Carina and

15   Amory, I don't have the ability to answer that question.

16             THE COURT:  Okay.  And what -- tell me about

17   Amory, because the name was in the papers, but what happened

18   there?

19             MR. HO:  Amory is also a subsidiary of Burford

20   that purchased claims in these cases from the bankruptcy

21   estate of the original plaintiff.  And so the -- and then as

22   assignee, it is asserting those claims.  Mr. Gant is also

23   counsel to Amory as well.

24             So the same arguments that we were talking about

25   in this hearing would apply to Amory.  And Amory has one

additional argument on top of that, which is that federal

bankruptcy law makes absolutely clear that it is not just

the right, but, in many instances, the obligation of the

trustee, in the context of a federal bankruptcy, to sell off

the assets of the estate.  And so it can't possibly be,

again, that state champerty law or some other kind of state

law would impede the ability of a federal bankruptcy trustee

to do exactly what it did here, which is to say we have

these valuable claims in these cases, we need to liquidate

them in order to try to give money to the creditors of the

estate, and we're going to sell the claims to an assignee

who can then pursue them in its own name.

THE COURT:  Are you aware of any case similar --

well, let me back up and ask a different question first.

Was the Amory assignment litigated the way this one is being

litigated?

MR. HO:  There -- in this -- in these cases, I'm

not aware of any motion practice with respect to Amory.  I

will say that in the *Turkey Antitrust* case, which is down in

Chicago, there has been a motion for summary judgment filed

against Amory on the ground that Amory has no valid rights

because the assignment is invalid.

THE COURT:  All right.  And is there, in your

view, any way to -- if I disappoint you and rule for the

defendants, is there any way of doing that without

1    invalidating the assignment?

2          MR. HO:  Is there a way to deny substitution

3    without invalidating the assignment?

4          THE COURT:  Right.  Correct.

5          MR. HO:  I suppose that -- you know, as I

6    understand it, the defendants have raised the possibility of

7    essentially punting the issue of the validity of the

8    assignment down the road.  We don't subscribe to that

9    because we think that the validity of the assignment is

10   clear as a matter of federal law and that there are no

11   factual disputes about the validity of the assignment

12   because all of the state law policies that they are talking

13   about are not applicable in the context of an assignment of

14   a federal antitrust claim.  So I suppose that is one

15   possibility where, you know, the defendants win for now, but

16   where the assignment is not rendered invalid.

17         THE COURT:  So if, for example, the motion for

18   substitution were to be denied, the effect would be that

19   Sysco would have to remain in the case even though they no

20   longer have any economic interest whatsoever in doing so?

21         MR. HO:  Not only no economic interest, but no

22   authority to actually prosecute these claims by virtue of

23   the Assignment Agreement.

24         THE COURT:  Unless the Assignment Agreement is

25   voided --

1          MR. HO:  Correct.

2          THE COURT:  -- one way or another?  All right.

3          All right.  Are you aware of any other -- of any

4   decided case in which a litigation funder has done what

5   Burford is doing here, which is to set up a special purpose

6   vehicle, take possession of assets in the form of litigation

7   claims, and then proceed in the shoes of the original party?

8          MR. HO:  I'm not aware of any case on all fours.

9   The reason for that is that this is not an ordinary

10  situation.  Litigation funders typically do not take over

11  claims, but there are some specific -- this is a special

12  context in which there was a dispute between Burford and

13  Sysco and -- over the prior arrangement in which Burford was

14  acting as a litigation funder.  And as I said before, as

15  a -- a settlement of that dispute, the parties decided to

16  have an assignment of claim.

17          I will say, though, that the notion that this is

18  somehow extraordinary I think is -- is -- misses the mark.

19  There are lots of cases in which assignments are done for

20  all kinds of business reasons.  You know, I refer you --

21  Your Honor back to the *Sprint* case.  There, you know, there

22  were a bunch of plaintiffs that had federal claims.  They

23  didn't want to litigate those claims on their own partly

24  because they were small, partly because they are not in the

25  business of litigation.  So they assigned the claims to an

assignee for purposes of the assignee bringing those claims

on their behalf.  And the Supreme Court said, That's totally

fine.  The assignee has Article III standing to bring those

claims.

And what the -- and I think it's important what

the standard was that *Sprint* set out.  *Sprint* said --

because the dissenting opinion said, Hey, what about

champerty?  You know, this looks kind of like an invalid

assignment where the assignor is saying that it assigns the

claims to the assignee, but all the economics of the claim

go back to the assignor.

And what the Supreme Court said about that, in the

majority opinion, is, We see no evidence that this was an

assignment done in bad faith.  This was done for an ordinary

business purpose.  And I think that's the relevant standard

that should be adopted in a case like this.  Is there any

evidence that this was done in bad faith?  No.  This was

done for an ordinary business purpose, mainly, to resolve a

dispute between Burford and Sysco in which Sysco decided

rather than continuing to fight with Burford, it would

assign its claims to a Burford subsidiary so that that

subsidiary could continue to prosecute those claims.

Nothing in that fact pattern suggests anything about bad

faith, and it certainly doesn't suggest anything that

offends the policies of the federal antitrust laws.

1          THE COURT:  I think the last -- coming to the end,

2     Sysco's promise to continue to behave as a party, how is

3     that enforceable?

4          MR. HO:  Enforceable by us?

5          THE COURT:  By either the defendants or by the

6     Court.

7          MR. HO:  So I would say a couple things on that.

8     One, the first party that will -- that has the ability to

9     enforce that is Carina because Carina has contractual rights

10    vis-a-vis Sysco to make sure that Sysco does comply with

11    those obligations.

12         Number Two, Sysco is representing to the Court --

13    and it did in its reply brief and I think Ms. Rubenstein is

14    here today to confirm those representations -- that Sysco is

15    willing to continue to be treated as a party.  And I think

16    if the Court, you know, feels it necessary to -- you know,

17    to make clear that Sysco remains within its jurisdiction for

18    the ancillary purpose of enforcing those commitments, it can

19    do that without the need to have Sysco be a full-fledged

20    party to the case.

21         There's no point in having Sysco be a full-fledged

22    party to the case because it has no right to prosecute the

23    claims.  The only interest that I have heard as to why Sysco

24    should remain in is with respect to this discovery, and that

25    can be handled within the context of a routine Rule 25(c)

1    substitution.

2            THE COURT:  Last question:  What limits are there

3    on the free assignability of federal antitrust claims, and

4    do any of them play a role in this motion?

5            MR. HO:  I think there are two.  The first is that

6    if Congress has said claims should not be freely assignable,

7    then Congress gets to decide.  So in the *John Wiley* case,

8    for example, the Second Circuit case that I alluded to, the

9    Second Circuit said, in the specific context of the

10   Copyright Clause, it has long been the tradition that the

11   owner of the underlying intellectual property right cannot

12   slice off the right to sue and assign it to a third party.

13   But that is specific to the copyright framework and also to

14   the patent framework.

15           And so the Second Circuit said, Congress has, in

16   fact, in Section 501(b) of the Copyright Act, said that

17   copyright claims are not freely assignable.  So that's one

18   limitation.  But the -- that does not apply here because

19   nothing in the Sherman Act or the Clayton Act express any

20   congressional intent to restrict the assignability of

21   federal antitrust claims.  To the contrary, they have long

22   been held to be freely assignable.

23           Number Two is what I was alluding to before with

24   respect to *Sprint*.  The Supreme Court said that there might

25   be a different result if there were evidence that the

assignment was in bad faith.  But, importantly, it said,

Assignment for ordinary business reasons is not bad faith.

And so that exception, I think, is out there.  It hasn't

been extensively litigated, but because the Supreme Court

said ordinary business purposes are not bad faith, I don't

think this Court needs to get into the, you know, contours

of that potential exception because settling a dispute is

not only an ordinary business reason, it is a business

reason that the Federal Courts have long said promote the

civil justice system because of the policy favoring the

enforcement of settlements.

THE COURT:  So over and above those two

limitations that you have just identified, I could auction

off an interest in a federal antitrust claim, I could donate

it to a charity, I could make a gift of it?  There's just no

limit?

MR. HO:  Other than those two.  And, I mean, some

of those examples that Your Honor gave are a little bit

unusual, but they are not that --

THE COURT:  That's why I chose them.

MR. HO:  -- they are not that unusual.

So in Amory, if I recall correctly, there was an

auction of federal antitrust claims out of the bankruptcy

estate because the bankruptcy estate is not only motivated

to but obliged under federal law to try to get the most

1   money that it can for the benefit of creditors from the

2   assets of the estate, and the assets of the estate include

3   federal claims.

4           There are routine situations where a federal

5   antitrust plaintiff will assign its claim to a trade

6   association because it doesn't want to have to prosecute the

7   claim, and the trade association prosecutes the claim on its

8   behalf.  In *Sprint*, there were assignments of claims to

9   collection entities that were set up for the sole purpose of

10  collecting on these claims.

11          So the -- it is not uncommon whatsoever for

12  federal antitrust claims to be assigned in this way, and all

13  of that is consistent with the fundamental policy of the

14  federal antitrust laws that we want vigorous enforcement of

15  those laws.  We don't want the -- the law to impede the

16  ability to transfer a claim from somebody who is willing,

17  able, and motivated -- who is not -- I'm sorry -- willing or

18  able or motivated to pursue it to somebody who is.

19          THE COURT:  All right.  Thanks very much.

20          MR. HO:  Thank you, Your Honor.  May I --

21          THE COURT:  Just one moment, Mr. Gant.

22          (Discussion off the record between the Court and

23  the court reporter)

24          THE COURT:  Mr. Gant, we'll hear from you and then

25  take a short break before hearing from the defense.

1          MR. GANT:  Thank you, Your Honor.

2          I wanted to start by going back to Amory

3     Investments since you asked about it, and I wanted to

4     clarify one thing Mr. Ho said and then see if you had any

5     other questions about it.

6          Amory is a plaintiff in both the *Pork* and *Beef*

7     cases, it is as well in *Broilers*, and recently filed a

8     *Turkey* case.  The claims that were acquired were from an

9     entity called Maines, which was a distributor --

10          THE COURT:  How do you spell that?

11          MR. GANT:  M-a-i-n-e-s.

12          THE COURT:  Thanks.

13          MR. GANT:  -- that went bankrupt.  And *Amory*

14     purchased the assets -- the litigation assets of Maines from

15     the bankruptcy court in a process that was, as the

16     bankruptcy processes are, overseen by the bankruptcy court

17     and ultimately subsumed within a confirmation order.

18          A couple of points about that.  One, Mr. Ho I

19     think just misspoke.  Maines was never a plaintiff in any of

20     the litigations.  So Maines went bankrupt, Amory purchased

21     the litigation assets, and then Amory subsequently filed its

22     own cases, so just to clarify that point.

23          Of significance, however, is, as you know, the

24     *Pork Litigation* is long past the end of fact discovery.

25     Amory completed fact discovery.  The defendants in the *Pork*

1    case were well aware of the circumstances of the acquisition

2    of the claims by Amory from Maines and never complained

3    about it, didn't ask to file an early summary judgment

4    motion.  As you may recall, Your Honor, one of the

5    defendants here asked to file summary judgment early on an

6    issue.  They did not ask to do that about Amory.  So they've

7    known about the facts of Amory for some time and haven't

8    said anything.  So to the extent that Amory is relevant to

9    your consideration, I wanted to paint a fuller picture with

10   respect to that.

11           THE COURT:  So what you are telling me about

12   Amory, Mr. Gant, is that it was not like the case that we're

13   here on today in it wasn't an active plaintiff that assigned

14   its claims to its litigation funder?

15           MR. GANT:  There's no dispute about that,

16   Your Honor.

17           THE COURT:  Okay.

18           MR. GANT:  It was not a plaintiff in the cases at

19   the time it made the assignment.

20           THE COURT:  All right.  Thanks very much .

21           MR. GANT:  A couple of other points.  I'll try and

22   get it under the ten minutes, and thank you for hearing me

23   out.

24           To follow up on some of the discussion between you

25   and Mr. Ho, there's a long line of cases -- and I don't

1     have -- I know these cases from other matters that I have

2     handled -- that Congress -- that the Supreme Court has

3     repeatedly said that Congress is understood to legislate

4     against the backdrop of federal common law.  The federal

5     common law that's outlined in our briefs and Mr. Ho so

6     comprehensively discussed with you this morning is the

7     backdrop against which Congress legislates in the

8     antitrust -- federal antitrust realm, so I think that's

9     another important consideration here, which is that Congress

10    is aware of the long-standing rulings that federal antitrust

11    claims are assignable, and it has left that in place and

12    that's understood, in the framework of federal antitrust

13    law, to be part of the fabric of federal antitrust law.

14              With respect to the countervailing policies that

15    you identified, Your Honor, of course, there's a third --

16    there's an established federal policy to encourage

17    settlements.  Our brief -- and Mr. Ho referred to this, so

18    I'd respectfully suggest that that's also a consideration

19    here.  The amount of work that went into both the

20    arbitration proceeding between Burford and Sysco and then

21    the substantial effort that went into resolution of that

22    should be encouraged with respect, Your Honor.  And

23    rejecting the assignment here would undo that and I think

24    send, you know -- have repercussions outside of this case

25    about risking -- undermining the policy of encouraging

1    settlements.

2         With respect to the notion that there is a policy

3    that litigation funders shouldn't control litigation, Mr. Ho

4    addressed that.  I just want to point out one other element

5    of that, Your Honor, which is that the federal rules

6    committee and Congress are well aware of the existence of

7    litigation funders.  And Your Honor may be aware that during

8    a recent round of the civil rules committee, there was

9    consideration about introducing some -- into some of the

10   rules something about litigation funding.  And the rules

11   committee decided not to do that.  And if there is going to

12   be a rule along the lines that you have suggested, and I'm

13   paraphrasing here, that litigation funders shouldn't control

14   litigation, with respect, Your Honor, that should come from

15   the rules committee or from Congress or both.  And it

16   shouldn't be done by the Federal Courts on an *ad hoc* basis.

17        I'd also like to remind Your Honor, you're well

18   aware of the Rules Enabling Act which says, among the --

19   28 U.S.C. 2072, that says that the rules cannot abridge,

20   modify substantive rights.  There's a standing requirement

21   under Article III that overlays all the federal rules, and

22   under the Rules Enabling Act, it's not pushed aside.  It

23   exists in this case just like any other.

24        And if Sysco has no right to prosecute its claims,

25   how can it remain a party to the case?  Let's pose a quick

1     thought experiment, which is if we had the complete

2     assignment, as we have here, of claims from Sysco to Carina,

3     and the defendants came in with a different position, and

4     then let's say that Sysco said, We want to stay in the case

5     as a plaintiff, and the defendants came in and said, No, you

6     can't do that.  You don't have standing.  The defendants

7     would be right and Sysco would be wrong.  There is no

8     standing.  And if there's no standing under Article III,

9     whatever Rule 25 says, it can't say that you create standing

10    where none exists.

11          Finally, Your Honor, I just want to, of course,

12    remind the Court, this is a Rule 25 motion.  Mr. Ho has

13    described the contours of that.  And the Supreme Court has

14    made clear in numerous cases, including *Amchem v. Windsor*,

15    521 U.S. 591 at 620, that the texts of the federal rules

16    limit judicial inventiveness, and Courts are not free to

17    amend a rule outside the process Congress ordered.  With

18    respect, Your Honor, Rule 25 does not present you with the

19    authority to invalidate an Assignment Agreement of federal

20    antitrust claims when it's clear that the federal policy

21    allows them to be freely assignable.

22          And on your question, for example, about the

23    hypothetical of the auction, Ms. Daley informed me that

24    Burford has actually acquired a claim out of an auction

25    process.  If there are going to be limits imposed on the

1    role of litigation funders in litigation, those should come

2    from Congress or from the rules committee.  Thank you,

3    Your Honor.

4              THE COURT:  Let's take a ten-minute break.  We'll

5    see you all back here in ten minutes.

6         (Recess taken at 11:02 a.m.)

7                   *   *   *   *   *

8         (11:10 a.m.)

9                        **IN OPEN COURT**

10

11             THE COURT:  All right.  So just before we start,

12   let's talk a little bit about logistics.  Ms. Rubenstein, is

13   Sysco going to want to be heard from?

14             MS. RUBENSTEIN:  Yes, Your Honor, if you're

15   amenable to hearing from me for five minutes or less.  I

16   think I can get it done in that amount of time.

17             THE COURT:  Five minutes we can do.

18             And then on the defense side, will there be one

19   presentation or will there be one for *Pork* and one for

20   *Cattle*?  How is that going to work?

21             MR. COLEMAN:  Your Honor, Craig Coleman, I'll be

22   arguing for *Pork*, and we have -- and *Beef* defendants are

23   also planning to separately argue.  We have coordinated to

24   try to minimize overlap.

25             THE COURT:  Okay.  The only thing I'll say is, I

mean, I think these are important issues.  They deserve some

time.  On the other hand, this isn't the only hearing of the

day, and so we really do need to wrap up around 12:15 unless

I'm going to keep other lawyers waiting.

So if Ms. Rubenstein takes five, Mr. Coleman, does

that leave you and co-counsel enough time?

MR. COLEMAN:  We'll make it work, Your Honor.

THE COURT:  Okay.  Well, I don't want to

shortchange you, but if you can make it work without

compromising your argument, then that's appreciated.  But,

you know, we can push things if need be.  Okay.

MR. COLEMAN:  We should be fine.  We'll see how

things go.

THE COURT:  Okay.  All right.  Ms. Rubenstein, you

have the floor.

MS. RUBENSTEIN:  Thank you very much, Your Honor.

Julie Rubenstein from Baker Botts on behalf of current

direct action plaintiff Sysco.  I promise I will keep it

short, Your Honor, because I think Mr. Ho did really cover

the waterfront, and I'm not here to repeat those points.

But from Sysco's perspective, the primary flaw in

defendants' argument, at least as they made in their

briefing, and I expect that they are going to get up here

today and repeat some of this faulty rhetoric, is that they

focus on facts that no longer exist.

1      It is true that Sysco used to own and control the

2   claims in these cases and that Burford was its litigation

3   funder.  And it is true, indeed, Your Honor, that Sysco and

4   Burford ended up in litigation -- in arbitration and

5   subsequent litigation regarding a dispute about the ability

6   to control and settle certain of those claims.  However,

7   those facts have now fundamentally changed.  Those

8   circumstances do not exist anymore.  Sysco does not own

9   these claims anymore.  Sysco does not control these claims

10   anymore.  In fact, Sysco assigned all of its right, title,

11   and interest in these claims to Carina, and now it is Carina

12   that has the exclusive right to litigate these claims, to

13   settle these claims, and to the counsel of its choice.  None

14   of the arguments that defendants make about Sysco apply to

15   the circumstances that are now before Your Honor.  They all

16   have to do with the old situation.

17      And, by the way, Sysco's consistent position

18   throughout all of this was and continues to be that only the

19   entity that owns the claims has a right to control

20   litigation and settlement.  And Carina is now the party that

21   owns the claims and has the right of control here.  It's our

22   position that Sysco does not have standing in these

23   claims -- in this case anymore, and were Your Honor to keep

24   Sysco in the case as some sort of nominal plaintiff, that

25   would prejudice Sysco greatly because we no longer have

standing to litigate the cases.

On the contrary, substitution here would not prejudice defendants, and I want to give Your Honor a little flesh on the bones of what Sysco has agreed to continue to do. Now Your Honor asked a question earlier of Mr. Ho, Well, how does the Court enforce Sysco's promises to continue to remain involved for the purposes of discovery? And if Your Honor is not satisfied with the statements we've put in our briefs, Sysco is more than happy to enter into a stipulation that then gets ordered by the Court as far as its obligations going forward. Sysco has agreed it will continue to respond to discovery as if it were a party.

A very good example is that the *Beef* defendants on Friday of last week served all direct action plaintiffs with Rule 33 interrogatories, Your Honor. Even if Your Honor were to grant substitution today and thereby Sysco would no longer be a plaintiff in the case, Sysco would still agree to answer those Rule 33 interrogatories. It isn't technically obligated to do it as a non-party, but Sysco would agree to continue to act as a party with respect to that type of discovery.

And as I said, Your Honor, we'd be happy to enter into a stipulation. We'd be happy to have Your Honor order us to, you know, comply with those obligations, and Sysco is willing to be subject to the continuing jurisdiction of the

1    Court for those purposes.

2            I think -- you know, as Mr. Ho and Mr. Gant said,

3    I think this is a very straightforward application of

4    Rule 25.  I think Carina and Sysco have met all of the

5    procedural requirements, and defendants have not pointed to

6    any case and we're not aware of any providing that

7    assignments to litigation funders should somehow be treated

8    differently from any other freely assignable antitrust case.

9    And I think Your Honor would actually be making new law if

10   you were to order that here today.

11           With that, I'm happy to answer any other

12   questions.  I'm also happy to sit down and let you move

13   along with defendants.

14           THE COURT:  I have no questions.

15           MS. RUBENSTEIN:  Okay.  Thank you, Your Honor.

16           THE COURT:  Thank you.  Thank you.

17           Mr. Coleman, you have the floor.  And I take it

18   you want me to switch to your slide deck?

19           MR. COLEMAN:  That would be the *Beef* defendants.

20           THE COURT:  Oh, okay.  Then I'll set that aside

21   for now.

22           MR. COLEMAN:  I'm arguing again on behalf of the

23   *Pork* defendants -- all *Pork* defendants.  I do not have a

24   PowerPoint presentation.

25           THE COURT:  That's all right.

1          MR. COLEMAN:  In lieu of a PowerPoint

2     presentation, I would like to start with the original Star

3     Wars movie, Episode 4, the best one.  And early in the

4     movie, Your Honor may recall the scene where we've just met

5     Obi-Wan Kenobi.  He's in a sand speeder with Luke Skywalker,

6     R2-D2, C-3PO, and they're trying to get off of Luke's home

7     planet.  Storm troopers approach.  They are looking for

8     R2-D2 and C-3PO, and they start to interrogate Obi-Wan about

9     the droids.  Obi-Wan waves his hand, tells the storm

10    troopers, these are not the droids you're looking for.  Move

11    along, move along.  Go about your business.  That's this

12    motion, or at least it's an attempt at a Jedi mind trick.

13          All that stuff about integrity of the judicial

14    system, the unconscionability of a litigation funder

15    controlling litigation claims, this motion is an attempt by

16    Sysco to wave its hand, try to make that all go away, tell

17    the Court to move along, move along, go about your business.

18          But there are a lot of problems with the motion.

19    We can start with the fact that with all due respect,

20    counsel for Sysco and Carina are not Jedi knights, we are

21    not storm troopers, and so we remember Sysco barging into

22    court with its house of fire, having terminated its counsel

23    for conspiring with Burford to derail settlements.  It was

24    mired in litigation with its funder, and it asked the Court

25    to halt the litigation.  Now just a couple months later, we

1    have the proposed solution of Sysco just walking away while

2    the litigation funder is replacing it as a plaintiff.

3         So no amount of distraction and deflections

4    related to choice of law, federal common law, and Carina's

5    other smoke screens can negate the conclusion that no Court,

6    no Court will tolerate a litigation funder taking full

7    control of a real plaintiff's claims and trying to turn

8    itself into a party to the litigation.

9         THE COURT:  Has any Court actually said no in

10   these -- in this situation?  Is there a reported case?

11        MR. COLEMAN:  No, Your Honor.  There are -- I want

12   to go through the cases in which --

13        THE COURT:  Sure.

14        MR. COLEMAN:  -- federal antitrust cases,

15   including this Court, the District of Minnesota, in an

16   antitrust case looking to state law limits on champerty.  So

17   we'll work through the choice of law question, and Federal

18   Courts clearly have looked to and invoked state champerty

19   law as a limit on assignability.  But in terms of

20   invalidating assignments under state champerty law, that

21   hasn't been reached.

22        What I would point Your Honor to, and we can get

23   there with a little bit more detail, but ultimately the --

24   we know where the law of the states come out.  In the

25   federal context, defendants cite the *In Re Prescription*

*Opiate Litigation* in which the Court demanded full disclosure of funding agreements. And it did so with the express intent to be able to scrutinize those funding agreements to determine whether litigation funders were controlling litigation decisions. And, in fact, Burford has cited that. You can go on its website. The Court can go on its website today and see Burford hailing that decision as litigation disclosure -- or funding disclosure done right.

And as Burford noted, the Court was specifically focused on ensuring whether litigation funders would control a claim. So we know that Federal Courts are concerned with limits on and involvement with litigation funders, specifically with respect to control of litigation claims, and we'll work through that.

So starting with the choice of law and the assignability of claims, Carina tries to make much of the totally unremarkable fact that federal antitrust claims are assignable. Defendants are not arguing otherwise. So Carina wants to turn the proposition that there are some assignments of antitrust claims that are valid into a sweeping rule that the Court must passively accept all assignments, and that is clearly not the law.

So, again, starting with Carina's case law, they cite the case law and discussed again the cases involving assignment of antitrust claims where we've got direct

1    purchasers assigning claims to indirect purchasers.  Those

2    cases are sort of all of a piece, and they have their

3    genesis in the federal rule in *Illinois Brick* that only

4    direct purchasers can pursue -- have standing to pursue

5    antitrust claims.

6           So I would point your Court to the *Wallach v.*

7    *Eaton Corp.* case as an example.  So in that case where we

8    have an indirect purchaser that wants to pursue litigation,

9    and it can pursue -- an indirect purchaser can pursue

10   litigation for its own reasons.  Maybe it feels like it was

11   the real party who suffered the harm -- the alleged harm

12   from an antitrust conspiracy.

13          So in that scenario, it's fine, the Court rules,

14   for the direct purchaser to assign claims to an indirect

15   purchaser.  And, in fact, we have that -- examples of that

16   in this case by Sysco.  So apparently Sysco, it has assigned

17   some of its claims.  It directly purchases pork from

18   defendants.  It assigned some of its claims to its

19   customers, indirect purchasers, and that is one of the

20   things that led to the fallout with Burford.  Burford was

21   challenging the assignments that the *Wallach* case permits.

22   But those type of assignments make good sense.

23          Under *Illinois Brick*, the Federal Courts are

24   concerned with when you've got a complicated stream of

25   commerce, the Court wants one plaintiff pursuing antitrust

harm.  And if assignments from one purchaser -- a direct

purchaser to indirect purchaser consolidate antitrust injury

in one plaintiff, that's consistent with *Illinois Brick*.

But the key point from the stream of cases is that

the assignments always involve a party with an underlying

interest in the litigation.  They did not involve a

litigation funder that has no interest in the litigation but

for the funding agreement.

THE COURT:  Does that matter, though?  If there

are no reported cases either for or against, I'd like to go

back to the question I posed to Mr. Ho, what are the limits

on free assignability of federal antitrust claims that are

implicated in this case?  And, you know, I take your point,

but at the same time, it's a point that's made there is no

case saying this can be done.  There is no case saying this

can't be done.  And so how -- what's the rule of decision

here?

MR. COLEMAN:  So first defendants would point

Your Honor to *Martin v. Morgan Drive Away, Inc.*  And the

citation for that is 665 F.2d 598.  It's a Fifth Circuit

case in 1982.  And, Your Honor, defendants are in the

position, given the way the briefing has gone down, that

we're talking about a few cases that we haven't cited, so

I'll read it into the record.  I also have a piece of paper

I could provide to the Court with cases that were new cases

1    that we're talking about at oral argument.

2         But in *Morgan v.* -- I'm sorry -- *Martin v. Morgan*

3    *Drive Away*, the Fifth Circuit specifically applied -- it's

4    an antitrust case. And the Fifth Circuit specifically

5    looked to state law champerty to determine whether there was

6    a problem with the validity of the assignment. Applying --

7    the assignment was from the corporation to shareholders.

8    The corporation didn't find -- I'm sorry -- the Court in

9    *Martin*, the Fifth Circuit, did not find a problem with the

10    assignment given that there was an interested party on the

11    receiving end of the assignment.

12         Carina, in its brief, tries to dismiss the *Martin*

13    case as outdated or not followed by other Courts, but

14    defendants would refer the Court to *Fischer Brothers*

15    *Aviation, Inc. v. Northwest Airlines,* 117 F.R.D. 144. It's

16    a District of Minnesota case in 1987 by Judge Symchych. And

17    that case involved antitrust claims brought by a small

18    aviation company against Northwest Airlines. And when the

19    company was sold in the middle of the litigation, the

20    antitrust claims were assigned to the shareholders. So,

21    again, much like the *Martin* case.

22         And Judge Symchych followed *Martin*, invoked

23    *Martin*. Said that if we have a challenge to an assignment

24    under champerty, we look to state law. And Judge Symchych

25    didn't find a problem because, again, the shareholders were

1    heavily invested in the litigation.  They were ultimately on

2    the receiving end of the financial harm if it had occurred.

3         Specifically, this Court, however, Judge Symchych,

4    found that the assignment was not, quote, an investment

5    gambit by a disinterested party attempting to use this

6    action to collect a windfall.  That's at page 147 of the

7    decision.  So that is this Court, in the form of Judge

8    Symchych, specifically casting a serious doubt on the type

9    of arrangement that we have here where we have a

10   disinterested litigation funder, that is, a funder that has

11   no interest in the litigation but for its investment, coming

12   in to the Court and trying to assert control and take an

13   assignment that would be champertous.

14        But that's two cases, the Fifth Circuit and then

15   this Court following the Fifth Circuit, looking to state

16   champerty law to determine whether an assignment is valid

17   where a champerty concern arises.

18        Also would refer Your Honor to Federal Courts that

19   look to state champerty law for other nonantitrust federal

20   claims.  An example of that is the *Riffin v. Consolidated*

21   *Rail Corp.* case, 783 Fed. Appx. 246.  This is a Third

22   Circuit case in 2019.  And there the Court -- this is not an

23   antitrust case, but the Third Circuit looked to state law of

24   federal claims and invalidated them under Pennsylvania

25   champerty law because the assignee was not an interested

1       party, didn't have any interest in the case but for the

2       investment.

3               So Federal Courts do look to state champerty law

4       when it's appropriate when that issue arises.  And Carina's

5       suggestion to the Court that Federal Courts can't consider a

6       state law on champerty, it's extreme.  No Court has said

7       that, and it's clear that states and state law do have an

8       obvious role to play in determining the validity of an

9       assignment like this one, the outer bounds of an assignment,

10      including champerty.

11              So Carina and Sysco are themselves creatures of

12      state law.  They exist as a result of state law.  The

13      contract at issue here, the assignment, invokes state law.

14      It's a vehicle of state law.  So the idea that the state law

15      just has nothing to say about whether the contract, which is

16      a state law vehicle, is valid and violates public policy, is

17      unwarranted and extreme.

18              But ultimately, Your Honor, we really don't need

19      to go too far and get too lost in the choice of law thicket,

20      because when it comes to assessing the validity of Carina's

21      assignment, all roads lead to the conclusion that no Court

22      would or has permitted this type of arrangement.  That's

23      true under state law.  I think that is ultimately true under

24      federal law.

25              Regarding state law, we would -- I think it's

1    helpful to start with the Minnesota case *Mazlowski v.*

2    *Prospect Funding Partners*.  And that case is discussed in

3    our brief.  The decision by the --

4              THE COURT:  Isn't it, though -- I mean, isn't it

5    federal common law that is the appropriate choice of law

6    answer in this case since this is a federal question case

7    brought under the Sherman Act and the Clayton Act?  I mean,

8    I understand that in a diversity case I would apply the

9    choice of law rules of Minnesota because it's the forum

10   state and it would generate the answer it generates.  But in

11   a federal question case?

12             MR. COLEMAN:  Well, two things:  Again, I mean,

13   the *Fischer Brothers* case is this Court applying state law

14   on this specific question.  So when it comes to evaluating

15   whether an assignment is valid, we think it's clear that in

16   federal antitrust cases, state law and state concerns about

17   champerty apply.

18             THE COURT:  So what I hear you saying, and correct

19   me if I'm wrong, is that although federal -- well, let me

20   back up -- is that I should be informed by state champerty

21   law, but I don't hear you saying that this is the applicable

22   law following a choice of law analysis.

23             MR. COLEMAN:  Well, both, Your Honor.  As a first

24   step, defendants believe that you should and Courts do

25   follow state champerty law.  And we do work through in our

1    briefing and point the Court to which exactly state laws we

2    think it applies.  Delaware, both entities are Delaware

3    entities; Illinois, which the contract invokes Illinois law,

4    so we think Illinois law should apply; or Minnesota where

5    the litigations are based.

6           So we provide three avenues.  I think we can

7    probably take those in order.  But, again, defendants' point

8    is it doesn't matter.  Even in the *Mazlowski* case -- it's a

9    Minnesota case -- it adopts what Carina describes as the

10   modern permissive approach to litigation funding, and that

11   draws a distinction between traditional litigation funding,

12   where a funder comes in, invests in the litigation, gets the

13   ability to get a return from a damages claim, that's

14   traditional litigation funding, and *Mazlowski* says, That's

15   fine, Minnesota permits that.  But, on the other hand, the

16   Minnesota Supreme Court draws a hard line between that and

17   the concept of a litigation funder controlling a litigation

18   on the other hand.

19          So every jurisdiction -- and we don't need to go

20   get too concerned about this parade of horribles about 50

21   jurisdictions potentially applying because it just doesn't

22   matter.  In every state, the concept of a litigation funder

23   turning itself into a party and assuming control of the

24   litigation is a bridge too far.

25          THE COURT:  So let me -- again, I'm sorry to

belabor this, but you don't seem willing to back away from
the assertion that the law of one of three candidate
states -- Delaware, Illinois, Minnesota -- is the
appropriate choice of law result in this case.  That's fine.

But let's say that I disagree and I conclude that
federal common law is the appropriate choice of law result.
Are you telling me that even if I do that, federal common
law says look to state law in order to decide whether an
assignment is valid?  I mean, because that seems to me to be
rather a leap.

MR. COLEMAN:  So let's -- so we'll put aside state
law.  You're acting as a federal common law judge at this
point, and then let's go through the lay of the land.

THE COURT:  Yes, that would be good.  Thank you.

MR. COLEMAN:  Right.  Thank you, Your Honor.  But
you are right, I don't think we should walk away from the
concept that state law ultimately applies because that's
exactly what this Court has held.  But we're here.  We're
acting at federal common law, to what do we look?

Carina tries to invoke the *Sprint* case and turn it
into a case on champerty and suggest that *Sprint* may
indicate some sort of permissive view towards champerty.
That is not the case at all.  The *Sprint* case involved an
assignment to aggregators.  So these are pay phones.
Your Honor may recall the pleasure of standing at a pay

phone, pulling a card out of your wallet, and punching in

numbers for a long distance carrier.  In those scenarios,

the long distance carriers have to pay money back to the pay

phone operator for the pay phones.  If they didn't get the

money, those are hard claims to pursue.  They set up these

entities called aggregators that would handle the claims,

take an assignment of the claims.

If damages were paid, the damages went back to the

pay phone companies, which is an important point here.

Supreme Court looked at this arrangement only as a question

of standing.  So in a scenario where you have an aggregator

that is going to litigate a claim but then remit damages

back to the pay phones, do they have standing?  The Supreme

Court said, That's fine, we're not worried about it.

And, in fact, what's notable about the *Sprint* case

is that the dissent raised champerty as an issue and the

majority just didn't go there.  It specifically declined not

to address champerty or go down that road, and it didn't

have a need to.  So *Sprint* doesn't give you an answer.  It

doesn't even inform the question.

I've talked about the *Opiate Litigation* case.  So

it's clear that Federal Courts are concerned about the

concept of a litigation funder taking control of a

litigation claim.  Burford knows it.

And so then we've got to go down the road of

1    there's not a lot there.  We don't have a Federal Court

2    saying federal common law applies because they have always

3    looked to state court on the champerty question.  So we

4    don't have, you know, a clear rule from a Federal Court

5    saying in federal common law, federal common law does not

6    permit champerty.

7         So how should you proceed?  The Restatement is not

8    the guide for it, you don't have prior orders, so we're

9    right back to state law, and state law does inform federal

10   common law.

11        I would refer the Court to a couple of cases.

12   *A.W.G. Farms, Inc. v. Federal Crop Insurance Corporation*,

13   757 F.2d 720.  That's an Eighth Circuit case in 1985.  And

14   it makes it clear that state law is one thing that federal

15   common law will invoke, particularly where you don't have

16   clear guidance on a particular issue.

17        Same thing from *LNV Corporation v. Outsource*

18   *Services Management*, 2015 WL 4898568.  I'd refer the Court

19   to page 11.  That's a District of Minnesota case in 2015.

20        So the idea that we, in federal law, the judge

21   will just put on blinders and ignore state law, that's

22   wrong.  So, again, if you are in a world where you don't

23   have clear, definitive guidance at federal common law, state

24   law is the natural place to look, particularly in a scenario

25   where you have got all 50 states aligned on a proposition,

1    which is what they are doing here, is wrong.

2          Moreover, we would -- if Your Honor is acting as

3    common law judge, you don't have a clear, definitive rule to

4    apply.  Look at the parties, look at the facts before the

5    Court.  And, again, defendants think that that leads to a

6    clear answer here.  We are not asking the Court to announce

7    a general rule applicable to all cases.  We're asking about

8    a particular -- the Court to deny a particular motion

9    involving a particular assignment.

10          And what's happened here is the worst-case

11   scenario.  This is everything that the Courts seek to avoid.

12   Sysco wanted to settle its claims.  Counsel for Carina

13   acknowledged that the Federal Courts have a policy

14   supporting settlement of claims.  It wanted to settle.  It

15   wanted out.

16          And, by the way, this notion that the defendants

17   were somehow leaning or exercising undue influence or any

18   kind of influence on Sysco, that is nowhere in the record.

19   Those are made-up facts.  There's nothing supporting that.

20   And, in fact, the Court should be highly skeptical of the

21   notion that Sysco, a company with a market capitalization in

22   excess of $30 billion, is somehow helpless at the hands of

23   defendants.  It's a little preposterous.  So we have a

24   litigation funder trying to bump Sysco out of the way so it

25   can continue litigation that Sysco wants to pursue.

1          The *Turkey Litigation* also should be instructive

2     to a Court sitting in federal common law.  Burford was

3     trying to pressure Sysco to bring litigation in the *Turkey*

4     case.  Apparently Sysco made the intentional decision --

5          THE COURT:  Okay.  Where's that in the record, I

6     mean, what's good for the goose, et cetera?

7          MR. COLEMAN:  That's in our briefing, Your Honor.

8     I -- I can find the specific page number on it.  But it's --

9     in that defendants go through the Burford-Sysco dispute.

10    And in the back and forth between Sysco and Burford, Burford

11    specifically accuses Sysco of breaching the funding

12    agreement by not bringing a lawsuit against -- in the *Turkey*

13    *Litigation* against the turkey defendants.  And --

14         THE COURT:  So if I look in the briefing, I'll

15    find a cross-reference to a declaration which will have an

16    exhibit which are e-mails or something like that?

17         MR. COLEMAN:  Yes, Your Honor.  Yeah.  And so, you

18    know, surprise, surprise, Carina is spawned on June 12,

19    2023, takes an assignment of the claims, and just last month

20    filed its own lawsuit in the *Turkey Litigation*, although not

21    actually in the *Turkey Litigation* in Illinois where it's

22    pending but in the Southern District of Texas.  So, again,

23    this is an example of a litigation funder blocking

24    settlements, propagating litigation that the real party in

25    interest, the party who, if any antitrust injury was

1    experienced or existed, it would have been Sysco that was on

2    the receiving end of it, and the funder here is propagating

3    litigation.

4         I would also refer the Court to what happened in

5    Amory.  And we don't need to prelitigate this.  Carina is

6    correct that we have not brought a summary judgment motion.

7    We did take discovery of Amory.  We took a 30(b)(6)

8    deposition of Amory.  The witness -- the 30(b)(6) witness

9    testifying about Maines Paper's claims, it was a Burford

10   executive.  And the Court can imagine how that went and

11   unfolded.  But defendants are mindful of Judge Tunheim's

12   direction that summary judgment motions should be brought on

13   the summary judgment deadline, and we'll deal with that.

14   But the way discovery unfolded again highlights the problems

15   of a litigation funder attempting to turn itself into a

16   party in the litigation.

17        I would also say on the common law question about

18   is this okay, is the assignment before the Court, the facts

19   before the Court, is it okay.  And what I would say is I

20   have counseled clients on whether to bring opt-out claims or

21   direct action claims, and an important question in that kind

22   of scenario is do your business people feel like they were

23   harmed?  Do they care?  Was there a wrong here?  Do they

24   feel like there's some injustice in the marketplace?  Are

25   they willing to stand up in court and point to something

1    that's -- that was a problem that they -- that they felt

2    like a victim?  Those are important questions.

3          And, Your Honor, we've all been in settlement

4    conferences where the Court or a mediator, settlement

5    neutral, wants the party with settlement authority before

6    them, and often the way that goes is do you really want to

7    go through with trial?  Is it worth the burden on the

8    business to try this claim?  And settlement neutral will

9    often have to explain just how burdensome litigation is to a

10    business.  It's a distraction.  That matters.  There's an

11    accountability in having a party who is actually a

12    participant in the marketplace present in court as an

13    accountable plaintiff.

14          The flip side, again, if we're acting in common

15    law, and the Court has got to decide is this okay, the flip

16    side of not invalidating the assignment is what happens if

17    the Court permits it?  And in that scenario, anything goes.

18    It's open season for Burford and any other litigation funder

19    to acquire claims by hook or by crook, bankruptcy, wherever

20    they can find a claim, and set up an LLC and litigate the

21    claims and attempt to cash out through the court.

22          So, unfortunately, Sysco and Carina have put this

23    Court in the position of being a gatekeeper and having to

24    bar the gates.  This arrangement has never been approved, so

25    I understand and sympathize with the Court kind of

1    struggling for what law do I apply, where do I look, where's

2    the clear rule.  What we can say is no Court has ever looked

3    at this and said it's okay.

4         THE COURT:  And no Court has ever looked at this

5    and said it's not okay?

6         MR. COLEMAN:  I disagree with that, Your Honor.

7         THE COURT:  No Federal Court.

8         MR. COLEMAN:  I would refer Your Honor to the

9    *Prescription* --

10        THE COURT:  The opiate --

11        MR. COLEMAN:  -- *opioid* case.  I would also --

12   that *Riffin* case is also a good example.  Again, not an

13   antitrust case, but we've got federal claims, they are

14   assigned to parties, look to state law and say, no, that's

15   not okay for a funder to violate state champerty law and

16   proceed as a plaintiff.

17        THE COURT:  All right.  I don't -- as I promised,

18   I'm not going to cut you short, but if we're going to stick

19   to a 12:15 termination, I think it's time for the *Beef* folks

20   to step up.

21        MR. COLEMAN:  Agreed, Your Honor.

22        THE COURT:  Are you done?

23        MR. COLEMAN:  This is the perfect time.

24        THE COURT:  Okay.

25        MR. COLEMAN:  Our allocation of argument was they

1      are going to address -- and he may kind of go through some

2      additional things here --

3                  THE COURT:  That's fine.

4                  MR. COLEMAN:  -- but they are planning to address

5      the Rule 25 considerations.

6                  THE COURT:  Thank you.

7                  MR. COLEMAN:  Thank you, Your Honor.

8                  MR. STOJILKOVIC:  Good afternoon, Your Honor.  Let

9      me see if I can get this to work.

10                 THE COURT:  Do you want to just identify yourself

11     for the record before you start your remarks?

12                 MR. STOJILKOVIC:  My name is Kosta Stojilkovic.  I

13     represent Cargill, and I'll be speaking on behalf of all of

14     the *Cattle* and *Beef* defendants.  And, Your Honor, I do have

15     a presentation.

16                 THE COURT:  Sure.

17                 MR. STOJILKOVIC:  I'll put it up there, but I'll

18     also try, going through it, to speak to some of the

19     questions that you have posed already.

20                 We have three core points.  Number One,

21     substitution is discretionary and should be denied when it

22     threatens the parties' substantive rights.

23                 Number Two, here it could and, in fact, we believe

24     would adversely threaten the defendants' substantive rights.

25                 And, Number Three, better options exist under the

1    rule.

2              And I do want to begin with the rule, and,

3    Your Honor, this is a permissive rule.  The default under

4    the rule is if you transfer an interest after a lawsuit is

5    filed -- that's why we're in Rule 25, not 17 -- the action

6    may be continued by or against the original party.  And

7    that's even if the assignment is valid.  There is not -- you

8    know, I was surprised to hear colleagues on the other side

9    say that there's only one real choice here.  The rule gives

10   you the choice to manage the docket in the way that you view

11   best.  The default is continue against Sysco even if there's

12   been an assignment.  The rule also allows the Court, but

13   does not command it, to substitute or to join.

14             And, Your Honor, with respect to comments about

15   the federal rules committee, there's nothing about this rule

16   that requires clarification that you have discretion.  And

17   the cases on this point, I believe, are uniform.  I don't

18   believe we have disagreement among the parties.  I'm on

19   Slide Number 3.  The *Froning's* case in the Eighth Circuit is

20   clear that you may refuse this even when one of the parties

21   so moves.  So this is not some ministerial request.  It's

22   left to your discretion, and it's reviewed for abuse of

23   discretion.

24             And what should guide you in exercising that

25   discretion?  As the *Jalin Realty* case that's been mentioned

says, substitution is not supposed to affect the substantive

rights of the parties involved. *Great Western Casualty*

*Company*, that one is not from this Court, it's the Southern

District of Iowa, but it says the same thing. Take care not

to impair the substantive rights of the parties. And,

Your Honor, the defendants believe that our substantive

rights are very much at risk here.

I'll turn in a moment to add a few comments to the

discussion of federal and state law and how to analyze

whether this is an enforceable assignment, but I want to

also note for the Court -- and I think this is a portion of

our brief that wasn't really responded to in reply -- that

we have concerns that go beyond that question. Because we

are concerned that here what Carina wants is all the benefit

of substitution now without a commitment to truly step into

the shoes of Sysco for purposes of potential downside. And

the reason I say that is that Carina wants substitution

granted now by this Court without any of the pending

discovery that could further probe their arrangement with

Sysco and grant it for all purposes, including remand from

the MDL if the case advances that far.

But when we had the meet and confer after the

Court directed it and we asked Mr. Gant, Well, will you

stipulate to lack of prejudice to defendants if we are

dealing with Carina rather than Sysco such as that evidence

from Sysco would be treated as from a party-opponent, that

whatever ability we have to contest liability and damages is

unchanged if you replace Sysco, that Carina will be

responsible for any costs or fees that might be incurred,

the response we got was no, and not only no, but that those

are issues in the future, that they may well not even be

properly before this Court because some may go beyond the

MDL posture.  And we don't think --

THE COURT:  Well, but they are issues for the

future.  I mean, for example, let's say that substitution is

denied.  Sysco stays in the case.  You have a statement, you

want to introduce it under the exception to the hearsay rule

for admissions of a party-opponent.  Sysco could very well

say that was not made by a current employee, that was not in

the course and furtherance of their employment.  There are

all sorts of things that Sysco could say, so --

MR. STOJILKOVIC:  Oh, absolutely.

THE COURT:  -- I mean, if you want everything that

emanates from Sysco to be treated as an admission of a

party-opponent under Rule 803, you wouldn't get that with

Sysco staying in the case.

MR. STOJILKOVIC:  I completely agree with your

statement, Judge.  But our concern went to a different

issue.  We understand -- and this is -- I mean, in our case,

we're a year away from discovery being over, let alone any,

1    you know, downstream proceedings past that.  We were not

2    asking Carina to stipulate to some particular thing.  We

3    haven't even deposed Sysco in our case.  Who knows what they

4    will say and how it will play out.  What we wanted was

5    agreement on the principle that substituting Carina in for

6    Sysco won't affect that analysis in all of these issues, and

7    that's what they were unwilling to stipulate and unwilling

8    to stipulate to anything other than that we could go get

9    discovery from Sysco.

10            THE COURT:  What is it about this particular

11   assignment that makes this a concern?  I mean, in any

12   assignment, these issues are going to come up, and I am not

13   familiar with, you know, sort of supervising assignments to

14   see what the effect is on the litigation posture of the

15   case; if Sysco had merged, if Sysco had been bought, if this

16   was a case against an individual, the individual died and

17   the estate substituted in.  In other words, why am I being

18   asked to make an assessment of litigation burden in this one

19   and not in others?

20            MR. STOJILKOVIC:  Your Honor, this is the first

21   Rule 25(c) motion that we have had.  This is the first time

22   we've had a chance to address this kind of issue in this

23   case.  And the reason -- I'm not asking Your Honor to jump

24   ahead and try to predict what might happen in a year or two

25   years' time.  What I am raising question of is we had Sysco

1    say, We're willing to act as a party in discovery.  We have

2    not had any concomitant commitment from Carina that they

3    won't in some fashion look to turn this to their advantage

4    down the road, and that concerns us.

5            And the cases say, Your Honor, when we look to --

6    I mean, the cases talk about will it affect substantive

7    rights, and oftentimes that is a forward-looking question.

8    If there's some reason for concern, that is something the

9    Court can consider in exercising its discretion.

10           But I also want to turn to the question that's

11   predominated today.  And I think Your Honor -- I agree with

12   Your Honor when you said that it looks like we're kind of

13   talking past each other, the two sides.  And I submit on the

14   core question of what law you look at, we're posing

15   different questions.  And if you decide which question is

16   right, that will lead you to the correct analysis.

17           What the movants have briefed and argued is

18   whether a federal antitrust claim is assignable.  What we

19   have briefed and argued is whether a party may assign that

20   claim to its litigation funder.  And the reason these two

21   questions are different is because in none of the cases

22   cited by the movants is there consideration of whether

23   there's a champerty concern and how to analyze champerty in

24   the context of a federal antitrust claim assignment.  And in

25   the cases we look to, now there are not that many of them,

1    to be sure, but in all the cases where we have both a

2    federal antitrust assignment and a concern about champerty,

3    the Courts have actually looked to state law.

4          And Mr. Coleman talked about *Martin*.  I just want

5    to put the quote up because it's the same point I just made.

6    What the Fifth Circuit says is, of course, federal antitrust

7    claims are assignable as a matter of federal law.  Our

8    concern here, however, is not with the substance of the

9    assignable claim.  It's not about direct, indirect, federal

10    law and how it treats the prosecution of Sherman Act claims,

11    but the form in which they may be assigned.  And there,

12    where a champerty concern was raised, the Fifth Circuit

13    said, we look to state law instead of creating a federal

14    common law of champerty out of whole cloth.

15          And the reason that we think that's important is

16    in some ways, the way the movants have postured this, they

17    say, Don't look to state law because we're governed by

18    federal common law, but then none of the federal common law

19    cases dealt with champerty, and so they combined those two

20    to say there's no prohibition on champerty in federal

21    antitrust assignments.  Respectfully, I don't think that's a

22    good way to proceed because no Court has said federal

23    antitrust is a champerty-free zone, which is essentially

24    their position.  And the *Martin* approach makes sense.

25          Now, Your Honor, on the question of whether you

1    want to proceed under state law or federal law, I mean, I

2    would go back -- the first thing I thought about when I read

3    the reply briefs was Justice Brandeis in *Erie* saying there's

4    no such thing as general federal common law.  You know, we

5    cross the street from state court to federal court.  We

6    don't just all of a sudden just come up with entirely new

7    principles.

8         All Courts that have looked at champerty have

9    said, control is the issue, and a funder that -- or any

10   other party who has no factual nexus to the claims.  This is

11   not -- and it's not a bankruptcy assignment or something

12   like that where you are trying to find a way for a claim to

13   survive that otherwise couldn't.  If somebody has no factual

14   nexus to the claims and is just in there to speculate,

15   that's the core of the issue.

16        And that's why we think the history here is

17   relevant, Your Honor.  I mean, in that respect, I think in

18   some ways we agree, because the movants say, Well, you have

19   to keep in mind this assignment is part of a broader

20   settlement.  You have to keep in mind, Your Honor, to what

21   that broader settlement dealt with.  If I had to ask the

22   kind of law school exam version of what this argument is,

23   it's the following:  If you have a funder improperly

24   exercising control in a champertous fashion over a party's

25   claim, can the objection to that be obviated by assigning

1    the claim? *Martin* says when you have champerty and federal

2    antitrust, you look to state law. And it's relevant that

3    *Fischer Brothers* in this district looked to that and so look

4    to Ohio law. That -- again, you don't see it in the quote

5    here, but that is a champerty decision.

6         And now in that case, the finding was no

7    champerty, but that was on the facts because they were found

8    to be -- it was not to somebody who was just speculating and

9    who had no factual tie to the issues in the litigation.

10   Here we have different facts.

11        And, Your Honor, I threw this one in, and I'll

12   pass it up. The third case -- we've looked everywhere.

13   These were the only three cases we found that present both

14   parts of this; federal antitrust claim, champerty objection

15   to an assignment. This third one is from the Second Circuit

16   in 1918. I guess the Sherman Act was still pretty fresh in

17   the mind. You can't see from here that it's champerty, but

18   if you look up the cite, it is a champerty case, and they

19   look to state law.

20        And by contrast, the movants' out-of-circuit

21   cases, they don't discuss champerty, neither do their

22   Supreme Court cases except in the dissent in *Sprint*, and the

23   majority says, We're not concerned about champerty because

24   there's no bad faith, and because of that, they also don't

25   analyze the issue.

1         Under federal law, is it consistent, Your Honor,

2    with the overall purposes of the antitrust statutes when

3    Sysco has a settlement with one of these defendants for

4    somebody to come and blow it up to seek more recovery?  No

5    cases -- none of the plaintiffs' cases analyze that, and the

6    facts are different.  So are Sysco's other assignments,

7    Mr. Coleman covered this, but they are indirect customers.

8         The other point I want to make, in our case, we

9    have posed discovery on this.  So, Your Honor, if you are in

10   a position, based on this record, to find that this

11   assignment is not enforceable, then I think you have all you

12   need.  But if there's any question about that in your mind,

13   I would position that we shouldn't have to litigate this

14   with one hand tied behind our back because what we have is

15   the assignment they chose to make public.  We know it's part

16   of a larger set of agreements to settle their dispute.  We

17   also know it involves and references underlying contracts

18   that were in place prior to the assignment.

19        All of the rest of that stuff has not been

20   disclosed.  We have sought discovery on it.  It may inform

21   -- not only further inform the history of this champertous

22   arrangement, it also may inform, you know, we know from

23   their assignment that Carina has gotten all the benefit and

24   all the control, but, you know, if we have offsets against

25   claim damages, if we have something about Sysco's conduct

1    that we can raise in our defense, we don't know whether that

2    has traveled to Carina or not.

3         We are also, no matter what, Your Honor, going to

4    have to deal with two sets of counsel.  Because at their

5    instruction, even if this is granted, we're going to go to

6    Sysco for discovery, we're going to go to Carina for

7    substance.  We submit, again, it's forward-looking.  I don't

8    know how it will play out, but one can easily imagine areas

9    where those two will overlap, and who is going to make the

10   calls and who are we going to deal with?

11        But the last point I want to make is kind of going

12   back to the beginning and Rule 25(c).  This is in the

13   heartland of the Court's discretion.  If you are persuaded

14   on the record we have here that the judgment is

15   unenforceable, then I think clearly you should deny

16   substitution.  But if there's any -- if you are uncertain

17   about that, the wise course would still be to proceed in

18   another fashion than what plaintiffs are asking.

19        And what we're asking for -- so if you don't reach

20   the ultimate issue, you could still deny it without

21   prejudice.  We can re-raise it once we've gotten our

22   discovery and fully litigate it.  If Carina wants to

23   continue to reserve the ability to kind of step out of

24   Sysco's shoes post-MDL, we could kick the can down further.

25        And the last point I'll make too is we're not the

movants here.  We're not making a motion for joinder.  We
have significant doubts that this is an enforceable
assignment, and so we're not inviting Carina into the case.
But I was surprised that counsel for Carina is unwilling to
explore that.  The case law says again when there's
uncertainty, if you have to do something.  Why are we in a
rush to get rid of Sysco?

          The rule is discretionary, Your Honor, and given
all the weighty concerns here, we submit that the right way
to approach that discretion here is to deny the request.

          THE COURT:  Thank you.

          MR. STOJILKOVIC:  Thank you.

          THE COURT:  Mr. Ho, do you want a few minutes to
respond just to --

          MR. RASHID:  Your Honor, can I just get two
minutes to say something specific to JBS?

          THE COURT:  And you are?

          MR. RASHID:  I'm Sami Rashid, counsel for JBS.

          THE COURT:  Thank you.  Sorry I didn't recognize
you.  Yes.

          MR. RASHID:  Two minutes or less.  Thank you,
Your Honor.

          So I'll be -- I'll be brief, Your Honor, but I
didn't want to leave here today and leave Your Honor
misapprised of an important detail in light of some comments

1    from Carina's counsel, Sysco's counsel.  And I believe

2    Your Honor said something earlier on that if this assignment

3    had not happened, Sysco would have settled some claims in

4    this litigation.

5          THE COURT:  And I don't -- I was careful in what I

6    said because I am not entirely sure what the state of the

7    record is on that point.

8          MR. RASHID:  Okay.  Well, I can clarify that for

9    Your Honor, and just to say that JBS, in both the *Pork* and

10   *Beef* cases, maintains that it has settlements with Sysco.

11   To the extent that Sysco or Carina are suggesting otherwise,

12   we are going to take that up with them separately.

13         Your Honor, I agree with Mr. Ho that you don't

14   need to delve into these underlying issues in great detail

15   in order to resolve the present motion to substitute that is

16   before the Court.  I will say though, Your Honor, that to

17   the extent that there is a dispute on this, that it would

18   only serve to underscore the extraordinary and troubling

19   nature of the assignment and substitution that has led to

20   this chain of events before Your Honor.

21         THE COURT:  All right.  Thank you for that

22   information.

23         Mr. Ho, we can have about ten minutes.

24         MR. HO:  I will try to keep it even briefer than

25   that.

1          THE COURT:  You can tell me if these are the

2     droids we're looking for.

3          MR. HO:  I cannot purport to be either a Jedi or a

4     storm trooper, although I feel like we are on the light side

5     of the force on this side.

6          The thing I really need to take issue with is the

7     characterization of *Fischer*.  Your Honor can read *Martin* for

8     yourself.  *Martin* is from 1982.  It said the only precedent

9     we can see on this point is the *Sampliner* case from, you

10    know, the early -- from 1910s.  And it recognized that

11    *Sampliner* was in tension with a long line of cases saying

12    that there needs to be federal uniformity on the question of

13    the standard for release of antitrust claims, but what it

14    said is, we'll follow *Sampliner* and what it said in a

15    footnote is because it doesn't matter.  Under Louisiana law,

16    Louisiana being a civil law jurisdiction never even adopted

17    champerty; and so if we apply Louisiana law, there's no

18    champerty.  And so the fact that Louisiana had no champerty

19    was a very important aspect of *Martin* because, otherwise,

20    you know, if champerty exists and applies, it's not about

21    the form of the assignment.  Champerty, certainly as the

22    defendants are seeking to apply it here, would be a direct

23    obstacle to the assignability of federal claims, and nothing

24    in *Martin*, I think, sanctions that.

25          But back to *Fischer*, it's been mischaracterized by

my friends on the other side.  It did not address the

question of whether federal common law should apply because

the defendants cited *Martin*, and the slide you saw you will

see, if you look back at it, it starts the sentence -- the

quotation in mid-sentence and suggests that that's a

characterization made by the Court.  That was a

characterization of the defendants' argument.

Defendants cited *Martin* for the proposition that

state law should apply, and what did the plaintiffs say?

And this is the key part of *Fischer*.  Plaintiff said, not

Ohio law, but it didn't say federal law should apply.  It

said Minnesota law should apply.  The direct quote is,

Plaintiff has cited only Minnesota law on the subject of

assignment validity.  So the issue of whether federal common

law should apply was never raised in *Fischer*, and so it

doesn't stand for the proposition that state law ought to

apply.

The second point is the notion that all 50 states

have said that you cannot assign a claim to a litigation

funder or, more accurately, a party that also provides

litigation funding to other clients and that did, in the

past, provide litigation funding to this client, there's no

fifth -- not all 50 states are in accord on that.  There's

not a single case from any of the 50 states that says that.

And so if you even were to be informed by state law on the

1    question, the alternative framing of the question, there

2    would be not a single state that would come to the answer

3    the defendants are asking for.

4          So with that, I'm going to yield to Mr. Gant who

5    has some specific points to raise as well.

6          MR. GANT:  With your permission, Your Honor, about

7    two minutes?

8          THE COURT:  Uh-huh.

9          MR. GANT:  Thank you.  Let me begin by something

10   that Mr. Coleman said and Mr. Rashid said when he just got

11   up.  If I heard Mr. Coleman correctly, he said Sysco wanted

12   out of the cases.  Just so the record is clear, and this is

13   a matter of public record from the filings in federal court

14   related to the arbitration proceedings, with respect to the

15   *Pork* and *Beef* case, there was only one common defendant in

16   *Pork* and *Beef* over which there was a potential settlement by

17   Sysco.  And that -- and Mr. Rashid just got up and made a

18   claim that it's JBS's position that Sysco has settled with

19   them.  I'll leave that to Sysco and JBS to settle at another

20   time, but that's not what Carina was told was the status of

21   the litigation.

22         But if Mr. Rashid was right, then if you reject

23   the assignment, Sysco would not be out of the case.  JBS was

24   the only party with which there was a *Beef* and *Pork*

25   settlement discussed.  So the suggestion by Mr. Coleman that

1    Sysco wanted out was a dramatic overstatement unsupported by

2    the facts or the record.

3              Second, the defendants are making a lot of

4    arguments that ask you to assume that Burford acted

5    improperly with respect to its position about Sysco's

6    authority to enter into those potential settlements.  I did

7    not represent either party in the arbitration proceedings.

8    But like anyone else can read the public record, it is --

9    and Mr. Ho discussed this, that the preliminary ruling from

10   the arbitration panel was that Burford was correct and Sysco

11   wasn't.  So the suggestion that there was something wrong --

12   that Burford was doing something wrong and not acting within

13   its rights, at least from the perspective of the arbitration

14   panel, was rejected.  The defendants' position did not carry

15   the day.

16             Third, Your Honor, the defendants clearly have

17   acknowledged what they are asking you to do is to create

18   federal common law that doesn't yet exist.  You repeatedly

19   asked questions about their authority, what the cases say.

20   They want you to create federal common law where it doesn't

21   exist, and with respect, Your Honor, that is not the

22   appropriate course of action.  You should only find that

23   federal common law dictates an outcome if there's a body of

24   federal common law that supports it that already exists, not

25   to make it up.  They are asking you to be a federal

policymaker, and that is not the role of this Court with

respect, Your Honor.

Finally, I just want to note I made a point about standing and Article III and that it was above and not subordinate to the federal rules. I made that comment and I note with interest that no defendant has gotten up today and asserted that Sysco has standing after the assignment by it to Carina. It doesn't, Your Honor. And Article III cannot be cast aside.

Unless you have any other questions for me or Mr. Ho, we thank you for your time.

THE COURT: No. Thank you.

Ms. Bloomenstein [sic], I don't know if this will wind up mattering or not, but what would you respond to the comments of Mr. Rashid, if you know?

MS. RUBENSTEIN: Well, Your Honor, what I would say is that, first of all, just to get rid of any confusion, there was never a time in which Sysco was prepared to settle all of its claims.

THE COURT: Right. I've never understood that. I have always understood it was a portion of its claims. That is correct?

MS. RUBENSTEIN: That is correct --

THE COURT: Okay.

MS. RUBENSTEIN: -- only a portion of its claims

1    here.

2           THE COURT:  What about JBS?

3           MS. RUBENSTEIN:  What is the Court's exact

4    question with regard to JBS?

5           THE COURT:  Well, Mr. Rashid got up and said that

6    JBS's position is that it has settled with Sysco.  As I say,

7    I don't know if this is going to wind up mattering or not,

8    but you are going to be gone soon, so before you go, I'd

9    like to hear what you have to say about those comments of

10    Mr. Rashid, if you have anything to say.  And if you don't,

11    that's fine.

12           MS. RUBENSTEIN:  I think I would have to confer

13    with my client in order to be able to respond fully to that

14    argument today.

15           THE COURT:  That's fine.

16           MS. RUBENSTEIN:  I'd be happy to do that and get

17    back to the Court if that is something the Court would like

18    an answer on before ruling?

19           THE COURT:  Well, we'll see.

20           MS. RUBENSTEIN:  Okay.

21           THE COURT:  I really don't know at this point.

22           Thank you all very much.  This has been

23    extensively and very well-briefed on both sides.  It was

24    very well-argued today.  Obviously this is not going to be a

25    rule-from-the-bench situation.

1      Just as a matter of housekeeping, I have been --

2 I've got these PowerPoint packets.  I am going to take these

3 away.  I am going to consider them unless there is an

4 objection by any of the attorneys.  Hearing none.

5      Mr. Coleman also stated that he would be willing

6 to get me a list of cases.  I'm happy to receive that, but I

7 want to give the same opportunity to Carina and Sysco.  So

8 if there are cases that you think I should read, but I am

9 not looking for any further argument.  We are at a point of

10 diminishing returns, but if there are particular cases and

11 you want to send me a cite -- a title and a cite, I'll be

12 happy to take those in.

13      Is there, Mr. Ho, or Mr. Gant, or Ms. Bloomenfield

14 [sic], anything from your point of view that we need to

15 address today?

16      MR. HO:  No, Your Honor.

17      MS. RUBENSTEIN:  No, Your Honor.

18      THE COURT:  Okay.  Mr. Coleman, Mr. Stojilkovic,

19 anything from your point of view?

20      MR. COLEMAN:  No, Your Honor.  Would the Court

21 prefer the cases put on the docket or just e-mail chambers?

22      THE COURT:  Let's put them on the docket.  I'm in

23 favor of transparency, so let's just file something, yeah.

24      MR. COLEMAN:  That sounds good, and just for the

25 Court's ease of reference, the *Turkey Litigation* is

1      discussed on pages 8 to 9 of our brief.

2                  THE COURT:  Thank you.  I appreciate that.

3                  Mr. Stojilkovic?

4                  MR. STOJILKOVIC:  Yes, Your Honor.  I had added

5      one slide to my presentation that isn't in the hard copy,

6      and if I can just pass that up.

7                  THE COURT:  Yeah, any objection to that?

8                  MR. STOJILKOVIC:  It's the Second Circuit case,

9      Sampliner.

10                 MR. GANT:  No, Your Honor.  Is it in the copy you

11     gave us?

12                 MR. STOJILKOVIC:  I'm going to give it to you.

13                 MR. GANT:  Okay.

14                 THE COURT:  All right.  Received.

15                 Mr. Stojilkovic, just before you leave, hand that

16     in and we'll -- and I'll incorporate it into what I have

17     got.

18                 MR. GANT:  Just one clarification about the cases

19     that Mr. Coleman mentioned, I thought I heard him say --

20                 THE COURT:  Can you speak into the microphone?

21     The reason is although I can hear you, it's not getting

22     recorded.

23                 MR. GANT:  Apologies, Your Honor.

24                 One clarification about the cases that are

25     proposed to be submitted.  When I heard Mr. Coleman, I

1    thought he was referring -- proposing to identify cases that

2    were mentioned today.

3                    THE COURT:  Yes.

4                    MR. GANT:  Yes.  You are not asking for additional

5    cases.

6                    THE COURT:  No.  I am asking for additional --

7    cases that were mentioned today but aren't in the papers,

8    and if you have got cases in that category, I'm happy to

9    receive them.  I want to be, you know, even-handed, but I

10   would -- I would like to receive the case list from

11   Mr. Coleman.

12                   MR. GANT:  Okay.  Thank you, Your Honor.

13                   THE COURT:  Okay.  All right.  Thank you all very

14   much.  Safe travels back for those of you who came in from

15   out of town, and this hearing is adjourned.  Thank you.

16        (Court adjourned at 12:15 p.m.)

17                         *     *     *

18

19        I, Erin D. Drost, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter to the best of my ability.

22

23            Certified by:  *s/ Erin D. Drost*

24                           Erin D. Drost, RMR-CRR

25