# EXHIBIT 11

# HEARING TO REVIEW THE ECONOMIC CONDITIONS FACING THE PORK INDUSTRY

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## LIVESTOCK, DAIRY, AND POULTRY

OF THE

## COMMITTEE ON AGRICULTURE
## HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

————

OCTOBER 22, 2009

————

## Serial No. 111–33



*Printed for the use of the Committee on Agriculture*
*agriculture.house.gov*

————

U.S. GOVERNMENT PRINTING OFFICE

54–577 PDF                    WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON AGRICULTURE

COLLIN C. PETERSON, Minnesota, *Chairman*

TIM HOLDEN, Pennsylvania,
  *Vice Chairman*
MIKE McINTYRE, North Carolina
LEONARD L. BOSWELL, Iowa
JOE BACA, California
DENNIS A. CARDOZA, California
DAVID SCOTT, Georgia
JIM MARSHALL, Georgia
STEPHANIE HERSETH SANDLIN, South
  Dakota
HENRY CUELLAR, Texas
JIM COSTA, California
BRAD ELLSWORTH, Indiana
TIMOTHY J. WALZ, Minnesota
STEVE KAGEN, Wisconsin
KURT SCHRADER, Oregon
DEBORAH L. HALVORSON, Illinois
KATHLEEN A. DAHLKEMPER,
  Pennsylvania
ERIC J.J. MASSA, New York
BOBBY BRIGHT, Alabama
BETSY MARKEY, Colorado
FRANK KRATOVIL, JR., Maryland
MARK H. SCHAUER, Michigan
LARRY KISSELL, North Carolina
JOHN A. BOCCIERI, Ohio
SCOTT MURPHY, New York
EARL POMEROY, North Dakota
TRAVIS W. CHILDERS, Mississippi
WALT MINNICK, Idaho

FRANK D. LUCAS, Oklahoma, *Ranking
  Minority Member*
BOB GOODLATTE, Virginia
JERRY MORAN, Kansas
TIMOTHY V. JOHNSON, Illinois
SAM GRAVES, Missouri
MIKE ROGERS, Alabama
STEVE KING, Iowa
RANDY NEUGEBAUER, Texas
K. MICHAEL CONAWAY, Texas
JEFF FORTENBERRY, Nebraska
JEAN SCHMIDT, Ohio
ADRIAN SMITH, Nebraska
ROBERT E. LATTA, Ohio
DAVID P. ROE, Tennessee
BLAINE LUETKEMEYER, Missouri
GLENN THOMPSON, Pennsylvania
BILL CASSIDY, Louisiana
CYNTHIA M. LUMMIS, Wyoming

———

PROFESSIONAL STAFF

ROBERT L. LAREW, *Chief of Staff*
ANDREW W. BAKER, *Chief Counsel*
APRIL SLAYTON, *Communications Director*
NICOLE SCOTT, *Minority Staff Director*

———

SUBCOMMITTEE ON LIVESTOCK, DAIRY, AND POULTRY

DAVID SCOTT, Georgia, *Chairman*

JIM COSTA, California
STEVE KAGEN, Wisconsin
FRANK KRATOVIL, JR., Maryland
TIM HOLDEN, Pennsylvania
LEONARD L. BOSWELL, Iowa
JOE BACA, California
DENNIS A. CARDOZA, California
BETSY MARKEY, Colorado
SCOTT MURPHY, New York
WALT MINNICK, Idaho

RANDY NEUGEBAUER, Texas, *Ranking
  Minority Member*
BOB GOODLATTE, Virginia
MIKE ROGERS, Alabama
STEVE KING, Iowa
K. MICHAEL CONAWAY, Texas
ADRIAN SMITH, Nebraska
DAVID P. ROE, Tennessee

CHANDLER GOULE, *Subcommittee Staff Director*

(II)

# C O N T E N T S

—————

|  | Page |
|---|---|
| Boswell, Hon. Leonard L., a Representative in Congress from Iowa, submitted article | 63 |
| Goodlatte, Hon. Bob, a Representative in Congress from Virginia, opening statement | 3 |
| Peterson, Hon. Collin C., a Representative in Congress from Minnesota, opening statement | 3 |
| Prepared statement | 4 |
| Scott, Hon. David, a Representative in Congress from Georgia, opening statement | 1 |
| Prepared statement | 2 |
| Smith, Hon. Adrian, a Representative in Congress from Nebraska, prepared statement | 4 |

## WITNESSES

| Scuse, Michael T., Deputy Under Secretary, Farm and Foreign Agricultural Services, U.S. Department of Agriculture, Washington, D.C. | 5 |
|---|---|
| Prepared statement | 7 |
| Submitted questions | 63 |
| Butler, Donald P., President, National Pork Producers Council; Director of Government Relations and Public Affairs, Murphy-Brown LLC, Warsaw, NC | 22 |
| Prepared statement | 23 |
| Greenwood, Mark, Vice President, Agri Business Capital, AgStar Financial Services, Mankato, MN | 32 |
| Prepared statement | 33 |
| Submitted questions | 126 |
| Buhr, Ph.D., Brian, Professor, Head and E. Fred Koller Chair in Applied Economics, University of Minnesota, St. Paul, MN | 38 |
| Prepared statement | 39 |
| Submitted questions | 126 |
| Brenneman, Rod K., President and CEO, Seaboard Foods LLC, Shawnee Mission, KS | 50 |
| Prepared statement | 52 |
| Moody, David, Chairman and Past President, Public Policy Committee, Iowa Pork Producers Association, Nevada, IA | 54 |
| Prepared statement | 56 |
| Submitted questions | 126 |

# HEARING TO REVIEW THE ECONOMIC CONDITIONS FACING THE PORK INDUSTRY

————

### THURSDAY, OCTOBER 22, 2009

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON LIVESTOCK, DAIRY, AND POULTRY,
COMMITTEE ON AGRICULTURE,
*Washington, D.C.*

The Subcommittee met, pursuant to call, at 10:05 a.m., in Room 1300 of the Longworth House Office Building, Hon. David Scott [Chairman of the Subcommittee] presiding.

Members present: Representatives Scott, Kagen, Holden, Boswell, Baca, Markey, Murphy, Minnick, Peterson (*ex officio*), Goodlatte, King, Smith, Roe, and Moran.

Staff present: Alejandra Gonzalez-Arias, Chandler Goule, Craig Jagger, James Ryder, April Slayton, Rebekah Solem, Patricia Barr, John Goldberg, Tamara Hinton, Pete Thomson, Jamie Mitchell, and Sangina Wright.

### OPENING STATEMENT OF HON. DAVID SCOTT, A REPRESENTATIVE IN CONGRESS FROM GEORGIA

The CHAIRMAN. This hearing of the Subcommittee on Livestock, Dairy, and Poultry to review the economic conditions facing the pork industry will now come to order.

I am going to start out by just welcoming everyone and making a few opening statements, and then we will proceed from there. This is indeed a very important and a very timely hearing. We have many challenges facing our pork industry. As always, I am very appreciative of all of you for taking the time during a very busy week to help us examine the economic conditions facing the pork industry.

Over the last several years, the pork industry has suffered a very serious decline in its financial state. It seems as though one calamity after another struck: high commodity prices, recession, the closing of export markets because of H1N1. As such, the pork industry has lost over $5 billion, nearly ⅔ of producer equity. Clearly, if this situation persists, we will lose producers altogether at an ever-increasing rate, which, in my opinion, is an unacceptable outcome. Something must be done both in the short term and the long term in order to aid the pork industry in turning itself around.

Just yesterday our full Committee on Agriculture reported out a bill to address speculation in the commodities markets. I am hopeful that Congress will pass this legislation into law soon so that the price shocks we have experienced in commodity markets will be

(1)

2

mitigated and producers will have more predictability, reliability and accurate pricing of their inputs.

As I said earlier, the decline in economic condition of the pork industry is due to a number of causes, not simply input costs, so we must examine closely these other factors as well. For instance, the widespread public misinformation both domestically and internationally regarding H1N1, the influenza, that has had a direct, demonstrable and severe impact on producer income. Unfortunately, the general public was led to believe that pork was not safe to eat and so changed their purchasing habits. Nothing could be further from the truth. Let me reiterate once again: Our pork is safe to eat. Also, several of the largest export markets for pork, Russia and China, for example, used the H1N1 outbreak to erect artificial trade barriers against our U.S. pork product. I feel that we as Members of Congress need to press United States Trade Representative Kirk and the rest of the Obama Administration to hold these trading partners—and I use the term "partner" loosely—to hold them accountable for their reactionary behavior and press them to use sound science rather than misinformation to fully reopen their markets to U.S. pork products.

These are just some of the issues the pork industry is facing currently, and I am sure our distinguished panelists will lay out numerous concerns in addition to those I have mentioned here. This Subcommittee is open to hearing everyone's opinion on what is hindering the pork industry currently, as well as hearing any ideas on how we may possibly assist this very vital and important industry in maintaining its long-term viability.

In closing, I just want to remind our Members and the public that this hearing is not just about H1N1. There are so many other issues that are affecting the pork industry and it is about all of the factors that are affecting the pork industry. I saw in the press just this morning that this Committee was having an H1N1 hearing today, and that is not true. Certainly we will deal with the H1N1 crisis, but it is definitely a topic that I expect us to discuss very thoroughly in addition to all of the other issues that are facing our pork industry in all of its entirety.

[The prepared statement of Mr. Scott follows:]

PREPARED STATEMENT OF HON. DAVID SCOTT, A REPRESENTATIVE IN CONGRESS FROM GEORGIA

I would like to welcome everyone once again to the Subcommittee on Livestock, Dairy, and Poultry. As always I very much appreciate you all taking time out during a very busy week to help us examine the economic conditions of the pork industry.

Over the last several years the pork industry has suffered a serious decline in its financial state. It seems as though one calamity after another has struck; high commodity prices, recession, the closing of export markets because of H1N1. As such the pork industry has lost over $5 billion, nearly ⅔ of producer equity. Clearly, if this situation persists we will lose producers altogether at an ever increasing rate, which in my opinion is an unacceptable outcome. Something must be done both in the short term and long term in order to aid the pork industry in turning itself around.

Just yesterday the full Committee on Agriculture reported out a bill to address speculation in the commodity markets. I am hopeful that Congress will pass this legislation into law soon, so that the price shocks we've experienced in commodity markets will be mitigated and producers will have more predictable, reliable and accurate pricing of their inputs.

3

As I said earlier, the decline in the economic condition of the pork industry is due to a number of causes, not simply input costs. So we must examine closely these other factors as well. For instance, the widespread public misinformation both domestically and internationally regarding H1N1 influenza has had direct, demonstrable and severe impacts on producer income. Unfortunately the general public was led to believe that pork was not safe to eat and so changed their purchasing habits. Let me reiterate once again: PORK IS SAFE TO EAT. Also, several of the largest export markets for pork, Russia and China for example, used the H1N1 outbreak to erect artificial trade barriers against U.S. product. I feel that we as Members of Congress need to press U.S. Trade Representative Kirk and the rest of the Administration to hold these trading partners, and I use the term 'partner' loosely, accountable for their reactionary behavior and press them to use sound science rather than misinformation, and to fully reopen their markets to U.S. pork products.

But these are just a few of the issues the pork industry is facing currently. I am sure our distinguished panelists will lay out numerous concerns in addition to those I have mentioned here. This Subcommittee is open to hearing everyone's opinion on what is hindering the pork industry currently, as well as hearing any ideas on how we may possibly assist the industry in maintaining its long term viability. With that I turn to the Ranking Member, Mr. Neugebauer, for any opening remarks he wishes to make.

The CHAIRMAN. And with that, now I will turn to our substitute Ranking Member, Mr. Goodlatte, for his opening comments.

### OPENING STATEMENT OF HON. BOB GOODLATTE, A REPRESENTATIVE IN CONGRESS FROM VIRGINIA

Mr. GOODLATTE. Well, thank you, Mr. Chairman, and I very much appreciate your calling this hearing today. I look forward to hearing the testimony and responses to questions of our witnesses and the Administration, the pork production sector, agricultural credit and academia.

A review of the prepared testimony tells a story of difficult economic conditions for the pork community. The causes are many and varied. As we listen to our witnesses today, I would ask that my colleagues pay particular attention to the adverse effects on producers that are the result of the actions of government, actions such as trade policies and additional regulatory burdens like mandatory country-of-origin labeling do not help, and in many cases hurt, the very people represented today. As we go forward in our work considering policy proposals like cap-and-trade, healthcare, antibiotic legislation, energy policy, animal welfare, industry structure, food safety, and changes to tax law, we should do it with today's hearing in mind. The people before us today will tell us about the sobering challenges they face. Each of us should measure our future votes according to whether we are helping them or contributing to their hardship.

Again, Mr. Chairman, thank you for calling this hearing today. I look forward to gaining a better understanding of the problems facing the pork sector and the suggestions that they may have to help us address them.

The CHAIRMAN. Thank you, Mr. Goodlatte.

Now I would like to recognize our distinguished Chairman, Mr. Peterson, for his opening statement.

### OPENING STATEMENT OF HON. COLLIN C. PETERSON, A REPRESENTATIVE IN CONGRESS FROM MINNESOTA

Mr. PETERSON. Thank you, Mr. Chairman, and I want to commend you and the Ranking Member for your leadership of this Subcommittee and on this issue, and all our Members that rep-

4

resent the areas that have pork production have been very much focused on this. I want to commend the Administration for doing whatever they can do to help with the situation. I think they have been very responsive. We have a number of Members who have really focused on this, Mr. Walz in my state, Mr. King, Mr. Latham, the folks in North Carolina, people around the country that have hog production. But I want to single out Mr. Boswell. There has been nobody that has been more focused on this, more interested, more on top of this than Mr. Boswell. He used to serve as Chairman of this Subcommittee and I just want to commend him for really stepping up to the plate on this, and not only on the overall situation with the industry but on the antibiotic issue.

So we have a lot of Members that are really paying attention to this and are really focused on this, and I commend all of them for their actions and hope that we can come up with some solutions that will be helpful to the industry. Thank you.

[The prepared statement of Mr. Peterson follows:]

PREPARED STATEMENT OF HON. COLLIN C. PETERSON, A REPRESENTATIVE IN CONGRESS FROM MINNESOTA

I want to thank Chairman Scott and Subcommittee Ranking Member Neugebauer for calling today's timely hearing and for their leadership on this Subcommittee. The situation facing the pork industry today is serious, and we need to find both short and long term solutions to stabilize the market for pork producers.

Since September 2007, the U.S. pork industry has lost an estimated $4.6 billion in equity, with producers losing an average of more than $21 for each hog marketed. Several factors have contributed to these severe losses, including rising input costs and a worldwide recession. Recently, the unreasonable reaction of our trading partners to the outbreak of H1N1, specifically Russia and China, has only further intensified the economic crisis facing the pork industry.

Responding to the current crisis, Secretary Vilsack has taken steps to bring some relief to U.S. pork producers. USDA recently announced that it will purchase $30 million of additional pork products this year. We will continue to work with USDA in finding more ways to support U.S. pork producers in the short term.

We also need to work with the U.S. Trade Representative Kirk to open and expand export markets for U.S. pork. It is unacceptable for our trading partners to deny access to U.S. pork products based not on sound science, but on faulty politics.

I look forward to hearing from our witnesses today about how we can best assist pork producers as they weather this economic storm. Thank you for appearing today before the Subcommittee and thank you again, Chairman Scott and Ranking Member Neugebauer for your leadership. I yield back my time.

The CHAIRMAN. Thank you very much, Mr. Chairman.

Now we would like to welcome our first witness, and I will request that other Members who have opening statements will submit their opening statements for the record so the witnesses can begin their testimony and ensure that we have ample time to hear from our witnesses.

[The prepared statement of Mr. Smith follows:]

PREPARED STATEMENT OF HON. ADRIAN SMITH, A REPRESENTATIVE IN CONGRESS FROM NEBRASKA

Good morning and thank you, Mr. Chairman, for holding this hearing today "to review the economic conditions facing the pork industry." As you know, over the past 2 years hog prices have declined due to loss of exports in the global economic downturn and the drop in demand after the H1N1 flu virus scare. Meanwhile, rising input costs and environmental regulations continue to further burden livestock producers. It is my hope this Subcommittee can explore robust solutions to assist pork producers in these tough economic conditions.

5

While I am very pleased the U.S. Department of Agriculture has announced approval to purchase an additional $30 million in pork products this year, we must continue to work to ensure policies which will strengthen our agriculture economy and provide real, long-term stability for our nation's producers. Traveling throughout Nebraska's Third District, I have organized a number of meetings with livestock producers, which have provided me a chance to discuss the real impact of increasing input costs and government mandates on those working on the front lines of agriculture. In addition, increasing export markets has long been a priority of mine, and I will continue to help Nebraska's producers meet global marketplace demands.

I look forward to hearing the testimony of our witnesses, including Deputy Under Secretary Michael Scuse who oversees, among many things, the Foreign Agriculture Service (FAS). As you know, the FAS is directed to foster economic opportunity for American farmers and U.S. agriculture products abroad. Since exports are imperative for U.S. pork producers, the recent announcements to expand the FAS development mission must not come at the expense of the U.S. producers. Now more than ever, our products must be as competitive as possible in the world market.

Thank you, Mr. Chairman.

The CHAIRMAN. Our first witness this morning is Mr. Michael Scuse, who is the Deputy Under Secretary for the Farm and Foreign Agricultural Services at the U.S. Department of Agriculture. Mr. Scuse, thank you very much for coming. You may begin.

## STATEMENT OF MICHAEL T. SCUSE, DEPUTY UNDER SECRETARY, FARM AND FOREIGN AGRICULTURAL SERVICES, U.S. DEPARTMENT OF AGRICULTURE, WASHINGTON, D.C.

Mr. SCUSE. Thank you, Mr. Chairman. If you don't mind, I do have a statement.

Chairman Scott, distinguished Members of the Subcommittee, I appreciate the opportunity to discuss the current economic situation facing the pork producers and the programs delivered by my mission area in the U.S. Department of Agriculture. As Deputy Under Secretary for Farm and Foreign Agricultural Services, I oversee three agencies: the Farm Service Agency, the Foreign Agricultural Service and the Risk Management Agency. I would like to take this opportunity to provide you with an update on the pork market situation, our forecast for the pork market, and my mission area's response to the sharp downturn.

The reasons for the recent economic distress in the U.S. hog sector are varied and complex, as you have stated. Some are similar to the reasons for the distress suffered in the dairy sector: over-expansion in response to higher than normal profits in previous years, combined with recession-driven declines in domestic and international demand. In addition, the U.S. hog sector has also been unfairly linked to the emergence of the novel H1N1 influenza, reducing demand for pork and pork products. The hog sector, like dairy, is expected to improve substantially over the next year as the breeding herd continues to contract and domestic and international demand improves.

September 2009 was the 22nd month of losses on hogs marketed since losses began accruing and the down phase of the current hog cycle in October of 2007. Given 200 million domestically produced hogs marketed during this 2 year period from October 2007 through September 2009, losses to the hog sector are estimated at approximately $4 billion. Losses are expected to moderate from now through 2010 as demand increases and hog supplies decline. Exports in the fourth quarter of 2009 are expected to be up 12 per-

6

cent from over a year ago to nearly 20 percent of fourth quarter production, just below the record 25 percent of production in the second quarter of 2008. The value of the U.S. dollar has fallen 10–30 percent against several major currencies since earlier this year, which should also help our exports. A return to domestic and global economic growth should also improve profitability. Ongoing adjustments on supply side are expected to also contribute to improved profitability in the U.S. hog sector in 2010. USDA forecasts that 2009 U.S. pork production will decline 1.45 percent from 2008 production, and 2010 production will be down an additional 2.5 percent compared to 2009.

I know that H1N1 has been at the forefront of our attention since these past few months and days especially. To briefly update you on the situation, USDA's National Veterinary Services Laboratories, NVSL, has confirmed the presence of 2009 pandemic H1N1 influenza virus in a pig sample collected at the Minnesota State Fair submitted by the University of Minnesota. Additional samples are currently being tested. The infection of the fair pig does not suggest infection in our commercial industry. If we do detect the 2009 pandemic H1N1 influenza virus in commercial swine, USDA will work with our state partners, producers and their veterinarians to prevent the spread of the virus, and we will continue to provide information and updates as they become available. When it comes to flu, swine are much like people: the vast majority recovers without lingering health effects. Only those animals that have fully recovered will be permitted to enter our food supply.

It is paramount to note that you cannot get infected with the 2009 pandemic H1N1 influenza virus from eating pork or pork products, as you stated, Mr. Chairman.

A number of our nation's trading partners have banned live pigs, pork or pork products since the outbreak among human beings. We will continue to urge countries to base any bans on scientific evidence and in accordance with international obligations.

USDA has taken many other actions to assist the pork industry. The Secretary announced on September 3, 2009, USDA's intention to immediately purchase up to $30 million in pork products prior to October 1st. Since October 2008, AMS has purchased about 100 million pounds of domestic pork products at a cost of approximately $165 million for distribution to Federal food and nutrition assistance programs. This includes $28.9 million in funds authorized by the American Recovery and Reinvestment Act of 2009.

The availability of credit is a critical factor to hog producers during this stressful period. This Administration has been proactive in efforts to assure that adequate credit is available for farmers and our ranchers. Within weeks of taking office, we aggressively sought additional funding for FSA farm loan programs. The American Recovery and Reinvestment Act provided an additional $173 million in direct operating loan funding.

On August 12, 2009, Secretary Vilsack sent letters to all FSA farm loan borrowers advising them of assistance available if they are experiencing financial hardship. The Secretary also sent a letter to FSA guaranteed loan lenders on the same day, encouraging them to consider all possible options for loan modifications under the FSA Loan Guarantee Program. We are continuing to consider

7

options and evaluate alternatives that might provide financial relief to hog producers and other farmers in financial distress.

USDA's Market Access Program and Foreign Market Development Program help finance promotional activities for U.S. agricultural exports. With MAP funds, the U.S. Meat Export Federation promotes pork in Southeast Asia, the Caribbean, Central and South America, Europe, China, Japan, Korea, Mexico, Russia and Taiwan. USMEF also used FMD funds in program year 2009 for administrative costs for operating 13 foreign offices that support U.S. meat export promotion activities, including pork.

Despite the challenges in the past 5 years, U.S. pork exports have nearly doubled and the proportion of production exported jumped almost 11 percent. Much of the growth has occurred in Japan, Canada, Mexico, China and Russia.

Two types of insurance for swine producers are available in the Federal crop insurance program: the Livestock Risk Protection and the Livestock Gross Margin Program Swine insures against declining markets. So far in 2009, 29,000 head were insured by LRP on 19 policies. The LGM for Swine insurance provides protection against the loss of gross margin. So far in 2009, 126,000 head were insured with 62 policies.

In conclusion, I appreciate the opportunity to testify before this Subcommittee today, and I look forward to working with each and every one of you, Mr. Chairman and all Members of this Committee, as we continue our hard work to ensure that USDA is responsive to the needs of our pork industry. At this time I will be happy to answer questions that, Mr. Chairman, you or the Committee may have.

[The prepared statement of Mr. Scuse follows:]

PREPARED STATEMENT OF MICHAEL T. SCUSE, DEPUTY UNDER SECRETARY, FARM AND FOREIGN AGRICULTURAL SERVICES, U.S. DEPARTMENT OF AGRICULTURE, WASHINGTON, D.C.

Chairman Scott, Ranking Member Neugebauer, and distinguished Members of the Subcommittee, I appreciate the opportunity to discuss the current economic situation facing pork producers and the programs delivered by my mission area in the U.S. Department of Agriculture (USDA). As Deputy Under Secretary for Farm and Foreign Agricultural Services (FFAS), I oversee three agencies: the Farm Service Agency (FSA), the Foreign Agricultural Service (FAS), and the Risk Management Agency (RMA). I would like to take this opportunity to provide you with an update on the pork market situation, our forecasts for the pork market, and my mission area's response to the sharp downturn.

**Background and Expectations for 2010**

The reasons for the recent economic distress in the U.S. hog sector are varied and complex. Some are similar to the reasons for the distress suffered in the dairy sector: over-expansion in response to higher than normal profits in previous years, combined with recession-driven declines in domestic and international demand. In addition, the U.S. hog sector has also been unfairly linked to the emergence of the novel H1N1 influenza reducing demand for pork and pork products. The hog sector, like dairy, is expected to improve substantially over the next year as the breeding herd continues to contract and domestic and international demand improve.

Hog production is cyclical, with a period of profits normally inducing expansion, followed by a period of losses that induce contraction. September 2009 was the 22nd month of losses on hogs marketed since losses began accruing in the down phase of the current hog cycle in October 2007. According to Dr. John Lawrence of Iowa State University, a typical Iowa-Southern Minnesota farrow-to-finish operation experienced monthly losses per hog marketed averaging about $20 for the 24 months from October 2007 to September 2009, with losses as high as $40–$46 per head in November and December 2008 (see chart). Given 200 million domestically-produced

8

hogs marketed during this 2 year period from October 2007 through September 2009, losses to the hog sector are estimated at approximately $4 billion.

These losses compare to average monthly profits, calculated by Dr. Lawrence, of $24.27 per head over the 43 months from February 2004 to September 2007. Those profits were due to rapid increases in domestic and export demand for pork, driven by strong worldwide economic growth and a depreciating U.S. dollar. That period of profitability was a contributing factor to the expansion of the hog sector in 2007. Annual farrowings in 2007 increased 5.3 percent over 2006 farrowings, and in the last half of 2007, farrowings were up 7.7 percent over farrowings in the last half of 2006. In contrast, farrowings between 2004 and 2006 increased an average of only 0.6 percent annually. Moreover, imports of live hogs from Canada increased 14 percent in 2007, to ten million head, as Canada's hog sector also expanded, and represented over nine percent of hogs slaughtered in the U.S. in 2007. Hog imports from Canada began to drop below year ago levels in May 2008 and are down 32 percent so far in 2009. Both countries have continued to experience increases in litter size, with litter size in the United States increasing 4.3 percent between the 4th quarters 2006 and 2008, for example.

The second contributing factor to the past 2 years of losses has been the worldwide recession. The combination of large inventories and recession caused a sharp drop in the market value of live hogs, from a June 2007 peak of $152.50 to $103.30 in November 2007. Hog prices were temporarily pulled up in 2008 because of a 49 percent increase in pork exports as a result of a continuation of world economic growth and a weakening U.S. dollar through the first half of 2008, with 2008 pork exports representing 20 percent of pork production. As worldwide economic growth slowed, and the U.S. dollar sharply appreciated in late-2008 in response to the September 2008 financial crisis, pork exports began declining sharply in late 2008. U.S. pork exports during the first 3 quarters of 2009 were down 18 percent over the same period in 2008 even before the 2009 pandemic H1N1 influenza outbreak. In recent months, pork exports have recovered somewhat and are forecast to decline by ten percent in 2009. The value of market hogs fell from $172.34 in August 2008 to the $120 range from January 2009 through July, before collapsing to $98.71 per head in August 2009.



The third factor contributing to recent losses in the hog sector has been the increase in feed prices starting in the fall of 2006. Increased feed costs pushed total production costs up from $110.43 per hog marketed in Oct. 2006 to the $130 level by June 2007, where they remained steady for a few months. Feed prices then began increasing again in fall 2007, with total production costs per hog marketed peaking at $163.79 in August 2008 before gradually declining to the $140 level, roughly where they have remained since August.

9

Losses are expected to moderate from now through 2010, as demand increases and hog supplies decline. Exports in 4th quarter 2009 are expected up 12 percent over a year ago, to nearly 20 percent of 4th quarter production, just below the record 25 percent of production in the 2nd quarter of 2008. The value of the U.S. dollar has fallen 10 percent to 30 percent against several major currencies since earlier this year, which should help exports. A return to domestic and global economic growth should also improve profitability.

Ongoing adjustments on the supply side are expected to also contribute to improved profitability in the U.S. hog sector in 2010. USDA forecasts that 2009 U.S. pork production will decline 1.45 percent from 2008 production, and 2010 production will be down an additional 2.5 percent compared to 2009 production. The September Hogs and Pigs report shows the June 2009 breeding herd down 2.7 percent from June 2008 and the September 2009 breeding herd down 3.1 percent from September 2008. The September 2009 breeding herd is down 5.4 percent from its September 2007 peak. Farrowing intentions for September 2009 through February 2010 are down 3.1 percent from the previous year. Year-over-year farrowings are expected to decline through the third quarter 2010, with total 2010 farrowings down over four percent from the 2007 high of 12.25 million. Moreover, live hog imports from Canada are forecast to decline by 875,000 from 6.475 million in 2008 to 5.6 million in 2010 compared to a peak of ten million in 2007, as Canada's hog sector also contracts.

USDA expects live hog prices to increase from the current mid-to-high $30 per cwt range to the high $40 per cwt range, and feed costs to average about the same in the last half of 2010 as in the last half of 2009. Unfortunately, the 4th quarter is the seasonal low for hog prices and the 4th quarter 2009 price for live hogs is expected to average $35 per cwt, down from a 3rd quarter average $38.90. Hog prices are expected to increase during the first 3 quarters of 2010. The 1st quarter 2010 price is expected to average $40 per cwt; the 2nd quarter average is an expected $45, and the 3rd quarter 2010 price is forecast to average $49 before seasonally declining to $45 in 4th quarter 2010. Feed prices are expected to increase seasonally, through the first and second quarters of 2010 before declining in the third and fourth quarters.

**H1N1**

USDA's National Veterinary Services Laboratories (NVSL) has confirmed the presence of 2009 pandemic H1N1 influenza virus in a pig sample collected at the Minnesota State Fair submitted by the University of Minnesota. Additional samples are currently being tested.

The infection of the fair pig does not suggest infection of commercial herds because show pigs and commercially raised pigs are in separate segments of the swine industry that do not typically interchange personnel or animal stock. If we do detect the 2009 pandemic H1N1 influenza virus in commercial swine, USDA will work with our state partners, producers and their veterinarians to prevent spread of the virus, and will continue to provide information and updates as they become available. When it comes to flu, swine are much like people—the vast majority recovers without any lingering health effects. Only those animals that have fully recovered will be permitted to enter the food supply. It is paramount to note that you cannot get infected with the 2009 pandemic H1N1 influenza virus from eating pork or pork products.

USDA continues to remind U.S. swine producers about the need for good hygiene, biosecurity and other practices that will prevent the introduction and spread of influenza viruses in their herd and encourage them to participate in USDA's swine influenza virus surveillance program.

Since last spring and the onset of the 2009 pandemic H1N1 influenza outbreak in humans, USDA has consistently asked that the media stop calling this "novel" pandemic virus "swine flu." By continuing to mislabel the 2009 pandemic H1N1 influenza virus that is affecting human populations around the world, the media is causing undue and undeserved harm to America's agriculture industry, especially to pork producers.

Each time the term is used it unfairly hurts America's hog producers who are suffering severe economic losses during these challenging economic times. It is simply not fair or correct to associate the 2009 pandemic H1N1 influenza with hogs, an animal that does not play a role in the ongoing transmission of the pandemic strain.

While about 27 countries originally imposed restrictions on U.S. pork since the April outbreak, 17 countries have removed their restrictions—in large part due to the Administration's efforts to encourage these countries to base their measures on science. We will continue to urge countries to base any bans on scientific evidence and in accordance with their international obligations. Three major international

10

health organizations—the World Organization for Animal Health (OIE), the United Nations' Food and Agriculture Organization, and the World Health Organization—have all issued statements that 2009 pandemic H1N1 influenza is not transmitted by eating pork.

USDA will be devoting $27.75 million provided via supplemental appropriations to 2009 H1N1 flu preparedness and response activities. Of this total, $25 million will go to the Animal and Plant Health Inspection Service (APHIS) for surveillance activities, outreach to industry, and support to help expedite licensing of any new swine vaccines. APHIS will also receive $0.75 million to purchase human antivirals and personal protective equipment for animal health officials through the National Veterinary Stockpile program. The remaining $2 million will go to the Agricultural Research Service to develop improved tools for detecting and preventing H1N1 from being established in U.S. swine populations.

Even before the novel H1N1 flu virus appeared last spring, we had been working with the Centers for Disease Control and Prevention on a voluntary surveillance program for swine influenza viruses. That program which now includes voluntary monitoring for the novel H1N1 flu virus, has now been launched, with the aim of identifying such viruses quickly in the U.S. swine herd. Monitoring and studying these influenza viruses in swine will help us learn about the virus, create better tools to diagnose the disease and develop new and improved vaccines to protect U.S. swine herds and humans. USDA continues to study the virus in agricultural animals to provide the best protection for both public and animal health. To address producer reluctance to participate in the program, we have worked with the states to formulate guidelines for swine infected with the novel H1N1 flu virus and ensure that infected swine may move freely in commerce once they recover from their illness.

APHIS also recently made available master seed virus for the novel H1N1 flu virus to interested manufacturers so they can produce approved vaccine more rapidly. We believe that a H1N1 vaccine for swine will be available in the coming months.

**Trade**

The U.S. pork industry has been facing barriers to trade because of non-science based restrictions that are being imposed by importing countries. The H1N1 pandemic virus is a primary example of an issue that has resulted in non-science based barriers to trade. Secretary Vilsack has worked to correct misconceptions about the relationship between the current H1N1 virus and swine and to emphasize that U.S. pork is safe.

A number of countries continue to maintain bans on U.S. live pigs, pork and pork products, contrary to advice of three major international health organizations, and USDA continues to press these countries to rescind these bans. President Obama and several Administration Cabinet officials including USDA Secretary Vilsack and U.S. Trade Representative Ron Kirk have sent letters to those countries maintaining bans and raised the topic in high level bilateral meetings. The U.S. delegation to the WTO SPS Committee, led by USTR, will also raise the issue at the upcoming committee meeting in Geneva in late October.

As a result of our efforts, many countries that initially imposed bans have rescinded them, but additional work remains. Russia and China are key pork export markets and USDA has expended considerable efforts to engage those countries on this issue. I am happy to report that Russia has rescinded all of their bans. China continues to maintain bans on all U.S. pork and pork products and the Administration is using every opportunity to press China to remove these unscientific bans.

Secretary Vilsack will travel to China to participate in the Oct. 28–29 meeting of the U.S.-China Joint Commission on Commerce and Trade (JCCT) in Hangzhou, along with U.S. Trade Representative Ron Kirk and Commerce Secretary Gary Locke. This issue is a high priority on their agenda. The JCCT serves as an important forum for Cabinet-level officials from both countries to resolve trade concerns and enhance economic opportunities and cooperation.

Another issue on which USDA has been working closely with the pork industry is that regarding residues of the veterinary drug ractopamine. Ractopamine is widely used in the U.S., but banned in some key markets such as the European Union, China, and Taiwan. The U.S. has been working diligently to gain final approval for an international standard for trace residues of ractopamine in pork to help address this issue with our key trading partners.

***Other USDA Actions and Programs to Assist the Pork Industry***

**USDA Purchases of Pork**

Due to the declining prices paid to producers, the Secretary announced on September 3, 2009, USDA's intention to immediately purchase up to $30 million in pork products prior to October 1, 2009. Since October 2008 (*i.e.,* FY 2009), Agricultural Marketing Service (AMS) has purchased about 100 million lbs. of domestic pork products at a cost of $164.6 million for distribution to Federal food and nutrition assistance programs. This includes $28.9 million in funds authorized by the American Recovery and Reinvestment Act of 2009 (ARRA). It is important to note that school districts are never required to accept any USDA Food, they cannot effectively use or do not want. In FY 2009, schools elected to order some pork products, but the majority or the USDA purchased pork products were provided to the Emergency Food Assistance Program. In FY 2008, AMS purchased approximately 40.6 million pounds of domestic pork products at a cost of $65.2 million. The Department continues to evaluate pork market conditions and, if justified, AMS will initiate additional surplus removal purchases this fiscal year.

**Credit Assistance**

The availability of credit is a critical factor for hog producers during this stressful period. This Administration has been proactive in efforts to assure that adequate credit is available for farmers and ranchers. Within weeks of taking office, we aggressively sought additional funding for FSA farm loan programs. The ARRA provided funding to support an additional $173 million in direct operating loans.

We recognize that some producers will be unable to meet their financial obligations due to negative profit margins in the pork industry. The Administration is committed to the use of the authorities at its disposal to assist those hog producers in coping with the financial challenges they face. On August 12, 2009, Secretary Vilsack sent letters to all FSA farm loan borrowers advising them of assistance available if they are experiencing financial hardship. The Secretary also sent a letter to FSA guaranteed loan lenders on the same day, encouraging them to consider all possible options for loan modifications under the FSA loan guarantee program. FSA field staffs have been given direction, and are prepared to assist hog producers and other farmers through loan restructuring up to and including write-down of FSA debt. Furthermore, we are continuing to consider options and evaluate alternatives that might provide financial relief to hog producers and other farmers under financial stress.

**Export Promotion**

USDA's Market Access Program (MAP) and Foreign Market Development (Cooperator) Program (FMD) help finance promotional activities for U.S. agricultural exports. With MAP funds, the U.S. Meat Export Federation (USMEF) promotes pork in Southeast Asia, the Caribbean, Central and South America, Europe, China, Japan, Korea, Mexico, Oceania, Russia, and Taiwan. USMEF also used FMD funds in program year 2009 for administrative costs for operating 13 foreign offices that support U.S. meat export promotion activities, including pork.

Export markets are increasingly important to the U.S. pork industry. Despite challenges, in the past 5 years, U.S. pork exports have nearly doubled and the proportion of production exported jumped from almost 11 percent to 18 percent. Much of the growth has occurred in Japan, Canada, Mexico, China, and Russia.

**Federal Crop Insurance Program**

Two types of insurance for swine production are available in the Federal crop insurance program: the Livestock Risk Protection (LRP) and the Livestock Gross Margin (LGM).

Livestock Risk Protection (LRP) Swine insures against declining market prices. Pork producers may select from a variety of coverage levels and insurance periods that match the time their hogs would normally be marketed. Producers may purchase this insurance throughout the year from approved livestock insurance agents. Premium rates, coverage prices, and actual ending values are posted on the RMA website daily. So far in 2009, 29,672 head were insured by LRP on 19 policies.

Livestock Gross Margin (LGM) Swine insurance provides protection against the loss of gross margin (market value of livestock minus feed costs) on swine. The indemnity at the end of the 6 month insurance period is the difference, if positive, between the gross margin guarantee and the actual gross margin. The LGM for Swine Insurance Policy uses futures prices to determine the expected gross margin and the actual gross margin. The price the producer receives at the local market is not used in these calculations. So far in 2009, 126,539 head were insured by 62 policies.

12

**Disaster Assistance Programs**

The 2008 Farm Bill created several new disaster programs that provide assistance through USDA's Farm Service Agency to producers. The program that is available to pork producers who have recently suffered a natural disaster, in addition to the current economic crisis, is the Livestock Indemnity Plan (LIP).

LIP compensates producers for livestock death losses in excess of normal mortality due to adverse weather that occurred on or after January 1, 2008 and before October 1, 2011. Counties are now authorized to make payments upon completed applications.

**Conclusion**

I recognize the decisions that we make in Washington affect the livelihood of America's farmers and ranchers and we are committed to ensuring that we work together to help meet the needs of U.S. pork producers.

I appreciate the opportunity to testify before this Subcommittee today, and I look forward to working with you, Mr. Chairman, Mr. Neugebauer, and all the Members of this Subcommittee as we continue our hard work to ensure that USDA is responsive to the needs of the pork industry. I will be happy to answer questions you may have.

The CHAIRMAN. Thank you very much, Mr. Scuse, and again, it is good to have you.

Let us just deal first of all with the situation facing us with the H1N1 situation to make sure that we get the accurate facts and information out. Isn't it a fact that the H1N1 flu virus cannot, cannot be transmitted through food including pork?

Mr. SCUSE. That is correct, Mr. Chairman. Pork, if properly prepared, you are not going to have a problem. It is not a human health issue to consume pork.

The CHAIRMAN. And——

Mr. SCUSE. That is the message that we do need to get out to the public, so thank you very much for your help in getting that message out, Mr. Chairman.

The CHAIRMAN. It is also important for us to note that the most important thing facing us now with H1N1 is to get our flu vaccinations and to make sure that we have that information be accurate and out. One of the tragic figures that we have before us is that there have been about 86 children who have died from the H1N1 virus, and just from your information, what research, what is the status of the research that the United States Department of Agriculture is now doing in regards to H1N1?

Mr. SCUSE. Mr. Chairman, the USDA continually does different types of research on swine to look at the different types of viruses that are out there.

The CHAIRMAN. Just finally on that, the situation with the pigs at the Minnesota State Fair, it is very important to note as Secretary Vilsack has pointed out that there was a situation with three pigs. Is that correct? What is the disposition on that at this point? Do you have any information on that?

Mr. SCUSE. Mr. Chairman, there was only one confirmed case at the Minnesota State Fair, and that was in a show hog. To the best of our knowledge, it did not come from a commercial operation. It was a show pig, and there was only one confirmed hog at the Minnesota State Fair for H1N1.

The CHAIRMAN. Thank you very much for that.

Let us move on to another question. What is the status of the Department of Agriculture's regulations implementing the competition provisions in the farm bill?

13

Mr. SCUSE. Mr. Chairman, we currently are working with the Department of Justice that will hold hearings after the 1st of the year to look at violations of antitrust laws and the Stockyard and Packers Act. We realize that there has been some concern in the industry about consolidation and we will be holding hearings, hopefully, and will have a tremendous amount of input from our producers as to what direction needs to be, what path we need to go down and to give us direction.

The CHAIRMAN. I understand, Mr. Scuse, that the USDA has announced that it along with the Department of Justice will hold a series of workshops in early 2010 to examine competition issues in the livestock industry. Could you share with the Committee further details about these workshops and how they will factor into decision making at the Department?

Mr. SCUSE. Mr. Chairman, we are going to hold a series workshops, again throughout the United States, to get input from industry as well as our producers on the effect that corporate consolidation and other issues affecting production agriculture—not just in the animal sector but in the feed grain sector, the dairy sector—as well as the effect that it has on our consumers. There has not—I don't believe we have established at this time where those meetings are going to be held, but they will be held so that, hopefully, we will get input from the various regions of the United States on all of those issues.

The CHAIRMAN. Now let me ask about the credit situation that still remains a very important issue to producers. What, aside from what you mentioned in your testimony, is the Department doing to ensure that credit remains available to producers and is FSA considering raising loan limits to help lenders better help producers?

Mr. SCUSE. Well, Mr. Chairman, in the 2008 Farm Bill, the loan limits were raised for both our guaranteed as well as our direct operating loans. USDA has sent out notices to all of our borrowers, as well as those lending institutions that we partner with, asking them to look at ways that we can help our producers through refinancing or other avenues to make sure that we can keep them in business. Our loan portfolio, we increased our lending this past year, 2008, by almost $1 billion. So we have been working very hard with Congress to make sure that we do have the funding available to help those producers that are in need.

The CHAIRMAN. Thank you, Mr. Scuse.

Mr. Goodlatte.

Mr. GOODLATTE. Thank you, Mr. Chairman.

Secretary, welcome. On October 2, over 60 Members of the House wrote to the Secretary of Agriculture to request $100 million in pork purchases, to secure appropriated funds for surveillance, diagnostic and vaccine development and to encourage efforts to address these export challenges that we have been talking about, particularly with China. Could you take a moment to outline the Secretary's progress in these areas?

Mr. SCUSE. Well, we have $25 million set aside for the surveillance program. AMS currently is looking at the request for the pork purchase. They are doing the analysis of that request, which will take some time. And as far as our trade goes, Secretary

14

Vilsack and Under Secretary Miller will be in China next week and our pork trade with the Chinese is a major topic for both of them.

Mr. GOODLATTE. Well, with regard to that, in 2006 we had $55 million in exports of pork products to China; in 2007, $147 million; in 2008, $268 million, and a very successful and rapidly growing market. Recently the Administration, President Obama placed a 35 percent tariff on tires imported from China. What participation or consultation did the Department of Agriculture have before that decision was made to engage in that measure with regard to China?

Mr. SCUSE. On the——

Mr. GOODLATTE. Which obviously many in this industry are concerned about the dampening impact on that growing market.

Mr. SCUSE. Specifically the question is the tire tariff?

Mr. GOODLATTE. Yes.

Mr. SCUSE. I can't answer that question, Congressman. I don't know at my level what discussions we had before that was done, but I will say that if you look at the tremendous increase in our exports to China for the year of 2008, there were two factors that contributed to that tremendous growth. One was the Summer Olympics and the demand for pork products to feed all the Olympians in Beijing, and the second factor was that the Chinese did have some health issues in their own pork industry at that particular period of time. So those two factors contributed to the steep increase in our exports to the Chinese. If you recall——

Mr. GOODLATTE. We want to try to sustain that growth, do we not?

Mr. SCUSE. No doubt about it, but if you will remember when H1N1 was first found in the United States, the Chinese immediately, unfortunately, banned all pork products from the United States. That is what the Secretary and the Under Secretary will be working very hard in the next 10 days to see if we can resolve that issue.

Mr. GOODLATTE. Well, I wish you would consult with the Secretary and his staff and determine whether or not they were consulted before a significant trade position was taken by the Administration that could have serious ramifications for agricultural trade, number one, and number two, if they have not been consulted, what measures they have taken to speak with the USTR and others and ask that they be consulted in the future when issues like this arise that could have ramifications for significant sectors of our agricultural economy.

Mr. SCUSE. If I may, I would like to say that USTR, State and the Department of Agriculture have been working very, very closely together on trade issues as they pertain to agriculture to see what we can do to——

Mr. GOODLATTE. I want to get one more question in. Let me shift over to this, because this is very important. Recently your Administration testified before the House Rules Committee in favor of H.R. 1549, which would severely restrict the use of antibiotics in food animal production. Did the Department of Agriculture have any input into that position?

Mr. SCUSE. I can't answer that question. I will get you a response, though, sir.

15

Mr. GOODLATTE. Has the Department done any economic analysis of the adverse economic impact on pork producers of this legislation?

Mr. SCUSE. Again, I can't answer that question, but I will supply you with the answer.

Mr. GOODLATTE. All right. Well, I thank you very much, because that is of grave concern to many people on this Committee and many people sitting behind you.

Mr. SCUSE. No doubt.

Mr. GOODLATTE. Thank you very much, Mr. Chairman.

The CHAIRMAN. Thank you.

The gentleman from Wisconsin, Mr. Kagen.

Mr. KAGEN. Well, thank you, Mr. Chairman.

Thank you very much for being here, Mr. Scuse. I really appreciate your efforts. I wish that all of your efforts would bring about an increase in the price of pork for our producers more immediately, but you can't control worldwide markets. But there are some things that you can have an influence on. With regard to our trade policies with China, is there any way you can bring about a more rapid response from the Chinese people understanding the facts are that H1N1 cannot be transmitted by properly prepared meat from pigs, understanding that when we ship our pork overseas after it has been properly prepared, it does not transmit the H1N1 virus?

Mr. SCUSE. Congressman, that is the one thing that we have tried to get across to all of our trading partners. We would like for them to follow the OIE guidelines from the World Animal Health Organization. We have been trying to convey that message to the Chinese and, hopefully, the Secretary and Under Secretary in their meetings with the Chinese next week will be successful, but again, that is a priority for them. We want to resolve this issue and open up our markets to China as quickly as possible, and we recognize the impact, the immediate impact that that opening would have on our pork industry and our pork producers. So it is a priority and we are urging them to follow the OIE guidelines which would allow our products into China.

Mr. KAGEN. Especially at a time when our dollar is at a current value that it really would favor the export of our pork and everything we manufacture and produce in this country.

I would like to ask you about the Livestock Risk Protection Program and also the Livestock Gross Margin Program. In particular, as a business owner myself, did a great number of producers take advantage of those programs?

Mr. SCUSE. No, they did not, and I gave the numbers in my opening statement. Very few producers, unfortunately, took advantage of the programs. But when you come out with new programs, it does take a while for them to become accepted, understood, and as well there probably are issues with the programs where there are changes that need to be made, as we go through this we have to take a look at those programs. Our Dairy Margin Insurance Program is another program, sir, that very few people took advantage of it, had they taken advantage of it they wouldn't be suffering the losses, but as you are well aware, hindsight is 20/20. So we are going to work to do a better job with outreach and tweak those pro-

16

grams so that we can get more producers involved in risk management.

Mr. KAGEN. I would encourage you to do that. I think that producers should take advantage of every possibility to not just hedge their commodity, but also to make certain that they have proper insurance, not just workmen's compensation but this risk insurance could be very valuable to them, especially right now.

I would also like to inquire about what role, if any, any possible speculation in the commodities market may have played with regard to the suppression of the price. Do you feel that that played any role at all?

Mr. SCUSE. At this point in time I doubt it. When you look at where the markets have been now for almost 2 years, there would be some that would argue yes, that it did. But, if you go back and look at the markets 2 years ago and what has happened in the last 2 years, I would say that had little, if any, impact.

Mr. KAGEN. And my final comment has to do with your immune system. I am an immunologist, and I will share with you the fact that if you are preparing pork that has the H1N1 virus protein in it and it is going to be denatured, it won't cause any infection in you, but if there is any protein left, it is going to stimulate your immune system. I am not suggesting that this is a way of getting immunized for H1N1 or to eat more pork, but you can certainly understand that by eating something you are stimulating your immune system at the same time. So, it would be a good thing for people to consider that feeding their family and themselves the pork product that we have here in this country could be good for your immune system, good for your health, and your economy as well.

So thank you for being here. I appreciate the opportunity to inquire about the programs.

Mr. SCUSE. Thank you, Congressman.

The CHAIRMAN. Thank you, Mr. Kagen.

The gentleman from Iowa, Mr. King.

Mr. KING. Thank you, Mr. Chairman. I appreciate Dr. Kagen's unique approach to this and want to let him know that we did our best. We roasted a 300 pounder last Saturday night.

Mr. KAGEN. Congratulations.

Mr. KING. Thanks for opening that subject up, and I would first turn to the issue of the letter signed by 61 or 62, many Members of the Agriculture Committee, Members of Congress, that asks the Department to purchase meat from sows as a way to take some of this pork off the market and, potentially, reduce the breeding stock. We need to do that so we can see more demand in this market and see some recovery after this perfect storm that we have seen in the pork industry. I thank you for your attention to that, and I encourage that there be a lot more of it. The issue, though, of meat from sows seems to be a little bit more difficult than we had anticipated. I am informed that in the school lunch program there is a restriction that exists that only pressed sausage patties from sow meat is approved, not other types of sow meat. Could you speak to that and let us know why that might be, if it is true?

Mr. SCUSE. I can't speak to that specifically but we will get you a response to that. I do know that on our pork purchases there are

17

a tremendous variety of different products, not just canned pork products but all the different pork products are actually purchased through our program, the Section 32 program. So I can't speak to that specifically on what the requirement is for our school lunch program, but we will get you a response for that.

Mr. KING. I appreciate you taking a look at that, and I also appreciate a broad and aggressive approach to this. I think it sends the right message to the pork industry when they see that kind of a response by the USDA, and we have a new budget here now to take a look at as well.

I also understand the USDA is now soliciting bids from sow processors and cookers but bids haven't been very great in number and that the USDA has imposed TARP-like restrictions on firms that are bidding. They want them to disclose the salaries of their top five employees. And it is presumed that the payroll czar, the executive pay czar, is taking a look at these. Can you confirm that that is the case and could you also advise this Committee as to whether you are compelled by law to evaluate the salaries of companies that are bidding to the USDA?

Mr. SCUSE. Congressman, I have no knowledge of that, and if that is taking place, it is something that I don't know about, but again, we can get you a response to that. I have no knowledge that that is taking place.

Mr. KING. Thanks, and I will look forward to that response and I would just tell you, in 28 years in business and bidding on Federal contracts, if the Federal Government asked me what I was paying myself as a condition to bid the project, I would take a look at that and maybe reduce my spectrum of potential customers by one.

So then I would turn our attention to—and the subject has been brought up of trade with China. I very much encourage, as emphatically as possible, an aggressive effort to open up that trade with China but also Korea, Colombia, and Panama. I have watched over the transition from the Clinton Administration through the Bush Administration to the Obama Administration, I give President Clinton significant credit for supporting trade agreements and holding Democrats together to get enough votes to actually pass them. Through the Bush Administration, I watched Democrats line up and incrementally start walking away from free trade, and now we have a President who, I will say for lack of a better term, is less than aggressive on free trade philosophy. Now, I am seeing that no free trade agreements appear to be moving anywhere. There may be slow walking going on but I don't think a commitment. Can you tell me what the position is of the Administration with regard to Korea, Colombia and Panama and whether there is any optimism there that we can open up that trade and help our pork industry as well?

Mr. SCUSE. Well, you understand that those negotiations and discussions are ongoing and continuing. The President has made it clear that we do support free trade, but we also want to make sure that it is not just free trade but fair trade. The Administration is going to take a very close look at these trade agreements as they come to pass to make sure that it is not only free trade but it is in fact fair trade.

18

Mr. KING. And as my clock ticks down, I would ask a couple questions all in one, and that would be: I would like to ask you to point out which country is the most likely to be defined as a free trade country that could have a bilateral trade agreement passed, but I would also ask this question about Canadian pigs. There are about six million pigs that are farrowed in Canada that come into the United States. About four million of them come to Iowa. These records are now about a year old because the dynamics of the market have changed. Have you been tracking the categories under country-of-origin labeling? Can you let this Committee know what is happening with those Canadian pigs now, and how that is affecting the market and the slaughter facilities that are available either in the United States or Canada for finished hogs of Canadian origin?

Mr. SCUSE. Well, there has been a sharp decline in the amount of pork that is coming across the border into the United States from Canada. In fact, this past year there was about a 30 percent decline in those numbers. That is the only information that I have available at this time, Congressman.

Mr. KING. On that country that is most likely to see a free trade agreement passed with the United States?

Mr. SCUSE. I will pass on that.

Mr. KING. Mr. Chairman, I have abused the time limit although I appreciate the witness and the opportunity to question. I yield back.

Mr. BOSWELL [presiding.] Thank you. Since I was the next in line over here before I took over the chair, I will take my moment here.

First of all, Mr. Secretary, thank you for taking on the responsibility of farm services. It is a big item for producers, everybody in America, really, and I want to compliment you or pass on to you really the unsolicited remarks I am getting from farmers and different people across my district for the good job that John Whittaker is doing. So I thank him for his hard work out there being state director, and we appreciate it.

Mr. SCUSE. Thank you.

Mr. BOSWELL. I am going to bounce around a little bit because you talk amongst your colleagues down there at the Department and the Secretary and so on, but some of the problems going on with pork producers are worrying us all. As I look at the loan rate, and we all know how capital intensive it is to put a crop in these days, and most, at least, if not all but at least most of the pork producers are raising their own grain, and the loan rate is basically $1.80. It costs them $4+ to produce a bushel of corn. It makes it pretty hard for them to go ahead and plan ahead and use that as a tool to get their next year acreage lined up. I would like to have that discussion with you or somebody down there sometime soon just as a sideline. You can comment if you want. But this is a serious problem out there for producers, and having been one, it is very important. So I would like for you just take note of that and hope we can talk some more.

Mr. SCUSE. The Under Secretary and I would welcome the opportunity, and as a grain farmer from Delaware just 2 hours east of here growing corn, soybeans and wheat, I would appreciate that discussion.

19

Mr. BOSWELL. Okay. So we will ask that to take place. Another thing is, there is a lot of discussion going on and we will continue with the next panel and you may not be available to stay, but I would like to make this point. I was going to ask the Chairman to enter this into the record, but since I am now the chair it will go into the record. But it has to do with a report. As you know, Congressman King and others, we made a little trip over to Denmark not too long ago and we didn't learn a terrible lot in the sense of what to do, or what not to do on this ban. We came back with a lot of questions and so on, but since then, we have received this little report here. It is short. I am going to read it and then I am going to put it in the record, and it has to do—the title is *Suspicious Rise in Danish Use of Pig Antibiotics*. "Use of antibiotics in Danish pig production increased 19 percent during 2001–2008, the report has shown, despite the fact that Danish law forbids the use of antibiotics for routine treatment of livestock. The ban on routine administration of antibiotics is intended to protect against the risk of antibiotic resistance in bacteria that can affect both animals and humans which is potentially life threatening. However, the recent Danmap (Danish integrated antimicrobial resistance monitoring and research program) report for 2008 showed that antibiotic use in pig production had gone up by 19 percent in 2001–2008, measured in daily pig doses per kilogram of pork. The findings were reported in the bimonthly *Maskinbladet* under the headline 'indications of routine treatment with antibiotics.' According to the article, the increase relates primarily to the use of tetracyclines, which rose by 118 percent and 60 percent respectively in weaned and finishing pigs for the period of 2003 to 2008." I want to enter this into the record, because that discussion is going on, and one thing I think that Congressman King and I would agree on, that when we visit with the farmers, they would like for this ban to take place. We kind of caught a moment, and well, it would make them more competitive. So there is that concern there.

[The document referred to is located on p. 63.]

Mr. BOSWELL. Now, setting that aside, we can come back to that. I do have a question in the short time I have left. Is the use of Section 32 for pork purchase subject to OMB's administrative PACO?

Mr. SCUSE. No, Congressman, that fund is a fund set aside for the Secretary to use. There is approximately $250 million that the Secretary can use for bonus purchases as requested in the October 2nd letter.

Mr. BOSWELL. Well, thank you very much. I am willing to yield back and go ahead and recognize Mr. Roe from Tennessee.

Mr. ROE. Thank you, Mr. Chairman.

Just a brief statement ahead of time. One, from what we know, H1N1 can't be transmitted through pork, and I think perception ends up being reality. I go back to 1976 when the last swine flu epidemic came through, and one of the scary parts for the public at that point was that the swine flu vaccine actually caused more problems than the swine flu did at that point. It caused a problem known as Guillain-Barré syndrome, which was a paralysis, and that still hangs around a little bit. But just to go ahead and dovetail with what Dr. Kagen said is that for people out there that don't understand immunology and immunizations, there is a thing

20

called the herd immunity where if enough people get immunized, the virus has nowhere to spread, and so that is one of the things from a perception and reality standpoint. I would take—haven't had an opportunity yet but I am taking the H1N1 vaccine. I am a physician and I am going to take the vaccine and encourage my patients to do the same. Apparently when it does hit, it is a very devastating illness. It causes a problem called ARDS, adult respiratory distress syndrome, which is very difficult to treat. But the bottom line is, it is not the pork producers that are the problem. It is human-to-human transmission and we have to cover our mouths and wash our hands and do all the things we know to do. So I did want to get that out there and let people know from a doctor's standpoint that they need to be doing these things. So I would encourage folks in this room or people watching to go ahead and do that and do the things we already know we should do.

Just to dovetail on what the Chairman was speaking of just a moment ago, I have done some reading on the antibiotic use in pork and don't know that that decision has been made. I know that the American Veterinary Association has asked for, at least from what I've read, a year to look at this issue because of what the EU is doing now, whether we are going to ban it in pork or not. Does the USDA have any position on that at all?

Mr. SCUSE. This is an issue that needs to be discussed within the industry as well as within FDA, USDA, but this is a decision that is going to take some time. There is some research that needs to be done with this. But it is not a decision that can just be made overnight. There are a lot of factors that the industry has to take into consideration. So it is an issue that is going to have to be looked at by all parties—FDA, USDA, the industry on what direction we want to go in.

Mr. ROE. Well, it makes sense to me to let the experts—they asked for a year to look at this and study this issue more and get some data. That makes sense to me to wait for that time and get the information so you are dealing with facts again, not perception.

Mr. SCUSE. Again, let us make decisions on sound science.

Mr. ROE. Yes, absolutely. Another question I have for you, Secretary Vilsack was here not too long ago when we were discussing the cap-and-trade legislation, and we were all concerned about the increasing and ever-rising costs of energy as oil goes up to near $80 a barrel and how it affects—I am from a rural area in Tennessee and agriculture is really struggling there. There are dairy farmers, we have had numerous hearings on that, and our pork producers. Have you all studied how the effect of increased costs of energy, if they have any more costs—I can tell you, our farmers where we are, are going under, and we have had to deal with the drought, and we had to deal with a year ago $4.50 diesel fuel. We have done the experiment where carbon-based energy went up in price and it was devastating to our farmers. They haven't gotten over it yet. Have you all studied the impact of the current legislation on that?

Mr. SCUSE. I think that—and I agree with you. Our costs of production have increased, and fortunately for this year, much of our cost has come down from the highs of a year ago. That is one of the reasons why we need to look at the alternative energies, the

21

biofuels, become more self-sufficient on energy and to look at what we can do to keep our energy costs low. Now——

Mr. ROE. That is not what I am asking.

Mr. SCUSE. I know.

Mr. ROE. I am asking—I agree with everything you just said.

Mr. SCUSE. You are asking about the issue on cap-and-trade. As far as cap-and-trade, I think that if you had the Secretary here testifying—last month you probably heard the Secretary say that we believe that agriculture will actually benefit from cap-and-trade legislation, especially the livestock sector. We believe that there will be opportunities for them to profit from this, just not be a financial liability but also be able to make additional revenues from their farming operations through the cap-and-trade.

Mr. ROE. I may have a different opinion, but I appreciate what the FSA is doing in our area too, Mr. Chairman, also. Thank you.

Mr. BOSWELL. Well, thank you, Dr. Roe, and on that note, some of things you were talking about I appreciate the discussion that you have had. I would hope that, and I think it will happen, that we are going to base our study on this situation, antibiotics, on science. I just call your attention to an Iowa State University study that estimated that a ban in the United States similar to Denmark's would raise the cost of production by $6 a hog, and $1 billion to industry. We have to apply science to this, and there are a number of variables that we don't have, animal ID and it just goes on and on, and also the scope of it, the size of it. So we have to turn to science. I think that not only the Department feels that way but pork producers feel that way too. So we have a lot of science available to us across this country, and if we commit to using that, why, in the end we will probably do the right thing.

That completes—everybody has had an opportunity to talk to the Secretary. Does anybody else have a question? If not, we are going to bring this part to a close. Thank you for your time today and we look forward to Chandler getting a hold of you so we can have further discussions on some of these items, and I appreciate your work.

Mr. SCUSE. And I appreciate the opportunity to be here today. Thank you for the questions, very good questions, and I look forward to seeing you on the other issue.

Mr. BOSWELL. We will be talking to you soon. With that, we will excuse you at this time with appreciation, and invite the second panel to join us.

We would like to welcome our second panel witnesses to the table. I will just recognize each quickly before we start our discussion. Mr. Donald Butler, President of the National Pork Producers Council, Warsaw, North Carolina, thank you very much for being with us. Mr. Mark Greenwood, Vice President of Agri Business Capital, AgStar Financial Services, Mankato, Minnesota. Mr. Brian Buhr, Ph.D., Professor, Head and E. Fred Koller Chair in Applied Economics, University of Minnesota, nice to have you with us. Mr. Rod Brenneman, President and CEO of Seaboard Foods, Shawnee Mission Kansas, and from my state, a person I go to from time to time, Mr. Dave Moody, Public Policy Chairman and Past President, Iowa Pork Producers Association, Nevada, Iowa. With that, we rec-

22

ognized everybody and we will at this time start off with Mr. Butler. Please share with us what you want to share with us.

## STATEMENT OF DONALD P. BUTLER, PRESIDENT, NATIONAL PORK PRODUCERS COUNCIL; DIRECTOR OF GOVERNMENT RELATIONS AND PUBLIC AFFAIRS, MURPHY-BROWN LLC, WARSAW, NC

Mr. BUTLER. Good morning, Mr. Chairman. Thank you. Before I get into my remarks, I want to clarify something that was alluded to earlier, and that is that H1N1 is a respiratory disease and that both USDA and CDC have confirmed that pork is safe to eat and it cannot be transmitted through pork products. I just want to make that clear.

I am a pork producer from North Carolina, and I am President of the National Pork Producers Council, and I appreciate the opportunity to come before you today and share and update on behalf of our industry.

First, let me say that the U.S. pork industry represents a very significant part of the U.S. economy. We contribute about $35 billion annually to the gross national product and support 550,000 jobs, mostly in rural areas across the country. We all know that we are in crisis today and we hope to find ways to stem the tide of foreclosures and bankruptcies for us to continue to contribute protein, the safest, most nutritious meat protein. We need to find a way out of this 2 year-old crisis. Producers have been averaging $23 per hog for every pig sent to market since September of 2007. These impacts are being felt in my home state as well as yours, states like Illinois, Indiana, Iowa, Kansas, Minnesota, Ohio, Oklahoma, Pennsylvania, Texas, Wisconsin and others, and there are many factors that contribute to the condition that we are in including the unwarranted bans on U.S. pork products by some of our trading partners, citing fears of H1N1 influenza. But the biggest reason, quite frankly, is higher input costs, higher feed cost. I want to make it clear that this crisis is not of our own making. It is not the result of over-expansion or overconfidence, and it is worse and fundamentally different than the downturn that we saw, the crisis we saw in 1998 and 1999.

So what can be done about it? First, we encourage the USDA to make additional purchases of pork products for various Federal food assistance programs. The Department, as you have heard, has recently purchased $55 million in pork products and we are very grateful for that assistance. We urge the Congress to reexamine the spending cap on USDA's Section 32 program, given the economic conditions of our industry. As I said, they are materially different today than they were during the farm bill debate when the cap on Section 32 funds was implemented. Also let me say that we are grateful to Mr. Walz, Mr. King and the other 61 Members of the House for sending a letter to Secretary Vilsack urging further support for our industry. We ask that Congress and the Obama Administration pressure U.S. trading partners, particularly China and Russia, to eliminate their barriers to U.S. pork products. We also strongly urge Congress to approve as soon as possible the pending free trade agreements with Colombia, Panama and South Korea. These trade agreements would be a great help to our pro-

23

ducers. The U.S.-Korea free trade agreement alone would add more than $10 per head to producers for each hog marketed.

As the number one user of corn, we request that a study be conducted of the economic impact on the livestock industry of any expansion of corn ethanol production and usage. As you know, there have been calls for raising the cap on the blending rate for ethanol into gasoline to 15 percent from its current ten percent. All the facts should be on the table before any policy decisions are made on this important question.

Additionally, NPPC has policy in place to support allowing the ethanol import tariff and Federal blenders tax credit to expire. These incentives promote ethanol production regardless of market demand which in turn creates additional competition for corn and hurts pork producers. NPPC supports as a safety net a WTO-compliant countercyclical payment for ethanol producers.

We urge Congress to oppose any measures that would place undue burdens and any higher cost on U.S. pork producers such as restrictions on access to capital and contract arrangements that can sustain hog operations during this crisis, or any prohibitions on production practices such as a ban on certain animal products. On this point, we thank the Chairman, Chairman Peterson, Chairman Boswell, Ranking Member Lucas and other Members of the Committee for your interest on this subject. NPPC is grateful for all the Members of the House Agriculture Committee, USDA and other members of the Administration for all the efforts you have already made to help us weather this economic storm.

As it did a decade ago when pork prices plunged to record lows, the U.S. industry will survive this crisis though no doubt we will be different, we will be smaller. Market forces will have their way. We are asking Congress and our government for some reasoned common sense help to help us get through what we are experiencing right now.

Mr. Chairman, thank you for the opportunity to be here today.

[The prepared statement of Mr. Butler follows:]

PREPARED STATEMENT OF DONALD P. BUTLER, PRESIDENT, NATIONAL PORK PRODUCERS COUNCIL; DIRECTOR OF GOVERNMENT RELATIONS AND PUBLIC AFFAIRS, MURPHY-BROWN LLC, WARSAW, NC

**Introduction**

The National Pork Producers Council (NPPC) is an association of 43 state pork producer organizations and serves as the voice in Washington, D.C., of America's 67,000 pork producers.

The U.S. pork industry represents a significant value-added activity in the agriculture economy and the overall U.S. economy. In 2008, it harvested more than 116 million hogs, and those animals provided total gross receipts of $16 billion. Overall, an estimated $21 billion of personal income from sales of more than $97 billion and $34.5 billion of gross national product are supported by the U.S. hog industry. Iowa State University economists Dan Otto and John Lawrence estimate that the U.S. pork industry is directly responsible for the creation of nearly 35,000 full-time equivalent jobs and helps generate an additional 515,000 indirect, mostly rural, jobs.

The U.S. pork industry today provides about 20 billion pounds of safe, wholesome and nutritious meat protein to consumers worldwide.

**U.S. Pork Industry Economic Crisis**

The U.S. pork industry is in the midst of the most severe economic crisis in its history. Over the past 24 months, U.S. pork producers have lost an average of near-

24

ly $23 on each hog marketed. Since September 2007, the industry has lost more than $5.3 billion or more than 66 percent of its equity as of Oct. 14, 2009.

And things look bleak, going forward. October 13 closing Chicago Mercantile Exchange lean hogs, corn and soybean meal futures prices suggest that producer losses will exceed $30 a head for pigs sold for the remainder of this year and will be nearly $40 a head in November.

Based on lower lean hogs futures prices, cash hog prices will be below the cost of production in all but 4 months through the end of 2010, according to economist Steve Meyer, president of Paragon Economics in Adel, Iowa.

**Origins of the Crisis**

Several factors have contributed to the U.S. pork industry's profit crisis, but primary among them is a surge in production costs due to higher feed prices. While corn and soybean meal prices have fallen from their record levels of 2008, they remain significantly higher than they were before 2007. (*Figure 1* shows that corn prices have moved from a historical level of near $2 per bushel to a new "normal" range of $3 to $4.20 per bushel.)

These higher prices for feed, which accounts for 60 percent of the cost of raising a hog, are mostly the result of a significant increase in the production of corn-based ethanol, which has driven up corn demand and, thus, prices. (The price of soybean meal also has risen dramatically as the price of corn has increased.) The use of corn for ethanol production has more than tripled since 2004, and ethanol production is the only usage of corn that has grown significantly during that time period.

NPPC has policy approved by delegates at its recent annual meetings—the National Pork Industry Forum—that calls for not renewing when they expire at the end of 2010 the tariff on imported ethanol and the Federal tax credit that the ethanol industry receives for blending ethanol into gasoline.

U.S. biofuels policy, which provides tax incentives for the use of corn-based ethanol and mandates minimum usage levels for ethanol, has created a strong link between corn and crude oil prices (see *Figure 2*). That link was particularly strong in 2008 when corn rose almost in lock-step with record-high oil prices. Financial difficulties for ethanol producers and the prospects of an exceptionally large crop allowed corn prices to fall relative to oil this summer, but the recent rise in oil prices to their highest level in nearly a year has been accompanied by another jump up in corn prices—even as a record-large corn crop is being harvested. Oil prices will continue to be a major driver of corn prices, with ethanol plants increasing production because of higher ethanol prices—just under the price of oil—and with U.S. policy encouraging the use of corn-based ethanol.

Higher feed prices have had a huge negative impact on animal protein sectors, all of which are shrinking this year. For the U.S. pork industry, the result is break-even hog production costs that are now in the low to mid-$60s on a carcass basis—roughly 20 to 30 percent higher than during the period from 1999–2007 (see *Figure 3*). While these cost levels now are much lower than the $80 per carcass hundredweight cost of the summer of 2008, the 28 percent increase in costs from now through 2010 over the 1999–2006 period must at some point be covered by the price of market hogs to return the pork industry to profitability.

It is important to note that this year's hog prices, which have been disappointing since the 2009 novel H1N1 influenza outbreak began in late April, had they been what they averaged between 1999 and 2006, would not have been low enough to cause producers to lose money until September. The biggest reason pork producers have lost money in 22 of the past 24 months is that production costs have been higher. And futures markets indicate they will remain so through the end of 2010.

The current economic crisis is *not* the result of over-expansion driven by selfishness or overconfidence, and it is fundamentally different from the economic catastrophe of 1998–1999. That situation was caused by rapid expansion of the U.S. breeding herd in the mid-1990s and a rationalization of excess U.S. packing capacity in the 1980s and early 1990s. The closure of a major packer in July 1998 that fall caused a processing capacity restriction that, when combined with significantly higher hog numbers, drove prices to record-low levels.

Once the industry emerged from that crisis, U.S. pork producers from February 2004 through September 2007 increased the size of their breeding herd by only 3.1 percent while enjoying the longest period of profits on record. That rate of breeding herd increase (0.8 percent per year) did not even keep pace with the growth of the U.S. population. Further, U.S. producers began reducing the size of the breeding herd in June 2008—after less than 1 year of losses—in response to the prospects of long-term higher production costs.

The ultimate irony of the current crisis is that even producers' efforts to take better care of their animals and increase their operating efficiencies have worked

25

against them. Technology, disease control and better diagnostics have improved the overall health of the U.S. hog herd and have increased productivity. The best example of this is the impact of circovirus vaccines on productivity.

Porcine circovirus contributed to the poor performance and/or death of millions of pigs during the decade prior to 2007. The disease took a terrible toll on animal well-being and the morale of owners and workers as well as the financial performance of hog production enterprises. Animal health companies responded to this challenge, introducing effective circovirus vaccines in late 2006. By mid-2007 these vaccines were available to all producers, and their adoption improved pig survival rates so dramatically that hog slaughter in the fourth quarter of 2007 was nearly eight percent higher than 1 year earlier—from a sow herd only two percent bigger.

Since late 2008, productivity increases have slowed (because year-over-year changes involved comparisons to a vaccinated, healthier population) but have remained significant. Preventing the immune-suppressing impacts of porcine circovirus has enabled pigs to more effectively fight other diseases, improving growth rates and, most importantly, driving average litter sizes higher by two percent or more for each quarter of the past 2 years. The productivity increases have resulted in enough market-weight pigs to nearly offset the 4.8 percent decrease in the U.S. sow herd since December 2007.

Certainly, the global economic slowdown that began in the fall of 2007 and the resulting "recession," which dramatically increased the value of the dollar and reduced foreign demand for U.S. products, also have had a negative effect on the U.S. pork industry, as well as on many other sectors of the economy.

More recent factors contributing to the industry's economic crisis have been higher-than-expected U.S. hog slaughter numbers, especially since late July, and, most importantly, higher slaughter weights, which have been as much as 6 pounds per head higher this past summer due to unusually cool temperatures that caused pigs to eat more and grow faster.

## 2009 Novel H1N1 Influenza

While higher production costs have been the main culprit for the U.S. pork industry's losses over the past 2 years, they have been only part of the problem since late spring. Hog prices have been disappointing relative to the levels expected back in late April just prior to reports on the 2009 novel H1N1 flu, which the media insisted on calling "swine" flu. In fact, actual prices since then have resulted in a $1.3 billion reduction in producer revenues—and an average loss of nearly $23 per market hog—from the level they would have been had prices been what were suggested by the Chicago Mercantile Exchange lean hogs futures prices in late April.

The 2009 novel H1N1 influenza caused a short-term reduction in domestic pork demand that hurt prices in May. While this demand decline was short-lived, according to research conducted by the National Pork Board, the negative publicity generated by "swine" flu stories has had a lasting effect on some consumers.

Additionally, 2009 novel H1N1 caused some significant disruptions in exports, most notably to Mexico—the No. three market for U.S. pork—in May and June due to lower pork demand as Mexican consumers shied away from pork from any source. Exports also fell when some U.S. trading partners implemented H1N1-related bans on pork imports from North America.

At the peak on May 5, official and unofficial bans on pork from the United States were in place in 27 countries, including China—the No. two export market for U.S. pork in 2008—and Russia—the No. five market. (Currently, seven countries, including China, maintain an H1N1-related ban on U.S. pork imports.) The prohibitions were put in place despite statements issued by the World Health Organization, the World Animal Health Organization and the World Trade Organization that import bans on pork due to 2009 novel H1N1 would be unjustified in light of the fact there was no evidence to indicate the virus could be transmitted by handling or consuming pork.

NPPC is appreciative of the efforts of the U.S. Department of Agriculture (USDA), the Office of the U.S. Trade Representative (USTR) and other agencies to keep export markets open to U.S. pork. Many of the countries that had H1N1-related bans rescinded their prohibitions within a few weeks of instituting them.

The industry again will be counting on USDA, USTR and other agencies to reassure U.S. trading partners that pork is safe to eat and handle and that the 2009 novel H1N1 flu is not transmitted through pork now that some pigs in Minnesota have tested positive for the 2009 novel H1N1 virus.

The unwarranted bans on U.S. pork imports have left two to three percent more pork on the U.S. market, and the extra supply has driven domestic prices downward.

**Export Issues**

Until the H1N1-related bans were imposed, exports for some time had been a bright spot for the U.S. pork industry. Indeed, 2008 was the 17th consecutive record year of U.S. pork exports and, in fact, exports saved the U.S. pork industry's bacon (pardon the pun) last year, when producers exported more than 2 million metric tons of pork—about 20 percent of total U.S. production—worth nearly $5 billion. That added about $48 to the value of each hog marketed and significantly tempered producer losses in 2008.

That said, exports of U.S. pork could have been even higher except for some nagging issues—in addition to the H1N1-related bans—with several U.S. trading partners.

China, which accounts for 47 percent of world pork consumption, serves as a good example. The Asian nation has a ban on imports of U.S. pork produced with ractopamine hydrochloride, a protein synthesis compound that significantly improves efficiency in pork production. In recent years, China has "delisted" or placed under review numerous U.S. pork plants because of the detection in U.S. pork imports of ractopamine hydrochloride. But ractopamine was approved for use in U.S. pork production after an extensive review by the U.S. Food and Drug Administration and is approved for use in 25 countries around the world, including several countries in Asia. As a further indication of the safety of the product, the U.N. *Codex Alimentarius* is in the final stages of an eight-step process for establishing a recommended maximum residue level (MRL) for ractopamine in pork production.

China began delisting U.S. pork plants because of the detection of ractopamine in 2006. In addition to the loss of exports from those U.S. plants that have been delisted due to ractopamine, China's arbitrary delisting policies throw a great deal of uncertainty into trade for plants that remain eligible to export to China.

China's delisting of U.S. pork plants due to ractopamine use is without health or scientific justification. In fact, its ractopamine policy reflects the Chinese Government's interest in strictly controlling imports to help support domestic pork prices.

Additionally, to curb imported pork products, Chinese authorities have over the past 2 years introduced a number of new subsidy programs aimed specifically at its pork producers. The most recent program is the National Hog Price Alert System, which is designed to ensure profitability and expansion of China's hog production. In addition, the Chinese pork industry derives significant benefits from a full exemption from the corporate income tax and a partial exemption from the country's value-added tax.

The United States is able to produce pork at a much lower cost than China. In mid-2008, it cost about 55¢ a pound to produce a live hog in the United States compared with 84¢ in China. With its competitive cost advantage—even with the recent rise in hog production costs—the United States would be a huge supplier of pork to China in the absence of the Chinese import restrictions and subsidy programs.

How big? China's pork imports in 2008 accounted for about one percent of total domestic consumption. (This compares with, for example, Japan's 50 percent, South Korea's 30 percent and Australia's 22 percent.) If China were to open its market to allow imports to account for 25 percent of total consumption, pork imports to the country would be 11.6 million metric tons. Even if the United States captured just a 25 percent share of that—compared to the 60 percent share it had in 2008—this would translate into U.S. pork exports to China of 2.9 million metric tons, an amount equivalent to 27 percent of total U.S. pork production. (Remember, in 2008 the U.S. pork industry exported to *all* countries 20 percent of production; it exported about five percent of production to China.) This would represent more than a doubling of U.S. pork exports to the entire world in 2008. A surge in U.S. pork exports of this magnitude would generate enormous benefits not only for the U.S. pork economy but for the U.S. rural economy.

The U.S. pork industry also has dealt with over the past 2 years a number of other trade issues that have dampened exports, including, for example, the arbitrary and non-science-based "delisting" of U.S. pork facilities by Russia and a change in that country's quota system for imported pork. Government officials in the country publicly have stated that they want to limit the amount of imported pork as a way to protect their domestic pork industry.

From 2005—the year the U.S. and Russia signed a meat agreement—through 2008, U.S. pork exports to Russia grew at an explosive pace, increasing in volume terms by more than 400 percent and in value by nearly 600 percent.

But over the past year and a half, Russia has "delisted" or failed to relist more than 30 U.S. pork production, processing and storage facilities, meaning more than 50 percent of U.S. pork production is ineligible for export to the country.

Russia did not identify any health or sanitary reasons for its actions, which are contrary to obligations contained in a 2006 side agreement that is part of World

27

Trade Organization bilateral negotiations between Russia and the United States. The agreement established specific criteria and methods for Russian approval of U.S. pork plants. The actions also are inconsistent with the WTO's Sanitary and Phytosanitary (SPS) Agreement, which requires WTO trading partners to recognize the SPS measures of other countries as equivalent to their own. (Russia does not adhere to the WTO principle of equivalence and approves U.S. meat facilities on a plant-by-plant basis.) The U.S. Government and the U.S. pork industry have demonstrated to Russian Government officials the effectiveness of the U.S. pork plant inspection system in ensuring a high level of product safety.

On the quota issue, last year the Russians demanded that the "out-of-quota" tariff on pork imports be raised. Consequently, in December 2008 the U.S. and Russia renegotiated the 2005 meat agreement, with Russia increasing the 2009 out-of-quota tariff from 40 percent to 75 percent. In return, the U.S. pork "in-quota" amount—the quantity of pork subject to a lower tariff—was raised.

Russia currently is insisting on another renegotiation of the pork quotas with the intention of further reducing the U.S. quota and restricting U.S. pork imports. These demands are unacceptable to U.S. pork producers. It is ironic that a country that seeks U.S. support for its WTO accession and that wants Congress to grant it Permanent Normal Trade Relations status is restricting rather than expanding access to its market.

The plant delistings coupled with its limited H1N1-related ban and the uncertainty surrounding the quotas have resulted in a 39 percent decline in U.S. pork exports to Russia in the first 8 months of 2009.

The result of all of the restrictions on U.S. pork exports—and undoubtedly of the global economic slowdown—has been a drop of 11 percent in U.S. pork exports from January through August 2009 compared with the same period in 2008. U.S. pork exports to China are down 50 percent through August and to Russia 39 percent.

NPPC urges Congress and the Obama Administration to pressure China to lift its H1N1-related ban on U.S. pork, to drop its objections to ractopamine and to eliminate its hog and pork subsidies; and it urges the U.S. Government to maintain the current U.S. country allocation for pork under Russia's global pork tariff rate quota at a level of market access equal or greater to that in 2008, to insist that Russia relist all U.S. pork facilities and to pressure Russia to agree to accept the U.S. meat inspection system as equivalent to its system and accept pork from all USDA-approved facilities. Russia should not be given special treatment but rather should be required, like China and Vietnam when they were joining the World Trade Organization, to memorialize with the U.S. the WTO principle of equivalence.

NPPC was heartened to hear that the Obama Administration's trade agenda has as a top priority enforcement of existing trade agreements, and it asks Congress to support the Administration on this. China and Russia should be at the top of the list.

While enforcement is important, exports have increased dramatically because of free trade agreements, starting in 1994 with implementation of the North American Free Trade Agreement and in 1995 with the conclusion of the Uruguay Round of the then-General Agreement on Tariffs and Trade. As a result of those and subsequent trade deals, U.S. pork exports have grown by more than 750 percent in value terms since then.

Given that result and the U.S. pork industry's current economic crisis, it is imperative that Congress approve as soon as possible the pending free trade agreements with Colombia, Panama and South Korea, which would add greatly to U.S. pork producers' bottom line. The U.S.-Korea FTA alone would add $10 to the price producers receive for each hog marketed, according to Iowa State University economist Dermot Hayes.

**Regional Effects**

Obviously, the effects of the current economic crisis are somewhat regionalized, affecting the pork-producing states clustered in the Midwest and those in the mid-Atlantic (mostly North Carolina, Pennsylvania and Virginia) more than other states.

North Carolina, for example, is one of the nation's leading pork-producing states. Its pork industry provides jobs, pays taxes and supports civic and social groups. The pork industry's economic impact is widely felt in local communities, especially rural communities, across the state. The state's farm families and production companies operate some 2,200 farms.

The income from these farms was North Carolina's second leading source of gross farm income in 2007 (the most recent year for which data is available). Hogs generated slightly more than 22 percent of all North Carolina farm receipts. Looking beyond cash farm receipts, the combined effects of swine production and pork packing and processing in North Carolina in 2007 were estimated at more than $7.2 bil-

28

lion in sales, $2.25 billion in value-added income and 46,657 jobs—more full-time jobs than North Carolina's entire Research Triangle Park provides.

Simply put, the pork industry is important to *all* of North Carolina and most especially, eastern North Carolina. But the industry is facing a crisis that could cause large-scale output reductions with a resulting loss of farm family producers and associated businesses and jobs.

At least three North Carolina hog producers have filed for bankruptcy or are in the process of doing so (*Triangle Business Journal*). The extended period of deep losses has drained the equity of all hog producers. As producers try to cut supply to increase pork prices, barns are being left empty. Similar events have been occurring over the past year in the broiler and turkey sectors in North Carolina. Some farmers faced foreclosure on broiler houses when a major producer went bankrupt. The implications extend throughout the rural communities in North Carolina, which are supported by these farming and meat-processing operations. Reduced production means lost income, lost employment, lost capital investment, lost tax base and lost economic activity throughout the local and state economy. Hog production represented 22.1 percent of North Carolina cash receipts from agriculture in 2007. Broilers (28.5 percent) and turkeys (5.9 percent) along with pigs account for 56.5 percent of North Carolina cash receipts from agriculture, so losses in these sectors have major effects in the state.

North Carolina has marketed about 18 million pigs or more per year over the last decade. National average losses of nearly $23 per head marketed mean about $828 million of equity lost in North Carolina over the past 2 years. Each dollar of lost income in hog production is estimated to result in 80¢ lost elsewhere in the North Carolina economy, so the state has lost an estimated $662 million in additional income. The combined effects of the pork sector crisis are estimated at $1.5 billion in lost income in North Carolina over the past 24 months with further losses anticipated over the next several months. State and local taxes based on income and sales are directly affected.

Job losses also result from reduced hog production. An estimated 8,000 full-time jobs existed in hog production in North Carolina in 2007. With an estimated five percent reduction in hog production in the state, about 400 full-time jobs have been lost. Each job in hog production is estimated to support 2.43 jobs elsewhere in the North Carolina economy. The loss of 400 jobs in hog production resulted in an estimated 970 jobs lost elsewhere in North Carolina, for a combined loss of 1,370 jobs in the state.

Capital losses due to reduced hog production include the loss of capital invested in buildings, land improvements and equipment. Buildings and equipment dedicated to hog production were estimated to have a depreciated value of $500 million in 2007. Abandoning five percent of that capacity resulted in a loss of $25 million in capital and property tax base.

Reduced hog production also reduced pork packing and processing. North Carolina experienced reductions in pork processing capacity over the past year. Further reductions are possible if hog production is further reduced in the state and regionally. The North Carolina pork processing sector was estimated to employ 11,686 people and generate $450 million per year in (value-added) income in 2007. The five percent reduction in pork packing and processing is estimated to have caused a loss of 584 full-time jobs and $22.5 million in annual income in North Carolina. Each job and $1 of income in pork processing are estimated to support 0.565 jobs and 59¢ of income, respectively, elsewhere in the North Carolina economy. So the five percent reduction in pork processing is estimated to have cost the rest of the state's economy 330 full-time equivalent jobs and $13.3 million of income.

Suffice to say, when added to the losses imposed on the state's broiler and turkey industries by higher feed prices, the effects of the current economic disaster in the U.S. pork industry are particularly severe in North Carolina. But North Carolina is by no means unique. The economic crisis is being felt by producers in Georgia, Iowa, Kansas, Minnesota, Oklahoma, Pennsylvania, Texas, Wisconsin, and, in fact, in all pork-producing states, with some hog farmers going out of business and others on the brink of bankruptcy.

**Pork Industry Efforts**

For its part, the U.S. pork industry has been working over the past 2 years to help pork producers deal with the economic crisis. NPPC has worked closely with the previous and with the present Administration to keep export markets open.

NPPC officers and staff, for example, have worked with their counterparts in Canada and Mexico to keep pork trade flowing to those important U.S. markets and have collaborated with the Office of the U.S. Trade Representatives (USTR) to resolve trade issues with Australia, Mexico and the Philippines.

29

Of course, the organization has been a strong and consistent supporter of additional free trade agreements—including the pending FTAs with Colombia, Panama and South Korea—which historically have boosted U.S. pork exports.

When the 2009 novel H1N1 flu outbreak occurred in late April, NPPC worked closely with the National Pork Board and the Obama Administration to communicate to the media, the public and U.S. trading partners that pork is safe to eat and that the 2009 novel H1N1 virus is not transmitted through food, including pork.

NPPC also has asked the U.S. Department of Agriculture to provide assistance to struggling producers.

In April 2008, with no signs of the then-6-month-old crisis abating, NPPC officers met with then-Agriculture Secretary Ed Schafer to ask that the Department make a supplemental purchase of pork. (USDA annually buys pork and other products for various Federal food programs. It bought $62.6 million of pork in 2008, for example.) They also asked that the Secretary implement emergency programs and loan guarantees to help producers purchase feed, consider allowing early release without penalty of non-environmentally sensitive Conservation Reserve Program acres back into crop production and support pork exports through USDA's Market Access Program and Foreign Market Development Program. The Bush Administration May 1, 2008, agreed to purchase up to $50 million of pork products.

At the beginning of 2009 and once more just after the 2009 novel H1N1 flu outbreak in late April, NPPC again asked USDA to lend assistance to the U.S. pork industry, each time urging Secretary Tom Vilsack to make additional supplemental purchases of pork. USDA in late March agreed to buy $25 million of pork.

Finally, in August of this year, NPPC yet again urged USDA to take immediate action to address the continuing pork industry economic crisis, asking that the agency to:

- Purchase immediately an additional $50 million of pork for various Federal food programs, using fiscal 2009 funds.
- Use Section 32 funds to purchase pork. Section 32 uses customs receipts to buy non-price-supported commodities for food-assistance programs.
- Buy on Oct. 1 a minimum of $50 million of pork, using fiscal 2010 funds.
- Use $100 million of the $1 billion appropriated for addressing the 2009 novel H1N1 virus for the swine industry, including $70 million for swine disease surveillance, $10 million for diagnostics and 2009 novel H1N1 vaccine development and $20 million for industry support.
- Work with USTR to open export markets to U.S. pork, focusing on the countries, including China, that continue to impose unwarranted H1N1-related bans on U.S. pork.
- Study the economic impact on the livestock industry of an expansion of corn-ethanol production and usage. The U.S. Environmental Protection Agency has proposed raising the cap on blending ethanol into gasoline to 15 percent from its current ten percent.

In early September, USDA agreed to purchase $30 million of pork, using fiscal 2009 funds.

NPPC is grateful to USDA for its assistance and strongly urges the Department to make additional pork purchases. It also is grateful to the Members of Congress who signed onto a letter circulated by Congressmen Tim Walz, D-Minn., and Steve King, R-Iowa, to Sec. Vilsack, asking that USDA make additional purchases of pork.

NPPC now asks that Congress reexamine the spending cap placed on Section 32 funds as part of the 2008 Farm Bill. NPPC believes such action is warranted given that economic conditions in the livestock, dairy and poultry industries now are materially different than they were during most of the farm bill debate. While it understands that lifting the Section 32 cap is a long-term goal, the U.S. pork industry is prepared to work with Congress to achieve this outcome.

**Conclusion**

The U.S. pork industry is an integral part of the U.S. economy, generating more than half a million jobs, adding nearly $35 billion to the gross national product, contributing to a positive agriculture balance of trade and providing consumers around the globe with the safest, most nutritious meat protein in the world.

The industry, so far, has weathered the now 2 year-old economic crisis, which is not of its own making but is the result of forces mostly beyond its control, through the perseverance of the producers who every day provide the best care possible to their hogs, use animal health products judiciously and responsibly, protect the environment, watch out for the safety of their workers and contribute to the communities in which they live and work.

30

As it did a decade ago when pork prices plunged to record lows, the U.S. pork industry will survive the current economic crisis—though, no doubt, as a much smaller sector. But U.S. pork producers are in need of lawmakers' continued assistance, and that means:

- Making additional purchases of pork for Federal food-assistance programs.
- Working with U.S. trading partners to get them to keep open or, if they've closed them, re-open their export markets.
- Passing free trade agreements, including the pending ones with Colombia, Panama and South Korea.
- Allowing the ethanol import tariff and Federal blenders' tax credit to expire.
- Studying the economic effects on the livestock industry of an increase in the amount of ethanol blended into gasoline to 15 percent from the current ten percent.
- Approving regulations and legislation that promote pork producers' ability to run their operations.
- Opposing regulations and legislation that would place an undue burden and higher costs on U.S. pork producers such as a ban on certain antibiotics.

With a little help, the U.S. pork industry will bounce back and continue to provide safe, nutritious pork products to consumers worldwide.

FIGURES

**Figure 1**

*Cash Corn Price, Omaha, Weekly*



Source: USDA, Agricultural Marketing Service.

31

**Figure 2**
*Oil and Corn Prices Link*



**Figure 3**
*Actual & Predicted Hog Production Costs \**



\* Based on relationship between ISU Estimated Costs & Returns data and
historic Omaha corn and Decatur soybean meal prices.

32

Mr. BOSWELL. Thank you for your testimony.
Mr. Greenwood.

### STATEMENT OF MARK GREENWOOD, VICE PRESIDENT, AGRI BUSINESS CAPITAL, AGSTAR FINANCIAL SERVICES, MANKATO, MN

Mr. GREENWOOD. Thank you, Members of the Subcommittee, for inviting me to present testimony today regarding the availability of credit for the swine industry. My name is Mark Greenwood. I am Vice President of commercial lending for AgStar Financial Services headquartered in Mankato, Minnesota. AgStar Financial Services is a cooperative owned by our client stockholders and is one of 95 institutions that together comprise the Farm Credit System. AgStar is one of the larger farm credit associations serving more than 23,000 clients and managing nearly $8 billion in loan and lease assets. My testimony today represents the views of AgStar and does not represent the views of the entire Farm Credit System.

My role at AgStar is managing the swine portfolio, which represents $1.4 billion in loan and lease volume, serving nearly 1,200 clients throughout the United States. I exclusively handle swine loans and leases with producers of all sizes. I was born and raised on a hog farm in southern Minnesota. I have been involved in the swine industry for my entire business career.

I can clearly tell you that the current financial situation the industry is facing is the worst I have ever seen in 28 years in working with swine producers. In October of 2007, the loan portfolio of swine producers that I worked with was in the best shape ever. Average owner equity was close to 70 percent. Working capital was abundant and most producers were in a very strong financial position. Most of these producers believed that they could handle some adversity for the future. Many producers I worked with had no debt and had a cash surplus. Now many of these same producers face dire financial circumstances.

I am going to show a couple slides here. It just talks about volatility and cost of production from where we saw it, basically, back in 2006. In August of 2008, cost of production was actually 145 percent greater in 2008 than it was back in 2006. This year it was 121 percent greater than it was back in 2006. And the other point to make is just volatility in the marketplace. Just in this past year, it is unprecedented. I received an e-mail from a market advisor in Chicago and he said I have never seen this in 25 years. We have seen costs of production from September 2007 to today actually increase by 15 to 20 percent. This is a span of 6 to 7 weeks. This is unprecedented.

The next point is just looking at owner equity decline, and this is where I see the industry. We are currently at about 30 percent owner equity, and the scenarios that we have seen in many swine producers, from a lender's perspective, when the owner equity is approaching 30 percent, the risk in the credit increases dramatically. The borrower is likely to have tapped all their cash reserves and now you are at a crossroads, and that is where I see the industry today. We are truly at a crossroads both for the producer and the lender. From a lender's perspective, the last thing we ever want to do is put people out of business. However, it does not make

33

sense for us to keep funding losses forever. The outlook for the next 6 months shows that more loses are coming. Without clear indications this down spiral in equity will change, prudent lenders and producers face difficult decisions about whether the best choice is to exit the business.

The economic stresses facing the pork industry have far-reaching impacts on towns, small businesses and families in the heart of rural America and beyond, because money generated by pork production circulates many times in the economy. When a pig owner is in financial trouble, it affects many people. Young and beginning farmers that are contract growers for the pig owners now have empty barns and no source of revenue to service their debt. That producer used to generate sales for local feed dealers, equipment suppliers, veterinary services and other local business, all which are now being affected because the producers are getting out of the industry. The volatility of this industry will impact capital availability, going forward. Lenders will not be willing to lend into an industry that has lost money unless there is a stronger linkage with a financially strong supplier, going forward. Remember, we had producers with no debt in 2007 that are now insolvent. Under the current system, pigs are being bought. Lenders and producers are not going to be in the same position to have this happen again.

In conclusion, the pork industry needs your help. Offering higher FSA loan limits would help lenders deal with the risk of continuing to provide credit to the industry. The current loan is simply too low for many family farmers. USDA should aggressively help by purchasing pork for use in Federal food programs. We thank you for your past support. Also, helping on the export and free trade would also be a benefit. The success has led to the industry to the brink of economic collapse for being the best in the world at what we do. The industry needs your help and support. As a lender, rest assured we are doing all that we can to stay with the industry and our borrowers, but we can't put the institution at risk by doing so.

I thank you for holding this important meeting today and I would be glad to answer any questions that you may have for me. Thank you.

[The prepared statement of Mr. Greenwood follows:]

PREPARED STATEMENT OF MARK GREENWOOD, VICE PRESIDENT, AGRI BUSINESS CAPITAL, AGSTAR FINANCIAL SERVICES, MANKATO, MN

Thank you Chairman Scott, Ranking Member Neugebauer, and Members of the Subcommittee for inviting me to present testimony today regarding the availability of credit for the swine industry.

My name is Mark Greenwood. I am Vice President of Commercial Lending for AgStar Financial Services, headquartered in Mankato, Minn. AgStar Financial Services is a cooperative, owned by our client-stockholders, and is one of 95 institutions that together comprise the Farm Credit System. We provide a broad range of financial services and business tools for agricultural and rural clients in Minnesota and northwest Wisconsin. AgStar is one of the larger Farm Credit associations, serving more than 23,000 clients and managing nearly $8 billion in loan and lease assets. My testimony today represents the views of AgStar and do not necessarily represent views of the entire Farm Credit System.

My role at AgStar is managing the swine portfolio, which represents over $1.4 billion in loan and lease volume serving nearly 1,200 clients throughout the United States. I exclusively handle swine loans and leases with producers of all sizes. I was born and raised on a hog farm in Southern Minnesota and have been involved in the swine industry for my entire business career. I can clearly tell you that the cur-

34

rent financial situation the industry is facing is the worst I have ever seen in 28 years of working with swine producers.

In October of 2007, the loan portfolio of swine producers that I worked with was in the best shape ever. The average owner equity was close to 70%, working capital was abundant, and most producers were in very strong financial position. Most of these producers believed that they could handle some adversity for the future. Many producers I worked with had no debt and had a cash surplus. Now, many of these same producers face dire financial circumstances.

In the past 24 months, volatility in both the cost of production and in the revenue producers receive has increased dramatically. In 2008, the average cost to raise a hog was approximately $165 a head and revenue was close to $140 a head. While this was one of the better years recently in terms of revenue, because of higher costs, most producers lost on average close to $25 per head. Producers that raised the majority of their own corn fared better because the cost to raise a bushel of corn was significantly less than producers who had to buy their corn. The best estimate for producers that raised their own corn actually broke even in 2008, but in 2009 since the cost to raise a bushel of corn increased significantly, their losses have been larger than producers that were buying a majority of their corn.

During 2009, the average loss per head has been about $25 per head, just as it was in 2008. Considering this level of losses over the past 24 months, the overall losses for producers are now approaching $5 billion. If you relate this to an average family farmer, assume a farm has 1,200 sows and they finish all of the animals. They had total assets of $3 million and in October of 2007, they had a net worth of 70% which equals $2.1MM. Again, if we assume the farm has lost $25 per head for the past 24 months, their total losses would equal $1,200,000 and their owner equity will have fallen to 30% from the 70% it was 2 years ago. This scenario is the norm for what we are seeing on many swine operations. From a lender's perspective, when the owner's equity is approaching 30%, the risk in the credit increases dramatically because the borrower is likely to have tapped all of their cash reserves and you now are at a crossroads. This is where I see the swine industry today; we are truly at a crossroads both for the producer and the lender. From a lender's perspective, the last thing we ever want to do is force people out of business. However, it does not make sense for us to keep funding losses forever. The outlook for the next 6 months shows that there are more losses coming. Without clear indications that this downward spiral in equity will change, prudent lenders and producers face difficult decisions about whether the best choice is to exit the business.

The economic stresses facing the pork industry have far-reaching impacts on towns, small businesses, and families in the heart of rural America and beyond, because money generated by pork production circulates many times in the economy. When a pig owner is in financial trouble, it affects many other people. Young and beginning farmers that are contract growers for the pig owners now have empty barns and no source of revenue to service their debt. That producer used to generate sales for local feed dealers, equipment suppliers, veterinary services and other local businesses all of which are now being affected because the producers are getting out of the industry.

The volatility of this industry will impact capital availability, going forward. Lenders will not be willing to lend money into an industry that has lost money unless there is a stronger linkage with a financially strong supplier, going forward. Remember we had producers with no debt in 2007 that are now insolvent, under the current system pigs are being bought. Lenders and producers are not going to be in the same position to have this happen again.

We are seeing producers cut back, but it is taking time for this process to impact the marketplace. The industry, according to many economists, needs to shrink by 8–10 million head or something must be done to stimulate that much more consumption. If the only alternative is to shrink production, this will result in significant job loss in rural America and will also affect many main street rural businesses.

In conclusion, the pork industry needs your help. Offering higher FSA loan limits would help lenders deal with the risk of continuing to provide credit to the industry. The current loan limit is simply too low to help many family farmers. USDA should aggressively help by purchasing pork for use in various Federal food programs. The U.S. pork industry has proven it is the best in the world at raising pork from a competitive standpoint. That success has led the industry to the brink of an economic collapse. The industry needs your help and support. As a lender, rest assured, we are doing all that we can to stay with the industry and our borrowers but we can't put the institution at risk by doing so.

35

I thank you for holding this important hearing today, and I am glad to answer any questions that you may have for me.

36

ATTACHMENT





37





38

Mr. Boswell. Thank you.
Dr. Buhr.

### STATEMENT OF BRIAN BUHR, Ph.D., PROFESSOR, HEAD AND E. FRED KOLLER CHAIR IN APPLIED ECONOMICS, UNIVERSITY OF MINNESOTA, ST. PAUL, MN

Dr. Buhr. Mr. Chairman, Members of the Subcommittee, thank you for inviting me here today. I am Brian Buhr, Professor, Head and E. Fred Koller Chair of Applied Economics at the University of Minnesota. My specialization is agriculture commodity marketing and price analysis with an emphasis on the livestock and meat sector. I received a Ph.D. at Iowa State University in 1992.

The U.S. pork industry is undergoing the longest and deepest economic loss in the past 20 years. Records complied by the University of Minnesota Center for Farm Financial Management show losses over $13 and over $10 per head sold in 2007 and 2008, respectively. Multiplying these per-head losses by the 250 million head of hogs marketed in 2007 and 2008 indicates a total pork industry farm loss of $2.5 billion in those 2 years. Producers are expected to lose another almost $31 per head in 2009 for another annual loss of $3 billion. This would bring the total 3 year losses to $5.5 billion.

It is likely losses will continue well into 2010. With current corn prices at $3.50 a bushel in April 2010, lean hog futures trading at $65, producers will just break even on these pigs, assuming they buy all their feed needs for finishing right now. However, significant concern is that cost increases will again undermine profitability. Crude oil prices are rising with December crude oil futures moving from $66 a barrel in September to nearly $80 a barrel in October. With the link to crude oil through ethanol, December 2009 corn futures have also rallied from $3 a bushel to $3.80 a bushel in October. Any further increases will deepen the pork industry's losses and extend their length.

With large losses in 2009, pork producers are expected to reduce production by about 2.5 percent. However, my estimate suggests that the pork industry will need to reduce production another seven percent to reach sustained profitability. This will result in as much as a 30 percent increase in retail pork prices at a time of economic distress for consumers as well. Still, with 2 years of losses, one has to ask, why didn't pork producers reduce production sooner? Are pork producers responsible for mismanaging their production levels? The answer is no. Looking back at futures prices demonstrates why. For the entire period of 2007 through 2010, the June lean hog futures price averaged $76 per carcass hundredweight. These prices were easily observed by producers, and using these values and other production cost results in a break-even corn price of $4.90 a bushel, well above the average corn price of $3.90 a bushel. Producers rightfully formed economic expectations that hog prices would follow cost increases and pork production would be profitable. Unfortunately, national cash hog prices, the price that producers actually receive when hogs are sold, averaged only $62 per carcass hundredweight for the period, $15 below the average futures price. Why was there this discrepancy between expectations and outcomes? While producers observed higher feed prices

39

and higher lean hog futures prices, very few anticipated the global financial crisis causing a dramatic run-up in the dollar, reducing export demand, or the public relations disaster of the H1N1 flu virus being misnamed swine flu and the resulting importer restrictions on U.S. pork, or the productivity boosting benefits of new porcine circovirus vaccine or the prolonged economic downturn resulting in increased unemployment and lower personal income that will likely continue to reduce demand. In short, unlike other hog cycles where producers' own actions may have had a significant role in determining the best and worst outcomes, this hog cycle has much to do with conflicting market signals and several broader economic events outside the fundamentals of the pork industry that arguably victimized otherwise good producers.

In conclusion, the pork industry is under severe financial distress, having lost over $5.5 billion in the past 3 years. Among many potential policy responses I would like to suggest five possible actions. One, provide increased capital to agricultural lenders to support their balance sheets and maintain credit to high-quality producers; two, promote risk and business management education programs we have heard about earlier; three, support additional farm mediation resources for producers under stress; four, increase pork purchases in response to increased need for food assistance programs due to rising unemployment and declining personal incomes; and fifth, support opening international markets and reducing unsubstantiated barriers to U.S. pork imports.

Mr. Chairman, thank you for the opportunity to present this testimony. I look forward to hearing your questions.

[The prepared statement of Dr. Buhr follows:]

PREPARED STATEMENT OF BRIAN BUHR, PH.D., PROFESSOR, HEAD AND E. FRED KOLLER CHAIR IN APPLIED ECONOMICS, UNIVERSITY OF MINNESOTA, ST. PAUL, MN

**Situation**

The U.S. pork industry is undergoing the longest and deepest economic losses in the past 20 years. Farm records compiled by the University of Minnesota Center for Farm Financial Management (CFFM) (*www.cffm.umn.edu*) show losses were $13.40 per head sold in 2007 and $10.27 per head sold in 2008. Estimates from Iowa State University suggest losses have been even greater: $14.55 per head in 2007 and $21.99 per head in 2008. The deeper losses estimated by Iowa State are because they assume that only prices impact profits. However, actual farm records likely demonstrate that producers respond to lower prices by trying to change production practices thereby reducing costs and providing some mitigation.

CFFM data shows losses for the industry, which had a federally inspected market hog harvest of more than 104 million head in 2007 and 111 million head in 2008, total about $1.4 billion in 2007 and more than $1.1 billion in 2008. This total of more than $2.5 billion in losses since 2007 is greater than the estimated $2.4 billion losses in 1998, which according to CFFM records was a 1 year event followed by positive profits typified by the usual hog cycle.

Based on year to date numbers, 2009 is shaping up to be even worse than 2007 and 2008 making this the longest continuous stretch of losses for the modern pork industry. My projections, based on cost parameters from CFFM and hog, corn and soymeal prices from January 2009–September 2009, estimate losses of $30.85 per head for 2009. For any individual producer, this number will be higher or lower depending on when and at what price they purchased feed inputs and marketed hogs, and *how* they marketed hogs (for a negotiated price or under some form of contract). The losses are more dependent than normal on these factors because of the extraordinary volatility the pork industry has faced during the past 2 years. For example, the 27 percent of producers that sell under "other market formula" or "other purchase arrangements" instead of on a "negotiated" basis or a "swine/pork market formula" basis, sold hogs at an average of $6 per hundred pounds of carcass weight

40

higher. If a producer purchased a significant share of corn in fall 2006 for 2007 feeding needs, the producer paid about $2.40 per bushel for corn. If corn was purchased throughout 2007 or 2008 a producer paid an average $3.39 to $4.78 per bushel for corn and if the producer purchased at the high of 2008, as many ethanol plants did out of concern for even higher projected prices, the producer paid as much as $5.47 per bushel. In short, this hog cycle has much to do with conflicting market signals and some key decisions that may be as much about luck as about management, arguably victimizing otherwise good producers.

It is likely losses will continue well into 2010. Pigs born in October 2009 will be sold in April 2010. With current corn prices at $3.54 per bushel and April 2010 Lean Hog futures prices trading at about $65 per carcass hundredweight, producers will just break-even on these pigs assuming all feed needs for finishing are purchased now. However, corn prices are once again rising and delay break-evens further into the future. The period between October and April will be worse, with average losses between $10 and $23 per head. At current market hog harvest rates about 2.5% less than 2008, the total expected loss for 2009 will be about $3 billion. This will bring the 3 year total losses to over $5.5 billion since the beginning of 2007.

### How Did the Pork Industry Get Here?

#### *Non-Pork Sector Causes*

How did the pork industry get into this situation? There is one very direct reason the pork industry had losses beginning in 2007—high corn and soybean meal prices that began in August 2006. *Figure 1* shows the prices of corn and soybean meal back to 1996. In August 2006 there was a sharp increase in prices of all crops; this dramatic change did not allow pork producers to respond with reduced production.

What was the cause of higher crop prices? *Figure 2* shows total corn demand by type of use. There has been an increase in corn use for food, feed and industrial uses which includes ethanol. Part of this increased use was due to renewable fuel standards, but it's unlikely that this was the sole cause of the dramatic price increases. Another factor was the rapid global economic growth and declining dollar which led to increased demand for commodities including oil and grains, and also an increase in meat demand that itself increased demand for feed grains and oilseeds. This rising global growth, coupled with rising demand affecting broader commodities is a key factor in the pork industry's lack of immediate response.

All indications in 2006 and even into 2007 were that global demand for agricultural commodities would continue to rise. Although a forward looking pork producer was concerned about rising grain prices, the reasonable expectation was that hog and pork prices would eventually follow. Essentially, like much of the rest of the world, including Federal Reserve Chairman Bernanke (*WSJ*, 7/16/08), pork producers expected growth to continue and prices to rise—allowing global growth to pull them out of the looming cost price squeeze.

The expected potential for price improvement is shown by the dramatic increase in pork exports in *Figure 3*. In hindsight, this chart also shows how much exports have declined since the highs, although pork exports remain on long run trend in recognition of the overall strength of demand for U.S. pork.

41



*Figure 1.* Weekly Omaha no. 2 corn and Decatur 48% protein soybean meal (1996–present).



*Figure 2.* Total corn disappearance by type of use. *Source: USDA, ERS Feedgrains Database.*

42



*Figure 3.* U.S. total net pork exports and pork exports to selected countries.

Part of this brief run-up in exports was due to global economic conditions and illustrated by the dramatic fluctuations associated with the dollar shown in *Figure 4*. As shown, pork exports increased as the value of the dollar decreased more rapidly beginning in 2002 and 2003. Exports, especially to China, react in tandem with the currency exchange rate primarily because the Chinese yuan does not freely float, so that a declining dollar or increasing dollar almost impacts the cost of pork to China on a one-for-one basis. This has again created global volatility difficult for pork producers to respond to, and which is not driven solely by the supply and demand factors fundamental to the pork sector. This trade relationship is also impacting other protein sectors such as dairy products.

### *Pork Industry Fundamental Causes*

Certainly fundamental aspects of pork markets have played a role in the current crisis. *Figure 5* shows annual September hog inventories. The overall trend for breeding herd is declining, primarily due to the increased productivity for each sow in the breeding herd. The productivity contrast is shown by the sharply increasing market hog inventories. This productivity increase has allowed producers to maintain a reasonably valued pork product for consumers, even in light of rising feed costs. The large relative increase in market hog inventories in 2007–2008 is due to a new porcine circovirus vaccine that reduced hog mortalities. This was another factor (economic shock) not anticipated by pork producers when making production decisions.

43



*Figure 4.* Trade weighted dollar exchange rate index and net pork export relationship.



*Figure 5.* Hog inventory trends and increasing productivity per sow.

Higher inventories resulted in both higher slaughter and production levels during 2007 and 2008 as shown in *Figure 6.* The rising production levels relative to slaughter (narrowing gap between slaughter and production) are due to higher slaughter

44

weights in hogs. This is again due to production efficiency improvements where hogs can be fed more cost effectively to heavier weights using less feed.



*Figure 6.* Federally inspected hog slaughter and pork production.

As shown in *Figure 5*, the pork industry is now responding to the sharply deteriorating market conditions experienced in 2009 by reducing breeding herd and market hog inventories by about 2.5 percent. However, using an equilibrium model of the pork industry that allows for simulation of quantity and price relationships, it is estimated that the total reduction in pork supplies to achieve the 21 percent increase in prices necessary to reach break-even is about ten percent—or an additional 7.5 percent reduction in hog and pork supplies. This dramatic reduction in pork production will also result in a nearly 30 percent increase in retail pork prices, increasing food prices at a time of rising unemployment and declining personal income.

The demand side of the pork fundamentals is somewhat mixed. *Figure 7* shows a scatter plot of pork demand with a linear trend line fit to represent price quantity trade-offs by consumers. Points approaching the origin represent weaker demand and points moving up to the right represent stronger demand—that is, consumers willing to consume more pork at higher prices. Domestic pork demand has been low relative to historical levels ever since 2005. This has been offset by very strong export demand for U.S. pork and these points also belie the fact that total consumption is at record levels, because it is affected by total population. Still, maintaining pork demand is a key concern as the economy weakens, unemployment rises, and personal incomes decline (*Figure 8*). Surprisingly, 2009 has been relatively strong (higher quantity consumed at slightly higher prices) compared to 2008 especially in light of concerns regarding the effects of H1N1 on consumer perceptions regarding pork safety. The Food Industry Center in Applied Economics at the University of Minnesota has created a "Consumer Food Safety Tracker" to track consumer knowledge about media information on food safety events. On April 29, 2009 they began tracking consumer response to H1N1. Within 3 weeks 99.3 percent of consumers had heard of H1N1. More importantly, in the first 13 weeks, 3.6 percent of respondents said they would avoid eating pork and 2.5 percent said they would avoid eating pork in the last 5 weeks (ending late September). It is not clear what impact this has had on actual demand, but it illustrates the importance of communication and effective information on these issues that could adversely affect demand. In summary, two key external factors—weakening consumer purchasing power and H1N1 also are likely to negatively impact pork demand.

45



*Figure 7.* Retail pork demand, 1990–present.

Many unforeseen factors including food and grain price inflation brought on by global economic growth, a declining U.S. dollar and rising oil prices placed cost pressure on pork production. This was followed by the global economic crisis that dramatically increased the value of the dollar and reduced foreign demand for U.S. pork products. Domestically, a new vaccine to reduce circovirus death loses increased supplies while rising unemployment and the emergence of H1N1 influenza softened domestic consumer demand for pork.

46



*Figure 8.* U.S. unemployment rate and personal income levels, 1990–2010.

### Why Didn't Pork Producers Reduce Production Sooner?

With 2 years of loses, why didn't pork producers reduce production sooner? Are pork producers responsible for mismanaging their production? The answer is no. *Figure 9* shows a continuous series of futures prices for the June Lean Hog futures contract for the period 2006–current. These are the hog prices a pork producer would look at in making production decisions.

For the entire period of 2007 through 2010, the June Lean Hog futures price averaged $76.06/carcass cwt. These prices were easily observed by producers, and accounting for soybean meal prices ($310/ton), weaned pig prices ($35/head) and other costs, result in a break-even corn price of $4.86/bushel. Therefore, producers rightfully formed expectations that hog production would be profitable. Unfortunately, *Figure 9* also shows that national cash hog prices (the price actually received at delivery) averaged $62/carcass cwt. for the period, $15/carcass cwt. below the average futures price, and most likely due to the external economic shocks described earlier.

June has on average the highest seasonal price of the year. However, a similar result emerges for December hogs which tend to average about 10% lower than the overall annual average for hogs. *Figure 10* shows the average December futures price of $65.64 was closer to the average cash price of $62.53, but most producers would look at this futures price as a seasonal low anticipating that the average for the rest of the year would be higher. Even assuming this price, the break-even corn price with $310 per ton soybean meal would have been $3.54/bushel, only about $0.40 below the average price of corn the past several years.

47



*Figure 9.* Continuation series of June Lean Hog futures prices 2007–2010.



*Figure 10.* Continuation series of December Lean Hog futures prices 2007–2010.

Obviously, corn prices were rising during this period, so it is possible that producers should have cut back if they expected losses due to rising costs. *Figure 11* shows the hog-corn price ratio for June Lean Hog futures and July Corn futures as a proxy for profit margins. The results again show that for all but mid-2008 when

48

corn prices spiked dramatically, pork producers could expect hog production to be profitable. Again, as market conditions eroded for hogs more than corn the actual cash prices received resulted in much lower returns than anticipated and likely forestalled more rapid and decisive reductions in the herd.



*Figure 11.* Hog-Corn price ratio comparison of expected profit margins.

This illustrates that while profitability remained negative, producers were reasonable in expectations from a theoretical standpoint that higher feed costs would eventually lead to higher hog prices. The observed futures markets provided real evidence that the theory was supported by traders and one could argue that futures traders also bought into that theory. However, very few anticipated the global financial crisis causing a dramatic run up in the dollar reducing export demand; the public relations disaster of the H1N1 flu virus being misnamed swine flu; the productivity boosting benefits of a new circovirus vaccine; and the prolonged downturn in employment and personal income that will likely reduce demand.

Even with these unanticipated shocks, why didn't pork producers lock in profits when they had the opportunity to do so? The primary reason is the extreme volatility during this period. During periods of rapidly changing markets, locking in prices can be as risky as just staying in the open market expecting that hog prices would follow corn prices as described earlier. The ethanol industry provided a dramatic illustration of what could happen if proper hedges weren't placed. In addition, the use of hedges or options becomes more costly during these periods as hedge margin requirements increase and option premiums can be very high due to high volatility. *Figure 12* shows the implied volatility of corn from 2005 to 2009. Implied volatility is calculated based on option premiums for underlying futures contracts. A higher volatility implies more risk and option premiums are higher to account for this risk. From 1997–2004, the annual average implied volatility was 23.64 percent, since 2004 it has averaged nearly 33 percent and recently it has hovered between 40 and 50 percent, making it difficult to execute risk mitigation strategies.

49



*Figure 12.* Corn implied volatility.

The concern, going forward, is that this economic scenario of high volatility and rapid cost increases will repeat itself. Crude oil prices are again rising, moving from $66/barrel in September to nearly $80 per barrel in mid-October for December Crude Oil futures. With the link to ethanol, December 2009 corn futures have also rallied from near $3/bushel in September to near $3.80 in October. Further increases will deepen the pork industry's losses and extend their length.

Producers are beginning to respond with lower production, primarily because they have eroded their equity base in production and can no longer simply hope that markets improve as has been anticipated. As described earlier, by mid-2010 there should be a rise in pork prices and profitability. There is potential, given the deep economic distress, that the liquidation will be extreme, on the order of ten percent of total production. A disorderly and extreme liquidation will ultimately harm consumers, also under economic distress, by increasing retail pork prices by as much as 30 percent.

**What Are Some Possible Policy Responses?**

The pork industry functions as a relatively competitive market with mostly secondary benefits from price and income stabilization programs. However, given the short term nature of this problem it is possible to provide some support to producers that can help mitigate the crisis.

1. *Provide capital or loan guarantees to agricultural lenders to support competitive pork producers.* While many community and local banks have withstood the credit crisis relatively well compared to the global banking community, the ability to continue to carry significant losses on their balance sheet is limited. Providing capital to lenders allows for them to work with producers and counsel them on strategies, going forward, while helping to provide a more stable transition.

2. *Financial mediation for pork producers.* Anecdotally, farm mediators in Minnesota are being overwhelmed with new cases. Many veteran mediators who may have retired from extension service or other agencies are being called back. There is a real need to train and attract more professionals to serve as farm mediators. The Extension Service is one possible conduit to provide mediation support services to help producers make good decisions under financially stressful circumstances. This should also include family counseling on stress.

50

3. *Expand educational programs in marketing and business planning.* As the report demonstrates, there were ample opportunities for producers to lock in profits using futures or other risk management strategies. Those who have the necessary marketing skills have done quite well, however, those who do not, have had substantial loses. Increasing support of educational programs on risk management can benefit pork producers. Greater sophistication is needed with greater systemic volatility.

4. *Pork purchasing programs for school lunch and food shelf aid.* According to the Minnesota Department of Human Services, the number of households using food stamps increased 30 percent from 2008–2009 and visits to Minnesota food shelves were greater than two million for the first time (*Star Tribune,* 9/28/09). At a time of high demand for food assistance programs, it seem natural to purchase pork to help support unprecedented needs based on nearly 10% unemployment rates and declining personal income.

Mr. BOSWELL. Well, thank you, Dr. Buhr.

Before we move on, I would like to recognize that Mr. Moran has joined us. He is not part of the Subcommittee, but he is certainly part of the full Committee, and my working partner on the risk management side of it. I have consulted with Mr. Goodlatte and we decided we would like to have you have full participation in the Committee today.

Mr. MORAN. Mr. Chairman, thank you very much for allowing me to join you, and I would ask unanimous consent that I be allowed to join the panel today.

Mr. BOSWELL. You just heard it was given.

Mr. MORAN. It is two for two. Thank you very much, Mr. Chairman.

Mr. BOSWELL. With that, I would like to pass on to our next witness, Mr. Brenneman.

## STATEMENT OF ROD K. BRENNEMAN, PRESIDENT AND CEO, SEABOARD FOODS LLC, SHAWNEE MISSION, KS

Mr. BRENNEMAN. Mr. Chairman, Ranking Member and Members of the Subcommittee, thank you for the honor and privilege to appear before you today. My name is Rod Brenneman and I am the President and CEO of Seaboard Foods. I have provided the Subcommittee with lengthier testimony for the record, so I will limit my comments this morning to 5 minutes in keeping with the rules.

Mr. Chairman, there are many challenges facing the economic viability of the pork industry including higher input costs for feed and energy, an overabundance of supply in the domestic market, weakening demand and international trade barriers. Higher feed and energy prices shape production decisions and prices paid for feed doubled from 2006 to 2008, mainly due to higher corn and soybean meal prices. By mid-2008, corn prices were nearly 150 percent higher than prices were in 2007, and soybean meal prices reached record levels during this same time period.

While there are various reasons for the increase in feed prices, certainly one of them has been the determined government policies to promote the use of corn for ethanol. This effort, while seeking a desirable goal, which is to lower the U.S. reliance on fossil fuels, has had an unfortunate, unintended consequence to the U.S. meat industry and ultimately to consumers. In my opinion, this policy must be reevaluated.

Increase in energy prices has also affected the pork sector. Meat products require energy-intensive refrigeration and pork supplies

51

in cold storage at the end of 2009 were estimated to be 517.9 million pounds, which is three percent higher than last year at this time and over 19 percent higher than the 5 year average. To keep pace with rising feed and energy prices, product pricing must also rise. However, prices have not risen at an adequate rate as supply has outpaced demand.

From a supply side, the productivity of U.S. hog production has continued to increase, and while the long-term trend is up approximately 1½ percent per year, the past number of years have seen an even greater increase in productivity. Granted, the total volume of pork produced is lower in 2009 than it was in 2008, but the reduction is still not enough to return pork producers to profitability. We will need to right-size the industry by either a further reduction in supply, an increase in demand or, more likely, some of both.

From a demand standpoint, this past summer's economic data on prices paid for hogs and pork continues to languish. Economic factors facing both domestic and foreign consumers in a recessionary period can be pointed to as one reason for low hog and pork prices and lower export demand.

Another major reason for the drop in hog and pork prices was the outbreak of the novel H1N1 influenza. Despite the fact that it was a human illness and not a swine illness, this outbreak in April of 2009 had a significant and immediate impact on the domestic and international pork markets. While the initial media frenzy misnamed and mischaracterized this as a food safety issue, this is not a food safety issue at all but rather a human health issue. If projected out to the end of 2009 and beyond using the futures prices in effect the day prior to the announcement of H1N1, which was on April 24, the true cost of this to the pork industry may well exceed $2 billion.

The outbreak of the H1N1 virus led to the enactment of new trade barriers. Of the 17 countries that banned pork and pork products from the United States, most notably were Russia and China. Before the ban, China was one of our fastest growing markets for pork exports. Until this year the United States had enjoyed 17 straight years of growth in pork exports. The United States pork industry is extremely competitive in the world markets and we must work hard to maintain open access to all markets and expand into new ones. In my opinion, the government should not try to address this issue by promoting subsidies to producers as the industry must downsize and the markets will force this to occur. We cannot allow trade barriers to be put in place against U.S. exports, and similarly, we should not take a protectionist posture against our trade partners. We need to let the markets work.

In conclusion, I want to recommend two areas for the Subcommittee to pursue immediately. Number one, to encourage and work with the Secretary of Agriculture to immediately make Section 32 funds available for additional purchases of pork for various Federal food programs. An emphasis should be placed on purchasing meat from sows with an objective to reduce breeding stock and correspondingly reduce market hog numbers. And second, to encourage and work with the U.S. Trade Representative to open export markets to U.S. pork, particularly China, which continues

52

to impose non-science-based restrictions on U.S. pork since the outbreak of novel H1N1.

Thank you for the opportunity to appear before the Subcommittee, and I will be happy to respond to any questions that you may have regarding my testimony.

[The prepared statement of Mr. Brenneman follows:]

PREPARED STATEMENT OF ROD K. BRENNEMAN, PRESIDENT AND CEO, SEABOARD FOODS LLC, SHAWNEE MISSION, KS

Mr. Chairman, Ranking Member, and Members of the Subcommittee, thank you for the honor and privilege to appear before you today. My name is Rod Brenneman and I am the President and CEO of Seaboard Foods. Seaboard Foods would like to express our appreciation to the Subcommittee for holding this hearing on the economic conditions facing the U.S. pork industry.

Seaboard Foods is a vertically integrated pork producer and processor, producing and selling fresh, frozen and processed pork products to further processors, foodservice operators, grocery stores, retail outlets and other distributors in the United States. Internationally, Seaboard sells to those same types of customers in Japan, China, Mexico, Russia, Korea and many other foreign markets. In 2008, the U.S. pork industry exported almost 20 percent of the total pork produced and Seaboard's amounts were in excess of this overall average at approximately 25 percent.

Seaboard Foods' live production facilities are located in Oklahoma, Kansas, Texas and Colorado, and are supported by our six centrally located feed mills. These facilities consist of genetic and commercial breeding, farrowing, nursery and finishing buildings. Seaboard Foods produces approximately four million hogs each year, making Seaboard the second largest hog producer in the United States. Our facilities consume more than 40 million bushels of corn and milo and over 350,000 tons of soybean meal per year.

Mr. Chairman, Seaboard Foods has experienced the current economic conditions facing the pork sector first-hand at the production, processing, marketing and international trade level. As the Members of this Subcommittee know, there are many challenges facing the economic viability of the pork sector including higher input costs for feed and energy, an over-abundance of supply in the domestic market, weakening demand and international trade barriers.

**Input Costs**

Higher feed and energy prices shape production decisions and prices paid for feed doubled from 2006 to 2008, mainly due to higher corn and soybean meal prices. Corn is estimated to account for upwards of 70 percent of feed grains in pork production and soybean meal accounts for another 20 percent of the feed. By mid-2008, corn prices were nearly 150 percent above year earlier prices. In addition, soybean meal prices reached record levels during this same time period. While some will say that corn prices have declined in 2009—and that is true—they are still very high when compared to historical levels. While there are various reasons for the increase in feed prices, certainly one of them has been the determined government policies to promote the use of corn for ethanol. This effort, while seeking a desirable goal which is to lower the U.S. reliance on fossil fuels, has had an unfortunate unintended consequence to the U.S. meat industry and ultimately to consumers. Given not only the inefficient results of converting corn to ethanol but also the impact on food costs and ultimately world hunger, this policy needs to be re-evaluated and in my opinion, completely changed. When roughly $\frac{1}{3}$ of the corn crop is used to produce fuel (ethanol) instead of food, it is difficult for anyone to argue that it has not had an impact on food prices. In the current year, USDA is estimating the corn crop to be the second largest crop in the history of the U.S., yet the current prices for corn are at levels well above historical trends. The immediate impact has been a significant cost increase to hog producers, but the ultimate impact will be a food cost increase to all consumers.

The increase in energy prices has also affected the pork sector by increasing costs on producers, processing plants, further processors, and retailers. As you know, meat products require energy-intensive refrigeration. USDA statistics show total pork supplies in cold storage at the end of August 2009 were estimated to be 517.9 million pounds. That number is significant as it is three percent higher than last year at this time and—over 19 percent higher than the 5 year average. To keep pace with rising feed and energy prices, product pricing must also rise. However, prices have not risen at an adequate rate as supply has outpaced demand.

53

**Supply**

From a supply side, the productivity of U.S. hog production has continued to increase and the long-term trend is up approximately 1.5 percent per year. In recent years this trend has been even higher. We are producing too much pork to match up with the demand has been weakened due to a number of factors which I will discuss below. While the total volume of pork produced is lower in 2009 than it was in 2008, the reduction is still not enough to return pork producers to profitability. This imbalance between supply and demand has created what some might call "the perfect storm" for pork producers. We will need to "right size" the industry by either a further reduction in supply, an increase in demand, or more likely, some of both.

**Demand**

From a demand standpoint, this past summer's economic data on prices paid for hogs and pork cuts continued to languish at year-over-year lower levels at a time of year when prices are typically trending upwards with higher demand. There are several key reasons for these depressed prices. Economic factors facing both domestic and foreign consumers in a recessionary period can be pointed to as one reason for low hog and pork prices and lower export demand. USDA's Estimated Pork Carcass Cutout for July showed U.S. wholesale pork prices to be almost 18 percent below prices in July 2007 and nearly 27 percent below prices in July 2008. You can imagine the impact on prices when you combine an over-supply of pork with decreased demand and closed market access around the world. The result is a significant increase in products to be consumed in the domestic market and a corresponding significant amount of downward pressure on pork prices.

**H1N1**

Another major reason for the drop in hog and pork prices was the outbreak of the novel H1N1 Influenza. Despite the fact that it was a human illness and not a swine illness, this outbreak in April 2009 had a significant and immediate impact on the domestic and international swine and pork markets. Fueled by confusion between a public health and an animal health issue, swine prices dropped and consumers questioned the safety of the pork products they were eating; however, Novel H1N1 is not a flu that was caused or spread by pig production nor is this virus transmitted to humans by consuming pork. In short, this is not a food safety issue at all—but rather it is a human health issue.

Media reports were alarmist and frequently used the inaccurate term "swine flu" to describe this particular strain. And while the novel strain has some genetic markings derived from swine, it also has significant human and avian genetic fingerprints. Unfortunately, early media coverage left that impression, and this was and continues to be disruptive to hog producers and pork processors.

Since April 24, the date Novel H1N1 was made public, the losses incurred by pork producers, processors and retailers has totaled in the hundreds of millions of dollars. Experts are saying that if we project these losses to October 2009, the total will be well over $1 billion. And, if projected out to the end of 2009 and beyond using the futures prices in effect the day prior to the announcement to today, the true cost of this will not only exceed $1 billion but may very well exceed $2 billion.

**Trade Barriers**

Not only has this issue affected the domestic markets, but the impact of that erroneous association between the novel H1N1 2009 virus, live hogs, and pork products also lead to the enactment of new trade barriers. Of the 17 countries that banned pork and pork products from the U.S., most notably were Russia and China. Russia banned pork and pork products from 16 states while China banned pork and pork products from the entire U.S. Before the ban, China was our fastest growing market for pork exports, importing $268 million in 2008, $147 million in 2007 and $55 million in 2006. China continues to ban U.S. pork and has only imported $47 million in the period of January through August of 2009 compared to $247 million during the same period in 2008.

Russia banned pork and pork products from 16 states and all but Florida can now ship pork products, depending on the eligible shipping date. The 15 states that were once banned began to get re-listed for exports in June and July. Russia was also a good export market for pork and pork products, taking $390 million in 2008, up from $184 million in 2007. In 2009, U.S. pork and pork product exports to Russia were only $143 million in the period of January through August, compared to $261 million in the same period of 2008.

Total U.S. pork exports world-wide in 2008 reached $4.4 billion, up from $2.8 billion in 2007. In the period of January to August 2009, exports were down 13 percent, at $2.5 billion compared to $2.9 billion in 2008. Until this year, the U.S. had

54

enjoyed 17 straight years of growth in pork exports. U.S. pork producers, processors and further processors are extremely competitive in the world markets, and we must work hard to maintain open access to all markets and expand into new ones. We need to let the markets work. The government needs to approach this crisis in the pork industry from the standpoint of enhancing demand through purchases of products with and for government programs and work to open market trade access around the world. The government should not approach it by promoting subsidies to producers as the industry must "right size" and the markets will respond and this will occur.

I want to strongly urge each Member of this Subcommittee to continue to work to keep open the markets we currently have, re-open the markets that we previously exported products to that are currently closed, and seek to open up trade channels with new countries around the world. We cannot allow trade barriers to be put in place against U.S. exports and similarly, we should not take a "protectionist" posture against our trade partners.

**Conclusion**

Many factors are influencing the current state of affairs in the pork sector and I am confident that we can address these problems and make the industry stronger than ever. Two areas I would recommend that this Committee pursue immediately are:

To encourage and work with the Secretary of Agriculture to immediately make available Section 32 funds for additional purchases of pork for various Federal food programs with a maximum emphasis on purchasing meat from sows with the objective to reduce breeding stock to reduce hog numbers; and

Encourage and work with the U.S. Trade Representative to open export markets to U.S. pork, particularly China, which continues to impose non-science-based restrictions on U.S. pork since the outbreak of Novel H1N1.

I know many Members of this Subcommittee and of the full Agriculture Committee have been working on both of these recommendations and I would like to thank you for your effort's and encourage you to stay the course. Also, I would like to commend Congress for recently taking the steps necessary to end the ban on allowing USDA to perform a risk analysis and issue a final rule on processed poultry products from China that has been included in recent Agriculture Appropriations bills. China has continuously pointed to this ban as a reason not to revisit opening their market to our pork products and now that issue has been addressed. Chairman Scott, I am aware of your position on this issue and of the letter you wrote to Appropriators urging them to address this issue and—I am grateful for your support.

Thank you for the opportunity to appear before the Subcommittee. I am happy to respond to any questions that the Member's of the Subcommittee may have regarding my testimony.

Mr. BOSWELL. Thank you, and now the chair recognizes Mr. Moody.

## STATEMENT OF DAVID MOODY, CHAIRMAN AND PAST PRESIDENT, PUBLIC POLICY COMMITTEE, IOWA PORK PRODUCERS ASSOCIATION, NEVADA, IA

Mr. MOODY. Thank you for the invitation to this hearing. My name is David Moody. I am the Public Policy Chairman and Past President of the Iowa Pork Producers Association. I am a pork producer from Nevada, Iowa. I want to thank Chairman Scott and Ranking Member Neugebauer and their staff for taking a leadership role and fellow Iowans' Representatives Boswell and King for bringing attention to the financial struggles of the pork industry.

The rapid increase and decrease in input costs and farm gate income has resulted in tremendous stress amongst farmers, lenders, grain merchandisers, consumers and others. During 2008, our losses were not because of low prices. In fact, prices received by pork farmers in 2008 were near record. But our input costs rose substantially. Please keep in mind, producers' business plans were developed and implemented based on a historic normal production

55

cost. Now in 2009, our input costs are down slightly but the market has slumped. The market drop has been caused by the flu events, lower exports, flat domestic demand, a drop in the U.S. and world economies, and last, increase in pork production efficiencies.

For pork producers, financial losses have been staggering. Since September of 2007, $5.3 billion have been lost and forecasts show only 4 profitable months between now and the end of 2010. While owners of the pigs have withstood the largest of these economic losses, other segments of our industry will also be impacted, specifically contractual producers, also known as contract growers. Most economists indicate that we will need to trim the herd by about nine million market pigs. Assuming a typical wean-to-finish facility, this means roughly 450 million spaces of finishing capacity need to be eliminated. On a typical Iowa farm site of two 1,200 head barns, that equates to approximately 1,900 fewer pig farms. Iowa alone might stand to lose 600 to 700 of these pig-finishing farms.

Unfortunately, many of these farms have been built by new, younger farmers of families trying to bring sons or daughters back into the farming operation. The next wave of losses will be from Main Street businesses, fewer equipment companies, fewer insurance sales and even fewer truckers, in other words, the ripple effect on Main Street will follow.

We all know there is no simple solution. I have three suggestions for this Subcommittee to consider. The first is to continue work on international trade. Much has been done. However, Congress should approve international trade agreements, especially the Korean free trade agreement because it is very valuable to pork sales. The value has been estimated at $10 per head of pigs produced in the United States. That would make an important step toward improving the economic crisis of the pork industry.

Second, pork producers appreciate all the pork purchases that have been made by the Department using Section 32 funds. We also appreciate the Members of this Subcommittee and of the full Agriculture Committee who have recently signed onto a letter circulated by Representatives King and Walz urging USDA to make another pork purchase in the immediate future. It would be a good opportunity for the USDA to purchase an additional $100 million worth of pork products with Section 32 funds. I realize there is a spending-cap issue on these funds. I would encourage this Committee to review this policy in light of the current conditions.

Last, I ask Members of Congress and the media to be vigilant about continuing to name the novel H1N1 influenza virus by the correct name. Our industry has taken on added economic pain and direct financial losses from the improper naming of H1N1 flu.

In summary, our farmers have struggled for some time and the financial outlook in the coming year is somewhat bleak. We have had tremendous loss of equity, little or no profit for almost 2 years, but our organization will be continually working to bring solutions that help bring this industry back into profitability. We stand ready with this Subcommittee and other policymakers to find solutions to this financial situation.

Thank you, and I would be happy to answer any questions.

[The prepared statement of Mr. Moody follows:]

56

PREPARED STATEMENT OF DAVID MOODY, CHAIRMAN AND PAST PRESIDENT, PUBLIC POLICY COMMITTEE, IOWA PORK PRODUCERS ASSOCIATION, NEVADA, IA

Thank you for the invitation to this hearing. My name is David Moody and I am the Public Policy Chairman and Past President of the Iowa Pork Producers Association. I am a pork producer from Nevada, Iowa. I want to thank Chairman Scott, Ranking Member Neugebauer and their staff for taking a leadership role with other Representatives to bring attention to the financial struggles of the pork industry.

We've all heard about "perfect storms." Most of the agricultural community and pork producers specifically are in the midst of a perfect economic storm and many in agriculture are being forced to respond to issues beyond their control.

The rapid increase and decrease in input costs and farm gate income has resulted in tremendous stress amongst farmers, lenders, grain merchandisers, consumers and others. To say the past couple of years has been a wild rodeo ride in agriculture is an understatement. During 2008 our losses were not because of low prices. In fact prices received by farmers in 2008 were a near record, but our input costs rose over 20%. Please keep in mind, producer business plans were developed and implemented based on normal production costs.

Now in 2009, our input costs are down slightly, but the market has slumped. The market drop has been caused by the April 24th flu event, lower exports, flat domestic demand, a drop in the U.S. and world economies, and lastly increased pork production efficiencies.

For pork producers, financial losses have been staggering. The total equity loss for pork producers since losses began in September 2007 amounts to $5.3 billion. Furthermore, based on recent economic forecasting, cash hog prices will be below cost of production in all except 4 months through the end of 2010. **That means, on average, pork producers have lost approximately ⅔ of their equity since September 2007.**

**Other Affects:**

While the owner of pigs has stood the largest of these economic losses, other segments of our industry will also be impacted. Specifically, contractual producers, also known as contract growers will also be affected. Most economists indicate it will take about a 9% to 10% drop in hog production to see a return of profitability. Assuming we need to trim the herd by about nine million market pigs and assuming typical wean to finish facilities, means that roughly 4.5 million spaces of finishing capacity will also be reduced. That equates to 3,750 fewer finishing barns needed or about 1,900 fewer pig farms. Iowa alone might stand to lose 600 to 700 pig finishing farms. Unfortunately, many of these farms have been built by new younger farmers of families trying to bring a son or daughter back into the farming operation.

The next wave of losses will be from main street businesses such as fewer feed dealers and cooperatives, equipment companies, veterinarians, insurance sales and even truckers. In other words, the ripple effect on main street will follow. And this will increase consolidation and concentration of the pork industry with fewer farmers raising more pigs.

**Potential and/or Partial Solutions:**

We all know there is no 'simple or perfect solution', but there are a few things mentioned which could improve the economic situation. I have three suggestions for this Subcommittee to consider.

First, policy makers and the Administration must continue to pressure for greater export access to other countries for our agricultural products. While much has been done, we need to continue to pressure our trading partners to eliminate non-tariff trade barriers. Also, Congress should approve international trade agreements, especially the Korean Free Trade Agreement because it is very valuable to pork sales. The value has been estimated to be up to $10.00 per head produced in the United States. That would make an important step towards improving the economic crisis in pork production.

Second, our producers appreciate all of the pork purchases that have been made by the Department using Section 32 funds to help get the surplus product off the marketplace. I appreciate the Secretary's support on these purchases. I also appreciate the Members of this Subcommittee and of the full Agriculture Committee who recently signed on to a letter circulated by Representative King and Representative Walz urging USDA to make another pork purchase in the immediate future. It would be a good opportunity for USDA to purchase an additional $100 million worth of pork products with Section 32 funds for various Federal food programs.

In regards to Section 32 funds, I understand there was a cap placed in the 2008 Farm Bill to achieve savings for the bill to help get consensus on the overall price

57

tag. Given the changes in the livestock sector and other sectors of agriculture who utilize these funds, we would appreciate it if you and your colleagues on the Agriculture Committee would reexamine the cap to see if there is anything to be done in the future to lift the cap or provide more flexibility for USDA to be able to utilize the Section 32 funds in the coming years.

Last, I ask Members of Congress and the media to be vigilant about continuing to name the Novel H1N1 Influenza virus by the correct name. Our industry has taken on added economic pain and direct financial losses from the improper naming of the H1N1 flu. Back home I hear from many pork producers about the improper name and it is perceived by them to be adding insult to financial injury. Ironically, producers are and should be more concerned about humans giving the virus to our pigs. We all should be talking about the new human flu virus that may be given to pigs.

In summary, our farmers have been struggling for some time and the financial outlook in the coming year looks somewhat bleak. We've had tremendous loss of equity, little or no profits for almost 2 years, but our organization will be continually working to bring solutions that help bring this industry back into profitability. We stand ready with the Subcommittee and other policy makers to find solutions for this financial situation.

Thank you.

Mr. BOSWELL. Well, thank all of you. It has been a great presentation. I am just curious from anybody or all of you, do you have anything that you can reflect back on that happened in the last financial crisis that you did or that we did that helped recovery in the markets, anything that you can pull back from that that you can share with us? Anybody?

Mr. GREENWOOD. Can you repeat the question again? I am sorry. We couldn't hear you.

Mr. BOSWELL. Well, I guess what I am saying is, that the industry, the swine industry in the last financial crisis did different things, things happened, and as you reviewed that I am sure many times over, particularly on the academic side, that maybe there are some things we are overlooking that might be a lesson learned that we haven't picked up on. Is there such a thing?

Mr. BUTLER. Mr. Chairman, I will take a crack at that. I don't know if it is any one specific action that could be pointed to except the United States' promotion of international trade. That has been tremendously helpful to our industry over the past 15 years. It was not in reaction to that particular crisis that you alluded to, but the growth in international markets has been a terrific stimulus to our industry, and we have seen recently that the closure of those international markets have a pretty severe impact if and when they occur. Beyond that, I can't think of a specific action that the government took in 1998 or 1999 that made any difference.

Mr. GREENWOOD. I was lending in 1998 and 1999 and I am here today. I can clearly tell you that what we are going through today is much more difficult that what we saw in 1998 and 1999. I think just a couple thoughts, I am not sure if there are answers for you there. I would say in 1998 and 1999 it was much more short-lived. It was a shorter period of time and the market kind of corrected itself. The issue that has been for the last 2 years is really market volatility with commodity prices that went up exponentially, and that has caused a great amount of economic pain. Also back in 2006 we were having some disease issues. We developed a porcine circovirus vaccine that had a dramatic improvement on mortality, and from an animal welfare standpoint, that was absolutely the right thing to do. But what it did in terms of reducing mortality across the United States in the operations I worked with was prob-

58

ably three percent. Well, three percent will equate to about three to four million extra hogs that ended up hitting the market from an animal health standpoint. You know, that is what it did. That was a little bit unprecedented. Also, if we look at the industry today and back in 1998 and 1999, the producers that are left, they are committed to the industry. They don't want to go out of business. It is their livelihood. It is what they—I mean, family farms across the United States, they don't want to go out. And back in 1998 and 1999 people probably had a little more flexibility on what decisions they wanted to make but the people today, they are really committed to the industry.

Mr. BOSWELL. Well, thank you very much. I think in the interest of time I am going to move on and recognize Mr. Goodlatte. We have been called for a vote but we have some time so maybe we can finish this. We will go to Mr. Goodlatte and then Mr. Moran and then we will see where we are at.

Mr. GOODLATTE. Well, thank you, Mr. Chairman. I want to welcome all the members of the panel. I will move through with these questions as quickly as I can.

I will start with Mr. Butler. In your view, has mandatory country-of-origin labeling provided any positive benefits to U.S. pork producers?

Mr. BUTLER. The short answer, Congressman, is no. We believe that country-of-origin labeling has added cost to our industry and we receive no benefit from it.

Mr. GOODLATTE. As you know, legislation has been introduced in the House that would severely limit the use of antibiotics in food animal production, and the Administration apparently without consulting the Department of Agriculture has indicated their support for that. Would this legislation have an adverse effect on the profitability of pork producers?

Mr. BUTLER. Yes, it would. We have heard earlier today about the Denmark experience. And an across-the-board ban on the use of animal health products would likely have the exact opposite of the intent. We believe that it is important to keep animals healthy as opposed to treating them after they become ill. So some people who are proposing a ban on animal health products for whatever set of reasons are wrongheaded about that.

Mr. GOODLATTE. Well, I agree and I really appreciated the piece that the Chairman introduced regarding what has happened in Denmark where they ostensibly have a ban on the use of it. They are using even more of it and I suspect it is because they have to contain these problems that they don't keep under control in the first place.

Mr. Greenwood, under existing conditions, does your institution find independent or contract growers to be preferable borrowers?

Mr. GREENWOOD. I think the best way for me to answer that question is, we work with producers of all types. To give you an example, we have big owners that own the pigs and they might own a facility, but then they work with other independent producers that help raise those pigs. From a production standpoint, and I call it producers really working together, that system has worked very, very well for this industry. The issue is now, I call it the cause and effect when you have a pig owner that is struggling financially and

59

all the ramifications that it has with other independent producers that have a direct linkage. They might not own the livestock but they are raising that livestock. It puts all those loans at risk that we are working with today, because many of those pig owners have multiple contract growers that are also, probably, our clients of our association and it puts everything at risk.

Mr. GOODLATTE. Thank you.

Mr. Brenneman, since your company exports a greater proportion of its products than the U.S. pork industry does, you must be even more sensitive to trade policy. In your view, what effect has the recent decision to impose tariffs on Chinese-made tires had on our prospects to improve pork exports to that nation?

Mr. BRENNEMAN. Yes, you are right. We are very dependent or more dependent on the export markets than maybe the industry on average is. I will tell you any kind of trade barriers that are put up, and I think that is a good example of one that has been placed recently, it is problematic. Every time the Chinese refer to the poultry issue that is getting resolved, that is something they point to as a reason why they are not opening back up due to H1N1, and I think that is just an excuse. I think they are looking at any types of trade barriers we are putting up and using those as reasons not to open trade back up for pork products.

Mr. GOODLATTE. Thank you. And your testimony discusses the adverse effect of government policies on the costs of feed and energy. Roughly what portion of the cost of raising hogs is feed and what portion of the cost of processing, refrigerating and transporting pork products is energy?

Mr. BRENNEMAN. That is a very good question. The feed side is easy. It is roughly 65 percent of the cost of raising a hog is feed. On the energy side, that is a little more difficult. If you look just at the processing part of it, the energy used in just the processing plant for refrigeration and everything else is roughly seven to eight percent. If you add in all the transportation costs, that number would go up higher, closer to probably 15 to 20 percent. The energy portion of that is hard to——

Mr. GOODLATTE. Mr. Chairman, my time is just about expired. I have other questions. Perhaps we could submit them and ask for answers in writing. I have some for Dr. Buhr and Mr. Moody that I would love to have them answer if time would permit.

Mr. BOSWELL. We can do that.

Mr. Moran.

Mr. MORAN. Mr. Chairman, thank you to you and Mr. Goodlatte for allowing me to join you here today. I feel badly intruding upon your time, although I have been told that this first vote is being held open for up to 30 minutes for an Afghan briefing, and we will not have that vote until that briefing is concluded, so perhaps we have a bit more time than what we are aware of.

Mr. BOSWELL. We will check that out.

Mr. MORAN. Thank you, Mr. Chairman.

I am pleased to be with you and this is an important issue in Kansas and the country and agriculture, and I welcome the panel. I appreciate having the opportunity to have heard all of their testimony, and I especially welcome Mr. Brenneman from Seaboard Foods. I smile as I want to compliment Seaboard Foods as a Kan-

60

sas company. No one would think a company called Seaboard would be located in Kansas, but we are delighted that you are. You are an important component of our economy and have made significant improvements in the economy in the Congressional district that I represent.

Mr. BRENNEMAN. Thank you.

Mr. MORAN. It is a pleasure to have the opportunity to ask these questions, although I am sorry the circumstances are so difficult for our pork producers. I want to follow up on a statistic that I saw recently, and perhaps this is for the active addition doctor. Retail pork prices, according to USDA, in the third quarter fell as compared to the third quarter of last year, 1 year comparison, fell 2.33 percent while pork prices paid to the farmer fell 31.68 percent. And I am not a conspiracy guy particularly, but what is the explanation for that, what seems to me to be a very dramatic difference in the reduction of prices between the retail and the wholesale sector?

Dr. BUHR. Well, to stay with economics for a minute, one of the technical issues is, there are some concerns about USDA's reporting of retail prices. For example, they don't adequately include featuring and coupon values that happen in retail so that actual retail price that the consumers pays is often quite different than that price decline as just as a technical matter. But beyond that, we do tend to see it economically change in the farm price, given a change in production, changes much more dramatically than do retail prices. Retail prices just tend to be stickier and they take a longer time to move into that supply chain. So some of those quick time changes like that and changes in production could affect that difference as well.

Mr. MORAN. What that suggests is that the elasticity, the relationship between price and demand and price and supply are significantly different at the retail and the wholesale level?

Dr. BUHR. Right. The farm level tends to be the most elastic response.

Mr. MORAN. And are those numbers any different than any other sector of the livestock side of beef prices or chicken prices, poultry prices? Is there a difference between these?

Dr. BUHR. There is a difference, but for the most part that is relatively consistent, that you do see retail prices change less than you do farm prices. Farm prices do tend to change more whether it is beef, pork or poultry.

Mr. MORAN. So no particular policy suggestion or recommendation related just to that fact other than you would suggest that USDA needs to change their calculation of price?

Dr. BUHR. I haven't thought about that much quite honestly and I am not sure where you are driving. I have a sense you are going somewhere with that. But, there are questions, of course, with margins and concentration of the industry, branding, promotion issues and so on out there in industry. My take on that, I look a good deal at antitrust issues and these competition issues that people looked at, and there is very little evidence to support noncompetitive pricing practices in the pork industry, and changes to competition policies would very likely adversely affect the pork industry from the ability to execute things like vertical integration, coordination and pricing. So from that perspective, that may be

61

where the concern is coming from. I do tend to chalk these changes up to what I was talking about, the normal price responsiveness of the pork industry between farm level, wholesale level and retail level.

Mr. MORAN. I was not taking that any other place than the normal question that I, as a Member of Congress, have: what can I do? I think what you are telling me is, the market is at work here and it is doing its function.

Dr. BUHR. Right.

Mr. MORAN. Thank you.

Mr. Brenneman, you indicated in your testimony that government should not approach this problem by promoting subsidies to producers as the industry must "right size and the markets will respond and this will occur." I think often we have the suggestion that government needs to do something. Subsidies are often one of the first suggestions. I wanted to give you the opportunity to expand upon your thoughts about why we should not do that.

Mr. BRENNEMAN. Thank you. Yes, and my concern is, that what we would see as a solution would be many of the comments made here in terms of focusing on the demand side and opening up new markets, reopening markets that were open and are now closed and continuing to enhance demand. What our fear is, and I will speak from Seaboard's standpoint, would be subsidies that continue to promote more and more production, we have mentioned that there is a supply problem and we need to get supply down and demand back into equilibrium, if you will, to get prices to where they can be sustainable for producers in the long term, and that was the essence of my comments. If subsidies are a way of dragging out and continuing to keep supply at too high a levels in relation to the demand, then that will be problematic for us and it will drag on this challenge for producers for a long, long time.

Mr. MORAN. And my impression is that the witnesses, all of you are in general agreement. Mr. Butler, I assume that is the case for the pork producers?

Mr. BUTLER. It is, yes, sir.

Mr. MORAN. Thank you, Mr. Chairman.

Mr. BOSWELL. Well, thank you, and thank all of you, and I see that Audrey is in the audience so we are going to have some questions submitted, Mr. Goodlatte will do that. And there is a vote going on. We can't confirm that it is going to be delayed so we will probably not—unless I'm getting ready to get some information here. I think that since we can't confirm that, rather than hold you here for a couple hours and then reconvene, we will submit those questions, unless some of you object to that. No objections, I see. Well, we can't thank you enough for your coming and sharing your expertise, and we have heard clearly that we want the Department to continue their purchases. We have heard clearly that we need to advance trade. I know that Mr. Goodlatte and some of the rest of us were in Korea last December and we certainly discussed this on the beef side, but we also had discussions on the pork side, be assured of that. So we hope we can move forward on that. Those of us that are producers, quite a few of us are on this panel, on this full Committee, we understand the pain, and we won't stop and we will do anything we possibly can that is reasonable to do.

62

So thank you again for coming and being with us. We appreciate it very much.

Under the rules of the Committee, the record of today's hearing will remain open for 10 calendar days to receive additional material and supplementary written responses from the witnesses to any questions posed by a Member of the panel.

The hearing of the Subcommittee on Livestock, Dairy, and Poultry is now adjourned.

[Whereupon, at 11:45 a.m., the Subcommittee was adjourned.]

[Material submitted for inclusion in the record follows:]

63

Submitted Article by Hon. Leonard L. Boswell, a Representative in Congress from Iowa

**Informa Economics *Policy Report***

dated October 16, 2009

**Miscellaneous . . .**

**Suspicious Rise in Danish Use of Pig Antibiotics**

Use of antibiotics in Danish pig production increased by 19 percent between 2001 and 2008, a report has shown, despite the fact that Danish law forbids the use of antibiotics for routine treatment of livestock.

The ban on routine administration of antibiotics is intended to protect against the risk of antibiotic resistance in bacteria that can infect both animals and humans, which is potentially life-threatening.

However, the recent Danmap (Danish integrated antimicrobial resistance monitoring and research program) report for 2008 showed that antibiotic use in pig production had gone up by 19 percent in 2001–2008, measured in daily pig doses per kilogram of pork.

The findings were reported in the bimonthly *Maskinbladet* under the headline: "Indications of routine treatment with antibiotics." According to the article, the increase relates primarily to the use of tetracyclines, which rose by 118 percent and 60 percent respectively in weaned and finishing pigs in the period 2003–2008.

———

Submitted Questions

**Response by Michael T. Scuse, Deputy Under Secretary, Farm and Foreign Agricultural Services, U.S. Department of Agriculture**

*Question Submitted by Hon. Collin C. Peterson, a Representative in Congress from Minnesota*

*Question.* In your testimony, you discussed two risk management programs available to swine producers: Livestock Gross Margin and Livestock Risk Protection. Also according to your testimony, the programs have low participation rates among swine producers. Under section 523(b)(10) of the Federal Crop Insurance Act (7 U.S.C. 1523(b)(10)), it appears that the cost of conducting these programs is capped at $20 million for each fiscal year. Does this account for the low participation rates? How much of the $20 million available for FY 2009 was unused?

*Answer.* You are correct that section 523(b)(10) of the Federal Crop Insurance Act (7 U.S.C. 1523(b)(10)) authorizes, on a yearly basis, $20 million to pay the expenses of the Federal Crop Insurance Corporation (FCIC) to conduct two or more livestock insurance pilots. These expenses include administrative and operating subsidy to approved insurance providers to administer the plans, and producer subsidy. For Fiscal Year 2009, approximately $1.5 million was expended. Therefore, the limitation on the amount to be expended has not had any impact on participation.

With regard to the livestock pilot programs, RMA contracted for an evaluation of the livestock products in 2007 requesting that the contractor specifically review the reasons for low participation in the livestock plans of insurance. The evaluation cited several reasons for the low participation rates and commented that these low participation rates are unlikely to change. Some of the reasons for low participation: (1) Agents used to selling crop insurance are unfamiliar with a financial based product like the livestock products; (2) The cost of the LRP insurance program was higher than the comparable options contracts; (3) The complexity of the LGM plan has made it difficult for agents to understand and market the product; (4) The perception, following RMA pulling the product in response to the first Bovine spongiform encephalopathy identification is that the product may be pulled from the market at any time; and (5) The limited sales period. Because these are derivatives of exchange traded contracts, the sale of the livestock products occurs after the commodity markets are closed.

With regard to the unfamiliarity and complexity of the products, several targeted training initiatives have taken place to assure a better understanding by producers and those involved in the sales and service of the Livestock insurance products.

*Questions Submitted by Hon. Frank D. Lucas, a Representative in Congress from Oklahoma*

*Question 1.* China had been a growing market for pork, buying $268 million in 2008, $147 million in 2007, and $55 million in 2006. This year exports to China are off $200 million over the same period last year. Recently, the Obama Administration

64

placed a 35 percent tariff on tires imported from China, which can only further dampen hopes for improvement. Did the Department of Agriculture participate in that decision?

*Answer.* Yes, as an active member of the Administration's formal interagency trade policy process (Trade Policy Staff Committee (TPSC)), USDA participated with other agencies in discussing options for this policy area. In that process, trade ramifications were among the concerns discussed.

*Question 2.* Recently, your Administration testified before the House Rules Committee in favor of H.R. 1549, which would severely restrict the use of antibiotics in food animal production. Did the Department of Agriculture have any input into that position? Has the Department done any economic analysis of the adverse economic impact on pork producers of this legislation?

*Answer.* The Administration has not taken a position on H.R. 1549.

USDA is working collaboratively with FDA on the issue of antibiotics. Antimicrobial drugs are critical agents for treating infectious disease both in humans and animals. We know that many livestock producers use antibiotics judiciously and want to preserve the effectiveness of these important drugs. We also know that antibiotic resistance is real and is a public health concern. The issue of antibiotic resistance requires close collaboration between Federal agencies, Congress, state health departments, and the agricultural community. We look forward to working closely with Congress on this issue in the future.

USDA's Economic Research Service has analyzed evidence on the extent of antibiotic use in U.S. hog production, alternatives to growth-promoting antibiotics, the farm-level effects of restriction on use, and the likely farm-level costs and consumer responses to a restriction.

*Question 3.* Observers have offered that a Free Trade Agreement with Korea would expand markets for pork producers and benefit them $10 per head. What priority is the Obama Administration placing on this FTA and FTAs with Columbia and Panama?

*Answer.* As President Obama stated after his recent summit meeting with President Lee, the Administration is committed to working together to move the KORUS FTA forward. This will involve working through a number of outstanding issues, including on autos, beef and non-tariff measures. The Administration is consulting with stakeholders and working to identify the most effective approaches for dealing with these concerns and those outstanding with the other pending FTAs. Successfully addressing these concerns will be an important step in determining when, in close consultation with the Congress and as part of the President's broader trade policy framework, these agreements should be considered by the Congress.

*Question 4.* I understand that the USDA has announced they will work with the U.S. Department of Justice on a series of workshops next year that will examine competition issues in the livestock industry. I think my colleagues would agree that while the livestock sector is struggling, it might not be the best time for the government to tinker with industry structure. Could you take a few minutes to outline the process the Secretary intends to follow and what outcomes do you anticipate with this effort?

*Answer.* USDA and the Department of Justice plan to hold workshops to explore competition issues affecting the agricultural sector and the appropriate role for antitrust and regulatory enforcement. On November 13, USDA and the Department of Justice announced the schedule of workshops as follows: March 12 in Ankeny, Iowa to discuss general producer issues, including seed technology, vertical integration, market transparency and buyer power; May 21, 2010 in Normal, Alabama to discuss concentration and buyer power in the poultry industry; June 7, 2010 in Madison, Wisconsin to discuss concentration and vertical integration in the dairy industry; August 26, 2010 in Fort Collins, Colorado to discuss concentration in the livestock industry; and December 8, 2010 in Washington, D.C., to discuss price discrepancies between prices received by farmers and the prices paid by consumers. We do not have specific outcomes for these workshops at this time. We are interested in engaging in a dialogue among interested parties and foster learning with respect to the appropriate legal and economic analysis of these issues as well as to listen and to learn from parties with real-world experience in the agricultural sector.

*Question 5.* In these troubled economic conditions for the pork industry, who is generally fairing better, independent producers or producers who have aligned with packers?

*Answer.* We have no information about how well independent producers are currently fairing *versus* producers who are aligned with packers. However, based on 2008 data from USDA's Agricultural Resources Management Survey, the financial

65

performance of hog farmers with production or marketing contracts tended to fair better, on average, than the performance of independent producers.

*Question 6.* The Administration was a very strong advocate of cap-and-trade legislation earlier this year. Has the Department conducted an analysis of this legislation regarding the economic impact specifically on pork producers? Is there anything in the House bill that will help pork producers with their current economic problems?

*Answer.* On July 22, the Department published a report, "A Preliminary Analysis of the Effects of H.R. 2454 on U.S. Agriculture" detailing the projected effects of the Waxman-Markey bill on U.S. agriculture. (*http://www.usda.gov/oce/newsroom/archives/releases/2009files/HR2454.pdf*). Because of provisions in H.R. 2454 that reduce the impact of the bill on fertilizer costs, the short-run (*i.e.,* 2012–2018) costs are estimated to be small and largely covered by offset markets. Over the medium and long terms, costs increase but it is estimated that the benefits to agriculture from offsets will increase more.

In 2005, greenhouse gas (GHG) emissions from U.S. livestock operations totaled 258.6 Tg $CO_2$. Hog production accounted for 21.0 Tg $CO_2$ eq., or 8.1 percent of all livestock related emissions. Waste management accounted for 91.1 percent of all GHG emissions related to hog production—this included methane emissions of 18.65 Tg $CO_2$ eq. and nitrous oxide emissions of 0.48 Tg $CO_2$ eq. Methane emissions from enteric fermentation accounted for the balance of GHG emissions from hog production (or 1.92 Tg $CO_2$ eq.). Given these sources, the major opportunities to reduce GHG emissions from hog operations will lie in changes in waste management systems. Covering open storage facilities (such as pits, ponds, and lagoons) and flaring the methane gas, switching to daily spread systems, and installing anaerobic digesters all offer potential opportunities for particular hog production facilities to significantly reduce their GHG emissions. Anaerobic digesters also have a number of other benefits that include reductions in odor, generation of electricity and heat for on-farm use, and (in some cases) bedding material. H.R. 2454 does not identify the set of agricultural practices that would be eligible to supply offsets but does stress the importance of any such offsets to be real, permanent, additional, and verifiable. In general, meeting these criteria are relatively straight forward for emissions reductions associated with changes in waste management systems.

*Question 7.* It is my understanding that the Administration has the statutory authority to suspend or alter the Renewable Fuels Standards in the event it creates adverse economic conditions? Has the Administration conducted any analysis about how such a decision could provide relief to the livestock sector generally or for pork producers specifically?

*Answer.* The Renewable Fuel Standard (RFS) program, which requires the use of renewable fuels in the U.S. transportation sector, was originally adopted by Congress in the Energy Policy Act of 2005. This program was modified by Congress in the Energy Independence and Security Act of 2007 (EISA). The RFS program provides that the Administrator of the Environmental Protection Agency (EPA), in consultation with the Secretaries of Agriculture and Energy, may waive the national renewable fuel volume requirements, in whole or in part, if the Administrator determines that implementation of the requirement would severely harm the economy or environment of a state, region, or the United States (see Clean Air Act section 211(o)(7)(A)).

On April 25, 2008, the Governor of the State of Texas requested a fifty percent waiver of the national volume requirements under the RFS mandate for the time period from September 1, 2008 through August 31, 2009. Texas based its request on the assertion that the RFS mandate is unnecessarily having a negative impact on the economy of Texas, specifically, that increased ethanol production is contributing to increased corn prices which are negatively affecting its livestock industry and food prices. EPA published in the *Federal Register* a notice of receipt of this request and invited public comment on all issues relevant to making a decision.

On August 13, 2008, EPA published in the *Federal Register* a Notice of Decision on the State of Texas request for a waiver of a portion of the RFS. In that Notice, EPA stated that, "[B]based on a thorough review of the record in this case, EPA finds that the evidence does not support a determination that implementation of the RFS mandate during the time period at issue would severely harm the economy of a state, a region, or the United States. EPA is therefore denying the request for a waiver."

In reaching its decision, EPA evaluated the information submitted by the State of Texas and other commenters, and, in addition, EPA conducted its own analysis. In consultation with the U.S. Department of Agriculture and the U.S. Department of Energy, EPA reviewed several economic models and chose a model created by re-

66

searchers at Iowa State University (ISU model) to analyze the impact of the RFS on corn, ethanol, and gasoline prices based on uncertainty in key variables such as crop yields and crude oil prices. For additional information regarding EPA's decision, see the following website: *http://www.epa.gov/fedrgstr/EPA-AIR/2008/August/Day-13/a18738.htm.* I am not aware of any more recent analysis that the Administration has conducted on suspending or altering the RFS and the potential impacts on livestock producers.

*Questions Submitted by Hon. Steve King, a Representative in Congress from Iowa*

*Question 1.* Could you please confirm or deny the information alleging that an Administration request for salary and benefits compensation data for the executives of meat processors or suppliers as a condition for consideration of bids to supply sow meat to the USDA?

*Answer.* For all recent cooked pork patty invitations to bid issued by USDA, offers from eligible contractors have been received that far exceed the amount needed to fill the contract demand. USDA is not imposing and does not plan to impose salary disclosure requirements on contractors or potential contractors for any of its purchases under the current funding authorizations, see section 1512 of ARRA and Federal Acquisition Regulation 52.204–11. That being said, USDA recently purchased pork products using funds authorized by the American Recovery and Reinvestment Act (ARRA) that required salary disclosure for a contractor under specific conditions. However, none of the firms awarded USDA pork product contracts using ARRA funds met the threshold requirements for salary disclosure.

*Question 2.* Does the USDA have the authority to require this information as a condition for considering bids? If so, please cite the statute, rule, constitutional provision(s), or precedents that you believe grant the basis for such a request.

*Answer.* See answer to *Question 1* above.

*Question 3.* If this is your practice, how long has it been in effect and why was it implemented?

*Answer.* See answer to *Question 1* above.

*Question 4.* Please attach the current USDA application requirements for the suppliers of sow meat and note any changes in requirements that have been implemented within the last year.

*Answer.* See attachment that follows.

*Question 5.* In addition, please attach a report of USDA sow meat purchases within the last year, by month of purchase.

*Answer.* In the past fiscal year, AMS has purchased approximately 12.2 million pounds of finished products produced from sow meat at a cost of $22.1 million. This was one purchase in September 2009.

67

ATTACHMENTS



United States
Department of
Agriculture

Agricultural
Marketing
Service

Stop 0253-Room 2610-S
1400 Independence Avenue, SW
Washington, DC 20250

**SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION**          **JUNE 2008**

### PURCHASE OF FULLY COOKED PORK ITEMS (FROZEN) FOR DISTRIBUTION TO CHILD NUTRITION AND OTHER FEDERAL FOOD AND NUTRITION ASSISTANCE PROGRAMS

This document provides additional USDA requirements and specification for the purchase of fully cooked pork items described in the attached References to the Applicable Bid and Contract Provisions (Exhibit A). In addition to product descriptions, this exhibit also provides information on the applicable Item Description and Checklist of Requirements (IDCR) for Pork Patties, Fully Cooked, Effective May 2008 (Attachment 1).

**I.     INSTRUCTIONS TO POTENTIAL BIDDERS**

A.    The fully cooked pork items will be purchased on a competitive bid basis from suppliers who have met the requirements described in Section I.B. Interested suppliers may submit a production plan at any time during this purchase program. Suppliers should allow 10 working days from receipt of production plan by USDA for notification of the results of the evaluation of the production plan from the Contracting Officer. A supplier is deemed eligible to bid after notification by the Contracting Officer.

Submission of a production plan is not binding on USDA. Actual purchases will be on a competitive bid basis as described in the Master Solicitation, this Supplement, and separately issued Invitations for Bid (IFB).

B.    Documentation and Assessment Requirements

To become an eligible supplier, the following must be submitted to the Contracting Officer, Agricultural Marketing Service, U.S. Department of Agriculture, Stop 0253, Room 2610-South Building, 1400 Independence Avenue, SW., Washington, D.C. 20250-0253, for evaluation and approval prior to bidding:

1.    Production Plan Requirement:
   a)  Include a description of the quality control program that includes procedures, records, form, pictures, etc, that demonstrates conformance to the requirements set forth in the IDCR.
   b)  Cover page that contains the company's name and address, contact person's name, phone number, including emergency contact information, and e-mail address;
   c)  Table of Contents listing the major areas as they appear in the production plan, and
   d)  List of attachments, forms provided with the proposal, if appropriate.

68

**SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION**                               **2**

2.   Product Sample Requirement:
   a)   Two 10 pound samples of each item offered including the label, ingredient
        statement and Nutrition Facts Panel that conforms to the IDCR.

**Note:    A supplier must submit cooked samples that are produced in accordance with
the submitted production plan.**

The Contracting Officer Technical Representative (COTR) will review each production plan to
determine if the plan and sample are adequate. The Contracting Officer will notify the supplier
of the status of their sample(s) and production plan and their eligibility to bid. Once a supplier
is eligible to bid, the supplier must request a Domestic Electronic Bid Entry System (DEBES)
Login ID (see Attachment II) and Address Information (Attachment III).

3.   Meat Grading and Certification (MGC) Branch Monitoring and Evaluation
     Program

Eligible suppliers who receive contracts must have a MGC Branch agent present during
the production of the fully cooked pork item. The MGC Branch agent will monitor and
verify the production based on the Contractor's approved production plan and the
IDCR. The contractor must provide a copy of the approved production plan and have
the supporting documentation readily available for review by the COTR or AMS and
MGC Branch agents. Records may be maintained on hard copy or electronic media.
However, records maintained as electronic media will be made available in printed
form immediately upon request by AMS or its agents.

4.   Audit, Review, and Compliance (ARC) Branch Assessment

   a)   Food Defense Assessment

   The AMS auditor will conduct a food defense audit that will include, but is not
   limited to, a thorough evaluation of the potential contractors' and subcontractors'
   food defense plan. Documentation must support the contractor's or subcontractor's
   food defense plan. Upon completion of the onsite capability assessment, the auditor
   will provide a report to the Contracting Officer for final review.

   If the report demonstrates that the food defense plan is inadequate, the applicant will
   be notified by the Contracting Officer that they are ineligible to bid. The applicant
   will have an opportunity to correct identified deficiencies, modify their food defense
   plan and resubmit a brief description for further consideration. Eligibility will
   depend on whether the modifications demonstrate compliance with their food defense
   plan.

   b)   Slaughter Requirement

   The AMS auditor will conduct monthly Harvesting (slaughter) audits based on the
   requirements stated in the attached IDCR and the company's approved production
   plan. The audit will review the humane handling and adherence to the non-
   ambulatory disabled animals. Documentation must support the contractor's or

69

**SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION**                                    3

subcontractor's adherence to meeting the harvesting requirements as set forth in the HDCR.

C.   Responsibility/Eligibility

Facilities used in fulfilling USDA contracts must be operating under the provisions of the Federal Meat Inspection Act (FMIA), 21 U.S.C. 601 et seq., and the regulations issued thereunder.

Subcontractors or suppliers of pork are: (1) ineligible if they are currently delivering late on USDA contracts, or USDA-approved subcontracts and late delivery is not due to causes beyond their control, and (2) nonresponsible if they are not operating under the provisions of the Federal Meat Inspection Act or have been suspended or debarred under the provisions of 48 C.F.R. Subpart 9.4.

C.   Loading and Sealing of Vehicles

Loading of the vehicle may also be conducted by a person authorized in a contractor's approved technical proposal.

D.   Domestic Requirements

All products used in fulfilling contracts awarded under the Master Solicitation and this Supplement LS-400 must be produced in the United States. United States produced (hereafter referred to as U.S.-produced) red meat means manufactured from hogs, beef, bison, or lambs raised in the United States, its territories, possessions, Puerto Rico, or the Trust Territories of the Pacific Islands (hereinafter referred to as the United States). U.S.-produced does not include imported pork, beef, lamb, bison, or hogs, cattle, lamb, bison imported for direct slaughter. If any meat or meat products originating from sources other than the United States are processed or handled, the contractor will develop and maintain an identification and record system for these products to assure USDA that they are segregated and not used to fulfill contracts awarded under this Supplement. Such segregation plan must be audited and made available to the AMS representative and the Contracting Officer or agent thereof upon request. The contractor must endure that the Contractor and any subcontractor(s) maintain records such as invoices or production and inventory records evidencing product origin, and will make such records available for review by the Government in accordance with FAR 52.214-26.

The contractor agrees to include this domestic origin certification clause in its entirety in all subcontracts for meat or meat products used in fulfilling any contracts awarded under this Supplement and Master Solicitation. The burden of proof of compliance is on the Contractor. All raw materials will be shipped in containers labeled as "Domestic Only Product" on the principle display panel and the bill of lading accompanying the shipment will contain the statement "Domestic Only Product."

Domestic verification requirements must be included in the contractor's technical proposal or production plan, if applicable.

70

**SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION**                                4

**II.  SUBMISSION OF BIDS**

The following item will be included in the certification section of the bid submitted in DEBES.
(See Exhibit 1 of the Master Solicitation).

    9.  By submitting this bid, offeror certifies that all products conforms with the Item
    Description and Checklist of Requirements and no changes to the production process or
    production plan have occurred without proper approval by the Contracting Officer.

      a.  Does

**III.  INSTRUCTIONS FOR SUBMISSION OF PRODUCTION PLAN**

The following procedures establish the acceptable minimum requirements for the format and
content of the proposals:

A.  The Government has provided a production plan format which is to be used in preparing the
production plan (see **Exhibit B**).  The offeror shall submit production plans in both hard copies
and an electronic format either on CD or e-mail.  The production plan shall be saved in the
portable document file (PDF) format.  This format and electronic form provided will aid in the
evaluation of the production plan.

B.  Offers must submit CDs in sealed disk mailers that have been signed by the same individual that
signed the original paper copy of the production plan.  Offerors submitting the electronic PDF
format by e-mail must have sent by the same individual that signed the original paper copy of the
production plan.  By signing both the production plan and disk mailer, this individual will be
attesting to the data in both formats being identical.  The seals on this information will be broken
by the Contracting Officer only.  The production plan must be submitted by an authorized agent
of the company.

C.  The offeror will submit the appropriate number of copies as stated in the table below:

| Description | Number of Hard Copies | Number of CDs |
|---|---|---|
| Production plan | 1 Original | 1 |
| 1.  8 ½" x 11" White Paper; | | |
| 2.  One sided-single spaced, (12 point font); | | |
| 3.  Plan is to be provided in protected document holder; and | | |
| 4.  Proposal submitted with all capital letters will be returned to offeror without further review. | | |

D.  While it is not the desire of the Government to penalize an offeror for noncompliance with
formatting instructions, technical evaluators may have difficulty evaluating the production plan to
the fullest extent possible.  Technical evaluators will not be required to search other subsections
or sections of the offeror's production plan for information requested for evaluation.

71

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION                                    5

> **Note:**  All hard copies and CDs shall be mailed to the Contracting Officer at the address stated in the Section I.B.

E.  Production plan Revisions

Changes to an offeror's production plan may be submitted based on the Government's Amendments, Clarification Request, monitoring program, or at the request of the offeror. Maintenance of the integrity and clarity of each production plan is critical. All production plan revisions must meet the following criteria:

1.  Any changes to a production plan made by the offeror after its initial submittal shall be accomplished by submitting replacement pages or an entire production plan package. A cover letter must be submitted with the changes identified and an explanation of the need for the change. The offeror shall include the revision date and the appropriate page number(s).

> **Note:**  Revisions to the approved production plan may be submitted by e-mail in a PDF format. Hard copies of the changes must be mailed to the Contracting Officer at the address stated in Section I.E.

2.  Changes must be submitted in the same number of copies as the initial production plan and must have the same information provided on revised CD. The revised CD should contain only the pages that are being changed. Additional pages should be numbered using a page number suffix (e.g. 1.1, 1.2, 1 a., 1 b).

3.  Submit changes to the production plans as a complete page change for each page on which a change occurs. Changes from the original page shall be on blue colored paper and the changes in text shall be highlighted or **bolded** and deletions in strikeouts.

## IV.  PRODUCT SPECIFICATIONS AND AUDIT SERVICES

A.  The specification for fully cooked pork items, frozen is identified in the Exhibit A. If AMS amends documents, Exhibit A will be updated to include appropriate references.

B.  The cost of all audit, product monitoring, and certification services performed by the AMS agents must be borne by the contractor. This includes, but is not limited to, audits, examinations, supervision, official documentation, and related services.

C.  Questions concerning AMS auditors should be discussed with the ARC Branch in Washington, D.C. on (202) 690-0406.

D.  Questions concerning changes and the availability of AMS agents should be discussed with the Office of Field Operations, Denver, Colorado (720) 497-2520.

## V.  INVOICES AND PAYMENT

In addition to the referenced payment documents in the Master Solicitation, please include a copy of the Contractor's Certificate of Conformance; (see Exhibit C).

72

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION                                 6

## VI. AMS CLAUSES

A. Contractor Checkloading

Contractor will perform checkloading examinations as described in the applicable specification at the time of shipment and issue contractor's certificate to accompany each shipment that includes all of the following information:

1. Contract Number;
2. N/D Number;
3. Name of product;
4. Shipping Date;
5. Production lot number(s) and date each lot was produced;
6. Count of shipping containers and total projected net weight in each production lot;
7. Identity of car or truck (car numbers and letters, seals, truck license, etc.) as applicable
8. Contractor certification that product conforms with the IDCR;
9. Count and projected net weight verified; and
10. Signature of company official responsible for checkloading

## VII. PROVISIONS INCORPORATED BY REFERENCE-A. FAR Provisions are modified as shown below:

(a) (1)   The North American Industry Classification System code for this acquisition is 311611.
   (2)   The small business size standard is 500 employees.

2.   Type of Contract--The Government contemplates award of a firm-fixed price contract(s).

3.   Service of Protest: address for the Contracting Officer is: 1400 Independence Ave. S.W., Mail Stop 0253, Room 2610-S; Washington, DC 20250-0253

_(signature)_  6/9/08

Associate Deputy Administrator
Livestock and Seed Program
Agricultural Marketing Service

Attachments

73

**USDA** United States Department of Agriculture

Agricultural Marketing Service

Stop 0253-Room 2610-S
1400 Independence Avenue, SW
Washington, DC 20250

EXHIBIT A DATED JUNE 2008
PAGE 1 OF 1

## CHECKLIST AND REFERENCES TO APPLICABLE BID AND CONTRACT PROVISIONS
### SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION, FOR FULLY COOKED PORK ITEMS, FROZEN
### PRODUCT DESCRIPTIONS (SECTION 1. A. (GENERAL)

**BID/CONTRACT PROVISIONS**

| Product/Commodity Item Code | Specifications Listed in Priority Order | Commodity Purchase Code | Packaging and Packing | Maximum Offer Unit Size/Shipping Unit | Tolerance Section | Shipping/Delivery Period | Federal/State Plants Section I.C. | Competition (See Invitation) |
|---|---|---|---|---|---|---|---|---|
| Pork Patties, Fully Cooked A729 | Item Descriptions and Checklist of Requirements (IDCR) for Pork Patties, Fully Cooked, Effective May 2008 | 24-73-10 | Fully cooked pork patties will be packed in either a vacuum packaged or packed in a sealed immediate package. 24+ 24# packages will be packed in a 40-pound shipping container. Each pattie will weigh approximately 2.6 ounces and be individually quick frozen (IQF) | 40,000 lbs (1,000 cases) | None | First half shipping period | Federal & State | Full & Open |

74

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION                    EXHIBIT B
                                                               PAGE 1 OF 2

Cover Page:
[Company Name]
[Company Address]
Contact Person, including title, phone number, including emergency contact
information, e-mail address (must be authorized to represent the company).

Production plan for: [Announcement Number] and [Specification]

Table of Contents (all pages and attachments must be number and identified--any
attachments must be identified and referenced in the Production plan)

*The production plan should document a quality control program that includes*
*procedures, records, forms, pictures etc. that demonstrates conformance with the*
*following checklist of requirements.*

I.   ITEM DESCRIPTION
II.  CHECKLIST OF REQUIREMENTS
     A.  MATERIALS.
         1.  Meat Component
             a)  DOMESTIC ORIGIN OF MEAT COMPONENT
             b)  HARVEST (SLAUGHTER)
                 (1)  HUMANE HANDLING
                 (2)  NON-AMBULATORY CATTLE
             c)  BONELESS PORK REQUIREMENTS
                 (1)  TRACEABILITY
                 (2)  HANDLING
                 (3)  PRODUCTION LOTS
                 (4)  OBJECTIONABLE MATERIALS
             d)  MECHANICALLY SEPARATED
         2.  NON-MEAT COMPONENTS
             a)  DOMESTIC ORIGIN
             b)  SEASONINGS AND OTHER INGREDIENTS
             c)  CARMEL COLORING
             d)  SOY PROTEIN PRODUCT (SPP)
             e)  MSG
     B.  PROCESSING
         1.  GRINDER PLATE
         2.  BONE COLLECTOR/EXTRUDER SYSTEM
         3.  PATTIES
             a)  WEIGHT
             b)  IQF
             c)  APPEARANCE
             d)  FLAVOR
             e)  SHAPE

75

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION

   4.  COOKING TEMPERATURE
   5.  METAL DETECTION
C.  FINISHED PRODUCT LIMITATIONS
   1.  FAT
   2.  SODIUM
   3.  MICROBIAL
D.  HEATING INSTRUCTIONS AND SERVING SIZE
   1.  HEATING INSTRUCTIONS
   2.  SERVING SIZE
E.  PREPARATION FOR DELIVERY
   1.  PACKAGING AND PACKING
      a)  Packaging
      b)  Packing
   2.  LABELING
      a)  Immediate Container Labels
      b)  Shipping Containers
   3.  CLOSURE
   4.  PALLETIZED UNIT LOADS
F.  DELIVERY UNIT
G.  DELIVERED PRODUCT
   1.  SIZE AND STYLE OF CONTAINER
   2.  TEMPERATURE
   3.  SEALING
H.  PRODUCT ASSURANCE
   1.  WARRANTY AND COMPLAINT RESOLUTION
      a)  Warranty
      b)  Complaint Resolution
   2.  NON-CONFORMING PRODUCT
   3.  AMS MONITORING AND PRODUCTION ASSESSMENT


**Attachments or Appendixes**

Please attach all referenced documents with the applicable document name and reference number.

76

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION                    EXHIBIT C

### UNITED STATES DEPARTMENT OF AGRICULTURE
### AGRICULTURAL MARKETING SERVICE
### LIVESTOCK AND SEED PROGRAM

### CERTIFICATE OF CONFORMANCE FOR
### THE PROCUREMENT OF FULLY COOKED PORK ITEMS, FROZEN

#### CERTIFICATE OF CONFORMANCE

I certify the following:

(1)   On [shipping date ], [Contractor's name] furnished the (insert the appropriate commodity description) called for by Contract Number via [ Carrier ] under Notice-to-Deliver Number _____ .

(2)   The (insert the appropriate commodity name) is of the quality specified and conforms in all respects with the contract requirements, including [Contractor's name] Production plan or Technical proposal  as approved by the AMS/LS, Commodity Procurement Branch, Contracting Officer.

(3)   Product identification, (i.e. lot number(s)) is in the quantity shown on the attached acceptance document.

(4)   Contractor assures all meat or meat products used in fulfilling this contract was produced in the United States as defined in the Livestock Master Solicitation, section IX.


Date:

Signature:

(Signed by an officer or representative authorized to sign offers )

Title:

77

SUPPLEMENT LS-406 TO AMS MASTER SOLICITATION

**USDA, AMS,**
**Livestock and Seed Program**

ITEM DESCRIPTION AND
CHECKLIST OF REQUIREMENTS (IDCR) FOR
PORK PATTIES, FULLY COOKED

ATTACHMENT 1
Page 1 of 5

**APPROVED**

Contracting Officer Technical Representative of OTR)
Standards, Analysis, and Technology Branch
Room 2607 S-Bldg, Phone: (202) 720-4486

Effective: May 2008

## I.   ITEM DESCRIPTION

Item --

Pork Patties, Fully Cooked -- This item consists of ground pork (shall be derived from suitable lean from any portion of the sow carcass) that is seasoned, formed into round or oval patties, fully cooked, and then individually Quick Frozen (IQF) for use as a sandwich component or a stand-alone item.  Portion Weight -- 2.0 ounces.

Formula --

Pork will comprise at least 90% of the raw formula.

Non-Meat
Component --

Non-meat components will comprise no more than 10% of the raw formula.

Fat --

Fat content will not exceed 20 grams per 100 gram serving.

Sodium --

The sodium content will not exceed 700 milligrams per 100 gram serving.

## II.   CHECKLIST OF REQUIREMENTS

All items must be produced in accordance with Food Safety and Inspection Service (FSIS) regulations and the checklist of requirements.  The contractor's production plan, submitted to the Contracting Officer, must adhere to the following checklist of requirements.

### A.   MATERIALS

The contractor's production plan must describe a documented quality control program that includes procedures, records, forms, pictures, etc., that demonstrate conformance with the following checklist of requirements.

1.   **MEAT COMPONENT**
Pork (shall be derived from suitable lean from any portion of the sow carcass) will be the only meat component allowed.  Pork derived from boars is not permissible.
a)   Domestic Origin of Meat Component -- All sows will originate from U.S. produced livestock as defined in the announcement.
b)   Harvesting (Slaughtering) -- All sows will be harvested in facilities that comply with the following requirements:
(1)   Humane Handling -- All sows will be humanely handled in accordance with all applicable FSIS regulations, directives, and notices.
(2)   Non-Ambulatory Disabled Animals -- Meat from carcasses of non-ambulatory disabled animals will not be included in USDA Purchase Programs.

   c) Boneless Pork -- Boneless pork will comply with the following requirements:

      (1) Traceability -- Contractors are responsible for providing sufficient product traceability and must have records to verify the source of raw materials used in each lot of product.

      (2) Handling -- All boneless pork must be maintained in excellent condition. The contractor's production plan shall include detailed production scheduling that addresses time and temperature controls necessary to maintain excellent condition of the boneless pork. Frozen boneless pork may be used provided it is processed into the final product within 60 days from the date of pack and was not initially placed into the freezer prior to contract award.

      (3) Production lots of boneless pork associated with positive pathogen test results will not be allowed.

      (4) Objectionable Materials -- Boneless pork shall be free of skin, bones, cartilages, organ tissue, heavy connective tissue, lymph glands, spinal cord, and foreign materials.

   d) Mechanical Separation -- Meat that is mechanically separated from bone with automatic deboning systems, advanced lean (meat) recovery (AMR) systems, or powered knives will not be allowed.

## 2. NON-MEAT COMPONENTS

   a) Domestic Origin of Non-Meat Component – Significant ingredients (more than 1 percent) will be derived from U.S. produced products.

   b) Seasonings and Other Ingredients -- Seasonings and other ingredients will be included to produce product with a traditional breakfast flavor profile and texture suitable for family feeding programs.

   c) Caramel Coloring - Caramel coloring is allowed.

   d) If soy protein product (SPP) is used, it must be a concentrate or isolate and when hydrated yield no less than 18% protein (as is basis).

   e) MSG - Monosodium Glutamate (MSG) is not allowed.

## B. PROCESSING

### 1. GRINDER PLATE

The size of the grinding plate for grinding boneless pork will be declared.

### 2. BONE COLLECTOR / EXTRUDER SYSTEM

A bone collector/extruder system must be in operation to effectively remove bone, cartilage, and heavy connective tissue during the final grind.

### 3. PATTIES

   a) Weight - Target packaged weight per cooked patty will be 2.0 ounces. All weights will be charted on control charts featuring average weight and range.

   b) IQF -- Patties will be IQF so individual patties do not stick together after they are packaged.

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION          **ATTACHMENT I**
Page 3 of 5

    c) Appearance -- Patties shall be of normal commercial fully cooked color without pink or burnt appearance after cooking.  Patties shall have subtle "browned" highlights with minimal evidence of gray color.

    d) Flavor -- Patties must not have a scorched flavor.

    e) Shape -- Patties will be round or oval shape.

### 4. COOKING TEMPERATURE

All products will be fully cooked in accordance with FSIS regulations.

### 5. METAL DETECTION

All products will be free of metal contaminants.  Detection of stainless steel, ferrous, and non-ferrous (e.g., lead, copper, and aluminum) metals is required.  The equipment, location, detection procedure, sensitivity levels, frequency of equipment validation, and corrective action procedures shall be described.

## C. FINISHED PRODUCT LIMITATIONS

The declared serving size, fat content, and sodium level will be stated on the nutrition facts panel on each label according to FSIS nutritional labeling regulations.

### 1. FAT

The fat content of the finished product will not exceed 20 percent.

(Percent Fat = (Total Fat ÷ Serving Size) x 100).

### 2. SODIUM

Sodium level must not exceed 700 mg per 100 g serving ((Declared Sodium Level (mg) X 100) ÷ Declared Serving Size (grams - racc*) ≤ 700)).

### 3. MICROBIAL

Contractor will have documented plan to comply with the latest FSIS *Salmonella* and *Listeria monocytogenes* requirements for ready-to-eat foods.  Product tested positive for any pathogen will not be allowed as rework or delivery to USDA

## D. HEATING INSTRUCTIONS AND SERVING SIZE

### 1. HEATING INSTRUCTIONS

Heating instructions for the end-user will be provided by the offeror and must be included on the immediate packaging.  These items will be processed so that the end-user may prepare them in a conventional or microwave type oven for serving.

### 2. SERVING SIZE

The serving size shall be declared on the nutritional facts panel in accordance with FSIS "referenced amounts customarily consumed" (racc) regulations and requirements.

## E. PREPARATION FOR DELIVERY

### 1. PACKAGING AND PACKING

    a) Packaging -- Cooked patties will be either vacuum packaged or packed in a sealed (tamper proof) immediate package.

    b) Packing -- Twenty (20) 2-pound immediate packages will be packed in a 40-pound (net weight) shipping container.

80

**2. LABELING**

The shipping containers will be in compliance with the National Motor Freight Classification, or the Uniform Freight Classification, as applicable. Both immediate and shipping containers will be labeled to include all information required by FSIS regulations.

a) Immediate Container Labels – Immediate container labels will contain the following information:

(1) A "Best-If-Used-By" date that is 180 calendar days from the date of production.

(2) A nutrition facts panel based on actual nutritional analysis of the product.

(3) A traceability code that is traceable back to establishment number, production lot, and date

(4) Heating instructions that describe the preparation of the cooked pork patties in both conventional and microwave type ovens for serving.

b) Shipping Container Labels – Shipping container labels will contain the following information.

(1) USDA shield at least 2-inches high and appearing on the top of the container or on the principle display panel.

(2) Applicable contract number

(3) A traceability code that is traced back to establishment number, production lot, and date.

(4) A nutrition facts panel based on actual nutritional analysis of the product.



(5) The appropriate product code: A729.

**3. CLOSURE**

Shipping containers will be closed by strapping, taping or gluing. When strapping is used, the initial closure (usually the bottom of container) shall be secured by the gluing or taping method.

**4. PALLETIZED UNIT LOADS**

All products will be stacked on new or well-maintained pallets and palletized with shrink wrap plastic.

**F. DELIVERY UNIT**

Each delivery unit will consist of 1,000 cases (40,000 pounds).

**G. DELIVERED PRODUCT**

**1. SIZE AND STYLE OF CONTAINER**

Only one size and style of immediate and shipping containers may be offered in an individual shipping unit.

**2. TEMPERATURE**

All products will not exceed 0°F at the time of shipment and delivery.

3. **SEALING**

All products must be delivered to AMS assigned destinations under seal with tamper proof, tamper resistant, serially numbered, high security seals that meet the American Society for Testing and Materials Standard F 1157-04 as required under this announcement.

H. **PRODUCT ASSURANCE**

1. **WARRANTY AND COMPLAINT RESOLUTION**

   a)  Warranty -- The contractor will warrant that the product complies with all specification requirements, production plan declarations, and provisions set forth in the program announcement.

   b)  Complaint Resolution -- Customer complaint resolution procedures will be included in the production plan. These procedures will include: a point of contact, investigation steps, and intent to cooperate with AMS, and product replacement or monetary compensation. The procedures will be used to resolve product complaints from recipient agencies or AMS.

2. **NON-CONFORMING PRODUCT**

   The contractor must have documented procedures that assure nonconforming product identification, segregation, and disposition in order to prevent misuse and that nonconforming product is not delivered to USDA. The contractor will ensure that product which does not conform to product requirements is identified and controlled to prevent unintended use or delivery.

3. **AMS MONITORING AND PRODUCTION ASSESSMENT**

   An AMS Meat Grading and Certification Branch agent must be present during the production of the finished product. The AMS agent will monitor and verify the processing steps, quality assurance activities, and corrective actions to assure that all requirements outlined in the approved production plan are complied with. The AMS agent will be conducting the monitoring and production verification in accordance with applicable MGC instructions. Any deviations to contractual requirements will be reported to the contractor and Contracting Officer.

82

SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION          ATTACHMENT H
## LIVESTOCK AND SEED PROGRAM
VENDOR REQUEST FOR LOGON IDENTIFICATION (ID) AND PASSWORD
DOMESTIC ELECTRONIC BID ENTRY SYSTEM (DEBES)

COMPANY INFORMATION:

| COMPANY NAME | | |
|---|---|---|
| Street Address | | |
| City | State | Zip Code |

Person to receive Vendor ID and password

Method to receive Vendor ID and password: (Complete one)

Telephone:

Fax:

E-mail:

Assign 5-8 digit alpha/numeric personal identification number (PIN) for
company: _____
(This code will be used as verification by USDA when assigning or resetting a password)

NAME AND TITLE OF PERSON REQUESTING LOGON ID:
(Must be authorized on SF-129 to sign bids)

Name_____Title _____

Signature_____ Date_____

TO BE COMPLETED BY USDA:

| VENDOR LOGON ID: | PASSWORD: |
|---|---|
| ("A" and 8 digits) | (must be changed at first DEBES logon): |
| Notified: .........................................<br>(Company Representative) | Date: ................... |
| USDA Marketing Specialist: | Date: |

Please return this form by FAX to: Contracting Officer, Commodity Procurement Branch, LSP Programs,
(202) 720-9538 FOR INFORMATION CALL (202) 720-3850

83

**SUPPLEMENT LS-400 TO AMS MASTER SOLICITATION**         **ATTACHMENT III**

ADDRESS INFORMATION FOR AMS COMMODITY PURCHASE PROGRAM

| Vendor Name and Address:<br><br>Contracts will be awarded and mailed to address provided. | Company Name: |
| --- | --- |
| | Contact: |
| | Address-Street: |
| | Address-P.O. Box: |
| | City, State, Zip: |
| | Fed. Meat Insp. Est. No.<br>Or State Insp. No. as appropriate: |
| | Phone:                          Fax: |
| Payment Disbursement Statement address:<br>Payments to Vendors must be made electronically. To set up electronic transfer, contact the Kansas City Mgmt. Office (816-926-6088)<br><br>☐ ACH   ☐ In Process | Company Name: |
| | Contact: |
| | Address-Street: |
| | Address-P.O. Box: |
| | City, State, Zip: |
| | Phone: |
| | Taxpayer Identification No. (TIN #): |
| Plant Address:<br><br>If Vendor address is same for plant, write "Same".<br><br>If multiple plants, attach additional pages. | Company Name: |
| | Contact: |
| | Address-Street: |
| | Address-P.O. Box: |
| | City, State, Zip: |
| | Phone: |
| Plant's Shipping Point Address:<br><br>If Plant address is same for shipping, write "Same".<br><br>If multiple shipping points, attach additional pages. | Company Name: |
| | Contact: |
| | Address-Street: |
| | Address-P.O. Box: |
| | City, State, Zip: |
| | Phone: |
| Notice to Deliver Address: | Company Name: |
| | Contact: |
| | Address-Street: |
| | Address-P.O. Box: |
| | City, State, Zip: |
| | Phone: |

Signature & Title (Authorized Company Representative)                    Date

PLEASE RETURN THIS FORM PRIOR TO SUBMITTING A BID
Send by FAX to Contracting Officer, Livestock & Seed Program, AMS, USDA; 202/720-9538

84

QUALIFICATION REQUIREMENTS FOR PROSPECTIVE CONTRACTORS SELLING
COMMODITIES TO USDA
April 2009

USDA's Agricultural Marketing Service (AMS) procures various products for school lunch and other domestic food nutrition programs.

The qualification requirements requested from a prospective contractor are a reexamination and revalidation of established qualification requirements as required by the Federal Acquisition Regulations (FAR) Part 9 and are necessary for AMS to carry out its procurement mission. A prospective contractor shall be determined to be qualified by the Contracting Officer prior to submitting offers for invitations for bids. An interested prospective contractor shall fully complete and provide all materials requested herein to the Contracting Officer in the applicable commodity Program. The Contracting Officer will review this submission and determine if a prospective contractor will be added to the Qualified Bidders List. Offers will not be accepted from a prospective contractor that has failed to comply with these requirements.

Procurement information concerning invitations for bid, commodity specifications, the master solicitation for commodity procurements, and historical contract award information can be located at http://www.ams.usda.gov.

A prospective contractor may submit applications at any time and will be notified in writing whether requirements have been satisfied. A prospective contractor that is a small business concern may be referred to the Small Business Administration (SBA) for a Certificate of Competency, if deemed necessary by the Contracting Officer.

Administrative Requirements

Each prospective contractor shall:

1. Register in the Central Contractor Registration (CCR) system at http://www.ccr.gov. The CCR requires a one-time business registration with mandatory annual updates. The CCR allows a prospective contractor to control the accuracy of its own business information. There is no fee to register in CCR. The data from registrations will be used for procurement and payment purposes.

2. Complete electronic annual representations and certifications at https://www.orca.bpn.gov in conjunction with required registration in the CCR database. Each prospective contractor is required to update its representations and certification submitted through the Online Representation and Certifications Application (ORCA) as necessary, but at least annually, to ensure they are kept current, accurate, and complete. The representations and certifications are effective until 1 year from date of submission or update to ORCA.

3. Complete Standard Form 3881, ACH Vendor/Miscellaneous Payment Enrollment Form, which can be located at http://www.sc.egov.usda.gov.

85

4.  Submit copy of applicable SBA certificate if the company is a certified small disadvantaged business (SDB), 8(a), and/or HUBZone, and is not certified in the CCR as such.

Capability Requirements

In accordance with FAR 9.104-1 and 9.104-3(b), each prospective contractor shall certify its capability to perform as follows:

1.  All written submissions from potential vendors must be on company letterhead authenticating the exact legal name and include the following:

   a.  A list of all products that it is interested in providing.

   b.  A description of historical experience including the number of years it has sold these or similar products in the commercial marketplace or to governmental organizations.

   c.  Three reference letters from customers you have sold products to (on letterhead with signatures).

   d.  Any additional pertinent information regarding a prospective contractor's capabilities such as, but not limited to, a satisfactory record of integrity and business ethics and verification that it is otherwise qualified and eligible to receive an award under applicable laws and regulations.

2.  In accordance with 13 CFR 121.406, a prospective contractor that is a non-manufacturer must be engaged in the wholesale or retail trade and sell the items being offered to the general public. The prospective contractor must furnish a copy of the written agreement in effect between itself and an approved supplier to certify compliance with the applicable AMS solicitation requirements.  The agreement must be on company letterhead and must be signed by both parties.

Financial Responsibility

1.  Financial responsibility determination will be made prior to award.  Prospective contractors must provide their Dun and Bradstreet (D&B) number (DUNS number).  In order to facilitate the responsibility determination, AMS will request and evaluate Dun and Bradstreet's business analysis reports for each prospective contractor.  If the financial information available through D&B business analysis reports is not sufficient to complete a satisfactory review of a prospective contractor's financial stability, AMS will request a prospective contractor to submit, prior to offer, its latest complete comparative financial statement.  The financial statement must be prepared in accordance with generally accepted accounting principles and be audited or reviewed by an independent certified public accountant in accordance with standards established by the American Institute of Certified Public Accountants.  At a minimum, the statement should include a balance sheet, profit and loss statement, statement of cash flows, statement of retained earnings and any notes to the financial statement.  For partnerships, the last fiscal year end or current financial statement of the partnership and the personal financial statement of each partner will be

86

required. For individuals, financial statements that include all of his/her personal and business assets and liabilities will be required.

A prospective contractor shall demonstrate that it has adequate financial resources to perform the contract or the ability to obtain them as required by FAR 9.104-3(a), including the availability of necessary working capital and satisfactory credit. This may include, but is not limited to, the financial protection against losses as set forth in FAR part 28.

The D&B business analysis report or the latest financial statement will be reviewed on an annual basis to determine continued eligibility to receive an award. Every January 1st each qualified contractor must submit its current audit or review level financial statements to D&B. In addition, a qualified contractor must notify its Contracting Officer when the financial information has been submitted to D&B. The D&B web address is: https://eupdate.dnb.com/default.asp?emid=iOG200047. The financial statements submitted to D&B should be no more than 16 months old. If the financial information submitted to D&B is sufficient to evaluate and determine financial responsibility, no further documentation or information will be required from the contractor.

It is highly recommended that each prospective or qualified contractor submit its audit or review level financial statement to D&B as this information impacts the D&B report. Failure to submit the required financial information to D&B or the Contracting Officer may result in the Contracting Officer making a nonresponsibility determination.

<u>Food Defense Requirements</u>

Contractor and all subcontractors must have a documented and operational food defense plan that provides for the security of a plant's production processes and includes the storage and transportation of pre-production raw materials and other ingredients and post-production finished products. The plan shall address the following areas, where applicable: (1) food defense plan management; (2) outside and inside security of the production and storage facilities; (3) slaughter and processing, including all raw material sources; (4) controlled access to production and storage areas; (5) storage; (6) water and ice supply; (7) mail handling; (8) personnel security; and (9) transportation, shipping, and receiving (includes the sealing of any transport conveyance for truck lot and less-than-truck lot quantities of finished product).

The food defense plans will be audited by the applicable AMS Branch. Any nonconformance identified must be addressed in writing to both the Contracting Officer and Auditor within 14 calendar days of the audit. See Food Safety and Inspection Service (FSIS) Security Guidelines for Food Processors at the following website: http://www.fsis.usda.gov/OA/topics/SecurityGuide.pdf and information for the transportation and distribution of meat, poultry, and egg products is located at the following website: http://www.fsis.usda.gov/oa/topics/transportguide.htm. For fruit and vegetable commodities, see http://www.ams.usda.gov/fv/pphweb/Food%20Defense/Food%20Defense%20Survey%20for%20web.pdf.

87

After receiving the qualification information, a pre-award survey shall be conducted to verify that a prospective contractor meets AMS qualification requirements. The pre-award survey will be conducted by the applicable AMS Grading/Inspection Branch to evaluate the technical, production, and transportation capabilities, and quality assurance and production control procedures of the vendor. Prior to approval, prospective contractors must be compliant with the applicable commodity requirements document that contains the specifications for each product.

If all qualification requirements are met, a vendor identification entity number (unique to each program area) will be assigned to the newly qualified contractor in order to submit future offers to AMS.

A prospective contractor is encouraged to submit its application package as soon as possible so it may be notified of qualification status in advance of upcoming invitations for bid. The qualification packages should be submitted under seal and marked **CONFIDENTIAL** to the Contracting Officer of the applicable Program below:

Fruit & Vegetable Commodity Procurement Branch
USDA/AMS
1400 Independence Avenue, SW
Stop Code 0239
Washington, DC  20250
FAX:  202-720-2782

Poultry Commodity Procurement Branch
USDA/AMS
1400 Independence Avenue, SW
Stop Code 0260
Washington, DC  20250
FAX:  202-720-5871

Livestock and Seed Commodity Procurement Branch
USDA/AMS
1400 Independence Avenue, SW
Stop Code 0253
Washington, DC  20250
FAX:  202-720-9538

Except as provided in FAR Part 24.2 (the "Freedom of Information Act") qualification information, including the pre-award survey report, accumulated for purposes of determining the responsibility of a prospective contractor shall not be released or disclosed outside the government.  All information provided will be kept confidential to the extent permitted by law.

Under penalty of perjury, each qualification package must be submitted and signed by an individual who has the legal authority to contractually bind a prospective contractor on whose behalf that information package is submitted.  If any information provided by a prospective contractor becomes inaccurate, a prospective contractor must immediately notify the contracting officer and provide updated and accurate information in writing.  AMS reserves the right to waive minor irregularities and omissions in the information obtained in the qualification package submitted.

88

Effective Date:  **May 2009**

## AGRICULTURAL MARKETING SERVICE
## MASTER SOLICITATION
## FOR COMMODITY PROCUREMENTS

### For Distribution to Eligible Outlets



89

## Table of Contents

I.      INSTRUCTIONS TO BIDDERS ................................................................................1

II.     SUBMISSION OF BIDS ........................................................................................3

III.    CONTRACT AWARD... ... ... ... ...............................................................................5

IV.     ORDER OF PRECEDENCE AND INCORPORATED TEXT ...................................5

V.      CONTRACT COMPLIANCE ..................................................................................5

VI.     SHIPMENT AND DELIVERY ...............................................................................5

        A.      Change in Place or Manner of Shipment or Delivery ...........................................6

        B.      Notice to Deliver.............................................................................................6

        C.      Early Delivery................................................................................................7

VII.    LIABILITY FOR LOSSES DUE TO DETERIORATION, SPOILAGE, OR RECALL....7

        A.      Loss Due to Deterioration or Spoilage ...............................................................7

        B.      Loss Due to Product Recalled for Health or Safety Risk.......................................7

VIII.   INVOICES AND PAYMENT .................................................................................7

IX.     CLAUSES INCORPORATED BY REFERENCE .......................................................9

X.      PROVISIONS INCORPORATED BY REFERENCE..................................................16

XI.     INQUIRIES ......................................................................................................19

EXHIBIT 1   Sample Format for Submitting Offers through DEBES .............................20

EXHIBIT 2   Domestic Origin Certification............................................................21

EXHIBIT 3   Browser Requirements.....................................................................23

90

This solicitation, called the Master Solicitation, is used by the U.S. Department of Agriculture (USDA), Agricultural Marketing Service (AMS) to procure commodities for the National School Lunch Program and other Federal Food and Nutrition Programs. The Master Solicitation will provide general guidance to potential bidders and/or offerors.

I.    INSTRUCTIONS TO BIDDERS

A.    USDA will periodically issue Solicitations/Invitations for Bid (IFB) under this Master Solicitation for various commodities under domestic food nutrition assistance programs. Specifications and program requirements will be further defined in the appropriate commodity supplement to this Master Solicitation and are incorporated herein and made a part hereof for specific requirements.

B.    Awards will be made following the principles in the Federal Acquisition Regulation (FAR), and the Agriculture Acquisition Regulations (AGAR). The Solicitations/IFBs will specify the commodity, the bid date, the delivery period, the destinations, estimated quantities, the closing time for receipt of bids, and any provisions, terms, and conditions applicable to the proposed procurement which are in addition to or different from those contained in the Master Solicitation. Bidders are cautioned to carefully read this Master Solicitation, the applicable IFB, and the applicable Specification. The full texts of the applicable FAR provisions and clauses incorporated into the contract can be found at http://www.acquisition.gov/comp/far/index.html.

C.    Bid prices will be either F.O.B. (or F.A.S vessel) at the destinations listed in the applicable IFB or on a shipping point basis. If F.O.B. destination, bids will be invited on a purchase unit basis or multiples thereof, except that from time to time the IFB will indicate two or more destinations in a line item which will require a split delivery (drop) at each destination. Delivery by either trucks or railcars is at the option of the Contractor except for those destinations which specify the method of delivery. If F.O.B. origin, delivery of the commodity will be made, either F.O.B. railroad cars or trucks or in-store USDA's option, at the shipping points named in the Solicitation/IFB. To submit bids, a company must be on the Qualified Vendors List. Contact the Contracting Officer for requirements, or visit "Commodity Purchasing" at http://www.ams.usda.gov.

D.    Annual Representations and Certifications

1.    Central Contractor Registration (CCR) and Online Representations and Certifications (ORCA) Application.

Contractor must be registered with the Central Contractor Registration (CCR) as prescribed in FAR 4.1104 and the Online Representations and Certifications Application (ORCA). Bidder must certify with each bid that its company is registered with both the CCR and ORCA. The CCR can be accessed at http://www.ccr.gov and the ORCA at https://orca.bpn.gov.

2.    The 8(a) Program

For the purposes of contracts made under the 8(a) program, FAR subpart 19.8, reference to "Contractor," in all USDA contract documents, means the 8(a) firm. In accordance with the Interagency Agreement as authorized under FAR 19.800(c), the Small Business Administration (SBA) has delegated responsibility to USDA for the administration of contracts awarded to 8(a) firms with complete authority to take any action on behalf of the Government under the terms

- 3 -

91

and conditions of the contract. All 8(a) contractors must be on the Qualified Vendors List.

   E.   Domestic Products

All products used in fulfilling contracts awarded must be of 100 percent domestic origin, meaning that it was produced and processed from products, including maltodextrin (products) which were produced, raised, and processed only in the United States, its territories or possessions, the Commonwealth of Puerto Rico, or the Trust Territories of the Pacific Islands (hereinafter referred to as "the United States"). If the Contractor processes or handles products originating from sources other than the United States, the Contractor must have an acceptable identification and segregation plan for those products to ensure they are not used in commodities purchased under the Master Solicitation. This plan must be made available to an AMS representative and the Contracting Officer or agent thereof upon request. The Contractor must ensure that the Contractor and any subcontractor(s) maintain records such as invoices, or production and inventory records evidencing product origin, and make such records available for review by the Government in accordance with FAR 52.214-26.

Contractor agrees to include this domestic origin certification clause in all subcontracts for products used in fulfilling contracts awarded under this Master Solicitation. The burden of proof of compliance is on the Contractor.

Domestic verification requirements must be included in the Contractor's technical proposal, if applicable. Otherwise, the attached form (EXHIBIT 2) must be completed for each contract awarded and, prior to performance in this program, must be presented to an AMS representative, the Contracting Officer, or agent thereof upon request.

   F.   Food Defense Requirements

Potential Contractor(s) and subcontractor(s) must have a food defense plan that provides for the security of a plant's production processes and includes the storage and transportation of pre-production raw materials and other ingredients and post-production finished product. The plan shall address the following areas, as applicable: (1) food defense plan management; (2) outside and inside security of the production and storage facilities; (3) slaughter and processing, including all raw material sources; (4) shipping and receiving; (5) storage; (6) water and ice supply; (7) mail handling; (8) personnel security; and (9) transportation, shipping, and receiving (includes the sealing of any transport conveyance for truck lot and less-than-truck lot quantities of finished product).

Prior to a contract award, the documented and operational food defense plan will be audited by the USDA, AMS. The food defense audit is based on the Food Safety and Inspection Service (FSIS) Security Guidelines for Food Processors at the following website: http://www.fsis.usda.gov/OA/topics/SecurityGuide.pdf and guidelines for the transportation and distribution of meat, poultry, and egg products located at the following website: http://www.fsis.usda.gov/oa/topics/transportguide.pdf. All nonconformances listed in the audit report must be addressed in writing within 14 days to the Contracting Officer. The potential contractors will have an opportunity to correct identified nonconformances and improve their food defense plan.

Potential contractors may request waivers when pre-award audits could not be scheduled in time to meet the time required for bid offering. The potential contractors will receive written notification from the Contracting Officer of their eligibility to bid.

- 2 -

92

Follow-up audits may be conducted as determined by the Contracting Officer.

Eligible suppliers who receive contracts must have their documented food defense plan and supporting documentation readily available for review by the Contracting Officer or AMS agents. Records may be maintained on hard copy or electronic media. However, records maintained as electronic media will be made available in printed form immediately upon request by AMS or its agents.

      G.    Loading and Sealing of Vehicles

Loading must be in accordance with good commercial practices and the sealing must be done at origin under the supervision of a USDA, AMS certification agent. Therefore, all delivery units—truck lot and less-than-truck lot (LTL) quantities—must be secured at all times prior to unloading with tamper resistant, serially numbered, high security seals. Suppliers of commodities, products and/or services shall be responsible for placing seal(s) on all doors of each transportation conveyance upon completion of loading or servicing. Seals shall be serially numbered, barrier-type and meet the American Society for Testing and Materials (ASTM) standards (F-1157-04). Seals shall be 1/8th inch diameter cable, high security bolt, or equivalent. The contractor must maintain a record of each seal number used per truck lot and LTL delivery unit. Additionally, the contractor must ensure that the applicable seal identification number is on each bill of lading, shipment manifest, certificate, or delivery documents for each delivery destination.

When LTL delivery units are transported on the same trailer and destined for multiple recipients, the trailer must be sealed after each delivery. The seal number must be recorded on the appropriate delivery documents and correspond with the applied seal at the time of arrival at the next destination. It will be the responsibility of the contractor to provide a sufficient number of seals to the carrier service and to ensure that the trailer is sealed after each delivery destination. Failure to seal the trailer after each stop may result in rejection of the shipment by the recipient agency at the next scheduled stop and rejection of any subsequent deliveries on the trailer.

      1.  Railcar.  Each railcar must be sealed.  The contractor is responsible for arranging for railcar deliveries of more than one delivery unit so that each delivery unit contained in the same railcar can be completely separated and sealed.

      2.  Truck or Piggyback.  Truck or piggyback shipments must be sealed at origin. A delivery unit shipped by truck or piggyback which includes split deliveries to multiple destinations will require sealing after each drop in accordance with I.G. of this Master Solicitation.

H.    SUBMISSION OF BIDS

Bids must be submitted via the Internet by accessing the Domestic Electronic Bid Entry System (DEBES) (see EXHIBIT 3 for browser requirements).  Bidders may request vendor DEBES identifications and passwords by contacting the Contracting Office.  Bids submitted by any means other than DEBES will be considered nonresponsive.

Access the DEBES website at:  https://prod.usda.gov/3077/mdbs1000.exe?.

Once connected to DEBES, follow the online procedures.  Click on the "Help" button for detailed instructions on using the system, or contact the Contracting Officer for assistance.

93

AMS will not be responsible for any failure attributed to the transmission of the bid data prior to being accepted and stored on our web server including, but not limited to the following:

1. Any failure of the bidder's computer hardware or software.
2. Availability of the bidder's Internet service provider.
3. Delay in transmission due to the speed of the bidder's modem.
4. Delay in transmission due to excessive volume of Internet traffic.

Bidders are advised to allow sufficient time to input bids on the date of bid opening due to high volume of internet traffic.

Bids, modifications, or withdrawals of bids must be received in DEBES by the time prescribed in the applicable Invitation. Whether a bid, modification, or withdrawal is received within the time limitation will be determined by the latest time recorded in DEBES.

All sections of the bid form must be completed, including prices and constraints. Complete the certifications using the following as a guide. (See EXHIBIT 1 of this Master Solicitation for an example of a bid.)

1.      Offer is made subject to the Master Solicitation, the Specification(s), Invitation No. ____; and FAR/AGAR.

2.      Furnish the name, complete mailing address, and telephone number of office or person to receive shipping and delivery instructions. NOTE: FURNISH ADDRESS WITH FIRST BID; THEREAFTER, ENTER "SAME" IF INFORMATION HAS NOT CHANGED. ONLY ENTER UPDATED INFORMATION AS NECESSARY.

3.      Timely Performance Certification. All products required under any existing USDA contract(s) or subcontract(s) with a not-later-than delivery date prior to this bid opening have been delivered. Choose one:

        (a)     Have
        (b)     Have not
        (c)     Have not, but has notified the Contracting Officer
        (d)     No existing contracts

4.      Offeror (HAS) registered in the Central Contractor Registration (CCR). Furnish the expiration date of registration.

5.      Offeror (HAS) registered with the Online Representations and Certifications Application. Furnish the expiration date of registration.

6.      Offeror requests HUBZone small business price evaluation preference (YES) (NO). Applies only to firms certified in the Small Business Administration's Historically Underutilized Business Zone program (FAR subpart 19.13).

7.      Furnish name, title, fax number, phone number and email address of person submitting this bid (must be an officer of the company or a person authorized to execute contracts on behalf of the bidder).

- 4 -

94

### III.   CONTRACT AWARD

Firm fixed price contracts will be awarded to the responsible bidder(s) whose offer conforms to the IFB, Master Solicitation and Commodity Specification and whose bid(s) are most advantageous to the Government in terms of, but not limited to, price (including any transportation costs) and quantity requirements. Award(s) will be made on the least price combination of quantity being awarded. Award(s) documents will be faxed on the date specified in the IFB. A notice of award will be issued in the form of a Food Purchase Report or other public notice posted at the Department's Office of Public Affairs, News Division, after award, on the day of acceptance. After award information is posted, inquiries may be made to the Contracting Officer.

Award(s), as specified above, will result in a binding contract without further action by either party. Information on awards is also available electronically through the commodity procurement website at http://www.ams.usda.gov after award.

### IV.   ORDER OF PRECEDENCE AND INCORPORATED TEXT

The contract will incorporate this Master Solicitation including; the applicable IFB; the Specification; the Contractor's bid; and the award document. If the contract documents are inconsistent or contradictory, the following order of precedence will prevail: IFB, Master Solicitation, and Commodity Specification(s).

### V.   CONTRACT COMPLIANCE

The Contractor must assure compliance with all requirements of this Master Solicitation and the Commodity Specification prior to submission of product to USDA for acceptance. Examination and certification by USDA is solely for the benefit of USDA and will not relieve the Contractor of its obligation and responsibility to deliver a product which complies with all requirements of this Master Solicitation and the Commodity Specification. USDA approval of any part of the production process, including but not limited to equipment, will not relieve the Contractor of the responsibility for performing in accordance with the contract.

### VI.   SHIPMENT AND DELIVERY

Shipment and delivery must be made in accordance with this Master Solicitation; the Commodity Specification; the applicable IFB; and the Notice to Deliver issued to the contractor by the Kansas City Commodity Office (KCCO) following award. The Contractor must closely follow delivery notification instructions contained in the Notice to Deliver. Such notification of delivery is vital, particularly in cases of minimal transit time.

When notified of shipments, consignees may request upgrading of delivery services or delivery to an alternate warehouse; for example, delivery within the consignee's premises or to a specific room within a building. Such delivery terms are beyond USDA contractual requirements. Any negotiations to upgrade services are between the Contractor and consignee and any additional charges for special delivery terms are between consignee and Contractor. Any charges invoiced to USDA for additional delivery services will be denied.

When making deliveries to more than one destination from the same railcar, the quantities required at each stop off must be placed in separate compartments under seal. Each railcar compartment must be stacked in a manner that will preclude containers shifting while in transit.

- 3 -

95

### A. Change in Place or Manner of Shipment or Delivery

#### 1. F.O.B. at Origin

If the commodity price is on the basis of delivery F.O.B. cars or trucks at origin and the Contractor requests a change in the shipping point named in the contract and such request is approved by USDA, any additional cost of transportation and related services shall be deducted from payments otherwise due the Contractor and any savings shall accrue to USDA. For F.O.B. Origin prices, the government will add the cost of transportation to the offer price in evaluation and award.

#### 2. F.O.B at Destination or F.A.S Vessel

If the commodity price is on the basis of delivery F.O.B. cars or trucks at destination or F.A.S. vessel at designated ports and if USDA orders delivery of the commodity in a manner or to destinations other than those stated in the contract, any additional cost of transportation and related services shall be for the account of USDA and any savings will accrue to USDA. When a place of delivery is changed by USDA, the contract price shall be adjusted for any resulting increase or decrease in the cost of performance in accordance with best available information as determined by USDA. No adjustment shall be made for changes in transportation costs when commodities are identically priced for delivery regionally or nationally and the place of delivery is changed within the area to which the identical price applies. In all other cases, price adjustments due to changes in transportation costs shall be determined by the USDA prior to shipment. If USDA orders delivery to a destination other than the original destination named in the contract, transportation costs adjustments will be made by the Kansas City Commodity Office.

### B. Notice to Deliver

The Kansas City Commodity Office shall issue a Notice(s) to Deliver at least 7 days prior to the first day of each period scheduled in the contract for the delivery of a specified quantity of the commodity. Any modification of such period must be made by agreement with the applicable Contracting Office. Such period or any modification thereof is hereinafter called "the contract delivery period." The date on which the Notice to Deliver is issued shall be shown thereon. The Contractor shall deliver in accordance with instructions in the Notice(s) to Deliver, except that (1) if a Notice to Deliver is issued less than 7 days prior to the first day of the contract delivery period, such delivery period and each subsequent consecutive delivery period under the contract directly affected by the delay shall be extended by the number of days such Notice is issued late; and (2) in any event, the Contractor shall be allowed the number of business days contained in the period specified in the contract for delivery of the contract quantity, beginning 7 days after the Notice to Deliver is issued. Notwithstanding the foregoing, the Contractor shall not be entitled to any extension of the contract delivery period under this clause unless it furnishes evidence satisfactory to the Contracting Officer that it was prepared to deliver during the contract delivery period.

The commodity shall be delivered by the Contractor in the manner (F.A.S. vessel, F.O.B. cars, etc.) and at the point(s) of delivery, as required by the contract, pursuant to delivery instructions issued by the Kansas City Commodity Office. Delivery shall not be made before receipt of delivery instructions, or before the time the commodity has been inspected and found to meet specifications.

- 6 -

96

Immediately on delivery, the Contractor shall, in accordance with instructions on the Notice to Deliver, notify USDA, or consignee, or both, of the delivery.

### C. Early Delivery

The Contractor may deliver early upon the approval of the KCCO. Approval may be obtained by telephoning (816) 926-6124. Approval is contingent on the recipient's concurrence to accept early delivery and upon AMS personnel being available to perform any necessary checkloading and final acceptance duties.

### VII.   LIABILITY FOR LOSSES DUE TO DETERIORATION, SPOILAGE, OR RECALL

#### A.   Loss Due to Deterioration or Spoilage

The Contractor shall reimburse USDA for all losses due to deterioration or spoilage sustained by USDA for which the Contractor is responsible, but only if such losses are discovered within a reasonable time, as determined by USDA, after delivery. The Contractor agrees to reimburse USDA for such losses within 10 days after date of billing by USDA. That part of the commodity as to which USDA makes a claim based on deterioration or spoilage shall be held by USDA subject to disposition instructions of the Contractor (unless the nature of the deterioration or spoilage is such as to require condemnation and destruction as determined by USDA or its authorized representative) but need not be held by USDA in excess of 30 days after USDA sends notice of such claim to the Contractor. In lieu of reimbursing USDA, the Contractor may replace the deteriorated or spoiled commodity with an equal quantity of commodity which conforms to all contract requirements and specifications, if such replacement is agreed to by USDA.

#### B.   Loss Due to Product Recalled for Health or Safety Risk

In the event the commodity or commodity product is recalled due to a health or safety risk, the Contractor is responsible for all costs associated with removal and replacement of recalled commodities or products, and reimbursement of State and local costs incurred as a result of the recall, as outlined in the Food and Nutrition Service's (FNS) Commodity Hold and Recall Process. A copy of this report can be obtained at: http://www.fns.usda.gov/fdd/foodsafety/hold-recallproc.pdf. These costs include, at a minimum, storage, transportation, processing, and distribution of the commodities or products.

### VIII.   INVOICES AND PAYMENT

Invoices requesting payment must be submitted separately by the Contractor to the Fiscal Division, Kansas City Commodity Office. Invoices for payment must be made on the invoice portion of the Notice to Deliver or on a commercial type invoice and be supported by the original (official) inspection and checkloading certificates, if applicable, and either a copy of commercial bill of lading or other commercial receipt signed by recipient agent evidencing delivery. Invoices for reimbursement of transportation and protective service charges, if any, must be supported by the original or a copy of carrier's receipted freight bill or invoice. If shipment is by contract carrier, the Contractor's invoice must also be supported by a copy of the contract between the Contractor and the truck or rail line showing the schedule of rates, or a copy of the truck or rail line's published rates.

97

For F.O.B at origin purchases, invoices for payment of freight charges, billed by the transportation companies, must be submitted to the Traffic Management Division, Kansas City Commodity Office. Invoices must contain the applicable Notice to Deliver number to be considered a proper invoice.

Only whole pounds should be shown on the invoice. When the total quantity to be invoiced includes a fraction of a pound, the fraction should be omitted if less than one-half pound and raised to the next full pound if one-half pound or more. The Contractor may include more than one shipment on any invoice.

Submission of an invoice when all contract terms and conditions have not been satisfied may subject the Contractor to civil and criminal penalties as provided in Titles 15, 18, and 31 of the United States Code. The USDA will make payment to the Contractor of any amounts due with respect to each shipment/delivery invoiced.

Payment is due after receipt by the Kansas City Finance Office (KCFO), of a properly prepared invoice with the required supporting documentation within the time indicated below. A properly prepared invoice package must include the following supporting documents:

    1.    USDA Form KC-269 (Notice to Deliver) or commercial invoice form;

    2.    Origin USDA Inspection Certificate issued at time of checkloading, if applicable; and

    3.    A copy of the Bill of Lading or other commercial receipt signed by recipient agent evidencing delivery date and quantity of product delivered or destination USDA Inspection Certificate evidencing delivery of product.

| If the items delivered are: | Payment must be made as close as possible to but not later than: |
| --- | --- |
| *Meat or meat food products.* As defined in section 2(a)(3) of the Packers and Stockyard Act of 1921 (7 U.S.C. 182(3)), and as further defined in Public Law 98-181, including any edible fresh or frozen poultry meat, and perishable poultry meat food product, fresh eggs, and any perishable egg product. | 7th day after product delivery |
| *Fresh or frozen fish.* As defined in section 204(3) of the Fish and Seafood Promotion Act of 1986 (16 U.S.C. 4003(3)). | 7th day after product delivery. |
| *Perishable agricultural commodities.* As defined in section 1(4) of the Perishable Agricultural Commodities Act of 1930 (7 U.S.C. 499a(4)). | 10th day after product delivery, unless another day is specified in the contract. |

For the purpose of payment, the date of delivery of each shipment of product will be the date of receipt by KCFO of a properly prepared invoice package.

98

The properly prepared invoice package must be mailed or delivered to the KCFO at the following address:

> Director, Kansas City Finance Office
> U.S. Department of Agriculture
> ATTN: Fiscal Operations Division
> Payment Certification Branch STOP 8578
> Kansas City, Missouri 64141-6205
> Telephone: (816) 926-6205

When applicable, the Contractor will note on their invoice, "Invoice subject to adjustment in transportation costs."

USDA payments must be made directly to a financial banking institution. To receive payments electronically, Form SF-1199A, Direct Deposit Sign-up Form, can be obtained from KCCO, Commodity Financial Operations Division, FCB; Telephone (816) 926-2550, or access the form via the internet at: https://pcsd.usda.gov/3076/finance/.

IX.     CLAUSES INCORPORATED BY REFERENCE

This Master Solicitation incorporates one or more solicitation clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a solicitation provision may be accessed electronically at this address: http://www.acqnet.gov/far.

| 48 CFR FAR Clause Reference Number | Description | Date (Month/Year) |
|---|---|---|
| 52.202-1 | Definition | Jul. 2004 |
| 52.203-3 | Gratuities | Apr. 1984 |
| 52.203-5 | Covenant Against Contingent Fees | Apr. 1984 |
| 52.203-6 | Restriction on Subcontractor Sales to the Government | Sep. 2006 |
| 52.203-7 | Anti-Kickback Procedures | Jul. 1995 |
| 52.203-8 | Cancellation, Rescission, and Recover of Funds for Illegal or Improper Activity | Jan. 1997 |
| 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity | Jan. 1997 |
| 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions | Sep. 2007 |
| 52.204-7 | Central Contractor Registration | Apr. 2008 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting with contractors Debarred, Suspended, or Proposed for Debarment. | Sep. 2006 |
| 52.211-5 | Material Requirements | Aug. 2000 |
| 52.211-16 | Variation in Quantity | Apr. 1984 |
| 52.211-17 | Delivery of Excess Quantities | Sep. 1989 |
| 52.219-3 | Notice of Total HUBZone Set-Aside (Applicable only for contracts involving Set-Asides) | Jan. 1999 |
| 52.219-6 | Notice of Total Small Business Set-Aside (Applicable only for contracts involving Set-Asides) | Jun. 2003 |

99

| 48 CFR FAR Clause Reference Number | Description | Date (Month/Year) |
|---|---|---|
| 52.219-7 | Notice of Partial Small Business Set-Aside (Applicable only for contracts involving Set-Asides) | Jun. 2003 |
| 52.219-8 | Utilization of Small Business Concerns (Applicable if contract amount exceeds $100,000) | May 2004 |
| 52.219-9 | Small Business Subcontracting Plan (Applicable if contract amount exceeds $550,000) | Apr. 2008 |
| 52.219-9 | Small Business Subcontracting Plan - Alternate I | Oct. 2001 |
| 52.219-14 | Limitations on Subcontracting (Applicable only for contracts involving Set-Asides if contract amount exceeds $100,000) | Dec. 1996 |
| 52.219-16 | Liquidated Damages -- Subcontracting Plan (Applicable only when Clause 52.219-16 applies) | Jan. 1999 |
| 52.222-3 | Convict Labor | Jun. 2003 |
| 52.222-4 | Contract Work Hours and Safety Standards Act -- Overtime Compensation | July 2005 |
| 52.222-21 | Prohibition of Segregated Facilities | Feb. 1999 |
| 52.222-26 | Equal Opportunity | Mar. 2007 |
| 52.222-35 | Equal Opportunity for Special Disabled Veterans, Veterans of Vietnam Era, and Other Eligible Veterans | Sep. 2006 |
| 52.222-36 | Affirmative Action for Workers with Disabilities | Jan. 1998 |
| 52.222-37 | Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans | Sep. 2006 |
| 52.223-6 | Drug-Free Workplace | May 2001 |
| 52.223-14 | Toxic Chemical Release Reporting (Applicable if contract amount exceeds $100,000) | Aug. 2003 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | Jun. 2008 |
| 52.229-3 | Federal, State, and Local Taxes | Apr. 2003 |
| 52.232-1 | Payments | Apr. 1984 |
| 52.232-8 | Discounts for Prompt Payment | Feb. 2002 |
| 52.232-11 | Extras | Apr. 1984 |
| 52.232-17 | Interest | Oct. 2008 |
| 52.232-18 | Availability of Funds | Apr. 1984 |
| 52.232-23 | Assignment of Claims | Jan. 1986 |
| 52.232-25 | Prompt Payment | Oct. 2008 |
| 52.232-33 | Payment by Electronic Funds Transfer -- Central Contractor Registration | Oct. 2003 |
| 52.233-1 | Disputes | Jul. 2002 |
| 52.233-3 | Protest after Award | Aug. 1996 |
| 52.233-4 | Applicable Law for Breach of Contract Claim | Oct. 2004 |
| 52.242-13 | Bankruptcy | Jul. 1995 |
| 52.242-17 | Government Delay of Work | Apr. 1984 |
| 52.243-1 | Changes - Fixed Price | Aug. 1987 |
| 52.244-6 | Subcontracts for Commercial Items | Feb. 2007 |
| 52.246-2 | Inspection of Supplies -- Fixed-Price | Aug. 1996 |
| 52.246-15 | Certificate of Conformance | Apr. 1984 |
| 52.246-16 | Responsibility for Supplies | Apr. 1984 |

100

| 48 CFR FAR Clause Reference Number | Description | Date (Month/Year) |
|---|---|---|
| 52.247-15 | Contractor Responsibility for Loading and Unloading | Apr. 1984 |
| 52.247-16 | Contractor Responsibility for Returning Undelivered Freight | Apr. 1984 |
| 52.247-34 | F.O.B. Destination | Nov. 1991 |
| 52.247-36 | F.A.S. Vessel, Port of Shipment | Apr. 1984 |
| 52.247-48 | F.O.B. Destination – Evidence of Shipment | Feb. 1999 |
| 52.247-58 | Loading, Blocking, and Bracing of Freight Car shipments | Apr. 1984 |
| 52.249-1 | Termination for Convenience of the Government (Fixed-Price)(Short Form) (Applicable if contract amount is $100,000 or less) | Apr. 1984 |
| 52.249-2 | Termination for Convenience of the Government (Fixed-Price) (Applicable if contract amount exceeds $100,000) | May 2004 |
| 52.249-8 | Default (Fixed-Price Supply and Service) | Apr. 1984 |
| 52.252-2 | Clauses Incorporated by Reference | Feb. 1998 |
| 52.253-1 | Computer Generated Forms | Jan. 1991 |

A.    AMS Clauses

1.    Checkloading

a.  The Contractor shall not load the commodity for shipment or transfer the commodity in store unless, at the time of such loading or transferring, the commodity is checkloaded by USDA or by a person of the inspection or grading service designated by USDA. The Contractor is responsible for giving notice in sufficient time for a USDA agent to be present. The cost of checkloading shall be for the account of the Contractor. Checkloading refers to identifying the commodity which was previously inspected and found to meet contract requirements, examining the commodity at the time of loading or transferring for condition of containers and for compliance with labeling and container marking requirements, and determining the number of containers per car, truck, or lot.

b. Checkloading by persons licensed or authorized by USDA shall not relieve the Contractor of the obligation to effect a delivery of the commodity meeting contract requirements or constitute a waiver of any of USDA's rights under the contract. The certificates issued as a result of such official checkloading shall be only prima facie evidence of the number and condition of containers.

c. The Contractor shall be liable for all shortages which occur before delivery, except that if shipment is by common carrier, the Contractor shall not be liable for a shortage reported at destination unless it can be established, notwithstanding the checkloading certificate, that there was an actual shortage at the time of loading for shipment.

d. This paragraph (d) is not applicable to purchases delivered F.O.B. origin. If the shipment is by truck and USDA specifically requests "Exclusive Use of Vehicle," USDA will reimburse the Contractor for any additional transportation costs due to shipment under "Exclusive Use of Vehicle." The sealing of trucks as part of the checkloading procedure

- 31 -

101

shall not be construed as such a request. In the absence of such a request by USDA, any additional cost of transportation and related services due to shipment under "Exclusive Use of Vehicle" shall be for the Contractor's account. The Contractor shall be responsible for making such arrangements as may be necessary to prevent the application of "Exclusive Use of Vehicle" charges when such charges result in higher transportation costs. The arrangements to be made by the Contractor may include an instruction to the checkloader not to seal the truck when the sealing will result in "Exclusive Use of Vehicle" charges. If, notwithstanding such arrangements, the checkloader seals the truck, the Contractor shall have the responsibility for removing the seals.

2.   Obliteration of Markings

The Contractor agrees to take necessary action to prevent the appearance in commercial or other channels of any labels, bags, cans, can lids, cases, or any other type of packaging, either filled or unfilled (hereinafter referred to as "containers and container materials"), bearing markings required under the contract, including those held by the Contractor or others, e.g., overruns. The following actions with respect to all inner and outer containers and container materials will constitute compliance with the intent of this clause: (a) complete obliteration of all markings required under the contract with a permanent opaque paint, or removal of labels which bear such markings, and overlaying or replacing markings so obliterated or removed with commercial labeling; (b) placing a transparent pressure-sensitive sticker on all containers and container materials bearing USDA markings, which shall state in lettering of a prominent size "SALVAGE BY (insert firm's name)" directly on the "NOT TO BE SOLD OR EXCHANGED" legend wherever it appears on the containers and container materials; (c) drawing one or more x's completely through the markings and with a permanent stamp conspicuously placing thereon the following legend: "This container has not been used and shall not be used for shipment of Government commodities.", or (d) any other actions, approved by the Contracting Officer, which accomplish the intent of the foregoing. The appearance in commercial or other channels of containers and container materials bearing markings required under the contract may cause USDA expense in determining whether commodities have been diverted from authorized use and in answering inquiries.

B.   FAR Clauses

1.   Qualification Requirements. (52.209-1)

(a) *Definition.* "Qualification requirement," as used in this clause, means a Government requirement for testing or other quality assurance demonstration that must be completed before award.

(b) One or more qualification requirements apply to the supplies or services covered by this contract. For those supplies or services requiring qualification, whether the covered product or service is an end item under this contract or simply a component of an end item, the product, manufacturer, or source must have demonstrated that it meets the standards prescribed for qualification before award of this contract. The product, manufacturer, or source must be qualified at the time of award whether or not the name of the product, manufacturer, or source is actually included on a qualified products list, qualified manufacturers list, or qualified bidders list. Offerors should contact the agency activity designated below to obtain all requirements that they or their products or services, or their subcontractors or their products or services, must satisfy to become qualified and to arrange for an opportunity to demonstrate their abilities to meet the standards specified for qualification.

- 32 -

102

Contracting Officer
USDA/AMS/LS/Commodity Procurement
1400 Independence Ave. S.W., Mail Stop 0253
Washington, DC  20250-0253
Telephone: 202/720-2650

(c) If an offeror, manufacturer, source, product or service covered by a qualification requirement has already met the standards specified, the relevant information noted below should be provided.

Offeror's Name .......................................................................

Manufacturer's Name ...........................................................

Source's Name .......................................................................

Item Name .......................................................................

Service Identification .......................................................................

Test Number .......................................................................
(to the extent known)

(d) Even though a product or service subject to a qualification requirement is not itself an end item under this contract, the product, manufacturer, or source must nevertheless be qualified at the time of award of this contract. This is necessary whether the Contractor or a subcontractor will ultimately provide the product or service in question. If, after award, the Contracting Officer discovers that an applicable qualification requirement was not in fact met at the time of award, the Contracting Officer may either terminate this contract for default or allow performance to continue if adequate consideration is offered and the action is determined to be otherwise in the Government's best interests.

(e) If an offeror, manufacturer, source, product or service has met the qualification requirement but is not yet on a qualified products list, qualified manufacturers list, or qualified bidders list, the offeror must submit evidence of qualification prior to award of this contract. Unless determined to be in the Government's interest, award of this contract shall not be delayed to permit an offeror to submit evidence of qualification.

(f) Any change in location or ownership of the plant where a previously qualified product or service was manufactured or performed requires reevaluation of the qualification. Similarly, any change in location or ownership of a previously qualified manufacturer or source requires reevaluation of the qualification. The reevaluation must be accomplished before the date of award.

2.  Liquidated Damages – Supplies, Services, or Research and Development (52.211-11)

(a) If the Contractor fails to deliver the supplies or perform the services within the time specified in this contract, the Contractor shall, in place of actual damages, pay to the Government liquidated damages of $0.0025 per pound per calendar day of delay, not to exceed 45 days of delay.

- 33 -

103

(b) If the Government terminates this contract in whole or in part under the Default—Fixed-Price Supply and Service clause, the Contractor is liable for liquidated damages accruing until the Government reasonably obtains delivery or performance of similar supplies or services. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

(c) The Contractor will not be charged with liquidated damages when the delay in delivery or performance is beyond the control and without the fault or negligence of the Contractor as defined in the Default—Fixed-Price Supply and Service clause in this contract.

3. Notification of Employee Rights Concerning Payment of Union Dues or Fees (52.222-39)

(a) *Definition.* As used in this clause—
"United States" means the 50 States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, American Samoa, Guam, the U.S. Virgin Islands, and Wake Island.

(b) Except as provided in paragraph (e) of this clause, during the term of this contract, the Contractor shall post a notice, in the form of a poster, informing employees of their rights concerning union membership and payment of union dues and fees, in conspicuous places in and about all its plants and offices, including all places where notices to employees are customarily posted. The notice shall include the following information (except that the information pertaining to National Labor Relations Board shall not be included in notices posted in the plants or offices of carriers subject to the Railway Labor Act, as amended (45 U.S.C. 151-188)).

Notice to Employees

Under Federal law, employees cannot be required to join a union or maintain membership in a union in order to retain their jobs. Under certain conditions, the law permits a union and an employer to enter into a union-security agreement requiring employees to pay uniform periodic dues and initiation fees. However, employees who are not union members can object to the use of their payments for certain purposes and can only be required to pay their share of union costs relating to collective bargaining, contract administration, and grievance adjustment.

If you do not want to pay that portion of dues or fees used to support activities not related to collective bargaining, contract administration, or grievance adjustment, you are entitled to an appropriate reduction in your payment. If you believe that you have been required to pay dues or fees used in part to support activities not related to collective bargaining, contract administration, or grievance adjustment, you may be entitled to a refund and to an appropriate reduction in future payments.

For further information concerning your rights, you may wish to contact the National Labor Relations Board (NLRB) either at one of its Regional offices or at the following address or toll free number:

National Labor Relations Board
Division of Information
1099 14th Street, N.W.
Washington, DC 20570
1-866-667-6572
1-866-316-6572 (TTY)

To locate the nearest NLRB office, see NLRB's website at http://www.nlrb.gov.

(c) The Contractor shall comply with all provisions of Executive Order 13201 of February 17, 2001, and related implementing regulations at 29 CFR Part 470, and orders of the Secretary of Labor.

- 14 -

104

(d) In the event that the Contractor does not comply with any of the requirements set forth in paragraphs (b), (c), or (g), the Secretary may direct that this contract be cancelled, terminated, or suspended in whole or in part, and declare the Contractor ineligible for further Government contracts in accordance with procedures at 29 CFR Part 470, Subpart B—Compliance Evaluations, Complaint Investigations and Enforcement Procedures. Such other sanctions or remedies may be imposed as are provided by 29 CFR Part 470, which implements Executive Order 13201, or as are otherwise provided by law.

(e) The requirement to post the employee notice in paragraph (b) does not apply to—
(1) Contractors and subcontractors that employ fewer than 15 persons;
(2) Contractor establishments or construction work sites where no union has been formally recognized by the Contractor or certified as the exclusive bargaining representative of the Contractor's employees;
(3) Contractor establishments or construction work sites located in a jurisdiction named in the definition of the United States in which the law of that jurisdiction forbids enforcement of union-security agreements;
(4) Contractor facilities where upon the written request of the Contractor, the Department of Labor Deputy Assistant Secretary for Labor-Management Programs has waived the posting requirements with respect to any of the Contractor's facilities if the Deputy Assistant Secretary finds that the Contractor has demonstrated that—
(i) The facility is in all respects separate and distinct from activities of the Contractor related to the performance of a contract; and
(ii) Such a waiver will not interfere with or impede the effectuation of the Executive order; or
(5) Work outside the United States that does not involve the recruitment or employment of workers within the United States.

(f) The Department of Labor publishes the official employee notice in two variations: one for contractors covered by the Railway Labor Act and a second for all other contractors. The Contractor shall—
(1) Obtain the required employee notice poster from the Division of Interpretations and Standards, Office of Labor-Management Standards, U.S. Department of Labor, 200 Constitution Avenue, NW, Room N-5605, Washington, DC 20210, or from any field office of the Department's Office of Labor-Management Standards or Office of Federal Contract Compliance Programs;
(2) Download a copy of the poster from the Office of Labor-Management Standards website at http://www.olms.dol.gov; or
(3) Reproduce and use exact duplicate copies of the Department of Labor's official poster.

(g) The Contractor shall include the substance of this clause in every subcontract or purchase order that exceeds the simplified acquisition threshold, entered into in connection with this contract, unless exempted by the Department of Labor Deputy Assistant Secretary for Labor-Management Programs on account of special circumstances in the national interest under authority of 29 CFR 470.3(c). For indefinite quantity subcontracts, the Contractor shall include the substance of this clause if the value of orders in any calendar year of the subcontract is expected to exceed the simplified acquisition threshold. Pursuant to 29 CFR Part 470, Subpart B—Compliance Evaluations, Complaint Investigations and Enforcement Procedures, the

105

Secretary of Labor may direct the Contractor to take such action in the enforcement of these regulations, including the imposition of sanctions for noncompliance with respect to any such subcontract or purchase order. If the Contractor becomes involved in litigation with a subcontractor or vendor, or is threatened with such involvement, as a result of such direction, the Contractor may request the United States, through the Secretary of Labor, to enter into such litigation to protect the interests of the United States.

4.   Alterations in Contract (52.252-4)

Portions of this contract are altered as follows:

.......................................................................................
.......................................................................................
.......................................................................................

X.   PROVISIONS INCORPORATED BY REFERENCE

This Master Solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The offeror is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragraph identifier and provide the appropriate information with its offer. The full text of a solicitation provision may be accessed electronically at: http://www.acqnet.gov/far.

| 48 CFR FAR Provision Reference Number | Description | Date (Month/Year) |
|---|---|---|
| 52.203-11 | Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions | Sep. 2007 |
| 52.204-4 | Recycled Paper Printed or Copies Double-Sided on Recycled Paper | Aug. 2000 |
| 52.214-3 | Amendments to Invitation for Bids | Dec. 1989 |
| 52.214-4 | False Statements in Bid | Apr. 1984 |
| 52.214-5 | Submission of Bids | Mar. 1997 |
| 52.214-6 | Explanation to Prospective Bidders | Apr. 1984 |
| 52.214-7 | Late Submissions, Modifications, and Withdrawals of Bids | Nov. 1999 |
| 52.214-10 | Contract Award-Sealed Bidding | Jul. 1990 |
| 52.214-15 | Period for Acceptance of Bids | Apr. 1984 |
| 52.214-20 | Bid Samples | Apr. 2002 |
| 52.214-21 | Descriptive Literature, Alternate I | Apr. 2002 |
| 52.214-22 | Evaluation of Bids for Multiple Awards | Mar. 1990 |
| 52.214-31 | Facsimile Bids | Dec. 1989 |
| 52.232-15 | Progress Payments Not Included | Apr. 1984 |
| 52.252-1 | Solicitation Provisions Incorporated by Reference | Feb. 1998 |

106

A. FAR Provisions

1. Annual Representations and Certifications (52.204-8)

(a)(1) The North American Industry Classification System (NAICS) code for this acquisition is _____ (insert NAICS code).

(2) The small business size standard is _____ (insert size standard)

(3) The small business size standard for a concern which submits an offer in its own name, other than on a construction or service contract, but which proposes to furnish a product which it did not itself manufacture, is 500 employees).

2. Type of Contract (52.216-1)

The Government contemplates award of a _____ [Contracting Officer insert specific type of contract] contract resulting from this solicitation.

3. Service of Protest (52.233-2)

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the General Accounting Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from USDA/AMS/LS/Commodity Procurement Branch, 1400 Independence Ave. S.W., Mail Stop 0253, Washington, DC 20250-0253.

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

4. F.O.B. Destination -- Evidence of Shipment (52.247-48)

(a) If this contract is awarded on a free on board (F.O.B.) destination basis, the Contractor---
   (1) Shall not submit an invoice for payment until the supplies covered by the invoice have been shipped to the destination; and
   (2) Shall retain, and make available to the Government for review as necessary, the following evidence of shipment documentation for a period of 3 years after final payment under the contract:
      (i) If transportation is accomplished by common carrier, a signed copy of the commercial bill of lading for the supplies covered by the Contractor's invoice, indicating the carrier's intent to ship the supplies to the destination specified in the contract.
      (ii) If transportation is accomplished by parcel post, a copy of the certificate of mailing.
      (iii) If transportation is accomplished by other than common carrier or parcel post, a copy of the delivery document showing receipt at the destination specified in the contract.

- 12 -

107

(b) The Contractor is not required to submit evidence of shipment documentation with its invoice.

5. Alterations in Solicitation (52.252-3)

Portions of this solicitation are altered as follows:

52.214-3   Amendments to Invitations for Bids (Dec 1989)
(Amendments shall be acknowledged only by the method specified in the IFB.)

52.214-22 Evaluation of bids for Multiple Awards (Mar 1990)
(Individual awards will be for the items or combination of items that result in the lowest aggregate cost to the Government, excluding the assumed administrative cost.)

52.246-16 Responsibility for Supplies (Apr 1984)

Title and risk of loss will pass to USDA on the date of receipt of the product at the destination specified in the contract, as evidenced by suitable dated documentation such as the consignee receipt, commercial bill of lading, warehouse receipt, dock receipt, or other similar signed and dated document evidencing delivery. If the Contractor has the product in storage and transfer of title is requested, title will pass to USDA as evidenced by the consignee receipt or commercial bill of lading or after final certification of the shipping unit by AMS agent. The Contractor is responsible for any shortage or damages as evidenced by the consignee receipt or other commercial receipt evidencing delivery of product.

Unless the contract specifically provides otherwise, risk of loss or damage to supplies shall remain with the Contractor until, and shall pass to the Government upon--
(1) Delivery of the commodity to a carrier, if contract delivery terms are F.O.B. origin; or
(2) Acceptance by the Government or delivery of the commodities to the Government at the destination specified in the contract, whichever is later, if contract delivery terms are F.O.B. destination.

(3) If delivery is F.A.S. vessel, title and risk of loss and damage shall pass to USDA when the commodity is placed:

(i) Alongside vessel within reach of its loading tackle, or
(ii) On the dock designated by USDA if the vessel is not available, unless Contractor failed to ship pursuant to the shipping instructions and USDA determines that such failure caused the commodity to arrive too late to be loaded aboard the vessel.

B. AGAR Clauses Incorporated by Reference:

| 48 CFR AGAR Clause Reference Number | Description | Date (Month/Year) |
|---|---|---|
| 452.211-72 | Statement of Work/Specifications | Feb. 1988 |
| 452.211-73 | Attachments to Statement of Work/Specifications | Feb. 1988 |

- 18 -

108

| 452.246-70 | Inspection and Acceptance | Feb. 1988 |
| 452.246-70 | Inspection and Acceptance – Alternate I | Feb. 1988 |
| 452.247-70 | Delivery Location | Feb. 1988 |
| 452.247-71 | Marking Deliverables | Feb. 1988 |
| 452.247-72 | Packing for Domestic Shipment | Feb. 1988 |

C. AGAR Clauses

Period of Performance (452.211-74)
The period of performance of this contract is stipulated in the IFB.

D. AGAR Provisions Incorporated by Reference:

| 48 CFR AGAR Provision Reference Number | Description | Date (Month/Year) |
|---|---|---|
| 452.214-70 | Award by Lot | Nov. 1996 |

XI.   INQUIRIES

A.   Inquiries pertaining to this Master Solicitation, Commodity Specifications, and applicable Invitations should be directed to:
Contracting Officer
Telephone:
        Fruit and Vegetable    202-720-4517
        Livestock and Seed    202-720-2650
        Poultry                       202-720-7693

B.   Inquiries concerning shipping instructions should be directed to:

Kansas City FSA Commodity Office
Processed Commodities Branch
U.S. Department of Agriculture
Mail STOP 8718
Kansas City, Missouri 64141-8718
Telephone:  (816) 926-6063

C.   Inquiries concerning payment should be directed to:

Director, Kansas City Finance Office
U.S. Department of Agriculture
ATTN: Fiscal Operations Division
Payment Certification Branch STOP 8578
Kansas City, Missouri  64141-6205
Telephone.  (816) 926-6205

- 19 -

109

**EXHIBIT 1**
Sample Format for Submitting Offers through DCBES

The following format, which contains all the necessary information for an electronic offer, will assist you in submitting your offer at minimum cost and in a concise and orderly manner. When submitting offers, please include all required information as in the following example (see Section H):

Submitted at: 2/01/2009 - 11:29:50 am Central Time
**COMPANY NAME**
**ADDRESS**
**CITY, STATE ZIP**

Plant 01-PLANT ADDRESS
Shipping Point 01-SHIPPING ADDRESS

| Line Item | Pack Size | Destination | Delivery Period | Est. LBS | Price/LBS | Trans Mode |
|---|---|---|---|---|---|---|
| 0001 | PACK SIZE | DESTINATION CITY | 05/16/2009 - 05/31/2009 | 36000 | 0.5500 | Truck |

High Bid Price:     0.5500 Line Item 0001
Low Bid Price:      0.5500 Line Item 0001
Sum of Bid Prices:  0.5500

Constraints

| Const # | Max Qty | Plant Location | Shipping Period | Product |
|---|---|---|---|---|
| 1 | 1 | Total for ALL Plants | Total for ALL Shipping Periods | COMMODITY |

Certifications

Restricted OCR license at Bid Report. Active Contractor DUNS000000000000-000 CCR Expiration Date: 08/25/09
Active Contractor DUNS Registered at time of Contract? (Yes/No) YES
Five bid, bid your category is your closed as NAICS BUS Pd SB

| Question | Answer |
|---|---|
| 01) Offer is made subject to Master Solicitation, the Specifications, Invitation No. 001, and FAR/AGAR. | |
| 02) I further the steps, complete mailing address, and telephone number of office to person to receive shipping and delivery instructions. NOTE: FURNISH ADDRESS WITH FIRST BID, THERE AFTER, ENTER "SAME" IF INFORMATION HAS NOT CHANGED. ONLY ENTER UPDATED INFORMATION AS NECESSARY. | SAME |
| 03) I Timely Performance Certification. All products required under any existing USDA contract(s) or subcontract(s) with it on been close delivery prior to this bid reporting have been delivered. (Refer to Section II.E, question no. 3.) Choose one | YES |
| 04) I Have DUNS registered at the Central Contractor Registry. Furnish the expiration date of registration. | 08/25/2009 |
| 05) I Choose DUNS registered with the Online Representations and Certifications Application. Furnish the expiration date of registration. | 08/01/2009 |
| 06) I offer response to HUBzone small business price evaluation preference (YES) (NO). Applies only to firms certified in the Small Business Administration's Historically Underutilized Business Zone program (48 C.F.R. 19.13) | No |
| 07) I furnish name, title, FAX number, phone number and email address of person submitting this bid. (Must be a person authorized to execute contracts on behalf of offeror.) | Mr. Washington, president Fax (222)333-4456 Ph. (222)567-7890 mrwashington@thecompanyname.com |

High Bid Price:     0.5500 Plant: 01 Shipping Point: 01 Line Item: 0001
Low Bid Price:      0.5500 Plant: 01 Shipping Point: 01 Line Item: 0001
Sum of Bid Prices:  0.5500

- 26 -

110

**EXHIBIT 2**

**DOMESTIC ORIGIN CERTIFICATION**
**For Poultry Products**

This form must be completed for each contract awarded and be presented to an AMS representative at the processing facility, and the Contracting Officer or agent thereof upon request. Each processing plant producing product under this contract must have a copy of this form on file.

Master Solicitation Number: .......................................................

Contract Number: .............................................

Invitation Number: ..............................................

Product: .............................................

Does your company process or handle products originating from sources other than the United States, its territories or possessions, Puerto Rico, or the Trust Territories of the Pacific Islands? ⃝ YES ⃝ NO  If yes, a copy of your segregation plan must be on file.

Do any of your Subcontractor/Suppliers process or handle products originating from sources other than the United States, its territories or possessions, Puerto Rico, or the Trust Territories of the Pacific Islands? ⃝ YES ⃝ NO  If yes, a copy of their segregation plan must be on file.

I certify under penalty of law that all products sold to the Department of Agriculture are of 100 percent domestic origin and that all above statements are true.

Signature: .............................................................

Title: ...............................................................

Company: ............................................................

Date: ..............................................................

- 21 -

111

## DOMESTIC ORIGIN CERTIFICATION
### For Fruit and Vegetable Products

This form must be completed by an authorized company official or their designee for each contract/delivery awarded. The completed form must be presented to a representative of the USDA, Agricultural Marketing Service (AMS), Fresh Products Branch (FPB), or Processed Products Branch (PPB) (USDA Grader) at the processing facility; the completed form must also be presented to the USDA Contracting Officer or agent thereof upon request. *If imported product is brought into the facility during the production and shipment of product for this contract, it is the contractor's responsibility to notify the Fresh Products Branch or Processed Products Branch immediately.* Each contractor and/or processing facility under this contract must have a copy of this form on file.

Master Solicitation Number:      ........................................................

Invitation Number:       ...........................................

Contract Number:       ...........................................

Product:       ...........................................

Crop Year (Packing Season):      ...........................................

Does your company process or handle products originating from sources other than the United States, its territories or possessions, Puerto Rico, or the Trust Territories of the Pacific Islands?

☐ YES  ☐ NO   If yes, attach a copy of your segregation plan explaining how such product is stored and processed separate from domestic product.

Do any of your Subcontractor/Suppliers process or handle products originating from sources other than the United States, its territories or possessions, Puerto Rico, or the Trust Territories of the Pacific Islands?

☐ YES  ☐ NO   If yes, attach a copy of each subcontractor's/supplier's segregation plan  explaining how such product is stored and processed separate from domestic product.

**I certify that all products sold to the Department of Agriculture are of 100 percent domestic origin and that all above statements are true. I further certify that traceability documentation will be made available to USDA, Agricultural Marketing Service representatives upon request.**
**WARNING:** *18 U.S.C. Part 1, Chapter 47, Section 1001 states that "Except as otherwise provided in this section  whoever, in any manner within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or devise a material fact; (2) makes any materially false, fictitious or fraudulent statement or representation, or (3) makes or uses any false writing or document knowing the same to contain materially false, fictitious, or fraudulent statement or entry; shall be fined under this title or imprisoned not more than 5 years, or both.*

*Knowingly and willingly making false statements for fresh or frozen fruits and vegetables may also constitute a violation of the Perishable Agricultural Commodities Act (7 U.S.C., 499a-499t), and may result in monetary penalties or license suspension or revocation.*

Signature:
                    ........................................................
                    Print and Sign Name (Only authorized signatures)

Title:       ........................................................
Company:       ........................................................
Date:       ........................................................

112

### EXHIBIT 3

#### Browser Requirements

Netscape 4.07 or above
OR
Internet Explorer (IE) 5.0 or above

The browser must be capable of handling 128-bit encryption. To determine this:

In IE, go to **Help/About Internet** Explorer. The display will show the following:

**Cipher Strength: 128-bit**

If it does not, you can download a new version of the browser from Microsoft at http://www.microsoft.com.

In Netscape, this can be determined by going to Help/About Communicator.

The display will show the following:

**This version supports U.S. security with
RSA Public Key Cryptography, MD2, MD5
RC2-CBC, RC4, DES-CBC,
DES-EDE3-CBC.**

If it does not, you can download a new version of the browser from Netscape at http://browser.netscape.com/releases. Choose the 128-bit Strong Encryption* version for your download.

The Production site is https://pcsd.usda.gov:3077/mdbe1000.exe?

#### Proxy Servers

Most connection problems are the result of improper browser version, not using 128-bit encryption, and connecting through your corporate proxy server. The proxy server must be set up to allow HTTPS protocol through the appropriate port: Production will be 3077.

- 33 -

113



**ITEM DESCRIPTION AND CHECKLIST OF REQUIREMENTS (IDCR) PORK PATTIES, FOR FULLY COOKED**

Contracting Officer Technical Representative (COTR)
Standards, Analysis, and Technology Branch
Room 3607 S-Bldg. Phone: (202) 720-4486

**Effective:** September 2003

## I. ITEM DESCRIPTION

| | |
|---|---|
| Item -- | Pork Patties, Fully Cooked -- This item consists of ground pork (shall be derived from suitable lean from any portion of the sow and/or hog carcass) that is seasoned, formed into round or oval patties, fully cooked, and then Individually Quick Frozen (IQF) for use as a sandwich component or a stand-alone item. Portion Weight -- 2.0 ounces. |
| Formula -- | Pork will comprise at least 90% of the raw formula. |
| Non-Meat Component -- | Non-meat components will comprise no more than 10% of the raw formula. |
| Fat -- | Fat content will not exceed 20 grams per 100 gram serving. |
| Sodium -- | The sodium content will not exceed 700 milligrams per 100 gram serving. |

## II. CHECKLIST OF REQUIREMENTS

All items must be produced in accordance with Food Safety and Inspection Service (FSIS) regulations and the checklist of requirements. The contractor's production plan, submitted to the Contracting Officer, must adhere to the following checklist of requirements.

### A. MATERIALS

The contractor's production plan must describe a documented quality control program that includes procedures, records, forms, pictures, etc., that demonstrate conformance with the following checklist of requirements.

#### 1. MEAT COMPONENT

Pork (shall be derived from suitable lean from any portion of the sow and/or hog carcass) will be the only meat component allowed. Pork derived from boars is not permissible.

    a) Domestic Origin of Meat Component -- All sows and/or hogs will originate from U.S. produced livestock as defined in the announcement.

114

b) Harvesting (Slaughtering) -- All sows and/or hogs will be harvested in facilities that comply with the following requirements:

    (1) Humane Handling -- All sows and/or hogs will be humanely handled in accordance with all applicable FSIS regulations, directives, notices and AMS requirements.

    (2) Non-Ambulatory Disabled Animals -- Meat from carcasses of non-ambulatory disabled animals will not be included in USDA Purchase Programs.

c) Raw Material Type* -- The type of boneless pork utilized shall be specified from the following options:

    (1) Type I -- Sow Trimmings Only
    (2) Type II -- Hog Trimmings Only
    (3) Type III -- Combination of Sow and Hog Trimmings**

The contracting officer will designate the raw material type permitted for each invitation.

*One, two, or all of these types may be represented in the contractor's production plan.
**The contractor shall specify the ratio of these two raw material types in their production plan.

d) Boneless Pork -- Boneless pork will comply with the following requirements:

    (1) Traceability -- Contractors are responsible for providing sufficient product traceability and must have records to verify the source of raw materials used in each lot of product.

    (2) Handling -- All boneless pork must be maintained in excellent condition. The contractor's production plan shall include detailed production scheduling that addresses time and temperature controls necessary to maintain excellent condition of the boneless pork. Frozen boneless pork may be used provided it is processed into the final product within 60 days from the date of pack and was not initially placed into the freezer prior to contract award.

    (3) Production lots of boneless pork associated with positive pathogen test results will not be allowed.

    (4) Objectionable Materials -- Boneless pork shall be free of skin, bones, cartilages, organ tissue, heavy connective tissue, significant glandular tissue, spinal cord, and foreign materials.

e) Mechanical Separation -- Meat that is mechanically separated from bone with automatic deboning systems, advanced lean (meat) recovery (AMR) systems, or powered knives will not be allowed.

2. **NON-MEAT COMPONENTS**

a) Domestic Origin of Non-Meat Component -- Significant ingredients (more than 1 percent) will be derived from U.S. produced products.

b) Seasonings and Other Ingredients -- Seasonings and other ingredients will be included to produce product with a traditional breakfast flavor profile and texture suitable for family feeding programs.

c) Caramel Coloring - Caramel coloring is allowed.

d) If soy protein product (SPP) is used, it must be a concentrate or isolate and when hydrated yield no less than 18% protein (as is basis).

2 *Martin E. O'Connor*

115

e) MSG - Monosodium Glutamate (MSG) is not allowed.

## B. PROCESSING

### 1. GRINDER PLATE

The size of the grinding plate for grinding boneless pork will be declared.

### 2. BONE COLLECTOR / EXTRUDER SYSTEM

A bone collector/extruder system must be in operation to effectively remove bone, cartilage, and heavy connective tissue during the final grind.

### 3. PATTIES

a) Weight - Target packaged weight per cooked patty will be 2.0 ounces. All weights will be charted on control charts featuring average weight and range.

b) IQF – Patties will be IQF so individual patties do not stick together after they are packaged.

c) Appearance – Patties shall be of normal commercial fully cooked color without pink or burnt appearance after cooking. Patties shall have subtle "browned" highlights with minimal evidence of gray color.

d) Flavor – Patties must not have a scorched flavor.

e) Shape – Patties will be round or oval shape.

### 4. COOKING TEMPERATURE

All products will be fully cooked in accordance with FSIS regulations.

### 5. METAL DETECTION

All products will be free of metal contaminants. Detection of stainless steel, ferrous, and non-ferrous (e.g., lead, copper, and aluminum) metals is required. The equipment, location, detection procedure, sensitivity levels, frequency of equipment validation, and corrective action procedures shall be described.

## C. FINISHED PRODUCT LIMITATIONS

The declared serving size, fat content, and sodium level will be stated on the nutrition facts panel on each label according to FSIS nutritional labeling regulations.

### 1. FAT

The fat content of the finished product will not exceed 20 percent.

(Percent Fat = (Total Fat ÷ Serving Size) x 100).

### 2. SODIUM

Sodium level, must not exceed 700 mg per 100 g serving (((Declared Sodium Level (mg) X 100) ÷ Declared Serving Size (grams - racc") ≤ 700)).

### 3. MICROBIAL

Contractor will have documented plan to comply with the latest FSIS *Salmonella* and *Listeria monocytogenes* requirements for ready-to-eat foods. Product tested positive for any pathogen will not be allowed as rework or delivery to USDA.

Martin E. O'Connor

116

**D. HEATING INSTRUCTIONS AND SERVING SIZE**

**1. HEATING INSTRUCTIONS**

Heating instructions for the end-user will be provided by the offeror and must be included on the immediate packaging. These items will be processed so that the end-user may prepare them in a conventional or microwave type oven for serving.

**2. SERVING SIZE**

The serving size shall be declared on the nutritional facts panel in accordance with FSIS "referenced amounts customarily consumed"* (racc) regulations and requirements.

**E. PREPARATION FOR DELIVERY**

**1. PACKAGING AND PACKING**

a) Packaging -- Cooked patties will be either vacuum packaged or packed in a sealed (tamper proof) immediate package.

b) Packing -- Twenty (20) 2-pound immediate packages will be packed in a 40-pound (net weight) shipping container.

**2. LABELING**

The shipping containers will be in compliance with the National Motor Freight Classification, or the Uniform Freight Classification, as applicable. Both immediate and shipping containers will be labeled to include all information required by FSIS regulations.

a) Immediate Container Labels -- Immediate container labels will contain the following information:

(1) A "Best-If-Used-By" date that is 180 calendar days from the date of production.

(2) A nutrition facts panel based on actual nutritional analysis of the product.

(3) A traceability code that is traceable back to establishment number, production lot, and date.

(4) Heating instructions that describe the preparation of the cooked pork patties in both conventional and microwave type ovens for serving.

b) Shipping Container Labels -- Shipping container labels will contain the following information:

(1) USDA shield at least 2-inches high and appearing on the top of the container or on the principle display panel.

(2) Applicable contract number.

(3) A traceability code that is traced back to establishment number, production lot, and date.

(4) A nutrition facts panel based on actual nutritional analysis of the product.

(5) The appropriate product code: A732.

**3. CLOSURE**

Shipping containers will be closed by strapping, taping or gluing. When strapping is used, the initial closure (usually the bottom of container) shall be secured by the gluing or taping method.

*Martin E. O'Connor*

117

   **4. PALLETIZED UNIT LOADS**

All products will be stacked on new or well-maintained pallets and palletized with shrink wrap plastic.

## F. DELIVERY UNIT

Each delivery unit will consist of 950 cases (38,000 pounds).

## G. DELIVERED PRODUCT

   **1. SIZE AND STYLE OF CONTAINER**

Only one size and style of immediate and shipping containers may be offered in an individual shipping unit.

   **2. TEMPERATURE**

All products will not exceed 0°F at the time of shipment and delivery.

   **3. SEALING**

All products must be delivered to AMS assigned destinations under seal with tamper proof, tamper resistant, serially numbered, high security seals that meet the American Society for Testing and Materials Standard F 1157-04 as required under this supplement.

## H. PRODUCT ASSURANCE

   **1. WARRANTY AND COMPLAINT RESOLUTION**

     a) Warranty – The contractor will warrant that the product complies with all specification requirements, production plan declarations, and provisions set forth in the program announcement.

     b) Complaint Resolution – Customer complaint resolution procedures will be included in the production plan. These procedures will include: a point of contact, investigation steps, and intent to cooperate with AMS, and product replacement or monetary compensation. The procedures will be used to resolve product complaints from recipient agencies or AMS.

   **2. NON-CONFORMING PRODUCT**

The contractor must have documented procedures that assure nonconforming product identification, segregation, and disposition in order to prevent misuse and that nonconforming product is not delivered to USDA. The contractor will ensure that product which does not conform to product requirements is identified and controlled to prevent unintended use or delivery.

   **3. AMS MONITORING AND PRODUCTION ASSESSMENT**

An AMS Meat Grading and Certification Branch agent must be present during the production of the finished product. The AMS agent will monitor and verify the processing steps, quality assurance activities, and corrective actions to assure that all requirements outlined in the approved production plan are complied with. The AMS agent will be conducting the monitoring and production verification in accordance with applicable MGC instructions. Any deviations to contractual requirements will be reported to the contractor and Contracting Officer.

*Martin E. O'Connor*

118



ITEM DESCRIPTION AND CHECKLIST OF
REQUIREMENTS (IDCR) FOR COOKED PORK
ITEMS

Contracting Officer Technical Representative (COTR)
Standards, Analysis, and Technology Branch
Room 2687 S-Bldg, Phone, (202) 720-4488

Effective:  January 2010

## I.  ITEM DESCRIPTIONS

Item --

(1)  Pork Taco Filling, Fully Cooked -- This item consists of ground pork cooked in lightly seasoned ingredients for use in a variety of applications, including taco fillings, burritos, enchiladas and similar items.

(2)  Pork Sloppy Joe Mix, Fully Cooked -- This item consists of ground pork cooked in seasoned tomato product for use in a variety of applications, including sandwich filling and similar items.

(3)  Breaded Pork Patties, Fully Cooked -- This item consists of ground pork that is formed into round or oval patties, breaded and Individually Quick Frozen (IQF) for use as sandwiches or a stand-alone item.  Portion Weight -- 3.6 ounces.

(4)  Pork Patties with SPP, Fully Cooked - 2.7 oz. -- This item consists of ground pork with soy protein product (SPP) and sausage seasonings, formed into round or oval patties, fully cooked, and then IQF for use as sandwiches or a stand-alone item.   Portion Weight -- 2.7 ounces.

(5)  Pork Patties with SPP, Fully Cooked -- 1.2 oz. -- This item consists of ground pork with SPP and sausage seasonings, formed into round or oval patties, fully cooked, and then IQF for use as sandwiches or a stand-alone item.  Portion Weight -- 1.2 ounce.

(6)  Pork Patty Links with SPP, Skinless, Fully Cooked -- This item consists of ground pork with SPP and sausage seasonings, processed into skinless links cylindrical in shape, fully cooked, and then IQF for use as a stand-alone item.  Portion Weight - 1.0 ounce

(7)  Pork Patty Crumbles, Fully Cooked -- This item consists of ground pork with SPP that is lightly seasoned and processed to a crumble size of ¾-inch maximum for use in a variety of applications such as chili, sloppy joe, tacos, spaghetti sauce, pizza, lasagna, casseroles, pasta dishes, and any recipe that calls for ground pork.

119

| | |
|---|---|
| Formula -- | Pork will comprise at least 75% of the raw formula for all items. |
| Non-Meat Component -- | Non-meat components will comprise no more than 25% of the raw formula |
| Fat -- | Fat will not exceed 13 grams per 100 gram serving. |
| Sodium -- | The sodium content will not exceed 550 milligrams per 100 gram serving. |
| Packing -- | Four (4) 10-pound, five (5) 8-pound, or eight (8) 5-pound immediate containers (packages) will be packed in a 40-pound (net weight) shipping container. |
| Delivery Unit -- | Each delivery unit will consist of 1,000 cases and 40,000 pounds, except for the pork patties 1.2/2.7 ounces which will consist of 950 cases and 38,000 pounds. |

## II. CHECKLIST OF REQUIREMENTS

All items must be produced in accordance with Food Safety and Inspection Service (FSIS) regulations. The contractor's technical proposal, submitted to the Contracting Officer, must adhere to the following checklist of requirements.

### A. MATERIALS

The contractor's technical proposal must include procedures to address conformance with the following material requirements.

#### 1. MEAT COMPONENT

Pork (shall be derived from suitable lean from any portion of the sow and/or hog carcass) will be the only meat component allowed. Pork derived from boars is not permissible.

a) Domestic Origin of Meat Component -- All sows and/or hogs will originate from U.S. produced livestock as defined in the supplement.

b) Harvesting (Slaughtering) -- All sows and/or hogs will be harvested in facilities that comply with the following requirements:

(1) Humane Handling -- All sows and/or hogs will be humanely handled in accordance with all applicable FSIS regulations, directives, notices and AMS requirements.

(2) Non-Ambulatory Disabled Animals -- Meat from carcasses of non-ambulatory disabled animals will not be included in USDA Purchase Programs.

*Martin E. O'Connor*

120

c) Raw Material Type* – The type of boneless pork utilized shall be specified from the following options:

(1) Type I – Sow Trimmings Only

(2) Type II – Hog Trimmings Only

(3) Type III – Combination of Sow and Hog Trimmings**

The contracting officer will designate the raw material type permitted for each invitation.

*One, two, or all of these types may be represented in the contractor's technical proposal.
**The contractor shall specify the ratio of these two raw material types in their technical proposal.

d) Boneless Pork – Boneless pork will comply with the following requirements:

(1) Traceability – Contractors are responsible for providing sufficient product traceability and must have records to verify the source of raw materials used in each lot of product.

(2) Handling – All boneless pork must be maintained in excellent condition. The contractor's technical proposal shall include detailed production scheduling that addresses time and temperature controls necessary to maintain excellent condition of the boneless pork. Frozen boneless pork may be used provided it is processed into the final product within 60 days from the date of pack.

(3) Objectionable Materials – Boneless pork shall be free of skin, bones, cartilages, organ tissue, heavy connective tissue, significant glandular tissue, spinal cord, and foreign materials.

e) Mechanical Separation – Meat that is mechanically separated from bone with automatic deboning systems, advanced lean (meat) recovery (AMR) systems, or powered knives will not be allowed.

f) Pathogen Testing – Boneless pork previously tested and found positive for any pathogen will not be allowed.

## 2. NON-MEAT COMPONENTS

a) Domestic Origin of Non-Meat Component – Significant ingredients (more than 1 percent) will be derived from U.S. produced products.

b) Seasonings and Other Ingredients – Seasonings and other ingredients will be used to produce products with mild flavor profiles suitable for institutional feeding systems. For crumbles and patties, seasonings and other ingredients will comprise no more than 2% of the raw formula.

c) MSG – Monosodium Glutamate (MSG) is not allowed.

3 *Martin E. O'Connor*

121

d) Soy Protein Product (SPP) -- Pork Patties with SPP, Pork Patty Links with SPP, and Pork Patty Crumbles must contain SPP in the raw formula that meets the following requirements:

(1)   The SPP will be hydrated to yield no less than 18% protein (as-is basis).

(2)   The physical characteristics of SPP, in the dry form, must be either granular or textured.  The types of soy that may be used are soy concentrate or isolate (65% and 85% as-is basis, respectively).

e) Batter and Breading -- For Breaded Pork Patties, Only -- If flour is used in the batter and breading combination, it must be enriched.

**B.  PROCESSING**

**1.   GRINDER PLATE**

The size of the grinding plate for grinding boneless pork will be declared.

**2.   BONE COLLECTOR / EXTRUDER SYSTEM**

A bone collector/extruder system must be in operation to effectively remove skin, bone, cartilage, and heavy connective tissue during the final grind.

**3.   PATTIES**

a) Raw Weight -- The raw weight of the patties will be declared and charted on control charts featuring average weight and range.

b) Individually Quick Frozen (IQF) -- Patties will be IQF so the individual pieces do not stick together after they are packaged and packed.

c) Pink Appearance -- Patties with pink appearance after cooking will not be allowed.

d) Shape -- Patties will be round or oval shape.

**4.   LINKS**

a) Skinless -- Casing must be removed.

b) Weight - Target packaged weight per cooked link will be 1.0 ounce.  The raw weight of links shall be declared.  All weights will be charted on control charts featuring average weight and range.

c) IQF -- Links will be IQF so individual links do not stick together after they are packaged.

d) Pink Appearance -- Links with pink appearance after cooking will not be allowed.

*Martin E. O'Connor*

122

5. **CRUMBLES**

   a) Size -- The size of the crumbles will be ¼-inch maximum with an allowance of five percent 'fines' (<½s-inch) in each immediate package. 'Fines' per immediate package will be charted on control charts featuring average value and range.

   b) IQF -- The crumbles will be IQF or may be produced from IQF's materials to prevent it from sticking together after freezing.

   c) Flavor -- Crumbles must not have a 'char-broil' flavor.

6. **COOKING TEMPERATURE**

   All products will be fully cooked in accordance with FSIS regulations.

7. **METAL DETECTION**

   All products will be free of metal contaminants. Detection of stainless steel, ferrous, and non-ferrous (e.g., lead, copper, and aluminum) metals is required. The contractor's technical proposal must identify and describe the equipment, location, detection procedure, sensitivity levels, frequency of equipment validation, and corrective action procedures.

C. **FINISHED PRODUCT LIMITATIONS**

   The declared serving size, fat content and sodium level will be stated on the nutrition facts panel on each label according to FSIS nutritional labeling regulations.

   1. **FAT**

      The fat content of the finished product will not exceed 13 percent

      (Percent Fat = (Total Fat ÷ Serving Size) x 100).

   2. **SODIUM**

      Sodium level, must not exceed 550 mg per 100 g serving

      ((Declared Sodium Level (mg) X 100) ÷ Declared Serving Size (grams - racc") ≤ 550)).

   3. **MICROBIAL**

      Contractor will have documented plan to comply with the latest FSIS *Salmonella* and *Listeria monocytogenes* requirements for ready-to-eat foods. Product tested positive for any pathogen will not be allowed as rework or delivery to USDA.

D. **HEATING INSTRUCTIONS**

   Heating instructions for the end-user will be provided in the offeror's technical proposal and must be included in the shipping container (e.g. flyer, included on the package label, etc.). The pork links and patties will be prepared so that the end-user may bake them in a conventional or convection type oven.

   5 *Martin E. O'Connor*

123

E. PREPARATION FOR DELIVERY

1. PACKAGING AND PACKING

a) Packaging -- All products will be vacuum packaged or packed in a sealed (tamper proof) immediate package. In addition, pork taco fillings and sloppy joe mix will be hot-filled into reheatable high oxygen and high moisture barrier pouches.

b) Packing -- Four (4) 10-pound, five (5) 8-pound, or eight (8) 5-pound immediate packages will be packed in a 40-pound (net weight) shipping container.

2. LABELING*

The shipping containers will be in compliance with the National Motor Freight Classification, or the Uniform Freight Classification, as applicable. Both immediate and shipping containers will be labeled to include all information required by FSIS regulations.

a) Immediate Container Labels -- Immediate container labels will contain the following information:

(1) A "Best-If-Used-By" date.

(2) A nutrition facts panel based on actual nutritional analysis of the product.

(3) A traceability code that is traced back to establishment number, production lot, and date.

b) Shipping Container Labels -- Shipping container labels will contain the following information:

(1) USDA shield at least 2 inches high and appearing on the top of the container or on the principle display panel.

(2) Applicable contract number.

(3) A traceability code that is traced back to establishment number, production lot, and date.

(4) A nutrition facts panel based on actual nutritional analysis of the product.

*Martin E. O'Connor*

124

(5) The appropriate product code listed in the table below for each of the items.

| Item | Code |
|---|---|
| Pork Taco Filling, Fully Cooked | A715 |
| Breaded Pork Patties, Fully Cooked | A713 |
| Pork Sloppy Joe Mix, Fully Cooked | A712 |
| Pork Patties with SPP, Fully Cooked, 2.7 ounce | A707 |
| Pork Patties with SPP, Fully Cooked, 1.2 ounce | A708 |
| Pork Patty Links, Skinless, Fully Cooked, 1.6 ounce | A719 |
| Pork Patty Crumbles, Fully Cooked | A720 |

*All labeling illustrations must be provided.

### 3. PALLETIZED UNIT LOADS

All product shall be stacked on new or well-maintained pallets and palletized with shrink wrap plastic, unless otherwise specified in the invitation.

Pallet loads shall be stacked in a manner that minimizes the overhang of the shipping containers over the edges of the pallets and exposes each shipping container's principle display panel to facilitate certification examinations.

### F. DELIVERY UNIT

Each delivery unit will consist of 1,000 cases and 40,000 pounds, except for pork patties 1.2/2.7 ounces which will consist of 950 cases and 38,000 pounds.

### G. DELIVERED PRODUCT

#### 1. SIZE AND STYLE OF CONTAINER

Only one size and style of immediate and shipping containers may be offered in an individual shipping unit.

#### 2. TEMPERATURE

All products will not exceed 0° F at the time of shipment and delivery.

#### 3. SEALING

All products must be delivered to AMS destinations under seal with tamper proof, tamper resistant, serially numbered, high security seals that meet the American Society for Testing and Materials Standard F 1157-04 as required under the AMS Master Solicitation.

*Martin E. O'Connor*

125

## H. PRODUCT ASSURANCE

### 1. WARRANTY AND COMPLAINT RESOLUTION

a) Warranty -- The contractor will warrant that the product complies with all specification requirements, technical proposal declarations, and provisions required under this Supplement LS-401.

b) Complaint Resolution -- Customer complaint resolution procedures will be included in the technical proposal. These procedures will include: a point of contact, investigation steps, intent to cooperate with AMS, and product replacement or monetary compensation. The procedures will be used to resolve product complaints from recipient agencies or AMS.

### 2. NON-CONFORMING PRODUCT

The contractor must have documented procedures that assure nonconforming product identification, segregation, and disposition in order to prevent misuse and that nonconforming product is not delivered to USDA. The plan must address 1) control and segregation of non-conforming product, 2) removal of any USDA markings, and 3) disposition of non-conforming product.

126

**Response by David Moody, Chairman and Past President, Public Policy Committee, Iowa Pork Producers Association**

*Question Submitted by Hon. Frank D. Lucas, a Representative in Congress from Oklahoma*

*Question.* In your prepared testimony, you discuss how current economic conditions will lead to contraction in the national herd. There has been some talk advocating a specific policy to reduce the number of sows in the United States—but not much in the way of details have been mentioned. Do you have any thoughts on this idea?

*Answer.* While the pork industry has been losing money for 2 years, most of the loss has been caused by things outside the producer's control. In 2008 the industry received nearly record income for our pigs but had extremely high input costs, mostly due to high feed costs. Since the April 24, 2009 flu event and the economic recession, the demand for pork has dropped world wide. This had brought the pork price down because of supply and demand factors.

However it has been a shorter time period of the reduced market price, which would indicate we need to reduce the sow herd. Most producers would like the market to dictate the herd size not a new government program. This thought was supported by Iowa Pork Producers Association's annual member survey. We had a question asking if producers would support a specific program to help with prices by reducing the sow herd with a government program and the answer was overwhelmingly 'no'.

Producers would much prefer that the government use existing government programs to purchase pork products for food programs. This could include purchases of sow meat, which would be cheaper and incentivize market driven herd reductions. The other item Congress and the Administration could do is continue work on trading with other countries and passing free trade agreements. Thank You.

**Response by Mark Greenwood, Vice President, Agri Business Capital, AgStar Financial Services ***

*Questions Submitted by Hon. Frank D. Lucas, a Representative in Congress from Oklahoma*

*Question 1.* Under existing conditions, does your institution find independent or contract growers to be preferable borrowers?

*Question 2.* In your testimony you call for higher FSA loan limits. Could you expand on the specifics of that? Where are we now? Where should we move to? What discretion does the Department of Agriculture have in that area?

**Response by Brian Buhr, Ph.D., Professor, Head and E. Fred Koller Chair in Applied Economics, University of Minnesota ***

*Questions Submitted by Hon. Frank D. Lucas, a Representative in Congress from Oklahoma*

*Question 1.* Would it be fair to summarize your testimony by saying that individual producers were making the right decisions with respect to market signals, but that those market signals turned out to be wrong? Do you have any suggestions how they might prevent this from happening again?

*Question 2.* During discussions of the current economic crisis for the pork sector, we frequently hear the term "hog cycle". Could you take a few minutes to explain the context of this term and offer some observations about how it relates to today's situation?

○

---

* There was no response from the witnesses by the time this hearing went to press.