## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE PORK ANTITRUST LITIGATION

This Document Relates To:

ALL ACTIONS BROUGHT BY DIRECT
ACTION PLAINTIFFS

Civil No. 18-1776 (JRT/JFD)

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION TO
DISMISS DIRECT ACTION PLAINTIFFS'
CONSOLIDATED COMPLAINT**

---

Robert N. Kaplan, **KAPLAN FOX & KILSHEIMER, LLP,** 850 Third Avenue, Fourteenth Floor, New York, NY 10022; Christopher P. Wilson, **BAKER BOTTS LLP,** 700 K Street Northwest, Washington, DC 20001; Samuel Jarashow Randall, **KENNY NACHWALTER, P.A.,** 1441 Brickell Avenue, Suite 1100, Miami, FL 33131; and Kyle G. Bates, **HAUSFELD LLP,** 600 Montgomery Street, Suite 3200, San Francisco, CA 94111, for Direct Action Plaintiffs.

Brian Edward Robison, **BROWN FOX PLLC,** 6303 Cowboys Way, Suite 450, Frisco, TX 75034; Emily Elizabeth Chow, **FAEGRE DRINKER BIDDLE & REATH LLP,** 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; Donald G. Heeman, **SPENCER FANE LLP,** 100 South Fifth Street, Suite 2500, Minneapolis, MN 55402; Peter J. Schwingler, **JONES DAY,** 90 South Seventh Street, Suite 4900, Minneapolis, MN 55402; William Thomson, **STINSON LEONARD STREET LLP,** 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402; John Anders Kvinge, **LARKIN HOFFMAN DALY & LINDGREN, LTD.,** 8300 Norman Center Drive, Suite 1000, Minneapolis, MN 55437; Christopher A. Smith, **HUSCH BLACKWELL LLP,** 8001 Forsyth Boulevard, Suite 1500, Saint Louis, MO 63105; and Jarod Taylor, **AXINN VELTROP & HARKRIDER, LLP,** 90 State House Square, Hartford, CT 06106, for Defendants.

This multidistrict litigation alleges anticompetitive conduct in the pork packing

industry. Over fifty Direct Action Plaintiffs ("DAPs") initiated actions against Defendants

Agri Stats, Inc.; Clemens Food Group, LLC, and The Clemens Family Corporation (together,

"Clemens"); Hormel Foods Corporation and Hormel Foods, LLC (together, "Hormel"); JBS USA Food Company; Seaboard Foods LLC; Smithfield Foods, Inc.; Triumph Foods, LLC; and Tyson Foods, Inc., Tyson Prepared Foods, Inc. and Tyson Fresh Meats, Inc. (together, "Tyson"). To better manage this litigation, the Court required the DAPs to file a single Consolidated Complaint which Defendants moved to dismiss on three grounds: (1) that the DAPs' claims are barred by the statute of limitations and they are not tolled either by *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) or under the doctrine of fraudulent concealment; (2) the DAPs bringing claims under the Packers and Stockyards Act ("PSA") lack standing to bring a private cause of action under the PSA; and (3) the DAPs failed to adequately allege that multi-ingredient products and pork by-products are subject to the purported conspiracy.

Because the Court finds that the DAPs' Consolidated Complaint does not foreclose the possibility of fraudulent concealment and because *American Pipe* tolling applies to their Sherman Act claims, the Court finds the DAPs' claims are not barred by the statute of limitations. The Court will allow the DAPs' PSA claims to proceed because they have plausibly alleged that they were injured by Defendants' violation of a PSA provision that relates to livestock. Finally, the Court finds that the DAPs have adequately alleged a conspiracy to restrict competition in the pork industry, which would plausibly impact the prices paid for pork for use in multi-ingredient pork products and pork by-products. The Court will therefore deny Defendants' Motion to Dismiss in its entirety.

**BACKGROUND**

**I.     FACTS**

The DAPs are comprised of nine groups of Plaintiffs: Action Meat DAPs, ALDI DAP, BSF DAPs, CF DAPs, CWT DAPs, Kroger DAPs, Nestlé DAPs; Publix DAPs; and Winn-Dixie DAPs.  (DAPs' Consolidated Compl. ("Compl.") at 5–21, Dec. 5, 2022, Docket No. 1659.) At the time the Consolidated Complaint was filed, there were over sixty DAPs in this litigation.  (*Id.*)  The DAPs allege that Defendants Clemens, Hormel, JBS, Seaboard, Smithfield, Triumph, and Tyson (collectively, "Packer Defendants"), and Defendant Agri Stats—along with various co-conspirators—conspired to restrain trade, including to fix, increase, maintain, and/or stabilize the price of pork sold to the DAPs and others.  (*Id.* ¶ 1.)  The alleged conspiracy began at least as early as January 2009 and continued until at least 2018.  (*Id.*)

The parties are familiar with the allegations in this litigation, so the Court will not reiterate them again here in detail.  *See, e.g., In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 765–767 (D. Minn. 2020).  The DAPs generally claim that Packer Defendants exchanged detailed, competitively sensitive, and non-public information through Agri Stats, including prices, capacity, production, sales volume, and demand.  (*Id.* ¶ 3.)  Packer Defendants allegedly used this information collectively with their market control to unlawfully restrain trade, including to fix, increase, maintain, and/or stabilize the price of pork sold to the DAPs and others in the United States.  (*Id.* ¶ 1.)

As is relevant for this Motion to Dismiss, the DAPs allege that the Packer Defendants maintained their conspiracy through both public and non-public statements. The Packer Defendants publicly declared that they would reduce their herds because such reductions were "a natural outcome of the economic conditions facing the industry." (*Id.* ¶ 7.) They also publicly encouraged other pork producers to decrease supply. (*Id.* ¶ 6.) The DAPs allege that the publicly-stated reasons for the herd reduction were untrue and merely a pretext for them to produce as much pork as possible when profit margins were positive. (*Id.* ¶ 7.) Additionally, the Consolidated Complaint alleges that the actual agreement between Packer Defendants to reduce the supply of pork was "reached in secret and concealed from the public." (*Id.*; *see also id.* ¶ 391 ("[B]y providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal—and did in fact conceal—that these actions were the result of collusion.").)

For instance, the DAPs allege that Smithfield's CEO announced a plan to reduce its sow herd and urged all others in the industry to follow suit in 2008. (*Id.* ¶ 6.) Smithfield confirmed publicly in 2009 that it had reduced the size of its herd by two million hogs annually, and that it intended to continue reducing its herd. (*Id.* ¶ 231.) Smithfield's CEO later stated that pork producers have been public about "cutting back" their herds. (*Id.* ¶ 305.) Though Smithfield's public statements indicated that supply reductions were dictated by economic factors facing pork producers, the DAPs allege that Smithfield's

internal communications demonstrate this is untrue.  (*Id.* ¶ 291.)  For example, the Executive Vice President of Smithfield emailed the National Pork Board on July 19, 2009, asking the National Pork Board to help Smithfield coordinate the supply reduction and stating, "[W]e have too many hogs in the country and need to take 6-8 million market hogs out of our supply.  Cheap corn is likely going to slow liquidation and I don't think this is good for the industry over the next 2-5 years." (*Id.*)  But Smithfield later publicly stated that the improved hog profitability was not due to the supply decrease, but rather due to "good programs with our retailers" and "lower grain costs."  (*Id.* ¶ 439.)

Tyson similarly announced a major sow liquidation in May 2009.  (*Id.* ¶¶ 285–286.)  The DAPs allege there are private emails between Packer Defendants' executives discussing Tyson's sow liquidation.  (*Id.* ¶ 287.)  Additionally, Tyson employees allegedly circulated confidential information from Agri Stats about which specific pork plants were in Agri Stats' kill/cut figures, and instructed Tyson employees to keep the information confidential.  (*Id.* ¶ 434.)  A Tyson employee also forwarded an email to other Tyson employees from Clemens regarding Clemens' pork processing plants with the instructions to "read and delete please." (*Id.* ¶ 422.)  The DAPs allege that other Defendants and pork producers made similar public statements encouraging pork producers to decrease supply, while hiding the real reasons for the supply cuts.  (*E.g., id.* ¶ 275.)

The DAPs assert that several trade associations facilitated the collusion:  industry trade associations, trade group meetings, and other events brought together senior

executives from Defendants and co-conspirators and gave them the opportunity to discuss restricting the pork supply and elevating pork prices.  (*Id.* ¶ 192.)  Because Defendants were already privately exchanging confidential information and publicly stating their intention to restrict pork supply, the DAPs assert that it is likely that the Defendants and Co-Conspirators secretly discussed the conspiracy at these trade meetings.  (*Id.*)

The Packer Defendants and co-conspirators allegedly continued to make public statements throughout the conspiracy period that communicated their planned supply restrictions to their competitors.  (*Id.* ¶ 264.)  According to the DAPs, the Defendants exploited these public statements, used them to further the conspiracy, and "couched the public disclosures in pretext so as to conceal what was really occurring."  (*Id.*)

## II.    PROCEDURAL HISTORY

The DAPs initiated these actions in various courts before being transferred to the District of Minnesota and this multidistrict litigation.  For the sake of case management, the Court required the DAPs to file a single Consolidated Complaint.  (Pretrial Order No. 1 at 2, Oct. 4, 2022, Docket No. 1525.)  Accordingly, the DAPs filed their Consolidated Complaint on December 5, 2022.  (*See generally* Compl.)  All DAPs brought a cause of action against Defendants for violating Section I of the Sherman Act.  (*Id.* at 178.)  Action Meat DAPs, Kroger DAPs, and Publix DAPs also allege that all Defendants—except Agri Stats—violated the Packers and Stockyard Act.  (*Id.* at 181.)

The DAPS alleged in their Consolidated Complaint that their claims are timely. (*Id.* at 162–174.) The DAPs assert that *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), applies and tolls their claims based on *Maplevale Farms, Inc. v. Agri Stats, Inc. et al.*, No. 18-1803. (*Id.* ¶¶ 389–90.) The DAPs also allege that the statute of limitations has been tolled because the Defendants fraudulently concealed their wrongful conduct. (*Id.* ¶ 449.)

Defendants each individually answered the Consolidated Complaint on January 20, 2023. (Seaboard's Answer, Docket No. 1746; Tyson's Answer, Docket No. 1747; Triumph's Answer, Docket No. 1748; Hormel's Answer, Docket No. 1749; JBS' Answer, Docket No. 1750; Clemens' Answer, Docket No. 1752; Agri Stats' Answer, Docket No. 1753; Smithfield Foods' Answer, Docket No. 1760.) Defendants filed a Joint Motion to Dismiss the DAPs' Consolidated Complaint on the same day they filed their Answers. (Mot. Dismiss DAPs' Claims, Jan. 20, 2023, Docket No. 1754.) Defendants assert that the DAPs' claims are time-barred because more than four years have passed since their causes of action accrued and that they have not adequately alleged fraudulent concealment. (Mem. Supp. Mot. Dismiss at 19, Jan. 20, 2023, Docket No. 1756.) They also claim that the DAPs have no private right of action under the PSA because they do not buy, sell, or handle livestock. (*Id.* at 28.) Lastly, Defendants contend that certain DAPs fail to plausibly allege that multi-ingredient products and by-products were affected by the purported conspiracy. (*Id.* at

30.)  The DAPs oppose Defendants' motion.  (Mem. Opp. Mot. Dismiss, Feb. 28, 2023, Docket No. 1830.)

## DISCUSSION

### I.    STANDARD OF REVIEW

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings."  *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor.  *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include more "than labels and

conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion to dismiss cannot be considered after an answer has been filed in response to the complaint. *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). However, Rule 12(h)(2) provides that "[a] defense of failure to state a claim upon which relief can be granted" may be advanced in a motion for judgment on the pleadings under Rule 12(c). *St. Paul Ramsey Cnty. Med. Ctr. v. Pennington Cnty.*, 857 F.2d 1185, 1187 (8th Cir. 1988); Fed. R. Civ. P. 12(h)(2). Rule 12(c) motions are reviewed under the same standard that governs 12(b)(6) motions, so this distinction is "purely formal" and need not affect a court's analysis. *See Westcott*, 901 F.2d at 1488.

## II.    ANALYSIS

Most Defendants filed their Answers to the DAPs' Consolidated Complaint before the Joint Motion to Dismiss was filed. The Court will therefore treat this motion as a Rule 12(c) motion, which applies the same standard of review as a Rule 12(b)(6) motion. The Court will first determine whether this action is timely before turning to the PSA claims and the multi-ingredient pork products and pork by-products issue.

### A.    Statute of Limitations

First, Defendants contend that the DAPs' Sherman Act and PSA claims are time-barred. The statute of limitations is typically an affirmative defense, and an argument that claims are time-barred is not ordinarily grounds for a Rule 12(b)(6) dismissal unless the complaint itself establishes the defense. *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at

772 (citing *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008)).  Thus, at the motion to dismiss stage, the Court need only consider whether the DAPs' Consolidated Complaint affirmatively establishes that their claims are time-barred.

The limitations period for any claims for damages under the Sherman Act and the PSA is four years.  15 U.S.C. § 15b; *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1460 (8th Cir. 1995).  The period begins to run when a defendant commits the injurious act.  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  A continuing violation restarts the statute of limitations period each time the defendant commits a new and independent act that inflicts new and accumulating injury on the plaintiff.  *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc).

Here, the DAPs allege that Defendants' conspiracy began "at least as early as January 2009."  (Compl. ¶¶ 1, 14.)  The first DAP in this litigation did not file its complaint until 2019.  The statute of limitations therefore provides that DAPs cannot recover for any claims arising prior to 2015.  The DAPs do not dispute Defendants' contention that their claims are predicated on pork purchases outside of the four years preceding 2019, and thus fall outside of the statute of limitations.  However, they assert that the statute of limitations is tolled under two doctrines: (1) fraudulent concealment and (2) *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  The Court will address each doctrine in turn.

### 1.     Fraudulent Concealment

The statute of limitations is tolled if the DAPs demonstrate that the Defendants fraudulently concealed the conspiracy.   To invoke fraudulent concealment, DAPs must allege facts showing "(1) Defendants' concealment of [DAPs'] cause of action, (2) failure by [DAPs] to discover the existence of their cause of action, and (3) due diligence by [DAPs] in attempting to discover the claim."   *In re Milk Prod. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999).   The DAPs must also meet Rule 9(b)'s heightened pleading standard, such that the DAPs must plead "the who, what, when, where, and how" of the concealment.   *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011); *see also In re Milk*, 84 F. Supp. 2d at 1022 (discussing the application of Rule 9(b)).   The Eighth Circuit requires "an **act of affirmative misrepresentation over and above** the acts creating the alleged cause of action." *Ripplinger v. Amoco Oil Co.*, 916 F.2d 441, 442–43 (8th Cir. 1990) (emphasis added). "Simply denying the existence of an antitrust violation does not constitute fraudulent concealment, and to hold otherwise 'would effectively nullify the statute of limitations in these cases.'"   *In re Milk*, 84 F. Supp. 2d at 1023 (quoting *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987)).

### a.     Concealment

First, Defendants assert that the DAPs have not alleged concealment because the DAPs claim that Packer Defendants carried out a conspiracy via public statements, which, by their very nature, are not concealed.

Two years ago, this Court held that Class Plaintiffs failed to adequately allege fraudulent concealment, so their claims arising from conduct from more than four years prior to filing were barred. The Court explained that "the heart of the complaint is that this conspiracy was agreed to and conducted in part via public statements between the Defendants" and that it was difficult to reconcile that with the assertion that Defendants were also concealing the conspiracy. *In re Pork*, 495 F. Supp. 3d at 774. Critically, Class Plaintiffs also did not meet the heightened pleading standard of Rule 9(b) because they failed to provide sufficient information regarding the "who, what, when, where, and how" that could lead the Court to "plausibly assume that the Defendants engaged in a fraudulent concealment campaign." *Id.* at 774.

Here too, the DAPs allege that Packer Defendants made public statements regarding their intent—and encouragement of others—to reduce their herds. But unlike the Class Plaintiffs, "the heart of" the DAPs' complaint is not that the conspiracy was agreed to and conducted via public statements. *Id*. Rather, the heart of the DAPs' complaint is that the Defendants' public statements were merely a pretextual justification for the supply reduction. (Compl. ¶ 7.) Defendants allegedly "exploited these public statements" to further the conspiracy while concealing what they were really doing. (*Id.* ¶ 264.)

Additionally, unlike the Class Plaintiffs, the DAPs' Consolidated Complaint details the "who, what, when, where, and how" of the fraudulent concealment such that they

comply with Rule 9(b).  They provide specific examples of affirmative acts taken to conceal the conspiracy.  For example, the DAPs identify many emails between Defendants' leadership in great detail.  (*E.g., id.* ¶ 393 ("Bret Getzel from Seaboard confirmed H1N1's short term impact on the pork market in a May 21, 2009 email to Chuck Faughnan, where he told him 'There was some very short term weakness in the market as a result of the H1N1 negative press, but this came and went pretty fast.'").)  The Consolidated Complaint includes quotes from confidential slide deck presentations alluding to the alleged conspiracy.  (*E.g., id.* ¶ 394 (detailing what was included in presentation slides Hormel gave to their sales team to "get everyone on the same page to justify their price increase").)  The DAPs quoted internal communications circulated within the individual Defendants' organizations.  (*E.g., id.* ¶ 403 (alleging that Seaboard executives received an email from a sales broker that included a spreadsheet of competitors' pricing and cautioned, "I got this from a source for you to help see the most current on the SBR competition.  Please guard it carefully.").)  The DAPs provide numerous other examples of emails, meetings, and secretive information sharing between Defendants.  (*E.g., id.* ¶ 409 (detailing the communications between JBS' Vice President of Sales and a senior sales executive at Indiana Packers).)  The majority of these allegations are dated, include the format in which the communication was made (such as email), and directly quote the communication.  (*See, e.g., id.*)

Moreover, the DAPs allege specific examples of affirmative acts taken to conceal the conspiracy, such as destroying evidence,[1] marking collusive communications as "confidential";[2] establishing rules for their trade association that prohibited attribution of statements to meeting attendees;[3] limiting attendance at conspiracy meetings;[4] limiting the number of individuals who knew competitors' confidential information; communicating by telephone to avoid creating a paper trail;[5] communicating in code;[6]

---

[1] "[A Tyson employee] then forwarded [a June 21, 2010 email containing JBS pricing information] on to several senior Tyson executives, stating 'competitive info — read and delete.'" (Compl. ¶ 311.)

[2] "Tyson executives also repeatedly urged confidentiality and discretion in not disclosing that they had deanonymized the reports. In an August 2012 email, a Tyson Fresh Meat VP writes that the Agri Stats '"name assignment" appears to be consistent with prior months' and goes on to advise email recipients '[b]e very confidential with this!!!!' Similarly, a January 2012 email from Tyson's Deb McConell to multiple executives states 'DO NOT FORWARD...DO NOT DISTRIBUTE...First tab- competitor- lists all 11 Agristats participants plus SL.... Each non-tyson participant on this file with 'name' is a best guess (basis KPI tracking).'" (Compl. ¶ 140.)

[3] "Defendants began to use their positions on the AMI and the Twenty-First Century Pork Club ('Pork Club') to coordinate supply cuts that could not be achieved in the absence of collusion. Defendants and Co-Conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and thus hide the existence of the conspiracy. For example, the Pork Club had a rule prohibiting meeting attendees from attributing comments to specific speakers that attended their meetings." (Compl. ¶ 265.)

[4] "Beginning in 2012, the Pork Club added a 'Just Pigs' meeting limited to just pork producers. This was intended to facilitate 'informal roundtable' discussions amongst the competitors. Legal counsel did not attend these meetings." (Compl. ¶ 410.)

[5] "On June 9, 2017, Dan Groff of Clemens emailed internally several senior executives and reported on a conversation he had with Gary Louis of Seaboard about the production plans and slaughter numbers for Seaboard and Triumph. Groff noted that he 'kept this DL list relatively small because there are a few sensitive things on here, so if you want to share anything specific, please copy/paste to a separate message.'" (Compl. ¶ 423.)

[6] "On May 22, 2015, Hormel's Cory Bollum emailed Tyson's Todd Neff, asking Neff to give Bollum a call. Neff—whose telephone records show myriad communications with senior executives at Smithfield (including Duane Diez, with whom he exchanged over two thousand calls and text messages from 2008 to 2017, and Joe Weber), Seaboard (including Terry Holton and CEO Duke Sand), JBS (Tim Uber, Brad Lorenger ,[sic] and Jerry Brooks) and Hormel—had an

allocating market share;[7] and making knowingly false representations to customers about the reasons for supply shortages and price increases.[8] Even if Defendants' alleged pretextual statements alone do not amount to fraudulent concealment, the DAPs have adequately pled other specific acts that Defendants committed with "the sole purpose of concealing a conspiracy." *In re Milk*, 84 F. Supp. 2d at 1023.

Defendants contend that keeping their internal communications private does not constitute an affirmative act of concealment because Defendants have no obligation to disclose their various communications to the DAPs. Defendants rely heavily on the Sixth Circuit's unpublished decision in *Premium Properties Unlimited, LLC v. Mercantile Bank Mortgage Company, LLC*, 732 Fed. App'x 414, 417–18 (6th Cir. 2018). However, the Court finds that this case is more akin to *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 262

---

'interesting call' with Bollum, who appeared to have stated Hormel's displeasure with customer 'W,' which is a likely reference to Wal Mart." (Compl. ¶ 351.)

[7] "On October 19, 2011, Indiana Packers' Doug Lorenger again emailed his brother Brad at JBS about boneless loins, asking 'rumor has it that JBS has sold bnls loins @ 1.80 fob for 2nd week of Nov is that true?' Brad immediately forwarded his brother's question to Tim Uber, his boss at JBS. That same day, Tyson executive Todd Neff emailed several colleagues that Tyson had 'earned the right to get our fair share of the slaughter since we are performing well versus the industry, I.e., making the other guys cut back' signing off the email by noting that 'I trust you'll read and delete and not repeat this.'" (Compl. ¶ 322.)

[8] "For example, producers claimed that decreased supply and higher prices were caused by the H1N1 outbreak. But a National Pork Board customer tracking research report dated May 6, 2009, stated that 'The overall perception of the safety of pork remains in a good trajectory' and that 'Among pork consumers, we continue to see purchase intent stabilizing....' And, Bret Getzel from Seaboard confirmed H1N1's short term impact on the pork market in a May 21, 2009 email to Chuck Faughnan, where he told him 'There was some very short term weakness in the market as a result of the H1N1 negative press, but this came and went pretty fast. The market had pretty much recovered by 05/08.'" (Compl. ¶ 393.)

-15-

(D. Minn. 1989).  The *Wirebound* plaintiffs alleged that the defendants used "various secretive means of communication in establishing and maintaining their unlawful activity," such as circulating "rules," "avoiding the use of telephones," and marking correspondence as "personal and confidential."  *Id.* at 266.  They also alleged that trade association meetings were a pretext for defendants' secret meetings regarding the conspiracy.  *Id.*  The District of Minnesota found these assertions sufficient to plead tolling of the statute of limitations by means of fraudulent concealment.  *Id.* at 267.

The DAPs here have similarly alleged secret communications, rules for the conspiracy, avoiding the use of work emails and telephones, marking correspondence as confidential—with explicit instructions to delete after reading—and using trade association meetings as a coverup for conspiratorial communications.  In fact, the DAPs' Consolidated Complaint includes significantly more detailed allegations of fraudulent concealment than what the plaintiffs alleged in *Wirebound*.  The truth of their assertions is a matter best left for discovery.

Defendants also argue that secret meetings also do not constitute acts of concealment.  Defendants rely on *In re Milk Products Antitrust Litigation*, in which the court held that "'clandestine meetings' at which price fixing was discussed" did not constitute acts of concealment.  84 F. Supp. 2d at 1023.  However, Defendants' reliance on *In re Milk* is misplaced because the key issue there was that the plaintiffs did not "allege a specific time that Defendants affirmatively concealed the existence of a

conspiracy." *Id*.  In contrast, the DAPs have alleged ways in which the Defendants affirmatively sought to keep their meetings secret, such as limiting who could attend. (Compl. ¶ 410 (noting that legal counsel did not attend the Pork Club meetings).) Moreover, the Consolidated Complaint details many other ways that Defendants affirmatively concealed the conspiracy, such as instructing colleagues to conceal or delete evidence, to not forward confidential information beyond a small group of senior executives, and to communicate using Defendants' personal email accounts.  (Compl. ¶ 400.)  Even if the secret meetings that took place at trade and industry conferences alone do not constitute affirmative acts of concealment, the Court must consider the Consolidated Complaint in its entirety.  *Braden*, 558 F.3d at 594.  The DAPs allege many other ways in which Defendants took affirmative acts to conceal their conspiracy.

Defendants also assert that the allegedly pretextual public statements do not satisfy the fraudulent concealment requirements because the DAPs have not alleged that the statements were actually communicated to them.  *See Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 434 (S.D.N.Y. 2021) ("[C]ommunications to the community at large will not generally support a finding of fraudulent concealment.").  But Defendants have not provided any binding precedent for this presumption, and the Court finds this rationale ill-suited for grounds for dismissal at this stage in the litigation because bar by statute of limitations is an affirmative defense that a defendant must prove.  *Jessie*, 516 F.3d at 713 n.2.  Rule 12(b)(6) dismissal is not appropriate unless a complaint completely

rules out tolling of statute of limitations. *Varner v. Peterson Farms*, 371 F.3d 1011, 1017–18 (8th Cir. 2004). The DAPs' Consolidated Complaint does no such thing.

The Court finds that the DAPs' Consolidated Complaint sufficiently pleads that Defendants fraudulently concealed their actions.

### b.  Failure to Discover

Second, the DAPs must allege that they failed to discover their cause of action earlier. The DAPs assert that because of the Defendants' and their co-conspirators' affirmative acts of concealment, "each Plaintiff did not have actual or constructive knowledge of its claims alleged in this Complaint, or the facts that might reasonably have led any Plaintiff to discovery or suspect that it had at least Sherman Act claims against Defendants and Co-Conspirators prior to June 24, 2014." (Compl. ¶ 445.) Defendants do not challenge that DAPs have adequately alleged this element, and the Court finds it sufficiently satisfied here.

### c.  Due Diligence

Third, the DAPs must allege that they exercised due diligence in attempting to discover their claims. The due diligence inquiry employs a reasonableness standard. *See Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 897 (8th Cir. 1997) ("A victim must be aware of some suspicious circumstances, some 'storm warnings,' to trigger the duty to investigate.") (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1402 (8th Cir. 1992)). The Court has previously explained that "[a]lthough public statements made by the Defendants could have tipped off a savvy consumer to the conspiracy, that does not

mean that a reasonable person must have discovered the conspiracy through the statements." *In re Pork*, 495 F. Supp. 3d at 774.

Here, the DAPs allege that they exercised due diligence to ensure that they received competitive pricing for pork. For example, the DAPs allege that they each used a method of purchasing pork that led them to believe in good faith that they were receiving competitive prices, such as seeking price quotes and bids from suppliers, and investigating reasonably available public information. (Compl. ¶ 448.) While the Consolidated Complaint does not detail each method used by each DAP, the Court finds this sufficient at the motion to dismiss stage.

Defendants assert that the DAPs should be held to a higher due diligence standard because they are sophisticated businesses that purchase millions of dollars of pork every year. *See Hope v. Klabal*, 457 F.3d 784, 792 (8th Cir. 2006) (holding a sophisticated party to a higher due diligence standard in a fraud claim). However, *Hope v. Klabal*, is distinguishable and this argument is unpersuasive. The DAPs provided examples of how some DAPs were diligent in seeking information to ensure that it received competitive pricing for pork. (Compl. ¶ 448.) This is sufficient to plausibly allege due diligence.

In sum, the Court finds that DAPs have adequately alleged fraudulent concealment such that the statute of limitations is tolled. Whether their allegations are supported by facts is an inquiry best resolved through discovery and addressed later in this litigation.

The Court therefore declines to dismiss the DAPs' Consolidated Complaint on statute of limitations grounds.

### 2. *American Pipe* Tolling

For the sake of completeness, the Court will also consider whether the DAPs' claims are tolled under *American Pipe*, 414 U.S. at 538. The Supreme Court in *American Pipe* explained that where a class action is not certified because the proposed class is not sufficiently numerous, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 553–54. The purpose of statutes of limitations are to "ensur[e] essential fairness to defendants" and to bar plaintiffs who have "slept on [their] rights." *Id.* at 554–55. The Court concluded that tolling did not frustrate these rights in *American Pipe* because the filing of the class action "notifie[d] the defendants . . . of the substantive claims." *Id.* The Supreme Court later explained that "the tolling effect given to the timely prior filings in *American Pipe* . . . depended heavily on the fact that those filings involved **exactly the same cause of action** subsequently asserted." *Johnson v. Ry Express Agency, Inc.*, 421 U.S. 454, 467 (1975) (emphasis added).

The Eighth Circuit has accordingly limited *American Pipe* tolling to later-filed claims that "are the same" as those pleaded in the earlier-filed class action. *Zarecor v. Morgan Keegan & Co., Inc.*, 801 F.3d 882, 888 (8th Cir. 2015). Following that line of reasoning, it held that *American Pipe* tolling does not apply where a plaintiff brought

claims under Section 10 of the Securities and Exchange Act, New Jersey securities law, and Arkansas security law, when the prior class action was based on provisions of the Securities Exchange Act other than Section 10. *Id.* at 885–86, 888.

Here, the *Maplevale* class action was filed on June 29, 2018. (No. 18-1803, Compl., June 29, 2018, Docket No. 1.) This could render timely any claims that accrued after June 29, 2014. But the *Maplevale* complaint only brought claims for violating Section 1 of the Sherman Act—not the Packers and Stockyards Act. (*See id.* at 44–46.) Because the PSA is not "exactly the same cause of action" that was asserted in *Maplevale*, *American Pipe* tolling does not apply to the PSA claims. Only the Sherman Act claims are tolled under *American Pipe*.

Moreover, the *Maplevale* complaint defined pork as "pig meat purchased fresh or frozen, smoked ham, sausage and bacon." (*Id.* ¶ 2 n.1.) In contrast, the DAPs' Consolidated Complaint defines pork to include a variety of meat products from pigs "purchased fresh, frozen, processed, rendered or non-rendered, including but not limited to any and all processed pork products, (e.g., smoked ham, sausage, bacon, pepperoni, lunch meats), and other processed products and by-products containing pork." (Compl. ¶ 1 n.4.) The DAPs have a broader definition of pork that includes products not covered in the *Maplevale* complaint, meaning these are not "exactly the same cause[s] of action" asserted in *Maplevale*. Any claims to injury related to pork products beyond "pig meat

purchased fresh or frozen, smoked ham, sausage and bacon" are therefore not tolled under *American Pipe*.

All of the DAPs' claims are tolled by fraudulent concealment, and *American Pipe* likewise tolls the statute of limitations for DAPs' claims arising under Section 1 of the Sherman Act that pertain to the narrower definition of pork used in the *Maplevale* complaint. The Court therefore concludes that the DAPs' action is sufficiently timely.

### B.    Packers and Stockyards Act Claims

Next, Defendants assert that the DAPs cannot sustain a private right of action under the Packers and Stockyards Act ("PSA"). Section 192 of the PSA enumerates several unlawful practices for packers "with respect to livestock, meats, meat food products, or livestock products." 7 U.S.C. § 192. One such unlawful practice is to conspire to "manipulate or control prices." 7 U.S.C. § 192(f). The PSA also contains a provision granting a private right of action in certain circumstances. In relevant part, Section 209 states that:

> If any person subject to this chapter violates any of the **provisions of this chapter** . . . **relating to the purchase, sale, or handling of livestock,** the purchase or sale of poultry, or relating to any poultry growing arrangement or swine production contract, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

7 U.S.C. § 209(a)(emphasis added). Such liability can be enforced by suit in any district court of the United States. 7 U.S.C. § 209(b).

Defendants read Section 209 to mean that DAPs cannot sustain an action under the PSA because they are not purchasers of "livestock."[9]  However, whether the DAPs purchase livestock or meat food products is irrelevant.  A plaintiff has a cause of action under the PSA as long as they were injured by a defendant's violation of a PSA "provision . . . relating to the purchase, sale, or handling of livestock."  7 U.S.C. § 209(a). The plaintiffs' injury need not relate to the purchase of livestock—only the PSA provision that the defendant violated does.  There is no requirement for the plaintiff other than that they sustained injuries "in consequence of such violation."  *Id.*

Here, the DAPs have alleged that Defendants "conspired to restrain trade, including to fix, increase, maintain and/or stabilize the price of pork."  (Compl. ¶ 1.)  If true, this would mean that Defendants violated Section 192(f) of the PSA, which makes it unlawful for packers to conspire to manipulate or control prices of meat food products. Section 192 is a PSA provision that is "relating to the purchase, sale, or handling of livestock" because Section 192 explicitly applies with respect to, *inter alia*, livestock.  *See* 7 U.S.C. § 192 ("It shall be unlawful for any packer or swine contractor with respect to livestock . . . to . . . .")  Because the DAPs have alleged that they were injured by

_____

[9] The PSA defines "livestock" as "cattle, sheep, swine, horses, mules, or goats—whether live or dead."  7 U.S.C. § 182(4).  In contrast, "meat food products" are defined as "all products and byproducts of the slaughtering and meat-packing industry—if edible."  7 U.S.C. § 182(3).  Based on the facts alleged in the Consolidated Complaint, DAPs likely purchase "meat food products"—not livestock—because pork is edible.

Defendants' violation of a PSA provision that is relating to the purchase, sale, or handling of livestock, they can sustain a cause of action against Defendants under the PSA. 7 U.S.C. § 209(a).

Defendants argue that the legislative history of the PSA demonstrates it was only intended to protect livestock producers, not meat product purchasers. *See, e.g.,* H.R. Rep. No. 94-1043, at 4–5 (1973) ( "[The livestock producer's] livestock may represent his entire year's output. And, if he is not paid, he faces ruin.") However, the Court need not consider the PSA's legislative history here because it finds that the PSA is not ambiguous. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985) (considering "relevant legislative history" such as "congressional purposes" because a statute was "ambiguous on its face"). Based on its clear language, the PSA does not limit who can bring a cause of action under the PSA—only who it may be brought against. It is unambiguous in this regard.

Because the DAPs have adequately alleged that they were injured by Defendants' violation of Section 192(f), which is a provision that relates to the purchase, sale, and handling of livestock, they can bring a cause of action against Defendants under the PSA. The Court will therefore allow the DAPs' PSA claims proceed.

### C. Multi-Ingredient Products and By-Products

Lastly, Defendants assert that certain DAPs fail to plausibly allege that multi-ingredient products and by-products were affected by the purported conspiracy. The DAPs define "pork" to include "processed products and by-products containing pork."

(Compl. ¶ 1 n.4.) "Pork by-products" may include "offal and individual parts of organs from pigs used in pet foods (e.g. livers, kidneys, lungs, hearts, cheeks) and/or rendered products (e.g., meat meals and bone meals)." (*Id.*) The DAPs do not specifically mention multi-ingredient pork products or by-products outside of their single definition of "pork."

Defendants urge the Court to dismiss the DAPs' claims arising out of the purchase of multi-ingredient pork products and pork by-products. However, the Court has not required the parties in this litigation to make specific allegations pertaining to each and every type of processed pork at the motion to dismiss stage. Moreover, the DAPs have alleged a conspiracy to fix the price of pork. If that conspiracy is plausible, then it is likewise plausible that multi-ingredient pork products and pork by-products would be impacted. As the Third Circuit has recognized, antitrust law should not be construed so that it may be "easily evaded" by allowing "the price-fixer of a basic commodity to escape the reach of a [] penalty simply by incorporating the tainted element into another product." *In re Sugar Indust. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978).

To the extent that Defendants assert the DAPs' allegations do not support a conspiracy for multi-ingredient products because pork is a commodity product, while multi-ingredient products like pork burritos are not commodity products, the Court finds that issue is better addressed at summary judgment than at the motion to dismiss stage. The issue will depend heavily on market variables and the interchangeability of goods, which are fact-intensive inquiries. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.

Supp. 2d 1109, 1118 (N.D. Cal. 2008) (denying a motion to dismiss "[t]o the extent that defendants raise questions about the scope of the market" because that is a factual question).

Lastly, Defendants contend that the DAPs do not allege that Defendants have market control over multi-ingredient products and pork by-products. However, the DAPs assert that Defendants and their Co-Conspirators "control and dominate the market for the production and sale of **pork products** in the U.S." (Compl. ¶ 2 (emphasis added).) "Pork products" could plausibly include products that incorporate pork, such as multi-ingredient pork products and pork by-products. The DAPs also assert that during the conspiracy "there was increased control over the breeding, production, growing, and processing of pork by the Packer Processor Defendants and Co-Conspirators through vertical integration and exclusive production contracts with hog farmers." (Compl. ¶ 163.) It is quite plausible that such vertical integration extends into multi-ingredient products and by-products. Whether Defendants actually had control over the market for pork that was specifically used in multi-ingredient pork products and pork by-products is a question of fact not to be decided at the motion to dismiss stage.

Because the DAPs have sufficiently pled that Defendants manipulated the price of pork, which would logically include the pork used in multi-ingredient pork products and pork by-products, the Court will deny Defendants' Joint Motion to Dismiss in this regard.

**CONCLUSION**

Because the DAPs have adequately pled fraudulent concealment and their Sherman Act claims are tolled under *American Pipe*, the Court finds that their claims are not barred by the statute of limitations and will deny Defendants' Joint Motion to Dismiss based on timeliness. The Court will also deny Defendants' Joint Motion to Dismiss as it pertains to DAPs' claims arising for multi-ingredient pork products and pork by-products because DAPs have adequately alleged that Defendants conspired to fix the price of pork, which would plausibly include the price of pork used in multi-ingredient products and by-products. Finally, the Court will allow the DAPs' PSA claims to proceed because they have plausibly alleged that they were injured by Defendants' violation of a PSA provision that relates to livestock. The Court will therefore deny Defendants' Motion to Dismiss in its entirety.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Joint Motion to Dismiss [Docket No. 1754] is **DENIED.**

DATED:  September 26, 2023
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge